# <u>EXECUTION SCHEDULED FOR JANUARY 14, 2021</u>

No. 20-15

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

**UNITED STATES OF AMERICA,**

**Plaintiff – Appellee,**

v.

**COREY JOHNSON, A/K/A O, A/K/A CO,**

**Defendant – Appellant.**

_____

Appeal from the United States District Court for the
Eastern District of Virginia

_____

## JOINT APPENDIX VOLUME I

_____

Joseph Attias, Esq.
Richard Cooke, Esq.
U.S. Attorney's Office
Eastern District of Virginia
2100 Jamison Avenue
Alexandria, Virginia 22314
Joseph.Attias@usdoj.gov
Richard.Cooke@usdoj.gov

*Counsel for Appellee*

Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7983
donald.salzman@skadden.com

*Counsel for Appellant*

# TABLE OF CONTENTS

PAGE(S)

## VOLUME I

### I. DOCKET SHEET

E.D. Va. Docket Sheet, No. 92CR68 (1992-2016)................................................J.A.1

E.D. Va. Docket Sheet, No. 92CR68 (2020) .....................................................J.A.25

### II. RELEVANT INDICTMENT, APPELLATE OPINION AND JUDGMENTS

Second Superseding Indictment, July 20, 1992.................................................J.A.32

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996)........................................J.A.54

Memorandum Opinion, *United States v. Roane*, No. 92CR98 (Oct. 29,
    2020), ECF No. 66........................................................................................J.A.97

Memorandum Order (Nov. 19, 2020), ECF No. 75...........................................J.A.140

### III. OTHER RELEVANT FILINGS

Motion for a Reconsideration of Sentence Hearing Pursuant to the
    First Step Act of 2018 (Aug. 19, 2020), ECF No. 38..............................J.A.154

Memorandum in Support of Motion for a Reconsideration of Sentence
    Hearing Pursuant to the First Step Act of 2018 (Aug. 19, 2020),
    ECF No. 39 ................................................................................................J.A.160

Index of Exhibits to Memorandum in Support of Motion for a
    Reconsideration of Sentence Hearing Pursuant to the First Step Act
    of 2018 (Aug. 19, 2020) ECF No. 39-1......................................................J.A.218

Exhibit 1 to Memorandum in Support, Special Findings, Feb. 16,
    1993, ECF No. 39-2.....................................................................................J.A.220

Exhibit 2 to Memorandum in Support, 21 U.S.C. § 848 (1988)
    (repealed 2006), ECF No. 39-3..................................................................J.A.233

Exhibit 3 to Memorandum in Support, Affidavit of Antoinette Joseph
    (Mr. Johnson's godmother), May 21, 2011, ECF No. 39-4 .....................J.A.240

Exhibit 4 to Memorandum in Support, Affidavit of Minnie Hodges
(Mr. Johnson's maternal aunt), Apr. 30, 2011, ECF No. 39-5 ..................J.A.252

Exhibit 5 to Memorandum in Support, Gloria Caro, Reassessment
Summary, May 21, 1982, ECF No. 39-6 ..................................................J.A.263

## VOLUME II

Exhibit 6 to Memorandum in Support, Affidavit of Robert Johnson
(Mr. Johnson's half-brother), June 29, 2011, ECF No. 39-7 ....................J.A.277

Exhibit 7 to Memorandum in Support, Sundar Collimuttam, M.D.,
Psychiatrist, Pleasantville Cottage School Psychological
Evaluation, Feb. 22, 1982, ECF No. 39-8 ...............................................J.A.289

Exhibit 8 to Memorandum in Support, 2/10/93 Trial Tr. 3547-3548,
3573-3574, 3578, 3582, 3584-85, 3607, 3619-21, 3682, 3684,
3690-92, 3694-95, ECF No. 39-9 ...........................................................J.A.293

Exhibit 9 to Memorandum in Support, Lynn Polstein, Change in
Permanency Plan, Apr. 13, 1984, ECF No. 39-10...................................J.A.322

Exhibit 10 to Memorandum in Support, Christine Aaron, MSW Intern,
Pleasantville Cottage School Current Assessment, Mar. 10, 1985,
ECF No. 39-11 ........................................................................................J.A.328

Exhibit 11 to Memorandum in Support, Odette Noble, UCR
Reassessment and Service Plan Review 6 Month, May 8, 1986,
ECF No. 39-12.........................................................................................J.A.332

Exhibit 12 to Memorandum in Support, Odette Noble, UCR Plan
Amendment: Form E Final Discharge, Mar. 26, 1987, ECF No. 39-
13.............................................................................................................J.A.342

Exhibit 13 to Memorandum in Support, Affidavit of David
Washington (caretaker at Elmhurst), Mar. 1, 2012, ECF No. 39-14.........J.A.346

Exhibit 14 to Memorandum in Support, Odette Noble, UCR Plan
Amendment: Form D Final Discharge, Feb. 23, 1987, ECF No. 39-
15.............................................................................................................J.A.350

Exhibit 15 to Memorandum in Support, Odette Noble, Three Month
Conference Note, Feb. 20, 1986, ECF No. 39-16 ...................................J.A.355

Exhibit 16 to Memorandum in Support, Affidavit of Darold Brown, June 15, 2011, ECF No. 39-17 ...................................................................... J.A.360

Exhibit 17 to Memorandum in Support, Affidavit of Darnell Brown, Oct. 14, 2011, ECF No. 39-18 ..................................................................... J.A.367

Exhibit 18 to Memorandum in Support, 1/15/93 Trial Tr. 921:12-922:01, ECF No. 39-19 ................................................................................ J.A.372

Exhibit 19 to Memorandum in Support, Declaration of Ann Harding (staff member at Pleasantville), Nov. 21, 2011, ECF No. 39-20 .............. J.A.376

Exhibit 20 to Memorandum in Support, Declaration of Sarah West (Mr. Johnson's prison chaplain), Mar. 24, 2011, ECF No. 39-21 ............. J.A.379

Exhibit 21 to Memorandum in Support, Affidavit of Priscilla Hodges (Mr. Johnson's cousin), Apr. 30, 2011, ECF No. 39-22 ........................... J.A.382

Exhibit 22 to Memorandum in Support, Affidavit of Julie McConnell, Mar. 23, 2011, ECF No. 39-23 .................................................................... J.A.390

Exhibit 23 to Memorandum in Support, Affidavit of Odette Noble (Mr. Johnson's social worker), Dec. 1, 2011, ECF No. 39-24 .................. J.A.393

Exhibit 24 to Memorandum in Support, L. Larrecq, City of New York Human Resources Administration, History Sheet, Nov. 20, 1984, ECF No. 39-25 ............................................................................................. J.A.400

Exhibit 25 to Memorandum in Support, Amira Offer, CSW, Caseworker, Pleasantville Diagnostic Center Psychosocial Summary, Mar. 15, 1982, ECF No. 39-26 .............................................. J.A.402

Exhibit 26 to Memorandum in Support, Lynn Polstein, Request for Authorization and Approval for Care and Services, Apr. 16, 1984, ECF No. 39-27 ..................................................................................... J.A.408

Exhibit 27 to Memorandum in Support, Declaration of Esther Johnson (Mr. Johnson's maternal grandmother), Apr. 30, 2011, ECF No. 39-28 ...................................................................................................... J.A.410

Exhibit 28 to Memorandum in Support, Affidavit of James Sykes (Mr. Johnson's father), May 17, 2011, ECF No. 39-29 .................................. J.A.416

Exhibit 29 to Memorandum in Support, Declaration of Pastor Bobby West (Mr. Johnson's prison chaplain), Mar. 24, 2011, ECF No. 39-30 .................................................................................................... J.A.426

Exhibit 30 to Memorandum in Support, Inmate Education Data Transcript, Mar. 25, 2012, ECF No. 39-31 ............................................. J.A.431

Exhibit 31 to Memorandum in Support, Motion to Have Defendant Declared Mentally Retarded, United States v. Vernon Lance Thomas, No. 3:92CR68 (E.D. Va. Apr. 15, 1993), ECF No. 39-32 ......... J.A.433

Exhibit 32 to Memorandum in Support, Corey Johnson's IQ Scores Compared to IQ Scores of Federal Death Penalty Defendants Found Intellectually Disabled After Contested Atkins Hearings, ECF No. 39-33 ...................................................................................... J.A.448

Exhibit 33 to Memorandum in Support, 6/1/93 Tr. 22#:1-14, ECF No. 39-34 ..................................................................................................... J.A.451

Exhibit 34 to Memorandum in Support, Jury Instructions 232a, ECF No. 39-35 ................................................................................................. J.A.455

Exhibit 35 to Memorandum in Support, 2/12/93 Trial Tr. 3883-94, ECF No. 39-36 ................................................................................................. J.A.458

Government's Opposition to Defendant's First Step Act Motion (Sept. 23, 2020), ECF No. 58 .......................................................................... J.A.467

Reply in Support of Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 (Oct. 8, 2020), ECF No. 64 ..................................................................................................... J.A.495

Index of Exhibits to Reply in Support of Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 (Oct. 8, 2020), ECF No. 64-1 .................................................................................. J.A.514

Exhibit A to Reply, 01/27/93 Tr. 2737-2738, ECF No. 64-2 ........................ J.A.515

Exhibit B to Reply, 06/01/93 Tr. 17, ECF No. 64-3 ..................................... J.A.518

Exhibit C to Reply, 01/13/93 Tr. 861, ECF No. 64-4 ................................... J.A.522

Notice of Appeal (Nov. 20, 2020), ECF No. 77 ............................................ J.A.526

Notice of Execution Date (Nov. 20, 2020), ECF No. 78 ............................... J.A.528

## VOLUME III

**IV. SEALED**

Presentence Investigation Report (Apr. 22, 1993) .......................................... J.A.530

| CRIMINAL | | | | | | | | | Mo. | Day | Yr. | | Docket No. | Def. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PO | 422 | 3 | 2218 | □ WRIT □ JUVENILE □ ALIAS | VS. | JOHNSON, CORY a/k/a "O"; a/k/a "CO" | | JURY | 04 | 24 | 92 | | 3:92CR68-02 | |
| Misd. □ | 422 | 3 | 2218 | | | | | | | | | | | |
| Felony ☒ | District | Off | Judge/Magistr. | OFFENSE ON INDEX CARD | | | | No. of Def's 7 | | U.S. MAG. CASE NO. ► | | | | |

## I. CHARGES

SUPERSEDING INDICTMENT: SAME CODE SECTIONS & COUNTS AS BELOW
SECOND SUPERSEDING INDICTMENT: SAME CODE SECTIONS & COUNTS AS BELOW

| Code Sections | Offense Charged | Counts | DISM. NG | GUILTY |
|---|---|---|---|---|
| 21:846 | Conspiracy (Ct. 1) | 1 | | X |
| 21:848 | Continuing Criminal Enterprise (Ct. 2) | 1 | | X |
| 21:848(e)(1)(A) & 18:2 | Murder in furtherance of CCE; aid & abet (Cts. 8, 11, 17-19; 24 & 25) | 7 | | X |
| 18:924(c) & 2 | Use of firearm in relation to crime of violence or drug trafficking crime; aid & abet (Cts. 9, 12, 15, 20 & 26) | 5 | | X |
| 18:1959 & 2 | Violent Crimes in aid of racketeering; aid & abet (Cts. 10, 13, 14, 16, 21-23, 27-30) | 11 | | X |
| 21:841(a)(10 & 18:2 | Distribution of Crack; aid & abet (Ct. 31) | 1 | | X |
| 21:841(a)(1) & 18:2 | Possession w/intent to distribute crack; aid & abet (Cts. 32) | 1 | | X |

SUPERSEDING COUNTS

## II. KEY DATE

| INTERVAL ONE | END ONE AND/OR BEGIN TWO (OR RESTART PERIOD TO TRIAL) | END INTERVAL TWO |
|---|---|---|
| KEY DATE EARLIEST OF □ arrest □ sum'ns □ custody □ appears—on complaint | KEY DATE ► 4/24/92 APPLICABLE □ Indictment filed/unsealed □ consent to Magr. trial on complaint □ Information □ Felony-W/waiver | KEY DATE ► 8/11/92 / 5/18/92 & 7/20/92 a) ☒ 1st appears on pending charge /R40 b) □ Receive file R20/21 c) ☒ Supsdg ☒ Indt □ Inf d) □ Order New trial e) □ Remand f) □ G/P Withdrawn | KEY DATE ► 1/11/93 APPLICABLE □ Dismissal □ Pled guilty ☐ After N.G. □ Nolo ☐ After nolo □ Trial (voir dire) began ☒ Jury □ N.J. |

| 1st appears with or waives counsel | ARRAIGNMENT 8/11/92 | 1st Trial Ended 2/16/93 | RE-TRIAL | 2nd Trial Began | DISPOSITION DATE 2/16/93 | SENTENCE DATE 6/1/93 | PTD Nolle Pros. | FINAL CHARGES DISMISSED □ on S.T. □ grounds □ W.P. □ WOP | on def motion on gov't motion |
|---|---|---|---|---|---|---|---|---|---|

## III. MAGISTRATE

| Search Warrant | Issued | DATE | INITIAL/NO. | INITIAL APPEARANCE DATE ► | | INITIAL/NO. | OUTCOME: |
|---|---|---|---|---|---|---|---|
| | Return | | | PRELIMINARY EXAMINATION OR REMOVAL HEARING | Date Scheduled ► Date Held ► | | □ DISMISSED HELD FOR GJ OR OTHER PRO-CEEDING IN THIS DISTRICT |
| Summons | Issued | | | | | | HELD FOR GJ OR OTHER PRO-CEEDING IN DISTRICT BELOW |
| | Served | | | □ WAIVED □ NOT WAIVED | Tape Number | | |
| Arrest Warrant Issued | | | | □ INTERVENING INDICTMENT | | | |
| COMPLAINT ► | | | | | | | |
| Date of Arrest | | OFFENSE (In Complaint) | | | | | |

## IV. NAMES & ADDRESSES OF ATTORNEYS, SURETIES, ETC.

Show last names and suffix numbers of other defendants on same indictment/information:

01-Tipton; 03-Roane; 04-Thomas; 05-Gaiters; 06-Hardy; 07-Reavis

RULE | 20 | 21 | 40 | In | Out

**ATTORNEYS**
U.S. Attorney or Asst.

Howard C. Vick, AUSA; William H. Parcell, III, Special AUSA

2255 See Tipton's Docket Sheet

Defense: 1 ☒ CJA.   2 □ Ret.   3 □ Waived.   4 □ Self.   5 □ Non / Other.   6 □ PD.   7 □ CD

John F. McGarvey, Esquire
320 West Broad Street
Richmond VA 23220
644-3420

Craig S. Cooley, Esquire
P.O. Box 7268
Richmond VA 23221
358-2328

<u>2255 petition</u>    as of 8/1/01
Barbara L. Hartung, Esq. Suite/600
~~#504, 1001 East Main Street~~ 700 E. Main
Richmond, VA 23219   353-4999
~~649-1088~~    FAX 353-5299

Edward E. Scher, Esquire
~~Thorsen & Scher~~ 316 West Broad St.
~~3810 Augusta Avenue~~
Richmond, VA 23230-4219
359-3000    FAX 359-3139

See Tipton's docket sheet for 2255 gout atty

Status : _____
On Motion : 11-2-92, 7:00
FPTC : _____

From 8-11-92 3.00

4CCA No.: 93-4006
Consolidated w/No.: 93-4005(L)

**BAIL ● RELEASE**

| PRE-INDICTMENT | |
|---|---|
| Release Date | |
| Bail □ Denied | □ Fugitive |
| | □ Pers. Rec. |
| AMOUNT SET | □ PSA |
| $ | Conditions |
| Date Set | □ 10% Dep. |
| | □ Surety Bnd |
| □ Bail Not Made | □ Collateral |
| Date Bond Made | □ 3rd Prty |
| | □ Other |

| POST-INDICTMENT | |
|---|---|
| Release Date | |
| Bail □ Denied | □ Fugitive |
| | □ Pers. Rec. |
| AMOUNT SET | □ PSA |
| $ | Conditions |
| Date Set | □ 10% Dep. |
| | □ Surety Bnd |
| □ Bail Not Made | □ Collateral |
| Date Bond Made | □ 3rd Prty |
| | □ Other |

X Docket Entries Begin On Reverse Side

## FINE AND RESTITUTION PAYMENTS

| DATE | RECEIPT NUMBER | C.D. NUMBER | DATE | RECEIPT NUMBER | C.D. NUMBER |
|---|---|---|---|---|---|
| | | | | | |

APPEALS FEE PAYMENTS

J.A.1

U.S. Government Attorneys

IV. NAMES & ADDRESSES OF

Robert J. Erickson          and          G. Wingate Grant
Deputy Chief,                            Assistant U. S. Attorney
Criminal Division
Appellate Section
U.S. Department of Justice
Room 6102, Patrick Henry Bdlg.
601 D Street, N.W.
Washington, D.C.   20530
(202) 514-2841                                    |X|
                                          DATE

51760

**J.A.2**

| | | |
|---|---|---|
| | DATE | |
| | DOCUMENT NO. | |

3:92CR68-02

MASTER DOCKET: MULTIPLE DEFENDANT CASE  PAGE 1 OF

[X] PROCEEDINGS DOCKET FOR SINGLE DEFENDANT

VI. EXCLUDABLE DELAY

**V. PROCEEDINGS**

(OPTIONAL) Show last names of defendants

**1992**

| April 24 | 1 | Indictment, a true bill, returned before a Judge in, Open Court at Richmond, filed.  UNDER SEAL  lcq |
|---|---|---|
| April 24 | | IN OPEN COURT:  Spencer, J., GJCR.  Appearances:  AUSA only.  Govt's motion that BW be issued, GRANTED.  lcq |
| April 28 | 2 | Govt's Motion to Unseal, filed.  lcq |
| April 28 | 3 | ORDER granting govt's motion to unseal indictment ent'd, JRS, filed.  lkm |
| May 7 | 42 | Govt's Motion Concerning the Setting of the Trial Date, filed.phb |
| May 18 | 49 | Superseding Indictment, a true bill, returned before the Judge in Open Court at Richmond, filed.  lkm |
| June 29 | 99 | CJA 20, appt of counsel, John McGarvey, for deft, executed, filed.  lkm |
| June 29 | 100 | CJA 20, appt of counsel, Craig Cooley, for deft, executed, filed.  lkm |
| June 29 | 101 | Govt's motion for issuance of subpoenas pursuant to Local Rule 19(e) for production prior to trial filed.  lkm |
| July 1 | 102 | ORDER granting govt's motion for early issuance of subpoenas; ent'd, JRS, filed.  Copies to counsel.  lkm |
| July 14 | 110 | ORDER granting defts Tipton, Roane & Thomas' motion for continuance of trial set for 9/16/92.  Trial rescheduled for 10 a.m. on 1/11/93; ent'd, JRS, filed.  Copies mailed.  lkm |
| July 20 | 115 | Second Superseding Indictment, a true bill, returned to a Judge in open court at Richmond, filed.  lkm |
| July 21 | - | Transcript of bond hearing on 5/5/92 filed by OCR.  lkm |
| July 23 | - | Copies of second superseding indictment mailed to counsel.  lkm |
| July 23 | - | BW issued as detainer on 2nd superseding indictment pursuant to order of USMJ Lowe.  lkm |
| July 31 | 124 | Deft's ex parte motion for preparation of transcript filed.  lkm |
| Jul. 31 | 125 | AMENDED ORDER continuing trial until 1/11/93.  ENT 7/31/92, JRS, filed.  Cps. dist.  phb |
| Jul. 31 | - | Magistrate's papers from SD/NY-New York, rec'd.  phb |
| Aug. 3 | 127 | ORDER UNDER SEAL .  ENT 8/3/92, JRS, filed.  Cps. dist.  phb |
| Aug. 5 | 128 | Deft's Motion for Appointment of Psychiatric, Neurologic, Investigative, Medical, & Mitigation Experts, filed.  phb |
| Aug. 5 | 129 | Deft's Motion for a Bill of Particulars, filed.  phb |
| Aug. 5 | 130 | Deft's Memorandum in Support of Motion, filed.  phb |
| Aug. 5 | 131 | Deft's Motion for Early Disclosure of Jencks Act & Brady Material & Incorporated Memorandum, filed.  phb |
| Aug. 5 | 132 | Deft's Motion for Disclosure of R.404 Evidence & Incorporated Memorandum, filed.  phb |
| Aug. 5 | 133 | Deft's Motion for Discovery & Inspection & Incorporated Memorandum, filed.  phb |
| Aug. 5 | 134 | Deft's Motion for Disclosure of Exculpatory Evidence & Incorporated Memorandum, filed.  phb |
| Aug. 5 | 135 | Deft's Motion to Adopt Codef's Motions & Supporting Memorandum, filed.  phb |
| Aug. 5 | 136 | Deft's Ex Parte Motion for Preparation of Transcript,filed.phb |
| Aug. 7 | 137 | EX PARTE ORDER that Deft's motin for 6/12/92 & 7/28/92 transcripts is GRANTED.  ENT 8/7/92, JRS, filed.  Cps.dist.phb |
| Aug. 11 | | IN OPEN COURT:  Lowe, M., Kull, OCR.  Appearances:  Deft. w/counsel. AUSA  Matter came on for arraignment.  Deft WFA, entered plea of not guilty to all charges; requested trial by jury.  Jury trial set for 1/11/93 at 10:00 a.m. Deft. to file any brief or objections within 10 days.  Bond hearing set for 8/17/92 at 2:00 p.m.  Deft. remanded. (:12)  lcq |
| Aug. 11 | 138 | Temporary Detention Order, ENT 08-11-92, DGL, filed.  lcq |
| Aug. 17 | | PROCEEDINGS BEFORE MAGISTRATE:  Lowe, M. Kull, OCR.  Appearances: Deft. w/counsel. AUSA.  Matter came on for bond hearing. Govt. adduced evidence, rested. Deft. adduced no evidence. Case submitted w/no arguments.  Govt's list of murders and witnesses submitted, UNDER SEAL.  Findings of fact stated from the bench. |

CONTINUED TO PAGE

J.A.3

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET   *U. S. vs*

JOHNSON, CORY              PAGE 2

AO 256A ⊕

92CR68-02

| Yr. | Docket No. | Def. |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
|------|------------------------|------|
| | (Document No.) | (a) | (b) | (c) | (d) |

**1992**

**Aug. 17** — PROCEEDINGS BEFORE MAGISTRATE continued: Deft. held w/o bond. Deft's request for transcript of bond hearing, GRANTED. Deft. remanded to custody. (:30)    lcq

**Aug. 18** — 140 — Order of Detention Pending Trial, ENT 08-18-92, DGL, filed.    lcq

**Aug. 18** — 141 — Govt's Omnibus Response to Deft. Johnson's Pre-trial Motions, filed.    lcq

**Aug. 20** — 144 — ORDER that Deft's motion for a bill of particulars is DENIED. ENT 8/20/92, JRS, filed. Cps. dist.    phb

**Aug. 20** — 145 — ORDER re: schedule of Discovery & Inpsection, Brady Material, & Jencks/Giblio Materials. ENT 8/20/92, JRS, filed. Cps. dist.    phb

**Aug. 21** — 146 — Deft's Motion for Penalty Phase Discovery, filed.    phb

**Aug. 27** — 148 — ORDER of the Court - EX PARTE. (SEALED) ENT 8/27/92, JRS, filed. Cps. dist.    phb

**Sep. 9** — 155 — Govt's Response to Deft's Motion for Penalty Phase Discovery, filed.    phb

**Sep. 17** — 160 — Deft's Motion for Bill of Particulars of the Notice of the Intention of the Govt to Seek the Death Penalty, filed.    phb

**Oct. 8** — - — Marshal's return on 4/24/92 Warrant for Arrest, executed, & filed.    phb

**Oct. 8** — - — Marshal's return on 7/23/92 Warrant for Arrest, unexecuted, & filed.    phb

**Oct. 14** — 174 — Deft's Motion for Compliance w/18:3432, filed.    phb

**Oct. 14** — 175 — Deft's Motion for Continuance, filed.    phb

**Oct. 14** — 176 — Deft's Motion for Discovery & Inspection from Codefts at a Joint Trial, filed.    phb

**Oct. 14** — 177 — Deft's Notice of Request for Hearing, filed.    phb

**October 14** — 179 — Govt's Response to Deft's Motion for Bill of Particulars of the Notice of the Intention of the United States to Seek the Death Penalty, filed.    rlw

**Oct. 14** — 181 — Deft's ex parte motion UNDER SEAL filed.    lkm

**Oct. 20** — 182 — EX PARTE ORDER UNDER SEAL. ENT 10/20/92, JRS, filed. Cps. to Deft's attys.    phb    [ (a) 2  (b) 10/21/92  (c) T2 ]

**Nov. 2** — - — IN OPEN COURT: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Matter came on for hearing on pending motions. Counsel heard on following motions: to continue trial; for discovery & inspection; for penalty phase discovery; for bill of particulars; for notice of govt's intention to seek death penalty; for early disclosure of Jencks & Brady; for compliance w/ 18 USC 3432; for discovery & inspection from co-defts. Motions taken under advisement; order to issue. Deft remanded.    lkm

**Nov. 4** — 197 — Deft's Motion and Memorandum to Transfer Deft, filed.    jtj

**Nov. 9** — 201 — Deft's Ex Parte Motion UNDER SEAL filed.    lkm

*(right margin, handwritten:)* FILE No. 2   FILE No. 3   FILE No. 4

| | | Interval (per Section II) | Start Date End Date | Ltr Code | Days |

JA.4

USCA4 Appeal: 20-15    Doc: 11-1    Filed: 12/28/2020    Pg: 10 of 281

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

U.S. v. JOHNSON, CORY

PAGE 3

3:92CR68

AO 256A

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| **1992** | | | | | | |
| Nov. 9 | 202 | Ex Parte ORDER **UNDER SEAL** ent'd, JRS, filed. Copy to deft's counsel.                                            lkm | | | | |
| Nov. 9 | 204 | ORDER ent'd, JRS, filed, with Court's ruling on motions heard in open court on 11/2/92. 1. Motion for continuance – denied. 2. motion for guilty phase discovery – denied. 3. motion for penalty phase discovery – granted; govt to provide information as it is available, but no later than 12/1/92 as relates to non-statutory aggravating factors; motion denied as to statutory aggravating factors. 4. motion for reconsideration w/respect to bill of particulars – denied. 5. motion for bill of particulars of notice of intention to govt to seek death penalty – denied. 6. mtion for compliance w/18 USC 3432 to furnish list of witnesses – granted; to be furnished no later than 1/1/93. 7. motion for discovery & inspection from co-defts – denied. 8. motion for early disclosure of Jencks and Brady materials – Order of 8/20/92 modified; govt ordered to produce such material no later than 1/4/93; counsel may disclose info to clients; may not provide clients w/copies; all such materials to be returned to USAtty at conclusion of trial; order of 8/20/92 remains in effect in all other respects. 9. motion to adopt co-defts' motions – denied; court will permit deft upon filing of appropriate motion to adopt co-deft Tipton's motion on constitutionality of federal death penalty statute & supporting memorandum.   Copy to counsel. lkm | | | | |
| Nov. 16 | 209 | ORDER that U.S. Marshal's Office transport Deft from Western Piedmont Regional Jail to the Richmond City Jail at the first opportunity.  ENT 11/16/92, JRS, filed. Cps. dist.                                             phb | | | | |
| Nov. 18 | 212 | Petition & ORDER FOR WHCAT for Maurice Saunders ret. 11/19/92 at 9 AM.  ENT 11/18/92, JRS, filed.    phb | | | | |
| Nov. 18 | – | WHCAT for Maurice Saunders ret. 11/19/92 at 9 AM, issued.                                                     phb | | | | |
| Nov. 19 | 214 | ORDER that Govt has until 11/27/92 to respond to Deft's Motion to Dismiss, filed.                    phb | | | | |
| Nov. 23 | 218 | Deft's Ex Parte Motion for Issuance of Subpoena Duces Tecum, filed.  **SEALED**                phb | | | | |
| Nov. 23 | 219 | Deft's Motion on the Constitutionality of the Fed. Death Penalty Statute on Its Fact & as Applied to Him, filed. phb | | | | |
| Nov. 23 | 220 | Deft's Memo. in Support of Motion, filed.    phb | | | | |
| Nov. 24 | – | Marshal's return on WHCAT for Maurice Saunders, unexecuted, & filed.                                   phb | | | | |
| Dec. 1 | 231 | Govt's Motion for Reciprocal Discovery, filed.    phb | | | | |
| Dec. 2 | 232 | EX PARTE ORDER **UNDER SEAL.**  ENT 12/2/92, JRS, filed. Cps. dist.                                             phb | | | | |
| Dec. 2 | 234 | EX PARTE ORDER **UNDER SEAL.**  ENT 12/2/92, JRS, filed. Cps. dist.                                             phb | | | | |
| Dec. 8 | 309 | Govt's response to deft's motion on constitutionality of Federal death penalty statute filed.        lkm | | | | |
| Dec. 10 | 316 | Govt's notice of intention to provide victim impact testimony filed.                                        lkm | | | | |

CONTINUED ON NEXT PAGE

| | Interval (per Section II) | Start Date End Date | Ltr. Total Days |
|---|---|---|---|

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET    *U. S. vs*    JOHNSON, CORY

AO 256A ⊕

3:92CR68-02

| | | Yr. | Docket No. | Def. |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
|------|------|------|
| | (Document No.) | (a) | (b) | (c) | (d) |

**1992**

| DATE | | PROCEEDINGS |
|------|---|-------------|
| Dec. 10 | – | One (1) box of records received from Dr. Natalie Weissblum, N.Y.,N.Y in response to subpoena.    km |
| Dec. 14 | 322 | Deft's Motion for Pretrial Conference, filed.    phb |
| Dec. 14 | 323 | Deft's Motion for Severance of Defts at Penalty Phase, filed.    phb |
| Dec. 14 | 324 | Deft's Memo. in Support of Motion, filed.    phb |
| Dec. 14 | 325 | Deft's Motion to Dismiss the Death Penalty Provision of 21 USC §848, for Want of Justice w/out Discrimination, filed.    phb |
| Dec. 14 | 326 | Deft's Memo. in Support of Motion, filed.    phb |
| Dec. 21 | 334 | Deft's Motion in Limine, filed.    phb |
| Dec. 21 | 335 | Deft's Request for Bill of Particulars Regarding Notice of the Intention of the Govt to Provide Victim Impact Testimony, filed.    phb |
| Dec. 21 | 336 | Govt's Motion for Permission to Allow Jurors to Take Notes During Trial, filed.    phb |
| Dec. 22 | 340 | Petition & ORDER FOR WHCAT for Douglas Cunningham ret. 1/11/93 at 10 AM.  ENT 12/22/92, JRS, filed.    phb |
| Dec. 22 | – | WHCAT for Douglas Cunningham ret. 1/11/93 at 10 AM, issued.    phb |
| Dec. 22 | 341 | Petition & ORDER FOR WHCAT for Rodney Tucker ret. 1/11/93 at 10 AM.  ENT 12/22/92, JRS, filed.    phb |
| Dec. 22 | – | WHCAT for Rodney Tucker ret. 1/11/93 at 10 AM, issued.phb |
| Dec. 22 | 342 | Petition & ORDER FOR WHCAT for Gregory Noble ret. 1/11/93 at 10 AM.  ENT 12/22/92, JRS, filed.    phb |
| Dec. 22 | – | WHCAT for Gregory Noble ret. 1/11/93 at 10 AM, issued.phb |
| Dec. 22 | 343 | Petition & ORDER FOR WHCAT for Daryl Moses ret. 1/11/93 at 10 AM.  ENT 12/22/92, JRS, filed.    phb |
| Dec. 22 | – | WHCAT for Daryl Moses ret. 1/11/93 at 10 AM, issued.phb |
| Dec. 22 | 344 | ORDER that parties & their counsel are ORDERED to treat all juror information as CONFIDENTIAL.  This requirement applies equally to specific information about individual jurors & to information about the panel as a whole.  Counsel are REMINDED that per Local R.9(A)(1), "no juror shall be approached, either directly or through any member of his or her immediate family, in an effort to secure information concerning such juror."  ENT 12/22/92, JRS, filed.  Cps. dist.  phb |
| Dec. 22 | – | **IN OPEN COURT:** Spencer, J., Medford W. Howard, Ct. Rept. Appearances:  Defts Tipton, Johnson, Roane w/counsel; deft Reavis by counsel; AUSA.  Matter came on for hearing on defts' motion on constitutional challenge to statue.  Counsel submitted issue on briefs by parties.  Order to enter.  Pretrial conference held to resolve issue raised by counsel prior to trial.  Counsel for Tipton, Johnson, Roane heard.  Govt heard.  Court to enter order setting forth procedures to be followed at trial.  Defts remanded.  (:40)    lkm |
| Dec. 23 | 348 | ORDER granting govt's motion for reciprocal discovery; directing defts to provide govt w/all materials required under FRCrP 16(b) and 12.2 by 12/30/92; entered, JRS, filed.  Copies to counsel.    lkm |
| Dec. 23 | 349 | Pretrial Order ent'd, JRS, filed.  Copies to counsel.    lkm |

FILE No. 6

FILE No. 7

| | Interval (per Section II) | Start Date End Date | Ltr. Total Code |

J.A.6

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET                          US v JOHNSON, CORY                    PAGE 5      3:9

AO 256A

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|
| | | (Document No.) | (a) | (b) | (c) | (d) |
| **1992** | | | | | | |
| Dec. 29 | 371 | MEMORANDUM OPINION of the Court. ENT 12/29/92, JRS, filed. Cps. dist.    phb | | | | |
| Dec. 29 | 372 | ORDER that Defts' motions challenging the constitutionality of the death penalty provisions of 21:848 are DENIED. ENT 12/29/92, JRS, filed. Cps. dist.    phb | | | | |
| Dec. 30 | 375 | Deft's ex parte motion UNDER SEAL filed.    lkm | | | | |
| Dec. 31 | 378 | Petition & ORDER FOR WHCAT for Anthony Holland ret. 1/11/93 at 10 AM. ENT 12/31/92, JRS, filed.    phb | | | | |
| Dec. 31 | - | WHCAT for Anthony Holland ret. 1/11/93 at 10 AM, issued. phb | | | | |
| Dec. 31 | 383 | EX PARTE ORDER UNDER SEAL. ENT 12/31/92, JRS, filed. Copy to Deft's atty.    phb | | | | |
| **1993** | | | | | | |
| Jan. 4 | 387 | ORDER Govt will not be permitted to make use of certain information re: nonstatutory aggravating factors at trial if the Govt has failed to provide such information to the Defts as previously ordered. Govt is REMINDED it may only introduce information re: nonstatutory aggravating factors for which notice has been provided. Deft's motions for trial date continuance are DENIED. ENT 1/4/93, JRS, filed. Cps. dist.    phb | | | | |
| Jan. 4 | 388 | ORDER DENYING Defts Johnson & Roane's motions to dismiss for want of justice w/out discrimination and Deft Tipton's motion to dismiss on grounds of racial discrimination. ENT 1/4/93, JRS, filed. Cps. dist. phb | | | | |
| Jan. 4 | 389 | ORDER DENYING Defts Johnson & Roane's motion to sever their trial. ENT 1/4/92, JRS, filed. Cps. dist. phb | | | | |
| Jan. 04 | 393 | Defts' Motion to Compel Disclosure of Addresses of Witnesses & Motion to Continue, rec'd.    rlw | | | | |
| Jan. 05 | 394 | Order directing that Gov't shall not be permitted to introduce certain victim impact testimony at the sentencing phase and that motions by Deft and Co-Deft Tipton seeking bills of particulars are hereby MOOT; ent'd 01-05-93 (JRS), filed. Copies distributed.    rlw | | | | |
| Jan. 05 | 396 | EX PARTE ORDER, pursuant to Co-Deft Roane's ex parte motion, pursuant to 21 USC §848(q)(9), relating to certain reasonable and necessary services required for his representation, APPROVING and AUTHORIZING the hiring of a stenographer by counsel for Co-Deft Roane for purposes of transcribing statements made on investigatory tapes previously provided to Deft and Co-Defts by Gov't, up to a maximum total cost for such services of $1,000.00, and defense counsel are ADMONISHED that these services should be thoroughly documented to assure payment of such services, and to ensure that services are not duplicative of other services; ent'd 01-05-93 (JRS), filed. Copies distributed.    rlw | | | | |
| Jan. 05 | 398 | Order that Deft's motion in limine seeking to exclude certain evidence of unadjudicated criminal conduct alledged to have been committed by Deft in New Jersey in 1989-1991 is hereby DENIED; ent'd 01-05-93 (JRS), filed. Copies distrbuted.    rlw | | | | |

*File No. 7*

*File No. 8*

Interval
(per Section II)

Start Date
End Date

Ltr. Total
Code Days

**J.A.7**

| UNITED STATES DISTRICT COURT CRIMINAL DOCKET | U. S. vs | JOHNSON, COREY | PAGE 6 | 3:92CR68-02 |
|---|---|---|---|---|

AO 256A ⊕

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|
| | (Document No.) | | (a) | (b) | (c) | (d) |

**1993**

| Jan. 5 | 399 | Govt's Proposed Voir Dire for the Jury, filed.　　phb | | | | |
| Jan. 6 | 400 | Govt's Response to the Court's Order to Specify Which Aggravating Factors Relate to Which Offense, filed.phb | | | | |
| Jan. 6 | 401 | Deft's Motion for Reconsideration of Atty. Participation in Voir Dire, filed.　　phb | | | | |
| Jan. 7 | 402 | ORDER that Deft's motion for reconsideration of atty. participation in voir dire is DENIED.  Counsel is REMINDED they may propose questions to be asked.  ENT 1/7/93, JRS, filed.  Cps. dist.　　phb | | | | |
| Jan. 7 | 403 | Petition & ORDER FOR WHCAT for Austin O. Nwanze ret. 1/11/93 at 10 AM.  ENT 1/7/93, JRS, filed.　　phb | | | | |
| Jan. 7 | - | WHCAT for Austin O. Nwanze ret. 1/11/93 at 10 AM, issued.phb | | | | |
| Jan. 7 | 404 | Govt's Proposed Jury Instructions, filed.　　phb | | | | |
| Jan. 11 | 414 | Deft's Proposed Voir Dire Questions for the Jury,filed.phb | | | | |
| Jan. 11 | 415 | Govt's List of Exhibits, filed.　　jtj | | | | |
| Jan. 11 | 416 | Govt's List of Witnesses, filed.　　jtj | | | | |
| Jan. 11 | 417 | Deft's ex parte request for subpoenas, filed.　　phb | | | | |
| Jan. 11 | - | JURY TRIAL PROCEEDINGS, DAY I: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. IN CHAMBERS: Pretrial motion heard; denied.  Procedure discussed; issues revolved. Govt's motion to dismiss Cts. II-13 as to deft Tipton granted. IN OPEN COURT:  Jury panel No. I appeared; sworn; examined on voir dire.  Individual voir dire commenced.  Trial adjourned for the day; to commence at 9:30 a.m. on II/12/93.  (7.0)　　lkm | 2 | 1/1/93 | T2 | 83 |
| Jan. 12 | - | JURY TRIAL PROCEEDINGS, DAY 2: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA.  Individual voir dire continued with Panel I.  Voir dire begun with Panel 2; excused until 1:00 P.M. on 1/13/93.  Panel I, Nos. II5-130 to return at 9:30 a.m. on 1/13/93.  Deft remanded.　　(8:15)　　lkm | | | | |
| Jan. 12 | 420 | Petition & ORDER FOR WHCAT for Ronita Rochelle Hollman ret. 1/19/93 at 10 AM.  ENT 1/12/93, JRS, filed.　　phb | | | | |
| Jan. 12 | - | WHCAT for Ronita Rochells Hollman ret. 1/19/93 at 10 AM, issued.　　phb | | | | |
| Jan. 12 | 421 | Petition & ORDER FOR WHCAT for Austin O. Nwanze ret. 1/25/93 at 10 AM.  ENT 1/13/93, JRS, filed.　　phb | | | | |
| Jan. 12 | - | WHCAT for Austin O. Nwanze ret. 1/25/93 at 10 AM, issued.phb | | | | |
| Jan. 13 | 422 | EX PARTE ORDER that Deft's motion for subpoenas is GRANTED, & Clerk is DIRECTED to issue subpoenas as set for in motion.  ENT 1/13/93, JRS, filed.　　phb | | | | |
| Jan. 13 | - | JURY TRIAL PROCEEDINGS, DAY 3: Spencer, J., Kull, OCR. Counsel present.  Individual voir continued w/Panel I; to return at 9:30 a.m. on1/14/93.  Panel 2 excused except for 26 jurors listed on attached list; remaining Panel 2 jurors to return at 10 a.m. on 1/14/93.　　(1:40)　　lkm | | | | |
| Jan. 14 | 427 | Petition & ORDER FOR WHCAT for Douglas Cunningham ret. 1/18/93 at 10 AM.  ENT 1/14/93, JRS, filed.　　phb | | | | |
| Jan. 14 | - | WHCAT for Douglas Cunningham ret. 1/18/93 at 10AM, issued.phb | | | | |
| Jan. 14 | - | JURY TRIAL PROCEEDINGS, DAY 4: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. IN CHAMBERS:  All motions in limine heard; Court to review video b/4 decision; other motions denied.  Court directed that questionnaires will be part of the record.  IN OPEN COURT:  Jury empaneled; sworn to try issue.  Opening statements made.  Trial adjourned for the day; to commence at 10 a.m. on 1/15/93.  Deft remanded.  (6:55)lkm | | | | |

FILE NO 8

Start Date
End Date
Ltr Tot.
Code Day

J.A.8

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

AO 256A

U.S. v. JOHNSON, CORY                    PAGE 7          3:92CR68-02

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|------|------|------|------|------|
| | (Document No.) | (a) | (b) | (c) | (d) |
| **1993** | | | | | |
| Jan. 14 | 428 Deft's Supplemental Proposed Voir Dire Questions, rec'd by the Court during voir dire and filed as of this date.                                      jtj | | | | |
| Jan. 15 | Marshal's return on WHCAT for Douglas Cunningham ret. 1/11/93 at 10 AM, unexecuted, & filed.          phb | | | | |
| Jan. 15 | Marshal's return on WHCAT for Austin O. Nwanze ret. 1/11/93 at 10 AM, unexecuted, & filed.          phb | | | | |
| Jan. 15 | 432 Petition & ORDER FOR WHCAT for Douglas Cunningham ret. 1/18/93 at 10 AM.  ENT 1/15/93, JRS, filed.          phb | | | | |
| Jan. 15 | WHCAT for Douglas Cunningham ret. 1/18/93 at 10 AM, issued. phb | | | | |
| Jan. 15 | **JURY TRIAL PROCEEDINGS, DAY 5:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Govt's evidence begun.  Trial adjourned for the day; to commence at 10 a.m. on 1/18/93.  Deft remanded.          lkm | | | | |
| Jan. 18 | 434 Defts' Motion for court-supervised access to witnesses in witness protection program filed.          lkm | | | | |
| Jan. 18 | **JURY TRIAL PROCEEDINGS, DAY 6:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA.  Counsel heard in argument as to order of witnesses; Court left issue up to counsel. Counsel heard on defts' motion for court-supervised access to WPP witnesses; motion denied.  Jury appeared.  Govt's evidence continued.  Trial adjourned for the day; to commence at 10 a.m. on 1/19/93.  Deft remanded.  (5:05)          lkm | | | | |
| Jan. 19 | Marshal's return on WHCAT for Douglas Cunningham ret. 1/18/93 at 10 AM, unexecuted, & filed.          phb | | | | |
| Jan. 19 | **JURY TRIAL PROCEEDINGS, DAY 7:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA.  Jury appeared.  Govt's evidence continued.  Trial adjourned for the day; to commence at 10 a.m. on 1/21/93.  Deft remanded.  (4:40)          lkm | | | | |
| Jan. 21 | **JURY TRIAL PROCEEDINGS, DAY 8:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA.  Jury appeared.  Govt's evidence continued.  Trial adjourned for the day; to commence at 10 a.m. on 1/22/93.  Deft remanded.          (4:30)          lkm | | | | |
| Jan. 21 | 439 Deft's Appellate exhibit filed.          lkm | | | | |
| Jan. 22 | **JURY TRIAL PROCEEDINGS, DAY 9:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA.  Jury appeared.  Govt's evidence continued.  BW for Dennis Moody – issued as a material witness – quashed upon completion of Moody's testimony.  Trial ajourned for the day; to commence at 10 a.m. on 1/25/93.  Deft remanded.          (4:10)          lkm | | | | |
| Jan. 25 | Marshal's return on WHCAT for Ronita Rochelle Hollman ret. 1/19/93 at 10 AM, executed, & filed.          phb | | | | |
| Jan. 25 | **JURY TRIAL PROCEEDINGS, DAY 10:** Spencer, J., Kull, OCR. appearances: Deft w/counsel, AUSA. Jury appeared. Defts' motion to voir dire jury on Saturday's newspapers article (Tipton appellate exhibit) granted.  Voir dire conducted.  Individual voir dire conducted as to Mr. Cooke and Ms. Hayes.  Mr. Cooke remains as juror; Ms. Hayes excused; first alternate, Debra J. Dabney seated. Govt's evidence continued.  Voir dire as to witness Montez McCoy conducted in chambers.  Trial adjourned for the day; to commence at 10 a.m. on 1/26/93.          (4:30)          lkm | | | | |

Interval
(per Section II)

Start Date
End Date

Ltr. Total
Code Days

JT-9

| | UNITED STATES DISTRICT COURT CRIMINAL DOCKET   U.S. vs | JOHNSON, CORY | 3:92CR68-02 |
|---|---|---|---|

AO 256A ⊕

| | | | Yr. | Docket No. | Def. |
|---|---|---|---|---|---|

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
|---|---|---|
| | | (a) | (b) | (c) | (d) |

(Document No.)

**1993**

Jan. 26 — Marshal's return on WHCAT for Austin O. Nwanze ret. 1/25/93 at 10 AM, unexecuted, & filed.                                     phb

Jan. 26 — **JURY TRIAL PROCEEDINGS, DAY II:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Govt's evidence continued. Trial ajourned for the day; to commence at 10 a.m. on 1/27/93. Deft remanded.   (4:30)       lkm

Jan. 27  443  Deft's Ex Parte Motion for Issuance of Subpoenae, filed.                                                   phb

Jan. 27  —  SO ORDERED that subpoenae be issued.  ENT 1/27/93, JRS, filed.  Cps. dist.                                   phb

Jan. 27 — **JURY TRIAL PROCEEDINGS, DAY 12:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Motion of defts Tipton, Johnson, Roane for Court to conduct examination as to competence of witnesses Pepsi Greene and Gwen Greene to testify denied. Govt's evidence continued. Trial adjourned for the day. Jury to return at 10 a.m. on 1/29/93; counsel to return at 9:45 a.m. on 1/28/93 for motions. Defts remanded. (4:55)

Jan. 28 — **JURY TRIAL PROCEEDINGS, DAY 13:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Matter came on for hearing on motions at conclusion of govt's evidence. Counsel heard on motion to strike and motions for judgments of acquittal. All motions denied except motions for judgment as to murder of Brown and wounding of McCoy; motion TUA. Deft remanded.(:55)lkm

Jan. 28  446  Deft's Ex Parte Motion for Issuance of Subpoena, filed.                                                   phb

Jan. 29  —  SO ORDERED that Clerk issue subpoena for Det. M.D.Scott. ENT 1/28/93, JRS, filed.  Copy to Deft's atty.        phb

Jan. 29  447  Deft's Ex Parte Motion for Issuance of Subpoena, filed.                                                   phb

Jan. 29  —  SO ORDERED that Clerk issue subpoena for Odette Noble. ENT 1/29/93, JRS, filed.  Copy to Deft's atty.         phb

Jan. 29  448  Deft's Ex Parte Motion, filed.  (SEALED)        phb

Jan. 29  — **JURY TRIAL PROCEEDINGS, DAY 14:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Govt's motion in limine as to testimony of some of defts' witnesses heard; guidelines directed by the Court. Court's ruling given as to Rule 29 motions as to Torrick Brown's murder. Motion denied. Jury appeared. Govt's case continued, concluded. Govt rested. Defts adduced evidence. Trial adjourned for the day; to commence at 10 a.m. on 2/1/93. Deft remanded. (2:35)   lkm

Feb. 1  451  EX PARTE ORDER UNDER SEAL.  ENT 2/1/93, JRS, filed. Cps. dist.                                               phb

Feb. 1  454  Appellate Exhibit for Tipton and Johnson filed.   lkm

Feb. 1  — **JURY TRIAL PROCEEDINGS, DAY 15:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Defts' evidence continued and concluded. Defts rested. Evidence concluded. Defts' renewed motions for dismissal heard; denied. Closing arguments of Govt, Tipton, & Johnson made. Trial adjourned for the day; to commence at 9:30 a.m. on 2/2/93. Deft remanded. (4:05) lkm

CONTINUED ON NEXT PAGE

| | | Interval (per Section II) | Start Date End Date | Ltr. Code Days |
|---|---|---|---|---|

J.A. T 10

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET     U.S. v. JOHNSON, CORY     3:92CR68-02
AO 256A

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|-------------------------|---------|---|---|---|
| | (Document No.) | (a) | (b) | (c) | (d) |

**1993**

**Feb. 2** — **JURY TRIAL PROCEEDINGS, DAY 16:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Closing arguments of defts Roane and Reavis made. Govt's rebuttal made. Jury charged by the Court. Objections noted to charge. Jury retired to deliberate at 1:25 p.m. Trial adjourned for the day; to commence at 9:30 a.m. on 2/3/93. Deft remanded. (3:40) lkm

**Feb. 2** 457 Appellate Exhibit on behalf of defts Tipton & Johnson filed. lkm

**Feb. 2** 458 Jury Instruction offered on behalf of defts Tipton, Johnson, Roane & Reavis; refused by the Court; filed. lkm

**Feb. 2** 459 ORDER directing that lunch be furnished to jury on 2/1/93 ent'd, JRS, filed. Copy to financial. lkm

**Feb. 2** 460 ORDER directing that lunch be furnished to jury on 2/2/93 ent'd, JRS, filed. Copy to financial. lkm

**Feb. 2** 462 Deft's ex parte motion for advance fund for penalty-phase witnesses filed; SO ORDERED, JRS, filed. lkm

**Feb. 3** — **JURY TRIAL PROCEEDINGS, DAY 17:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Jury excused to continue deliberations. Question of jury rec'd, answered. Jury returned verdict at 5:05 p.m. Jury found deft Johnson guilty as charged in Counts 1,2,8,9,10,11,12,13,14,15,16,17,18, 19,20,21,22,23,,24,25,26,27,28,29,30,31,32 (all counts as charged in indictment. Jury polled. Jury excused until 10 a.m. on 2/8/93 for penalty phase. Court directed lawyers to make no comments to press. Deft remanded. (:45) lkm

**Feb. 3** 466 Jury Verdict filed. lkm

**Feb. 4** 470 Govt's List of Proposed Witnesses (Penalty Phase), filed. phb

**Feb. 4** 470A ORDER that jurors' 2/3/93 lunch bill be paid by Clerk. ENT 2/4/93, JRS, filed. phb

**Feb. 5** 471 Petition & ORDER FOR WHCAT for Douglas Cunningham ret. 2/8/93 at 10 AM. ENT 2/5/93, JRS, filed. phb

**Feb. 5** — WHCAT for Douglas Cunningham ret. 2/8/93 at 10AM, issued. phb

**Feb. 5** 472 Petition & ORDER FOR WHCAT for Paris Robinson ret. 2/8/93 at 10 AM. ENT 2/5/93, JRS, filed. phb

**Feb. 5** — WHCAT for Paris Robinson ret. 2/8/93 at 10 AM, issued. phb

**Feb. 5** 478 Petition and ORDER directing that WHCAT be issued for Rodney Tucker ret. 2/8/93 at 10:00 a.m., ENT 02-05-93, DGL, filed. lcq

**Feb. 5** WHCAT issued for Rodney Tucker ret. 2/8/93 at 10:00 a.m. lq

**Feb. 5** 479 Deft's Motion for Proffer from the Govt as to Relevance of the Testimony from Proposed Witnesses, filed. phb

**Feb. 5** 480 Deft's Motion in Linine Re: 1)Murder of Torrick Brown & Wounding of Martha McCoy & 2)Murder of Katrina Rozier, filed. phb

**Feb. 8** 483 Govt's Amended List of Proposed Witnesses (Penalty Phase), filed. phb

Interval (per Section II)   Start Date End Date   Code Days

J. A 11

| UNITED STATES DISTRICT COURT CRIMINAL DOCKET | U.S. vs | JOHNSON, CORY | PAGE 10 | 3:92CR68-02 |
|---|---|---|---|---|

AO 256A ⊕

Yr. | Docket No. | Def.

| DATE | PROCEEDINGS (continued) (Document No.) | V. EXCLUDABLE DELAY (a) (b) (c) (d) |
|---|---|---|

**1993**

Feb. 8 — 484 — Govt's List of Proposed Exhibits· (Penalty Phase), filed. phb

Feb. 8 — 485 — Petition & ORDER FOR WHCAT for Melvin E. Garrison aka Willie Seward ret. 2/8/93 at 1PM.  ENT 2/8/93, JRS, filed. phb

Feb. 8 — — WHCAT for Melvin E. Garrison aka Willie Seward ret. 2/8/93 at 1 PM, issued. phb

Feb. 8 — — Marshal's return on WHCAT for Rodney Tucker ret. 1/11/93 at 10 AM, executed, & filed.  (iss.12/22/92) phb

Feb. 8 — — Marshal's return on WHCAT for Rodney Tucker ret. 1/11/93 at 10 AM, executed, & filed.  (iss.12/29/92) phb

Feb. 8 — — **JURY TRIAL PROCEEDINGS, DAY 18 OF TRIAL, DAY 1 of PENALTY PHASE:** Spencer, J., Kull, OCR.  Appearances: Deft w/counsel, AUSA.  IN CHAMBERS:  Counsel heard as to procedures to be followed in penalty phase.  Counsel heard in argument on motions; Court's rulings in record.  IN OPEN COURT: Jury appeared.  Jury instructed by the Court on penalty phase. Govt adduced evidence; rested.  Jury discharged for the day. Counsel heard in arguments on motion for mistrial and motions regarding aggravating factors.  Court's ruling given from the bench as to those statutory and non–statutory factors that would be dismissed.  Trial adjourned for the day; to commence at 10 a.m. on 2/9/93. Deft remanded.    (2:10) lkm

Feb. 8 — 490 — Govt's Notice of the Intention of the U.S.A. to Seek the Death Penalty, filed. phb

Feb. 9 — — **JURY TRIAL PROCEEDINGS, DAY 19 OF TRIAL, DAY 2 OF PENALTY PHASE:** Spencer, J., Kull, OCR.  Appearances: Deft w/counsel, AUSA.  IN CHAMBERS:  Counsel heard of deft Tipton's motion, joined by all defts, to excuse juror Cooke because of previous newspaper article on shooting at Det. Woody's car & trial testimony of defts' plans to have Det. Woody killed.  Motion denied. Style article of 2/9/93 submitted as appellate exhibit on behalf of all defts.  IN OPEN COURT: Jury appeared.  Jury admonished by the Court to avoid 2/9/93 issue of Style.  Opening statement made on behalf of deft Tipton.  Evidence adduced on behalf of deft Tipton; deft rested.  Trial adjourned for the day; to commence at 10 a.m. on 2/10/93. Deft remanded.    (3:05) lkm

Feb. 9 — 491 — Appellate Exhibit filed on behalf of all defts. lkm

Feb. 9 — 492 — Deft's Tendered Punishment Phase Insturctions filed. phb

Feb. 10 — — **JURY TRIAL PROCEEDINGS, DAY 20 OF TRIAL, DAY 3 OF PENALTY PHASE:** Spencer, J., Kull, OCR.  Appearances: Deft w/counsel, AUSA.  Jury appeared.  Deft Johnson's opening statement made.  Evidence adduced by deft Johnson. Deft rested.  Trial adjourned for the day; to commence at 10 a.m. on 2/11/93. Deft remanded.    (4:05) lkm

CONTINUED ON NEXT PAGE

File No. 9

File No. 10

Interval (per Section II) | Start Date End Date | Ltr. Total Code Days

**JA 12**

| UNITED STATES DISTRICT COURT<br>CRIMINAL DOCKET<br><br>AO 256A | U.S. v. JOHNSON, CORY | PAGE 11        3:92CR68 |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|
| | (Document No.) | (a) | (b) | (c) | (d) |
| **1993** | | | | | |
| Feb. 11 | JURY TRIAL PROCEEDINGS, DAY 21 OF TRIAL, DAY 4 OF PENALTY PHASE: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Deft Roane's opening statement made. Evidence adduced by deft Roane. Deft rested. Trial adjourned for the day; to commence at 10 a.m. on 2/12/93. Deft remanded.         (3:35)        lkm | | | | |
| Feb. 11 | 496 ORDER FOR SEQUESTRATION.   ENT 2/11/93, JRS, filed. Cps. dist. (SEALED)        phb | | | | |
| Feb. 12 | Marshal's return on executed WHCAT for Douglas Cunningham, filed.        lcq | | | | |
| Feb. 12 | Marshal's return on executed WHCAT for Daryl Moses, filed.        lcq | | | | |
| Feb. 12 | Marshal's return on executed WHCAT for Gregory Noble, filed.        lcq | | | | |
| Feb. 12 | Marshal's return on executed WHCAT for Melvin E. Garrison, filed.        lcq | | | | |
| Feb. 12 | Marshal's return on executed WHCAT of Douglas Cunningham, filed.        lcq | | | | |
| Feb. 12 | Marshal's return on executed WHCAT for Rodney Tucker, filed.        lcq | | | | |
| Feb. 12 | Marshal's return on executed WHCAT for Paris Robinson, filed.        lcq | | | | |
| Feb. 12 | JURY TRIAL PROCEEDINGS, DAY 22, DAY 5 OF PENALTY PHASE. Appearances: Deft w/counsel, AUSA. Jury appeared. Closing arguments of counsel made. Defts' motions for mistrial and renewed motions for severance based on govt's closing arguments heard; ruling given from the bench; motions denied. Jury charged by the Court. Alternate jurors discharged. Jury retired to deliberate at 2:30 p.m. No objections noted to charge. Trial adjourned for the day; to commence on 2/13/93 at 9:30 a.m. Deft remanded.        lkm | | | | |
| Feb. 13 | JURY TRIAL PROCEEDINGS, DAY 23, DAY 6 OF PENALTY PHASE. Appearances: Deft w/counsel, AUSA. Jury appeared.. Jury retired to continue deliberations. Inquiry of jury rec'd, answered. Trial adjourned for the day; to commence at 9:30 a.m. on 2/15/93. Deft remanded.        lkm | | | | |
| Feb. 15 | JURY TRIAL PROCEEDINGS, DAY 24, DAY 7 OF PENALTY PHASE. Appearances: Deft w/counsel, AUSA. Jury appeared. Jury retired to continue deliberations. Trial adjourned for the day; to commence at 9:30 a.m. on 2/16/93. Deft remanded.        (:06)        lkm | | | | |
| Feb. 16 | 498 ORDER that jurors be kept together in custody of U.S. Marshal who shall furnish them lunch Feb. 8, 9, 10, 11, 12, & 13, 1993.  ENT 2/16/93, JRS, filed.        phb | | | | |
| Feb. 16 | 499 ORDER that U.S. Marshals Service & U.S. Bureau of Prisons are DIRECTED to permit Deft reasonable access to phones to speak w/counsel.  ENT 2/16/93, JRS, filed. Cps. dist.        phb | | | | |
| | CONTINUED ON NEXT PAGE | | | | |

File No. 10

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET    *U. S. vs*

JOHNSON, CORY

3:92CR68-02

AO 256A ⊕

Yr. | Docket No. | Def.

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
| | (Document No.) | | (a) | (b) | (c) | (d) |

**1993**

| Feb. 16 | — | **JURY TRIAL PROCEEDINGS, DAY 25, DAY 8 OF PENALTY** PHASE. Appearances: Deft w/counsel, AUSA. Jury appeared. Jury retired to continue deliverations. Jury returned verdict at 1:30 p.m. Jury voted a sentence of death as to killing of Peyton Maurice Johnson, Louis J. Johnson, Bobby Long, Anthony Carter, Dorothy Mae Armstrong, Curtis Thorne, and Linwood Chiles. Jury polled. Jury discharged. Sentencing set for 9 a.m. on 5/18/93. Sentencing Guideline Order ent'd. Deft remanded.    (:40)        lkm |
| Feb. 16 | 508 | Special Findings of Jury filed.        lkm |
| Feb. 16 | 509 | Decision Form as to the killing of Peyton Maurice Johnson filed.        lkm |
| Feb. 16 | 510 | Decision Form as to the killing of Louis J. Johnson filed.        lkm |
| Feb. 16 | 511 | Decision Form as to the killing of Bobby Long filed.        lkm |
| Feb. 16 | 512 | Decision Form as to the killing of Anthony Carter filed.        lkm |
| Feb. 16 | 513 | Decision Form as to the killing of Dorothy Mae Armstrong filed.        lkm |
| Feb. 16 | 514 | Decision Form as to the killing of Curtis Thorne filed.        lkm |
| Feb. 16 | 515 | Decision Form as to the killing of Linwood Chiles filed.        lkm |
| Feb. 16 | 516 | Certificate of Jury filed.        lkm |
| Feb. 16 | 523 | Sentencing Guideline Order ent'd, JRS, filed.        lkm |
| Feb. 16 | - | Trial exhibits in exhibit room; weapons & drugs in Drawer 2 of evidence safe; trial minutes, etc. in expandable w/file.        km |
| March 16 | 535 | Third Superseding Indictment returned before a Judge in Open Court, filed. (Applied to deft Thomas; not this deft)  lkm |
| May  7 | 567 | Govt's Motion, filed.        phb |
| May 14 | 572 | Defts' Motion to Bar Imposition of the Death Penalty & for a New Jury Sentencing Hearing Due to Improper Weighing of Aggravating Circumstances, filed.        phb |
| May 17 | 573 | Defts' Motion to Bar Execution of Defts Due to Absence of a Congressionally Authorized Execution Method, filed.        phb |
| May 18 | 580 | Deft's Motion for Stay of Execution, filed.        phb |
| May 18 | - | **IN OPEN COURT:** Spencer, J., Kull, OCR. appearances: Deft w/counsel, AUSA. Deft's motion for continuance of sentencing heard; granted. Sentencing rescheduled for 9:30 a.m. on 6/1/93. Deft remanded.        lkm |
| May 21 | 581 | Deft's Motion for New Penalty Phase Trial, filed. phb |
| May 21 | 585 | ORDER that Defts' Joint Motion to Bar Imposition of Death Penalty Due to Improper Weighing of Aggravating Circumstances is DENIED. Deft Tipton's Motion for Leave to Interview Jury Foreperson RE:  Penalty Phase Deliberations is DENIED. Deft Tipton's Motion for Disclosure of Information Relating to Mental Condition of Deft Thomas is DENIED, but doe not preclude Deft from asking 4CCA to order same, if appealed.  Defts' Motions to Stay Execution are DENIED.  ENT 5/21/93, JRS, filed.  Cps. dist.        phb |

Interval (per Section II) | Start Date End Date | Ltr. | Total

J.A.14

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

AO 256A

U.S. v. JOHNSON, CORY

PAGE 13     3:92CR68-C

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|-------------------------|---------|---------|---------|---------|
| | (Document No.) | (a) | (b) | (c) | (d) |
| **1993** | | | | | |
| May  24 | 586  MEMORANDUM OPINION of the Court.  ENT 5/24/93, JRS, filed.  Cps. dist.                                phb | | | | |
| May  24 | 587  ORDER that Deft's motion for new sentencing hearing is DENIED.  ENT 5/24/93, JRS, filed.  Cps. dist.    phb | | | | |
| May  25 | 588  Govt's Memo. in Opposition to the Motion to Bar Execution of Defts Due to the Absence of a Congressionally-Authorized Execution Method, filed.                 phb | | | | |
| May  28 | 590  Deft's Position w/Respect to Sentencing Factors,filed.phb | | | | |
| May  28 | 591  Deft's Motion to Vacate Judgments of Convictions,filed.phb | | | | |
| June 1 | -  **SENTENCING PROCEEDINGS:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSAs. Matter came on for sentencing.  Deft's motion to vacate judgment denied. Court advised parties that jury's recommended sentence would be imposed but that the Court would not designate method of execution unless and until Congress enacted proper legislation. Objections to PSR heard; overruled.  Statements made on behalf of and by deft.  Govt heard.  Sentence imposed: Cts. 8, 11, 17, 18, 19, 24, 25 - Death as to each ct.  Life plus 85 years consisting of Ct. 2 - Life.  Cts. 10,13,14,21,22,23,27,28 - Life as to each ct, concurrent.  Ct. 29 - 30 yrs, concurrent. Ct. 30 - 30 yrs, concurrent.  Ct. 16 - 20 yrs, concurrent. Ct. 31 - 20 yrs, concurrent. Ct. 32 - 40 yrs, concurrent.  Ct. 9 - 5 yrs consecutive.  Cts 12,15,20,26 - 20 yrs as to each ct., consecutive.  Should deft be released, deft is placed on 5 yrs. supr release.  $1300 SA.  Note: conspiracy sentence is set aside when deft is convicted of both 21 USC 848 and 21 USC 848; no sentence was imposed as to Ct. 1.  Deft advised of right of appeal.  Deft remanded to BOP until sentence is carried out.                                       lkm | | | | |
| June 1 | 593  Judgment is a Criminal Case ent'd, JRS, filed.  Copies distributed. lkm | | | | |
| June 10 | 598  Deft's Notice of Appeal filed.   TPO to both counsel.     lkm | | | | |
| June 10 | 599  Deft's Notice of Appeal from Sentence of Death filed.    lkm | | | | |
| June 17 | ---  P.S.R. from Probation Office, rec'd. UNDER SEAL      jjp | | | | |
| June 18 | 600  ORDER that Defts are hereby ORDERED to file such amended motions by and no later than July 9, 1993, ENT 06/18/93, JRS, filed. Cps. mailed.                        jjp | | | | |
| Jun. 29 | 601  Govt's Notice of Appeal, filed.   TPO pkg. sent.     phb | | | | |
| Jun. 29 | -  Transcript of 6/1/93, filed by OCR.                  phb | | | | |
| July 22 | ---  Order from USCA consolidating cases Richard Tipton 93-4005, Cory Johnson 93-4006, James H. Roane, Jr. 93-4007, Tipton, Johnson and Roane 93-4009, and Tipton 93-4010, for purposes of briefing and oral argument, filed.                                       jjp | | | | |
| Aug. 25 | 610  Copy of 4CCA Order extending time to file transcript, filed.                                         phb | | | | |
| Aug. 30 | 611  MEMORANDUM OPINION of the Court.  ENT 8/30/93, JRS, filed.  Cps. dist.                             phb | | | | |
| Aug. 30 | 612  ORDER that Deft Tipton's Amended Motion to Vacate Judgments of Conviction is DENIED.  ENT 8/30/93, JRS, filed. Cps. dist.                                     phb | | | | |

| UNITED STATES DISTRICT COURT CRIMINAL DOCKET | U. S. vs | JOHNSON, CORY | PAGE 14 | 3:92CR68-02 |
|---|---|---|---|---|

AO 256A ⊕

| | | | Yr. | Docket No. | Def. |
|---|---|---|---|---|---|

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
|---|---|---|
| | (Document No.) | (a) (b) (c) (d) |

**1993**

| Sep. 3 | Transcript of proceedings of January 11, 1993, Volume I, filed by OCR. | lcq |
|---|---|---|
| Sep. 3 | Transcript of proceedings 1f January 12, 1993, Volume II, filed by OCR. | lcq |
| Sep. 3 | Transcript of proceedings of January 13, 1993, Volume III, filed by OCR. | lcq |
| Sep. 3 | Transcript of proceedings of January 14, 1993, Volume IV, filed by OCR. | lcq |
| Sep. 3 | Transcript of proceedings of January 15, 1993, Volume V, filed by OCR. | lcq |
| Sep. 3 | Transcript of proceedings of January 18, 1993, Volume VI, filed by OCR. | lcq |
| Sep. 3 | Transcript of proceedings of January 19, 1993, Volume VII, filed by OCR. | lcq |
| Sep. 3 | Transcript of proceedings of January 20, 1993, Volume VIII, filed by OCR. | lcq |
| Sep. 3 | Transcript of proceedings of January 21, 1993, Volume IX, filed by OCR. | lcq |
| Sep. 8 | Transcript of 1/25/93, Vol. X, filed by OCR. | phb |
| Sep. 8 | Transcript of 1/26/93, Vol. XI, filed by OCR. | phb |
| Sep. 8 | Transcript of 1/27/93, Vol. XII, filed by OCR. | phb |
| Sep. 8 | Transcript of 1/28/93, Vol. XIII, filed by OCR. | phb |
| Sep. 8 | Transcript of 1/29/93, Vol. XIV, filed by OCR. | phb |
| Sep. 8 | Transcript of 2/1/93, Vol. XV, filed by OCR. | phb |
| Sep. 8 | Transcript of 2/2/93, Vol. XVI, filed by OCR. | phb |
| Sep. 8 | Transcript of 2/3/93, Vol. XVII, filed by OCR. | phb |
| Sep. 14 | Transcript of 2/8/93, Vol. XVIII, filed by OCR. | phb |
| Sep. 14 | Transcript of 2/9/93, Vol. XIX, filed by OCR. | phb |
| Sep. 14 | Transcript of 2/10/93, Vol. XX, filed by OCR. | phb |
| Sep. 20 | Transcript of proceedings of February 11, 1993 Volume XXI, filed by OCR. | lcq |
| Sep. 20 | Transcript of proceedings of February 12, 1993 Volume XXII, filed by OCR. | lcq |
| Sep. 20 | Transcript of proceedings of February 13, 1993 Volume XXIII, filed by OCR. | lcq |
| Sep. 20 | Transcript of proceedings of February 15, 1993 Volume XXIV, filed by OCR. | lcq |
| Sep. 20 | Transcript of proceedings of February 16, 1993 Volume XXV, filed by OCR. | lcq |
| Sept. 29 | 615 Certification of Completion sent to USCA re: appeal by Deft.(jpea) | |
| Nov. 30 | - Transcript of 12/22/92 at 2:00 p.m., filed by Crane-Snead.phb | |
| Dec. 15 | 628 Amended Certificate of Completion sent to USCA re: appeal (jpea) | |
| Dec. 20 | --- Amended Certificate of Completion RETURNED to USDC from USCA because additional transcripts requested. | JJP |
| Dec. 22 | Transcript of proceedings of November 2, 1992 filed by OCR. | lcq |
| **1994** Jan. 20 | - Transcript of 8/11/92 filed by OCR. | phb |

* See Next Page *

| | Interval (per Section II) | Start Date End Date | Ltr. | Total |
|---|---|---|---|---|

J.A.16

USCA4 Appeal: 20-15    Doc: 11-1    Filed: 12/28/2020    Pg: 22 of 281

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

U.S. v. JOHNSON, CORY                                PAGE 15          3:92CR68-02

AO 256A

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| **1994**<br>March 7 | 632 | 2nd Amended Certificate of Completion sent to USCA re: appeal by Deft.(jpea) | | | | |
| **1996** | | | | | | |
| July 8 | 650 | Per curiam opinion, Vol. 1 of 2, affirming in part, vacating and remanding, filed. | dht | | | |
| July 8 | 651 | Per curiam opinion, Vol. 2 of 2, affirming in part, vacating and remanding, filed. | dht | | | |
| Novm 5 | 652 | Cert. copy of judgment of USCA, filed. | dht | | | |
| Nov. 22 | 654 | ORDER of Execution setting date of 3-20-97 setting forth procedures to be followed, ent'd, JRS, filed. Copies as directed. | lkm | | | |
| **1997** | | | | | | |
| Feb. 20 | 656 | Deft's Consent Motion to Stay Execution filed. | lkm | | | |
| Feb. 21 | 657 | ORDER granting motion for stay of deft's execution scheduled for 3/20/97; execution stayed pending further order of Court. Copies to counsel. | lkm | June 2 Order of Su denying cer | | |
| ****<br>Oct. 14 | 675 | Deft's Motion for leave to proceed in forma pauperis filed. | lkm | | | |
| Oct. 14 | 676 | Petitioner's Motion for appointment of counsel before filing writ of H.C. filed. | lkm | | | |
| Oct. 14 | 677 | Petitioner's Memorandum in support of motion for appointment of counsel filed. | lkm | | | |
| Nov. 14 | 679 | ORDER granting motion to proceed in forma pauperis; granting motion for appointment of counsel; appointing Barbara L. Hartun, Esq., and Edward E. Scher, Esq for petitioner. | lkm | | | |
| Nov. 14 | 680 | CJA30 appointing Edward E. Scher, Esquire. | lkm | | | |
| Nov. 14 | 681 | CJA 30 appointment Barbara L. Hartung, Esquire. | lkm | | | |
| **1998**<br>Feb. 23 | 693 | CJA30, No. 2 sent to Edward E. Scher, filed. | lkm | | | |
| **April 16 | 699 | CJA30, No. 2, for Ms. Hartung filed. | lkm | | | |
| April 17<br>*** | 701 | ORDER directing that Petition for writ of habeas corpus be filed by 6/1/98, ent'd, JRS, filed. Copies mailed. | lkm | | | |
| May 8 | 702 | Motion Pursuant to Local Rule 83.5 for leave to interview Jurors, Incorporating Memorandum in Support as to Cory Johnson, Richard Tipton and James Roane, Jr. Filed. | | lcn | | |
| May 22 | 707 | (See Richard Tipton) | | | | |
| May 26 | 708 | (See Richard Tipton) | | | | |
| May 26 | 709 | (See Richard Tipton) | | | | |
| June 5 | 712 | (See Richard Tipton) | | | | |
| June 10 | 713 | (See Richard Tipton) | | | | |
| June 1 | 714 | 2255 petition filed as to Cory Johnson. Civil Action #3:98CV895. | | lcn | | |
| June 15 | 719 | Memorandum in support of [714] Motion to vacate set aside, or correct sentence. as to Cory Johnson. Filed. | | lcn | | |
| ** Apr. 16 | 700A | Petitioner's Motion UNDER SEAL. | lkm | | | |
| Apr. 16 | 700B | Petitioner's Motion UNDER SEAL. | lkm | | | |
| ***Apr. 24 | 701A | ORDER UNDER SEAL. | lkm | | | |

Interval (per Section II) | Start Date / End Date | Ltr. Total Days

J.A. 17

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET  *U. S. vs*  Cory Johnson          *Page 16*          3:92CR68-02

AO 256A ⊕

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|---|------------------------|---|---|---|---|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| June 16 | 721 | ORDER as to Cory Johnson directing the Respondent to file an answer to the claims contained in the petition no later than August 14, 1998; and the Petitioner Johnson shall respond to respondent's answer within thirty (30) days of receipt of a copy of the answer. Entered JRS 6-16-98. Filed Copies distr. | 1cn | | | |
| July 22 | 727 | (See Richard Tipton) | | | | |
| July 24 | 728 | (See Richard Tipton) | | | | |
| Aug. 14 | 731 | CJA30, No. 3, to Barbara Hartung. | 1km | | | |
| Sept. 3 | 735 | Govt's Consent Motion for additional extension of time to file response to 2255 filed. | | 1km | | |
| Sept. 3 | 736 | Order granting extension to file response to 2255 until 9/29/98, ent'd, JRS, filed. Copies mialed. | 1km | | | |
| Sept. 24 | 737 | Deft's first amendment to intitial petition under 2255 and to memorandum in support of petition. | 1km | | | |
| Sept. 25 | 738 | Consent Motion for additional extension of time for U.S. to file response to 2255 Petition filed. | 1km | | | |
| Sept. 28 | 739 | ORDER granting U.S. extension of time until 10/29/98 to filed consolidated response to 2255 petition; ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Oct. 29 | 745 | Govt's Motion for leave to file outsized consolidated response to 2255 motions filed. | 1km | | | |
| Oct. 29 | 746 | Govt's Memorandum in response to Petitioners' Motions under 2255 filed. | 1km | | | |
| Nov. 20 | 748 | Joint Consent Motion for extension of time for Petitioners to file reply to U.S. Memorandum for dismissal of 2255 Petitions filed. | | 1km | | Seep |
| Nov. 25 | 749 | ORDER granting leave for petitioners to file response to govt's Memorandum on 2/1/99; ent'd, JRS, filed. Copies mailed. | 1km | | | |
| **1999** | | | | | | |
| Jan. 11 | 751 | ORDER granting govt's motion for leave to file outsized consolidated response to petitioners' motion under 2255, ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Jan. 19 | 752 | Joint Consent Motion for extension of time to file petitioners' reply to US memorandum requesting summary dismissal of 2255 motions for collateral relief filed. | 1km | | | |
| Jan. 28 | 753 | ORDER extending time for petitioners to file response to govt's memo seeking dismissal of 2255 petition until 2/22/99; ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Feb. 18 | 754 | Petitioners' Joint Consent Motion for Extension of Time to respond to U.S. Memo requesting dismissal of 2255 filed. | 1km | | | |
| Feb. 22 | 755 | ORDER granting motion to extend petitioners' time to respond to govt's response to 2255 until 3/15/99, ent'd, JRS, filed. Copies mailed. | 1km | | | |
| March 15 | 760 | Petitioner Johnson's Motion for leave to amend and Second Amendment to Initial Petition under 2255 and to Memo in support of Petition filed. | 1km | | | |
| March 15 | 761 | Petitioner Johnson's Reply Memorandum in support of initial Petition under 2255 filed. | 1km | | | |

| | Interval (per Section II) | Start Date End Date | Ltr. | Total |
|---|---|---|---|---|

J.A.18

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

AO 256A

**U.S. v. CORY JOHNSON**        3:92CR68-02        *PAge 17*

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| **1999** | | | | | | |
| April 26 | 765 | Petitioner's Notice of Supplemental Authority filed.        Ikm | | | | |
| May 20 | 768 | Order granting petitioner's motion for leave to file second amendment to 2255 Petition; ent'd. JRS, filed.  Copies to counsel.        Ikm | | | | |
| **June 14** | 769 | CJA 30, No. 4, filed; mailed to counsel.        Ikm | | | | |
| June 24 | 770 | Joint Petitioners' Motion for leave to take discovery.        Ikm | | | | |
| June 29 | 771 | Petitioners' Joint Motion to Amend 2255 Petition filed.        Ikm | | | | |
| July 7 | 772 | Govt Motion for extension of time to file response to Petitioners' joint motion for leave to take discovery (Styled as Consent Motion; no signatures of Petitioners; counsel.)        Ikm | | | | |
| July 9 | 773 | ORDER granting govt motion for extension of time to respond to petitioners' Joint Motion for leave to take discovery; Response due by 9/7/99; ent'd, JRS, filed.  Copies mailed.        Ikm | | | | |
| 7/16/99 | 774 | Govt's Response to Petitioners' Motion to Amend petition filed.  Ikm | | | | |
| Aug. 3 | 775 | ORDER granting Petitioners' Motion for leave to amend petition; directing amendments be filed by 10/1/99; govt response 60 days thereafter; petitioners' replies 20 days thereafter; ent'd, JRS, filed.  Copies mailed.        Ikm | | | | |
| Sept. 2 | 776 | Govt's Motion for extension of time to file Response to Petitioners' Joint Motion for leave to take discovery filed.  Ikm | | | | |
| Sept. 7 | 777 | Petitioner Johnson's Response to govt's Motion for extension of time to file response to petitioners' Joint Motions for leave to take discovery filed.        Ikm | | | | |
| Sept. 24 | 778 | Govt's Response to Petitioners' Consolidated Motion for Discovery filed.        Ikm | | | | |
| Oct. 1 | 780 | Johnson's Third Amendment to initial Petition under 2255 w/supporting Memorandum filed.        Ikm | | | | |
| Oct 13 | 782 | Consent Motion for an extention to time for Petitioner to file a reply to the govt's response to Petitoners' Joint Motion for Leave to take discovery, filed        srb | | | | |
| Nov. 10 | 783 | ORDER granting Petitioners' motion for extension of time to file reply to govt's response to petitioners' joint motion for leave to take discovery; directing reply be filed by COB on 1/10/00; ent'd, JRS, filed.  Copies mailed.        Ikm | | | | |
| Nov. 30 | 784 | Consolidated Response of U.S. to Petitioners Tipton's & Roane's 2nd Amendment to 2255 Petition & to Petitioner Johnson's 3rd Amendment to 2255 Petition.        Ikm | | | | |
| Dec. 10 | 785 | Joint Consent Motion for extension of time to file Petitioners' Reply to U.S. Consolidated Response to Second and Third Amendment to 2255 Petitions filed.        Ikm | | | | |
| **2000** | | | | | | |
| Jan. 5 | 786 | Petitioner Tipton's Motion for appt of counsel; Petitioners' Joint Motion for extension of time to file reply to U.S.'s consolidated response to Second and Third Amendments to 2255 Petition; Petitioners' Joint Motion for extension of time to file reply to U.S.'s response to Petitioners' consolidated motion for discovery; filed.        Ikm | | | | |
| Jan. 6 | 787 | ORDER granting petitioner Tipton's motion for new counsel; counsel to be appointed; granting Petitioner Tipton's motions for extensions of time on matters pending b/4 Court; granting Petitioner Johnson's and Roane's motions for extensions of time requested in Pleadings No. 782 and 785; directing responses be filed by 2/14/00; ent'd, JRS, filed.  Copies faxed & mailed.  Ikm | | | | |

| | | | | | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|---|---|

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET    *U. S. vs*    JOHNSON, CORY

*Page 18*

AO 256A ⊕

**92 C R 68–02**

Yr. | Docket No. | Def.

| DATE | | PROCEEDINGS (continued) | (a) | (b) | (c) | (d) |
|---|---|---|---|---|---|---|
| | (Document No.) | | | | | |
| **2000** | | | | | | |
| Feb. 14 | 791 | Petitioner Johnson's Reply to Govt's Consolidated Response to Petitioner's 3rd Amendment to 2255 Petition.filed.    lkm | | | | |
| Feb. 14 | 792 | Petitioner Johnson's Reply to U.S.'s Response to Petitioners' Consolidated Motion for Discovery filed.    lkm | | | | |
| March 6 | 796 | Petitioner Johnson's Supplemental Exhibit in support of Claim VIII of initial 2255 Petition filed.    lkm | | | | |
| April 27 | 799 | Petitioner Johnson's Notice Adopting Tipton's Reply in support of Tipton's 2nd Amendment to his 2255 Petition.filed.    lkm | | | | |
| April 27 | 800 | Petitioner Johnson's Notice Adopting Tipton's Reply in support of Petitioners' Joint Discovery Motions filed.    lkm | | | | |
| April 27 | 801 | Petitioner Johnson's Notice of Supplemental Authority in support of Petitioners' Joint Motion for Leave to Take Discovery filed.    lkm | | | | |
| April 27 | 802 | Petitioner Johnson's Notice of Supplemental Authority in support of his 2255 Petition raising cliams of Ineffective Assistance by Counsel filed.    lkm | | | | |
| May 3 | 803 | Memorandum Opinion relating to Petitioners' Joint Motion for leave to take discovery ent'd, JRS, filed.Copies mailed. | | lkm | | |
| May 3 | 804 | ORDER denying Petitioners' Joint Motion for leave to take discovery EXCEPT as to Tipton who will have until 6/16/00 to have knife tested and relevant information submitted; ent'd, JRS, filed.  Copies mailed.    lkm | | | | |
| June 1 | 805 | Petitioners' Joint Motion for reconsideration of Court's Discovery Order and supporting memorandum filed.    lkm | | | | |
| June 22 | 809 | ORDER granting motion of U.S. for extension until 7/10/00 to file response to Petitioners' Joint Motion for reconsideration of Discovery Order; ent'd, JRS, filed. Copies mailed.    lkm | | | | |
| July 10 | 813 | Response of U.S. to Petitioners' Joint Motion for Reconsideration of Discovery Order & supporting Memorandum filed.    lkm | | | | |
| July 12 | 814 | Petitioner's Notice of Supplemental Authority and Second Supplemental Exhibit in support of Claim VIII of 2255 filed.  lkm | | | | |
| July 19 | 815 | Petitioners' Reply to Response of U.S. to Petitioners' Joint Motion for Reconsideration of Court's Discovery Order and Supporting Memorandum filed.    lkm | | | | |
| Aug. 17 | 820 | Petitioner Johnson's Notice of Supplemental Authority and Supplemental Exhibit in support of Claim IV(B)(1) of Second Amendment to 2255 Petition filed.    lkm | | | | |
| Sept. 25 | 826 | Petitioner's Notice of Supplemental Authority w/exhibit filed.  lkm | | | | |
| Dec. 11 | 830 | ORDER directing that Tipton's Motion to Amend 2255 Petition is granted; directing counsel to provide index for grounds for relief, listing of claims raised in Petition w/i 15 days; govt to respond & file index w/i 30 days; directing that Court will review only those claims so designated as directed in this Order; ent'd, JRS, filed. Copies mailed and faxed.    lkm | | | | |
| Dec. 14 | 831 | Petitioner's Motion for extension of time to respond to Order of 12/11/00 filed.  (Styled Consent Motion; no signatures for other Petitioners; filed only as to Johnson.)    lkm | | | | |
| Dec. 18 | 832 | ORDER granting Petitioner Johnson's motion for extension of time until 1/9/01 for filing directed in Order of 12/11/00; govt's response due 1/24/01.  Copies mailed.    lkm | | | | |

| | Interval (per Section II) | Start Date End Date | Code | Days |
|---|---|---|---|---|

UNITED STATES DISTRICT COURT      JOHNSON, CORY       Page 19
CRIMINAL DOCKET

AO 256A

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|---|---|---|---|---|---|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| **2001** | | | | | | |
| Jan. 9 | 835 | Petitioner's Index to Grounds for 2255 Relief filed.   lkm | | | | |
| Jan. 18 | 837 | Govt's Motion for extension of time to file Index of Pleadings filed. | | lkm | | |
| | Jan. 19   — | SO ORDERED: Govt's motion for extension of time to file Index until 1/29/01; ent'd, JRS, filed. Copies to counsel. lkm | | | | |
| Jan. 29 | 838 | Govt's Index to 2255 claims raised by petitioner Johnson filed.   lkm | | | | |
| July 18 | 843 | Ms. Hartung's Notice of New address and telephone number filed. lkm | | | | |
| August 10 | 844 | ORDER granting [841] Motion to Amend. United States DIRECTED to file its response to the amended claim w/in 20 days of date of entry hereof. Any reply by Tipton, Johnson or Roane shall be filed w/in 30 days of date of entry hereof; def. Tipton, Johnson or Roane shall file w/in 30 days of date of entry hereof briefs directed to additional allegations of default; United States must inform the Court w/in 15 days of date of entry hereof to demand summary judgment on the record currently before the Court. ENTERED: JRS. Copies mailed: yes | | lts | | |
| Aug. 10 | 847 | Petitioner's Notice and Motion adopting Petitioner Roane's Third Amendment as Johnson's Fourth Amendment to 2255 petition filed pursuant to Order of 8/10/01.   lkm | | | | |
| Aug. 22 | 850 | Petitioners' Joint Consent Motion for extension of time to file briefs in response to govt's new allegations of procedural default filed.   lkm | | | | |
| Aug. 23 | 851 | Govt's Motion to Dismiss, or in the alternative, for summary judgment and Brief in support filed.   lkm | | | | |
| Aug. 30 | 852 | Joint Consent Motion for extension of time for petitioners to file opposition to govt's motion to dismiss or for summary judgment filed (As to petitioners Johnson & Roane only; incorrect signature as to Tipton.)   lkm | | | | |
| Aug. 30 | 853 | Govt's Supplemental Motion to Dismiss, or in alternative, for Summary Judgment; Response of US to petitioners Johnson & Tipton's 4th Amended motion and petitioner Roane's 3rd amended motion filed.   lkm | | | | |
| Aug. 31 | 854 | ORDER granting petitioners extension of time to 10/1/01 to file responses to new assertions of procedural default; govt's reply due 10/11/01. Court directs U.S. to file statement of undisputed facts for summary judgment claims by 9/20/01; petitioners to respond by 10/22/01; U.S. to reply by 11/2/01; ent'd, JRS, filed.   lkm | | | | |
| Sept. 19 | 855 | Govt's Motion for extension of time to file Statement of Undisputed Facts filed.   lkm | | | | |
| Sept. 25 | 856 | ORDER grant govt's motion for extension of time to file statement of undisputed facts until 10/10/01; responses due 11/12/01; reply due 11/22/01; ent'd, JRS, filed. Copies mailed. lkm | | | | |
| Oct. 1 | 858 | Petitioner's Reply to govt's claims of procedural default filed. lkm | | | | |

SEE NEXT PAGE

Interval    Start Date    Ltr. Total
(per Section II)    End Date    Code
J.A.21

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET    U. S. vs

JOHNSON, CORY                    Page 20                3:92 C R 68-2

AO 256A ⊕                                                      Yr. | Docket No. | Def.

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|--|-------------------------|:---:|:---:|:---:|:---:|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| **2001** | | | | | | |
| Oct. 10 | 860 | Govt's Motion for extension of time to reply to petitioners' Procedural Default Responses filed. | lkm | | | |
| Oct. 10 | 861 | Govt's Supplemental Statement of Undisputed Material Facts in support of govt's Motion for Summary Judgment filed. | lkm | | | |
| Oct. 23 | 862 | ORDER granting U.S. an extension of time until 10/26/01 to file responses to petitioners' new assertions of procedural default; ent'd, JRS, filed. Copies mailed. | lkm | | | |
| Oct. 26 | 864 | Govt's Response to Petitioner's Pleading regarding procedurally defaulted claims filed. | lkm | | | |
| Nov. 13 | 868 | Petitioner's Opposition to govt's Motion for Summary Judgment and Motion to Dismiss and Supplemental Statement of undisputed material facts in support of its Motion for Summary Judgment filed. | lkm | | | |
| Nov. 27 | 870 | EX PARTE, SEALED ORDER as to deft Johnson filed. | lkm | | | |
| Dec. 4 | 871 | Petitioner Johnson's Exparte, Under Seal motion filed. | | | | |
| **2002** | | | lts | | | |
| Jan. 2 | 872 | Exparte, Under Seal ORDER ent'd, JRS, filed. Copy to counsel. | lkm | | | |
| Jan. 4 | 873 | Exparte, Under Seal Response filed by Petititioner Johnson. | lkm | | | |
| Jan. 14 | 874 | ORDER, Ex parte, Under Seal, ent'd as to Petitioner Johnson, JRS, filed. Copy to Johnson counsel only. | lkm | | | |
| Aug. 14 | 886 | ORDER directing all counsel to advise the Court by 8/30/02 if any motion/amendment based on videotapes recently provided by the U.S. will be filed. Any such pleading must be filed by 9/13/02; U.S. to reply by 10/4/02; ent'd, JRS, filed. Copies mailed. | lkm | | | |
| Aug. 30 | 888 | Petitioner Johnson's Consent motion for 2 week extension of time to review videotapes and submit notice to Court filed. | lkm | | | |
| Aug. 30 | 889 | Petitioner Johnson's Notice and motion adopting argument of Petitioner roane submitted in reponse to govt letter dated 7/18/02 filed. | lkm | | | |
| Sept. 11 | 893 | ORDER extending deadlines in Order of 8/14/02 to 9/13/02 to advise Court if motion or amendment will be filed relating to videotapes and 9/27/02 to file any such motion or amendment; ent'd, JRS, filed. Faxed and mailed to counsel. | lkm | | | |
| Sept. 13 | -- | By letter: counsel advises that Petitioner Johnson will not be filing any additional motions or amendments relating to videotapes interviews. | lkm | | | |
| **2003** | | | | | | |
| May 1 | 896 | Memorandum Opinion ent'd, JRS, filed. Copies mailed. | lkm | | | |
| May 1 | 897 | ORDER granting US' motion for summary judgment in part, denying in part; dismisssing Petitioners Tipton and Johnsons' grounds for 2255 relief & their motions under 2255 are denied; dismissing all of Petitioner Roane's 2255 grounds except for his claim that he was denied effective assistance of counsel in conjunction with charges pertaining to murder of Douglas Moody & his claim that he is innocent of the murder of Moody; denyinig Tipton's request to conduct add'l discovery; ent'd, JRS, filed. Copies mailed. | lkm | | | |

Interim | Start Date | End Date | Code Days
(per Section II) |

J.A. 22

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET                          JOHNSON, CORY

AO 256A

| DATE | (Document No.) | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY (a) | (b) | (c) | (d) |
|------|------|------|------|------|------|------|
| **2003** | | | | | | |
| May 15 | 900 | Motion of Petitioners Tipton, Johnson & Roane to alter Court's Order and Opinion dated 5/1/03 pursuant to FRCiP 52(b) and 59(e) filed. | | 1km | | |
| May 27 | 901 | Govt's motion for extension of time to file response to Petitioners' motions pursuant to Rules 52 and 59 filed. | 1km | | | |
| June 2 | 902 | ORDER granting govt's motion for extension of time to respond to petitioners' motion to alter opinion of 5/1/03, ent'd JRS, filed. Cps mailed. | 1km | | | |
| June 5 | 903 | Counsel's Notice of new address filed by Mr. Scher. | 1km | | | |
| June 12 | 904 | Govt's Response to petitioners' motion to alter Order of 5/1/03 filed. | 1km | | | |
| July 15 | 906 | Memorandum Opinion ent'd, JRS, filed; cps mailed. | 1km | | | |
| July 15 | 907 | ORDER denying Petitioners' motion to alter or amend judgment ent'd 5/1/03 ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Sept. 11 | 908 | Petitioner Johnson's Notice of Appeal from Order ent'd 5/1/03, Order of 7/15/03, Order of 5/1/03, Order of 6/10/03, Order of 5/3/00 filed. | 1km | TPO ✓ | | |
| Sept 17 | --- | Copy of Notice of Appeal, Orders, Memorandum Opinions, and docket sheet sent to USCA. | 1cb | | | |
| Oct. 10 | 913 | Petitioner Johnson's Motion for Certificate of Appealability filed. | 1km | | | |
| Oct. 24 | 916 | Response of U.S. to Petitioners Tipton and Johnson's Applications for Certificates of Appealability filed. | 1km | | | |
| Nov. 3 | 918 | Petitioner's Johnson Rely to Response of U.S. to Petitioner's Application for Certificate of Appealability filed. | 1km | | | |
| Nov. 26 | 920 | Memorandum of the Court ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Nov. 26 | 921 | Order granting Petitioners' motions for certificates of appealability ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Dec. 9 | 923 | Certification of completion sent to USCA re: as to Cory Johnson [908] appeal by Cory Johnson | 1cb | | | |
| Aug. 9 | 935 | Opinion of USCA affirming in part, reversing in part, rec'd, filed. | 1km | | | |
| Oct. 12 | 937 | Mandate of USCA filed. | 1km | | | |
| Oct. 18 | 938 | Govt's motion to vacate stays of execution & vacate orders setting time, place & method of execution filed. | 1km | | | |
| Oct. 31 | 941 | Petitioner's Memorandum in opposition to govt's motion to vacate stay of execution & to vacate order setting execution filed. | 1km | | | |
| Nov. 3 | 942 | Govt's Reply Memorandum to its Motion tovacate stay of execution, etc. filed. | 1km | | | |

Interval
(per Section II)   Start Date   Ltr. Total
End Date   Code Days

**J.A.23**

PAGE 22

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET      U. S. vs   JOHNSON, CORY                                    3:92CR68-02

AO 256A ⊕                                                            Yr. | Docket No. | Def.

| DATE | (Document No.) | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|
| | | | (a) | (b) | (c) | (d) |
| 2005 | | | | | | |
| Nov. 16 | 943 | Govt's Notice advising Court that matter is ripe & that no hearing is requested. | | 1km | | |
| Nov. 17 | 944 | ORDER granting govt's motion to vacate Orders of 11/22/96; Orders vacated. Court to issue execution orders; vacting Order of 2/21/97 staying execution; ent'd, JRS, filed. | | 1km | | |
| Nov. 17 | 946 | ORDER directing execution of the sentence of death by a U.S. Marshal; execution shall be by lethal injection at date and place designated by the Director, Bureau of Prisons; committing Johnson to custody of Attorney General for appropriate detention pending execution; directing U.S. Marshal designated to promptly return to the Court the document informing the Court that the sentence of death has been executed; ent'd, JRS, filed. Copies to counsel, USM, BOP. | | 1km | | |
| 7/31/09 | 969 | ORDER - appointing PAUL GILL, Asst. Federal Public Defender for the purpose of seeking clemency | | kbh | | |
| 8/11/10 | 974 | EXPARTE MOTION | | KBH | | |
| 8/17/10 | 975 | EXPARTE ORDER | | KBH | | |
| 9/10/10 | 976 | USCA Order That the Court GRANTS counsel's motion to withdraw from further representation | | kbh | | |
| 6/30/14 | 991 | Sealed Ex Parte Motion by Cory Johnson (w/sketch Order) | | JLT | | |
| 5/20/16 | | USCA 2244 In re: Cory Johnson case docketed. USCA Case No. 16-4; Case Manager R.Warren | | lcb | | |
| 6/6/16 | 1000 | USCA 2244 ORDER: The Court DENIES movant's 28 U.S.C. 2244 motion(in #16-4). | | lcb | | |
| 6/20/16 | | USCA 2244 In re: Cory Johnson case docketed. USCA Case No. 16-13, Case manager R.Warren. | | lcb | | |
| 6/22/16 | 1002 | USCA 2244 ORDER: The Court DENIES MOVANT"S 28 U.S.C. 2244 motion (in #16-13). | | lcb | | |
| 4/17/19 | | USCA 2244 In re: Cory Johnson case docketed. USCA Case No. 19-1; Case Manager E.Borneisen | | lcb | | |
| 5/14/19 | 1003 | USCA ORDER: Movant has filed a motion under 28 USC 2244 for an order authorizing the district court to consider a second or successive application for relief under 28 USC 2255. THE COURT DENIES THE MOTION for authorization to file a second or successive application for relief under 28 USC 2255 and GRANTS THE MOTION FOR LEAVE TO FILE A REPLY. | | lcb | | |

2255,CLOSED

# U.S. District Court
## Eastern District of Virginia - (Richmond)
## CRIMINAL DOCKET FOR CASE #: 3:92-cr-00068-DJN-2

Case title: USA v. Tipton, et al
Related Case: 3:20-cv-00957-DJN

Date Filed: 04/24/1992
Date Terminated: 06/01/1993

Assigned to: District Judge David J.
Novak

**Defendant (2)**

**Cory Johnson**
*TERMINATED: 06/01/1993*
*also known as*
"O"
*also known as*
"Co"

represented by **David Emmett Carney**
Skadden Arps Slate Meagher & Flom
LLP
1440 New York Ave NW
Washington, DC 20005-2111
(202) 371-7000
Email: David.Carney@skadden.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander C Drylewski**
Skadden Arps Slate Meagher & Flom
One Manhattan West
New York City, NY 10001
**NA**
212-735-2123
Fax: 917-777-2129
Email:
Alexander.Drylewski@skadden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Appointed Attorney*

**Donald Paul Salzman**
Skadden, Arps, Slate, Meagher & Flom
(DC-NA)
1440 New York Avenue, N.W.
Washington, DC 20005
**NA**
202-371-7983
Fax: 202-661-9098
Email: salzman@skadden.com
*PRO HAC VICE*

CM/ECF - vaed

*ATTORNEY TO BE NOTICED*
*Designation: Appointed Attorney*

**Judith A Flumenbaum**
Skadden Arps Slate Meagher & Flom
One Manhattan West
New York City, NY 10001
**NA**
212-735-2764
Fax: 917-777-2764
Email:
Judy.Flumenbaum@skadden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Appointed Attorney*

**Lotus Davna Ryan**
Skadden Arps Slate Meagher & Flom
LLP (DC)
1440 New York Ave NW
Washington, DC 20005-2111
202-371-7000
Fax: 202-661-0527
Email: lotus.ryan@skadden.com
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
| --- | --- |
| None | |

| **Highest Offense Level (Opening)** | |
| --- | --- |
| None | |

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

| **Highest Offense Level (Terminated)** | |
| --- | --- |
| None | |

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

---

**Intervenor**
**Willie Lee Seward**

**J.A.26**

**Plaintiff**

| | | |
|---|---|---|
| **USA** <br> *TERMINATED: 05/27/1992* | represented by | **S. David Schiller** <br> Office of the U.S. Attorney <br> SunTrust Building <br> 919 East Main Street <br> Suite 1900 <br> Richmond, VA 23219 <br> (804) 819-5400 <br> Email: david.schiller@usdoj.gov <br> *LEAD ATTORNEY* <br> *ATTORNEY TO BE NOTICED* |

**Joseph Attias**
United States Attorney Office
(Richmond-NA)
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219
**NA**
804-819-5400
Email: joseph.attias2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Richard D. Cooke**
United States Attorney's Office
(Richmond)
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219
804-819-5449
Email: richard.cooke@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Thomas Arthur Garnett**
US Attorney Office (Richmond)
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219
(804) 819-5431
Email: Thomas.A.Garnett@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| | | |

| 03/23/2020 | | Case reassigned to District Judge David J. Novak. District Judge James R. Spencer no longer assigned to the case. (jsmi, ) (Entered: 03/23/2020) |
|---|---|---|
| 05/27/2020 | | Appeal Remark: USCA 2255 case docketed. USCA Case 20-8, Case Manager EBorneisen (lgar, ) (Entered: 05/27/2020) |
| 07/16/2020 | 12 | 2255 ORDER of USCA as to Cory Johnson : Upon consideration of submissions relative to the movants motion to hold in abeyance, the court grants the motion and places this case in abeyance pending a decision by this court in United States v. Taylor, No. 19-7616. Entered at the direction of Judge Motz with the concurrence of Judge Floyd. Judge Wilkinson voted to deny authorization to file a successive motion under 28 U.S.C. § 2255. (lbre, ) (Entered: 07/16/2020) |
| 08/07/2020 | 28 | NOTICE OF ATTORNEY APPEARANCE Richard D. Cooke appearing for USA. (Cooke, Richard) (Entered: 08/07/2020) |
| 08/19/2020 | 33 | NOTICE OF ATTORNEY APPEARANCE: David Emmett Carney appearing for Cory Johnson (Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 34 | Motion to appear Pro Hac Vice by Donald P. Salzman and Certification of Local Counsel David E. Carney (Filing fee $ 75 receipt number 0422-7359816.) by Cory Johnson. (Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 35 | Motion to appear Pro Hac Vice by Alexander C. Drylewski and Certification of Local Counsel David E. Carney (Filing fee $ 75 receipt number 0422-7359818.) by Cory Johnson. (Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 36 | Motion to appear Pro Hac Vice by Judith A. Flumenbaum and Certification of Local Counsel David E. Carney (Filing fee $ 75 receipt number 0422-7359819.) by Cory Johnson. (Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 37 | MOTION for Leave to File Excess Pages by Cory Johnson. (Attachments: # 1 Proposed Order)(Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 38 | MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* by Cory Johnson. (Attachments: # 1 Proposed Order)(Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 39 | Memorandum in Support by Cory Johnson re 38 MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* (Attachments: # 1 Exhibit Index, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35) (Carney, David) (Entered: 08/19/2020) |
| 08/20/2020 | 40 | ORDER that the Court hereby GRANTS Defendant Corey Johnsons 37 Motion for Leave to File Excessive Pages. The Government shall have an equal number of pages for its response. See Order for details. Signed by District Judge David J. Novak on 8/20/2020. (jsmi, ) (Entered: 08/20/2020) |

J.A.28

| 09/04/2020 | 46 | ORDER as to Corey Johnson that the Court hereby DIRECTS the United States Attorney's Office to respond within 15 days of this Order and to explain its position regarding Defendant's First Step Act Motion and requested relief. If Defendant disagrees with the Government's response, Defendant may reply to the Government's response within 15 days of the date that the Government's response is filed. The United States Probation Office is DIRECTED to prepare a First Step Act Worksheet within 14 days of the date of entry hereof. See Order for details. Signed by District Judge David J. Novak on 9/2/2020. (jsmi, ) (Entered: 09/04/2020) |
| 09/04/2020 | 47 | ORDERS granting 34 , 35 , and 36 Motions for Pro hac vice as to Cory Johnson. Alexander C. Drylawski, Judith A. Flumenbaum, and Donald P. Salzman added. Signed by District Judge David J. Novak on 9/2/2020. (jsmi, ) (Entered: 09/04/2020) |
| 09/18/2020 | 51 | First Step Act Work Sheet (Sealed Document) as to Cory Johnson (drumheller, dorothy) (Entered: 09/18/2020) |
| 09/21/2020 | 52 | MOTION for Extension of Time to File Response/Reply as to 39 Memorandum in Support of Motion,,, 38 MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* by USA as to Cory Johnson. (Attias, Joseph) (Entered: 09/21/2020) |
| 09/22/2020 | 56 | ORDER that Government's 52 Unopposed Motion for a Two Day Extension for Filing the United States' Response to§ 404 Motion moving for a two-day extension to respond to Defendant Corey Johnson's First Step Act Motion is hereby GRANTED. The Government shall have until September 23, 2020, by which to file its response to Defendant's First Step Act Motion. Signed by District Judge David J. Novak on 9/21/2020. (jsmi, ) (Entered: 09/22/2020) |
| 09/23/2020 | 58 | RESPONSE in Opposition by USA as to Cory Johnson re 38 MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* (Attias, Joseph) (Entered: 09/23/2020) |
| 10/08/2020 | 63 | NOTICE OF ATTORNEY APPEARANCE: Lotus Davna Ryan appearing for Cory Johnson (Ryan, Lotus) (Entered: 10/08/2020) |
| 10/08/2020 | 64 | Reply to Motion by Cory Johnson re 38 MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* (Attachments: # 1 Index to Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Carney, David) (Entered: 10/08/2020) |
| 11/03/2020 | 68 | ORDER of USCA(20-8) as to Cory Johnson : For reasons appearing to the court, this case is placed in abeyance pending a decision by this court in U.S. v. Juan Ortiz-Orellana, No. 16-4844. (lgar, ) (Entered: 11/03/2020) |
| 11/17/2020 | 72 | PAPER DOCKET SHEET as to Cory Johnson. (jsmi, ) (Entered: 11/17/2020) |
| 11/19/2020 | 75 | ORDER as to Cory Johnson that the Court finds that Defendant's convictions on Counts Two, Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-Four and Twenty-Five Jo not constitute covered offenses under the First Step Act. Although Defendant's convictions on Counts Thirty-One and Thirty-Two do constitute covered offenses, the Court declines to exercise its discretion to |

J.A.29

| | | reduce Defendant's sentence. Therefore, Defendant's 38 Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 will be denied. Signed by District Judge David J. Novak on 11/19/2020. (jsmi, ) (Entered: 11/19/2020) |
|---|---|---|
| 11/20/2020 | 77 | NOTICE *of Appeal* by Cory Johnson re 75 Order on Motion to Reduce - First Step Act,, (Carney, David) (Entered: 11/20/2020) |
| 11/20/2020 | 78 | NOTICE *of execution date* by USA (Cooke, Richard) Modified on 11/23/2020 to correct text(tjoh, ). (Entered: 11/20/2020) |
| 11/23/2020 | 79 | Transmission of Notice of Appeal to US Court of Appeals as to Cory Johnson re 77 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (lbre, ) (Entered: 11/23/2020) |
| 11/23/2020 | | USCA Case Number 20-15, Case Manager E.Borneisen, for 77 Notice of Appeal filed by Cory Johnson.(lbre, ) (Entered: 11/24/2020) |
| 12/08/2020 | 84 | MOTION TO INTERVENE by Willie Lee Seward. (jsmi, ) (Entered: 12/08/2020) |
| 12/14/2020 | 86 | MOTION to Vacate under 28 U.S.C. 2255 by Cory Johnson. (Attachments: # 1 Index to Exhibits, # 2 Exhibit 1, # 3 Exhibit 1(a), # 4 Exhibit 2, # 5 Exhibit 2(a), # 6 Exhibit 3, # 7 Exhibit 3(a), # 8 Exhibit 4, # 9 Exhibit 5, # 10 Exhibit 6) (Carney, David) Civil case 3:20-cv-00957 opened. (Entered: 12/14/2020) |
| 12/14/2020 | 87 | NOTICE *of Submission of Exhibit 7 - Parts 1-3* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 7 - Part 1, # 3 Exhibit 7 - Part 2, # 4 Exhibit 7 - Part 3)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 88 | NOTICE *of Submission of Exhibits 8 - 17* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 8, # 3 Exhibit 9, # 4 Exhibit 10, # 5 Exhibit 11, # 6 Exhibit 12, # 7 Exhibit 13, # 8 Exhibit 14, # 9 Exhibit 15, # 10 Exhibit 16, # 11 Exhibit 17)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 89 | NOTICE *of Submission of Exhibits 18 - 30* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 18 - Part 1, # 3 Exhibit 18 - Part 2, # 4 Exhibit 19, # 5 Exhibit 20, # 6 Exhibit 21, # 7 Exhibit 22, # 8 Exhibit 23, # 9 Exhibit 24, # 10 Exhibit 25, # 11 Exhibit 26, # 12 Exhibit 27, # 13 Exhibit 28, # 14 Exhibit 29, # 15 Exhibit 30)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 90 | NOTICE *of Submission of Exhibits 31 - 44* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 31, # 3 Exhibit 32, # 4 Exhibit 33, # 5 Exhibit 34, # 6 Exhibit 35, # 7 Exhibit 36, # 8 Exhibit 37, # 9 Exhibit 38, # 10 Exhibit 39, # 11 Exhibit 40, # 12 Exhibit 41, # 13 Exhibit 42, # 14 Exhibit 43, # 15 Exhibit 44)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 91 | |

| | | NOTICE *of Submission of Exhibits 45 - 54* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 45, # 3 Exhibit 46, # 4 Exhibit 47, # 5 Exhibit 48, # 6 Exhibit 49, # 7 Exhibit 50, # 8 Exhibit 51, # 9 Exhibit 52, # 10 Exhibit 53, # 11 Exhibit 54)(Carney, David) (Entered: 12/14/2020) |
|---|---|---|
| 12/14/2020 | 92 | NOTICE *of Submission of Exhibits 55 - 70* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 55, # 3 Exhibit 56, # 4 Exhibit 57, # 5 Exhibit 58, # 6 Exhibit 59, # 7 Exhibit 60, # 8 Exhibit 61, # 9 Exhibit 62, # 10 Exhibit 63, # 11 Exhibit 64, # 12 Exhibit 65, # 13 Exhibit 66, # 14 Exhibit 67, # 15 Exhibit 68, # 16 Exhibit 69, # 17 Exhibit 70)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 93 | NOTICE *of Submission of Exhibits 71 - 74* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 71, # 3 Exhibit 72, # 4 Exhibit 73 - Part 1, # 5 Exhibit 73 - Part 2, # 6 Exhibit 74)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 94 | NOTICE *of Submission of Exhibits 75 - 79* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 75 - Part 1, # 3 Exhibit 75 - Part 2, # 4 Exhibit 76, # 5 Exhibit 77, # 6 Exhibit 78, # 7 Exhibit 79)(Carney, David) (Entered: 12/14/2020) |
| 12/15/2020 | 95 | ORDER that the Government file a brief addressing these issues, which shall not exceed 14 pages, not later than December 21, 2020. Petitioner shall file any reply, limited to 7 pages, not later than December 24, 2020. Following this briefing, should the Court find that it may consider the merits of the Second § 2255 Petition, the Court will set a briefing schedule to address the merits of the Second § 2255 Petition. See Order for details. Signed by District Judge David J. Novak on 12/15/2020. (jsmi, ) (Entered: 12/15/2020) |
| 12/21/2020 | 96 | RESPONSE in Opposition by USA as to Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Cooke, Richard) (Entered: 12/21/2020) |
| 12/24/2020 | 97 | REPLY TO RESPONSE to by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 *(Corey Johnson's Reply Pursuant to December 15, 2020 Order)* (Attachments: # 1 Exhibit 1)(Carney, David) (Entered: 12/24/2020) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/26/2020 21:29:26 | | |
| **PACER Login:** | SkaddenDC18:2629000:0 | **Client Code:** 811110-06586 Owens |
| **Description:** | Docket Report | **Search Criteria:** 3:92-cr-00068-DJN |
| **Billable Pages:** | 5 | **Cost:** 0.50 |



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division



JUL 2 0 1992

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 3:92CR68 |
| ) | |
| RICHARD TIPTON aka Whittey ) | 21 USC § 846 |
| (Counts 1-7, 11-30, 32-33) ) | Conspiracy |
| ) | (Count 1) |
| CORY JOHNSON aka "O" aka "CO" ) | |
| (Counts 1, 2, 8-32) ) | 21 USC § 848 |
| ) | Continuing Criminal Enterprise |
| JAMES H. ROANE, JR., aka "J.R." ) | (Count 2) |
| (Counts 1, 2, 5-16, 32) ) | |
| ) | 21 USC § 848(e)(1)(A) & 18 USC § 2 |
| VERNON LANCE THOMAS ) | Murder in Furtherance of CCE |
| aka Anthony Mack aka "V" ) | (Counts 3,5,8,11,17,18,19,24,25) |
| (Counts 1, 2, 11-16, 24-30, 32) ) | |
| ) | 18 USC § 924(c) |
| JERRY R. GAITERS ) | Use of Firearm in Relation to Crime of |
| (Counts 1, 17-23, 32) ) | Violence or Drug Trafficking Crime |
| ) | (Counts 6,9,12,15,20,26) |
| STERLING HARDY ) | |
| (Counts 1, 14-16, 32) ) | 18 USC §§ 1959 & 2 |
| ) | Violent Crimes in Aid of Racketeering |
| SANDRA REAVIS ) | (Counts 4,7,10,13,14,16,21-23,27-30) |
| (Count 1) ) | |
| ) | 21 USC § 841(a)(1) |
| ) | Distribution of Crack |
| ) | (Count 31) |
| ) | |
| ) | 21 USC § 841(a)(1) & 18 USC § 2 |
| ) | Possession w/Intent to Distribute Crack |
| ) | (Counts 32-33) |

115

00085

J.A.32

## SECOND SUPERSEDING INDICTMENT

### JULY 1992 TERM - At Richmond

### COUNT ONE

THE GRAND JURY CHARGES that from on or about January, 1989, the exact date being unknown to the grand jury, and continuously thereafter up to and including the filing of this indictment, in the Eastern District of Virginia, and elsewhere, the defendants, RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES H. ROANE, JR., aka "J.R.", JERRY GAITERS, STERLING HARDY, and SANDRA REAVIS, did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with each other and with other persons, both known and unknown to the grand jury to commit the following offenses against the United States of America:

1.      To knowingly, intentionally, and unlawfully possess with the intent to distribute, and to distribute, a Schedule II narcotic controlled substance, that is, at least fifty (50) grams or more of a mixture or substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, in violation of Title 21, United States Code, Section 841(a)(1).

### WAYS, MANNERS, AND MEANS OF THE CONSPIRACY

The ways, manners, and means by which the conspirators carried out the purpose of the conspiracy includes, but are not limited to, the following:

1.      It was part of the conspiracy that defendants and co-conspirators would cause cocaine to be purchased in New York City, and elsewhere, and transported to Richmond, Virginia, where the cocaine was to be distributed.

2

00086

J.A.33

2.      It was further part of the conspiracy that once the defendants and co-defendants would receive cocaine in Richmond, Virginia, they would cook the cocaine in such a way to make it cocaine base ("crack" or "cook-em-up"), which cocaine was intended to be distributed on the streets of Richmond, Virginia.

3.      It was further part of the conspiracy that the defendants and co-defendants would induce other individuals to work for them selling the crack cocaine on the streets of Richmond, Virginia.

4.      It was further part of the conspiracy to engage in a pattern of violent activity, including murder, assaults, and threats of violence to further the goals of the conspiracy.  To that end, members of the conspiracy bought, possessed, and transferred firearms, which firearms were used in their violent activities.

## OVERT ACTS

In furtherance of this conspiracy, and to bring about the objects and goals of the conspiracy, the defendants, co-conspirators, and unindicted co-conspirators committed overt acts in the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

1.      In or about December, 1991, defendants RICHARD TIPTON, aka Whittey, and CORY JOHNSON, aka "O," aka "CO", assaulted an individual known to the grand jury over a cocaine debt.

2.      On or about January 5, 1992, RICHARD TIPTON, aka Whittey, murdered Douglas A. Talley.

3

00087

J.A.34

3. On or about January 13, 1992, RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R." murdered Douglas Moody.

4. On or about January 13, 1992, an individual known to the grand jury, disposed of the knife used by JAMES ROANE, JR., aka "J.R.", to kill Doug Moody.

5. On or about January 14, 1992, members of the conspiracy caused an individual known to the grand jury to purchase one Glock handgun and two Tech 9mm handguns from Southern Gun World in Richmond, Virginia.

6. On or about January 14, 1992, JAMES ROANE, JR., aka "J.R." and CORY JOHNSON, aka "O;" aka "CO", murdered Peyton Maurice Johnson.

7. On or about January 15, 1992, CORY JOHNSON, aka "O," aka "CO", distributed a certain amount of cocaine base ("crack" or "cook em up") in Richmond, Virginia.

8. On or about January 29, 1992, RICHARD TIPTON aka Whittey, JAMES ROANE, JR., aka "J.R.", and CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", murdered Louis J. Johnson, Jr., in Richmond, Virginia.

9. On or about January 31, 1992, CORY JOHNSON, aka "O," aka "CO", assaulted an individual known to the grand jury over a drug debt, and solicited that individual to kill Dorothy Armstrong.

10. On or about February 1, 1992, JAMES ROANE, JR., aka "J.R.", RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", VERNON

4

00088

LANCE THOMAS, aka Anthony Mack, aka "V",and STERLING HARDY murdered Torrick Brown and shot Martha McCoy in Richmond, Virginia.

11.    On or about February 1, 1992, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS murdered Bobby Long, Anthony Carter, and Dorothy Mae Armstrong aka Mousey, in Richmond, Virginia.

12.    On or about February 2, 1992, defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", STERLING HARDY, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES H. ROANE, JR., aka "J.R.", and JERRY GAITERS possessed with the intent to distribute crack cocaine.

13.    On or about February 13, 1992, STERLING HARDY solicited the murders of certain individuals.

14.    On or about February 19, 1992, RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", murdered Curtis Thorne, Linwood Chiles, and shot, seriously wounding, Gwendolyn Green and Priscilla Green, in Richmond, Virginia.

15.    On or about April 10, 1992, RICHARD TIPTON, aka Whittey, possessed with the intent to distribute crack cocaine in Richmond, Virginia.

(In violation of Title 21, United States Code, Section 846).

## COUNT TWO

THE GRAND JURY FURTHER CHARGES that from at least January, 1991, and continuously thereafter up to and including the date of the filing of this indictment, in the Eastern District of Virginia, and elsewhere, the defendants RICHARD TIPTON,

5

00089

J.A.36

aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", unlawfully, intentionally, and knowingly, did engage in a Continuing Criminal Enterprise, that is, they did violate Title 21, United States Code, Section 841 and 846, including, but not limited to, those violations alleged in the instant indictment, which are realleged and incorporated by reference herein, and did commit other violations of said statutes, which violations were part of a continuing series of violations of said statutes undertaken by RICHARD TIPTON, aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", in concert with at least five other persons with respect to whom they occupied positions of organizer, supervisor, and manager, and from which continuing series of violations the defendant, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O", aka "CO," JAMES H. ROANE, JR., aka "JR," and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", obtained substantial income and resources.

(In violation of Title 21, United States Code, Section 848.)

## COUNT THREE

THE GRAND JURY FURTHER CHARGES that on or about January 5, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant RICHARD TIPTON aka Whittey, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Douglas A. Talley, and such killing resulted.

6

00090

J.A.37

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT FOUR

THE GRAND JURY FURTHER CHARGES that on or about January 5, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant, RICHARD TIPTON aka Whittey, did knowingly, intentionally, and unlawfully cause the murder of Douglas Talley, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT FIVE

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Douglas Moody, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

7

00091

J.A.38

## COUNT SIX

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is, a violation of Title 21, United States Code, Section 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Five and Seven of this Indictment. (In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT SEVEN

THE GRAND JURY FURTHER CHARGES that on or about January 13, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, and JAMES H. ROANE, JR., aka "J.R.", did knowingly, intentionally, and unlawfully cause the murder of Douglas Moody, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

8

00092

J.A.39

## COUNT EIGHT

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Peyton Maurice Johnson, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT NINE

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants JAMES H. ROANE, JR., aka "J.R.", and CORY JOHNSON, aka "O," aka "CO", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Eight and Ten of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

9

00093

J.A.40

## COUNT TEN

THE GRAND JURY FURTHER CHARGES that on or about January 14, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, JAMES H. ROANE, JR., aka "J.R." and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Peyton Maurice Johnson, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT ELEVEN

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Louis J. Johnson, Jr., and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

10

00094

J.A.41

## COUNT TWELVE

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Eleven and Thirteen of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT THIRTEEN

THE GRAND JURY FURTHER CHARGES that on or about January 29, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", and VERNON LANCE THOMAS, aka Anthony Mack, aka "V", did knowingly, intentionally, and unlawfully cause the murder of Louis J. Johnson, Jr., as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in

11

00095

J.A.42

narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT FOURTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY, did knowingly, intentionally, and unlawfully cause the murder of Torrick Brown, Jr., as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT FIFTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY, did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court

12

00096

of the United States, that is a violation of Title 21, United States Code, Section 846, and Title 18, United States Code, Section 1959, as set forth in Counts One, Fourteen and Sixteen of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT SIXTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, JAMES H. ROANE, JR., aka "J.R.", CORY JOHNSON, aka "O," aka "CO", VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and STERLING HARDY, did knowingly, intentionally, and unlawfully commit assault resulting in serious bodily injury to Martha McCoy, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT SEVENTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21

13

00097

J.A.44

USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Bobby Long, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT EIGHTEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Anthony Carter, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT NINETEEN

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded,

14

00098

J.A.45

induced, procured, and caused the intentional killing of Dorothy Mae Armstrong, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT TWENTY

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Sections 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Seventeen, Eighteen & Nineteen and Twenty-One through Twenty-Three of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT TWENTY-ONE

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Bobby Long, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity,

15

00099

J.A.46

and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-TWO

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Anthony Carter, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-THREE

THE GRAND JURY FURTHER CHARGES that on or about February 1, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", and JERRY GAITERS, did knowingly, intentionally, and unlawfully cause the murder of Dorothy Mae Armstrong, as consideration for the receipt of, and as consideration for a promise and

16

00100

J.A.47

agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-FOUR

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly, intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Curtis Thorne, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT TWENTY-FIVE

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", while engaged in and working in furtherance of a Continuing Criminal Enterprise, 21 USC § 848(a), knowingly,

17

00101

J.A.48

intentionally, and unlawfully killed and counseled, commanded, induced, procured, and caused the intentional killing of Linwood Chiles, and such killing resulted.

(In violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.).

## COUNT TWENTY-SIX

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, willfully, and unlawfully use a firearm, during and in relation to a crime of violence or a drug trafficking crime, which is a felony prosecutable in a court of the United States, that is a violation of Title 21, United States Code, Section 846 and 848, and Title 18, United States Code, Section 1959, as set forth in Counts One, Twenty-Four, Twenty-Five and Twenty-Seven through Thirty of this Indictment.

(In violation of Title 18, United States Code, Sections 924(c) and 2.)

## COUNT TWENTY-SEVEN

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Curtis Thorne, as consideration for the receipt of, and as

18

00102

J.A.49

consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-EIGHT

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the murder of Linwood Chiles, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT TWENTY-NINE

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and

19

00103

J.A.50

unlawfully cause the maiming of Priscilla Green, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT THIRTY

THE GRAND JURY FURTHER CHARGES that on or about February 19, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON, aka Whittey, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", and CORY JOHNSON, aka "O," aka "CO", did knowingly, intentionally, and unlawfully cause the maiming of Gwendolyn Green, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value from an enterprise engaged in racketeering activity, and for the purpose of gaining entrance to and maintaining and increasing position in an enterprise engaged in racketeering activity, said racketeering activity being dealing in narcotic or other dangerous drugs.

(In violation of Title 18, United States Code, Sections 1959 and 2.)

## COUNT THIRTY-ONE

THE GRAND JURY FURTHER CHARGES that on or about January 15, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendant, CORY

20

JOHNSON, aka "O," aka "CO", did knowingly and intentionally distribute a Schedule II narcotic controlled substance, that is, a mixture and substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

## COUNT THIRTY-TWO

THE GRAND JURY FURTHER CHARGES that on or about February 2, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD TIPTON aka Whittey, CORY JOHNSON, aka "O," aka "CO", STERLING HARDY, VERNON LANCE THOMAS, aka Anthony Mack, aka "V", JAMES ROANE, JR., aka "J.R.", and JERRY GAITERS, did knowingly and intentionally possess with the intent to distribute a Schedule II narcotic controlled substance, that is, more than fifty (50) grams of a mixture and substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

## COUNT THIRTY-THREE

THE GRAND JURY FURTHER CHARGES that on or about April 10, 1992, at Richmond, Virginia, in the Eastern District of Virginia, the defendants, RICHARD

21

00105

J.A.52

TIPTON aka Whittey, did knowingly and intentionally possess with the intent to distribute a Schedule II narcotic controlled substance, that is, more than fifty (50) grams of a mixture and substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base, commonly known as "crack," or "cook em up."

(In violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.)

A TRUE BILL:

ISl *Christopher F. Snead*
**F O R E P E R S O N**

RICHARD CULLEN
UNITED STATES ATTORNEY

By:

Howard C. Vick, Jr.
Assistant United States Attorney

William Parcell
Special Assistant U.S. Attorney

22

00106

J.A.53

🚩 KeyCite Yellow Flag - Negative Treatment

Disagreed With by   U.S. v. Mikos,   N.D.Ill.,   September 11, 2003

90 F.3d 861
United States Court of Appeals,
Fourth Circuit.

UNITED STATES of America, Plaintiff–Appellee,

v.

Richard TIPTON, a/k/a Whittey,
Defendant–Appellant (Two Cases).

UNITED STATES of America, Plaintiff–Appellee,

v.

Cory JOHNSON, a/k/a "O", a/
k/a "CO", Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

James H. ROANE, Jr., a/k/
a J.R., Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellant,

v.

Richard TIPTON, a/k/a Whittey; Cory
Johnson, a/k/a "O", a/k/a "CO"; James H.
Roane, Jr., a/k/a J.R., Defendants–Appellees.

Nos. 93–4005 to 93–4007, 93–4009 and 93–4010.

|

Argued Dec. 7, 1994.

|

Decided July 8, 1996.

**Synopsis**

Three defendants were convicted in the United States District Court for the Eastern District of Virginia, James R. Spencer, J., of capital murder in furtherance of a continuing criminal enterprise and various related racketeering, firearms and drug offenses. Each defendant was sentenced to death, but death sentences were stayed on ground that Congress had not authorized means by which death sentences should be carried out. Defendants appealed, and government cross-appealed. The Court of Appeals, Phillips, Senior Circuit Judge, held that: (1) trial court's question to prospective jurors, which asked "do you have any strong feelings in favor of the death penalty?" was sufficient to determine any bias in favor of death penalty; (2) prosecutor did not violate defendants' constitutional rights to confront witnesses by advising witnesses in witness protection program that they

did not have to agree to submit to interviews with defense counsel; (3) defendants were not entitled to severance of penalty phase of capital murder trials; and (4) although trial court erred in instructing jury in penalty phase of capital murder trial that it could find any or all of four levels of culpability set out in aggravating factor, error was harmless.

Affirmed in part, vacated and remanded in part.

West Headnotes (51)

**[1]** **Constitutional Law** 🔑 Presence and Appearance of Defendant and Counsel

**Criminal Law** 🔑 Proceedings in absence of accused

Confrontation clause of Sixth Amendment and due process clause of Fifth Amendment together guarantee right of federal defendants charged with felonies to be present at all critical stages of their trials. U.S.C.A. Const.Amends. 5, 6.

2 Cases that cite this headnote

**[2]** **Criminal Law** 🔑 During preliminary proceedings and on hearing of motions

Defendant's constitutional right to be present at all critical stages of his trial includes right to be present at voir dire and impaneling of jurors. U.S.C.A. Const.Amends. 5, 6; Fed.Rules Cr.Proc.Rule 43(a), 18 U.S.C.A.

5 Cases that cite this headnote

**[3]** **Criminal Law** 🔑 Objections and exceptions

**Criminal Law** 🔑 Presentation of questions in general

Where protected trial right has been effectively waived by defendant, all possibility of error respecting that right has been extinguished; but even where right has not been waived, any entitlement to have error in its denial or abridgement corrected on appellate review may be forfeited by failure to make timely assertion of right at trial.

USCA4 Appeal: 20-15   Doc: 11-1   Filed: 12/28/2020   Pg: 60 of 281

2 Cases that cite this headnote

**[4]     Criminal Law** 🔑 Presence of Accused

**Criminal Law** 🔑 Course and conduct of trial in general

Denial of defendant's constitutional and rule-based right to be present at all critical stages of trial does not affect defendant's substantial rights independent of any prejudicial impact and, thus, to establish plain error on appeal based on denial of right to be present at trial, defendant must demonstrate prejudice. U.S.C.A. Const.Amends. 5, 6; Fed.Rules Cr.Proc.Rule 43(a), 18 U.S.C.A.

5 Cases that cite this headnote

**[5]     Criminal Law** 🔑 Conduct of trial in general

Prejudice could not be presumed from denial of defendants' constitutional and rule-based right to be present during voir dire in murder, racketeering and drug trial, where defendants did not object to absences, and absences were intermittent and did not approach total denial of any effective participation in critical phases of voir dire. U.S.C.A. Const.Amends. 5, 6; Fed.Rules Cr.Proc.Rule 43(a), 18 U.S.C.A.

5 Cases that cite this headnote

**[6]     Criminal Law** 🔑 Course and conduct of trial in general

Defendants were not prejudiced by their absence from certain portions of voir dire in murder, racketeering and drug trial and, thus, their absence did not amount to plain error in violation of defendants' constitutional and rule-based right to be present at all critical stages of trial; defendants offered no showing of prejudice, and defendants were present during initial interviews of prospective jurors and when peremptory strikes were used. U.S.C.A. Const.Amends. 5, 6; Fed.Rules Cr.Proc.Rule 43(a), 18 U.S.C.A.

10 Cases that cite this headnote

**[7]     Jury** 🔑 Bias and prejudice

**Jury** 🔑 Form and Sufficiency of Questions Propounded

Trial court's procedure during voir dire, whereby court would ask prospective jurors "do you harbor any bias or prejudice, racial or otherwise, that would prevent you from being fair to the defendants in this case?" followed by limited follow-up questions by counsel, was sufficient to determine any racial bias in prospective jurors in murder, firearms and drug trial, where race was not itself an issue and none of offenses charged was interracial in nature.

2 Cases that cite this headnote

**[8]     Criminal Law** 🔑 Selection and impaneling

**Jury** 🔑 Bias and prejudice

Once decision has been made to conduct any inquiry into any racial bias of prospective jurors, exact nature and scope of that inquiry is committed to broad discretion of district court, and is subject to review only for abuse.

**[9]     Jury** 🔑 Personal opinions and conscientious scruples

Trial court's question to prospective jurors in capital trial, which asked "do you have any strong feelings in favor of the death penalty?" was sufficient to determine any bias in favor of death penalty and, thus, defendants' were not entitled to conduct detailed questioning of prospective jurors on specific mitigating factors; district court's inquiry was sufficient to cull out any prospective juror who would always vote for death penalty whatever the circumstances.

20 Cases that cite this headnote

**[10]    Jury** 🔑 Summoning and impaneling; voir dire

Defendants have a right, grounded in Sixth Amendment, to voir dire adequate to assure defendant a jury, all of whose members are able impartially to follow court's instructions and evaluate evidence. U.S.C.A. Const.Amend. 6.

J.A.55

3 Cases that cite this headnote

**[11]**    **Jury**  🔑  Summoning and impaneling; voir dire

During voir dire of trial for capital crime, defendant has a right to an inquiry sufficient to ensure—within limits of reason and practicality—a jury none of whose members would unwaveringly impose death after finding of guilt and hence would uniformly reject any and all evidence of mitigating factors, no matter how instructed on the law. U.S.C.A. Const.Amend. 6.

5 Cases that cite this headnote

**[12]**    **Jury**  🔑  View of capital punishment

Sixth Amendment's guarantee of impartial jury is violated by exclusion of prospective juror simply because he expresses some reservations about imposing death penalty in any case; it is not violated, however, by exclusion of juror whose expressed reservations are such as to make him irrevocably committed to vote against death penalty regardless of facts and circumstances of case or, short of that, such as to prevent or substantially impair performance of his duties as juror in accordance with his instruction and his oath. U.S.C.A. Const.Amend. 6.

3 Cases that cite this headnote

**[13]**    **Criminal Law**  🔑  Selection and impaneling

**Jury**  🔑  Punishment prescribed for offense

Whether prospective juror's reservations about voting for death penalty require exclusion of juror is committed to trial court discretion based upon voir dire inquiry, and review of that determination is most deferential.

7 Cases that cite this headnote

**[14]**    **Jury**  🔑  Punishment prescribed for offense

Trial court properly struck three prospective jurors for cause in capital murder trial based on their opposition to death penalty, where each prospective juror expressed reservations, never

retracted, about whether they could vote for death penalty under any circumstances.

3 Cases that cite this headnote

**[15]**    **Criminal Law**  🔑  Competency of jurors and challenges

Court of Appeals would not consider defendants' claim that government impermissibly exercised its peremptory strikes against disproportionate number of women in violation of defendants' constitutional rights, where defendants never objected to government's use of peremptory strikes and offered no evidence of gender discrimination other than number of women struck relative to men. U.S.C.A. Const.Amend. 5.

5 Cases that cite this headnote

**[16]**    **Conspiracy**  🔑  Cocaine

Evidence in drug conspiracy prosecution sustained finding that three defendants were part of single conspiracy, even though conspiracy existed in shifting geographical areas and not all defendants were members of conspiracy at same time; despite changing areas and membership, conspiracy used single name, operated under same leadership, and employed same methods of intimidation and violence to dominate crack cocaine trade in its markets.

**[17]**    **Criminal Law**  🔑  Joint or Separate Trials of Codefendants

**Criminal Law**  🔑  Conspiracy

Persons who have been indicted together, particularly for conspiracy, should be tried together.

8 Cases that cite this headnote

**[18]**    **Conspiracy**  🔑  Object of Conspiracy, Means of Accomplishing, and Conduct in Furtherance

Government may not properly be deprived of its right to detail full scope of conspiracy and to present its case in proper context simply because

particular coconspirators were not involved in full scope of its activities.

2 Cases that cite this headnote

**[19]    Conspiracy** 🔑 Controlled substances and intoxicating liquors

**Criminal Law** 🔑 Restriction to special purpose in general

Drug conspiracy defendants were not entitled to exclusion of evidence or limiting instructions regarding activities of others in furtherance of conspiracy, where each defendant was member of same conspiracy.

1 Cases that cite this headnote

**[20]    Criminal Law** 🔑 Conspiracy cases

Three defendants in drug conspiracy prosecution were not entitled to severance of trial, where each was member of same conspiracy.

2 Cases that cite this headnote

**[21]    Criminal Law** 🔑 Elements and incidents of offense

Even if defendants were entitled to multiple conspiracy instruction in drug conspiracy prosecution, defendants were not prejudiced by lack of multiple conspiracy instruction, where evidence of single conspiracy was strong enough in relation to that of multiple conspiracies that defendants would have been convicted even if multiple conspiracy instruction had been given.

12 Cases that cite this headnote

**[22]    Criminal Law** 🔑 Elements and incidents of offense in general

Properly requested multiple conspiracy instruction is not required if evidence only supports finding of single conspiracy as charged.

4 Cases that cite this headnote

**[23]    Conspiracy** 🔑 Single or Multiple Conspiracies

**Criminal Law** 🔑 Defenses in general

Multiple conspiracy jury instruction may be required, as may instructions on specific defense theories generally, if sufficiently supported by evidence.

5 Cases that cite this headnote

**[24]    Criminal Law** 🔑 Elements and incidents of offense

Failure to give multiple conspiracy jury instruction is not reversible error unless defendant can show that this caused him substantial prejudice.

8 Cases that cite this headnote

**[25]    Controlled Substances** 🔑 Indictment, Information or Complaint

Indictment alleging a continuing criminal enterprise (CCE) adequately identified drug-related violations comprising continuing series of violations and five persons allegedly supervised by defendants as part of enterprise; defendants could not claim unfair surprise since indictment tracked language of CCE offense, incorporated other crimes alleged in indictment by reference, and gave notice of five supervisees by reference to other counts of indictment. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a), 21 U.S.C.A. § 848(a).

3 Cases that cite this headnote

**[26]    Controlled Substances** 🔑 Continuing criminal enterprise; drug organizations

Capital murder in furtherance of continuing criminal enterprise (CCE) could be considered by jury as predicate offense for violation of CCE statute; statute stated that person is engaged in CCE if he violates any provision of subchapter as part of continuing series of violations of subchapter, and subchapter specifically listed murder in furtherance of CCE in its provisions. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a, e), 21 U.S.C.A. § 848(a, e).

5 Cases that cite this headnote

**[27]    Controlled Substances**    Sale, distribution, delivery, transfer or trafficking

Trial court did not fail to adequately instruct jury that it must find each of five elements of continuing criminal enterprise (CCE) offense as to each of three defendants, where trial court specifically instructed jury that government must prove each of five elements as to each defendant, and generally cautioned jury that as to all charges, case of each defendant must be considered separately and individually. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a, e), 21 U.S.C.A. § 848(a, e).

2 Cases that cite this headnote

**[28]    Criminal Law**    Failure to instruct in general

In continuing criminal enterprise (CCE) prosecution, trial court's failure to instruct jury that it must be unanimous as to three predicate violations and five supervisees as to each defendant was not plain error; by its verdict it was clear that jury unanimously found each defendant guilty of at least five predicate violations, and special unanimity instruction was not required on five supervisees element, as focus of CCE is size of enterprise rather than particular identities of those involved. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a, e), 21 U.S.C.A. § 848(a, e).

6 Cases that cite this headnote

**[29]    Criminal Law**    Assent of required number of jurors

There is no general requirement of jury unanimity on preliminary factual issues which underlie verdict.

1 Cases that cite this headnote

**[30]    Criminal Law**    Unanimity as to facts, conduct, methods, or theories

Special unanimity instruction is required only when there is genuine risk of juror confusion or that conviction could result from different jurors having concluded that defendant committed quite different acts within those of a prescribed set or among multiple means of violating statute.

2 Cases that cite this headnote

**[31]    Criminal Law**    Elements of offense and defenses

In continuing criminal enterprise (CCE) prosecution, trial court's error in instructing jury that government must prove that continuing series of violations "was undertaken by the defendants" rather than by each defendant individually was not plain error; error was merely slip of the tongue by trial court, and other instructions adequately advised jury that to convict, each element of offense must be proved separately as to each defendant. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a), 21 U.S.C.A. § 848(a).

**[32]    Criminal Law**    Form and language; procedure in giving instructions

Although trial court technically violated rule governing jury instructions by giving supplemental jury instruction after closing arguments in continuing criminal enterprise (CCE) prosecution, error was harmless, where supplemental instruction was accurate statement of law and defendants did not indicate how they would have changed their arguments if they had been allowed to argue after supplemental instruction was given. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a), 21 U.S.C.A. § 848(a); Fed.Rules Cr.Proc.Rule 30, 18 U.S.C.A.

2 Cases that cite this headnote

**[33]    Homicide**    Conspiracy and racketeering

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**J.A.58**

In prosecution for capital murder in furtherance of continuing criminal enterprise (CCE), trial court adequately instructed jury that it must find substantive connection between murders and CCE; instructions stated that defendants were charged with two specific, distinct types of homicide, including "killing while engaged in or in furtherance of a [CCE]," and that to find defendants guilty, they must find that each defendant "was engaged in or working in furtherance of the [CCE]" and that the killing occurred "while the defendant was so engaged." Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a, e), 21 U.S.C.A. § 848(a, e).

14 Cases that cite this headnote

**[34]    Criminal Law** Elements of offense and defenses

In racketeering prosecution, trial court's failure on two occasions to differentiate between an "enterprise engaged in racketeering activity" and "racketeering activity" did not amount to plain error; trial court clearly identified the two different concepts in explaining racketeering statute and correctly told jury that to convict, it had to find that defendants acted to "gain entrance to" an "enterprise engaged in racketeering activity." 18 U.S.C.A. § 1959.

**[35]    Criminal Law** Consultation between accused or counsel and witnesses

Prosecutor did not violate defendants' constitutional right to confront witnesses by advising witnesses in witness protection program that they did not have to agree to submit to interviews with defense counsel; although a defendant has right to have access to witnesses, there is no right to compel witness to submit to interview. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. § 3521.

7 Cases that cite this headnote

**[36]    Criminal Law** Failure to produce or disclose witnesses or evidence

Government's delay in providing defendants with addresses of witnesses who were participating in witness protection program did not violate defendants' constitutional right to confront witnesses against them, where defendants were not prejudiced by delay. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. §§ 3521, 3532.

2 Cases that cite this headnote

**[37]    Criminal Law** Cross-examination and impeachment

Trial court's refusal to allow defense counsel to cross-examine witnesses who were participating in witness protection program about their reasons for refusing to submit to interviews with defense counsel did not violate defendants' constitutional right to confront witnesses against them, where motives and biases of witnesses were otherwise freely exposed to cross-examination. U.S.C.A. Const.Amend. 6; 18 U.S.C.A. § 3521.

4 Cases that cite this headnote

**[38]    Controlled Substances** Continuing criminal enterprise; drug organizations

Evidence sustained finding that defendants acted as organizers, supervisors or managers with respect to five or more persons in a continuing criminal enterprise (CCE); street-level drug dealers acted as "workers" who were either or both organized, supervised, and managed by defendants who were acting as "partners" in concerted drug-trafficking enterprise. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(a, b), 21 U.S.C.A. § 848(a, b).

**[39]    Homicide** Multiple perpetrators

Evidence was sufficient for conviction of six murders in furtherance of a continuing criminal enterprise, even though defendant did not actually carry out execution of victims; evidence established that defendant was instrumental in planning murders in relation to drug-trafficking enterprise and that defendant directly

aided their execution by driving designated executioner to scene, making sure executions were carried out and seeing that those responsible escaped detection. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(e), 21 U.S.C.A. § 848(e).

6 Cases that cite this headnote

**[40]**    **Racketeer Influenced and Corrupt Organizations**  ⟜  Weight and sufficiency

Evidence was sufficient for conviction of two defendants for committing violent crimes for purpose of maintaining or increasing their position in enterprise engaged in racketeering activity; although defendants claimed that killing of one victim and wounding of potential eyewitnesses was prompted by personal grievance against victim for "messing with" one defendant's girlfriend, evidence showed that such violence was part of enterprise's policy of reacting violently to affronts against enterprise's members and thereby furthering reputation for violence essential to maintenance of enterprise's place in drug-trafficking business. 18 U.S.C.A. § 1959.

13 Cases that cite this headnote

**[41]**    **Racketeer Influenced and Corrupt Organizations**  ⟜  Weight and sufficiency

Evidence is sufficient for conviction of committing violent crime for purpose of maintaining or increasing position in enterprise engaged in racketeering activity if jury could properly infer that defendant committed his violent crime because he knew it was expected of him by reason of his membership in enterprise or that he committed it in furtherances of that membership. 18 U.S.C.A. § 1959.

15 Cases that cite this headnote

**[42]**    **Indictments and Charging Instruments**  ⟜  Conspiracy, racketeering, and money laundering

**Indictments and Charging Instruments**  ⟜  Controlled substances

Conspiracy to distribute controlled substances is lesser included offense of conducting continuing criminal enterprise (CCE) and, thus, defendants' convictions of conspiracy to distribute controlled substances would be vacated. Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 406, 408, 21 U.S.C.A. §§ 846, 848.

**[43]**    **Sentencing and Punishment**  ⟜  Hearing

Three defendants were not entitled to severance of penalty phase of capital murder trials; since penalty phases were required by statute to be held in front of same jury that determined guilt and guilt phase was tried jointly, same jury would have heard same evidence regardless of whether penalty phase was joint or severed, and trial court reduced potential prejudice by repeatedly instructing jury on its duty "to decide whether each individual defendant shall live or die." Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(i)(1)(A), 21 U.S.C.A. § 848(i)(1)(A).

21 Cases that cite this headnote

**[44]**    **Criminal Law**  ⟜  Custody and conduct of jury

Appellate court is entitled, in absence of any directly negating evidence, to presume that jury heard, understood, and followed its instructions.

3 Cases that cite this headnote

**[45]**    **Constitutional Law**  ⟜  Sentencing and punishment

Any delegation of legislative functions to executive branch by Congress in allowing prosecutors to introduce nonstatutory aggravating factors in penalty phase of capital case is sufficiently circumscribed by intelligible principles to avoid violating separation of powers principles. U.S.C.A. Const. Art. 3, § 1 et seq.; Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(h)(1)(B), (j, k), 21 U.S.C.A. § 848(h)(1)(B), (j, k).

10 Cases that cite this headnote

**[46]  Sentencing and Punishment** ← Aggravating or mitigating circumstances

Aggravating factor that defendant committed offense after substantial planning and premeditation was not unconstitutionally vague in penalty phase of capital murder trial; although "substantial" may have different meanings depending upon context, in context of statutory text and district court's instructions, "substantial planning and premeditation" could only have been understood by jury to mean more than minimum amount sufficient to commit offense. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(n)(8), 21 U.S.C.A. § 848(n)(8).

40 Cases that cite this headnote

**[47]  Sentencing and Punishment** ← Aggravating circumstances in general

An aggravating factor in penalty phase of capital case is not unconstitutional if it has some common-sense core of meaning that criminal juries should be capable of understanding.

12 Cases that cite this headnote

**[48]  Sentencing and Punishment** ← Sufficiency

In penalty phase of capital murder prosecution, evidence sustained finding of aggravating factor that defendant committed offense after substantial planning and premeditation, even though defendant stabbed victim in spontaneous effort to prevent victim from escaping after victim was shot by accomplice; although means of carrying out murder may have been spontaneous, evidence indicated that defendant and accomplice visited victim's apartment for preplanned and premeditated purpose of murdering him. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(n)(8), 21 U.S.C.A. § 848(n)(8).

15 Cases that cite this headnote

**[49]  Sentencing and Punishment** ← Aggravating or mitigating circumstances

**Sentencing and Punishment** ← Extent of offender's personal participation

Aggravating factor which requires jury to determine both defendant's intention to cause victim's death and defendant's level of culpability in order to recommend death penalty is not unconstitutional on ground that it fails adequately to guide and channel sentencing discretion in imposing death sentence; by separating different levels of culpability, aggravating factor provides constitutionally required, principled basis for distinguishing between those murderers thought deserving of death and those thought not to be. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(n)(1), 21 U.S.C.A. § 848(n)(1).

9 Cases that cite this headnote

**[50]  Sentencing and Punishment** ← Harmless and reversible error

Although trial court erred in instructing jury in penalty phase of capital murder trial that it could find any or all of four levels of culpability set out in aggravating factor, error was harmless; jury obviously found highest level of culpability with regard to each murder since it determined that all four levels of culpability existed, and jury did not place extra weight on aggravating factor based on finding of all four levels of culpability, evidenced by fact that it did not recommend death sentence for each defendant for each murder even though it found all four levels of culpability existed for all murders. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(n)(1), 21 U.S.C.A. § 848(n)(1).

9 Cases that cite this headnote

**[51]  Attorney General** ← Powers and Duties

**Constitutional Law** ← Encroachment on legislature

**Sentencing and Punishment** ← Mode of execution

Attorney General had constitutional and statutory authority to provide by regulation

that death sentences imposed for murder in furtherance of continuing criminal enterprise (CCE) would be carried out by lethal injection and, thus, district court's order staying execution of death sentence pending congressional authorization of means of execution would be vacated; Congress' power to legislate means of executing death sentence was not exclusive of power of executive branch, and Congress had not expressly or by implication preempted power of executive branch to authorize means of execution. Comprehensive Drug Abuse Prevention and Control Act of 1970, § 408(e), 21 U.S.C.A. § 848(e); 28 C.F.R. § 26.3.

2 Cases that cite this headnote

**Attorneys and Law Firms**

*867  ARGUED: Scott Lawrence Nelson, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for Appellant Roane; Eric David White, Morchower, Luxton & Whaley, Richmond, Virginia, for Appellant Tipton; Craig Stover Cooley, Richmond, Virginia, for Appellant Johnson. Robert John Erickson, United States Department Of Justice, Washington, D.C., for Appellee. **ON BRIEF:** Paul F. Enzinna, Miller, Cassidy, Larroca & Lewin, Washington, D.C.; David Baugh, Richmond, Virginia, for Appellant Roane; Robert P. Geary, Richmond, Virginia, for Appellant Tipton; John F. McGarvey, Richmond, Virginia, for Appellant Johnson. Helen F. Fahey, United States Attorney, United States Department Of Justice, Washington, D.C., for Appellee.

Before WILKINSON, Chief Judge, ERVIN, Circuit Judge, and PHILLIPS, Senior Circuit Judge.

Affirmed in part, vacated and remanded in part by published opinion. Senior Judge PHILLIPS wrote the opinion, in which Chief Judge WILKINSON and Judge ERVIN joined.

## OPINION

PHILLIPS, Senior Circuit Judge:

Richard Tipton, Cory Johnson, and James Roane were tried to a jury on a 33–count indictment charging each with a number of federal crimes, including capital murder, growing out of their concerted drug-trafficking activities, principally in Richmond, Virginia during a several-year period.[1] Each was  *868  convicted on multiple charges, including capital murder; each was sentenced to death on one or more of the capital murder charges on which he was convicted and to various terms of imprisonment on other charges. Each has appealed challenging his conviction on various of the charges against him and the sentence(s) of death imposed upon him. Save for the necessity imposed by double jeopardy concerns to vacate their several convictions for drug conspiracy violations under 21 U.S.C. § 846, we find no error requiring reversal or remand among those assigned by appellants and we therefore affirm their respective convictions and sentences in all other respects.

[1] All were jointly charged with conspiracy to possess with intent to distribute and to distribute in excess of 50 grams of cocaine base, in violation of 21 U.S.C. § 846 (Supp.1996) (Count 1), and with engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(a) (Supp.1996) (Count 2). In addition, they were variously charged with capital murders in furtherance of a criminal enterprise, in violation of 21 U.S.C. § 848(e) and 18 U.S.C. § 2 (1988) (Counts 3, 5, 8, 17, 18, 19, 24 and 25); commission of violent crimes in aid of racketeering activity, in violation of 18 U.S.C. § 1959 (Supp.1996) (Counts, 4, 7, 10, 13, 14, 16, 21–23, and 27–30); use of a firearm in relation to a crime of violence or a drug-trafficking offense, in violation of 18 U.S.C. § 924(c) (Supp.1996) (Counts 6, 9, 12, 15, 20, and 26); and distribution (Count 31) and possession with intent to distribute (Counts 32–33) of cocaine base, in violation of 21 U.S.C. § 841(a)(1) (1988).

Also charged in this indictment were alleged co-conspirators Vernon Lance Thomas, Jerry Gaiters, Sterling Hardy, and Sandra Reavis. Gaiters and Hardy pled guilty and testified for the Government at appellants' trial. Reavis, who was tried with appellants, and Thomas, who was tried separately, both were convicted on various charges.

The Government has cross-appealed the district court's order staying execution of the death sentences pending Congressional authorization of the means of execution. We vacate that order and remand for entry of appropriate orders.

J.A.62

## I.

Recounted in summary form and in the light most favorable to the Government, the core evidence revealed the following. Tipton, Roane, and Cory Johnson were principal "partners" in a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992. The conspiracy's operations began in Trenton, New Jersey where Johnson and Tipton, both from New York City, became members. In August of 1990, the conspiracy expanded its operations to Richmond, Virginia where Roane joined the conspiracy in November of 1991. The Trenton-based operation came to an end on June 4, 1991 when police confiscated a large quantity of crack cocaine and firearms. In late 1991, the conspiracy's operations were expanded from the Central Gardens area of Richmond to a second area in Richmond called Newtowne.

During the period of the conspiracy's operation, its "partners", including appellants, obtained wholesale quantities of powdered cocaine from suppliers in New York City, converted it by "cooking" into crack cocaine, then packaged it, divided it among themselves, and distributed it through a network of 30–40 street level dealers, "workers." Typically, the appellants and their other partners in the conspiracy's operations took two-thirds of the proceeds realized from street-level sales of their product.

Over a short span of time in early 1992, Tipton, Cory Johnson, and Roane were variously implicated in the murders of ten persons within the Richmond area—all in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the "partners."

On January 4, 1992, Tipton and Roane drove Douglas Talley, an underling in disfavor for mishandling a drug transaction, to the south side of Richmond. Once there, Roane grabbed Talley from the rear while Tipton stabbed him repeatedly. The attack lasted three to five minutes and involved the infliction of eighty-four stab wounds to Talley's head, neck, and upper body that killed him.

On the evening of January 13, 1992, Tipton and Roane went to the apartment of Douglas Moody, a suspected rival in their drug-trafficking area, where Tipton shot Moody twice in the back. After Moody fled by jumping through a window, both Tipton and Roane pursued. Roane, armed with a military-style

knife retrieved from an apartment where the knife was kept for co-conspirator Curtis Thorne, caught up with Moody in the front yard of the apartment where he stabbed him eighteen times, killing him.

On the night of January 14, 1992, Roane, Cory Johnson, and a third person retrieved a bag of guns that they had left at an apartment earlier that day. Roane then located Peyton Johnson, another rival drug dealer, at a tavern. Shortly after Roane left the tavern, Cory Johnson entered with another person and fatally shot Peyton Johnson with a semi-automatic weapon.

**\*869** On January 29, 1992, Roane pulled his car around the corner of an alley, got out of the vehicle, approached Louis Johnson, whom appellant Johnson thought had threatened him while acting as bodyguard for a rival dealer, and shot him. Cory Johnson and co-conspirator Lance Thomas then got out of Roane's car and began firing at Louis Johnson. As Louis Johnson lay on the ground, either Cory Johnson or Thomas shot him twice at close range. Louis Johnson died from some or all of these gunshot wounds.

On the evening of February 1, 1992, Cory Johnson and Lance Thomas were told that Roane had gone to the apartment of Torrick Brown, with whom Roane had been having trouble. Johnson and Thomas armed themselves with semi-automatic weapons and went to the apartment where they joined appellant Roane outside. The three then knocked on Brown's door and asked his half-sister, Martha McCoy, if Brown was there. She summoned Brown to the door and Cory Johnson, Roane, and Thomas opened fire with semi-automatic weapons, killing Brown and critically wounding McCoy.

In late January, 1992, after being threatened by Cory Johnson for not paying for a supply of crack cocaine, Dorothy Armstrong went to live with her brother, Bobby Long. On February 1, Cory Johnson learned from Jerry Gaiters the location of Long's house. Thereafter, Tipton and an unidentified "young fellow" picked up Gaiters and Cory Johnson who were then driven by Tipton to a house where the group obtained a bag of guns. After dropping off the unidentified third party, the group proceeded to Long's house. Upon arriving at Long's house, Cory Johnson and Gaiters got out of the car and approached the house. While Tipton waited in the car, Cory Johnson and Gaiters went to the front door. When Long opened the door, Cory Johnson opened fire, killing both Dorothy Armstrong and one Anthony Carter.

J.A.63

Bobby Long fled out the front door, but was fatally shot by Cory Johnson in the front yard.

In early February 1992, Cory Johnson began to suspect that Linwood Chiles was cooperating with the police. On February 19, 1992, Johnson borrowed Valerie Butler's automobile and arranged to meet with Chiles. That night, Chiles, Curtis Thorne, and sisters Priscilla and Gwen Greene met Cory Johnson and drove off together in Chiles's station wagon. Chiles parked the car in an alley, and Tipton soon drove in behind it in another car, got out, and came up alongside the stationwagon. With Tipton standing by, Cory Johnson told Chiles to place his head on the steering wheel and then shot Chiles twice at close range. Additional shots were fired, killing Thorne and critically wounding both of the Greene sisters. The autopsy report indicated that Thorne had been hit by bullets fired from two different directions.

Tipton was charged under 21 U.S.C. § 848(e) and 18 U.S.C. § 2 with capital murder for eight of these killings (Talley, Moody, Louis Johnson, Long, Carter, Armstrong, Thorne, and Chiles); Cory Johnson, with seven (Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson); and Roane, with three, (Moody, Louis Johnson, and Peyton Johnson).

The jury convicted Tipton of six of the eight capital murders with which he was charged under § 848(e) (Talley, Armstrong, Long, Carter, Chiles, and Thorne). One of the other two § 848(e) charges was dismissed (Louis Johnson) and the other resulted in acquittal (Moody). Tipton was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a CCE (21 U.S.C. § 848(a)), eight counts of committing acts of violence (the eight killings charged under § 848(e)) in the aid of racketeering activity (18 U.S.C. § 1959), two counts of using a firearm in relation to a crime of violence or a drug-trafficking crime (18 U.S.C. § 924(c)), and two counts of possessing cocaine base with intent to distribute (21 U.S.C. § 841(a)(1)).

The jury convicted Cory Johnson of all seven of the capital murders with which he was charged under § 848(e) (Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson). He was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a CCE (21 U.S.C. § 848(a)), eleven counts of committing acts of violence (including the seven killings charged under **\*870** § 848(e)) in aid of racketeering activity

(18 U.S.C. § 1959), five counts of using a firearm in relation to a crime of violence or drug-trafficking offense (18 U.S.C. § 924(c)), and two counts of possession of cocaine base with the intent to distribute (21 U.S.C. § 841(a)(1)).

The jury convicted Roane of all three of the capital murders with which he was charged under § 848(e) (Moody, Peyton Johnson, and Louis Johnson.) He was also convicted of conspiracy to possess cocaine base with the intent to distribute (21 U.S.C. § 846), engaging in a CCE (21 U.S.C. § 848(a)), five counts of committing acts of violence (including the three killings charged under § 848(e)) in aid of racketeering activity (18 U.S.C. § 1959), four counts of using a firearm in relation to a crime of violence or a drug-trafficking offense (18 U.S.C. § 924(c)), and one count of possession of cocaine base with the intent to distribute (21 U.S.C. § 841(a)(1)).

Following a penalty hearing on the capital murder counts, the jury recommended that Cory Johnson be sentenced to death on all of the seven § 848(e) murders of which he had been convicted; that Tipton be sentenced to death for three of the six § 848(e) murders of which he was convicted (Talley, Chiles, and Thorne); and that Roane be sentenced to death for one of the three of which he was convicted (Moody). The district court sentenced Johnson, Tipton, and Roane to death in accordance with the jury's recommendations pursuant to 21 U.S.C. § 848(*l* ), and imposed various sentences of imprisonment upon each of the appellants for the several non-capital counts on which they were convicted and for those capital murder counts on which Tipton and Roane had been convicted but were not given death sentences.

On appellants' motion, the district court refused to order execution of the several death sentences on the grounds that Congress had neither directly authorized the means by which the death sentences imposed under § 848 should be carried out, nor properly delegated to the Attorney General the authority to issue the implementing regulations that were invoked by the Government. In consequence, the district court stayed execution of the death sentences it had imposed until such time as Congress had authorized the means of execution.

These appeals by Tipton, Roane, and Johnson and a cross-appeal by the Government from the district court's stays of execution of the death sentences followed.

Appellants present some sixty issues for our review. Most are presented as issues common to all; some only in behalf of particular appellants. [2] They pertain to the jury selection

J.A.64

process, to the trial proper, and to the death penalty hearing and sentencing phases. Some warrant extended discussion; others, for various reasons, warrant no more than recognition or summary discussion. We will take first the issues jointly and separately presented by the appellants. Lastly, we will consider the Government's cross-appeal.

[2]     We ordered that all common issues in these consolidated appeals be presented and argued in one brief. Appellant Roane's brief served this function, presenting potentially common issues along with issues specific only to his appeal. Appellants Tipton and Cory Johnson filed separate briefs presenting some issues specific to their respective appeals and identifying those issues raised in Roane's brief which they adopted as common issues. Their identifications of common issues are not always as precise as might be, *see* Tipton Br. 11, 12; Johnson Br. 27–30, and some issues identified as "common" may be questionable as such either conceptually or as adequately preserved for review by all the appellants. We have assumed an intention to adopt wherever the intention was not clear, and have treated all adopted as common so far as was conceptually possible.

## II.

We first consider a number of joint challenges by all the appellants to various aspects of the jury-selection process.

## A.

The principal challenge is to the district court's having conducted portions of the jury voir dire out of the immediate presence of the appellants. Appellants jointly contend that this violated their constitutional right under the Fifth Amendment and their parallel statutory right under Rule 43, Fed.R.Crim.P., to be personally present throughout **\*871** the voir dire process. The Government contends in opposition (1) that appellants effectively waived any constitutional or statutory right they possessed to be personally present throughout the process, or (2) that if the right was not effectively waived, any ensuing error was forfeited by the appellants' failure to object either contemporaneously or by post-verdict motions, so that it is only reviewable for plain error under Rule 52(b), Fed.R.Crim.P., and that under that

Rule's standard this forfeited error does not warrant appellate correction.

To address these issues of waiver, forfeiture, and plain error review, a fairly detailed account of the relevant proceedings is required. The issues arose as a result of the district court's decision to handle the jury selection process in a series of discrete steps designed to accommodate what the district court obviously saw as special difficulties posed by the size of the venire—250 prospective jurors—and by the capital murder counts. Initially, as a matter of convenience for the prospective jurors, they would be examined in two separate, roughly equal groups, with the second group not required to report until the first group had been preliminarily screened. Preliminary screening of the two groups was intended to yield a group of around 70 prospective jurors who had not been found excusable for various individual reasons or not subject to challenges for cause. From that preliminarily qualified set of venirepersons, the petit jury and alternates would then be chosen by lottery and the exercise of peremptory challenges.

The preliminary screening process of the two groups was to be carried out in what developed as three distinct steps. In the first step, general questions would be addressed by the court to the whole group of prospective jurors concerning such generally non-sensitive sources of possible disqualifying bias as knowledge of the case or of the parties, witnesses, or counsel. This would be done in open court, with the various defendants all present with their counsel. If in response to specific questions from the court prospective jurors indicated by standing that a question posed a possible problem they would be called individually to the bench where, with counsel present, they would be further questioned on the matter by the court. In this step of the process, challenges for cause would be ruled upon or granted *sua sponte,* yielding a reduced set of prospective jurors. That set would then be further screened in a final step designed in particular to explore the sensitive subjects of death-penalty attitudes and possible racial prejudices. This step would be conducted by the judge in chambers with only counsel and individual prospective-jurors present with him. Further challenges for cause would be ruled upon or granted *sua sponte* during this final step in the screening process, which would yield the final pool of prospective jurors from which the jury would be selected.

Jury voir dire proceeded essentially in accordance with this plan. The fact that at two of its proposed steps the process apparently would be conducted out of the immediate presence of the defendants was not, so far as the record shows, raised

in advance as a possible problem by the court or any counsel in the case. That there might be a problem was first suggested only after twelve prospective jurors from the first group had been individually questioned by the court at the bench following their indications of problems in response to the first general question put to the group. At that point, counsel for one of the appellants remarked simply, "I would remind [the court] that under *Rogers v. United States,* [853 F.2d 249 (4th Cir.1988) ], our clients must waive presence." JA 885. In immediate response, the judge asked, "Does everybody waive presence of their clients?" *Id.* To this, defense counsel who had first raised the issue remarked, "We better take one second to be sure. This is a capital case." *Id.* The record then indicates that following a conference of unspecified duration between counsel and their respective client-defendants, counsel for each of the appellants in turn stated to the court that his client, by name, waived. *Id.* The process then resumed according to plan with further questioning at the bench of those prospective jurors whose responses to general questions required further inquiry. During that phase of the process, a significant number of prospective jurors were excused for cause, either **\*872** in response to challenges by counsel or by the court *sua sponte.*

When this step had been completed and just as in-chambers individual questioning of the remaining unexcused members of the group was about to commence, the courtroom clerk inquired, apparently of defense counsel, "if the defendants can go back to the lock-up or do you want them in the courtroom ... to be available to talk to them if you want?" Roane's counsel responded, "Just send them back ....," and Johnson's counsel added, "They have waived." Though the record is not clear on the point, it would appear that the defendants were not actually taken from the courtroom at that time, but only later after the in-chambers process had been underway for some time. *See* JA 1101.

During that in-chambers process, the district court concentrated in its questioning, as had been indicated to counsel, on death-penalty attitudes and possible racial or other bias, and routinely allowed Government and defense counsel to pursue limited further examination on those subjects. As a result of that examination, a number of prospective jurors were excused either upon challenge by counsel or by the judge *sua sponte* because of intimations either of disqualifying death-penalty attitudes (running both ways) or possible racial biases.

Although the second group of prospective jurors was brought in and briefly examined in a general voir dire before in-chambers examination of members of the first group had been completed, a sufficient pool of prospective jurors was obtained from the first group to allow the jury to be selected entirely from that pool. This was done, as planned, by the exercise of peremptory challenges to persons successively called to the jury box by lottery. This final step in the process was carried out in open court, with all appellants present and able to consult with counsel. A total of 52 peremptory challenges were allotted to the then four defendants for exercise with respect to the regular jurors and an additional two with respect to four alternates.

The upshot, for purposes of the denial-of-presence issue, is that appellants were personally and immediately present during some but not all portions of the overall voir dire process as it involved those prospective jurors from whom the regular and alternate jurors ultimately were selected. Specifically, they were personally and immediately present while the district court was addressing to the whole group general questions respecting possible sources of bias from relationships or knowledge of the case, and during the final jury selection process involving the exercise of peremptory challenges. They were not immediately present, though in the courtroom, during any of the judge's examination of prospective jurors at the bench in the presence of their counsel. And they were not present during any of the in-chambers examination of individual prospective jurors.

**[1]** **[2]** The Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment together guarantee the right of federal defendants charged with felonies to be present at all critical stages of their trials. *Illinois v. Allen,* 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970) (Sixth Amendment); *Snyder v. Massachusetts,* 291 U.S. 97, 106–08, 54 S.Ct. 330, 332–33, 78 L.Ed. 674 (1934) (Fifth Amendment). Rule 43(a), Fed.R.Crim.P., deriving from these constitutional guarantees and the even broader common law privilege, *see United States v. Gregorio,* 497 F.2d 1253, 1257–59 (4th Cir.1974), confers a comparable right to "be present ... at every stage of the trial." Included is the right to be present at the voir dire and "impaneling of jurors." *Snyder,* 291 U.S. at 106, 54 S.Ct. at 332 (dictum); Rule 43(a) (as quoted).

The Government does not contend that the appellants' constitutional and rule-based right did not extend to the specific portions of the voir dire from which they were absent. Instead, as indicated, the Government contends only that any such right as existed was effectively waived by

defense counsels' several in-court announcements of waiver following consultations with their respective clients or that, if it was not waived, any ensuing error, having been forfeited, does not warrant appellate correction as "plain error" under Fed.R.Crim.P. 52(b). Responding to the Government's claim of waiver, appellants **\*873** jointly have raised two difficult issues: first, whether under Fourth Circuit precedent the right of presence may ever and by any means be waived in capital cases;[3] second, whether—if waiver is possible in such cases—it may only be effected by a formal in-court proceeding not provided in this case.[4]

[3] The difficulty on this issue is created by this circuit's 1963 decision in *Near v. Cunningham,* 313 F.2d 929 (4th Cir.1963), a capital case in which it was held that the right to presence in such a case is "[s]o fundamental ... that it may not be waived." *Id.* at 931 (principally relying on *Hopt v. Utah,* 110 U.S. 574, 578, 4 S.Ct. 202, 204, 28 L.Ed. 262 (1884)). *Near* (which was not brought to the district court's attention) has never been expressly overruled on this point either by this court or by the Supreme Court. Whether it has been implicitly overruled is unsettled. At least one circuit has flatly held that intervening Supreme Court decisions have established that waiver is possible in such cases. *See Campbell v. Wood,* 18 F.3d 662, 671–72 (9th Cir.1994) (concluding that *Snyder,* 291 U.S. at 106, 117, 54 S.Ct. at 332, 336, and *Allen,* 397 U.S. at 342, 90 S.Ct. at 1060, by rejecting as "mere dicta" earlier statements of non-waivability in, *e.g., Hopt* and *Lewis v. United States,* 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892), have rejected any such rule). A leading commentator also believes it "highly doubtful" in light of these decisions that "there is [now] such a limitation on waiver." 3A Charles A. Wright, *Federal Practice & Procedure* § 723, at 18 (2d ed.1982). On the other hand, another circuit is not that sure on the point. *See Proffitt v. Wainwright,* 706 F.2d 311, 312 (11th Cir.1983) (on rehearing) (noting that earlier non-waivability holdings of the Supreme Court have not been expressly overruled, and reserving decision on the issue). And, expressing similar uncertainty, the drafters of amended Rule 43 consider that so far as the rule is concerned, the question of waiver in capital cases remains open "for

further clarification by the courts." Fed.R.Crim.P. 43 advisory committee's note to 1974 amendment.

[4] The difficulty of this issue involves uncertainty as to how, if waiver is at all possible in capital cases, it may be effected. It is now settled that without any formal proceeding, waiver of the right to presence may be implied from a defendant's sufficiently disruptive conduct during trial, *see Allen,* 397 U.S. at 342, 90 S.Ct. at 1060 (removal by court permissible); or from his voluntarily absenting himself from a trial at whose commencement he was present, *see Taylor v. United States,* 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973) (per curiam), or from a stage of trial of whose nature he was aware, *see United States v. Gagnon,* 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) (per curiam). But, the question whether non-disruptive defendants in custody such as appellants here may waive the right to presence by any means other than an express waiver following a formal on-the-record proceeding arguably remains open. Appellants, relying on *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (proceeding required to insure "intentional relinquishment or abandonment of a known right"), contend that a formal in-court proceeding is required in such circumstances and was not provided here; the Government, that waiver may and should be implied here, as in *Taylor* and *Gagnon,* from a defendant's voluntary conduct, including his presumed acquiescence through failure to object contemporaneously to the conduct of proceedings in his absence.

Because we conclude that even if for either reason no effective waiver occurred here, any ensuing error, having been procedurally forfeited, does not warrant correction as plain error, we reserve decision on the difficult waiver issues and proceed to the discussion of the plain error basis for our decision.

*United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), guides us here, both as to the relationship between waiver of rights and forfeiture of errors at trial, and as to the proper application of Rule 52(b)'s "plain error" limitation on appellate correction (noticing) of forfeited errors.

J.A.67

**[3]** Where a protected trial right has been effectively waived by a defendant, as the Government claims occurred here, all possibility of error respecting that right has been extinguished. *Id.* at 733, 113 S.Ct. at 1777. But even where a right has not been waived, any entitlement to have error in its denial or abridgement corrected on appellate review may be forfeited by the "failure to make timely assertion of [the] right" at trial. *Id.* Such a forfeiture, does not, as does waiver, extinguish the error, *id.,* but it does impose stringent limitations, embodied in Rule 52(b), on the power of appellate courts to correct the error. *Olano* has now instructed, clarifying the matter, that under Rule 52(b) a court of appeals "has authority" to correct forfeited error only if it is "plain" and "affects substantial rights," and even then is "not required to do so" unless the error is one that "causes the conviction or sentencing of an actually innocent defendant" or otherwise "seriously affect[s] the fairness, integrity **\*874** or public reputation of judicial proceedings." *Id.* at 734–36, 113 S.Ct. at 1777–79.

Here, where we have assumed for purposes of this case that there was not an effective waiver of the right at issue, there indisputably was, however, a forfeiture of entitlement to appellate correction of any ensuing error in denying or abridging the right. Not only was there no contemporaneous or post-verdict challenge to conducting portions of the jury voir dire outside the immediate presence of the appellants, counsel for each appellant specifically invited the procedure.

Proceeding then to the *Olano* analysis respecting forfeited error, we further assume, without deciding, that error did occur in the form of a "deviation" from the constitutionally-grounded legal rule that presence was required throughout the proceedings at issue.[5] *See id.* at 732–33, 113 S.Ct. at 1776–77. And, we also assume—as the Government seems to concede—that any such error as occurred was "plain," in the sense that it is clear on the record that the challenged proceedings were held outside the immediate presence of appellants.

[5] As indicated in earlier text, the Government relies only on its alternative claims of waiver and forfeiture, and has not contended that the general right of presence during jury voir dire does not necessarily extend to immediate physical presence during all its phases, and did not extend under the circumstances of this case to the specific phases here in issue. Because no such contention is

advanced, we do not address it, and proceed on the stated assumption for purposes of this case.

This brings us to the question whether the "plain error," whose occurrence we assume *arguendo,* affected any "substantial rights" of the appellants. *Olano* has now instructed that this may ordinarily (and perhaps only) be established by a defendant's specific showing—the burden being upon him—that the error caused him actual prejudice by affecting the trial outcome. *Id.* at 734, 113 S.Ct. at 1777–78. But *Olano* also noted—without deciding—that aside from this most obvious means, there might be forms of forfeited error that, for Rule 52(b) purposes, "affect substantial rights independent of any prejudicial impact," and still other forms from which prejudice should be presumed where the defendant could not make a specific showing. *Id.* at 734–35, 113 S.Ct. at 1777–78.

As did the *Olano* Court, we must address all three possibilities, assuming *arguendo* the existence of the latter two forms of correctable forfeited errors as to which actual prejudice either need not or cannot be proved. *See id.* at 737–41, 113 S.Ct. at 1779–82.

**[4]** We first consider whether the assumed error here—conducting some phases of the jury voir dire out of the appellants' immediate presence—is one which could be found to "affect substantial rights independent of any prejudicial impact." We can reserve, as did the *Olano* court, the question whether any such category of forfeited plain error does in fact exist. If it does, it seemingly could only involve violations of absolute rights entitled for overarching systemic reasons to absolute enforcement without regard to any demonstrable (or presumed) prejudicial impact on the defendant. *See Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991) (defining category of constitutional errors that may not be found harmless because, without regard to actual prejudice, they deprive defendants of "basic protections" of fundamentally fair trial). The constitutional and Rule-based right to presence at all critical stages of trial, though obviously important, is not such an absolute, systemic right. That it is not absolute is of course settled by those Supreme Court decisions, most notably *Snyder* and *Allen,* upholding the power of courts in certain circumstances to conduct trials (or portions) in absentia. *See also Rushen v. Spain,* 464 U.S. 114, 117–18, 104 S.Ct. 453, 454–55, 78 L.Ed.2d 267 (1983) (per curiam) (though right to personal presence is "fundamental," errors in conducting proceedings out of presence of defendant may be found harmless). To the extent the right is based, as is that claimed here, upon the Due Process Clause (and Rule 43's codification), it exists only

"to the extent that a fair and just hearing would be thwarted by [the defendant's] absence," or, put otherwise, it is limited to "those circumstances where a defendant's presence **875 has a relation, reasonably substantial, to the fullness of his opportunity to defend himself." *Snyder,* 291 U.S. at 105–08, 54 S.Ct. at 332–33. The right is thus by definition limited to those circumstances in which absence has a "prejudicial impact" on a defendant's opportunity effectively to assist in his defense. The courts accordingly have so interpreted it, not as one to be enforced "independent of any prejudicial impact" from a defendant's absence but as one actually dependent upon the existence of such an impact. *See, e.g., United States v. Boone,* 759 F.2d 345 (4th Cir.1985) (absence from in-chambers conference between judge and counsel respecting dismissal of juror did not, under the circumstances, frustrate trial's fairness); *United States v. Fontenot,* 14 F.3d 1364 (9th Cir.1994) (absence from peremptory challenge conference between judge and counsel not, under the circumstances, prejudicial); *cf. Olano,* 507 U.S. at 738–39, 113 S.Ct. at 1779 (comparable analysis employed in finding violation of Criminal Rule 24(c) not an "error affecting substantial rights independent of any prejudicial impact").

Accordingly, we conclude that if there be a category of plain errors affecting substantial rights "independent of any prejudicial impact," absence from portions of a jury voir dire is not among them.

 **[5]**    We next consider whether, assuming there is a category of plain errors as to which prejudice should be presumed, the assumed error here falls in that category. We conclude that it does not.

There may be circumstances of involuntary absence from jury voir dire where prejudice should be presumed, but we think they could only involve absences throughout the entire process. *See United States v. Crutcher,* 405 F.2d 239, 244 (2d Cir.1968) (complete absence never harmless error). Such an absence almost assuredly deprives a defendant of any effective means of giving informed advice or suggestions to his counsel respecting the ultimate decisions to challenge prospective jurors for cause or peremptorily. But not every absence of whatever nature and duration and during whatever phase of the voir dire necessarily has that effect. Some phases obviously are more critical than others. The potential prejudice from some absences may be relieved by other circumstances. It all depends. Where absence has not been total but only intermittent during the process the courts accordingly have not presumed prejudice but have

analyzed the circumstances to determine whether prejudice has been specifically established. *See, e.g., United States v. Bascaro,* 742 F.2d 1335, 1349–50 (11th Cir.1984) (although peremptory strike phase of voir dire is critical, no prejudice to defendants where attorneys conferred about peremptories outside their presence, but defendants were present both while questioning took place and when strikes actually entered); *United States v. Alessandrello,* 637 F.2d 131, 137–141 (3d Cir.1980) (absence of defendants from in-chambers questioning of venirepersons respecting pre-trial publicity not prejudicial in view of their presence at substantial part of voir dire and their counsels' presence during in-chambers proceedings).

The absences here plainly were of the intermittent sort, not approaching the total denial of any effective participation in critical phases of the voir dire that might warrant a presumption of prejudice.[6] Accordingly if prejudice is to be found here, it must be by specific showing. *Cf. Olano,* 507 U.S. at 740–41, 113 S.Ct. at 1781–82 (comparable analysis employed to hold no presumption of prejudice from violation of Criminal Rule 24(c)).

[6]    In their jointly adopted argument on the denial-of-presence issue, appellants suggest that this case *does* involve a "complete exclusion of [the appellants] from the entirety of the voir dire," so that prejudice should be presumed. Roane Br. 29, 30. As we have pointed out, the record flatly belies this as an accurate statement of the extent of appellants' physical absences from the voir dire process.

 **[6]**    Relegated to this means of showing error that "affected substantial rights," appellants' burden is to persuade us of actual prejudice, *i.e.,* that their absences "affected the outcome of the [trial]," or "probably influenced the verdict[s]" against them either on the guilt or sentencing phases. *Olano,* 507 U.S. at 734–35, 113 S.Ct. at 1777–78. We **876 conclude that they have not carried that heavy burden.

Just how one shows that his absence during portions of a jury selection process actually "affected the outcome of [trial]," or "probably influenced the verdict" against him has apparently never been definitively explored. Literally applied, the standard would seem to require a showing in the end that a defendant's absence resulted in selection of a jury that probably reached a verdict different from that which would have been reached by a jury selected with benefit of his

J.A.69

presence at the times of his absence. If that be the ultimate burden, it is a stringent one indeed—near if not beyond the limits of practical possibility given the variables in the process and evidentiary restrictions. *See* Fed.R.Evid. 606(b). If we start analysis from the other end, it is obvious that at a very minimum a defendant must show that had he been present a *somehow* different jury would have been selected. The due process-based right to presence is not violated, hence could not be the source of prejudice, unless one's presence demonstrably would have made *some* difference. *See Snyder,* 291 U.S. at 106, 107, 54 S.Ct. at 332, 333 (no violation, hence no prejudice possible, "when presence would be useless, or the benefit but a shadow"). But, just as surely, showing only that *some* difference would have resulted could not suffice to show actual prejudice. If no more is shown, for example, than that jurors 1, 3, and 5 would have been excluded, this could not suffice to show that their presence caused the finally unfavorable "outcome." Something more, for example, that jurors 1, 3, and 5 in the above hypothetical were demonstrably biased, surely must be shown, and even that might not, under all the circumstances, suffice.

Fortunately, we need not in this case seek to decide just what showing between these extremes is required. Appellants, relying primarily on their argument of presumed prejudice, offer nothing on actual prejudice beyond the conclusory assertion that "[e]ven if defendants were required to demonstrate prejudice, that prejudice was patent in this case." Roane Br. 30. This obviously could not suffice to show specific prejudice. [7]

[7] Appellants' brief seeks to offer more specific support for this conclusive assertion by referring to an affidavit of Appellant Roane appended to their motion for supplementation of the record or remand. *See supra* note 6. Although in denying that motion we refused to treat the affidavit as properly before us, we observe that it asserted no more than that had Roane been present, he would have insisted on excluding three identified jurors by peremptory challenges. As indicated in text, even if this were accepted as fact, it would not suffice as a showing of actual prejudice. Nor would the stated bases for his challenges—relationships to law enforcement officers and to the victim of a rape-murder—suffice without more to tip the balance.

Accordingly, we conclude that appellants have not carried their burden to show actual prejudice resulting from their absences during portions of the jury voir dire.

Having earlier held that their absences could not constitute error "affecting substantial rights independent of prejudicial impact," nor "presumed error affecting substantial rights," we need not consider whether, even if prejudicial, the assumed error so "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" that correction was warranted. *Olano,* 507 U.S. at 741, 113 S.Ct. at 1781. Because appellants have not shown that their absence from portions of the jury voir dire "affected substantial rights," we conclude that any error involved, having been forfeited, does not warrant correction.

## B.

We next consider appellants' claim that the district court erred in refusing to permit defense counsel to conduct adequate voir dire and in failing itself to conduct adequate voir dire regarding possible racial bias and attitudes respecting aggravating and mitigating factors if the capital sentencing phase were reached.

## 1.

 [7]    Appellants moved pre-trial, with supporting affidavits, that defense counsel be permitted detailed participation in jury voir dire questioning on possible racial biases, pointing to the fact that each of the appellants was black and to the pervasiveness in society of racial prejudice. The court denied **\*877** the motion but invited defense counsel to submit proposed questions pursuant to Fed.R.Crim.P. 24(a). Counsel submitted 62 such questions on such matters as beliefs in the trustworthiness and criminal propensities of black persons, whether the prospective jurors lived in racially separated neighborhoods or attended racially separated churches, and the like. The district court declined to incorporate these questions in its own in-chambers questioning of individual prospective jurors, and put only a single question respecting their possible racial bias: "Do you harbor any bias or prejudice, racial or otherwise, that would prevent you from being fair to the defendants in this case?" *See, e.g.,* JA 1009. The court then permitted limited follow-up inquiry by counsel depending upon responses made to his general question. JA 1061.

J.A.70

Appellants contend that this was insufficient to provide reasonable assurance that if bias did exist, it would be uncovered, as they say was their right. And, they argue that in this case its insufficiency was exacerbated by the fact that the district judge was himself a black person, thereby making the concealment of racial bias more than ordinarily a risk.

We disagree and find no error in the district court's decision (1) not to allow detailed questioning of the type proposed by appellants, whether done by himself or defense counsel; and (2) to limit the questioning on this subject to the general question he put.

No question is raised of entitlement to *some* inquiry into possible racial bias—whether under the Constitution, *see Ristaino v. Ross,* 424 U.S. 589, 597, 96 S.Ct. 1017, 1021, 47 L.Ed.2d 258 (1976) (constitutionally compelled where racial issues "inextricably bound up with the conduct of the trial") or under the Supreme Court's broader supervisory rule for federal courts, *see Rosales–Lopez v. United States,* 451 U.S. 182, 191, 101 S.Ct. 1629, 1636, 68 L.Ed.2d 22 (1981) (compelled where "circumstances ... indicate ... reasonable possibility that racial ... prejudice might have influenced the jury"). Inquiry was made here; the challenge is only to its confinement to the single question put by the trial judge, with opportunity only for limited followup questioning by counsel.

 **[8]**    Once the decision has been made to conduct any inquiry into this sensitive matter, the exact nature and scope of that inquiry is committed to the broad discretion of the district court, and is subject to review only for abuse. *Rosales–Lopez,* 451 U.S. at 189, 101 S.Ct. at 1634–35; *Ham v. South Carolina,* 409 U.S. 524, 527, 93 S.Ct. 848, 850–51, 35 L.Ed.2d 46 (1973); *see also* Fed.R.Crim.P. 24(a) (discretion extends to party participation in voir dire). Powerful conflicting considerations inform that discretion. On the one hand, there must be the concern to root out a form of bias that prospective jurors may be particularly reluctant to reveal. *See, e.g., United States v. Lewin,* 467 F.2d 1132, 1137 (7th Cir.1972). On the other hand, there has to be an equally weighty concern where race is not directly in issue not to overemphasize in jurors' minds the facts and possible relevance of the racial identities of litigants or witnesses. *See Ristaino,* 424 U.S. at 596 n. 8, 96 S.Ct. at 1021 n. 8 (danger of creating impression that justice in the courts turns on race or ethnicity); *United States v. Barber,* 80 F.3d 964, 967, 968 (4th Cir.1996) (en banc) (danger of "divert[ing] the trial's focus from the guilt or innocence of

the defendant to peripheral factors, such as the defendant's race ...").

Undoubtedly taking these considerations into account, the Supreme Court has indicated that even where inquiry is constitutionally required because of inextricably involved racial issues, questioning may properly be confined to the sort of single, general question put to jurors here. *Ham,* 409 U.S. at 525 n. 2, 527, 93 S.Ct. at 849 n. 2, 850–51 (question "Would you fairly try this case on the basis of the evidence and disregarding the defendant's race," held "sufficient to focus the attention of prospective jurors on any racial prejudice they might entertain").

In this case, given the critical circumstances that race was not itself an issue and that none of the offenses charged was interracial in nature, we cannot find abuse of discretion in the district court's decision to confine questioning on racial bias to the general question the court put with opportunity **\*878** provided for follow-up questioning by counsel. [8]

[8]    We reject appellants' apparent contention that the district judge's decision to confine questioning to himself, as Fed.R.Crim.P. 24(a) specifically authorizes, constituted in this case an abuse of discretion because the judge was a black person. Aside from the shakiness of the reason advanced by appellants—that prospective jurors would be significantly more inhibited by questions put by the judge himself than by questions put by others in his immediate presence—the adoption of such a per se rule would be unthinkable as a matter of policy.

### 2.

 **[9]**    Appellants tendered a set of proposed questions respecting prospective jurors' attitudes about various possibly mitigating factors as they might influence jurors' consideration of the penalty phase. They included inquiries into the prospective jurors' willingness to consider factors such as a defendant's "deprived, poor background," "emotional, physical abuse," "young age," "limited intelligence," and "brain disfunction." The district court declined to incorporate these in its own questioning, and when counsel for appellants attempted to ask these or similar questions, refused to allow them. Appellants claim that this violated their constitutional and rule-based right to a voir dire

J.A.71

adequate to assure an impartial jury on the critical capital sentencing issue. We disagree.

 [10]   [11]   It is important in assessing this claim to identify the voir dire right at issue. In general terms it is the right, grounded in the Sixth Amendment, to a voir dire adequate to assure a defendant a jury, all of whose members are "able impartially to follow the court's instructions and evaluate the evidence," *Rosales–Lopez,* 451 U.S. at 188, 101 S.Ct. at 1634, here instructions and evidence relevant to imposition of the death penalty. More specifically it is the right to an inquiry sufficient to ensure—within the limits of reason and practicality—a jury none of whose members would "unwaveringly impose death after a finding of guilt" and hence would uniformly reject anyand all evidence of mitigating factors, no matter how instructed on the law. *Morgan v. Illinois,* 504 U.S. 719, 733–34, 112 S.Ct. 2222, 2232–33, 119 L.Ed.2d 492 (1992) (right to such an inquiry established).

Just how an inquiry adequate for this specific purpose should be conducted is committed to the discretion of the district courts. The Constitution no more "dictate[s] a catechism" for its conduct than it does for any other subject of required voir dire inquiry. *Id.* at 729, 112 S.Ct. at 2229–30; *Rosales–Lopez,* 451 U.S. at 189, 101 S.Ct. at 1634–35; *Aldridge v. United States,* 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931). Obviously, the most direct way to get at the possibility that a prospective juror would *always* impose death following conviction is to put that very "reverse-*Witherspoon* " question directly to him and take it from there. *Morgan,* 504 U.S. at 724 n. 3, 112 S.Ct. at 2227 n. 3. But, just as obviously, that cannot be the "only means of ensuring ... an impartial jury" on the life-or-death issue. *Id.*

Here, by way of getting at that possible disqualifying bias, the district court first explained to each juror that if guilt of a capital offense was found in a first stage of the trial, the jury would then consider whether to impose the death penalty in a second stage at which the Government would try to convince the jury that aggravating factors warranted death while the defense would try to convince the jury that because of mitigation, death was not appropriate, and that this was then to be decided by the jurors on the basis of that evidence and the court's instructions on the law. *See, e.g.,* JA 1170–72 (juror Catlett). Against this background, the court then asked each prospective juror: "[D]o you have strong feelings in favor of the death penalty?" *See, e.g.,* JA 1172 (juror Catlett). If the juror answered with an unqualified "No," the court moved on.

*E.g.,* JA 1172 (juror Catlett). If, however, the prospective juror gave any answer other than an unqualified "No" the court then asked directly whether "you would always vote to impose the death penalty in every case where a defendant is found guilty of a capital offense." *See, e.g.,* JA 1205 (juror Coleman). [9] By this course of **\*879** inquiry the district court obviously considered that the question, "Do you have strong feelings in favor of the death penalty?" was sufficient for the purpose if it received an immediate and unqualified "No" in response. Presumably, the thought was that except where the response was hesitant or equivocal, a direct "reverse-*Witherspoon* " question, such as "Does this mean that you would not always vote to impose death following conviction?" would be at least an unnecessary redundancy and possibly an imprudent risk of encouraging an opposite partiality. That only if "strong feelings in favor" were revealed need there be further inquiry into just *how* strong; that a person not strongly in favor of the death penalty necessarily is not one who feels so strongly that he will always impose the death penalty no matter what the circumstances. *Cf. Lockhart v. McCree,* 476 U.S. 162, 170 n. 7, 106 S.Ct. 1758, 1763 n.7, 90 L.Ed.2d 137 (1986). ("State may challenge for cause prospective jurors whose opposition to the death penalty is so strong that it would prevent [their impartiality].") We cannot say that such a view of the matter is so implausible as to make the inquiry inadequate as a matter of law. An inquiry which more explicitly embodies the "reverse-*Witherspoon* " question might give greater assurance —might in some cases be more prudent—but that is not the question for us. Under all the circumstances—the question's logical adequacy to address the ultimate issue of death-penalty impartiality, the context in which it was put, the court's repeated admonitions that under the law consideration of mitigating factors would be required—we could not find constitutional abuse in the court's confinement of its "life-qualifying" inquiry in this way.

[9]    Of the twelve regular jurors who sat on the case five responded unequivocally "No" to the question whether they had strong feelings in favor of the death penalty and were not questioned further on that subject by the court. JA 1496 (juror Hodson); JA 1483 (juror Hayes); JA 1465 (juror Harrison); JA 1172 (juror Catlett); JA 1470 (juror Harvey). The remaining seven, each of whom answered the "strong feelings in favor" question other than by an unequivocal "No," were then asked the specific "reverse-*Witherspoon* " question by the court, and each answered it, after further questioning, in the negative. JA 1372 (juror Faircloth); JA 1349 (juror

Eike); JA 1431 (juror Griffiths); JA 1436 (juror Guthrie); JA 1205 (juror Coleman); JA 1216 (juror Cooke); JA 1361 (juror Jackson).

We are bolstered in this conclusion by the fact that in this case appellants never requested that a further specific "reverse-*Witherspoon* " question be put to those prospective jurors who already had responded unequivocally that they had no strong feelings in favor of the death penalty. The right to any inquiry on this subject is dependent upon request, *Morgan,* 504 U.S. at 736, 112 S.Ct. at 2233, and though appellants requested detailed questioning about specific mitigating factors, they neither requested that a specific "reverse-*Witherspoon* " question be put to any prospective juror nor objected contemporaneously to the district court's mode of inquiry as to basic death penalty attitudes.

From what has been said, it follows that the district court's refusal to question or allow detailed questioning about specific mitigating factors did not constitute an abuse of discretion. The undoubted fact that such detailed questioning might have been somehow helpful to appellants in exercising peremptory challenges does not suffice to show abuse of the district court's broad discretion in conducting the requisite inquiry. *See Mu'Min v. Virginia,* 500 U.S. 415, 424–25, 111 S.Ct. 1899, 1904–05, 114 L.Ed.2d 493 (1991). Because we conclude that the district court's inquiry into death penalty attitudes was sufficient to cull out any prospective juror who would *always* vote for the death penalty whatever the circumstances, we cannot find error in the court's refusal to conduct or allow further detailed inquiry about specific mitigating factors.

C.

Appellants jointly contend that three prospective jurors, Beazley, Ellis, and Gainsburg, were erroneously removed for cause by the district court in violation of appellants' rights under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and its progeny. We disagree.

 **[12]** **[13]** The Sixth Amendment's guarantee of an impartial jury is violated by the exclusion of a prospective juror simply because **\*880** he expresses some reservations about imposing the death penalty in any case. *Id.* at 520–23, 88 S.Ct. at 1776–78. It is not violated, however, by the exclusion of a juror whose expressed reservations are such as to make him "irrevocably committed to ... vote against the death penalty regardless of the facts and circumstances" of a case,

*id.* at 522 n. 21, 88 S.Ct. at 1777 n. 21, or, short of that, such as to "prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). Whether such reservations as are expressed cross the line into "irrevocable commitment" or "substantial impairment" is perforce committed in the first instance to trial court discretion based upon the voir dire inquiry. Because what is being inquired into is a state of mind whose determination turns largely on assessments of demeanor and credibility, matters peculiarly within the province of trial judges, our review of those determinations is appropriately most deferential. *Witt,* 469 U.S. at 428, 105 S.Ct. at 854; *Keeten v. Garrison,* 742 F.2d 129, 135 (4th Cir.1984); *Briley v. Bass,* 750 F.2d 1238, 1246 (4th Cir.1984).

 **[14]** Here, we can find no abuse of discretion or error of law in the district court's exclusion of these three prospective jurors. Following the initial expression by each of some degree of reservation, each was extensively questioned further by the court and by opposing counsel. Each responded to some extent ambiguously as to the depth and likely consequence of his or her reservation. In the end, however, each expressed reservations, never retracted, sufficient to warrant the district court's determination that they would substantially impair the juror's performance of duty to vote for the death penalty if the evidence and law so dictated.

Prospective juror Ellis, asked at the outset by the court whether on the basis of the evidence and the court's instructions she could "make an objective, reasoned and fair decision about imposing the death penalty" responded "I don't know," and to the court's follow-up question, "What gives you pause?" responded "I'm not sure at this time if I could give the death penalty." Later, in response to the prosecution's question whether her personal opinion could "substantially impair [her] service as a juror," she answered "I would hope not," and to a reiterated, "But could it?" responded, "It might." Still later, in response to defense counsel's question whether she could imagine cases "where she could contemplate imposing the death penalty" she stated that "there are some cases where I could," and to a follow-up question whether in such cases her "personal feeling would get in the way" answered "No." JA 1351–57. This simply left the court with facially ambiguous and arguably contradictory indications of the depth of her reservations. In those circumstances we have felt obliged to "rely on the trial court's discretion in determining which

responses best manifested the juror's true opinions." *Briley, 750 F.2d at 1246.* [10] We so conclude as to the court's removal of prospective juror Ellis.

[10]   Significantly, the court, taking account of the fact that the most directly contradictory expressions came in response to opposing counsels' understandably weighted questions, remarked: "She gave a right answer to [the prosecutor] when he asked it, she gave a right answer for [defense counsel] when he asked it. She gave the wrong answer to me."

The same analysis applies to the Court's removal for cause of the other two prospective jurors. Prospective juror Beazley first responded to the court's question whether he would be able to impose the death penalty "disregarding any views that you might have as to what the law is or ought to be" by saying, "I doubt it," and explained, "If I get on the jury and I have to give a death sentence, I don't think I could live with it ... I really don't." Under probing by defense counsel he later said "yes" to questions whether he could "imagine" a crime sufficiently severe that he would impose the death penalty, and whether the multiple murders charged in this case would "in your estimation justify it." But when in conclusion he was asked "what about a cold-blooded murder for profit?" his final response on the subject was, "I feel yes, but like I say, I'm just a nervous person. If I could live with it after I done it, I just wonder." JA 1063–65. **\*881** We cannot quarrel with the district court's obvious determination that the first and last expressions by this venireman "best manifested the juror's true opinion." *Briley, 750 F.2d at 1246*.

So also, with respect to prospective juror Gainsburg. After indicating some reservations about imposing the death penalty in any but "a very limited number of situations," he responded to the court's question whether in this case he could make "a fair, reasoned, objective determination" whether to impose the penalty by saying, "I would like to say yes. But I really suspect that my prejudices might to some extent affect my decision." Though later, under questioning by defense counsel, he stated that he "absolutely would consider it," he immediately qualified this by saying, "But I honestly believe that my decision would be based on my own biases and prejudices." And, when the court then asked if by this response he was saying that he didn't believe he could follow the court's instructions if they were "not in sync" with his biases and prejudices, he responded, "I suspect that's what I'm

telling you." JA 1401–05. The court did not err in excluding venireman Gainsburg based on the course of inquiry.

### D.

[15]   Appellants' final joint challenge to the jury selection process is that in exercising its peremptory strikes the prosecution impermissibly struck a disproportionate number of women, thereby violating appellants' constitutional right as recognized in *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, ——, 114 S.Ct. 1419, 1430, 128 L.Ed.2d 89 (1994) (equal protection under Fourteenth Amendment); *see United States v. Lane,* 866 F.2d 103, 104 n. 1 (4th Cir.1989) (Fifth Amendment provides comparable rights in federal prosecutions).

Appellants did not contemporaneously object on this basis to the prosecution's exercise of peremptory challenges, and the Government contends that this forecloses them on the issue in this court. Ordinarily it would, *see Clark v. Newport News Shipbuilding & Dry Dock,* 937 F.2d 934, 939–40 (4th Cir.1991), but appellants point out that *J.E.B.* was only decided after completion of the trial in this case and that at that time the rule in this circuit was that *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (race-based peremptory challenges prohibited), did not extend to gender-based challenges, *see United States v. Hamilton,* 850 F.2d 1038, 1041–42 (4th Cir.1988), so that their failure to object contemporaneously must be excused. To this, the Government responds that the failure is not excused, notwithstanding *Hamilton,* because at the time of trial, there was a direct conflict on the issue within the circuits and among the state courts, *see, J.E.B.,* 511 U.S. at —— n. 1, 114 S.Ct. at 1422 n. 1, so that appellants were obliged under Fed.R.Crim.P. 51 to object in order to preserve the claim.

Without accepting the Government's position on procedural default, we nevertheless conclude that the bare showing of gender discrimination first attempted on this direct appeal does not suffice either to allow first instance consideration by this court (as appellants concede), nor to warrant a remand for first instance consideration by the district court. [11]

[11]   The specific claim, supported by references to the record and an affidavit of counsel, is that the raw figures of the proportion of women to men peremptorily challenged suffice to make out a

**J.A.74**

prima facie case under *J.E.B./Batson.* According to the affidavit, of the twenty women who were called by lottery for possible selection as jurors in the final stage of the selection process, eight were struck by Government peremptory challenges while only two of the twenty-one men called in that stage were struck. Roane Br. 58. No other suggestion of gender discrimination than these raw figures is offered as the basis of a *Batson/J.E.B.* prima facie case.

### III.

We next address a number of challenges, some joint, some separate, to various trial court rulings at the guilt phase of the trial.

### A.

Based on an underlying contention that the evidence on the conspiracy count tended to prove three separate conspiracies rather than the single one charged, appellants jointly and individually challenge a number of **\*882** related district court rulings which denied (1) Roane's motions for severance and for an *in limine* exclusion of any evidence against him except that related to the Newtowne phase of any concerted drug trafficking activities, (2) related motions for instructions limiting the evidence properly to be considered against particular appellants, and (3) motions for a multiple-conspiracy instruction. We find no reversible error as to any of these.

 [16]    Critical to all of these challenges is the argument that the evidence could have supported findings only of three separate conspiracies, and not of the single one charged. Specifically, it is contended that the evidence only supported findings of an original conspiracy centered on Trenton, New Jersey involving the "New York Boyz" group that included Tipton and Johnson, a separate conspiracy centered on the Central Gardens area of Richmond in which only Tipton and Johnson of the appellants were involved, and another separate conspiracy centered on the Newtowne area of Richmond in which all three appellants—Roane for the first time—were involved. We disagree with this critical contention; the evidence supports the jury's finding of the single conspiracy charged and of Roane's connection to it.

The indictment charged that "from on or about January, 1989, ... and continuously thereafter up to and including the

filing of this indictment," appellants and others conspired to possess with intent to distribute and to distribute cocaine base "in the Eastern District of Virginia and elsewhere." The evidence amply supports the jury's finding that such a single conspiracy existed and that each applicant was a participant in that conspiracy. In summary, the evidence was sufficient to show the following: Such a conspiracy originated in the Trenton, New Jersey area in 1989, involving as its core members a group known as the "New York Boyz" and including as members Appellants Tipton and Johnson and co-defendant Lance Thomas. In 1991, law enforcement efforts resulted in a cessation of the conspiracy's operations in the Trenton area but not in its continued existence and operation elsewhere. At that time, some members of the conspiracy ceased their participation while some went to New York City and others, including Appellants Tipton and Johnson, and Lance Thomas, went to Richmond. Earlier, while still engaged in the Trenton operation, Tipton had organized a Central Garden operation in Richmond that expanded the conspiracy's geographical area while continuing to use its established mode of obtaining, processing, and distributing its drug product. The Central Garden operation was supplied from the New York drug source that supplied the Trenton-based operation. Under Tipton's leadership, it employed the same methods of intimidation and violence to dominate the crack cocaine trade in this new market area of its operation. Shortly after the Central Garden operation commenced, "Hess," one of the New York Boyz group, came from New York to act as an enforcer for the operation; later, he returned to New York to deal with "trouble" resulting from a police raid on a house used by the New York Boyz. Appellant Johnson came from the New York area to the Richmond area in the summer of 1990 for the specific purpose, according to Tipton, of making sure that the losses taken in earlier operations were not repeated there. Throughout the Richmond-based operations, Tipton, as key man of the conspiracy's operations there, asserted his ability to call on the New York Boyz group—who remained in the New York area—to assist the Richmond operation. Seeking to further expand the conspiracy's operations in the Richmond area, Tipton directed the development of another distribution network in the Newtowne area of Richmond. By late 1991, it was the main focus and the most productive area of the conspiracy's operations in the Richmond area. It was during the early stages of this new market area's development that Appellant Roane joined the conspiracy. A cousin of Tipton's who "had a spot" in Newtowne, Roane was brought in at Tipton's instigation in the Fall of 1991 soon after being released from prison, to help develop that new area.

J.A.75

From that point on, he participated as a full "partner" with Tipton, Johnson, and other conspiracy leaders in the ongoing operations of the conspiracy.

Appellants emphasize the evidence that membership in the groups participating in the concerted drug trafficking activities in **\*883** the Trenton and Richmond areas shifted over time and that the activities were widely separated geographically and in time. That evidence was of course relevant to the ultimate factual issue whether the single conspiracy charged did exist, but it surely did not prevent a properly supported finding that it did. *See United States v. Banks,* 10 F.3d 1044, 1053–54 (4th Cir.1993) (single conspiracy properly found despite looseness of organizational structure, changing membership, shifting roles of participants, limited roles and knowledge of some members).

 [17]    [18]    [19]    [20]    Once that underlying contention is rejected, all the claims of error dependent upon it fail. With its rejection, no appellant has any basis for claiming unfair prejudice from the introduction and consideration against him of any evidence about any activities of others in furtherance of the single conspiracy charged. The basic rule is that persons who have been indicted together, particularly for conspiracy, should be tried together. *United States v. Brooks,* 957 F.2d 1138, 1145 (4th Cir.1992). Once the scope of that conspiracy is established, one's having come late to or having varied his level of participation in it from time to time puts him in a position "no different from that of any co-conspirator who claims to be prejudiced by evidence that goes to the activities of co-conspirators." *United States v. Leavis,* 853 F.2d 215, 218 (4th Cir.1988). The Government may not properly be "deprived ... of its right to detail the full scope of the conspiracy and to present its case in proper context" simply because particular co-conspirators were not involved in the full scope of its activities. *Id.* That would be the effect of the severance and evidence exclusion and limitation rulings that were denied; the district court did not, therefore, abuse its discretion in denying them.

 [21]    [22]    [23]    [24]    Appellants' joint claim that "at a minimum," Roane Br. 75, they were entitled to a "multiple conspiracy" instruction to enable fair presentation of this theory of defense fails essentially for the same reasons. A properly requested multiple conspiracy instruction is not of course required if the evidence only supports a finding of a single conspiracy as charged. *United States v. Crockett,* 813 F.2d 1310, 1316 (4th Cir.1987). It may be required, as

may instructions on specific defense theories generally, if sufficiently supported by the evidence. *See United States v. Dornhofer,* 859 F.2d 1195, 1198 (4th Cir.1988). Even where so required, however, failure to give it is not reversible error unless a defendant can show that this caused him substantial prejudice. *See United States v. Maldonado–Rivera,* 922 F.2d 934, 962–63 (2d Cir.1990). Assuming without deciding that the evidence here might have supported findings of multiple conspiracies, we are satisfied that failure to instruct the jury to that effect could not have resulted in unfair prejudice to any of the appellants, including Roane, the conspirator last in.

To find such prejudice, we would have to conclude that the evidence of multiple conspiracies was *so* strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction. We are not persuaded of that. The evidence of the single conspiracy charged was not only strong enough to support the verdict reached, it was strong enough in relation to that of only multiple conspiracies that we do not believe failure to give a special instruction on this theory of defense possibly could have swayed the verdict on this count.

### B.

We next consider a number of challenges to the appellants' several convictions of continuing criminal enterprise (CCE) violations under 21 U.S.C. § 848(a) (Supp.1996).

### 1.

 [25]    It is claimed that the indictment failed adequately to charge a CCE violation, specifically that it failed to identify the three drug-related violations comprising the "continuing series of violations" element of the offense and the five persons whose supervision, organization, or management by particular defendants constituted another element. There is no merit to this claim.

The indictment charged in Count 2 that, in violation of 21 U.S.C. § 848, all of the appellants **\*884** engaged in a CCE by violating 21 U.S.C. §§ 841 and 846 (1988 & Supp.1996), "including, but not limited to, those violations alleged in [this] indictment, which are realleged and incorporated by reference herein, and ... other violations ... which ... were part of a continuing series of violations of [those] statutes ...

J.A.76

undertaken ... in concert with at least five other persons with respect to whom [appellants] occupied positions of organizer, supervisor, and manager, etc."

This language essentially tracked the statutory definition of the offense and hence satisfies basic constitutional guarantees. *United States v. Amend,* 791 F.2d 1120, 1125 (4th Cir.1986). Appellants cannot claim any unfair surprise under the particular circumstances of this case from the failure of the indictment specifically to identify in Count 2 the predicate violations and the five "supervisees" upon which the Government's proof would focus. In the absence of a bill of particulars, sufficient protection against unfair surprise may be found in allegations in other counts of an indictment than that whose sufficiency is directly challenged. That form of protection amply served here. Count 2, as indicated, identified and incorporated by reference all violations of 21 U.S.C. §§ 841 and 846 charged against the appellants elsewhere in the indictment. That gave each of them ample notice of all the predicate drug-related violations relied upon by the Government at trial, including the conspiracy charged in Count 1, the drug distribution jointly charged in Count 32, and the several murders in furtherance of the CCE variously charged under 21 U.S.C. § 848(e). Similarly, allegations in other counts of the indictment gave adequate notice of all those persons, more than five, relied upon by the Government as the minimum of five "supervisees" essential to proof of CCE violations by each.

of violations" making up the proscribed "continuing ... enterprise." *See United States v. Head,* 755 F.2d 1486, 1490 (11th Cir.1985) (telephone facilitation violations under 21 U.S.C. § 843(b) (1988) properly considered predicate violations in CCE prosecution). The district court did not err therefore in instructing the jury that it might consider any murder-in-furtherance violations found under § 848(e) among the predicate violations required to convict on the CCE Count.

12    The argument actually is two-pronged: (1) § 848(e) violations are not properly considered predicate CCE violations under any circumstances; or (2) alternatively, they may only be considered where the murder-in-furtherance occurred *after* a CCE had already come into existence. We think the plain language of the relevant provisions defeats both.

Nor were appellants unfairly surprised by the way in which the 848(e) violations were charged as predicate violations in the CCE Count. This was done by incorporating and realleging the conspiracy count in the CCE Count, thereby realleging the several § 848(e) murders charged to each in the conspiracy count. Appellants were sufficiently on notice by this indictment that the various § 848(e) murders-in-furtherance charged to them in the several substantive counts, then identified in the conspiracy count as overt acts, were among the predicate violations charged in the CCE Count.

### 2.

**[26]**    It is contended that the district court erred in allowing the jury to consider as predicate violations under the CCE Count any of the § 848(e) capital murders "in furtherance of" the CCE charged. Specifically, the argument is that as a matter of statutory interpretation one could not murder "in furtherance of" any CCE except one whose existence was proven independently of such a murder. There is a superficial plausibility to this argument, but the plain language of the relevant statutory provisions defeats it. [12] Section 848(e) provides in relevant part that "a person is engaged in a [CCE] if ... he violates any provision of this subchapter [I] or subchapter II of this chapter the punishment for which is a felony, and ... such violation is part of a continuing series of violations of [either subchapter I or II] of this chapter." The "murder-in-furtherance" provision in § 848(e) is "a provision of this subchapter [I]," hence by the statute's plain terms may be counted "a part of a continuing series

### 3.

Appellants make a cluster of interrelated challenges to the court's instructions on the **\*885** Count 2 CCE charge. Specifically, they contend that the instructions given did not sufficiently emphasize that the jury must find all the CCE elements as to each of the defendants; did not advise that the jury must be unanimous as to which three (at least) predicate violations each committed and which five (at least) persons each supervised; and misstated the predicate violations element. We find no reversible error in any of these respects.

**[27]**    The instructions as a whole unmistakably told the jury that it must find each of the five elements of the CCE offense as to each defendant in the case. Appellants pick out snippets of the instructions which they claim could have misled the jury as to the need for individualized consideration of each element as to each defendant, but that possibility is belied by the instructions looked at whole. The court

J.A.77

specifically instructed that the Government must prove each of the five elements that it had properly listed as to each of the defendants, and generally cautioned that as to all the charges, the case of each defendant must be considered "separately and individually." JA 4018, 4056. *See Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (instructions as a whole control).

**[28]** The failure to instruct that the jury must be unanimous as to the three (at least) predicate violations and the five (at least) supervisees does not constitute reversible error. The court gave a general unanimity instruction as to all elements of the offense. None of the appellants requested a "special unanimity" instruction on these two elements, nor objected to the court's failure to give one sua sponte. We review this challenge therefore only for plain error, and find none warranting correction.

**[29] [30]** There is, preliminarily, a question whether there was error, plain or otherwise. There is no general requirement of jury unanimity "on the preliminary factual issues which underlie the verdict." *Schad v. Arizona,* 501 U.S. 624, 632, 111 S.Ct. 2491, 2497, 115 L.Ed.2d 555 (1991) (plurality opinion) (quoting *McKoy v. North Carolina,* 494 U.S. 433, 449, 110 S.Ct. 1227, 1236, 108 L.Ed.2d 369 (1990) (Blackmun, J., concurring)). A special unanimity instruction is required only when there is a genuine risk of juror confusion or that a conviction could result from different jurors having concluded that the defendant committed quite different acts within those of a prescribed set or among multiple means of violating a statute. *See, e.g., United States v. Holley,* 942 F.2d 916, 925–29 (5th Cir.1991) (multiple false statements charged in single count required special unanimity instruction). There is a division among the circuits on the question whether under this general principle a special unanimity instruction is required, upon request, as to the predicate violation element in CCE prosecutions. *See United States v. Echeverri,* 854 F.2d 638 (3d Cir.1988) (required); *United States v. Canino,* 949 F.2d 928, 945–48 (7th Cir.1991) (not required).

We need not decide that general question up or down in this case. Here, the record plainly indicates that appellants could have suffered no actual prejudice from the lack of a special unanimity instruction on the predicate violation element. The district court properly instructed that to convict each of the appellants on the CCE count the jury must find that he committed at least three, *see United States v. Ricks,* 802 F.2d 731, 733 (4th Cir.1986) (en banc), of the predicate acts listed in the indictment. By its verdict, it is clear

that the jury unanimously found each guilty of at least five predicate violations: the conspiracy charged in Count 1, the drug possession charged in Count 32, and at least three of the § 848(e) murders as variously charged to them. Assuming, without deciding, that unanimity on at least three predicate violations is required to convict, it is clear that unanimity occurred here as to each appellant so that no actual prejudice from the failure so to instruct could be shown. *See Olano,* 507 U.S. at 734, 113 S.Ct. at 1777–78 (burden is on defendant to show actual prejudice from forfeited error).

As to the failure to give a special unanimity instruction on the five supervisees element, we hold, in accord with a majority, if not all, of the circuits that have addressed the question, that none is required. *See, e.g.,* **\*886** *United States v. Tarvers,* 833 F.2d 1068, 1074 (1st Cir.1987); *United States v. Bond,* 847 F.2d 1233, 1237 (7th Cir.1988). We agree with those courts that the CCE focus in this element is upon the size of the enterprise—set at a floor of five—rather than upon the particular identities of those who make up the requisite number. *See Bond,* 847 F.2d at 1237 (sufficient that jurors unanimously find that at least some five were supervised by defendant, to require unanimity on identities inimical to statutory purpose).

**[31]** Appellants' final challenge to the CCE instruction seizes on an obvious slip of the tongue when the court said while instructing on the continuing series of violations element that the required proof was that the continuing series of violations "was undertaken by the defendants" (plural) rather than by each defendant individually. No contemporaneous objection to this obviously inadvertent misstatement was made, so it could only be reviewed for plain error. So reviewing it, it is obvious that no actual prejudice from it could be shown. In other parts of the instructions the court sufficiently emphasized, as earlier noted, that each element must be proved separately as to each defendant. From the instructions as a whole the jury was adequately advised that to convict each of the appellants on the CCE count, the jury must find that he individually committed at least three predicate violations and that in the course of doing so he individually supervised at least five other persons.

### 4.

**[32]** Johnson and Tipton jointly claim error in the district court's having amended its jury instruction on the CCE

supervision element after they had given their respective closing arguments. We find no reversible error.

The court initially instructed the jury that the terms "organizer," "supervisory position," and "position of management," were to be "given their usual and ordinary meaning"; that they "imply the exercise of power and authority by a person who occupies some position of management or supervision" but who "need not be the sole or only organizer, supervisor or manager of the activities in question." The Government did not object to this instruction when it was proposed at the court's charge conference. But, after it had been given and after Tipton and Johnson had concluded their closing jury arguments, the Government moved for a supplemental instruction that more fully reflected this court's interpretation of the terms in *United States v. Butler,* 885 F.2d 195, 200–01 (4th Cir.1989). Over defense counsel's objection, the court gave a supplemental instruction whose central points were that "a person may occupy a position of organizer, a supervisory position or any other position of management without having direct personal contact with [those organized, etc.]" and that "it is ... possible for a single [CCE] to have more than one organizer [etc.]."

There is no question of the court's discretionary power to give post-argument instructions "to remedy omissions in pre-argument instructions or to add instructions necessitated by the arguments." Fed.R.Crim.P. 30 advisory committee's note to 1987 Amendment. But the rule plainly contemplates that parties will know what the court will instruct before they make their arguments. *See id.* Here that would have required either that the supplemental instruction not be given or that appellants be allowed to supplement their closing argument after it was given. Neither occurred, so there was a technical violation of the Rule. We conclude, however, that any error involved was harmless. The supplemental instruction added but one element not specifically reflected in the initial instruction: that to be an organizer, etc., a defendant need not have had direct contact with the person organized, etc. This was an accurate statement of the law under *Butler.* The fact that contact is not essential probably lies within the "ordinary and usual" meaning of the term. Certainly it did not "contradict or repudiate the thrust of [appellants'] closing argument," *United States v. McCown,* 711 F.2d 1441, 1452 (9th Cir.1983). Appellants indeed do not suggest how they would have changed their arguments had they been allowed to supplement them. Accordingly, though it might well have been better to allow supplemental argument or at least to inquire of the substance of any proposed before giving the

supplemental instruction, **\*887** we are satisfied that any error in not doing so was harmless.

### C.

[33] Appellants jointly contend that the district court erred in not making sufficiently clear in its instructions on the various capital murder counts under § 848(e) that to convict, the jury must find a substantive connection between the murders and the continuing criminal enterprise with which each was charged.[13] We disagree.

[13]
> As the Government concedes, such a substantive connection must be implied as an essential element of § 848(e). Appellee's Br. 94; *see United States v. Chandler,* 996 F.2d 1073, 1097 (11th Cir.1993). Appellants make no claim that such a connection may not be implied as a matter of statutory interpretation. *Cf. United States v. Whiting,* 771 F.Supp. 476, 477 (D.Mass.1991) (no substantive connection implicit in "engaging in" prong, though implicit in "in furtherance of" prong).

The specific contention focuses upon the court's instruction that to find a defendant guilty of § 848(e) murder, the jury must find "First, that the defendant was engaged in or working in furtherance of the [CCE] charged in Count [2];" second, "that while ... so engaged, the defendant either intentionally killed or counseled ... the intentional killing of the individual named in a particular count; and three, that the killing actually resulted." Under this instruction, the claim goes, a defendant could be found guilty simply on the basis of a temporal coincidence of a murder with a CCE; no substantive connection between the two was required. Were this the only instruction touching the offense the contention would be a serious one. But, it is not. At the outset of its instructions on the various murder counts, the court pointed out that appellants were charged with two very specific, very distinct types of homicide including "[k]illing while engaged in or in furtherance of a [CCE]." JA 4039. Further, the court noted in this portion of its instructions that it "would not be enough" to prove only that a defendant had killed someone; that "each of the specific elements of the federal crime charged" must be proved, JA 4041; and that the jury must find the defendant "was engaged in or working in furtherance of the [CCE]" and that the killing occurred "while the defendant was so engaged." JA 4042.

J.A.79

Considered in total compass, *see Cupp,* 414 U.S. at 146–47, 94 S.Ct. at 400, we believe that these instructions sufficiently required proof of a substantive as well as merely temporal connection between the § 848(e) murder and the § 848(a) CCE charged to a defendant, though it must be conceded that the substantive connection is not as clearly expressed as it might be. Any concerns that invalidating confusion on the point might actually have resulted are, however, removed by consideration of the trial evidence and the Government's arguments to the jury. The Government's evidence expressly linked each of the nine § 848(e) murders of which the appellants were severally convicted to a furtherance of the CCE's purposes: either silencing potential informants or witnesses, eliminating supposed drug trafficking rivals, or punishing underlings for various drug-trafficking misfeasances. In both its opening and closing arguments the Government emphasized that the § 848(e) murder charges were "predicated upon the [CCE]" in that they charged "murder in furtherance of a [CCE]." JA 3818, 1609, 3814–15. And it pursued this substantive connection-theme by arguing that each of the murders charged had occurred "in an effort to further [appellants'] drug business," JA 1610, pointing out, murder by murder, the specific enterprise-connected motive for each. *See, e.g.,* JA 1625–28, 1631–35. By contrast, the failure to have charged under § 848(e) an unconnected killing revealed in the evidence was explained on that basis. All this considered, we are satisfied that no reversible error resulted from the district court's instructions on the nature of the § 848(e) capital murders charged.

### D.

 **[34]**    Appellants challenge the court's instructions on the "enterprise" element of the offense charged under 18 U.S.C. § 1959 [14] in  **\*888**  several counts. Because none objected to the instructions at trial, we review only for plain error and find none warranting correction.

[14]    In relevant part, § 1959(a) provides that
> (a) whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders ... shall be punished....

The specific claim is that in listing the elements of this offense, the district court failed to differentiate between "an enterprise engaged in racketeering activity" and the "racketeering activity" in which it was engaged. The court did misspeak in twice referring to "racketeering activity" when it should have referred to "enterprise engaged in racketeering activity." The two are different concepts: An "enterprise" is an entity distinct from the "racketeering activity" in which it engages. *See United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981) (pointing out distinction in RICO statute from which § 1959 elements derived). Had this been all the court said in its instructions on the offense, it is arguable that plain error would have occurred by effectively reading the "enterprise" element out of the offense. But that is not all that was said. Assessing the instructions as a whole, *see Cupp,* 414 U.S. at 146–47, 94 S.Ct. at 400, we are satisfied that, as the Government contends, the jury was adequately told that the elements were separate and distinct ones and that both must be proved. Viewed in total context, the two isolated references to "racketeering activity" when "enterprise engaged in racketeering activity" was appropriate must have been understood as short-hand references to the "enterprise" itself. The court earlier had read § 1959 verbatim, including the reference to an "enterprise engaged in racketeering activity." JA 4044–45. This clearly identified two different concepts. The point was further emphasized by the court's identification of an "enterprise" as including "any group of individuals associated in fact which is engaged in or the activities of which affect interstate commerce." JA 4046. Further, the court had already explained before making the two challenged misstatements that what the defendants had to act to "gain entrance to" was an "enterprise engaged in racketeering activity." JA 4044. And finally, in the course of the same passage in which the two misstatements occurred, the court instructed that the jury could convict if it found the defendants had acted for the purpose of maintaining or increasing their positions in "the racketeering enterprise" or had received or been promised in exchange for their acts pecuniary gain from "the racketeering enterprise."

It obviously would have been better had the court not made the two challenged slips, but assessed in total context of the instructions, we could not find them plain error warranting correction. *See United States v. Locascio,* 6 F.3d 924, 941 (2d Cir.1993) (district court's use of arguably erroneous "short-hand" language in § 1959 instruction not erroneous when viewed in total context).

J.A.80

### E.

Appellants claim that their constitutional confrontation rights were violated by the Government's impeding their timely and effective access to a number of its witnesses who were under the Government Protection Program pursuant to 18 U.S.C. § 3521 (1988 & Supp.1996), and further by the court's restriction of their cross-examination of those witnesses respecting the reasons for their refusals to submit to interviews by defense counsel. We find no error in these respects.

In a pre-trial order entered pursuant to 18 U.S.C. § 3432, [15] the district court ordered **\*889** the Government to provide the defense with the names and addresses of all its witnesses except those under Government protection ten days in advance of trial date. The Government complied by timely providing a list of 99 witnesses, including 18 identified as protected, giving addresses for all but the protected witnesses. The court then denied a defense motion that these addresses be submitted *in camera* to allow defense interviews before trial. The court ruled that the Government's refusal to disclose the addresses was authorized by its order and was consistent "with the letter and spirit of the [Witness Protection] program," but stated that the court would arrange for defense interviews with protected witnesses before they testified. Once trial was underway, defense counsel were allowed access to these witnesses, some of whom agreed to be interviewed, but most of whom did not. In the course of this process the court denied a defense motion that the court supervise the defense counsels' access to these witnesses based upon an assertion that the prosecution had interfered with their access by advising one such witness that he need not submit to interview. Receiving the prosecution's response that he had indeed advised the witness that whether to interview was his decision, the court ruled that defense counsel was only entitled to request interviews, not to compel them, and admonished the prosecution that the defense was to have a meaningful opportunity to seek interviews.

---

[15] At the time, § 3432 provided that

> A person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with a copy of the indictment and a list of the veniremen and the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness.

The statute has since been amended by the addition of a critical proviso:

> except that such list of veniremen and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.

Pub.L. No. 103–322, Tit. VI, § 60025, 108 Stat.1982 (1994).

[35] [36] We find no denial of constitutional rights in the court's handling of defense access to the protected witnesses. As the court ruled, only access is a matter of right, there is no right to have witnesses compelled to submit to interview, hence no violation by a prosecutor's advising witnesses to that effect. *See United States v. Black,* 767 F.2d 1334, 1338 (9th Cir.1985); *United States v. Walton,* 602 F.2d 1176, 1179–80 (4th Cir.1979). Except for not providing the addresses of protected witnesses, the Government effectively complied with the court's order and with 18 U.S.C. § 3432 by submitting its entire list at least three days before the taking of testimony at trial began. The failure to provide the addresses of protected witnesses was a technical violation of § 3432 (in its then form) that may not have been curable, as the district court sought to do, by drawing on the "spirit" of the "Witness Protection Program," 18 U.S.C. § 3521 *et seq.* However, we agree with those courts that have held that a defendant claiming a violation of the right to access that § 3432 is designed to protect must show actual prejudice from any impairment or interference with the right, *see United States v. Pepe,* 747 F.2d 632, 654–55 (11th Cir.1984), and appellants have shown no particularized prejudice here. Their access to protected witnesses was delayed, but this is justified when, as clearly was the case here, the threat of violence is palpable. *See Walton,* 602 F.2d at 1179–80. Access was ultimately provided, and though appellants quarrel with its timing and its circumstances, they have offered nothing indicating how exactly they were harmed by the delay. Accordingly, we conclude that no prejudicial error occurred respecting the appellants' constitutional right not to be denied effective access to witnesses.

[37] Finally, we find no violation of appellants' confrontation rights in the court's refusal to allow defense counsel to cross-examine protected witnesses about the reasons for their refusals to submit to interviews. The motives and biases of all these witnesses were otherwise freely

J.A.81

exposed to cross-examination. The restriction imposed was well within the district court's discretion.

### F.

Appellants severally challenge the sufficiency of the evidence to convict them on various of the counts on which the jury found them guilty. We assess these insufficiency claims under the familiar test of *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), which asks whether viewing the evidence in the light most favorable to the prosecution "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." And, applying that test, we find no error among those assigned.

We review a voluminous trial record here and our review has disclosed a number of insufficiency claims whose lack of merit warrants **\*890** no extended discussion—indeed whose only justification would appear to be an understandable abundance of caution. We will identify all the insufficiency claims made but confine detailed discussion to those revealed by our review to warrant it.

### 1.

 [38]    Each of the appellants challenges the sufficiency of the evidence to support the requisite finding under the CCE count that he acted as an organizer, supervisor, or manager with respect to five or more persons. *See* 21 U.S.C. § 848(a), (b). Our review of the record satisfies us that the evidence was more than sufficient to support the requisite jury findings on this issue as to each appellant. Briefly, the crux of the appellants' several contentions here —indeed their indispensable point—is that appellants did not organize, supervise, or manage anyone; that the persons relied upon by the Government as "supervisees" and with whom they indisputably engaged in drug trafficking activities were essentially independent retail dealers with whom their only relationships were those of seller and buyer. This essential factual theory of their defenses, and the indispensable point of their insufficiency claims, is completely belied by the record. That record reveals—certainly supports findings beyond a reasonable doubt—that these "retailers," in more than sufficient numbers as to each of the appellants, acted as "workers" who were either or both organized, supervised, and managed by appellants while acting as principal "partners"

in a concerted drug trafficking enterprise, and that some of these people served variously not only as street dealers for the enterprise but as sometime chauffeurs, hideout providers, weapons-keepers, and general underlings for each of the appellants.

Our review of the record similarly discloses no merit in Roane's further claim that the evidence on the CCE count was not sufficient to prove that he had committed three (at least) predicate drug-related violations, nor in Roane's and Johnson's respective claims that neither was shown to have "obtain[ed] substantial income as resources" from the CCE, as required under § 848(c).

### 2.

 [39]    Tipton who, as earlier indicated, was convicted of six of the eight capital murders charged to him under § 848(e) and sentenced to death on three of the six (those involving Talley, Thorne, and Chiles) challenges the sufficiency of the evidence to convict him on all but the one involving Talley. We find the evidence sufficient to convict on all those challenged.

The five killings at issue resulted from two separate episodes, one involving the contemporaneous murders of Armstrong, Long, and Carter; the other involving the contemporaneous murders of Chiles and Thorne. We consider them in that order.

As our earlier summary account of the Armstrong, Carter, Long murder episode reveals, the actual killings were done by Cory Johnson. The evidence of Tipton's culpability was only that of aider and abettor; specifically that he was instrumental in planning the murders and directly aided their execution by driving Cory Johnson, the designated executioner, to the scene, awaiting accomplishment of the deed in a getaway car, then driving the executioner from the scene.

Similarly, though the evidence of the murders of Chiles and Thorne most surely identified Cory Johnson as the actual executioner of both, it also suffices to support verdicts against Tipton as principal or as aider and abettor in those murders. Specifically it suffices to support findings that Tipton and Johnson planned the executions of both victims for suspected treachery (Chiles) and thievery (Thorne) in relation to the drug-trafficking enterprise, and that Tipton was present at the scene as an active participant in seeing that the executions were carried out and that those responsible escaped detection.

### 3.

[40]  Roane and Johnson raise like challenges to their respective convictions on Counts 14 and 16. Each attacks the sufficiency of the evidence to convict him of two counts of violating 18 U.S.C. § 1959 by killing one Torrick Brown (Count 14) and **\*891** wounding one Martha McCoy (Count 16), thereby committing violent crimes "for the purpose of ... maintaining or increasing [his] position in an enterprise engaged in racketeering activity...." The evidence on these two counts was that the killing of Brown and wounding of potential eyewitness McCoy were prompted by a purely personal grievance of Roane's against Brown for "messing" with his girlfriend. From this circumstance, each appellant contends that the evidence was insufficient to show any enterprise-related "purpose" in his participation in these deeds: on Roane's part, that it showed nothing but a private purpose of revenge; on Johnson's, no more than a private purpose to assist a friend in avenging an affront. But the evidence was sufficient to support jury findings that the deeds were done by Roane and other enterprise members, including Johnson, in part at least in furtherance of the enterprise's policy of treating affronts to any of its members as affronts to all, of reacting violently to them and of thereby furthering the reputation for violence essential to maintenance of the enterprise's place in the drug-trafficking business. The evidence also sufficed to support further findings that participation in this sort of group retaliatory action in behalf of fellow enterprise members was critical to the maintenance of one's position in the enterprise.

[41]  So considered, the evidence sufficed to show the requisite purpose as to each of these appellants. We agree with the Second Circuit that this purpose can be shown by proof that "a defendant who holds a position in a RICO enterprise ... committed an underlying crime of violence with a motive of retaining or enhancing that position"; that such "self-promotion" need not be "the defendant's only or primary concern"; and that evidence suffices if from it a jury "could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherances of that membership." *United States v. Concepcion,* 983 F.2d 369, 381 (2d Cir.1992)**.**

Here, the jury properly could have inferred from the evidence of the enterprise's policies of mutual support, violent retaliatory action, and group expectations of its members

that both Johnson and Roane participated in the killing of Brown and the contemporaneous wounding of McCoy as "an integral aspect of [their] membership" in the enterprise and in furtherance of its policies. *See id.* As to Johnson, who had no personal grievance against either Brown or McCoy, the evidence clearly suffices to show "maintenance of his position" in the enterprise as the sole or certainly dominant purpose of his conduct. As to Roane, we agree with the Government that although the evidence clearly established private revenge as his primary purpose, it also supported a finding that once he had enlisted the aid of his fellow enterprise members in his behalf, he acted not only for himself but as a member of the enterprise in furthering its policies of retaliatory violence against any who sufficiently antagonized any of its members, and in order to maintain his position in it.

### G.

[42]  Appellants contend, and the Government concedes, that their several convictions and sentences on the § 848 CCE and § 846 conspiracy counts cannot both stand because the § 846 conspiracy as charged is a lesser included offense within the § 848 CCE as charged. We agree. *Rutledge v. United States,* 517 U.S. 292, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996) (so holding); *see also United States v. Butler,* 885 F.2d 195, 202 (4th Cir.1989) (same). Accordingly, we must remand for vacatur of the § 846 judgments against each of the appellants.

### H.

We have considered the various other challenges made by appellants to guilt-phase rulings of the district court,[16] and find no reversible error with respect to any.

[16]  These include the court's failure to define the term "reasonable doubt" in its guilt phase instructions; its refusal to remove juror Cooke because of exposure to mid-trial publicity; and its denial of appellants' motions to dismiss all the capital charges because of a violation of 21 U.S.C. § 848(*o*)'s guarantee of a "Right ... to justice without discrimination."

**\*892**  IV.

We next consider a number of challenges to the district court's conduct of the capital-penalty phase of the trial.

### A.

[43] Appellants contend that the district court erred in denying their several motions for severance of their trials in the capital-penalty phase. They point to social science studies suggesting that joint trials in this phase lead to a higher percentage of death verdicts and to less individualized decisionmaking, and to the Supreme Court's recognition of the constitutionally-grounded need for "a greater degree of reliability when the death sentence is imposed," *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978), as confirming that heightened vigilance in applying severance principles is required in the capital-penalty phase. Roane Br. 116–17. More specifically, they argue that joint capital-penalty trials necessarily reduce the jury's ability to give individualized consideration to aggravating and mitigating factors, and that, in particular, 21 U.S.C. § 848(m)(8), which requires the jury to consider as a mitigating factor that "[a]nother defendant ... equally culpable ... will not be punished by death," perversely operates against jointly-tried defendants in the penalty phase by encouraging juries to finesse the difficult relative culpability inquiry by simply sentencing all to death. Roane Br. 118–19.

From all this, appellants contend that "joint capital sentencing hearings are *prima facie* inconsistent with the Eighth Amendment." Roane Br. 117. By this we understand them to concede that such joint trials are not *per se* unconstitutional and to assert only that discretion as to severance in this particular context is ultimately subject to constitutional constraints derived from the Supreme Court's "individualized consideration" jurisprudence as embodied in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and its progeny. Without accepting the "*prima facie* unconstitutional" characterization, we basically agree with the position that trial court discretion as to severance in the capital-penalty phase must be considered so constitutionally constrained at its outer limits and, as a corollary, that our standard of review is for abuse of a discretion so constrained. *Cf. Sampley v. Attorney Gen.,* 786 F.2d 610, 613 (4th Cir.1986) (Sixth Amendment right to counsel ultimately constrains discretion in ruling on continuance motions).

Reviewing under that standard, we cannot find abuse of discretion here. The concerns raised by appellants are legitimate ones. But there are countervailing considerations that properly may be weighed in the discretionary balance. Because the relevant statutory provision, § 848(i)(1)(A), requires that, except in situations not present here, the penalty hearing shall be conducted before the same jury that determined guilt, severance here would have required three separate, largely repetitive penalty hearings before this jury. The same considerations of efficiency and fairness to the Government (and possibly the accused as well) that militate in favor of joint trials of jointly-charged defendants in the guilt phase, *see Lockhart v. McCree,* 476 U.S. 162, 181, 106 S.Ct. 1758, 1769, 90 L.Ed.2d 137 (1986); *Richardson v. Marsh,* 481 U.S. 200, 210, 107 S.Ct. 1702, 1708–09, 95 L.Ed.2d 176 (1987), must remain generally in play at the penalty phase. The district court was therefore entitled to weigh those considerations in the balance.

More important of course than any consideration of inconvenience or possible unfairness to the Government from sequential separate trials are the possibilities of unfairness to the accused persons from a joint penalty-phase trial—specifically the threat posed to individualized consideration of their situations, and in particular the quite different mitigating factors relevant to each. While such a potential risk was certainly present here, as it will be in any case involving multiple defendants, it could not of course have been entirely removed by conducting three sequential, largely repetitive hearings before the same jury. More critically, we are satisfied that the court's frequent instructions on the need to give each defendant's case individualized consideration sufficed to reduce the risk to acceptable levels. At the outset of the penalty phase, the **\*893** court—obviously aware of the special risk—admonished the jurors that they "must consider each defendant individually." JA 4137. In its concluding instructions on the jury's duty "to decide whether each individual defendant shall live or die," JA 4810–11, the court reiterated that the duty was "to make a decision regarding each defendant and each capital case," JA 4817. Further, in its instructions on the critical weighing process, the court especially emphasized the need for individualized consideration by pointing out that "not all aggravating factors alleged are alleged against each of the three defendants, or in reference to each capital offense," JA 4794, and that each defendant relied on mitigating factors specific to his case. JA 4803. This critical point was further emphasized by the court's submission of separate packets of penalty verdict forms for each defendant. JA 4813. Still further emphasis occurred in the court's remonstrances to Government counsel to "be specific" and to "do it individually," whenever

J.A.84

objections were made to Government counsels' references to the defendants collectively. JA 4770–72, 4775.

**[44]** We are entitled, in the absence of any directly negating evidence, to presume that the jury heard, understood, and did follow these instructions. *See Richardson,* 481 U.S. at 206, 107 S.Ct. at 1706–07. And we are bolstered in the general presumption by the results of this jury's deliberations. Only Johnson was sentenced to death on all of the capital murder counts on which he was convicted. Tipton was sentenced to death on three of the six on which he was convicted; Roane on one of three.

We therefore find no abuse of discretion in conducting a joint penalty-phase trial in this case.

### B.

Appellants make a number of interrelated facial and as-applied constitutional challenges to certain of the capital sentencing provisions of § 848, hence to the death sentences each received upon jury recommendation for violations of the capital-murder provisions of § 848(e). We preface our discussion of the challenges with a summary of the most directly relevant provisions and their applications in this case.

In general the provisions at issue prescribe a "weighing-process" involving jury consideration of "information" designed to establish the existence of aggravating and mitigating factors as the basis for deciding whether to recommend a death sentence. Non-exclusive "statutory" lists of both aggravating and mitigating factors are provided in subsections (n) and (m) respectively. Only those statutory and non-statutory aggravating factors of which a defendant has been given prior written notice by the Government may be considered by the jury, § 848(h)-(j), while any statutory or non-statutory mitigating factor may be considered, § 848(j), (m). In the weighing process, jurors may only consider those aggravating factors found unanimously to exist beyond a reasonable doubt, but any juror may consider any mitigating factor found by him to exist by a preponderance of the evidence, without regard to whether it has been found by any other. § 848(k). The prescribed weighing process is a sequential one. The jury first must determine that at least one of the four aggravating factors listed in subsection (n)(1) exists. *Id.* These (n)(1) factors all relate to the particular intention had by the defendant in relation to the § 848(e) murder of which he has been convicted: that he

(A) "intentionally killed"; (B) "intentionally inflicted serious bodily injury which resulted in ... death"; (C) "intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim"; or (D) "intentionally engaged in conduct which [he] knew would create a grave risk of death to a person, other than one of the participants in the offense and [which] resulted in the death of the victim." If (somehow) none of these (n)(1) factors is unanimously found to exist, the jury proceeds no further and the death sentence may not be imposed. § 848(k). If any of the (n)(1) factors is unanimously found to exist, the jury then considers whether one or more of the other statutory factors listed in (n)(2)-(12) also exists. If it does not so find, it proceeds no further and the death sentence may not be imposed. *Id.* If it does find at **\*894** least one additional statutory aggravating factor to exist, it may then also consider whether any properly noticed non-statutory aggravating factors also exist. *Id.* If they find one (n)(1) aggravating factor, plus one further (n)(2)-(12) statutory aggravating factor to exist, the jurors may then weigh all the statutory and non-statutory aggravating factors they have unanimously found to exist against all mitigating factors properly being taken into account by individual jurors to determine "whether the aggravating factors ... sufficiently outweigh any mitigating factor or factors" to warrant imposition of a death sentence. If the jurors unanimously so find, they may, but need not, recommend the death sentence. *Id.* If the jury so recommends, the court "shall sentence the defendant to death"; if the jury does not so unanimously recommend, the court may only impose a sentence other than death. § 848(e).

Following this prescribed process, the Government re-introduced, in transcript form, all the guilt-stage evidence of the capital-murders of which appellants severally had been convicted. Further, it introduced evidence respecting various post-trial episodes in which, while in prison, each of the appellants had threatened reprisal against one or another of the witnesses who testified against him at trial. Finally, the Government introduced records of prior criminal convictions of Johnson and Roane.

Each of the appellants introduced testimonial evidence designed to establish statutory and non-statutory mitigating factors. Principally, in each case, this evidence involved histories of childhood abuse in dysfunctional, unstable family situations and various forms of mental disorders and disabilities.

Following the district court's comprehensive instructions on the application of these sentencing provisions to the aggravating and mitigating factor information before it, *see* JA 3963–95, the jury returned the several verdicts previously noted in the form of special findings and ultimate recommendations. With respect to each of the seven § 848(e) murders for which Johnson had been convicted, the six for which Tipton had been convicted, and the three for which Roane had been convicted, the jury unanimously found as statutory aggravating factors all four of the (n)(1) factors, plus the (n)(8) factor that each of the murders was "the result of substantial planning and premeditation." With respect to the murders of Chiles and Thorne for which Tipton and Johnson had been convicted, the jury additionally found the (n)(5) factor—creation of a grave risk of death to persons other than the victim—to exist. With respect to the Talley murder for which Tipton was convicted, the jury also found the (n)(12) aggravating factor—commission of murder in an especially heinous, cruel, or depraved manner involving serious physical abuse—to exist. Further, as to each of the appellants with respect to each of the capital murders for which he had been convicted, the jury found as additional nonstatutory aggravating factors the commissions of multiple murders, substantial criminal histories, and memberships in a conspiracy that had as a goal the murders of persons other than the victims of the capital murders in issue. Finally, as to both Johnson and Tipton with respect to each of the capital murders for which they had been convicted, the jury found as an additional non-statutory aggravating factor that each had seriously wounded two other persons in the course of committing those murders.

Some or all of the jurors found as to Johnson 18 mitigating factors; as to Tipton, 12; and as to Roane nine.

On verdict Decision Forms which recited compliance in detail with the court's instructions on the weighing process, the jury unanimously recommended the death sentence for Johnson on all seven of the § 848(e) capital murders for which he had been convicted, those of Louis Johnson, Long, Carter, Armstrong, Thorne, Chiles, and Peyton Johnson; unanimously recommended the death sentence for Tipton on three of the capital murders, those of Talley, Chiles, and Thorne, of the six for which he had been convicted; and unanimously recommended the death sentence for Roane on one of the capital murders, that of Moody, of the three for which he had been convicted. As to the other three murders of which Tipton had been convicted, those of Long, Armstrong, and Carter, and **\*895** as to the other two of which Roane had

been convicted, those of Louis Johnson and Peyton Johnson, the jury reported itself "not unanimously persuaded" on the evidence and in light of the court's instructions that the death sentence should be imposed upon those defendants. Sentences were imposed accordingly.

### 1.

 **[45]**    Appellants jointly challenge, as facially unconstitutional, the § 848 sentencing provisions, § 848(h)(1)(B), (j), and (k), which permit nonstatutory aggravating factors to be considered. Specifically, they contend that by delegating authority to Government prosecutors to introduce such factors for consideration in sentencing, Congress violated separation-of-powers principles, thereby invalidating the whole process.

We disagree. Assuming, without deciding, that by specifically authorizing consideration of non-statutory aggravating factors noticed by prosecutors, Congress actually delegated a legislative function to the Executive Branch, as opposed to merely recognizing a traditionally shared function with that branch, *see United States v. Pretlow,* 779 F.Supp. 758, 765–67 (D.N.J.1991), any delegation involved was sufficiently circumscribed by "intelligible principles" to avoid violating separation of power principles. *See Mistretta v. United States,* 488 U.S. 361, 390, 109 S.Ct. 647, 664, 102 L.Ed.2d 714 (1989); *accord United States v. McCullah,* 76 F.3d 1087, 1106–07 (10th Cir.1996).

### 2.

 **[46]**    Appellants jointly claim that the (n)(8) aggravating factor—that "the defendant committed the offense after substantial planning and premeditation"—is unconstitutionally vague. Because the death penalty imposed upon each of them was based in part upon the jury's finding of that factor's existence, they contend that those death sentences are, as to each of them, invalid.

 **[47]**    We disagree. No objection on this basis was made in the district court, so we review the claim only for plain error under the stringent Rule 52(b) standard as defined in *Olano. See supra* Part II.A. And, because mathematical precision in defining eligibility and selection factors often is not possible, "vagueness review" is quite "deferential" in any event. *See Tuilaepa v. California,* 512 U.S. 967, ——,

**J.A.86**

114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994). Under such deferential review, an aggravating factor such as the (n)(8) factor "is not unconstitutional if it has some 'common sense core of meaning ... that criminal juries should be capable of understanding.' " *See id.* at —— – ——, 114 S.Ct. at 2635–36 (quoting *Jurek v. Texas,* 428 U.S. 262, 279, 96 S.Ct. 2950, 2959–60, 49 L.Ed.2d 929 (1976) (White, J., concurring)).

The specific claim of vagueness here is directed at use of the word "substantial" as a modifier of "planning and premeditation" in defining the (n)(8) factor. "Substantial," the argument runs, is not sufficiently precise in meaning to serve the discretion-channeling function constitutionally required for applying eligibility factors in capital sentencing. *See id.* at ——, 114 S.Ct. at 2635; *Arave v. Creech,* 507 U.S. 463, 470–71, 113 S.Ct. 1534, 1540–41, 123 L.Ed.2d 188 (1993).

We disagree. While, as the Supreme Court has recognized, "substantial" may have quite different, indeed almost contrary, meanings depending upon its context, *see Pierce v. Underwood,* 487 U.S. 552, 564, 108 S.Ct. 2541, 2549, 101 L.Ed.2d 490 (1988) (either, *e.g.,* "large," or, *e.g.,* "in the main"); *Victor v. Nebraska,* 511 U.S. 1, ——, 114 S.Ct. 1239, 1250, 127 L.Ed.2d 583 (1994) (either "not seeming or imaginary," or "to a large degree"), context, including clarifying jury instructions, may supply the needed "common sense core of meaning ... that criminal juries should be capable of understanding." *Compare, e.g., Cage v. Louisiana,* 498 U.S. 39, 41, 111 S.Ct. 328, 329–30, 112 L.Ed.2d 339 (1990) (in total context of reasonable doubt instruction, "substantial doubt" would be "commonly understood [to] suggest a higher degree of doubt than [would 'reasonable' alone]") *with Victor,* 511 U.S. at ——, 114 S.Ct. at 1250 (in total context of reasonable doubt instruction, "substantial doubt" not likely to have been interpreted as higher degree than "reasonable").

**\*896** Here, we are satisfied that in total context of the statutory text and the district court's instructions on the (n)(8) aggravating factor, "substantial" as a modifier of "planning and premeditation" could only have been understood by the jury to mean a higher degree of planning than would have the words "planning and premeditation" alone—*i.e.,* more than the minimum amount sufficient to commit the offense. The district court instructed in essentially this vein, that "substantial planning means planning that is considerable, or ample for the commission of a crime at issue in this case: murder." JA 4796. We are therefore satisfied that the (n)(8) aggravating factor's use of the word "substantial" to modify "planning and premeditation" does not render § 848(n)(8)

unconstitutionally vague, but instead, conveys with adequate precision a commonly understood meaning of "considerable," or "more than merely adequate," thereby ensuring that the (n)(8) factor served sufficiently to channel the jury's discretion in assessing eligibility for the death penalty. *See McCullah,* 76 F.3d at 1110, 1111 (accord). [17]

[17] Appellants relatedly argue, though they did not object below, that in its jury instructions, *see* JA 4795, the district court erroneously indicated that in considering the (n)(8) factor, the jury need find only substantial planning and not, also, substantial premeditation. That this was necessarily the meaning conveyed is not that clear. Even assuming that it was, we could not find in such a slip plain error requiring correction under the *Olano* standard. It is not conceivable that a jury which had found substantial planning of a murder would not also, if properly instructed, *see Walton v. Arizona,* 497 U.S. 639, 654, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990), have found substantial premeditation of its commission.

### 3.

Appellants Roane and Tipton each claim that even if the (n)(8) aggravating factor is constitutionally valid, the information before the jury was insufficient to support the findings of its existence as to Roane's murder of Moody, and Tipton's murders of Chiles and Thorne. We review such insufficiency claims under the same *Jackson v. Virginia* standard applied to guilt findings. *Lewis v. Jeffers,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990).

**[48]** Roane's contention as to the Moody murder is that the information before the jury showed only that his involvement in Moody's murder was confined to an unplanned, spontaneous effort to prevent Moody's escape following his gun-shot wounding by Tipton. In essence, his claim is that only unpremeditated, reflexive action on his part, not "substantial planning and premeditation" preceded his stabbing murder of the fleeing Moody.

We disagree. This account of the relevant information before the jury respecting Roane's murder of Moody substantially understates the relevant circumstances revealed by the trial evidence. The jury had before it information that well before Moody's murder, a motive for it, to which Roane

was privy with Tipton and Cory Johnson, had developed. Specifically, trial evidence showed that Moody and his superior, Peyton Johnson, a rival drug dealer, were thought by Tipton, Cory Johnson, and Roane to be standing in the way of their taking over the Newtowne drug market whose development was Roane's special function. Evidence from the guilt phase revealed that Roane had in fact stated that Tipton and Johnson "and them didn't want Maurice [Peyton Johnson] and 'Little Doug' [Moody] to work in that area ... selling cocaine." JA 3382. From this and other information respecting the details of Moody's murder, the jury properly could find that the visit of Roane and Tipton to Moody's apartment on the night of his murder was for the pre-planned, premeditated purpose of murdering him. It showed that they went there armed with the pistol used by Tipton in wounding Moody although members of the enterprise did not as a matter of policy ordinarily carry weapons. It showed that Moody's initial wounding and eventual killing were in the pattern of the comparable enterprise-related, cold-blooded assassinations of Talley some ten days earlier and of Moody's superior, Peyton Johnson, the night after Moody was killed. If consideration were narrowly confined only to Roane's conduct in killing Moody when he fled following Tipton's failed murder attempt, there might be a serious question whether that specific reactive conduct **\*897** involved "substantial planning and premeditation." But of course the issue was whether the murder, not its exact means, was the result of substantial planning and premeditation by Roane. And on that issue the jury had ample information upon which to base its finding beyond a reasonable doubt that Moody's murder was "substantially planned and premeditated" by Roane in concert with Tipton.

Tipton's contention as to the murders of Chiles and Thorne is, as the Government points out, simply a reiteration of his argument that the evidence was insufficient to support his convictions on those two murder counts. We have rejected that argument in Part III.F.2., *supra,* and the reasons given apply to this argument as well. Specifically, the information before the sentencing jury sufficed to support its finding that Tipton, in concert with Cory Johnson, substantially planned and premeditated those murders in which he and Johnson actively participated.

### 4.

Appellants jointly challenge the constitutionality of the (n)(1) aggravating factor both facially and as applied. They are correct that if this challenge succeeds on either basis, their several death sentences must be vacated because this particular factor's existence is an absolute prerequisite to imposition of the death penalty under the § 848 capital-sentencing scheme earlier summarized.

 **[49]**    Consideration of the facial challenge requires close attention to the statutory text of (n)(1) and to its intended functioning within the weighing process prescribed by § 848's capital-sentencing scheme. Under that scheme, a jury must, in order to recommend the death penalty, first find as an aggravating factor under (n)(1) that

(1) The defendant—

(A) intentionally killed the victim;

(B) intentionally inflicted serious bodily injury which resulted in the death of the victim;

(C) intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim;

(D) intentionally engaged in conduct which—

(i) the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and

(ii) resulted in the death of the victim.

Appellants' facial challenge is based on the claim that the (n)(1) aggravating factor fails, as is constitutionally required, adequately to guide and channel sentencing discretion in imposing the death penalty. Roane Br. 133. We disagree.

Appellants properly point out that under the Supreme Court's decision in *Arave,* "[w]hen the purpose of a statutory aggravating circumstance is to enable the sentencer to distinguish those who deserve capital punishment from those who do not, the circumstance must provide a principled basis for doing so. If the sentencer fairly could conclude that an aggravating factor applies to *every* defendant eligible for the death penalty, the circumstance is constitutionally infirm." 507 U.S. at 474, 113 S.Ct. at 1542 (citations omitted). And, they also point out, correctly we may assume, that the four separate circumstances, (A)-(D), set out as bases for finding the (n)(1) aggravating factor to exist essentially replicate the threshold mental states constitutionally required for death-penalty eligibility under *Tison v. Arizona,* 481 U.S. 137, 158,

107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987), and *Enmund v. Florida,* 458 U.S. 782, 788, 792, 102 S.Ct. 3368, 3371–72, 3374, 73 L.Ed.2d 1140 (1982). From these two propositions, they then contend that because "every murderer must constitutionally satisfy one of these requirements to be subject to the death penalty," the several (n)(1) circumstances that merely replicate the required threshold eligibility states fail under *Arave* to provide a principled basis for distinguishing those who deserve capital punishment from those who do not.

This contention fails in its conclusion. The four (n)(1) circumstances do essentially replicate the required mental states for constitutional imposition of the death penalty, but in **\*898** doing so they reflect four distinctly different levels of moral culpability, ranging downward from direct "intentional killing," (A), to intentionally engaging in conduct with known potential for causing death that did in fact cause it, (D). Depending upon the evidence, a properly instructed jury which has returned an unspecific general verdict of guilty on a § 848(e) capital-murder count may have found either that the defendant "intentionally kill[ed]" or only "counsel[led], command[ed], induce[d], procure[d], or cause[d]" or "aid[ed] and abet[ted]" the intentional killing. § 848(e)(1)(A); 18 U.S.C. § (2)(a). [18]

[18]    The alternative means to "intentional killing" that are provided in § 848(e)(1)(A) as elements of the offense simply replicate—for whatever reason—the alternative means, in addition to aiding and abetting, that make one "punishable as a principal" under the generally applicable provisions of 18 U.S.C. § 2(a).

In requiring the jury at sentencing then to address and make findings respecting these different circumstances—some of which are necessarily implicit in any guilty verdict on a § 848(e)(1)(A) murder count— § 848(n)(1) provides precisely the constitutionally required, principled basis for further distinguishing between those murderers thought deserving of death and those not thought to be. *See Arave,* 507 U.S. at 475–76, 113 S.Ct. at 1543 (degree of culpability, as measured by specific mental state, is proper basis for making death penalty choices among murderers); *Tison,* 481 U.S. at 157–58, 107 S.Ct. at 1688 ("highly culpable mental state ... may be taken into account in making a capital sentencing judgment"). They might well, for example, guide a discretionary decision to recommend death for one defendant found guilty under § 848(e) because he "intentionally killed," *i.e.,* was a direct executioner, but not to recommend death

for another defendant also found guilty not because he had been the actual executioner of a victim but because he had "caused" or "procured" his intentional killing by another and thereby had "intentionally engaged in conduct intending that the victim be killed."

We therefore reject appellants' facial challenge to the constitutionality of § 848(n)(1). [19]

[19]    We understand the appellants' facial constitutional challenge to be confined to the "failure-to-channel-discretion" theory discussed and rejected in the text. *See* Roane Br. (as adopted) 133–37. Picking up on an assertion in appellants' argument that repeating a guilt-phase element (intent) as an aggravating factor ((n)(1)) "increases the bias in favor of the death penalty," *id.* at 136, the Government relies on *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), as foreclosing any such "impermissible-duplication" claim. The appellants, however, expressly disavow that this is an independent basis of their challenge, asserting that it is "much more than that," hence not affected by *Lowenfield.* Roane Br. 137, n.100. We have, as indicated, so understood their position, but to the extent an "impermissible-duplication" claim inheres as such in their challenge, we agree with the Government that *Lowenfield* forecloses it. *See Chandler,* 996 F.2d at 1092–93 & n. 4 (accord).

### 5.

**[50]**    Appellants jointly contend that, in any event, the (n)(1) aggravating factor was unconstitutionally applied as to each of them in the sentencing phase, thereby invalidating the several death sentences imposed upon them. The contention is a serious one, and we conclude that error did occur in the district court's submission and instructions respecting this factor, but we further conclude that the error was harmless beyond a reasonable doubt as to each appellant.

Over appellants' objections, JA 4688, 4786, the district court, by its verdict forms and its instructions, allowed the jury, if it chose, to find more than one of the specific circumstances, (A)-(D), as a basis for its determination of the (n)(1) aggravating factor's existence. The special verdict forms listed these circumstances—as does the statute [20]—as if **\*899** they might be found cumulatively, *see* JA 414 (Tipton

**J.A.89**

form), and the court instructed that "you must find *at least one* from the first category [the (n)(1) category] of aggravators." JA 4793, 4794 (emphasis added). Following the apparent authorization thus given, the jury, as previously noted, found all four circumstances as to each of the murders for which each of the appellants had been convicted, including of course those for which it then recommended death sentences.

20      *See ante* at 897–98. As there indicated, § 848(n) (1) in listing the (A) & (D) circumstances contains no conjunction signalling whether it was intended that only one of the circumstances should be found or that more than one might be. Predictably, this regrettable omission quickly has led to uncertainty on the point among district courts making early applications of the statute. In addition to the district court in this case, the district court in *McCullah,* 76 F.3d 1087, apparently had assumed that cumulative findings should be allowed. Other district courts, however, seemingly have assumed that only one should be allowed. *See, e.g., Chandler,* 996 F.2d at 1082; *United States v. Pitera,* 795 F.Supp. 546, 556 (E.D.N.Y.1992); *Pretlow,* 779 F.Supp. at 771.
Correctly pointing out that the statute does not in terms prohibit multiple findings, the Government contends on this appeal, as presumably it did in the district court, that the district court's submission for multiple findings was proper. Gov't Br. 126 n.80. We observe, however, that perhaps aware of the difficulty created by such an interpretation, the Government, in summarizing the (n)(1) provisions, elsewhere suggests that a disjunctive reading should be implied. *Id.* at 122 (implying an "or" reading).
For reasons following, we simply disagree with that position.

Appellants contend that allowing such a cumulation of "multiple overlapping aggravating factors, based upon a single element of the crime" to be considered in the weighing process unconstitutionally skewed the process in favor of death. And they argue that skewing was further exacerbated by the court's instruction to the jury that having already necessarily found in the guilt phase that each of the murders in issue was intentional, the purpose of requiring a re-finding of at least one of the specific intentions embodied in the (A)-(D) circumstances was simply "to insure that this factor was considered by you at the first phase, or guilt phase." JA 4793.

We agree with appellants that the district court's verdict submission and instructions respecting the purpose of the (n) (1) factor(s) and their proper application by the sentencing jury was erroneous. The court's instructions misconstrued the essential purpose of the specific (A)-(D) circumstances set out as discrete alternative bases for making the required (n)(1) finding. That purpose, as earlier discussed, is not the anomalous one of merely re-confirming (or, by not confirming, impeaching?) the jury's earlier finding of intent in the guilt phase. It is instead to focus the jury's attention upon the different levels of moral culpability that these specific circumstances might reasonably be thought to represent, thereby channeling jury discretion in the weighing process.[21]
To allow cumulative findings of these intended alternative circumstances, all of which do involve different forms of criminal intent, runs a clear risk of skewing the weighing process in favor of the death penalty and thereby causing it to be imposed arbitrarily, hence unconstitutionally. *Stringer v. Black,* 503 U.S. 222, 230–32, 112 S.Ct. 1130, 1136–37, 117 L.Ed.2d 367 (1992). On this basis, the Tenth Circuit recently has vacated a death sentence imposed for a § 848(e) capital murder where the district court had erroneously, in the Tenth Circuit's view, allowed the jury to find both the (C) and (D) circumstances to exist as (n)(1) aggravating factors. *McCullah,* 76 F.3d at 1111 ("while the factors are not identical per se, [one] necessarily subsumes the [other]," and so impermissibly duplicates).

21      In fairness to the district court, it should be observed that the court also indicated in supplemental instructions to the jury that the (n) (1) circumstances served the function, beyond that of merely re-confirming its guilt-phase criminal intent finding, of pointing up specific levels of culpability depending upon the factual basis for the guilt finding. But, the court then, erroneously we conclude, reiterated that the jury could find more than one circumstance. JA 4837–39.

We agree with the *McCullah* court that such a submission (here of all four (n)(1) circumstances) that permits and results in cumulative findings of more than one of the (n) (1) circumstances as an aggravating factor is constitutional error. As earlier indicated, however, we further conclude, as we properly may in appellate review, *Stringer,* 503 U.S. at 232, 112 S.Ct. at 1137, that the error was harmless beyond a reasonable doubt.[22]

J.A.90

22    The Tenth Circuit in *McCullah* recognized its power to conduct harmless error review of a comparable error, but for unstated reasons declined to do so and remanded for reweighing and resentencing by the district court. 76 F.3d at 1112; *see Clemons v. Mississippi,* 494 U.S. 738, 754, 110 S.Ct. 1441, 1451, 108 L.Ed.2d 725 (1990).

In considering whether the error was so harmless, we keep in mind the two possible ways in which it could have prejudiced —not **\*900** been harmless—in producing the challenged death sentences: first, by causing the jury to assess the weight of the (n)(1) circumstances it found on an unfair quantitative basis that gave four-fold effect to what was essentially a single factor—criminal intent; second, by allowing the jury to find a more morally culpable circumstance than was supported by the sentencing information, including the guilt-phase evidence, that was before it. With those two possible sources of actual prejudice in mind, we then ask what the record indicates the jury would have done had it been properly instructed on its consideration of the critical (n)(1) factor. If the answer is that it would surely have done just what it did in the end under the erroneous instruction—recommended each of the death sentences now challenged—harmlessness is thereby demonstrated as to each. *See Clemons,* 494 U.S. at 754, 110 S.Ct. at 1451 (so stating proper harmlessness test).

To get at this, we have first to establish what a proper instruction would have been as to those murders for which the challenged death sentences were imposed. Fortunately, we need not decide for the limited purpose at hand whether as a general proposition a proper (n)(1) instruction would always submit for jury consideration only those (n)(1) circumstances, (A)-(D), for which there was sufficient evidentiary support before the jury.[23] Here, though on a mistaken legal premise, that was indeed done as to each of the murders for which the death sentence was imposed. For as to each there was evidentiary support for all four of the circumstances submitted, including (A), the most culpable. Critically for our purpose, however, a proper instruction would also have directed that from among those circumstances, (A)-(D), submitted for consideration as alternatives, only one should be found as the basis of the required (n)(1) aggravating factor. Accordingly, the harmless-error question for us becomes whether if the jury had been instructed properly that as to each of the murders in issue it might consider circumstance (A) and one or more of (B), (C), and (D), but could only find one of these as the basis for its (n)(1) finding, it would have reached

the same result it reached under the erroneous instruction. We are so convinced.

23    We need not decide it because of the fortuity noted, but we would be amiss not to note the obvious potential for prejudicial error if a jury were permitted to consider and find the (A) circumstance when the guilt-phase evidence sufficed only to convict a defendant as a marginal aider and abettor who did not participate directly in the killing. *See* note 24.

First off, it is obvious that as to each of the murders in issue, the jury under a proper instruction would have found circumstance (A), intentional killing, as the sole basis for its (n)(1) finding. It did, after all, find this as the most culpable of the circumstances actually submitted to it; it is inconceivable that if confined to finding one, it would not have so found. Might it, however, having found only that one circumstance as an (n)(1) aggravating factor, then have accorded it so much less weight than it did to the four circumstances it improperly found that it would have come out differently in its weighing process? We are satisfied that it would not have, for several reasons.

First, because, as the Government points out, each of the other three (n)(1) circumstances, (B), (C), and (D), that the jury found is necessarily subsumed as merely a "lesser-included" aspect of the (A)—"intentionally killed"—circumstance. That being so obviously the case, we cannot believe that the jury gave any greater weight to the aggregate of overlapping mental-state circumstances than it would have to the all-embracing (A) circumstance alone. We are bolstered in this conviction by the district court's careful instructions which emphasized both the impropriety of quantitative weighing of factors, and the overlapping, "lesser-included" relationship between the (A) & (D) circumstances it allowed the jury to find. In its original sentencing instructions, the court emphasized that the weighing process "is not a mechanical" one; that it is not "determined by raw numbers"; and that "[i]nstead, you must consider them qualitatively." JA 4810. In supplemental instructions, responding to a jury inquiry, the court pointed out that one who under its instructions might be found to have "intentionally engaged in conduct intending that the victim be killed" under (C), might also **\*901** be found, if he followed through on that intention with an "actual stabbing and shooting," to have "intentionally killed" under (A). JA 4837–38. While, as indicated, this instruction was given on the erroneous premise that more than one such circumstance could properly be found, it nevertheless

J.A.91

served to convey to the jury that, as necessarily subsumed circumstances, they were not to be given cumulative weight.

Most critical, however, to our assessment that the jury did not in recommending the challenged death sentences give more weight to the aggregate of (n)(1) circumstances than it would have to the (A) circumstance alone under a proper instruction, is the actual result it reached on the various murders for which it had severally convicted the appellants. Though it found *all* the (n)(1) circumstances as to *each* appellant on *each* of these murders, it only recommended the death sentence in respect of those murders as to which the evidence supported a finding either that the particular appellant was the actual killer or was physically present as an active participant in the killing. This clearly indicates to us that whatever misapprehensions the jury may have received from the court's allowance of cumulative findings of (n)(1) circumstances, the jury properly accorded the weight it should have to the (A) circumstance in those cases where, under a proper instruction, it would have been found as the sole (n)(1) factor. [24]

[24]    We do not overlook that the jury clearly was under misapprehension—not only as to the propriety of making multiple findings on the (n)(1) factor, but as to the relationship between the basis upon which it had found guilt for a particular murder and the (n)(1) circumstance which reflected that basis. Obviously worried about what (n)(1)(A)'s "intentionally killed" embraced, the jury requested supplemental instruction on the point. In response, the district court gave instructions which in ways were accurate and helpful, but it concluded with an unfortunate summation that clearly led the jury to believe that having found guilt, on whatever basis, whether as principal or aider and abettor, they had necessarily found, for (n)(1) purposes, that a defendant had "intentionally killed," so that any and all of the (n)(1) circumstances might appropriately be found. JA 4837–39. This might well have prejudiced any defendant who received the death sentence for a murder in whose commission he was not a direct participant, but of course we are not presented with such a claim, there being no such defendant in this case. Our question is only whether, all things considered, such a misapprehension could possibly have prejudiced a defendant who had been found guilty because the jury determined that he had directly participated in the murder's commission, and we are convinced

that the answer to that question is, beyond a reasonable doubt, no.

Neither, on this assessment, is there any possibility of the other potential prejudice from erroneously allowing multiple (n)(1) findings: that this permitted the finding of a higher degree of culpability than was supported by the evidence. As to each of the murders for which the death sentence was imposed, the evidence clearly (and uniquely) supported a finding of the (A) circumstance.

We therefore conclude that beyond a reasonable doubt the district court's error in allowing the jury to find all of the (n) (1) circumstances as an aggravating factor was harmless in respect of the several death sentences imposed.

### C.

We have carefully considered appellants' other claims of error in the capital sentencing phase [25] and find no error warranting correction or discussion.

[25]    These include, *inter alia,* facial challenges to the use of two nonstatutory aggravating factors— substantial criminal histories and participation in a conspiracy having murder as a purpose—; failure to define reasonable doubt in the capital-sentencing instructions; failure to hold the Government to penalty-phase discovery and proof requirements; failure to instruct on proper use of mental and neurological impairments evidence; failure to declare a mistrial because of a prosecutor's comment on Tipton's failure to testify; and failure to order a new penalty-phase trial because of the Government's withdrawal of death-penalty notice against a co-defendant.

### V.

 **[51]**    We consider last the Government's cross-appeal from the district court's order staying execution of the death sentences severally imposed upon appellants pending congressional authorization of the means of execution.

At the time these death sentences were imposed, no federal statute provided authorization **\*902** for the specific means of executing such sentences. Before enactment of the Sentencing Reform Act of 1984 (the "Sentencing Guidelines"), 18 U.S.C.

USCA4 Appeal: 20-15    Doc: 11-1    Filed: 12/28/2020    Pg: 98 of 281

§ 3566 had provided that with respect to death sentences imposed under the few then extant federal capital offenses the means of execution should be that "prescribed by the laws of the place within which the sentence is imposed," or, failing such laws, as prescribed by the law of another state designated by the sentencing court. Section 3566, however, was repealed upon enactment of the Sentencing Reform Act and had not been replaced by any other generally applicable provision when these death sentences were imposed.

Effective on February 18, 1993, however, the Attorney General of the United States had promulgated regulations providing that as to death sentences imposed under § 848(e), "[e]xcept to the extent a court orders otherwise, a sentence of death shall be executed ... [b]y intravenous injection of a lethal substance or substances in a quantity sufficient to cause death." 58 Fed.Reg. 4898, 4901–02 (1993) (codified at 28 C.F.R. § 26.3). Invoking these regulations as authority, the Government moved for issuance of an order of execution that would permit a United States Marshal to carry out appellants' several death sentences at a time and place to be designated by the Director of the Bureau of Prisons. The appellants objected to issuance of such an order, contending that the Attorney General's regulations were *ultra vires* its powers, hence provided no authority for judicial issuance of such an order; that Congress possessed the exclusive power to prescribe, as a legislative matter, the means by which federal death sentences should be executed; and that in the absence of congressional authorization, the appellants' death sentences could not be executed. The district court agreed and entered an order affirmatively staying the executions until such time as Congress provided specific authorization of means.

Since entry of that order, Congress has enacted the Federal Death Penalty Act of 1994 as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796. This legislation created a number of new capital offenses, and contained capital-sentencing provisions for the new capital offenses and for previously existing ones which, unlike 21 U.S.C. § 848(e), did not contain them. It also included a general implementation provision, 18 U.S.C. § 3596 (Supp.1996), which authorized the execution of any defendant "sentenced to death *pursuant to this chapter,*" *id.* (emphasis added), essentially as was provided in former 18 U.S.C. § 3566, *i.e.,* under the law of the state of imposition or of a court-designated state. This provision, however, does not by its terms apply to death sentences imposed under § 848(e).

At the present time, therefore, the situation remains as it was when the district court issued its stay of execution order: The only formal authorization for the means of execution is the regulation issued by the Attorney General. We therefore address the correctness of the district court's holding that this regulation is not constitutionally valid because it purports to exercise a power which, being legislative, is exclusively that of Congress. And, we disagree with that holding.

We conclude, first off, that although Congress clearly may, if it chooses, preemptively legislate the means of executing federal death sentences, its power to do so is not exclusive of the power of the executive branch, where Congress has not acted preemptively, to provide those means as an aspect of its constitutional power to see "that the laws be faithfully executed." U.S. Const. art. II, § 3. Congress has itself authorized the Attorney General to "prescribe regulations for the government of [her] department, ... [and] the distribution of its business ...," 5 U.S.C. § 301 (1996), has vested all functions of the Department of Justice in the Attorney General, and has authorized officers, employees, and agencies of the Department to perform those functions, 28 U.S.C. §§ 509, 510 (1996). Among those agencies are the United States Marshals, whose legislatively conferred obligation is to "obey, execute, and enforce all orders of the United States District Courts," 28 U.S.C. § 566(a) (1993). We conclude that, absent directly preempting congressional action, the Attorney General had constitutional and statutory **\*903** authority to provide by regulation the means for executing death sentences imposed under 21 U.S.C. § 848(e), there being no claim made here that lethal injection is itself an unconstitutional means.

Next, we conclude that Congress has not, either expressly or by necessary implication, preempted the power of the executive branch, through the Attorney General, to authorize the means at issue. There is of course no claim that Congress has expressly provided some other means for executing § 848(e) death sentences, nor that it has expressly reserved that power to itself, nor that it has expressly forbidden exercise of the power by the Attorney General. Appellants essentially claim, however, that Congress has by necessary implication asserted its exclusive power to provide the means, thereby preempting any power otherwise possessed by the Attorney General to act in the absence of express congressional legislation. We disagree.

The claims of implied preemption are based essentially on the fact that from time to time Congress has exercised exclusive power in the matter (before repeal of § 3566) and

J.A.93

USCA4 Appeal: 20-15    Doc: 11-1    Filed: 12/28/2020    Pg: 99 of 281

an almost exclusive power (since enactment of the Violent Crime Control and Law Enforcement Act of 1994). But we know of no constitutional or separation-of-powers principle which dictates that where branches share power in a matter, the exercise of that power at any time and to any extent by the branch having primary power acts totally and for all time to preempt exercise of the power by the other branch in areas not expressly preempted by the former. *Cf. Wilkerson v. Utah,* 99 U.S. 130, 137, 25 L.Ed. 345 (1879) (in absence of statutory prescription for means of execution of sentence, sentencing court had authority to prescribe).

Finally, we reject appellants' contention that even if the Attorney General had power to issue the regulation in issue, its application to appellants would violate the Ex Post Facto Clause because it was promulgated after the commissions of the capital offenses at issue. We agree with the Eleventh Circuit in *Chandler,* 996 F.2d at 1095–96, that this contention is foreclosed by *Dobbert v. Florida,* 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977) (application of constitutionally adequate capital-sentencing provision enacted after commission of offense not violative of Ex Post Facto Clause because procedural).

## VI.

We affirm the convictions and sentences of all appellants in all respects except for their several convictions and sentences on the Count 1 conspiracy count under 21 U.S.C. § 846. We vacate those convictions and sentences for reasons given in Part III.G. of this opinion.

On the Government's cross-appeal, we vacate the district court's order staying execution of the several death sentences imposed upon each of the appellants and remand with instructions to enter appropriate orders for the executions in accordance with regulation promulgated by the Attorney General.

*SO ORDERED.*

## All Citations

90 F.3d 861

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

J.A.94

**History (10)**

**Direct History (4)**

1. U.S. v. Tipton
90 F.3d 861 , 4th Cir.(Va.) , July 08, 1996

*Certiorari Denied by*

2. Roane v. U.S.
520 U.S. 1253 , U.S. , June 02, 1997

*AND Certiorari Denied by*

3. Johnson v. U.S.
520 U.S. 1253 , U.S. , June 02, 1997

*AND Certiorari Denied by*

4. Tipton v. U.S.
520 U.S. 1253 , U.S. , June 02, 1997

**Related References (6)**

5. U.S. v. Roane
378 F.3d 382 , 4th Cir.(Va.) , Aug. 09, 2004

*Certiorari Denied by*

6. Roane v. U.S.
546 U.S. 810 , U.S. , Oct. 03, 2005

*AND Certiorari Denied by*

7. Johnson v. U.S.
546 U.S. 810 , U.S. , Oct. 03, 2005

*AND Certiorari Denied by*

8. Tipton v. U.S.
546 U.S. 810 , U.S. , Oct. 03, 2005

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

9. United States v. Roane
2020 WL 6370984 , E.D.Va. , Oct. 29, 2020

*Appeal Filed by*

10. US v. JAMES ROANE, JR.
, 4th Cir. , Nov. 18, 2020

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

v.                                                       Criminal No. 3:92cr68 (DJN)

JAMES H. ROANE, JR.,
        Defendant.

**MEMORANDUM OPINION**

Convicted serial killer James H. Roane, Jr. ("Defendant" or "Roane") comes before the

Court with a Motion for Imposition of a Reduced Sentence Pursuant to Section 404 of the First

Step Act (ECF No. 17) in a last ditch effort to avoid the just punishment imposed on him for his

role in killing multiple people in furtherance of his drug enterprise.  Defendant has challenged

his convictions and sentences on numerous occasions throughout the years.  But each time they

survived appellate review.  Defendant now seeks to latch onto laws passed to reduce the

sentencing disparities between non-violent crack and powder cocaine offenses as a vehicle to

reduce his sentences imposed for multiple drug-related murders.  But those murders, and the

statute under which a jury convicted Defendant for them, have nothing to do with the penalties

for drug quantities that the First Step Act addressed.  Because the First Step Act does not cover

the offenses for which a jury convicted Defendant, the Court will deny his Motion.

**I.    BACKGROUND[1]**

**A.    Factual Background**

Defendant, along with Richard Tipton ("Tipton") and Cory Johnson ("Johnson")

_____

[1]    The Court takes these background facts from the Fourth Circuit's opinion in *United
States v. Roane*, 378 F.3d 382 (4th Cir. 2004), which recited the factual summary *in haec verba*
from *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), the opinion on the defendants' direct
appeal.

(collectively, the "partners"), ran a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992. *Roane*, 378 F.3d at 389. The partners in the conspiracy obtained wholesale quantities of powder cocaine from suppliers in New York City, converted it into crack cocaine, divided it among themselves and then distributed it through a network of 30-40 street level dealers. *Id.* at 389-90. Typically, the partners took two-thirds of the proceeds realized from the street-level sales of their product. *Id.* at 390.

Over a short time in early 1992, the partners took part, in some form, in the murders of ten persons in the Richmond area. *Id.* These murders occurred "in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the 'partners.'" *Id.* The murders described below directly implicated Defendant.

On January 4, 1992, Roane and Tipton drove Douglas Talley, an underling in disfavor for mishandling a drug transaction, to the south side of Richmond. *Id.* Roane grabbed Talley and Tipton stabbed him repeatedly for three to five minutes. *Id.* Talley died from eighty-four stab wounds to his head, neck and upper body. *Id.*

On January 13, 1992, Roane and Tipton went to the apartment of Douglas Moody, a suspected rival in their drug-trafficking area, and Tipton shot Moody twice in the back. *Id.* Roane chased down the fleeing Moody and stabbed him eighteen times, killing him. *Id.*

On January 14, 1992, Roane and Johnson located Peyton Johnson, another rival drug dealer, at a tavern. *Id.* Shortly after Roane left the tavern, Cory Johnson entered and fatally shot Peyton Johnson. *Id.*

On January 29, 1992, Roane pulled his car around the corner of an alley, got out and shot

**J.A.98**

Louis Johnson, who had threatened one of the partners while acting as a bodyguard for a rival drug dealer. *Id.* Roane first shot Louis Johnson, and then Cory Johnson and Lance Thomas ("Thomas") got out of Roane's car and shot Louis Johnson again. *Id.* Louis Johnson died from these gunshot wounds. *Id.*

On February 1, 1992, Roane, Johnson and Thomas went to the apartment of Torrick Brown, who had given Roane trouble. *Id.* After the three men knocked on the apartment door, Brown's half-sister opened the door and summoned Brown. *Id.* The three men opened fire with semiautomatic weapons, killing Brown and critically wounding his half-sister. *Id.*

## B.    Verdict and Sentencing

In January and February of 1993, United States District Judge James R. Spencer presided over the trial of Defendant and his co-conspirators. Defendant[2] faced capital murder charges for Murder in Furtherance of a Continuing Criminal Enterprise ("CCE") under 21 U.S.C. § 848(e)(1)(A) for three of these killings — Moody (Count Five), Peyton Johnson (Count Eight) and Louis Johnson (Count Eleven) (collectively, the "Capital Murder Counts" or "Capital Murder Convictions"). *Id.* at 391; (Second Superseding Indictment ("Indictment") (Dkt. No. 115) at 7-10). On February 3, 1993, the jury convicted him of all three Capital Murder Counts. 378 F.3d at 391. The jury also convicted Defendant of participating in a Conspiracy to Possess Cocaine Base with the Intent to Distribute, in violation of 21 U.S.C. § 846 (Count One), and engaging in a CCE, in violation of 21 U.S.C. § 848(a) (Count Two). *Id.*; (Indictment at 1-6.) Additionally, the jury convicted Defendant of five counts of Committing Acts of Violence in Aid of Racketeering ("VICAR"), in violation of 18 U.S.C. § 1959 (Counts Seven, Ten, Thirteen, Fourteen, Sixteen), and four counts of Using a Firearm in Relation to a Crime of Violence or a

---

[2]    The Court tried Roane, Tipton and Johnson along with four other defendants on a thirty-three-count superseding indictment.

3

J.A.99

Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c) (Counts Six, Nine, Twelve, Fifteen). 378 F.3d at 392; (Indictment at 8-13). Finally, the jury convicted Defendant of one count of Possession of Cocaine Base with the Intent to Distribute, in violation of 21 U.S.C. § 841(a)(1) (Count Thirty-Two (the "Drug Distribution Count" or the "Drug Distribution Conviction")). 378 F.3d at 392; (Indictment at 21). Defendant's First Step Act Motion pertains only to the Capital Murder Counts and the Drug Distribution Count.

On February 16, 1993, following a penalty hearing on the Capital Murder Counts, the jury recommended that Defendant be sentenced to death for the murder of Moody. 378 F.3d at 392. On June 1, 1993, pursuant to 21 U.S.C. § 848(l), the Court sentenced Roane to death for Count Five. *Id.* Relevant here, the Court also sentenced Defendant to life imprisonment for each of the Capital Murder Convictions that he did not receive a death sentence — Counts Eight and Eleven. *Id.* Defendant also received a life imprisonment sentence for the CCE conviction in Count Two, life sentences for Counts Seven, Ten, Thirteen and Fourteen, and a forty-year term of imprisonment on Count Thirty-Two, the Drug Distribution Count, all to run concurrently with the other sentences imposed. *Id.*; (Dkt. No. 594).[3][4]

---

[3]    The jury convicted Richard Tipton of six counts of Murder in Furtherance of a CCE (Counts Three, Seventeen, Eighteen, Nineteen, Twenty-Four, Twenty-Five); one count of participating in a Conspiracy to Possess Cocaine Base with Intent to Distribute (Count One); one count of engaging in a CCE (Count Two); eight counts of VICAR (Counts Four, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Seven, Twenty-Eight, Twenty-Nine, Thirty); two counts of Use of a Firearm in Relation to a Crime of Violence or Drug Trafficking Offense (Counts Twenty, Twenty-Six); and two counts of Possession with Intent to Distribute Crack Cocaine (Counts Thirty-Two, Thirty-Three). (Dkt. No. 592.)

The jury recommended a death sentence as to each of Counts Three, Twenty-Four and Twenty-Five. In addition to the death sentences, the Court sentenced Tipton to sentences of life imprisonment for Counts Two, Four, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Seven and Twenty-Eight. Tipton received a sentence of forty years' imprisonment for Count Thirty-Two, thirty years' imprisonment for each of Counts Twenty-Nine and Thirty, twenty years' imprisonment for each of Counts Twenty-Six and Thirty-Three and five years' imprisonment for

4

The Court refused to order the execution on the grounds that Congress had neither

directly authorized the means to carry out the death sentences, nor properly delegated to the

Attorney General the authority to issue the implementing regulations that the Government

invoked. *Id.* As a result, the Court stayed the execution of the death sentences until such time as

Congress had authorized the means of execution. *Id.*

## C.    Post-Trial Proceedings

The defendants appealed their convictions and sentences and the Government cross-

appealed the stay of the death sentences. *Id.* at 392. In a lengthy opinion, the Fourth Circuit

analyzed and disposed of approximately sixty issues, including challenges by the defendants to

aspects of the jury-selection process and both the guilt and penalty phases of the trial. *Tipton*, 90

F.3d 861. The Fourth Circuit rejected nearly all of the claims, affirming the convictions and

sentences of all of the defendants, except that it vacated on double jeopardy grounds the drug

conspiracy convictions under 21 U.S.C. § 846, finding that the CCE convictions in Count Two

---

Count Twenty.  (Dkt. No. 592.)

[4]     The jury convicted Cory Johnson of seven counts of Murder in Furtherance of a CCE
(Counts Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-Four, Twenty-Five); one count of
participating in a Conspiracy to Possess Cocaine Base with Intent to Distribute (Count One); one
count of engaging in a CCE (Count Two); eleven counts of VICAR (Counts Ten, Thirteen,
Fourteen, Sixteen, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Seven, Twenty-Eight,
Twenty-Nine, Thirty); five counts of Use of a Firearm in Relation to a Crime of Violence or
Drug Trafficking Offense (Counts Nine, Twelve, Fifteen, Twenty, Twenty-Six); one count of
Distribution of Crack Cocaine (Count Thirty-One); and one count of Possession with Intent to
Distribute Crack Cocaine (Count Thirty-Two).  (Dkt. No. 593.)

The jury recommended a death sentence for all seven of Johnson's capital convictions.
In addition to the death sentences, the Court sentenced Johnson to sentences of life imprisonment
for Counts Two, Ten, Thirteen, Fourteen, Twenty-One, Twenty-Two, Twenty-Three, Twenty-
Seven and Twenty-Eight. Johnson received a sentence of forty years' imprisonment for Count
Thirty-Two, thirty years' imprisonment for each of Counts Twenty-Nine and Thirty, twenty
years' imprisonment for each of Counts Twelve, Fifteen, Sixteen, Twenty, Twenty-Six and
Thirty-One and five years' imprisonment for Count 9.  (Dkt. No. 593.)

5

precluded sentences for the drug conspiracy offenses. *Id.* at 903. Additionally, the Fourth

Circuit vacated the stay of the death sentences and remanded for the executions to proceed in

accordance with regulations promulgated by the Attorney General. *Id.* at 901-03.

Defendant continued to press his appeals. On June 1, 1998, Defendant filed a motion

under 28 U.S.C. § 2255 to vacate and set aside his sentences. *Roane*, 378 F.3d at 392. Chief

among his habeas claims, Defendant advanced an actual innocence claim with respect to the

Moody murder and argued that his trial attorney had rendered ineffective assistance of counsel in

his investigation and defense of the Moody murder charges. *Id.* at 393. The district court held

an evidentiary hearing on the habeas claims before issuing an opinion denying Defendant's

actual innocence claim, but granting his ineffective assistance of counsel claim. *Id.*

Consequently, the district court vacated Defendant's convictions on the Moody murder charges

— Counts Five (Murder in Furtherance of CCE), Six (Use of a Firearm in Relation to Crime of

Violence or Drug Trafficking Crime) and Seven (VICAR). *Id.* at 394. The Government

appealed the ineffective assistance of counsel ruling and Defendant cross-appealed certain claims

resolved against him. *Id.* Notably, Defendant did not appeal the denial of his actual innocence

claim. *Id.* at 394 n.3.

The Fourth Circuit ruled against Defendant on all accounts. Specifically, the court

affirmed on all of the grounds raised by Defendant and reversed the grant of relief based on

ineffective assistance of counsel. *Id.* at 408-12. In so ruling, it reversed the vacatur of

Defendant's convictions on Counts Five, Six and Seven. *Id.* at 412.

In 2009, Defendant filed an application with the Fourth Circuit to file a successive

§ 2255 petition on actual innocence grounds. The Fourth Circuit denied his request. *In re James

Roane, Jr.,* No. 09-8 (4th Cir.), ECF No. 24. On May 22, 2020, Defendant filed yet another

6

application with the Fourth Circuit for a successive § 2255 petition pursuant to the Supreme

Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). The application remains

pending, as the Fourth Circuit placed the case in abeyance pending its decision in *United States

v. Taylor*. *In re James Roane, Jr.*, No. 20-7 (4th Cir.), ECF Nos. 2, 18.[5]

## D.    Defendant's First Step Act Motion

On July 22, 2020, Defendant filed the instant motion under § 404 of the First Step Act,

asking the Court to reduce his sentences for the Capital Murder Counts and the Drug Distribution

Count. (Def.'s Mot. for Imposition of a Reduced Sentence Pursuant to Section 404 of the First

Step Act ("Def.'s Mot.") (ECF No. 17).) Defendant argues that these convictions constitute

covered offenses under the First Step Act, because the Fair Sentencing Act modified the

statutory penalties for §§ 841 and 848, and the First Step Act allows the Court to retroactively

impose those modified statutory penalties. (Def.'s Mot. at 2-5.) Defendant argues that the

statutory maximum under § 848 "was increased to a death sentence as a result of his possession

with intent to distribute cocaine base conviction that would no longer subject him to the death

penalty." (Def.'s Mot. at 3-4.) Further, Defendant claims that, because his Count Two CCE

conviction rested on his Drug Distribution Conviction, and his Capital Murder Convictions

---

[5]    On October 14, 2020, the Fourth Circuit decided *United States v. Taylor*, holding that attempted Hobbs Act robbery does not a "crime of violence" upon which a § 924(c) conviction can be predicated. __ F.3d __, 2020 WL 6053317, at *5 (4th Cir. Oct. 14, 2020). However, the Fourth Circuit has not yet ruled on Defendant's application to file a successive § 2255 petition.

In any event, *Taylor* has no impact on Defendant's First Step Act Motion. Neither the Capital Murder Convictions nor the Drug Distribution Convictions were predicated on an attempted robbery or, more generally, a crime of violence. Indeed, Defendant does not attack the counts at issue here in his proposed successive § 2255 petition. *In re James Roane, Jr.*, Case No. 20-7 (4th Cir.), ECF No. 2-2 (moving to vacate his convictions under 18 U.S.C. § 924(c) in Counts Six, Nine, Twelve and Fifteen). Although in his proposed § 2255 petition he argues that his Capital Murder Convictions cannot form the predicates for his § 924(c) convictions, he does not attack the convictions or sentences for the Capital Murder Counts. *Id.*

7

rested on his CCE conviction, then his Capital Murder Convictions must be covered offenses under the First Step Act. (Def.'s Reply in Supp. of Mot. for Imposition of a Reduced Sentence Pursuant to Section 404 of the First Step Act ("Def.'s Reply") (ECF No. 60) at 2-3.) At bottom, then, Defendant claims that his Drug Distribution Conviction pervades his Capital Murder Convictions, bringing his Capital Murder Convictions under the coverage of the First Step Act.

Because his convictions constitute covered offenses under the First Step Act, Defendant claims that this entitles him to "complete review on the merits," which includes a consideration of the sentencing factors in 18 U.S.C. § 3553(a). (Def.'s Mot. at 5.) To that end, Defendant devotes the bulk of his brief to arguing that the sentencing factors warrant a reduced sentence. Specifically, Defendant advances his actual innocence claim with respect to the murder of Douglas Moody, the subject of Count Five. (Def.'s Mot. at 9-16.) Further, Defendant argues that his history militates in favor of a sentence reduction, specifically his neglectful and abusive childhood. (Def.'s Mot. at 17-33.) Additionally, Defendant argues that he suffers from brain damage, warranting a reduced sentence. (Def.'s Mot. at 33-40.) Finally, Defendant argues that he has changed for the good in prison and his discipline record reflects good conduct over the course of his incarceration, weighing in favor of a sentence reduction. (Def.'s Mot. at 40-45.) Because some of his sentences warrant reduction, and his multiple sentences constitute a complete sentencing package, Defendant claims that the entire sentencing package contains fatal deficiencies. (Def.'s Mot. at 45-49.) To reach this conclusion, Defendant argues that several of his convictions are invalid, despite the Fourth Circuit only invalidating one conviction to date following multiple appeals. (Def.'s Mot. at 45-49.) Because these invalid convictions infect the entire sentencing package, Defendant argues that the Court must conduct a full and complete resentencing. (Def.'s Mot. at 50-52.) Accordingly, Defendant requests that the Court grant an

evidentiary hearing regarding the imposition of a reduced sentence on the Drug Distribution Conviction and the two Capital Murder Convictions that carry life sentences. (Def.'s Mot. at 53.) Additionally, Defendant asks the Court to order a resentencing hearing before a jury on Count Five — the Capital Murder Conviction for which he received the death penalty. (Def.'s Mot. at 53.)

On August 28, 2020, the Government filed its opposition to Defendant's Motion, primarily arguing that his convictions under § 848(e) do not constitute covered offenses and, therefore, the Court may not reduce his sentence. (Govt's Opp. to Def.'s First Step Act Mot. ("Govt's Resp.") (ECF No. 43).) On October 2, 2020, Defendant filed his reply, rendering this matter now ripe for review.

## II.   STATUTORY BACKGROUND

Defendant's motion relies on the interplay between three statutes, each of which plays a role in the Court's analysis. First, 18 U.S.C. § 3582(c)(1)(B) grants the Court the authority to consider modifying Defendant's sentence. Second, the Fair Sentencing Act provides the substantive relief sought in Defendant's motion. Third, the First Step Act allows the Court to apply the Fair Sentencing Act retroactively. Essentially, the Fair Sentencing Act altered the sentences applicable to certain offenses and the First Step Act provides the vehicle by which the Court may apply those altered sentences.

Neither party has identified any binding authority from the Fourth Circuit or the Supreme Court (or persuasive authority from other circuit courts) interpreting the relevant portions of these statutes and their interplay with each other as applied to these facts and counts of conviction. Thus, the Court must primarily engage in an exercise of statutory interpretation. "The starting point of any issue of statutory interpretation . . . is the language of the statute

9

J.A.105

itself." *United States v. Bly*, 510 F.3d 453, 460 (4th Cir. 2007). "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (citations omitted). Because none of the three statutes at issue suffers from ambiguity, and because their relationships to each other and the statutes under which the jury convicted Defendant lack ambiguity as well, the Court's analysis begins and ends with the text.

## A.    18 U.S.C. § 3582(c)(1)(B)

Courts operate under a "baseline rule of sentence finality," which states that "sentences may not be modified once imposed." *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020). Congress has provided a "narrow exception to finality" in 18 U.S.C. § 3582(c)(1)(B). *United States v. Wirsing*, 943 F.3d 175, 184 (4th Cir. 2019). This statute provides that "[t]he court may not modify a term of imprisonment once it has been imposed except that, in any case, the court may modify an imposed term of imprisonment *to the extent otherwise expressly permitted by statute*." 18 U.S.C. § 3582(c)(1)(B) (emphasis added).

This general rule of finality guides the Court in its interpretation of the scope of the other specific statutes in this case. By the plain language of § 3582(c)(1)(B), the Court may modify Defendant's sentences only as *expressly permitted* by the Fair Sentencing Act and the First Step Act. *See Wirsing*, 943 F.3d at 184 ("The First Step Act thus fits under the narrow exception to finality provided in § 3582(c)(1)(B) because it expressly permits the court to modify a term of imprisonment." (quotations omitted)). Accordingly, the Court turns to those statutes.

## B.    The Fair Sentencing Act

The Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010), provided

the substantive change that Defendant claims entitles him to a reduction of his sentences for his murder convictions. The Fair Sentencing Act addressed a sentencing disparity between crack and powder cocaine offenses by increasing the amount of crack cocaine needed to trigger mandatory minimum sentences. *Wirsing*, 943 F.3d at 178. The disparity originated in a statute passed in 1986 titled the Anti-Drug Abuse Act of 1986. *Kimbrough v. United States*, 552 U.S. 85, 95 (2007) (citing Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207). The Anti-Drug Abuse Act introduced mandatory minimums for drug offenses tied to specific weights of particular drugs. Anti-Drug Abuse Act § 1002, 100 Stat. at 3207-2 to -4 (codified at 21 U.S.C. § 841(b)(1)). A defendant convicted of an offense involving 5 kilograms of cocaine or 50 grams of crack cocaine faced a ten-year mandatory minimum. *Id.* § 1002, 100 Stat. at 3207-2. Similarly, the statute mandated a five-year minimum sentence for a conviction of 500 grams or more of powder cocaine or 5 grams or more of crack cocaine. *Id.* § 1002, 100 Stat. at 3207-3. Thus, the Anti-Drug Abuse Act provided that "a drug trafficker dealing in crack cocaine [was] subject to the same sentence as one dealing in 100 times more powder cocaine." *Kimbrough*, 552 U.S. at 91.

This "100-to-1 ratio came under heavy criticism." *Wirsing*, 943 F.3d at 177 (citing *Dorsey v. United States*, 567 U.S. 260, 268 (2012) and *Kimbrough*, 552 U.S. at 97-100). Such criticism stemmed from the fact that "research showed the relative harm between crack and powder cocaine [was] less severe than 100 to 1." *Dorsey*, 567 U.S. at 268. Additionally, "the public had come to understand sentences embodying the 100-to-1 ratio as reflecting unjustified race-based differences." *Id.* Finally, the disparity "mean[t] that a major supplier of powder cocaine [could] receive a shorter sentence than a low-level dealer who b[ought] powder from the supplier but then convert[ed] it to crack." *Kimbrough*, 552 U.S. at 95.

11

In 2010, Congress passed the Fair Sentencing Act to reduce this disparity. *See United States v. Black*, 737 F.3d 280, 282 (4th Cir. 2013) ("Congress enacted the Fair Sentencing Act [] in response to extensive criticism about the disparity in sentences between crack offenses and powder cocaine offenses."). In § 2, the Fair Sentencing Act reduced the statutory minimums for crack cocaine offenses by increasing the quantity of crack cocaine necessary to trigger the minimums. *Id.* Specifically, Section 2 amended 21 U.S.C. § 841(b)(1) to raise the amount from 5 grams to 28 grams for the 5-year minimum, and from 50 grams to 280 grams for the 10-year minimum sentence. Fair Sentencing Act § 2, 124 Stat. at 2372 (codified at 21 U.S.C. § 841(b)(1)). Additionally, in Section 3, the Fair Sentencing Act eliminated the mandatory minimum sentence for "simple possession" of crack cocaine. *Id.* § 3, 124 Stat. at 2372 (codified at 21 U.S.C. § 844(a)).

Although the Fair Sentencing Act reduced the sentencing disparity in offenses involving the possession, production or distribution of crack cocaine, it did not amend the statutory penalties for violent crimes in furtherance of trafficking crack cocaine. On the contrary, rather than reducing the statutory penalties for violent drug offenses, Congress instructed the United States Sentencing Commission to amend the sentencing guidelines to increase the offense levels "if the defendant used violence, made a credible threat to use violence, or directed the use of violence during a drug trafficking offense." *Id.* § 5, 124 Stat. at 2373. Likewise, Congress directed the Sentencing Commission to increase the offense levels based on the defendant's role and other aggravating factors, including that the "defendant committed the drug trafficking offense as part of a pattern of criminal conduct engaged in as a livelihood." *Id.* at § 6, 124 Stat. at 2373-4. The statute's language clearly demonstrates Congress' intent to reduce the penalties for non-violent crack cocaine offenses without commensurate reductions for violent crack

cocaine offenses.

Later, the Supreme Court held that the new penalty provisions in the Fair Sentencing Act applied to all crack cocaine offenders sentenced on or after August 3, 2010, even for offenses committed before that date. *Dorsey*, 567 U.S. at 264. However, the modifications to the statutory minimum sentences did "not apply retroactively to defendants who both committed crimes and were sentenced for those crimes before August 3, 2010." *Black*, 737 F.3d at 287.

## C.    The First Step Act

In December 2018, Congress remedied the non-retroactivity of the Fair Sentencing Act with the passage of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. "On its face, the First Step Act allows the retroactive application of the modifications to penalties that Congress enacted in the Fair Sentencing Act." *Wirsing*, 943 F.3d at 180. Specifically, Section 404 made the Fair Sentencing Act's modifications to crack cocaine offenses retroactive for defendants convicted before its enactment.

Section 404 has three subsections. Subsection 404(a) defines which offenses the First Step Act's imposition of retroactivity covers:

> (a)  DEFINITION OF COVERED OFFENSE.— In this section, the term "covered offense" means a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (citation omitted), that was committed before August 3, 2010.

First Step Act, § 404(a), 132 Stat. at 5222. For those defendants sentenced for a covered offense, the next subsection provides how the Court may reduce that sentence:

> (b)  DEFENDANTS PREVIOUSLY SENTENCED.— A court that imposed a sentence for a covered offense, may, on motion of the defendant, the Director of the Bureau of Prisons, the attorney for the Government, or the court, impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 (citations omitted) were in effect at the time the covered offense was committed."

*Id.* § 404(b), 132 Stat. at 5222. The final subsection of § 404 limits those defendants who may

13

bring a motion and makes clear that the Court retains discretion whether to grant a motion for a sentence reduction:

> (c) LIMITATIONS.— No court shall entertain a motion made under this section to reduce a sentence if the sentence was previously imposed or previously reduced in accordance with the amendments made by sections 2 and 3 of the Fair Sentencing Act (citations omitted) or if a previous motion made under this section to reduce the sentence was, after the date of the enactment of this Act, denied after a complete review of the motion on the merits. Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section.

*Id.* § 404(c), 132 Stat. at 5222. Thus, Section 404 of the First Step Act defines which sentences the Court may reduce and provides the procedure and authority to apply the Fair Sentencing Act's crack cocaine penalties retroactively for defendants who committed their covered offenses before August 3, 2010.

## III.    ANALYSIS

Defendant argues that the First Step Act grants the Court authority to modify his sentences for offenses committed under § 848(e) and § 841. The Court entertains this request for a modified sentence mindful of the "baseline rule of sentence finality," *Chambers*, 956 F.3d at 671, and that "[t]he law closely guards the finality of criminal sentences against judicial 'change of heart.'" *United States v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010); 18 U.S.C. §3582(b). Clearly, Defendant's desire to have the sentences reduced for his Capital Murder Convictions drives his request, so those offenses likewise will direct the Court's analysis. Thus, Defendant's motion first and foremost requires the Court to determine whether Defendant's convictions for Murder in Furtherance of a Continuing Criminal Enterprise, in violation of 21 U.S.C. § 848(e)(1)(A), constitute covered offenses under the First Step Act.

The Court must first address the threshold covered offense question, because "eligibility [for a sentence modification] turns on the proper interpretation of a 'covered offense.'" *Wirsing*,

14

**J.A.110**

943 F.3d at 185; *United States v. Gravatt*, 953 F.3d 258, 260 (4th Cir. 2020) ("[T]he existence of a 'covered offense' is a threshold requirement under the [First Step] Act."). By its own terms, the First Step Act defines a "covered offense" as "a violation of a Federal criminal statute, the statutory penalties for which were modified by Sections 2 or 3 of the Fair Sentencing Act of 2010." First Step Act, § 404(a), 132 Stat. 5222. Accordingly, eligibility turns on which statute Defendant violated and whether Section 2 or 3 of the Fair Sentencing Act modified the statutory penalties for that statute. *See United States v. Woodson*, 962 F.3d 812, 816 (4th Cir. 2020) (emphasizing that "covered offense" inquiry turns on change to statutory penalties for the defendant's statute of conviction). In conducting its covered offense inquiry, the Court first will analyze Defendant's particular convictions; then, it will conduct a textual analysis of the statute of those convictions; and, finally, it will analyze the potential application of Defendant's reading of the statute.

Because the Court ultimately finds that Defendant's Capital Murder Convictions do not constitute covered offenses, the Court will then determine whether Defendant's Drug Distribution Conviction nevertheless warrants a sentence reduction.

## A.    Defendant's Capital Murder Convictions under § 848(e).

Defendant argues that his Capital Murder Counts qualify as covered offenses under the First Step Act. In each of those counts, the jury convicted Defendant of violating 21 U.S.C. § 848(e)(1)(A). To determine whether Defendant's statute of conviction for these counts constitutes a covered offense, the Court will first examine which statutes the relevant provisions of the Fair Sentencing Act affected. Section 2 of the Fair Sentencing Act, titled "Cocaine Sentencing Disparity Reduction," amended 21 U.S.C. §§ 841(b)(1)(A)(iii), 841(b)(1)(B)(iii), 960(b)(1)(C) and 960(b)(2)(C). Additionally, Section 3 of the Fair Sentencing Act, titled "Elimination of Mandatory Minimum Sentences for Simple Possession," amended 21 U.S.C.

§ 844(a). Thus, together, Sections 2 and 3 expressly affected three criminal statutes: 21 U.S.C. § 841(b)(1), 21 U.S.C. § 960(b) and 21 U.S.C. § 844(a). Violations of these three statutes constitute "covered offenses" under § 404(a) of the First Step Act. However, § 848 proves conspicuously absent from Sections 2 and 3 of the Fair Sentencing Act. And for good reason: as § 848 targets dangerous drug kingpins while the Fair Sentencing Act seeks to address the sentencing disparity between low-level crack dealers and large-scale powder cocaine distributors.

Given that § 3582(c)(1)(B) permits modifications to a sentence only when "expressly permitted" by statute or Rule 35, and only then "to the extent" that the statute expressly provides, this absence provides strong evidence that a violation of § 848(e)(1)(A) does not constitute a "covered offense." 18 U.S.C. § 3582(c)(1)(B); *see United States v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth."). However, because some parts of the CCE statute reference the statutes that the Fair Sentencing Act did modify, the Court will make further inquiry into the question. Armed with an understanding of what statutes the Fair Sentencing Act affected, the Court can now turn to an analysis of whether the Fair Sentencing Act affected the statutory penalties for Defendant's statute of conviction. Specifically, the Court must identify with particularity Defendant's statute of conviction and then address Defendant's arguments as to why his particular convictions qualify as covered offenses.

i.    **Section 848(e)(1)(A) as a Standalone Offense Constitutes Defendant's Statute of Conviction.**

In identifying with particularity Defendant's statute of conviction, the Court must determine whether to analyze § 848 as a whole or specifically § 848(e)(1)(A) as Defendant's

16

statute of conviction. Indeed, the Court's review of § 848 and the relevant case law indicates that the Fair Sentencing Act potentially modified the sentencing penalties for some § 848 convictions, but not all. For the reasons stated below, the Court finds that § 848(e)(1)(A) constitutes Defendant's statute of conviction, rendering the case law regarding other sections of § 848 inapposite.

Section 848 penalizes engaging in a "continuing criminal enterprise," which occurs if:

(1) he violates a provision of this subchapter or subchapter II the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

21 U.S.C. § 848(c). Section 848 contains three substantive provisions, each of which provides for its own criminal liability and penalties. 21 U.S.C. § 848(a), (b), and (e). Section 848(a) provides for a 20-year mandatory-minimum sentence for "any person who engages in a continuing criminal enterprise," and increases that mandatory-minimum to 30 years if the person has a previous drug conviction. 21 U.S.C. § 848(a). Section 848(b) mandates a life sentence for any principal of a sufficiently large continuing criminal enterprise, as measured in terms of either drug quantity or gross receipts. 21 U.S.C. § 848(b). Notably, the drug quantity necessary to trigger the mandatory life sentence hinges on the amount in 21 U.S.C. § 841(b)(1)(B). Thus, Section 2 of the Fair Sentencing Act may have an indirect effect on the statutory penalties of 21 U.S.C. § 848(b).

However, the possibility that the First Step Act may implicate § 848(b) does not help

17

Defendant, because the jury convicted Defendant of violating § 848(e). And under Fourth Circuit precedent, § 848(e) acts as an entirely self-contained subsection of the statute. *See United States v. NJB*, 104 F.3d 630, 635 (4th Cir. 1997) ("In sum, because § 848(e) clearly sets forth a separate substantive violent offense, the Government's certification of this fact did not constitute error."). Indeed, § 848(e)(1)(a) clearly defines the conduct that it prohibits and the penalties for violating it. Moreover, other provisions in a previous version of the statute referenced § 848(e) as a distinct offense, which the Fourth Circuit has determined "clearly expresses Congress' intent that § 848(e) be a separate crime." *Id.* at 633. Thus, for purposes of Defendant's First Step Act motion, the Court finds that § 848(e)(1)(A) — and not § 848 broadly — constitutes his statute of conviction.

Focusing then on Defendant's statute of conviction, the Court finds that § 848(e)(1)(A) does not constitute a covered offense within the meaning of the First Step Act. Section 848(e)(1)(A) provides that:

> any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

21 U.S.C. § 848(e)(1)(A). This statute clearly defines the conduct that it prohibits — killing in furtherance of any one of three distinct predicate offenses — and the statutory penalties for engaging in the prohibited conduct — death or life imprisonment with a mandatory minimum of 20 years' imprisonment. The Fair Sentencing Act did not change either. Accordingly, the Court starts with the premise that, on its face, neither sections 2 nor 3 of the Fair Sentencing Act directly altered the statutory penalties in § 848(e) and, therefore, the First Step Act does not directly apply. However, in arguing that his Capital Murder Convictions constitute covered

18

offenses, Defendant relies on the specific facts underlying his convictions. Yet, the facts underlying Defendant's convictions cut against a finding that his Capital Murder Convictions constitute covered offenses under the First Step Act.

**ii.     Defendant's Conviction Under § 848(e)(1)(A) Did Not Directly Rely on a Violation of § 841(b)(1)(A).**

Defendant argues that the First Step Act covers his convictions under § 848(e), because his "statutory maximum under § 848 was increased to a death sentence as a result of his possession with intent to distribute cocaine base conviction that would no longer subject him to the death penalty." (Def.'s Mot. at 3-4.) Defendant further claims that "[b]ecause conviction of an offense punishable under § 841(b)(1)(A) is incorporated as an element of § 848(e)(1)(A), Mr. Roane's § 848 convictions would no longer be subject to the death penalty." (Def.'s Mot. at 4.) In addition to the fact that his argument stretches the First Step Act well beyond Congress' intended reach, as discussed below, his argument plainly misstates the facts of his § 848(e)(1)(A) convictions. In truth, Defendant's § 848(e)(1)(A) convictions had no basis in § 841(b)(1)(A) and did not incorporate § 841(b)(1)(A) as an element.

As the statute itself makes clear and the Fourth Circuit has noted, §848(e)(1)(A) has three distinct prongs. *United States v. Hager*, 721 F.3d 167, 179-80 (4th Cir. 2013). A review of the record clearly demonstrates that Defendant's convictions rested on the first prong — engaging in or working in furtherance of a continuing criminal enterprise. First, in the Indictment, the Capital Murder Counts all charge Defendant with a specific killing "while engaged in and working in furtherance of a Continuing Criminal Enterprise." (Indictment at 7, 9-10.) The Counts make no mention of § 841(b)(1)(A). Second, the Court's instructions to the jury with respect to these Counts make no reference to § 841(b)(1)(A). Instead, the Court informed the jurors that the Indictment charged Defendant with a killing "while engaged in or working in

19

furtherance of a continuing criminal enterprise." (Instruction No. 20.) Importantly, the jury

instruction providing the statute of offense appears below, exactly as the jury received it:

> Title 21, United States Code, Section 848(e)(1)(A) provides in pertinent part that:
>
>> any person engaging in or working in the furtherance of a continuing criminal
>> enterprise . . . who intentionally kills or counsels, commands, induced, procures,
>> or causes the intentional killing of an individual and such killing results
>
> is guilty of an offense against the United States.

(Instruction No. 21.) Indeed, the jury instructions *expressly omitted* the statute's reference to

§ 841(b)(1)(A). The Court further instructed the jury on the elements of the offense, referencing

only the continuing criminal enterprise and, again, omitting any reference to § 841(b)(1)(A).

Finally, on the verdict form returned by the jury for the Capital Murder Counts, the jury found

Defendant guilty of "Killing of [victim's name] while Engaged In or Working In Furtherance of

a Continuing Criminal Enterprise." (Instruction No. 21.) Again, no mention of § 841(b)(1)(A)

existed. Simply put, Defendant's convictions in no way rest on the second prong — engaging in

an offense punishable under § 841(b)(1)(A).

As the record makes clear, Defendant's conviction on Count Two for engaging in a CCE

served as the predicate offense for his Capital Murder Convictions. And, neither the Fair

Sentencing Act nor the First Step Act extinguished his criminal liability for his CCE conviction

under § 848(a). A CCE conviction requires proof that the defendant "violate[d] any provision of

this subchapter or subchapter II the punishment for which is a felony." 21 U.S.C. § 848(c). In

finding Defendant guilty of the CCE violation in Count Two, the jury found that Defendant had

committed felony violations of federal narcotics laws, including § 841(a). That is, in Count

Thirty-Two, the jury found beyond a reasonable doubt that Defendant had possessed with the

intent to distribute, and conspired to possess with the intent to distribute, more than 50 grams of

20

**J.A.116**

crack cocaine. The jury's findings would still lead to convictions of felony federal narcotics laws, including § 841(a), even after the Fair Sentencing Act. *See* 21 U.S.C. § 841(b)(1)(B)(iii) (providing for a sentence of 5 to 40 years' imprisonment for more than 28 grams of crack cocaine); *United States v. Venable*, 943 F.3d 187, 193 (4th Cir. 2019) (noting how the offenses reclassified under Fair Sentencing Act remain felonies). The Fair Sentencing Act did not change the fact that Defendant would still have been found guilty of federal narcotics laws, only that the statutory penalties for such stand-alone convictions based on those violations would have differed.

The verdicts in this case make clear that the jury found beyond a reasonable doubt that Defendant had committed the predicate offenses for both § 848(a) and § 848(e)(1)(A), and any modification to the statutory penalties of the underlying offenses does not change that finding. *Cf. United States v. Hopkins*, 310 F.3d 145, 153 (4th Cir. 1997) ("Moreover, a defendant's conviction under § 924(c) does not depend on his being convicted — either previously or contemporaneously — of the predicate offense, as long as all of the elements of that offense are proved and found beyond a reasonable doubt." (internal quotations omitted)). In short, Defendant's possession with intent to distribute more than 50 grams of crack can still serve as a predicate for his CCE conviction, regardless of his sentencing exposure for a separate charge for that conduct. Consequently, the jury necessarily found beyond a reasonable doubt that Defendant had committed all of the elements of an offense for engaging in a continuing criminal enterprise, in violation of § 848(a), regardless of the statutory penalties for each element. Likewise, the jury found that Defendant had committed all of the elements necessary to prove a violation § 848(e)(1)(A), regardless of the statutory penalties for each element standing alone. And Defendant received the challenged sentences for murdering individuals in furtherance of a

**J.A.117**

continuing criminal enterprise, not for violating the federal narcotics laws. Thus, the statutes modified by the Fair Sentencing Act did not form the predicate for Defendant's convictions under § 848(e)(1)(A).

### iii.    Defendant's § 848(e)(1)(A) Convictions Did Not Indirectly Rely on a Violation of § 841(b)(1)(A).

Aside from incorrectly arguing that § 841(b)(1)(A) formed the predicate for his Capital Murder Convictions, Defendant also asks the Court to connect several dots to find that his convictions under § 848(e)(1)(A) constitute covered offenses. (Def.'s Reply at 2.) Specifically, Defendant offers two alternative paths for the Court to reach this conclusion. First, Defendant argues that the Fourth Circuit found that Defendant's § 848(e)(1)(A) conviction included as a lesser offense his conviction under § 846 in Count One, vacating his Count One conviction on Double Jeopardy grounds.[6] (Def.'s Reply at 2.) His § 846 conviction, in turn, rested on a conspiracy to violate § 841(b)(1)(A). According to Defendant, because the Fair Sentencing Act modified the statutory penalties for violations of § 841(b)(1)(A), it modified the statutory penalties for violations of § 846 and, therefore, modified the statutory penalties for violations of § 848(e)(1)(A). In sum, Defendant argues that his "§ 848(e)(1)(A) convictions did indeed rest on proof of a violation of § 841(b)(1)(A)." (Def.'s Reply at 2.)

Alternatively, Defendant argues that his § 848(e)(1)(A) conviction relied on his § 848(a) conviction in Count Two.[7] (Def.'s Reply at 2.) His § 848(a) conviction, in turn, rested on violations of § 841(b)(1)(A). (Def.'s Reply at 2.) Again, according to Defendant, this modified the statutory penalties for violations of § 848(a) and, therefore, modified the statutory penalties

---

[6]    Notably, the Fair Sentencing Act did not expressly modify the statutory penalties for violations of § 846.

[7]    Likewise, the Fair Sentencing Act did not expressly modify the statutory penalties for violations of § 848(a).

22

for violations of § 848(e)(1)(A). (Def.'s Reply at 2.) In essence, Defendant argues that his Capital Murder Convictions necessarily flow from his Drug Distribution Convictions, rendering them covered by the First Step Act.

However, this argument ignores the fact that § 848(e)(1)(A) operates as a stand-alone offense. *See NJB*, 104 F.3d at 633 (holding that the statute "clearly expresses Congress' intent that § 848(e) be a separate crime"). Importantly, this also ignores the fact that Congress created distinct penalties for violations of § 841 on the one hand, and violations of § 848 on the other. *Garrett v. United States*, 471 U.S. 773, 794-95 (1985) (allowing cumulative sentences for § 841 and § 848 convictions). Indeed, the Supreme Court in *Garrett* held "that Congress intended separate punishments for the underlying substantive predicates and for the CCE offense." *Id.* at 795. Because Congress created separate punishments, modifications to the statutory penalties in § 841 do not necessarily result in modifications to the statutory penalties in § 848. Moreover, as described above, the jury found beyond a reasonable doubt that Defendant had committed all of the elements of § 848(e)(1)(A), regardless of the statutory penalties that those elements could expose Defendant to when charged as separate offenses.

Defendant's argument attempts to rewrite the definition of a covered offense to mean "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010, or a violation of a Federal criminal statute that rests on the violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010." Congress did not write the First Step Act this broadly. Instead, Congress limited covered offenses to those discreet offenses whose statutory penalties the Fair Sentencing Act modified. The following textual analysis of the statute confirms the conclusion that Congress did not intend the First Step Act to reach so broadly as to

23

J.A.119

cover all offenses related to crack cocaine, especially deadly offenses.

**B.    A Textual Analysis of the Statutes at Issue Demonstrates That Congress Did Not Intend to Cover § 848(e)(1)(A) Convictions Under the First Step Act.**

In analyzing the texts of the statutes at issue, it becomes clear that Congress did not intend for the First Step Act to cover offenses under § 848(e)(1)(A). The structure of the Fair Sentencing Act further evinces this intent. Likewise, the general Savings Statute confirms that the First Step Act does not cover Defendant's murder convictions.

**i.    Congress Clearly Did Not Intend for the First Step Act to Cover Convictions Under § 848(e).**

Congress' clearly expressed intent with respect to both § 848(e)(1)(A) and the Fair Sentencing Act directly contradicts Defendant's argument for application of the First Step Act to § 848(e)(1)(A). Congress enacted § 848 to combat violent drug traffickers. "A common-sense reading of [the definition of a continuing criminal enterprise] reveals a carefully crafted prohibition aimed at a special problem. This language is designed to reach the 'top brass' in the drug rings, not the lieutenants and foot soldiers." *Garrett*, 471 U.S. at 781. Conversely, the Fair Sentencing Act aimed to ameliorate a disparate sentencing scheme for those lieutenants and foot soldiers (but not the top brass) serving sentences for possession and distribution (but not for violence). *See, e.g., Kimbrough*, 552 U.S. at 98 (noting that the disparate sentencing scheme ran contrary to the "goal of punishing major drug traffickers more severely than low-level dealers"); *Dorsey*, 567 U.S. at 269-70 (noting that Congress enacted the Fair Sentencing Act in response to, among other problems, the disproportionate treatment of low-level dealers and major drug traffickers). And in passing the First Step Act, "Congress's clear intent was to apply the Fair Sentencing Act to pre-Fair Sentencing Act offenders, including those who were heretofore ineligible for such relief." *Wirsing*, 943 F.3d at 186.

Defendant did not simply deal drugs. Defendant dealt drugs, managed other drug dealers

24

**J.A.120**

and *murdered others in furtherance of his drug dealing.* Nothing in the three statutes above indicates that Congress intended to reduce the sentences for lethal drug dealers. In fact, the Fair Sentencing Act's instructions to *increase* the guidelines for violent drug crimes clearly demonstrates the opposite intent of that which Defendant seeks.

This conclusion becomes even stronger in light of the fact that Congress must "expressly" provide for any exceptions to the narrow rule of sentencing finality. Defendant asks the Court to shoehorn a stretched implication into a narrow exception to allow a serial murderer to use the First Step Act to reduce his murder sentences, all in contradiction of the Fair Sentencing Act's clear intent. *See Chambers*, 956 F.3d at 676 (Rushing, J., dissenting) ("As the text makes clear, Congress's concern in Section 404 was to extend the cocaine sentencing provisions of the Fair Sentencing Act retroactively, not to provide a general opportunity to collaterally attack a final sentence.").

> ii. **The Structure of The First Step Act Demonstrates that It Does Not Apply to Defendant's Convictions.**

The First Step Act's structure directs its application in a manner that demonstrates its inapplicability to Defendant's convictions. The text indicates that "[a] court that imposed a sentence for a covered offense may . . . impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 . . . were in effect at the time the covered offense was committed." First Step Act, § 404(b). Put simply, if a defendant received a sentence before the Fair Sentencing Act that was subject to shorter statutory penalties after the Fair Sentencing Act, then the Court may now — in its discretion — impose a shorter sentence. Here, that is not possible.

If Defendant had been convicted of § 848(e)(1)(A) after the passage the Fair Sentencing Act, his sentences on the Capital Murder Counts still would have subjected him to either a sentence of death or life imprisonment with a mandatory minimum of 20 years' imprisonment.

J.A.121

The Fair Sentencing Act did not alter that a jury would render his sentence on these Counts. And, nothing in sections 2 or 3 of the Fair Sentencing Act would have changed the instructions or evidence given to the jury in the penalty phase. Moreover, unlike a covered offense under § 841, the Court here would have no new statutory penalties on which to base a reduced sentence. In sum, nothing in sections 2 or 3 of the Fair Sentencing Act would have changed Defendant's sentencing exposure on his § 848(e)(1)(A) convictions. This precludes the Court from imposing a reduced sentence "as if" the Fair Sentencing Act had been in effect. If the possibility of a reduced sentence for an offense does not exist, then the "reduced sentence" and "as if" provisions in the First Step Act have no meaning. But Congress chose to include these provisions, and this Court must "give effect to Congress' choice" to include the provisions. *See Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 354 (2013); *United States v. Menasche*, 348 U.S. 528 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section."). Consequently, the Court will not interpret the statute in a way that essentially reads the "reduced sentence" and "as if" provisions out of the statute. *United States v. Atlantic Research Corp.*, 551 U.S. 128, 137 (2007) (rejecting an interpretation that would render a statutory provision "a dead letter"). The fact that the Court cannot impose a reduced sentence under the Fair Sentencing Act supports the conclusion that Defendant's § 848(e)(1)(A) convictions do not constitute covered offenses.

### iii.      The Savings Statute Renders the Penalties for Defendant's § 848(e)(1)(A) Convictions Unchanged.

The Government argues that the Savings Statute precludes a finding that Defendant's Capital Murder Convictions constitute covered offenses. (Govt's Resp. at 23.) The Court agrees.

J.A.122

The general Savings Statute provides in pertinent part:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109. First, neither the First Step Act nor the Fair Sentencing Act expressly provided for the release or elimination of any penalty or liability incurred under § 848(e)(1)(A), so the Court starts with the presumption that neither Act had the effect of doing so. Yet, even under Defendant's theory that the modifications of the penalties in § 841(a)(1) work their way up the chain to modify the penalties of § 848(e), the chain breaks under the weight of the Savings Statute.

The Savings Statute comes into play with respect to the reduced penalties for crack offenses, because "[c]ase law makes clear that the word 'repeal' applies when a new statute simply diminishes the penalties that the older statute set forth." *Dorsey*, 567 U.S. at 272; *see also United States v. Bullard*, 645 F.3d 237, 248 (4th Cir. 2011) ("But we have squarely held that although § 109 specifically refers only to repealed statutes, it also applies to statutes changed by amendment." (internal quotations omitted)). Accordingly, the Fair Sentencing Act "repealed" § 841(a)(1) and § 841(b)(1) and replaced them with different statutory penalties.

In examining the effect of a later statute under the Savings Statute, Congress need not use any particular magic words to extinguish liability or penalties, because the Savings Statute "cannot justify a disregard of the will of Congress as manifested either expressly or by *necessary implication* in a subsequent enactment." *Dorsey*, 567 U.S. at 274 (internal quotations omitted) (emphasis in original). Neither the Fair Sentencing Act nor the First Step Act expressly provided

27

J.A.123

that it would extinguish liability incurred under § 841(a)(1). Likewise, neither necessarily implied that they would extinguish liability incurred under § 841(a)(1). Instead, they altered the statutory penalties but not criminal liability. Thus, under the Savings Statute, neither statute could have the effect of extinguishing criminal liability for violations of § 841(a)(1). *See United States v. Stitt*, 552 F.3d 345, 353 (4th Cir. 2008) (explaining that "under the Savings Statute, a liability that arises under a later-repealed statute is preserved despite repeal and may be enforced by a post-repeal action." (internal quotations omitted)).

Consequently, Defendant's criminal liability incurred for violations of § 841(a)(1) in Count Thirty-Two stands. Defendant's criminal liability incurred for violations of § 848(a) for engaging in a continuing criminal enterprise in Count Two — based in part on conduct that violated § 841(a) — stands. And his criminal liability for murders — based in part on conduct that violates § 848(a) — stands.

Indeed, Defendant correctly concedes that his convictions under all of these statutes remain intact. (Def.'s Reply at 5.) Defendant completed each crime at the time of the murder, and no adjustments to the penalties of the offenses in § 841 have altered his criminal liability or the penalties for § 848. *See Dorsey*, 567 U.S. at 272 ("Case law also makes clear that penalties are 'incurred' under the older statute when an offender becomes subject to them, *i.e.*, commits the underlying conduct that makes the offender liable."); s*ee also United States Guerrero*, 813 F.3d 462, 466 (2d Cir. 2016) ("Because the [Fair Sentencing Act] did not expressly extinguish any criminal liability under § 848(e)(1)(A), the law's enactment did not retroactively invalidate Guerrero's convictions."). Accordingly, the Savings Statute pushes Defendant's § 848(e)(1)(A) conviction farther beyond the reach of the First Step Act than even a straightforward reading of the statutes suggests.

28

**C.      Application of the Fair Sentencing Act Demonstrates that It Does Not Apply to Defendant's Convictions.**

Not only would the conclusion that the First Step Act covers Defendant's convictions

contravene the intent of Congress as clearly expressed in the text of the statutes, but attempting

to apply that conclusion proves untenable.  This result further demonstrates the defect in

Defendant's argument.

**i.      Section 848(e) Differs from the Other Statutes Found to Have Been Indirectly Modified by the Fair Sentencing Act.**

The Court recognizes that the Fourth Circuit has found that the First Step Act can cover

offenses not directly amended by sections 2 or 3 of the Fair Sentencing Act.  *See, e.g., Woodson*,

962 F.3d at 816 (finding a conviction under § 848(b)(1)(C) a "covered offense" although the Fair

Sentencing Act did not amend the text).  The Fourth Circuit's analysis in *Woodson* as to why

"Congress did not need to amend the text of Subsection 841(b)(1)(C) to make this change"

supports the conclusion that Defendant's convictions under § 848(e)(1)(A) do not constitute

covered offenses.  *Id.*  In *Woodson*, the Fourth Circuit used a before-and-after approach to

determine whether the Fair Sentencing Act modified § 841(b)(1)(C), the statute at issue there.

*Id.*  In answering in the affirmative, the court noted:

> Before the Fair Sentencing Act, Subsection 841(b)(1)(C)'s penalty applied only to
> offenses involving less than 5 grams of crack cocaine (or an unspecified amount).  But
> because of the changes rendered by Section 2 of the Fair Sentencing Act, the penalty in
> Subsection 841(b)(1)(C) now covers offenses involving between 5 and 28 grams of crack
> cocaine as well.

962 F.3d at 816.  Continuing, "Subsection 841(b)(1)(C) set forth the penalty for quantities of

crack cocaine between zero and 5 grams (or an unspecified amount) before the Fair Sentencing

Act, and between zero and 28 grams (or an unspecified amount) after.  This is a modification."

*Id.*  The court went on to note that Woodson's conviction of 0.41 grams of crack cocaine

amounted to 8.2% of the upper end of Subsection 841(b)(1)(C)'s range before the Fair

29

Sentencing Act, but only 1.5% of the upper end after the Fair Sentencing Act, which a sentencing judge could find relevant. *Id.* at 817. Because of the calculable differences in the penalties associated with Woodson's conviction before and after the Fair Sentencing Act, the Fourth Circuit found the offense covered by the First Step Act. The conclusion in *Woodson* falls squarely in line with Congress' intent to reduce the crack cocaine-to-powder cocaine disparity for non-violent offenses, even if it did not directly amend the text of § 841(b)(1)(C).

Applying the same before-and-after analysis here to Defendant's convictions leads to the opposite result. Before the Fair Sentencing Act, § 848(e)(1)(A)'s penalties applied to killings in furtherance of a continuing criminal enterprise. After the changes rendered by Section 2 of the Fair Sentencing Act, the penalty in § 848(e)(1)(A) still covers killings in furtherance of a continuing criminal enterprise. In other words, § 848(e)(1)(A) set forth the penalty for killing in furtherance of a continuing criminal enterprise both before and after the Fair Sentencing Act. No modification exists. The penalties in § 848(e)(1)(A) simply do not depend on a specific quantity of drugs. Both before and after the passage of the Fair Sentencing Act Defendant's convictions for killing Douglas Moody, Peyton Johnson and Louis Johnson in furtherance of a continuing criminal enterprise remain punishable by death or life imprisonment with a mandatory minimum of 20 years' imprisonment. As a result, this case differs from *Woodson*, where the Fourth Circuit found that by modifying the conduct at issue under § 841(b)(1)(C), the Fair Sentencing Act also modified the statutory penalties for § 841(b)(1)(C). Here, unlike in *Woodson*, Congress did not modify the conduct at issue in § 848(e)(1)(A) and, therefore, did not modify the statutory penalties. Accordingly, the suggestion that Congress amended § 848(e)(1)(A) to reduce the penalties for lethal drug traffickers finds itself far afield of any intent expressed by Congress.

30

ii.    **The First Step Act Cannot Override the Sentencing Statutes Applicable to Defendant's Convictions.**

Even if the Fair Sentencing Act could have indirectly modified the statutory penalties for convictions under § 848(e)(1)(A), the Court could not reduce Defendant's death sentence. A comparison of the language between the statutes at issue reveals that Congress did not intend for the First Step Act to authorize courts to reduce death sentences imposed under § 848(e)(1)(A). First, Defendant's sentencing statute mandated the imposition of the death penalty upon the jury's recommendation.[8] 21 U.S.C. § 848(l) (repealed 2006) ("Upon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death."). The statute that would govern sentencing if Defendant were convicted for similar crimes today likewise contains mandatory language. *See* 18 U.S.C. § 3591(a) (mandating that a defendant "shall be sentenced to death" if the jury recommends such a sentence following a hearing). That mandatory language contrasts starkly with the First Step Act, which contains undeniably permissive language in two of its three sections: "A court that imposed a sentence for a covered offense *may*, on motion of the defendant . . . impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed." First Step Act, § 404(b) (emphasis added). The next subsection reinforces the discretion granted the courts: "Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section." *Id.*, § 404(c).

The Court must give effect to both statutes. "[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the

---

[8]    Congress repealed §§ 848(g)-(r) in 2006 and made § 848(e)(1)(A) offenses subject to the death penalty provisions of the Federal Death Penalty Act, 18 U.S.C. § 3591, *et seq.* ("FDPA"). Pub. L. 109-177, 120 Stat. 231, 232. However, the Fourth Circuit has held that §§ 848(g)-(r) continue to apply to defendants sentenced before the repeal of those sections. *Stitt*, 552 F.3d at 354 ("We think this case law leads inexorably to the conclusion that §§ 848(g)-(r) are saved by the Savings Statute.").

31

contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). Regarding both as effective leads the Court to follow the mandate set forth in the sentencing statutes and sentence Defendant to death as the jury recommended. The permissive language of the First Step Act cannot overrule the mandatory language in the sentencing statutes. And, instead of "clearly expressed congressional intention to the contrary" of this conclusion, Congress' definitively expressed intent supports this conclusion. With the Fair Sentencing Act, Congress intended to increase the sentences of violent drug offenders. *See* Fair Sentencing Act, § 5, 124 Stat. at 2373 (directing the Sentencing Guideline Commission to increase the Sentencing Guidelines "if the defendant used violence, made a credible threat to use violence, or directed the use of violence during a drug trafficking offense."). Thus, it defies logic to suggest that Congress intended the First Step Act to grant discretion to the courts in sentencing the most violent drug offenders when none previously existed. Allowing the Court to override the jury's death recommendation to reduce Defendant's sentences for his § 848(e)(1)(a) convictions would run contrary to the intent of the Fair Sentencing Act and result in giving the sentencing statutes no effect. This the Court cannot do.

Defendant's specific request with respect to Count Five highlights the difficulty in squaring the two statutes in the manner that he suggests. Although the First Step Act only gives courts the discretion to impose a reduced sentence for a covered offense, Defendant does not (and cannot) request that the Court impose a reduced sentence for Count Five. Defendant instead asks the Court to impanel a new sentencing jury. But the First Step Act did not expressly vest the courts with the discretion or authority to impanel a new sentencing jury, because Congress did not intend the statute to cover violent offenses for which a jury could sentence a defendant to death. Therefore, the Court cannot grant Defendant's request.

32

J.A.128

### iii. The Sentencing Guidelines Demonstrate that Defendant's Convictions Do Not Fall Under the First Step Act.

The Sentencing Guidelines further support the conclusion that Defendant's sentencing exposure under his § 848(e)(1)(A) remained unchanged by the First Step Act.[9] The Fair Sentencing Act did not result in changes to the guidelines for convictions under § 848(e). Those convictions currently fall under the "First Degree Murder" section of the Sentencing Guidelines, which suggest a guideline sentencing range of life imprisonment.[10] U.S.S.G. § 2A1.1. Likewise, before the Fair Sentencing Act, and at the time of Defendant's sentencing, convictions under § 848(e) fell under the "First Degree Murder" section of the Sentencing Guidelines. *See, e.g.,* U.S.S.G. § 2A1.1 (U.S. Sentencing Comm'n 1993); (PSR at 42). Moreover, unlike other sections of the Sentencing Guidelines that take into account the drug quantity in the underlying offense, the "First Degree Murder" section contains no such provision. *Compare, e.g.,* U.S.S.G. § 2D1.1 (taking into account drug quantity in calculating base offense level for various offenses), *with* U.S.S.G. § 2A1.1 (no reference to drug quantities in calculating base offense level for first degree murder). This provides further support for the conclusion that the Fair Sentencing Act had no effect on the penalties applicable to Defendant's Capital Murder Convictions.

---

[9]     The Court recognizes that the First Step Act concerns changes to the statutory penalties rather than the Sentencing Guidelines. *See Wirsing,* 943 F.3d at 186 ("The First Step Act specifies that it is 'statutory penalties' that are at issue to avoid any ambiguity that might arise in the sentencing context between penalties specified by statute or by the Guidelines."). Nevertheless, this brief analysis of the relevant Sentencing Guidelines highlights the lack of change to Defendant's sentencing exposure produced by the First Step Act and illustrates that Congress did not intend to reduce the statutory penalties for violent drug offenders.

[10]     "This guideline applies when a sentence of death is not imposed under [21 U.S.C. § 848(e)]." U.S.S.G. § 2A1.1 cmt. 3. And, of course, the Fair Sentencing Act did not change the fact that the death penalty (or a sentence of life imprisonment) may still be imposed under 21 U.S.C. § 848(e).

J.A.129

**D.     Other Courts Have Considered Similar, But Not Identical, Issues.**

Defendant further argues that other courts have found that § 848 convictions qualify as covered offenses. (Def. Mem. at 5.) However, Defendant cites only non-binding and inapposite cases. The Fourth Circuit has not spoken on the issue. Yet, in the only published circuit court opinion to address an § 848(e) conviction under the First Step Act, the Sixth Circuit came to the same conclusion as the Court does here. In *United States v. Snow*, the Sixth Circuit held that Defendant's conviction under § 848(e)(1)(a) for conspiracy to kill a person while engaged in a conspiracy to distribute at least 50 grams of cocaine base did not constitute a covered offense for purposes of the First Step Act. 967 F.3d 563, 564 (6th Cir. 2020). The defendant argued that the increase in the threshold quantity to trigger § 841(b)(1)(A), combined with § 848(e)(1)(A)'s requirement of an offense punishable under § 841(b)(1)(A), qualified his § 848(e)(1)(A) conviction as a covered offense. *Id.* at 564. The Sixth Circuit rejected this argument: "We disagree and hold that the First Step Act's text and structure do not support extending resentencing relief to Snow's § 848(e)(1)(A) conviction." *Id.*

This rejection relied on two main reasons. First, the court determined that under the defendant's theory, the previous elements of the defendant's conviction — murder in furtherance of a conspiracy to distribute at least 50 grams of cocaine base — *"no longer amount to an offense under § 848 at all* and there is *no* applicable statutory sentencing range" after the Fair Sentencing Act. *Id.* at 565 (emphasis in original). The Sixth Circuit determined that this constituted an elimination of statutory penalties, not a modification, and, therefore, the First Step Act did not apply. Second, and relatedly, the district court could not impose a reduced sentence as if the Fair Sentencing Act had been in effect, because the First Step Act "simply does not contemplate the *elimination* of a sentence, as would be required here." *Id.* (emphasis in original). Therefore, it

34

**J.A.130**

concluded that "Snow's § 848(e)(1)(A) conviction is not a covered offense and he is ineligible for a reduction in his sentence for Count 2." *Id.* For the reasons stated above, the Court agrees with the Sixth Circuit's conclusion.

The cases cited by Defendant for the proposition that "courts have consistently found that a conviction under § 848 is a covered offense under the First Step Act" fail to persuade the Court. (Def.'s Mot. at 5.) For example, in *United States v. Davis*, the court found that "a defendant's § 848(e)(1)(A) conviction is a covered offense because it relies on the drug quantity thresholds set by § 841 and, therefore, requires a jury finding that the defendant committed a murder in furtherance of a drug conspiracy to sell 280 or more grams of cocaine base." 2020 WL 1131147, at *2 (W.D. Va. Mar. 9, 2020). Here, however, as described above, Defendant's § 848(e)(1)(A) conviction does not rely on the drug quantity thresholds set by § 841. Moreover, for the reasons stated above, the Court disagrees with the reasoning in *Davis*.[11]

The remaining cited cases are inapposite. In *United States v. Brown*, the Court found that the defendant's convictions under § 848 (a) and (b) constituted covered offenses under the First Step Act. 2020 WL 3106320 (W.D. Va. June 11, 2020). It did not address a conviction under § 848(e)(1)(A). In any event, its finding that § 848 as a whole constituted the statute of conviction contradicts Fourth Circuit precedent that § 848(e)(1)(A) stands by itself apart from the rest of § 848. *See NJB*, 104 F.3d at 633 (holding that the statute "clearly expresses Congress' intent that § 848(e) be a separate crime"). Likewise, in *United States v. Kelly*, the Court addressed the defendant's convictions under § 848(c) and sentence under § 848(a) and (b). No. 2:94cr163 (E.D. Va. June 5, 2020). It did not address a conviction under § 848(e)(1)(A).

---

[11] Despite the faulty eligibility analysis, the court in *Davis* did find that the First Step Act did not alter the § 848(e)(1)(A) conviction and instead only made him eligible for a sentence reduction. And the court denied him such a reduction. 2020 WL 1131147, at *2-3.

35

J.A.131

Finally, in *Wright v. United States*, the Court addressed the defendant's § 841 convictions, but excluded the defendant's § 848(c) conviction when listing the counts covered by the First Step Act. 425 F. Supp. 3d 588, 592-94 (E.D. Va. 2019). It did not address a conviction under § 848(e)(1)(A) or any other section of § 848 and, therefore, has no bearing on the instant analysis. The other unpublished, out-of-district and out-of-circuit cases cited by Defendant similarly fail to convince this Court that it may modify Defendant's sentences for convictions for murder in furtherance of a continuing criminal enterprise in violation of § 848(e)(1)(A).

At bottom, Defendant comes before the Court with unaltered convictions under a statute with unaltered statutory penalties and asks the Court to alter his sentence. Defendant received a death sentence and life imprisonment sentences for drug-related murders. However, these sentences had no foundation in the type or quantity of drug that led to the murders. Instead, they were predicated on the fact that Defendant killed multiple people to advance his drug enterprise. Yet, Defendant attempts to use the Fair Sentencing Act and First Step Act — enacted to correct disparate sentences that had a foundation only in the type and quantity of the drug at issue — to reduce his sentences for these murders. Congress plainly did not intend for those Acts to apply to Defendant's deadly drug crimes.

Because the statutory penalties for his statute of conviction remain unchanged, the First Step Act does not reach Defendant's sentences under § 848(e)(1)(A). *See United States v. Woodson*, 962 F.3d at 816-17 (holding that "the relevant change for purposes of a 'covered offense' under the First Step Act is a change to the statutory penalties for a defendant's statute of conviction"). Accordingly, the Court holds that Defendant's convictions under § 848(e)(1)(A) for the Capital Murder Counts do not constitute "covered offenses" for purposes of the First Step Act. The Court's decision on these counts does not end the analysis, as Defendant also moves

36

for a reduction of his sentence imposed for his Drug Distribution Conviction.

**E.     Count Thirty-Two's Status as a Covered Offense Will Not Result in a Sentence Reduction.**

Although the First Step Act does not cover Defendant's convictions under § 848(e)(1)(A), it does cover his Drug Distribution Conviction in Count Thirty-Two for violations of § 841(a)(1). Under Count Thirty-Two, Defendant received a sentence of forty years' imprisonment for a violation of § 841(a)(1), to run concurrently with any other sentence imposed. Defendant argues that this sentence makes up part of a larger sentencing package that the Court must revisit.[12] Therefore, the combination of a covered offense with non-covered offenses presents two issues that the Court must resolve. First, does a conviction of one covered offense entitle Defendant to reconsideration of his sentences for all convictions? And second, should the Court reduce Defendant's sentence for his Drug Distribution Conviction? For both questions, the Court answers in the negative.

**i.     The Court Cannot Impose a Reduced Sentence for Non-Covered Offenses.**

First, the statute's text demonstrates that the First Step Act does not permit the Court to impose a reduced sentence for non-covered offenses. By its operative language, section 404(b) provides, "[a] court that imposed a sentence for a covered offense may . . . impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act . . . were in effect at the time the covered offense was committed." First Step Act, § 404(b), 132 Stat. 5194. In deciphering the meaning of the term "sentence," the Court must keep in mind the "normal rule of statutory

---

[12]     Defendant also attacks the other convictions that comprise his sentencing package. (Def.'s Mot. at 47-50.) However, only Counts Five, Eight, Eleven and Thirty-Two form the basis of his First Step Act Motion, as only those counts could arguably fall under the First Step Act. Because a First Step Act motion does not provide the proper vehicle for the attacks on Defendant's other convictions that he raises, the Court will not entertain those arguments here. *See Chambers*, 956 F.3d at 676 (Rushing, J., dissenting) (noting that the First Step Act does not "provide a general opportunity to collaterally attack a final sentence").

interpretation that identical words used in different parts of the same statute are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 33-34 (2005). Giving the word "sentence" a consistent meaning in Section 404(b), the Court can impose a "reduced sentence" only to replace the "sentence for a covered offense." Along these same lines, the Court must read section 404(b) in conjunction with the narrow limitations placed on sentence modifications by 18 U.S.C. § 3582(c)(1)(B). And, section 404(b) did not expressly permit the Court to modify a defendant's sentence for a non-covered offense. Accordingly, the Court finds that it cannot reduce Defendant's sentences for the Capital Murder Convictions based solely on the fact that Defendant received a sentence for a covered offense for the Drug Distribution Count.

    ii.    The Calculation of Defendant's Sentence and the Concurrent Sentences
           Imposed Weigh Against a Sentence Reduction.

Although the First Step Act covers Defendant's offense in Count Thirty-Two, the Court need not reduce his sentence. Even if a defendant meets the eligibility criteria for a sentence reduction under the First Step Act, the Court retains discretion over whether to grant the reduction. *Wirsing*, 943 F.3d at 180 ("Among other limitations, Congress left the decision as to whether to grant a sentence reduction to the district court's discretion."); FSA § 404(c), 132 Stat. at 5222 ("Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section."). Here, the Court will exercise that discretion and deny Defendant's request for a reduction below forty years' imprisonment.

In exercising this discretion, the Court notes that Defendant's sentence appears to have been imposed as if the Fair Sentencing Act were in effect at the time of his sentencing. In Count Thirty-Two, the jury convicted Defendant of Possession with Intent to Distribute 50 Grams or More of Cocaine Base, in violation of §§ 841(a)(1) and (b)(1)(A)(ii). At the time of Defendant's

sentencing, before the Fair Sentencing Act, Defendant's conviction for more than 50 grams of cocaine base mandated a sentence of ten years to life imprisonment. *Wirsing*, 943 F.3d at 180-81. Today, after the Fair Sentencing Act, possession of 50 grams of cocaine base mandates a sentence of imprisonment of five to forty years. 21 U.S.C. § 841(b)(1)(B)(iii). However, in preparing Defendant's Presentence Investigation Report (("PSR") ECF No. 27-1), the Probation Officer calculated Defendant's statutory penalty range for Count Thirty-Two as five to forty years' imprisonment. (PSR at 36, 53.) The Court sentenced Defendant within this range, albeit at the top of this range — forty years. Accordingly, due to a potential miscalculation, it would appear as if Defendant already received the benefit of the Fair Sentencing Act with respect to the Drug Distribution Conviction.

The concurrent sentence doctrine further counsels against reducing Defendant's sentence for the Drug Distribution Conviction. The concurrent sentence doctrine generally provides that where a defendant receives concurrent sentences on plural counts, a reviewing court need not pass on the validity of a sentence where the sentence runs concurrently with an equal or longer sentence. *United States v. Charles*, 932 F.3d 153, 160-61 (4th Cir. 2019). The doctrine "has continuing force as a species of harmless-error review where a defendant seeks to challenge the legality of a *sentence* that was imposed for a valid conviction, but where the challenged sentence runs concurrently with a valid sentence of an equal or greater duration." *Id.* (emphasis in original). Here, Defendant received a forty-year sentence for his covered offense to run concurrently with his death sentence and five other life imprisonment sentences. These other sentences clearly eclipse his sentence on the Drug Distribution Conviction, such that the Court need not pass on imposing a new sentence for Count Thirty-Two.

J.A.135

### iii.    The § 3553(a) Factors Weigh Against A Sentence Reduction.

Even absent these factors, the Court would not exercise its discretion to reduce

Defendant's sentence.  In declining to reduce Defendant's sentence, the Court has considered the

factors set forth in 18 U.S.C. § 3553(a), which include:

1.    the nature and circumstances of the offense and the history and characteristics of the defendant;

2.    the need for the sentence imposed –

    a.    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    b.    to afford adequate deterrence to criminal conduct;

    c.    to protect the public from further crimes of the defendant; and

    d.    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3.    the kinds of sentences available;

4.    the kinds of sentences and the sentencing range established for [the applicable offense category as set forth in the guidelines];

5.    any pertinent policy statement . . . by the Sentencing Commission;

6.    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7.    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  The applicable factors weigh against granting Defendant's motion.

First, "the nature and circumstances of the offense and the history and characteristics of

the defendant" weigh heavily against Defendant.  Defendant murdered multiple people on

different occasions in cold blood in furtherance of his drug trafficking.  Even before these

convictions, Defendant committed several other violent and drug-related crimes, leading to a

criminal history category of V.  (PSR at 50-52.)  The Court has considered Defendant's good

40

J.A.136

conduct and rehabilitative efforts while in prison, which factor in his favor. Moreover, the Court has considered the evidence of the mitigating factors that Defendant has raised in his Motion, including his abusive childhood and his brain damage. However, these mitigating factors do not outweigh the heinous nature and circumstances of his offenses.[13]

Next, the Court believes that reducing Defendant's sentence would not reflect the seriousness of the offense, promote just punishment for the offense, provide respect for the law or afford adequate deterrence to criminal conduct. Indeed, reducing the sentence of a lethal drug dealer would undermine these goals. Defendant has proven himself as the ultimate danger to the community. Defendant led an extremely violent drug enterprise that killed at least ten people, with Defendant personally implicated in at least five killings. The jury recognized Defendant's status as a highly dangerous individual in sentencing him to the death penalty — a penalty reserved for only the most vicious and dangerous criminals. Defendant's rehabilitative efforts, although substantial and commendable, pale in comparison to the dangers that he poses to society. A reduced sentence would fail to reflect the seriousness of Defendant's crimes. Nor would a reduced sentence provide for a just punishment for Defendant's horrific acts. Likewise, reducing the sentence of a serial killer would undermine respect for the law and detract from adequate deterrence to criminal conduct.

---

[13]    In his First Step Act Motion, Defendant advances claims of actual innocence for the murder of Douglas Moody in arguing that the circumstances of the offense militate in favor of a reduced sentence. (Def.'s Mot. at 8-16.) However, his actual innocence claim has received multiple exhaustive reviews by this Court and the Fourth Circuit. Each review has resulted in a rejection of the actual innocence claim. In any event, a First Step Act Motion does not provide the proper vehicle to litigate this claim yet again.

Notably, his insistence on pressing his rejected actual innocence claim undermines his argument that he has accepted responsibility for his actions and changed his life. Nevertheless, the Court has considered the evidence supporting Defendant's claim of actual innocence and his rehabilitation, but it finds that this evidence does not outweigh the reprehensible nature and circumstances of the offense.

41

**J.A.137**

The kinds of sentences and sentencing range weigh in favor of not reducing Defendant's sentence, as he has already received a sentence in the applicable Guideline Range for the Drug Distribution Conviction. Likewise, no policy statement from the Sentencing Commission weighs in favor of reducing Defendant's sentence, as the Guidelines for both offenses remain unchanged with respect to the Drug Distribution Conviction and the Capital Murder Convictions. Finally, the Court finds that reducing Defendant's sentence could lead to unwarranted sentence disparities, as defendants with similar records who have been convicted of similar conduct would likely not receive sentences below what Defendant has received here.

The applicable § 3553(a) factors, taken as a whole, counsel against reducing Defendant's term of imprisonment for Count Thirty-Two below forty years.

## IV.    CONCLUSION

Throughout both the guilt and penalty phases, the jury in this case heard all of the evidence relating to Defendant's role in this drug enterprise and the five individuals that he killed to protect his enterprise. Beyond evidence of the atrocious crimes for which it convicted Defendant, the jury heard evidence relating to his character. That jury — speaking on behalf of the community — unanimously decided that this heinous serial killer deserved to die for his actions. The Court refuses to overturn the will of the community. It is not the Court's role to revisit the jury's determination, especially when doing so would run contrary to the goals of the First Step Act.

For the reasons stated above, the Court finds that Defendant's convictions on Counts Five, Eight and Eleven do not constitute covered offenses under the First Step Act. Although Defendant's conviction on Count Thirty-Two does constitute a covered offense, the Court declines to exercise its discretion to reduce Defendant's sentence. Therefore, Defendant's

42

Motion for Imposition of a Reduced Sentence Pursuant to Section 404 of the First Step Act (ECF No. 17) will be denied.

An appropriate Order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

                                                        _____/s/_____
                                                        David J. Novak
                                                        United States District Judge

Richmond, Virginia
Dated:  October 29, 2020

43

**J.A.139**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

v.                                            Criminal No. 3:92cr68 (DJN)

COREY JOHNSON,
Defendant.

### MEMORANDUM ORDER
#### (Denying First Step Act Motion)

Convicted serial killer Corey Johnson ("Defendant" or "Johnson") comes before the

Court with a Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of

2018 (ECF No. 38) in a last-ditch effort to avoid the just punishment imposed on him for his role

in killing multiple people in furtherance of his drug enterprise. The Court has already rejected a

nearly identical effort from one of Defendant's co-conspirators.[1] Defendant has challenged his

convictions and sentences on numerous occasions throughout the years. But each time they

survived appellate review. Defendant now seeks to latch onto laws passed to reduce the

sentencing disparities between non-violent crack and powder cocaine offenses as a vehicle to

reduce his sentences imposed for running a drug enterprise and committing multiple murders in

furtherance of the drug enterprise. But that enterprise and those murders, and the statutes under

which a jury convicted Defendant for them, have nothing to do with the penalties for drug

quantities that the First Step Act addressed.

---

[1]    The Court hereby expressly incorporates into this Memorandum Order the Memorandum
Opinion (the "*Roane* Mem. Op." (ECF No. 67)) denying Roane's First Step Act Motion, entered
on October 29, 2020. The instant Memorandum Order supplements the *Roane* Memorandum
Opinion to address the new or individualized arguments raised by Defendant.

J.A.140

## I.    BACKGROUND[2]

### A.    Factual Background

Defendant, along with Richard Tipton ("Tipton") and James Roane, Jr. ("Roane") (collectively, the "partners"), ran a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992. *Roane*, 378 F.3d at 389. The partners in the conspiracy obtained wholesale quantities of powder cocaine from suppliers in New York City, converted it into crack cocaine, divided it among themselves and then distributed it through a network of 30-40 street level dealers. *Id.* at 389-90. Typically, the partners took two-thirds of the proceeds realized from the street-level sales of their product. *Id.* at 390.

Over a short time in early 1992, the partners took part, in some form, in the murders of ten persons in the Richmond area. *Id.* These murders occurred "in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the 'partners.'" *Id.* The murders described below directly implicated Defendant.

On January 14, 1992, Roane and Johnson located Peyton Johnson, another rival drug dealer, at a tavern. *Id.* Shortly after Roane left the tavern, Corey Johnson entered and fatally shot Peyton Johnson with a semiautomatic weapon. *Id.*

On January 29, 1992, Roane pulled his car around the corner of an alley, got out and shot Louis Johnson, who had threatened one of the partners while acting as a bodyguard for a rival drug dealer. *Id.* Corey Johnson and Lance Thomas ("Thomas") then got out of Roane's car and

---

[2]    The Court takes these background facts from the Fourth Circuit's opinion in *United States v. Roane*, 378 F.3d 382 (4th Cir. 2004), which recited the factual summary *in haec verba* from *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), the opinion on the defendants' direct appeal.

2

began firing at Louis Johnson. *Id.* As Louis Johnson laid on the ground, either Corey Johnson or Thomas shot him twice at close range. *Id.* Louis Johnson died from these gunshot wounds. *Id.*

On February 1, 1992, Roane, Johnson and Thomas went to the apartment of Torrick Brown, who had given Roane trouble. *Id.* After the three men knocked on the apartment door, Brown's half-sister opened the door and summoned Brown. *Id.* The three men opened fire with semiautomatic weapons, killing Brown and critically wounding his half-sister. *Id.*

In late January 1992, after Johnson threatened Dorothy Armstrong for not paying for a supply of crack cocaine, Armstrong went to live with her brother, Bobby Long. *Id.* On February 1, 1992, Johnson, Tipton and Jerry Gaiters ("Gaiters") went to Long's house. *Id.* at 391. While Tipton waited in the car, Johnson and Gaiters approached the front door. *Id.* When Long opened the door, Johnson opened fire, killing Dorothy Armstrong and Anthony Carter. *Id.* As Bobby Long fled out the front door, Johnson shot him dead in the front yard. *Id.*

On February 19, 1992, Johnson arranged to meet with Linwood Chiles, who Johnson suspected of cooperating with the police. *Id.* That night, Chiles and Johnson drove off together in Chile's station wagon, with Curtis Thorne and sisters Priscilla and Gwen Greene also in the car. *Id.* Chiles parked in an alley before Tipton parked behind the station wagon and walked up beside it. *Id.* With Tipton standing by, Johnson told Chiles to place his head on the steering wheel before shooting him twice at close range. *Id.* The partners fired additional shots, killing Thorne and critically wounding the Greene sisters in the station wagon. *Id.*

**B.    Verdict and Sentencing**

In January and February of 1993, United States District Judge James R. Spencer presided

3

over the trial of Defendant and his co-conspirators. Defendant[3] faced capital murder charges for Murder in Furtherance of a Continuing Criminal Enterprise ("CCE") under 21 U.S.C. § 848(e)(1)(A) for seven of these killings — Peyton Johnson (Count Eight), Louis Johnson (Count Eleven), Armstrong (Count Seventeen), Carter (Count Eighteen), Long (Count Nineteen), Thorne (Count Twenty-Four) and Chiles (Count Twenty-Five) (collectively, the "Capital Murder Counts" or "Capital Murder Convictions"). *Id.* at 391; (Second Superseding Indictment ("Indictment") (Dkt. No. 115) at 7-18). On February 3, 1993, the jury convicted him of all seven Capital Murder Counts. 378 F.3d at 391. The jury also convicted Defendant of one count of participating in a Conspiracy to Possess Cocaine Base with Intent to Distribute, in violation of 21 U.S.C. § 846 (Count One); one count of engaging in a CCE, in violation of 21 U.S.C. § 848(a) (Count Two (the "CCE Count" or "CCE Conviction")); eleven counts of Committing Acts of Violence in Aid of Racketeering ("VICAR"), in violation of 18 U.S.C. § 1959 (Counts Ten, Thirteen, Fourteen, Sixteen, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Seven, Twenty-Eight, Twenty-Nine, Thirty); five counts of Use of a Firearm in Relation to a Crime of Violence or Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c) (Counts Nine, Twelve, Fifteen, Twenty, Twenty-Six); and two counts of Distribution of or Possession with Intent to Distribute Crack Cocaine, in violation of § 841(a)(1) (Counts Thirty-One and Thirty-Two (the "Drug Distribution Counts" or the "Drug Distribution Convictions")). 378 F.3d at 392; (Dkt. Nos. 466, 593). Defendant's First Step Act Motion pertains only to the CCE Conviction, the Capital Murder Convictions and the Drug Distribution Convictions.

On February 16, 1993, following a penalty hearing on the Capital Murder Convictions, the jury recommended that Defendant be sentenced to death for all seven of the Capital Murder

---

[3]    The Court tried Roane, Tipton and Johnson along with four other defendants on a thirty-three-count superseding indictment.

4

Convictions. 378 F.3d at 392. On June 1, 1993, pursuant to 21 U.S.C. § 848(l), the Court

sentenced Johnson to death for Counts Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-

Four and Twenty-Five. (Dkt. No. 593.) Defendant received a life imprisonment sentence for the

CCE Conviction and each of the VICAR convictions. *Id.* Additionally, Defendant received a

sentence of forty years' imprisonment for Count Thirty-Two, thirty years' imprisonment for each

of Counts Twenty-Nine and Thirty, twenty years' imprisonment for each of Counts Twelve,

Fifteen, Sixteen, Twenty, Twenty-Six and Thirty-One and five years' imprisonment for Count

Nine. *Id.*

The Court refused to order the execution on the grounds that Congress had neither

directly authorized the means to carry out the death sentences, nor properly delegated to the

Attorney General the authority to issue the implementing regulations that the Government

invoked. 378 F.3d at 392. As a result, the Court stayed the execution of the death sentences

until such time as Congress had authorized the means of execution. *Id.*

## C.    Post-Trial Proceedings

The defendants appealed their convictions and sentences and the Government cross-

appealed the stay of the death sentences. *Id.* at 392. In a lengthy opinion, the Fourth Circuit

analyzed and disposed of approximately sixty issues, including challenges by the defendants to

aspects of the jury-selection process and both the guilt and penalty phases of the trial. *Tipton*, 90

F.3d at 861. The Fourth Circuit rejected nearly all of the claims, affirming the convictions and

sentences of all of the defendants, except that it vacated on Double Jeopardy grounds the drug

conspiracy convictions under 21 U.S.C. § 846, finding that the CCE convictions in Count Two

precluded sentences for the drug conspiracy offenses. *Id.* at 903. Additionally, the Fourth

Circuit vacated the stay of the death sentences and remanded for the executions to proceed in

accordance with regulations promulgated by the Attorney General. *Id.* at 901-03.

Defendant continued to press his appeals. On June 1, 1998, Defendant filed a motion under 28 U.S.C. § 2255 to vacate and set aside his sentences. *Roane*, 378 F.3d at 392. The Court granted the Government's summary judgment motion, and Defendant appealed. *Id.* at 393. The Fourth Circuit affirmed, ruling against Defendant on all accounts. *Id.* at 398-406.

In 2016, Defendant filed multiple applications with the Fourth Circuit to file successive § 2255 petitions to invalidate his § 924(c) convictions. The Fourth Circuit denied his requests. *In re Corey Johnson*, No. 16-4 (4th Cir. 2016), ECF Nos. 2, 10; *In re Corey Johnson*, No. 16-13 (4th Cir. 2016), ECF Nos. 2, 8. On May 22, 2020, Defendant filed yet another application with the Fourth Circuit for a successive § 2255 petition pursuant to the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). The Fourth Circuit has placed the case in abeyance pending its decision in *United States v. Dickerson*. *In re Corey Johnson*, No. 20-8 (4th Cir. 2020), ECF Nos. 2, 23.[4]

## D.    Defendant's First Step Act Motion

On August 19, 2020, Defendant filed the instant motion under § 404 of the First Step Act, asking the Court to reduce his sentences for the CCE counts, the Capital Murder Counts and the Drug Distribution Counts. (Mem. in Supp. of Def.'s Mot. for Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 ("Def.'s Mot.") (ECF No. 39).) Defendant argues that these convictions constitute covered offenses under the First Step Act, because the Fair

---

[4]    Johnson's proposed successive § 2255 petition has no impact on his First Step Act motion. In his proposed petition, he attacks his convictions under § 924(c) and does not attack the counts at issue here. *In re Corey Johnson*, No. 20-8 (4th Cir. 2020), ECF No. 2-2 (moving to vacate his convictions under 18 U.S.C. § 924(c) in Counts Nine, Twelve, Fifteen, Twenty and Twenty-Six). Although in his proposed § 2255 petition he argues that his Capital Murder Convictions cannot form the predicates of his § 924(c) convictions, he does not attack the convictions or sentences for the Capital Murder Counts. *Id.*

Sentencing Act modified the statutory penalties for §§ 841 and 848, and the First Step Act allows the Court to retroactively impose those modified statutory penalties. (Def.'s Mot. at 8-10.) Because his resentencing implicates the death penalty, Defendant claims that a jury must resentence him on the Capital Murder Convictions. (Def.'s Mot. at 11.) To that end, Defendant devotes the bulk of his brief to arguing that mitigating factors warrant a reduced sentence. Specifically, Defendant argues that his abusive and neglectful childhood and intellectual disability counsel against imposing the death penalty. (Def.'s Mot. at 16-31.) Further, Defendant argues that his remorse and post-conviction record warrant a reduced sentence. (Def.'s Mot. at 32-35, 40-42.) Finally, Defendant claims that his entire sentencing package contains fatal deficiencies, warranting a sentence reduction. (Def.'s Mot. at 43.) To reach this conclusion, Defendant argues that his § 846, § 924(c) and VICAR convictions are all invalid, despite the Fourth Circuit only invalidating the § 846 conviction to date (on Double Jeopardy grounds) following multiple appeals. (Def.'s Mot. at 43-46.) Accordingly, Defendant requests that the Court grant a full resentencing hearing on the Capital Murder Convictions and a reconsideration of the sentence on the remaining convictions by the Court. (Def.'s Mot. at 47.)

On September 23, 2020, the Government filed its opposition to Defendant's Motion, primarily arguing that his convictions under §848 do not constitute covered offenses and, therefore, the Court may not reduce his sentence. (Govt's Opp. to Def.'s First Step Act Mot. ("Govt's Resp.") (ECF No. 39).) On October 8, 2020, Defendant filed his reply ("Def.'s Reply" (ECF No. 64)), rendering this matter now ripe for review.

## II.    DISCUSSION

The Court must first address whether Defendant's convictions for which he seeks a reduction constitute covered offenses. *United States v. Gravatt*, 953 F.3d 258, 260 (4th Cir.

7

J.A.146

2020) ("[T]he existence of a 'covered offense' is a threshold requirement under the [First Step] Act."). Defendant's desire to have his death sentences reduced for his Capital Murder Convictions clearly drives his request, but the Court has recently determined that those convictions do not constitute covered offenses under the First Step Act. Thus, the Court need not engage in that analysis again. The Court will then address whether Defendant's CCE Conviction constitutes a covered offense, because it did not previously have occasion to address that conviction. Finally, the Court must determine whether to reduce Defendant's sentences for the Drug Distribution Counts, which do constitute covered offenses.

### A.  Defendant's Capital Murder Convictions under § 848(e) Do Not Constitute Covered Offenses.

Defendant argues that his Capital Murder Convictions qualify as covered offenses under the First Step Act. The Court has recently rejected this identical argument as advanced by his co-conspirator, James Roane. On October 29, 2020, the Court denied Roane's First Step Act Motion. (ECF No. 66.) In the accompanying Memorandum Opinion, the Court thoroughly analyzed the question of whether the defendants' murder convictions under § 848(e)(1)(A) constitute covered offenses under the First Step Act. *Roane* Mem. Op. at 15-37. The Court concluded that they do not. *Id.* That analysis applies equally to Defendant's Capital Murder Convictions, and Defendant has offered no compelling arguments to reach a different result. Therefore, the Court hereby incorporates its previous Memorandum Opinion and finds that Defendant's Capital Murder Convictions under Counts Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-Four and Twenty-Five do not constitute covered offenses for purposes of the First Step Act.

### B.  Defendant's CCE Conviction under § 848(a) Does Not Constitute a Covered Offense.

Defendant also argues that his CCE Conviction in Count Two constitutes a covered

8

offense. (Def.'s Mot. at 8-10.) In the *Roane* Memorandum Opinion, the Court did not analyze whether a conviction under § 848(a) constitutes a covered offense, because Roane did not move to reduce his sentence imposed under Count Two. However, for many of the same reasons that Defendant's Capital Murder Convictions do not constitute covered offenses, his CCE Conviction likewise does not constitute a covered offense.

First, the Fair Sentencing Act did not modify the statutory penalties in § 848(a), demonstrating that the First Step Act does not apply. *See Roane* Mem. Op. at 24-28 (determining that textual analysis of statutes at issue demonstrate that convictions under § 848(e)(1)(A) do not constitute covered offenses). Second, and relatedly, Congress did not intend for the Fair Sentencing Act to reduce the sentences for the drug kingpins that § 848 targets. *See Roane* Mem. Op. at 24-25 (explaining why Congress did not intend the Fair Sentencing Act to apply to § 848(e) convictions). Third, Defendant's CCE Conviction, and the convictions predicating his CCE Conviction, remain valid. That is, the jury found beyond a reasonable doubt that Defendant had committed all of the required elements of a violation of § 848(a), regardless of the statutory penalties that those elements could expose Defendant to when charged as separate offenses. *See id.* at 22-23, 26-28 (explaining why convictions remain valid). Finally, should the Court resentence Defendant under Count Two, his sentencing exposure would remain the same as when the Court originally imposed his sentence — a potential life imprisonment sentence. In short, just as with his Capital Murder Convictions, Defendant comes before the Court with unaltered convictions for statutes that have unaltered statutory penalties and asks the Court to alter his sentence anyway. The First Step Act does not allow for such a result.

9

**C.    The Court Will Not Reduce Defendant's Sentences for the Drug Distribution Convictions.**

Although the First Step Act does not cover Defendants convictions under § 848(a) or (e), it does cover his Drug Distribution Convictions in Counts Thirty-One and Thirty-Two for violations of § 841(a)(1). However, even if a defendant meets the eligibility requirement for a sentence reduction under the First Step Act, the Court retains discretion over whether to grant the reduction. *United States v. Wirsing*, 943 F.3d 175, 180 (4th Cir. 2019) ("Among other limitations, Congress left the decision as to whether to grant a sentence reduction to the district court's discretion."). The Court imposed a sentence of twenty years' imprisonment for Count Thirty-One and forty years' imprisonment for Count Thirty-Two. (Dkt. No. 593.) Under the current statutory penalties, the Court may impose a sentence up to twenty years' imprisonment for Count Thirty-One and forty years' imprisonment for Count Thirty-Two. Thus, Defendant received sentences in 1993 that remain within the statutory penalties today. However, the Court could still exercise its discretion and reduce Defendant's sentences for the Drug Distribution Convictions.[5]

The Court will not exercise its discretion to reduce Defendant's sentence. In declining to reduce Defendant's sentence, the Court has considered the factors set forth in 18 U.S.C. § 3553(a), which include:

1.    the nature and circumstances of the offense and the history and characteristics of the defendant;

2.    the need for the sentence imposed –

   a.    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

---

[5]    As the Court previously decided, the fact that Defendant received sentences for covered offenses does not permit the Court to impose a reduced sentence for his non-covered offenses. *See Roane* Mem. Op. at 37-38.

b.   to afford adequate deterrence to criminal conduct;

c.   to protect the public from further crimes of the defendant; and

d.   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3.   the kinds of sentences available;

4.   the kinds of sentences and the sentencing range established for [the applicable offense category as set forth in the guidelines];

5.   any pertinent policy statement . . . by the Sentencing Commission;

6.   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7.   the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The applicable factors weigh against granting Defendant's motion.

First, "the nature and circumstances of the offense and the history and characteristics of the defendant" weigh heavily against Defendant. Defendant murdered multiple people on different occasions in cold blood in furtherance of his drug trafficking. Defendant maimed several others in the commission of those murders. Defendant did not limit his violence to others engaged in drug trafficking — innocent bystanders fell victim to Defendant simply as a result of finding themselves in the wrong place at the wrong time. Moreover, even before these convictions, Defendant committed other violent and drug-related crimes, leading to a criminal history category of IV. (PSR ¶ 123-25.) The Court has considered Defendant's good conduct and rehabilitative efforts while in prison, which factor in his favor. Moreover, the Court has considered the evidence of the mitigating factors that Defendant has raised in his Motion, including his neglectful and abusive childhood and his intellectual disability. However, these mitigating factors do not outweigh the heinous nature and circumstances of his offenses.

Next, the Court believes that reducing Defendant's sentence would not reflect the

11

seriousness of the offense, promote just punishment for the offense, provide respect for the law or afford adequate deterrence to criminal conduct. Indeed, reducing the sentence of a lethal drug dealer would undermine these goals. Defendant has proven himself as the ultimate danger to the community. Defendant led an extremely violent drug enterprise that killed at least ten people, with Defendant personally implicated in at least eight killings. The jury recognized Defendant's status as a highly dangerous individual in sentencing him to the death penalty — a penalty reserved for only the most vicious and dangerous criminals. Defendant's rehabilitative efforts, although substantial and commendable, pale in comparison to the dangers that he poses to society. A reduced sentence would fail to reflect the seriousness of Defendant's crimes. Nor would a reduced sentence provide for a just punishment for Defendant's horrific acts. Likewise, reducing the sentence of a serial killer would undermine respect for the law and detract from adequate deterrence to criminal conduct.

The kinds of sentences and sentencing range weigh in favor of not reducing Defendant's sentence, as he has already received sentences in the applicable Guideline Range for the Drug Distribution Convictions. Likewise, no policy statement from the Sentencing Commission weighs in favor of reducing Defendant's sentences, as the Guidelines for both offenses remain unchanged.

Finally, the Court finds that reducing Defendant's sentence could lead to unwarranted sentence disparities, as defendants with similar records who have been convicted of similar conduct would likely not receive sentences below what Defendant has received here. Defendant argues the opposite, claiming that the life sentences (rather than death) imposed for four murder convictions on his co-conspirator, Thomas, demonstrates that Defendant's sentence "is disproportionate compared to other similarly situated defendants." (Def.'s Mot. at 2; Def.'s

12

Reply at 11-12.)  However, the Court has reviewed and considered Thomas's convictions and sentences and finds that they do not warrant reducing Defendant's sentences.  With respect to the murder convictions, Defendant arguably played a larger role in the killings.  For instance, although the jury convicted both Thomas and Defendant of the murders of Thorne and Chiles, Defendant pulled the trigger while Thomas sat in jail at the time of the killings.  *United States v. Reavis*, 48 F.3d 763, 766 (4th Cir. 1995) (describing respective roles in murders in affirming Thomas's convictions).  More importantly, an individualized inquiry into whether the specific defendant deserves the death penalty constitutes the hallmark of the penalty phase in death penalty litigation.  *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (holding that the Eighth and Fourteenth Amendment require the sentencer to make an individualized consideration of mitigating factors); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) ("[T]he fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense.").  And here, the jury made that individualized determination, finding that Defendant deserved the death penalty after hearing the evidence relating to Defendant's character and record and the circumstances of the murders.  Moreover, with respect to the Drug Distribution Convictions that the First Step Act covers, Defendant received the same sentences as his co-conspirators, and those sentences do not diverge from other similarly-situated defendants such that the Court should reduce them.

The applicable § 3553(a) factors, taken as a whole, counsel against reducing Defendant's term of imprisonment for Count Thirty-One below twenty years or Count Thirty-Two below forty years.

13

J.A.152

## III. CONCLUSION

Throughout both the guilt and penalty phases, the jury in this case heard all of the evidence relating to Defendant's role in this drug enterprise and the eight individuals that he killed to protect his enterprise. Beyond evidence of the atrocious crimes for which it convicted Defendant, the jury heard evidence relating to his character. That jury — speaking on behalf of the community — unanimously decided that this heinous serial killer deserved to die for his actions. The Court refuses to overturn the will of the community. It is not the Court's role to revisit the jury's determination, especially when doing so would run contrary to the goals of the First Step Act.

For the reasons stated above and in the Court's *Roane* Memorandum Opinion, the Court finds that Defendant's convictions on Counts Two, Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-Four and Twenty-Five do not constitute covered offenses under the First Step Act. Although Defendant's convictions on Counts Thirty-One and Thirty-Two do constitute covered offenses, the Court declines to exercise its discretion to reduce Defendant's sentence. Therefore, Defendant's Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 (ECF No. 38) will be denied.

Let the Clerk file a copy of this Memorandum Order electronically and notify all counsel of record.

It is so ORDERED.

/s/
David J. Novak
United States District Judge

Richmond, Virginia
Dated: November 19, 2020

14

**J.A.153**

USCA4 Appeal: 20-15  Doc: 11-1  Filed: 12/28/2020  Pg: 159 of 281

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **COREY JOHNSON,** | : | |
| | : | |
| **Movant,** | : | **Case No. 3:92CR68** |
| | : | **CAPITAL CASE** |
| **v.** | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Respondent**. | : | |

**MOTION FOR A RECONSIDERATION OF SENTENCE HEARING**
**PURSUANT TO THE FIRST STEP ACT OF 2018**

The Defendant, Corey Johnson, by his attorneys, hereby moves for a reconsideration of

sentence hearing pursuant to the First Step Act of 2018 in the above-captioned case.  In support

of his Motion and as set forth more fully in the accompanying Memorandum in Support of

Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018

(hereinafter, "Memorandum"), he submits the following information:

1.      On February 3, 1993, Mr. Johnson was convicted after a jury trial that was held

before the Honorable James R. Spencer (Ret.) of the following offenses that are eligible as

covered offenses under the First Step Act: engaging in a continuing criminal enterprise in

violation of 21 U.S.C. § 848(a) (Count 2); murder in furtherance of a continuing criminal

enterprise in violation of 21 U.S.C. § 848(e)(1)(A) (Counts 8, 11, 17-19, 24, and 25); and

**J.A.154**

distribution of crack cocaine base ("crack cocaine") and possession with intent to distribute in violation of § 841(a)(1) (Counts 31 and 32).[1]

2.      The First Step Act, enacted on December 21, 2018, authorizes a reduced sentence for certain convictions that would have had lower statutory penalties had the Fair Sentencing Act, a 2010 law, applied at the time of the original sentencing.  First Step Act of 2018, Pub. L. No. 115-391, § 404(b), 132 Stat. 5194, 5222.  Mr. Johnson is eligible for a sentence reconsideration because ten of his 1993 convictions are drug-related crimes deemed "covered offenses" by the First Step Act.

3.      Seven of Mr. Johnson's convictions that meet the eligibility requirements of the First Step Act resulted in sentences of death (Counts 8, 11, 17-19, 24, and 25).  Accordingly, by law, reconsideration of those convictions must be conducted by a jury.  *See* 18 U.S.C. § 3593(b)(2)(D); 21 U.S.C. § 848(g), (i)(1)(B)(iv) (1988) (repealed 2006); *see also Hurst v. Florida,* 136 S. Ct. 616, 624 (2016); *United States. v. Stitt*, 552 F.3d 345, 354-55 (4th Cir. 2008).  Accordingly, Mr. Johnson submits that the Court must order a capital resentencing hearing before a jury.  At that hearing, the jury would receive evidence in order to reconsider the appropriate sentence, specifically whether Mr. Johnson should receive a sentence of death or a reduced sentence of life imprisonment on the capital offenses.

---

[1]   Mr. Johnson was also convicted of killing and maiming in aid of racketeering under 18 U.S.C. § 1959 (Counts 10, 13, 14, 16, 21-23, and 27-30); and use of a firearm during and in relation to any crime of violence or drug trafficking crime under 21 U.S.C. § 924(c) (Counts 9, 12, 15, 20, and 26).  Mr. Johnson was also convicted of violating 21 U.S.C. § 846 for having possessed with intent to distribute, and for having distributed, 50 grams or more of crack cocaine in violation of 21 U.S.C. § 841(a) (Count 1).  His sentence for this Count was later vacated by the Fourth Circuit on direct appeal.

2

**J.A.155**

4.      Mr. Johnson submits that, after conducting a capital resentencing hearing and after the jury renders its verdict on the capital offenses, the Court should consider whether to reduce his sentences on his non-capital convictions.

Accordingly, Mr. Johnson respectfully requests, as set forth more fully in the accompanying Memorandum, that:

a.   the Court find that Mr. Johnson was convicted of "covered offenses" that merit reconsideration of his sentences;

b.   the Court vacate the sentences of death imposed for Counts 8, 11, 17-19, 24, and 25, and grant Mr. Johnson a capital resentencing hearing before a jury on those counts;

c.   after the jury returns a resentencing verdict at a capital resentencing hearing, this Court should consider all the evidence presented therein and determine whether the imposition of reduced sentences on the Counts 2, 8, 11, 17-19, 24, 25, 31, and 32 pursuant to § 404 of the First Step Act is appropriate; and

d.   this Court grant any other further relief necessary to effectuate this Court's judgment.

3

**J.A.156**

Dated: August 19, 2020                 Respectfully submitted,


                                       /s/ David E. Carney
                                       David E. Carney, VA Bar #: 43914
                                       Donald P. Salzman*
                                       Lotus D. Ryan**
                                       Skadden, Arps, Slate, Meagher & Flom, LLP
                                       1440 New York Avenue, NW
                                       Washington, DC 20005
                                       Telephone: (202) 371-7246
                                       Fax: (202) 661-8295
                                       Email: david.carney@skadden.com

                                       Alexander C. Drylewski*
                                       Judith A. Flumenbaum*
                                       Skadden, Arps, Slate, Meagher & Flom, LLP
                                       One Manhattan West
                                       New York, NY 10001
                                       Telephone: (212) 735-3000

                                       *Pending Application to Qualify as a Foreign
                                       Attorney Under Local Criminal Rule 57.4.

                                       **Forthcoming Application for Full Admission

                                       *Counsel for Corey Johnson*


4

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of August 2020, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will then send notification

of such filing to all parties and counsel included on the Court's Electronic Mail notice list.


/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Ph: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

USCA4 Appeal: 20-15   Doc: 11-1        Filed: 12/28/2020     Pg: 164 of 281

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **COREY JOHNSON,** | : | |
| | : | |
| **Movant,** | : | **Case No. 3:92CR68** |
| | : | **CAPITAL CASE** |
| **v.** | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Respondent**. | : | |

**O R D E R**

In consideration of the foregoing Motion for Reconsideration of a Sentence Hearing

Pursuant to the First Step Act of 2018, there being good cause shown, it is this __ day of

_____, 2020 hereby

ORDERED that the Motion for a Reconsideration of Sentence Hearing Pursuant to the

First Step Act of 2018 is GRANTED.

_____
United States District Court for the
Eastern District of Virginia

**J.A.159**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| **COREY JOHNSON,** | : | |
| | : | |
| **Movant,** | : | |
| | : | |
| v. | : | **Case No. 3:92CR68** |
| | : | **CAPITAL CASE** |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Respondent**. | : | |

**MEMORANDUM IN SUPPORT OF MOTION FOR A RECONSIDERATION OF
SENTENCE HEARING PURSUANT TO THE FIRST STEP ACT OF 2018**

David E. Carney, VA Bar #: 43914
Donald P. Salzman*
Lotus D. Ryan**
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

Alexander C. Drylewski*
Judith A. Flumenbaum*
Skadden, Arps, Slate, Meagher & Flom, LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000

*Pending Application to Qualify as a Foreign
Attorney Under Local Criminal Rule 57.4

**Forthcoming Application for Admission

*Counsel for Corey Johnson*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

I.    INTRODUCTION ...................................................................................................1

II.   COVERED OFFENSES AND THEIR SENTENCES .............................................3

III.  LEGISLATIVE BACKGROUND..........................................................................4

      A.    Fair Sentencing Act of 2010 ........................................................................4

      B.    First Step Act of 2018 ..................................................................................5

IV.   ARGUMENT............................................................................................................5

      A.    Mr. Johnson's Convictions Under 21 U.S.C. §§ 841(a)(1) and 848 Are
            Covered Offenses Under the First Step Act...............................................5

            1.    Structure of the First Step Act Review .........................................5

            2.    Mr. Johnson Was Convicted of Violating 21 U.S.C. § 841(a),
                  which Is a Covered Offense.........................................................7

            3.    Mr. Johnson Was Convicted of Violating 21 U.S.C. § 848, which
                  Is a Covered Offense...................................................................8

      B.    Mr. Johnson Meets the Eligibility Requirements under the First Step Act
            so Is Entitled to Have His Sentences Reconsidered.................................11

      C.    Because Mr. Johnson's Resentencing Consideration Implicates the Death
            Penalty, He Must Be Resentenced by a Jury on His Capital Sentenced
            Counts ......................................................................................................11

      D.    A Capital Resentencing Hearing with Respect to Mr. Johnson's Capital
            Convictions Is the Only Means to Fully and Fairly Consider the 18 U.S.C.
            § 3553(a) Sentencing Factors as Required by the First Step Act ...........13

            1.    Compelling Evidence Shows that Corey Johnson's Sentences
                  Should Be Reduced.....................................................................16

            2.    Corey Johnson's Childhood Was Marred by Abuse, Chaos, and
                  Neglect .......................................................................................18

                  a.    Corey suffered physical and emotional abuse as a child ...............18

                  b.    Corey was regularly uprooted from his homes and schools
                        and eventually abandoned to social service custody....................20

3.  Mr. Johnson Was a Follower Who Was Easily Manipulated—a
Common Outcome for People with Intellectual Disability—and
Sought Protection from People Who Led Him Down a Violent
Path ...............................................................................................................23

    a.  Corey Johnson drifted into a drug group after his discharge
from residential placement with no plan or support ......................23

    b.  Mr. Johnson was a follower who exhibited extreme loyalty
to people viewed as family ............................................................25

4.  Mr. Johnson Is a Person with Intellectual Disability ................................27

    a.  Mr. Johnson has significant limitations in intellectual
functioning ....................................................................................28

    b.  Mr. Johnson has significant limitations in adaptive
functioning ....................................................................................29

    c.  Mr. Johnson's significant limitations in intellectual
functioning and in adaptive functioning were present
during his childhood .....................................................................31

5.  The Jury Considering Mr. Johnson's Sentence Will Hear Evidence
from Experts Who Are Specialists in Intellectual Disability—
Evidence No Court or Jury Has Heard to Date .........................................32

6.  Mr. Johnson's Flawless Prison Record Indicates that a Sentence
Reduction Would Not Encourage Further Crime Nor Would It
Endanger the Public ..................................................................................34

7.  Mr. Johnson's Sentence Was Unwarranted Compared to Sentences
to Similarly Situated Defendants ..............................................................36

8.  Mr. Johnson Committed His Crimes at 22 but Is Now 51 ........................39

9.  Mr. Johnson Has Demonstrated Sincere Remorse....................................40

E.  Mr. Johnson's §§ 846, 924(c), and 1959 Convictions Are Invalid and
Impermissibly Influenced His Original Sentence .................................................43

1.  Mr. Johnson's § 846 Conviction Was Vacated.........................................43

2.  Mr. Johnson's § 924(c) Convictions Are Invalid......................................43

3.  Mr. Johnson's § 1959 Convictions Were Improperly Charged and
Are Invalid ...............................................................................................44

J.A.162

4.   Discounting These Convictions Should Result in a Sentence Less than Death ...........................................................................................46

V.   CONCLUSION.........................................................................................47

iii

J.A.163

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Bourgeois v. Whitley*, 784 F.2d 718 (5th Cir. 1986)........................................................46

*Dorsey v. United States*, 567 U.S. 260 (2012) ................................................................4

*Hurst v. Florida*, 136 S. Ct. 616 (2016)..............................................................11, 16

*James v. United States*, 476 F.2d 936 (8th Cir. 1973) .................................................46

*Jerkins v. United States*, 530 F.2d 1203 (5th Cir. 1976)..............................................46

*Johnson v. Mississippi*, 486 U.S. 578 (1988)................................................................46

*Lockett v. Ohio*, 438 U.S. 586 (1978) ..........................................................................13

*Mills v. Maryland*, 486 U.S. 367 (1988) .......................................................................46

*Pepper v. United States*, 562 U.S. 476 (2011) .............................................................34

*Ring v. Arizona*, 536 U.S. 584 (2002)...........................................................................16

*Skipper v. South Carolina*, 476 U.S. 1 (1986) .............................................................13

*Stirone v. United States*, 361 U.S. 212 (1960)..............................................................45

*United States v. Barnes*, No. 3:94cr80 (DJN), 2020 WL 1281235 (E.D. Va. Mar. 17, 2020) .........................................................................................................................8

*United States v. Boulding*, 960 F.3d 774 (6th Cir. 2020)..............................................7

*United States v. Brown*, No. 3:08-CR-00011-1, 2020 WL 3106320 (W.D. Va. June 11, 2020) ................................................................................................................. passim

*United States v. Candelario-Santana*, 834 F.3d 8 (1st Cir. 2016)................................38

*United States v. Cantu-Rivera*, CR No. H-89-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019) ......................................................................................................................36

*United States v. Chambers*, 956 F.3d 667 (4th Cir. Apr. 23, 2020).................... passim

*United States v. Cisneros*, 385 F. Supp. 2d 567 (E.D. Va. 2005)................................37

*United States v. Davis*, No. 5:93-cr-30025, 2020 WL 1131147 (W.D. Va. Mar. 9, 2020) ............9

iv

**J.A.164**

*United States v. Davis*, 139 S. Ct. 2319 (2019) ..............................................................44

*United States v. Davis*, 679 F.3d 190 (4th Cir. 2012)....................................................34

*United States v. Davis*, 611 F. Supp. 2d 472 (D. Md. 2009) .........................................38

*United States v. Dean*, No. 97-276-3, 2020 WL 2526476 (D. Minn. May 18, 2020) .....................9

*United States v. Doan*, 498 F. Supp. 2d 816 (E.D. Va. 2007) .......................................36

*United States v. Ealy*, 363 F.3d 292 (4th Cir. 2004)....................................................37

*United States v. Edelin*, 134 F. Supp. 2d 59 (D.D.C. 2001) .........................................37

*United States v. Fletcher*, No. CR TDC-05-0179-01, 2020 WL 2490025 (D. Md. May 14, 2020) ..................................................................................................................39

*United States v. Floresca*, 38 F.3d 706 (4th Cir. 1994) (*en banc*)................................45

*United States v. Green*, 654 F.3d 637 (6th Cir. 2011) ..................................................37

Order, *United States v. Groves*, No. 5:94-CR-97 (E.D.N.C. Nov. 21, 2019) ..................8

*United States v. Hardnett*, 417 F. Supp. 3d 725 (E.D. Va. 2019)..............................7, 40

*United States v. Hardy*, 762 F. Supp. 2d 849 (E.D. La. 2010) ....................................38

Order, *United States v. Hines*, No. 5:94-CR-150 (N.D.N.Y. Nov. 8, 2019)....................9

*United States v. Jackson*, 964 F.3d 197 (3d Cir. 2020) .................................................6

*United States v. Jackson*, No. 3:99-00015-05, 2019 WL 6245759 (S.D. W. Va. Nov. 21, 2019) .................................................................................................................10

Order, *In re Johnson*, No. 20-8 (4th Cir. July 15, 2020) ...............................................44

*United States v. Johnson*, No. 7:04-CR-128-1, 2020 WL 2563541 (W.D. Va. May 20, 2020) .................................................................................................................34

*United States v. Jimenez*, No. 92-CR-550, 2020 WL 2087748 (S.D.N.Y. Apr. 30, 2020) .............9

*United States v. Kehoe*, 610 F.3d 579 (8th Cir. 2002)..................................................38

Order, *United States v. Kelly*, No. 2:94-CR-163 (E.D. Va. June 5, 2020)......................8

*United States v. Lewis*, No. 1:08 CR 404, 2010 WL 5418901 (N.D. Ohio Dec. 23, 2010)...........38

*United States v. Martin*, No. 19-3905, 2020 WL 3251021 (6th Cir. June 16, 2020)....................15

J.A.165

*United States v. Mayhew*, 337 F. Supp. 2d 1048 (S.D. Ohio 2004)..............................................38

*United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010)..........................................................37

*United States v. Nieves*, 108 F. App'x 790 (4th Cir. 2004) .........................................................45

*Unites States v. Northington*, Crim. Action No. 07-550-05, 2014 WL 1789151 (E.D. Pa. May 6, 2014)......................................................................................................................37

*United States v. Patterson*, 755 F. App'x 238 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1576 (2019).........................................................................................................................38

*United States v. Pitera*, 5 F.3d 624 (2d Cir. 1993) ......................................................................38

*United States v. Randall*, 171 F.3d 195 (4th Cir. 1999)..............................................................45

*United States v. Roane*, 378 F.3d 382 (4th Cir. 2004) ................................................................33

Order, *United States v. Robinson*, No. 98-CR-60 (E.D. Wis. Sept. 27, 2019)...................................9

*United States v. Shaw*, 957 F.3d 734 (7th Cir. 2020)..................................................................6, 7

*United States v. Smith*, 959 F.3d 701 (6th Cir. 2020) ..............................................................7, 23

*United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006) (*Stitt IV*).....................................................12

*United States. v. Stitt*, 552 F.3d 345 (4th Cir. 2008) (*Stitt V*) .......................................2, 11, 13, 15

*United States v. Tatum*, 31 F. App'x 156 (5th Cir. 2001)............................................................38

Order, *United States v. Taylor*, No. 19-7616 (4th Cir. Feb. 12, 2020) ..........................................44

*United States v. Taylor*, No. 04 CR 495-38, 2020 WL 2476529 (N.D. Ill. May 13, 2020)...........40

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996)..............................................................25, 43

*United States v. Tucker*, 404 U.S. 443 (1972) .............................................................................46

*United States v. Venable*, 943 F.3d 187 (4th Cir. 2019) ................................................................8

Order, *United States v. Walker*, No. 5:95-CR-101 (N.D.N.Y. Oct. 25, 2019)..................................9

*United States v. Whitfield*, 695 F.3d 288 (4th Cir. 2012)..............................................................45

*United States v. Wirsing*, 943 F.3d 175 (4th Cir. 2019)........................................................6, 7, 8, 9

*United States v. Williams*, 610 F.3d 271 (5th Cir. 2010) .............................................................38

*Wright v. United States*, 425 F. Supp. 3d 588 (E.D. Va. 2019) ............................................6, 8, 15

J.A.166

## STATUTES

18 U.S.C. § 1959 ...................................................................................................3, 43, 44, 45

18 U.S.C. § 3553 ................................................................................................. passim

18 U.S.C. § 3593 ...................................................................................................11, 16

18 U.S.C. § 3596 ...........................................................................................................33

21 U.S.C. § 841 ................................................................................................... passim

21 U.S.C. § 846 .........................................................................................................3, 43

21 U.S.C. § 848 ................................................................................................... passim

21 U.S.C. § 924 ..................................................................................................3, 43, 44

21 U.S.C. § 960 ...........................................................................................................10

Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 ..........................13, 14, 18, 32

Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 .................................. passim

Federal Death Penalty Act of 1994, Pub. L. No. 103-322, 108 Stat. 1959 ...................................18

First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 .............................................. passim

## OTHER AUTHORITIES

AAIDD Ad Hoc Committee on Terminology and Classification, *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed. 2010)................................28

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders DSM-5* (5th ed. 2013) .................................................................................28

Danielle Sered, Accounting for Violence: How to Increase Safety and Break Our Failed Reliance on Mass Incarceration, Vera Institute of Justice (2017) ....................................40

Death Penalty Information Center, *Defendants Whose Sentences Have Been Reduced Because of a Finding of "Mental Retardation" since Atkins v. Virginia (2002)* (July 19, 2012), http://www.deathpenaltyinfo.org/node/2395...........................................38

James C. Howell et al., Bulletin 5: *Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know* 17 (2013), https://www.ncjrs.gov/pdffiles1/nij/grants/242935.pdf..............................................39, 40

**J.A.167**

James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414 (1985) ...................................................................................25, 27

John H. Blume & Karen L. Salekin, *The Death Penalty and Intellectual Disability*, *Analysis of Atkins Cases*, American Association on Intellectual and Developmental Disabilities (Edward A. Polloway ed., 2015) ...........................................41

Rachel E. Barkow, *Prisoners of Politics: Breaking the Cycle of Mass Incarceration* (2019) ...........................................................................................................................40

U.S. Sentencing Commission, *The Effects Of Aging On Recidivism Among Federal Offenders* (2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders........................................................................................40

J.A.168

## I.   INTRODUCTION

The First Step Act, enacted on December 21, 2018, authorizes a reduced sentence for certain convictions that would have had lower statutory penalties had the Fair Sentencing Act, a 2010 law, applied at the time of the original sentencing.  The First Step Act involves a two-step inquiry.  First, a court determines eligibility, *i.e.*, whether one of the defendant's convictions is a "covered offense" per the statute.  And, second, after satisfying this threshold inquiry, a sentencer then reconsiders the original sentence and determines, after a "complete review," whether a reduced sentence is merited.

As demonstrated below, Corey Johnson is eligible for a sentence reconsideration because ten of Mr. Johnson's 1993 convictions are drug-related crimes deemed "covered offenses" by the First Step Act.  Seven of Mr. Johnson's convictions that meet the eligibility requirements of the First Step Act are death sentences and, by law, reconsideration of those convictions must be conducted by a jury.

In step two of the First Step Act consideration, a jury would receive evidence in order to determine a sentence that fulfils the sentencing goals of 18 U.S.C. § 3553(a)—one that is sufficient, but not greater than necessary, taking into account the history and characteristics of the defendant, the nature and circumstances of the crime, and the need for the sentence imposed.  Mr. Johnson has significant evidence, much of which has never been previously presented to any factfinder, that will better shape an understanding of his moral culpability.  Among the wide array of factors that a jury should weigh in reconsideration of his death sentences are:

- Mr. Johnson suffered horrific abuse, neglect, and abandonment throughout his childhood. *See infra* at 18-23.
- As is often the case with people with intellectual impairments who lack life skills—particularly those who were physically and emotionally abused as children—Mr. Johnson, a follower, not a leader, was easily manipulated, and would do anything to

please others. This element of his character is critical to an understanding of his role in the crimes of which he was convicted. *See infra* at 23-27.

- The evidence, science, and law demonstrate that Mr. Johnson is a person with intellectual disability. This evidence includes three opinions of experts who specialize in identifying and diagnosing intellectual disability. *See infra* at 27-33.

- Mr. Johnson has an essentially flawless prison record, and a sentence reconsideration would not encourage future crime or endanger the public. Mr. Johnson has been incarcerated for 28 years, and during that time he has been a model inmate. *See infra* at 33-36.

- Mr. Johnson's sentence is disproportionate compared to sentences imposed on his co-defendant Vernon Lance Thomas, who has intellectual disability, like Mr. Johnson, but was spared the death penalty despite being found guilty of four murders in furtherance of a continuing criminal enterprise, and is disproportionate compared to other similarly situated defendants. *See infra* at 36-38.

- Mr. Johnson was only 22 at the time of his arrest. Now, Mr. Johnson is 51 years old and poses no threat to the prison population at large. *See infra* at 38-40.

- Mr. Johnson has demonstrated sincere remorse. Even with his limited ability to express himself, he conveyed his profound regret and accepted responsibility for his crimes at his sentencing hearing. *See infra* at 40-41.

To be clear, on his death sentenced counts, Mr. Johnson does not suggest that there should be any choice before the jury other than life in prison or the death penalty as required by law.

Accordingly, Mr. Johnson respectfully submits that the Court should order a capital resentencing hearing at which a new jury would determine whether to reduce his sentences pursuant to § 404(b) of the First Step Act. *United States v. Stitt*, 552 F.3d 345, 354-55 (4th Cir. 2008) (hereinafter, "*Stitt V*"). With respect to his non-death sentenced counts that are covered offenses pursuant to the First Step Act, because those counts are eligible for First Step Act relief, the Court must reconsider those sentences. Mr. Johnson further submits that, after the jury resentencing proceeding, this Court should use its discretion to reduce those counts in light of all of the evidence, pursuant to § 3553(a).

2

## II.    COVERED OFFENSES AND THEIR SENTENCES

On February 3, 1993, Mr. Johnson was convicted of the following offenses that are eligible as covered offenses under the First Step Act: engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(a) (Count 2); murder in furtherance of a continuing criminal enterprise in violation of 21 U.S.C. § 848(e)(1)(A) (Counts 8, 11, 17-19, 24, and 25); and distribution of crack cocaine base ("crack cocaine") and possession with intent to distribute in violation of § 841(a)(1) (Counts 31 and 32).[1]

Mr. Johnson was also convicted of violating 21 U.S.C. § 846 for having possessed with intent to distribute, and for having distributed, 50 grams or more of crack in violation of 21 U.S.C. § 841(a) (Count 1).  His sentence for this Count was later vacated by the Fourth Circuit on direct appeal, but the jury had been instructed at the conclusion of the guilt phase that Count 1 could serve as part of the basis for finding Mr. Johnson had participated in a continuing criminal enterprise under § 848.

After the guilt phase of the trial, the same jury then considered whether to impose the death penalty on Mr. Johnson.  During a penalty hearing in which the government relied largely on the same evidence presented at trial, Mr. Johnson presented limited evidence of his learning

---

[1]    Mr. Johnson was also convicted of killing and maiming in aid of racketeering under 18 U.S.C. § 1959 (Counts 10, 13, 14, 16, 21-23, and 27-30); and use of a firearm during and in relation to any crime of violence or drug trafficking crime under 21 U.S.C. § 924(c) (Counts 9, 12, 15, 20, and 26).

3

difficulties and traumatic childhood through a defense psychologist and two other witnesses.

Even with this spare presentation,[2] the jurors found significant mitigating evidence existed.[3]

Nevertheless, the jury sentenced Mr. Johnson to death on his § 848(e)(1)(A) convictions (Counts 8, 11, 17-19, 24, and 25); and the court imposed a life sentence plus 85 years for his § 848 conviction (Count 2); and 20 years and 40 years, to run concurrently for his § 841(a) convictions (Counts 31 and 32).[4]

### III.   LEGISLATIVE BACKGROUND

**A.   Fair Sentencing Act of 2010**

In 2010, President Obama signed into law the Fair Sentencing Act, which codified the long-recognized reality that federal drug statutes had imposed overly harsh penalties for cocaine-base offenses, *i.e.*, crack cocaine, by comparison to the penalties for powder cocaine offenses, with a disproportionate effect on African-American defendants.[5] *Dorsey v. United States*, 567 U.S. 260, 268-69 (2012).  Congress adjusted the penalties for offenses involving crack cocaine by increasing the threshold drug quantities required to trigger mandatory minimum sentences under § 841(b)(1).  Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 2, 124 Stat. 2372, 2372. Per those amendments, under § 841, the quantity needed to trigger the five-year mandatory minimum was increased from five grams of cocaine base to 28 grams of cocaine base, and the

---

[2]   The jurors were not asked to consider whether Mr. Johnson was intellectually disabled.

[3]   *See infra* note 36 (discussing Special Findings (Feb. 16, 1993) ("Special Findings") at 7-11 (Ex. 1)).

[4]   The Court also imposed a life sentence plus 85 years for Counts 10, 14, 21-23, 27, and 28; 30 years for Counts 29 and 30, to run concurrently; 20 years for Count 16, to run concurrently; five years for Count 9, to run consecutively; and 20 years for Counts 12, 15, 20, and 26, to run consecutively.

[5]   Mr. Johnson is African-American, as are the co-defendants and the victims in this case.

4

quantity needed to trigger the ten-year mandatory minimum was increased from 50 grams of cocaine base to 280 grams. *Id*. These changes have had a ripple effect because convictions under § 841, and their designation as felonies, are predicates for other provisions of Title 21, including § 848.

### B.      First Step Act of 2018

On December 21, 2018, President Trump signed the First Step Act of 2018 into law. Section 404 of that law made the Fair Sentencing Act retroactive to defendants convicted of crack cocaine offenses whose statutory penalties were modified by the Fair Sentencing Act. First Step Act of 2018, Pub. L. No. 115-391, § 404(b), 132 Stat. 5194, 5222. Specifically, under the First Step Act, the Fair Sentencing Act relief was made available to defendants convicted of a "covered offense"—defined as "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010, that was committed before August 3, 2010." *Id*. Section 404(b) of the First Step Act provides that defendants who were convicted of such covered offenses would now be entitled to have their sentences reconsidered and possibly reduced. *Id*.

### IV.     ARGUMENT

### A.      Mr. Johnson's Convictions Under 21 U.S.C. §§ 841(a)(1) and 848 Are Covered Offenses Under the First Step Act

#### 1.      Structure of the First Step Act Review

First Step Act cases proceed in a series of steps; there is, in effect, an order of operations to them. As an initial matter, a movant must show that he committed an offense: (1) before August 3, 2010; (2) that he was not sentenced or resentenced under the Fair Sentencing Act; and

5

**J.A.173**

(3) that he has not previously been denied a request for reduction under the First Step Act after "a complete review of the motion on the merits."[6]  *Id.*

Section 404(b) states: "A court that imposed a sentence for a covered offense may . . . impose a reduced sentence as if sections 2 or 3 of the Fair Sentencing Act of 2010 . . . were in effect at the time the covered offense was committed."  *See also United States v. Wirsing*, 943 F.3d 175, 186 (4th Cir. 2019) (holding that "*all* defendants who are serving sentences for violations of 21 U.S.C. § 841(b)(1)(A)(iii) and (B)(iii), and who are not excluded pursuant to the expressed limitations in § 404(c) of the Act, are eligible to move for relief under that Act" (emphasis added)); *Wright v. United States,* 425 F. Supp. 3d 588, 595 (E.D. Va. 2019) ("[T]he Court finds that the FIRST STEP Act grants broad discretion to the district courts in providing relief under this Act.").

The movant must demonstrate that the offense was a "covered offense."  To decide that a conviction is a covered offense, a court must make a legal determination that the Fair Sentencing Act modified the penalty associated with the statute of conviction.  Importantly, the court is *not* to concern itself with the actual quantities of crack involved in the offense.  *See Wirsing*, 943 F.3d at 185-86; *see also United States v. Jackson*, 964 F.3d 197, 206 (3d Cir. 2020) (holding that "§ 404 eligibility turns on a defendant's statute of conviction, not on his possession of a certain quantity of drugs"); *United States v. Shaw*, 957 F.3d 734, 735 (7th Cir. 2020) ("To determine whether a defendant is eligible for a reduced sentence under the First Step Act, a court needs to look only at a defendant's statute of conviction, not to the quantities of crack involved in the offense.").

---

[6]   Mr. Johnson meets these requirements.  He committed his offenses long before 2010; he was not sentenced or resentenced under the Fair Sentencing Act; and no court has previously denied him any request for a reduction under the First Step Act.

6

**J.A.174**

Once a movant has made this showing, and the court has determined the movant was convicted of a covered offense, the movant is eligible for First Step Act relief and the movant's sentence must be reconsidered. In reconsidering the sentence, the sentencer exercises its discretion as to whether ultimately to reduce it. Before exercising that discretion, the sentencer must first take into account the factors listed in 18 U.S.C. § 3553. *See* Pub. L. No. 115-391, § 404(c) (2018) (requiring the district court to "complete review on the merits" and consider the sentencing factors enumerated in 18 U.S.C. § 3553(a)); *see also United States v. Hardnett*, 417 F. Supp. 3d 725, 735 (E.D. Va. 2019) (stating that after determining a movant is eligible under the Act, the sentencer then "'consider[s] whether the authorized reduction is warranted, either in whole or in part, according to the factors set forth in § 3553(a)'") (quoting *Dillon v. United States*, 560 U.S. 817, 826 (2010)); *Shaw*, 957 F.3d at 742 (holding that record must show that the sentencer "considered the arguments presented" and "accounted for the 18 U.S.C. § 3553(a) factors"); *United States v. Boulding*, 960 F.3d 774, 776 (6th Cir. 2020) (holding that "an eligible defendant is entitled to an accurate amended guideline calculation and renewed consideration of the 18 U.S.C. § 3553(a) factors"); *United States v. Smith,* 959 F.3d 701, 703 (6th Cir. 2020) (holding that a district court must consider the factors in § 3553(a) to determine a sentence "not greater than necessary"). These factors include, *inter alia*, the nature and circumstances of the crime and the history and characteristics of the defendant, and the reconsideration must always be guided by the statute's admonition that the sentence be sufficient, but not greater than, necessary.

### 2. Mr. Johnson Was Convicted of Violating 21 U.S.C. § 841(a), which Is a Covered Offense

Mr. Johnson was convicted under Counts 31 and 32 of offenses under 21 U.S.C. § 841(a). The Fourth Circuit has already determined that 21 U.S.C. § 841(a) is a covered offense. *Wirsing*,

7

943 F.3d at 186; *see also United States v. Venable*, 943 F.3d 187, 193 (4th Cir. 2019) ("841(a)

falls within the First Step Act's definition of 'covered offense.'"); *United States v. Barnes*, No.

3:94cr80 (DJN), 2020 WL 1281235, at *2 (E.D. Va. Mar. 17, 2020).  Thus, Mr. Johnson is

eligible and must have his sentences reconsidered.

In reaching this result, the Fourth Circuit in *Wirsing* established two essential points

about the meaning of the First Step Act.  First, it determined that, under the First Step Act, the

court must look only to the statute of conviction, not the specific manner in which it was violated

in the instant case.  943 F.3d at 185 (finding that the phrase "the statutory penalties for which"

modifies the term "Federal criminal statute," not the term "violation of a federal criminal

statute").  Second, Congress specifically used the term "statutory" to identify the type of penalty

that was modified by operation of the Fair Sentencing Act, not whether the sentencing ranges

assessed against the particular defendant were necessarily changed by the 2010 enactment.  *Id.* at

185-86.  Thus, a statute is a covered offense if: (a) it is a federal criminal statute; and (b) the

statutory penalties for that criminal statute were modified by the Fair Sentencing Act.  The Court

emphasized, moreover, that "[t]here is no indication that Congress intended a complicated and

eligibility-limiting determination at the 'covered offense' stage of the analysis."  *Id.* at 186

(citation omitted).

### 3.   Mr. Johnson Was Convicted of Violating 21 U.S.C. § 848, which Is a Covered Offense

Numerous district courts around the country, including the Eastern District of Virginia

and others within the Fourth Circuit, have already determined that 21 U.S.C. § 848 is a covered

offense.  *See, e.g.*, *United States v. Brown*, No. 3:08-CR-00011-1, 2020 WL 3106320, at *4

(W.D. Va. June 11, 2020); Order at 5, *United States v. Kelly*, No. 2:94-CR-163 (E.D. Va. June 5,

2020); *Wright v. United States*, 425 F. Supp. 3d 588, 598 (E.D. Va. 2019); Order at 1, *United*

8

*States v. Groves*, No. 5:94-CR-97 (E.D.N.C. Nov. 21, 2019); *United States v. Dean*, No. 97-276-3, 2020 WL 2526476, at \*3 (D. Minn. May 18, 2020); *United States v. Jimenez*, No. 92-CR-550, 2020 WL 2087748, at \*2 (S.D.N.Y. Apr. 30, 2020); Order at 4, *United States v. Hines*, No. 5:94-CR-150 (N.D.N.Y. Nov. 8, 2019), ECF No. 607; Order at 4, *United States v. Walker*, No. 5:95-CR-101 (N.D.N.Y. Oct. 25, 2019), ECF No. 620; Order at 4, *United States v. Robinson*, No. 98-CR-60 (E.D. Wis. Sept. 27, 2019), ECF No. 606.

The government itself has conceded that an offense is a covered offense under the First Step Act where the statute under which the movant was convicted makes reference to or has as a predicate statute amended by sections 2 and 3 of the Fair Sentencing Act, including 21 U.S.C. § 848. *See, e.g.*, United States' Mot. to Remand at 8, *United States v. Maupin*, No. 19-6817 (4th Cir. Aug. 29, 2019), ECF No. 26; *see also United States v. Davis*, No. 5:93-cr-30025, 2020 WL 1131147, at \*2 (W.D. Va. Mar. 9, 2020) ("The government acknowledges that the defendant is eligible for a sentence reduction under the 2018 FSA for all three counts, including Count Two due to § 848's requirement of a § 841(b)(1)(A) violation.").

The court in *United States v. Brown*, No. 3:08-cr-00011-1, 2020 WL 3106320 (W.D. Va. June 11, 2020), employed an analysis similar to that used by the Fourth Circuit in *Wirsing*. The court reasoned that 21 U.S.C. § 848(c) defines a single criminal act—engaging in a continuing criminal enterprise—and § 848(a), (b), and (e) define the applicable penalties, including penalty enhancements, for the criminal conduct defined in subsection (c).[7] The *Brown* court noted (as the government acknowledged) that § 848(b) was modified by the Fair Sentencing Act. 2020

---

[7]   The court noted, for example, that Congress titled § 848(a) "Penalties, Forfeitures," and § 848(e) "Death Penalty." *Id*. at \*4.  Section 848(b) is likewise entitled "Life imprisonment for engaging in continuing criminal enterprise." *Id.* at \*2.  All three sections define levels of punishment based on the commission of a continuing criminal enterprise based on drug trafficking.

9

J.A.177

WL 3106320, at *2, and that a sister court had previously found that the penalty imposed under §

848(e)(1)(A) was modified by the Fair Sentencing Act, *id.* at *4 (citing *Davis*, 2020 WL

1131147 at *2).  The court in *Brown* thus concluded that 21 U.S.C. § 848 is a covered offense *in*

*toto* "because at least one of the penalties . . . was modified by Section 2 or 3 of the Fair

Sentencing Act." *Id.* at *4.  Thus, any violation of § 848—that is, any continuing criminal

enterprise as defined by § 848(c) and penalized under any provision of § 848—constitutes a

covered offense.

In any event, there is nothing about § 848(e) that would suggest a different approach or a

different result here.  To the contrary, § 848(e) references and relies upon as predicates §

841(b)(1)(A) and § 960(b)(1), both of which were specifically modified by the Fair Sentencing

Act.[8]  *See* Fair Sentencing Act of 2010, Section 2, Cocaine Sentencing Disparity Reduction §

401(b)(1), Pub. L. No. 111-220, 124 Stat. 2372.

Accordingly, Mr. Johnson's §§ 841 and 848(a) and (e) convictions are covered offenses

under the First Step Act.[9]

---

[8]  Section 848(e)(1)(A) provides that

> any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

[9]  Even if the Court determines one of Mr. Johnson's convictions is not eligible for resentencing under the First Step Act (and it should not), Mr. Johnson's sentences could still be reduced by applying the sentencing package doctrine.  The Fourth Circuit has adopted a sentence-package theory wherein if "an appellate court . . . rejects one of the grounds on which [a] sentence is based" and "vacates and remands a prisoner's sentence," a "district court may not simply re-enter the non-offending portions of the original sentence, but must conduct a new resentencing hearing to reformulate the entire sentence package." *United*

10

**B.    Mr. Johnson Meets the Eligibility Requirements under the First Step Act so Is Entitled to Have His Sentences Reconsidered**

Mr. Johnson committed his crimes before 2010.  He has never been resentenced under the Fair Sentencing Act.  He was never previously denied a sentence reduction after a complete review of the merits of a First Step Act motion.  Mr. Johnson was convicted of, and sentenced for, covered offenses.

He is, therefore, entitled to reconsideration of his sentences, including the capital sentences imposed for his convictions under 21 U.S.C. § 848(e).

**C.    Because Mr. Johnson's Resentencing Consideration Implicates the Death Penalty, He Must Be Resentenced by a Jury on His Capital Sentenced Counts**

When reconsideration of a death sentence is required, the new sentencing must be done by a jury.  *See* 18 U.S.C. § 3593(b)(2)(D) (providing that where defendant is subject to the death penalty, a sentencing hearing shall be conducted "before a jury impaneled for purposes of the hearing if . . . after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary"); 21 U.S.C. § 848(g), (i)(1)(B)(iv) (1988) (repealed 2006) ("A person shall be subjected to the penalty of death for any offense under this section only if a hearing is held in accordance with this section," and "[t]he hearing shall be conducted before a jury impaneled for the purpose of the hearing.") (Ex. 2); *see also Hurst v. Florida,* 136 S. Ct. 616, 624 (2016).  The Fourth Circuit has likewise held that a jury, not a court, must be fact-finder with respect to a capital resentencing.  *Stitt V*, 552 F.3d at 354-55 (finding that a defendant who was sentenced to death under § 848(e)(1)(A) and whose sentence was vacated

---

*States v. Jackson*, No. 3:99-00015-05, 2019 WL 6245759, at *4 (S.D. W. Va. Nov. 21, 2019) (alteration in original) (quoting *United States v. Hadden*, 475 F.3d 652, 669 (4th Cir. 2007)).

11

and reconsidered after §§ 848 (g)-(r) were repealed by Congress, was entitled a jury resentencing under § 848(i)(1)(B)(iv) because the Savings Statute preserved this remedy for him).

The implications of the *Stitt* opinions go beyond merely preserving the right to jury resentencing despite the repeal of §§ 848 (g)-(r).  An earlier decision in *Stitt* addressed the relief available for capital litigants under 28 U.S.C. § 2255.  *United States v. Stitt*, 459 F.3d 483, 486-87 (4th Cir. 2006) (hereinafter, "*Stitt IV*").  *Stitt IV* demonstrates that, when a statute provides relief applicable to both non-capital and capital defendants, the courts have the equitable obligation to shape relief for the capital defendants notwithstanding that the express statutory language only provides a mechanism for relief to non-capital defendants.  *See id*. at 485 (holding that because *Andrews v. United States*, 373 U.S. 334 (1963), required resentencing before a grant of relief pursuant to § 2255 could be appealed in a non-capital case, the same requirement necessarily applied in a capital case).  When a court does so, it must fashion the remedy to comport with established principles of Eighth Amendment jurisprudence and statutory provisions that reflect those principles—by empaneling a jury to resentence.

Thus, although the First Step Act speaks in terms of a "court" engaging in reconsideration of an eligible movant's sentence, applying this provision to a capital litigant, a jury must be empaneled to engage in the necessary sentencing determination.  *See, e.g.*, *Stitt IV* at 485.  Once a jury has determined whether to resentence Mr. Johnson to death or to life without possibility of parole, this Court would be the appropriate sentencer (as the statute contemplates) for determining whether Mr. Johnson is entitled to any other sentence reductions for his non-capital covered offenses.  For the sake of judicial efficiency, the Court should hold one resentencing hearing where the jury is the sentencer for the capital offenses, and this Court, thereafter, is the sentencer for the non-capital offenses.

12

**D.      A Capital Resentencing Hearing with Respect to Mr. Johnson's Capital Convictions Is the Only Means to Fully and Fairly Consider the 18 U.S.C. § 3553(a) Sentencing Factors as Required by the First Step Act**

As previously noted, the First Step Act entitles an eligible litigant to have his sentence reconsidered in light of the factors set forth in § 3553(a).  Section 3553(a) directs that the sentence imposed shall be "sufficient, but not greater than necessary" to comply with its purposes of deterrence, punishment, and rehabilitation.  Significantly, these factors include: (i) both the nature and circumstances of the offense, and the history and characteristics of the defendant; and (ii) the need to avoid unwarranted sentence disparities.  In considering a sentence reduction, the sentencer can also consider all post-conviction behavior.  *United States v. Chambers*, 956 F.3d 667, 675 (4th Cir. Apr. 23, 2020) (holding that post-sentencing evidence is properly considered in a First Step Act motion to reconsider sentence).

Mr. Johnson was sentenced to death in 1993 under the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (the "ADAA").  The ADAA requires the jury to consider mitigating factors similar to those prescribed under § 3553(a), such as: Mr. Johnson's "capacity to appreciate the wrongfulness of his crime," his age at the time of the crime, his lack of prior criminal record, and whether "another defendant or defendants, equally culpable in the crime will not be punished by death,"[10] as well as other mitigating factors.  *See* Special Findings (Ex. 1); 21 U.S.C. § 848(*m*) (1988) (repealed 2006) (Ex. 2).  Although it was not presented with the variety of critical evidence about his background and development that was available, the jury nevertheless recognized the evidence before it at the time was compelling and mitigating.  For

---

[10]   While the provisions of this section of the ADAA are no longer in effect, capital jurisprudence has long required jurors to take these factors into consideration.  *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986).  Moreover, the Fourth Circuit has held that certain provisions of the ADAA continue to have effect despite its subsequent repeal as a result of the Savings Statute.  *Stitt V*, 552 F.3d at 354.

13

**J.A.181**

example, all 12 jurors found that Mr. Johnson "was subjected to emotional and physical abuse, abandonment and neglect as a child, and was deprived of the parental guidance and protection that he needed" and that his "severe learning disability based on neurological impairment (brain damage) could impair his ability to exercise good judgment," and eleven jurors found that Mr. Johnson had "eagerness to be accepted by others" and that he was "easily manipulated."  Special Findings at 7-11 (Ex. 1).  However, in 1993, the jury was not presented with the most compelling evidence of Mr. Johnson's lack of moral culpability, namely his intellectual disability, evidence of which would make him ineligible for a death sentence.  In fact, the ADAA, under which Mr. Johnson was sentenced to death, contained an absolute bar providing that "a sentence of death shall not be carried out upon a person who is mentally retarded."[11]  § 848(*l*) (1988) (repealed 2006) (Ex. 2).

Nearly 30 years later, a full record of Mr. Johnson's severe impairment and childhood abuse exists.  The mitigation evidence, much of which was not presented at the time of trial, is even more powerful and compelling than the evidence the original jury heard during the penalty phase of trial, and includes evidence and findings by experts that Mr. Johnson is intellectually disabled.  The sentencer—in this case, a jury at a new capital resentencing hearing, with respect to Mr. Johnson's death sentenced counts, and the Court, with respect to the remaining counts—is required to examine all § 3553(a) factors.  18 U.S.C. § 3553(a); *Chambers*, 956 F.3d at 675.  In addition, the jury would be required to consider the capital sentencing factors established by the ADAA.

---

[11]   The modern convention is to use the terminology of "intellectual disability" or "intellectually disabled."  However, because the statute uses "mentally retarded" and "mental retardation," this memorandum will at times use those terms when discussing the statutes and trial testimony.

14

In the resentencing, the jury and Court should consider relevant evidence regarding Mr. Johnson which was not presented at the time of sentencing. Neither the new capital resentencing jury nor the Court is precluded from looking at evidence that was not presented at the time of sentencing—in fact, both are required to do so because such evidence is highly relevant. *Chambers*, 956 F.3d at 675 (*"*Having concluded that the § 3553(a) factors apply in the § 404(b) context, post-sentencing evidence 'may be highly relevant to several of [those] factors.'") (quoting *Pepper v. United States*, 562 U.S. 467, 491 (2011)). In Mr. Johnson's case, had the substantial evidence of his intellectually disability and his chaotic and abusive childhood, particularly the expert opinions that he is a person with intellectual disability, been presented to the jury in 1993, Mr. Johnson should have been spared the death penalty.

As explained below, there is significant evidence that indicates that the new capital resentencing jury and the Court should impose reduced sentences in light of the § 3553(a) factors in Mr. Johnson's case. And, as explained above, in light of the statutory requirement (and the constitutional implications) that juries sentence in federal capital cases, this Court should grant Mr. Johnson a full sentencing proceeding before a jury. At such a proceeding, Mr. Johnson is prepared to present to the jury evidence concerning his intellectually disability, his chaotic and abusive childhood, and his post-incarceration rehabilitation. *See Wright*, 425 F. Supp. 3d at 597; *United States v. Martin*, No. 19-3905, 2020 WL 3251021, at *2 (6th Cir. June 16, 2020) (concluding that the "district court erred in limiting what information it could consider for resentencing under the First Step Act" and observing "that it is within the district court's discretion to hold a hearing on remand"). Indeed, clearly established law provides that any capital resentencing hearing must be held before a jury. *See Stitt V*, 552 F.3d at 354-55; 21

15

U.S.C. § 848(g); 18 U.S.C. § 3593; *see also Hurst*, 136 S. Ct. at 624; *Ring v. Arizona*, 536 U.S. 584, 609 (2002).

### 1.    Compelling Evidence Shows that Corey Johnson's Sentences Should Be Reduced

The full scope of evidence supporting the reduction of Corey Johnson's sentences pursuant to the First Step Act has never been presented previously. The jury that sentenced Mr. Johnson to death heard some, but not nearly all, of the evidence about his trauma-filled childhood, early adult experiences, and other mitigating circumstances discussed below.[12] That evidence was presented primarily through testimony from the defense psychologist, Dr. Dewey Cornell, who conducted a pretrial examination of Mr. Johnson.[13] In addition to meetings with Mr. Johnson, Dr. Cornell interviewed Mr. Johnson's mother in person, and had phone calls with five professionals who worked with Corey Johnson during his residential and group home placements as a teenager. The jury did not hear testimony from any family member, close family friend, or witness who knew Corey Johnson outside of his residential placement and who could

---

[12]  Undoubtedly, Mr. Johnson was involved in a terrible series of crimes that weighed heavily on the original jury as it considered the appropriate punishment (though without evidence in mitigation essential to its decision making) and contributed to their ultimate decision to sentence him to death. However, there have been a number of cases in which the death penalty was never sought or in which juries or the courts have concluded that sentences other than death were the appropriate sentences despite the heinous nature of the crimes committed by those defendants. *See infra* note 33. In addition, shortly after the jury returned its recommendation that Mr. Johnson be sentenced to death, the government withdrew its death penalty notice for Mr. Johnson's co-defendant, Mr. Thomas, who was charged and convicted of four separate murders, shortly before trial after Mr. Thomas produced evidence of his intellectual disability. There have been numerous capital defendants who committed crimes equally as violent as Mr. Johnson's who did not receive the death penalty because of their intellectual disability. *See infra* note 34.

[13]  The jury also heard from two other defense witnesses who worked with Corey Johnson when he was a teenager in residential placements.

16

**J.A.184**

describe from personal knowledge the trauma he suffered as a young child and adolescent (as well as the other evidence also described below).

At a new capital resentencing hearing, the jury would hear from some of the following witnesses:

- Mr. Johnson's family members, including his maternal aunt; his brother; his cousins; his stepfather; and his stepmother;

- Friends who knew Mr. Johnson during his childhood, adolescence, and as a young adult, including his godmother and her daughter;

- Individuals who knew Mr. Johnson during his childhood, adolescence, and/or as a young adult, including a high school friend and the son of one of his mother's abusive boyfriends;

- Individuals who knew Mr. Johnson through their involvement in drug trafficking offenses, including former girlfriends during that period and the leaders of the Trenton drug-dealing group (*see infra* at IV.D.3.a);

- At least five professionals who worked with or evaluated Mr. Johnson during his childhood and adolescence, some of whom administered psychological and/or academic achievement assessments (including IQ tests) to him;

- Individuals who have known Mr. Johnson since his incarceration for the offenses in this case, including church and other religious officials who ministered to him and other inmates; a criminal justice reform advocate; and a former warden;

- A mitigation specialist who conducted a comprehensive investigation into his background, history, and characteristics; and

- Experts who have evaluated Corey Johnson and can speak to his intellectual impairments.

As summarized below, Mr. Johnson's witnesses will describe persuasively the trauma Mr. Johnson experienced throughout his life, including: (1) the abuse and neglect he suffered at the hands of those who were supposed to care for and nurture him; (2) his utter inability to learn in school; (3) his transient life as a child and adolescent; (4) his ultimate abandonment by his mother; (5) his placement in structured residential settings where he continued to severely struggle and fail academically, socially, and practically; (6) his discharge into the community without a plan and without independent living skills at age 18; and (7) his extreme vulnerability

17

to being manipulated by others, particularly in light of his desire to be accepted by and to please them.  This and other evidence will underscore and explain Mr. Johnson's significant intellectual functioning deficiencies and his impaired adaptive functioning skills which all directly establish his diminished moral culpability and, combined with all of the other relevant factors, demonstrate why a sentencing reduction from the death penalty to life in prison is the necessary and appropriate outcome in his case.

### 2.    Corey Johnson's Childhood Was Marred by Abuse, Chaos, and Neglect[14]

The First Step Act, § 3553(a)(1), and the capital sentencing provisions of the ADAA and the Federal Death Penalty Act of 1994, Pub. L. No. 103-322, 108 Stat. 1959, require the sentencer to consider "the history and characteristics of the defendant" and all relevant mitigating evidence.  Corey Johnson's full life history is central to that inquiry. Contemporaneous records from his childhood and scores of interviews with family members, friends, social workers, educators, and professionals document his traumatic background.  Below is a summary of some of the key events that shaped him and some of the evidence he would present during a capital resentencing hearing before a jury.

#### a.    Corey suffered physical and emotional abuse as a child

Corey Johnson is 51 years old now.  He was born in 1968 to parents Emma Johnson and James Sykes, who were both teenagers at the time of his birth.  James Sykes was in prison for most of Corey's childhood and never played a significant role in his upbringing.  Emma Johnson, an immature, cocaine-addicted, narcissistic single mother lacking empathy and capacity, abused

---

[14]    Unless specifically noted, the facts contained in this section are documented in contemporaneous records created during Corey Johnson's childhood and adolescence and in declarations from witnesses who knew him during those periods and/or during adulthood, which are attached to this memorandum as exhibits 3 through 29.

18

her children, both physically and emotionally.  She allowed them to be abused by others.  And, ultimately, she abandoned them.

Key individuals from Corey's childhood will attest that Emma Johnson physically and emotionally abused Corey and his brother.  His godmother recalled that Emma Johnson threatened to kill or get rid of her children "because they were getting on her nerves" or "because she was tired of them." Ex. 3.  Family members say that Emma Johnson was particularly physically abusive toward Corey, and several witnessed her beating Corey.

Some of this abuse was specifically driven by Corey's undiagnosed intellectual disability. Emma Johnson was cruel to Corey, often criticizing his low intelligence and comparing Corey to his younger brother, whom she viewed as smarter and better than Corey.  Frustrated, Emma Johnson would hit Corey when he struggled at school.  Corey's aunt recalled:

> I saw Emma hit and smack Corey many times . . . .  One time, Emma and Corey separately told me that she had beaten Corey with her high heel shoe because he either got left back in school or failed in school.

Ex. 4.  After this incident, Emma Johnson realized she was out of control and sent Corey to live with his godmother for six or seven months.

Corey's mother also frequently derided and beat Corey for wetting or soiling the bed, which he often did until at least the age of 12.  Corey tried to hide the sheets after he had an accident.  If Emma Johnson discovered Corey had wet the bed, she did not wash his bedding, leaving him to sleep on sheets dirty with urine and feces.

Corey's childhood was scarred by Emma Johnson's volatile and abusive relationships with a series of men.  Bobby Koger, a heroin addict, was the most violent of her boyfriends. Koger, who lived with Emma Johnson and Corey for about four years, from the time he was nine to 12, once tried to set fire to their apartment.  Emma Johnson reported to psychiatrists and social workers that Koger abused both of her children and once expressed her fear, because of Koger's

19

violence, that "Corey [would be] at risk were he to return home" from a residential placement. Ex. 5. Family and friends saw bruises on Corey, Robert, and Emma Johnson, which they believed Koger had inflicted. Emma Johnson herself acknowledged that this was a destructive and chaotic relationship.

Family members and others will testify that Corey was severely neglected at various times throughout his childhood. Emma Johnson was often absent. She would leave her sons with others for "days, weekends, and sometimes even weeks and months." Ex. 6. Frequently, Corey and his brother were locked out of the apartment when they returned from school because Emma Johnson was gone. Corey's brother summed up their situation: "From an early age, Corey and I were pretty much on our own." *Id*. When Emma Johnson was home, she often partied and used drugs, even while Corey and his brother were present. "Corey told me that Emma always had visitors in their apartment and music would be played so loudly that Corey could not sleep at night. He said that he was tired at school during the day and couldn't concentrate on his schoolwork." Ex. 4.

Witnesses will describe how the abuse and neglect significantly impacted Corey. Corey's aunt is available to share her observations of young Corey, including that he was "sad a great deal of the time." *Id.* His godmother reported that he had "difficulty dealing with the situation." Ex. 3. Corey reported to counselors at the time that he "felt at times like wanting to stab himself." Ex. 7. When he was 13, Corey told a psychiatrist, "If he got lost in a forest, he did not know who would come looking for him." *Id.*

### b.   Corey was regularly uprooted from his homes and schools and eventually abandoned to social service custody

Witnesses will testify that, by the time he was 12, Corey had lived in roughly a dozen different places throughout Brooklyn, Manhattan, Queens, and Jersey City, New Jersey. Due to

20

her volatile relationships, drug use, and intermittent employment, Emma Johnson moved frequently, taking Corey and Robert with her from apartment to apartment. Because of this transience, Corey also attended numerous schools. Corey attended at least six different elementary schools before the end of second grade and at least ten schools before the age of 13.

When he was 13, Corey's mother abandoned Corey, voluntarily surrendering him to the social service system—not because Corey was acting out, misbehaving, or otherwise causing problems, but instead because she was focused on her desires, not her son's needs. Following two months of evaluation at the Pleasantville Diagnostic Center, Corey was moved to the Pleasantville Cottage School, a residential treatment facility for emotionally disturbed boys. He lived and attended school there for three years. Upon arrival, Corey underwent diagnostic screening which showed that he was functioning on second- and third-grade levels in word recognition, spelling, and arithmetic. The Pleasantville records describe Corey as having a "severe learning disability," an erroneous classification that nevertheless reflected awareness that Corey simply could not learn, no matter the strategies used to help him.[15] Despite his constant

---

[15] At sentencing, Dr. Cornell testified that Corey Johnson was "severely learning disabled" but was not intellectually disabled. *See* 2/10/93 Trial Tr. 3573-3574; 3682; 3684; 3690-3692 (Ex. 8). Corey Johnson is indeed intellectually disabled. *See infra* IV.D.4. Dr. Cornell's misdiagnosis of Corey Johnson was the result of a series of systematic failures occurring long before Dr. Cornell conducted his evaluation that resulted in the mischaracterization of Corey's intellectual impairments. Throughout childhood, Corey was repeatedly labeled as learning disabled, first in the public school system and then at Pleasantville, where he was deemed "severely learning disabled." However, as noted *infra* at note 22, experts in learning disabilities and intellectual disability—knowledgeable about the evaluation and diagnoses of children with learning disabilities and intellectual disability in New York City during the 1970s and 1980s—have since concluded that Corey Johnson did not meet the clinical guidelines for a learning disability at the time he was diagnosed, and he does not today. They also have described how young African-American children who met the criteria of "mental retardation" were mislabeled as learning disabled, a classification viewed as having less of a stigma, due to the threat of litigation and regulatory changes that occurred during that era.

21

failure, his teachers praised his commitment to improving; Corey wanted to learn, but he could not.  They observed that Corey was eager and motivated to improve his situation.

Witnesses who worked in these residential settings will explain that, when Corey turned 16, he was transferred to a group home called Elmhurst Boys Residence because he was too old to remain at Pleasantville.  At Elmhurst, the primary focus of the social workers and staff was to prepare Corey for the time when he would age out of the group home and would have to live independently.  Yet, despite significant efforts, Corey was unable to learn even minimal independent living skills during his two years at Elmhurst, a cause for significant concern for the social workers and staff responsible for him.

In his residential settings, Emma Johnson continued to inflict emotional abuse upon Corey.  She would cancel Corey's weekend home visits or lobby to reduce them, and she fell out of contact with Corey for long stretches of time.  Contemporaneous records from Corey's residential placements will provide descriptions of Emma Johnson as "a narcissistic" and "self-focused woman" who showed a "lack of empathy and sensitivity toward Corey," and was only "surfacely [sic] involved with Corey," "elusive," and "impossible to engage."  Exs. 9-12.

Nevertheless, even with their concerns about his ability to be safe outside the Elmhurst environment and in his mother's care, witnesses will testify that staff told Corey to leave Elmhurst for ten days when he refused to participate in group discussions and exhibited disrespectful behavior toward staff.  Some staff felt they clearly communicated to Corey that he should go home to his mother's house, use the ten days to consider how to improve his attitude and behavior, and then return to Elmhurst.  But another staff member had doubts at the time whether Corey understood that he was welcome to return. Ex. 13.  Over the next few weeks, staff wrote to Emma Johnson and Corey urging them to contact Elmhurst but never received any

22

reply.  Shortly after that, the Department of Social Services closed Corey's case and discharged him from the foster care system permanently.  Ex. 14; Ex. 12.

One of the social workers who worked with Corey will share her realization that, in hindsight, the system, which was supposed to protect and nurture Corey, let Corey fall through the cracks, depriving him of the security, stability, and structure of the residential placements where he had lived since he was 13.  Like his mother had done six years before, the system abandoned Corey without providing him the independent living and the social, practical, and other life skills vital to his survival.  With nowhere else to turn and without the life skills to survive on his own, Corey returned—as a highly vulnerable young man—to a highly volatile environment to live with his mother (who was using hard drugs) and his younger brother (who was dealing them).

### 3.   Mr. Johnson Was a Follower Who Was Easily Manipulated—a Common Outcome for People with Intellectual Disability—and Sought Protection from People Who Led Him Down a Violent Path

Section 3553(a)(1) requires the sentencer to consider "the nature and circumstances of the offense" in addition to the "history and characteristics of the defendant."  *Smith*, 959 F.3d at 703. Mr. Johnson acknowledges that his offenses are among the most serious possible.  However, it is vital to understand the context within which he committed those crimes.

### a.   Corey Johnson drifted into a drug group after his discharge from residential placement with no plan or support

A social worker will testify that she had written a tragically prophetic case note (just months before he was sent home) that foreshadowed the results when Corey was sent home from his last residential placement without any supports in place.  The social worker, who conducted individual and group therapy sessions with Corey at Elmhurst, documented her grave concerns about his mother's impact on Corey and his future.

23

**J.A.191**

> I suspect that Corey will be at risk when it comes time to leave us and the security that we have provided him all this time . . . [which] is necessary if he is going to be able to survive in the community and make constructive choices and not perpetuate the same patterns that he learned from his mother.

Ex. 15.  This is exactly what happened.

With severe cognitive, social, and practical deficits due to his intellectual disability, no job skills, and no support community, Corey was highly vulnerable.  He idolized his younger brother Robert, who first started selling drugs when Robert was 13 years old.  Soon after his discharge from Elmhurst, Corey tried to sell drugs, too.  Because of his intellectual disability, Corey had problems figuring out how much money he was owed in exchange for the drugs he sold.  Once, Robert gave Corey drugs to sell—50 vials of crack to sell for $5 each—but Corey returned with only $50, not the expected $250.  After that, Robert could not trust Corey to calculate the money owed him and therefore stopped giving him drugs to sell.  Ex. 6.

In 1989, still just 18, Corey joined a group of men he knew from his Brooklyn neighborhood who were selling drugs in Trenton, New Jersey, led by brothers Darnell and Darold Brown.  The leaders recognized that Corey was slow, and Corey's role in the Trenton group was very limited.  Corey viewed the Trenton group as his surrogate family: "Corey considered our group to be his family and was very protective of the group."[16]  Vernon Thomas, as well as Richard Tipton, his co-defendants in the case that brought him to death row, were a part of this group.  Tipton was viewed much differently than Corey by the leaders of the Trenton group.  Tipton was "active, hyper, and rowdy . . . very loud" and "considerably more intelligent than Corey."  Ex. 16.

---

[16]   *See* Ex. 16; Ex. 17.  Prosecution witnesses during Corey Johnson's death penalty trial confirmed that members of the group called each other "brother" and "cousin" and Corey viewed them as his family.

24

**J.A.192**

In 1991, the police raided a home where the members of the Trenton drug group were staying, and its leaders and many other members were arrested. Mr. Johnson, Vernon Thomas, and Richard Tipton were not at the house during the raid, and they were not arrested. Tipton suggested to the remnants of the Trenton group who were not in jail that they move to Richmond, Virginia, where Tipton had ties and believed they could make "big money" selling drugs. Tipton, Thomas, and Corey Johnson soon relocated to Richmond, and Tipton connected them there with James Roane. 1/15/93 Trial Tr. 921-922 (Ex. 18). In Richmond, the group engaged in the violent crimes underlying their capital convictions.[17]

### b.   Mr. Johnson was a follower who exhibited extreme loyalty to people viewed as family

It is well recognized that individuals with intellectual disability often act on impulse, that they are easily influenced, and that in group settings, they are usually followers rather than leaders. James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 429 (1985) (hereafter "Ellis *et al.*").[18] Witnesses will describe significant

---

[17]   While trial testimony depicted Corey as a "supervisor" of the activities in Virginia, witnesses who knew him at the time would testify to their observations of Corey that provide a more complete and accurate depiction of his limitations and his role. "Compared to Roane and Tipton, Corey appeared to be a follower. Tipton and Roane could have been the bosses; they had the strong personalities, unlike Corey. Corey wanted to be accepted and could have been influenced by others." Ex. 20. "I would have expected [Tipton], rather than Corey or [Thomas], to be the leader of the group in Virginia." Ex. 17. "Both [Tipton] and Corey were followers, but between the two, Corey would follow [Tipton]." Ex. 16. In any event, the meaning of being a "supervisor" for purposes of establishing the crimes for which Corey Johnson was convicted ("exercis[ing] power and authority by a person who occupies some position of management or supervision," *see United States v. Tipton*, 90 F.3d 861, 886 (4th Cir. 1996) (citation omitted)), is not inconsistent with the evidence powerfully demonstrating Corey Johnson's significant deficits in life skills that began during his childhood but continued up until his incarceration.

[18]   *See infra* at IV.D.4 (summary of expert evidence that Mr. Johnson will present to the jury that he is a person with intellectual disability).

25

J.A.193

evidence that Corey Johnson was a follower, not a leader, throughout his life. He has always exhibited traits of a follower, rather than a leader. Teachers, caseworkers, family, and friends will attest to the same, describing him as someone desperate to be accepted by peers and who was willing to do anything he was told, regardless of the consequences. They also described Corey as being "easily manipulated" and victimized by others, including peers and his mother and brother. Exs. 16 & 22. Corey would do whatever his friends told him to do, going to great lengths to fit in with the crowd, including jeopardizing his own wellbeing by doing things that could get him injured or killed. Corey's cousin, Priscilla Hodges, recalls that as a young teenager, he performed reckless acts—like riding his bike through traffic across a busy street and roller-skating down a steep hill—simply on a dare by his peers. Ex. 21.

Witnesses who worked with Corey in his residential placements will explain that he was perceived as someone who was so limited that he would always remain a follower. Counselors at Corey's placement stated that he was easily influenced and taken advantage of by his peers. He often required protection from the other children in his class because he was frequently scapegoated. Corey was desperate to be accepted by his peers and would do anything that someone told him to do.

This understanding is consistent with numerous trial witnesses who will describe Tipton as the leader of the Richmond group. At trial, Mr. Johnson was described as one of Tipton's "stickmen"—an enforcer—in the Richmond group's drug business. In short, due to his intellectual disability and consistent with the fact that individuals with cognitive limitations are usually followers, Mr. Johnson was willing to follow Tipton and Roane, who used him not for his drug dealing ability, but to do their bidding. While in no way excusing his actions, it is important to understand that Mr. Johnson viewed the Richmond group as his surrogate family,

26

just as his similar feelings toward the Trenton group had made him extremely "protective" toward them.  In fact, during the penalty phase, the jury was convinced of Mr. Johnson's susceptibility to manipulation—all 12 jurors voted that Corey was easily manipulated and eager to be accepted by others.  *See* Special Findings at 11 (Ex. 1).[19]

People who knew Mr. Johnson, Tipton, and Roane similarly concluded that Mr. Johnson followed Tipton and Roane's lead.  "Compared to Roane and Tipton, Corey appeared to be a follower."  Ex. 20.  A criminal justice reform advocate who interacted with all three men on eight to ten different occasions while visiting inmates on death row did not perceive Mr. Johnson to be the leader of the group; in fact she believed "no one could reasonably have thought of Corey as the leader in that group."  Ex. 22; *see also* Ex. 17 ("I would have expected [Tipton], rather than Corey or [Thomas], to be the leader of the group in Virginia."); Ex. 16 ("Both [Tipton] and Corey were followers, but between the two, Corey would follow [Tipton].").  Even Roane and Mr. Tipton indicated to the criminal justice advocate that Corey was the follower of the group and that they were aware that Mr. Johnson was slow.  Ex. 22.

### 4.    Mr. Johnson Is a Person with Intellectual Disability

A jury reconsidering Mr. Johnson's sentence will be provided with considerable evidence establishing that he is a person with intellectual disability.  This evidence will include the findings of three nationally renowned experts in the field of intellectual disability who evaluated Mr. Johnson and concluded that he is a person with intellectual disability.  These experts base their conclusions on numerous records from Mr. Johnson's childhood of the type regularly relied

---

[19]    What the jury was not given was an understanding that the "follower" and "eager-to-please" attributes are frequently seen among those with intellectual disability.  *See* Ellis *et al*. at 429.

on by specialists in intellectual disability, as well as interviews with individuals who observed him through the years and other measures that are standard in the field.

To be considered intellectually disabled, a person must meet the criteria established by the leading professional organizations in the field.  The American Psychiatric Association ("APA") in its *Diagnostic and Statistical Manual of Mental Disorders DSM-5* (5th ed. 2013) (hereinafter, "DSM-5") and the American Association on Intellectual and Developmental Disabilities in its Ad Hoc Committee on Terminology and Classification, *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed. 2010) (hereinafter, "Classification Manual") set forth three-prong standards that essentially mirror each other.  Both standards require: (1) significant limitations in intellectual functioning, as measured by a reliable and valid IQ test; (2) significant limitations in adaptive functioning, which gauges how effectively individuals cope with everyday life demands and how well they meet the standards of personal independence of someone in their age group, sociocultural background, and community setting;[20] and (3) the onset of these significant deficits during the development period.[21]

### a.      Mr. Johnson has significant limitations in intellectual functioning

At a capital sentencing hearing before a jury, Mr. Johnson's experts will show that he has an IQ in the intellectual disability range.  For example, Corey had a valid and reliable full scale IQ score of 69 on the gold-standard WISC-R that was administered by an experienced

---

[20]   A diagnosis of intellectual disability requires significant deficits in at least one of three areas of adaptive functioning—(1) conceptual functioning, (2) social functioning, or (3) practical functioning.  DSM-5 at 33; Classification Manual at 6-7.

[21]   DSM-5 at 33; Classification Manual at 6-7.

J.A.196

psychologist when Corey was 16 years old and living in the Pleasantville residential facility.[22] Mr. Johnson's valid IQ score below 70, namely the 69 IQ test noted above, is sufficient evidence of his significant limitations in intellectual functioning to proceed with an evaluation of Mr. Johnson under the second prong of the intellectual disability diagnostic criteria, an assessment of adaptive behavior.

### b.　　Mr. Johnson has significant limitations in adaptive functioning

Mr. Johnson's evidence will show that he has significant limitations in adaptive functioning as well.  That evidence is based on well-documented, detailed, and consistent contemporaneous records from teachers, social workers, psychologists, and psychiatrists who worked with Corey before and during his residential placements.  It is corroborated by interviews with and statements by several dozen people (family members, friends, acquaintances, professionals who worked with Corey as a child, and adults who have interacted with him in prison) who describe further examples of his broad limitations in learning, social interactions, and practical living skills.  Finally, the evidence will include the results of standardized adaptive behavior instruments administered by an experienced expert to three people (a family member, a very close friend, and a teacher) who knew Corey well during his childhood and teenage years and that place Corey Johnson in the intellectual disability range of adaptive behavior.

---

[22]  As noted *supra* note 15, Mr. Johnson's experts in the evaluation and diagnosis of learning disabilities have concluded that Corey was misdiagnosed as a child with severe learning disabilities for a number of reasons, rather than correctly diagnosed as a child with intellectual disability.  Those reasons include pressure, during the era when Corey entered the New York City school system, to classify children who met the criteria to be diagnosed with "mental retardation" as children with learning disabilities so as not to place the negative label of "mental retardation" on children, particularly African-American children in urban environments.  Another reason for his erroneous "learning disability" diagnoses were two flawed and invalid IQ tests given to Corey as a child and the lack of awareness of the timing and circumstances related to all of the assessments by those who lacked complete records related to his childhood.

29

At a capital resentencing hearing before a jury, Mr. Johnson will present testimony that demonstrates his broad adaptive behavior impairments during childhood.  The following highlights some of the evidence and testimony he would present.

### i.   Corey was unable to learn

Corey's school records document his consistent academic failure from a young age.  He repeated several grades, and as he got older, he fell further and further behind.  Corey was in the second grade from 1975, when he was six, until 1979, when he was ten.  At age ten, Corey was referred to the Committee on the Handicapped for "school failure" and, after testing, was placed in Special Education classes.

Corey's academic failures continued in his late teens.  When he was 16, his reading comprehension, oral comprehension, sight vocabulary, and arithmetic ability were all on second- or third-grade levels.  While at Elmhurst, he attended high school but was placed in remedial, special education, and vocational classes, but, even then, failed or got Ds in nearly every class. His teachers determined that he was unable to pass school competency tests and he ultimately left high school without graduating[23] or obtaining a certificate of attendance.

Corey stood out to staff and evaluators at his residential placements because of his severe disability.  "Corey was very slow intellectually . . . .  I do not remember anyone else at Pleasantville who was similarly slow intellectually."  Ex. 19.  "Compared to virtually all of the other boys I encountered at Elmhurst, Corey was much weaker cognitively."  Ex. 23.  "My impression was that while there were many boys with below normal intellectual ability and various levels of functioning, almost all of the other boys there were more intelligent than

---

[23]   Prison records confirm that, since his incarceration almost 30 years ago, Mr. Johnson has continued taking courses and trying to pass his General Equivalency Diploma (hereinafter, "GED") exams.

Corey." Ex. 13. A Pleasantville psychologist who evaluated Corey twice in three years later said,

> Nearly 30 years after I met and evaluated him, Corey still stands out in my mind due to his profound impairment in learning. Corey's deficit in phonological processing remains the most profound impairment of this kind I have encountered in three decades of clinical practice.

He considered Corey's deficit "so profound" that he has "used it over the past 30 years as a teaching example in [his] classes."

### ii.     Corey failed to learn skills for independent living

Toward the end of his residential placement, professionals at Elmhurst recognized that returning to his mother's residence was not in Corey's best interests, and they worked with him to focus on independent living skills. But Corey was not able to develop independent living skills, nor did he possess the judgment to ensure his own safety. One social worker who worked with Corey at Elmhurst, questioned Corey's ability to handle "simple, day-to-day tasks that community life requires, such as paying bills, obtaining a driver's license, or purchasing and maintaining a car," noting that "[s]omewhat more complex skills—like planning a budget—were clearly beyond Corey's abilities." Ex. 23. According to family and friends, Corey never lived alone and always lived with girlfriends or more competent peers.

### c.     Mr. Johnson's significant limitations in intellectual functioning and in adaptive functioning were present during his childhood

Finally, Mr. Johnson will present evidence that his significant limitations in intellectual functioning and in adaptive functioning were manifested during his childhood, the developmental period for intellectual disability diagnoses. Accordingly, his experts will testify before the capital resentencing jury that Mr. Johnson is a person with intellectual disability because he meets the current diagnostic criteria.

31

**J.A.199**

**5.    The Jury Considering Mr. Johnson's Sentence Will Hear Evidence from Experts Who Are Specialists in Intellectual Disability—Evidence No Court or Jury Has Heard to Date**

While Mr. Johnson previously raised an intellectual disability claim in his § 2255 proceeding, the court was not provided with evidence from experts in the field of intellectual disability.  Nor has Mr. Johnson ever had an opportunity to present comprehensive evidence of his intellectual disability to any trier of fact at an evidentiary hearing.

Mr. Johnson's capital trial was among the first federal death penalty cases after the enactment of the ADAA, and defense practices then were not as developed as they are today.  His trial attorneys did not obtain all available school, social services, and other similar records created during his childhood.[24]  In addition, Dr. Cornell, the psychologist they retained to assess Mr. Johnson's competency to stand trial, to determine if there were any grounds to assert a not-criminally-responsible claim, and to assist with preparing mitigation evidence generally, was not an expert in intellectual disability.  For a number of reasons, Dr. Cornell was unable to accurately evaluate Mr. Johnson's intellectual capabilities.  Because of that inability, he did not complete a comprehensive assessment of Mr. Johnson's adaptive functioning.  Accordingly, Dr. Cornell erroneously testified before the jury that Mr. Johnson was not "mentally retarded." 2/10/93 Trial Tr. 3692 (Ex. 8).  Dr. Cornell's conclusion was unfortunately incorrect, based on the complete record of Mr. Johnson's valid and reliable childhood IQ scores and broad and significant impairments in adaptive functioning (which were not presented to Dr. Cornell).

After his convictions and death sentences were affirmed on direct appeal, Mr. Johnson was appointed new counsel to represent him on proceedings to vacate his sentences, pursuant to § 2255.  Mr. Johnson's § 2255 attorneys raised a claim that he is "mentally retarded" and that his

---

[24]    *See, e.g.*, *supra* note 15.

32

execution was therefore barred by 21 U.S.C. § 848(*l*) and 18 U.S.C. § 3596(c), both of which provide that a "sentence of death shall not be carried out upon a person who is mentally retarded," and they asserted that Mr. Johnson's trial attorneys provided ineffective assistance of counsel by failing to argue at sentencing that he could not be executed because he is "mentally retarded."[25]  However, Mr. Johnson's § 2255 counsel did not submit any expert opinions or expert reports in support of their barebones claims that he had "mental retardation."

This Court rejected Mr. Johnson's claims related to "mental retardation," concluding: "Hence, the record before this Court demonstrates that Johnson is not mentally retarded."[26]  The Court further concluded that Mr. Johnson's trial counsel did not provide deficient representation because counsel reasonably relied upon the conclusion of the psychologist they retained to assist them, who informed them that Mr. Johnson was not "mentally retarded."  Mem. Op. at 82-84.

Mr. Johnson appealed the dismissal of his § 2255 petition and raised, among other issues, the denial of his "mental retardation" claim.[27]  The Fourth Circuit later affirmed this Court's ruling on appeal.  *United States v. Roane*, 378 F.3d 382, 408-09 (4th Cir. 2004).

---

[25]  *See* Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255 at 108-11 (June 15, 1998) and subsequent filings related to Mr. Johnson's mental retardation claims.

[26]  Memorandum Opinion (May 1, 2003) at *80-82 (hereinafter, "Mem. Op.") (observing that Mr. Johnson was "granted another full opportunity to demonstrate that he is mentally retarded" and that "Johnson rejected the Court's invitation to submit any new evidence of his mental retardation").

[27]  *See* Petitioner Johnson's Motion for a Certificate of Appealability Pursuant to 28 U.S.C. §§ 2253(c)(1)(B) and 2255 at 43-45 (October 10, 2003); Brief for Appellants Corey Johnson and Richard Tipton at 139-45, *United States v. Johnson & Tipton*, Nos. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004).

33

### 6.      Mr. Johnson's Flawless Prison Record Indicates that a Sentence Reduction Would Not Encourage Further Crime Nor Would It Endanger the Public

The sentencing factors require the "need for the sentence imposed" to "afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B), (a)(2)(C).  In *Pepper v. United States*, 562 U.S. 476 (2011), the Supreme Court instructed courts to consider a defendant's post-sentencing mitigation evidence at the time of resentencing.  *See also United States v. Davis*, 679 F.3d 190, 195-96 (4th Cir. 2012) (holding that the sentencer "can consider other sentencing factors" when reducing a sentence). Courts have relied on post-sentencing mitigation efforts by petitioners in granting First Step Act motions.  *See*, *e.g.*, *Chambers*, 956 F.3d at 674-75 ("There are generally no limitations on the types of character and background information a court may consider for sentencing purposes."); *Brown*, 2020 WL 3106320, at *4 ("After consideration of the 3553(a) factors, in particular the history and characteristics of the Defendant and the need for the sentence imposed, the Court finds that a [reduced sentence] is appropriate . . . .").

Mr. Johnson's immaculate prison record weighs in favor of sentence reduction.  *See United States v. Johnson*, No. 7:04-CR-128-1, 2020 WL 2563541, at *7 (W.D. Va. May 20, 2020) ("The court finds that his ability to stay out of trouble and his efforts to improve himself indicate that he has learned to respect the rules of the institution and that he does not present the same threat to the public that he did prior to his incarceration.").  Mr. Johnson has been incarcerated for the past 28 years.[28]  For more than two decades, he has been a model inmate, following prison rules and doing what he was told to do by prison officials.  In the last 20 years,

---

[28]    For the first approximately seven years of his incarceration after his arrest in 1992, both before and after his federal trial and sentencing, Mr. Johnson was held in the custody of the Virginia Department of Corrections.  Since 1999, Mr. Johnson has been incarcerated on the federal death row in the USP in Terre Haute, Indiana.

Mr. Johnson only received one disciplinary infraction for using a staff restroom without permission in 2002 while working in the kitchen at USP Terre Haute. He has avoided getting into altercations with other inmates and he has never engaged in violence. His lack of any violent behavior in prison and his long period without any infractions is a strong demonstration that he does not pose a danger in prison. Special Confinement Unit reports described Mr. Johnson as being quiet, civil, quick to smile, and a relaxed person.

A pastor who ministered to Mr. Johnson every other week for several years while he was held in Virginia after his sentencing met with Mr. Johnson in Terre Haute, Indiana five times after he was transferred to the Bureau of Prisons, and spoke with him another dozen times by phone, described Mr. Johnson as "less vocal and opinionated" than most inmates, "soft-spoken, quiet, and humble [and] seemed eager to please." Ex. 29. During all the times he observed him, Mr. Johnson appeared to get along with the other inmates and never got into any "disagreements with anyone." *Id.* In contrast, the pastor believed that Tipton and Roane, whom he also knew, were quick to anger and engage in confrontations with prison officials, while Mr. Johnson "seemed to 'go with the flow.'"[29]

Although he is a person with intellectual disability, Corey Johnson, despite his inability to do so, continues to believe that he can obtain a GED, and has been diligently trying since 2006 to obtain it.[30] Achieving his GED is one serious goal that Mr. Johnson set for himself. After decades of dedicated effort, Mr. Johnson has never been able to take, much less pass, the GED test because he has never progressed past the pre-GED stage, even though—year in and year

---

[29] Ex. 29. A volunteer chaplain who also knew Tipton, Roane, and Mr. Johnson well at the same prisons describes Mr. Johnson as "pleasant and eager for acceptance . . . [and] polite, respectable, and kind." Ex. 20.

[30] Inmate Education Data Transcript, Mar. 25, 2012 (Ex. 30).

35

out—his prison programming reviews note he "[w]orks hard in the GED program" and each year they set the coming December as the target for Mr. Johnson to get his GED.  To this day, he continues to study for the GED test regularly and works on his reading, social studies, and math abilities.

Mr. Johnson has also held a number of very simple jobs and has received positive performance evaluations, in both the Virginia prisons and federal prison.  In addition to these jobs, he has also learned to sew and has been mending old undershirts for himself.  He has developed other pastimes such as learning to knit and creating painting projects such as paint-by-numbers.  Throughout his incarceration, Mr. Johnson has worked hard to become a better person.

**7.      Mr. Johnson's Sentence Was Unwarranted Compared to Sentences to Similarly Situated Defendants**

An especially compelling factor in this case is the mandate to avoid unwarranted sentence disparities among defendants who are guilty of similar misconduct.  18 U.S.C. § 3553(a)(6); *see also United States v. Cantu-Rivera*, CR No. H-89-204, 2019 WL 2578272, at \*2 (S.D. Tex. June 24, 2019) (finding a reduced sentence would "also avoid unwarranted disparities among defendants with similar records convicted of similar conduct" because defendant's time served "exceeds the sentences imposed on other members of the . . . conspiracy").  Moreover, the Fourth Circuit has allowed the consideration of a co-defendant's sentence when determining a defendant's sentence.  *United States v. Doan*, 498 F. Supp. 2d 816, 819-20 (E.D. Va. 2007) (discussing Fourth Circuit authority).

Here, Mr. Johnson's co-defendant Thomas was spared the death penalty despite being found guilty of four murders in furtherance of a continuing criminal enterprise ("CCE").[31]

---

[31]    Thomas's case was severed from Mr. Johnson's and the other co-defendants, and he was tried and sentenced after Mr. Johnson.  However, after Mr. Johnson's sentencing hearing, all

36

Shortly after Mr. Johnson was sentenced to death, Thomas's lawyers submitted an expert report

showing that Thomas had an IQ score of 71.[32]   And soon afterward, on the eve of trial, the

government withdrew its death notice with respect to Thomas.

While the facts of the crime here are certainly horrendous and evoke sympathy for the

victims, there are several federal capital juries that have returned life sentences in cases that were

at least as aggravated as the instant case.[33]   The disparity between their sentences is contrary to

---

twelve jurors still found that other defendants who were "equally culpable in the crime(s), will not be punished by death."  *See* Special Findings at 8 (Ex. 1).

[32]   Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993) (Ex. 31).

[33]   *United States v. Ealy*, W.D. Va. No. 00-CR-104 (Defendant was convicted of the 1989 murder of a family of three—a husband, wife, and son.  The husband and wife were found shot to death outside their home; their son was found shot to death in a closet inside the home.); *see also United States v. Ealy*, 363 F.3d 292 (4th Cir. 2004); *United States v. Oscar Grande and Israel Cisnero*s, E.D. Va. No. 04-CR-83 (Defendants, who were members of the MS-13 street gang, were convicted of the stabbing murder of a pregnant teenager in 2003. The victim was 17-years-old and was targeted because she was a former member of the gang and had become a federal informant.  Shortly after she left the witness protection program, defendants repeatedly stabbed her.); *see also United States v. Cisneros*, 385 F. Supp. 2d 567 (E.D. Va. 2005); *United States v. Moussaoui,* E.D. Va. No. 01-CR-455 (Defendant was convicted of being a co-conspirator in the September 11, 2001, terrorist attack on the World Trade Center and Pentagon, which killed over 3,000 people and resulted in four airplane crashes in New York, Pennsylvania, and Virginia); *see also United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010); *United States v. Edelin*, D.D.C. No. 98-264 (Defendant was convicted of ordering four murders that he ordered as the so-called "drug kingpin" of DC-area gang known as the "1-5 Mob."  Two of those murders involved ordering the killing of a 14-year-old and a 19-year-old.); *see also United States v. Edelin*, 134 F. Supp. 2d 59 (D.D.C. 2001); *United States v. Northington*, E.D. Pa. No. 2:07-CR-00550-RBS (Defendant was convicted of a 2004 arson fire that killed six people, including four children—ages 1, 10, 12, and 15.  The fire was set to retaliate against a federal informant."); *see also United States v. Northington*, Crim. Action No. 07-550-05, 2014 WL 1789151, at *1 (E.D. Pa. May 6, 2014); *United States v. Green*, W.D. Ky. No. 5:06-CR-00019-TBR (Defendant was convicted of the 2006 murders of a family of four, including two children, and the rape and murder of the daughter.); *see also United States v. Green*, 654 F.3d 637 (6th Cir. 2011); *United States v. Kehoe,* E.D. Ark. No. 97-243 (Defendant was convicted of the murder of a family of three— an Arkansas gun dealer, his wife, and their 8-year-old daughter—in furtherance of a white supremacist racketeering enterprise.  Along with her parents, Defendant disposed of the 8-

37

this sentencing factor's goal of "promot[ing] national uniformity in sentencing rather than uniformity among codefendants in the same case." *United States v. Patterson*, 755 F. App'x 238, 241 (4th Cir. 2018) (citation omitted), *cert. denied*, 139 S. Ct. 1576 (2019).[34]

---

year-old girl's body by dumping her in a swamp.); *see also United States v. Kehoe*, 310 F.3d 579 (8th Cir. 2002); *United States v. Candelario-Santana*, D.P.R. No. 3:09-CR-00427-JAF (Defendant, who already had 13 prior murder convictions, was convicted of 20 murders, including the October 17, 2009 "Tombola Massacre," where eight people were killed and twenty wounded in a shooting at a bar, including an unborn child.); *see also United States v. Candelario-Santana*, 834 F.3d 8 (1st Cir. 2016); *United States v. Pitera*, E.D.N.Y. No. 90-0424 (RR) (Defendant, a contract killer for the Mafia, was convicted of six murders. Several of the murders involved torturing the victims, dismembering their bodies, and burying them in a deserted marsh on Staten Island.); *see also United States v. Pitera*, 5 F.3d 624 (2d Cir. 1993); *United States v Tatum,* E.D. Tex. No. 2:99-CR-5 (Defendant, a member of the "Crips" gang, was convicted of murdering three people, one of whom was a 63-year-old retired minister whom defendant also kidnapped and murdered.); *see also United States v. Tatum*, 31 F. App'x 156 (5th Cir. 2001); *United States v. Williams*, S.D. Tex. No. 03-CR-221 (Defendant was convicted for his participation in an immigrant smuggling operation that led to 19 people's deaths by dehydration, overheating, and suffocation in the back of a truck trailer driven by him.); *see also United States v. Williams*, 610 F.3d 271, 274-75 (5th Cir. 2010); *United States v. Mayhew*, S.D. Ohio CR No. 02 03-165 (Defendant was convicted of murdering his ex-wife, her boyfriend, and defendant's own 18-year-old daughter, with whom defendant had an incestuous relationship.); *see also United States v. Mayhew*, 337 F. Supp. 2d 1048 (S.D. Ohio 2004).

[34] Mr. Johnson's death sentences are also disparate to other federal defendants who committed similar crimes and have similar characteristics and history who did not receive the death penalty because of their intellectual disability. *See* Corey Johnson's IQ Scores Compared to IQ Scores of Federal Death Penalty Defendants Found Intellectually Disabled After Contested *Atkins* Hearings (the "IQ Chart") (Ex. 32). The IQ Chart does not include other federal defendants for whom the government did not authorize seeking the death penalty or in whose cases the government withdrew its death notice based on IQ scores similar to Mr. Johnson's IQ scores. *See* Death Penalty Information Center, *Defendants Whose Sentences Have Been Reduced Because of a Finding of "Mental Retardation" since Atkins v. Virginia (2002)* (July 19, 2012), http://www.deathpenaltyinfo.org/node/2395. Further, Mr. Johnson's IQ scores are similar to the Flynn-corrected IQ scores for three defendants whose *Atkins* claims were granted and who were found to be ineligible for the death penalty due to their intellectual disability after applying the Flynn effect. *United States v. Hardy*, 762 F. Supp. 2d 849, 857 (E.D. La. 2010); *United States v. Davis*, 611 F. Supp. 2d 472, 477-78 (D. Md. 2009); *United States v. Lewis*, No. 1:08 CR 404, 2010 WL 5418901, at *8-9 (N.D. Ohio Dec. 23, 2010).

38

### 8.      Mr. Johnson Committed His Crimes at 22 but Is Now 51

The age of the defendant is a factor that can be considered on a First Step Act motion. *See*, *e.g.*, *Brown*, 2020 WL 3106320, at *4 ("Also weighing in the Court's consideration is that Defendant is now fifty-five years old . . . ."); *United States v. Fletcher*, No. CR TDC-05-0179-01, 2020 WL 2490025, at *4 (D. Md. May 14, 2020) (finding a downward variance in sentencing appropriate "particularly in light of Fletcher's advanced age and health conditions"). It is also a factor the jury will consider in assessing the sentence.

First, Mr. Johnson committed these offenses at only 22 years old. Even in 1993, the jurors on Mr. Johnson's case found his age at the time of the crime compelling. Nine of 12 jurors found Mr. Johnson's youthfulness mitigating at sentencing. Since then, there has been significant advancement in understanding how adolescent and young adult brains develop. For instance, in a study funded by the Department of Justice, researchers opined that, "unlike logical-reasoning abilities, which appear to be more or less fully developed by age 15[,] psychological capabilities that improve decision making and regulate risk taking—such as impulse control, emotion regulation, delay of gratification, and resistance to peer influence—continue to mature well into young adulthood." James C. Howell et al., Bulletin 5: *Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know* 17 (2013), https://www.ncjrs.gov/pdffiles1/nij/grants/242935.pdf. The study found that "adolescents and young adults simply do not have the physiological capacity of adults over age 25 to exercise judgment or control impulses" and concluded that policymakers should implement a "categorical rule of youthfulness as a mitigating factor in sentencing" as opposed to "individualized discretion." *Id.* at 18, 29.

39

**J.A.207**

Second, Mr. Johnson is now over 50, a critically important factor that demonstrates that he is unlikely to pose a risk of violence if his sentence were to be reduced and he remained in prison for the rest of his life.[35]  Studies of crime patterns generally demonstrate "that as a general matter, people age out of crime . . . .  Not only are most crimes committed by people under 30, but even the criminality that continues after that declines drastically after age 40 and even more so after age 50."  *Id.* at 17.  Lifers are often model inmates because nearly all criminals "mature out of lawbreaking before middle age."  Danielle Sered, Accounting for Violence: How to Increase Safety and Break Our Failed Reliance on Mass Incarceration at 20, Vera Institute of Justice (2017).  Research concludes that most people "age out of crime," meaning that "[f]or most crimes, the likelihood that someone will continue committing them once they hit 40 is negligible."  Rachel E. Barkow, *Prisoners of Politics: Breaking the Cycle of Mass Incarceration* 44-45 (2019).  Mr. Johnson is not a risk to fellow prisoners or prison officials; he does not pose a danger in prison.

### 9.     Mr. Johnson Has Demonstrated Sincere Remorse

Courts, including in the Fourth Circuit, have considered a petitioner's remorse in determining a First Step Act motion.  *See, e.g.*, *Hardnett*, 417 F. Supp. 3d at 743 (granting a sentence reduction and relying on, among other things, the petitioner's "letter describing remorse for his behavior sixteen years ago"); *United States v. Taylor*, No. 04 CR 495-38, 2020 WL 2476529, at *5 (N.D. Ill. May 13, 2020).

---

[35]  U.S. Sentencing Commission, *The Effects Of Aging On Recidivism Among Federal Offenders* at 22 (2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

40

Mr. Johnson is remorseful for taking the lives of his victims and those he injured, and the awful pain and loss he caused for their families.  However, due to his intellectual disability, the genuine remorse he feels may not be apparent to untrained observers.

> Due to their impairments, there [are] a host of reasons, including . . . a lesser ability (due to limited communications skills) to effectively testify on their own behalf, that "in the aggregate," [render] offenders with intellectual disability subject to an unacceptable "risk of wrongful execution" (*Atkins v. Virginia*, 2002, pp. 320-21).  The Court also noted the particular danger that their "demeanor may create an unwarranted impression of lack of remorse for their crimes," which could enhance the likelihood that the jury will impose the death penalty due to a belief that they pose a future danger (*Atkins v. Virginia*, 2002, p. 321).

John H. Blume & Karen L. Salekin, *The Death Penalty and Intellectual Disability*, *Analysis of Atkins Cases* 39, American Association on Intellectual and Developmental Disabilities (Edward A. Polloway ed., 2015).

Nevertheless, at his sentencing hearing, before this Court ordered the death sentences recommended by the jury, Mr. Johnson expressed, to the best of his ability given his significant limitations, his regret for his crimes and accepted responsibility:  "I'm sorry for the great number of people who are dead, you know, and there is a lot on us, and I feel we are no angels."

In an impromptu statement, Corey Johnson also extemporaneously addressed a group of high school students who neither his counsel nor he had known would be present during his sentencing immediately before the judge imposed his death sentence.  His lead trial attorney, Craig Cooley, recalls that Mr. Johnson gave a sincere, powerful, and moving statement to the high school students urging them not to commit crimes in any way or make the mistakes he had in his life.

> All crimes, crimes is not good, period.  All crimes, period, is not good.  Being the fact that you are here, take a lesson to what's going on.  I mean, you get old enough and realize that this is not the life that you are living.  I am unfortunate that I never had nobody.  That's no excuse . . . .  And I would hope you discuss this.  Because I would hate to see you all end up this way.  I would hate to see you have kids in this way, because this is not right.

41

6/1/93 Tr. 22#:1-14 (Ex. 33). This evidence of Mr. Johnson's clear remorse is important to the

sentencer's review.

* * *

The above summary demonstrates the type of evidence Mr. Johnson would present to the

sentencer—here, the jury—to show that he should be sentenced to life in prison without parole

rather than death. In addition, under the First Step Act, that sentencer must consider post-

conviction evidence as well all the evidence that was previously presented. *See Chambers*, 956

F.3d at 674-75 (holding there is no limit to scope of evidence court can consider for purposes of

First Step Act resentencing). At the jury sentencing in 1993, some evidence was presented in

mitigation, albeit through just two witnesses and a psychologist, as to some of the factors that

influenced Mr. Johnson's upbringing. Indeed, even based on that limited evidence, the jury

unanimously recognized that the abuse; the absence of a stable home life; and the poverty and

violence and the drug addictions that Corey grew up around all mattered. *See* Special Findings

at 7-11 (Ex. 1).[36]

Some but not all of the jurors found his low IQ,[37] as well as his youth and his adjustment

to prison, mitigating. *Id*. What the jury knew at that point, which pales in comparison to his

model prison record of more than twenty years, is proof that he can be kept secure and will not

---

[36] Jurors unanimously found eight separate mitigating factors related to the physical and
emotional abuse, abandonment, and neglect he suffered as a child, his extremely violent,
unstable, and neglectful family, the impoverished and violent environment in which he was
raised, the extreme violence to which he was exposed as a child, and his "severe learning
disability," among other mitigation findings by the jury. *Id*. Mr. Johnson will show that the
last of those findings, that he had a "severe learning disability," was based on erroneous
testimony that he was not "mentally retarded, "when the evidence he will now present shows
that he is a person with intellectual disability.

[37] Of course, as noted above, the jurors were mistakenly not told that he is a person with
intellectual disability, a bar to the death penalty.

42

**J.A.210**

create problems for staff or other prisoners.  If a jury that saw only a glimpse of Mr. Johnson's

background found it mitigating, it is highly likely that the wealth of evidence that is available to

be presented will convince the sentencer to reduce his punishment.

**E.      Mr. Johnson's §§ 846, 924(c), and 1959 Convictions Are Invalid and Impermissibly Influenced His Original Sentence**

Mr. Johnson was convicted of additional counts that, while not the subject of this motion,

are invalid.  While the statutes and case law are clear that only a jury can reconsider Mr.

Johnson's previous, death-sentenced counts, the First Step Act provides that the Court must

reconsider the sentences for his non-capital counts and must decide whether to reduce them in

light of all of the § 3553 factors.  In considering whether to reduce Mr. Johnson's non-capital

sentences, which Mr. Johnson suggests the Court should do after the capital resentencing

hearing, this Court should account for the effect of these improper convictions on the original

sentencing determinations.

**1.      Mr. Johnson's § 846 Conviction Was Vacated**

Mr. Johnson was convicted of conspiracy to possess cocaine base with intent to distribute

in violation of 21 U.S.C. § 846 (Count 1).  On appeal, however, the Fourth Circuit vacated Mr.

Johnson's § 846 conviction because it violated the Constitution's double jeopardy clause, as it

"is a lesser included offense within the § 848 CCE as charged." *Tipton*, 90 F.3d at 891.  Mr.

Johnson should be resentenced without the influence of this superadded, unconstitutional

conviction on the sentencing decision.

**2.      Mr. Johnson's § 924(c) Convictions Are Invalid**

Mr. Johnson was also convicted of five counts (Counts 9, 12, 15, 20, and 26) of using a

firearm in relation to a crime of violence or a drug trafficking crime in violation of 21 U.S.C. §

924(c).  Mr. Johnson has moved the Fourth Circuit for authorization to file a successive motion

43

pursuant to 28 U.S.C. § 2255 in this Court that will seek relief from these unconstitutional convictions in light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), which he believes has rendered those § 924(c) convictions unconstitutional.  That pleading addresses Mr. Johnson's arguments in more detail.  Motion for Authorization to File a Successive Motion Pursuant to 28 U.S.C. § 2255(h)(2), *In re Johnson*, No. 20-8 (4th Cir. May 22, 2020).  On July 15, 2020, the Fourth Circuit ordered that motion placed in abeyance pending its upcoming decision in *United States v. Taylor*, No. 19-7616.  Order, *In re Johnson*, No. 20-8 (4th Cir. July 15, 2020).  *Taylor*, in turn, will address "whether an 18 U.S.C. § 924(c) conviction is subject to vacatur where the indictment charged multiple predicates, one of which is invalid." Order, *United States v. Taylor*, No. 19-7616 (4th Cir. Feb. 12, 2020).

### 3. Mr. Johnson's § 1959 Convictions Were Improperly Charged and Are Invalid

Mr. Johnson was convicted of eight counts of murder "to maintain or increase position in racketeering enterprise" (Counts 10, 13, 14, 21-23, 27, and 28) and three counts of maiming "to maintain or increase position in racketeering enterprise" (Counts 16, 29, and 30), all in violation of 18 U.S.C. § 1959.  In the Second Superseding Indictment under which Mr. Johnson was tried, these § 1959 counts each defined the illegal racketeering enterprise simply as "dealing in narcotic or other dangerous drugs."  None of these counts identified a state or federal statute, and none referenced other counts in the indictment.  When instructing the jury, however, the trial court defined "racketeering activity" as "any act or threat involving *murder* or dealing in narcotic or other dangerous drugs."  Jury Instructions 232a (Ex. 34).

This instruction constructively amended the indictment.  Based upon the instruction, the jurors could have convicted Mr. Johnson of these § 1959 offenses based upon conduct that *was not charged in the indictment*: an enterprise whose racketeering activity was murder.

44

As the Fourth Circuit has recognized, a jury instruction which "broadens the bases for conviction beyond those charged in the indictment" creates "a constructive amendment" or "fatal variance" which so alters the indictment as "to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (internal quotations and citations omitted). Where constructive amendment occurs, "it cannot be said with certainty that with a new basis for conviction added, [the defendant] was convicted solely on the charge made in the indictment the grand jury returned." *Stirone v. United States*, 361 U.S. 212, 217 (1960). As such, constructive amendment "destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." *United States v. Floresca*, 38 F.3d 706, 712 (4th Cir. 1994) (*en banc*).

Because such constructive amendments "violate[] the Fifth Amendment right to be indicted by a grand jury," the violation "is error *per se*, and must be corrected on appeal even when the defendant did not preserve the issue by objection." *Randall*, 171 F.3d at 203; *see also United States v. Whitfield*, 695 F.3d 288, 309 (4th Cir. 2012) (quoting *United States v. Robinson*, 627 F.3d 941, 958 (4th Cir. 2010)); *Floresca*, 38 F.3d at 712 (holding that a constructive amendment is "not subject to review for harmlessness"). "[E]ven if there was sufficient evidence to convict the defendant on the specific charges made out by the grand jury," reversal is required. *United States v. Nieves*, 108 F. App'x 790, 793 (4th Cir. 2004) (citing *Floresca*, 38 F.3d at 711).

Mr. Johnson did not challenge the constructive amendment of his § 1959 counts on appeal or in post-conviction proceedings. When resentencing him on his covered offenses, however, the appropriate sentencer can and should consider that these invalid convictions

45

influenced the original sentencing decisions—including his original jury's decision to sentence him to death.[38]

### 4.   Discounting These Convictions Should Result in a Sentence Less than Death

As the Supreme Court recognized in *United States v. Tucker*, "the real question" is "whether the sentence" for those convictions of Mr. Johnson that remain in place "might have been different if the [jury] had known that [Mr. Johnson's] previous convictions had been unconstitutionally obtained."  404 U.S. 443, 448 (1972).  In keeping with *Tucker,* courts have held that a defendant must be resentenced on any valid convictions "unless it can be ascertained from the record that a [jury's] sentence on a valid conviction was not affected" by invalid convictions.  *Bourgeois v. Whitley,* 784 F.2d 718, 721 (5th Cir. 1986); *see also Jerkins v. United States,* 530 F.2d 1203, 1204 (5th Cir. 1976) (same); *James v. United States,* 476 F.2d 936, 937 (8th Cir. 1973) (same).  That assessment must be guided by the principle that "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to *a special need for reliability* in the determination that death is the appropriate punishment in any capital case." *Johnson v. Mississippi,* 486 U.S. 578, 584 (1988) (citation omitted) (emphasis added).  Indeed, because "[t]he decision to exercise the power of the State to execute a defendant is unlike any other decision citizens and public officials are called upon to make," the Supreme Court has made clear that "[t]he *possibility* that [a defendant's] jury conducted its task improperly certainly is great enough to require resentencing." *Mills v. Maryland,* 486 U.S. 367, 383-84 (1988) (emphasis added).

---

[38]   The record shows that the government's penalty phase case almost exclusively relied on evidence from the guilt-innocence phase of the trial.  The government "did not put on a great deal of evidence" during the penalty phase.  *See* 2/12/93 Trial Tr. 3883 (Ex. 35).  Rather, it urged the jury to rely upon its findings "in your guilt phase verdict." *Id.* at 3893.

46

**J.A.214**

Mr. Johnson has shown above why a jury must be empaneled since he meets all the requirements for reconsideration under the First Step Act.  The sentencer (here, the jury) will also have to determine whether to sentence Corey Johnson to life imprisonment without possibility of parole rather than death in light of the impact of these vacated convictions in addition to the affirmative evidence in mitigation, including his intellectual disability, described above.  Given that the original jury was told by the prosecution to rely upon its findings "in your guilt phase verdict," the harm from the jury's consideration of these invalid criminal charges in sentencing Mr. Johnson should not be underestimated.  It is not merely possible, but likely, that these invalid convictions profoundly affected the jury's decision to impose a sentence of death. This provides yet another reason why reconsideration of Mr. Johnson's sentences is required.

## V.  CONCLUSION

Mr. Johnson requests that the Court first determine his eligibility for reconsideration and resentencing, which he respectfully submits is an issue of law.  As a matter of law, Mr. Johnson respectfully submits that Fourth Circuit precedent and other persuasive authority demonstrate that he was convicted of "covered offenses" and therefore is entitled to consideration of whether resentencing is appropriate in his case.

Furthermore, he respectfully submits that the case law is clear that reconsideration and sentencing of the counts for which he has been sentenced to death must be held before a jury, while the remaining, non-death sentenced counts, are for the Court's consideration.

For all the reasons set forth above, Mr. Johnson respectfully requests that the Court grant his motion.

**J.A.215**

Dated: August 19, 2020                    Respectfully submitted,


                                          /s/ David E. Carney
                                          David E. Carney, VA Bar #: 43914
                                          Donald P. Salzman*
                                          Lotus D. Ryan**
                                          Skadden, Arps, Slate, Meagher & Flom, LLP
                                          1440 New York Avenue, NW
                                          Washington, DC 20005
                                          Telephone: (202) 371-7246
                                          Fax: (202) 661-8295
                                          Email: david.carney@skadden.com


                                          Alexander C. Drylewski*
                                          Judith A. Flumenbaum*
                                          Skadden, Arps, Slate, Meagher & Flom, LLP
                                          One Manhattan West
                                          New York, NY 10001
                                          Telephone: (212) 735-3000

                                          *Pending Application to Qualify as a Foreign
                                          Attorney Under Local Criminal Rule 57.4


                                          **Forthcoming Application for Full Admission


                                          *Counsel for Corey Johnson*

48

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of August 2020, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will then send notification of such

filing to all parties and counsel included on the Court's Electronic Mail notice list.


/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

**J.A.217**

**INDEX OF EXHIBITS TO MEMORANDUM IN SUPPORT OF**
**MOTION FOR A RECONSIDERATION OF SENTENCING HEARING**
**PURSUANT TO THE FIRST STEP ACT OF 2018**

| Exhibit No. | Description |
|---|---|
| 1 | Special Findings, Feb. 16, 1993 |
| 2 | 21 U.S.C. § 848 (1988) (repealed 2006) |
| 3 | Affidavit of Antoinette Joseph (Mr. Johnson's godmother), May 21, 2011 |
| 4 | Affidavit of Minnie Hodges (Mr. Johnson's maternal aunt), Apr. 30, 2011 |
| 5 | Gloria Caro, Reassessment Summary, May 21, 1982 |
| 6 | Affidavit of Robert Johnson (Mr. Johnson's half-brother), June 29, 2011 |
| 7 | Sundar Collimuttam, M.D., Psychiatrist, Pleasantville Cottage School Psychological Evaluation, Feb. 22, 1982 |
| 8 | 2/10/93 Trial Tr. 3547-3548, 3573-3574, 3578, 3582, 3584-85, 3607, 3619-21, 3682, 3684, 3690-92, 3694-95 |
| 9 | Lynn Polstein, Change in Permanency Plan, Apr. 13, 1984 |
| 10 | Christine Aaron, MSW Intern, Pleasantville Cottage School Current Assessment, Mar. 10, 1985 |
| 11 | Odette Noble, UCR Reassessment and Service Plan Review 6 Month, May 8, 1986 |
| 12 | Odette Noble, UCR Plan Amendment: Form E Final Discharge, Mar. 26, 1987 |
| 13 | Affidavit of David Washington (caretaker at Elmhurst), Mar. 1, 2012 |
| 14 | Odette Noble, UCR Plan Amendment: Form D Final Discharge, Feb. 23, 1987 |
| 15 | Odette Noble, Three Month Conference Note, Feb. 20, 1986 |
| 16 | Affidavit of Darold Brown, June 15, 2011 |
| 17 | Affidavit of Darnell Brown, Oct. 14, 2011 |
| 18 | 1/15/93 Trial Tr. 921:12-922:01 |
| 19 | Declaration of Ann Harding (staff member at Pleasantville), Nov. 21, 2011 |
| 20 | Declaration of Sarah West (Mr. Johnson's prison chaplain), Mar. 24, 2011 |
| 21 | Affidavit of Priscilla Hodges (Mr. Johnson's cousin), Apr. 30, 2011 |
| 22 | Affidavit of Julie McConnell, Mar. 23, 2011 |
| 23 | Affidavit of Odette Noble (Mr. Johnson's social worker), Dec. 1, 2011 |
| 24 | L. Larrecq, City of New York Human Resources Administration, History Sheet, Nov. 20, 1984 |
| 25 | Amira Offer, CSW, Caseworker, Pleasantville Diagnostic Center Psychosocial Summary, Mar. 15, 1982 |

J.A.218

| Exhibit No. | Description |
|---|---|
| 26 | Lynn Polstein, Request for Authorization and Approval for Care and Services, Apr. 16, 1984 |
| 27 | Declaration of Esther Johnson (Mr. Johnson's maternal grandmother), Apr. 30, 2011 |
| 28 | Affidavit of James Sykes (Mr. Johnson's father), May 17, 2011 |
| 29 | Declaration of Pastor Bobby West (Mr. Johnson's prison chaplain), Mar. 24, 2011 |
| 30 | Inmate Education Data Transcript, Mar. 25, 2012 |
| 31 | Motion to Have Defendant Declared Mentally Retarded, *United States v. Vernon Lance Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993) |
| 32 | Corey Johnson's IQ Scores Compared to IQ Scores of Federal Death Penalty Defendants Found Intellectually Disabled After Contested Atkins Hearings |
| 33 | 6/1/93 Tr. 22#:1-14 |
| 34 | Jury Instructions 232a |
| 35 | 2/12/93 Trial Tr. 3883-94 |

2

**J.A.219**

USCA4 Appeal: 20-15      Doc: 11-1          Filed: 12/28/2020      Pg: 225 of 281

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**



|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
|  | ) |
| v. | ) |
|  | ) |
| CORY JOHNSON | ) |
| a.k.a. "O," a.k.a. "CO" | ) |
|  | ) |

Criminal Case No. 3:92CR68-02

## SPECIAL FINDINGS

### I.  Statutory Aggravating Factors:

**Category One:**  (21 U.S.C. § 848(n)(1))

WE, THE JURY, FIND as follows:

1A.  That defendant CORY JOHNSON intentionally killed the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
        beyond a reasonable doubt:

As to Peyton Maurice Johnson ......... __Yes__
                                        (Yes or No)

As to Louis J. Johnson, Jr. .......... __Yes__
                                        (Yes or No)

As to Bobby Long ..................... __Yes__
                                        (Yes or No)

As to Anthony Carter ................. __Yes__
                                        (Yes or No)

As to Dorothy Mae Armstrong .......... __Yes__
                                        (Yes or No)

As to Curtis Thorne .................. __Yes__
                                        (Yes or No)

As to Linwood Chiles ................. __Yes__
                                        (Yes or No)

J.A.221

1B. That defendant CORY JOHNSON intentionally inflicted serious bodily injury which resulted in the death of the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
    beyond a reasonable doubt:

As to Peyton Maurice Johnson ......... ___Yes___
                                        (Yes or No)

As to Louis J. Johnson, Jr. .......... ___Yes___
                                        (Yes or No)

As to Bobby Long ..................... ___Yes___
                                        (Yes or No)

As to Anthony Carter ................. ___Yes___
                                        (Yes or No)

As to Dorothy Mae Armstrong .......... ___Yes___
                                        (Yes or No)

As to Curtis Thorne .................. ___Yes___
                                        (Yes or No)

As to Linwood Chiles ................. ___Yes___
                                        (Yes or No)

1C. That defendant CORY JOHNSON intentionally engaged in conduct intending that the victim of the capital crime be killed, or that lethal force be employed against the victim, which resulted in the death of the victim.

Proven to the jury's unanimous satisfaction,
    beyond a reasonable doubt:

As to Peyton Maurice Johnson ......... ___Yes___
                                        (Yes or No)

As to Louis J. Johnson, Jr. .......... ___Yes___
                                        (Yes or No)

As to Bobby Long ..................... ___Yes___
                                        (Yes or No)

As to Anthony Carter ................. ___Yes___
                                        (Yes or No)

As to Dorothy Mae Armstrong .......... ___Yes___
                                        (Yes or No)

As to Curtis Thorne .................. ___Yes___
                                        (Yes or No)

As to Linwood Chiles ................. ___Yes___
                                        (Yes or No)

2

428a

J.A.222

1D.  That defendant CORY JOHNSON intentionally engaged in conduct which defendant JOHNSON knew would create a grave risk of death to a person, other than one of the participants in the offense, and that such conduct resulted in the death of the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
        beyond a reasonable doubt:

As to Peyton Maurice Johnson ........    _____Yes_____
                                          (Yes or No)

As to Louis J. Johnson, Jr. ..........    _____Yes_____
                                          (Yes or No)

As to Bobby Long ....................    _____Yes_____
                                          (Yes or No)

As to Anthony Carter ................    _____Yes_____
                                          (Yes or No)

As to Dorothy Mae Armstrong ..........    _____Yes_____
                                          (Yes or No)

As to Curtis Thorne .................    _____Yes_____
                                          (Yes or No)

As to Linwood Chiles ................    _____Yes_____
                                          (Yes or No)

Jurors:  At this point, review your findings on the Category One aggravating factors as to each individual victim. Each victim represents a separate capital crime. If, as to any victim, you have not found one of the Category One aggravating factors proven to your unanimous satisfaction, beyond a reasonable doubt, you must now complete Section A of the Decision Form for defendant CORY JOHNSON that relates to that victim.

If, as to one or more victims, you have found a Category One aggravating factor proven to your unanimous satisfaction, continue to the Category Two factors on the following page.

3

J.A.223

**Category Two**:   (21 U.S.C. §§ 848(n)(2)-(12))


WE, THE JURY, find as follows:


2A.  That defendant CORY JOHNSON committed the killing of the victim of the capital crime after substantial planning and premeditation.

Proven to the jury's unanimous satisfaction,
    beyond a reasonable doubt:


As to Peyton Maurice Johnson .........   ___Yes___
                                         (Yes or No)

As to Louis J. Johnson, Jr. ..........   ___Yes___
                                         (Yes or No)

As to Bobby Long .....................   ___Yes___
                                         (Yes or No)

As to Anthony Carter .................   ___Yes___
                                         (Yes or No)

As to Dorothy Mae Armstrong ..........   ___Yes___
                                         (Yes or No)

As to Curtis Thorne ..................   ___Yes___
                                         (Yes or No)

As to Linwood Chiles .................   ___Yes___
                                         (Yes or No)


2B.  That, in the commission of the capital crime, defendant CORY JOHNSON knowingly created a grave risk of death to one or more persons in addition to the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
    beyond a reasonable doubt:


As to Curtis Thorne ..................   ___Yes___
                                         (Yes or No)

As to Linwood Chiles .................   ___Yes___
                                         (Yes or No)

<u>Jurors</u>:   At this point, again review your findings as to each individual victim.  If, as to any victim, you now have not found proven, to your unanimous satisfaction, both one of the Category One factors <u>and</u> one of the Category Two factors, you must complete Section A of the Decision Form for defendant CORY JOHNSON that relates to that victim, if you have not already done so.

If, however, you have found both a Category One factor and a Category Two factor proven to your unanimous satisfaction as to one or more victims (i.e., one or more capital crimes), continue your deliberations with regard to those particular capital crimes by proceeding to the section on the next page dealing with nonstatutory aggravating factors.

5

431a

J.A.225

## II.  Nonstatutory Aggravating Factors:

WE, THE JURY, FIND as follows:

1.    That defendant CORY JOHNSON committed multiple murders.

      Proven to the jury's unanimous satisfaction,
            beyond a reasonable doubt:

                        _____Yes_____
                        (Yes or No)

2.    That defendant CORY JOHNSON has a substantial criminal
      history.

      Proven to the jury's unanimous satisfaction,
            beyond a reasonable doubt:

                        _____Yes_____
                        (Yes or No)

3.    That defendant CORY JOHNSON seriously wounded two
      individuals in the course of committing the CCE murders
      for which he has been convicted.

      Proven to the jury's unanimous satisfaction,
            beyond a reasonable doubt:

                        _____Yes_____
                        (Yes or No)

4.    That defendant CORY JOHNSON was knowingly and willfully
      a member of a conspiracy which had as one of its goals
      the murder of individuals other than those for which the
      defendant was charged.

      Proven to the jury's unanimous satisfaction,
            beyond a reasonable doubt:

                        _____Yes_____
                        (Yes or No)

Jurors:  Regardless of your findings as to these nonstatutory
         aggravating factors, proceed to the next section
         concerning mitigating factors.

6

432a

J.A.226

### III.  Mitigating Factors:

WE, THE JURY, FIND as follows:

<u>Jurors</u>:       Consideration of the following mitigating factors is specifically provided for by statute.

1.    That defendant CORY JOHNSON's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge(s).

Number of jurors who so find,
by a preponderance of the evidence:
                                               (Number)

2.    That defendant CORY JOHNSON is punishable as a principal (as defined in section 2 of Title 18 of the United States Code) in the offense(s), which was (were) committed by another, but defendant CORY JOHNSON's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge(s).

Number of jurors who so find,
by a preponderance of the evidence:
                                               (Number)

3.    That defendant CORY JOHNSON could not reasonably have foreseen that his conduct in the course of the commission of the murder(s) would cause, or would create a grave risk of causing, death to any person.

Number of jurors who so find,
by a preponderance of the evidence:
                                               (Number)

4.    That defendant CORY JOHNSON was youthful, although not under the age of 18.

Number of jurors who so find,
by a preponderance of the evidence:    9
                                               (Number)

7

433a

J.A.227

5.   That defendant CORY JOHNSON did not have a significant
     prior criminal record.

     Number of jurors who so find,
     by a preponderance of the evidence:            9
                                                _____
                                                  (Number)

6.   That defendant CORY JOHNSON committed the offense(s)
     under severe mental or emotional disturbance.

     Number of jurors who so find,
     by a preponderance of the evidence:            ∅
                                                _____
                                                  (Number)

7.   That another defendant or defendants, equally culpable in
     the crime(s), will not be punished by death.

     Number of jurors who so find,
     by a preponderance of the evidence:           12
                                                _____
                                                  (Number)

8.   That the victim(s) consented to the criminal conduct that
     resulted in his (her) (their) deaths.

     Number of jurors who so find,
     by a preponderance of the evidence:           12
                                                _____
                                                  (Number)

9.   That the following other factors in the defendant's
     background or character mitigate against imposition of a
     death sentence:

     Jurors:   The following are nonstatutory mitigating
               factors.

a)   That defendant CORY JOHNSON was subjected to emotional
     and physical abuse, abandonment and neglect as a child,
     and was deprived of the parental guidance and protection
     that he needed.

     Number of jurors who so find,
     by a preponderance of the evidence:           12
                                                _____
                                                  (Number)

b)   That defendant CORY JOHNSON suffers from neurological
     impairments which were identified and which were not
     adequately treated or addressed when he was a child or
     adolescent.

     Number of jurors who so find,
     by a preponderance of the evidence:           12
                                                _____
                                                  (Number)

8

c)   That defendant CORY JOHNSON suffers from brain
     dysfunction which has gravely impaired his ability to
     function in the absence of strong support or guidance.

     Number of jurors who so find,
     by a preponderance of the evidence:    _____8_____
                                                 (Number)

d)   That defendant CORY JOHNSON was introduced to addictive
     drugs and alcohol while still a child.

     Number of jurors who so find,
     by a preponderance of the evidence:    _____12_____
                                                 (Number)

e)   That defendant CORY JOHNSON has responded well to
     structured environments, and would likely make a
     reasonable adaptation to prison if he were sentenced to
     life imprisonment.

     Number of jurors who so find,
     by a preponderance of the evidence:    _____7_____
                                                 (Number)

f)   That defendant CORY JOHNSON's full scale I.Q. is 77.

     Number of jurors who so find,
     by a preponderance of the evidence:    _____8_____
                                                 (Number)

g)   That defendant CORY JOHNSON grew up in an impoverished
     and violent environment, and was exposed to extreme
     violence as a child and throughout his life.

     Number of jurors who so find,
     by a preponderance of the evidence:    _____12_____
                                                 (Number)

h)   That defendant CORY JOHNSON suffers from an extremely
     severe learning disability which impairs his ability to
     use good judgment to control his behavior, and to
     understand and foresee the consequences of his actions.

     Number of jurors who so find,
     by a preponderance of the evidence:    _____0_____
                                                 (Number)

9

435a

J.A.229

i) That defendant CORY JOHNSON suffers from a neurological impairment (brain damage) that impairs his ability to exercise good judgment, to control his behavior and to understand and foresee the consequences of his actions.

Number of jurors who so find,
by a preponderance of the evidence: _____2_____
(Number)

j) That defendant CORY JOHNSON was brought up in an extremely unstable, abusive and neglectful family.

Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

k) That defendant CORY JOHNSON's severe learning disability affected his intelligence, his speech, and his ability to read, write and learn. Those limitations impaired his ability to exercise good judgment and to control his behavior.

Number of jurors who so find,
by a preponderance of the evidence: _____5_____
(Number)

l) That defendant CORY JOHNSON had no parental involvement or support from or by his father.

Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

m) That defendant CORY JOHNSON, if not sentenced to death, will be sentenced to life in prison without any possibility of parole.

Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

Jurors: If any juror or jurors find(s) that a mitigating factor not listed above has been proven to exist by a preponderance of the evidence, please identify that mitigating factor on the following page, together with the number of jurors who so find. Remember, however, that you need not be able to articulate a mitigating factor with specificity to consider it in your deliberations.

10

**436a**

**J.A.230**

If additional space is needed, use the back of this page.

Factor: ~~XXXX~~ ~~Is~~ The defendants eagerness to be accepted by ~~the~~ others ~~the~~ he was easily manipulated.

Number of jurors who so find,
by a preponderance of the evidence:   _____11_____
                                         (Number)

Factor: That the defendant's severe Learning Disability, based on neurological impairment (brain damage could impair his ability to exercise good judgem.

Number of jurors who so find,
by a preponderance of the evidence:   _____12_____
                                         (Number)

Factor: _____

_____

Number of jurors who so find,
by a preponderance of the evidence:   _____
                                         (Number)

Factor: _____

_____

Number of jurors who so find,
by a preponderance of the evidence:   _____
                                         (Number)


Jurors:   You have completed the Special Findings as to defendant CORY JOHNSON, and must now begin the process of weighing the aggravating and mitigating factors to determine if the death penalty is justified as to each capital crime for which this defendant has been convicted. Remember, you are now considering only those capital crimes for which you have not already completed Section A of the Decision Form. Upon completing your deliberations as to the remaining capital crimes charged to this defendant, complete Section B, C or D of the Decision Form for each crime as appropriate.


11

J.A.231

The date and your foreperson's signature should appear below, certifying that these are your Special Findings as to defendant CORY JOHNSON.


_____          _____
FOREPERSON'S SIGNATURE                      2/15/93
                                            DATE

J.A.232

USCA4 Appeal: 20-15      Doc: 11-1          Filed: 12/28/2020      Pg: 238 of 281

# EXHIBIT 2

J.A.233

USCA4 Appeal: 20-15     Doc: 11-1     Filed: 12/28/2020     Pg: 239 of 281

**(d) Penalty for providing or distributing controlled substance to underage person**

Any person who violates subsection (a)(1) or (2) of this section [4]

(1) by knowingly providing or distributing a controlled substance or a controlled substance analogue to any person under eighteen years of age; or

(2) if the person employed, hired, or used is fourteen years of age or younger,

shall be subject to a term of imprisonment for not more than five years or a fine of not more than $50,000, or both, in addition to any other punishment authorized by this section.

**(e) Suspension of sentence; probation; parole**

In any case of any sentence imposed under this section, imposition or execution of such sentence shall not be suspended and probation shall not be granted. An individual convicted under this section of an offense for which a mandatory minimum term of imprisonment is applicable shall not be eligible for parole under section 4202 of title 18 [5] until the individual has served the mandatory term of imprisonment as enhanced by this section.

**(f) Distribution of controlled substance to pregnant individual**

Except as authorized by this subchapter, it shall be unlawful for any person to knowingly or intentionally provide or distribute any controlled substance to a pregnant individual in violation of any provision of this subchapter. Any person who violates this subsection shall be subject to the provisions of subsections (b), (c), and (e) of this section.

(Pub. L. 91–513, title II, § 405B, as added Pub. L. 99–570, title I, § 1102, Oct. 27, 1986, 100 Stat. 3207-10, and amended Pub. L. 100–690, title VI, §§ 6452(b)(1), 6459, 6470(d), Nov. 18, 1988, 102 Stat. 4371, 4373, 4378.)

### REFERENCES IN TEXT

Section 4202 of title 18, referred to in subsec. (e), which, as originally enacted in Title 18, Crimes and Criminal Procedure, related to eligibility of prisoners for parole, was repealed and a new section 4202 enacted as part of the repeal and enactment of a new chapter 311 (§ 4201 et seq.) of Title 18, by Pub. L. 94–233, § 2, Mar. 15, 1976, 90 Stat. 219. For provisions relating to the eligibility of prisoners for parole, see section 4205 of Title 18. Pub. L. 98–473, title II, §§ 218(a)(5), 235(a)(1), (b)(1), Oct. 12, 1984, 98 Stat. 2027, 2031, 2032, as amended, provided that, effective on the first day of the first calendar month beginning 36 months after Oct. 12, 1984 (Nov. 1, 1987), chapter 311 of Title 18 is repealed, subject to remaining effective for five years after Nov. 1, 1987, in certain circumstances. See Effective Date note set out under section 3551 of Title 18.

### AMENDMENTS

1988—Subsec. (a)(3). Pub. L. 100–690, § 6459, added par. (3).

Subsec. (c). Pub. L. 100–690, § 6452(b)(1), struck out "or convictions" after "a prior conviction" and inserted at end "Penalties for third and subsequent convictions shall be governed by section 841(b)(1)(A) of this title."

---

[4] So in original. Probably should be followed by a dash.

[5] See References in Text note below.

Subsec. (e). Pub. L. 100–690, § 6470(d), struck out "required by section 841(b) of this title" after "mandatory term of imprisonment".

### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 841 of this title.

### § 846. Attempt and conspiracy

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

(Pub. L. 91–513, title II, § 406, Oct. 27, 1970, 84 Stat. 1265; Pub. L. 100–690, title VI, § 6470(a), Nov. 18, 1988, 102 Stat. 4377.)

### AMENDMENTS

1988—Pub. L. 100–690 substituted "shall be subject to the same penalties as those prescribed for the offense" for "is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense".

### § 847. Additional penalties

Any penalty imposed for violation of this subchapter shall be in addition to, and not in lieu of, any civil or administrative penalty or sanction authorized by law.

(Pub. L. 91–513, title II, § 407, Oct. 27, 1970, 84 Stat. 1265.)

### § 848. Continuing criminal enterprise

**(a) Penalties; forfeitures**

Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 20 years and which may be up to life imprisonment, to a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $2,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, and to the forfeiture prescribed in section 853 of this title; except that if any person engages in such activity after one or more prior convictions of him under this section have become final, he shall be sentenced to a term of imprisonment which may not be less than 30 years and which may be up to life imprisonment, to a fine not to exceed the greater of twice the amount authorized in accordance with the provisions of title 18 or $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, and to the forfeiture prescribed in section 853 of this title.

**(b) Life imprisonment for engaging in continuing criminal enterprise**

Any person who engages in a continuing criminal enterprise shall be imprisoned for life and fined in accordance with subsection (a) of this section, if—

(1) such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and

J.A.234

§ 848                    TITLE 21—FOOD AND DRUGS                    Page 1206

(2)(A) the violation referred to in subsection (d)(1) of this section involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title, or

(B) the enterprise, or any other enterprise in which the defendant was the principal or one of several principal administrators, organizers, or leaders, received $10 million dollars in gross receipts during any twelve-month period of its existence for the manufacture, importation, or distribution of a substance described in section 841(b)(1)(B) of this title.

### (c) "Continuing criminal enterprise" defined

For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—

(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

### (d) Suspension of sentence and probation prohibited

In the case of any sentence imposed under this section, imposition or execution of such sentence shall not be suspended, probation shall not be granted, and the Act of July 15, 1932 (D.C. Code, secs. 24–203—24–207), shall not apply.

### (e) Death penalty

(1) In addition to the other penalties set forth in this section—

(A) any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death; and

(B) any person, during the commission of, in furtherance of, or while attempting to avoid apprehension, prosecution or service of a prison sentence for, a felony violation of this subchapter or subchapter II of this chapter who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of any Federal, State, or local law enforcement officer engaged in, or on account of, the performance of such officer's official duties and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

(2) As used in paragraph (1)(b),[6] the term "law enforcement officer" means a public servant authorized by law or by a Government agency or Congress to conduct or engage in the prevention, investigation, prosecution or adjudication of an offense, and includes those engaged in corrections, probation, or parole functions.

### (g) [7] Hearing required with respect to death penalty

A person shall be subjected to the penalty of death for any offense under this section only if a hearing is held in accordance with this section.

### (h) Notice by Government in death penalty cases

(1) Whenever the Government intends to seek the death penalty for an offense under this section for which one of the sentences provided is death, the attorney for the Government, a reasonable time before trial or acceptance by the court of a plea of guilty, shall sign and file with the court, and serve upon the defendant, a notice—

(A) that the Government in the event of conviction will seek the sentence of death; and

(B) setting forth the aggravating factors enumerated in subsection (n) of this section and any other aggravating factors which the Government will seek to prove as the basis for the death penalty.

(2) The court may permit the attorney for the Government to amend this notice for good cause shown.

### (i) Hearing before court or jury

(1) When the attorney for the Government has filed a notice as required under subsection (h) of this section and the defendant is found guilty of or pleads guilty to an offense under subsection (e) of this section, the judge who presided at the trial or before whom the guilty plea was entered, or any other judge if the judge who presided at the trial or before whom the guilty plea was entered is unavailable, shall conduct a separate sentencing hearing to determine the punishment to be imposed. The hearing shall be conducted—

(A) before the jury which determined the defendant's guilt;

(B) before a jury impaneled for the purpose of the hearing if—

(i) the defendant was convicted upon a plea of guilty;

(ii) the defendant was convicted after a trial before the court sitting without a jury;

(iii) the jury which determined the defendant's guilt has been discharged for good cause; or

(iv) after initial imposition of a sentence under this section, redetermination of the sentence under this section is necessary; or

(C) before the court alone, upon the motion of the defendant and with the approval of the Government.

---

[6] So in original. Probably should be "(1)(B),".
[7] So in original. Section does not contain a subsec. (f), see 1988 Amendment note below.

USCA4 Appeal: 20-15    Doc: 11-1    Filed: 12/28/2020    Pg: 241 of 281

(2) A jury impaneled under paragraph (1)(B) shall consist of 12 members, unless, at any time before the conclusion of the hearing, the parties stipulate with the approval of the court that it shall consist of any number less than 12.

**(j) Proof of aggravating and mitigating factors**

Notwithstanding rule 32(c) of the Federal Rules of Criminal Procedure, when a defendant is found guilty of or pleads guilty to an offense under subsection (e) of this section, no presentence report shall be prepared. In the sentencing hearing, information may be presented as to matters relating to any of the aggravating or mitigating factors set forth in subsections (m) and (n) of this section, or any other mitigating factor or any other aggravating factor for which notice has been provided under subsection (h)(1)(B) of this section. Where information is presented relating to any of the aggravating factors set forth in subsection (n) of this section, information may be presented relating to any other aggravating factor for which notice has been provided under subsection (h)(1)(B) of this section. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. Any other information relevant to such mitigating or aggravating factors may be presented by either the Government or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials, except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The Government and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any of the aggravating or mitigating factors and as to appropriateness in that case of imposing a sentence of death. The Government shall open the argument. The defendant shall be permitted to reply. The Government shall then be permitted to reply in rebuttal. The burden of establishing the existence of any aggravating factor is on the Government, and is not satisfied unless established beyond a reasonable doubt. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless established by a preponderance of the evidence.

**(k) Return of findings**

The jury, or if there is no jury, the court, shall consider all the information received during the hearing. It shall return special findings identifying any aggravating factors set forth in subsection (n) of this section, found to exist. If one of the aggravating factors set forth in subsection (n)(1) of this section and another of the aggravating factors set forth in paragraphs (2) through (12) of subsection (n) of this section is found to exist, a special finding identifying any other aggravating factor for which notice has been provided under subsection (h)(1)(B) of this section, may be returned. A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established for purposes of this subsection, regardless of the number of jurors who concur that the factor has been established. A finding with respect to any aggravating factor must be unanimous. If an aggravating factor set forth in subsection (n)(1) of this section is not found to exist or an aggravating factor set forth in subsection (n)(1) of this section is found to exist but no other aggravating factor set forth in subsection (n) of this section is found to exist, the court shall impose a sentence, other than death, authorized by law. If an aggravating factor set forth in subsection (n)(1) of this section and one or more of the other aggravating factors set forth in subsection (n) of this section are found to exist, the jury, or if there is no jury, the court, shall then consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote, or if there is no jury, the court, shall recommend that a sentence of death shall be imposed rather than a sentence of life imprisonment without possibility of release or some other lesser sentence. The jury or the court, regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence and the jury shall be so instructed.

**(l) Imposition of sentence**

Upon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death. Otherwise the court shall impose a sentence, other than death, authorized by law. A sentence of death shall not be carried out upon a person who is under 18 years of age at the time the crime was committed. A sentence of death shall not be carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability—

(1) cannot understand the nature of the pending proceedings, what such person was tried for, the reason for the punishment, or the nature of the punishment; or

(2) lacks the capacity to recognize or understand facts which would make the punishment unjust or unlawful, or lacks the ability to convey such information to counsel or to the court.

**(m) Mitigating factors**

In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider mitigating factors, including the following:

(1) The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

(2) The defendant was under unusual and substantial duress, regardless of whether the

duress was of such a degree as to constitute a defense to the charge.

(3) The defendant is punishable as a principal (as defined in section 2 of title 18) in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

(4) The defendant could not reasonably have foreseen that the defendant's conduct in the course of the commission of murder, or other offense resulting in death for which the defendant was convicted, would cause, or would create a grave risk of causing, death to any person.

(5) The defendant was youthful, although not under the age of 18.

(6) The defendant did not have a significant prior criminal record.

(7) The defendant committed the offense under severe mental or emotional disturbance.

(8) Another defendant or defendants, equally culpable in the crime, will not be punished by death.

(9) The victim consented to the criminal conduct that resulted in the victim's death.

(10) That other factors in the defendant's background or character mitigate against imposition of the death sentence.

**(n) Aggravating factors for homicide**

If the defendant is found guilty of or pleads guilty to an offense under subsection (e) of this section, the following aggravating factors are the only aggravating factors that shall be considered, unless notice of additional aggravating factors is provided under subsection (h)(1)(B) of this section:

(1) The defendant—

(A) intentionally killed the victim;

(B) intentionally inflicted serious bodily injury which resulted in the death of the victim;

(C) intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim;

(D) intentionally engaged in conduct which—

(i) the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and

(ii) resulted in the death of the victim.

(2) The defendant has been convicted of another Federal offense, or a State offense resulting in the death of a person, for which a sentence of life imprisonment or a sentence of death was authorized by statute.

(3) The defendant has previously been convicted of two or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury upon another person.

(4) The defendant has previously been convicted of two or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance.

(5) In the commission of the offense or in escaping apprehension for a violation of subsection (e) of this section, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense.

(6) The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.

(7) The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.

(8) The defendant committed the offense after substantial planning and premeditation.

(9) The victim was particularly vulnerable due to old age, youth, or infirmity.

(10) The defendant had previously been convicted of violating this subchapter or subchapter II of this chapter for which a sentence of five or more years may be imposed or had previously been convicted of engaging in a continuing criminal enterprise.

(11) The violation of this subchapter in relation to which the conduct described in subsection (e) of this section occurred was a violation of section 845 of this title.

(12) The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim.

**(o) Right of defendant to justice without discrimination**

(1) In any hearing held before a jury under this section, the court shall instruct the jury that in its consideration of whether the sentence of death is justified it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or the victim, and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, may be. The jury shall return to the court a certificate signed by each juror that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, may be.

(2) Not later than one year from November 18, 1988, the Comptroller General shall conduct a study of the various procedures used by the several States for determining whether or not to impose the death penalty in particular cases, and shall report to the Congress on whether or not any or all of the various procedures create a significant risk that the race of a defendant, or the race of a victim against whom a crime was committed, influence the likelihood that defendants in those States will be sentenced to

USCA4 Appeal: 20-15    Doc: 11-1    Filed: 12/28/2020    Pg: 243 of 281
Case 3:92-cr-00068-DJN    Document 39-3    Filed 08/19/20    Page 6 of 7 PageID# 1596

death. In conducting the study required by this paragraph, the General Accounting Office shall—

(A) use ordinary methods of statistical analysis, including methods comparable to those ruled admissible by the courts in race discrimination cases under title VII of the Civil Rights Act of 1964 [42 U.S.C. 2000e et seq.];

(B) study only crimes occurring after January 1, 1976; and

(C) determine what, if any, other factors, including any relation between any aggravating or mitigating factors and the race of the victim or the defendant, may account for any evidence that the race of the defendant, or the race of the victim, influences the likelihood that defendants will be sentenced to death. In addition, the General Accounting Office shall examine separately and include in the report, death penalty cases involving crimes similar to those covered under this section.

**(p) Sentencing in capital cases in which death penalty is not sought or imposed**

If a person is convicted for an offense under subsection (e) of this section and the court does not impose the penalty of death, the court may impose a sentence of life imprisonment without the possibility of parole.

**(q) Appeal in capital cases; counsel for financially unable defendants**

(1) In any case in which the sentence of death is imposed under this section, the sentence of death shall be subject to review by the court of appeals upon appeal by the defendant. Notice of appeal must be filed within the time prescribed for appeal of judgment in section 2107 of title 28. An appeal under this section may be consolidated with an appeal of the judgment of conviction. Such review shall have priority over all other cases.

(2) On review of the sentence, the court of appeals shall consider the record, the evidence submitted during the trial, the information submitted during the sentencing hearing, the procedures employed in the sentencing hearing, and the special findings returned under this section.

(3) The court shall affirm the sentence if it determines that—

(A) the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(B) the information supports the special finding of the existence of every aggravating factor upon which the sentence was based, together with, or the failure to find, any mitigating factors as set forth or allowed in this section.

In all other cases the court shall remand the case for reconsideration under this section. The court of appeals shall state in writing the reasons for its disposition of the review of the sentence.

(4)(A) Notwithstanding any other provision of law to the contrary, in every criminal action in which a defendant is charged with a crime which may be punishable by death, a defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services at any time either—

(i) before judgment; or

(ii) after the entry of a judgment imposing a sentence of death but before the execution of that judgment;

shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with paragraphs (5), (6), (7), (8), and (9).

(B) In any post conviction proceeding under section 2254 or 2255 of title 28 seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with paragraphs (5), (6), (7), (8), and (9).

(5) If the appointment is made before judgment, at least one attorney so appointed must have been admitted to practice in the court in which the prosecution is to be tried for not less than five years, and must have had not less than three years experience in the actual trial of felony prosecutions in that court.

(6) If the appointment is made after judgment, at least one attorney so appointed must have been admitted to practice in the court of appeals for not less than five years, and must have had not less than three years experience in the handling of appeals in that court in felony cases.

(7) With respect to paragraphs (5) and (6), the court, for good cause, may appoint another attorney whose background, knowledge, or experience would otherwise enable him or her to properly represent the defendant, with due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation.

(8) Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, each attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications,[8] for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

(9) Upon a finding in ex parte proceedings that investigative, expert or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or sentence, the court shall authorize the defendant's attorneys to obtain such services on behalf of the defendant and shall order the payment of fees and ex-

---

[8] So in original. The comma probably should not appear.

penses therefore, under paragraph (10). Upon a finding that timely procurement of such services could not practically await prior authorization, the court may authorize the provision of and payment for such services nunc pro tunc.

(10) Notwithstanding the rates and maximum limits generally applicable to criminal cases and any other provision of law to the contrary, the court shall fix the compensation to be paid to attorneys appointed under this subsection and the fees and expenses to be paid for investigative, expert, and other reasonably necessary services authorized under paragraph (9), at such rates or amounts as the court determines to be reasonably necessary to carry out the requirements of paragraphs (4) through (9).

### (r) Refusal to participate by State and Federal correctional employees

No employee of any State department of corrections or the Federal Bureau of Prisons and no employee providing services to that department or bureau under contract shall be required, as a condition of that employment, or contractual obligation to be in attendance at or to participate in any execution carried out under this section if such participation is contrary to the moral or religious convictions of the employee. For purposes of this subsection, the term "participation in executions" includes personal preparation of the condemned individual and the apparatus used for execution and supervision of the activities of other personnel in carrying out such activities.

(Pub. L. 91-513, title II, § 408, Oct. 27, 1970, 84 Stat. 1265; Pub. L. 98-473, title II, §§ 224(b), formerly § 224(c), 305, Oct. 12, 1984, 98 Stat. 2030, 2050; Pub. L. 99-570, title I, §§ 1005(b)(2), 1252, 1253, Oct. 27, 1986, 100 Stat. 3207-6, 3207-14; Pub. L. 100-690, title VI, § 6481, title VII, § 7001, Nov. 18, 1988, 102 Stat. 4382, 4387.)

#### REFERENCES IN TEXT

The Act of July 15, 1932 (D.C. Code, secs. 24-203-24-207), referred to in subsec. (d), is act July 15, 1932, ch. 492, 47 Stat. 696, as amended, which appears in sections 24-203 to 24-209 of Title 24, Prisoners and Their Treatment, and section 22-2601 of Title 22, Criminal Offenses, of the District of Columbia Code.

The Federal Rules of Criminal Procedure, referred to in subsec. (j), are set out in the Appendix to Title 18, Crimes and Criminal Procedure.

The Civil Rights Act of 1964, referred to in subsec. (o)(2)(A), is Pub. L. 88-352, July 2, 1964, 78 Stat. 252, as amended. Title VII of the Civil Rights Act of 1964 is classified generally to subchapter VI (§ 2000e et seq.) of chapter 21 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 2000a of Title 42 and Tables.

#### AMENDMENTS

1988—Subsec. (a). Pub. L. 100-690, § 6481(a), increased minimum term of imprisonment for first violations to 20 from 10 years and for subsequent violations to 30 from 20 years.

Subsecs. (c), (d). Pub. L. 100-690, § 6481(b), redesignated subsecs. (d) and (e) as (c) and (d), respectively.

Subsec. (e). Pub. L. 100-690, § 7001(a)(2), added subsec. (e). Former subsec. (e) redesignated (d).

Pub. L. 100-690, § 7001(a)(1), which directed redesignation of former subsec. (e) as (f), could not be executed because of prior redesignation of former subsec. (e) as (d) by Pub. L. 100-690, § 6481(b), which resulted in there not being a subsec. (f).

Subsecs. (g) to (r). Pub. L. 100-690, § 7001(b), added subsecs. (g) to (r).

1986—Subsec. (a). Pub. L. 99-570, § 1252, substituted "to a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $2,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual," for "to a fine of not more than $100,000," and "to a fine not to exceed the greater of twice the amount authorized in accordance with the provisions of title 18 or $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual," for "to a fine of not more than $200,000,".

Subsecs. (b) to (e). Pub. L. 99-570, § 1253, added subsec. (b) and redesignated former subsecs. (b) and (c) as (d) and (e), respectively, which resulted in there not being a subsec. (c).

1984—Subsec. (a). Pub. L. 98-473, § 305, struck out par. (1) designation, substituted references to section 853 of this title for references to paragraph (2) in two places, and struck out par. (2) which related to forfeitures to the United States by any person convicted under par. (1).

Subsec. (d). Pub. L. 98-473, § 305(b), struck out subsec. (d) relating to jurisdiction of courts of the United States.

Subsec. (e). Pub. L. 98-473, § 224(b), as renumbered by Pub. L. 99-570, § 1005(b)(2), which directed the amendment of subsec. (c) of this section by striking out "and section 4202 of title 18 of the United States Code", was executed by striking out that language in subsec. (e) to reflect the probable intent of Congress and the intervening amendment by Pub. L. 99-570, § 1253, which redesignated subsec. (c) as (e). See 1986 Amendment note above.

#### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by section 224(b) of Pub. L. 98-473 effective Nov. 1, 1987, and applicable only to offenses committed after the taking effect of such amendment, see section 235(a)(1) of Pub. L. 98-473, set out as an Effective Date note under section 3551 of Title 18, Crimes and Criminal Procedure.

#### GAO STUDY OF COST OF EXECUTIONS

Section 7002 of title VII of Pub. L. 100-690 provided that:

"(a) STUDY.—No later than three years after the date of the enactment of this Act [Nov. 18, 1988], the Comptroller General shall carry out a study to review the cost of implementing the procedures for imposing and carrying out a death sentence prescribed by this title [see Tables for classification].

"(b) SPECIFIC REQUIREMENT.—Such study shall consider, but not be limited to, information concerning impact on workload of the Federal prosecutors and judiciary and law enforcement necessary to obtain capital sentences and executions under this Act [see Short Title note set out under section 1501 of this title].

"(c) SUBMISSION OF REPORT.—Not later than four years after date of the enactment of this Act [Nov. 18, 1988], the Comptroller General shall submit to Congress a report describing the results of the study."

#### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 853 of this title; title 18 section 1956.

### § 849. Repealed. Pub. L. 98-473, title II, § 219(a), Oct. 12, 1984, 98 Stat. 2027

#### EFFECTIVE DATE OF REPEAL; OFFENSES COMMITTED PRIOR TO NOV. 1, 1987

Section 235(a)(1) of Pub. L. 98-473, set out as an Effective Date note under section 3551 of Title 18, Crimes and Criminal Procedure, provided that the repeal of this section is effective Nov. 1, 1987, and ap-

USCA4 Appeal: 20-15     Doc: 11-1        Filed: 12/28/2020     Pg: 245 of 281

# EXHIBIT 3

## AFFIDAVIT

State of New York )
                  ) ss:
County of New York )

ANTOINETTE DANIELS JOSEPH, being duly sworn, deposes and says:

1.    I reside at 819 FDR Drive, Apt. 10H, New York, NY 10009.

2.    I was born on ████████████

3.    I am Corey Johnson's godmother, and have known him since his birth. I knew Corey's mother, Emma Lee Johnson, for more than 30 years, from the time we met when we were both about 12 years old until Emma's death in 1995. For most of that time, we were very close friends.

4.    Corey and my daughter Courtney are about the same age. During his childhood and adolescence, Corey would often spend time at my house, which was a "hang out" for neighborhood children and teenagers. When Corey was a child, Emma frequently asked me to care for Corey at my house when she wanted to go out and party and use drugs or when she could not handle taking care of Corey, often leaving him overnight or entire weekends.

5.    I visited Corey and his mother at their home on many different occasions.

6.    Corey also lived with me and my children during several summers in his youth.

1

J.A.241

## Early Relationship with Emma Johnson

7.      I first met Corey's mother Emma when I was in the fifth or sixth grade at PS 64, located on 9th Street and Avenue B in Manhattan.  Emma attended an elementary school located nearby on Avenue A. Soon after we met Emma and I became very close friends.  We both attended the same junior high school, JHS 71, located on 6th Street and Avenue B, and the same high school, Brandeis High School, located on 84th Street between Amsterdam and Columbus, both in Manhattan.

8.      Emma and I were very close throughout our school years.  Emma's sister Minnie was much older than she.  Emma and I acted more like sisters than friends.  We would frequently dress alike and wear the same hairstyle.  We had the same friends.  In fact, people thought we were sisters.  Even though we grew apart at times in our lives as we grew older, we always knew we could count on each other.

9.      Throughout school, Emma was a low average student who received grades in the 60s, while I received higher grades, generally in the 80s.  I helped Emma with her schoolwork throughout school.  Emma did not read very well, even as a high school student.  Neither Emma's parents nor her sister Minnie seemed to be well-educated people.

10.      Emma was a follower and was easily influenced by others.  When I would occasionally play hooky from school, Emma would too.  As another example, I became pregnant when I was 17 years old.  Shortly after I told Emma that I was pregnant, Emma became pregnant.  Emma told me that she had tried to become pregnant because I was pregnant.  I was surprised Emma had become pregnant, because she was from a very strict family.

2

J.A.242

11.    In June 1968, I gave birth to my daughter Courtney.

12.    About four months later, in November 1968, Emma gave birth to Corey.

13.    I completed high school after the birth of my daughter but, to my knowledge, Emma dropped out of high school after giving birth to Corey and never graduated.

### Emma Johnson's Alcohol and Drug Use, and Impact on Her Parenting

14.    In our teenage years, Emma, I, and our friends all partied and experimented with alcohol and drugs.  However, Emma did not seem to recognize the same limits that I did.

15.    Whereas we all would go to dance clubs, Emma would frequently stay out to go to "after hour spots" – bars that remained open for her and some other patrons after they were closed to the general public for the night.

16.    We all experimented with alcohol and some drugs.  However, while I was sometimes called "chicken" because I did not try as many drugs as the others, Emma began to get heavily involved with alcohol and drugs.

17.    My pregnancy indicated to me that I needed to get my life together. Emma's pregnancy with Corey did not seem to give her the same indication.

18.    Indeed, Emma became very wild around the time she met Robert Butler, shortly after Corey was born.  She was continuing to party and use drugs even after the birth of her second child, Robert.

19.    After she and Robert Butler separated, Emma appeared to be using drugs heavily.  In addition, at that time, I would frequently see Emma with large

3

**J.A.243**

quantities of drugs on her person, leading me to believe that she was a drug dealer. She was keeping company with drug dealers, hustlers, and pimps during this time. In my view, Corey and Robert could not have been unaware of Emma's involvement with drugs during this time.

20. Emma's partying, drinking and drug use left her with little time to care for her children. As a mother, she provided the basics for her children but not much more. She would provide clothes and food for them but did not have time to talk to them or provide emotional support.

### Emma's Involvement in Volatile and Abusive Relationships

21. Emma did not provide a stable home life for Corey or her younger son, Robert.

22. During Corey's childhood, Emma was involved in relationships with several different men, many (if not all) of whom were verbally or physically abusive to her.

23. Emma also moved around from place to place frequently when Corey and Robert were young children.

24. Emma's relationship with Corey's father, James Sykes, was short and, for a long time after that, James seemed not to be around Corey very much.

25. Shortly after Corey was born, Emma became involved with Robert Butler, with whom she later had her son Robert. Emma was still in a relationship with Robert Butler as of 1973 (the year I got married) and I believe their relationship continued for several more years.

4

J.A.244

26. During the course of their relationship, Emma and Robert Butler had arguments to which Corey and Robert were exposed. While Robert Butler treated both Corey and Robert well, he was verbally abusive to Emma.

27. Later, near the end of the 1970s, Emma became involved for several years with a man named Bobby Koger, who was physically abusive towards her.

28. Some time after Emma started dating Bobby, Emma came to stay with me for about a month in order to escape from Bobby Koger. Bobby was very abusive—both physically and verbally. I even saw bruises on her when she came to stay with me.

29. As a teenager, Corey told me that he did not like the men with whom his mother was keeping company. Robert was tougher, had thicker skin, and was better able than Corey to cope with Emma's men and the life she lived. Corey appeared to have more difficulty dealing with the situation.

30. The last time I saw Emma, shortly before her death at about 45 years old, she had visible bruises on her body.

### Corey Has Always Been "Slow" and his Abilities Limited

31. My impression of Corey during the entire time I knew him was that he was very slow.

32. His slowness cut across different parts of his life. He had a general inability to learn, reading problems, and difficulty socializing at times and, as a result of all of these problems, was teased by other children at school. I also remember Corey stuttering. He never seemed to get the help he needed to deal with any of these problems.

5

J.A.245

33. When he was as old as 8 or 9, Corey had a problem with bedwetting. Corey's mother Emma would complain to me that Robert (who was two years younger than Corey) was not wetting the bed, while Corey was. I would try to reassure her that Corey would grow out of it eventually.

34. Corey had a lisp when he was younger and children would tease him about it.

35. Corey's was very slow in learning when he attended school. Even though his brother Robert was younger than Corey, Robert always seemed more advanced than Corey while they were growing up. Emma also would frequently remark that Robert was smarter than Corey, even though he was younger.

36. While Emma would criticize Corey's intelligence and abilities in school, I never witnessed her try to help Corey with his school work. As I mentioned above, Emma was not a very good student in school either and perhaps she did not really know how to help him.

37. My daughter Courtney would frequently help Corey with his homework. In high school, Courtney would help him in Math, English and the rest of his subjects. I particularly recall that Corey would become frustrated when he was not able to understand Math problems.

38. During all the time I spent with Corey, I never saw him read anything. My understanding was that his reading ability was very poor.

39. Whenever Corey went to the store in my neighborhood (as a child and even later as a teenager), he always went with Courtney. I am not at all confident that he could have handled even relatively simple transactions on his own. Indeed,

**J.A.246**

people took advantage of him because he would readily give his money away. If someone asked Corey for money, he would not hesitate to give away the money he had on him or do whatever he could to help.

40.    Emma's Physical Abuse and Other Mistreatment of Corey

41.    Emma was physically abusive with Corey and Robert. There were several occasions when Emma would lose her temper and hit Corey.

42.    For example, as I mentioned above, Corey would sometimes wet the bed at his home, even as an older child of 8 or 9. Emma would usually not even change the sheet and simply let Corey sleep in the soiled sheets.

43.    To avoid Emma getting angry, Corey would sometimes try to hide the wet sheets. Emma would become angry when she discovered his soiled sheets in the closet and would then yell and beat Corey.

44.    Emma struck Corey several other times as well.

45.    When Corey was 9 or 10, Emma once became so angry with Corey that she hit him on his head with a high heel shoe. Emma called me on the phone after she hit Corey; she still seemed very angry with Corey and said she was going to "kill" him.

46.    After that incident, Corey came to live with me for six or seven months because Emma realized that she was out of control. But Corey would always insist on going back to his mother, because he wanted to be with her.

47.    Emma also said hurtful things to and about Corey.

7

**J.A.247**

48.     On more than one occasion, Emma told me that she was going to kill both Corey and Robert because they were getting on her nerves.  I was concerned enough about her seriousness that I asked Emma to bring the children to my house.

49.     Emma would also frequently tell me she wanted to get rid of both Corey and Robert because she was tired of them.  I believe that Corey overheard these conversations.

50.     There were times when Emma would also yell at Corey and tell him that Robert was doing better than him.

51.     Throughout his childhood and teenage years, Corey was generally very meek, mild, and calm.  By contrast, his brother Robert appeared to me to be tough and mean.

52.     Corey seemed very unhappy as a child.  I could see the unhappiness in Corey when I went to visit him at Emma's house.

53.     Part of Corey's unhappiness seemed came from his mother's treatment of him, as well as her general instability, drug use and involvement with abusive men.

54.     Corey was very upset when Emma went to jail and blamed her boyfriend at the time for getting her arrested.  Around this time he told me that he wished I was his mother.

55.     I believe that Corey's unhappiness also stemmed from his father not being much of a presence in his life.  Corey's brother Robert spent time with his father, Robert Butler.  Indeed, Robert's father seemed to be around more, while Corey's father

8

James seemed to be constantly in and out of prison and absent for long periods of time. I believe that Corey may have been jealous of Robert's relationship with his father.

### Corey's Difficulties in Social Situations

56. Both as a child and as a teenager, Corey was withdrawn socially.

57. He would have friends but did not appear to be close with any of them.

58. As a teenager, Corey spent a lot of time with Courtney and her friends. But sometimes, when Courtney's friends would visit the house while Corey was there, Corey would retreat to my room, as opposed to hanging out with the others – even though they were his own age.

### Corey's Being Turned Over to the Administration for Children's Services

59. When Corey was 13, Emma turned him over to the Administration of Children Services. I believe this was due to her drug use and inability to care for her children.

60. During the period that followed Corey's placement, I lost contact with both Emma and Corey for awhile, although I eventually regained contact with both of them.

### Corey's Late High School Years and Subsequent Involvement in Hustling

61. When Corey was attending high school in Queens, I was living in Queens and reconnected with him.

62. During this time, I could see that Corey lacked confidence, especially around girls he did not know well. He would mainly spend time with my daughter Courtney and her friends.

9

J.A.249

63.    Corey began hustling in the streets at the time he started attending high school in Queens. After he left high school, he began spending more time on the streets. Corey would sometimes stay with Emma, but Emma was moving around a lot and living with different people, so Corey was effectively on his own after he turned 18.

64.    I believe Corey turned to a life of hustling on the streets because his options were limited and he needed money to feed and clothe himself, not because he liked it.

65.    I think that Corey did not know any other path – his mother, the men with whom she kept company, and his brother Robert had all been involved with hustling drugs. I tried to tell Corey that hustling was not right for him. While I could imagine Robert doing it, I thought Corey was too soft.

66.    When both were in their late teens, Robert was, in my impression, smarter, tougher and more of a bully than Corey. Corey was more gentle and therefore less well able to function on the street.

67.    On the streets, people readily took advantage of Corey because of his easygoing nature and the fact that he had difficulty dealing with money.

68.    Corey was easily influenced by his brother, even as an adult. Robert would get Corey to do things or go to certain places even if he did not want to. For example, I had the feeling that Robert would have Corey act as his backup when they were buying drugs.

69.    The last time I had contact with Corey was when he was about 19 and living in New Jersey.

10

**J.A.250**

70. I am not aware of Corey ever having a job. I believe that he would have had difficulty in filling out a job application or passing a job test.

### Corey's Demeanor in My Presence

71. I remember Corey as always being respectful and calm despite his difficult and unstable home life, including the family's moving from place to place, his constantly changing schools, his mother's drug use, his mother's physical and emotional abuse by boyfriends, and his own physical abuse at his mother's hands, as well as his later being sent away by his mother.

72. Corey always showed love and affection towards me with hugs and kisses. He was never angry or violent in my presence. He was very pleasant and gentle. I have never had a problem with Corey.

STATE OF NEW YORK

COUNTY OF NEW YORK

SWORN TO BEFORE ME THIS

MAY 21 2011

ANTOINETTE DANIELS JOSEPH

Sworn to before me on this ____ day of May, 2011

_____
Notary Public

IRA MARK LIPPELL
Notary Public, State of New York
No. 60-4652304
Qualified in Westchester County
Certificate filed in New York County
Commission Expires March 30, 2015

11

**J.A.251**

USCA4 Appeal: 20-15      Doc: 11-1        Filed: 12/28/2020      Pg: 257 of 281

J.A.252

# EXHIBIT 4

J.A.252

## AFFIDAVIT

State of New York            )
                             ) ss:
County of New York           )

MINNIE HODGES, being duly sworn, deposes and says:

1.    I reside at 2133 Madison Avenue, Apartment 5C, New York, New York 10037.

2.    I am Corey Johnson's aunt. My younger sister, Emma Lee Johnson, who is now deceased, was Corey's mother.

3.    I have known Corey Johnson since he was born. I regularly cared for Corey as a child. He often spent long periods of time at my home.

### My Background

4.    I was born on ▇▇▇▇▇▇▇ in Sumpter, South Carolina. I am the oldest of three children. My younger sister, Emma Lee Johnson, was Corey Johnson's mother. My biological father died of pneumonia when I was very young, long before Emma was born. My mother remarried, and Emma's father was my stepfather. I lived with my mother and stepfather, Love Johnson, in South Carolina until I was about 9-10 years old, when they left South Carolina and came to New York to work. Emma was about 3 years old at that time.

5.    After my mother and stepfather left South Carolina, Emma, my brother, and I lived with our grandmother in South Carolina. My mother and stepfather visited us in South Carolina and when in New York, they sent us boxes of clothing and belongings, as well as money to take care of ourselves.

6.    I, along with Emma and my brother, were reunited with my mother and stepfather when I was a teenager. My stepfather had a drinking problem which was

J.A.253

exacerbated when they moved to New York, and eventually caused my mother to separate from him. Before my mother left him, he was physically abusive to her and was violent towards her in front of me and my siblings. Being the eldest, I felt I had to protect my mother and would stay by her side or try to get in between them to prevent her from getting hurt when they fought. I remember trying to protect my mother by hitting Love with a broom, my fists, a mop- anything I could find to get him off her, especially when he was choking her. I was often scared to go to school because I did not want to leave my mother by herself with Love. My brother would also physically intervene in their fights. Emma would just cry when our parents were fighting.

### Corey's Childhood

7.    I was close with my sister Emma since she was born.

8.    Emma started abusing drugs, particularly crack and cocaine, when she was a teenager. I now believe that she was using drugs while she was pregnant with Corey and her younger son Robert, although I did not know of her drug abuse until after she gave birth to Corey.

9.    Emma lived with our mother when Corey was born, but then moved out and lived with Robert Butler, the father of her younger son, Robert. She worked and had good jobs, but would always eventually lose her jobs due to her drug use.

10.    I took care of Corey and Robert a great deal when they were babies and on and off during their pre-teen lives. Emma would initially ask me to watch them for a day and this would turn into an overnight, the weekend, and sometimes the entire summer.

11.    In addition to the many occasions where I took care of Corey and Robert at their house when Emma would leave for undetermined amounts of time, Corey

2

**J.A.254**

and Robert often used to sleep over at my house when they were young children. Emma would call me and ask if I wanted to take care of my nephews, and would ask me to come and get them or else Emma would bring them to my house herself. I would always volunteer to take Corey and Robert because I knew Emma did not have patience with them and did not provide them with the attention they needed. When Corey and Robert would come over, the two boys would sleep in my daughters' room in twin beds, and my daughters would sleep in the living room. I noticed that both Corey and Robert were nervous most of the time, and they behaved differently from my children.

12. In addition to leaving Corey and Robert with me, Emma did not spend much time with her sons. She would ask me and others, such as her friend Antoinette Joseph, to come to her house to watch Corey and Robert when she left to use drugs and be on her own, or else she would ask me and others to take her sons for sleepovers or weekends. Emma started doing this almost immediately after Robert was born, and this behavior lasted until Corey was old enough to take care of himself.

13. I witnessed behavior that led me to believe Emma was often getting high while caring for her children. The first time I witnessed Emma using drugs was shortly after Corey was born. I saw Emma sniffing white powder, and afterwards, she was behaving strangely and had bloodshot eyes.

14. Emma's drug addiction became significantly worse as soon as Robert was born, and continued to get progressively worse as her two sons were growing up. I used to go to Emma's house to baby-sit Corey and Robert, and Emma's eyes would be bloodshot and she would be behaving strangely.

3

15. Moreover, Emma often used drugs with a friend named Carol. Carol would bring her son over to play with Corey and Robert, and Emma and Carol would get high together in the other room.

16. On many occasions, my mother and I would speak to Emma about her drug addiction and try to convince her to get help.

17. When Emma's drug use escalated, she spent even less time with her sons and became more and more frustrated with taking care of them. Her main interest was in getting high and running around with different men.

18. Emma lived with different men. She was on and off of welfare, but during her times of heavy drug use, she was unable to hold on to her money. She would try to take care of her children, but there were many times when she was not providing them with care.

19. Corey told me that Emma always had visitors in their apartment and music would be played so loudly that Corey could not sleep at night. He said that he was tired at school during the day and couldn't concentrate on his schoolwork.

20. She would sometimes show up at our mother's house high on drugs. We were very worried about her and about how she was treating Corey and Robert.

21. On a number of occasions, Emma would call me, crying, and I would go over to her apartment to care for her. Her mood was always very sad and depressed.

22. I continued to have Corey and Robert stay over at my house often, particularly for weekends, and was worried when they would return back to their home with Emma.

4

**J.A.256**

23.    Emma did not have much patience with Corey and Robert and she hit them and cursed and yelled at them quite often.  I was particularly worried about Emma's treatment of Corey.  I saw Emma hit and smack Corey many times.  Corey also told me on many occasions how his mother beat him and hit him on the head.  I would tell Emma not to hit Corey on the head.

24.    One time, Emma and Corey separately told me that she had beaten Corey with her high heel shoe because he either got left back in school or failed in school.  I was very furious with Emma for having hit Corey with her shoe, and my mother and I told her never to hit Corey again.

25.    I had a feeling that one of Emma's boyfriends, Bobby Koger, also was hitting Corey and Robert, but when I asked Emma, she immediately denied it.  I saw bruises on the boys' bodies when they spent the night at my house, but they told me that these were bruises from when they were playing.  I was very concerned that the boys were being abused, and I told my mother about it.  Emma continued to deny that anything was wrong.  I also saw bruises on Emma, who would wear shades to cover bruises on her face.  On one occasion, I went over to Emma's apartment after she called me and I remember almost getting into a fight with Bobby for hitting Emma.  I felt bad for my sister but was angry with her for subjecting her sons to such a bad environment.

26.    When I asked Corey and Robert how Bobby Koger treated them, they told me that he was very mean.  I believed that Emma or Bobby (or both of them) instructed the boys not to say anything more than that about how they were being treated.

27.    I was very concerned when Emma would take Corey and Robert back to their apartment, as I did not know whether they would be taken care of, and I worried about them having food to eat and being in a safe environment.  Corey appeared

5

sad a great deal of the time. Sometimes when I would ask him why he was so sad, he would tell me that he did not like his mother around "those kind of people." He would also tell me how it upset him to see his mother using drugs.

28. Corey and Robert would often get locked out of their apartment because they didn't have a key and Emma would not be at home when they came back from school. They would usually hang around the neighborhood until she returned home.

29. Sometimes when at my house, Corey would not go outside with the other children, but wanted to stay in the house with me. Corey appeared so sad that I figured something must have happened at home prior to his coming over to my house. When he would first arrive at my home at the beginning of a weekend, he would remain very quiet and look very sad. Towards the end of the weekend, his mood would lighten because my children would engage him in playing and going outside.

30. Even so, I cannot recall ever seeing Corey genuinely happy.

31. He would cry when his mother left him at my house, and Emma would tell him that if he did not stop she would spank him, or she would hit him on the hand and tell him to be quiet. Robert would also cry, and sometimes he would wake up in the middle of the night from crying in his sleep.

32. I tried to keep them at my house as much as possible so they wouldn't have to stay with Emma while she was using drugs and creating a bad environment for them.

33. Corey used to tell me that he didn't think his mother loved him. He would say this to me quite often – at least every other time he visited me. I would reassure him that Emma did love him, but Corey would overhear conversations when Emma would complain to me about how her children didn't listen and she wanted to put

6

them away.  I told Emma that neither Corey nor Robert behaved badly or gave me a hard time, and that they generally listened to me.  Corey used to ask to live with me, but he also told me that he was concerned about his mother's well being and did not want to be away from her.  He told me that he didn't like the people his mother associated with. He seemed very conflicted and depressed when he thought about his mother.

### Corey was slower than other children

34.    When Corey and Robert would stay with me, I spent more time with Corey because he appeared slower than Robert and my two daughters, Queenie and Pricilla.  When my daughters read books, they were able to read better than Corey even though Priscilla was the same age as Corey and Queenie was younger.  Corey had difficulty reading and my daughters would help him to figure out how to read the words. Priscilla would tell me how Corey did not know how to read little words.  Corey was also not able to work out math problems that my daughters were able to do by themselves.  It would take much longer to explain things to Corey than to the rest of the children, and he could not do ordinary things that the others did, such as telling the time.  Even when Corey first started walking, he was not on the same level as the other children his own age.

35.    I told Emma to take him to the doctor when he was younger to have him evaluated.  Emma told me that she took Corey to the pediatrician and was told he was fine.  I explained to Emma that she had to disclose to the doctor what she observed in Corey, or the doctor would not know to look for the symptoms.

36.    From the time Corey was a young child until he was about ten years old, Corey would wet the bed in his sleep.  His clothing and the bed would be wet in the morning.  He would come to me in the morning with an embarrassed look on his face,

and I would reassure him that it was okay. I would remind him not to drink too many fluids before going to bed, and I started to wake him up in the middle of the night to use the bathroom. Corey's mother would yell at Corey and complain about his bedwetting. I repeatedly told my sister not to yell at him, and that yelling would only make the problem worse. I tried to remind her that the doctor told us that Corey would eventually grow out of this problem, but my sister continued to yell at him. I never knew whether the sheets were washed at Corey's house after he wet the bed. My sister was not fond of housework or cooking, and I am not sure whether Corey washed the bed sheets himself or continued to sleep in the soiled bedding.

37.    Corey had difficulty following certain instructions, and I would have to repeat myself many times before he could comprehend what I was directing him to do. Sometimes he appeared to be puzzled or mixed up when I would tell him certain things.

38.    At age 10-13, he couldn't prepare a meal or even a simple sandwich. By age 15, he only improved a little in that he didn't make as much of a mess when preparing simple meals. I didn't give him much to do because he couldn't do it. I pampered him a lot because he needed more attention. Even when he made a sandwich, I'd have to stand there and check.

39.    In early adolescence, he would switch topics during a conversation, so if you asked him a question, he would answer about something else.

40.    When he was about 12-13 years old, I would send him to the store either by himself of with my children to buy snacks such as cookies, potato chips, soda or juice. I never gave him more than $5.00. I would usually give him change or dollar bills. Sometimes I told him exactly how much change he was supposed to get back from the

8

J.A.260

clerk, and other times I didn't tell him anything. Sometimes he would count the change in front of me, and he would always make mistakes and be a few cents short. I would correct him, even though I noticed that the other children who were the same age were able to count small change all the time without making any mistakes. Corey struggled and always made mistakes.

41.    Corey used to tell me that the children in school teased him a great deal about his academic abilities. He would often look very sad when he told me about this. I told him that some children cannot do as well as others, but he should keep trying to do the best he could.

42.    At age 14, his only interest was watching cartoons on television and playing by himself. He would bring his homework with him when he spent the weekends at my house, but my children would get frustrated when they tried to help him because he struggled with his work. My daughters would tell Corey how to say a word and he would immediately forget when he was shown the word again. My daughters were frustrated that they would have to repeat the same thing to Corey over and over again. They would show him how to do something, but if they moved on to something else, he would forget what he previously learned. They complained that he had difficulty reading even the small words, and was not able to work out math problems that they were able to do on their own. Sometimes Corey overheard my daughters complaining, or they would tease him for being slow to his face, and he would feel really badly about himself.

43.    Corey could not keep up academically with the other children, and I felt very sorry for him.

9

J.A.261

44.    Other people took advantage of him, such as taking his lunch money. People found it easy to take advantage of him all throughout his childhood and teen years. He wouldn't understand others but didn't want to look bad, so other children easily tricked and manipulated him.

45.    Corey would get very frustrated or upset, and almost have a tantrum. He could not express himself in a mature fashion. He would cry much longer than the other children. He would get very upset when he was teased by the other children. When Corey would interact with the other children, he would mainly play by himself, but the other children would tease him and try to take his ball away from him. If my children or Robert didn't intervene, the children in the neighborhood would bully him and take his ball or candy away from him. He could not defend himself or stick up for himself without protection, and chose to play by himself most of the time instead.

46.    Based on my relationship and observations of Corey since he was a young child through elementary school, I believe that Corey was seriously disabled and slower than others. He was always embarrassed by his slowness, and wanted to be considered a strong man who would have done what others told him to be more accepted in the group.

_Minnie Hodges_
MINNIE HODGES

Sworn to before me on this
30th day April, 2011

_Delores Green_
Notary Public

DELORES GREEN
Notary Public, State of New York
No. 31-4527811
Qualified in New York County
Commission Expires Aug. 31, 2014

10

J.A.262

# EXHIBIT 5

| DSS-3402 (3/81) NYC | CASE NAME | | CHILD'S NAME | | Date of Birth |
|---|---|---|---|---|---|
| **VISITATION PLAN** | Emma Lee Johnson | | Corey Johnson | | █████ |
| | COMPLETED BY | DATE | SSC NUMBER: | | |
| | Gloria Caro | 5/21/82 | 4766716-28 | | |
| | AGENCY/DISTRICT | | LOCAL DISTRICT/AGENCY USE | | |
| | JCCA/PCS | | | | |

- Complete a Visitation Plan for each child placed or to be placed in foster care.
- Complete according to the time requirements for the Initial Service Plan and revise at each Service Plan Review.

| PERMANENCY GOAL | ANT. COMP. DATE |
|---|---|
| Return to parent. | 8/83 |

**1. VISITATION SINCE LAST PLAN (If child has been in placement).**

| DATE | LOCATION | PARTICIPANTS | DATE | LOCATION | PARTICIPANTS |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | PLEASE SEE CALENDAR OF CONTACTS | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**2. DESCRIBE QUALITY OF VISITS,** highlighting positive and negative factors. If family is not meeting visitation goals, explain reasons and efforts to encourage visiting.

Child has visited once since entering Pleasantville Cottage School on May 7 to May 9, 1982.

Mother states that Corey can only visit maternal grandfather's home because of her own highly problematic living situation. She states that the man she lives with is drug addicted and involved in a drug scene which would be detrimental to Corey.

**3. PLAN FOR VISITATION IN NEXT PERIOD.** Include name of participants, frequency and location. Explain any changes in visitation plan.

Corey will visit mother according to our visiting calendar twice a month. Visits will take place at maternal grandfather's, Mr. Lou Johnson, 727 Schneider Avenue, Brooklyn.

He has lived with his grandfather on and off during difficulties at home. Mother states grandfather is functioning well and that she will spend time with Corey there.

*(Use reverse if additional space is required)*

**J.A.264**

| DSS-3403-F (3/81) NYC | CASE NAME | | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|---|
| GOAL AND OBJECTIVE REVIEW FAMILY | Emma Lee Johnson | | | |
| | COMPLETED BY | | DATE | |
| | Gloria Caro | | 5/21/82 | |
| ☒ 90 Days  ☒ 6 Months  ☐ Change in Program Status | AGENCY/DISTRICT  JCCA/PCS | | | |

Complete a Family Goal and Objective Review for the family of each child receiving foster care, preventive services for children, adoption or Child Protective Services at the time of the Service Plan Review. Service Plan Reviews occur as follows:
- 1st Service Plan Review 60 days from establishment of the Initial Service Plan.
- 2nd Service Plan Review 6 months from application for service for non-placement Child Protective Service case, 6 month from an indicated case determination.
- Subsequent Service Plan Reviews every 6 months thereafter.
- Change in Service Status - Prior to the status change.

LIST DATE, PLACE AND PARTICIPANTS FOR ALL FACE-TO-FACE CONTACTS WITH NATURAL FAMILY DURING REVIEW PERIOD. State Client's response to contacts with case planner, If unsatisfactory, state efforts to further involve family.

We met with ;Mrs. Johnson on Corey's admission date and on May 4, 1982. She cancelled on May 18, 1982. Mrs. Johnson appears to be cooperative. States she wishes to keep appointments in the office not in home. She is a chronically depressed and dependent woman who is currently overwhelmed by being unable to extricate herself from a relationship with a drug addicted man. She has incurred many debts and now works two jobs, finding little time to visit her children. She has a younger son, Robert, age 11, who is in placement at Children's Village.

---

**Goal No. 1**   **Objective No.**

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

CCRS CODES
Client Goal
OBJ. OBJ. OBJ.
Serv. Serv. Serv.

Goal:   Mrs. Johnson will work at making decisions in her relationship with Mr. Kraeger to be less destructive or to extricate herself from it.

Mrs. Johnson has stated that her relationship with Mr. Kraeger is destructiv to her and her children. She states Corey cannot visit her in her home because he is drug addicted, part of the drug scene and at times violent, she takes little responsibility herself. Casework service will explore referral for individual treatment.

---

**Goal No. 2**   **Objective No.**

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

CCRS CODES
Client Goal
OBJ. OBJ. OBJ.
Serv. Serv. Serv.

Goal:   Mrs. Johnson will be consistent in her contact with Corey.

Mrs. Johnson states she now works at two jobs, has little time to visit PCS, but will allow home visits to her father. It is early in our contact. However, Mrs. Johnson has placed many obstacles to visiting Corey. Worker will offer flexible schedule and transportation and funds to cover cost of visits.

**J.A.265**

Page

| DSS-3403-F(3/81) NYC | CASE NAME. | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| **GOAL AND OBJECTIVE** | Emma Lee Johnson | | |
| **REVIEW** | COMPLETED BY | DATE | |
| **FAMILY** | Gloria Caro | 5/21/82 | |

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 3 | | |
| **CCRS CODES** Client Goal OBJ. OBJ. OBJ. Serv. Serv. Serv. | | Goal: Mrs. Johnson will understand importance of having regular contact with Corey.<br><br>She has parcelled out responsibility for each of her children. Robert, Corey's brother, visits his own father. Corey is to visit grandfather. Casework contact will establish whether Mrs. Johnson can be more available to her children. |

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| | | |
| **CCRS CODES** Client Goal OBJ. OBJ. OBJ. Serv. Serv. Serv. | | |

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| | | |
| **CCRS CODES** Client Goal OBJ. OBJ. OBJ. Serv. Serv. Serv. | | |

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| | | |
| **CCRS CODES** Client Goal OBJ. OBJ. OBJ. Serv. Serv. Serv. | | |

**J.A.266**

| DSS-3403-C (3/81) NYC | CASE NAME | | CHILD'S NAME | Date of Birth |
|---|---|---|---|---|
| GOAL AND OBJECTIVE | Emma Lee Johnson | | Corey Johnson | |
| REVIEW | COMPLETED BY | DATE | SSC NUMBER: | |
| CHILD | Gloria Caro | 5/21/82 | 4766716-28 | |
| ☒ 90 Days   ☒ 6 Months | AGENCY/DISTRICT | | LOCAL DISTRICT/AGENCY USE | |
| ☐ Change in Program Status | JCCA/PCS | | | |

Complete a Child Goal and Objective Review for each child receiving foster care, preventive services for children, adoption or Child Protective Service at the time of the Service Plan Review. Service Plan Reviews occur as follows:
- 1st Service Plan Review - 60 days from establishment of the Initial Service Plan.
- 2nd Service Plan Review - 6 months from application for services or from an indicated case determination for non-placement Child Protective Service cases.
- Subsequent Service Plan Reviews - every 6 months thereafter.
- Change in Service Status - prior to the status change.

**PERMANENCY GOAL PROGRESS REPORT**

| | YES | NO |
|---|---|---|
| PERMANENCY GOAL CHANGED | | X |

Describe the effect progress in the achievement of the family's and child's goals and objectives has had on the accomplishment of this child's permanency goal.

Child will return to mother. Caseworker will explore Mrs. Johnson's ability to offer consistent care and take responsibility for Corey. At our Diagnostic Center Mrs. Johnson was believed to be overwhelmed by her problems and unavailable to Corey emotionally at this time. Corey's problems of severe learning deficiencies, truancy and depressed affect would be aided by institutional care with an on-grounds school until his mother is able to take better hold of her life.

For child in foster boarding home or agency operated boarding home, list date, place and participants for all face-to-face contacts between child and caseworker during review period.

Corey is seen once a week for casework services.

| Goal No. | Objective No. | Include services given and client's response to services, client progress towards meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 1 | | Goal: Corey will attend school every day and will improve academic functioning. |
| CCRS CODES | | |
| Client Goal | | Corey is a 13 year old boy who is reading on a 2nd grade level and has |
| OBJ. OBJ. OBJ. | | severe learning deficiencies and some organic impairment. He will attend |
| Serv. Serv. Serv. | | our on-grounds special school in a class of 8 children and receive special remediation in reading and math. Class attendance will be monitored. Close communication between school and cottage is maintained. |

**J.A.267**

Page 2

DSS-3403-C (3/81) NYC

**GOAL AND OBJECTIVE REVIEW CHILD**

| CASE NAME. | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|
| Emma Lee Johnson | | |
| COMPLETED BY | DATE | |
| Gloria Caro | 5/21/82 | |

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 2 | | |
| CCRS CODES | | Goal:  Corey will feel safe at Cottage School. |
| Client Goal | | |
| OBJ. OBJ. OBJ. | | Corey has had a chaotic home life for the past four years.  He is slow to understand things.  Cottage staff will make special effort to acclimate him to routine and provide a predictable environment for him. |
| Serv. Serv. Serv. | | |

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 3 | | |
| CCRS CODES | | Goal:  Corey will discuss and come to understand his family history. |
| Client Goal | | |
| OBJ. OBJ. OBJ. | | Corey is confused about relationships in his family since he was recently told that his brother's father was not his. |
| Serv. Serv. Serv. | | Joint casework discussion with mother to help clarify these issues. |

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 4 | | |
| CCRS CODES | | Goal:  Corey will understand his reasons for placement. |
| Client Goal | | |
| OBJ. OBJ. OBJ. | | Corey believes he was bad and does not fully understand his mother's inability to cope with the many complicated aspects of her life. |
| Serv. Serv. Serv. | | Casework after Corey has developed some beginnings of a relationship will help him clarify these issues. |

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| | | |
| CCRS CODES | | |
| Client Goal | | |
| OBJ. OBJ. OBJ. | | |
| Serv. Serv. Serv. | | |

**J.A.268**

| COMPREHENSIVE SERVICE PLAN FAMILY | CASE NAME Emma Lee Johnson | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| | COMPLETED BY Gloria Caro | DATE 5/21/82 | |
| ☒ 90 Days ☒ 6 Months ☐ Change in Program Status | AGENCY/DISTRICT JCCA/PCS | | |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE 10/8 |
|---|---|---|---|
| | 1 | Mrs. Johnson will work at making decisions in her relationship with Mr. Krae| |

| | | OBJECTIVE/CLIENT TASK | | | METHOD/SERVICE TASK |
|---|---|---|---|---|---|
| CCRS CODE | Obj. No. A | Mrs. Johnson will consider individual treatment to help resolve relationship conflicts. | CCRS CODE | | Caseworker will offer referral for individual treatment. |
| CCRS CODE | Obj. No. | | CCRS CODE | | |
| CCRS CODE | Obj. No. | | CCRS CODE | | |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE 10/82 |
|---|---|---|---|
| | 2 | Mrs. Johnson will be consistent in her contact with Corey. | |

| | | OBJECTIVE/CLIENT TASK | | | METHOD/SERVICE TASK |
|---|---|---|---|---|---|
| CCRS CODE | Obj. No. A | Mrs. Johnson will plan specific times she can see Corey. | CCRS CODE | | Caseworker will help her arrange visits to suit her work schedule. |
| CCRS CODE | Obj. No. B | Mrs. Johnson will be available when Corey visits his grandfather. | CCRS CODE | | Casework discussion with mother. |
| CCRS CODE | Obj. No. | | CCRS CODE | | |

J.A.269

| DSS-3404-F (3/81) NYC | CASE NAME Emma Lee Johnson | | LOCAL DISTRICT/AGENCY USE | Pa |
|---|---|---|---|---|
| COMPREHENSIVE SERVICE PLAN FAMILY | COMPLETED BY Gloria Caro | DATE 5/21/82 | | |

| CCRS CODE | Goal No. 3 | GOAL Mrs. Johnson will understand importance of having regular contact with Corey. | ANT. COMP. DATE 9/8 |
|---|---|---|---|

| OBJECTIVE/CLIENT TASK | | METHOD/SERVICE TASK | |
|---|---|---|---|
| CCRS CODE | Goal No. | CCRS CODE | |
| CCRS CODE | Goal No. | CCRS CODE | |
| CCRS CODE | Goal No. | CCRS CODE | |

**DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN**

Corey and Mrs. Johnson have participated in formulating service plan and visiting in a joint interview.

**AGENCY CONTACT PLAN WITH NATURAL PARENTS.** Include frequency and location of planned interviews.

We shall see Mrs. Johnson at our New York City office. She states she is working at two jobs and feels home visits in her home would not be feasible.

**CLIENT CONCURRENCE (Optional)**

I understand that all information pertaining to my case, including this Plan for Service developed by my worker and me. is confidential.

I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including the opportunity for an Administrative Review and Fair Hearing.

My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.
Goals and objective review and formulation of comprehensive service plan for family and child took place at treatment conference in which the unit administrator, psychiatrist, psychologist, child care workers, and school representative participated.

| SIGNATURE OF CLIENT, Parent or Guardian X | DATE | LOCAL DSS/SSC SIGNATURE X | DATE |
|---|---|---|---|
| CASE PLANNER'S SIGNATURE X _Gloria Caro_ | DATE 5/24/52 | SUPERVISOR'S SIGNATURE X _Bernard Ford_ | DATE / / |

**J.A.270**

| DSS-3404-C (3/81) NYC | CASE NAME | | CHILD'S NAME | Date of Birth |
|---|---|---|---|---|
| **COMPREHENSIVE SERVICE PLAN CHILD** | Emma Lee Johnson | | Corey Johnson | ▮ |
| | COMPLETED BY | DATE | SSC NUMBER: | |
| | Gloria Caro | 5/21/82 | 4766716-28 | |
| XX 90 Days   XX 6 Months | AGENCY/DISTRICT | | LOCAL DISTRICT/AGENCY USE | |
| ] Change in Program Status | JCCA/PCS | | | |

| CCRS CODE | PERMANENCY GOAL | ANT. COMP. DATE 8/83 |
|---|---|---|
| ▮ | Return to parent. | |

| CCRS CODE | GOAL NO. | GOAL | ANT. COMP. DATE 10/82 |
|---|---|---|---|
| ▮ | 1 | Corey will attend school every day and improve academic functioning. | |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| ▮ | A | Corey will not wander out of class. | ▮ | Close monitoring will be maintained between on-grounds school and cottage. |
| ▮ | B | Corey will improve reading level. | ▮ | Corey reads on 2nd grade level.  One-to-one remediation will be provided at our on-grounds school. |
| ▮ | | | ▮ | |

| CCRS CODE | GOAL NO. | | ANT. COMP. DATE 10/82 |
|---|---|---|---|
| ▮ | 2 | Corey will feel safe at Cottage School. | |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| ▮ | A | Corey will come to understand that he will be cared for. | ▮ | Corey has had a very unstable life. Cottage staff will acclimate him to structured routine. |
| ▮ | | | ▮ | |
| ▮ | | | ▮ | |

**J.A.271**

Page 2

| DSS-3404-C'(3/81) NYC **COMPREHENSIVE SERVICE PLAN CHILD** | CASE NAME Emma Lee Johnson | | CHILD'S NAME Corey Johnson | Date of Birth |
|---|---|---|---|---|
| | COMPLETED BY Gloria Caro | DATE 5/21/82 | SSC NUMBER: 4766716-28 | |

| CCRS CODE | Goal No. | GOAL | | ANT. COMP. DATE 10/82 |
|---|---|---|---|---|
| | 3 | Corey will discuss and understand family relationships. | | |

| OBJECTIVE/CLIENT TASK | METHOD/SERVICE TASK |
|---|---|

| CCRS CODE | Goal No. | | CCRS CODE | |
|---|---|---|---|---|
| | A | Corey will discuss his family. | | Casework sessions with Corey and mother will be directed toward clarifying family relationships. |
| | B | Corey will understand reasons for placement. | | Joint casework sessions with mother and Corey to discuss why he cannot visit or remain at home. |
| | | | | |

DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN.

Mrs. Johnson and Corey were seen together and to formulate service plan and visiting.

BRIEFLY DESCRIBE ANY COURT INVOLVEMENT in this case and indicate services which are being provided pursuant to a remand or court order.

N/A

For Child in Foster Boarding Home or Agency Operated Boarding Home, DESCRIBE THE AGENCY PLAN OF CONTACT BETWEEN THE CASE-WORKER AND CHILD IN NEXT PERIOD. INCLUDE FREQUENCY AND LOCATION.

Goals and objective review and formulation of comprehensive service plan for family and child took place at treatment conference in which the unit administrator, psychiatrist, psychologist, child care workers, and school representative participated.

CLIENT CONCURRENCE (Optional)

I understand that all information pertaining to my case, including this Plan for Service developed by my worker and me, is confidential.

I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including the opportunity for an Administrative Review and Fair Hearing.

My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.

| SIGNATURE OF CLIENT, Parent or Guardian X | DATE | LOCAL DSS/SSC SIGNATURE X | DATE |
|---|---|---|---|
| CASE PLANNER'S SIGNATURE X *Gloria Caro* | DATE 5/24/82 | SUPERVISOR'S SIGNATURE X *signature* | DATE 5/24/82 |

**J.A.272**

DSS-3407-S(3/81)NYC

| CASE NAME | | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| Emma Lee Johnson | | | |

**REASSESSMENT SUMMARY**

| COMPLETED BY | | DATE |
|---|---|---|
| Gloria Caro | | 5/21/82 |
| AGENCY/DISTRICT | | |
| JCCA/PCS | | |

4 / 26 / 82    DATE FAMILY BEGAN TO RECEIVE SERVICES FROM YOUR AGENCY

| Yes | No | |
|---|---|---|
| X | | A. This Reassessment Summary is being completed as part of a Service Plan Review. |

UPDATE changes, that have occurred since the last assessment summary, by answering each checklist item. The items on the checklist correspond to sections 1 through 8 of this form.

| Yes | No | |
|---|---|---|
| ☐ | ☒ | Has there been a change in the level of risk to the child if he/she returns home or remains at home? (If yes complete question 1.) |
| ☐ | ☒ | Has there been a change in the family's ability to benefit from the provision of preventive services? (If yes complete question 2.) |
| ☐ | ☒ | Has there been a change in service needs? ( If yes complete question 3.) |
| ☐ | ☒ | Has there been a change in program choice? (If yes complete Sect. B & questions 1 - 8.) |
| ☐ | ☒ | Has there been a change in the factors justifying placement and or preventive services? (If yes complete question 5. |
| ☒ | ☐ | Has there been a change in the child's location? (If yes complete question 6. |
| ☐ | ☒ | Has this child been transfered to a more restrictive placement? (If yes complete Sect. B & questions 1 - 8.) |
| ☐ | ☐ | Has this child been in placement for 18 months or more and his/her permanency goal is return to home? (If yes complete question 8.) |

| Yes | No | |
|---|---|---|
| | | B. This Reassessment Summary is being completed as the result of a PROGRAM STATUS change and requires the completion of the checklist below. For any change indicated in Section B, complete sections 1 through 8 of this form. |

☐ Case Closing                        ☐ Change in Permanency Goal

☐ Change in Level of Foster Care

☒ Change in Program choice

- Preventive Non-mandated
- Preventive Mandated
- Placement/Preventive Mandated
- Placement/Preventive Non-mandated
- Placement
- Child Protective Non-placement

☒ Movement Between Agencies or District   Transfer from PDC to PCS.

1. CONSIDERING IDENTIFIED PROBLEMS AND ASSETS, EVALUATE THE RISK TO THE CHILD IF SHE/HE RETURNS HOME, OR REMAINS AT HOME. Evaluate the areas of parental functioning or child's behavior which limit the family's ability to provide a safe and supportive environment for the child. According to mother, Mr. Kraeger, with whom she lives, is a violent, drug addicted man.  Corey is at risk were he to return home.  Mother feels unable to extricate or change the quality of her relationship at this time.

2. ASSESS THE FAMILY'S ABILITY TO BENEFIT FROM THE PROVISION OF FAMILY SUPPORT SERVICES AND TO MAINTAIN THE CHILD IN THE HOME. Support services at this time would not lessen risk to child.  Child needs closely structured setting with on-grounds school to assure school attendance.

**J.A.273**

DSS-3407-S(3/81) NYC

**REASSESSMENT SUMMARY**

| CASE NAME | | | |
|---|---|---|---|
| Emma Lee Johnson | | | LOCAL DISTRICT/AGENCY USE |
| COMPLETED BY | | DATE | |
| Gloria Caro | | 5/21/82 | |

Pa

**3. Complete the following service needs information:**

| A. NAME OF PERSON(S) NEEDING SERVICE | B. CCRS CODE | SERVICE NEEDS | C. CCRS CODE | AVAILABLE/ ACCEPTED* | D. PRIMARY/SECONDARY SERVICE NEED CC CO |
|---|---|---|---|---|---|
| Corey Johnson | 12 | Special Ed | C | Provided | |
| | 11 | Ed. Testing | C | Provided | |
| | 9 | Remedial Ed | C | Provided | |
| | 14 | Recreation | C | Provided | |
| | 24 | Medical/Dental | C | Provided | |
| | 30 | Casework Counseling | C | Provided | |
| | 29 | Psych/Psychological | C | Provided | |
| | 42 | Institution | C | Provided | |
| Mrs. Johnson | 30 | Casework Counseling | C | Provided | |
| Corey | | Family Planning | | Planned | |
| | | | | | |
| | | | | | |
| | | | | | |

\* A. **NOT AVAILABLE** · The required service is currently not being delivered to other clients in your service community.
B. **REFUSED** · the client has not agreed to participate in the needed service.
C. **PLANNED** · provision of the needed service is being planned; specific arrangements are being made or services are currently being provided.
D. **PLANNED, AWAITING OPENING** · the needed service is available, but currently there are no openings for this client.

**4.** Based on the assessment of Problems, Assets and Service Needs, indicate which of the following Program Choices is most appropriate for the child-(ren) in this case.

A. **PREVENTIVE SERVICES (non-mandated):** Preventive Services are needed by this child and family. In their absence out-of-home placement would <u>NOT be necessary</u> within the next 60 days. Placement may be necessary for the child in the future.

B. **PREVENTIVE SERVICES (mandated):** Preventive Services are needed by this child and family. In their absence out-of-home placement <u>would be necessary</u> for the child within the next 60 days.

C. **PLACEMENT/PREVENTIVE (mandated):** This child is currently in placement. The provision of preventive services <u>will enable him or her to return home</u> within the next 90 days.

D. **PLACEMENT/PREVENTIVE (non-mandated):** This child is currently in placement. Preventive Services are also needed. However, these services <u>will NOT enable the client to return home</u> within the next 90 days.

E. **PLACEMENT SERVICES:** Out-of-home placement is needed for this child within the next 60 days. Also include children surrendered for adoption.

F. **CHILD PROTECTIVE SERVICES (non-placement):** Community based services are needed which are <u>not preventive</u> in nature.

| Program Choice CCRS code | NAME OF CHILD IN NEED OF SERVICE |
|---|---|
| E | Corey Johnson |
| | |
| | |
| | |
| | |
| | |
| | |

**J.A.274**

DSS-3407-S(3/81) NYC

| REASSESSMENT SUMMARY | CASE NAME Emma Lee Johnson | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| | COMPLETED BY Gloria Caro | DATE 5/21/82 | |

5. For each child whose program choice is Preventive Services (mandated), Placement/Preventive (non-mandated or mandated) or Placement S (see question 4, B,C,D and E) check the factors which describe the reason(s) why placement services and/or preventive services are needed.

CHILD'S NAME

1. Corey Johnson
2. Robert Johnson
3.
4.

**FACTORS**

Check all that apply.

| (✓) | (✓) | (✓) | (✓) | Factor |
|---|---|---|---|---|
| X | X | | | A. Caretaker expresses unwillingness to maintain the child in the home. |
| | | | | B. Parent(s) have voluntarily surrendered the child for adoption. |
| | | | | C. Child has been adjudged neglected in a Family Court proceeding. |
| | | | | D. Child has been adjudged abused in a Family Court proceeding. |
| | | | | E. Alleged abuse or neglect by parent or caretaker, in the caseworker's judgement, places the child imminent danger of serious physical or emotional harm. |
| | | | | F. Child has been placed in the custody of the Commissioner of Social Services under Article 7 or 10 of t Family Court Act and foster care placement has been recommended or ordered by the court. |
| | | | | G. Parents or caretakers are unavailable due to arrest, detainment, imprisonment, or other situations volving the law. |
| | | | | H. Parents or caretakers are temporarily unable to maintain the child at home due to a housing or financ emergency, acute physical illness, or other emergency situation. |
| | | | | I. Parents or caretakers are incapable of providing proper care due to chronic or permanent conditio such as diagnosed mental illness, diagnosed developmental disability, alcohol or drug abuse, physic disability or illness or other comparable condition. |
| | | | | J. Continuous, serious conflict between parent and child. |
| | | | | K. Parents are dead or missing. |
| | X | | | L. Child's behavior presents a serious danger to other people or to the child's own well being. |
| | | | | M. Child's behavior results in damage to property or a criminal act related to property. |
| | | | | N. Child's behavior, although not dangerous, results in severe management problems and constant disrup tion of group activities in at least two of the following three settings: home, school, and community. |
| X | | | | O. Child's behavior caused by a serious emotional, physical or development disability is characterized by severe deficits in adaptive behavior. |
| | | | | P. Other, describe: |

(use additional sheets as needed)

**J.A.275**

| DSS-3407-S(3/81) NYC | CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| **REASSESSMENT SUMMARY** | Emma Lee Johnson | | |
| | COMPLETED BY | DATE | |
| | Gloria Caro | 5/21/82 | |

**6A. IF INITIAL OR SUBSEQUENT PLACEMENT IS OUT OF PARENTS' COUNTY/BOROUGH OR RESIDENCE, EXPLAIN REASON.**

Appropriate placement not available in home borough.

**B. IF INITIAL OR SUBSEQUENT PLACEMENT DOES NOT MEET THE PARENT(S)' EXPRESSED RELIGIOUS PREFERENCE, PLEASE EXPLAIN.**

Religious instruction in Corey's faith is being provided.

**C. IF THE CHILD'S PHYSICAL LOCATION HAS CHANGED SINCE LAST REVIEW, EXPLAIN EACH CHANGE.**

**7. IF THE CHILD HAS BEEN TRANSFERRED TO A MORE RESTRICTIVE PLACEMENT,** state why previous placement could not be continued with additional services.

Child has been transferred from Diagnostic Unit to regular part of our institution.

**8. Answer question 8 for all children whose PERMANENCY GOAL IS DISCHARGE TO PARENT(S) OR GUARDIAN(S) AND WHO HAVE BEEN IN PLACEMENT 18 MONTHS OR MORE.**

A. Is discharge planned within the next 6 months?   ☐ Yes   ☐ No

B. If **No**, what specific barriers prevent this course of action, and explain what alternatives to the original Comprehensive Service Plan are being considered, or have been tried to achieve discharge to parent(s) or legal guardian(s).

| CASE PLANNER'S SIGNATURE | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| x *Gloria Caro* | | X | |
| | | SUPERVISOR'S SIGNATURE | |
| | | x *Bernice Jack* | 5/24/82 |

**J.A.276**