<u>**EXECUTION SCHEDULED FOR JANUARY 14, 2021**</u>

No. 20-15

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

_____

**UNITED STATES OF AMERICA,**

**Plaintiff – Appellee,**

v.

**COREY JOHNSON, A/K/A O, A/K/A CO,**

**Defendant – Appellant.**

_____

Appeal from the United States District Court for the
Eastern District of Virginia

_____

## JOINT APPENDIX VOLUME II

_____

Joseph Attias, Esq.
Richard Cooke, Esq.
U.S. Attorney's Office
Eastern District of Virginia
2100 Jamison Avenue
Alexandria, Virginia 22314
Joseph.Attias@usdoj.gov
Richard.Cooke@usdoj.gov

*Counsel for Appellee*

Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7983
donald.salzman@skadden.com

*Counsel for Appellant*

# TABLE OF CONTENTS

PAGE(S)

## VOLUME I

### I. DOCKET SHEET

E.D. Va. Docket Sheet, No. 92CR68 (1992-2016)................................................J.A.1

E.D. Va. Docket Sheet, No. 92CR68 (2020) ...................................................J.A.25

### II. RELEVANT INDICTMENT, APPELLATE OPINION AND JUDGMENTS

Second Superseding Indictment, July 20, 1992..................................................J.A.32

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996)........................................J.A.54

Memorandum Opinion, *United States v. Roane*, No. 92CR98 (Oct. 29, 2020), ECF No. 66....................................................................................J.A.97

Memorandum Order (Nov. 19, 2020), ECF No. 75......................................J.A.140

### III. OTHER RELEVANT FILINGS

Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 (Aug. 19, 2020), ECF No. 38................................J.A.154

Memorandum in Support of Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 (Aug. 19, 2020), ECF No. 39 ....................................................................................................J.A.160

Index of Exhibits to Memorandum in Support of Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 (Aug. 19, 2020) ECF No. 39-1........................................................J.A.218

Exhibit 1 to Memorandum in Support, Special Findings, Feb. 16, 1993, ECF No. 39-2......................................................................................J.A.220

Exhibit 2 to Memorandum in Support, 21 U.S.C. § 848 (1988) (repealed 2006), ECF No. 39-3..................................................................J.A.233

Exhibit 3 to Memorandum in Support, Affidavit of Antoinette Joseph (Mr. Johnson's godmother), May 21, 2011, ECF No. 39-4 ......................J.A.240

Exhibit 4 to Memorandum in Support, Affidavit of Minnie Hodges
(Mr. Johnson's maternal aunt), Apr. 30, 2011, ECF No. 39-5 .................. J.A.252

Exhibit 5 to Memorandum in Support, Gloria Caro, Reassessment
Summary, May 21, 1982, ECF No. 39-6 ................................................. J.A.263

## VOLUME II

Exhibit 6 to Memorandum in Support, Affidavit of Robert Johnson
(Mr. Johnson's half-brother), June 29, 2011, ECF No. 39-7 ..................... J.A.277

Exhibit 7 to Memorandum in Support, Sundar Collimuttam, M.D.,
Psychiatrist, Pleasantville Cottage School Psychological
Evaluation, Feb. 22, 1982, ECF No. 39-8 .............................................. J.A.289

Exhibit 8 to Memorandum in Support, 2/10/93 Trial Tr. 3547-3548,
3573-3574, 3578, 3582, 3584-85, 3607, 3619-21, 3682, 3684,
3690-92, 3694-95, ECF No. 39-9 ........................................................... J.A.293

Exhibit 9 to Memorandum in Support, Lynn Polstein, Change in
Permanency Plan, Apr. 13, 1984, ECF No. 39-10 ................................... J.A.322

Exhibit 10 to Memorandum in Support, Christine Aaron, MSW Intern,
Pleasantville Cottage School Current Assessment, Mar. 10, 1985,
ECF No. 39-11 ..................................................................................... J.A.328

Exhibit 11 to Memorandum in Support, Odette Noble, UCR
Reassessment and Service Plan Review 6 Month, May 8, 1986,
ECF No. 39-12 ..................................................................................... J.A.332

Exhibit 12 to Memorandum in Support, Odette Noble, UCR Plan
Amendment: Form E Final Discharge, Mar. 26, 1987, ECF No. 39-
13 ....................................................................................................... J.A.342

Exhibit 13 to Memorandum in Support, Affidavit of David
Washington (caretaker at Elmhurst), Mar. 1, 2012, ECF No. 39-14 ......... J.A.346

Exhibit 14 to Memorandum in Support, Odette Noble, UCR Plan
Amendment: Form D Final Discharge, Feb. 23, 1987, ECF No. 39-
15 ....................................................................................................... J.A.350

Exhibit 15 to Memorandum in Support, Odette Noble, Three Month
Conference Note, Feb. 20, 1986, ECF No. 39-16 ................................... J.A.355

Exhibit 16 to Memorandum in Support, Affidavit of Darold Brown, June 15, 2011, ECF No. 39-17 ....................................................... J.A.360

Exhibit 17 to Memorandum in Support, Affidavit of Darnell Brown, Oct. 14, 2011, ECF No. 39-18 ...................................................... J.A.367

Exhibit 18 to Memorandum in Support, 1/15/93 Trial Tr. 921:12- 922:01, ECF No. 39-19................................................................. J.A.372

Exhibit 19 to Memorandum in Support, Declaration of Ann Harding (staff member at Pleasantville), Nov. 21, 2011, ECF No. 39-20 .............. J.A.376

Exhibit 20 to Memorandum in Support, Declaration of Sarah West (Mr. Johnson's prison chaplain), Mar. 24, 2011, ECF No. 39-21............. J.A.379

Exhibit 21 to Memorandum in Support, Affidavit of Priscilla Hodges (Mr. Johnson's cousin), Apr. 30, 2011, ECF No. 39-22 .......................... J.A.382

Exhibit 22 to Memorandum in Support, Affidavit of Julie McConnell, Mar. 23, 2011, ECF No. 39-23 .................................................... J.A.390

Exhibit 23 to Memorandum in Support, Affidavit of Odette Noble (Mr. Johnson's social worker), Dec. 1, 2011, ECF No. 39-24................... J.A.393

Exhibit 24 to Memorandum in Support, L. Larrecq, City of New York Human Resources Administration, History Sheet, Nov. 20, 1984, ECF No. 39-25 ....................................................................... J.A.400

Exhibit 25 to Memorandum in Support, Amira Offer, CSW, Caseworker, Pleasantville Diagnostic Center Psychosocial Summary, Mar. 15, 1982, ECF No. 39-26 ............................................. J.A.402

Exhibit 26 to Memorandum in Support, Lynn Polstein, Request for Authorization and Approval for Care and Services, Apr. 16, 1984, ECF No. 39-27 ....................................................................... J.A.408

Exhibit 27 to Memorandum in Support, Declaration of Esther Johnson (Mr. Johnson's maternal grandmother), Apr. 30, 2011, ECF No. 39-28 ............................................................................... J.A.410

Exhibit 28 to Memorandum in Support, Affidavit of James Sykes (Mr. Johnson's father), May 17, 2011, ECF No. 39-29.................................. J.A.416

Exhibit 29 to Memorandum in Support, Declaration of Pastor Bobby West (Mr. Johnson's prison chaplain), Mar. 24, 2011, ECF No. 39- 30................................................................................................ J.A.426

Exhibit 30 to Memorandum in Support, Inmate Education Data Transcript, Mar. 25, 2012, ECF No. 39-31............................................. J.A.431

Exhibit 31 to Memorandum in Support, Motion to Have Defendant Declared Mentally Retarded, United States v. Vernon Lance Thomas, No. 3:92CR68 (E.D. Va. Apr. 15, 1993), ECF No. 39-32 ......... J.A.433

Exhibit 32 to Memorandum in Support, Corey Johnson's IQ Scores Compared to IQ Scores of Federal Death Penalty Defendants Found Intellectually Disabled After Contested Atkins Hearings, ECF No. 39-33 .................................................................................. J.A.448

Exhibit 33 to Memorandum in Support, 6/1/93 Tr. 22#:1-14, ECF No. 39-34 ............................................................................................ J.A.451

Exhibit 34 to Memorandum in Support, Jury Instructions 232a, ECF No. 39-35 ............................................................................................ J.A.455

Exhibit 35 to Memorandum in Support, 2/12/93 Trial Tr. 3883-94, ECF No. 39-36 .......................................................................................... J.A.458

Government's Opposition to Defendant's First Step Act Motion (Sept. 23, 2020), ECF No. 58 ............................................................................ J.A.467

Reply in Support of Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 (Oct. 8, 2020), ECF No. 64 .......................................................................................................... J.A.495

Index of Exhibits to Reply in Support of Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 (Oct. 8, 2020), ECF No. 64-1 ...................................................................... J.A.514

Exhibit A to Reply, 01/27/93 Tr. 2737-2738, ECF No. 64-2 ........................ J.A.515

Exhibit B to Reply, 06/01/93 Tr. 17, ECF No. 64-3 ..................................... J.A.518

Exhibit C to Reply, 01/13/93 Tr. 861, ECF No. 64-4 ................................... J.A.522

Notice of Appeal (Nov. 20, 2020), ECF No. 77 ........................................... J.A.526

Notice of Execution Date (Nov. 20, 2020), ECF No. 78 ............................... J.A.528

## VOLUME III

### IV. SEALED

Presentence Investigation Report (Apr. 22, 1993) ........................................ J.A.530

# EXHIBIT 6

# AFFIDAVIT

State of New York       )
                   ) ss:
County of New York     )

ROBERT JOHNSON, being duly sworn, deposes and says:

1.     I am currently 40 years old and live at 550 West 125th Street, apt. 2C, New York, NY 10027.

2.     Corey Johnson is my half brother. Corey is about two years older than I. Emma Johnson, who is now deceased, was our mother. My father is Robert Butler, Sr. From the time I was born until I was about 10, I generally lived in the same household with Emma and Corey. After that, Corey and I each were placed in separate group homes for periods of time, although we still saw each other on the weekends. Later, in our late teens, Corey and I again lived together with our mother for a brief time and saw each other regularly. I have not seen Corey since in or about 1990.

3.     By way of background, I am now married and have a young son. I obtained my GED in 2002. I failed it twice before due to difficulties with the math section. In the past, I have spent time in prison on charges related to drug sales.

## General Family Background

4.     My mother, Emma Johnson, had Corey when she was about 17 years old and had me when she was about 19 years old. Throughout our childhoods, Emma moved us from place to place and was involved with different men (some of whom were verbally and physically abusive both to her and to Corey and me). When Corey and I were still young children, I witnessed her using drugs. Our mother was not very stable and seemed to have difficulty dealing with Corey and me. She yelled at us, hit us, and often left us to stay with other

family members or friends for days, weekends, and sometimes even weeks and months because of her frustration with us.

5.    My dad, Robert Butler, Sr., drove a taxi and did a few other things to earn a living.  My father was smooth, laid back, proud to be a black man, and proud to have sons. During the brief time he and my mother were together, they were young and went out a lot together at night.  They would go to night clubs and juke joints.  When they went out, Corey and I would stay with my grandmother, Esther. My mother and father lived together only briefly.

6.    Esther Johnson, Emma's mother and my and Corey's maternal grandmother, was the matriarch of our family.  My grandmother took care of us a lot.  She was very strict and took good care of us.  We stayed with her at times during our childhood. During these times, she was separated from my grandfather, Love Johnson.

7.    Corey and I had a good relationship with our grandfather, Love. I even used to call him "dad."  Love would take me and Corey to work with him. He used to drive trucks; he would take us with him in the truck sometimes. We would hang out all day.  Love was very close to our mother, and he loved her very much.

### Living with My Mother and Father

8.    My parents were together for a very short period of time.

9.    It is my understanding that we all lived in Brooklyn with my grandmother for a short period when I was very young.

10.    We then moved into Manhattan, and my mother, father, Corey and I all lived together in an apartment on 14th Street.

11.    My parents broke up when I was around 3 or 4, and my father moved to California to take advantage of a job opportunity.

904540.06-New York Server 4A

2

12. My dad asked my mom to come with him to California, but she wanted to remain in New York.

13. I didn't see my father regularly again until I was around age 8. Although he didn't live in New York, he would keep in touch by phone calls and short visits to New York. When he came, I would meet him in Brooklyn or Central Park.

14. While I am my father's only biological child, my father always treated Corey like his own son. He never showed any favoritism to either of us. Corey never talked about his biological father, or how he felt about him; I think my dad (Robert Butler) was the only real father to Corey.

15. When my dad moved to California and my parents broke up, our mother moved us to various places – Jersey City, Brooklyn, Queens, and, finally back to Manhattan. We lived in each place for a short period.

**Moving from Place to Place with My Mother and Corey**

16. While in New Jersey, we lived in Jersey City in the Gregory Park Apartments with my mother's boyfriend, Mitch.

17. Mitch was pretty cool.

18. Corey and I both attended school in Jersey City, but I don't remember much about it.

19. After leaving Jersey City, we moved to Queens and lived with my uncle Amos (who is my mother Emma's brother) and his wife, Vonna.

20. During the time we lived there, my uncle was hardly ever home because he was always working. Meanwhile, Vonna was very mean and always yelling.

21. I did not like living there.

904540.06-New York Server 4A

3

**J.A.280**

## Living with Bobby Koger in Manhattan

22.    We eventually settled in Harlem.

23.    My mother had met Bobby Koger, and we lived with him at 150th St. and Edgecombe.

24.    My mom got involved with Bobby Koger when I was around 7 years old, and he was in the picture until I was in my early teens.

25.    Things changed for the worse when my mother got involved with Bobby Koger.  She became less concerned with us, and was not involved with our schooling.  From an early age, Corey and I were pretty much on our own. When I was 7 (and Corey was about 9), we would go to school alone.   After she became involved with Bobby, our mother was not affectionate with us.  As discussed below, during this time, I witnessed my mother using drugs. She was always losing her job, and a lot of different people were going in and out of the house.

26.    I had never met anyone like Bobby Koger, and I disliked him. He was sick – he had diabetes and was a heroin addict. He was very bitter and violent.

27.    As a young boy, I was confused by Bobby's behaviors.

28.    When I was between the ages 8 and 10, I would wonder why Bobby had a needle stuck in his arm, why blood was dripping down his arm, and why he was bouncing around the room naked. I saw him get high and pass out while the needle was still in his arm.

29.    Bobby was violent towards my mother, me, and Corey.

30.    Bobby was verbally abusive to us as well as his own children. He was most aggressive when he was either having a drug binge or when he would find his money missing. He would have verbal and physical fights with my mother.  He would usually hit her

and then leave the house. After their fights, I would see the bruises he left on her. Sometimes she had to go to the hospital to have her injuries treated.

31. During the fights between Bobby and Emma, Corey and I would sometimes go into our room and play video games on our Atari, just to escape the mayhem.

32. Often, when I was as young as 10, I would try and jump in to stop Bobby from hitting my mother.

33. Corey, then about 12 years old, did not jump in. He would just stand still and cry. I think he was afraid.

34. We would never call the police. I didn't think too much about the fights between my mother and Bobby – I used to visit a friend down the hall, and his parents often fought physically but would then be back together soon afterwards, as if the fighting had never happened.

35. I would steal money from Bobby every chance I got because I didn't like him. When I got caught, Bobby would strike me with an open hand. Sometimes, my mother intervened to protect me, but other times she wouldn't because, after all, I was wrong for stealing his money.

36. It was during the time that we were living with Bobby Koger that I witnessed drug use by my mother. I was shocked when I first saw her use drugs, but after a while, Corey and I got used to it.

37. I blame Bobby for my mother's drug use.

38. At first, she smoked marijuana and would drink Harvey's Bristol Cream. I didn't notice heavier drug use until my early teens. My mom could have been using heavier drugs when I was younger, but I didn't become aware until I was older.

904540.06-New York Server 4A

5

**J.A.282**

39.    Later, when I was out in the streets at age 12 or 13 and I saw what cocaine users looked like, I realized my mom was one of them.

40.    When I was 13 or 14, I saw my saw my mom with a crack pipe in her bedroom.

41.    I believe that my mother continued to use drugs until her death in 1995.

**Corey Was Slow**

42.    Even though he was two years older, throughout our lives, Corey was slower than I.

43.    Corey was unable to grasp a lot of things. He also didn't pick up on things as quickly.

44.    Corey had difficulty in school. By the time Corey was in about second grade, he had trouble in all of his subjects. I often helped him with reading, writing, and penmanship.

45.    Corey's handwriting was (and still is) like chicken scratch. Corey would ask me to show him how to write like me. I would do hand over hand with him to show him how to write better, but he never caught on to it.

46.    I don't know how Corey got promoted to higher grades. Perhaps his teachers just passed him along without requiring that he be able to do the work.

47.    In general, I felt like I was more like the big brother than Corey. I got involved in the drug world long before Corey – I was about 13. Corey would not even attempt to get involved in selling drugs until several years later.

**J.A.283**

48.     I enjoyed hustling on the streets. I liked the lifestyle and the money I made. I wore a lot of nice clothes and jewelry, and I had a motorcycle. Even though I was younger, I would give Corey money to buy things, or else I would just give him things.

49.     A lot of the guys that hung around me thought that I was the oldest sibling, because I was the one showing Corey the ropes.

50.     Corey would brag to others about the way I dressed and the things I had.

51.     Corey took a while to catch on to some things. For example, when I started hustling on the streets, I used to buy a lot of footwear and clothes. I kept them in the bedroom I shared with Corey. Corey would see the items and ask me where I got them. Corey never appeared to make the connection between me being out in the streets and selling drugs and me having money to buy the items.

52.     Corey also had a hard time finding his way around. In terms of travelling, I would be able to pick up on a route the first time just by paying close attention. But Corey needed a lot more training in that area. Around the ages of eight to ten, my mother would choose me rather than Corey to go to my grandfather's house in Brooklyn because she knew that Corey would get lost.

53.     Corey was unable to keep up an in-depth conversation. He would usually just stay quiet during those times.

**Corey Was a Follower**

54.     When I was about seven or eight years old, Corey would sometimes get in trouble because of me – I would encourage or influence him to do mischievous things with me. For instance, I would ask Corey to steal money from Bobby Koger. I would just tell Corey, "Do

it with me, because either way, if I get caught, I am going to tell mom that you were involved." Corey would very often go along with me and do what I asked.

55.   I heard from my father about an incident that happened when Corey was living in North Carolina that also shows how susceptible Corey was, even as an older teenager. My dad and his wife were out of the house, and Corey was convinced to throw a party. I think Corey had it because he saw it as a way to meet and attract girls. The house ended up getting robbed and trashed by the friends that Corey had over. My father was very angry, because he had a lot of nice things in the home. If I had been in North Carolina with Corey, that incident would not have happened.

### Corey's Failed Attempt at the "Street Life" in New York

56.   Corey was not a street person. He was a ball player, and liked girls. He would play basketball all day long. He was well known for playing basketball and messing around with girls.

57.   Corey got involved in the street life at the relatively late age of about 19.

58.   I didn't want Corey to get involved in selling drugs for several reasons. First, he didn't know anything about selling drugs. Also, it didn't fit his character or skills. Corey really didn't have what it took to be successful; he was not street smart enough. He didn't have "follow-through," wasn't "hip enough," and wasn't tough enough.

59.   The guys I was involved with selling drugs wouldn't let him participate. I believe that they could see that he just wasn't capable, as shown by the one experience I had with Corey attempting to sell drugs.

60.   Once, Corey approached me about selling drugs. He told me he wanted to be down with me and make money, too. I did him a favor and gave him 50 vials of crack to sell.

Corey was supposed to sell one vial of crack for $5, and bring back $250 from the sales of 50 vials.

61.    After Corey finished his sales, he was extremely short on the money – he only brought back $50.

62.    I think Corey just could not calculate or count the amounts of money he was supposed to receive in each transaction.

63.    I had to take money out of my own pocket to make up the difference for Corey. I never sent him out to sell drugs after that. That was the first and last time I had Corey sell drugs with me.

### Corey's Time Living in New Jersey

64.    I saw Corey a few times when he was living in New Jersey in 1989 and 1990.

65.    When Corey first moved to Trenton, he lived in a house with girls and guys. He lived in several different places while in Trenton, always with others. Corey never lived by himself.

66.    I knew some other guys who were originally from New York who went to New Jersey, and with whom Corey was involved in New Jersey. Darold Brown and Aldon Mitchell, were my friends before they were friends with Corey. I hoped that Corey was in good hands with those guys and that they were looking out for him. I thought they knew what they were doing – I had contact with a few of them from New York. I felt like they had a well-run operation, which is why I didn't understand how Corey fit in. Then again, I didn't know the structure of the operation. Maybe their operations didn't require as much toughness or street smarts, maybe they gave Corey a role he could do.

J.A.286

67.    When I witnessed Corey on the streets in New Jersey, his only role was to collect money from the guys who were actually selling and give them more drugs to sell. I didn't see him do anything more than transport money and drugs. He was definitely not a ring leader. He wasn't dealing with the drug buyers. I can't see any set-up other than one in which Corey only had to perform the simple task of transporting money or drugs to and from the real dealers working for Corey. Even in the slower-paced New Jersey, Corey's limited role in selling drugs was somewhat surprising to me, given the disastrous experience I had with him selling drugs in New York.

68.    In New Jersey, I met two of the guys who would later go to Virginia and become co-defendants in Corey case, Richard Tipton and Vernon Lance Thomas. I cannot see Corey being the boss in Virginia. The others were more street smart and also more headstrong than Corey.

69.    Corey was very loyal to his family or anyone he believed to be his family. If Corey considered the guys with whom he was involved in selling drugs in Virginia to be his family, then it isn't surprising to me that he would be protective of them if he thought they were being threatened.

70.    For some of the time Corey lived in Trenton, he lived with a woman called "Mudda." She was much younger than Corey. They lived in a "shack" that appeared to be a crack house. It was a real hovel. I would never have lived there because everything was old, dark, and dirty. I was surprised Corey would live in such a filthy house because we were young we were raised to be clean and tidy. There were a lot of wild, small children living in the home.

71.    While in New Jersey, Corey was also involved with a girl named Monica, who I believe to be the mother of Corey's daughter. I last spoke to Monica in 1996. I had called

**J.A.287**

about seeing my niece. Monica said she was with a family member and would call me back. She never called back and we lost contact.

### My Recent Contact with Corey

72.    I speak to Corey on a regular basis, at least once a week. I would like to visit him in prison.

73.    I once had a conversation over the phone with Corey about our mother. Corey raised the topic. He asked if I had visited her gravesite. I told him that I hadn't, and that I was not ready to visit it. I have this picture of our mother in my mind, and I don't want to see her any other way. This was the first time we spoke over the phone about our mother's death.

_Robert Johnson_ 6-29-11
ROBERT JOHNSON

Sworn to before me on this
29th day of June, 2011

_Delores Green_
Notary Public
DELORES GREEN
Notary Public, State of New York
No. 31-4527811
Qualified in New York County
Commission Expires Aug. 31, 2014

11

J.A.288

# EXHIBIT 7

PLEASANTVILLE DIAGNOSTIC CENTER

Name of Child: COREY JOHNSON       Date of Evaluation: 2/8/82
Date of Birth: ███████            By: Sundar Collimuttam, M.D.
Date of (PDC) Adm: 2/1/82          Worker: Ms. Offer
Referred by: Manhattan SSC

## PSYCHIATRIC EVALUATION - CONFIDENTIAL

Corey Johnson is a 13-year old Black boy the older of two half-siblings living with his mother and her boyfriend attending Special Education Class. He is referred to the Diagnostic Center by Manhattan SSC for an evaluation as his mother has been requesting a placement. Corey's mother presents him with the complaint of having difficulties in school. He is disruptive in the class, fights and does not learn and has a history of being truant. In addition, he does not listen to the mother at home and stays out late. Corey was suspended from school last year for fighting. In addition, he has been stealing from his mother and her boyfriend. These problems have "always" been there but have become worse in the past two years. Corey believed his half-brother's father to be his natural father until early last year when his father unexpectedly came into the picture after being released from jail. Corey has been seeing his father very regularly since then.

Birth and early developmental history is normal. Corey was enuretic until age 11 and occasionally encopretic between ages 8 to 12. He stuttered until age 5 and still has a slight lisp. Corey's parents broke up when he was an infant and they lived with Robert's (his half-brother's) father until age 6 and with the mother's current boyfriend for the past four years who is described as being addicted to Heroin and of being abusive to the kids.

Corey's half-brother was hospitalized last summer following a suicidal attempt (walking on a ledge) and is currently in Children's Village.

Interview with the Child:

Corey came readily to the interview. He is an alert, oriented and cooperative boy who relates with eye contact and speaks with a slight slur. He talked of wanting to go to Children's Village. He doesn't want to return home for a while so that "I can straighten my head" and "my mother can straighten herself out." Corey feels he has problems with learning and reading. He likes the school and the counselor here. He does not like what the kids do and the way they behave in the cottage but feels that they also have problems as he does and he has to straighten himself out and not bother about them. He wants to be a different person when he returns home. Corey has been having problems for two years "since I turned 12." He thinks he has had problems because he became a teenager and he felt he had to do good things so that his brother could look up to him. He feels sad when his mother keeps telling him about his father being in jail. He has felt at times like wanting to stab himself but has never done anything to hurt himself and doesn't think that he will ever do it. Corey talked about

J.A.290

Corey Johnson                                                    -2-

his brother trying to kill himself "because of my mother," and says
that he feels very sad about it.  Corey blames his mother a great deal
for asking him to do things at home and for the way she talks about
his father.

"I hate him" referring to his mother's boyfriend who the family has
been living with for the last four years.  Corey says that he is on
drugs and doesn't treat any of them right.

His three wishes were: 1) "to get my act straight," 2) "to get my
head straight" and 3) "to be okay when I go back home."  He wants
to grow up to be a human being who people will look up to and trust.
He doesn't feel that people trust him now because he has been steal-
ing.  If he were to go to a deserted island and could take one per-
son with him he would take his brother along.  If he got lost in a
forest he did not know who would come looking for him.  Corey thinks
the best thing that ever happened to him in his life was that he met
his family and his relatives (his father) and the worst thing, he
couldn't think of anything.

He denies nightmares, denies hallucinations, denies suicidal or homi-
cidal thoughts.  He is not delusional, there is no evidence of paranoi
There is no evidence of any thinking disorder.

Corey shows moderately positive soft neurological signs.  His hopping
on one foot is very clumsy, so is skipping.  Finger-thumb sequence,
alternating movements of hands and tapping index finger on thumb on
each hand is very slow, clumsy and reckless.  In addition, he shows
evidence of right-left confusion on pointing to the examiner and on
writing confuses b's and d's.  Three dimensional drawings are very
poor and inaccurate.  Draw A Person was an immature drawing with no
hands or legs drawn obliquely on the page.

Diagnostic Impression:

Axis I.    Adjustment Disorder with Mixed Features.

Axis II.   Special Developmental Reading Disorder.

Axis III.  Positive Soft Neurological Signs.

Formulation:

Life has been very chaotic for this family especially during the
last four years with Corey's mother having had financial problems
of being in debt, having difficulties with her job and her relation-
ships.  Mother appears depressed and unavailable to the children emo-
tionally.  There have been frequent moves, stays in the homes of re-
latives often with the mother and children being in different homes.
This was followed with the period of being with the mother's boyfriend
who Corey did not get along with and would steal from "to get back at
him."  Corey is a child who has been reacting to the chaotic life
in the last four years.  In addition, he has shown evidence of mild
to moderate neurological deficits of dyslexia and speech impairment.

J.A.291

Corey Johnson                                                    -3-

He has the capacity to relate well and seems motivated towards improv
ment.  He seems to be happy with his mother and reaches out to her.
Corey's mother comes across as a depressed lady preoccupied with her
own problems and emotionally unavailable to the children.  She, how-
ever, seems very willing to be involved and seems to be motivated to-
wards treatment.

Corey I think would benefit from residential treatment.  This would
provide him with consistency which has been lacking and structure
and also provide him with Special Education.  His mother would need
help in dealing with her depression and in organizing her life to
help her be more available to her children when they return home to
her.

Sundar Collimuttam, M.D.:ww  D-2/19/82   T-2/22/82

Sundar Collimuttam, M.D.
Psychiatrist

J.A.292

USCA4 Appeal: 20-15  Doc: 11-2  Filed: 12/28/2020  Pg: 22 of 258

# EXHIBIT 8

J.A.293

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,


                              Plaintiff;

     v.                              CRIMINAL ACTION
                                        92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

----------------------------------------
                    VOLUME XX

                February 10, 1993
                Richmond, Virginia
                   10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
               JEFFREY B. KULL
               OFFICIAL COURT REPORTER

                P-R-O-C-E-E-D-I-N-G-S
          THE CLERK:  Case Number 92CV68: United
States of America versus Richard Tipton, Cory

Johnson, and James H. Roane, Jr., the twentieth day of trial. Are counsel ready to proceed?

MR. VICK: Government is ready.

MR. McGARVEY: Defendant Johnson is ready.

MR. GEARY: Defendant Tipton is ready.

MR. BAUGH: Defendant Roane is ready.

THE COURT: All right. Let's bring in the jury.

(The jury entered the courtroom.).

THE COURT: All right. Mr. McGarvey?

MR. McGARVEY: Thank you, Your Honor. May it please the Court, co-counsel, ladies and gentlemen of the jury and of the prosecution: Folks, why are we here today? Well, I figured it would be easier to tell you why we are not here. We are not here to try to excuse the acts of Cory Johnson. There is no excuse for eight murders. That's not what this is about. We are not here to try to tell you that Mr. Johnson didn't know the difference between right or wrong. When you folks entered your verdict, you decided that Mr. Johnson knew the difference between right and wrong. We are not here today to ask you not to punish Mr. Johnson. The alternatives here are life in the penitentiary without possibility of parole, to die in the penitentiary. I should think that anyone would think that is punishment. What we are here today to do is to decide whether or not to kill Cory Johnson. That's what it boils down to.

Traditionally, the death penalty in this country is reserved for the most severe cases, the cases where the guilty person is completely and totally blameworthy, fully responsible for his actions. Those factors which tend to lessen blame, which indicate that a person is not fully and totally blameworthy, should indicate that that person does not merit the most severe punishment; i.e., to be killed.

This isn't my point of view. This is the law. And the law requires this hearing before anyone can be given the death penalty. The purpose of this hearing is to assure that you folks consider that the guilty person deserves the maximum sentence of death. That person is guaranteed the right to this hearing in order to present reasons from our point of view why he doesn't deserve the maximum punishment. These reasons are called mitigation. The government has already put on what they called the aggravating factors. This is our opportunity to put on what is called mitigation.

The law states that mentally retarded persons cannot be executed. And the reason that they are excluded is because the law recognizes that mentally

retarded persons are not totally and completely blameworthy. They are not fully responsible for their actions.

Now, I'm not intending to suggest at this juncture or any other juncture that Cory Johnson is mentally retarded. It doesn't suggest that mentally retarded persons aren't responsible for their actions. It just indicates that the law recognizes that they are not as fully and totally blameworthy as an individual who has all his faculties.

Mentally retarded people have capabilities. Most mentally retarded people can hold jobs, raise families, be educated. Mildly mentally remember retarded people can be educated to, say, a sixth-grade reading level. I'm not suggesting that that is the case in the most severe cases of mental retardation, but in mildly mentally retarded cases, they can be educated. They can be arrested and they can be held accountable for their actions. However, because of the limitations that mentally retarded people have, they are not as fully responsible, as I indicated, not as fully blameworthy.

In this case, Cory Johnson, as I said, is not mentally retarded. But he has substantial mental, intellectual deficits that he has been plagued with his entire life. His IQ is within two points of being classified by the law mentally retarded, and therefore, legally not executable. Two points. He has severe neuropsychological impairment, and he is severely learning-disabled. This was diagnosed back when he was 13 years old, and we will present evidence today by Dr. Cornell here, who has administered tests and neuropsychological tests that have verified this. He has an IQ of 77.

In listening to Mr. Tipton's presentation yesterday, I was struck by the fact that he indicated that these learning-disabled ADD-type people tend to group together. And I think ultimately that's what we are going to be able to show you folks; that they somehow gravitated to each other. And when Dr. Evans yesterday was talking about the fact that learning-disabled people and ADD people have great difficulty in problem-solving, that they are very narrow minded, very focused, inflexible, I believe we will be able to show you folks today that that is the case with Cory Johnson. I don't just believe it. It is going to be shown. That is coupled with this severe learning disability and an IQ of 77.

Cory's situation, Cory's physical impairment, which I can't overemphasize is not Cory's fault -- what Cory did is Cory's fault, but what Cory's physical problems are are not his fault -- as I said,

**J.A.296**

they don't meet the standard definition of mental retardation.  But his condition is very, very similar.  As I indicated, mentally retarded people, mildly mentally retarded people can learn to read up to a sixth-grade level.  But from the age of six to seven, Cory has been in special education.  At 13, as I indicated, he was diagnosed with this learning disability.  And after years and years of special education and the like, he is still only able to read on a second to third-grade level.  So when I say that his condition is very similar to the mildly mentally retarded, in some instances it is much more severe.  I've just given you an example of that.  And this is after years and years of special instruction.

Now, we couple that with severe emotional deprivation as well.  Again, when I was listening to Mr. Tipton's presentation yesterday I was struck by the similarity in backgrounds.  Cory Johnson had a family.  And I use "family" in quotations.  He met his father when he was 12 years old.  In the course of his lifetime he has seen his father three to five times since he was 12 years old.  From age one until he was 12 years old, Cory Johnson moved at least 12 times.  He moved 12 times to some relatives, to some friends, lived principally with his mother.  And again, I mean no disrespect to Mr. Johnson, but I use the term "mother" in quotes as well.  His mother was a drug abuser.  His mother was abusive emotionally and physically to Cory.  And to make matters worse, his mother took up with a number of gentlemen who were also drug abusers and physically abusive to Cory and his younger brother.

When Cory was 12-and-a-half to 13 years old, the New York justice system took jurisdiction over Cory and his brother and placed him in a foster care situation; principally, not because Cory had done anything wrong, but because his mother was flat-out unable, to put it charitably, to take care of him.

When I talked about emotional abuse, I'd like to illustrate that.  Principally, the emotional abuse from his mother came about as a result of expectations that once again Cory Johnson couldn't meet.  And he couldn't meet those expectations not because of anything that he had done, but because he was born with this severe neurological impairment.  Despite that, Cory tried.  His mother, believe it or not, expected Cory to go to college.  And try as Cory Johnson might have, Cory Johnson couldn't read beyond the second-grade level.  When the New York justice system took jurisdiction of Cory, they placed him in a foster home situation.  This was the Pleasantville Cottage Home.  You will hear from two people who

J.A.297

worked with him in this, the Jewish Child Care Association of New York. And what you will hear from these people and from the reports that we are going to give you is that despite Cory's mental and physical limitations, Cory always wanted to please. Cory was not a mean-spirited person. Despite his background, Cory wanted to learn. He wanted to learn. And I would suggest to you folks it is going to be shown that he wanted to learn because he wanted to please his mother. But there wasn't a darn thing that Cory could do to please his mother.

The reports are rife with references to the fact that Cory was not visited by his mother; that his mother took no interest in the fact that he was trying; and that on the few occasions that his mother actually did visit him, the notes suggest that she was very rejective of him to the point that the staff there made comments about it; that she would get phone calls from the Home, and she wouldn't return the phone calls. She would call only to cancel an appointment, and not reschedule them. But despite this, Cory tended to treat his mother like a goddess.

There was a quote that you folks are going to have in front of you that I found particularly instructive and particularly touching, and I'd like to read it to you now. This is from a January, 1983 treatment review of Cory Johnson by Gail Turnquest, the caseworker at the Pleasantville Cottage School.

"Child care workers note that Cory's behavior deteriorates when he has no contact with his mother. He can also become quite depressed when he has not heard from or seen her for a period of time. It is the opinion of his child care workers that Pleasantville is good for him and that he is functioning fairly well here. Cory realizes his learning disabilities. However, he struggles to do his homework. He is truly motivated to do well and to succeed, and has not yet given up on himself.

"Cory presents with no real behavior problems. Within the last two weeks, there has been some decline. Cory fantasizes that his mother will come up in a car and take him to Pizza Hut. Child care workers report that Cory's mood is basically that of a depressed child. He longs for his mother and acts out his realization that in fact his mother is emotionally unavailable to him. However, he denies his feelings when confronted directly. He also struggles to involve his father --" his father who he had seen three to five times in his life "-- who also does not come through for him. Sundays can be very difficult for Cory because he usually doesn't

have any visitors."

From the age of twelve-and-a-half until he was 18, this basically was Cory Johnson's life: attempting to learn and not being able to learn; attempting to be accepted by the only family that he had, his mother, and to be continually rejected by his mother.  And you couple that with a childhood that was -- if you can call it a childhood -- basically, Cory took care of himself since he was three years old because his mother was too busy doing drugs and taking care of herself and living with her boyfriends.

When you couple this background of abuse, depression, lack of acceptance, rejection by the one person who mattered most to him, along with the severe, and I'm talking severe, cognitive deficiencies in Cory, it might provide somewhat of an explanation of what happened.  As I suggested to you, there is no excuse.

At the conclusion of this presentation, I would suggest to you folks that the question you have to ask yourself is not whether Cory is guilty, not whether he should be punished, not whether he knew what he was doing was right or wrong.  Those have already been decided.  But whether he is fully and completely blameworthy; whether he is totally responsible for his actions.  This penalty phase is, as the Supreme Court says, a narrowing process. Because as I indicated, the death penalty is reserved for those who are totally and completely blameworthy in the most severe cases.

When you ask yourself that question, you have to ask whether or not, after this presentation, Cory is fully and totally blameworthy; whether he is completely responsible for his actions.  Has he lived his life as the normal, average person, who might be totally and fully responsible?  Or has he lived his life under these situations that I have described.

We will demonstrate to you today that Cory is not a normal young person.  He is 24 years old now. He has severe neurological impairment.  He is two points above being mentally retarded.  And when you couple that with this abusive background, I think you are going to be able to see that he is not as totally and completely responsible as a person who doesn't have those deficits.  And life in the penitentiary without possibility of parole is no bargain, either. Thank you, folks.

THE COURT:  All right.  Call your first witness.

MR. COOLEY:  Our first witness will be Dr. Dewey Cornell.

                        DEWEY CORNELL,
called as a witness by and on behalf of defendant
Johnson, having been first duly sworn by the Clerk,
was examined and testified as follows:
                    DIRECT EXAMINATION
BY MR. COOLEY:
Q    Dr. Cornell, good morning to you.
A    Good morning.
Q    Would you please tell the ladies and gentlemen
of the jury your full name and your profession?
A    Dr. Dewey G. Cornell.  I'm a clinical
psychologist and associate professor.

Q    And where are you employed?
A    University of Virginia.
Q    And is your title there associate professor?
A    I'm associate professor of education in the
programs in clinical and school psychology at the
University of Virginia.  I am also a faculty
associate of the Institute of Law, Industry and
Public Policy.
Q    And what are your professional duties as an
associate professor?
        MR. VICK:  We would stipulate as to his
expertise.
        MR. COOLEY:  I very much appreciate that,
Your Honor.  I would like for the jury to know
something about him.
        THE COURT:  Go ahead.
BY MR. COOLEY:
Q    Doctor, what are your professional duties as an
associate professor?
A    My principal duties are teaching, research, and
service at the University of Virginia.  I teach
graduate courses in our training program that trains
Ph.D.s in clinical and school psychology.  I teach
courses in personality assessment, in
psychopathology; that is, in mental disorders.  I am

I am also the assistant director of our training
clinic, which is a clinic that provides psychological
assessments, and I'm in charge of the psychological
assessments that our university clinic provides.  I
also am involved in the training of psychologists and
psychiatrists who specialize in forensic mental
health, and I conduct research in those areas as
well.
Q    I see.  Doctor, can you describe briefly your
educational background and any training that you had
in clinical psychology?
A    My training in clinical psychology began at the
University of Michigan.  I obtained my Master's
degree in 1979 and my Ph.D. in 1981 at the University
of Michigan from the Department of Psychology, from

J.A.300

Q   All right.  And did you include certain things such as definitions of some of the conditions that Cory has?

A   Yes.  I also included the federal and accepted professional definitions for learning difficulties, learning disabilities, and mental retardation as well.

MR. COOLEY:  Your Honor, with the Court's permission, we have a copy of the full report and appendages for each member of the jury.  The government already has their copies, and also a copy for each defense counsel and the Court.

THE COURT:  All right.

(Documents proffered to Court, counsel, and jury.)

MR. COOLEY:  If I could be so bold as to request of those folks who have received a copy if they could try to follow along with us as we go through it rather than leafing through, which I think is a tendency, naturally.  We would appreciate that in presenting it in the form Dr. Cornell has set it up.

THE COURT:  All right.

BY MR. COOLEY:

Q   Doctor, if you would, we would like to start with a review of Cory's life and ask you, based on your evaluation and various sources of information that you have described to the ladies and gentlemen of the jury and obtained during the course of your evaluation, did you formulate an opinion about the psychological background, development of Cory Johnson?

A   Yes, I did.

Q   Could you summarize for us what you concluded?

A   When I put all the information that I reviewed together, I think there are two primary factors that I felt the jury should be informed about for purposes of mitigation.  The first of these is Cory Johnson's upbringing in a severely unstable, neglectful, and abusive family environment, which had a devastating effect on his psychological development and his emotional maturity.

The second main factor that I felt was important was his degree of brain impairment, which is exhibited as a very severe learning disability, a speech impairment which he suffered during his childhood years and still has remnants of today, and his generally impaired intelligence, which places him just above the level of mental retardation.  Those two factors in combination, I feel, made Cory unprepared to function in society, unprepared to survive on his own when he left institutional care

J.A.301

and had no place to turn to, and made him unable to cope and adapt to society in a way that a normal individual would.

Q   I'd like for you to explain to me and to the ladies and gentlemen of the jury, if you would, how you came to those conclusions. Can you tell the Court what information about Cory's background led you to this, or these, conclusions?

A   This would take some time. First, regarding his upbringing, I looked at his life as being in three phases: the first phase being his life with his mother up until about age 13; and then the years that he spent in institutional settings; and then finally, the third phase, after he left the institutions and was out pretty much on his own.

During that first phase of time when he was with his mother, or at least mother had formal legal custody of him, he lived in an extremely unstable situation. He actually was under his grandmother's care initially as an infant. When I interviewed his mother, she had very poor recollection of his upbringing and was not very involved in his child care. That was either taken care of by her own mother, when she lived at home for a couple of years, or he was left basically unattended for long periods of time. The mother could not recall details of his life, basic things that most mothers can recall about their children, such as when they learned to walk and talk, and how they were potty-trained, and how they did when they were in school. Stories from their childhood.

She was not around very much during his upbringing. She was involved in jobs that she held. She was involved in relationships with a series of men. And as she said a number of times, he couldn't fit into her life, and neither could his half-brother, Robert. The father, of course, was not in the picture at all. He was in prison. He had no contact with Cory. Cory was led to believe by his mother that his father was actually a man named Robert Butler, who was actually father to Cory's brother. Cory only met his father, basically by coincidence, when he was 12 or 13 years old. And up until that time, he thought the man named Robert Butler was his father. This was a man that his mother lived with for a short period of time. He was abusive. They had a parting of the ways and he was one of a series of men that she lived with at various times who were abusive to her and to the children, and who were involved in drug abuse. And at various times, those individuals moved in and out of the residence.

J.A.302

Now, it was very difficult for me to determine where Cory lived and how many times he moved. I know that at least 12 times, his mother changed residence. But there were many more times in which Cory was sent back and forth to other relatives. He didn't have a stable place that was his home. He didn't have a single individual that he could regard as a parent in the sense of someone who is going to always be there, be there and take care of him. His mother nominally would be his parent, but his involvement with her was neglectful and abusive. And he and his brother had evidence of serious emotional problems well before they were teenagers.

He had troubles with enuresis, bedwetting, up until age 11; encopresis, fecal soiling of pants, when he was 10 and 11 years old, which are signs of quite serious emotional disturbance. His brother Robert, at a young age, I believe ten or eleven, made a suicide attempt and was hospitalized for five months in a psychiatric setting. So both these boys were quite emotionally troubled; understandably so, given the kind of extremely unstable environment that they grew up in.

And I mentioned also that there were abusive boyfriends. And the mother related to me a number of violent incidents in which either she or the boys were physically assaulted and threatened by various boyfriends. And Cory had quite serious difficulties with one boyfriend, to the point that she did not think it was safe for him to stay in her residence any longer. That is basically the first phase of Cory's life up until about age 13.

Q   If I could ask the ladies and gentlemen of the jury to go, and you as well, to the green tab and to turn that over to the chronology of events in Cory Johnson's life.

You have basically described what would be the top third of that chronology, I believe.

A   Yes.

Q   And he was, of course, born in Brooklyn, and his birthdate was in ▉▉▉▉▉▉▉▉▉▉. You have indicated a number of movements by Cory with his mother or without his mother during the time frame from birth to the age of 13, at which time he was committed by her to the state, and ultimately placed in foster care; is that correct?

A   That's correct. At approximately age 13, he was placed in the Pleasantville Diagnostic Center, a residential facility for diagnosis of children with emotional disturbance. He was there for two months of evaluation, and at that point they felt it was more appropriate for him to be placed in an

**J.A.303**

institutional setting.  It is called the Pleasantville Cottage School.  It is called Cottage School, but actually what it involves is that he lives in a home that's supervised  --  in a cottage with several other emotionally-disturbed boys on the grounds.  There is also a school that he would attend during the day.  And he was placed there basically because the Court determined that his mother was not appropriate, and that he could not be well-raised at home.  He remained there from about age 13 to 16.

Q    If I could refer the jury to the blue tab in your book, open that first document that is behind the blue tab.

Doctor, you have blown that up, I believe.  You have taken a quotation from the petition which removed Cory from the home and indicated -- and I don't want to belabor this because I know that each person who has this can read for themselves -- but in that petition, and this is the language from the Court itself, there was a determination that the child, Cory, had been removed from his home on February 1st, 1982, and that the parent was unable to make adequate provision for his care, maintenance, and supervision; is that correct?

A    That's correct.  And in this tab are the quotations that I selected.  Now, in order to give you the context for these quotations, the next tab has the report, the legal petition, for example, that the quote comes from.  So I'm going to focus on the quotation, but it is possible for anyone to look at where that quotation came from and to read what came before it and what came after it.  In addition, there are other reports as well.

Q    If I can, so that everyone can understand what we are doing, the volume that's behind the blue tab are quotations which you have drawn from reports from the child care agencies.

A    Right.

Q    The specific reports from which these quotations are drawn are behind the orange tab.

A    That's right.

Q    We do not intend to read all of those reports or to require you to read them, but they are there in case there was a concern that your quote had been taken out of context; is that correct?

A    That's correct.

Q    And the items that are behind the orange tab are excerpts from the reports that are contained in these volumes that were supplied by the child care agencies.

A    That's right.

Q    If you would, can you relate to the ladies and

J.A.304

gentlemen what occurred and how things were occurring once this second stage arrives in Cory's life, where he has been voluntarily, by his mother, removed from his home or her home and placed with the state?

A    Yes.  Once he was placed with the state he had a series of psychiatric, psychological, and educational evaluations.  He had those initially when he first came there so that they could decide what needed to be done, and then he had further evaluations repeatedly over the years that he was there as they tried to monitor his progress and refine their treatment to help him.

And what I have done is I've gone through all of those records page by page, and what I have selected here are the ones that I felt that were most influential to me in formulating my opinion, and which I think accurately reflect his time spent at this institution.  And then I follow that up by contacting the authors of most of these reports.  I talked to six individuals that I could identify, and spoke with them about the reports to make sure I understood what they were saying and that I had an appropriate interpretation of what was said.

First of all, from the very beginning, they assessed that he had serious emotional problems. They reported emotional disturbance that he had prior to coming to the child agency, and then they described what he was like once he is there.

The first psychiatric evaluation, which actually is page six of these quotations, describe that he was cooperative, that he related well, but that he had a slurred speech, and he said he doesn't want to come home for awhile so that "I can straighten my head and my mother can straighten herself out."  Quotations that he made to the psychiatrist who saw him, Collimuttam.

Cory feels he has problems with learning and reading.  He likes the school and the counselor here.  Cory feels sad when his mother keeps telling him about his father being in jail.  He has felt at times like wanting to stab himself, but has never done anything to hurt himself and doesn't think he will ever do it.  Cory talked about his brother trying to kill himself, "because of my mother," he said, and says that he feels very sad about it.

Q    Cory's brother was younger?

A    His brother was two years younger.  He made a suicide attempt and was placed at another agency called Children's Village, and he was there for awhile and then later was switched to Pleasantville as well.

Dr. Collimuttam I thought, summarized well his

early impression on page seven. He says, "life has been very chaotic for this family with Cory's mother having had financial problems, having difficulties with her job and her relationships. Mother appears depressed and unavailable to the child emotionally. There have been frequent moves, stays in the homes of relatives often with the mother and children being in different homes. This was followed up with a period of being with the mother's boyfriend, who Cory did not get along with and would steel from to get back at home. Cory is a child who has been reacting to the chaotic life in the last four years. In addition, he has shown evidence of mild to moderate neurological deficits of dyslexia and speech impairment."

And then Dr. Collimuttam gave him diagnoses using our standard diagnostic manual, the DSM-III. He saw him as having an adjustment disorder, which means he was reacting to stressful events in his life with symptoms. He was diagnosed as having a special developmental reading disorder. It is another term for dyslexia. It is another term for learning disability. Those are all interchangeable terms. He was also diagnosed as having positive soft neurological signs, which means that there was evidence that he had brain damage.

He was then given a psychological evaluation by a psychologist. This is a little bit out of order. This is on page five. Dr. Cary Gallaudet gave him a series of psychological tests. He described serious problems, deficits in nonverbal abstract reasoning, perceptual organization, visual perception and perceptual motor functioning. These weaknesses were also evident in his Bender-Gestalt test, which was characterized by rotations and distortions. Performance was comparable to a child five years below his chronological age, an underlying neurological deficit.

Q   Cory was age 14 at this point in time. Then he would have been operating at the level of a normal nine year old?

A   At the level of a 9 year old, yes. Yes, in these areas where he showed brain impairment. It says, "In summary, Cory is a sensitive and dependent boy who is struggling with issues revolving around independence. An underlying organic component," that means brain damage, "serves to exacerbate the anxiety, dependence, affectional needs, and hostile impulses, and as a result, Cory has an extremely hard time trying to integrate emotional challenges. Although evidence of a learning disability exists, he continues to be an ambitious boy who is motivated to

improve his situation and would benefit highly from both remediation in academic areas as well as psychotherapy."

What's surprising about this statement and other statements that follow is that Cory remained very motivated. He remained cooperative, eager to learn, and willing to take on the challenge of his disability. If any of you have had experience with learning-disabled youngsters, you know that even mildly disabled youngsters become discouraged. They try to avoid their disability, understandably so. What was unique about Cory was, first of all, that he had a very severe learning disability -- I'll talk more about that later -- but that he continued to be motivated to try to overcome it. He had an educational evaluation. That's page eight of the quotations, by an education specialist who again pointed out that he was reading on the second-grade level. Third-grade level was too difficult to read. His spelling was second-grade level. His arithmetic was mid-third grade. It said that he couldn't multiply by three. He couldn't divide a number by two. He couldn't read digits of more than four digits. He could recite the months of the year only up to August. He knew there were 12 months, but he couldn't say them all. So this is when he is 13 years old. And he doesn't know all the months in the year, he can't read and do arithmetic beyond about a second or third-grade level. Of course, he has moved at least 12 times and had to change schools and classrooms, and I'm sure that he wasn't given much of an opportunity for teachers to work with him while he was in schools.

I also looked at part of this at what his mother was like at this time. Because a very important part of any kind of treatment is to get the family involved and to work with them. And I got very consistent descriptions of his mother, who was the only family member that they had any contact with. This is on page nine, Gloria Caro, caseworker assigned to work with him, they have a conference report. This conference involves a psychiatrist, a psychologist, teachers. The mother is invited to come, although most of the time she did not come, and Cory participates in parts of these conversations. But the caseworker -- he had a series of caseworkers -- the first one said, "Ms. Johnson is an attractive, stylishly-dressed woman who works as a receptionist. She is an articulate woman who reacted to my statement with anger, indicating she is trying to put her life together. She says right now she does not have too much energy or time for her kids.

She believes they will have to understand it.

"The message is, if her kids can live her life right now, okay.  If not, she can't see them.  She says she loves her kids, but putting her life together comes first.

"A joint interview with Cory elicited almost no comment from Cory, who stared at the ceiling while his mother pretty much lectured to him on how insensitive he was to 'where I am now and have to be.'  It was not concern for him and his situation, being separated from family, being institutionalized."

She continues.  She says, "It is difficult to see how Ms. Johnson can be engaged unless her needs are seen as primary.  She refuses referral for treatment for herself.  Further contact will reveal how fixed she is in this narcissistic, self-focused stand."

This is June.  He has been in the setting for about four months.  They are concerned that they cannot work with the mother, and this continued.  In January of 1983, this is page ten, he now had a new caseworker, had a change in caseworker.  He has now been in the institution almost a year.  And here we have the quotation you may have heard before:  "Child care workers note that Cory's behavior deteriorates when he has no contact with his mother.  He can become quite depressed when he has not heard from or seen her for a period of time.  It is the opinion of the child care workers that Pleasantville is good for him, that he is functioning fairly well here.  Cory realizes his learning disabilities.  However, he struggles to do his homework.  He is truly motivated to do well and succeed, and he has not yet given up on himself.  Within the last two weeks, there has been some decline.  Cory fantasizes that his mother will come up in a car and take him to Pizza Hut.  Child care worker reports that Cory's mood is basically that of a depressed child."

It continues to report that Cory wants to have contact with his mother, wants to have contact with his father.  He tries to maintain the view that they are available to him.  He cares about them, but not accepting that they are not available to him.

Q   If I might, obviously, these reports being written by his workers in 1982 and 1983, and for that matter, the remaining ones that you are going to comment on, obviously were not done in anticipation of a trial proceeding.

A   That's right.

Q   These are excerpts taken from the reports of evaluations being done of Cory in an effort to help

J.A.308

A    That's right.

Q    That transfer was made in the summer of 1984.

A    They made the transfer, started giving him summer employment jobs, doing manual labor.  He held a variety of summer jobs.  He was proud of the fact when I spoke with him, Cory was, that he stuck out those jobs.  He worked at them even though he didn't particularly like the manual labor that he had to do.  He also was placed in a more vocational-oriented program called BOCES.  It is a special educational program in which he was learning carpentry and did reasonably well.  He tended to do best when he did things with his hands that did not involve language. Anything that involved language, he had serious impairment in.

Q    The last sentence in that first paragraph on page 15?

A    Yes.  "He is supposed to receive remedial reading and speech therapy, but for reasons not clear, has had no one-to-one instruction for several months."  This is a report of another psychiatrist, Dr. Clemmens.  This is, I think, the third psychiatrist to see him.  And again, they had trouble providing him with the special services he needed, and for some reason these services lapsed at various times.

Q    And this certainly was in spite of his desire to be  --  to have this treatment, to address his problem; is that correct?

A    He voices it here.  I think now at 16, he has been there several years.  He says, "Cory was sarcastic and extremely resentful about receiving neither remedial reading or speech therapy."  The psychiatrist quotes him.  "'School-wise, they haven't done a thing for me.'  When I questioned the lack of remedial reading he answered angrily, 'They get my hopes up high and then you do no shit.  That's why I want to depend on nobody no more.  You are all full of shit, every one of you.  Nobody has raised a finger."

        He had an angry outburst to this psychiatrist over his frustration.  And then when I read that I thought well, he is now starting to really bad mouth the institution and show a more negative attitude.  I wondered what the staff think of him.  Dr. Clemmens in that report says  --  he agreed with him.  She said, "Outside of being raised in a problematic family he has to cope with a severe learning disability which is highly frustrating and embarrassing.  It is understandable that he feels bitter and resentful about not receiving adequate help.  In addition, it is difficult for him that he

apartment in a highrise.  A social worker is assigned to meet with him weekly, to meet with the mother, and to continue to work towards Cory eventually going home.  That's the plan.  She expressed in this quotation her frustration.

"Ms. Johnson is extremely elusive.  I have made numerous appointments with her and she has not kept them.  She will call and cancel, but she will not follow up and make another appointment.  She is also not terribly responsible about calling and arranging for Cory to come home over the weekend.  Even though Ms. Johnson is quite irresponsible in her relationship to Cory, Cory talks about her as if she is a goddess and is terribly responsible in relation to her.  It is as if he is compensating for her real neglect of him."  This is stated several times in the records.

Q    Ms. Noble makes a second report in the group home conference report on page 21.

A    Right.  It is now 1986, six months later or so.  "On the whole, Cory continues to be using the residence well, and would seem to want to remain living there.  He has made relationships with both the house parents and the boys, and is liked by both.  Cory continues to be quite active and assertive in how he handles himself.  And he can be a bit of a monopolizer.  But the boys continue to take this in their stride and not seem to mind it.  He talks a lot, apparently, in group meetings.  Part of the boys' acceptance would seem to be related to Cory's ingenuousness and decency.  Cory is very in earnest about succeeding and articulates that point of view to the other boys."  At another place, they talk about him sort of almost like having a preacher quality.  He is telling the other boys they have to do well.

MR. VICK:  The editorialization, I thought, was not appropriate.  I object to it.

THE COURT:  The objection is overruled.

BY MR. COOLEY:

Q    That reference is not  --  that's coming out of the reports, isn't it?

A    I'm referring to portions of the report that I read, that are not in the quotation, to try to explain them.  Let me just read verbatim what he says here.  "One senses that periodically Cory might feel the wish to live with his mother, but he doesn't discuss it openly and, I think, deep down he knows that his mother is just not able to provide a stable, secure home for him.  Cory is quite secretive about his mother's lifestyle and doesn't share with me and, I don't believe, with the house parents, some of his

chagrin at what his mother does. We only pick it up by his behavior and what he does not say."

Q   Finally, Doctor, the difficulties with his mother continued to be reported in the June, 1986 report. They had not seen her or had any contact with her at that point in time?

A   Right.

Q   And then Cory became aware of her own -- of her, being his mother's, difficulties with the authorities.

A   That's right. It says at the beginning of March '86, Cory learned that she was arrested and was in jail in New Jersey. He told his house parent to inform me, and then Cory and I discussed it. I haven't heard from her or any other family member. Cory states he doesn't believe his mother is guilty and that she was framed. He acknowledged it had something to do with the use of credit cards. I suspect Cory knows the truth, but is keeping it from us."

Q   Doctor, let me ask you if you would to go back to the chronology, which is behind the green tab at the front of the book. At this point in time, you have brought him down through the summer of 1986.

A   Yes.

Q   In the summer of 1986, the entry there on chronology that shows his age, 17, he was involved in something that brought him into the criminal justice system.

A   Yes. That's right. During this time he became aware of his mother's increasing involvement in drug abuse, crack addiction. He was very upset by that. His attitude declined dramatically. And he became more involved with several of the other boys, Dwight and Mitch, who lived in the group home. And he related to me that he wanted very much to be accepted by these boys; they were his friends. He felt like they were -- like he was loyal to them. And one fellow, Mitch, whom he looked up to, told him he was having trouble with another boy. He referred to him as a Hispanic young man. And Mitch encouraged Dwight and Cory to go with him to try to intimidate this other boy.

And Cory related to me that they in fact did go up to this boy and threatened him, and that this boy, somewhat to his surprise, pulled out his paycheck -- Mitch and this boy worked together -- and gave it to them. So in essence, they robbed him. He told me at first they hadn't intended to do that, but when they saw that this boy did it, they went back and did it a second time. And when that happened, the police were contacted. Mitch was arrested. Mitch then was

J.A.311

interviewed by the police and revealed that he was assisted by Cory and Dwight.  Cory and Dwight then spoke with their foster care people and went down to the jail or to the police department and turned themselves in.

Q   He was, in fact, incarcerated at that time at Riker's Island?

A   He was put in jail initially.  He was bailed out by the foster parents.  He then pled guilty and received a sentence of, I think, ten to twelve days in Riker's Island, which is a rather well-known, rather rough jail in an island in New York City.  And he was very distressed by that experience.  That was a very troubling experience.  He had never been exposed to quite that kind of environment before. But he had got involved with Dwight and Mitch, wanted to be accepted by them.  Mitch wanted to take revenge on another boy, and Cory, who I don't think really knew this boy, wanted to be loyal to his friends and do what his friends did, and he got himself involved.  He admitted this candidly do me.

Q   No disputing he was guilty of that?

A   No.  He told me he was guilty.  He told me what he did.  He told me he was in jail.

Q   He continued after that to stay at Elmhurst for some months; is that correct?

A   Well, he came back to Elmhurst, after his time in jail.  He showed a real decline in attitude.  He seemed very uncooperative with the foster parents there.  He expressed a lot of anger.  They continued to press him about what was going on with his mother. He got angry.  He was offended by that and he defended his mother.  And at one point, I believe in February, several months after this arrest, he had an argument with the staff and they laid down the law to him.  They told him "Look, if you aren't more cooperative, if you don't agree to follow our rules, you are going to have to leave."  I checked into it carefully.  He had not assaulted anyone.  He had not broken laws there.  But he was showing a bad attitude and they didn't accept boys there who didn't show that they wanted to be there.  So they told him that he would have to temporarily go home until his attitude improved.  And so he abruptly left, and he did not return.

Q   And thereafter, was there an occasion in which he was charged with an offense?

A   That's right.  He returned home to his mother, continued going to school, was suspended from school for squirting a teacher with a fire extinguisher the last week of school, did not attend his graduation.

Q   Was he to receive a diploma if he graduated?

J.A.312

3622

A    Well, there is  --  the mother couldn't tell me.  She didn't know.  My best understanding from the records and from what Cory told me is that he was to get a certificate of completion; that he couldn't get a full diploma because he was in the occupational training program and he could not pass the literacy test to get a diploma.

Q    Thereafter, he got into some trouble; is that correct?

A    Yes.  After that time, he was arrested and accused of another robbery with several other young men.  He was put in a police line-up and he was identified in the police line-up.  He strongly indicated to me and also indicated in the record at that time that he was mistakenly identified; that he was not  --  that he did not commit this offense.

Q    So as to that alleged attempted robbery, he denied that he was indeed the person who had committed that?

A    Yes.  That's the only thing he ever denied to me.

Q    From the birth through age 21.

A    Ever.

Q    In discussing those items with him, he acknowledged guilt and wrongdoing at any point where

3623

it was raised.

A    Yes.

Q    But as to this issue he did not, and in fact adamantly proclaimed his innocence; is that right?

A    That's right.  He acknowledged to me a number of extensive involvement in some drug dealing and illegal activity.  This is the only incident of which he was accused which he told me he did not do and that he was falsely accused.

Q    In spite of his proclamation of innocence, based on one-on-one identification of Cory, he was indeed convicted.

        MR. COOLEY:  And Judge, we would reference for the record, I believe it is Government Exhibit PP-1, which is the conviction for attempted robbery.

BY MR. COOLEY:

Q    And he received what penalty?

A    I don't know the exact penalty.  He decided to plead guilty because he was told that he would receive several years in prison if he were convicted, and that he would be convicted.  And he decided that if he pled guilty he would get a period of up to a year.

        MR. COOLEY:  And indeed, Judge, if we can ask the Court to take judicial notice of that, that

3624

exhibit, there is a one-year sentence to Riker's

J.A.313

still present and that I would arrive at the same diagnosis based on my own sources of information.  So I went back and conducted my own psychological testing of Cory.

Q    Now, these would be found behind the white tab in the book; is that correct?

A    Yes.

Q    And there are some blown-up  --  Marshal, could you help me?

(Documents displayed on easel before jury.)

BY MR. COOLEY:

Q    Doctor, can you tell the ladies and gentlemen of the jury the results of your tests?  And they have before them in an expanded version, blown-up version, the graph.

A    Yes.  I'll try to be brief about this.  First, I wanted to document his level of intelligence.  I gave him the standard individual intelligence test called the Wechsler Adult Intelligence Scale-Revised Version.  It is a standard test for adults to assess their intelligence.  He had been previously given the children's version of that test when he was younger.

3681

This test is composed of a number of sub-tests that are listed here: information, digit span, vocabulary, and so on.  And those scores are combined to give you the person's IQ.  You expect that on each of these tests, the average score is a 10.  That is, the person right at the fiftieth percentile, right in the middle of the population in his age group, would attain a 10 sub-test score.  The average person gets a 10, sometimes you get a 9, 11, 12.  You vary a little bit around 10 as a big point.

Obviously, a very bright person gets scores over 10, and a less intelligent person gets scores much lower than 10.  In Cory's case, you will see he started off getting 5's and 6's in all of these first set of tests.  Those are consistent with someone who is mildly retarded.  That is, if he had continued to get that pattern of 5's and 6's on all his tests he would have scored in the retarded range.  Those initial tests, the first ones that are listed there where he got the 5's and 6's, are all of the verbal tests, the language tests, vocabulary, arithmetic, comprehension, all things that involve use of language.

The latter tests where he started to score higher are the nonverbal tests, sometimes called the

3682

performance tests.  These are tests that involve puzzles, blocks, things that he does with his hands. You will recall he had some carpentry training that probably enhanced his skills in that area.  And in those areas, he did better.  And actually, on one of

J.A.314

them he got a 10, which would be the average expected score for a normal individual.

Because these latter scores were higher, his overall IQ fell above the range of mental retardation, just above that range.

(Another document displayed on easel.)

BY MR. COOLEY:

Q   The next to the last page in that section is a bar graph that is entitled "Reading and Math Scores."  Would you tell the ladies and gentlemen of the jury very briefly what that entails and what that shows us?

A   I gave him an intelligence test, but also gave him an achievement test.  Again, I gave him the standard individually-administered achievement test, the Woodcock-Johnson Test of Achievement.  This is a test.  Actually, I didn't give him the entire test.  There are 20-some parts to this test.  But I gave him specifically the tests in reading, two tests in reading and two tests in math, identification, and comprehension.  Identification is his ability to identify a word -- identify words.  He is presented a word, has to be able to pronounce what that word is to show he can identify it.  In Comprehension, he has to be able to comprehend the meaning of a sentence and choose the correct word to complete a sentence.  Those turn out to be too easily objectively scored tests of reading ability.  On both of those he scored at the second-grade level, a 2.4 means at the second-grade level, a 2.6 also is at the second-grade level.

In the area of mathematics.  The first is calculation, which is ability to do arithmetic problems: addition, subtraction, division, multiplication.  And there he scored at the sixth-grade level, 6.7.  He also had applied problems, which are kind of common sense word problems, such as how much change should you get back if you are buying something that costs a certain amount of money, so forth.  That's sort of a practical arithmetic skill.  There he was at the fourth-grade level.  So certainly, the second-grade scores in reading were very consistent with what he had obtained when he was a teenager.  The somewhat higher scores reflect the fact that he was able to do somewhat better in arithmetic, although obviously still a very low level.

Q   Finally, the last bar graph, the last page of that section, is labeled "Intelligence and Achievement."  Can you tell the ladies and gentlemen of the jury what that represents?

A   This bar puts together those two tests.  That

is, we look at someone's intelligence and look at their achievement and see if they correspond.  We expect that a person's achievement should be commensurate with their intelligence.  That is, even if you have got low intelligence, you ought to achieve up to the level of your intelligence.  Now, if you look here on just the right-hand side, you will see where it says "Math."  The black bar graph where it says 100, that's the expected level that the average person at the 50th percentile would get in both intelligence and achievement.  So that's sort of our standard.  In intelligence he gets a 77.  That was his IQ result.  That's clearly well below average.  It is close to the level of mental retardation.  In math he gets a 77.  If I take those grade-level scores and I can look them up in a table and transform them into a standard score, he gets a 77.  So his math level is equivalent, exactly

equivalent, to what his intellectual level is.  That to me is an indication that he is not learning disabled in math.  He is low in math, but he is at the level you would expect, given his intelligence.

If we look on the left, those three bars are not even.  We have the 100 standard bar that's black on the left, and he has a 77, which is the same intelligence score.  But then his reading is 53.  That is, if you transform that second-grade reading level into a standard score, it is a standard score of 53.  And that is clearly in the mentally retarded range, in the moderately retarded range, actually.  So that we cannot only see in this graph that his general intelligence is low, but his ability to learn in the area of reading is lower still.  So a person can be both mentally retarded and learning disabled.  In his case, he is very low in general intelligence, although not retarded, and learning disabled.

Q   Doctor, also, I believe you did a test in the course of this relating to Cory's writing.

(Document displayed on easel.)

A   I gave him a standard test of his ability to write, a test of written language, TOWL, the part of the test that is most commonly used.  The person is given a picture.  You see this outer-space scene.

And the young person is asked to make up a story to go with the picture.  They are given 15 minutes to write up a story.  Then you evaluate the story for its vocabulary, spelling, grammar, for its complexity of the themes that are presented, and this is the story that Cory gave me to this picture.  This was very striking to me because this story is very immature.  The writing is very immature.  The spelling is very immature, leaving aside the

J.A.316

penmanship.

Q    This is reprinted in the book before the ladies and gentlemen.  It is the fourth page back in behind the white tab.  And the third page back is your findings related to that; is that right?  And it also includes your typed-out interpretation of what Cory wrote.

A    Yes, I typed out what I thought he wrote.  There were a couple words I couldn't decipher, but I typed out the story which you can read and see is a very immature story.  And then below that, I have listed the scores that he received for this story, and the typical age level of someone who writes a story of that type.

Q    He begins his story with "Me and my mom."

A    You want me to read that?

Q    Well  --

         MR. VICK:  It is all in front of the jury.
         MR. COOLEY:  I'm not going to use it.
         THE COURT:  All right.  Go on.

BY MR. COOLEY:

Q    But the story was about Cory and his mother going to the moon?

A    That's right.  He chose to tell a story about he and his mother going on a trip together to see the rockets.

Q    And obviously there was more space, but he ended where he did.

A    Yes.  His story was a little short for someone of his age.

Q    Now, Doctor, you also had an opportunity to refer Cory for evaluation by Dr. Peck; you made some reference to that.  Dr. Peck is a neuropsychologist.  His report is found behind the pink tab in the book.  And I will ask you to somewhat rapidly summarize what the findings from Dr. Peck showed.

A    I gave intelligence and achievement.  I asked Dr. Peck to give him neuropsychological tests, which are sensitive to brain damage, to see if we could identify specific areas of brain impairment or dysfunction.  These tests are commonly given when someone has had a head injury or has  --  there is reason to believe that they have had some kind of brain impairment.  They are very technical tests.  There is a large number of them.  Nobody is expected to do poorly on all of them; that is, they tap as many areas of brain functioning as we have tests for, everything from abstract reasoning to fine motor coordination, visual motor coordination, auditory processing, lots of different areas.

     And what Dr. Peck found is that Cory's performance indicated abnormal neuropsychological

functioning.  That is, it did indicate impairment, brain impairment, in a number of areas.  First of all, he found that he had impairment in visual memory, memory for things he sees, and visual sequencing.  That is, the ability to keep things in proper order sequentially, visually.  Now, if you think about reading, those are two critical skills. You have to keep the letters in the proper order and the words in the proper order, and you have to be able to remember what words are, how they are spelled and so forth, in order to read.  He has deficits in both those areas.

In addition, Dr. Peck found that he had deficits in auditory processing.  That is, often, if somebody can't read and they have visual problems, you try to teach them auditorily through the spoken word.  But he has deficits in auditory discrimination; that is, the ability to listen and understand what is said to him.  At the end of this complicated report that Dr. Peck has written, he points out that this kind of person could have difficulty understanding what people are saying, and that that could create social and interpersonal difficulties for him.  He doesn't quite understand when people are arguing with him or talking with him, what they are saying and what their intention is, and he doesn't have good skills in that area.  Abstract reasoning and judgment were poor. For example, on the category test, which is a highly sensitive test to brain impairment, he shows inflexible thinking; that is, kind of approach to problems where he cannot shift from one approach to another approach.  He cannot, when he is making an error or making a mistake in solving a problem, he does not show the ability to recognize a mistake and to shift from that mistake to another strategy.  He tends to persist in a poor strategy of solving problems.

So in a number of different areas, he shows neuropsychological impairment.  Not all areas.

Rarely does anyone show impairment in all areas.  But he shows impairment in quite a number of them.

Q    If I could, I would move your attention to the concept of mental retardation.  I would ask you to look at this last chart that's being displayed to the jury.  Can you tell the ladies and gentlemen of the jury what they are being shown at this point?  And this would be the last page behind the second green tab, the definition of mental retardation.

A    Yes.

Q    What does the term mean?

A    Mental retardation means that the person has significantly sub-average intelligence which can be

measured by a general intelligence test, as well as impairment in adaptive behavior.  Adaptive behavior means their ability to sort of function in every day life; to have practical intelligence, if you will, and good survival skills.  And you can measure the first part by giving them an intelligence test. Individuals that fall in the range of 70 to 75 can be considered in the range of mental retardation.  And then of course, anything lower than that indicates mental retardation.  In addition to having low intelligence, you need to show that the person has impaired adaptive behavior in any two of about ten areas that are listed there.  Certainly functional academics, the ability to do academic work is one in which he has impairment.  Also, communication deficits with his speech impairment and communication problems, he has some deficits there.  Self care, social skills, work, the ability to maintain a job, to have good work habits, to use the kind of common sense you need to hold a job, all of those are possible areas in which his functioning is not at a normal level.  As I said before, my conclusion was that he is just above the level of mental retardation.

Q    And Doctor, when you made that, reached that conclusion, you were aware that if he could be categorized as mentally retarded, that Cory would not be death-eligible under the statute; is that right?

A    Yes.  I realized this was a very serious issue. The law states very specifically that if he were mentally retarded, we would not have this sentencing hearing for the death penalty.  So I checked my scores, went back, and saw him a second time.  I consulted with colleagues.  I wanted to make very sure that this was an accurate score.  Because the definition of mental retardation is not a hard and fast absolute.  It is a gray area.  And people have stereotypes of mental retardation as someone who looks very impaired and looks unusual and so forth. But in fact, many mentally-retarded people look very normal and can function fairly well in daily life. So I did not very easily reach this conclusion that he is just above the level of mental retardation.

Q    And exactly where is he?  How close is he to being mentally retarded?

A    The IQ score I got was 77.  If he had gotten a 75, he would be within the range that counts as mental retardation.  70 to 75 is kind of the gray area.  If you are in that area, you can be mildly retarded.  He was two points above that, which is a matter of one or two questions on an intelligence test that would make the difference there.

J.A.319

Q    Doctor, would it be fair to say that most mentally-retarded folks are only mildly retarded?

A    Yes.  There is a social stereotype we have of the retarded person that really is of the more seriously retarded person.  We used to think that everybody who was mentally retarded would have to be put in an institution and they could never live on their own or function or hold a job.  In fact, if you put people in institutions they will become institutionalized and sort of look and function that way.

We now know that a mildly retarded person can be educated up to about the sixth-grade level.  We know that a mildly retarded person can hold a job if they have good training, if it is a structured job, if they have good supervision.  We know that many mildly retarded people get married, live on their own, pay their bills, have families.  So we know that mild mental retardation doesn't mean that the person is completely dysfunctional, the way that you might characterize it on television, but has some capabilities.  And so I had to compare that to Cory.

Q    On some tests Cory was given by you and on some of the tests he was given by the folks at Pleasantville Cottage School back in his adolescent years, Cory in fact scored in the mentally retarded range, did he not?

A    Yes.

Q    And would it be fair to say that in some areas, Cory functions on the same level as someone who is mentally retarded?

A    That's correct.

Q    And is it fair to say that because of his intellectual limitations, that Cory Johnson has impaired ability to reason?

A    Yes.

Q    Would it be fair to say that Cory Johnson has an impaired ability to use good judgment to control his behavior?

A    Absolutely.

Q    Would it be fair to say that Cory Johnson has impaired ability to understand and foresee the consequences of his actions?

A    He has impairment in that area, yes.

Q    Is there anything in the scientific literature on mental retardation about individuals with these limitations committing illegal acts?

A    Yes.  It is not uncommon for individuals who are mildly retarded to commit illegal acts.  We find, in part of assessing their adaptive behavior, that very commonly they do break the law.  They use poor judgment.  They don't have good self control.  And

J.A.320

USCA4 Appeal: 20-15    Doc: 11-2    Filed: 12/28/2020    Pg: 50 of 258

they do break the law.

Q   Is it the case that mentally retarded individuals are often very dependent on others and tend to rely on others in the decisions they make?

A   Yes.  That's one of the factors you have to consider, because part of the limitation is that the person then is more vulnerable to what other people tell them to do or suggest that they do, or look for cues in what other people are doing and try to fake it, emulate them.  And individuals with severe intellectual deficits are very susceptible to that kind of pressure.

Q   And while Cory Johnson is technically not mentally retarded, because he does have these similar intellectual limitations, would it be fair to say that he may be overly dependent on others and tend to rely on others for decisions?

A   Yes.

Q   Is it not the case that mentally retarded individuals are often overly susceptible to influence by others, doing what others direct them to do?

A   That's a standard part of when you evaluate anyone who is mentally retarded; you expect that that problem is going to be present to some degree, and it usually is.

Q   Part of their brain impairment is impairment in the ability to use independent judgment when somebody wants them to do something.

A   Yes.  And to foresee future consequences of actions.  That is, you can put a mildly retarded person and give them a very structured question, a very specific situation, and they can sort of give you the right answer.  But then you put them in a different situation when they are in a different emotional state and they don't give you the right answer anymore.  They don't use the same level of judgment.  They are variable in their level of functioning.

Q   Would it be fair to say with the limitations that Cory Johnson has, as you and the other professionals and the reports have indicated, would it be fair to say that he, too, could be lacking in independent judgment and susceptible to being influenced by others?

A   To some degree, yes.  He would have to be.

Q   Does learning ability only affect ability to read and write or to do other kinds of schoolwork?

A   No.  That term is used because that's where it is first identified, but there is more to it.

Q   Is that just your opinion?

A   No, it is not.  If you take any standard textbook on learning disability, Handbook of Learning

J.A.321

USCA4 Appeal: 20-15   Doc: 11-2   Filed: 12/28/2020   Pg: 51 of 258

# EXHIBIT 9

J.A.322

| DISCHARGE/TRANSFER | JOHNSON · | COREY JOHNSON | ■ |
|---|---|---|---|

**CHANGE IN PERMANENCY PLAN**

- ☐ DISCHARGE
- ☐ TRANSFER

| COMPLETED BY | Lynn Polstein | DATE 4/13/84 | SSC NUMBER 4766716-28 |
|---|---|---|---|
| AGENCY/DISTRICT | JCCA/PCS | | LOCAL DISTRICT/AGENCY USE |

- Complete a Discharge Plan for child in foster care 6 months prior to discharge or at the time the decision to discharge is made.
- Complete a Transfer Plan for child in foster care prior to transfer between Child Caring Agencies or Districts.

**PLAN**

We are requesting a change in permanency plan, from discharge to parent to discharge to self.

During the course of placement it has become clear that Ms. Johnson cannot provide Corey with the emotional support and attention he needs to overcome his severely impaired self-concept. Corey, who is severely learning disabled and barely able to read, feels inept and damaged. His mother is a narcissistic and self-focused woman whose lack of empathy and sensitivity toward Corey, exacerbates his bad feelings. When he is feeling depressed, he resorts to anti-social behavior to avoid this feeling.

**JUSTIFICATION OF DISCHARGE GRANT** to parent, relative or child when essential to effectuate discharge.

**ANTICIPATED LENGTH OF TRIAL DISCHARGE:**

J.A.323

| | | | | |
|---|---|---|---|---|
| **COMPREHENSIVE SERVICE PLAN CHILD** | CASE NAME: JOHNSON, EMMA | | CHILD'S NAME: COREY JOHNSON | Date of Birth |
| | COMPLETED BY: LYNN POLSTEIN | DATE: 4/13/84 | SSC NUMBER: 4766716-28 | |
| ☐ 90 Days  ☐ 6 Months  ☐ Change in Program Status | AGENCY/DISTRICT: JCCA/PCS | | LOCAL DISTRICT/AGENCY USE | |

| CCRS CODE | PERMANENCY GOAL | ANT. COMP. DATE |
|---|---|---|
| | DISCHARGE TO SELF | |

| CCRS CODE | GOAL NO. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 1 | COREY WILL CONTINUE TO PARTICIPATE IN THE INTENSIVE REMEDIATION PROGRAM. | |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

| CCRS CODE | GOAL NO. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 2 | COREY WILL USE OPPORTUNITIES OFFERED HIM TO LEARN INDEPENDENT LIVING SKILLS. | |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | A | Corey will explore the possibilities of an off-campus job. | | A cottage parent will help Corey read ads and apply for a job. |
| | B | Corey will learn how to handle money so that he can begin to shop for himself. | | Teacher will help Corey learn enough simple arithmetic that he will be able to figure out correct change. |
| | | | | |

J.A.324

| DSS-3404-C (3/81) NYC | CASE NAME | CHILD'S NAME | Date of Birth |
|---|---|---|---|
| COMPREHENSIVE SERVICE PLAN CHILD | JOHNSON, EMMA | COREY JOHNSON | ▇▇▇ |
| | COMPLETED BY  LYNN POLSTEIN | DATE 4/13/84 | SSC NUMBER: 4766716-28 |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE 10/8 |
|---|---|---|---|
| ░░ | 3 | COREY WILL USE TREATMENT TO RESOLVE HIS FEARS THAT HE WILL LOSE HIS MOTHER THROUGH CONTINUED PLACEMENT. | |

| OBJECTIVE/CLIENT TASK | | METHOD/SERVICE TASK | |
|---|---|---|---|
| CCRS CODE | Goal No. | CCRS CODE | |
| CCRS CODE | Goal No. | CCRS CODE | |
| CCRS CODE | Goal No. | CCRS CODE | |

**DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN.**

MEETING HELD 4/12/84.

**BRIEFLY DESCRIBE ANY COURT INVOLVEMENT** in this case and indicate services which are being provided pursuant to a remand or court order.

For Child in Foster Boarding Home or Agency Operated Boarding Home, DESCRIBE THE AGENCY PLAN OF CONTACT BETWEEN THE CASE WORKER AND CHILD IN NEXT PERIOD. INCLUDE FREQUENCY AND LOCATION.

CLIENT CONCURRENCE (Optional)

I understand that all information pertaining to my case, including this Plan for Service developed by my worker and me, is confidential.

I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including the opportunity for an Administrative Review and Fair Hearing.

My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.

| SIGNATURE OF CLIENT, Parent or Guardian | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| X | | X | |
| CASE PLANNER'S SIGNATURE  X *Lynn Polster* | DATE 4/16/84 | SUPERVISOR'S SIGNATURE  X *Bernice Faek* ( by LP) | DATE 4/16/ |

**J.A.325**

| COMPREHENSIVE SERVICE PLAN FAMILY | CASE NAME JOHNSON | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| | COMPLETED BY LYNN POLSTEIN | DATE 4/13/84 | |
| ☐ 90 Days ☐ 6 Months ☐ Change in Program Status | AGENCY/DISTRICT | | |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 1 | MS. JOHNSON WILL REMAIN CONSISTENT IN HER CONTACTS WITH COREY DESPITE THEIR DECISION TO LIVE APART. | 10/ |

| CCRS CODE | Obj. No. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | A | Ms. Johnson will encourage Corey's regular visits. | | Social worker will continue regular meetings with Ms. Johnson around the issue of her continued involvement with Corey and the importance to him of feeling like family member even though he live apart from the family. |
| | B | Ms. Johnson will include Corey in all family celebrations and occasions. | | SAME AS ABOVE |
| | C | Ms. Johnson will not withdraw from Corey in response to her perceived belief that he is withdrawing from her. | | SAME AS ABOVE |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 2 | MS. JOHNSON WILL LEARN TO SUPPORT COREY'S STRENGTHS AND ACCEPT HIS WEAKNESSES. | 10/8 |

| CCRS CODE | Obj. No. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | A | Ms. Johnson will demonstrate approval of Corey's athletic abilities. | | Social worker will work with Ms. Johnson around giving Corey approval for what he does well an making less important those areas in which he has poor success. |
| | B | Ms. Johnson will de-emphasize Corey's academic abilities. | | SAME AS ABOVE |
| | | | | |

J.A.326

DSS-3404-F (3/81) NYC

| | | CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|---|
| **COMPREHENSIVE SERVICE PLAN FAMILY** | | JOHNSON | | |
| | | COMPLETED BY | DATE | |
| | | LYNN POLSTEIN | 4/13/84 | |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 3 | MS. JOHNSON WILL ENCOURAGE COREY'S ATTEMPTS TO LEARN SKILLS SUCH AS COOKING, SHOPPING. | 10, |

| OBJECTIVE/CLIENT TASK | | | METHOD/SERVICE TASK | |
|---|---|---|---|---|
| CCRS CODE | Goal No. | | CCRS CODE | |
| | | | | |
| CCRS CODE | Goal No. | | CCRS CODE | |
| | | | | |
| CCRS CODE | Goal No. | | CCRS CODE | |
| | | | | |

**DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN**

Meeting held 4/12/84 with treatment team. Participants included Unit Administrator, acting as Independent Reviewer, Social Worker, Child Care Worker, Ms. Johnson and Corey.

**AGENCY CONTACT PLAN WITH NATURAL PARENTS. Include frequency and location of planned interviews.**

At least quarterly.

**CLIENT CONCURRENCE (Optional)**

I understand that all information pertaining to my case, including this Plan for Service developed by my worker and is confidential.

I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including th opportunity for an Administrative Review and Fair Hearing.

My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.

| SIGNATURE OF CLIENT, Parent or Guardian | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| X | | X | |
| CASE PLANNER'S SIGNATURE | DATE | SUPERVISOR'S SIGNATURE | DATE |
| X _Lynn Polstein_ | 4/16/84 | X _Bernice Falk_ | |

J.A. 327

USCA4 Appeal: 20-15      Doc: 11-2      Filed: 12/28/2020      Pg: 57 of 258

# EXHIBIT 10

J.A.328

PLEASANTVILLE COTTAGE SCHOOL

### CURRENT ASSESSMENT

Name of Child: Corey Johnson
Date of Birth: ███████

School Grade: BOCES, 10th
Placement: Voluntary

Date of Admission(PCS): 4-26-82
Date of Admission(PDC): 2-1-82
Date of Conference: 2-25-85
Date of Assessment: 3-10-85

CONFERENCE PARTICIPANTS:

Jerry Lefkowitz, Unit Administrator; Christine Aaron, Social Work Intern; Gerard Maier, Social Worker; Dr. Elizabeth Clemmens, Psychiatrist; Dr. Ken Barish, Psychologist; Rich Benedict, Teacher; Leon Robinson, Cottage Parent; Corey Johnson. Mrs. Johnson did not attend the conference.

I.   REASON FOR PLACEMENT:

Corey Johnson was initially placed at Pleasantville Cottage School due to truancy, acting out in school and at home. An emotionally disturbed boy with organic deficits, he was raised in an unstable and chaotic environment. His mother was unavailable to him, unable to provide structure and support. Corey's developmental history included stuttering until age five and encopresis from age eight to twelve. He was left back in school in the 3rd and 4th grade. He was placed in a special class in 1980. He has severe learning disabilities and has only recently progressed beyond the 2nd grade reading level. Upon admission he was seen as a depressed youngster with soft neurological signs, was reacting to the family's chaotic situation and to his mother's unavailability.

II.   CURRENT FUNCTIONING:

1.) Adjustment to Placement:

Corey has been in Cottage #7 since June, 1984. He adjusted well to the cottage. Corey is not a managment problem. He has developed positive and appropriate interpersonal relaionships with both staff and other boys. Corey is a positive group leader in the cottage.

Corey continued to attend the B.O.C.E.S. Program this fall. It was arranged that Corey would receive remedial education. However, due to Corey's reluctance to attend, and staff's miscommunications around the time of the appointment, sessions were infrequent, irregular, and this was not beneficial to Corey. Currently Corey is given the remedial education materials as part of the BOCES program. Corey's motivation towards school work fluctuates. When emotionally upset or frustrated, Corey tends to slack off in school, and refrain from working. Due to his low self-esteem exacerbated by his perception he is "stupid" as a result of his experienced learning disability, Corey requires much support and reassurance to continue to apply self to school work. BOCES reports that he is doing satisfactorily in the carpentry program and that with more training, a future employment position as a carpenter's helper, is not unreasonable. Corey states he enjoys the carpentry work and considers it to be an area he would want to work in in the future.

Corey is a good athlete and enjoys sports. He participates regularly in physical activities and particularly enjoys playing baseball and basketball.

2.) Response to Treatment:

Present worker has been working with Corey since 10/84. Corey has had numerous workers in the last year and initial work focused on development of a relationship with this young man. Corey attends sessions regularly. Corey is a friendly, related, appropriate and engaging young person. He is quite verbal, anxious to make a good impression, and seeks approval. Key issues for Corey continue to be around loss, and an inability to express ambivalence regarding his unavailable, though outwardly conforming mother. In late December and January Corey's half-brother Robert was admitt-

**J.A.329**

to the Pleasantville Diagnostic Center for evaluation. Within the same time span, Ms. Johnson got a job. With Robert temporarily in placement, and a new job, Ms. Johnson withdrew more from Corey. She requested home weekend trips go back to 2x month (Corey had been going home weekly), and refused a visit at the last minute. Corey reacted with anger, and it was seen as a good sign that for the first time he was able to verball state his anger at her. Corey regressed somewhat during this time period. He refused to attend school on several days, was despondent, depressed, acting inappropriately in cottage (i.e. making animal noises) and avoided sessions with worker. It is felt this was due to the mother's withdrawal, Robert's presence on campus (resulting in Corey feeling responsible for this boy) and his growing recognition he will be leaving PCS this summer. With structure, reassurance, and support, Corey was able to mobilize self and pull out of the depression before acting out in any serious manner. This is seen as a positive progression for Corey.

Recent sessions have dealt with age-appropriate issues including separation/ individuation and problem-solving. Corey is quite concerned, anxious and ambivalent abc his upcoming discharge from PCS. He is able to talk about his fears and hopes, and is interested in living in a group residence and attending an ed/voc. program. This is a realistic plan for Corey. Future work will focus on helping Corey to deal with the many changes with which he is faced, while continuing to enable him to grow and develop.

3.) Family Response to Treatment:

Mrs. Johnson continues to be surfacely involved with Corey and PCS. Though available to attend some meetings with the agency, she has frequently concelled appointments - for apparently valid reasons. She does not visit Corey on campus.

Mrs. Johnson is a self-focused woman concerned primarily with her own needs. Though verbally expressing her concern for Corey, her actions continue to speak to her emotional unavailability to him. Current plans are for Corey to go to a group residence upon discharge from PCS. Mrs. Johnson has agreed to this. Her primary interest re Corey concerns his academic future. Despite attempts to sensitize her to Corey's severe learning disability, and its impact on his self esteem - she continues to place emphasis on academics.

Work with Mrs. Johnson will continue to focus on the importance of her maintaining contact with Corey, and helping her to accept an appropriate ed/voc. and group residence referral for Corey.

III.    PSYCHIATRIC EVALUATION AND PSYCHOLOGICAL EVALUATION: (see current evaluations in clinical portion of this record.)

IV.    PSYCHODYNAMIC EVALUATION:

Corey is a 16 year old, tall, good-looking black youth of average weight. He is an organically impaired boy, whose learning disabilities strongly and negatively impact his self-esteem. Corey is placed voluntarily at PCS. Mrs. Johnson is a self-focused woman who has been unable to meet Corey's dependency and other emotional needs.

Corey is well oriented, and his sense of reality is good. He generally uses good judgement-but is environment-sensitive and can become withdrawn, depressed, disorg: ized and impulsive when his environment is chaotic or emotionally stressful. Corey is a likeable, engaging youth who relates appropriately to both staff and peers. He respo: well to structure, is a positive group leader, and has a strong sense of responsibility Corey is concerned about his future plans and is engaged actively in sessions with worker. His problem-solving skills have improved. His ability to voice his thoughts and feelings is a considerable strength. This strength has enabled him to maintain better self-control, and is a mobilizing force helping him to pull himself out of depression with outside support.

J.A.330

V.    DISCHARGE PLANNING:

The present goal for Corey is discharge to self.  It is felt that referral to a Group Residence will provide the structure that will enable Corey to grow and develop.  At this point, a vocational program referral seems in Corey's best interests due to his severe learning disabilities.  It is hoped that discharge will be effective by July, 1985.  Corey had been working with school worker in finding an appropriate part-time job for Corey, as a way in which to gradually expose Corey to the community. School worker is presently on sick leave, and therefore caseworker will attempt to continue this process with Corey.

CONFERENCE RECOMMENDATION:

1) Caseworker will continue to focus on providing Corey with support and encouragement to individuate.
2) Caseworker will investigate possibility of a part-time job for Corey in the community.
3) Referral will be made for appropriate vocational programs.  If appropriate one not available, will consider referral to special education setting.
4) Referrals will be made to Group Residence.
5) Caseworker will work with Mrs. Johnson to help her accept appropriate plan for this boy.  Work must be done to help Mrs. Johnson realistically appreciate Corey's academic limitations, and be able to provide support for him when referred to a vocatio training program.

Christine Aaron, MSW Intern

J.A.331

USCA4 Appeal: 20-15      Doc: 11-2         Filed: 12/28/2020      Pg: 61 of 258

# EXHIBIT 11

## UCR REASSESSMENT AND SERVICE PLAN REVIEW
### 6 Month

| CASE NAME | CASE NUMBER | COMPLETED BY | UNIT/WORKER NUMBER |
|---|---|---|---|
| Johnson | S4766716 | Odette Noble | 908-5 |

| AGENCY/DISTRICT | PLAN DATE |
|---|---|
| JCCA-NYC | 6/28/86 |

**GENERAL INSTRUCTIONS:**

This form is to be completed 6 months from Day 1 (CID) and every 6 months thereafter (refer to Section VII of the UCR Desk Aid)

**Bold type following questions indicate Utilization Review Regulatory Reminders.**

1. REASSESSMENT

Write a narrative reassessment which describes changes in family situation and summarizes family's current functioning. *If a Foster Care Placement* describe adjustment to foster care of any child in placement. *For Protective Services Cases* reassess the family's ability to protect and potential to harm the child. Conclude with a statement which provides the most significant service priorities and (re)evaluate the family's ability to benefit from these services. **Continuing Necessity for Placement or Mandated Preventive Services; Risk of Foster Care; Ability to Benefit from Services.**

Mrs. Johnson continues to be elusive and impossible to engage. On 12/16/85 she kept an appointment, and I spoke with her about the importance of keeping regular appointments and letting us know who she is, and what her concerns for Corey are. She didn't understand why we needed to know anything about her, but she did agree to keep appointments. I have not seen her since or had any contact with her; although, she did sign and return a consent for Corey to have oral surgery.

At the beginning of March '86 Corey learned that she was arrested and was in jail in New Jersey. He told his houseparent who informed me, and then Corey and I discussed it. I haven't heard from her or any other family member. Corey states he doesn't believe his mother is guilty, and that she was framed. He acknowledged it had something to do with the use of Credit Cards. I suspect Corey knows the truth, but is keeping it from us. He visited family in the home at xmas, and returned with extremely expensive leather goods. He was defensive when we discussed this with him, and said he got them from his relatives. Corey has talked with his mom in jail, but he states he doesn't want to visit her.

Corey's brother has returned from the South. I don't think he is attending school. Corey doesn't like to discuss his brother. When I've encouraged him to have the brother visit the residence he has shrugged it off.

Corey continues to use our services well, and expresses satisfaction about being in placement. It wouldn't seem that there is another constructive place for him to live.

(Reassessment)

J.A.333

DSS-3627 (12/84)

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S 4766716 |

## 2. CASEWORK CONTACTS

Summarize the nature of the interaction between the participants during the casework contacts. Indicate any barriers to such contacts and steps planned or taken to overcome those barriers. Include in the summary the frequency and location of the contacts. (If the Casework Contact Grid is completed, it is not necessary to include the frequency and location of contacts in the summary.) **Required Casework Contacts with Child, Child's Caretaker, Parents and In-Home Contacts.**

Corey is seen for weekly casework sessions. He has put up some resistence to appointments both verbally and by not keeping appointments. He also attends biweekly group meetings with caseworker houseparents and other boys. His attitude towards group is often negative, but he never misses.

Treatment Team Staff including GHD Director, Psychiatrist, Child Care Coordinator, Nurse, Houseparents and Caseworker meet on a biweekly basis.

Mother has resisted involvement (See Section 1).

## 3. COURT INVOLVEMENT

a) Has there been any court related or legal activity since the last Plan?

☐ Yes   ☒ No

If Yes, complete the following:*

| Date Of Event | Court | Event (Petition filed, hearing held, referral) | Type (ex. Neglect, Abuse JD, PINS, criminal court, etc.) | Child(ren) Involved | Outcome (Adjudication, Disposition, Court Orders, other) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

*For cases tracked in CCRS encode appropriate legal activities on Services Activity Log.

(Reassessment)

J.A.334

USCA4 Appeal: 20-15 Doc: 11-2 Filed: 12/28/2020 Pg: 64 of 258

DSS-3627-3(12/84)

| CASE NAME | | CASE NUMBER |
|---|---|---|
| Johnson | | S 4766716 |

3. b) What effect did the legal activity have on the plan and the child's Permanency Planning Goal?

## 4. PROGRAM CHOICE AND PERMANENCY PLANNING GOAL

a) List the names of each child for whom services are authorized and identify the program choice(s), permanency planning goal (PPG) an the anticipated completion date(ACD) for the PPG.

| CHILD'S NAME | PROGRAM CHOICE* (Choose all that apply) | PPG*ACD* | | CHILD'S NAME | PROGRAM CHOICE* (Choose all that apply) | PPG*ACD* | |
|---|---|---|---|---|---|---|---|
| | | Goal | Mo. Yr. | | | Goal | Mo. Yr. |
| Corey | C | 03 | 11 89 | | | | |
| | | | | | | | |
| | | | | | | | |

### PROGRAM CHOICE CODES

**A** Preventive Non-Mandated
**B** Preventive Mandated
**C** Placement
**D** Protective

### PERMANENCY PLANNING GOALS

**01** Discharge to Parents
**02** Discharge to Primary Resource Person(s)/Relative(s)
**03** Discharge to Independent Living
**04** Discharge to Adoption
**05** Discharge to Adult Residential Care
**06** Prevent Placement
**07** Prevent Return to Placement
**10** Independent Living -Unaccompanied Refugee Only
**11** Protect Child (No PPG for CCRS)

b) If there has been a change in PPG since the previous plan, explain the reason.

*For cases tracked in CCRS encode the Program Choice, Reasons, PPG and Anticipated Completion Date on Assessment Plan Grid (turnaround).

(Reassessment)

J.A.335

DSS-3627-4(3/83)

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S 4766716 |

**5. PERMANENCY PROGRESS (for Placement Cases only)**

Check (✔) each question "YES" or "NO." If "YES" is checked then give the requested information in the space provided. List the children involved in the righthand column.

| YES | NO | | WHICH CHILD |
|---|---|---|---|
| | X | A. Is any child with a permanency goal of return to parents or relatives expected to remain in placement another 6 months or more? If so, specify barriers preventing discharge, and what alternatives are being considered or have been tried.* | |
| | X | B. Has any child who is not legally free had a permanency goal of adoption 6 months or more? If so, specify the actions taken to free the child and any barriers to freeing. | |
| | X | C. Is any legally free child with a permanency goal of adoption not in adoptive placement? If so, specify the actions taken to place the child into an adoptive home and barriers to placement.** | |
| | X | D. Has any child been in an adoptive placement 6 months or more? If so, specify the barriers preventing legal adoption in this home and actions taken to overcome these. | |
| | X | E. Is any child expected to be discharged to Independent Living or Adult Residential Care within 24 months? If so, describe the services needed to permit discharge, and to support the child after discharge. Specify barriers to their provision. | |

**USE SPACE BELOW** to provide information requested for any "YES" answer given in Question 5. Be sure to indicate child(ren) involved.

*If such a child will be in care with a permanency goal of return home for 24 months, a UR exception is required.
*If a legally free child with a PPG of adoption will be free 12 months and not in adoptive placement, a UR exception is required.

**FOLLOW LOCAL PROCEDURES FOR UR EXCEPTION CASES.**

(Reassessment)

J.A.336

DSS-3627-5(12/84)

| CASE NAME | CASE NUMBER | SCR NUMBER |
|---|---|---|
| Johnson | S 4766716 | |

**8. PLAN REVIEW: GOAL REVIEW AND SETTING**

Review all goals from previous plan (including any Plan Amendment). Restate each goal and explain the extent of goal achievement. If a previous goal is to be retained, complete the block by entering the date the goal is expected to be achieved, the tasks and the family member(s) and/or service providers(s) expected to carry out the tasks. If a goal is to be discontinued, complete all parts except target date and tasks. After reviewing previous goals, list any new goals set, omitting the question about goal achievement. **Services Consistent with Needs***

The Goal below is: New _____    Retained __X__    Target Date __11/87__      Discontinued _____

(Re)State Goal: __Mrs. Johnson will remain consistent in her contacts with Corey despite their decision to live apart.__

Explain level of goal achievement: __Mrs. Johnson remains inconsistent and hard to engage.__
__(See Section 1)__

**TASKS**

| CHILD/FAMILY (list names) | SERVICE PROVIDERS (list names) |
|---|---|
| Mrs. Johnson will encourage Corey's regular visits. | Social worker will continue regular meetings with Mrs. Johnson around the issue of her continued involvement with Corey and the importance to him of feeling included as a family. |
| Mrs. Johnson will include Corey in all family celebrations and occasions. | Same as above. |
| Mrs. Johnson will not withdraw from Corey in response to her perceived belief that he is withdrawing. | Same as above. |

The Goal below is: New _____    Retained __X__    Target Date __11/89__      Discontinued _____

(Re)State Goal: __Mrs. Johnson will learn to support Corey's strengths and accept his weaknesses.__

Explain level of goal achievement: __As long as others are raising Corey, Mrs. Johnson appears to be more accepting of Corey. However, this remains an area of concern.__

**TASKS**

| CHILD/FAMILY (list names) | SERVICE PROVIDERS (list names) |
|---|---|
| Mrs. Johnson will demonstrate approval of Corey's athletic abilities. | Social worker will work with Mrs. Johnson around giving Corey approval for what he does well and making less important the areas in which he has poor success. |
| Mrs. Johnson will de-emphasize Corey's academic ability. | Same as above. |
| Mrs. Johnson will support the plan of vocational training for Corey. | Same as above. |

*For cases tracked in CCRS encode Child and Family Service Needs and Service Status on Assessment Plan Grid (turnaround).

(Reassessment)

J.A.337

| CASE NAME | | CASE NUMBER | SCR NUMBER |
|---|---|---|---|
| Johnson | | S  4766716 | |

The Goal below is: New __X__    Retained _____    Target Date __11/86__    Discontinued _____

(Re)State Goal: __Corey will find a place for himself in the residence, make positive__ __attachment to boys, houseparents and caseworker and learn to trust staff.__

Explain level of goal achievement: __Corey has established quite a positive leadership place for__ __himself.__

## TASKS

**CHILD/FAMILY (list names)**

Corey will participate constructively in biweekly group meetings.

**SERVICE PROVIDERS (list names)**

Caseworker will help Corey see the purpose of biweekly group meetings.

---

The Goal below is: New __X__    Retained _____    Target Date __11/89__    Discontinued _____

(Re)State Goal: __Corey will learn to face up to his mother's limitations and establish a__ __separate identity.__

Explain level of goal achievement: __Corey remains quite identified with his mother and her life__ __style; even though, he would seem to have some awareness of its destructiveness.__

## TASKS

**CHILD/FAMILY (list names)**

Corey will learn to trust the JCCA staff, and share some of his conflicts about his mother's life style with them.

Corey will identify with a more constructive life style.

**SERVICE PROVIDERS (list names)**

Caseworker and houseparents will establish a trusting nurturing relationship with Corey.

Caseworker and houseparents will be constructive role models.

(Reassessment)

J.A.338

| CASE NAME | CASE NUMBER | SCR NUMBER |
|---|---|---|
| Johnson | S 4766716 | |

The Goal below is: New __X__ Retained _____ Target Date __6/88__ Discontinued _____

(Re)State Goal: Corey will attend Newtown High School Special Education program daily and on time.

Explain level of goal achievement: Corey continues to be pleased with his report cards and ........ is quite committed to school.

### TASKS

| CHILD/FAMILY (list names) | SERVICE PROVIDERS (list names) |
|---|---|
| Corey will continue to attend specialized classes. | Teacher will encourage Corey to keep working and help him to understand that his difficulties do not reflect upon his intelligence. |
| Corey will discuss his learning disability in treatment. | Social worker will work with Corey towards understanding the implication of his learning disability. |
| Corey will use nightly study hour constructively. | Houseparents will organize a nightly study hour. |

The Goal below is: New _____ Retained __X__ Target Date __11/87__ Discontinued _____

(Re)State Goal: Corey will use opportunities offered him to learn independent living skills.

Explain level of goal achievement: Corey wants very much to be able to care for himself in the community. The biggest obstacle will be for him to find a way to support himself. We will continue to work with him toward this end. He will again work for Neighborhood Youth Corp this summer.

### TASKS

| CHILD/FAMILY (list names) | SERVICE PROVIDERS (list names) |
|---|---|
| Corey will explore the possibilities of a part time job. | Houseparents will help Corey read ads and apply for a job. |
| Corey will learn how to handle money so that he can shop for himself. | Caseworker, houseparents and teachers will help Corey learn enough simple arithmetic that he will be able to figure out correct change. |

(Reassessment)

J.A.339

DSS-3521 (26/12/84)

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S 4766716 |

7. FAMILY/CHILD VISITING PLAN (for Placement Cases only)

a) For each child in foster care, summarize the nature of the interaction between the child and parent(s) and/or relative(s) during the visits, highlighting positive and negative factors. Include in this summary the frequency and location of the visits. (If the Family/Child Visiting Grid is completed, it is not necessary to include the frequency and location of visits in the summary.)

Corey went home with his grandfather at xmas.  However, he returned late missing two days of school.  He was not very communicative re. visit.  Corey is allowed to visit his mother when she calls to arrange it, but she doesn't do so very often. While he states these visits go well, one wonders what really happens.

b) For each child in foster care, describe the visiting plan for the next period. Include who will visit, how often, and where. Indicate any changes from the previous visiting plan and the reason for the changes. Facilitate Bi-Weekly Visiting.

Corey is allowed a weekend visit a month and a day visit a month.

| | CASE NUMBER |
|---|---|
| | S 4766716   (Reassessment) |

J.A.340

| CASE NAME | CASE NUMBER | SCR NUMBER |
|---|---|---|
| Johnson | **S** 4766716 | |

**8. PLAN DEVELOPMENT**

a) Discuss the level of involvement of parent(s) and children in the development of the service plan. **Parent/Child Participation.**

Corey was involved in developing service plan in regular discussions with houseparents and weekly caseworker meetings.

b) List all participants in the planning conference with their title or role and state date of conference. **Service Plan Review. Third Party Reviewer/Foster Care.**

Gilbert Gordon - Director GHD
Murray Gordon - Clinical Director - Third Party Reviewer
Diane Yarborough - Child Care Coordinator
Shari Siegel - Nurse
Odette Noble - Caseworker
John Rios - Residence Supervisor
Marvin Hunt - Houseparent
Carmen Carrasquillo - Houseparent
Joe Rivera - Houseparent

| | SIGNATURES | DATE SIGNED |
|---|---|---|
| Case Planner | Odette Noble | 5/8/86 |
| Case Planner's Supervisor | Gilbert Gordon | 5/1/86 |
| Case Manager | | |
| CPS Monitor | | |
| | | |

I have read and I understand the Service Plan.

| | | |
|---|---|---|
| Parent | | |
| Parent | | |
| Child | | |
| Child | | |

(Parent/Child signatures are optional)

(Reassessment)

J.A.341

# EXHIBIT 12

Case 3:92-cr-00068-DJN   Document 39-13   Filed 08/19/20   Page 2 of 4 PageID# 1701

FORM DSS-3528-NYC-E
4/85

HUMAN RESOURCES ADMINISTRATION
SPECIAL SERVICES FOR CHILDREN

# UCR PLAN AMENDMENT: FORM E
## FINAL DISCHARGE

| | | | SCR # |
|---|---|---|---|
| CASE NAME<br>Johnson | CASE NUMBER<br>S 4766716 | COMPLETED BY<br>Odette Noble | UNIT/WORKER NUMBER<br>OPA/908-5 |

| AGENCY/DISTRICT | |
|---|---|
| | JCCA - NYC |

**GENERAL INSTRUCTIONS:**

Complete Section I for all children being final discharged from foster care. If a Voluntary Agency did not receive written approval for trial discharge of a child or there was no trial discharge period, also complete Section II and obtain SSC approval.

**Bold type following questions indicate Utilization Review Regulatory Reminders**

## SECTION I: CASE REVIEW

| CHILD'S NAME | DATE OF TRIAL DISCHARGE | DATE OF FINAL DISCHARGE |
|---|---|---|
| Corey Johnson | 2/13/87 | 5/13/87 |
| | | |
| | | |

*If additional space is required, please attach another sheet.*

1. If a child has been on trial discharge, assess this period in terms of family and child adjustment, risk to child, and need for further services.*

    Caseworker wrote to both Mrs. Johnson and Corey on 2/18/87 (See Copies). They did not respond. On 3/9/87 Mrs. Chang, telephone #266-2500 from Parents and Children's Rights called saying that Mrs. Johnson had complained to them regarding our treatment of Corey. What happened was explained to her and caseworker said she would be willing to meet with Mrs. Johnson and Corey if Mrs. Chang felt it would be helpful. Mrs. Chang said she would get back to me if she had any difficulties. So far caseworker has not heard from her.

2. If a preventive agency is involved in the case, briefly describe services planned for the post-discharge period.

*For cases tracked in CCRS encode appropriate movement activities on Services Activity Log.

(Amendment E)

J.A.343

FORM DSS-3628-NYC E2
4/85

| | SCR # |
|---|---|
| CASE NAME  Corey Johnson | CASE NUMBER  s    4766716 |

TO BE COMPLETED BY A VOLUNTARY FOSTER CARE AGENCY ONLY IF THERE WAS NO WRITTEN APPROVAL FOR TRIAL DISCHARGE OR THERE WAS NO TRIAL DISCHARGE PERIOD.

### SECTION II: TRIAL DISCHARGE INFORMATION

1. Discuss the circumstances surrounding the unplanned trial discharge or reason(s) there was no trial discharge period.

In retrospect it would seem that Corey's behavior and attitude was deliberate on his part, so there would have to be some kind of resolution. However, Corey couldn't ask his mother directly if he could return home for fear of her answer and for fear he would have to take responsibility for what he wanted.

By provoking an incident he was able to test out living at home.

2. Are you requesting a discharge grant?

[X] Yes   Since Caseworker hasn't heard from either Corey   CHILD
or Mrs. Johnson discharge grant cannot be re-       COREY
quested at this time, but would like to _____
keep the option open.  Effort will be
made for case aide to make a home       _____
visit.

[ ] No

IF YES, PLEASE INCLUDE A JUSTIFICATION.

(See form D 2/23/87).

(Amendment E2)

J.A.344

| | SCR # |
|---|---|
| CASE NAME Corey Johnson | CASE NUMBER S 4766716 |

TO BE COMPLETED BY A VOLUNTARY FOSTER CARE AGENCY ONLY IF THERE WAS NO WRITTEN AP-PROVAL FOR TRIAL DISCHARGE OR THERE WAS NO TRIAL DISCHARGE PERIOD.

### SECTION III: PLAN AMENDMENT PARTICIPATION

Discuss the level of involvement of parent(s) and children in the development of the service plan amendment. Specify how and when the discharge plan was conveyed to the parent(s) and/or child(ren), if applicable. **PARENT/CHILD PARTICIPATION.**

Mrs. Johnson was impossible to engage during the time Corey lived with us. Corey was seen for weekly casework sessions; he participated in bi-weekly groups and participated in a treatment team meeting on 1/9/87.

ON/mo

| SIGNATURES | DATE SIGNED |
|---|---|
| Case Planner _Odette Noble_ | 3/26/87 |
| Case Planner's Supervisor | |
| Case Manager | |
| Case Manager's Supervisor | |
| CPS Monitor | |
| | |
| | |
| | |
| I have read and I understand the Service Plan. | |
| Parent | |
| Parent | |
| Child | |
| Child | |
| (Parent/Child signatures are optional) | |

(Amendment E3)

J.A.345

USCA4 Appeal: 20-15   Doc: 11-2   Filed: 12/28/2020   Pg: 75 of 258

J.A.346

# EXHIBIT 13

## AFFIDAVIT

State of New York            )
                             ) ss:
County of Bronx              )

DAVID WASHINGTON, being duly sworn, deposes and says:

1.    I am currently 61 years old and reside at 4347 Furman Avenue, Bronx, New York.

2.    I worked for Jewish Child Care Association (the "JCCA") for 23 years. While working for the JCCA, I worked in various capacities, including about half this period at various group homes in New York City that were a part of the JCCA network.

3.    From about 1987 through 1989, I was a child care worker at Elmhurst Boys Residence in Elmhurst, New York, a foster care residence for youth operated by the JCCA.

4.    The residence consisted of two apartments, and housed up to eight boys at a time. I and other staff members alternated living in the apartment in three to four day shifts. In addition, a social worker who worked offsite would pay periodic visits to the apartment.

5.    I met and interacted with Corey Johnson during the approximately year-and-a-half period that I worked at the Elmhurst Boys Residence. As far as I remember, Corey was between 16 and 18 years old at the time.

6.    At the time that Corey was at Elmhurst Boys Residence, most of the other boys were black males of about the same age.

7. My impression was that while there were many boys with below normal intellectual ability and various levels of functioning, almost all of the other boys there were more intelligent than Corey.

8. My impression was that Corey sensed he was not as bright as the other residents. As a consequence, Corey would often not express his opinion and chose to remain quiet. For example, Corey would not join staff and residents during group conversations at meal time, and also did not join other residents to play games or for other recreational activities.

9. While I do not know whether Corey understood all the rules that he was expected to follow at the Elmhurst Boys Residence, I do recall one instance in which Corey repeatedly turned on the television when he was not supposed to do so. This prompted me to unplug the television. I asked him to try to explain why he was disobeying rules, but he did not or could not articulate his reason for keeping the television on.

10. Corey was very quiet, kept to himself and (although he was athletically built) never picked on anyone. During the year and a half that I knew Corey, he did not confide in me.

11. Corey seemed outwardly sad much of the time I observed him. I very rarely saw him laugh or express happiness.

12. Corey was a follower in that he would generally go along with what others wanted to do.

13. In fact, Corey was known at the Elmhurst Boys Residence as someone who could be convinced to do what you asked him to do.

2

J.A.348

14.   I recall an occasion when Odette Noble, a social worker at Elmhurst Boys Residence, asked Corey to speak in a group session and Corey refused.

15.   As I recall, subsequently Corey was told to "leave." As I recall, this incident led to Corey's leaving Elmhurst Boys Residence, and I do not remember Corey returning to Elmhurst Boys Residence again.

16.   This incident sticks out in my mind because I remember questioning whether Odette's reaction to Corey's refusal to speak was excessive, and also whether Corey understood what Odette intended when she told Corey to "leave."

DAVID WASHINGTON

Sworn before me on this
1st day of March, 2012

NOTARY PUBLIC

CLARENCE PYNE
Notary Public, State of New York
No. 5026495
Qualified in Bronx & Westchester County
Commission Expires 7   1   14

3

J.A.349

USCA4 Appeal: 20-15 Doc: 11-2 Filed: 12/28/2020 Pg: 79 of 258

# EXHIBIT 14

J.A.350

**FORM DSS-3628-NYC-D1**
**4/85**

HUMAN RESOURCES ADMINISTRATION
SPECIAL SERVICES FOR CHILDREN

## UCR PLAN AMENDMENT: FORM D
## TRIAL DISCHARGE

| CASE NAME Johnson | CASE NUMBER S 4766716 | COMPLETED BY Odette Noble | UNIT/WORKER NUMBER 908-5 |
|---|---|---|---|
| AGENCY/DISTRICT JCCA-NYC | | | |

GENERAL INSTRUCTIONS:

Complete this form at least 30 days prior to the child's planned trial discharge or immediately after an unplanned trial discharge date has been established

**Bold type following questions indicate Utilization Review Regulatory Reminders**

### SECTION I: CASE REVIEW

| CHILD'S NAME | ANTICIPATED DATE OF TRIAL DISCHARGE |
|---|---|
| Corey Johnson | 2/13/87 |
| | |
| | |

*If additional space is required, please attach another sheet.*

1. Discuss why trial discharge is now appropriate. What services or supervision will be provided to the family including the child, during the trial discharge period and by whom? Evaluate the risk of harm if the child returns home.* (If preventive services are being requested at this time, complete Form G, in addition to this Plan Amendment Form.)

As per 853C 2/6/87 Corey returned to his mother's home on 2/3/87 to give him an opportunity to consider his behavior and attitude in our residence. If he was willing to change it, we would be most willing to consider his returning to the residence. As you know Corey was offered a follow up appointment which he refused, and we have not heard from him or his mother. Newtown High School has been informed that he is now living with his mother. He is continuing to attend school. We have written to Corey and his mother offering further servcies. If we hear from them, we will make every effort to try to help.

For cases tracked in CCRS encode appropriate movement activities on Services Activity Log.

(Amendment D)

**FORM DSS-3628-NYC-D2**
**4/85**

| CASE NAME | CASE NUMBER |
|-----------|-------------|
| Johnson | S  4766716 |

2. Are you requesting a discharge grant?

☒ Yes                                                          CHIILD

_____

_____

☐ No

IF YES, PLEASE INCLUDE A JUSTIFICATION BELOW.

Mrs. Johnson lives in a run  down building and would seem to have chronic financial
difficulty, although, she would seem to have money from questionable sources at times
and spends extravagantly.  As you know she spent 4 months in jail for credit card
fraud.  From our point of view Corey could use the help and if he asks for it even
though he left on a bad note,we would give him every consideration.  If we don't
hear from him in the next few weeks in response to my letters, we will not make
the request, however, I will make the request if I hear from him.

(Amendment D2)

J.A.352

**FORM DSS-3628-NYC D3**
**4/85**

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S   4766716 |

## SECTION II: NEW GOALS

Review the plan for the child and family. Indicate any goals, target dates, tasks or activities which will be altered in light of the status change. Use additional sheets as necessary. **SERVICES CONSISTENT WITH NEEDS.**

The Goal below is: New _____ Retained __X__ Target Date 6/88 Discontinued _____

(Re) State Goal: Corey will attend Newtown High School Special Education program

daily and on time.

Explain level of goal achievement: On 1/31/87 I met with Corey and Newtown teacher Mrs. Rosen,

re: Corey's progress. It was pointed out that it is unlikely that he will be able to pass competency tests, but if he completes all his classes, he should be able to receive a certificate of completion in 6/87. It is painful of Corey to face his dyslexia but at the same time there are other opportunities available to him. He is involved with an OVR counselor, Mr. Gloekner, who is willing to help Corey explore programs in carpentry etc.

**TASKS**

| CHILD/FAMILY (LIST NAMES) | SERVICE PROVIDERS (LIST NAMES) |
|---|---|
| Corey will attend Newtown and on time. | Caseworker will continue to be available to Newtown and Corey if they should ask. |

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

The Goal below is: New _____ Retained __X__ Target Date 11/89 Discontinued _____

(Re) State Goal: Corey will learn to face up to his mother's limitations and extablish

a separate identity.

Explain level of goal achievement: It would seem that Corey wanted this opportunity to live with his mother, but he just didn't know how to do it constructively. Hopefully he will get a better sense of his mother and begin to see her more realistically. If that happens at another point, he might be more willing to accept appropriate help from either JCCA or other agencies in the community.

**TASKS**

| CHILD/FAMILY(LIST NAMES) | SERVICE PROVIDERS (LIST NAMES) |
|---|---|
| Corey will hopefully remember that JCCA staff is available. | Caseworker and houseparents will remain available to Corey if he should ask. |

(Amendment D3) **J.A.353**

FORM DSS-3628-NYC D4
4/85

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S 4766716 |

## SECTION III: PLAN AMENDMENT PARTICIPATION

Discuss the level of involvement of parent(s) and children in the development of the service plan amendment. Specify how and when the the trial discharge plan was conveyed to the parent(s) and/or child(ren), if applicable. **PARENT/CHILD PARTICIPATION.**

Mrs. Johnson has not responded to our hand delivery letter. Corey met with Director, Mr. Gordon, Child Care Coordinator, Miss Yarborough and Senior Caseworker, Miss Noble on 2/3/87. He refused a follow up appointment and we have not heard from him since, although, he does telephone the other boys.

| SIGNATURES | DATE SIGNED |
|---|---|
| Case Planner _Odette Noble_ | 2/20/87 |
| Case Planner's Supervisor _Gilbert Gordon_ | 2/23/87 |
| Case Manager | |
| Case Manager's Supervisor | |
| CPS Monitor | |
| | |
| | |
| | |
| I have read and I understand the Service Plan. | |
| Parent | |
| Parent | |
| Child | |
| Child | |
| (Parent/Child signatures are optional) | |

(Amendment D4)

**J.A.354**

USCA4 Appeal: 20-15      Doc: 11-2        Filed: 12/28/2020      Pg: 84 of 258

# EXHIBIT 15

JEWISH CHILD CARE ASSOCIATION OF NEW YORK

GROUP HOME DIVISION

Three Month Conference Note

**Due Date:** 12/28/85

**Dictation Date:** 2/19/86

**Resident:** Corey Johnson

**Group Home:** Elmhurst Boys Residence

(Even though this is overdue, I will include information up until 2/19/86.)

**Birthdate:** ███████████

**Treatment Team Participants & Titles:**

**Admission to Group Home:** 6/28/85

Murray Gordon, Consulting Psychiatrist; Diane Yarborough, Child Care Coordinator; Shari Segal, Nurse; John Rios, House Supervisor; Marvin Hunt, Joe Rivera and Connie Carrasquella, House Parents.

**From:** Pleasantville Cottage School

**Team Chairperson:** Odette Noble

I.   GROUP HOME PLACEMENT/SOCIALIZATION:

On the whole Corey continues to be using the residence well and would seem to want to remain living there. He has made relationships with both the house parents and the boys, and is liked by both. Corey continues to be quite active and assertive in how he handles himself, and can be a bit of a monopolizer, but the boys continue to take this in their stride and not seem to mind it. Part of the boys' acceptance would seem to be related to Corey's ingenuousness and decency. Corey is very in earnest about succeeding and articulates that point of view to the other boys.

One senses that periodically Corey might feel the wish to live with his mother but he doesn't discuss it openly and, I think, deep down he knows that his mother is just not able to provide a stable, secure home for him. Corey is quite secretive about his mother's life style and doesn't share with me and, I don't believe, with the house parents, some of his chagrin at what his mother does. We only pick it up by his behavior and what he does not say.

Over Christmas, we did have a bit of a difficulty with Corey because he was given permission to go South with his grandfather and returned four days late. Obviously, this is a serious concern and we spoke to Corey about it. Corey got quite distressed but we told him that it would call into question his ability to stay with us if this kind of behavior persisted. We told Corey that we expected him to return when he said he was going to return and we could not have him returning when he chose to. In fact, when we were making arrangements for Corey to go to Florida to visit his grandfather, in the session with his mother, Corey got very distressed when I questioned the time frame and questioned his going. His verbalization was that it was his family and that we had no right to question what he did with his family. Corey and I had a number of discussions around this and it was pointed out to him that he lives with us and that we take the daily responsibility of raising him and as a minimum, we expect him to abide by what we say.

**J.A.356**

-2-

Ultimately, we were able to help Corey work this through and he seems to have a bit better understanding of our role in relation to him. Nevertheless, his mom's secretiveness and tendency to want Corey to keep her secrets does make our role very difficult. I sometimes wonder if we will ever break through what I perceive as Corey's false loyalty to his mother.

Along with what Corey was saying about his relationship with us by returning to the residence late, it was also distressing because he missed two days of school. This seems to be partly what his family does to him. They don't seem to have any real appreciation of what it takes to be able to succeed in a mainstream world. Corey, on the whole, is doing well in school and it's just not helpful for him to miss two whole days of school for no apparent reason.

Mrs. Johnson did not call and talk with us about his late return at all. This is characteristic of her style in relating to us. She seems to feel that we should take care of her son and that we have no right to ask her any questions or expect any information about her life style and what goes on. I have challenged this point of view in a session with Corey and Mrs. Johnson, but Corey does seem to be in collusion with his mother's point of view. It is difficult to know how we will handle this in the next period of time. What does seem to be important is that Corey is growing and developing and using our program, so it is questionable how much we challenge the mother's modus of operating. I suspect that Corey will be at risk when it comes time to leave us and the security that we have provided him all this time. I am not sure how much he has internalized our value system and can take a critical stand in relation to his mother's value system. It seems to me that this is necessary if he is going to be able to survive in the community and make constructive choices and not perpetuate the same patterns that he learned from his mother. However, we will try to work on this in the next period of time.

II. | EDUCATIONAL/VOCATIONAL/WORK EXPERIENCE;

Corey continues to attend the Special Ed Program at Newtown High School. He is doing very well. As indicated in the past dictation, this is a very restitutive experience for Corey and he takes school very seriously. He gets up in the morning, gets to school, and his report card was quite good, considering his learning deficits. His final report card on 1/31 indicated that he received 3 - 80's, 2 - 70's, a 75 and a 70. He was rated S (satisfactory) on all his behavior; was absent for a total of 5 times. I suspect there were a couple days of cutting but we did not find out about it prior to receiving the report card.

While theoretically we would expect Corey to work part-time but, at this point, we haven't insisted that he do so. He is on the wrestling team and this does consume a good deal of his time after school.

As indicated in the past dictation, Corey did have an appointment with OVR in September which I attended with him. At this point, he asked to put off getting OVR training until he completed high school. Since the high school experience is so constructive for him, we are supporting his attendance at high school.

J.A.357

-3-

Corey Johnson
Due Date: 12/28/85
Cont'd.

III.    RECREATION:

Corey continues to be quite active in the community and does a number of
things with the other boys in the residence.  He plays football and basket-
ball with them regularly.  He also has gone to play pool with a house
parent and the boys and will go to films with them.  Corey tends to be a
bit girl crazy and has a way of flirting with girls and including them in
not only his life, but the other boys' lives.  He is very invested in his
participation in the wrestling team and appears to be doing well.

The recreational goals in the next period of time are as follows:

1.   Corey will learn to be more autonomous in his relationship
     with girls and find ways to establish meaningful connections
     with them, without getting involved with a number of them at
     the same time.

2.   Corey will learn to seek out leisure activities on his own
     and take  initiative to participate.

3.   Corey will appropriately and include other fellows in the
     residence in recreational activities and learn to engage
     in healthy competition with them.

4.   Corey will pursue his wrestling activity which will help
     build his self-esteem and gain confidence.

IV.     ETHNIC and CULTURAL IDENTITY:

As indicated, the mother's life style is so mysterious and in some ways
amorphous, tht it is difficult to know just what Corey thinks and feels.
The mother would seem to be somewhat identified with Black street culture,
but it is difficult to know.  The few times that I have seen her in my
office, she has been expensively dressed but her clothes have not been
well cared for.

She is almost impossible to pin down and one really doesn't know what she
does.  Corey would seem to know but he does not share that with any of us
at this point.  As indicated by Corey's visiting the South, the mother has
family there but here again, Corey is quite secretive about what they are
all about, too.  He came back with a leather jacket, a leather bookbag and
a TV.  One wonders where family members get this kind of money but when we
questioned Corey about it, he got very defensive and distressed.  His re-
action was that we were accusing him of Mugging.  But that wasn't the
issue and we explained this to him.  We told him that we had some respon-
sibility to SSC in terms of the kinds of monies he had, and his spending
money.  We also felt that since we were raising him, that we should have
some control over it.  He simmered down some but it is very difficult to
get clear facts from him.

Certainly, all of Corey's family would seem to be Black and he does not
seem to have had much direct contact with White people, other than his
experience here at JCCA.

-5-

**V.**  **RELIGION:**

Corey acknowledges a belief in God and he and I have talked about this question from time to time. However, we never get into any real depth discussion and he has shown no interest in going to church. A couple of the boys in the residence have expressed some interest in the Nation of Islam. However, I don't know that Corey shares any of that interest.

We did have a discussion of Martin Luther King's contribution on Martin Luther King Day.

**VI.**  **FAMILY:**

Mother seems to feel little chagrin about not keeping appointments. When she does come in, she talks the right talk but you know she won't follow through. Recently, she called me collect, which was a bit surprising. I accepted the call and asked her why. She said she didn't have any money. She was calling to ask if Corey could visit the weekend. Permission was granted. Corey is allowed to visit his mother when she calls. However, she calls so seldom. We have thought of not letting Corey visit if she doesn't keep appointments but that would only be hurtful to Corey, and I'm not sure that it would be productive. With the exception of the Christmas visit South, Corey does come back on time and he really does try to cooperate. My feeling is that his pain is so intense and deep in his relationship with his mother that it will take a long time, if not years, for him to ever face up to how inadequate and neglectful his mother really is.

*Odette Noble*
Odette Noble, CSW
Group Home Division

D. 2/19/86  T. 2/20/86 ip

J.A.359

# EXHIBIT 16

J.A.360

## AFFIDAVIT

State of New Jersey        )
                          ) ss:

County of _Mercus_        )

DAROLD BROWN, being duly sworn, deposes and says:

1. I live at 873 Parkside Avenue, Trenton, NJ, 08618.

2. I was born in New York City on March 22, 1968. I grew up on 155th Street in New York City.

3. I first met Corey in New York through some mutual friends. Corey and I are the same age. But when I first met Corey, I had the impression that Corey was younger than I because Corey tended to hang out with guys who were younger. I was surprised when I later found out that we were the same age. I spent some time with Corey while in New York but did not really begin hanging out with him until we had both moved to New Jersey.

### Trenton Group Generally

4. Around 1986, I moved to Trenton, New Jersey with some friends and my brother, Darnell. Corey soon followed. We rented a house at 203 Locust Street in East Trenton.

5. In Trenton, Darnell and I formed a group that sold drugs.

6. I was generally in charge of our group. If I was not there, the group would listen to my brother Darnell. If Darnell was not there, they would listen to the next person in charge. Everyone in the group knew who was in charge and what the pecking order was.

7. Looking back, nothing that the group did showed good judgment. But within our group, my brother and I were the closest to having good judgment, which is why we were in charge.

1

J.A.361

8. The group also included guys we called "block hustlers," "workers," or "worker ants." These terms, which we used interchangeably, were used to describe guys who had no rank or status within the group. They worked for someone else. They did not save money from drug sales and did not pay bills. They did not have cars or anything expensive. They did not have a plan for the future.

### Corey and His Role in Trenton Group

9. Corey was what we referred to as a block hustler, worker or worker ant.

10. Corey didn't have a level or rank in the organization. Corey was not someone that anyone in the group saw as a leader and no one would have listened to him.

11. Moreover, Corey was not capable of giving instructions to others. He would let others make decisions and go along with what someone else was doing just to please the other person.

12. Corey was a follower. Corey would go along with anything anyone in the family – our group – would say. If, hypothetically, you would say to Corey "let's rob a bank," Corey would be there with you. He wouldn't analyze whether it was a good idea. Corey's view was that he'd do anything for the people he considered his family.

13. Indeed, Corey would go along with whatever someone else was doing no matter who he was or what his status was within our group. If someone in the group said, "let's do something," Corey would automatically do it, no questions asked. Corey had poor judgment.

14. One time, some other friends of mine went to a party with Corey. I didn't attend, but heard that there was an argument between my other friends and a different group of guys. I rushed over to the party to prevent Corey from getting involved in any fight that might

2

J.A.362

unfold. Corey would go along with the crowd unless someone told him not to go along. Corey tended to listen to me when I spoke to him.

15. One of Corey's limitations was that he would always defer to someone else's leadership – even if the someone else was exhibiting what I would have recognized to be poor judgment.

16. Corey would even defer leadership to younger people, even if they seemed predisposed to defer to him because he was older than they.

17. Corey was trustworthy and loyal. He was respected by everyone in the group. Corey considered our group to be his family and was very protective of the group.

18. I don't believe Corey had the capacity to walk away from the group. Everyone he considered to be his family was in Trenton.

19. Based on the way Corey expressed himself, his intellect seemed very low to me. Corey had difficulties expressing himself. When Corey spoke, he was never very assertive and spoke of everyday things. He rarely initiated conversations. He seemed to have trouble following along in conversations and would often stay quiet. You had to spend time around Corey in order to fully understand his limitations, which were significant.

20. Because of his lack of leadership and intellectual abilities, Corey did not venture out on his own when it came to selling drugs. He always sold drugs for others and did what they told him to do.

21. If he had to travel, Corey would usually rely on a cab to take him and would rarely go out alone. I never saw Corey drive a car (and do not know if he even was able to).

22. Corey lived with us in the house in New Jersey for about a year before he moved out to live with a girl. I believe this girl's nickname was "Mudda" or something similar.

3

**J.A.363**

23. Corey generally did not share much information about his relationships.

24. The house we lived in Trenton (in which, as I have said, Corey lived for about a year) was occupied at times by as many as 15-20 guys. Many of the people who stayed there would move in and out and often stay at hotel, motels, or with various women. No one in the group talked about whatever families they may have had. The house was never very clean. We mostly ate out and Chinese take-out boxes would be strewn all over the house.

25. Corey sometimes gave one of the other roommates money to pay the bills, but I never saw Corey pay an actual bill himself or even count money on his own.

26. I never saw Corey count money. In one situation, Corey could not account for his money and had no way of explaining where his money went.

27. Corey never had any real money. When he was involved with a woman named Monica, he would give any money he made to her. I felt that she took advantage of Corey.

28. I thought Corey would remain at the same level – block hustler, worker or worker ant – as long as he sold drugs because he never figured out how to make it on his own.

29. I don't know whether Corey ever had a job besides his involvement in our group. If Corey had not been with our group, the only other job I could have believed Corey to be able to perform would have been a job requiring manual labor, like on an assembly line, where the work is repetitive and a supervisor would have been available to tell Corey what to do. Corey could not handle a job where unexpected problems came up, as he would not know what to do. Corey was not a problem solver.

J.A.364

## Roles of Thomas and Tipton in Trenton Group

30. Vernon Lance Thomas was also a block hustler, worker or worker ant, without rank or status in our group. He was very similar to Corey, just a hair above Corey in all of his capabilities.

31. Tipton, who we called "Whitey," was a block hustler, worker or worker ant, too. He had no rank in our group. Whitey was active, hyper, and rowdy.

32. Corey and Whitey were like yin and yang -- Whitey was very loud, while Corey was quiet and laid back.

33. Both Whitey and Corey were followers, but between the two, Corey would follow Whitey. Corey would not even stop to analyze a situation before doing something; he would act based on nothing more than other people telling him to. On the other hand, Whitey would analyze a situation first, even if he would eventually be persuaded to do what you were asking him to do. Whitey was considerably more intelligent than Corey.

## My Brother and My Arrests in 1991, and Later Events

34. In 1991, my brother Darnell and I were arrested. Our arrests left the group without its leaders.

35. Corey's options were limited after our arrests. If Corey had gone back to New York, he would have had no friends there, only whatever family he had. As I mentioned earlier, the only job he could have done would have been rote manual labor. Corey needed to be told what to do.

36. I still found it amazing that guys who were workers or block hustlers in our group in New Jersey -- Tipton, Thomas and Corey -- went to Virginia to try to make a go of it without those who had led our group.

5

J.A.365

37. It was not surprising to me that they had trouble in Virginia. None of them had good judgment – least of all, Corey. None of them had to do any planning while they were part of our group in New Jersey. In Trenton, my brother and I were around to handle any problems and we did so diplomatically.

38. If those who went to Virginia encountered others trying to sell drugs in Richmond, I can understand how the situation could have quickly escalated to violence. None of those guys – least of all Corey – had the leadership or other skills to resolve a situation like that.

39. Because of Corey's always deferring to others (including to Tipton), and because he was felt that those in our group were his family, I would have been particularly afraid for how he would have reacted in any situation in which there was no one with good leadership skills involved and if he felt that his "family" was in danger.

_Darold Brown_
DAROLD BROWN

Sworn to before me on this

_15_ day of June, 2011

_Nelen Glonu_
Notary Public

Sworn to and subscribed
before me this
15 day of June, 20 11

J.A.367

# EXHIBIT 17

**AFFIDAVIT**

State of New York          )
                           ) ss:
County of New York         )

DARNELL BROWN, being duly sworn, deposes and says:

1.  I was born in 1970.  I currently live at 411 Broad Street Northfield, NJ 08225.

2.  I grew up in Manhattan and moved to Trenton in or about 1987.  In Trenton, in or about 1989, my brother Darryl Brown introduced me first to Corey Johnson's brother Robert Johnson and then, also in or about 1989, to Corey Johnson.

3.  After I met Corey, I started hanging out with him and ended up spending more time with Corey than with Robert.  I played basketball with Corey and we also went to parties together.  Corey was much quieter and more laid back than Robert.

4.  In or around 1988 my brother Darryl, some friends and I started to spend time at a house at 203 Locust Street in East Trenton.  After I met Corey he also started to spend time at that house.  Corey did not live there; he lived at the places of various girlfriends but came to the house regularly.

5.  The males who spent time at the house took part in selling drugs to support ourselves – although as I discuss later in this statement, Corey's role in the selling of drugs was very limited.

6.  Those guys spending time at the house who had money would pay the bills.  Corey was never one of those guys.  Any money Corey ever had seemed to go to his girlfriend Monica or other girlfriends.

1

903464.05-New York Server 4A - MSW

**J.A.368**

7. The women who came to the house did the laundry, cooked the meals, and did other household chores. They looked out for the men who came to the house, in terms of personal things.

8. Our group in Trenton was an informal family. We all had to trust each other for it to work. I considered Corey family – a cousin (even though he was not related to me). Corey treated me and my brother as if we were important members of his family. For example, he gave us money when we needed it, or he helped us when we needed a ride.

9. In our group in New Jersey, there was a hierarchy of responsibilities. The officers were the leaders in the group; they made the decisions. My brother Darryl and I were both officers. The workers were followers.

10. Corey was a worker and a follower. He sold drugs, but he never did so on his own. He never went anywhere or did anything without having someone with him. Corey's assignments when it came to selling drugs never required much. He was not given assignments that required much because Corey did not appear capable of making decisions on his own. He had to be told what to do. Corey did not refuse to do something once asked. Even if he did not seem to want to do something, he would do it.

11. Corey comprised the lowest level of the worker/follower group. He and Vernon Lance Thomas, who we called "V" and was also at a low level, were the quietest guys in the group. Compared to Corey, V was more likely to try to analyze something. But, as with Corey, V had to be told what to do.

12. "Whitey" (Richard Tipton) was also of our group in New Jersey. Whitey was also a worker. But within the worker group, Whitey was at a higher level than Corey or V. Whitey was more outgoing, outspoken and intelligent than either Corey or V.

2

903464.05-New York Server 4A - MSW

**J.A.369**

13. Corey also seemed incapable of taking any initiative on his own in other aspects of his life. He was very unassertive in his personal life and never appeared to have any confidence in himself. He had several girlfriends, but other than Monica, I thought they looked like men.

14. If a girl liked Corey, she would have to take the initiative to approach him, because he would not approach her.

15. Corey did not talk much, especially when he was among a group of housemates. It was as though he did not want to be put on the spot. Corey went along with what everyone else was doing and did not come up with his own ideas.

16. I never knew Corey to have a job (aside from his lowest level involvement in the drug selling activity). I never knew Corey to have a car, and never saw him drive.

17. I never saw Corey read a book or a newspaper.

18. In my experience, Corey was a good person when it came to helping others. He gave food to people to who did not have any, and was generally willing to help people in need.

19. Sometimes, Corey would go along with me New York to visit his mother. I saw her a few times and she always appeared to be on drugs. Corey would never talk about his mother to me.

20. In 1991, my brother Darryl and I were both arrested and sent to prison.

21. Thereafter, some of the other guys from our New Jersey group went to Virginia.

22. I don't know which of them had the idea to go there, or what reason that person or person had for that idea.

3

903464.05-New York Server 4A - MSW

J.A.370

23. The people from our group who went to Virginia – Whitey (Tipton), CO (Corey) and V (Thomas) – had all been workers in New Jersey.

24. Based on their statuses in our group, I would have expected Whitey, rather than Corey or V, to be the leader of the group in Virginia.

25. Corey unfortunately ended up in a situation in which those whom he was following were not as skilled at leadership as my brother and I had been.

DARNELL BROWN

Sworn before me on this

14th day of October, 2011

Notary Public

Susie Ng
NOTARY PUBLIC, State of New York
No. 01NG4948150
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires March 6, 201_

4

903464.05-New York Server 4A - MSW

J.A.371

USCA4 Appeal: 20-15      Doc: 11-2      Filed: 12/28/2020      Pg: 101 of 258

# EXHIBIT 18

not be right.  In the meantime, you all have been given a tremendous and heavy responsibility, and I know the weight of it is going to come down on you tonight.  But we are assured by our questions of you and our having dealt with you over the last few days that you are able to handle it.  So you all go home and have a good evening and we will start out fresh on tomorrow morning at 10 o'clock.

Everyone remain seated while the jury leaves the courtroom.  Just a second.  They tell me you have to report to a different place in the morning.  Check in at Room 302.  It is on the third floor in this hallway down this way.  That's Room 302 for your check-in.  Thank you.  We will see you tomorrow.

(The jury left the courtroom.)

All right, Mr. Marshal, you may remove the defendants.

(Proceedings adjourned at 5:11 p.m.)

0890

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

------------------------------------------

UNITED STATES OF AMERICA,


                              Plaintiff;

     v.                              CRIMINAL ACTION
                                        92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

------------------------------------------
                    VOLUME V

                January 15, 1993
                Richmond, Virginia
                   10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge

**J.A.373**

APPEARANCES:    HOWARD C. VICK, JR., ESQ.
                WILLIAM H. PARCELL, III, ESQ.
                Office of the United States Attorney;
                    Counsel for Government;

                ROBERT P. GEARY, ESQ.
                ERIC D. WHITE, ESQ.
                    Counsel for Defendant Tipton;
                CRAIG S. COOLEY, ESQ.
                JOHN F. McGARVEY, ESQ.
                    Counsel for Defendant Johnson;
                DAVID P. BAUGH, ESQ.
                ARNOLD R. HENDERSON, V, ESQ.
                    Counsel for Defendant Roane;
                ROBERT J. WAGNER, ESQ.
                    Counsel for Defendant Reavis.
                JEFFREY B. KULL
                OFFICIAL COURT REPORTER

                    P-R-O-C-E-E-D-I-N-G-S

THE CLERK:  Case Number 92CV68: United States of America versus Richard Tipton, Cory Johnson, James Roane, Jr. and Sandra Reavis, the fifth day of trial.  Are counsel ready to proceed?

MR. VICK:  The government is ready to proceed.

MR. GEARY:  Defendant Tipton is ready.

MR. McGARVEY:  Defendant Johnson is ready.

MR. HENDERSON:  Defendant Roane is ready.

MR. WAGNER:  Defendant Reavis is ready.

MR. VICK:  In light of opening statements by defense counsel yesterday, I do believe the government should now be allowed in direct examination of its witnesses who have been provided protection and money to be able to testify why it is indeed that they have been provided money by the government, and that's simply because they have been in protective custody.  Not a single witness has been provided any money other than necessity money to put them in hotels, put them in witness protection.  In light of opening, although that's not normally allowed, in light of the arguments that were here for an hour-and-a-half yesterday, we think that's proper testimony.

THE COURT:  Well, Mr. Vick, I would not make a decision like that based on opening statements.  Opening statements are full of sound and fury and signify nothing.  If they do as they have indicated and bring out this information in cross-examination, then you can do that in rebuttal.  You can't do it in direct.

MR. VICK:  Yes, sir.

MR. GEARY:  May I be heard?  Your Honor, in

J.A.374

Q    Was Richard Tipton there on a continuous basis?

A    No, he was always away on spurts, gone for two months here, a month here.

Q    Did you ever have occasion to talk to Mr. Richard Tipton about Richmond, Virginia?

A    Yes.

Q    And what did Mr. Tipton tell you about Richmond, Virginia?

A    That there was big money down here.

Q    Big money in what regard?

A    Selling drugs.

Q    How did he say it was big money?

A    Said you could sell three times as much as what you were selling in New Jersey.

Q    Three times the quantity, or a gram of cocaine would sell for three times more?

A    A gram of cocaine would sell for three times

0922

more.

Q    On June 4th, 1991, there was a search of a residence that you were living in; is that correct?

A    Yes.

Q    What residence was that?

A    491 Martin Luther King Boulevard.

Q    Trenton?

A    Yes.

Q    Again, that's what you are pending sentencing for?

A    Yes.

Q    Who else lived in that house with you?

A    Darryl Matthews, also known as "Heavy D," "C.O.," also known as Cory Johnson, "V," Vernon Lance Thomas, and Gary Williams.

Q    And were drugs seized from that house?

A    Yes, they were.

Q    Were you present at the house when the search was conducted?

A    Yes.

Q    Based upon your presence at the house, did you know where the drugs were seized?

A    Yes.

Q    Where were they seized from?

A    Mostly from Darryl Matthews's room and "C.O."

0923

and "V's" room.

Q    The drugs seized from Darryl Matthews's room, whose were they?

A    Matthews's.

Q    How were they packaged?

A    In a big plastic bag.

Q    The drugs seized from the room of Cory Johnson, "C.O.," and "V," how were they packaged?

A    In crack vials.

Q    What room was that?

J.A.376

# EXHIBIT 19

## DECLARATION

I, ANN HARDING, hereby affirm the following:

1.      I live at 2120 Carrell Road, Apt 210, Fort Myers, FL 33901.

2.      For 22 years, I was a staff member at Pleasantville Cottage School ("Pleasantville" or "the school"), a residential treatment center for emotionally troubled youth run by the Jewish Child Care Association.

3.      I knew Corey Johnson from 1982-1985 while Corey was living at Pleasantville. We both lived in the older boys' cottage. When I was placed there he was already there. I had a supervisory role at the school and saw him on a daily basis.

4.      Corey was a sweet boy and a good kid. He was always very quiet and respectful, and did whatever I asked him to do. Corey obeyed all of the school's rules, as far as I knew. I cannot think of any instance where Corey violated the school's rules or behaved disobediently. Some kids were quiet, some were loud, it depended on the child.

5.      I had a good relationship with Corey. I frequently used to work the night shift, and Corey would come downstairs to my post when he could not sleep. Sometimes he said he was having nightmares because of a scary movie he had seen that day. He would ask if he could sit with me, and we would watch television together and talk until he was ready to go back to bed again. I was the only female staff member at Pleasantville at that time, and I believe Corey thought of me as a maternal figure.

6.      Corey was very slow intellectually. I knew this by the way he would talk to me. I do not remember anyone else at Pleasantville who was similarly slow intellectually.

J.A.377

7.    Corey never discussed his "slowness" with me.

8.    I did not work with Corey on identifying and achieving his goals, as I did with other children at the school. Our conversations were basic and did not involve school or other residents at Pleasantville.

9.    Corey participated in social activities and got along well with his peers. Corey was generally friendly, nice, slow to anger, easygoing and respectful.

10.   I do not think Corey possessed leadership qualities. To the contrary, he was more of a follower than a leader in his interactions.

11.   I believe that Corey was probably taken advantage of by the other students occasionally.

12.   Corey understood and complied with basic requirements of the daily routine at Pleasantville. Very little changed at the school during the time that Corey was there, and I cannot remember any situation in which Corey had to adapt to new circumstances.

I declare the above is true and correct.

Dated: November 21, 2011

ANN HARDING

City of Fort Myers
State of Florida

2

**J.A.378**

USCA4 Appeal: 20-15      Doc: 11-2          Filed: 12/28/2020      Pg: 108 of 258

# EXHIBIT 20

## DECLARATION

I, SARAH JANE WOODSON WEST, hereby affirm the following:

1.      I live at 6849 Wood Haven Road, Roanoke, Virginia, 24019.

2.      For thirty-five years, ending in 2006, I was a volunteer prison chaplain with my husband, Bob West. I ministered to death row inmates for fifteen of those thirty-five years. I have met with death row prisoners on hundreds of occasions.

3.      I first met Corey Johnson in 1997, shortly after he was moved from Powhatan Correctional Facility. I visited with Corey at two correctional facilities in Virginia (Mecklenburg and Sussex), where my husband and I saw Corey individually and in groups. In addition to the visits my husband and I jointly made, I met with Corey one-on-one on five or six different times while Corey was in Virginia. My husband and I also made approximately five visits to see Corey at a prison in Terre Haute, Indiana. My last visit with Corey was in March 2006. I probably met with Corey Johnson on ten to eleven occasions.

4.      While Corey was at Mecklenburg, I also met Corey's co-defendants, James Roane and Richard Tipton. Both Roane and Tipton had stronger personalities than Corey. Tipton, in particular, was assertive and boastful. It seemed like he was always trying to accomplish or gain something from his contacts.

5.      Both Roane and Tipton were "up" on their cases and used the law library to research their cases. Corey was not knowledgeable about his case. Corey and I never discussed him using the law library.

**J.A.380**

6.      Compared to Roane and Tipton, Corey appeared to be a follower. Tipton and Roane could have been the bosses; they had the strong personalities, unlike Corey. Corey wanted to be accepted and could have been influenced by others.

7.      I tried to act as a mother figure to all of the people I visited. Corey seemed especially receptive to my visits. When we visited the facilities in Virginia, Corey sought me out to talk to me. At Mecklenburg, we held hands, spoke and prayed together. At Sussex, I spoke with him through a hole in a door through which food was passed.

8.      During the times that I observed Corey, he was pleasant and eager for acceptance. I did not observe him in disagreements with others.

9.      Corey is a fine person. He was always polite, respectable and kind when we met.

I declare the foregoing is true and correct.

Dated: _March 24_, 2011.

_Sarah Jane Woodson West_
SARAH JANE WOODSON WEST

Commonweath of Virginia
City of Roanoke

**J.A.381**

USCA4 Appeal: 20-15      Doc: 11-2          Filed: 12/28/2020      Pg: 111 of 258

# EXHIBIT 21

J.A.382

## AFFIDAVIT

State of New York      )
                 ) ss:
County of New York    )

**PRISCILLA HODGES, being duly sworn, deposes and says:**

1. My address is 400 East 105th Street, Apt. 3F, New York, NY 10029.

2. I was born ███████████

3. I am currently 43 years old.

4. Corey Johnson is my first cousin. Corey and his half-brother, Robert, are the sons of my mother's younger sister. My mother is Minnie Hodges. Her younger sister was Emma Johnson, who passed away in 1995. Corey is about 8 months younger than me. I have known Corey as long as I can remember.

5. We grew up together, and Corey and I were always very close. We played, skated, and went to the movies together. When we were children, I visited Corey's house, and more often, Corey would spend time at my house where he visited at least once a week. Corey frequently stayed the night at my house when he was a child.

6. My mother Minnie practically raised him since he was a baby.

7. I spent time with Corey not only when he was a child, but also when he was a teenager and a young adult in his early twenties. I also have maintained some contact with Corey since he has been in prison.

8. Even when we were both children, I could tell that Corey was slow.

9. For example, Corey wet his bed when he was as old as ten. Aunt Emma complained to my mother about Corey wetting the bed, saying he was too old to be doing so.

1

J.A.383

Corey also wet the bed when staying at our house.  Whenever Corey wet the bed at our house, he would try to cover the wet sheets with a comforter, but my sister Queenie and I could tell that he had wet the bed.  I do not remember if we teased him, but we might have.  My mother said that he was too old to be wetting the bed.

10.    Corey was slow in other ways, too – ways that involved his ability to do things that required thinking and knowing about things.  For example, Corey had significant problems counting change from the time he was a child until at least his late teens.  On many occasions, I accompanied Corey to the store where he would pay for an item and receive change, and then ask me how much change he should have received and if he had in fact gotten the proper amount of change.  He did not know how to calculate the proper amount of change or even how to count change, mechanically.  Often times when Corey went to the store alone, Corey's mother would yell at him for bringing back incorrect change.

11.    In addition, Corey always had great difficulty reading.  He was embarrassed to read aloud because he would mispronounce words and would not know the meaning of even very simple words.  I and others tried to help him with his reading.  Despite the help he received, I did not see much improvement in Corey's reading even as he got older.

12.    More generally, Corey did not do well in school.  In addition to his reading problems, Corey's math skills were poor and also did not seem to improve despite his receiving help from me and others.

13.    Indeed, Corey struggled with all of his classes.  Corey needed help in all of his subjects and I regularly helped him with his homework in elementary.  Corey also received regular homework help from his godsister, Courtney.  Despite our efforts, I believe Corey continued to struggle in school throughout the time he attended.

J.A.384

14. As a child, Corey complained that other kids bothered him and would take his money, ball, or other possessions. Corey would not assert himself with these other kids. Sometimes, Robert (who was two years younger than Corey) would confront them. At other times, my sister Queenie or I would confront the neighborhood children whom Corey had accused of bothering him.

15. Corey was a follower, rather than a leader, first as a child and then as a teenager. Corey was easily influenced by others and could be persuaded to do things that, in my view, showed very poor judgment. He would go to great lengths – and jeopardize his own well-being – just to fit in with the crowd.

16. Once, when Corey was in his early teenage years, his "friends" dared him to roller skate down an incredibly steep hill, an act that no one else would attempt. I told him not to do it, but his friends insisted. He ended up falling and suffering a bruise and scrapes. I believe he accepted the dare only to please his "friends."

17. On another occasion when Corey was also a young teen, Corey's "friends" told him to ride his bike across a busy two-way street in the middle of traffic. I warned Corey not to do it, but he did it anyway. He made it across but was nearly hit by a car. The driver had to slam on his brakes to avoid hitting Corey.

18. Corey would do whatever his "friends" told him to do, even if it could have killed or seriously hurt him.

19. Corey has always been very private and reserved; in my experience, he rarely volunteers information unless you ask him a specific question. Even though we spent a lot of time together, Corey did not often talk about his feelings.

3

J.A.385

20.    However, at various times when Corey was between 11 and 16 years old, he expressed to me feelings of hurt and sadness about his relationships with both his father and mother. For example, around the age of 11 or 12, Corey told me that he felt like his father did not want to be bothered with him because his father would go months or even a year between contacting (much less visiting) Corey. In addition, Corey would talk about his father breaking promises to visit him. At other times, Corey mentioned that he disliked his mother's boyfriends and questioned why she was even with them. Corey seemed to feel unloved by his parents.

21.    As a teenager, Corey was extremely shy, especially in approaching girls. On several occasions, I talked to my friends for him because he was too shy or afraid to talk to them on his own. He worried that girls would not like him.

22.    I know of three girls with whom Corey was friends during his teenage years. Two of them were also my friends. In both of those cases, I know that there was no romantic or sexual relationship between Corey and the girl. I do not know the nature of Corey's relationship with the third girl.

23.    Although Corey never directly admitted it to me, I am aware that both he and Robert were involved in the sale of drugs. I believe Robert started selling drugs when he was about 16 years old, and Corey began his involvement with the sale of drugs when he was a teenager. I think their mother Emma's involvement with drugs (using and possibly selling) played a role in each of her sons being involved in selling drugs. I encouraged them to stop their involvement in selling drugs.

24.    Robert appeared to have some success in selling drugs. He had a lot of money and nice clothes, which he appeared to acquire through drug selling.

4

J.A.386

25.    As compared to Robert, Corey seemed much less successful in his involvement in selling drugs.  Corey had considerably less money and clothes.  Sometimes, Robert (who was two years younger) would give Corey money or clothes to help him get by.  I had the sense that Corey was trying to keep up with Robert but would always fall short.

26.    On several occasions, Corey had problems obtaining the correct amount of money in exchange for drugs he was selling.

27.    Once, I saw Robert get upset with Corey for coming up short on money in a drug sale.  In fact, Robert's complaining about Corey's mishandling of money is how I first became aware that Corey was involved in the sale of drugs.

28.    Men in the neighborhood whom I understood were supplying Corey with drugs to sell also got angry with Corey (and some would avoid dealing with him entirely) because Corey would come up short on money in drug deals.

29.    Corey's trouble dealing with money in this context was not surprising to me because I already knew about Corey's change-counting problems.

30.    During this period, Corey was no longer attending school and I encouraged him to return, if only to learn how to count change.

31.    When they were in their late teenage years, Corey and Robert acted completely differently at my mother's house than when they were at home with Aunt Emma.  When they came to my house, they did not talk about drug sales or making money.  Nor did they bring their "friends" to my mother's house.  My mother was religious, and Corey and Robert knew that they could not expose her to their street life.

32.    During the same period, because I knew Aunt Emma lived with what I considered to be a negative lifestyle that involved heavy drug use, I visited Corey and Robert at

5

J.A.387

Aunt Emma's house frequently to make sure they were okay. When I visited Corey at his mother's house, Aunt Emma often seemed "out of it," that is, under the influence of drugs or alcohol. She would complain of being tired, and would get very easily frustrated and angry with Corey and Robert. She often told Corey to get out of the house, and Corey would sometimes leave and not return until the next day. I do not know where Corey went or where he spent the night on those occasions.

33.    From an early age (as reflected the incidents I mentioned above in paragraphs 16 and 17 above) and continuing into his adulthood, Corey was very susceptible to others' influence and his "friends" knew they could take advantage of him.

34.    When Corey was 18 or 19, he went to live with his stepfather, Robert Butler, in North Carolina. I heard about an incident in which Mr. Butler's house was robbed after Corey had held a party at the house. It was my understanding that Corey's "friends" had convinced Corey to have a party and then used the party as a set-up to later rob the house.

35.    Later, I saw Corey once or twice when he was living in New Jersey. I think he was about 20 years old. I met some of his friends there, including a guy they called "Whitey" (who was later one of Corey's co-defendants). I didn't know them well, but they seemed like tough guys. The males who Corey surrounded himself with in New Jersey did not seem like good people, but Corey considered them friends.

36.    Throughout his life, from when he was very young up until when I visited him in New Jersey when he was in his early twenties, Corey struck me as directionless.

37.    I am unaware of his ever having had a job.

38.    I still keep in contact with Corey on the phone and through letters.

6

J.A.388

39.     Corey's letters are extremely disorganized and incoherent.   There are always misspellings, words used incorrectly, and he jumps from topic from topic.   I become extremely frustrated reading Corey's letters.   Sometimes I have to put the letters down and return to them at a later time.

PRISCILLA HODGES

Sworn to before me on this
30th day April, 2011

Notary Public

DELORES GREEN
Notary Public, State of New York
No. 31-4527811
Qualified in New York County
Commission Expires Aug. 31, 2014

7

J.A.389

USCA4 Appeal: 20-15      Doc: 11-2        Filed: 12/28/2020      Pg: 119 of 258

# EXHIBIT 22

<u>AFFIDAVIT</u>

JULIE MCCONNELL, being duly sworn, deposes and says:

1.      I reside in Richmond, Virginia.

2.      During the early 1990's, I was the Executive Director of the Virginia Association to Abolish the Death Penalty and visited inmates on death row. I visited death row many times from 1989 to 1992.

3.      Prior to meeting Corey Johnson, I, along with Reverend Henry Gerrard, Sr. (who is now deceased), and King Salim Khalfani, had been visiting three other inmates at Powhatan Correctional Center in Virginia for some time.

4.      At first, Corey Johnson, James Roane and Richard Tipton were generally asleep during my visits and there was little interaction. Later, all three men began to interact with the three of us, and in particular, Reverend Gerrard. I estimate that I interacted with Corey Johnson on eight to ten different occasions. I interacted with Roane and Tipton approximately the same number of times.

5.      Corey appeared to be very simplistic in his thinking. He struck me as quite childlike. I had the sense that he really did not understand what had happened to him or why he was in prison. He was very suggestable and would basically agree to whatever you said to him. He was very polite, but seemed completely overwhelmed by the situation. If I had to guess, I would say that he probably suffers from mental retardation and a very low IQ. I have

worked with many young people with special education needs, and he certainly had some similar characteristics.

6. During the times I visited him, Corey appeared much younger than his counterparts and not at all worldly. He seemed shell-shocked, withdrawn and depressed. At the same time, Corey was very respectful and especially appreciative of Reverend Gerrard's religious role. I had the impression that he saw Reverend Gerrard as a father figure.

7. Compared to his co-defendants, Corey was the quietest of the three. Both Tipton and Roane were more verbal and outgoing. Corey appeared much slower than either Roane or Tipton. I did not perceive him as the leader of the trio. Indeed, I believe they indicated to me that he was the follower of the group. Tipton and Roane seemed very aware that Corey was slow. In my view, no one could reasonably have thought of Corey as the leader in that group.

_____
JULIE MCCONNELL

Commonwealth of Virginia
City of Richmond

I, Linda Lee McGrew, a Notary Public in and for the Commonwealth of Virginia at large, do hereby certify that the foregoing Affidavit was executed before me by Julie McConnell on this 23 day of March, 2011.

_____
Linda L. McGrew
Notary Public

My commission expires: April 30, 2015
Notary Registration No: 7389801



2

USCA4 Appeal: 20-15      Doc: 11-2         Filed: 12/28/2020      Pg: 122 of 258

# EXHIBIT 23

**J.A.393**

## AFFIDAVIT

State of New York           )
                            ) ss:
County of New York          )

ODETTE NOBLE, being duly sworn, deposes and says:

1.      I reside at 101 W. 85th St. Apt. 6-1, New York, New York.

2.      I received my master's degree in social work in 1973.   From approximately 1973 until 1987, I was a caseworker for the Jewish Child Care Association (JCCA).  During some of that period, as part of my work for JCCA, I ran therapy sessions for boys who lived at Elmhurst Boys Residence in Queens, New York (Elmhurst).

3.      Elmhurst was a group home located in an apartment unit.  The residence housed eight boys – typically between 14 and 19 years of age – who, for various reasons, were not able to live with their families.  Several individuals acted as house parents and provided supervision at the home.  One house parent slept at the residence each night.

4.      As a social worker with responsibilities for Elmhurst, I met with each of the resident boys individually for an hour each week.  I also conducted a group session with the boys and the house parents every other week.

5.      I met Corey Johnson when he was 16 years old, shortly after he moved into Elmhurst in June 1985.  For approximately the next 20 months, until February 1987, when Corey left Elmhurst when he was age 18, Corey regularly attended my weekly individual therapy sessions as well as my bi-weekly group therapy sessions. In total, I met with Corey more than 100 times, either individually or in a group setting.

6.      After Corey left Elmhurst in 1987, I did not see Corey again until 1993, when I saw him in the court room as I testified at his trial in Richmond, Virginia.  I have not seen Corey since the trial in 1993.

**J.A.394**

7. Compared to virtually all of the other boys I encountered at Elmhurst, Corey was much weaker cognitively.

8. While living at Elmhurst, Corey attended special education classes at Newtown High School in Queens. Most of the other boys in the residence attended mainstream classes at high schools in the area and were expected to go on to college. I believe that this upset Corey.

9. Corey had real intellectual limitations. During our sessions, I sometimes read to him and his comprehension of what I had read was poor. His own ability to read was very limited.

10. Corey worked very hard, but because of these limitations, could just not perform well in school.

11. Based on my regular interactions with Corey, I believe that Corey's cognitive problems were not limited to his school work.

12. For example, even though he could understand the rules regarding group meetings well enough to follow those rules most of the time, he never understood the purpose or reasoning behind the rules.

13. Corey did not pose any serious behavior problems for me. He was a very sweet kid -- not mean-spirited. He generally got along with and was liked by the other boys in the residence. Corey certainly was not one of the more difficult boys that I worked with in my years of working with teenagers.

14. The residence had a strict policy against physical confrontations and, to my knowledge, Corey abided by that policy.

15. During the time I knew Corey (from ages 16 to 18), he was "girl crazy" and we often spoke of him trying to develop close relationships.

2

**J.A.395**

16.    In my view, Corey was not capable of "consequential" thinking. Thus, I believe, he lacked the ability to understand the consequences that his actions could have.

17.    In social settings, he did not initiate action, but rather went along with what others did.  He was very susceptible to peer pressure.

18.    Corey did not have a good "read" of situations or other people.  He was not very sensitive to social cues.  He had difficulty learning "the rules of the game" and understanding who was in charge.

19.    In counseling him, I spoke with him about making good decisions and trying to judge who was trustworthy and who was not, but Corey seemed unable to apply our discussions to his actions.

20.    Corey was a poor social decisionmaker.  When it came to making decisions, Corey seemed to live in the moment.  As a result, Corey could be easily influenced into doing what his peers wanted him to do.  If some of his more intellectually developed peers convinced Corey to do something, he would go along with it even if he did not perceive any logical reason for doing so.  He would act in this way in circumstances in which, if he had been more intelligent, he would have realized that his actions could get him into difficulty.

21.    I believe that Corey's arrest for robbery in August of 1986 is an example of such a circumstance. Corey was arrested for robbery, along with two other teenagers, Mitch and Dwight.  Mitch worked in the Youth Corps and apparently had a bossy co-worker against whom he wanted to retaliate.  It is my understanding that Mitch enlisted the help of Dwight and Corey to rob the co-worker.  I believe Mitch may have explained the situation to Dwight and Corey in a way that was intended to make it seem

3

J.A.396

as if Mitch had somehow been wronged. Mitch was clearly the leader in this robbery. I believe Mitch may have chosen Corey as an accomplice due to Corey's known susceptibility to peer pressure. True to form, Corey went along with Mitch's plan.

22. Corey's mother very rarely visited him at Elmhurst. I met Corey's mother only once or twice during Corey's nearly two-year stay at Elmhurst, which was an unusually low number. By contrast, I met other boys' families much more frequently.

23. I frequently tried to contact Corey's mother by telephone, but she did not respond.

24. In short, Corey's mother was almost non-existent in his life while he was living at Elmhurst.

25. Whenever we talked about his mother, Corey could not discuss or consciously express any anger towards her. He would always talk about her as if she were terrific.

26. In my experience, Elmhurst gave a chance to youths who were coming out of bad, controlling situations to get their lives on track if they could honestly deal with their emotions. Corey did not confront his emotions with respect to his mother, and in my view, Corey's inability to do so was a problem for his development.

27. Elmhurst provided a structured environment for its residents. For example, the house parents shopped and cooked for the boys and even some of the leisure time was structured by the program.

28. That said, there was somewhat less structure at Elmhurst than at Pleasantville, where Corey had previously resided.

29. Corey may have needed more structure and support than Elmhurst provided.

4

J.A.397

30. Towards the end of his time at Elmhurst, Corey began to ignore the instructions of house parents and the house rules.

31. In or about February of 1987, there was a meeting at which Corey was asked to leave Elmhurst for violating house rules. In my view, the message we were trying to communicate to Corey was "you should go away and think about this for awhile, and then come back."

32. However, Corey left Elmhurst permanently. We tried to invite Corey back to the residence, which we felt provided a structured and loving setting for him, especially compared to life with his mother or life on the streets. I, personally, as well as the rest of the staff wanted Corey to come back.

33. I believe that Corey's decisions to move out and stay out of the Elmhurst residence despite the staff's desire to have him back was an example of Corey's inability to think about the consequences of his actions and plan for his future.

34. I and my colleagues worried greatly for his future after he left Elmhurst.

35. As I mentioned above, while most of the boys living at Elmhurst were expected to (and did) go on to college, neither I nor my colleagues believed that Corey would be able to do so, because of his limited cognitive abilities.

36. Because of Corey's intellectual limitations, I had concerns that Corey would not be able to hold a job.

37. Beyond that, I questioned Corey's ability to negotiate even the simple, day-to-day tasks that community life requires, such as paying bills, obtaining a driver's license, or purchasing and maintaining a car. Somewhat more complex skills – like planning a budget – were clearly beyond Corey's abilities, in my view.

5

J.A.398

38.    In short, I doubted that Corey was equipped to make it on his own, to live independently as an adult.  Some people stay in a protected setting their entire lives and that may have been what was appropriate for Corey.

_____
ODETTE NOBLE

Sworn before me on this
1st day of December, 2011

_____
Notary Public

PATRICIA TERRANOVA-GERACI
NOTARY PUBLIC, State of New York
No. 01TE5063454
Qualified in New York County
Commission Expires July 22, 2014

6

**J.A.399**

USCA4 Appeal: 20-15      Doc: 11-2            Filed: 12/28/2020      Pg: 129 of 258

# EXHIBIT 24

Form W-25
Rev. 10/3/75

The City of New York
Human Resources Administration

## HISTORY SHEET

| CASE NAME | ADDRESS | CAT./CASE NO./SUF. |
|---|---|---|
| Johnson | | PAGE NO. |

DATE

**11/20/84** — Call from the w/ma stating she wants Rbt. replaced. Apparently Ms. Johnson is having problems handling Rbt. She reports she has not been able to get him into the correct COH placement & states that COH advises her they do not have the appropriate placement for him. Additionally, her former boy friend (the drug addict she was with at the time of Corey's placement) last night tried to set fire to her apt. Ms. Johnson believes he is now in protective custody. But this added problem makes it all the more necessary that have Rbt placed.

Ms. Johnson proceeded to claim she'd been trying to get Rbt. replaced thru FCCA for several months without success. Note: Rbt. does not want to return to Children's Village. Since Ms. Johnson will be meeting with her PCS s/w later today, Sup. I advised her to fully discuss her replacement request with PCS

Note: mother states she is no p.a. recipient (& ∴ not a candidate for payment towards cost of care)

L. Lawrece

USCA4 Appeal: 20-15      Doc: 11-2        Filed: 12/28/2020      Pg: 131 of 258

# EXHIBIT 25

J.A.402

PLEASANTVILLE DIAGNOSTIC CENTER

PSYCHOSOCIAL SUMMARY

Name of Child:  COREY JOHNSON
Date of Birth:  ▮▮▮▮▮
Date of Adm:    2/1/82

I. IDENTIFYING INFORMATION:

Corey is a 13-year old Black boy who was admitted to PDC on 2/1/82
on a Voluntary basis. His mother, Mrs. Johnson, requested    that
Corey be evaluated to determine whether placement at Children's Village would be
feasible, as his brother Robert is in placement there. Mrs. Johnson is currently
unemployed and resides with her drug addicted common-law husband in a
Brooklyn apartment.

II. REASON FOR REFERRAL:

Corey's mother, a depressed, dependent woman is seeking placement for
Corey because she is struggling with taking charge of her own life
and is therefore unable to cope with Corey's problems at the present
time. Upon admission Mrs. Johnson reported that Corey had been truant
since September 1981. Corey's academic deficits have been a serious
problem and he has been left back twice in 3rd and 4th grade. His
behavior has reportedly been disruptive in school, he gets into fights
and does not learn. He currently reads on 2nd grade level and has not
improved in quite some time. Corey lived with his maternal grandfather
at times that his mother could not cope with his behavior. During his
last stay with his grandfather, while he was attending Catholic School,
Corey was suspended from school for fighting. Mrs. Johnson stated
that Corey had been stealing from her and her boyfriend, items such
as tape recorders, radios and she feels that this was done in anger
or revenge. As noted above, Mrs. Johnson has been living with a drug
addicted, unemployed man for the past four years and she noted that
although Corey's school problems have always been there, they have
intensified since she has been living with Mr. Krager (with whom she
is still living at the present time).

Until a year ago, Corey believed that his younger half-brother's father
was his real father. Corey's natural father unexpectedly came into
the picture after he was released from jail for armed robbery. Corey
has been visiting his father and his wife (who is expecting a baby)
regularly but feels that his father is uninvolved in his life and
is wary about approaching him.

Mrs. Johnson stated that her home environment has been unstable and
chaotic since she started living with Mr. Krager. He required numer-
ous emergency hospitalizations and Corey and his brother witnessed
many fights and arguments between Mrs. Johnson and Mr. Krager. Mrs. Joh
son is aware that she has been unable to provide a calmer more stable
and consistent home environment for her children and noted that she
is in the process of finding a job and seeking new residence so that
she can provide a better home for her children.

Corey Johnson                                                              -2-

III. FAMILY BACKGROUND:

Mrs. Johnson comes from a chaotic and unstable home environment as
well.  She noted that her father drank heavily and was abusive with
her mother, "they fought all the time."  She is the youngest of three,
her two older siblings had different fathers.  Mrs. Johnson is "very
close" to her father who left the family during her adolescence but
continued to be supportive to her.  He supports her financially and
emotionally when she is needy.  Her father took care of Corey when-
ever Mrs. Johnson was emotionally unavailable.

Mrs. Johnson said that she became pregnant at age 17 in order to "get
away from home" but returned to live with her mother after Corey was
born.  Mrs. Johnson went to work and Corey's maternal grandmother
cared for him.  Subsequently Mrs. Johnson got pregnant with Robert
and was living with Robert's father for several years.  Mrs. Johnson
reported that he was a good father to both children and a good provider, how-
ever, he used money to gamble.  He apparently became a compulsive
gambler and although Mrs. Johnson believed that he had been paying
the bills she one day came home and discovered that the family had
been evicted from their apartment because their rent was not paid.
Mrs. Johnson subsequently left Robert's father and returned to her
mother's home.  As noted above, she started living with Mr. Krager
four years ago.  This has been a destructive and chaotic relation-
ship and Mrs. Johnson who has been quite depressed over this relation-
ship has not been able to extricate herself.  Mr. Krager has been drug
addicted and has been involved with another woman over the past two
years and this has been a very painful situation for Mrs. Johnson
who feels trapped and wants help to reorganize her life.

IV. DEVELOPMENTALLY HISTORY OF CHILD:

There were no complications in pregnancy or birth.  Corey weighed
7.4 at birth and was described as having been a "cheerful baby."
His early developmental milestones were normal, he walked and talked
at 1-year.  Mrs. Johnson said that Corey was hyperactive and at age 2
she reported that he fell down a staircase and was admitted to Kings
County.  He was released with no significant findings, and there were no neurological
tests.                              Corey stuttered until age 5 and he
continues to have a slight lisp.  He was enuretic until age 11 and
encopretic occasionally between ages 8 and 12.  Mrs. Johnson said
that Corey talks to an imaginary friend especially when he is angry
at her.  She does not know how long he has been doing this.  She noted
that Corey becomes defiant especially when he is jealous of his broth-
er Robert.  Robert was hospitalized last summer at the Psychiatric
Institute following a suicidal attempt, (he walked on a ledge). Robert
became more of a problem for Mrs. Johnson during the last year with
significant increase in his aggressive unsocialized behavior.  Robert's
behavior was seen as risk taking behavior and that has also increased
recently.  Robert reportedly hates Corey and there was intense sibling
rivalry.  Robert has been referred to Children's Village
following              a five month stay at the Psychiatric Institute.

V. CHILD AT PDC:

     Cottage

In our cottage, Corey is seen as an easy child to care for.  He is

J.A.404

Corey Johnson                                                    -3-

generally cooperative and challenges adults in a playful, immature,
way.  He relates like a younger child and appears limited.  He very
often acts silly and is seen as the cottage clown.  This seems to stem
from his low self-esteem.  Corey does not have friends, he appears
frightened of children and does not like any physical contact with
them.  He also doesn't like to be teased by children and he gets very
verbal and loud when he is teased.  He seeks adult intervention in
those situations and is calmed easily by adults.  Corey seems to be
afraid of the dark but there has been no history of bedwetting or
nightmares during his stay at DC.  Overall, he is a child who main-
tains a low profile in the cottage and has not been difficult to
care for.

### Casework

Initially, in our sessions, Corey was anxious and appeared to have a
great deal of discomfort especially around discussion related to his
mother and her drug addicted, common-law husband.  With time Corey
appeared less anxious, spoke with greater ease and appropriately ex-
pressed anger at his mother for placing him away from home.  He also
became more depressed and teary, in joint sessions with his mother,
when she told him that he can't come home for visits at the present
time.  Mrs. Johnson, a depressed, dependent woman tearfully and pain-
fully told Corey that she doesn't want him to come home now for visits
and witness struggles, fights and drug abuse.  She does not want him
to live in a "depressing" environment and said she is unavailable to
deal with Corey's emotional needs because of her own problems.  She
noted that she would like to protect Corey and have him in placement
while she attempts to take charge of her life by seeking employment
and a new residence.  Corey seemed to be more accepting of his mother's
current state of depression and views placement as a temporary option
because of his mother's current inability to cope.  There are also
feelings of anger and rejection around this issue which surface from
time to time and need to continue to be addressed.

### School

Corey has had many failures in school and is reading on a 2nd grade
level.  Testing indicated a lack of phonic skills which might enable
him to sound out words.  He also has a minimal sight vocabulary.  He
has difficulty blending and these combined factors make reading very
difficult for Corey.  He could recite the month of the year in sequence
only up to August although he knew that there were twelve months in
the year.  Corey could tell time on the hour only but seemed to feel
that he could learn in a short time.  He is essentially seen as a co-
operative child in school who has great academic deficits and needs
individualized instruction.

VI. FAMILY'S RESPONSE TO PDC:

Mrs. Johnson has kept all scheduled appointments and welcomed inter-
vention.  She has visited Corey regularly with one exception when
she was expected to have lunch with him at the cottage and did not
keep this appointment.  Corey was quite upset and disappointed and

**J.A.405**

Corey Johnson                                                        -4-

when Mrs. Johnson was called she said she was too depressed to come
Mrs. Johnson added that whe would contact Corey in the future if this should happen
again to let him know that she can't come.  In order to enhance her self-esteem and
help her begin to feel like Corey's mother, arrangements were made to have her visit
him in the cottage and have lunch with him there.  She has been quite
responsive to this plan and expresses gratefulness for the help that
she is getting here.

VII. DIAGNOSTIC APPRAISAL AND RECOMMENDATIONS:

Since Corey's admission to PDC on February 1, 1982 he has had psychiatri
and psychological testing, medical and dental examinations, the social
worker has completed the social history and met several times with his
mother and regularly with the boy.  In addition, he has been evaluated
in our school and cared for in our cottage.  On February 25, 1982 a
Multi-Disciplinary Conference was held with representatives of clinic-
al, child care and educational personnel.  The findings and recommenda-
tions of that conference are contained in the Psychosocial.

Our psychologist found Corey to be a sensitive and dependent boy who
is struggling with issues revolving around independence.  There was
an underlying organic component which serves to exacerbate the anxiety,
dependence, affectional needs and hostile impulses.  As a result, Corey
has an extremely hard time trying to integrate emotional challenges.
He is motivated to improve his situation and would benefit from both
remediation in academic areas as well as psychotherapy.  For a complete
report please refer to Dr. Gallaudet's evaluation.

Our psychiatrist sees Corey as a child who has the capacity to relate
well.  He is happy with his mother and reaches out to her.  His be-
havior is seen as reactive to a very chaotic home situation especial-
ly during the last four years with Mrs. Johnson having had great fin-
ancial problems and difficulties with her job and in her relationship.
For complete evaluation please see Dr. Collimuttam's report.

Our psychosocial formulation is that Corey is a likeable, related,
youngster whose depression is seen as reactive to an unstable family
situation within the past 4 years and to maternal rejection.  Corey's mother
is depressed and unavailable emotionally.  For the last four years
she has been living with an unemployed, drug addicted man who mis-
treated her and her children.  Mrs. Johnson has had great financial
difficulties as she is unemployed and in debt (having supported her
boyfriend's addiction as well).  Furthermore she is stressed in this
relationship as her common-law husband is involved with another woman
and Mrs. Johnson, who is quite dependent on this man, feels trapped,
unable to extricate herself from this relationship.  Corey's acting
out behavior is reactive to her emotional absence and her common-law
husband's abusive and destructive behavior.

We, therefore, with reluctance, recommend placement in a residential
treatment center at the present time while Mrs. Johnson takes a better
hold of her life.  Although Corey has great educational deficiencies
and needs intensive remedial work, we believe that he could have re-
turned home and residential treatment placement is only a viable op-

**J.A.406**

Corey Johnson                                                            -5-

tion because Mrs. Johnson is depressed and overwhelmed with diffi-
culties in her own life at the present time.  Mrs. Johnson will benefit from treatment
to help her cope with her problems, reorganize her life and then
become more available to her children so that they may return home.
She has agreed to contact Robert's former therapist at Psychiatric
Institute and will seek counselling.  We have tried to schedule an
appointment, during her recent visit to Corey, but have been unsuccess-
ful.  Mrs. Johnson stated that she will contact Robert's therapist
and will resume treatment.
        Amira Offer, CSW:ww  D-3/9/82     T-3/15/82


                                Amira Offer, CSW
                                Caseworker

J.A.407

USCA4 Appeal: 20-15      Doc: 11-2           Filed: 12/28/2020      Pg: 137 of 258

# EXHIBIT 26

**J.A.408**

Form W-853C (Icce)
Rev. 3/20/75

**REQUEST FOR AUTHORIZATION AND APPROVAL**
**FOR CARE AND SERVICES**

The City of New York
Department of Social Services
Special Services for Children

TO:

SPECIAL SERVICES FOR CHILDREN
80 Lafayette Street
New York, New York 10013

SSC WORKER

| | | | |
|---|---|---|---|
| AGENCY DATE | April 16, 1984 | | |
| CASE SURNAME | JOHNSON | | |
| BCW CASE NO. | 4766716-28 | TEAM/CSLD | 9095 |
| Mother's full name (incl. maiden name) | EMMA JOHNSON | | Social Security No |
| Address | 640 Riverside Drive | | |
| City | New York | St. N.Y. | ZIP 10031 |
| Father's full name | JAMES SYKES | | Social Security No |
| Address | Unknown | | |
| City | | St. | ZIP |

AGENCY FOLD

TO: AGENCY  Jewish Child Care Association of New York

PLEASANTVILLE COTTAGE SCHOOL
345 Madison Avenue
New York, New York 10017

NAME OF WORKER   LYNN POLSTEIN

▨ Shaded area for IARP use only

INDICATE FOR:
Code 00 Addl. Placement Effective Date
Code 02 Ann. Reauthorization Annual Period
Other Specifications Below

| IARP FOLD | CHILDREN SURNAME | FIRST | M.I. | DATE OF BIRTH | WHEREABOUTS ADDRESS OR AGENCY | INITIAL PLACEMENT DATE | CITY BILL NUMBER | Request Code | APPD YES | NO |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | JOHNSON, | COREY | | ▮ | PCS | 2/1/82 | 12178 | 49 | | |
| 2 | | | | | | | | | | |
| 3 | | | | | | | | | | |
| 4 | | | | | | | | | | |

AGENCY: (Check one) ☐ Reply ☐ Report Only ☑ Request (See Reverse) Specify Type of Request: Permanency Goal Change

SUMMARY: (ATTACH ADDITIONAL SHEET OF PAPER IF REQUIRED)

This is to request a change in discharge goal for Corey Johnson. We are requesting that Co have a permanency goal of discharge to independent living.

Corey is a 15½-year old boy with severe learning disabilities in reading, spelling and arithmethic. Within the course of his placement, these disabilities have been identified and he has received a program to remediate his defects. To date, his progress in learning to read has been only minimally successful. Coupled with, and perhaps as a result of, his learning problems, Corey has a very damaged sense of self which interferes with his assertiveness and which seems to be at the root of his feelings of depression and hopelessn He is a youngster who needs to live in an environment in which he feels nurtured and in whi his non-academic strengths are supported. When his environment is non-supportive, Corey act out in the community by stealing and truancy.

During the course of placement, work has been done to enable Mrs. Johnson to be more (OVER)

**AUTHORIZATION SPECIFICATIONS FOR REQUEST CODES OTHER THAN 00 AND 02**

| DISCHARGE CODE | TYPE | NAME, RELATIONSHIP, ADDRESS | CODE 15 | PLACE ON ADOP. REFERRAL | AGENCY: |
|---|---|---|---|---|---|
| 04 | FINAL | TO: | | | |
| 05 | $500 | | CODE 28 | TAKE SURRENDER | DATE: |
| 06 | TRIAL | DATE: | | | |
| CODE 07 | EXTEND CARE | Until date: | CODE 20 RETURN TO CARE CODE 55 PROC.SUSP. PAYMENT | EFFECTIVE DATE REASON | CODE 33 PL. IN PFDC Parent's $ |

SSC: (Check one) ☐ Reply ☐ Request ☐ Report

We approve your request to change the permanency goal to "Independent Living".

AUTHORIZING SIGNATURE

DATE: 5-1-81

J.A.409

# EXHIBIT 27

J.A.410

## DECLARATION

I, ESTHER JOHNSON, hereby affirm the following:

1.      I live at 10 West 138th Street, Apartment 4K, New York, New York 10037.

2.      I am Corey Johnson's maternal grandmother.  The youngest of my three children, Emma Lee Johnson (who is no longer alive), was Corey's mother.

3.      I was born on ▓▓▓▓▓▓▓▓ in Sumpter, South Carolina.  My parents were Julius and Emma Brunson.

4.      My parents worked hard and were very strict with me.  I tried to avoid getting in trouble because when I did, I would receive a "whooping" from my parents.

5.      While in South Carolina, when I was about 17 years old, I had my eldest daughter, Minnie Hodges.  About two years later, my son Amos Brunson was born. His father was a man named Jimmy Lee Brown.

6.      A few years later, I met and later married Love Johnson, with whom I had my third child, Emma, Corey Johnson's mother.

7.      Love Johnson and I lived with my three children in South Carolina for a short period before relocating to New York.  We moved to New York without bringing my children with us, leaving them with my parents.  The children joined us some time later.

8.      Love and I were married for many years.  He drank a lot and ran around with many other women, which is why we eventually divorced.  He would also occasionally hurt me when he was drunk.  While I drank alcohol in excess when I was younger, after I stopped, I found it very difficult to be around Love when he was drinking because he behaved badly.

9.      I lived in Brooklyn, New York in 1968, when Corey was born.

1

J.A.411

10.    Corey's father, James Sykes, was a nice man who treated me and Emma with respect when he was dating Emma. At the beginning of their relationship, he spent a lot of time at our house. Emma got along well with him. I remember that there was a discussion about Emma and James getting married. I wanted them to get married.

11.    Corey was born at Brooklyn Jewish Hospital. I was with Corey's mother, Emma, at the hospital during his delivery.

12.    After it became clear that Emma and James would marry, Emma wanted to see other people after Corey was born. Emma began spending time with the type of people that I did not like, because they were pushing her around and did not treat her properly. I think these people also hit Emma and used drugs but this never happened in front of me.

13.    While Corey was growing up, Emma dated a number of different men. She first dated Robert Butler, with whom she had her younger son, Robert Johnson. She later dated a man she called "Mitch," with whom she lived in Jersey City. He was a very nice man, who treated Corey well and wanted to adopt him. However, Mitch was killed in a dispute following card game. Corey and Robert were with me when they learned that Mitch had been killed.

14.    Emma later became involved with a man named Bobby Koger, who treated Emma, Corey and Robert very badly. He never hurt her in front of me, but I could tell that he was bad for her and told her that I did not think that he was right for her. Bobby also used to drink a lot. He was not a good person.

15.    Emma also had some friendships with women of whom I did not approve. In particular, I did not like her friend Carol because I thought she was a bad influence on Emma. Carol talked about people behind their backs. She used to take Emma's clothes and talk rudely

J.A.412

to people. She wanted me to be like a mother to her, but I told her that she would need to change her ways for me to do that. She never did that.

16. During Corey's and Robert's childhoods, Emma and the children lived with me at various times. Even when they were not living in my house with me, Emma often left Corey and Robert with me on nights and weekends. Corey and Robert even had a bedroom at my house. Emma was working and could not take care of them as much as I could. I fed them, clothed them and watched over them when they went outside. I did not let them go too far from the house and I gave them a curfew when they went outside. I always talked to them about right about wrong, and they attended church with me on most Sundays. I treated them as if they were my own children.

17. Corey was a good boy, while Robert could be mischievous at times. I treated them strictly, the way that I was raised.

18. In general, they did not give me a hard time. They showed me respect. They usually obeyed when I told them to do something (although sometimes Corey needed things repeated to him before he would understand what I was saying).

19. Corey was a quiet child, while Robert liked to talk a lot. Even though he was two years younger than Corey, Robert was better at standing up for himself, and Corey was more likely to be taken advantage of.

20. Corey was the kind of child that always took the back seat and let other people take the front seat. If he had money, children would not need to steal it from him because he would give it away.

21. Corey did not engage much with other children and did not make friends easily. I do not think that Corey got into fights at school, but my understanding was that he was

3

J.A.413

teased a lot by the other children. Robert often told me that the children picked on Corey at school, although I am not sure what the children teased him about.

22. On more than one occasion, Corey came home from school without the sweater that he had worn to school that day. When his mother, Emma, questioned him after this had happened, he told her that boys from school had taken his sweater from him. Emma not only became very angry with Corey but physically beat him for allowing the boys to take his sweater.

23. While I do not recall what prompted Emma to do so, I recall another incident in which Emma beat Corey with a shoe on the head. I asked her not to do it again.

24. I specifically remember talking to Emma about the physical beatings she gave Corey and Robert and encouraging her to talk to them instead of hitting them.

25. Throughout his childhood and teenage years, Corey seemed to be slower than Robert, even though he was two years older.

26. For example, Corey had problems dealing with money and I did not feel comfortable trusting Corey with money. If I wanted Corey to buy something for me from the store across the street where the owner knew both me and Corey, I would send Corey's younger brother Robert to accompany Corey, to make sure that the purchase was done right and that Corey received the proper change. I did not want to send Robert alone, however, because he would spend the entire amount. Therefore sending them together was the best solution.

27. I recall that Corey had problems in school, although I do not know the full extent of his problems. I heard to he had difficulties studying and succeeding in school. Also, I believe that he had problems with reading. Even now, when he writes me letters from prison as

J.A.414

an adult, I have trouble reading his letters. His spelling is not very good and the letters contain a lot of grammatical errors.

28.    I was sick quite often with diabetes and in and out of hospital a lot when Corey approached his teenage years and in his early teen years. I think that the family kept a lot of problems from me back then because they were concerned about my health and did not want to worry me. For instance, I remember hearing that Corey had been sent away to school north of New York City, but Emma did not tell me much about it. I do not know much about what happened with him while he was there.

29.    I was not aware that Emma was using drugs until my daughter, Minnie Hodges, told me so shortly after Corey was born. However, I think that I may have been in denial, because I didn't want to believe that Emma was using drugs.

30.    After I learned about her drug use, I frequently told her that she needed to stop. Because of this, she never used drugs in front of me, and she put on an act as if she was not using drugs when she was around me.

31.    Shortly before Emma died, I knew that she had boils underneath her arms and was too weak and sick to the go the doctor. However, I do not know the details of her death.

32.    The last time I saw Corey was on Mother's Day many years ago, while his mother was still alive. He brought me some decorative flowers.

I declare the above is true and correct.

Dated:  April 30, 2011.

_Esther Johnson_
ESTHER JOHNSON

New York, New York

5

**J.A.415**

USCA4 Appeal: 20-15      Doc: 11-2         Filed: 12/28/2020      Pg: 145 of 258

# EXHIBIT 28

## AFFIDAVIT

State of _New York_            )
                              ) ss:
County of _Bronx_             )

JAMES SYKES, being duly sworn, deposes and says:

1.      I was born ███████. I am currently 62 years old and live in the Bronx, New York with my son, James Sykes, Jr. I am currently unemployed, although actively looking for work, and receive public assistance. In the past, I spent time in prison and used heroin for about 25 years. I have now been clean for more than 15 years and have served as a drug counselor to others with substance abuse problems.

2.      Corey Johnson is my son. He was my first child and my only child with Emma Johnson. Corey was born when I was about 17 years old. Although Emma and I never married or lived together after Corey was born, and I was absent for significant periods of Corey's youth, I made contact with Corey when he was about 10 or 11 years old and spent time intermittently with him until he was about 17.

3.      After Corey, I later had four other biological children: two children by Mabel Sykes (James and Anita), one child by Maryann Sykes (Fairesha), and another child by Lori Martin (Amir). Mabel, who died in 1992, had three other children, who are my stepchildren (Elizabeth, Nadine, and Curtis).

### MY LEARNING DISABILITY

4.      I graduated junior high school (JHS 271 in Brooklyn) and later attended high school (Boys High School in Brooklyn), despite not knowing how to read at or near my grade level. Back then, many children were socially promoted to higher grades without being able to do the required work.

1

**J.A.417**

5.  I completed the 9th grade and then dropped out. At the time I dropped out, I was reading only at a 5th grade level.

6.  Later in life, I discovered that I had a learning disability.

7.  Both while I was in junior high school and as an adult, I was given various tests, including two IQ tests. Based on the results of these tests, I was diagnosed as learning disabled and told I had spatial deficits and dyslexia. I first received this diagnosis when I was in my late twenties or early thirties.

8.  As an adult, I have been evaluated by and have received services through VESID (Office of Vocational and Educational Services for Individuals with Disabilities) – a program that helps peoples with disabilities secure employment and maintain independent lives.

9.  In mid-1990s, I began attending Hudson Valley Community College under a special program through the Americans with Disabilities Act and graduated with an Associates Degree. In 1998 enrolled at SUNY Albany, also under the ADA program. At both Hudson Valley and at SUNY Albany, I received extra time to complete assignments and tests, and proctors would assist me in writing my answers on exams.

10.  Nonetheless, I had a difficult time in this program. I always have had a lot of problems retaining information. In the end, however, I was able to complete the program and in May 2000, I graduated with a degree in sociology from SUNY Albany.

11.  I had a total of four siblings, three brothers (two now deceased) and one sister. My youngest brother, Ezzie Johnson, was sent to Cleveland, Ohio to live with our aunt. He is now about 55-56 years old and resides in Cleveland, Ohio. My other siblings and I would see him during visits. As a child, Ezzie attended a special school because of his difficulties in becoming educated in rather basic things. In particular, he could not retain information and it took him a long time to learn his ABCs. Ezzie did not learn the alphabet until he was around the

2

age of 12 or 13. My sister, Daphne (Sykes) Moore (also still living), has a history of mental illness. I am not sure of her exact diagnosis but am aware that she has been treated and hospitalized for her illness in the past.

## MY RELATIONSHIP WITH EMMA JOHNSON AND COREY'S EARLY YEARS

12.    Emma Johnson and I met at a party in Brooklyn. At that time, I was living in the Crown Heights section of Brooklyn with my mother, Sarah Sykes. I believe that I was about 15 years old and attending junior high school in Brooklyn (JHS 271) when I met Emma. I believe that Emma was younger, about 14 years of age, and attending junior high school at the time. Emma was visiting her aunt and cousins in the area when we met.

13.    After we met, Emma and I started dating. We went out to the movies, went to Coney Island, and double-dated with Emma's brother and his girlfriend.

14.    When I first knew her, Emma was living with her parents and two siblings. Emma attended church on a regular basis and was closely protected by her parents. Our dates were sometimes chaperoned by Emma's brother and sister.

15.    Esther Johnson, Emma's mother, was really nice to me when we started dating, and we got along well.

16.    Love Johnson, Emma's father, was a small but strong man. He had been a Chief Petty Officer in the Navy and was a war veteran. Love was responsible for maintenance work in a building. I used to help him clean up the building.

17.    Love used to drink a lot, though, and was pretty hard-headed. He went out a great deal with his friends, and he had a lot of lady friends.

18.    I witnessed arguments between Love and Esther. Most of the time, the arguments seemed to be about infidelities. Eventually, Love and Esther separated and Emma moved out.

3

19. Love treated Emma better than her brother and sister. He gave Emma money and freedom. In fact, Emma's father pretty much gave her whatever she wanted, and he would say Emma was spoiled by him. Love was in agreement with my dating Emma.

20. When I was dating Emma, her sister, Minnie, had a tendency to agree with others and was easy to convince. Later, when Corey was a teenager I noticed that Corey displayed similar characteristics but to an even greater extent. I remember Minnie being slow – in that she did not fully understand certain things and did not catch on easily to other things. Minnie behaved much younger than her age. She did not go outside often, and when she did, she went with her mother or brother.

21. I also knew Amos Brunson, Emma's brother. He was a good, kind-hearted, hard-working person.

22. At the time I was dating Emma, I was involved with a gang called the Chapmans. Other popular gangs were the Tomahawks and the Buccaneers. The gangs fought each other, but they were also into dancing, taking care of the neighborhood, and marching in the streets. My gang even had a drum and bugle group – I played the drums.

23. Emma became pregnant with Corey while we were dating.

24. My involvement with gangs and fighting got me in trouble and ultimately incarcerated.

25. I was about 17 years old and incarcerated on a robbery charge when Corey was born. Even though I was a minor, I was sent to adult prisons (Elmira CF and Woodbourne CF). I believe I was in prison for about a year or so.

26. When I was released from prison, Corey was about 18 months old.

4

J.A.420

27.     After my release from prison, I moved in with my mother in Brooklyn. Emma and Corey were living with her mother in Brooklyn. Emma was still living apart from Love.

28.     During this time, I saw Corey frequently. I used to pick him up and take him around regularly. As an infant, Corey appeared to me healthy and vibrant.

29.     My mother, Sarah Johnson, also saw Corey when he was a baby. However, there was a conflict between her and Emma's mother, Esther. Esther wanted me and Emma to marry; my mother disagreed because she thought we were too young. I later learned that my mother refused to sign papers that would permit the marriage. This incident soured my relationship with Esther.

30.     When I was around age 18, I was introduced to heroin and started sniffing it. I continued to use drugs on and off for many years.

31.     Due to my involvement with drugs, I was soon incarcerated again, and my time with Corey as a baby was short-lived.

32.     I went back to prison. After I got out of prison for the second time, I went to Emma's house, but the family had moved, with no forwarding address. I visited the home of a cousin of the family, thinking he could help me locate Emma and Corey, but he had moved as well.

33.     I eventually learned of Emma and Corey's whereabouts while serving another prison term.

34.     One of the correctional officers knew Minnie (Emma's sister). The officer gave me Love Johnson's address and phone number, and that enabled me to get in touch with Emma once I got out of prison.

J.A.421

## MY RELATIONSHIP WITH COREY FROM ABOUT AGES 9 TO 17

35.    When I got in touch with her, Emma told me that Corey was living with his grandfather, Love Johnson, in Brooklyn and provided me with Love's address.   Emma claimed that Corey was staying with his grandfather because he was not manageable. Emma complained of Corey's "antics," and also said that Corey was also having problems in school.  I believe that Love took good care of Corey.

36.    After having not seen him since he was a baby, I finally saw Corey again when he was 9 or 10.

37.    Thereafter, I had contact with him until he was about 17 or so.  The visits and contact were quite sporadic. Corey was placed in several different schools and residences during this time.  In addition, during this period, I violated parole and was sent to a prison upstate for a time.

38.    When I first came back into contact with Corey, I was living in the Brownsville section of Brooklyn, and Corey would sometimes visit me. Corey and I also visited my other children, his half-siblings.

39.    I was told that Corey was having problems with reading and math, and that he could not read or write. I talked to Corey about this, but I didn't know what to do about this.

40.    I met Bobby Koger, Emma's boyfriend, on one occasion when Corey was between the ages of 10 and 13 (I cannot recall his exact age).

41.    Previously, Love had called me and told me that Corey was being physically abused by Bobby.  Love suggested that I try to obtain custody of Corey.

6

J.A.422

42.    I confronted Bobby about the abuse on a Sunday when Corey, Bobby, and I were all at Love Johnson's house. Bobby and I exchanged harsh words, and I told Bobby not to hit or beat Corey.

43.    Bobby was vocal about his dislike for Corey and said that Corey did not listen and was difficult. Bobby told me Corey needed to be put away due to his behavior.

44.    Bobby said that if he did not take care of Corey, someone else would. Bobby also said Corey would get himself killed. I took this to mean that he would kill Corey because Corey was bothering him so much. The conversation got really heated.

45.    On that day, Corey told me that he felt that Bobby did not want him around. Corey further told me that he believed that his mother was choosing Bobby over him.

46.    Based on my observations of Corey's demeanor and physical appearance in the presence of Bobby that day, I believe that Corey was being abused by Bobby. Corey did not look directly at Bobby – he was always keeping his head down or looking away from Bobby. Corey did not sit or stand next to Bobby. I also remember seeing dark bruises on Corey's forehead that day.

47.    The day described above is the only time I saw Bobby.

48.    When Corey was about 12 and placed upstate at the Pleasantville Cottage School, Corey would sometimes visit me over the weekends.

49.    While Corey was at Pleasantville, I once went to see his counselors there. They told me that Corey was not doing well in school but was not a troublemaker.

50.    The main problem, they said, was that Corey could not read. Also, Corey's tendency to follow others would land him in trouble.

51.    When I saw Corey between the ages of 10 to 13 or so, he did not talk much about his living situation. We would basically talk about the family and sometimes school.

7

J.A.423

I remember Corey telling me that he often felt embarrassed about not being able to read and that he would clown around and try to be funny to distract from the fact that he could not read.

52.    In truth, I never felt as though I really got a chance to know Corey because I had lost contact with Corey during his crucial growing years.

53.    I did not realize that Corey felt as though he was not wanted by me. He was always playful around me and my other children and stepchildren, and he appeared to be happy. I was not aware of how Corey felt – but I did not ask him either. I would ask Corey how things were at home, and he would respond that things were fine. I would not push the conversation and just accepted his answer.

54.    He spoke very little about his mother; when I asked about her, Corey would just say she was doing well.

55.    It troubles to me to think that I could possibly have made things better for Corey by asking him to live with me and my wife at the time (Maryann), but never did so. I never made Corey an offer to come live with me.

56.    Later, when Corey was around 16 or 17 and living at the Elmhurst group home, he came over to visit me a couple of times and I believe he saw other members of my family. Corey always seemed glad to come on these visits, but he also would act a little distant.

57.    I did not see Corey after he left school, when I understand he was hustling on the streets. At that time, I tried to get information about Corey from Emma, but she was not informative.

58.    Emma gave up on Corey. While I was not aware of Emma using drugs when I was around her frequently (when she was a teenager), in later years when Emma was in her late twenties I became aware that she abused drugs. Still, I was surprised when I learned she had died of a drug overdose.

8

J.A.424

59.     My mother recently told me that she would have helped Corey during the time after he left high school, but no one ever told her anything about his situation then.

## MY CONTACT WITH COREY SINCE HIS INCARCERATION

60.     I spoke with Corey a few times while he was on death row in Virginia. I have also sent him some money. Corey never talked much on the phone; we basically talked about Corey's maternal grandmother and myself.

61.     I speak to Corey on the phone about once a month. We usually only speak for a few minutes and I ask him how he is doing. Sometimes, he also tells me about his daughter

62.     Since Corey has been in prison, our communication has mostly been by phone. Occasionally, Corey writes me letters but they are infrequent. The letters are also difficult to understand and I have to read them several times to understand them. Both his handwriting, grammar, and spelling are very poor.

_____
JAMES SYKES

Sworn to before me on this
__17__ day of May, 2011

_____
Notary Public

ARLETTE GUERRA
Notary Public - State of New York
NO. 01GU6178311
Qualified in Bronx County
My Commission Expires 11/26/11

9

J.A.425

# EXHIBIT 29

J.A.426

DECLARATION

I, Bobby H. West, hereby affirm the following:

1.    I reside at 6849 Wood Haven Road, Roanoke, Virginia 24019.

2.    I am Senior Pastor of Covenant Community Church in Salem Virginia. I am also ordained by the Church of God in Anderson, Indiana.

3.    From approximately 1971 until 2006, I was a volunteer prison chaplain with my wife, Sarah West. During my thirty-five years as a chaplain, I met with several thousand prisoners.

4.    For fifteen of those thirty-five years, I ministered specifically to death row inmates. For those fifteen years, I spent approximately five hours every other week visiting with death row inmates in Virginia. I estimate that I met with approximately seventy-five death row prisoners during those years.

5.    I first met Corey Johnson in 1997 at the Mecklenburg Correctional Center in Boydton, VA, shortly after Corey was moved there from Powhatan Correctional Facility. I visited with Corey every other week while he was at Mecklenburg, where he lived on a pod that housed between eight to twelve prisoners. During that time, I saw him both individually and as part of larger group meetings with the other men on the pod. During this time, I also met with Corey's co-defendants, James Roane and Richard Tipton, and had an opportunity to observe them individually as well as with Corey. When Corey was moved to a facility in Sussex County, Virginia, I visited him there as well. In total, I estimate that I saw Corey approximately one hundred times while he was at the two Virginia facilities. Later, Corey was transferred to a facility in Terre Haute, Indiana, where I visited him four or five times. My last in-person visit with Corey was in

J.A.427

March 2006. I have probably spoken to Corey ten to twelve times while he has been in Indiana. My phone contact with him ended in 2005.

6.      At Mecklenburg, I was able to see Corey in the same setting as James Roane and Richard Tipton. Corey was less vocal and opinionated than either Roane or Tipton. Whereas Roane and Tipton expressed anger regarding, for example, the prison food, Corey seemed to "go with the flow." Roane and Tipton challenged the statements of others if they disagreed with them, whereas I did not observe Corey do the same. Corey seemed considerably less intelligent than Roane or Tipton in the way he spoke.

7.      Roane and Tipton were "up" on their legal cases, including the argument that they and Corey should not have been tried together. On the other hand, Corey expressed no understanding of the status of his legal case and instead appeared to rely completely on his lawyers regarding what should be done on his behalf. Corey expressed hope that his lawyers were doing a good job representing him.

8.      Most of the men on death row at Mecklenburg, including Roane and Tipton, were researching their cases. I have no memory of any discussion with Corey related to the use of the law library. He only commented from time to time that he had talked to his attorneys.

9.      Corey was less vocal and opinionated than most death row prisoners I have observed. Generally, the more vocal inmates had jobs in prison but Corey did not. In general, Corey did not appear to possess leadership capabilities.

10.     At Mecklenburg, Corey lived on a pod, where eight to twelve other men also lived. Corey appeared to get along with his fellow prisoners. I did not observe him

2

**J.A.428**

in disagreements with anyone. As compared to Roane and Tipton, Corey seemed softer and kinder. In my interactions with Corey, he was soft-spoken, quiet, and humble. He seemed eager to please, wanting to "say the right thing."

11.    During my discussions with Corey over the years, we generally talked about his family, daily living activities, and sporting events. Where it was common for other death row prisoners to raise deep or complex spiritual questions, Corey never did. We had very basic spiritual discussions.

12.    While I observed him, Corey did not appear to engage in subjects that required analysis or decision making. This was in contrast to Tipton and Roane, who did make decisions. For example, Tipton would say things that would hurt him in prison, just to make a point. I envisioned Tipton as the strong man of the group, with Corey down at the bottom of the pecking order in terms of power.

13.    During the time I was in contact with Corey, I wrote several letters to Corey. I never received any letters from Corey. When I visited Corey in the pod area of Mecklenburg or at his cell door in Sussex, I never observed him writing letters. He also never discussed writing letters to anyone with me.

14.    I learned about the crimes of which Corey Johnson, James Roane and Richard Tipton had been tried and convicted. Based on my interactions with Corey Johnson, those crimes seemed totally out of character for Corey. On the other hand, based on my interactions with James Roane, I found it less difficult to believe Roane could have been involved in such crimes. And, based on my interactions with Richard

3

Tipton, I did not find it difficult to believe that Tipton would be involved in such crimes.

15.     Based on my observations of Corey alone and his interactions with Roane and Tipton, I believe that Corey wanted to be considered a strong man who would have done what others told him to be more accepted in the group.

I declare the foregoing is true and correct.

Dated: _MARCH 24_, 2011.

_Bobby H. West_
BOBBY H. WEST

Commonwealth of Virginia
City of Roanoke

4

**J.A.430**

USCA4 Appeal: 20-15      Doc: 11-2          Filed: 12/28/2020      Pg: 160 of 258

# EXHIBIT 30

J.A.431

```
   THAEK        *         INMATE EDUCATION DATA      *      05-25-2012
 PAGE 001 OF 001 *            TRANSCRIPT             *      08:23:09

 REGISTER NO: 27832-054    NAME..: JOHNSON              FUNC: PRT
 FORMAT.....: TRANSCRIPT   RSP OF: THP-TERRE HAUTE USP

 ------------------------- EDUCATION INFORMATION -----------------------------
 FACL ASSIGNMENT DESCRIPTION              START DATE/TIME STOP DATE/TIME
 THP  ESL HAS   ENGLISH PROFICIENT        08-24-1999 0001 CURRENT
 THP  GED EN    ENROLL GED NON-PROMOTABLE 08-24-1999 0001 CURRENT
 THP  GED SAT   GED PROGRESS SATISFACTORY 04-28-2000 1233 CURRENT

 ------------------------- EDUCATION COURSES ---------------------------------
 SUB-FACL DESCRIPTION              START DATE  STOP DATE EVNT AC LV HRS
 THP SCU  SCU GED 7:30-9:00 AM     08-04-2005 CURRENT
 THA SCU  SCU GED SELF STUDY-12-1PM 08-25-1999 03-07-2005   P   W  I   518

 ------------------------- HIGH TEST SCORES ----------------------------------
 TEST         SUBTEST      SCORE   TEST DATE    TEST FACL   FORM     STATE
 ABLE         LANGUAGE      2.8    02-15-2000   THA         F
              NUMBER OPR    5.7    02-15-2000   THA         F
              PROB SOLV     4.5    02-15-2000   THA         F
              READ COMP     7.3    02-15-2000   THA         F
              SPELLING      3.6    02-15-2000   THA         F
              VOCABULARY    7.0    02-15-2000   THA         F
 GED PRAC     LIT/ARTS    400.0    04-12-2006   THP         PE
              MATH        330.0    04-12-2006   THP         PE
              SCIENCE     350.0    04-12-2006   THP         PE
              SOC STUDY   350.0    04-12-2006   THP         PE
              WRITING     380.0    04-12-2006   THP         PE




 G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

J.A.432

USCA4 Appeal: 20-15      Doc: 11-2          Filed: 12/28/2020      Pg: 162 of 258


# EXHIBIT 31

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,          }
                                   }
v.                                 } *Criminal No. 3:92CR68*
                                   }
VERNON LANCE THOMAS.               }

### MOTION TO HAVE DEFENDANT DECLARED MENTALLY RETARDED

**COMES NOW** the defendant, Vernon Lance Thomas, by and through his counsel, Cary B. Bowen, Attorney at Law, and requests that the defendant be declared mentally retarded, and to that end states as follows:

1. That the defendant, Vernon Lance Thomas, stands charged herein with capital murder, as well as other related charges, currently scheduled for a jury trial on April 26, 1993.

2. That Henry L. Dee, Ph.D., P.A., has evaluated and tested the defendant and has determined him to be mentally retarded. (A copy of said evaluation is attached hereto as Exhibit "A" as well as a copy of Dr. Dee's CV as Exhibit "B").

3. That the American Association on Mental Retardation has defined "mental retardation" as follows:

> Mental retardation consists of substantial limitations in present functioning characterized by significantly sub-average intellectual functioning (i.e. an I.Q. of 70 - 75 or below), existing concurrently with related limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.

4. That the accused's performance on the Wechsler Adult Intelligence Scale - Revised Edition fell into the retarded range with a full scale I.Q. of 71.

5. That the Wechsler Adult Intelligence Scale - Revised Edition is generally considered to be the most reliable and valid test to determine mental levels and is used throughout the country.

6. That the accused had a score of 60 on the Stanford - Binet Verbal Reasoning sub tests.

7. That the accused not only performs in the retarded range on the I.Q. testing but that he also shows significant adaptive impairments which further define and reinforce the fact that he is mentally retarded.

8. That the United States does not allow anyone determined to be mentally retarded to be executed.

**WHEREFORE**, premises considered, defendant herein should be declared mentally retarded.

Respectfully submitted,

**VERNON LANCE THOMAS**

By _____
Counsel

Reginald M. Barley, Esquire
2025 East Main Street
Richmond, Virginia 23219
(804) 783-8468

Cary B. Bowen, Esquire
**Bowen and Bowen, Attorneys at Law, P.C.**
304 West Broad Street
Richmond, Virginia 23220-4219
(804) 648-7400

## CERTIFICATE

I hereby certify that a true and exact copy of the foregoing Motion was mailed, postage prepaid, this 15th day of April, 1993, to Howard C. Vick, Jr., Assistant United States Attorney, Office of the United States Attorney, Main Street Centre, 600 East Main Street, Suite 1800, Richmond, Virginia 23219.

_____
CARY B. BOWEN, Esquire

*Henry L. Doe, Ph.D., P.A.*

CLINICAL AND CONSULTING PSYCHOLOGY

1506 SOUTH FLORIDA AVENUE
LAKELAND, FLORIDA 33802
(813) 488-6477

<u>United States</u> v. <u>Vernon Lance Thomas</u>
Criminal No. 3:92CR68
EXHIBIT "A"

April 9, 1993

Resume' of Neuropsychological Evaluation

Re: Vernon Thomas

Test Battery: Wechsler Adult Intelligence Scale - Revised;
Selected Subtests of the Stanford-Binet: Fourth Edition;
Selected Subtests of the Woodcock-Johnson Tests of
Achievement - Revised; Minnesota Multiphasic Personality
Inventory; 16 PF Test Profile; Denman Neuropsychology Memory
Scale; Multilingual Aphasia Examination: Controlled Word
Association, Sentence Repetition, Oral Language Token Test,
Visual Naming; Benton Visual Retention Test; Finger
Localization; Right/Left Orientation; Stereognosis Test;
Judgment of Line Orientation; Facial Recognition Test; Visual
Form Discrimination; Clinical Interview and Interpretation

J.A.437

<u>VERNON THOMAS</u>

<u>REASON FOR REFERRAL AND BACKGROUND INFORMATION</u>

Vernon Thomas is a twenty-five year old, African-American male who was referred for evaluation by Cary Bowen, Esquire, appointed counsel.  According to Mr. Thomas, he is charged with, among other things, murder and conspiracy to commit murder in a continuing criminal enterprise.

He reports that the crime allegedly occurred on February 1, 1992, although he is unable to supply the time of day or night that it is supposed to have occurred.  He reports that the prosecutor alleges that he shot two people on February 1 He is alleged to be the person who was actually involved in the shooting and is also alleged to have "masterminded" the operation and ordered the murder of others.

He reports that he is accused of having conspired with his co-defendants to distribute drugs and to murder.

With regard to his Competence to Proceed, Mr. Thomas apparently understands the function of his attorney, the prosecution, the role of the jury, and the judge.  He understands the nature of a Plea Bargain.


<u>HISTORY</u>

Mr. Thomas was born on ███████████████, at St. Luke's Hospital in New York, to Illona Miller Thomas and Richard Thomas.  Mrs. Thomas is currently forty-six years of age and disabled with heart problems.  Mr. Thomas reports that his father, Richard Thomas, lives in Chicago and he denies any knowledge of what he does, and indeed, reports that since his parents separated when he was approximately eight or nine years of age, he rarely ever saw his father.

Further evidence revealed that Mr. Thomas believed that his father fled New York with a homosexual lover and took up residence in Chicago, which has led to some of his bitter comments about the fact that "It's like I don't have any father", etc.

Mr. Thomas reports that he went through eleven years of schooling and left because "I was getting too old", and revealed that he had "reading problems" in school.  While he reports that he learned these skills afterwards "on the street", there is good reason to question this statement because of his present abilities (see below).

**J.A.438**

Henry L. Dee, Ph.D., P. A.
Page 2

It would appear from his school record that by the time he was roughly twelve years of age, Mr. Thomas was placed in special education. According to the report of Jerry Kulba, who was in charge of the special education program at the time Vernon was in PS 143 in New York City, Vernon was seen as a "very low functioning" child. Even in this special education program, he was in the low functioning group and Mr. Kulba estimated his IQ at that time to be roughly 60. At first, he was classified as CRMD (children with retarded mental development). Later, the labels in the school system were changed and he was classified as EMR or educable mentally regarded. At that time, the perameters for EMR were an IQ between 50 and 75. At that time, his estimated IQ was well below 70 and his achievement scores were very low. Mr. Kulba also described Mr. Thomas as being "a follower.....easily swayed......could be drawn by the promise of anything....friendship.....not necessarily money."

Phyllis Williams, the principal at PS 143, was at that time a special education teacher while Mr. Thomas attended school. She describes him as "limited....very limited." She had him in her Social Studies class and describes his writing as "very poor and his reading ability very limited." Indeed, she describes his attempts at reading as "painful to watch...". She too reported that his IQ was clearly below 75. She described him as "not well cared for.....disheveled", and also describes him as having been easily led. She felt he had grave difficulties in premeditating or planning anything and stated that he needed "simple, clear directions from others."

While his high school records have been diligently searched for, his special education records have somehow been lost or destroyed.

Rodney Lofton, the supervisor of special education at Mr. Thomas' middle school IS 143 notes that Mr. Thomas had "learning disabilities with attention and concentration problems", and that while very extensive efforts had been made to locate the special education records, they simply cannot be found anywhere in the city school system.

Mr. Thomas' brother, Ralph Miller, notes that he recalls that Vernon had problems in school and that other children frequently made fun of him. He reported that it was difficult for Vernon to admit that he couldn't do the work and couldn't understand what he was reading. While he was allegedly somewhat better with math, his reading was always a serious impediment. Ralph recalled that Vernon would try to look for jobs after leaving high school, but was unable to

Henry L. Dee, Ph.D., P. A.
Page 3

obtain work. He had not completed high school, had no job training or skills and frequently asked his brother for money. Indeed, the only job that he apparently successfully carried on for any period of time was that with a messenger service for roughly six months, and a Federally Funded summer youth job funded by the city. It involved delivering mail to different buildings. The only other work that he apparently was able to do was clean-up work at the U. S. Tennis Open, a job that was obtained for him by others.

Fran Leichter, Vernon's home room teacher, noted that he was a lad who "could be swayed.....not very bright." She too felt that he was probably retarded and described the family as dysfunctional. She described Vernon as a person who wanted to please other people. He would frequently comply with the requests of other people.

Mr. Thomas lived at home with his mother until age twenty-one, apparently because he could not maintain employment and a home of his own. He did get an apartment with a Nicole Bishop at age twenty-four, but never really lived on his own. Ms. Bishop reports that while Vernon talked about wanting to find a job, he really did not know how to go about looking for work and had no idea of what he could do. She reports that he never had a checking or savings account and would carry only small amounts of cash. He occasionally could give her $50.00 or $60.00 for groceries.

He was and is lacking in the skills required to seek out employment and certainly has no vocational training. His lack of formal education is clearly a bar to gainful employment, particularly with his academic limitations (see below).

As much of his school records as could be found were reviewed. As of the time that he left school in the eleventh grade, he was still failing in reading and math, as he frequently had in school previously. On the California Test of Basic Skills at that time, he was reading some place between Grade Level 3 and 3.6, which is, of course, not functional literacy for someone of his age or educational level. It certainly would not allow him to do high school work, something that he alluded to when he said that he was leaving school in part because he was getting too old, and it was implied, that it was also in part because he was learning nothing. Consistent with this, throughout his school history, he seems to most of the time not met the criteria for promotion and nowhere could I find evidence that he read above Grade Level 3.5 or 3.6 or that any of his general educational development exceeded this.

Henry L. Dee, Ph.D., P. A.
Page 4


His early school records contain frequent comments about his
behavior which suggests that he suffered an Attention Deficit
Disorder with Hyperactivity. He rarely completed his work
and needed constant attention even though interestingly, he
was frequently noted to be "courteous". As he grew older, he
apparently began to outgrow the hyperactivity and was able to
sit and do more of his work but continued to require constant
support and attention.

Information gathered by Jill Miller, MSSW, indicated that
besides the rather distressing loss of his father at age
nine, there was apparently significant neglect of he and his
five siblings. His mother attempted to raise the children
alone, but also tried to carry on some life of her own and
apparently indulged in some alcohol abuse. On one occasion,
when Vernon was but seventeen months of age, she left the
children alone and the family apartment caught fire. The
firemen, after pulling the children from the blaze, found it
necessary to resuscitate Vernon twice, suggesting potential
for possible brain damage from lack of oxygen. The possible
etiology of his later educational and mental handicaps.


## INTELLECTUAL AND NEUROPSYCHOLOGICAL FACTORS

## Wechsler Adult Intelligence Scale - Revised

| Area Measured | Approximate Percentile | Rating |
|---|---|---|
| Information | 1 | Very Low |
| Digit Span | 5 | Low |
| Vocabulary | 1 | Very Low |
| Arithmetic | 16 | Low |
| Comprehension | 1 | Very Low |
| Similarities | 0.4 | Very Low |

    Verbal Abilities: 1st Percentile

| | | |
|---|---|---|
| Picture Completion | 9 | Low |
| Block Design | 5 | Low |
| Digit Symbol | 37 | Average |

    Performance Abilities: 7th Percentile


    General Intellectual Functioning: 3rd Percentile

Mr. Thomas' performance on the Wechsler Adult Intelligence
Scale - Revised Edition, fell into the retarded range, with a

J.A.441

Henry L. Dee, Ph.D., P. A.
Page 5

Full Scale IQ of 71. Mental retardation, as defined by the American Association on Mental Retardation, consists of substantial limitations in present functioning characterized by significantly sub-average intellectual functioning (i.e. an IQ of 70 - 75 or below), existing concurrently with related limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. It is also a condition that is manifest before age eighteen, and this is clearly the case in Mr. Thomas as can be seen from the history and the history of his testing.

The Wechsler Adult Intelligence Scale - Revised Edition, is generally considered the most reliable and valid test of mental level, being in absolutely standard use throughout the country. It is the standard which other tests are compared because of its superior norms, construction, and validity.

The Woodcock-Johnson Tests of Achievement - Revised Edition, is similarly regarded as an absolutely objective, standard measure of practical academic skills, and is once again, probably the most frequently used test of these abilities. On these tests, his performance indicated broad written language capacities at Grade Level 2.1, letter-word identification at Grade Level 4.7, passage comprehension at Grade Level 4.6, dictation skills at Grade Level 2.5 and writing samples at Grade Level 2.4. He, thus, has little in the way of reading or writing skills, which is consistent with his previous history and general mental level.

In the area of self-direction, one indication that can be gained (aside from the above testimony of those that knew him) is his performance on the verbal reasoning subtests of the Stanford-Binet, which yield a Verbal Reasoning score of 60, which is well below two standard deviations below the mean, indicating little capacity for competent verbal reasoning to assist him in handling situations requiring judgment and ability to make appropriate decisions.

On the Denman Neuropsychology Memory Scale, a clinical assessment of immediate recall, short term memory, and long term memory in both verbal and nonverbal areas, his performance yielded a Full Scale Memory Quotient of 75, which may be compared to his Full Scale Intelligence Quotient of 71, which indicates that his memory is about at the same level as his compromised general mental level, i.e. severely impaired.

On the Multilingual Aphasia Examination, a clinical

J.A.442

Henry L. Dee, Ph.D., P. A.
Page 6

assessment of linguistic skills, he showed basically intact
verbal fluency and auditory verbal language comprehension,
but defective immediate verbal repetition and very marginal
capacity to name a variety of common visual objects, his
performance falling at the 5th percentile.

His performance on tests of finger localization and
right/left orientation were broadly intact.

His performance on a test of stereognosis (crossmodal spatial
perception) was basically intact.

The same may be said of his performance on a test of facial
recognition, although his performance was done in such a slow
fashion that it was apparent that it was an extremely
difficult task for him.

On a test of judgment of line orientation, he shows severely
defective performance.

These findings are consistent with a diagnosis of mental
retardation.  He shows an IQ in the retarded range, with
significant adaptive impairments in the area of academic
skills, capacity to seek and maintain employment,
difficulties with self-direction and planning, limited social
skills (see below) and the fact that this retardation has
apparently been an aspect of his life that has been constant
throughout his life.  Like most individuals who are retarded,
and this examiner has seen thousands of them, Mr. Thomas has
acquired certain ways of interacting and behaving which allow
him to "pass" as a nonretarded individual, particularly to
the casual observer.  Nonetheless, careful intellectual
assessment certainly confirms this examiner's clinical
impression of mental retardation.

He has needed support and direction for all of his life and
will probably continue to need it for the rest of his life.

Looking at Mr. Thomas from a neuropsychologist's point of
view, which is, of course, the purpose of this examiner, it
is clear that Mr. Thomas suffers an Organic Brain Syndrome
based on his performance on the Wechsler (which is actually a
neuropsychological instrument) and other scattered cognitive
deficits, including memory impairment, difficulties with
spatial orientation and certain personality features (see
below).

PERSONALITY FACTORS

Mr. Thomas' performance on the personality tests indicate

J.A.443

Henry L. Dee, Ph.D., P. A.
Page 7

that he is a person who feels lonely, misunderstood, and not a part of his social environment. This is apparently based upon a lifelong history of mild to moderate rejection by his peers because of his mental retardation, something of which he is acutely aware.

His profile also indicates that he is likely to be overactive and impulsive as well as undercontrolled. This is, of course, not surprising, since people who have cerebral involvment of whatever etiology show most frequently two behavioral characteristics: memory impairment and increased impulsivity and an incapacity to control their impulses. Such people frequently show poor social judgment, and all of these characteristics are clear in Mr. Thomas' case.

Parenthetically, it might be added that the same is true of people who show mental retardation, but after all, mental retardation and cerebral damage or disease are but two sides of the same coin, i.e. two ways of looking at the same phenomenon.

He is an extremely concrete-thinking person who has difficulty reasoning through things. The notion of abstract reasoning or analogies is almost totally foreign to him.

Interestingly enough, he does appear on the psychological tests to be a person who is somewhat easily led and who tends to go along with others in order to win their approval and support. Once again, this probably has its origin in his feelings of alienation and rejection by his peers, i.e. a general desire to want to be "one of the guys".

SUMMARY IMPRESSION

1 - Mental Retardation, with multiple deficits in adaptive functioning.

2 - Organic Brain Syndrome with Mixed Features, i.e. generally lowered intellectual capacity, memory, and difficulties in impulse control and judgment.

*Henry L. D— Ph.D.*

Henry L. Dee, Ph.D., P. A.

HLD/ab

CURRICULUM VITAE

United States v. Vernon Lance Thomas

minal No. 3:92CR68

EXHIBIT "B"

## HENRY L. DEE

BORN:

████████████
Chattanooga, Tennessee

DEGREES:

B.A.    University of South Florida, 1964
M.A.    University of Iowa, 1966
Ph.D.   University of Iowa, 1969

APPOINTMENTS:

1964-65    Research Assistant in Psychological Psychology, University of Iowa
1965-66    Graduate Assistant in Psychology, University of Iowa
1966-67    Intern in Psychology, Connecticut Valley Hospital
1967-68    Graduate Assistant in Psychology, Scott County Mental Health Center, Davenport, Iowa

Summer,
1968      Lecturer in Psychology, University of Iowa

1968-70    Research Associate in Neurology and Psychology, University of Iowa
1970-73    Consultant in Psychology, Veterans Administration Hospital, Iowa City, Iowa
1973-77    Consulting Psychologist, Byron Harless, Reid and Associates, Inc., Lakeland, Florida
1977-      Consulting Psychologist, independent practice Lakeland, Florida
1988-      Supervising and Consulting Psychologist for the Child Protection Team, Lakeland, Florida (Polk Highland, and Hardee counties)
1988-      Consulting Psychologist, Vocational Rehabilitation, Winter Haven, Florida (Polk and Highlands counties)

MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS:

American Psychological Association
American Adademy of Neurology
Academy of Aphasia
Society of Neuroscience
American Association for the Advancement of Science
Sigma Xi
Iowa Academy of Science

J.A.445

HENRY L. DEE                                      Page Two

Publications:

Dee, H. L. & Fontenot, D. J. Use of the non-preferred hand in graphomotor performance: a methodological study. Confinia Neurologica, 1969, 31, 273-280

Dee, H.L. Visuoconstructive and visuoperceptive deficit in patients with unilateral cerebral lesions. Neuropsychologia, 1970, 8, 305-314.

Dee, H. L. & Benton, A. L. A crossmodal investigation of spatial performances in patients with unilateral cerebral lesions. Cortex, 1970, 6, 261-272.

Dee, H.L., Benton, A.L. & Van Allen, M. W. Apraxia in relation to hemispheric locus of lesion and aphasia. Transactions of the American Neurological Association, 1970, 95, 147-150.

Dee, H.L. Auditory asymmetry and strength of manual preference Cortex, 1971, 7, 236-245.

Dee, H.L. & Van Allen, M. W. Simple and choice reaction time and motor strength in unilateral cerebral disease. Acta Psychiatrica Scandinavica, 1971, 47, 315-323.

Dee, H.L. Mental Retardation and brain damage. Paper presented at the 1972 meeting of the American Association on Mental Deficiency.

Dee, C. K. & Dee, H.L. Objective assessment of the characteristics of parents of children with developmental problems: Journal of Consulting & Clinical Psychology, 1972, 38, 464.

Dee, H.L. & Van Allen, M. W. Psychomotor testing as an aid in the recognition of cerebral disease. Neurology, 1972, 22, 845-848.

Dee, H.L. & Van Allen, M. W. Hemispheric differences in complex reaction time. Transactions of the American Neurological Association, 1972, 97.

Dee, H.L. & Van Allen, M. W. Speed of decision-making processes in patients with unilateral cerebral disease. Archives of Neurology, 1972, 28, 163-166.

CURRICULUM VITAE

HENRY L. DEE                                          Page Three

Publications: (Continued)

Dee, H. L. & Fontenot, D.J. Cerebral dominance and lateral differences in perception and memory. Neuropsychologia, 1973, 2, 167-173.

Dee, H. L. & Hannay, H. J. Asymmetry in perception: attention vs. other determinants. Acta Psychologia, 1973, 37, 241-247.

Dee, H. L. & Hannay, H. J. Asymmetry in Perception: Familization and labeling as determinants (two papers in preparation).

Dee. H. L. & Hannay, H. J. Asymmetry in perception: attention vs. other determinants. Acta Psychologica, 1973, 37, 241-247.

Dee, H. L. & Hannay, H. J. Reversal of Asymmetry in Human Perceptual Performance as a function in labeling, Mode of Response, and Familiarity. In press, Cortex

Dee, H. L. & Hannay, H. J. Experimental REversal of a Left Visual Field Superiority for Forms. In press, Percept. Mot. Skills

J.A.447

USCA4 Appeal: 20-15      Doc: 11-2          Filed: 12/28/2020      Pg: 177 of 258

# EXHIBIT 32

J.A.448

**Corey Johnson's IQ Scores Compared to IQ Scores of Federal Death Penalty Defendants Found Intellectually Disabled After Contested *Atkins* Hearings**

The following chart demonstrates that Corey Johnson's IQ scores, both before and after being corrected for the Flynn effect, are similar to the IQ scores for other federal capital defendants who were granted relief by courts and found to be intellectually disabled after contested *Atkins* hearings. This chart includes IQ scores in Corey Johnson's case, the three cases in Chart 2 in Corey Johnson's clemency petition, and three additional cases. It does not include other federal capital defendants for whom the Government did not authorize the filing of a death notice nor does it include those cases in which the Government withdrew death notices based on IQ scores in the range similar to Corey Johnson's IQ scores.

| Case | Year *Atkins* Claim Decided | Full Scale IQ | | Flynn Adjusted Full Scale IQ | |
|---|---|---|---|---|---|
| | | Year | IQ | Year | Flynn IQ |
| *United States v. Johnson*, No. 92CR68 (E.D. Va. 1993). | | 1977 | 73 | 1977 | 71 |
| | | 1981 | 78 | 1981 | 75 |
| | | 1985 | 69 | 1985 | 65 |
| | | 1992 | 77 | 1992 | 73 |
| *United States v. Nelson,* 2:02-CR 00304 CJB-ALC (E.D. La. Feb. 22, 2006). | **2006** | 1994 | 65 | N/A[1] | N/A |
| | | 1997 | 76 | N/A | N/A |
| | | 2004 | 72 | N/A | N/A |
| | | 2005 | 78 | N/A | N/A |
| *United States v. Davis*, 611 F. Supp. 2d 472 (D. Md. 2009). | **2009** | 1982 | 76 | 1982 | 66 |
| | | 1992 | 76 | 1992 | 73 |
| | | 2006 | 65 | 2006 | 62 |
| | | 2009 | 70 | 2009 | 70 |

[1] The *Nelson* court did mention the Flynn effect in its decision and did not correct Nelson's IQ scores for the Flynn effect.

| Case | Year Decided | Full Scale IQ | | Flynn Adjusted Full Scale IQ | |
|---|---|---|---|---|---|
| | | Year | IQ | Year | Flynn IQ |
| *United States v. Shields*, No. 2:04-cr-20254 BBD-tmp (W.D. Tenn. May 11, 2009). | **2009** | 1989 | 69 | 1989 | N/A[2] |
| | | 1992 | 73 | 1992 | N/A |
| | | 1995 | 70 | 1995 | N/A |
| | | 1997 | 68 | 1997 | N/A |
| | | 2005 | 68 | 2005 | N/A |
| *United States v. Hardy*, 762 F. Supp. 2d 849 (E.D. La. 2010). | **2010** | 1993 | 73 | 1993 | 67 |
| | | 1993 | 76 | N/A[3] | N/A |
| *United States v. Lewis*, No. 1:08 CR 404, 2010 WL 5418901 (N.D. Ohio Dec. 23, 2010). | **2010** | 2008 | 72 | 2008 | 67.71 |
| | | 2010 | 75 | 2010 | 72.03 |
| *United States v. Smith*, 790 F. Supp. 2d 482 (E.D. La. 2011). | **2011** | 2004 | 67 | 2004 | 64/65 |
| | | 2006 | 67 | 2004 | 64/65 |

---

[2] The *Shields* court found that the Flynn effect is a valid scientific phenomena that must be considered and is particularly relevant in assessing dated IQ tests (administered years after the test was normed), but the *Shields* court did not calculate scores as corrected for the Flynn effect.

[3] The *Hardy* Court found that the practice effect inflated the second IQ test given to Hardy and disregarded that test. For this reason, the Court did not apply the Flynn effect and did not correct this IQ test for norm obsolescence.

2

**J.A.450**

USCA4 Appeal: 20-15      Doc: 11-2          Filed: 12/28/2020      Pg: 180 of 258

# EXHIBIT 33

1 #

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

------------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

    v.                                    CRIMINAL ACTION
                                          92CV68
RICHARD TIPTON, CORY JOHNSON, and
JAMES H. ROANE, JR.,

                              Defendants.

------------------------------------------

FILED
JUN 29 1993
D-PHB
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

                    June 1, 1993
                    Richmond, Virginia
                    9:30 a.m.


BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney
               Main Street Centre
               Richmond, Virginia  23219
                         Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
               CRAIG S. COOLEY, ESQ.
               JOHN McGARVEY, ESQ.
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                         Counsel for Defendants.

                    JEFFREY B. KULL
               OFFICIAL COURT REPORTER

4862

J.A.452

2 #

P-R-O-C-E-E-D-I-N-G-S

THE CLERK: Case Number 92CV68: United States of America versus Richard Tipton, Cory Johnson, and James H. Roane, Jr.  Mr. Howard C. Vick and Mr. William H. Parcell, III represent the United States.  Mr. Eric D. White and Mr. Robert P. Geary represent Defendant Tipton.  Mr. Craig S. Cooley and Mr. John F. McGarvey represent Defendant Johnson. Mr. David P. Baugh and Mr. Arnold R. Henderson, V represent Defendant Roane.  Are counsel ready to proceed?

MR. VICK:  The government is ready to proceed.

MR. GEARY:  Defendant Tipton is ready.

MR. COOLEY:  Defendant Johnson is ready.

MR. BAUGH:  Defendant Roane is ready, Your Honor.

THE COURT:  All right.  We had a couple of outstanding motions.  And before we get into the sentencing proper, we need to go ahead and rule on these motions.  They have been fully briefed and there is no need for any additional argument.

MR. BAUGH:  Your Honor, if I might, I would ask permission to allocute or argue for new sentencing phase as Defendant Roane, in light of the

4863

J.A.453

22#

All crimes, crimes is not good, period. All crimes, period, is not good. Being the fact that you are here, take a lesson to what's going on. I mean, you get old enough and realize that this is not the life that you are living. I am unfortunate that I never had nobody. That's no excuse. I'm a grown man. I am going to take my punishment the way I have to. Same with my co-defendants. They have to take their punishment. We have to deal with this reality. And I would hope that you take heed to this. I would hope you discuss this. Because I would hate to see you all end up this way. I would hate to see you have kids in this way, because this is not right. This is stress.

No man can really stand up here and have somebody come and sentence them to death. I can't take it. My co-defendants can't take it. We try to joke about it, to laugh, you know, to laugh the stress off. But it is a hurting feeling knowing the fact that you will be sentenced to death and you don't know when it is going to happen.

I'm sorry for my family, my co-defendants' families. I didn't mean no harm to you. I love you all. I love you from the heart. I thank my counselors again. I'm not mad at Mr. Vick, because

4883

J.A.454

Case 3:92-cr-00068-DJN   Document 39-35   Filed 08/19/20   Page 1 of 3 PageID# 1813
USCA4 Appeal: 20-15      Doc: 11-2          Filed: 12/28/2020      Pg: 184 of 258


# EXHIBIT 34


J.A.455

The United States Government does not apologize to you for the photographs you have had to see.  We don't owe to you the apology.  We didn't kill them. It is part of our job to produce those photographs so you will see how horrendous and horrible these people were and are.

I, too, appreciate you listening on behalf of the United States Government.  The government would also want to encourage you to go through all of these exhibits and evidence.  You go through your notes. What I have said, Mr. Vick said, or the defense lawyers say, is not fact.  It is not law.  The facts are what you recall.  Judge Spencer will give you the law.

One other thing about Judge Spencer:  These lawyers have been saying 5K.1, 5K.1, 5K.1.  There is only one human being in the whole world that can cut a sentence in this case, and that's that man.  You

3192

heard Gaiters and Hardy both tell you they pled in front of Judge Spencer.  The government can make the motion.  But it is in that man's discretion.  And you go back and look at Gaiters' and Hardy's plea agreements, and what do they tell you?  They have to be truthful in their cooperation with the government, all the people that are getting 5K's.  That man knows it, these men know it.

MR. GEARY:  I object.  Greg Scott is a key witness in this case.

MR. PARCELL:  Ladies and gentlemen, thank you very much.

MR. GEARY:  Another misstatement by Mr. Parcell.

THE COURT:  Objection overruled.  We are going to take about 10 or 15 minutes, then we will get started with the instructions.  They are going to take awhile, and you have been sitting awhile.  So we will give you a break.  Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

(Defendants removed from courtroom.)

(Recess taken from 11:50 a.m. to 12:05 p.m.)

## Court Instructions to Jury re Guilt (3192)

THE COURT:  All right, let's bring in the jury.

3193

(The jury entered the courtroom.)

Members of the jury:  You have now heard all of the evidence in the case as well as the final arguments of the lawyers for the parties.  It becomes my duty therefore to instruct you on the rules of law that you must follow and apply in arriving at your

218a

J.A.456

the following elements beyond a reasonable doubt: First, that a racketeering activity actually did exist; second, that the racketeering activity affected interstate commerce; third, that an individual defendant did knowingly and intentionally commit or conspire to commit the crime charged in the particular count under consideration.  Fourth, that the defendant acted for the purpose of gaining entrance to the racketeering activity or for the purpose of maintaining or increasing his position in the racketeering enterprise; or that the defendant received or was promised that he would receive something of pecuniary value from the racketeering enterprise in exchange for his acts.

I will now explain and define for you the meaning of certain terms found in the statute and within these instructions relating to the elements of the 1959 murders referred to as violent crimes in aid of racketeering activity.

3221

As I've outlined for you, those offenses are in Counts Four, Seven, Ten, Thirteen, Fourteen, Sixteen, Twenty-one, Twenty-two, Twenty-three, Twenty-seven, Twenty-eight, Twenty-nine, and Thirty of the indictment.

"Racketeering activity" means any act or threat involving murder or dealing in narcotic or other dangerous drugs.  An enterprise includes any group of individuals associated in fact which is engaged in or the activities of which affect interstate commerce. The phrase "anything of pecuniary value" means anything of value in the form of money or negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage.

It is charged in the indictment that within the Eastern District of Virginia, between on or about January 13th, 1992 and on or about February 19th, 1992, the defendants Richard Tipton, Cory Johnson, James H. Roane, Jr., Vernon Lance Thomas, and Sterling Hardy used a firearm during and in relationship  --  or in relation to the commission of a crime of violence or a drug-trafficking crime.

Now again, as I mentioned with respect to some of the charges I discussed earlier, no single

3222

defendant is charged in each of these counts.  The verdict form will assist you in keeping track of which defendants are charged in which counts and in giving individual consideration to each defendant for each count against him or her.

Let me read the firearms statute.  And the firearms violations are contained in Counts Six, Nine, Twelve, Fifteen, Twenty, and Twenty-six.  Title

USCA4 Appeal: 20-15      Doc: 11-2        Filed: 12/28/2020      Pg: 187 of 258

# EXHIBIT 35

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
                        RICHMOND DIVISION


-----------------------------------------

UNITED STATES OF AMERICA,



                        Plaintiff;

     v.                                    CRIMINAL ACTION
                                              92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                        Defendants.

-----------------------------------------
                        VOLUME XXII

                    February 12, 1993
                    Richmond, Virginia
                       10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
               JEFFREY B. KULL
               OFFICIAL COURT REPORTER
```

P-R-O-C-E-E-D-I-N-G-S

THE CLERK:  Criminal Action Number 92CR68:
United States of America versus Richard Tipton, Cory

All right, let's bring in the jury, please.

(The jury entered the courtroom.)

All right, this morning we are going to have the closing arguments in the aggravation and mitigation phase. Mr. Vick?

MR. VICK: Thank you, Your Honor. Good morning again, ladies and gentlemen. First, I'd like to take the time very briefly to thank you for your attention throughout this five weeks of trial. Your attention this week has also been admirable, and I'm sure that you will go back and apply that same sort of diligence to the verdict that you render on this phase of trial.

Ladies and gentlemen, now it is your time. The lawyers have had their time. The evidence has all been presented. Now it is time for you to go back and do your duty.

Each of you during the voir dire, prior to your selection as members of this jury, stated that in the appropriate case, given the appropriate circumstances, that you could indeed render a verdict of death against a defendant. Ladies and gentlemen, I submit that based upon the evidence that you have seen from this witness stand over the last five weeks, that this is the appropriate case to render a verdict of death as to each and every defendant.

You took an oath. It is an awesome responsibility. It is an awesome duty. But nonetheless, it is just that, a duty. Your duty, ladies and gentlemen of the jury, given the evidence that you have heard, requires no less verdict than death.

As I said in my opening this week, and as I remind you now, ladies and gentlemen, this is a case where you are deciding the fate of mass murderers. Each of these defendants has been convicted by you of being just that, a mass murderer. Each of these defendants comes before you for sentencing having killed a number of people.

The human cost of what these three men have done to support their drug dealing, to further their drug dealing, is immeasurable. Absolutely immeasurable. The evidence is clear, beyond a reasonable doubt, that they have laid waste to the lives of a number of people for their own personal gain, for their own personal satisfaction, for their own personal machismo. They have left ten dead people on the streets of the City of Richmond. They have left two people so seriously wounded that they will never recover. They have left one other seriously wounded person. They have shot one person in front of her children.

J.A.460

Think of the immeasurable harm that has been done to the minds of Montez McCoy and his sisters, who saw their uncle brutally mowed down in front of them, and saw their mother shot by James Roane and Cory Johnson.  You can't quantify or qualify the amount of harm that has been caused by these people.

As I said at the beginning of this week and I remind you now, we have the burden -- that is, the United States, the government -- of proving the aggravating factors which need to be proven in order to impose the death penalty beyond a reasonable doubt.  I also told you that we would not put on a great deal of evidence this week.  And you saw.  We did not put on a great deal of evidence.  Our evidence came prior to this week, in the four weeks of testimony which led you to find these people guilty.  That evidence, as you know, has already been reintroduced and is in front of you in total this

3884

week.  That evidence is to be considered by you in total this week when rendering the appropriate sentence against these defendants.

The aggravating factors are listed in the jury's instructions, in the Court's instructions to you.  There are specific aggravating factors as to each and every defendant.  In most cases, they repeat themselves as to each defendant:

That the defendant intentionally killed the victim; that the defendant intentionally inflicted serious bodily injury which resulted in the death of a victim; that the defendant intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim which resulted in the death of the victim; that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person other than one of the participants in the offense and which resulted in the death of the victim.

Those four aggravating factors are repeated as to each and every defendant in this case.  And given the evidence that is presented to you, the government has shown beyond a reasonable doubt that each and every one of those factors has been satisfied.  Each

3885

and every murder committed in furtherance of the Continuing Criminal Enterprise satisfies all four of those aggravating factors.

Remember I told you at the beginning of the week that the aggravating factors are to a certain extent duplicative or overlapping?  But going back, applying your common sense, what you understand to be the normal meaning of those words, you will see that the government has proven each one of those aggravating

**J.A.461**

factors beyond a reasonable doubt as to each one of the defendants.

That is the first group of aggravating factors out of which you must find that at least one exists. I submit all four exist as to each and every defendant, each and every murder that they are being sentenced on here today.

In the second group of aggravating factors, defendant Cory Johnson and defendant Richard Tipton have been charged with, in the commission of the offenses enunciated in the indictment, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense. Clearly they have done that in the case of Gwendolyn and "Pepsi" Greene. That has been proven to you beyond a reasonable doubt. You have already found that aggravating factor beyond a reasonable doubt, as you have already found the other aggravating factors beyond a reasonable doubt, shown by the verdict you returned on the guilt phase of this case.

As to each one of the defendants, it is charged that the defendant committed the murders enunciated after substantial planning and premeditation. The Court will provide you instructions on that, and I submit to you that you have already found beyond a reasonable doubt that these murders were committed after substantial planning and premeditation. Each one of these murders was premeditated. You know that from the evidence that has been presented.

And I remind you just briefly of the evidence that indeed shows premeditation. Remind yourself of the clear testimony from the mouths of "J.R." and "Whitey" to Ronita Hollman and others in the Newtowne area. "We are going to take over up here." Remind yourself of that credo following them down here from New York, from New Jersey, with the New York Boyz, where they clearly intended to take over blocks in New Jersey. They brought that mind set, that modus operandi, that way of operating, to Richmond. And indeed, they implemented it in the most violent fashion that they could. They laid waste the bodies that they promised they would lay waste in order to take over. Clear premeditation. But as to each one of the specific murders charged in the indictment, you also have clear premeditation based upon the evidence that you have heard, and substantial planning.

The Court's instruction to you as to substantial planning says that substantial planning means planning which is considerable, or ample, for the commission of the crime at issue. Ample for the

**J.A.462**

commission of the crime at issue. Clearly, as to each one of the murders perpetrated by these defendants, they put in ample enough planning to carry it out. Start with murder number one, the murder of Doug Talley by Richard Tipton and James Roane: 84 stab wounds, most of them to the head and upper body. 84 stab wounds where they clearly intended to plan that murder by taking him to South Richmond, by recovering the knife that was used to stab him 84 times. They got out of the car and talked about it with each other, James Roane and "Whitey," got back in the car. James Roane grabbed him around the neck, and "Whitey" began to stab him for four or five minutes. They then took that knife, disposed of that knife by giving it to "Pepsi" Greene to hold.

And you have the lead-in to the clear premeditation and murder of the next victim, Douglas Moody. They went and retrieved that knife. Why did they retrieve that knife, ladies and gentlemen? They retrieved that knife with one thought in mind: killing Doug Moody. Clear premeditation, substantial planning. They intended the consequences of their actions. They intended to kill these people to clear their way for drug dealing in Newtowne.

Go next to the murder of Peyton Maurice Johnson. They stalked that man. "J.R." stalked that man. They went and retrieved the weapons, which is further planning, further evidence of premeditation and planning, as indeed the purchase of the weapons themselves is evidence of premeditation and planning. Why do you think they purchased those weapons? To carry out their plan of taking over Newtowne. And they used them beginning the day they got them, January 14th, 1992. They stalked Peyton Maurice Johnson. "J.R." found him. "C.O." and "E.B." walked in that house and blew that man away like he was an animal. They then took the guns and, planning and premeditating their next murder, gave them to "Papoose" to wipe down and hide.

They went and retrieved those guns and indeed killed Louis Johnson with those guns on January 29th. Remember the statements of Sterling Hardy and Jerry Gaiters, where "J.R." told them "Keep him in the alley." Keep Louis Johnson in the alley. They pulled up clearly intending to kill that man. They got out of the car, put the guns to his head, and blew him away like an animal in the street, also. Clear planning and premeditation as to that murder.

The triple homicide in Church Hill, "Mousey" Armstrong, again hunted down like an animal by "C.O." He made Jerry Gaiters take him and find "Mousey"

Armstrong.  Could there be any question in your mind as to the premeditation and planning of that.

Could there be any question in your mind as to the premeditation and planning of the killings on February 19th, 1992, where "C.O." and "Whitey" hunted down Linwood Chiles and Curt Thorne, found them with "Pepsi" and Gwen and mowed all of them down because they had received a telephone call from "V" in the jail indicating that they might be cooperating with the police?  How much more clear planning and premeditation could there be than that particular murder.

3890

The aggravating factors, ladies and gentlemen, have been proven to you already beyond a reasonable doubt.  Your jury verdict on the guilt phase of this trial establishes that.  There is listed, as to each of the defendants, other factors, non-statutory factors, that you can consider when rendering the proper verdict of sentence against these defendants: that the defendants committed multiple murders.  Indeed, that they are mass murderers.  That the defendants have substantial criminal histories.  In the case of James Roane, you will see a series of convictions against him.  You will see two convictions against Cory Johnson.  No convictions of record have been introduced into evidence as to Richard Tipton, but I suggest to you that based upon the evidence you have heard, Richard Tipton, Cory Johnson, and James Roane were virtual crime waves in and of themselves.  Wherever they went, crime followed, be it New York, New Jersey, or Richmond.  They were virtual crime waves with substantial criminal histories.  Remind yourself of Anthony Howlen and his mutilated face; the arrest of Richard Tipton by the police in New Jersey.  They are in and of themselves crime waves.

That the defendant, each of them, has been

3891

charged with seriously wounding individuals in the course of the murders outlined.  Remind yourself again of Gwen and "Pepsi," of Martha, and the woundings that they received because these people wanted to carry out their drug business.  And each of them has been charged in the statutory aggravating factor with knowingly and willfully being a member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant has been charged.  And that's important.  You need to remember that.

Now, you can find that a verdict of death should be entered as to each one of these defendants only on the CCE murders that they have been found guilty of.  So for example, you could find that Richard Tipton

deserves to die for the murder of Doug Talley, or that Cory Johnson deserves to die for the murder of Linwood Chiles, or that James Roane deserves to die for the murder of Peyton Maurice Johnson.  You have got to decide that individually as to the murders charged in the indictment.

But in rendering that decision, you are free to remember all of the evidence of other murders and crimes that were carried out in furtherance of this conspiracy.  You are not constrained in making that

3892

decision as to what the appropriate punishment is for that CCE murder to limit yourself only to that murder.  You can consider the goals of the conspiracy.  You can consider the actions of other co-conspirators and what they did in furtherance of this conspiracy when rendering that.  You cannot kill James Roane, statutorily, because of his murder of Torrick Brown.  But you can indeed consider that when determining whether that's the appropriate verdict for him based upon his murder of Peyton Maurice Johnson.  You can consider the fact that he, in reptillian-like coldness went in and shot Torrick Brown.  That can all be considered by you.  It is in evidence.  It has been proven beyond a reasonable doubt.

You can consider the evidence that's been put on this week by the government concerning the fact that from jail, while incarcerated, these defendants continued to try to have people killed.  Specifically, you can consider that "Whitey" wanted C.T. Woody killed and wanted "Wildman" killed.  You can consider that Cory Johnson wanted C.T. Woody killed and wanted Valerie Butler killed.  You can consider that James Roane wanted Martha McCoy and Montez McCoy and the other witnesses killed, and was

3893

even going to take action against Doug Cunningham and the uncle of Martha McCoy if they testified at trial.  You can properly consider that in rendering the right verdict and deciding what is the proper verdict in this situation of mass murder.

Go back and look at what the government has to prove.  I submit to you each and every one of the aggravating factors has been proven to you beyond a reasonable doubt.  You have already found them in your guilt phase verdict.

The defense case this week -- let me back up a second.  In reaching your decision, what you need to do, and the Court will instruct you about this, what you need to do is take the government's aggravating factors that have been proven beyond a reasonable doubt, take the mitigating factors that you find to have been proven, and simply weigh them.  It is not a

**J.A.465**

mathematical formula.  You don't have to go back there and say the government has proven 16 aggravating factors and the defense has proven 83 based upon the Court's submission to me, so therefore, the defense evidence weighs more.  No. Any one aggravating factor can be found by you to outweigh the entire defense case as to the mitigating factors that you must decide.  It is a weighing decision that you must make.  Given what you saw in the first four weeks of trial concerning these men's actions as opposed to given what you have seen this week concerning the mitigation, what is the appropriate sentence?  What should these men be sentenced to?

And while we are speaking about that, let's talk about the evidence that you have heard this week in mitigation.  The evidence that you have heard in aggravation is clear, clear beyond a reasonable doubt.  What have you heard this week?  From defendant Tipton, you heard that it is not his fault. His bad youth made him do it.  His bad relationship with his mother made him do it.  It is not his fault.

We are sorry he has had an unfortunate youth. He is not the only child who has had an unfortunate youth.  Indeed, each one of these defendants has put on evidence this week about attention deficit problems, learning disabilities.  I suggest that each one of you on that jury knows someone who has a learning disability.  Is that an excuse for murder.

Each one of the defense counsel stood up and said to you, "We don't intend this as an excuse." That's a smokescreen, ladies and gentlemen.  That's exactly what it is intended as.  It is intended as a smokescreen.  It is intended as an excuse.  These people cannot be forgiven their actions because they had a hard time learning.  And that's in essence what you have been asked to do this week.  That would substantially negate all the hard work that has been done by all those other people with learning disabilities and bad backgrounds who overcome that. People with those learning disabilities and bad backgrounds don't have a license to kill.  Indeed, you remember Dr. Bright's testimony about Richard Tipton.  He has worked with thousands of children with learning disabilities.  Never before, ever, has he worked or seen one who has committed six murders. None of the doctors who testified here this week, despite their extensive involvement with children with these problems, has testified that they ever have seen anybody commit the amount of murders that these defendants have been found guilty of

J.A.466

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 3:92-cr-68 (DJN) |
| | ) | |
| COREY JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

**Government's Opposition to
Defendant's First Step Act Motion**

Corey Johnson was convicted in February 1993 for his role in a drug organization that was responsible for numerous murders and maimings. A jury found that Johnson participated in seven murders and convicted him of, among other things, seven counts of violating 21 U.S.C. § 848(e)(1)(A). The jury ultimately imposed a death sentence on all seven murder convictions.

In the first of these murders, which occurred in mid-January 1992, and was charged as Count 8, Johnson used a semi-automatic weapon to gun down Peyton Johnson at a tavern. Peyton Johnson was a rival drug dealer. *United States v. Tipton*, 90 F.3d 861, 868 (4th Cir. 1996). Less than two weeks later, on January 29, 1992, Johnson murdered Louis Johnson. *Id*. at 869. This murder, which was charged as Count 11, occurred after Johnson approached Louis Johnson in an alley, and, believing him to have previously threatened him while acting as a bodyguard for a rival drug dealer, began shooting him. *Id*. While Louis Johnson lay on the ground, either Johnson or another codefendant shot him twice at close range. *Id*.

The third, fourth, and fifth murders occurred on February 1, 1992, and were charged in Counts 17, 18, and 19. These murders began with a drug debt owed by Dorothy Mae Armstrong and ended in her death by gunfire. Johnson located Armstrong at her brother's home, approached

**J.A.467**

the home, and opened fire on Armstrong and Anthony Carter. *Id*. Armstrong's brother, Bobby Long, fled out the front door but was fatally shot by Johnson in the front yard. *Id*.

The sixth and seventh murders, charged in Counts 24 and 25, occurred in early February 1992 and resulted in the deaths of Curtis Thorne and Linwood Chiles. Johnson, along with codefendant Richard Tipton, shot Chiles at close range after instructing him to place his head on the steering wheel of his car. *Id*.; *United States v. Roane*, 378 F.3d 382, 389 n.6 (4th Cir. 2004). Johnson and Tipton also murdered Thorne by gunfire. Thorne's autopsy report indicated he had been hit by bullets from two different directions. *Id*. Two other passengers in the car, Gwen and Priscilla Greene, were also critically wounded in this attack. *Id*.

A jury convicted Johnson of all seven § 848(e)(1)(A) murders discussed above, as well as eleven counts of committing violent crimes in aid of racketeering activity under 18 U.S.C. § 1959. Two of those counts (Counts 29 and 30) related to the maiming of Gwen and Priscilla Greene during the attack on Chiles and Thorne. Two other convictions under § 1959 stemmed from Johnson's murder of Torrick Brown (Count 14) and wounding of Martha McCoy (Count 16). Johnson killed Brown due to his codefendant James Roane's personal grievance. Namely, that Brown was "messing" with his girlfriend. *Id*. at 891. Johnson and Roane located Brown at his apartment on the evening of February 1, 1992, and, armed with semi-automatic weapons, opened fire on Brown as he approached his doorway. *Id*. at 869. Brown was killed in the attack. McCoy was critically wounded and was likely shot due to her being a potential eyewitness to Brown's murder. *Id*. at 891.

Johnson's convictions and sentences have withstood the test of direct appeal and collateral review. *See, e.g.*, *Tipton*, 90 F.3d at 870–903; *Roane*, 378 F.3d at 395–407. On August 19, 2020, Johnson, filed a motion to reduce his sentence under § 404 of the First Step Act. (ECF No. 39.) In

2

J.A.468

seeking a sentence reduction under § 404, Johnson argues that his seven convictions under § 848(e)(1)(A) (Counts 8, 11, 17, 18, 19, 24, and 25) are "covered offenses." He also contends that his concurrent sentences on Counts 31 and 32, drug offenses that in the context of this case are essentially incidental, are also covered offenses. As to relief, Johnson requests "that the Court [] order a capital resentencing hearing at which a new jury would determine whether to reduce his sentences pursuant to § 404(b) of the First Step Act." (*Id.* at 2.) After this capital resentencing, Johnson requests that "this Court should use its discretion to reduce those counts in light of all of the evidence, pursuant to § 3553(a)." (*Id.*)

Johnson's requests should be denied. Globally, the penalties for trafficking in crack cocaine were changed because of findings like the U.S. Sentencing Commission's that "crack is associated with significantly less trafficking-related violence … than previously assumed." *Kimbrough v. United States*, 552 U.S. 85, 98 (2007) (internal quotation marks and citation omitted). But Johnson's particular case involved an extremely violent drug organization. His death sentences for the murders of Peyton Johnson, Louis Johnson, Bobby Long, Anthony Carter, Dorothy Mae Armstrong, Curtis Thorne, and Linwood Chiles were driven by his violent acts, and the Fair Sentencing Act would not realistically have made any difference in this case if it had been in effect at the time he was prosecuted. Under § 404(b), even when a defendant has a covered offense, the Court should assess a defendant's case "as if" the Fair Sentencing Act had applied. *See, e.g.*, *United States v. Jones*, 962 F.3d 1290, 1303 (11th Cir. 2020). As discussed below, if the Fair Sentencing Act had been in effect at the time of Johnson's prosecution, he would still have death sentences for all seven murder counts. Regardless of whether the "as if" provision in § 404(b) is treated as guiding judicial discretion or as a mandatory limit on sentence reductions, Johnson's request should be denied. He seeks an unjustified windfall. Johnson offers no persuasive basis for this

**J.A.469**

Court to reduce his sentence for intentionally killing numerous people. Nothing he offers in mitigation outweighs the gravity of his criminal conduct—conduct so serious that a jury imposed the highest sentence available under the law.

Johnson's requested sentence reduction also falters on legal grounds. Johnson is mistaken that his convictions under § 848(e)(1)(A) should be deemed "covered offenses" under § 404(a) of the First Step Act. His convictions under § 848(e)(1)(A) are not covered offenses. *See United States v. Snow*, 967 F.3d 563 (6th Cir. 2020). In labeling § 848(e)(1)(A) a covered offense, Johnson seeks not a sentence reduction, but rather elimination of criminal liability for a drug-related murder, as *Snow* persuasively explains. As the Tenth Circuit has likewise observed, "[u]nlike a direct appeal of a conviction, which challenges the underlying conviction, a motion brought under the 2018 FSA only challenges the sentence—the length of incarceration[.]" *United States v. Mannie*, – F.3d –, 2020 WL 4810084, at *6 (10th Cir. Aug. 18, 2020). The result Johnson seeks cannot be squared with the text of § 404, which includes no provision for eliminating criminal liability, and would be inconsistent with the Savings Statute, 1 U.S.C. § 109, which operates as a background provision to preserve criminal liability, including for death sentences. *See, e.g.*, *United States v. Stitt*, 552 F.3d 345, 353–55 (4th Cir. 2008).

Moreover, the Sixth Circuit in *Snow* considered and rejected the best-case scenario for finding § 848(e)(1)(A) a covered offense. As the Fourth Circuit has explained, § 848(e)(1)(A) has three prongs. *United States v. Hager*, 721 F.3d 167, 179–80 (4th Cir. 2013) (citing *United States v. Aguilar*, 585 F.3d 652, 657 (2d Cir. 2009)). Only one of those prongs requires proof of a violation 21 U.S.C. § 841(b)(1)(A), an offense that might have been modified by the Fair Sentencing Act. The other two prongs of § 848(e)(1)(A) require that the charged murder be in relation to a continuing criminal enterprise under 21 U.S.C. § 848 and do not require proof of a

4

**J.A.470**

violation of § 841(b)(1)(A). Notably, Johnson was separately convicted in Count 2 of engaging in a continuing criminal enterprise, and his § 848(e)(1)(A) convictions rested on those findings. *See Tipton*, 90 F.3d at 887. Johnson did not incur criminal liability under § 848(e)(1)(A) by having the government rely on the prong requiring a § 841(b)(1)(A) violation. But as *Snow* persuasively explains, even if Johnson's § 848(e)(1)(A) convictions had depended on a violation of § 841(b)(1)(A), those offenses still would not be covered offenses under the First Step Act.

Johnson's argument that § 404 provides an avenue for a resentencing is also legally untenable. Section 404 specifically provides for a sentence reduction by a court, but by statute and constitutional command, the death sentence must be imposed by a jury. Under 21 U.S.C. § 848(i), in a capital sentencing procedure that is saved by the Savings Statute, as *Stitt* held, a court must conduct a capital sentencing before a jury. And if the jury returns a death sentence, the court must impose that sentence. "Upon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death." 21 U.S.C. § 848(l). This more specific provision about a death sentence governs over the more general provisions of § 404. "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'clearly expressed congressional intention' that such a result should follow." *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018). The most natural reading of § 404 is that it does not displace the provisions governing capital sentencings and does not disturb a death sentence, which must be imposed by a jury, not a court. Section 404 simply does not permit a court to upset a death sentence.

These points also fit with the background rule, accepted by every circuit to address the question, that a § 404 motion does not trigger a *de novo* resentencing and is instead a limited proceeding. *See, e.g., United States v. Easter*, – F.3d –, 2020 WL 5525395, at *7 (3d Cir. Sept. 15,

**J.A.471**

2020) ("We also hold, however, that Easter is not entitled to a plenary resentencing hearing");

*United States v. Smith*, 958 F.3d 494, 499 (6th Cir. 2020) ("Our sister circuits have likewise held

that the First Step Act authorizes a limited sentencing modification, not a full resentencing." (citing

*United States v. Curry*, 792 F. App'x 267, 268 (4th Cir. 2020)); *United States v. Foreman*, 958

F.3d 506, 508 (6th Cir. 2020) ("[N]othing in the First Step Act entitles a defendant to a plenary

resentencing."); *United States v. Hamilton*, 790 F. App'x 824, 826 (7th Cir. 2020); *United States

v. Williams*, 943 F.3d 841, 843 (8th Cir. 2019)); *see also United States v. Denson*, 963 F.3d 1080,

1086–87 (11th Cir. 2020); *United States v. Jackson*, 945 F.3d 315, 321 (5th Cir. 2019).

### Procedural History

#### A.     Johnson is indicted, convicted, and sentenced.

On July 20, 1992, Johnson, along with six others, was charged as part of a 33-count

indictment with:

- Conspiracy to possess with intent to distribute and to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846 (Count 1);

- Engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(a) (Count 2);

- Capital murder in furtherance of a criminal enterprise, in violation of 21 U.S.C. § 848(e) and 18 U.S.C. § 2 (Counts 8, 11, 17, 18, 19, 24, and 25);

- Commission of violent crimes in aid of racketeering activity, in violation of 18 U.S.C. § 1959 (Counts 10, 13, 14, 16, 21, 22, 23, 27, 28, 29, and 30);

- Use of a firearm in relation to a crime of violence or a drug-trafficking offense, in violation of 18 U.S.C. § 924(c) (Counts 9, 12, 15, 20, and 26); and

- Possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Counts 31 and 32).

(Second Superseding Indictment.) These charges stemmed from Johnson's leadership role, along

with Richard Tipton and James Roane, in a continuing criminal enterprise, the "New York Boyz,"

6

**J.A.472**

that trafficked large quantities of cocaine in the Richmond, Virginia area between 1990 and 1992.

The facts relevant to the instant motion were summarized by the Fourth Circuit on direct appeal as follows:

> Tipton, Roane, and Cory Johnson were principal "partners" in a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992. The conspiracy's operations began in Trenton, New Jersey where Johnson and Tipton, both from New York City, became members. In August of 1990, the conspiracy expanded its operations to Richmond, Virginia where Roane joined the conspiracy in November of 1991. The Trenton-based operation came to an end on June 4, 1991 when police confiscated a large quantity of crack cocaine and firearms. In late 1991, the conspiracy's operations were expanded from the Central Gardens area of Richmond to a second area in Richmond called Newtowne.
>
> During the period of the conspiracy's operation, its "partners", including appellants, obtained wholesale quantities of powdered cocaine from suppliers in New York City, converted it by "cooking" into crack cocaine, then packaged it, divided it among themselves, and distributed it through a network of 30–40 street level dealers, "workers." Typically, the appellants and their other partners in the conspiracy's operations took two-thirds of the proceeds realized from street-level sales of their product.
>
> Over a short span of time in early 1992, Tipton, Cory Johnson, and Roane were variously implicated in the murders of ten persons within the Richmond area—all in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the "partners."
>
> On January 4, 1992, Tipton and Roane drove Douglas Talley, an underling in disfavor for mishandling a drug transaction, to the south side of Richmond. Once there, Roane grabbed Talley from the rear while Tipton stabbed him repeatedly. The attack lasted three to five minutes and involved the infliction of eighty-four stab wounds to Talley's head, neck, and upper body that killed him.
>
> On the evening of January 13, 1992, Tipton and Roane went to the apartment of Douglas Moody, a suspected rival in their drug-trafficking area, where Tipton shot Moody twice in the back. After Moody fled by jumping through a window, both Tipton and Roane pursued. Roane, armed with a military-style knife retrieved from an apartment where the knife was kept for co-conspirator Curtis Thorne, caught up with Moody in the front yard of the apartment where he stabbed him eighteen times, killing him.
>
> On the night of January 14, 1992, Roane, Cory Johnson, and a third person retrieved a bag of guns that they had left at an apartment earlier that day. Roane then located

7

Peyton Johnson, another rival drug dealer, at a tavern. Shortly after Roane left the tavern, Cory Johnson entered with another person and fatally shot Peyton Johnson with a semi-automatic weapon.

On January 29, 1992, Roane pulled his car around the corner of an alley, got out of the vehicle, approached Louis Johnson, whom appellant Johnson thought had threatened him while acting as bodyguard for a rival dealer, and shot him. Cory Johnson and co-conspirator Lance Thomas then got out of Roane's car and began firing at Louis Johnson. As Louis Johnson lay on the ground, either Cory Johnson or Thomas shot him twice at close range. Louis Johnson died from some or all of these gunshot wounds.

On the evening of February 1, 1992, Cory Johnson and Lance Thomas were told that Roane had gone to the apartment of Torrick Brown, with whom Roane had been having trouble. Johnson and Thomas armed themselves with semi-automatic weapons and went to the apartment where they joined appellant Roane outside. The three then knocked on Brown's door and asked his half-sister, Martha McCoy, if Brown was there. She summoned Brown to the door and Cory Johnson, Roane, and Thomas opened fire with semi-automatic weapons, killing Brown and critically wounding McCoy.

In late January, 1992, after being threatened by Cory Johnson for not paying for a supply of crack cocaine, Dorothy Armstrong went to live with her brother, Bobby Long. On February 1, Cory Johnson learned from Jerry Gaiters the location of Long's house. Thereafter, Tipton and an unidentified "young fellow" picked up Gaiters and Cory Johnson who were then driven by Tipton to a house where the group obtained a bag of guns. After dropping off the unidentified third party, the group proceeded to Long's house. Upon arriving at Long's house, Cory Johnson and Gaiters got out of the car and approached the house. While Tipton waited in the car, Cory Johnson and Gaiters went to the front door. When Long opened the door, Cory Johnson opened fire, killing both Dorothy Armstrong and one Anthony Carter. Bobby Long fled out the front door, but was fatally shot by Cory Johnson in the front yard.

In early February 1992, Cory Johnson began to suspect that Linwood Chiles was cooperating with the police. On February 19, 1992, Johnson borrowed Valerie Butler's automobile and arranged to meet with Chiles. That night, Chiles, Curtis Thorne, and sisters Priscilla and Gwen Greene met Cory Johnson and drove off together in Chiles's station wagon. Chiles parked the car in an alley, and Tipton soon drove in behind it in another car, got out, and came up alongside the stationwagon. With Tipton standing by, Cory Johnson told Chiles to place his head on the steering wheel and then shot Chiles twice at close range. Additional shots were fired, killing Thorne and critically wounding both of the Greene sisters. The autopsy report indicated that Thorne had been hit by bullets fired from two different directions.

8

**J.A.474**

*Tipton*, 90 F.3d at 868–69.

In February 1993, a jury convicted Johnson of seven capital murders under § 848(e) (Counts 8, 11, 17, 18, 19, 24, 25); conspiracy to possess cocaine base with the intent to distribute under § 846 (Count 1); engaging in a continuing criminal enterprise under § 848(a) (Count 2); committing violent crimes in aid of racketeering activity under § 1959 (Counts 10, 13, 14, 16, 21, 22, 23, 27, 28, 29, 30); using a firearm in relation to a crime of violence or a drug-trafficking offense under § 924(c) (Counts 9, 12, 15, 20, 26); and possession of cocaine base with the intent to distribute under § 841(a)(1) (Counts 32, 33). Following a penalty hearing on the capital murder counts, the jury recommended that Johnson be sentenced to death for all of the seven murders for which he was convicted under § 848(e) (Counts 8, 11, 17, 18, 19, 24, 25). *See Tipton*, 90 F.3d at 870.

In accordance with the jury's recommendation, the Honorable James R. Spencer, then the presiding district judge, sentenced Johnson to death. *Id*. The jury also sentenced Richard Tipton to death on three of the § 848(e)(1)(A) murders for which he had been convicted, and sentenced James Roane to death for one of the three § 848(e)(1)(A) murders for which he was convicted. *Id*.

After sentencing, Judge Spencer refused, however, to order the defendants' execution on the grounds that Congress neither authorized the means by which the death sentences were to be carried out nor authorized the Attorney General to implement regulations to that effect. *Id*.

All three defendants appealed their convictions and sentences and the government cross-appealed Judge Spencer's stay of execution of the death sentences. *Id*. The Fourth Circuit affirmed the defendants' convictions and sentences, with the exception of the Count One § 846 cocaine conspiracy, which it vacated as being a lesser included offense of the § 848 continuing criminal enterprise convictions. *Id*. at 891, 903. As to Judge Spencer's refusal to execute the defendants'

9

death sentences, the Fourth Circuit reversed and "remand[ed] with instructions to enter appropriate orders for the executions in accordance with regulation promulgated by the Attorney General." *Id*. at 903.

### B.    Johnson's post-conviction litigation.

Following the Fourth Circuit's decision, Johnson sought relief from the district court under 28 U.S.C. § 2255. The district court dismissed or denied all of Johnson's claims and he appealed. *See Roane*, 378 F.3d at 389.

On appeal, Johnson claimed that (1) the district court erred by (a) not properly instructing the jury regarding the unanimity requirement of § 848(e), as well as by committing other instructional errors; (b) improperly adjudicating his discovery request at the § 2255 stage and by awarding summary judgment; and (c) denying his request to interview jurors; (2) that his trial was tainted by prosecutorial misconduct because the government knowingly introduced perjured testimony and withheld certain exculpatory evidence; (3) that his death sentences were constitutionally invalid under the Fifth Amendment because the indictment failed to allege the statutory aggravating factors under 21 U.S.C. § 848(n)(1)-(12); (4) that his counsel was ineffective for failing to (a) further investigate his alleged gang activities in New York and New Jersey; (b) request a voir dire inquiry on whether prospective jurors had a tendency to favor the death penalty; (c) present mitigating evidence regarding prison conditions; and (d) request certain unanimity instructions; (5) that the prosecution discriminated against women in the jury selection process; and (6) that his death sentence violates the Eighth Amendment because "he is mentally retarded and cannot constitutionally be executed, and that his counsel were ineffective in failing to address this issue at sentencing and on direct appeal." *Id*. at 395–96 & n.8.

The Fourth Circuit rejected each argument in a lengthy opinion. *Id*. at 396–407.

**J.A.476**

**C.** **Johnson's motion under § 404(b) of the First Step Act.**

On August 19, 2020, Johnson filed the instant motion for a sentence modification under § 404(b) of the First Step Act. (ECF No. 39.) In his motion, Johnson advances one overarching argument: that his murder convictions under § 848(e) (Counts 8, 11, 17, 18, 19, 24, and 25), and his cocaine distribution convictions (Count 31 and 32) are "covered offenses" under § 404(b) of the First Step Act. As to relief, Johnson requests "that the Court [] order a capital resentencing hearing at which a new jury would determine whether to reduce his sentences pursuant to § 404(b) of the First Step Act." (*Id.* at 2.) After this capital resentencing, Johnson requests that "this Court should use its discretion to reduce those counts in light of all of the evidence, pursuant to § 3553(a)." (*Id.*)

**Argument**

As outlined above, Johnson's convictions for capital murder in furtherance of a criminal enterprise under § 848(e) (Counts 8, 11, 17, 18, 19, 24, and 25) are not covered offenses under § 404(b) of the First Step Act. For this reason, he is not entitled to a modification of his death sentence under the Act. Moreover, even assuming Johnson's death sentences could be reduced, this Court should exercise its discretion under the First Step Act and deny his motion. *See* First Step Act § 404(c) ("Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section."). A district court is "not obligated to reduce [the defendant's] sentence at all." *United States v. Jackson*, 952 F.3d 492, 502 (4th Cir. 2020). For example, the Fourth Circuit has recognized that relief may be denied to "defendants who almost certainly would not have faced a different sentence if they had been charged, convicted, and sentenced after the Fair Sentencing Act." *United States v. Wirsing*, 943 F.3d 175, 179 (4th Cir. 2019) (citing *United States v. Peters*, 843 F.3d 572, 577, 581 (4th Cir. 2016)). Even when a defendant has a covered

11

Case 3:92-cr-00068-DJN   Document 58   Filed 09/23/20   Page 12 of 28 PageID# 1993

offense, a court may consider the drug quantities involved in the offense "in evaluating [the defendant's] motion on the merits." *United States v. Gravatt*, 953 F.3d 258, 264 (4th Cir. 2020). The drug quantities in this case far exceeded the new 280-gram threshold imposed by the Fair Sentencing Act. For Johnson in particular, the PSR attributed him with 18.49 kilograms of crack. *See* PSR ¶ 55; *see also id.* at 37.

In seeking relief under the First Step Act for his seven § 848(e) convictions, all of which resulted in the imposition of the death penalty, Johnson fails to show that they are covered offenses, and offers no support for his theory that he is entitled to a new capital resentencing. Still more, Johnson offers no relevant authority for the proposition that after a capital resentencing, a court can subsequently reduce a sentence under the § 3553(a) factors. (*See* ECF No. 39 at 2.) In fact, such an approach is directly in conflict with the Fourth Circuit's decision in *Stitt*, as explained in more detail below.

## I.      Johnson's murder convictions under § 848(e) are not covered offenses under § 404(b) of the First Step Act.

The First Step Act provides that a sentencing court "may … impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed." First Step Act § 404(b), 132 Stat. at 5222. Under the First Step Act, a "covered offense" is "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010, that was committed before August 3, 2010." *Id.* § 404(a), 132 Stat. at 5222.

As noted above, for an offense to qualify as "covered" under § 404(b), its statutory penalties must have been modified by the Fair Sentencing Act. *See Wirsing*, 943 F.3d at 180 ("On its face, the First Step Act allows the retroactive application of the modifications to penalties that Congress enacted in the Fair Sentencing Act."). The statutory penalties for a violation of § 848(e),

12

however, were not changed by the Fair Sentencing Act. The penalties under § 848(e), remain, both before and after the Fair Sentencing Act, 20 years to life imprisonment or death. *See* § 848(e)(1)(A). Neither the Fair Sentencing Act nor the First Step Act altered this scheme.

Because the plain language of the First Step does not encompass convictions under § 848(e), those offenses are not "covered offenses" under the First Step Act. Although the bare text of the Act bars relief, further support is found for excluding § 848(e) from § 404(b)'s coverage in the operation of the statute itself. In *United States v. NJB*, 104 F.3d 630 (4th Cir. 1997), the Fourth Circuit held that § 848(e) is a separate substantive offense, and not just a penalty enhancement. *Id.* at 633. Section 848(e) is therefore separable from its underlying "predicates," whether they be acts "in furtherance of a continuing criminal enterprise" or "offense[s] punishable under section 841(b)(1)(A)[.]" *See* § 848(e)(1)(A). In the context of a § 848(e)(1)(A) prosecution, these predicates function as elements which must be found by a jury. As such, it is impossible for them to be "statutory penalties for which were modified . . . the Fair Sentencing Act of 2010." First Step Act § 404(a), 132 Stat. at 5222.

Moreover, § 848(e)(1)(A) has three prongs. *Hager*, 721 F.3d at 179–80 (citing *Aguilar*, 585 F.3d at 657). Only one of those prongs requires proof of a violation § 841(b)(1)(A), while the other two prongs of § 848(e)(1)(A) require that the murder be in relation to a continuing criminal enterprise under 21 U.S.C. § 848 and do not require proof of a violation of § 841(b)(1)(A). Johnson was convicted in Count 2 of engaging in a continuing criminal enterprise, and his § 848(e)(1)(A) convictions rested on those findings. *See Tipton*, 90 F.3d at 887 ("The Government's evidence expressly linked each of the nine § 848(e) murders of which the appellants were severally convicted to a furtherance of the CCE's purposes: either silencing potential informants or witnesses, eliminating supposed drug trafficking rivals, or punishing underlings for various drug-

13

**J.A.479**

trafficking misfeasances."). Johnson did not sustain criminal liability under § 848(e)(1)(A) by having the government rely on the prong requiring a § 841(b)(1)(A) violation.

The predicate facts required to find a violation of § 848(e) are akin to elements of the crime, and even though § 848(e) references § 841(b)(1)(A), a defendant is only eligible for a § 404(b) reduction if the *penalties* for his offense of conviction have been modified by the Fair Sentencing Act. Here, the Fair Sentencing Act did no such thing. *See United States v. Guerrero*, 813 F.3d 462, 464–65 (2d Cir. 2016) ("The [Fair Sentencing] Act makes no mention of § 848(e)(1)(A)."); *see also United States v. Spearman*, No. 91-CR-50013-01 (BAF), 2020 WL 4390632, at \*5 (E.D. Mich. Aug. 1, 2020) ("The § 848(e)(1)(A) drug-related murder convictions … likewise have nothing to do with drug quantities, and the statutory penalty (twenty years to life) has not been changed by the Fair Sentencing Act or the First Step Act."); *United States v. Martinez*, No. 06 CR. 987-1 (DC), 2020 WL 4226639 (S.D.N.Y. July 23, 2020) (after the First Step Act, "Count Two -- the [§ 848(e)(1)(A)] murder count -- still carries a mandatory minimum sentence of twenty years") (Chin, J.,); *United States v. Potts*, 389 F. Supp. 3d 352, 356 (E.D. Pa. 2019) ("The Fair Sentencing Act made many changes to elements of various crack offenses, but it did not amend the text of § 848(e)."); *United States v. Valentine*, No. 06-CR-580 (JSR), 2019 WL 3242494, at \*1 (S.D.N.Y. July 2, 2019) ("[T]he Fair Sentencing Act … did not modify the sentences for the [§ 848(e)(1)(A)] murder … crimes to which defendant pled guilty").[1]

To be sure, § 2 of the Fair Sentencing Act modified the statutory penalties for crack cocaine offenses by increasing the quantity of crack cocaine necessary to trigger the minimums—"raising the amount from 15 grams to 28 grams for the 5–year minimum sentence, and from 50 grams to

---

[1] The government recognizes that since the passage of the First Step Act, several district courts have held otherwise. *See* ECF No. 39 at 8–10. For the reasons appearing in this section, the government respectfully maintains that these cases are wrongly decided.

14

280 grams for the 10–year minimum sentence." *United States v. Black*, 737 F.3d 280, 282 (4th Cir. 2013). And of course, § 404 of the First Step Act "makes retroactive the provisions of the Fair Sentencing Act of 2010 that reformed crack cocaine sentencing." *United States v. Woodson*, 962 F.3d 812, 813 (4th Cir. 2020). But none of these amendments altered § 848(e)'s penalty scheme. It may be the case that the Fair Sentencing Act indirectly limited the number of defendants who can be charged with § 848(e) offenses by increasing the threshold amounts of crack cocaine required under § 841(b)(1)(A), but even assuming the truth of the latter does not render § 848(e) a covered offense under the First Step Act.

The Second Circuit has rejected a similar attempt to obtain relief under the Fair Sentencing Act from an § 848(e) conviction. In *United States v. Guerrero*, 813 F.3d 462 (2d Cir. 2016), the defendant argued that the Fair Sentencing Act compelled vacatur of his § 848(e) conviction because after the Act's passage, "§ 848(e)(1)(A)'s drug trafficking element required the jury to find that the conspiracy involved at least 280 grams of crack cocaine" and "[b]ecause only a quantity of 50 grams was alleged and proved, … the Government failed to establish an element of the charged murder offense[.]" *Id*. at 465. The Second Circuit rejected this argument, holding as follows:

> A defendant may be convicted under § 848(e)(1)(A) if he was engaged in a drug trafficking offense punishable under § 841(b)(1)(A) at the time he committed intentional murder. The crime is complete at the time of the murder, *see* 21 U.S.C. § 848(e)(1)(A), and it is as of that time that the statute's drug trafficking element is measured. Here, Guerrero committed the murders in September 1994, at which time the threshold quantity of crack cocaine necessary under § 841(b)(1)(A) was 50 grams or more. The jury's finding that Guerrero had been engaged in a conspiracy to distribute 50 grams or more of crack cocaine at the time he intentionally killed Ortega and Garrido therefore satisfied the drug trafficking element of the § 848(e)(1)(A) murder offense. There was no error in the indictment, the instructions, or the verdict.

*     *     *

15

**J.A.481**

> No other conclusion flows from the FSA, a sentencing statute principally designed to increase threshold quantities of drugs necessary to trigger certain enhanced penalty schemes, to remove certain mandatory minimum sentences, and to direct the promulgation of new Sentencing Guidelines.

*Id*. As in *Guerrero*, Johnson's convictions under § 848(e)(1)(A) were complete the day his seven murders occurred "and it is as of that time that the statute's drug trafficking element is measured." Neither the Fair Sentencing Act nor the First Step Act counsel otherwise, *see id*. at 466 ("Because the FSA did not expressly extinguish any criminal liability under § 848(e)(1)(A), the law's enactment did not retroactively invalidate Guerrero's conviction."), and there is no reason to believe that Congress, through statutes aimed at remedying disparities between cocaine base and powder cocaine, *see Gravatt*, 953 F.3d at 260, intended to absolve murders from criminal liability, to say nothing of vacating lawfully imposed death sentences. *Cf*. ECF No. 38 at 2 (requesting resentencing hearing on all seven § 848(e)(1)(A) counts).

The only court of appeals to have considered the eligibility of a § 848(e) conviction under the First Step Act has held that it is not a "covered offense" under § 404(b). In *United States v. Snow*, 967 F.3d 563 (6th Cir. 2020), the defendant argued that the Fair Sentencing Act's increase of the threshold amount of crack cocaine under § 841(b)(1)(A) to 280 grams "combined with § 848(e)(1)(A)'s requirement of an offense punishable under § 841(b)(1)(A), qualifies his § 848(e)(1)(A) conviction as a "covered offense," making him eligible for a First Step Act sentence reduction." *Id*. at 564. The Sixth Circuit disagreed, holding "that the First Step Act's text and structure do not support extending resentencing relief to Snow's § 848(e)(1)(A) conviction." *Id*.

*Snow* first noted that "[i]n run-of-the-mill First Step Act cases, applying the Fair Sentencing Act retroactively requires only a change in degree: adjusting from a previous and higher statutory sentencing range to a new and lower one." *Id*. at 565. "Thus,"

16

the court continued, "in such cases, it makes sense to say that the Fair Sentencing Act 'modified' the statutory penalties. But the same is not true of Snow's § 848(e)(1)(A) conviction for murder while engaged in a conspiracy to distribute at least 50 grams of cocaine base." *Id*. This was so, the court held, because

> [t]he Fair Sentencing Act did not reduce the sentencing range that applies to a conviction with those elements. Instead, after the Fair Sentencing Act, those elements no longer amount to an offense under § 848 at all and there is no applicable statutory sentencing range. The elimination of statutory penalties cannot be called a "modification" of statutory penalties without putting great strain on the ordinary meaning of the word "modify." This strongly suggests that Snow's § 848(e)(1)(A) conviction cannot be considered a covered offense as defined in § 404(a) of the First Step Act.

*Id*. Continuing, the Sixth Circuit noted that § 404(b) of the Act confirmed its conclusion. As it reiterated, § 404(b) permits courts to "impose a reduced sentence" for a covered offense "'as if [the changes made by the Fair Sentencing Act] were in effect' when the offense was committed." *Id*. Revisiting the defendant's § 848(e)(1)(A) conviction under this rubric, however, would have resulted in the unusual step of eliminating the statutory penalties for his conviction. As *Snow* held,

> if the district court chose to revisit Snow's Count 2 sentence as if the Fair Sentencing Act were in effect, it would be unable to "impose" any sentence because, again, there would no longer be any statutory penalties prescribed for Snow's conviction. In other words, § 404(b) on its face presupposes that the district court may still impose some sentence even after applying the Fair Sentencing Act retroactively; it simply does not contemplate the elimination of a sentence, as would be required here.

*Id*. "In sum," the Sixth Circuit concluded the defendant's "§ 848(e)(1)(A) conviction is not a covered offense and he is ineligible for a reduction in his sentence for Count 2." *Id*.

The Sixth Circuit's holding accounts for both the text of the First Step Act as well as

17

**J.A.483**

§ 404(b)'s actual, "real time" operation. This Court should adopt its reasoning.[2]

## II.   The First Step Act did not displace § 848(e)'s detailed provisions concerning imposition of the death penalty.

Johnson was convicted of seven counts of capital murder in furtherance of a criminal enterprise, in violation of § 848(e) (Counts 8, 11, 17, 18, 19, 24, 25) and was sentenced to death on all seven counts. Johnson was sentenced in accordance with the jury's recommendation pursuant to 21 U.S.C. § 848(l), *Tipton*, 90 F.3d at 870, a statutory provision which has since been repealed.

The Fourth Circuit has held that even in a case where a defendant obtains post-conviction relief from a faulty capital sentencing proceeding, courts are still obligated to follow the penalty scheme attendant to § 848(e) convictions, even if they have been repealed and replaced by the different procedures of the Death Penalty Act, 18 U.S.C.A. § 3591 *et seq*. ("FDPA"). *See United States v. Stitt*, 552 F.3d 345 (4th Cir. 2008). In *Stitt*, a defendant was convicted and sentenced to death under § 848(e)(1)(A). *Id*. at 352. The defendant obtained relief under § 2255 due to his defense attorney's conflict of interest during the penalty phase of his trial, which resulted in vacatur of his death sentence. *Id*. at 348. During the pendency of various appeals related to the case, Congress repealed §§ 848(g) through (r) and made § 848(e) convictions death penalty eligible in

---

[2] Although Johnson is likely eligible for a sentence modification on Counts 31 and 32, crack offenses under § 841(a)(1), the Court need not reach this contention due to his ineligibility for relief under the concurrently imposed death sentences under § 848(e). *See United States v. Charles*, 932 F.3d 153, 160 (4th Cir. 2019) ("[T]he [concurrent-sentence] doctrine still has continuing force as a species of harmless-error review where a defendant seeks to challenge the legality of a sentence that was imposed for a valid conviction, but where the challenged sentence runs concurrently with a valid sentence of an equal or greater duration."); *accord United States v. McCain*, – F.3d –, 2020 WL 5414850, at *5 (4th Cir. Sept. 10, 2020) ("Even assuming the district court plainly erred in not vacating McCain's Section 1512 conviction, he has not shown that the error affected his substantial rights. McCain received two concurrent life sentences: on Count One for violating Section 1512 and on Count Five for violating Section 924.").

accordance with the FDPA. *Id*. 352. Given this change-in-law, the district court refused to empanel a new sentencing jury under the relevant, but since-repealed, provisions of § 848, instead opting to resentence the defendant to life imprisonment without a jury. *Id*. at 351-52.

The government appealed and the Fourth Circuit reversed. In so holding, the Fourth Circuit held that the Savings Statute, 1 U.S.C. § 109, saved §§ 848(g) through (r) as applied to the defendant. *Stitt* first noted that "courts are in agreement that 'sentencing provisions' are saved as part of the 'prosecution' of a 'penalty' even when a later change alters the availability of a particular sentence." *Id*. at 354. As such, *Stitt* held that "we continue to apply the original sentencing provisions because the repeal of §§ 848(g)-(r) would have the effect of eliminating a previously-available sentencing option, a death sentence, at the resentencing." *Id*. *Stitt* also noted "that the penalty provided in § 848(e) cannot be fully preserved without also preserving the mechanisms for enforcing it, §§ 848(g)-(r). Indeed, the repealed portions of § 848 are a constitutionally required condition precedent to imposing § 848(e)'s penalty of a death sentence." *Id*. Concluding, the Fourth Circuit held that because the "'enforcing provisions' of § 848(g)-(r) are both akin to a 'sentencing provision' and also have a constitutionally mandated 'special relation to the accrued right,' the Savings Statute operates to save them against Stitt. And, § 848(i)(1)(B)(iv) provided for the empanelling of a sentencing jury in cases where the original death sentence was later vacated." *Id*.

Addressing the district court's assertion of equitable power to personally resentence the defendant, despite an earlier jury's imposition of the death penalty, *Stitt* held as follows:

> Section 848(i) provided that, if the Government files the appropriate death-eligibility notice (which it did in 1998), and if the defendant is found guilty of the death eligible offenses (which Stitt was in 1999), then "the judge who presided at the trial … *shall* conduct a separate hearing to determine the punishment to be imposed." 21 U.S.C.A. § 848(i)(1) (emphasis added). That hearing "*shall*" be conducted "before a jury impaneled for the purpose of the hearing if ... after initial

19

> imposition of a sentence under this section, redetermination of the sentence under this section is necessary." 21 U.S.C.A. § 848(i)(1)(B)(iv) (emphasis added). And, if a jury recommends a sentence of death, "the court shall sentence the defendant to death." 21 U.S.C.A. § 848(l) (emphasis added). Given the repeated use of the term "shall," we believe it was not "appropriate" for the district court to forego empanelling a new penalty-phase jury.

*Id*. at 355–56.

Given the First Step Act's text and animating purpose, *Gravatt*, 953 F.3d at 260, there is little indication that it was intended to override the § 848(e)'s more specific provisions addressing the imposition of death sentences. Relatedly, there is no evidence that the First Step Act permits courts to disturb jury-imposed death sentences as an exercise of discretion under § 404(b) and Johnson points to no statute or case providing as such. Johnson's argument for a resentencing on all seven § 848(e) counts should therefore be rejected.

## III. Johnson's remaining arguments are improperly brought in a First Step Act motion.

Johnson raises four additional points which, although having no bearing on the instant motion, he nonetheless asks this Court to consider. Each should be rejected as improvidently brought in a First Step Act motion or barred by prior litigation in this case.

Johnson first notes that his conviction on Count 1 was vacated by the Fourth Circuit on direct appeal. (ECF No. 39 at 43.). He therefore asks to be resentenced "without the influence of this superadded, unconstitutional conviction on the sentencing decision." (*Id*.) Johnson also states that his § 924(c) convictions (Counts 9, 12, 15, 20, and 26) are invalid in light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). (*Id*. at 43-44.) Johnson also claims that his eleven convictions for committing violent crimes in aid of racketeering activity under § 1959 (Counts 10, 13, 14, 21, 22, 23, 27, and 28) were improperly charged and are therefore invalid. (*Id*. at 44-46.) And finally, Johnson claims that he has an intellectual disability and can demonstrate that fact through a new capital resentencing. (*Id*. at 13-34.)

20

**J.A.486**

Case 3:92-cr-00068-DJN Document 58 Filed 09/23/20 Page 21 of 28 PageID# 2002

As noted above, each argument is either irrelevant to the Court's consideration of the instant motion, improperly raised through a First Step Act motion, or barred by prior litigation in this case. With regards to Johnson's first argument, of course the government recognizes that the Fourth Circuit vacated his conviction on Count 1. This vacatur occurred in 1996 though, *see Tipton*, 90, F.3d at 891, and presumably resulted in little more than an amended judgment. The time has long-since-passed to seek any other type of relief from the Fourth Circuit's vacatur. And in any event, the likelihood that the elimination of a cocaine distribution conspiracy conviction would/will have any impact on Johnson's sentence is infinitesimal in light of the fact that he stands convicted of seven murders.

As to Johnson's *Davis* argument, and as he himself recognizes, he is currently seeking authorization from the Fourth Circuit to even raise such a claim in the district court. Accordingly, even if a First Step Act motion was the proper forum to raise such a claim, it would make little sense to consider his *Davis* argument until after the Fourth Circuit actually authorizes it, to say nothing about its success on the merits. Because Johnson's application to file a successive § 2255 petition on this very issue is fully briefed and pending before the Fourth Circuit, the government does not address the merits of this claim herein. *See In re Corey Johnson*, No. 20-8, ECF Nos. 2, 7, 12, 13, 14, 16, 17, 18.

Johnson's claims of instructional error also have no place in a First Step Act motion. To begin, the First Step Act permits sentence modifications under specified circumstances. The Act is not a vehicle by which to raise perceived infirmities in a conviction. *See United States v. Moore*, – F.3d –, 2020 WL 5523205, at *5 (2d Cir. Sept. 15, 2020) ("By its express terms, [§ 404 of the First Step Act] does not require plenary resentencing or operate as a surrogate for collateral review, obliging a court to reconsider all aspects of an original sentencing."); *Mannie*, 2020 WL 4810084,

21

**J.A.487**

at *6 ("Unlike a direct appeal of a conviction, which challenges the underlying conviction, a motion brought under the 2018 FSA only challenges the sentence—the length of incarceration."). If Johnson believed instructional error infected his eleven § 1959 convictions, he should have raised the argument on direct appeal or in a § 2255 motion. At this juncture, Johnson would need prefilling authorization from the Fourth Circuit to even raise such arguments before this Court. *See In re Vassell*, 751 F.3d 267, 271 (4th Cir. 2014) ("Section 2255(h) requires a court of appeals considering whether to authorize a second or successive § 2255 motion to follow the gatekeeping procedure 'provided in section 2244.'"). Because Johnson has not done so, his claims of instructional error are improperly raised in the instant motion.[3]

And finally, Johnson's attempt to re-litigate his mental status should be rejected as both procedurally improper and barred by the law of the case doctrine. As a preliminary matter, a First Step Act motion is not a vehicle to raise arguments about a defendant's mental health at the time of his offense conduct and sentencing. Notwithstanding, Johnson has already litigated this general issue in the district court and on appeal, and lost. In appealing the denial of his § 2255 motion, Johnson argued that "he is mentally retarded and that, under federal law, he cannot be executed[] … [and] that his counsel were ineffective for failing to argue this point during sentencing." *Roane*, 378 F.3d at 408. Like the district court, the Fourth Circuit disagreed.

---

[3] On direct appeal, the Fourth Circuit rejected an instructional error challenge brought by Johnson, Tipton, and Roane to their § 1959 convictions. The defendants argued that "the district court failed to differentiate between 'an enterprise engaged in racketeering activity' and the 'racketeering activity' in which it was engaged." *Tipton*, 90 F.3d at 888. The Fourth Circuit rejected the argument on plain error review, holding that "we are satisfied that, as the Government contends, the jury was adequately told that the elements were separate and distinct ones and that both must be proved. Viewed in total context, the two isolated references to 'racketeering activity' when 'enterprise engaged in racketeering activity' was appropriate must have been understood as short-hand references to the 'enterprise' itself." *Id.*

22

**J.A.488**

In rejecting the first argument, the Fourth Circuit held as follows:

The district court found, based on data of the American Association on Retardation, that an IQ of 75 or below places a person in the retarded category. At the penalty phase of Johnson's trial, Dr. Dewey Cornell, a psychologist, testified that, on October 10, 1992, he had administered a Wechsler Adult Intelligence Scale Test ("WAIS Test"). Johnson exhibited an IQ of 77, which indicated a "generally impaired intelligence," placing him "just above the level of mental retardation." Importantly, Dr. Cornell testified that he knew the significance of finding Johnson's IQ to be above 75 (i.e., this finding would render Johnson death-eligible), and that he double-checked his numbers and consulted colleagues before reaching this conclusion.

Despite Dr. Cornell's evidence, Johnson asserts that he is in fact mentally retarded. In support of this proposition, Johnson points to evidence offered during the penalty phase that his IQ was somewhere between 69 and 74 in 1985, and he relies on a 1996 publication concluding that the WAIS test tends to inflate IQ scores over the years:

Individuals appear to gain 3-5 IQ points over a ten year period. Since the WAIS-R was published in 1981, this inflation factor could mean that the average IQ could be as high as 105-107 points rather than the accepted value of 100.

Based on these authorities, Johnson maintains that his actual IQ is below 75 and that his score of 77 is a product of score inflation. As the district court explained, however, Dr. Cornell's evidence that he double-checked his findings and consulted with colleagues before concluding that Johnson was not mentally retarded "belies the suggestion that Dr. Cornell's analysis did not account for possible variations in his testing instrument." Accordingly, Johnson is not barred from execution due to mental retardation.

*Id.* at 408–09 (internal citations omitted). With regards to Johnson's related ineffective assistance

of counsel argument, the Fourth Circuit held as follows:

Johnson next contends that his counsel was ineffective for failing to assert possible IQ-score inflation at sentencing. We agree with the district court that Johnson's trial attorney was not ineffective for failing to raise this issue. Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." And "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." In this instance, Johnson's lawyer was presented with a mental health report, and he was under no

23

**J.A.489**

mandate to second-guess that report. In these circumstances, Johnson's counsel was not constitutionally ineffective in this respect.

*Id.* at 409 (internal citations omitted).

As is clear from the Fourth Circuit's decision, Johnson's arguments concerning his mental health have been fully aired and rejected.[4] In addition to being inappropriately brought in a First Step Act motion, these arguments are barred by the mandate rule and the law of the case doctrine. *See United States v. Alston*, 722 F.3d 603, 606 (4th Cir. 2013) ("The mandate rule is a specific application of the law of the case doctrine that prohibits a lower court from reconsidering on remand issues laid to rest by a mandate of the higher court." (internal quotation marks omitted)); *United States v. Susi*, 674 F.3d 278, 283 (4th Cir. 2012) (mandate rule "compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court.").

Ultimately, Johnson's motion offers no persuasive reason for reducing his sentence—even if a reduction were authorized—given the gravity of his crimes. Even if the Fair Sentencing Act were applied, Johnson would still face statutory maximums of life for every count on which he received a death sentence for murder. His guideline range would remain unchanged at life imprisonment. He would still be eligible for a death sentence and the jury's decision to impose death sentences on all seven murder counts would still stand.

## IV.    Response to the Court's September 4, 2020, Order.

On September 4, 2020, the Court ordered the government to provide its position with regards to Johnson's First Step Act motion. (*See* ECF No. 46.) As noted above, the government

---

[4] Although Johnson's motion does not formally cite the Supreme Court's decision *in Atkins v. Virginia*, 536 U.S. 304 (2002), several of his secondary sources make reference to this decision. It bears mentioning that the Fourth Circuit's rejection of Johnson's mental status argument came two years after *Atkins* and acknowledged the Court's decision therein. *See Roane*, 378 F.3d at 408.

24

**J.A.490**

maintains that Johnson's death sentences cannot be reduced under § 404 of the First Step Act. His convictions under § 848(e) are not "covered offenses," and § 404 does not authorize a court to reduce the death sentences imposed by the jury. Even if that were not the case, this Court should exercise its discretion under the First Step Act, *see* First Step Act § 404(c), and deny Johnson's request for a sentence reduction due to the serious nature of his offenses and the risk he poses to the public.

Johnson stands convicted of seven murders under § 848(e). The details of the murders are distilled as follows:

- In mid-January 1992, Johnson and another individual used semi-automatic weapons to gun down Peyton Johnson at a tavern (Count 8). Peyton Johnson was a rival drug dealer. *Tipton*, 90 F.3d at 868. The medical examiner's report noted that Peyton Johnson was left with 15 gunshot wounds to his head, chest, and legs. PSR ¶ 73.

- Less than two weeks later, on January 29, 1992, Johnson murdered Louis Johnson (Count 11). *Tipton*, 90 F.3d at 869. Johnson approached Louis Johnson in an alley, and, believing him to have previously threatened him while acting as a body guard for a rival drug dealer, began shooting him. *Id*. While Louis Johnson lay on the ground, either Johnson or another codefendant shot him twice at close range. *Id*. Louis Johnson's body was found on the street with seven gunshot wounds, several of which were to his head and body. PSR ¶ 75.

- In early February 1992, Johnson murdered Bobby Long, Anthony Carter, and Dorothy Mae Armstrong (Counts 17, 18, and 19). Armstrong was murdered because she owed a drug debt to Johnson and Tipton and because "she knew too much" about their activities. PSR ¶ 85. The pair located Armstrong at her home, where she was hiding until she could repay her debts, and while Tipton acted as lookout, Johnson burst through the side door and shot her. PSR ¶ 86; *Tipton*, 90 F.3d at 869. Carter and Long were also killed as part of this attack, likely because they witnessed Armstrong's murder. PSR ¶ 87.

- In February 1992, Johnson murdered Curtis Thorne and Linwood Chiles (Counts 24 and 25). The murder involved Johnson and Tipton arranging to meet Thorne, Chiles, and Priscilla and Gwen Greene in an alley. Johnson then instructed Chiles to place his head on the steering wheel of his car and, with Tipton standing by, shot him at close range. *Tipton*, 90 F.3d at 869. Tipton also participated in this shooting. *Roane*, 378 F.3d at 389 n.6. Additional shots were fired at Thorne and the Greene sisters. *Id*. Thorne's autopsy report indicated

**J.A.491**

that he had been hit by bullets from two different directions. *Id*. When police arrived at the scene, they found a male victim lying on the ground outside the rear passenger door and one of the Greene sisters on the curb several feet away. Chiles was found slumped over the steering wheel, with the other Greene sister to his right in the passenger seat. PSR ¶ 90. The Greene sisters were simply in the wrong place at the wrong time. PSR ¶ 92.

Johnson was also convicted of eleven counts of committing violent crimes in aid of racketeering activity under 18 U.S.C. § 1959. Two of those counts (Counts 29 and 30) related to the maiming of Gwen and Priscilla Greene during the attack on Chiles and Thorne. Two other convictions under § 1959 stemmed from Johnson's murder of Torrick Brown (Count 14) and wounding of Martha McCoy (Count 16). Johnson killed Brown due to his codefendant Roane's personal grievance. Namely, that Brown was "messing" with his girlfriend. *Tipton*, 90 F.3d at 891. Johnson and Roane located Brown as his apartment on the evening of February 1, 1992, and, armed with semi-automatic weapons, opened fire on Brown as he approached his doorway. *Id*. at 869. Brown was killed in the attack. McCoy was critically wounded and was likely shot due to her being a potential eyewitness to Brown's murder. *Id*. at 891. Johnson and Roane shot McCoy in front of her three children, aged two to seven, whom she was feeding at the moment Johnson began firing his weapon at Brown. PSR ¶ 78.

As is evident, the nature and circumstances of Johnson's offenses could hardly be worse. Johnson received numerous terms of life imprisonment and a death sentence on all seven murder counts. There is every reason to believe that a defendant who plotted and participated in violent murders, and callously attacked unrelated bystanders, poses a serious risk to public safety. Johnson's murders were deliberate and premediated. The passage of time and new Congressional legislation cannot undo such grave acts. *See United States v. Umana*, 750 F.3d 320, 358 (4th Cir. 2014) (death penalty proportional to crime where defendant "killed two people in furtherance of a racketeering enterprise, … had killed before and posed a danger in the future.").

26

The Court also requested that the government provide the following information:

**A. The number of months and years of supervised release that it considers appropriate;**

The government believes that a lifetime period of supervised release would be appropriate should the Court reduce Johnson's sentence.

**B. The status of Johnson's educational and vocational training;**

Between 1999 and 2020, Johnson has taken numerous courses in prison, including:

1. Art courses (water color, colored pencil, charcoal pencil, and crochet);
2. Exercise courses (yoga and abdominal techniques); and
3. General educational and vocational courses (GED Self-Study and other unspecified GED courses).

**C. The status of any treatment pertaining to substance abuse or physical/mental health;**

The government is not aware of any mental or substance abuse treatment, or any other treatment that is germane to the issues in this motion.

**D. Johnson's post-sentencing conduct:**

The government is not aware of any prison infractions related to Johnson.

## Conclusion

For the reasons explained above, the Court should deny Johnson's First Step Act motion.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:    _____/s/_____
Richard D. Cooke
Joseph Attias
Assistant United States Attorneys

27

Case 3:92-cr-00068-DJN   Document 58   Filed 09/23/20   Page 28 of 28 PageID# 2009

**Certificate of Service**

I certify that on September 23, 2020, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.

By: _____/s/_____

Joseph Attias
Assistant United States Attorney

28

**J.A.494**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 3:92CR68 (DJN)** |
| | **:** | **CAPITAL CASE** |
| **COREY JOHNSON** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**REPLY IN SUPPORT OF MOTION FOR A RECONSIDERATION OF SENTENCE
HEARING PURSUANT TO THE FIRST STEP ACT OF 2018**

David E. Carney, VA Bar # 43914
Donald P. Salzman*
Lotus D. Ryan, VA Bar # 71425
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Ph: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com


Alexander C. Drylewski*
Judith A. Flumenbaum*
Skadden, Arps, Slate, Meagher & Flom, LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000

*Admitted Pro Hac Vice



*Counsel for Corey Johnson*

**J.A.495**

**TABLE OF CONTENTS**

I.      Mr. Johnson's Convictions Are Covered Offenses Subject to Reconsideration by a
        Sentencing Jury..............................................................................................................1

        A.      Mr. Johnson's Convictions Under 21 U.S.C. § 848 Rest on Violations of
                21 U.S.C. § 841(b)(1)(A), Which Is a Covered Offense .........................................1

        B.      The Government Is Not Helped by the Out-of-Circuit Cases It Cites.....................3

        C.      Mr. Johnson Is Entitled to Have His Capital Sentences Reconsidered by a
                Jury.........................................................................................................................6

II.     Mr. Johnson's Mitigation Evidence Is Properly Considered by This Court or the
        Resentencing Jury...........................................................................................................8

III.    The First Step Act and Fair Sentencing Act Were Intended to Correct Racial
        Disparities in Sentencing, as Exemplified by This Case ....................................................12

J.A.496

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Andrews v. United States*, 373 U.S. 334 (1963)...............................................................................7

*Blockburger v. United States*, 284 U.S. 299 (1932)..........................................................................2

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ....................................................................................9

*Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018).......................................................................8

*Kimbrough v. United States*, 552 U.S. 85 (2007) ...........................................................................12

*Lockett v. Ohio*, 438 U.S. 586 (1978) ..............................................................................................9

*Richardson v. United States*, 526 U.S. 813 (1999) .........................................................................13

*Skipper v. South Carolina*, 476 U.S. 1 (1986) .................................................................................9

*United States v. Brown*, No. 3:08-CR-00011-1, 2020 WL 3106320 (W.D. Va. June 11, 2020) ...................................................................................................................................1, 2, 5

*United States v. Chambers*, 956 F.3d 667 (4th Cir. 2020).........................................................9, 10

*United States v. Davis*, No. 5:93-cr-30025, 2020 WL 1131147 (W.D. Va. Mar. 9, 2020), *appeal filed*, No. 20-6383 (4th Cir. Mar. 20, 2020).............................................................6

*United States v. Gravatt*, 953 F.3d 258 (4th Cir. 2020)...............................................................4, 8

*United States v. Guerrero*, 813 F.3d 462 (2d Cir. 2016) .................................................................4

*United States v. NJB*, 104 F.3d 630 (4th Cir. 1997) ........................................................................2

*United States v. Snow*, 967 F.3d 563 (6th Cir. 2020).......................................................................5

*United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006).....................................................................7, 8

*United States. v. Stitt*, 552 F.3d 345 (4th Cir. 2008)........................................................................8

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996)...................................................................2, 3

*United States v. Webster*, 639 F.2d 174 (4th Cir. 1981) .................................................................13

*United States v. Wirsing*, 943 F.3d 175 (4th Cir. 2019)...................................................................4

*Wiggins v. Smith*, 539 U.S. 510 (2003)............................................................................................9

ii

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ..........................................................................9

## STATUTES

18 U.S.C. § 3553.................................................................................................................. passim

18 U.S.C. § 3594......................................................................................................................8

21 U.S.C. § 841.................................................................................................................... passim

21 U.S.C. § 846.....................................................................................................................2, 3

21 U.S.C. § 848.................................................................................................................... passim

21 U.S.C. § 848(*l*) (1988) ..........................................................................................................7, 8

Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 ..........................................6, 7

Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 ...................................... passim

First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194................................................. passim

## OTHER AUTHORITIES

United States' Motion to Remand, *United States v. Maupin*, No. 19-6817 (4th Cir. Aug.
29, 2019), ECF No. 26 .......................................................................................................6

iii

J.A.498

The Government's Opposition to Defendant's Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act (the "Opposition") fails to provide a basis to deprive Mr. Johnson of the statutory relief afforded by the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. The charges for which Mr. Johnson received his death sentences are covered offenses, and he is entitled to have his sentences reconsidered by a jury. As Mr. Johnson has highlighted for this Court, he has substantial evidence, including his unblemished 27-year record of incarceration, to put before a sentencer that demonstrates a life sentence is sufficient, and not more than necessary, to meet the purposes of 18 U.S.C. § 3553(a)(2). Accordingly, Mr. Johnson is eligible for reconsideration of his sentences on Counts 2, 8, 11, 17-19, 24, 25, 31, and 32 pursuant to Section 404 of the First Step Act, and he respectfully asks this Court to grant him a capital resentencing hearing before a jury.

I.    **Mr. Johnson's Convictions Are Covered Offenses Subject to Reconsideration by a Sentencing Jury.**

   A. **Mr. Johnson's Convictions Under 21 U.S.C. § 848 Rest on Violations of 21 U.S.C. § 841(b)(1)(A), Which Is a Covered Offense**

No matter how one looks at Mr. Johnson's convictions under § 848(e), they are covered offenses under the First Step Act. As Mr. Johnson noted in his initial Memorandum in Support of Motion for Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 ("Memorandum"), the Western District of Virginia, this Court's sister jurisdiction, concluded that § 848 as a whole is a covered offense. *See United States v. Brown*, No. 3:08-cr-00011-1, 2020 WL 3106320, at *4 (W.D. Va. June 11, 2020) (Section 848 is a covered offense *in toto* "because at least one of the penalties . . . was modified by Section 2 or 3 of the Fair Sentencing

**J.A.499**

Act.").  The Government has not appealed that decision.  Nor has the Government addressed

*Brown* in its Opposition and has, therefore, waived its opportunity to do so.[1]

Instead, while recognizing that § 848(e) may specifically rest on a § 841(b)(1)(A)

predicate, the Government nevertheless argues that Mr. Johnson's § 848(e) convictions are not

covered offenses because they rest on an alternative basis: a continuing criminal enterprise

("CCE").  Opposition at 13-14.  The Government's argument, however, is no more than a sleight

of hand because, as the Fourth Circuit's opinion on Mr. Johnson's direct appeal makes clear, his

CCE convictions rest on § 841(b)(1)(A) offenses.  *United States v. Tipton*, 90 F.3d 861, 891, 903

(4th Cir. 1996).

In that opinion, as the Government acknowledges, Opposition at 9, the Fourth Circuit

vacated Count 1—conspiracy to distribute cocaine in violation of 21 U.S.C. § 846—on the basis

that Count 1 was a lesser included offense of each of Mr. Johnson's § 848 charges.  *Tipton*, 90

F.3d at 891, 903.  The conspiracy charged in Count 1 was, in turn, based upon violations of §

841(b)(1)(A).  *See* Second Superseding Indictment at 2, Docket Entry 115 (Count 1 alleges Mr.

Johnson did "possess with the intent to distribute, and to distribute . . . at least fifty (50) grams or

more of a mixture or substance described in Title 21, United States Code, Section

841(b)(1)(A)(ii), which contains cocaine base.").  To have Count 1 be a lesser included offense

of the § 848 offenses, all of the elements of Count 1 must have also been elements of § 848.

*Blockburger v. United States*, 284 U.S. 299, 304 (1932).  ("[T]he test to be applied to determine

---

[1]    Without directly addressing *Brown*, the Government cites *United States v. NJB*, 104 F.3d 630
(4th Cir. 1997), for the proposition that § 848(e) is a separate offense, and not an integral part
of an indivisible § 848 statute.  Opposition at 13.  This argument gets the Government
nowhere.  In *Brown*, the court found that § 848(a), which does not itself specifically mention
§ 841(b)(1)(A), was nevertheless a covered offense.  Therefore, consistent with *Brown*,
criminality under § 848(e) *does* specifically rest on violations of § 841(b)(1)(A).

*(cont'd)*

2

**J.A.500**

whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.").

The direct appeal opinion further underscores that Mr. Johnson's CCE violation in Count 2 was based on a series of violations of § 841.[2]  *Tipton*, 90 F.3d at 884.[3]  In other words, the Fourth Circuit has specifically determined that the CCE conviction, on which Mr. Johnson's § 848(e) offenses were based were, in turn, based on drug distribution offenses charged under § 841(b)(1)(A).  Thus, it is the law of this case that § 841(b)(1)(A) offenses were the predicates for the § 848(e) offense, which the Government is not free to dispute.  Accordingly, Mr. Johnson's § 848(e) convictions are covered offenses.

## B.  The Government Is Not Helped by the Out-of-Circuit Cases It Cites

While conceding that its position in this case does not align with the holdings of courts within the Fourth Circuit, Opposition at 14 n.1, the Government seeks to persuade this Court with out-of-circuit authority that § 848(e) is not a covered offense.  The Government lacks any convincing basis for asking this Court to disregard relevant and well-reasoned authority for two inapposite cases from the Second and Sixth Circuit.

---

[2]   The Government does not dispute that Mr. Johnson's convictions for possession with intent to distribute in violation of § 841(a)(1)—Counts 31 and 32 of the indictment—are covered offenses.  Opposition at 18 n.2.

[3]   As the Fourth Circuit explained in its direct appeal opinion, Count 2 "identified and incorporated by reference all violations of 21 U.S.C. §§ 841 and 846 charged against the appellants elsewhere in the indictment . . . , including the conspiracy charged [under § 846] in Count 1 [and] the drug distribution jointly charged [under § 841(b)(1)(A)] in Count 32." *Id.*; *see also* Second Superseding Indictment at 6, Docket Entry 115 (Count Two charges Mr. Johnson with "engag[ing] in a Continuing Criminal Enterprise, that is, . . . violat[ing] Title 21, United States Code, Section 841 and 846" as "part of a continuing series of violations.").

*(cont'd)*

3

J.A.501

The Government cites *United States v. Guerrero*, 813 F.3d 462 (2d Cir. 2016), for the proposition that because Mr. Johnson possessed the requisite quantity of crack under § 841(b)(1)(a) at the time the § 848 offense was committed, his liability under § 848(e)(1)(a) is unchanged.  Opposition at 15-16.[4]  However, *Guerrero*, which predates the First Step Act, is inapposite.  In *Guerrero*, the defendant was convicted prior to, but sentenced after, the enactment of the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372, and argued on appeal for vacatur of his conviction based on retroactivity of the Fair Sentencing Act, which was prospective only.  *Id.* at 464-65.  *Guerrero* does not address, and bears no relevance to, a court's "covered offense" determination for purposes of resentencing under the First Step Act.

Moreover, the Government's position is inconsistent with the remedial purpose of the First Step Act, which was based on the recognition that sentences for crack offenses prior to enactment of the Fair Sentencing Act were too severe.  *See, e.g.*, *United States v. Gravatt*, 953 F.3d 258, 260 (4th Cir. 2020).  Congress enacted the Fair Sentencing Act "in response to extensive criticism about the disparity in sentences between crack cocaine offenses and powder cocaine offenses."  *Id.* (quoting *United States v. Black*, 737 F.3d 280, 282 (4th Cir. 2013)).  Congress also enacted the First Step Act to address "disparities between sentences for crack cocaine offenses and powder cocaine offenses [that] remained for defendants sentenced before . . . the effective date of the Fair Sentencing Act."  *Id.*; *see also Wirsing*, 943 F.3d at 186 ("Congress's clear intent was to apply the Fair Sentencing Act to pre-Fair Sentencing Act

---

[4]     The Fourth Circuit has held that—in the absence of a plea statement or special jury verdict specifying the amount of a drug that was distributed—a court may not make its own finding, regardless of the evidence presented by the Government at trial.  *United States v. Wirsing*, 943 F.3d 175, 181 (4th Cir. 2019).  There was no such special jury verdict in Mr. Johnson's case.

4

offenders."). Thus, the Government's reliance on *Guerrero* is both misplaced and inconsistent with the legislative purpose of the statute.

Next, the Government relies on *United States v. Snow*, 967 F.3d 563 (6th Cir. 2020), to argue that § 848(e)(1)(A) is not a "covered offense" because it constitutes a separate offense, not a sentencing enhancement, and thus under the Fair Sentencing Act modifications, Mr. Johnson would be subject to a vacatur of his conviction instead of a lower sentencing range. As an initial point, the Government's position that § 848(e)(1)(A) constitutes a separate offense is unpersuasive. *See, e.g.*, *Brown*, 2020 WL 3106320, at *3-4 (explaining that the most "straightforward" understanding of § 848 is that the "statute of conviction is § 848 as a whole," with the specific subsections setting forth the penalties) (citing *United States v. Smith*, 954 F.3d 446, 450 (1st Cir. 2020))).

Most importantly, Mr. Johnson has not argued that the Fair Sentencing Act modifications to § 841(b)(1)(A) render him not guilty under § 848(e)(1)(A) or that his convictions should be vacated under the First Step Act. Mr. Johnson simply argues that his convictions are "covered offenses" under the First Step Act because they are based on violations of § 841(b)(1)(A)—which the Fair Sentencing Act modified—and thus his sentences are subject to reconsideration, just as the First Step Act contemplates. Indeed, after considering the necessary sentencing factors, the sentencer may impose the same sentence that Mr. Johnson currently has, or a reduced sentence, if that reduced sentence is "sufficient, but not more than necessary" to effectuate the goals described in 18 U.S.C. § 3553. *See* Pub. L. No. 115-391, § 404(c), 132 Stat. 5194, 5222 (2018) ("Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section."). Thus, the Government's reliance on *Snow* is also unpersuasive.

5

**J.A.503**

Furthermore, the Government has conceded in similar cases that "covered offenses" include those that were indirectly modified by sections 2 and 3 of the Fair Sentencing Act because they rested on a violation of § 841(b)(1)(A). *See, e.g.*, United States' Mot. to Remand at 8, *United States v. Maupin*, No. 19-6817 (4th Cir. Aug. 29, 2019), ECF No. 26 (agreeing that RICO conviction was a "covered offense" under the First Step Act because the violation rested on a predicate offense involving the distribution of crack cocaine); *United States v. Davis*, No. 5:93-cr-30025, 2020 WL 1131147, at \*2 (W.D. Va. Mar. 9, 2020) ("The government acknowledges that the defendant is eligible for a sentence reduction under the 2018 FSA for . . . Count Two due to § 848's requirement of a § 841(b)(1)(A) violation."), *appeal filed*, No. 20-6383 (4th Cir. Mar. 20, 2020).

**C.  Mr. Johnson Is Entitled to Have His Capital Sentences Reconsidered by a Jury**

The Government's contention that the First Step Act is inapplicable to capital offenses lacks merit.

First, the Government spends several pages of its Opposition attacking a position that Mr. Johnson has not taken in this litigation—that the "First Step Act permits courts[5] to disturb jury-imposed death sentences as an exercise of discretion under § 404(b)." Opposition at 18-20. In opposition to Mr. Johnson's request for resentencing, the Government contends that the "First Step Act did not displace § 848(e)'s detailed provisions concerning imposition of the death penalty." *Id.* at 18. Mr. Johnson, though, has not argued that any of these detailed provisions are displaced by the First Step Act. To the contrary, because Mr. Johnson's § 848(e) offenses are covered offenses for purposes of the First Step Act, he requests jury consideration consistent with the provisions of the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (the

---

[5]     The Government here apparently means a district court judge.

6

"ADAA"). Specifically, the applicable ADAA provisions state that: (1) a sentencing jury must be impaneled pursuant to § 848(i); (2) the sentencing jury receives aggravating and mitigating evidence pursuant to § 848(j); and (3) the sentencing jury determines whether a sentencing reduction from death to life imprisonment is appropriate, consistent with the provisions of § 848(k). If the sentencing jury determines that a reduction to a life sentence is appropriate, a court must impose the sentence determined by the jury pursuant to § 848(*l*) (1988) (repealed 2006).

Contrary to the Government's claim, the First Step Act does not bar resentencing in capital cases. The Fourth Circuit has recognized that when Congress passes a law that confers rights on capital and noncapital defendants and the wording of the law fails to consider the special and necessary aspects of capital jurisprudence, courts have an obligation to shape equitable relief for the capital defendants notwithstanding that the express statutory language of a statute only provides a mechanism for relief to non-capital defendants. *United States v. Stitt*, 459 F.3d 483, 485 (4th Cir. 2006) ("*Stitt IV*") (holding that because *Andrews v. United States*, 373 U.S. 334 (1963), required resentencing before a grant of relief pursuant to § 2255 could be appealed in a non-capital case, the same requirement necessarily applied in a capital case). In other words, capital resentencing can, and must, be done by a jury pursuant to the First Step Act notwithstanding the Government's contention that the First Step Act does not apply to capital cases.

The Government points to nothing in the plain language of the First Step Act or in the legislative history to suggest that capital cases were meant to be excluded from relief. Nor does the Government offer statutory or case law support to establish that capital defendants are not entitled to a jury resentencing under the First Step Act. The purpose of the statute is to provide

7

for resentencing consideration for defendants sentenced under a regime that sentenced too harshly those defendants convicted of crack-related offenses. *See, e.g.*, *Gravatt*, 953 F.3d at 260. Under the holding of *Stitt IV*, and absent any evidence of legislative intent to the contrary, the First Step Act should not be read to exclude covered capital offenses or capitally-sentenced prisoners from resentencing consideration.

In this regard, the Government fails the tests of two of the cases upon which it relies. Opposition at 5 (citing *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018)), 18-19 (citing *United States v. Stitt*, 552 F.3d 345 (4th Cir. 2008) ("*Stitt V*")). First, the Government, and not Mr. Johnson, seeks to suggest that the First Step Act and § 848(*l*) (1988) (repealed 2006) (and 18 U.S.C. § 3594) cannot be harmonized. Given this, it is the Government's "heavy burden" to show that Congress intended the disharmony, *Epic Sys.*, 138 S. Ct. at 1624, and the Government fails to carry the burden. Second, the Government, not Mr. Johnson, is resisting the effort to empanel a new sentencing jury, despite the fact that such a result is consistent with the First Step Act and compelled by § 848(*l*) (1988) (repealed 2006) (and § 3594). The Government's approach in Mr. Johnson's case is the same flawed approach that led the Fourth Circuit to reverse in *Stitt IV*, and Mr. Johnson respectfully suggests this Court should reject the Government's position here.

## II.     Mr. Johnson's Mitigation Evidence Is Properly Considered by This Court or the Resentencing Jury

In its Opposition, the Government misapprehends Mr. Johnson's purposes in highlighting his mitigation evidence. The First Step Act and the Fourth Circuit's cases interpreting and implementing the Act make clear that once a defendant has demonstrated he or she has committed a covered offense, that defendant is entitled to have a sentencer consider all evidence going to "the nature and circumstances of the offense and the history and characteristics of the

8

J.A.506

defendant," 18 U.S.C. § 3553(a)(1), to determine a sentence that is "sufficient, but not greater than necessary" to effectuate the purposes of § 3553(a)(2).  *United States v. Chambers*, 956 F.3d 667, 674-75 (4th Cir. 2020) ("[T]here are generally no limitations on the types of character and background information a court may consider.").

In his initial Memorandum, Mr. Johnson sketched out four categories of evidence he intends to put before a sentencer to make this determination.  Each of the four categories Mr. Johnson highlighted is an appropriate factor for a sentencer to consider, and these categories have also long been recognized as relevant to capital sentencing determinations.  Capital sentencing determinations "require that the sentencer . . . not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original).  "A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind."  *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).  While individualized sentencing in non-capital cases reflects "simply enlightened policy," in capital cases, "the fundamental respect for humanity underlying the Eighth Amendment" makes such consideration "constitutionally indispensable."  *Id.*  The Supreme Court has long held that this includes consideration of a defendant's age, difficult family history, and emotional disturbance, *Eddings v. Oklahoma*, 455 U.S. 104, 113 (1982), his record as a well-behaved and well-adjusted prisoner, *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986), and his disadvantaged background and diminished mental capacity, *Wiggins v. Smith*, 539 U.S. 510, 512-13 (2003).

9

**J.A.507**

While Mr. Johnson provided a description of his evidence to give this Court the flavor of the evidence he would present to a jury in his initial Memorandum, he highlights a few points about these categories in reply.

First, although much of the evidence Mr. Johnson has highlighted in his Memorandum was presented at trial, a resentencing decision must be based upon all of the evidence now available. *Chambers*, 956 F.3d at 675 ("Having concluded that the § 3553(a) factors apply in the § 404(b) context, post-sentencing evidence 'may be highly relevant to several of [those] factors.'") (quoting *Pepper v. United States*, 562 U.S. 467, 491 (2011)). This includes the fact, acknowledged by the Government, that he has a 27-year unblemished record in prison—stark evidence that he is not a danger in prison. Memorandum at 34-36; Opposition at 27.[6] At the time of his trial and initial penalty-phase hearing, the jury had no such evidence on which to base its sentencing decision, but this is often a powerful determiner of sentences for courts and juries.

Second and notably, the Government does not respond to most of Mr. Johnson's other evidence in support of imposing a reduced sentence after reconsideration of the § 3553 factors, including (1) the abuse and neglect he suffered at the hands of his caretakers; (2) his persistent school failure and inability to learn; (3) his mother's abandonment of him; (4) his discharge into the community after a residential stay without independent living skills or support; and (5) his vulnerability to being manipulated by others in light of his desire to be accepted. Memorandum at 13-33.

---

[6] Section 3553(2)(C) states that a sentencer should consider the sentence sufficient "to protect the public from further crimes of the defendant." In its Opposition, the Government notes it "is not aware of any prison infractions related to Johnson." Opposition at 27 (observing also Mr. Johnson's participation in art, exercise, and general educational classes including water color, colored pencil, charcoal pencil, crochet, yoga, abdominal techniques, and GED courses).

Third, the Government comments only on the issue of Mr. Johnson's intellectual impairments, dismissing it on the basis that "a First Step Act motion is not a vehicle to raise arguments of a defendant's mental health at the time of his offense conduct and sentencing." Opposition at 22. Actually, the First Step Act is precisely a vehicle for presenting any and all evidence that would mitigate the sentence a defendant received, which includes arguments about his mental health and impairments. Whether or not Mr. Johnson will eventually be permitted to argue to a jury that, under current medical and legal standards, he should be deemed intellectually disabled, he is not making that argument here. He has only described in his First Step Act motion his history: as a child, teenager and young adult who was never able to read beyond a second- or third-grade level or to count money; soiled his bed until adolescence; was deemed by the professionals who ran the institutional home to which he was sent when his mother abandoned him to be among the most severely impaired special needs child they had ever worked with; was consistently in special education classes and was unable to pass school competency tests. Memorandum at 18-31. Section 3553(a)(1) specifically instructs a court to consider a defendant's history and Mr. Johnson's mental impairments are a critical aspect of his history.

Mr. Johnson acknowledges that the crimes he committed were extremely violent and caused great pain, and that for them he must never leave prison. However, across the country, prosecutors have chosen not to seek death, and courts and juries have determined not to impose death, on defendants who committed crimes that were equally aggravated. Memorandum at 36-38. This includes Mr. Johnson's own co-defendant, Vernon Lance Thomas, for whom the

J.A.509

Government itself withdrew its request for a death sentence despite his being guilty of four CCE murders,[7] presumably because of Mr. Thomas's own borderline intellectual disability.[8]

Mr. Johnson's struggles and impairments and his model incarceration history are highly relevant considerations to any decision about his sentence; he should not be foreclosed from raising any of them.

## III.    The First Step Act and Fair Sentencing Act Were Intended to Correct Racial Disparities in Sentencing, as Exemplified by This Case

Finally, the Government argues that penalties for crack-related offenses were changed because of findings that crack is associated with less violence than previously thought, and that this rationale undermines Mr. Johnson's request for reconsideration of his sentences for his § 848 convictions.  Opposition at 3.  However, the Government's reasoning warps the purpose of both the First Step Act and the Fair Sentencing Act, which were enacted to improve the vastly disparate racial impact of the previous sentencing guidelines pertaining to crack versus powder cocaine.[9]

These race disparities are evident in Mr. Johnson's case, which concluded 17 years prior to the passage of the Fair Sentencing Act.  The CCE statute pursuant to which he was prosecuted "is sometimes called 'the kingpin statute' because it is designed to apply to ringleaders of large-

---

[7]    Memorandum at 36-38.

[8]    Mr. Thomas presented evidence to the Government pre-trial that he had an IQ of 71.  *Id.* at 36-37; Mem. Ex. 31, ECF No. 39-32.

[9]    At the time Mr. Johnson was sentenced in this case, the sentencing disparity between crack and powder cocaine fell most heavily on African-American defendants.  *See, e.g.*, *Kimbrough v. United States*, 552 U.S. 85, 98 (2007) (noting Sentencing Commission's finding that "[a]pproximately 85 percent of defendants convicted of crack offenses in federal court are black; thus the severe sentences required by the 100-to-1 ratio are imposed primarily upon black offenders" (citation omitted)).

12

**J.A.510**

scale illegal narcotics operations." *United States v. Webster,* 639 F.2d 174, 180 (4th Cir. 1981); *see also Richardson v. United States,* 526 U.S. 813, 819 (1999). Just as Mr. Johnson's motion does not impact the validity of his § 848 convictions, the racial injustice landscape for the Fair Sentencing Act and the First Step Act does not invalidate his § 848 drug kingpin convictions. However, the racial injustice backdrop is relevant to the sentencer because it provides context to understand Mr. Johnson's particular situation. For example, despite Mr. Johnson's involvement in drug distribution activities, he had no assets and was described as living in squalor during the period when he was engaged in drug trafficking, including in Trenton and in Richmond.

The Presentence Investigation Report (the "PSR") confirms that Mr. Johnson had a "net worth of zero and no liquid assets." PSR at 29. Indeed, Mr. Johnson's living conditions in Trenton, New Jersey, where he lived for the majority of the drug conspiracy, are described as a "'shack' that appeared to be a crack house," a "a real hovel" that was "old, dark, and dirty," that "was occupied at times by as many as 15-20 guys," and was "never very clean" with "Chinese take-out boxes [ ] strewn all over the house." Mem. Ex. 6, ECF No. 39-7; Mem. Ex. 16, ECF No. 39-17. Mr. Johnson had no car, no substantial jewelry and no items of substantial value, and he could not afford to rent an apartment, let alone own a home. 1/27/93 Tr. 2737:21-24, 2738:2-9 (identifying Mr. Johnson's "expensive" possessions as "Timberland boots and Guess jeans") (Ex. A); 6/1/93 Tr. 16:24 – 17:17 (Defense closing argument) (Ex. B); 1/13/93 Tr. 861:5-17 (Defense opening statement) (Ex. C). This is certainly mitigating evidence that a jury should consider when determining whether a sentence reduction is appropriate in Mr. Johnson's case, in addition to the compelling evidence regarding his childhood, upbringing, and mental capacity.

13

**J.A.511**

## CONCLUSION

For the reasons set forth above and in Mr. Johnson's Memorandum, Mr. Johnson respectfully requests that this Court conclude that his convictions under Counts 2, 8, 11, 17-19, 24, 25, 31, and 32 are covered offenses under Section 404 of the First Step Act and grant him a capital resentencing hearing.

Dated: October 8, 2020

Respectfully submitted,


/s/_____

David E. Carney, VA Bar # 43914
Donald P. Salzman*
Lotus D. Ryan, VA Bar # 71425
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

Alexander C. Drylewski*
Judith A. Flumenbaum*
Skadden, Arps, Slate, Meagher & Flom, LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000

*Admitted Pro Hac Vice

*Counsel for Corey Johnson*

14

**J.A.512**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of October 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to all parties and counsel included on the Court's Electronic Mail notice list.

/s/

David E. Carney, VA Bar # 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

**J.A.513**

**INDEX OF EXHIBITS TO REPLY IN SUPPORT OF**
**MOTION FOR A RECONSIDERATION OF SENTENCING HEARING**
**PURSUANT TO THE FIRST STEP ACT OF 2018**

| Exhibit No. | Description |
|---|---|
| A | 01/27/93 Tr. 2737-2738 |
| B | 06/01/93 Tr. 17 |
| C | 01/13/93 Tr. 861 |

**J.A.514**

# EXHIBIT A

```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
                     RICHMOND DIVISION

   -----------------------------------------

   UNITED STATES OF AMERICA,



                        Plaintiff;

       v.                              CRIMINAL ACTION
                                           92CR68
   RICHARD TIPTON, CORY JOHNSON,
   JAMES H. ROANE, JR., AND
   SANDRA REAVIS,
                        Defendants.

   -----------------------------------------
                      VOLUME XII

                   January 27, 1993
                   Richmond, Virginia
                     10:00 a.m.

   BEFORE:        HONORABLE JAMES R. SPENCER
                  United States District Judge


   APPEARANCES:   HOWARD C. VICK, JR., ESQ.
                  WILLIAM H. PARCELL, III, ESQ.
                  Office of the United States Attorney;
                      Counsel for Government;

                  ROBERT P. GEARY, ESQ.
                  ERIC D. WHITE, ESQ.
                      Counsel for Defendant Tipton;
                  CRAIG S. COOLEY, ESQ.
                  JOHN F. McGARVEY, ESQ.
                      Counsel for Defendant Johnson;
                  DAVID P. BAUGH, ESQ.
                  ARNOLD R. HENDERSON, V, ESQ.
                      Counsel for Defendant Roane;
                  ROBERT J. WAGNER, ESQ.
                      Counsel for Defendant Reavis.
                      JEFFREY B. KULL
                  OFFICIAL COURT REPORTER
```

                    P-R-O-C-E-E-D-I-N-G-S
           THE CLERK:  Case Number 92CV68: United
States of America versus Richard Tipton, Cory

**J.A.516**

A   I actually saw.
Q   You actually saw it.  Was it someplace other than your home?
A   Yes.
Q   Where was it?
A   It was at Nita's house.
Q   How often were you at Nita's house?
A   Almost every day.
Q   Who was taking care of your children while you were at Nita's house?
A   They were there with me.

2737

Q   With you?
A   Yes.
Q   So drug dealing was taking place in front of your children, correct?
A   No.
Q   If they were there and drug dealing was taking place, were they in another room, what?
A   They were outside.
Q   Did you leave them out in the car while the dealing took place?
A   No.
        MR. VICK:  No need to get offensive.
        THE COURT:  Mr. McGarvey, go on.  Ask some more questions.
        MR. McGARVEY:  I asked the question, Your Honor.  I would ask her to answer.
BY MR. McGARVEY:
Q   Where were your kids when the drug dealing was going on at Nita's house?
A   Outside playing with other kids.
Q   With respect to Mr. Johnson, did Mr. Johnson own a lot of diamonds, jewelry, gold, anything like that?
A   No.
Q   Did he have expensive clothes?  I saw the black

2738

hooded sweatshirt; did he own expensive clothes?
A   What he had was expensive.
Q   The black hooded sweatshirt was expensive?
A   No, but the Timberland boots and Guess jeans were expensive clothing.
Q   Guess jeans and Timberland boots.
A   Yes.
Q   Did he have an automobile?
A   No.
Q   He borrowed your automobile?
A   Yes.
Q   When you were asked and then pressed by Mr. Vick for an amount of money that you had seen, first you said that you didn't know.  And then he said "more than a hundred" and you agreed.  And then "up to a thousand  --"

**J.A.517**

# EXHIBIT B


J.A.518

1 #

8C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

------------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

     v.                                    CRIMINAL ACTION
                                              92CV68
RICHARD TIPTON, CORY JOHNSON, and
JAMES H. ROANE, JR.,

                              Defendants.

------------------------------------------

                    June 1, 1993
                    Richmond, Virginia
                    9:30 a.m.

F I L E D
JUN 2 9 1993
D-PHB
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney
               Main Street Centre
               Richmond, Virginia  23219
                         Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
               CRAIG S. COOLEY, ESQ.
               JOHN McGARVEY, ESQ.
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                         Counsel for Defendants.

                    JEFFREY B. KULL
                    OFFICIAL COURT REPORTER

4862

J.A.519

16#

Good morning.  Counsel, have you all had an adequate opportunity to review the pre-sentence report and discuss it with your client?

MR. COOLEY:  We have, Your Honor.

THE COURT:  Do you have any objections, comments, or amendments to the Presentence Report?

MR. COOLEY:  Yes, Your Honor.

THE COURT:  All right.

MR. COOLEY:  As the Court knows, we filed a position paper regarding the sentencing factors, and we raised principally the two issues of the exaggerated quantity of cocaine that was allegedly distributed.  I would adopt the comments made by counsel for Mr. Tipton, but I would also note to the Court that while counsel for the government indicates there was testimony from Mr. Townes, Mr. Saunders regarding the quantity that was being distributed by them and by others, the Court will also recall that their testimony related to at the conclusion of each month when there was a necessity for the five folks living at that one home to contribute the $100 for their share of the rent.  They didn't have it and they often fought over it.

The Court will also recall from the evidence that came before you that there was absolutely no

4877

J.A.520

17

testimony relating to the accrual of funds, of assets for any of the three individuals, specifically with Cory Johnson. No cars, no substantial jewelry, no items or assets of any value whatsoever. Indeed, when pressed, each of the witnesses, most, said they couldn't identify anything that he had as to Cory Johnson, and one ultimately said to the jury that what he had was nice, and when questioned further, she said it was a Guess shirt and a pair of Timberland boots. That's the totality of the assets described and attributed to Mr. Cory Johnson out of this purported 42, and in addition to 42-and-a-half kilograms of cocaine. And I would suggest to the Court that the lifestyle that was proven by the government's witnesses contradicts the government's theory as to the quantity of the drugs that were being distributed.

Your Honor, in addition to that issue, we have raised the jeopardy issues or the issues that the Court has already addressed and ruled upon. I would simply note to the Court that in challenging whether the sentences could be imposed upon the counts that were related to the murders in furtherance of racketeering, that while it certainly could be, I believe, under the government's theory that if

4878

J.A.521

# EXHIBIT C

MR. HENDERSON: Judge, in light of the order the Court sent, I have previously made arrangements to have a hearing in Richmond at 9 o'clock in the morning. I don't know that I will be able to be here by 9:30.

MR. WHITE: We really don't have that more to pick.

THE COURT: We can do it without you. I think we will be fine. 62. We might get enough.

(Proceedings adjourned at 6:31 p.m.)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-----------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

    v.                                  CRIMINAL ACTION
                                           92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

-----------------------------------------
                    VOLUME III

January 13, 1993
Richmond, Virginia
10:00 a.m.

BEFORE:          HONORABLE JAMES R. SPENCER
                 United States District Judge


APPEARANCES:     HOWARD C. VICK, JR., ESQ.
                 WILLIAM H. PARCELL, III, ESQ.
                 Office of the United States Attorney;
                     Counsel for Government;

                 ROBERT P. GEARY, ESQ.
                 ERIC D. WHITE, ESQ.
                     Counsel for Defendant Tipton;
                 CRAIG S. COOLEY, ESQ.
                 JOHN F. McGARVEY, ESQ.
                     Counsel for Defendant Johnson;
                 DAVID P. BAUGH, ESQ.
                 ARNOLD R. HENDERSON, V, ESQ.
                     Counsel for Defendant Roane;
                 ROBERT J. WAGNER, ESQ.
                     Counsel for Defendant Reavis.
                     JEFFREY B. KULL
                 OFFICIAL COURT REPORTER.

(January 13th, 1993 at 9:35 a.m.  United States versus Richard Tipton, et al., the third day of trial.)

(A juror entered Chambers.)

THE COURT:  This is Ava K. Holloway.

BY THE COURT:

Q   Ms. Holloway, just have a seat.  Ms. Holloway, I have got to ask you a few questions.  And before I ask these questions of you, I need to give you some information.  What I want you to understand is that this is a trial that could possibly proceed in two stages.  The first stage is when the government would put on its evidence in an attempt to prove the defendants guilty beyond a reasonable doubt.  Now, you would listen to all of that evidence, I would advise you as to the law, the jury would go out and decide whether or not the defendants are guilty or not guilty.  That's the first stage.

The second stage is if you all were to find the defendants guilty of certain of these charges, then we would proceed to a sentencing or penalty phase.  This is the second stage.  This is when the government would have the opportunity to present or bring to your attention aggravating evidence, try to convince you that the death penalty is appropriate in this case.  The defense would have the opportunity to

**J.A.524**

Mr. Gaiters being a capital defendant.

MR. COOLEY:  That might be true of the government.  His actions qualify him is what I said, Judge, and that's evidence.

THE COURT:  I think that's fair.

MR. COOLEY:  Sterling Hardy is another one of the government's bounty hunters.  In his opening statement, Mr. Vick said, "not an angel of a man." That is truly a masterful understatement.  The information is that Sterling Hardy participated in the events of these killings.  The government's information is that Sterling Hardy personally directed the killing of Linwood Chiles.  Sterling Hardy, by his actions, is subject to the potential of capital punishment.  But no more.  No more.  Because he is a bounty hunter who has joined the team.

There are 30 other felons, convicted or admitted, also looking for their reward, their silver, their money, their immunity, their 5K.  They will allege that these young folks, all of these young folks, are members of an ongoing Continuing Criminal Enterprise and that they reaped substantial income.  But the evidence will belie that, ladies and gentlemen.  Cory Johnson came to Richmond in October of 1991, October of 1991, for the first time.  Cory knew Richard Tipton, but he never met James Roane until December or later, December of 1991 or later. Cory owned no car.  You are not going to hear any witness testify Cory had a car.  Cory had owned no truck.  He had no BMW, no Mercedes.  He didn't even have a 1979 Pontiac.  He had no vehicle.  Cory, I think you will hear, owned no house, couldn't rent an apartment, generally lived with four, five, sometimes seven and eight other folks in an apartment.  Cory, the evidence will show, had no bank account, no substantial cash holdings.  Cory had no flashy clothes, no jewelry.  Cory had not even small assets, much less substantial assets, as the government alleges and must prove to establish the Continuing Criminal Enterprise.

MR. VICK:  That's a misstatement, also.  We need not prove substantial assets.  We need only prove there was substantial income, money generated.

THE COURT:  That is correct.  The objection will be sustained.

BY MR. COOLEY:

Q   I apologize.  That's correct.  The evidence will show, ladies and gentlemen, that Cory Johnson was not a member of a Continuing Criminal Enterprise.  The evidence from the bounty hunters will suggest that Cory was involved in some street-level sales.  But a kingpin?  Never.  A manager?  Never.  Supervisor?

**J.A.525**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 3:92CR68 (DJN)** |
| | **:** | **CAPITAL CASE** |
| **COREY JOHNSON,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## NOTICE OF APPEAL

Notice is hereby given that the defendant in the above-captioned case hereby appeals to

the United States Court of Appeals for the Fourth Circuit from the Memorandum Order denying

Defendant's Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act

entered in this case on the 19th day of November 2020.

Respectfully submitted,

Dated: November 20, 2020

/s/
David E. Carney, VA Bar # 43914
Donald P. Salzman*
Lotus D. Ryan, VA Bar # 71425
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

Alexander C. Drylewski*
Judith A. Flumenbaum*
Skadden, Arps, Slate, Meagher & Flom, LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000

*Admitted Pro Hac Vice

*Counsel for Corey Johnson*

**J.A.526**

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of November 2020, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will then send notification

of such filing to all parties and counsel included on the Court's Electronic Mail notice list.

/s/
David E. Carney, VA Bar # 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

2

**J.A.527**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 3:92-cr-68 (DJN) |
| COREY JOHNSON, | |
| *Defendant.* | |

**NOTICE OF EXECUTION DATE**

The United States hereby notifies the Court that the Director of the Federal Bureau of Prisons, upon the direction of the Attorney General and in accordance with 28 C.F.R. Part 26, has scheduled the execution of Corey Johnson for January 14, 2021.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

_____/s/_____
Richard D. Cooke
Assistant United States Attorney
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Office: (804) 819-5471
Email: richard.cooke@usdoj.gov

1

J.A.528

**Certificate of Service**

I certify that on November 20, 2020, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.


By:    _____/s/_____
       Richard D. Cooke
       Assistant United States Attorney
       United States Attorney's Office
       919 East Main Street, Suite 1900
       Richmond, Virginia 23219
       Office:    (804) 819-5471
       Email:     richard.cooke@usdoj.gov


2

**J.A.529**