**EXECUTION SCHEDULED FOR JANUARY 14, 2021**

No. 20-15

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff – Appellee,**
**v.**

**COREY JOHNSON, A/K/A O, A/K/A CO,**

**Defendant – Appellant.**

_____

**APPENDIX VOLUME I**

_____

Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7983
donald.salzman@skadden.com

*Counsel for Appellant*

# TABLE OF CONTENTS

PAGE(S)

## VOLUME I

### I. DISTRICT COURT FILINGS

Motion for a Reconsideration of Sentence Hearing Pursuant to the
First Step Act of 2018 (Aug. 19, 2020), ECF No. 38 .................................. APP.1

Memorandum in Support of Motion for a Reconsideration of Sentence
Hearing Pursuant to the First Step Act of 2018 (Aug. 19, 2020),
ECF No. 39 ...................................................................................................... APP.7

Index of Exhibits to Memorandum in Support of Motion for a
Reconsideration of Sentence Hearing Pursuant to the First Step Act
of 2018 (Aug. 19, 2020), ECF No. 39-1 .................................................... APP.65

Exhibit 1 to Memorandum in Support, Special Findings, Feb. 16,
1993, ECF No. 39-2 .................................................................................... APP.67

Exhibit 2 to Memorandum in Support, 21 U.S.C. § 848 (1988)
(repealed 2006), ECF No. 39-3.................................................................. APP.80

Exhibit 3 to Memorandum in Support, Affidavit of Antoinette Joseph
(Mr. Johnson's godmother), May 21, 2011, ECF No. 39-4 ...................... APP.87

Exhibit 4 to Memorandum in Support, Affidavit of Minnie Hodges
(Mr. Johnson's maternal aunt), Apr. 30, 2011, ECF No. 39-5 .................. APP.99

Exhibit 5 to Memorandum in Support, Gloria Caro, Reassessment
Summary, May 21, 1982, ECF No. 39-6 ................................................. APP.110

Exhibit 6 to Memorandum in Support, Affidavit of Robert Johnson
(Mr. Johnson's half-brother), June 29, 2011, ECF No. 39-7 ................... APP.124

Exhibit 7 to Memorandum in Support, Sundar Collimuttam, M.D.,
Psychiatrist, Pleasantville Cottage School Psychological
Evaluation, Feb. 22, 1982, ECF No. 39-8 .............................................. APP.136

Exhibit 8 to Memorandum in Support, 2/10/93 Trial Tr. 3547-3548,
3573-3574, 3578, 3582, 3584-85, 3607, 3619-21, 3682, 3684,
3690-92, 3694-95, ECF No. 39-9 ........................................................... APP.140

Exhibit 9 to Memorandum in Support, Lynn Polstein, Change in
Permanency Plan, Apr. 13, 1984, ECF No. 39-10.................................. APP.169

Exhibit 10 to Memorandum in Support, Christine Aaron, MSW Intern, Pleasantville Cottage School Current Assessment, Mar. 10, 1985, ECF No. 39-11 .................................................................................. APP.175

Exhibit 11 to Memorandum in Support, Odette Noble, UCR Reassessment and Service Plan Review 6 Month, May 8, 1986, ECF No. 39-12 .................................................................................. APP.179

Exhibit 12 to Memorandum in Support, Odette Noble, UCR Plan Amendment: Form E Final Discharge, Mar. 26, 1987, ECF No. 39-13 .................................................................................................. APP.189

Exhibit 13 to Memorandum in Support, Affidavit of David Washington (caretaker at Elmhurst), Mar. 1, 2012, ECF No. 39-14 ....... APP.193

Exhibit 14 to Memorandum in Support, Odette Noble, UCR Plan Amendment: Form D Final Discharge, Feb. 23, 1987, ECF No. 39-15 .................................................................................................. APP.197

Exhibit 15 to Memorandum in Support, Odette Noble, Three Month Conference Note, Feb. 20, 1986, ECF No. 39-16 ................................... APP.202

Exhibit 16 to Memorandum in Support, Affidavit of Darold Brown, June 15, 2011, ECF No. 39-17 ................................................................. APP.207

Exhibit 17 to Memorandum in Support, Affidavit of Darnell Brown, Oct. 14, 2011, ECF No. 39-18 ................................................................. APP.214

Exhibit 18 to Memorandum in Support, 1/15/93 Trial Tr. 921:12-922:01, ECF No. 39-19 ............................................................................ APP.219

Exhibit 19 to Memorandum in Support, Declaration of Ann Harding (staff member at Pleasantville), Nov. 21, 2011, ECF No. 39-20 ............ APP.223

Exhibit 20 to Memorandum in Support, Declaration of Sarah West (Mr. Johnson's prison chaplain), Mar. 24, 2011, ECF No. 39-21........... APP.226

Exhibit 21 to Memorandum in Support, Affidavit of Priscilla Hodges (Mr. Johnson's cousin), Apr. 30, 2011, ECF No. 39-22 ........................ APP.229

**VOLUME II**

Exhibit 22 to Memorandum in Support, Affidavit of Julie McConnell, Mar. 23, 2011, ECF No. 39-23 ............................................................. APP.237

Exhibit 23 to Memorandum in Support, Affidavit of Odette Noble (Mr. Johnson's social worker), Dec. 1, 2011, ECF No. 39-24 ................ APP.240

Exhibit 24 to Memorandum in Support, L. Larrecq, City of New York Human Resources Administration, History Sheet, Nov. 20, 1984, ECF No. 39-25 ..................................................................................... APP.247

Exhibit 25 to Memorandum in Support, Amira Offer, CSW, Caseworker, Pleasantville Diagnostic Center Psychosocial Summary, Mar. 15, 1982, ECF No. 39-26 ............................................. APP.249

Exhibit 26 to Memorandum in Support, Lynn Polstein, Request for Authorization and Approval for Care and Services, Apr. 16, 1984, ECF No. 39-27 ..................................................................................... APP.255

Exhibit 27 to Memorandum in Support, Declaration of Esther Johnson (Mr. Johnson's maternal grandmother), Apr. 30, 2011, ECF No. 39-28 ......................................................................................... APP.257

Exhibit 28 to Memorandum in Support, Affidavit of James Sykes (Mr. Johnson's father), May 17, 2011, ECF No. 39-29 ................................... APP.263

Exhibit 29 to Memorandum in Support, Declaration of Pastor Bobby West (Mr. Johnson's prison chaplain), Mar. 24, 2011, ECF No. 39-30 ........................................................................................................ APP.273

Exhibit 30 to Memorandum in Support, Inmate Education Data Transcript, Mar. 25, 2012, ECF No. 39-31 ............................................. APP.278

Exhibit 31 to Memorandum in Support, Motion to Have Defendant Declared Mentally Retarded, United States v. Vernon Lance Thomas, No. 3:92CR68 (E.D. Va. Apr. 15, 1993), ECF No. 39-32 ....... APP.280

Exhibit 32 to Memorandum in Support, Corey Johnson's IQ Scores Compared to IQ Scores of Federal Death Penalty Defendants Found Intellectually Disabled After Contested Atkins Hearings, ECF No. 39-33 ..................................................................................... APP.295

Exhibit 33 to Memorandum in Support, 6/1/93 Tr. 22#:1-14, ECF No. 39-34 ................................................................................................... APP.298

Exhibit 34 to Memorandum in Support, Jury Instructions 232a, ECF No. 39-35 ............................................................................................ APP.302

Exhibit 35 to Memorandum in Support, 2/12/93 Trial Tr. 3883-94, ECF No. 39-36 .................................................................................... APP.305

Government's Opposition to Defendant's First Step Act Motion (Sept. 23, 2020), ECF No. 58 .................................................................................... APP.314

Reply in Support of Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 (Oct. 8, 2020), ECF No. 64 .......................................................................................................... APP.342

Index of Exhibits to Reply in Support of Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 (Oct. 8, 2020), ECF No. 64-1 ................................................................................ APP.361

Exhibit A to Reply, 01/27/93 Tr. 2737-2738, ECF No. 64-2 ....................... APP.362

Exhibit B to Reply, 06/01/93 Tr. 17, ECF No. 64-3 .................................... APP.365

Exhibit C to Reply, 01/13/93 Tr. 861, ECF No. 64-4 .................................. APP.369

## II. RELEVANT OPINIONS

Memorandum Opinion, *United States v. Roane*, No. 92CR98 (Oct. 29, 2020), ECF No. 66 ...................................................................................... APP.373

Memorandum Order (Nov. 19, 2020), ECF No. 75 ...................................... APP.416

## III. DOCKET SHEETS

E.D. Va. Docket Sheet, No. 92CR68 (1992-2019) ...................................... APP.430

E.D. Va. Docket Sheet, No. 92CR68 (2020) ............................................... APP.454

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| **COREY JOHNSON,** | : | |
| | : | |
| **Movant,** | : | **Case No. 3:92CR68** |
| | : | **CAPITAL CASE** |
| **v.** | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Respondent**. | : | |

**MOTION FOR A RECONSIDERATION OF SENTENCE HEARING
PURSUANT TO THE FIRST STEP ACT OF 2018**

The Defendant, Corey Johnson, by his attorneys, hereby moves for a reconsideration of

sentence hearing pursuant to the First Step Act of 2018 in the above-captioned case.  In support

of his Motion and as set forth more fully in the accompanying Memorandum in Support of

Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018

(hereinafter, "Memorandum"), he submits the following information:

1.      On February 3, 1993, Mr. Johnson was convicted after a jury trial that was held

before the Honorable James R. Spencer (Ret.) of the following offenses that are eligible as

covered offenses under the First Step Act: engaging in a continuing criminal enterprise in

violation of 21 U.S.C. § 848(a) (Count 2); murder in furtherance of a continuing criminal

enterprise in violation of 21 U.S.C. § 848(e)(1)(A) (Counts 8, 11, 17-19, 24, and 25); and

**APP.1**

distribution of crack cocaine base ("crack cocaine") and possession with intent to distribute in violation of § 841(a)(1) (Counts 31 and 32).[1]

2.      The First Step Act, enacted on December 21, 2018, authorizes a reduced sentence for certain convictions that would have had lower statutory penalties had the Fair Sentencing Act, a 2010 law, applied at the time of the original sentencing.  First Step Act of 2018, Pub. L. No. 115-391, § 404(b), 132 Stat. 5194, 5222.  Mr. Johnson is eligible for a sentence reconsideration because ten of his 1993 convictions are drug-related crimes deemed "covered offenses" by the First Step Act.

3.      Seven of Mr. Johnson's convictions that meet the eligibility requirements of the First Step Act resulted in sentences of death (Counts 8, 11, 17-19, 24, and 25).  Accordingly, by law, reconsideration of those convictions must be conducted by a jury.  *See* 18 U.S.C. § 3593(b)(2)(D); 21 U.S.C. § 848(g), (i)(1)(B)(iv) (1988) (repealed 2006); *see also Hurst v. Florida,* 136 S. Ct. 616, 624 (2016); *United States. v. Stitt*, 552 F.3d 345, 354-55 (4th Cir. 2008).  Accordingly, Mr. Johnson submits that the Court must order a capital resentencing hearing before a jury.  At that hearing, the jury would receive evidence in order to reconsider the appropriate sentence, specifically whether Mr. Johnson should receive a sentence of death or a reduced sentence of life imprisonment on the capital offenses.

---

[1]    Mr. Johnson was also convicted of killing and maiming in aid of racketeering under 18 U.S.C. § 1959 (Counts 10, 13, 14, 16, 21-23, and 27-30); and use of a firearm during and in relation to any crime of violence or drug trafficking crime under 21 U.S.C. § 924(c) (Counts 9, 12, 15, 20, and 26).  Mr. Johnson was also convicted of violating 21 U.S.C. § 846 for having possessed with intent to distribute, and for having distributed, 50 grams or more of crack cocaine in violation of 21 U.S.C. § 841(a) (Count 1).  His sentence for this Count was later vacated by the Fourth Circuit on direct appeal.

4.       Mr. Johnson submits that, after conducting a capital resentencing hearing and after the jury renders its verdict on the capital offenses, the Court should consider whether to reduce his sentences on his non-capital convictions.

Accordingly, Mr. Johnson respectfully requests, as set forth more fully in the accompanying Memorandum, that:

    a.  the Court find that Mr. Johnson was convicted of "covered offenses" that merit reconsideration of his sentences;

    b.  the Court vacate the sentences of death imposed for Counts 8, 11, 17-19, 24, and 25, and grant Mr. Johnson a capital resentencing hearing before a jury on those counts;

    c.  after the jury returns a resentencing verdict at a capital resentencing hearing, this Court should consider all the evidence presented therein and determine whether the imposition of reduced sentences on the Counts 2, 8, 11, 17-19, 24, 25, 31, and 32 pursuant to § 404 of the First Step Act is appropriate; and

    d.  this Court grant any other further relief necessary to effectuate this Court's judgment.

3

**APP.3**

Dated: August 19, 2020

Respectfully submitted,

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Donald P. Salzman*
Lotus D. Ryan**
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

Alexander C. Drylewski*
Judith A. Flumenbaum*
Skadden, Arps, Slate, Meagher & Flom, LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000

*Pending Application to Qualify as a Foreign
Attorney Under Local Criminal Rule 57.4.

**Forthcoming Application for Full Admission

*Counsel for Corey Johnson*

4

**APP.4**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of August 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing to all parties and counsel included on the Court's Electronic Mail notice list.

/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Ph: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

**APP.5**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| **COREY JOHNSON,** | : | |
| | : | |
| **Movant,** | : | **Case No. 3:92CR68** |
| | : | **CAPITAL CASE** |
| **v.** | : | |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Respondent**. | : | |

**O R D E R**

In consideration of the foregoing Motion for Reconsideration of a Sentence Hearing

Pursuant to the First Step Act of 2018, there being good cause shown, it is this __ day of

_____, 2020 hereby

ORDERED that the Motion for a Reconsideration of Sentence Hearing Pursuant to the

First Step Act of 2018 is GRANTED.

_____
United States District Court for the
Eastern District of Virginia

**APP.6**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| COREY JOHNSON, | : | |
| | : | |
| **Movant,** | : | |
| | : | |
| v. | : | **Case No. 3:92CR68** |
| | : | **CAPITAL CASE** |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| **Respondent**. | : | |

## MEMORANDUM IN SUPPORT OF MOTION FOR A RECONSIDERATION OF SENTENCE HEARING PURSUANT TO THE FIRST STEP ACT OF 2018

David E. Carney, VA Bar #: 43914
Donald P. Salzman*
Lotus D. Ryan**
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

Alexander C. Drylewski*
Judith A. Flumenbaum*
Skadden, Arps, Slate, Meagher & Flom, LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000

*Pending Application to Qualify as a Foreign
Attorney Under Local Criminal Rule 57.4

**Forthcoming Application for Admission

*Counsel for Corey Johnson*

**APP.7**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iv

I.      INTRODUCTION ....................................................................................1

II.     COVERED OFFENSES AND THEIR SENTENCES .....................................3

III.    LEGISLATIVE BACKGROUND...............................................................4

        A.    Fair Sentencing Act of 2010 .......................................................4

        B.    First Step Act of 2018 ................................................................5

IV.     ARGUMENT...........................................................................................5

        A.    Mr. Johnson's Convictions Under 21 U.S.C. §§ 841(a)(1) and 848 Are
              Covered Offenses Under the First Step Act...................................5

              1.    Structure of the First Step Act Review .......................................5

              2.    Mr. Johnson Was Convicted of Violating 21 U.S.C. § 841(a),
                    which Is a Covered Offense........................................................7

              3.    Mr. Johnson Was Convicted of Violating 21 U.S.C. § 848, which
                    Is a Covered Offense..................................................................8

        B.    Mr. Johnson Meets the Eligibility Requirements under the First Step Act
              so Is Entitled to Have His Sentences Reconsidered..............................11

        C.    Because Mr. Johnson's Resentencing Consideration Implicates the Death
              Penalty, He Must Be Resentenced by a Jury on His Capital Sentenced
              Counts .....................................................................................11

        D.    A Capital Resentencing Hearing with Respect to Mr. Johnson's Capital
              Convictions Is the Only Means to Fully and Fairly Consider the 18 U.S.C.
              § 3553(a) Sentencing Factors as Required by the First Step Act .........13

              1.    Compelling Evidence Shows that Corey Johnson's Sentences
                    Should Be Reduced...................................................................16

              2.    Corey Johnson's Childhood Was Marred by Abuse, Chaos, and
                    Neglect ...................................................................................18

                    a.    Corey suffered physical and emotional abuse as a child ..............18

                    b.    Corey was regularly uprooted from his homes and schools
                          and eventually abandoned to social service custody....................20

3.    Mr. Johnson Was a Follower Who Was Easily Manipulated—a Common Outcome for People with Intellectual Disability—and Sought Protection from People Who Led Him Down a Violent Path ...............................................................................................23

    a.    Corey Johnson drifted into a drug group after his discharge from residential placement with no plan or support .....................23

    b.    Mr. Johnson was a follower who exhibited extreme loyalty to people viewed as family ...........................................................25

4.    Mr. Johnson Is a Person with Intellectual Disability ................................27

    a.    Mr. Johnson has significant limitations in intellectual functioning ....................................................................................28

    b.    Mr. Johnson has significant limitations in adaptive functioning ....................................................................................29

    c.    Mr. Johnson's significant limitations in intellectual functioning and in adaptive functioning were present during his childhood ...................................................................31

5.    The Jury Considering Mr. Johnson's Sentence Will Hear Evidence from Experts Who Are Specialists in Intellectual Disability—Evidence No Court or Jury Has Heard to Date ..........................................32

6.    Mr. Johnson's Flawless Prison Record Indicates that a Sentence Reduction Would Not Encourage Further Crime Nor Would It Endanger the Public ...................................................................................34

7.    Mr. Johnson's Sentence Was Unwarranted Compared to Sentences to Similarly Situated Defendants .............................................................36

8.    Mr. Johnson Committed His Crimes at 22 but Is Now 51 ........................39

9.    Mr. Johnson Has Demonstrated Sincere Remorse...................................40

E.    Mr. Johnson's §§ 846, 924(c), and 1959 Convictions Are Invalid and Impermissibly Influenced His Original Sentence ................................................43

1.    Mr. Johnson's § 846 Conviction Was Vacated.........................................43

2.    Mr. Johnson's § 924(c) Convictions Are Invalid......................................43

3.    Mr. Johnson's § 1959 Convictions Were Improperly Charged and Are Invalid ..............................................................................................44

4. Discounting These Convictions Should Result in a Sentence Less than Death ..................................................................................................46

V. CONCLUSION ..................................................................................................47

iii

**APP.10**

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Bourgeois v. Whitley*, 784 F.2d 718 (5th Cir. 1986) ...................................................46

*Dorsey v. United States*, 567 U.S. 260 (2012) ..............................................................4

*Hurst v. Florida*, 136 S. Ct. 616 (2016)..............................................................11, 16

*James v. United States*, 476 F.2d 936 (8th Cir. 1973) ..............................................46

*Jerkins v. United States*, 530 F.2d 1203 (5th Cir. 1976)...........................................46

*Johnson v. Mississippi*, 486 U.S. 578 (1988)............................................................46

*Lockett v. Ohio*, 438 U.S. 586 (1978) .......................................................................13

*Mills v. Maryland*, 486 U.S. 367 (1988) ...................................................................46

*Pepper v. United States*, 562 U.S. 476 (2011) ..........................................................34

*Ring v. Arizona*, 536 U.S. 584 (2002)........................................................................16

*Skipper v. South Carolina*, 476 U.S. 1 (1986) ..........................................................13

*Stirone v. United States*, 361 U.S. 212 (1960) ..........................................................45

*United States v. Barnes*, No. 3:94cr80 (DJN), 2020 WL 1281235 (E.D. Va. Mar. 17, 2020) ....................................................................................................................8

*United States v. Boulding*, 960 F.3d 774 (6th Cir. 2020)............................................7

*United States v. Brown*, No. 3:08-CR-00011-1, 2020 WL 3106320 (W.D. Va. June 11, 2020) .......................................................................................................... passim

*United States v. Candelario-Santana*, 834 F.3d 8 (1st Cir. 2016) ...........................38

*United States v. Cantu-Rivera*, CR No. H-89-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019) .................................................................................................................36

*United States v. Chambers*, 956 F.3d 667 (4th Cir. Apr. 23, 2020)..................... passim

*United States v. Cisneros*, 385 F. Supp. 2d 567 (E.D. Va. 2005) .............................37

*United States v. Davis*, No. 5:93-cr-30025, 2020 WL 1131147 (W.D. Va. Mar. 9, 2020) ............9

iv

**APP.11**

*United States v. Davis*, 139 S. Ct. 2319 (2019) ..................................................................44

*United States v. Davis*, 679 F.3d 190 (4th Cir. 2012)...........................................................34

*United States v. Davis*, 611 F. Supp. 2d 472 (D. Md. 2009) ................................................38

*United States v. Dean*, No. 97-276-3, 2020 WL 2526476 (D. Minn. May 18, 2020) ....................9

*United States v. Doan*, 498 F. Supp. 2d 816 (E.D. Va. 2007) .............................................36

*United States v. Ealy*, 363 F.3d 292 (4th Cir. 2004) ............................................................37

*United States v. Edelin*, 134 F. Supp. 2d 59 (D.D.C. 2001) .................................................37

*United States v. Fletcher*, No. CR TDC-05-0179-01, 2020 WL 2490025 (D. Md. May 14, 2020) ...................................................................................................................39

*United States v. Floresca*, 38 F.3d 706 (4th Cir. 1994) (*en banc*)....................................45

*United States v. Green*, 654 F.3d 637 (6th Cir. 2011) ..........................................................37

Order, *United States v. Groves*, No. 5:94-CR-97 (E.D.N.C. Nov. 21, 2019) ....................8

*United States v. Hardnett*, 417 F. Supp. 3d 725 (E.D. Va. 2019)...............................7, 40

*United States v. Hardy*, 762 F. Supp. 2d 849 (E.D. La. 2010) ..........................................38

Order, *United States v. Hines*, No. 5:94-CR-150 (N.D.N.Y. Nov. 8, 2019)...................9

*United States v. Jackson*, 964 F.3d 197 (3d Cir. 2020) ......................................................6

*United States v. Jackson*, No. 3:99-00015-05, 2019 WL 6245759 (S.D. W. Va. Nov. 21, 2019) .......................................................................................................................10

Order, *In re Johnson*, No. 20-8 (4th Cir. July 15, 2020) ...................................................44

*United States v. Johnson*, No. 7:04-CR-128-1, 2020 WL 2563541 (W.D. Va. May 20, 2020) .......................................................................................................................34

*United States v. Jimenez*, No. 92-CR-550, 2020 WL 2087748 (S.D.N.Y. Apr. 30, 2020) .............9

*United States v. Kehoe*, 610 F.3d 579 (8th Cir. 2002)........................................................38

Order, *United States v. Kelly*, No. 2:94-CR-163 (E.D. Va. June 5, 2020)........................8

*United States v. Lewis*, No. 1:08 CR 404, 2010 WL 5418901 (N.D. Ohio Dec. 23, 2010)...........38

*United States v. Martin*, No. 19-3905, 2020 WL 3251021 (6th Cir. June 16, 2020)....................15

**APP.12**

*United States v. Mayhew*, 337 F. Supp. 2d 1048 (S.D. Ohio 2004)...............................................38

*United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010)...............................................37

*United States v. Nieves*, 108 F. App'x 790 (4th Cir. 2004) ...............................................45

*Unites States v. Northington*, Crim. Action No. 07-550-05, 2014 WL 1789151 (E.D. Pa. May 6, 2014)...............................................37

*United States v. Patterson*, 755 F. App'x 238 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 1576 (2019)...............................................38

*United States v. Pitera*, 5 F.3d 624 (2d Cir. 1993) ...............................................38

*United States v. Randall*, 171 F.3d 195 (4th Cir. 1999)...............................................45

*United States v. Roane*, 378 F.3d 382 (4th Cir. 2004) ...............................................33

Order, *United States v. Robinson*, No. 98-CR-60 (E.D. Wis. Sept. 27, 2019)...............................................9

*United States v. Shaw*, 957 F.3d 734 (7th Cir. 2020)...............................................6, 7

*United States v. Smith*, 959 F.3d 701 (6th Cir. 2020) ...............................................7, 23

*United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006) (*Stitt IV*)...............................................12

*United States. v. Stitt*, 552 F.3d 345 (4th Cir. 2008) (*Stitt V*) ...............................................2, 11, 13, 15

*United States v. Tatum*, 31 F. App'x 156 (5th Cir. 2001)...............................................38

Order, *United States v. Taylor*, No. 19-7616 (4th Cir. Feb. 12, 2020) ...............................................44

*United States v. Taylor*, No. 04 CR 495-38, 2020 WL 2476529 (N.D. Ill. May 13, 2020)...........40

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996)...............................................25, 43

*United States v. Tucker*, 404 U.S. 443 (1972) ...............................................46

*United States v. Venable*, 943 F.3d 187 (4th Cir. 2019) ...............................................8

Order, *United States v. Walker*, No. 5:95-CR-101 (N.D.N.Y. Oct. 25, 2019)...............................................9

*United States v. Whitfield*, 695 F.3d 288 (4th Cir. 2012)...............................................45

*United States v. Wirsing*, 943 F.3d 175 (4th Cir. 2019)...............................................6, 7, 8, 9

*United States v. Williams*, 610 F.3d 271 (5th Cir. 2010)...............................................38

*Wright v. United States*, 425 F. Supp. 3d 588 (E.D. Va. 2019)...............................................6, 8, 15

## STATUTES

18 U.S.C. § 1959.................................................................................3, 43, 44, 45

18 U.S.C. § 3553.................................................................................. passim

18 U.S.C. § 3593.................................................................................11, 16

18 U.S.C. § 3596.................................................................................33

21 U.S.C. § 841.................................................................................. passim

21 U.S.C. § 846..................................................................................3, 43

21 U.S.C. § 848.................................................................................. passim

21 U.S.C. § 924..................................................................................3, 43, 44

21 U.S.C. § 960.................................................................................10

Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 ..........................13, 14, 18, 32

Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 ..................................... passim

Federal Death Penalty Act of 1994, Pub. L. No. 103-322, 108 Stat. 1959...................................18

First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.............................................. passim

## OTHER AUTHORITIES

AAIDD Ad Hoc Committee on Terminology and Classification, *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed. 2010)................................28

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders DSM-5* (5th ed. 2013) ..................................................................28

Danielle Sered, Accounting for Violence: How to Increase Safety and Break Our Failed Reliance on Mass Incarceration, Vera Institute of Justice (2017) ....................................40

Death Penalty Information Center, *Defendants Whose Sentences Have Been Reduced Because of a Finding of "Mental Retardation" since Atkins v. Virginia (2002)* (July 19, 2012), http://www.deathpenaltyinfo.org/node/2395............................................38

James C. Howell et al., Bulletin 5: *Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know* 17 (2013), https://www.ncjrs.gov/pdffiles1/nij/grants/242935.pdf.............................................39, 40

**APP.14**

James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414 (1985) .................................................................................25, 27

John H. Blume & Karen L. Salekin, *The Death Penalty and Intellectual Disability*, *Analysis of Atkins Cases*, American Association on Intellectual and Developmental Disabilities (Edward A. Polloway ed., 2015) ...........................................41

Rachel E. Barkow, *Prisoners of Politics: Breaking the Cycle of Mass Incarceration* (2019) ..............................................................................................................40

U.S. Sentencing Commission, *The Effects Of Aging On Recidivism Among Federal Offenders* (2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders..................................................................40

**APP.15**

## I.    INTRODUCTION

The First Step Act, enacted on December 21, 2018, authorizes a reduced sentence for certain convictions that would have had lower statutory penalties had the Fair Sentencing Act, a 2010 law, applied at the time of the original sentencing.  The First Step Act involves a two-step inquiry.  First, a court determines eligibility, *i.e.*, whether one of the defendant's convictions is a "covered offense" per the statute.  And, second, after satisfying this threshold inquiry, a sentencer then reconsiders the original sentence and determines, after a "complete review," whether a reduced sentence is merited.

As demonstrated below, Corey Johnson is eligible for a sentence reconsideration because ten of Mr. Johnson's 1993 convictions are drug-related crimes deemed "covered offenses" by the First Step Act.  Seven of Mr. Johnson's convictions that meet the eligibility requirements of the First Step Act are death sentences and, by law, reconsideration of those convictions must be conducted by a jury.

In step two of the First Step Act consideration, a jury would receive evidence in order to determine a sentence that fulfils the sentencing goals of 18 U.S.C. § 3553(a)—one that is sufficient, but not greater than necessary, taking into account the history and characteristics of the defendant, the nature and circumstances of the crime, and the need for the sentence imposed.  Mr. Johnson has significant evidence, much of which has never been previously presented to any factfinder, that will better shape an understanding of his moral culpability.  Among the wide array of factors that a jury should weigh in reconsideration of his death sentences are:

- Mr. Johnson suffered horrific abuse, neglect, and abandonment throughout his childhood.  *See infra* at 18-23.
- As is often the case with people with intellectual impairments who lack life skills— particularly those who were physically and emotionally abused as children—Mr. Johnson, a follower, not a leader, was easily manipulated, and would do anything to

please others.  This element of his character is critical to an understanding of his role in the crimes of which he was convicted.  *See infra* at 23-27.

- The evidence, science, and law demonstrate that Mr. Johnson is a person with intellectual disability.  This evidence includes three opinions of experts who specialize in identifying and diagnosing intellectual disability.  *See infra* at 27-33.

- Mr. Johnson has an essentially flawless prison record, and a sentence reconsideration would not encourage future crime or endanger the public.  Mr. Johnson has been incarcerated for 28 years, and during that time he has been a model inmate.  *See infra* at 33-36.

- Mr. Johnson's sentence is disproportionate compared to sentences imposed on his co-defendant Vernon Lance Thomas, who has intellectual disability, like Mr. Johnson, but was spared the death penalty despite being found guilty of four murders in furtherance of a continuing criminal enterprise, and is disproportionate compared to other similarly situated defendants.  *See infra* at 36-38.

- Mr. Johnson was only 22 at the time of his arrest.  Now, Mr. Johnson is 51 years old and poses no threat to the prison population at large.  *See infra* at 38-40.

- Mr. Johnson has demonstrated sincere remorse.  Even with his limited ability to express himself, he conveyed his profound regret and accepted responsibility for his crimes at his sentencing hearing.  *See infra* at 40-41.

To be clear, on his death sentenced counts, Mr. Johnson does not suggest that there should be any choice before the jury other than life in prison or the death penalty as required by law.

Accordingly, Mr. Johnson respectfully submits that the Court should order a capital resentencing hearing at which a new jury would determine whether to reduce his sentences pursuant to § 404(b) of the First Step Act.  *United States v. Stitt*, 552 F.3d 345, 354-55 (4th Cir. 2008) (hereinafter, "*Stitt V*").  With respect to his non-death sentenced counts that are covered offenses pursuant to the First Step Act, because those counts are eligible for First Step Act relief, the Court must reconsider those sentences.  Mr. Johnson further submits that, after the jury resentencing proceeding, this Court should use its discretion to reduce those counts in light of all of the evidence, pursuant to § 3553(a).

2

## II.    COVERED OFFENSES AND THEIR SENTENCES

On February 3, 1993, Mr. Johnson was convicted of the following offenses that are eligible as covered offenses under the First Step Act: engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848(a) (Count 2); murder in furtherance of a continuing criminal enterprise in violation of 21 U.S.C. § 848(e)(1)(A) (Counts 8, 11, 17-19, 24, and 25); and distribution of crack cocaine base ("crack cocaine") and possession with intent to distribute in violation of § 841(a)(1) (Counts 31 and 32).[1]

Mr. Johnson was also convicted of violating 21 U.S.C. § 846 for having possessed with intent to distribute, and for having distributed, 50 grams or more of crack in violation of 21 U.S.C. § 841(a) (Count 1).  His sentence for this Count was later vacated by the Fourth Circuit on direct appeal, but the jury had been instructed at the conclusion of the guilt phase that Count 1 could serve as part of the basis for finding Mr. Johnson had participated in a continuing criminal enterprise under § 848.

After the guilt phase of the trial, the same jury then considered whether to impose the death penalty on Mr. Johnson.  During a penalty hearing in which the government relied largely on the same evidence presented at trial, Mr. Johnson presented limited evidence of his learning

---

[1]    Mr. Johnson was also convicted of killing and maiming in aid of racketeering under 18 U.S.C. § 1959 (Counts 10, 13, 14, 16, 21-23, and 27-30); and use of a firearm during and in relation to any crime of violence or drug trafficking crime under 21 U.S.C. § 924(c) (Counts 9, 12, 15, 20, and 26).

difficulties and traumatic childhood through a defense psychologist and two other witnesses. Even with this spare presentation,[2] the jurors found significant mitigating evidence existed.[3]

Nevertheless, the jury sentenced Mr. Johnson to death on his § 848(e)(1)(A) convictions (Counts 8, 11, 17-19, 24, and 25); and the court imposed a life sentence plus 85 years for his § 848 conviction (Count 2); and 20 years and 40 years, to run concurrently for his § 841(a) convictions (Counts 31 and 32).[4]

### III.    LEGISLATIVE BACKGROUND

#### A.    Fair Sentencing Act of 2010

In 2010, President Obama signed into law the Fair Sentencing Act, which codified the long-recognized reality that federal drug statutes had imposed overly harsh penalties for cocaine-base offenses, *i.e.*, crack cocaine, by comparison to the penalties for powder cocaine offenses, with a disproportionate effect on African-American defendants.[5] *Dorsey v. United States*, 567 U.S. 260, 268-69 (2012). Congress adjusted the penalties for offenses involving crack cocaine by increasing the threshold drug quantities required to trigger mandatory minimum sentences under § 841(b)(1). Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 2, 124 Stat. 2372, 2372. Per those amendments, under § 841, the quantity needed to trigger the five-year mandatory minimum was increased from five grams of cocaine base to 28 grams of cocaine base, and the

---

[2]    The jurors were not asked to consider whether Mr. Johnson was intellectually disabled.

[3]    *See infra* note 36 (discussing Special Findings (Feb. 16, 1993) ("Special Findings") at 7-11 (Ex. 1)).

[4]    The Court also imposed a life sentence plus 85 years for Counts 10, 14, 21-23, 27, and 28; 30 years for Counts 29 and 30, to run concurrently; 20 years for Count 16, to run concurrently; five years for Count 9, to run consecutively; and 20 years for Counts 12, 15, 20, and 26, to run consecutively.

[5]    Mr. Johnson is African-American, as are the co-defendants and the victims in this case.

4

quantity needed to trigger the ten-year mandatory minimum was increased from 50 grams of

cocaine base to 280 grams. *Id*. These changes have had a ripple effect because convictions

under § 841, and their designation as felonies, are predicates for other provisions of Title 21,

including § 848.

**B.      First Step Act of 2018**

On December 21, 2018, President Trump signed the First Step Act of 2018 into law.

Section 404 of that law made the Fair Sentencing Act retroactive to defendants convicted of

crack cocaine offenses whose statutory penalties were modified by the Fair Sentencing Act.

First Step Act of 2018, Pub. L. No. 115-391, § 404(b), 132 Stat. 5194, 5222. Specifically, under

the First Step Act, the Fair Sentencing Act relief was made available to defendants convicted of a

"covered offense"—defined as "a violation of a Federal criminal statute, the statutory penalties

for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010, that was

committed before August 3, 2010." *Id*. Section 404(b) of the First Step Act provides that

defendants who were convicted of such covered offenses would now be entitled to have their

sentences reconsidered and possibly reduced. *Id*.

**IV.    ARGUMENT**

**A.      Mr. Johnson's Convictions Under 21 U.S.C. §§ 841(a)(1) and 848 Are Covered
          Offenses Under the First Step Act**

**1.      Structure of the First Step Act Review**

First Step Act cases proceed in a series of steps; there is, in effect, an order of operations

to them. As an initial matter, a movant must show that he committed an offense: (1) before

August 3, 2010; (2) that he was not sentenced or resentenced under the Fair Sentencing Act; and

5

**APP.20**

(3) that he has not previously been denied a request for reduction under the First Step Act after "a complete review of the motion on the merits."[6] *Id.*

Section 404(b) states: "A court that imposed a sentence for a covered offense may . . . impose a reduced sentence as if sections 2 or 3 of the Fair Sentencing Act of 2010 . . . were in effect at the time the covered offense was committed." *See also United States v. Wirsing*, 943 F.3d 175, 186 (4th Cir. 2019) (holding that "*all* defendants who are serving sentences for violations of 21 U.S.C. § 841(b)(1)(A)(iii) and (B)(iii), and who are not excluded pursuant to the expressed limitations in § 404(c) of the Act, are eligible to move for relief under that Act" (emphasis added)); *Wright v. United States,* 425 F. Supp. 3d 588, 595 (E.D. Va. 2019) ("[T]he Court finds that the FIRST STEP Act grants broad discretion to the district courts in providing relief under this Act.").

The movant must demonstrate that the offense was a "covered offense." To decide that a conviction is a covered offense, a court must make a legal determination that the Fair Sentencing Act modified the penalty associated with the statute of conviction. Importantly, the court is *not* to concern itself with the actual quantities of crack involved in the offense. *See Wirsing*, 943 F.3d at 185-86; *see also United States v. Jackson*, 964 F.3d 197, 206 (3d Cir. 2020) (holding that "§ 404 eligibility turns on a defendant's statute of conviction, not on his possession of a certain quantity of drugs"); *United States v. Shaw*, 957 F.3d 734, 735 (7th Cir. 2020) ("To determine whether a defendant is eligible for a reduced sentence under the First Step Act, a court needs to look only at a defendant's statute of conviction, not to the quantities of crack involved in the offense.").

---

[6]  Mr. Johnson meets these requirements. He committed his offenses long before 2010; he was not sentenced or resentenced under the Fair Sentencing Act; and no court has previously denied him any request for a reduction under the First Step Act.

6

Once a movant has made this showing, and the court has determined the movant was convicted of a covered offense, the movant is eligible for First Step Act relief and the movant's sentence must be reconsidered. In reconsidering the sentence, the sentencer exercises its discretion as to whether ultimately to reduce it. Before exercising that discretion, the sentencer must first take into account the factors listed in 18 U.S.C. § 3553. *See* Pub. L. No. 115-391, § 404(c) (2018) (requiring the district court to "complete review on the merits" and consider the sentencing factors enumerated in 18 U.S.C. § 3553(a)); *see also United States v. Hardnett*, 417 F. Supp. 3d 725, 735 (E.D. Va. 2019) (stating that after determining a movant is eligible under the Act, the sentencer then "'consider[s] whether the authorized reduction is warranted, either in whole or in part, according to the factors set forth in § 3553(a)'") (quoting *Dillon v. United States*, 560 U.S. 817, 826 (2010)); *Shaw*, 957 F.3d at 742 (holding that record must show that the sentencer "considered the arguments presented" and "accounted for the 18 U.S.C. § 3553(a) factors"); *United States v. Boulding*, 960 F.3d 774, 776 (6th Cir. 2020) (holding that "an eligible defendant is entitled to an accurate amended guideline calculation and renewed consideration of the 18 U.S.C. § 3553(a) factors"); *United States v. Smith,* 959 F.3d 701, 703 (6th Cir. 2020) (holding that a district court must consider the factors in § 3553(a) to determine a sentence "not greater than necessary"). These factors include, *inter alia*, the nature and circumstances of the crime and the history and characteristics of the defendant, and the reconsideration must always be guided by the statute's admonition that the sentence be sufficient, but not greater than, necessary.

2.     **Mr. Johnson Was Convicted of Violating 21 U.S.C. § 841(a), which Is a Covered Offense**

Mr. Johnson was convicted under Counts 31 and 32 of offenses under 21 U.S.C. § 841(a). The Fourth Circuit has already determined that 21 U.S.C. § 841(a) is a covered offense. *Wirsing*,

943 F.3d at 186; *see also United States v. Venable*, 943 F.3d 187, 193 (4th Cir. 2019) ("841(a)

falls within the First Step Act's definition of 'covered offense.'"); *United States v. Barnes*, No.

3:94cr80 (DJN), 2020 WL 1281235, at *2 (E.D. Va. Mar. 17, 2020).  Thus, Mr. Johnson is

eligible and must have his sentences reconsidered.

In reaching this result, the Fourth Circuit in *Wirsing* established two essential points

about the meaning of the First Step Act.  First, it determined that, under the First Step Act, the

court must look only to the statute of conviction, not the specific manner in which it was violated

in the instant case.  943 F.3d at 185 (finding that the phrase "the statutory penalties for which"

modifies the term "Federal criminal statute," not the term "violation of a federal criminal

statute").  Second, Congress specifically used the term "statutory" to identify the type of penalty

that was modified by operation of the Fair Sentencing Act, not whether the sentencing ranges

assessed against the particular defendant were necessarily changed by the 2010 enactment.  *Id.* at

185-86.  Thus, a statute is a covered offense if: (a) it is a federal criminal statute; and (b) the

statutory penalties for that criminal statute were modified by the Fair Sentencing Act.  The Court

emphasized, moreover, that "[t]here is no indication that Congress intended a complicated and

eligibility-limiting determination at the 'covered offense' stage of the analysis."  *Id.* at 186

(citation omitted).

### 3.    Mr. Johnson Was Convicted of Violating 21 U.S.C. § 848, which Is a Covered Offense

Numerous district courts around the country, including the Eastern District of Virginia

and others within the Fourth Circuit, have already determined that 21 U.S.C. § 848 is a covered

offense.  *See, e.g.*, *United States v. Brown*, No. 3:08-CR-00011-1, 2020 WL 3106320, at *4

(W.D. Va. June 11, 2020); Order at 5, *United States v. Kelly*, No. 2:94-CR-163 (E.D. Va. June 5,

2020); *Wright v. United States*, 425 F. Supp. 3d 588, 598 (E.D. Va. 2019); Order at 1, *United*

*States v. Groves*, No. 5:94-CR-97 (E.D.N.C. Nov. 21, 2019); *United States v. Dean*, No. 97-276-3, 2020 WL 2526476, at *3 (D. Minn. May 18, 2020); *United States v. Jimenez*, No. 92-CR-550, 2020 WL 2087748, at *2 (S.D.N.Y. Apr. 30, 2020); Order at 4, *United States v. Hines*, No. 5:94-CR-150 (N.D.N.Y. Nov. 8, 2019), ECF No. 607; Order at 4, *United States v. Walker*, No. 5:95-CR-101 (N.D.N.Y. Oct. 25, 2019), ECF No. 620; Order at 4, *United States v. Robinson*, No. 98-CR-60 (E.D. Wis. Sept. 27, 2019), ECF No. 606.

The government itself has conceded that an offense is a covered offense under the First Step Act where the statute under which the movant was convicted makes reference to or has as a predicate statute amended by sections 2 and 3 of the Fair Sentencing Act, including 21 U.S.C. § 848. *See, e.g.*, United States' Mot. to Remand at 8, *United States v. Maupin*, No. 19-6817 (4th Cir. Aug. 29, 2019), ECF No. 26; *see also United States v. Davis*, No. 5:93-cr-30025, 2020 WL 1131147, at *2 (W.D. Va. Mar. 9, 2020) ("The government acknowledges that the defendant is eligible for a sentence reduction under the 2018 FSA for all three counts, including Count Two due to § 848's requirement of a § 841(b)(1)(A) violation.").

The court in *United States v. Brown*, No. 3:08-cr-00011-1, 2020 WL 3106320 (W.D. Va. June 11, 2020), employed an analysis similar to that used by the Fourth Circuit in *Wirsing*. The court reasoned that 21 U.S.C. § 848(c) defines a single criminal act—engaging in a continuing criminal enterprise—and § 848(a), (b), and (e) define the applicable penalties, including penalty enhancements, for the criminal conduct defined in subsection (c).[7] The *Brown* court noted (as the government acknowledged) that § 848(b) was modified by the Fair Sentencing Act. 2020

---

[7]   The court noted, for example, that Congress titled § 848(a) "Penalties, Forfeitures," and § 848(e) "Death Penalty." *Id*. at *4. Section 848(b) is likewise entitled "Life imprisonment for engaging in continuing criminal enterprise." *Id.* at *2. All three sections define levels of punishment based on the commission of a continuing criminal enterprise based on drug trafficking.

9

**APP.24**

WL 3106320, at \*2, and that a sister court had previously found that the penalty imposed under §

848(e)(1)(A) was modified by the Fair Sentencing Act, *id.* at \*4 (citing *Davis*, 2020 WL

1131147 at \*2).  The court in *Brown* thus concluded that 21 U.S.C. § 848 is a covered offense *in

toto* "because at least one of the penalties . . . was modified by Section 2 or 3 of the Fair

Sentencing Act." *Id.* at \*4.  Thus, any violation of § 848—that is, any continuing criminal

enterprise as defined by § 848(c) and penalized under any provision of § 848—constitutes a

covered offense.

In any event, there is nothing about § 848(e) that would suggest a different approach or a

different result here.  To the contrary, § 848(e) references and relies upon as predicates §

841(b)(1)(A) and § 960(b)(1), both of which were specifically modified by the Fair Sentencing

Act.[8]  *See* Fair Sentencing Act of 2010, Section 2, Cocaine Sentencing Disparity Reduction §

401(b)(1), Pub. L. No. 111-220, 124 Stat. 2372.

Accordingly, Mr. Johnson's §§ 841 and 848(a) and (e) convictions are covered offenses

under the First Step Act.[9]

---

[8]   Section 848(e)(1)(A) provides that

> any person engaging in or working in furtherance of a continuing criminal
> enterprise, or any person engaging in an offense punishable under section
> 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or
> counsels, commands, induces, procures, or causes the intentional killing of an
> individual and such killing results, shall be sentenced to any term of imprisonment,
> which shall not be less than 20 years, and which may be up to life imprisonment,
> or may be sentenced to death.

[9]   Even if the Court determines one of Mr. Johnson's convictions is not eligible for
resentencing under the First Step Act (and it should not), Mr. Johnson's sentences could still
be reduced by applying the sentencing package doctrine.  The Fourth Circuit has adopted a
sentence-package theory wherein if "an appellate court . . . rejects one of the grounds on
which [a] sentence is based" and "vacates and remands a prisoner's sentence," a "district
court may not simply re-enter the non-offending portions of the original sentence, but must
conduct a new resentencing hearing to reformulate the entire sentence package." *United*

10

APP.25

**B.      Mr. Johnson Meets the Eligibility Requirements under the First Step Act so Is Entitled to Have His Sentences Reconsidered**

Mr. Johnson committed his crimes before 2010.  He has never been resentenced under the Fair Sentencing Act.  He was never previously denied a sentence reduction after a complete review of the merits of a First Step Act motion.  Mr. Johnson was convicted of, and sentenced for, covered offenses.

He is, therefore, entitled to reconsideration of his sentences, including the capital sentences imposed for his convictions under 21 U.S.C. § 848(e).

**C.      Because Mr. Johnson's Resentencing Consideration Implicates the Death Penalty, He Must Be Resentenced by a Jury on His Capital Sentenced Counts**

When reconsideration of a death sentence is required, the new sentencing must be done by a jury.  *See* 18 U.S.C. § 3593(b)(2)(D) (providing that where defendant is subject to the death penalty, a sentencing hearing shall be conducted "before a jury impaneled for purposes of the hearing if . . . after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary"); 21 U.S.C. § 848(g), (i)(1)(B)(iv) (1988) (repealed 2006) ("A person shall be subjected to the penalty of death for any offense under this section only if a hearing is held in accordance with this section," and "[t]he hearing shall be conducted before a jury impaneled for the purpose of the hearing.") (Ex. 2); *see also Hurst v. Florida,* 136 S. Ct. 616, 624 (2016).  The Fourth Circuit has likewise held that a jury, not a court, must be fact-finder with respect to a capital resentencing.  *Stitt V*, 552 F.3d at 354-55 (finding that a defendant who was sentenced to death under § 848(e)(1)(A) and whose sentence was vacated

---

*States v. Jackson*, No. 3:99-00015-05, 2019 WL 6245759, at *4 (S.D. W. Va. Nov. 21, 2019) (alteration in original) (quoting *United States v. Hadden,* 475 F.3d 652, 669 (4th Cir. 2007)).

11

and reconsidered after §§ 848 (g)-(r) were repealed by Congress, was entitled a jury resentencing under § 848(i)(1)(B)(iv) because the Savings Statute preserved this remedy for him).

The implications of the *Stitt* opinions go beyond merely preserving the right to jury resentencing despite the repeal of §§ 848 (g)-(r). An earlier decision in *Stitt* addressed the relief available for capital litigants under 28 U.S.C. § 2255. *United States v. Stitt*, 459 F.3d 483, 486-87 (4th Cir. 2006) (hereinafter, "*Stitt IV*"). *Stitt IV* demonstrates that, when a statute provides relief applicable to both non-capital and capital defendants, the courts have the equitable obligation to shape relief for the capital defendants notwithstanding that the express statutory language only provides a mechanism for relief to non-capital defendants. *See id*. at 485 (holding that because *Andrews v. United States*, 373 U.S. 334 (1963), required resentencing before a grant of relief pursuant to § 2255 could be appealed in a non-capital case, the same requirement necessarily applied in a capital case). When a court does so, it must fashion the remedy to comport with established principles of Eighth Amendment jurisprudence and statutory provisions that reflect those principles—by empaneling a jury to resentence.

Thus, although the First Step Act speaks in terms of a "court" engaging in reconsideration of an eligible movant's sentence, applying this provision to a capital litigant, a jury must be empaneled to engage in the necessary sentencing determination. *See, e.g.*, *Stitt IV* at 485. Once a jury has determined whether to resentence Mr. Johnson to death or to life without possibility of parole, this Court would be the appropriate sentencer (as the statute contemplates) for determining whether Mr. Johnson is entitled to any other sentence reductions for his non-capital covered offenses. For the sake of judicial efficiency, the Court should hold one resentencing hearing where the jury is the sentencer for the capital offenses, and this Court, thereafter, is the sentencer for the non-capital offenses.

12

APP.27

**D.** **A Capital Resentencing Hearing with Respect to Mr. Johnson's Capital Convictions Is the Only Means to Fully and Fairly Consider the 18 U.S.C. § 3553(a) Sentencing Factors as Required by the First Step Act**

As previously noted, the First Step Act entitles an eligible litigant to have his sentence reconsidered in light of the factors set forth in § 3553(a).  Section 3553(a) directs that the sentence imposed shall be "sufficient, but not greater than necessary" to comply with its purposes of deterrence, punishment, and rehabilitation.  Significantly, these factors include: (i) both the nature and circumstances of the offense, and the history and characteristics of the defendant; and (ii) the need to avoid unwarranted sentence disparities.  In considering a sentence reduction, the sentencer can also consider all post-conviction behavior.  *United States v. Chambers*, 956 F.3d 667, 675 (4th Cir. Apr. 23, 2020) (holding that post-sentencing evidence is properly considered in a First Step Act motion to reconsider sentence).

Mr. Johnson was sentenced to death in 1993 under the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (the "ADAA").  The ADAA requires the jury to consider mitigating factors similar to those prescribed under § 3553(a), such as: Mr. Johnson's "capacity to appreciate the wrongfulness of his crime," his age at the time of the crime, his lack of prior criminal record, and whether "another defendant or defendants, equally culpable in the crime will not be punished by death,"[10] as well as other mitigating factors.  *See* Special Findings (Ex. 1); 21 U.S.C. § 848(*m*) (1988) (repealed 2006) (Ex. 2).  Although it was not presented with the variety of critical evidence about his background and development that was available, the jury nevertheless recognized the evidence before it at the time was compelling and mitigating.  For

---

[10]   While the provisions of this section of the ADAA are no longer in effect, capital jurisprudence has long required jurors to take these factors into consideration. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Skipper v. South Carolina*, 476 U.S. 1, 8 (1986).  Moreover, the Fourth Circuit has held that certain provisions of the ADAA continue to have effect despite its subsequent repeal as a result of the Savings Statute. *Stitt V*, 552 F.3d at 354.

13

**APP.28**

example, all 12 jurors found that Mr. Johnson "was subjected to emotional and physical abuse, abandonment and neglect as a child, and was deprived of the parental guidance and protection that he needed" and that his "severe learning disability based on neurological impairment (brain damage) could impair his ability to exercise good judgment," and eleven jurors found that Mr. Johnson had "eagerness to be accepted by others" and that he was "easily manipulated." Special Findings at 7-11 (Ex. 1). However, in 1993, the jury was not presented with the most compelling evidence of Mr. Johnson's lack of moral culpability, namely his intellectual disability, evidence of which would make him ineligible for a death sentence. In fact, the ADAA, under which Mr. Johnson was sentenced to death, contained an absolute bar providing that "a sentence of death shall not be carried out upon a person who is mentally retarded."[11] § 848(*l*) (1988) (repealed 2006) (Ex. 2).

Nearly 30 years later, a full record of Mr. Johnson's severe impairment and childhood abuse exists. The mitigation evidence, much of which was not presented at the time of trial, is even more powerful and compelling than the evidence the original jury heard during the penalty phase of trial, and includes evidence and findings by experts that Mr. Johnson is intellectually disabled. The sentencer—in this case, a jury at a new capital resentencing hearing, with respect to Mr. Johnson's death sentenced counts, and the Court, with respect to the remaining counts—is required to examine all § 3553(a) factors. 18 U.S.C. § 3553(a); *Chambers*, 956 F.3d at 675. In addition, the jury would be required to consider the capital sentencing factors established by the ADAA.

---

[11] The modern convention is to use the terminology of "intellectual disability" or "intellectually disabled." However, because the statute uses "mentally retarded" and "mental retardation," this memorandum will at times use those terms when discussing the statutes and trial testimony.

14

In the resentencing, the jury and Court should consider relevant evidence regarding Mr. Johnson which was not presented at the time of sentencing.  Neither the new capital resentencing jury nor the Court is precluded from looking at evidence that was not presented at the time of sentencing—in fact, both are required to do so because such evidence is highly relevant.  *Chambers*, 956 F.3d at 675 (*"*Having concluded that the § 3553(a) factors apply in the § 404(b) context, post-sentencing evidence 'may be highly relevant to several of [those] factors.'") (quoting *Pepper v. United States*, 562 U.S. 467, 491 (2011)).  In Mr. Johnson's case, had the substantial evidence of his intellectually disability and his chaotic and abusive childhood, particularly the expert opinions that he is a person with intellectual disability, been presented to the jury in 1993, Mr. Johnson should have been spared the death penalty.

As explained below, there is significant evidence that indicates that the new capital resentencing jury and the Court should impose reduced sentences in light of the § 3553(a) factors in Mr. Johnson's case.  And, as explained above, in light of the statutory requirement (and the constitutional implications) that juries sentence in federal capital cases, this Court should grant Mr. Johnson a full sentencing proceeding before a jury.  At such a proceeding, Mr. Johnson is prepared to present to the jury evidence concerning his intellectually disability, his chaotic and abusive childhood, and his post-incarceration rehabilitation.  *See Wright*, 425 F. Supp. 3d at 597; *United States v. Martin*, No. 19-3905, 2020 WL 3251021, at *2 (6th Cir. June 16, 2020) (concluding that the "district court erred in limiting what information it could consider for resentencing under the First Step Act" and observing "that it is within the district court's discretion to hold a hearing on remand").  Indeed, clearly established law provides that any capital resentencing hearing must be held before a jury.  *See Stitt V*, 552 F.3d at 354-55; 21

15

U.S.C. § 848(g); 18 U.S.C. § 3593; *see also Hurst*, 136 S. Ct. at 624; *Ring v. Arizona*, 536 U.S.

584, 609 (2002).

### 1.    Compelling Evidence Shows that Corey Johnson's Sentences Should Be Reduced

The full scope of evidence supporting the reduction of Corey Johnson's sentences

pursuant to the First Step Act has never been presented previously.  The jury that sentenced Mr.

Johnson to death heard some, but not nearly all, of the evidence about his trauma-filled

childhood, early adult experiences, and other mitigating circumstances discussed below.[12]  That

evidence was presented primarily through testimony from the defense psychologist, Dr. Dewey

Cornell, who conducted a pretrial examination of Mr. Johnson.[13]  In addition to meetings with

Mr. Johnson, Dr. Cornell interviewed Mr. Johnson's mother in person, and had phone calls with

five professionals who worked with Corey Johnson during his residential and group home

placements as a teenager.  The jury did not hear testimony from any family member, close family

friend, or witness who knew Corey Johnson outside of his residential placement and who could

---

[12]   Undoubtedly, Mr. Johnson was involved in a terrible series of crimes that weighed heavily on the original jury as it considered the appropriate punishment (though without evidence in mitigation essential to its decision making) and contributed to their ultimate decision to sentence him to death.  However, there have been a number of cases in which the death penalty was never sought or in which juries or the courts have concluded that sentences other than death were the appropriate sentences despite the heinous nature of the crimes committed by those defendants.  *See infra* note 33.  In addition, shortly after the jury returned its recommendation that Mr. Johnson be sentenced to death, the government withdrew its death penalty notice for Mr. Johnson's co-defendant, Mr. Thomas, who was charged and convicted of four separate murders, shortly before trial after Mr. Thomas produced evidence of his intellectual disability.  There have been numerous capital defendants who committed crimes equally as violent as Mr. Johnson's who did not receive the death penalty because of their intellectual disability.  *See infra* note 34.

[13]   The jury also heard from two other defense witnesses who worked with Corey Johnson when he was a teenager in residential placements.

16

describe from personal knowledge the trauma he suffered as a young child and adolescent (as well as the other evidence also described below).

At a new capital resentencing hearing, the jury would hear from some of the following witnesses:

- Mr. Johnson's family members, including his maternal aunt; his brother; his cousins; his stepfather; and his stepmother;

- Friends who knew Mr. Johnson during his childhood, adolescence, and as a young adult, including his godmother and her daughter;

- Individuals who knew Mr. Johnson during his childhood, adolescence, and/or as a young adult, including a high school friend and the son of one of his mother's abusive boyfriends;

- Individuals who knew Mr. Johnson through their involvement in drug trafficking offenses, including former girlfriends during that period and the leaders of the Trenton drug-dealing group (*see infra* at IV.D.3.a);

- At least five professionals who worked with or evaluated Mr. Johnson during his childhood and adolescence, some of whom administered psychological and/or academic achievement assessments (including IQ tests) to him;

- Individuals who have known Mr. Johnson since his incarceration for the offenses in this case, including church and other religious officials who ministered to him and other inmates; a criminal justice reform advocate; and a former warden;

- A mitigation specialist who conducted a comprehensive investigation into his background, history, and characteristics; and

- Experts who have evaluated Corey Johnson and can speak to his intellectual impairments.

As summarized below, Mr. Johnson's witnesses will describe persuasively the trauma Mr. Johnson experienced throughout his life, including: (1) the abuse and neglect he suffered at the hands of those who were supposed to care for and nurture him; (2) his utter inability to learn in school; (3) his transient life as a child and adolescent; (4) his ultimate abandonment by his mother; (5) his placement in structured residential settings where he continued to severely struggle and fail academically, socially, and practically; (6) his discharge into the community without a plan and without independent living skills at age 18; and (7) his extreme vulnerability

17

to being manipulated by others, particularly in light of his desire to be accepted by and to please them. This and other evidence will underscore and explain Mr. Johnson's significant intellectual functioning deficiencies and his impaired adaptive functioning skills which all directly establish his diminished moral culpability and, combined with all of the other relevant factors, demonstrate why a sentencing reduction from the death penalty to life in prison is the necessary and appropriate outcome in his case.

### 2.    Corey Johnson's Childhood Was Marred by Abuse, Chaos, and Neglect[14]

The First Step Act, § 3553(a)(1), and the capital sentencing provisions of the ADAA and the Federal Death Penalty Act of 1994, Pub. L. No. 103-322, 108 Stat. 1959, require the sentencer to consider "the history and characteristics of the defendant" and all relevant mitigating evidence. Corey Johnson's full life history is central to that inquiry. Contemporaneous records from his childhood and scores of interviews with family members, friends, social workers, educators, and professionals document his traumatic background. Below is a summary of some of the key events that shaped him and some of the evidence he would present during a capital resentencing hearing before a jury.

### a.    Corey suffered physical and emotional abuse as a child

Corey Johnson is 51 years old now. He was born in 1968 to parents Emma Johnson and James Sykes, who were both teenagers at the time of his birth. James Sykes was in prison for most of Corey's childhood and never played a significant role in his upbringing. Emma Johnson, an immature, cocaine-addicted, narcissistic single mother lacking empathy and capacity, abused

---

[14]    Unless specifically noted, the facts contained in this section are documented in contemporaneous records created during Corey Johnson's childhood and adolescence and in declarations from witnesses who knew him during those periods and/or during adulthood, which are attached to this memorandum as exhibits 3 through 29.

her children, both physically and emotionally.  She allowed them to be abused by others.  And, ultimately, she abandoned them.

Key individuals from Corey's childhood will attest that Emma Johnson physically and emotionally abused Corey and his brother.  His godmother recalled that Emma Johnson threatened to kill or get rid of her children "because they were getting on her nerves" or "because she was tired of them."  Ex. 3.  Family members say that Emma Johnson was particularly physically abusive toward Corey, and several witnessed her beating Corey.

Some of this abuse was specifically driven by Corey's undiagnosed intellectual disability.  Emma Johnson was cruel to Corey, often criticizing his low intelligence and comparing Corey to his younger brother, whom she viewed as smarter and better than Corey.  Frustrated, Emma Johnson would hit Corey when he struggled at school.  Corey's aunt recalled:

> I saw Emma hit and smack Corey many times . . . .  One time, Emma and Corey separately told me that she had beaten Corey with her high heel shoe because he either got left back in school or failed in school.

Ex. 4.  After this incident, Emma Johnson realized she was out of control and sent Corey to live with his godmother for six or seven months.

Corey's mother also frequently derided and beat Corey for wetting or soiling the bed, which he often did until at least the age of 12.  Corey tried to hide the sheets after he had an accident.  If Emma Johnson discovered Corey had wet the bed, she did not wash his bedding, leaving him to sleep on sheets dirty with urine and feces.

Corey's childhood was scarred by Emma Johnson's volatile and abusive relationships with a series of men.  Bobby Koger, a heroin addict, was the most violent of her boyfriends.  Koger, who lived with Emma Johnson and Corey for about four years, from the time he was nine to 12, once tried to set fire to their apartment.  Emma Johnson reported to psychiatrists and social workers that Koger abused both of her children and once expressed her fear, because of Koger's

19

violence, that "Corey [would be] at risk were he to return home" from a residential placement. Ex. 5. Family and friends saw bruises on Corey, Robert, and Emma Johnson, which they believed Koger had inflicted. Emma Johnson herself acknowledged that this was a destructive and chaotic relationship.

Family members and others will testify that Corey was severely neglected at various times throughout his childhood. Emma Johnson was often absent. She would leave her sons with others for "days, weekends, and sometimes even weeks and months." Ex. 6. Frequently, Corey and his brother were locked out of the apartment when they returned from school because Emma Johnson was gone. Corey's brother summed up their situation: "From an early age, Corey and I were pretty much on our own." *Id.* When Emma Johnson was home, she often partied and used drugs, even while Corey and his brother were present. "Corey told me that Emma always had visitors in their apartment and music would be played so loudly that Corey could not sleep at night. He said that he was tired at school during the day and couldn't concentrate on his schoolwork." Ex. 4.

Witnesses will describe how the abuse and neglect significantly impacted Corey. Corey's aunt is available to share her observations of young Corey, including that he was "sad a great deal of the time." *Id.* His godmother reported that he had "difficulty dealing with the situation." Ex. 3. Corey reported to counselors at the time that he "felt at times like wanting to stab himself." Ex. 7. When he was 13, Corey told a psychiatrist, "If he got lost in a forest, he did not know who would come looking for him." *Id.*

### b. Corey was regularly uprooted from his homes and schools and eventually abandoned to social service custody

Witnesses will testify that, by the time he was 12, Corey had lived in roughly a dozen different places throughout Brooklyn, Manhattan, Queens, and Jersey City, New Jersey. Due to

20

**APP.35**

her volatile relationships, drug use, and intermittent employment, Emma Johnson moved frequently, taking Corey and Robert with her from apartment to apartment. Because of this transience, Corey also attended numerous schools. Corey attended at least six different elementary schools before the end of second grade and at least ten schools before the age of 13.

When he was 13, Corey's mother abandoned Corey, voluntarily surrendering him to the social service system—not because Corey was acting out, misbehaving, or otherwise causing problems, but instead because she was focused on her desires, not her son's needs. Following two months of evaluation at the Pleasantville Diagnostic Center, Corey was moved to the Pleasantville Cottage School, a residential treatment facility for emotionally disturbed boys. He lived and attended school there for three years. Upon arrival, Corey underwent diagnostic screening which showed that he was functioning on second- and third-grade levels in word recognition, spelling, and arithmetic. The Pleasantville records describe Corey as having a "severe learning disability," an erroneous classification that nevertheless reflected awareness that Corey simply could not learn, no matter the strategies used to help him.[15] Despite his constant

---

[15]  At sentencing, Dr. Cornell testified that Corey Johnson was "severely learning disabled" but was not intellectually disabled. *See* 2/10/93 Trial Tr. 3573-3574; 3682; 3684; 3690-3692 (Ex. 8). Corey Johnson is indeed intellectually disabled. *See infra* IV.D.4. Dr. Cornell's misdiagnosis of Corey Johnson was the result of a series of systematic failures occurring long before Dr. Cornell conducted his evaluation that resulted in the mischaracterization of Corey's intellectual impairments. Throughout childhood, Corey was repeatedly labeled as learning disabled, first in the public school system and then at Pleasantville, where he was deemed "severely learning disabled." However, as noted *infra* at note 22, experts in learning disabilities and intellectual disability—knowledgeable about the evaluation and diagnoses of children with learning disabilities and intellectual disability in New York City during the 1970s and 1980s—have since concluded that Corey Johnson did not meet the clinical guidelines for a learning disability at the time he was diagnosed, and he does not today. They also have described how young African-American children who met the criteria of "mental retardation" were mislabeled as learning disabled, a classification viewed as having less of a stigma, due to the threat of litigation and regulatory changes that occurred during that era.

21

failure, his teachers praised his commitment to improving; Corey wanted to learn, but he could not. They observed that Corey was eager and motivated to improve his situation.

Witnesses who worked in these residential settings will explain that, when Corey turned 16, he was transferred to a group home called Elmhurst Boys Residence because he was too old to remain at Pleasantville. At Elmhurst, the primary focus of the social workers and staff was to prepare Corey for the time when he would age out of the group home and would have to live independently. Yet, despite significant efforts, Corey was unable to learn even minimal independent living skills during his two years at Elmhurst, a cause for significant concern for the social workers and staff responsible for him.

In his residential settings, Emma Johnson continued to inflict emotional abuse upon Corey. She would cancel Corey's weekend home visits or lobby to reduce them, and she fell out of contact with Corey for long stretches of time. Contemporaneous records from Corey's residential placements will provide descriptions of Emma Johnson as "a narcissistic" and "self-focused woman" who showed a "lack of empathy and sensitivity toward Corey," and was only "surfacely [sic] involved with Corey," "elusive," and "impossible to engage." Exs. 9-12.

Nevertheless, even with their concerns about his ability to be safe outside the Elmhurst environment and in his mother's care, witnesses will testify that staff told Corey to leave Elmhurst for ten days when he refused to participate in group discussions and exhibited disrespectful behavior toward staff. Some staff felt they clearly communicated to Corey that he should go home to his mother's house, use the ten days to consider how to improve his attitude and behavior, and then return to Elmhurst. But another staff member had doubts at the time whether Corey understood that he was welcome to return. Ex. 13. Over the next few weeks, staff wrote to Emma Johnson and Corey urging them to contact Elmhurst but never received any

22

**APP.37**

reply.  Shortly after that, the Department of Social Services closed Corey's case and discharged him from the foster care system permanently.  Ex. 14; Ex. 12.

One of the social workers who worked with Corey will share her realization that, in hindsight, the system, which was supposed to protect and nurture Corey, let Corey fall through the cracks, depriving him of the security, stability, and structure of the residential placements where he had lived since he was 13.  Like his mother had done six years before, the system abandoned Corey without providing him the independent living and the social, practical, and other life skills vital to his survival.  With nowhere else to turn and without the life skills to survive on his own, Corey returned—as a highly vulnerable young man—to a highly volatile environment to live with his mother (who was using hard drugs) and his younger brother (who was dealing them).

**3.     Mr. Johnson Was a Follower Who Was Easily Manipulated—a Common Outcome for People with Intellectual Disability—and Sought Protection from People Who Led Him Down a Violent Path**

Section 3553(a)(1) requires the sentencer to consider "the nature and circumstances of the offense" in addition to the "history and characteristics of the defendant."  *Smith*, 959 F.3d at 703.  Mr. Johnson acknowledges that his offenses are among the most serious possible.  However, it is vital to understand the context within which he committed those crimes.

**a.     Corey Johnson drifted into a drug group after his discharge from residential placement with no plan or support**

A social worker will testify that she had written a tragically prophetic case note (just months before he was sent home) that foreshadowed the results when Corey was sent home from his last residential placement without any supports in place.  The social worker, who conducted individual and group therapy sessions with Corey at Elmhurst, documented her grave concerns about his mother's impact on Corey and his future.

23

> I suspect that Corey will be at risk when it comes time to leave us and the security that we have provided him all this time . . . [which] is necessary if he is going to be able to survive in the community and make constructive choices and not perpetuate the same patterns that he learned from his mother.

Ex. 15.  This is exactly what happened.

With severe cognitive, social, and practical deficits due to his intellectual disability, no job skills, and no support community, Corey was highly vulnerable.  He idolized his younger brother Robert, who first started selling drugs when Robert was 13 years old.  Soon after his discharge from Elmhurst, Corey tried to sell drugs, too.  Because of his intellectual disability, Corey had problems figuring out how much money he was owed in exchange for the drugs he sold.  Once, Robert gave Corey drugs to sell—50 vials of crack to sell for $5 each—but Corey returned with only $50, not the expected $250.  After that, Robert could not trust Corey to calculate the money owed him and therefore stopped giving him drugs to sell.  Ex. 6.

In 1989, still just 18, Corey joined a group of men he knew from his Brooklyn neighborhood who were selling drugs in Trenton, New Jersey, led by brothers Darnell and Darold Brown.  The leaders recognized that Corey was slow, and Corey's role in the Trenton group was very limited.  Corey viewed the Trenton group as his surrogate family: "Corey considered our group to be his family and was very protective of the group."[16]  Vernon Thomas, as well as Richard Tipton, his co-defendants in the case that brought him to death row, were a part of this group.  Tipton was viewed much differently than Corey by the leaders of the Trenton group.  Tipton was "active, hyper, and rowdy . . . very loud" and "considerably more intelligent than Corey."  Ex. 16.

---

[16] *See* Ex. 16; Ex. 17.  Prosecution witnesses during Corey Johnson's death penalty trial confirmed that members of the group called each other "brother" and "cousin" and Corey viewed them as his family.

24

In 1991, the police raided a home where the members of the Trenton drug group were staying, and its leaders and many other members were arrested. Mr. Johnson, Vernon Thomas, and Richard Tipton were not at the house during the raid, and they were not arrested. Tipton suggested to the remnants of the Trenton group who were not in jail that they move to Richmond, Virginia, where Tipton had ties and believed they could make "big money" selling drugs. Tipton, Thomas, and Corey Johnson soon relocated to Richmond, and Tipton connected them there with James Roane. 1/15/93 Trial Tr. 921-922 (Ex. 18). In Richmond, the group engaged in the violent crimes underlying their capital convictions.[17]

### b.    Mr. Johnson was a follower who exhibited extreme loyalty to people viewed as family

It is well recognized that individuals with intellectual disability often act on impulse, that they are easily influenced, and that in group settings, they are usually followers rather than leaders. James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 429 (1985) (hereafter "Ellis *et al*.").[18] Witnesses will describe significant

---

[17]    While trial testimony depicted Corey as a "supervisor" of the activities in Virginia, witnesses who knew him at the time would testify to their observations of Corey that provide a more complete and accurate depiction of his limitations and his role. "Compared to Roane and Tipton, Corey appeared to be a follower. Tipton and Roane could have been the bosses; they had the strong personalities, unlike Corey. Corey wanted to be accepted and could have been influenced by others." Ex. 20. "I would have expected [Tipton], rather than Corey or [Thomas], to be the leader of the group in Virginia." Ex. 17. "Both [Tipton] and Corey were followers, but between the two, Corey would follow [Tipton]." Ex. 16. In any event, the meaning of being a "supervisor" for purposes of establishing the crimes for which Corey Johnson was convicted ("exercis[ing] power and authority by a person who occupies some position of management or supervision," *see United States v. Tipton*, 90 F.3d 861, 886 (4th Cir. 1996) (citation omitted)), is not inconsistent with the evidence powerfully demonstrating Corey Johnson's significant deficits in life skills that began during his childhood but continued up until his incarceration.

[18]    *See infra* at IV.D.4 (summary of expert evidence that Mr. Johnson will present to the jury that he is a person with intellectual disability).

25

evidence that Corey Johnson was a follower, not a leader, throughout his life.  He has always

exhibited traits of a follower, rather than a leader.  Teachers, caseworkers, family, and friends

will attest to the same, describing him as someone desperate to be accepted by peers and who

was willing to do anything he was told, regardless of the consequences.  They also described

Corey as being "easily manipulated" and victimized by others, including peers and his mother

and brother.  Exs. 16 & 22.  Corey would do whatever his friends told him to do, going to great

lengths to fit in with the crowd, including jeopardizing his own wellbeing by doing things that

could get him injured or killed.  Corey's cousin, Priscilla Hodges, recalls that as a young

teenager, he performed reckless acts—like riding his bike through traffic across a busy street and

roller-skating down a steep hill—simply on a dare by his peers.  Ex. 21.

Witnesses who worked with Corey in his residential placements will explain that he was

perceived as someone who was so limited that he would always remain a follower.  Counselors

at Corey's placement stated that he was easily influenced and taken advantage of by his peers.

He often required protection from the other children in his class because he was frequently

scapegoated.  Corey was desperate to be accepted by his peers and would do anything that

someone told him to do.

This understanding is consistent with numerous trial witnesses who will describe Tipton

as the leader of the Richmond group.  At trial, Mr. Johnson was described as one of Tipton's

"stickmen"—an enforcer—in the Richmond group's drug business.  In short, due to his

intellectual disability and consistent with the fact that individuals with cognitive limitations are

usually followers, Mr. Johnson was willing to follow Tipton and Roane, who used him not for

his drug dealing ability, but to do their bidding.  While in no way excusing his actions, it is

important to understand that Mr. Johnson viewed the Richmond group as his surrogate family,

26

just as his similar feelings toward the Trenton group had made him extremely "protective" toward them. In fact, during the penalty phase, the jury was convinced of Mr. Johnson's susceptibility to manipulation—all 12 jurors voted that Corey was easily manipulated and eager to be accepted by others. *See* Special Findings at 11 (Ex. 1).[19]

People who knew Mr. Johnson, Tipton, and Roane similarly concluded that Mr. Johnson followed Tipton and Roane's lead. "Compared to Roane and Tipton, Corey appeared to be a follower." Ex. 20. A criminal justice reform advocate who interacted with all three men on eight to ten different occasions while visiting inmates on death row did not perceive Mr. Johnson to be the leader of the group; in fact she believed "no one could reasonably have thought of Corey as the leader in that group." Ex. 22; *see also* Ex. 17 ("I would have expected [Tipton], rather than Corey or [Thomas], to be the leader of the group in Virginia."); Ex. 16 ("Both [Tipton] and Corey were followers, but between the two, Corey would follow [Tipton]."). Even Roane and Mr. Tipton indicated to the criminal justice advocate that Corey was the follower of the group and that they were aware that Mr. Johnson was slow. Ex. 22.

### 4.      Mr. Johnson Is a Person with Intellectual Disability

A jury reconsidering Mr. Johnson's sentence will be provided with considerable evidence establishing that he is a person with intellectual disability. This evidence will include the findings of three nationally renowned experts in the field of intellectual disability who evaluated Mr. Johnson and concluded that he is a person with intellectual disability. These experts base their conclusions on numerous records from Mr. Johnson's childhood of the type regularly relied

---

[19]  What the jury was not given was an understanding that the "follower" and "eager-to-please" attributes are frequently seen among those with intellectual disability. *See* Ellis *et al*. at 429.

27

on by specialists in intellectual disability, as well as interviews with individuals who observed him through the years and other measures that are standard in the field.

To be considered intellectually disabled, a person must meet the criteria established by the leading professional organizations in the field. The American Psychiatric Association ("APA") in its *Diagnostic and Statistical Manual of Mental Disorders DSM-5* (5th ed. 2013) (hereinafter, "DSM-5") and the American Association on Intellectual and Developmental Disabilities in its Ad Hoc Committee on Terminology and Classification, *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed. 2010) (hereinafter, "Classification Manual") set forth three-prong standards that essentially mirror each other. Both standards require: (1) significant limitations in intellectual functioning, as measured by a reliable and valid IQ test; (2) significant limitations in adaptive functioning, which gauges how effectively individuals cope with everyday life demands and how well they meet the standards of personal independence of someone in their age group, sociocultural background, and community setting;[20] and (3) the onset of these significant deficits during the development period.[21]

### a.    Mr. Johnson has significant limitations in intellectual functioning

At a capital sentencing hearing before a jury, Mr. Johnson's experts will show that he has an IQ in the intellectual disability range. For example, Corey had a valid and reliable full scale IQ score of 69 on the gold-standard WISC-R that was administered by an experienced

---

[20]   A diagnosis of intellectual disability requires significant deficits in at least one of three areas of adaptive functioning—(1) conceptual functioning, (2) social functioning, or (3) practical functioning. DSM-5 at 33; Classification Manual at 6-7.

[21]   DSM-5 at 33; Classification Manual at 6-7.

28

psychologist when Corey was 16 years old and living in the Pleasantville residential facility.[22] Mr. Johnson's valid IQ score below 70, namely the 69 IQ test noted above, is sufficient evidence of his significant limitations in intellectual functioning to proceed with an evaluation of Mr. Johnson under the second prong of the intellectual disability diagnostic criteria, an assessment of adaptive behavior.

### b.    Mr. Johnson has significant limitations in adaptive functioning

Mr. Johnson's evidence will show that he has significant limitations in adaptive functioning as well.  That evidence is based on well-documented, detailed, and consistent contemporaneous records from teachers, social workers, psychologists, and psychiatrists who worked with Corey before and during his residential placements.  It is corroborated by interviews with and statements by several dozen people (family members, friends, acquaintances, professionals who worked with Corey as a child, and adults who have interacted with him in prison) who describe further examples of his broad limitations in learning, social interactions, and practical living skills.  Finally, the evidence will include the results of standardized adaptive behavior instruments administered by an experienced expert to three people (a family member, a very close friend, and a teacher) who knew Corey well during his childhood and teenage years and that place Corey Johnson in the intellectual disability range of adaptive behavior.

---

[22] As noted *supra* note 15, Mr. Johnson's experts in the evaluation and diagnosis of learning disabilities have concluded that Corey was misdiagnosed as a child with severe learning disabilities for a number of reasons, rather than correctly diagnosed as a child with intellectual disability.  Those reasons include pressure, during the era when Corey entered the New York City school system, to classify children who met the criteria to be diagnosed with "mental retardation" as children with learning disabilities so as not to place the negative label of "mental retardation" on children, particularly African-American children in urban environments.  Another reason for his erroneous "learning disability" diagnoses were two flawed and invalid IQ tests given to Corey as a child and the lack of awareness of the timing and circumstances related to all of the assessments by those who lacked complete records related to his childhood.

At a capital resentencing hearing before a jury, Mr. Johnson will present testimony that demonstrates his broad adaptive behavior impairments during childhood. The following highlights some of the evidence and testimony he would present.

### i. Corey was unable to learn

Corey's school records document his consistent academic failure from a young age. He repeated several grades, and as he got older, he fell further and further behind. Corey was in the second grade from 1975, when he was six, until 1979, when he was ten. At age ten, Corey was referred to the Committee on the Handicapped for "school failure" and, after testing, was placed in Special Education classes.

Corey's academic failures continued in his late teens. When he was 16, his reading comprehension, oral comprehension, sight vocabulary, and arithmetic ability were all on second- or third-grade levels. While at Elmhurst, he attended high school but was placed in remedial, special education, and vocational classes, but, even then, failed or got Ds in nearly every class. His teachers determined that he was unable to pass school competency tests and he ultimately left high school without graduating[23] or obtaining a certificate of attendance.

Corey stood out to staff and evaluators at his residential placements because of his severe disability. "Corey was very slow intellectually . . . . I do not remember anyone else at Pleasantville who was similarly slow intellectually." Ex. 19. "Compared to virtually all of the other boys I encountered at Elmhurst, Corey was much weaker cognitively." Ex. 23. "My impression was that while there were many boys with below normal intellectual ability and various levels of functioning, almost all of the other boys there were more intelligent than

---

[23] Prison records confirm that, since his incarceration almost 30 years ago, Mr. Johnson has continued taking courses and trying to pass his General Equivalency Diploma (hereinafter, "GED") exams.

30

Corey." Ex. 13. A Pleasantville psychologist who evaluated Corey twice in three years later said,

> Nearly 30 years after I met and evaluated him, Corey still stands out in my mind due to his profound impairment in learning. Corey's deficit in phonological processing remains the most profound impairment of this kind I have encountered in three decades of clinical practice.

He considered Corey's deficit "so profound" that he has "used it over the past 30 years as a teaching example in [his] classes."

### ii.     Corey failed to learn skills for independent living

Toward the end of his residential placement, professionals at Elmhurst recognized that returning to his mother's residence was not in Corey's best interests, and they worked with him to focus on independent living skills. But Corey was not able to develop independent living skills, nor did he possess the judgment to ensure his own safety. One social worker who worked with Corey at Elmhurst, questioned Corey's ability to handle "simple, day-to-day tasks that community life requires, such as paying bills, obtaining a driver's license, or purchasing and maintaining a car," noting that "[s]omewhat more complex skills—like planning a budget—were clearly beyond Corey's abilities." Ex. 23. According to family and friends, Corey never lived alone and always lived with girlfriends or more competent peers.

### c.     Mr. Johnson's significant limitations in intellectual functioning and in adaptive functioning were present during his childhood

Finally, Mr. Johnson will present evidence that his significant limitations in intellectual functioning and in adaptive functioning were manifested during his childhood, the developmental period for intellectual disability diagnoses. Accordingly, his experts will testify before the capital resentencing jury that Mr. Johnson is a person with intellectual disability because he meets the current diagnostic criteria.

31

**5.    The Jury Considering Mr. Johnson's Sentence Will Hear Evidence from Experts Who Are Specialists in Intellectual Disability—Evidence No Court or Jury Has Heard to Date**

While Mr. Johnson previously raised an intellectual disability claim in his § 2255 proceeding, the court was not provided with evidence from experts in the field of intellectual disability.  Nor has Mr. Johnson ever had an opportunity to present comprehensive evidence of his intellectual disability to any trier of fact at an evidentiary hearing.

Mr. Johnson's capital trial was among the first federal death penalty cases after the enactment of the ADAA, and defense practices then were not as developed as they are today.  His trial attorneys did not obtain all available school, social services, and other similar records created during his childhood.[24]  In addition, Dr. Cornell, the psychologist they retained to assess Mr. Johnson's competency to stand trial, to determine if there were any grounds to assert a not-criminally-responsible claim, and to assist with preparing mitigation evidence generally, was not an expert in intellectual disability.  For a number of reasons, Dr. Cornell was unable to accurately evaluate Mr. Johnson's intellectual capabilities.  Because of that inability, he did not complete a comprehensive assessment of Mr. Johnson's adaptive functioning.  Accordingly, Dr. Cornell erroneously testified before the jury that Mr. Johnson was not "mentally retarded." 2/10/93 Trial Tr. 3692 (Ex. 8).  Dr. Cornell's conclusion was unfortunately incorrect, based on the complete record of Mr. Johnson's valid and reliable childhood IQ scores and broad and significant impairments in adaptive functioning (which were not presented to Dr. Cornell).

After his convictions and death sentences were affirmed on direct appeal, Mr. Johnson was appointed new counsel to represent him on proceedings to vacate his sentences, pursuant to § 2255.  Mr. Johnson's § 2255 attorneys raised a claim that he is "mentally retarded" and that his

---

[24]    *See, e.g.*, *supra* note 15.

32

execution was therefore barred by 21 U.S.C. § 848(*l*) and 18 U.S.C. § 3596(c), both of which provide that a "sentence of death shall not be carried out upon a person who is mentally retarded," and they asserted that Mr. Johnson's trial attorneys provided ineffective assistance of counsel by failing to argue at sentencing that he could not be executed because he is "mentally retarded."[25]  However, Mr. Johnson's § 2255 counsel did not submit any expert opinions or expert reports in support of their barebones claims that he had "mental retardation."

This Court rejected Mr. Johnson's claims related to "mental retardation," concluding: "Hence, the record before this Court demonstrates that Johnson is not mentally retarded."[26]  The Court further concluded that Mr. Johnson's trial counsel did not provide deficient representation because counsel reasonably relied upon the conclusion of the psychologist they retained to assist them, who informed them that Mr. Johnson was not "mentally retarded."  Mem. Op. at 82-84.

Mr. Johnson appealed the dismissal of his § 2255 petition and raised, among other issues, the denial of his "mental retardation" claim.[27]  The Fourth Circuit later affirmed this Court's ruling on appeal.  *United States v. Roane*, 378 F.3d 382, 408-09 (4th Cir. 2004).

---

[25]  *See* Memorandum in Support of Initial Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2255 at 108-11 (June 15, 1998) and subsequent filings related to Mr. Johnson's mental retardation claims.

[26]  Memorandum Opinion (May 1, 2003) at *80-82 (hereinafter, "Mem. Op.") (observing that Mr. Johnson was "granted another full opportunity to demonstrate that he is mentally retarded" and that "Johnson rejected the Court's invitation to submit any new evidence of his mental retardation").

[27]  *See* Petitioner Johnson's Motion for a Certificate of Appealability Pursuant to 28 U.S.C. §§ 2253(c)(1)(B) and 2255 at 43-45 (October 10, 2003); Brief for Appellants Corey Johnson and Richard Tipton at 139-45, *United States v. Johnson & Tipton*, Nos. 03-13(L), 03-26, 03-27 (4th Cir. Feb. 17, 2004).

33

APP.48

**6.      Mr. Johnson's Flawless Prison Record Indicates that a Sentence Reduction Would Not Encourage Further Crime Nor Would It Endanger the Public**

The sentencing factors require the "need for the sentence imposed" to "afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B), (a)(2)(C). In *Pepper v. United States*, 562 U.S. 476 (2011), the Supreme Court instructed courts to consider a defendant's post-sentencing mitigation evidence at the time of resentencing. *See also United States v. Davis*, 679 F.3d 190, 195-96 (4th Cir. 2012) (holding that the sentencer "can consider other sentencing factors" when reducing a sentence). Courts have relied on post-sentencing mitigation efforts by petitioners in granting First Step Act motions. *See*, *e.g.*, *Chambers*, 956 F.3d at 674-75 ("There are generally no limitations on the types of character and background information a court may consider for sentencing purposes."); *Brown*, 2020 WL 3106320, at *4 ("After consideration of the 3553(a) factors, in particular the history and characteristics of the Defendant and the need for the sentence imposed, the Court finds that a [reduced sentence] is appropriate . . . .").

Mr. Johnson's immaculate prison record weighs in favor of sentence reduction. *See United States v. Johnson*, No. 7:04-CR-128-1, 2020 WL 2563541, at *7 (W.D. Va. May 20, 2020) ("The court finds that his ability to stay out of trouble and his efforts to improve himself indicate that he has learned to respect the rules of the institution and that he does not present the same threat to the public that he did prior to his incarceration."). Mr. Johnson has been incarcerated for the past 28 years.[28] For more than two decades, he has been a model inmate, following prison rules and doing what he was told to do by prison officials. In the last 20 years,

---

[28]   For the first approximately seven years of his incarceration after his arrest in 1992, both before and after his federal trial and sentencing, Mr. Johnson was held in the custody of the Virginia Department of Corrections. Since 1999, Mr. Johnson has been incarcerated on the federal death row in the USP in Terre Haute, Indiana.

34

Mr. Johnson only received one disciplinary infraction for using a staff restroom without permission in 2002 while working in the kitchen at USP Terre Haute. He has avoided getting into altercations with other inmates and he has never engaged in violence. His lack of any violent behavior in prison and his long period without any infractions is a strong demonstration that he does not pose a danger in prison. Special Confinement Unit reports described Mr. Johnson as being quiet, civil, quick to smile, and a relaxed person.

A pastor who ministered to Mr. Johnson every other week for several years while he was held in Virginia after his sentencing met with Mr. Johnson in Terre Haute, Indiana five times after he was transferred to the Bureau of Prisons, and spoke with him another dozen times by phone, described Mr. Johnson as "less vocal and opinionated" than most inmates, "soft-spoken, quiet, and humble [and] seemed eager to please." Ex. 29. During all the times he observed him, Mr. Johnson appeared to get along with the other inmates and never got into any "disagreements with anyone." *Id.* In contrast, the pastor believed that Tipton and Roane, whom he also knew, were quick to anger and engage in confrontations with prison officials, while Mr. Johnson "seemed to 'go with the flow.'"[29]

Although he is a person with intellectual disability, Corey Johnson, despite his inability to do so, continues to believe that he can obtain a GED, and has been diligently trying since 2006 to obtain it.[30] Achieving his GED is one serious goal that Mr. Johnson set for himself. After decades of dedicated effort, Mr. Johnson has never been able to take, much less pass, the GED test because he has never progressed past the pre-GED stage, even though—year in and year

---

[29]  Ex. 29. A volunteer chaplain who also knew Tipton, Roane, and Mr. Johnson well at the same prisons describes Mr. Johnson as "pleasant and eager for acceptance . . . [and] polite, respectable, and kind." Ex. 20.

[30]  Inmate Education Data Transcript, Mar. 25, 2012 (Ex. 30).

out—his prison programming reviews note he "[w]orks hard in the GED program" and each year they set the coming December as the target for Mr. Johnson to get his GED.  To this day, he continues to study for the GED test regularly and works on his reading, social studies, and math abilities.

Mr. Johnson has also held a number of very simple jobs and has received positive performance evaluations, in both the Virginia prisons and federal prison.  In addition to these jobs, he has also learned to sew and has been mending old undershirts for himself.  He has developed other pastimes such as learning to knit and creating painting projects such as paint-by-numbers.  Throughout his incarceration, Mr. Johnson has worked hard to become a better person.

### 7.    Mr. Johnson's Sentence Was Unwarranted Compared to Sentences to Similarly Situated Defendants

An especially compelling factor in this case is the mandate to avoid unwarranted sentence disparities among defendants who are guilty of similar misconduct.  18 U.S.C. § 3553(a)(6); *see also United States v. Cantu-Rivera*, CR No. H-89-204, 2019 WL 2578272, at \*2 (S.D. Tex. June 24, 2019) (finding a reduced sentence would "also avoid unwarranted disparities among defendants with similar records convicted of similar conduct" because defendant's time served "exceeds the sentences imposed on other members of the . . . conspiracy").  Moreover, the Fourth Circuit has allowed the consideration of a co-defendant's sentence when determining a defendant's sentence.  *United States v. Doan*, 498 F. Supp. 2d 816, 819-20 (E.D. Va. 2007) (discussing Fourth Circuit authority).

Here, Mr. Johnson's co-defendant Thomas was spared the death penalty despite being found guilty of four murders in furtherance of a continuing criminal enterprise ("CCE").[31]

---

[31]    Thomas's case was severed from Mr. Johnson's and the other co-defendants, and he was tried and sentenced after Mr. Johnson.  However, after Mr. Johnson's sentencing hearing, all

Shortly after Mr. Johnson was sentenced to death, Thomas's lawyers submitted an expert report showing that Thomas had an IQ score of 71.[32]  And soon afterward, on the eve of trial, the government withdrew its death notice with respect to Thomas.

While the facts of the crime here are certainly horrendous and evoke sympathy for the victims, there are several federal capital juries that have returned life sentences in cases that were at least as aggravated as the instant case.[33]  The disparity between their sentences is contrary to

---

twelve jurors still found that other defendants who were "equally culpable in the crime(s), will not be punished by death."  *See* Special Findings at 8 (Ex. 1).

[32]  Motion to Have Defendant Declared Mentally Retarded, *United States v. Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993) (Ex. 31).

[33]  *United States v. Ealy*, W.D. Va. No. 00-CR-104 (Defendant was convicted of the 1989 murder of a family of three—a husband, wife, and son.  The husband and wife were found shot to death outside their home; their son was found shot to death in a closet inside the home.); *see also United States v. Ealy*, 363 F.3d 292 (4th Cir. 2004); *United States v. Oscar Grande and Israel Cisnero*s, E.D. Va. No. 04-CR-83 (Defendants, who were members of the MS-13 street gang, were convicted of the stabbing murder of a pregnant teenager in 2003. The victim was 17-years-old and was targeted because she was a former member of the gang and had become a federal informant.  Shortly after she left the witness protection program, defendants repeatedly stabbed her.); *see also United States v. Cisneros*, 385 F. Supp. 2d 567 (E.D. Va. 2005); *United States v. Moussaoui,* E.D. Va. No. 01-CR-455 (Defendant was convicted of being a co-conspirator in the September 11, 2001, terrorist attack on the World Trade Center and Pentagon, which killed over 3,000 people and resulted in four airplane crashes in New York, Pennsylvania, and Virginia); *see also United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010); *United States v. Edelin*, D.D.C. No. 98-264 (Defendant was convicted of ordering four murders that he ordered as the so-called "drug kingpin" of DC-area gang known as the "1-5 Mob."  Two of those murders involved ordering the killing of a 14-year-old and a 19-year-old.); *see also United States v. Edelin*, 134 F. Supp. 2d 59 (D.D.C. 2001); *United States v. Northington*, E.D. Pa. No. 2:07-CR-00550-RBS (Defendant was convicted of a 2004 arson fire that killed six people, including four children—ages 1, 10, 12, and 15.  The fire was set to retaliate against a federal informant."); *see also United States v. Northington*, Crim. Action No. 07-550-05, 2014 WL 1789151, at *1 (E.D. Pa. May 6, 2014); *United States v. Green*, W.D. Ky. No. 5:06-CR-00019-TBR (Defendant was convicted of the 2006 murders of a family of four, including two children, and the rape and murder of the daughter.); *see also United States v. Green*, 654 F.3d 637 (6th Cir. 2011); *United States v. Kehoe,* E.D. Ark. No. 97-243 (Defendant was convicted of the murder of a family of three—an Arkansas gun dealer, his wife, and their 8-year-old daughter—in furtherance of a white supremacist racketeering enterprise.  Along with her parents, Defendant disposed of the 8-

37

this sentencing factor's goal of "promot[ing] national uniformity in sentencing rather than uniformity among codefendants in the same case." *United States v. Patterson*, 755 F. App'x 238, 241 (4th Cir. 2018) (citation omitted), *cert. denied*, 139 S. Ct. 1576 (2019).[34]

year-old girl's body by dumping her in a swamp.); *see also United States v. Kehoe*, 310 F.3d 579 (8th Cir. 2002); *United States v. Candelario-Santana*, D.P.R. No. 3:09-CR-00427-JAF (Defendant, who already had 13 prior murder convictions, was convicted of 20 murders, including the October 17, 2009 "Tombola Massacre," where eight people were killed and twenty wounded in a shooting at a bar, including an unborn child.); *see also United States v. Candelario-Santana*, 834 F.3d 8 (1st Cir. 2016); *United States v. Pitera*, E.D.N.Y. No. 90-0424 (RR) (Defendant, a contract killer for the Mafia, was convicted of six murders. Several of the murders involved torturing the victims, dismembering their bodies, and burying them in a deserted marsh on Staten Island.); *see also United States v. Pitera*, 5 F.3d 624 (2d Cir. 1993); *United States v Tatum,* E.D. Tex. No. 2:99-CR-5 (Defendant, a member of the "Crips" gang, was convicted of murdering three people, one of whom was a 63-year-old retired minister whom defendant also kidnapped and murdered.); *see also United States v. Tatum*, 31 F. App'x 156 (5th Cir. 2001); *United States v. Williams*, S.D. Tex. No. 03-CR-221 (Defendant was convicted for his participation in an immigrant smuggling operation that led to 19 people's deaths by dehydration, overheating, and suffocation in the back of a truck trailer driven by him.); *see also United States v. Williams*, 610 F.3d 271, 274-75 (5th Cir. 2010); *United States v. Mayhew*, S.D. Ohio CR No. 02 03-165 (Defendant was convicted of murdering his ex-wife, her boyfriend, and defendant's own 18-year-old daughter, with whom defendant had an incestuous relationship.); *see also United States v. Mayhew*, 337 F. Supp. 2d 1048 (S.D. Ohio 2004).

34    Mr. Johnson's death sentences are also disparate to other federal defendants who committed similar crimes and have similar characteristics and history who did not receive the death penalty because of their intellectual disability. *See* Corey Johnson's IQ Scores Compared to IQ Scores of Federal Death Penalty Defendants Found Intellectually Disabled After Contested *Atkins* Hearings (the "IQ Chart") (Ex. 32). The IQ Chart does not include other federal defendants for whom the government did not authorize seeking the death penalty or in whose cases the government withdrew its death notice based on IQ scores similar to Mr. Johnson's IQ scores. *See* Death Penalty Information Center, *Defendants Whose Sentences Have Been Reduced Because of a Finding of "Mental Retardation" since Atkins v. Virginia (2002)* (July 19, 2012), http://www.deathpenaltyinfo.org/node/2395. Further, Mr. Johnson's IQ scores are similar to the Flynn-corrected IQ scores for three defendants whose *Atkins* claims were granted and who were found to be ineligible for the death penalty due to their intellectual disability after applying the Flynn effect. *United States v. Hardy*, 762 F. Supp. 2d 849, 857 (E.D. La. 2010); *United States v. Davis*, 611 F. Supp. 2d 472, 477-78 (D. Md. 2009); *United States v. Lewis*, No. 1:08 CR 404, 2010 WL 5418901, at *8-9 (N.D. Ohio Dec. 23, 2010).

### 8.      Mr. Johnson Committed His Crimes at 22 but Is Now 51

The age of the defendant is a factor that can be considered on a First Step Act motion. *See*, *e.g.*, *Brown*, 2020 WL 3106320, at \*4 ("Also weighing in the Court's consideration is that Defendant is now fifty-five years old . . . ."); *United States v. Fletcher*, No. CR TDC-05-0179-01, 2020 WL 2490025, at \*4 (D. Md. May 14, 2020) (finding a downward variance in sentencing appropriate "particularly in light of Fletcher's advanced age and health conditions").  It is also a factor the jury will consider in assessing the sentence.

First, Mr. Johnson committed these offenses at only 22 years old.  Even in 1993, the jurors on Mr. Johnson's case found his age at the time of the crime compelling.  Nine of 12 jurors found Mr. Johnson's youthfulness mitigating at sentencing.  Since then, there has been significant advancement in understanding how adolescent and young adult brains develop.  For instance, in a study funded by the Department of Justice, researchers opined that, "unlike logical-reasoning abilities, which appear to be more or less fully developed by age 15[,] psychological capabilities that improve decision making and regulate risk taking—such as impulse control, emotion regulation, delay of gratification, and resistance to peer influence—continue to mature well into young adulthood."  James C. Howell et al., Bulletin 5: *Young Offenders and an Effective Response in the Juvenile and Adult Justice Systems: What Happens, What Should Happen, and What We Need to Know* 17 (2013), https://www.ncjrs.gov/pdffiles1/nij/grants/242935.pdf.  The study found that "adolescents and young adults simply do not have the physiological capacity of adults over age 25 to exercise judgment or control impulses" and concluded that policymakers should implement a "categorical rule of youthfulness as a mitigating factor in sentencing" as opposed to "individualized discretion."  *Id.* at 18, 29.

39

Second, Mr. Johnson is now over 50, a critically important factor that demonstrates that he is unlikely to pose a risk of violence if his sentence were to be reduced and he remained in prison for the rest of his life.[35]  Studies of crime patterns generally demonstrate "that as a general matter, people age out of crime . . . .  Not only are most crimes committed by people under 30, but even the criminality that continues after that declines drastically after age 40 and even more so after age 50."  *Id.* at 17.  Lifers are often model inmates because nearly all criminals "mature out of lawbreaking before middle age."  Danielle Sered, Accounting for Violence: How to Increase Safety and Break Our Failed Reliance on Mass Incarceration at 20, Vera Institute of Justice (2017).  Research concludes that most people "age out of crime," meaning that "[f]or most crimes, the likelihood that someone will continue committing them once they hit 40 is negligible."  Rachel E. Barkow, *Prisoners of Politics: Breaking the Cycle of Mass Incarceration* 44-45 (2019).  Mr. Johnson is not a risk to fellow prisoners or prison officials; he does not pose a danger in prison.

### 9.    Mr. Johnson Has Demonstrated Sincere Remorse

Courts, including in the Fourth Circuit, have considered a petitioner's remorse in determining a First Step Act motion.  *See, e.g.*, *Hardnett*, 417 F. Supp. 3d at 743 (granting a sentence reduction and relying on, among other things, the petitioner's "letter describing remorse for his behavior sixteen years ago"); *United States v. Taylor*, No. 04 CR 495-38, 2020 WL 2476529, at *5 (N.D. Ill. May 13, 2020).

---

[35]  U.S. Sentencing Commission, *The Effects Of Aging On Recidivism Among Federal Offenders* at 22 (2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders.

40

Mr. Johnson is remorseful for taking the lives of his victims and those he injured, and the awful pain and loss he caused for their families.  However, due to his intellectual disability, the genuine remorse he feels may not be apparent to untrained observers.

> Due to their impairments, there [are] a host of reasons, including . . . a lesser ability (due to limited communications skills) to effectively testify on their own behalf, that "in the aggregate," [render] offenders with intellectual disability subject to an unacceptable "risk of wrongful execution" (*Atkins v. Virginia*, 2002, pp. 320-21).  The Court also noted the particular danger that their "demeanor may create an unwarranted impression of lack of remorse for their crimes," which could enhance the likelihood that the jury will impose the death penalty due to a belief that they pose a future danger (*Atkins v. Virginia*, 2002, p. 321).

John H. Blume & Karen L. Salekin, *The Death Penalty and Intellectual Disability*, *Analysis of Atkins Cases* 39, American Association on Intellectual and Developmental Disabilities (Edward A. Polloway ed., 2015).

Nevertheless, at his sentencing hearing, before this Court ordered the death sentences recommended by the jury, Mr. Johnson expressed, to the best of his ability given his significant limitations, his regret for his crimes and accepted responsibility:  "I'm sorry for the great number of people who are dead, you know, and there is a lot on us, and I feel we are no angels."

In an impromptu statement, Corey Johnson also extemporaneously addressed a group of high school students who neither his counsel nor he had known would be present during his sentencing immediately before the judge imposed his death sentence.  His lead trial attorney, Craig Cooley, recalls that Mr. Johnson gave a sincere, powerful, and moving statement to the high school students urging them not to commit crimes in any way or make the mistakes he had in his life.

> All crimes, crimes is not good, period.  All crimes, period, is not good.  Being the fact that you are here, take a lesson to what's going on.  I mean, you get old enough and realize that this is not the life that you are living.  I am unfortunate that I never had nobody.  That's no excuse . . . .  And I would hope you discuss this.  Because I would hate to see you all end up this way.  I would hate to see you have kids in this way, because this is not right.

6/1/93 Tr. 22#:1-14 (Ex. 33).  This evidence of Mr. Johnson's clear remorse is important to the sentencer's review.

* * *

The above summary demonstrates the type of evidence Mr. Johnson would present to the sentencer—here, the jury—to show that he should be sentenced to life in prison without parole rather than death.  In addition, under the First Step Act, that sentencer must consider post-conviction evidence as well all the evidence that was previously presented.  *See Chambers*, 956 F.3d at 674-75 (holding there is no limit to scope of evidence court can consider for purposes of First Step Act resentencing).  At the jury sentencing in 1993, some evidence was presented in mitigation, albeit through just two witnesses and a psychologist, as to some of the factors that influenced Mr. Johnson's upbringing.  Indeed, even based on that limited evidence, the jury unanimously recognized that the abuse; the absence of a stable home life; and the poverty and violence and the drug addictions that Corey grew up around all mattered.  *See* Special Findings at 7-11 (Ex. 1).[36]

Some but not all of the jurors found his low IQ,[37] as well as his youth and his adjustment to prison, mitigating.  *Id*.  What the jury knew at that point, which pales in comparison to his model prison record of more than twenty years, is proof that he can be kept secure and will not

---

[36] Jurors unanimously found eight separate mitigating factors related to the physical and emotional abuse, abandonment, and neglect he suffered as a child, his extremely violent, unstable, and neglectful family, the impoverished and violent environment in which he was raised, the extreme violence to which he was exposed as a child, and his "severe learning disability," among other mitigation findings by the jury.  *Id*.  Mr. Johnson will show that the last of those findings, that he had a "severe learning disability," was based on erroneous testimony that he was not "mentally retarded, "when the evidence he will now present shows that he is a person with intellectual disability.

[37] Of course, as noted above, the jurors were mistakenly not told that he is a person with intellectual disability, a bar to the death penalty.

42

create problems for staff or other prisoners.  If a jury that saw only a glimpse of Mr. Johnson's background found it mitigating, it is highly likely that the wealth of evidence that is available to be presented will convince the sentencer to reduce his punishment.

**E.     Mr. Johnson's §§ 846, 924(c), and 1959 Convictions Are Invalid and Impermissibly Influenced His Original Sentence**

Mr. Johnson was convicted of additional counts that, while not the subject of this motion, are invalid.  While the statutes and case law are clear that only a jury can reconsider Mr. Johnson's previous, death-sentenced counts, the First Step Act provides that the Court must reconsider the sentences for his non-capital counts and must decide whether to reduce them in light of all of the § 3553 factors.  In considering whether to reduce Mr. Johnson's non-capital sentences, which Mr. Johnson suggests the Court should do after the capital resentencing hearing, this Court should account for the effect of these improper convictions on the original sentencing determinations.

**1.     Mr. Johnson's § 846 Conviction Was Vacated**

Mr. Johnson was convicted of conspiracy to possess cocaine base with intent to distribute in violation of 21 U.S.C. § 846 (Count 1).  On appeal, however, the Fourth Circuit vacated Mr. Johnson's § 846 conviction because it violated the Constitution's double jeopardy clause, as it "is a lesser included offense within the § 848 CCE as charged." *Tipton*, 90 F.3d at 891.  Mr. Johnson should be resentenced without the influence of this superadded, unconstitutional conviction on the sentencing decision.

**2.     Mr. Johnson's § 924(c) Convictions Are Invalid**

Mr. Johnson was also convicted of five counts (Counts 9, 12, 15, 20, and 26) of using a firearm in relation to a crime of violence or a drug trafficking crime in violation of 21 U.S.C. § 924(c). Mr. Johnson has moved the Fourth Circuit for authorization to file a successive motion

43

pursuant to 28 U.S.C. § 2255 in this Court that will seek relief from these unconstitutional convictions in light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019), which he believes has rendered those § 924(c) convictions unconstitutional.  That pleading addresses Mr. Johnson's arguments in more detail.  Motion for Authorization to File a Successive Motion Pursuant to 28 U.S.C. § 2255(h)(2), *In re Johnson*, No. 20-8 (4th Cir. May 22, 2020).  On July 15, 2020, the Fourth Circuit ordered that motion placed in abeyance pending its upcoming decision in *United States v. Taylor*, No. 19-7616.  Order, *In re Johnson*, No. 20-8 (4th Cir. July 15, 2020).  *Taylor*, in turn, will address "whether an 18 U.S.C. § 924(c) conviction is subject to vacatur where the indictment charged multiple predicates, one of which is invalid." Order, *United States v. Taylor*, No. 19-7616 (4th Cir. Feb. 12, 2020).

**3.      Mr. Johnson's § 1959 Convictions Were Improperly Charged and Are Invalid**

Mr. Johnson was convicted of eight counts of murder "to maintain or increase position in racketeering enterprise" (Counts 10, 13, 14, 21-23, 27, and 28) and three counts of maiming "to maintain or increase position in racketeering enterprise" (Counts 16, 29, and 30), all in violation of 18 U.S.C. § 1959.  In the Second Superseding Indictment under which Mr. Johnson was tried, these § 1959 counts each defined the illegal racketeering enterprise simply as "dealing in narcotic or other dangerous drugs."  None of these counts identified a state or federal statute, and none referenced other counts in the indictment.  When instructing the jury, however, the trial court defined "racketeering activity" as "any act or threat involving *murder* or dealing in narcotic or other dangerous drugs."  Jury Instructions 232a (Ex. 34).

This instruction constructively amended the indictment.  Based upon the instruction, the jurors could have convicted Mr. Johnson of these § 1959 offenses based upon conduct that *was not charged in the indictment*: an enterprise whose racketeering activity was murder.

44

As the Fourth Circuit has recognized, a jury instruction which "broadens the bases for conviction beyond those charged in the indictment" creates "a constructive amendment" or "fatal variance" which so alters the indictment as "to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (internal quotations and citations omitted). Where constructive amendment occurs, "it cannot be said with certainty that with a new basis for conviction added, [the defendant] was convicted solely on the charge made in the indictment the grand jury returned." *Stirone v. United States*, 361 U.S. 212, 217 (1960). As such, constructive amendment "destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury." *United States v. Floresca*, 38 F.3d 706, 712 (4th Cir. 1994) (*en banc*).

Because such constructive amendments "violate[] the Fifth Amendment right to be indicted by a grand jury," the violation "is error *per se*, and must be corrected on appeal even when the defendant did not preserve the issue by objection." *Randall*, 171 F.3d at 203; *see also United States v. Whitfield*, 695 F.3d 288, 309 (4th Cir. 2012) (quoting *United States v. Robinson*, 627 F.3d 941, 958 (4th Cir. 2010)); *Floresca*, 38 F.3d at 712 (holding that a constructive amendment is "not subject to review for harmlessness"). "[E]ven if there was sufficient evidence to convict the defendant on the specific charges made out by the grand jury," reversal is required. *United States v. Nieves*, 108 F. App'x 790, 793 (4th Cir. 2004) (citing *Floresca*, 38 F.3d at 711).

Mr. Johnson did not challenge the constructive amendment of his § 1959 counts on appeal or in post-conviction proceedings. When resentencing him on his covered offenses, however, the appropriate sentencer can and should consider that these invalid convictions

45

influenced the original sentencing decisions—including his original jury's decision to sentence him to death.[38]

### 4.    Discounting These Convictions Should Result in a Sentence Less than Death

As the Supreme Court recognized in *United States v. Tucker*, "the real question" is "whether the sentence" for those convictions of Mr. Johnson that remain in place "might have been different if the [jury] had known that [Mr. Johnson's] previous convictions had been unconstitutionally obtained."  404 U.S. 443, 448 (1972).  In keeping with *Tucker,* courts have held that a defendant must be resentenced on any valid convictions "unless it can be ascertained from the record that a [jury's] sentence on a valid conviction was not affected" by invalid convictions.  *Bourgeois v. Whitley,* 784 F.2d 718, 721 (5th Cir. 1986); *see also Jerkins v. United States,* 530 F.2d 1203, 1204 (5th Cir. 1976) (same); *James v. United States,* 476 F.2d 936, 937 (8th Cir. 1973) (same).  That assessment must be guided by the principle that "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to *a special need for reliability* in the determination that death is the appropriate punishment in any capital case."  *Johnson v. Mississippi,* 486 U.S. 578, 584 (1988) (citation omitted) (emphasis added).  Indeed, because "[t]he decision to exercise the power of the State to execute a defendant is unlike any other decision citizens and public officials are called upon to make," the Supreme Court has made clear that "[t]he *possibility* that [a defendant's] jury conducted its task improperly certainly is great enough to require resentencing."  *Mills v. Maryland,* 486 U.S. 367, 383-84 (1988) (emphasis added).

---

[38]   The record shows that the government's penalty phase case almost exclusively relied on evidence from the guilt-innocence phase of the trial.  The government "did not put on a great deal of evidence" during the penalty phase. *See* 2/12/93 Trial Tr. 3883 (Ex. 35).  Rather, it urged the jury to rely upon its findings "in your guilt phase verdict." *Id.* at 3893.

46

Mr. Johnson has shown above why a jury must be empaneled since he meets all the requirements for reconsideration under the First Step Act.  The sentencer (here, the jury) will also have to determine whether to sentence Corey Johnson to life imprisonment without possibility of parole rather than death in light of the impact of these vacated convictions in addition to the affirmative evidence in mitigation, including his intellectual disability, described above.  Given that the original jury was told by the prosecution to rely upon its findings "in your guilt phase verdict," the harm from the jury's consideration of these invalid criminal charges in sentencing Mr. Johnson should not be underestimated.  It is not merely possible, but likely, that these invalid convictions profoundly affected the jury's decision to impose a sentence of death.  This provides yet another reason why reconsideration of Mr. Johnson's sentences is required.

## V.    CONCLUSION

Mr. Johnson requests that the Court first determine his eligibility for reconsideration and resentencing, which he respectfully submits is an issue of law.  As a matter of law, Mr. Johnson respectfully submits that Fourth Circuit precedent and other persuasive authority demonstrate that he was convicted of "covered offenses" and therefore is entitled to consideration of whether resentencing is appropriate in his case.

Furthermore, he respectfully submits that the case law is clear that reconsideration and sentencing of the counts for which he has been sentenced to death must be held before a jury, while the remaining, non-death sentenced counts, are for the Court's consideration.

For all the reasons set forth above, Mr. Johnson respectfully requests that the Court grant his motion.

Dated: August 19, 2020                    Respectfully submitted,

/s/ David E. Carney

David E. Carney, VA Bar #: 43914
Donald P. Salzman*
Lotus D. Ryan**
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com


Alexander C. Drylewski*
Judith A. Flumenbaum*
Skadden, Arps, Slate, Meagher & Flom, LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000

*Pending Application to Qualify as a Foreign
Attorney Under Local Criminal Rule 57.4


**Forthcoming Application for Full Admission


*Counsel for Corey Johnson*

48

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of August 2020, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will then send notification of such

filing to all parties and counsel included on the Court's Electronic Mail notice list.


/s/ David E. Carney
David E. Carney, VA Bar #: 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

**INDEX OF EXHIBITS TO MEMORANDUM IN SUPPORT OF
MOTION FOR A RECONSIDERATION OF SENTENCING HEARING
PURSUANT TO THE FIRST STEP ACT OF 2018**

| Exhibit No. | Description |
|---|---|
| 1 | Special Findings, Feb. 16, 1993 |
| 2 | 21 U.S.C. § 848 (1988) (repealed 2006) |
| 3 | Affidavit of Antoinette Joseph (Mr. Johnson's godmother), May 21, 2011 |
| 4 | Affidavit of Minnie Hodges (Mr. Johnson's maternal aunt), Apr. 30, 2011 |
| 5 | Gloria Caro, Reassessment Summary, May 21, 1982 |
| 6 | Affidavit of Robert Johnson (Mr. Johnson's half-brother), June 29, 2011 |
| 7 | Sundar Collimuttam, M.D., Psychiatrist, Pleasantville Cottage School Psychological Evaluation, Feb. 22, 1982 |
| 8 | 2/10/93 Trial Tr. 3547-3548, 3573-3574, 3578, 3582, 3584-85, 3607, 3619-21, 3682, 3684, 3690-92, 3694-95 |
| 9 | Lynn Polstein, Change in Permanency Plan, Apr. 13, 1984 |
| 10 | Christine Aaron, MSW Intern, Pleasantville Cottage School Current Assessment, Mar. 10, 1985 |
| 11 | Odette Noble, UCR Reassessment and Service Plan Review 6 Month, May 8, 1986 |
| 12 | Odette Noble, UCR Plan Amendment: Form E Final Discharge, Mar. 26, 1987 |
| 13 | Affidavit of David Washington (caretaker at Elmhurst), Mar. 1, 2012 |
| 14 | Odette Noble, UCR Plan Amendment: Form D Final Discharge, Feb. 23, 1987 |
| 15 | Odette Noble, Three Month Conference Note, Feb. 20, 1986 |
| 16 | Affidavit of Darold Brown, June 15, 2011 |
| 17 | Affidavit of Darnell Brown, Oct. 14, 2011 |
| 18 | 1/15/93 Trial Tr. 921:12-922:01 |
| 19 | Declaration of Ann Harding (staff member at Pleasantville), Nov. 21, 2011 |
| 20 | Declaration of Sarah West (Mr. Johnson's prison chaplain), Mar. 24, 2011 |
| 21 | Affidavit of Priscilla Hodges (Mr. Johnson's cousin), Apr. 30, 2011 |
| 22 | Affidavit of Julie McConnell, Mar. 23, 2011 |
| 23 | Affidavit of Odette Noble (Mr. Johnson's social worker), Dec. 1, 2011 |
| 24 | L. Larrecq, City of New York Human Resources Administration, History Sheet, Nov. 20, 1984 |
| 25 | Amira Offer, CSW, Caseworker, Pleasantville Diagnostic Center Psychosocial Summary, Mar. 15, 1982 |

| Exhibit No. | Description |
|---|---|
| 26 | Lynn Polstein, Request for Authorization and Approval for Care and Services, Apr. 16, 1984 |
| 27 | Declaration of Esther Johnson (Mr. Johnson's maternal grandmother), Apr. 30, 2011 |
| 28 | Affidavit of James Sykes (Mr. Johnson's father), May 17, 2011 |
| 29 | Declaration of Pastor Bobby West (Mr. Johnson's prison chaplain), Mar. 24, 2011 |
| 30 | Inmate Education Data Transcript, Mar. 25, 2012 |
| 31 | Motion to Have Defendant Declared Mentally Retarded, *United States v. Vernon Lance Thomas*, No. 3:92CR68 (E.D. Va. Apr. 15, 1993) |
| 32 | Corey Johnson's IQ Scores Compared to IQ Scores of Federal Death Penalty Defendants Found Intellectually Disabled After Contested Atkins Hearings |
| 33 | 6/1/93 Tr. 22#:1-14 |
| 34 | Jury Instructions 232a |
| 35 | 2/12/93 Trial Tr. 3883-94 |

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**



FEB 16 1993

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal Case No. 3:92CR68-02 |
| ) | |
| CORY JOHNSON ) | |
| a.k.a. "O," a.k.a. "CO" ) | |

## SPECIAL FINDINGS

### I.  Statutory Aggravating Factors:

**Category One:**  (21 U.S.C. § 848(n)(1))

WE, THE JURY, FIND as follows:

1A.  That defendant CORY JOHNSON intentionally killed the victim of the capital crime.

Proven to the jury's unanimous satisfaction, beyond a reasonable doubt:

As to Peyton Maurice Johnson .........    _Yes_
                                          (Yes or No)

As to Louis J. Johnson, Jr. ..........    _Yes_
                                          (Yes or No)

As to Bobby Long .....................    _Yes_
                                          (Yes or No)

As to Anthony Carter .................    _Yes_
                                          (Yes or No)

As to Dorothy Mae Armstrong ..........    _Yes_
                                          (Yes or No)

As to Curtis Thorne ..................    _Yes_
                                          (Yes or No)

As to Linwood Chiles .................    _Yes_
                                          (Yes or No)

**APP.68**

1B. That defendant CORY JOHNSON intentionally inflicted serious bodily injury which resulted in the death of the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
   beyond a reasonable doubt:

As to Peyton Maurice Johnson ........   <u>Yes</u>
                                         (Yes or No)

As to Louis J. Johnson, Jr. ..........   <u>Yes</u>
                                         (Yes or No)

As to Bobby Long .....................   <u>Yes</u>
                                         (Yes or No)

As to Anthony Carter .................   <u>Yes</u>
                                         (Yes or No)

As to Dorothy Mae Armstrong ..........   <u>Yes</u>
                                         (Yes or No)

As to Curtis Thorne ..................   <u>Yes</u>
                                         (Yes or No)

As to Linwood Chiles .................   <u>Yes</u>
                                         (Yes or No)

1C. That defendant CORY JOHNSON intentionally engaged in conduct intending that the victim of the capital crime be killed, or that lethal force be employed against the victim, which resulted in the death of the victim.

Proven to the jury's unanimous satisfaction,
   beyond a reasonable doubt:

As to Peyton Maurice Johnson ........   <u>Yes</u>
                                         (Yes or No)

As to Louis J. Johnson, Jr. ..........   <u>Yes</u>
                                         (Yes or No)

As to Bobby Long .....................   <u>Yes</u>
                                         (Yes or No)

As to Anthony Carter .................   <u>Yes</u>
                                         (Yes or No)

As to Dorothy Mae Armstrong ..........   <u>Yes</u>
                                         (Yes or No)

As to Curtis Thorne ..................   <u>Yes</u>
                                         (Yes or No)

As to Linwood Chiles .................   <u>Yes</u>
                                         (Yes or No)

2

428a

APP.69

1D.   That defendant CORY JOHNSON intentionally engaged in conduct
which defendant JOHNSON knew would create a grave risk of
death to a person, other than one of the participants in the
offense, and that such conduct resulted in the death of the
victim of the capital crime.

Proven to the jury's unanimous satisfaction,
     beyond a reasonable doubt:

As to Peyton Maurice Johnson ......... ___Yes___
                                         (Yes or No)

As to Louis J. Johnson, Jr. .......... ___Yes___
                                         (Yes or No)

As to Bobby Long ..................... ___Yes___
                                         (Yes or No)

As to Anthony Carter ................. ___Yes___
                                         (Yes or No)

As to Dorothy Mae Armstrong .......... ___Yes___
                                         (Yes or No)

As to Curtis Thorne .................. ___Yes___
                                         (Yes or No)

As to Linwood Chiles ................. ___Yes___
                                         (Yes or No)


Jurors:   At this point, review your findings on the Category One
          aggravating factors as to each individual victim.  Each
          victim represents a separate capital crime.  If, as to
          any victim, you have not found one of the Category One
          aggravating factors proven to your unanimous
          satisfaction, beyond a reasonable doubt, you must now
          complete Section A of the Decision Form for defendant
          CORY JOHNSON that relates to that victim.

          If, as to one or more victims, you have found a Category
          One aggravating factor proven to your unanimous
          satisfaction, continue to the Category Two factors on the
          following page.

3

APP.70

**Category Two**:    (21 U.S.C. §§ 848(n)(2)-(12))


WE, THE JURY, find as follows:


2A.    That defendant CORY JOHNSON committed the killing of the
       victim of the capital crime after substantial planning and
       premeditation.

       Proven to the jury's unanimous satisfaction,
           beyond a reasonable doubt:

       As to Peyton Maurice Johnson .........    __Yes__
                                                 (Yes or No)

       As to Louis J. Johnson, Jr. ..........    __Yes__
                                                 (Yes or No)

       As to Bobby Long .....................    __Yes__
                                                 (Yes or No)

       As to Anthony Carter .................    __Yes__
                                                 (Yes or No)

       As to Dorothy Mae Armstrong ..........    __Yes__
                                                 (Yes or No)

       As to Curtis Thorne ..................    __Yes__
                                                 (Yes or No)

       As to Linwood Chiles .................    __Yes__
                                                 (Yes or No)


2B.    That, in the commission of the capital crime, defendant CORY
       JOHNSON knowingly created a grave risk of death to one or more
       persons in addition to the victim of the capital crime.

       Proven to the jury's unanimous satisfaction,
           beyond a reasonable doubt:

       As to Curtis Thorne ..................    __Yes__
                                                 (Yes or No)

       As to Linwood Chiles .................    __Yes__
                                                 (Yes or No)


4


430a

APP.71

<u>Jurors</u>: At this point, again review your findings as to each individual victim.  If, as to any victim, you now have not found proven, to your unanimous satisfaction, both one of the Category One factors <u>and</u> one of the Category Two factors, you must complete Section A of the Decision Form for defendant CORY JOHNSON that relates to that victim, if you have not already done so.

If, however, you have found both a Category One factor and a Category Two factor proven to your unanimous satisfaction as to one or more victims (i.e., one or more capital crimes), continue your deliberations with regard to those particular capital crimes by proceeding to the section on the next page dealing with nonstatutory aggravating factors.

5

**431a**

**APP.72**

## II.  Nonstatutory Aggravating Factors:

WE, THE JURY, FIND as follows:


1.    That defendant CORY JOHNSON committed multiple murders.

Proven to the jury's unanimous satisfaction,
        beyond a reasonable doubt:

        _____Yes_____
        (Yes or No)


2.    That defendant CORY JOHNSON has a substantial criminal
history.

Proven to the jury's unanimous satisfaction,
        beyond a reasonable doubt:

        _____Yes_____
        (Yes or No)


3.    That defendant CORY JOHNSON seriously wounded two
individuals in the course of committing the CCE murders
for which he has been convicted.

Proven to the jury's unanimous satisfaction,
        beyond a reasonable doubt:

        _____Yes_____
        (Yes or No)


4.    That defendant CORY JOHNSON was knowingly and willfully
a member of a conspiracy which had as one of its goals
the murder of individuals other than those for which the
defendant was charged.

Proven to the jury's unanimous satisfaction,
        beyond a reasonable doubt:

        _____Yes_____
        (Yes or No)


Jurors:  Regardless of your findings as to these nonstatutory
aggravating factors, proceed to the next section
concerning mitigating factors.


6


432a


APP.73

### III.  Mitigating Factors:

WE, THE JURY, FIND as follows:

<u>Jurors</u>:    Consideration of the following mitigating factors is specifically provided for by statute.

1.    That defendant CORY JOHNSON's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge(s).

Number of jurors who so find,
by a preponderance of the evidence:
(Number)

2.    That defendant CORY JOHNSON is punishable as a principal (as defined in section 2 of Title 18 of the United States Code) in the offense(s), which was (were) committed by another, but defendant CORY JOHNSON's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge(s).

Number of jurors who so find,
by a preponderance of the evidence:
(Number)

3.    That defendant CORY JOHNSON could not reasonably have foreseen that his conduct in the course of the commission of the murder(s) would cause, or would create a grave risk of causing, death to any person.

Number of jurors who so find,
by a preponderance of the evidence:
(Number)

4.    That defendant CORY JOHNSON was youthful, although not under the age of 18.

Number of jurors who so find,
by a preponderance of the evidence:    $9$
(Number)

7

433a

APP.74

5. That defendant CORY JOHNSON did not have a significant prior criminal record.

   Number of jurors who so find,
   by a preponderance of the evidence: ___9___
   (Number)

6. That defendant CORY JOHNSON committed the offense(s) under severe mental or emotional disturbance.

   Number of jurors who so find,
   by a preponderance of the evidence: ___0___
   (Number)

7. That another defendant or defendants, equally culpable in the crime(s), will not be punished by death.

   Number of jurors who so find,
   by a preponderance of the evidence: ___12___
   (Number)

8. That the victim(s) consented to the criminal conduct that resulted in his (her) (their) deaths.

   Number of jurors who so find,
   by a preponderance of the evidence: ___12___
   (Number)

9. That the following other factors in the defendant's background or character mitigate against imposition of a death sentence:

   <u>Jurors</u>: The following are nonstatutory mitigating factors.

a) That defendant CORY JOHNSON was subjected to emotional and physical abuse, abandonment and neglect as a child, and was deprived of the parental guidance and protection that he needed.

   Number of jurors who so find,
   by a preponderance of the evidence: ___12___
   (Number)

b) That defendant CORY JOHNSON suffers from neurological impairments which were identified and which were not adequately treated or addressed when he was a child or adolescent.

   Number of jurors who so find,
   by a preponderance of the evidence: ___12___
   (Number)

8

434a

APP.75

c) That defendant CORY JOHNSON suffers from brain dysfunction which has gravely impaired his ability to function in the absence of strong support or guidance.

Number of jurors who so find,
by a preponderance of the evidence: _____8_____
(Number)

d) That defendant CORY JOHNSON was introduced to addictive drugs and alcohol while still a child.

Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

e) That defendant CORY JOHNSON has responded well to structured environments, and would likely make a reasonable adaptation to prison if he were sentenced to life imprisonment.

Number of jurors who so find,
by a preponderance of the evidence: _____7_____
(Number)

f) That defendant CORY JOHNSON's full scale I.Q. is 77.

Number of jurors who so find,
by a preponderance of the evidence: _____8_____
(Number)

g) That defendant CORY JOHNSON grew up in an impoverished and violent environment, and was exposed to extreme violence as a child and throughout his life.

Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

h) That defendant CORY JOHNSON suffers from an extremely severe learning disability which impairs his ability to use good judgment to control his behavior, and to understand and foresee the consequences of his actions.

Number of jurors who so find,
by a preponderance of the evidence: _____0_____
(Number)

9

435a

APP.76

i)   That defendant CORY JOHNSON suffers from a neurological impairment (brain damage) that impairs his ability to exercise good judgment, to control his behavior and to understand and foresee the consequences of his actions.

Number of jurors who so find,
by a preponderance of the evidence:       2
                                                   (Number)

j)   That defendant CORY JOHNSON was brought up in an extremely unstable, abusive and neglectful family.

Number of jurors who so find,
by a preponderance of the evidence:       12
                                                   (Number)

k)   That defendant CORY JOHNSON's severe learning disability affected his intelligence, his speech, and his ability to read, write and learn.  Those limitations impaired his ability to exercise good judgment and to control his behavior.

Number of jurors who so find,
by a preponderance of the evidence:       5
                                                   (Number)

l)   That defendant CORY JOHNSON had no parental involvement or support from or by his father.

Number of jurors who so find,
by a preponderance of the evidence:       12
                                                   (Number)

m)   That defendant CORY JOHNSON, if not sentenced to death, will be sentenced to life in prison without any possibility of parole.

Number of jurors who so find,
by a preponderance of the evidence:       12
                                                   (Number)

Jurors:   If any juror or jurors find(s) that a mitigating factor not listed above has been proven to exist by a preponderance of the evidence, please identify that mitigating factor on the following page, together with the number of jurors who so find.  Remember, however, that you need not be able to articulate a mitigating factor with specificity to consider it in your deliberations.

10

**436a**

**APP.77**

If additional space is needed, use the back of this page.

Factor: ~~XXXX~~ ~~X~~ The defendant's eagerness to be accepted by ~~the~~ others ~~XX~~ he was easily manipulated.

Number of jurors who so find,
by a preponderance of the evidence: _____11_____
(Number)

Factor: That the defendant's severe Leaning Disability, based on neurological impairment (brain damage could impair his ability to exercise good judgement.

Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

Factor: _____

_____

Number of jurors who so find,
by a preponderance of the evidence: _____
(Number)

Factor: _____

_____

Number of jurors who so find,
by a preponderance of the evidence: _____
(Number)

**Jurors:**   You have completed the Special Findings as to defendant CORY JOHNSON, and must now begin the process of weighing the aggravating and mitigating factors to determine if the death penalty is justified as to each capital crime for which this defendant has been convicted.  Remember, you are now considering only those capital crimes for which you have not already completed Section A of the Decision Form.  Upon completing your deliberations as to the remaining capital crimes charged to this defendant, complete Section B, C or D of the Decision Form for each crime as appropriate.

11

The date and your foreperson's signature should appear below, certifying that these are your Special Findings as to defendant CORY JOHNSON.


_____        _____
FOREPERSON'S SIGNATURE                  2/15/93
                                            DATE

# EXHIBIT 2

**APP.80**

USCA4 Appeal: 20-15    Doc: 15-2    Filed: 01/07/2021    Pg: 86 of 241

### (d) Penalty for providing or distributing controlled substance to underage person

Any person who violates subsection (a)(1) or (2) of this section [4]

   (1) by knowingly providing or distributing a controlled substance or a controlled substance analogue to any person under eighteen years of age; or

   (2) if the person employed, hired, or used is fourteen years of age or younger,

shall be subject to a term of imprisonment for not more than five years or a fine of not more than $50,000, or both, in addition to any other punishment authorized by this section.

### (e) Suspension of sentence; probation; parole

In any case of any sentence imposed under this section, imposition or execution of such sentence shall not be suspended and probation shall not be granted. An individual convicted under this section of an offense for which a mandatory minimum term of imprisonment is applicable shall not be eligible for parole under section 4202 of title 18 [5] until the individual has served the mandatory term of imprisonment as enhanced by this section.

### (f) Distribution of controlled substance to pregnant individual

Except as authorized by this subchapter, it shall be unlawful for any person to knowingly or intentionally provide or distribute any controlled substance to a pregnant individual in violation of any provision of this subchapter. Any person who violates this subsection shall be subject to the provisions of subsections (b), (c), and (e) of this section.

(Pub. L. 91–513, title II, § 405B, as added Pub. L. 99–570, title I, § 1102, Oct. 27, 1986, 100 Stat. 3207-10, and amended Pub. L. 100–690, title VI, §§ 6452(b)(1), 6459, 6470(d), Nov. 18, 1988, 102 Stat. 4371, 4373, 4378.)

#### REFERENCES IN TEXT

Section 4202 of title 18, referred to in subsec. (e), which, as originally enacted in Title 18, Crimes and Criminal Procedure, related to eligibility of prisoners for parole, was repealed and a new section 4202 enacted as part of the repeal and enactment of a new chapter 311 (§ 4201 et seq.) of Title 18, by Pub. L. 94-233, § 2, Mar. 15, 1976, 90 Stat. 219. For provisions relating to the eligibility of prisoners for parole, see section 4205 of Title 18. Pub. L. 98–473, title II, §§ 218(a)(5), 235(a)(1), (b)(1), Oct. 12, 1984, 98 Stat. 2027, 2031, 2032, as amended, provided that, effective on the first day of the first calendar month beginning 36 months after Oct. 12, 1984 (Nov. 1, 1987), chapter 311 of Title 18 is repealed, subject to remaining effective for five years after Nov. 1, 1987, in certain circumstances. See Effective Date note set out under section 3551 of Title 18.

#### AMENDMENTS

1988—Subsec. (a)(3). Pub. L. 100–690, § 6459, added par. (3).

Subsec. (c). Pub. L. 100–690, § 6452(b)(1), struck out "or convictions" after "a prior conviction" and inserted at end "Penalties for third and subsequent convictions shall be governed by section 841(b)(1)(A) of this title."

---

[4] So in original. Probably should be followed by a dash.

[5] See References in Text note below.

Subsec. (e). Pub. L. 100–690, § 6470(d), struck out "required by section 841(b) of this title" after "mandatory term of imprisonment".

#### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 841 of this title.

### § 846. Attempt and conspiracy

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

(Pub. L. 91–513, title II, § 406, Oct. 27, 1970, 84 Stat. 1265; Pub. L. 100–690, title VI, § 6470(a), Nov. 18, 1988, 102 Stat. 4377.)

#### AMENDMENTS

1988—Pub. L. 100–690 substituted "shall be subject te the same penalties as those prescribed for the offense" for "is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense".

### § 847. Additional penalties

Any penalty imposed for violation of this subchapter shall be in addition to, and not in lieu of, any civil or administrative penalty or sanction authorized by law.

(Pub. L. 91–513, title II, § 407, Oct. 27, 1970, 84 Stat. 1265.)

### § 848. Continuing criminal enterprise

#### (a) Penalties; forfeitures

Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 20 years and which may be up to life imprisonment, to a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $2,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual, and to the forfeiture prescribed in section 853 of this title; except that if any person engages in such activity after one or more prior convictions of him under this section have become final, he shall be sentenced to a term of imprisonment which may not be less than 30 years and which may be up to life imprisonment, to a fine not to exceed the greater of twice the amount authorized in accordance with the provisions of title 18 or $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual, and to the forfeiture prescribed in section 853 of this title.

#### (b) Life imprisonment for engaging in continuing criminal enterprise

Any person who engages in a continuing criminal enterprise shall be imprisoned for life and fined in accordance with subsection (a) of this section, if—

   (1) such person is the principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers, or leaders; and

USCA4 Appeal: 20-15    Doc: 15-2    Filed: 01/07/2021    Pg: 87 of 241

(2)(A) the violation referred to in subsection (d)(1) of this section involved at least 300 times the quantity of a substance described in subsection 841(b)(1)(B) of this title, or

(B) the enterprise, or any other enterprise in which the defendant was the principal or one of several principal administrators, organizers, or leaders, received $10 million dollars in gross receipts during any twelve-month period of its existence for the manufacture, importation, or distribution of a substance described in section 841(b)(1)(B) of this title. ·

### (c) "Continuing criminal enterprise" defined

For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—

(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

### (d) Suspension of sentence and probation prohibited

In the case of any sentence imposed under this section, imposition or execution of such sentence shall not be suspended, probation shall not be granted, and the Act of July 15, 1932 (D.C. Code, secs. 24-203—24-207), shall not apply.

### (e) Death penalty

(1) In addition to the other penalties set forth in this section—

(A) any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death; and

(B) any person, during the commission of, in furtherance of, or while attempting to avoid apprehension, prosecution or service of a prison sentence for, a felony violation of this subchapter or subchapter II of this chapter who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of any Federal, State, or local law enforcement officer engaged in, or on account of, the performance of such officer's official duties and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

(2) As used in paragraph (1)(b),[6] the term "law enforcement officer" means a public servant authorized by law or by a Government agency or Congress to conduct or engage in the prevention, investigation, prosecution or adjudication of an offense, and includes those engaged in corrections, probation, or parole functions.

### (g) [7] Hearing required with respect to death penalty

A person shall be subjected to the penalty of death for any offense under this section only if a hearing is held in accordance with this section.

### (h) Notice by Government in death penalty cases

(1) Whenever the Government intends to seek the death penalty for an offense under this section for which one of the sentences provided is death, the attorney for the Government, a reasonable time before trial or acceptance by the court of a plea of guilty, shall sign and file with the court, and serve upon the defendant, a notice—

(A) that the Government in the event of conviction will seek the sentence of death; and

(B) setting forth the aggravating factors enumerated in subsection (n) of this section and any other aggravating factors which the Government will seek to prove as the basis for the death penalty.

(2) The court may permit the attorney for the Government to amend this notice for good cause shown.

### (i) Hearing before court or jury

(1) When the attorney for the Government has filed a notice as required under subsection (h) of this section and the defendant is found guilty of or pleads guilty to an offense under subsection (e) of this section, the judge who presided at the trial or before whom the guilty plea was entered, or any other judge if the judge who presided at the trial or before whom the guilty plea was entered is unavailable, shall conduct a separate sentencing hearing to determine the punishment to be imposed. The hearing shall be conducted—

(A) before the jury which determined the defendant's guilt;

(B) before a jury impaneled for the purpose of the hearing if—

(i) the defendant was convicted upon a plea of guilty;

(ii) the defendant was convicted after a trial before the court sitting without a jury;

(iii) the jury which determined the defendant's guilt has been discharged for good cause; or

(iv) after initial imposition of a sentence under this section, redetermination of the sentence under this section is necessary; or

(C) before the court alone, upon the motion of the defendant and with the approval of the Government.

---

[6] So in original. Probably should be "(1)(B),".

[7] So in original. Section does not contain a subsec. (f), see 1988 Amendment note below.

(2) A jury impaneled under paragraph (1)(B) shall consist of 12 members, unless, at any time before the conclusion of the hearing, the parties stipulate with the approval of the court that it shall consist of any number less than 12.

**(j) Proof of aggravating and mitigating factors**

Notwithstanding rule 32(c) of the Federal Rules of Criminal Procedure, when a defendant is found guilty of or pleads guilty to an offense under subsection (e) of this section, no presentence report shall be prepared. In the sentencing hearing, information may be presented as to matters relating to any of the aggravating or mitigating factors set forth in subsections (m) and (n) of this section, or any other mitigating factor or any other aggravating factor for which notice has been provided under subsection (h)(1)(B) of this section. Where information is presented relating to any of the aggravating factors set forth in subsection (n) of this section, information may be presented relating to any other aggravating factor for which notice has been provided under subsection (h)(1)(B) of this section. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. Any other information relevant to such mitigating or aggravating factors may be presented by either the Government or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials, except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The Government and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any of the aggravating or mitigating factors and as to appropriateness in that case of imposing a sentence of death. The Government shall open the argument. The defendant shall be permitted to reply. The Government shall then be permitted to reply in rebuttal. The burden of establishing the existence of any aggravating factor is on the Government, and is not satisfied unless established beyond a reasonable doubt. The burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless established by a preponderance of the evidence.

**(k) Return of findings**

The jury, or if there is no jury, the court, shall consider all the information received during the hearing. It shall return special findings identifying any aggravating factors set forth in subsection (n) of this section, found to exist. If one of the aggravating factors set forth in subsection (n)(1) of this section and another of the aggravating factors set forth in paragraphs (2) through (12) of subsection (n) of this section is found to exist, a special finding identifying any other aggravating factor for which notice has been provided under subsection (h)(1)(B) of this section, may be returned. A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established for purposes of this subsection, regardless of the number of jurors who concur that the factor has been established. A finding with respect to any aggravating factor must be unanimous. If an aggravating factor set forth in subsection (n)(1) of this section is not found to exist or an aggravating factor set forth in subsection (n)(1) of this section is found to exist but no other aggravating factor set forth in subsection (n) of this section is found to exist, the court shall impose a sentence, other than death, authorized by law. If an aggravating factor set forth in subsection (n)(1) of this section and one or more of the other aggravating factors set forth in subsection (n) of this section are found to exist, the jury, or if there is no jury, the court, shall then consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death. Based upon this consideration, the jury by unanimous vote, or if there is no jury, the court, shall recommend that a sentence of death shall be imposed rather than a sentence of life imprisonment without possibility of release or some other lesser sentence. The jury or the court, regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence and the jury shall be so instructed.

**(l) Imposition of sentence**

Upon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death. Otherwise the court shall impose a sentence, other than death, authorized by law. A sentence of death shall not be carried out upon a person who is under 18 years of age at the time the crime was committed. A sentence of death shall not be carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability—

(1) cannot understand the nature of the pending proceedings, what such person was tried for, the reason for the punishment, or the nature of the punishment; or

(2) lacks the capacity to recognize or understand facts which would make the punishment unjust or unlawful, or lacks the ability to convey such information to counsel or to the court.

**(m) Mitigating factors**

In determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider mitigating factors, including the following:

(1) The defendant's capacity to appreciate the wrongfulness of the defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

(2) The defendant was under unusual and substantial duress, regardless of whether the

USCA4 Appeal: 20-15     Doc: 15-2     Filed: 01/07/2021     Pg: 89 of 241

duress was of such a degree as to constitute a defense to the charge.

(3) The defendant is punishable as a principal (as defined in section 2 of title 18) in the offense, which was committed by another, but the defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

(4) The defendant could not reasonably have foreseen that the defendant's conduct in the course of the commission of murder, or other offense resulting in death for which the defendant was convicted, would cause, or would create a grave risk of causing, death to any person.

(5) The defendant was youthful, although not under the age of 18.

(6) The defendant did not have a significant prior criminal record.

(7) The defendant committed the offense under severe mental or emotional disturbance.

(8) Another defendant or defendants, equally culpable in the crime, will not be punished by death.

(9) The victim consented to the criminal conduct that resulted in the victim's death.

(10) That other factors in the defendant's background or character mitigate against imposition of the death sentence.

**(n) Aggravating factors for homicide**

If the defendant is found guilty of or pleads guilty to an offense under subsection (e) of this section, the following aggravating factors are the only aggravating factors that shall be considered, unless notice of additional aggravating factors is provided under subsection (h)(1)(B) of this section:

(1) The defendant—

(A) intentionally killed the victim;

(B) intentionally inflicted serious bodily injury which resulted in the death of the victim;

(C) intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim;

(D) intentionally engaged in conduct which—

(i) the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and

(ii) resulted in the death of the victim.

(2) The defendant has been convicted of another Federal offense, or a State offense resulting in the death of a person, for which a sentence of life imprisonment or a sentence of death was authorized by statute.

(3) The defendant has previously been convicted of two or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury upon another person.

(4) The defendant has previously been convicted of two or more State or Federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance.

(5) In the commission of the offense or in escaping apprehension for a violation of subsection (e) of this section, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense.

(6) The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.

(7) The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value.

(8) The defendant committed the offense after substantial planning and premeditation.

(9) The victim was particularly vulnerable due to old age, youth, or infirmity.

(10) The defendant had previously been convicted of violating this subchapter or subchapter II of this chapter for which a sentence of five or more years may be imposed or had previously been convicted of engaging in a continuing criminal enterprise.

(11) The violation of this subchapter in relation to which the conduct described in subsection (e) of this section occurred was a violation of section 845 of this title.

(12) The defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim.

**(o) Right of defendant to justice without discrimination**

(1) In any hearing held before a jury under this section, the court shall instruct the jury that in its consideration of whether the sentence of death is justified it shall not consider the race, color, religious beliefs, national origin, or sex of the defendant or the victim, and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, may be. The jury shall return to the court a certificate signed by each juror that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, may be.

(2) Not later than one year from November 18, 1988, the Comptroller General shall conduct a study of the various procedures used by the several States for determining whether or not to impose the death penalty in particular cases, and shall report to the Congress on whether or not any or all of the various procedures create a significant risk that the race of a defendant, or the race of a victim against whom a crime was committed, influence the likelihood that defendants in those States will be sentenced to

USCA4 Appeal: 20-15 Doc: 15-2 Filed: 01/07/2021 Pg: 90 of 241

death. In conducting the study required by this paragraph, the General Accounting Office shall—

(A) use ordinary methods of statistical analysis, including methods comparable to those ruled admissible by the courts in race discrimination cases under title VII of the Civil Rights Act of 1964 [42 U.S.C. 2000e et seq.];

(B) study only crimes occurring after January 1, 1976; and

(C) determine what, if any, other factors, including any relation between any aggravating or mitigating factors and the race of the victim or the defendant, may account for any evidence that the race of the defendant, or the race of the victim, influences the likelihood that defendants will be sentenced to death. In addition, the General Accounting Office shall examine separately and include in the report, death penalty cases involving crimes similar to those covered under this section.

**(p) Sentencing in capital cases in which death penalty is not sought or imposed**

If a person is convicted for an offense under subsection (e) of this section and the court does not impose the penalty of death, the court may impose a sentence of life imprisonment without the possibility of parole.

**(q) Appeal in capital cases; counsel for financially unable defendants**

(1) In any case in which the sentence of death is imposed under this section, the sentence of death shall be subject to review by the court of appeals upon appeal by the defendant. Notice of appeal must be filed within the time prescribed for appeal of judgment in section 2107 of title 28. An appeal under this section may be consolidated with an appeal of the judgment of conviction. Such review shall have priority over all other cases.

(2) On review of the sentence, the court of appeals shall consider the record, the evidence submitted during the trial, the information submitted during the sentencing hearing, the procedures employed in the sentencing hearing, and the special findings returned under this section.

(3) The court shall affirm the sentence if it determines that—

(A) the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor; and

(B) the information supports the special finding of the existence of every aggravating factor upon which the sentence was based, together with, or the failure to find, any mitigating factors as set forth or allowed in this section.

In all other cases the court shall remand the case for reconsideration under this section. The court of appeals shall state in writing the reasons for its disposition of the review of the sentence.

(4)(A) Notwithstanding any other provision of law to the contrary, in every criminal action in which a defendant is charged with a crime which may be punishable by death, a defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services at any time either—

(i) before judgment; or

(ii) after the entry of a judgment imposing a sentence of death but before the execution of that judgment;

shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with paragraphs (5), (6), (7), (8), and (9).

(B) In any post conviction proceeding under section 2254 or 2255 of title 28 seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with paragraphs (5), (6), (7), (8), and (9).

(5) If the appointment is made before judgment, at least one attorney so appointed must have been admitted to practice in the court in which the prosecution is to be tried for not less than five years, and must have had not less than three years experience in the actual trial of felony prosecutions in that court.

(6) If the appointment is made after judgment, at least one attorney so appointed must have been admitted to practice in the court of appeals for not less than five years, and must have had not less than three years experience in the handling of appeals in that court in felony cases.

(7) With respect to paragraphs (5) and (6), the court, for good cause, may appoint another attorney whose background, knowledge, or experience would otherwise enable him or her to properly represent the defendant, with due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation.

(8) Unless replaced by similarly qualified counsel upon the attorney's own motion or upon motion of the defendant, each attorney so appointed shall represent the defendant throughout every subsequent stage of available judicial proceedings, including pretrial proceedings, trial, sentencing, motions for new trial, appeals, applications,[6] for writ of certiorari to the Supreme Court of the United States, and all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant.

(9) Upon a finding in ex parte proceedings that investigative, expert or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or sentence, the court shall authorize the defendant's attorneys to obtain such services on behalf of the defendant and shall order the payment of fees and ex-

---

[6] So in original. The comma probably should not appear.

USCA4 Appeal: 20-15    Doc: 15-2    Filed: 01/07/2021    Pg: 91 of 241

penses therefore, under paragraph (10). Upon a finding that timely procurement of such services could not practicably await prior authorization, the court may authorize the provision of and payment for such services nunc pro tunc.

(10) Notwithstanding the rates and maximum limits generally applicable to criminal cases and any other provision of law to the contrary, the court shall fix the compensation to be paid to attorneys appointed under this subsection and the fees and expenses to be paid for investigative, expert, and other reasonably necessary services authorized under paragraph (9), at such rates or amounts as the court determines to be reasonably necessary to carry out the requirements of paragraphs (4) through (9).

**(r) Refusal to participate by State and Federal correctional employees**

No employee of any State department of corrections or the Federal Bureau of Prisons and no employee providing services to that department or bureau under contract shall be required, as a condition of that employment, or contractual obligation to be in attendance at or to participate in any execution carried out under this section if such participation is contrary to the moral or religious convictions of the employee. For purposes of this subsection, the term "participation in executions" includes personal preparation of the condemned individual and the apparatus used for execution and supervision of the activities of other personnel in carrying out such activities.

(Pub. L. 91–513, title II, § 408, Oct. 27, 1970, 84 Stat. 1265; Pub. L. 98–473, title II, §§ 224(b), formerly § 224(c), 305, Oct. 12, 1984, 98 Stat. 2030, 2050; Pub. L. 99–570, title I, §§ 1005(b)(2), 1252, 1253, Oct. 27, 1986, 100 Stat. 3207–6, 3207–14; Pub. L. 100–690, title VI, § 6481, title VII, § 7001, Nov. 18, 1988, 102 Stat. 4382, 4387.)

### REFERENCES IN TEXT

The Act of July 15, 1932 (D.C. Code, secs. 24–203–24–207), referred to in subsec. (d), is act July 15, 1932, ch. 492, 47 Stat. 696, as amended, which appears in sections 24–203 to 24–209 of Title 24, Prisoners and Their Treatment, and section 22–2601 of Title 22, Criminal Offenses, of the District of Columbia Code.

The Federal Rules of Criminal Procedure, referred to in subsec. (j), are set out in the Appendix to Title 18, Crimes and Criminal Procedure.

The Civil Rights Act of 1964, referred to in subsec. (o)(2)(A), is Pub. L. 88–352, July 2, 1964, 78 Stat. 252, as amended. Title VII of the Civil Rights Act of 1964 is classified generally to subchapter VI (§ 2000e et seq.) of chapter 21 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 2000a of Title 42 and Tables.

### AMENDMENTS

1988—Subsec. (a). Pub. L. 100–690, § 6481(a), increased minimum term of imprisonment for first violations to 20 from 10 years and for subsequent violations to 30 from 20 years.

Subsecs. (c), (d). Pub. L. 100–690, § 6481(b), redesignated subsecs. (d) and (e) as (c) and (d), respectively.

Subsec. (e). Pub. L. 100–690, § 7001(a)(2), added subsec. (e). Former subsec. (e) redesignated (d).

Pub. L. 100–690, § 7001(a)(1), which directed redesignation of former subsec. (e) as (f), could not be executed because of prior redesignation of former subsec. (e) as (d) by Pub. L. 100–690, § 6481(b), which resulted in there not being a subsec. (f).

Subsecs. (g) to (r). Pub. L. 100–690, § 7001(b), added subsecs. (g) to (r).

1986—Subsec. (a). Pub. L. 99–570, § 1252, substituted "to a fine not to exceed the greater of that authorized in accordance with the provisions of title 18 or $2,000,000 if the defendant is an individual or $5,000,000 if the defendant is other than an individual," for "to a fine of not more than $100,000," and "to a fine not to exceed the greater of twice the amount authorized in accordance with the provisions of title 18 or $4,000,000 if the defendant is an individual or $10,000,000 if the defendant is other than an individual," for "to a fine of not more than $200,000,".

Subsecs. (b) to (e). Pub. L. 99–570, § 1253, added subsec. (b) and redesignated former subsecs. (b) and (c) as (d) and (e), respectively, which resulted in there not being a subsec. (c).

1984—Subsec. (a). Pub. L. 98–473, § 305, struck out par. (1) designation, substituted references to section 853 of this title for references to paragraph (2) in two places, and struck out par. (2) which related to forfeitures to the United States by any person convicted under par. (1).

Subsec. (d). Pub. L. 98–473, § 305(b), struck out subsec. (d) relating to jurisdiction of courts of the United States.

Subsec. (e). Pub. L. 98–473, § 224(b), as renumbered by Pub. L. 99–570, § 1005(b)(2), which directed the amendment of subsec. (c) of this section by striking out "and section 4202 of title 18 of the United States Code", was executed by striking out that language in subsec. (e) to reflect the probable intent of Congress and the intervening amendment by Pub. L. 99–570, § 1253, which redesignated subsec. (c) as (e). See 1986 Amendment note above.

### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by section 224(b) of Pub. L. 98–473 effective Nov. 1, 1987, and applicable only to offenses committed after the taking effect of such amendment, see section 235(a)(1) of Pub. L. 98–473, set out as an Effective Date note under section 3551 of Title 18, Crimes and Criminal Procedure.

### GAO STUDY OF COST OF EXECUTIONS

Section 7002 of title VII of Pub. L. 100–690 provided that:

"(a) STUDY.—No later than three years after the date of the enactment of this Act [Nov. 18, 1988], the Comptroller General shall carry out a study to review the cost of implementing the procedures for imposing and carrying out a death sentence prescribed by this title [see Tables for classification].

"(b) SPECIFIC REQUIREMENT.—Such study shall consider, but not be limited to, information concerning impact on workload of the Federal prosecutors and judiciary and law enforcement necessary to obtain capital sentences and executions under this Act [see Short Title note set out under section 1501 of this title].

"(c) SUBMISSION OF REPORT.—Not later than four years after date of the enactment of this Act [Nov. 18, 1988], the Comptroller General shall submit to Congress a report describing the results of the study."

### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 853 of this title; title 18 section 1956.

**§ 849. Repealed. Pub. L. 98–473, title II, § 219(a), Oct. 12, 1984, 98 Stat. 2027**

### EFFECTIVE DATE OF REPEAL; OFFENSES COMMITTED PRIOR TO NOV. 1, 1987

Section 235(a)(1) of Pub. L. 98–473, set out as an Effective Date note under section 3551 of Title 18, Crimes and Criminal Procedure, provided that the repeal of this section is effective Nov. 1, 1987, and ap-

# EXHIBIT 3

## AFFIDAVIT

State of New York　　　　）
　　　　　　　　　　　　）ss:
County of New York　　　）

ANTOINETTE DANIELS JOSEPH, being duly sworn, deposes and says:

1.　　I reside at 819 FDR Drive, Apt. 10H, New York, NY 10009.

2.　　I was born on ██████████

3.　　I am Corey Johnson's godmother, and have known him since his birth. I knew Corey's mother, Emma Lee Johnson, for more than 30 years, from the time we met when we were both about 12 years old until Emma's death in 1995. For most of that time, we were very close friends.

4.　　Corey and my daughter Courtney are about the same age. During his childhood and adolescence, Corey would often spend time at my house, which was a "hang out" for neighborhood children and teenagers. When Corey was a child, Emma frequently asked me to care for Corey at my house when she wanted to go out and party and use drugs or when she could not handle taking care of Corey, often leaving him overnight or entire weekends.

5.　　I visited Corey and his mother at their home on many different occasions.

6.　　Corey also lived with me and my children during several summers in his youth.

1

## Early Relationship with Emma Johnson

7.      I first met Corey's mother Emma when I was in the fifth or sixth grade at PS 64, located on 9th Street and Avenue B in Manhattan. Emma attended an elementary school located nearby on Avenue A. Soon after we met Emma and I became very close friends. We both attended the same junior high school, JHS 71, located on 6th Street and Avenue B, and the same high school, Brandeis High School, located on 84th Street between Amsterdam and Columbus, both in Manhattan.

8.      Emma and I were very close throughout our school years. Emma's sister Minnie was much older than she. Emma and I acted more like sisters than friends. We would frequently dress alike and wear the same hairstyle. We had the same friends. In fact, people thought we were sisters. Even though we grew apart at times in our lives as we grew older, we always knew we could count on each other.

9.      Throughout school, Emma was a low average student who received grades in the 60s, while I received higher grades, generally in the 80s. I helped Emma with her schoolwork throughout school. Emma did not read very well, even as a high school student. Neither Emma's parents nor her sister Minnie seemed to be well-educated people.

10.     Emma was a follower and was easily influenced by others. When I would occasionally play hooky from school, Emma would too. As another example, I became pregnant when I was 17 years old. Shortly after I told Emma that I was pregnant, Emma became pregnant. Emma told me that she had tried to become pregnant because I was pregnant. I was surprised Emma had become pregnant, because she was from a very strict family.

2

**APP.89**

11. In June 1968, I gave birth to my daughter Courtney.

12. About four months later, in November 1968, Emma gave birth to Corey.

13. I completed high school after the birth of my daughter but, to my knowledge, Emma dropped out of high school after giving birth to Corey and never graduated.

**Emma Johnson's Alcohol and Drug Use, and Impact on Her Parenting**

14. In our teenage years, Emma, I, and our friends all partied and experimented with alcohol and drugs. However, Emma did not seem to recognize the same limits that I did.

15. Whereas we all would go to dance clubs, Emma would frequently stay out to go to "after hour spots" – bars that remained open for her and some other patrons after they were closed to the general public for the night.

16. We all experimented with alcohol and some drugs. However, while I was sometimes called "chicken" because I did not try as many drugs as the others, Emma began to get heavily involved with alcohol and drugs.

17. My pregnancy indicated to me that I needed to get my life together. Emma's pregnancy with Corey did not seem to give her the same indication.

18. Indeed, Emma became very wild around the time she met Robert Butler, shortly after Corey was born. She was continuing to party and use drugs even after the birth of her second child, Robert.

19. After she and Robert Butler separated, Emma appeared to be using drugs heavily. In addition, at that time, I would frequently see Emma with large

3

APP.90

quantities of drugs on her person, leading me to believe that she was a drug dealer. She was keeping company with drug dealers, hustlers, and pimps during this time. In my view, Corey and Robert could not have been unaware of Emma's involvement with drugs during this time.

20.     Emma's partying, drinking and drug use left her with little time to care for her children. As a mother, she provided the basics for her children but not much more. She would provide clothes and food for them but did not have time to talk to them or provide emotional support.

## Emma's Involvement in Volatile and Abusive Relationships

21.     Emma did not provide a stable home life for Corey or her younger son, Robert.

22.     During Corey's childhood, Emma was involved in relationships with several different men, many (if not all) of whom were verbally or physically abusive to her.

23.     Emma also moved around from place to place frequently when Corey and Robert were young children.

24.     Emma's relationship with Corey's father, James Sykes, was short and, for a long time after that, James seemed not to be around Corey very much.

25.     Shortly after Corey was born, Emma became involved with Robert Butler, with whom she later had her son Robert. Emma was still in a relationship with Robert Butler as of 1973 (the year I got married) and I believe their relationship continued for several more years.

4

APP.91

26.    During the course of their relationship, Emma and Robert Butler had arguments to which Corey and Robert were exposed. While Robert Butler treated both Corey and Robert well, he was verbally abusive to Emma.

27.    Later, near the end of the 1970s, Emma became involved for several years with a man named Bobby Koger, who was physically abusive towards her.

28.    Some time after Emma started dating Bobby, Emma came to stay with me for about a month in order to escape from Bobby Koger. Bobby was very abusive—both physically and verbally. I even saw bruises on her when she came to stay with me.

29.    As a teenager, Corey told me that he did not like the men with whom his mother was keeping company. Robert was tougher, had thicker skin, and was better able than Corey to cope with Emma's men and the life she lived. Corey appeared to have more difficulty dealing with the situation.

30.    The last time I saw Emma, shortly before her death at about 45 years old, she had visible bruises on her body.

### Corey Has Always Been "Slow" and his Abilities Limited

31.    My impression of Corey during the entire time I knew him was that he was very slow.

32.    His slowness cut across different parts of his life. He had a general inability to learn, reading problems, and difficulty socializing at times and, as a result of all of these problems, was teased by other children at school. I also remember Corey stuttering. He never seemed to get the help he needed to deal with any of these problems.

5

33. When he was as old as 8 or 9, Corey had a problem with bedwetting. Corey's mother Emma would complain to me that Robert (who was two years younger than Corey) was not wetting the bed, while Corey was. I would try to reassure her that Corey would grow out of it eventually.

34. Corey had a lisp when he was younger and children would tease him about it.

35. Corey's was very slow in learning when he attended school. Even though his brother Robert was younger than Corey, Robert always seemed more advanced than Corey while they were growing up. Emma also would frequently remark that Robert was smarter than Corey, even though he was younger.

36. While Emma would criticize Corey's intelligence and abilities in school, I never witnessed her try to help Corey with his school work. As I mentioned above, Emma was not a very good student in school either and perhaps she did not really know how to help him.

37. My daughter Courtney would frequently help Corey with his homework. In high school, Courtney would help him in Math, English and the rest of his subjects. I particularly recall that Corey would become frustrated when he was not able to understand Math problems.

38. During all the time I spent with Corey, I never saw him read anything. My understanding was that his reading ability was very poor.

39. Whenever Corey went to the store in my neighborhood (as a child and even later as a teenager), he always went with Courtney. I am not at all confident that he could have handled even relatively simple transactions on his own. Indeed,

6

APP.93

people took advantage of him because he would readily give his money away. If someone asked Corey for money, he would not hesitate to give away the money he had on him or do whatever he could to help.

40. Emma's Physical Abuse and Other Mistreatment of Corey

41. Emma was physically abusive with Corey and Robert. There were several occasions when Emma would lose her temper and hit Corey.

42. For example, as I mentioned above, Corey would sometimes wet the bed at his home, even as an older child of 8 or 9. Emma would usually not even change the sheet and simply let Corey sleep in the soiled sheets.

43. To avoid Emma getting angry, Corey would sometimes try to hide the wet sheets. Emma would become angry when she discovered his soiled sheets in the closet and would then yell and beat Corey.

44. Emma struck Corey several other times as well.

45. When Corey was 9 or 10, Emma once became so angry with Corey that she hit him on his head with a high heel shoe. Emma called me on the phone after she hit Corey; she still seemed very angry with Corey and said she was going to "kill" him.

46. After that incident, Corey came to live with me for six or seven months because Emma realized that she was out of control. But Corey would always insist on going back to his mother, because he wanted to be with her.

47. Emma also said hurtful things to and about Corey.

7

48.     On more than one occasion, Emma told me that she was going to kill both Corey and Robert because they were getting on her nerves.  I was concerned enough about her seriousness that I asked Emma to bring the children to my house.

49.     Emma would also frequently tell me she wanted to get rid of both Corey and Robert because she was tired of them.  I believe that Corey overheard these conversations.

50.     There were times when Emma would also yell at Corey and tell him that Robert was doing better than him.

51.     Throughout his childhood and teenage years, Corey was generally very meek, mild, and calm.  By contrast, his brother Robert appeared to me to be tough and mean.

52.     Corey seemed very unhappy as a child.  I could see the unhappiness in Corey when I went to visit him at Emma's house.

53.     Part of Corey's unhappiness seemed came from his mother's treatment of him, as well as her general instability, drug use and involvement with abusive men.

54.     Corey was very upset when Emma went to jail and blamed her boyfriend at the time for getting her arrested.  Around this time he told me that he wished I was his mother.

55.     I believe that Corey's unhappiness also stemmed from his father not being much of a presence in his life.  Corey's brother Robert spent time with his father, Robert Butler.  Indeed, Robert's father seemed to be around more, while Corey's father

APP.95

James seemed to be constantly in and out of prison and absent for long periods of time. I believe that Corey may have been jealous of Robert's relationship with his father.

### Corey's Difficulties in Social Situations

56. Both as a child and as a teenager, Corey was withdrawn socially.

57. He would have friends but did not appear to be close with any of them.

58. As a teenager, Corey spent a lot of time with Courtney and her friends. But sometimes, when Courtney's friends would visit the house while Corey was there, Corey would retreat to my room, as opposed to hanging out with the others – even though they were his own age.

### Corey's Being Turned Over to the Administration for Children's Services

59. When Corey was 13, Emma turned him over to the Administration of Children Services. I believe this was due to her drug use and inability to care for her children.

60. During the period that followed Corey's placement, I lost contact with both Emma and Corey for awhile, although I eventually regained contact with both of them.

### Corey's Late High School Years and Subsequent Involvement in Hustling

61. When Corey was attending high school in Queens, I was living in Queens and reconnected with him.

62. During this time, I could see that Corey lacked confidence, especially around girls he did not know well. He would mainly spend time with my daughter Courtney and her friends.

9

APP.96

63.    Corey began hustling in the streets at the time he started attending high school in Queens.  After he left high school, he began spending more time on the streets.  Corey would sometimes stay with Emma, but Emma was moving around a lot and living with different people, so Corey was effectively on his own after he turned 18.

64.    I believe Corey turned to a life of hustling on the streets because his options were limited and he needed money to feed and clothe himself, not because he liked it.

65.    I think that Corey did not know any other path – his mother, the men with whom she kept company, and his brother Robert had all been involved with hustling drugs.  I tried to tell Corey that hustling was not right for him.  While I could imagine Robert doing it, I thought Corey was too soft.

66.    When both were in their late teens, Robert was, in my impression, smarter, tougher and more of a bully than Corey.  Corey was more gentle and therefore less well able to function on the street.

67.    On the streets, people readily took advantage of Corey because of his easygoing nature and the fact that he had difficulty dealing with money.

68.    Corey was easily influenced by his brother, even as an adult.  Robert would get Corey to do things or go to certain places even if he did not want to.  For example, I had the feeling that Robert would have Corey act as his backup when they were buying drugs.

69.    The last time I had contact with Corey was when he was about 19 and living in New Jersey.

10

70.     I am not aware of Corey ever having a job.  I believe that he would have had difficulty in filling out a job application or passing a job test.

### Corey's Demeanor in My Presence

71.     I remember Corey as always being respectful and calm despite his difficult and unstable home life, including the family's moving from place to place, his constantly changing schools, his mother's drug use, his mother's physical and emotional abuse by boyfriends, and his own physical abuse at his mother's hands, as well as his later being sent away by his mother.

72.     Corey always showed love and affection towards me with hugs and kisses.  He was never angry or violent in my presence.  He was very pleasant and gentle. I have never had a problem with Corey.

STATE OF NEW YORK

COUNTY OF NEW YORK

SWORN TO BEFORE ME THIS

MAY 21 2011

Sworn to before me on this
_____ day of May, 2011

_____
Notary Public

ANTOINETTE DANIELS JOSEPH

IRA MARK LIPPELL
Notary Public, State of New York
No. 60-4652304
Qualified in Westchester County
Certificate filed in New York County
Commission Expires March 30, 2015

11

**APP.98**

USCA4 Appeal: 20-15     Doc: 15-2          Filed: 01/07/2021      Pg: 104 of 241

# EXHIBIT 4

## AFFIDAVIT

State of New York        )
                         ) ss:
County of New York       )

MINNIE HODGES, being duly sworn, deposes and says:

1.    I reside at 2133 Madison Avenue, Apartment 5C, New York, New York 10037.

2.    I am Corey Johnson's aunt. My younger sister, Emma Lee Johnson, who is now deceased, was Corey's mother.

3.    I have known Corey Johnson since he was born. I regularly cared for Corey as a child. He often spent long periods of time at my home.

### My Background

4.    I was born on ███████ in Sumpter, South Carolina. I am the oldest of three children. My younger sister, Emma Lee Johnson, was Corey Johnson's mother. My biological father died of pneumonia when I was very young, long before Emma was born. My mother remarried, and Emma's father was my stepfather. I lived with my mother and stepfather, Love Johnson, in South Carolina until I was about 9-10 years old, when they left South Carolina and came to New York to work. Emma was about 3 years old at that time.

5.    After my mother and stepfather left South Carolina, Emma, my brother, and I lived with our grandmother in South Carolina. My mother and stepfather visited us in South Carolina and when in New York, they sent us boxes of clothing and belongings, as well as money to take care of ourselves.

6.    I, along with Emma and my brother, were reunited with my mother and stepfather when I was a teenager. My stepfather had a drinking problem which was

exacerbated when they moved to New York, and eventually caused my mother to separate from him. Before my mother left him, he was physically abusive to her and was violent towards her in front of me and my siblings. Being the eldest, I felt I had to protect my mother and would stay by her side or try to get in between them to prevent her from getting hurt when they fought. I remember trying to protect my mother by hitting Love with a broom, my fists, a mop- anything I could find to get him off her, especially when he was choking her. I was often scared to go to school because I did not want to leave my mother by herself with Love. My brother would also physically intervene in their fights. Emma would just cry when our parents were fighting.

### Corey's Childhood

7.    I was close with my sister Emma since she was born.

8.    Emma started abusing drugs, particularly crack and cocaine, when she was a teenager. I now believe that she was using drugs while she was pregnant with Corey and her younger son Robert, although I did not know of her drug abuse until after she gave birth to Corey.

9.    Emma lived with our mother when Corey was born, but then moved out and lived with Robert Butler, the father of her younger son, Robert. She worked and had good jobs, but would always eventually lose her jobs due to her drug use.

10.    I took care of Corey and Robert a great deal when they were babies and on and off during their pre-teen lives. Emma would initially ask me to watch them for a day and this would turn into an overnight, the weekend, and sometimes the entire summer.

11.    In addition to the many occasions where I took care of Corey and Robert at their house when Emma would leave for undetermined amounts of time, Corey

2

**APP.101**

and Robert often used to sleep over at my house when they were young children. Emma would call me and ask if I wanted to take care of my nephews, and would ask me to come and get them or else Emma would bring them to my house herself. I would always volunteer to take Corey and Robert because I knew Emma did not have patience with them and did not provide them with the attention they needed. When Corey and Robert would come over, the two boys would sleep in my daughters' room in twin beds, and my daughters would sleep in the living room. I noticed that both Corey and Robert were nervous most of the time, and they behaved differently from my children.

12. In addition to leaving Corey and Robert with me, Emma did not spend much time with her sons. She would ask me and others, such as her friend Antoinette Joseph, to come to her house to watch Corey and Robert when she left to use drugs and be on her own, or else she would ask me and others to take her sons for sleepovers or weekends. Emma started doing this almost immediately after Robert was born, and this behavior lasted until Corey was old enough to take care of himself.

13. I witnessed behavior that led me to believe Emma was often getting high while caring for her children. The first time I witnessed Emma using drugs was shortly after Corey was born. I saw Emma sniffing white powder, and afterwards, she was behaving strangely and had bloodshot eyes.

14. Emma's drug addiction became significantly worse as soon as Robert was born, and continued to get progressively worse as her two sons were growing up. I used to go to Emma's house to baby-sit Corey and Robert, and Emma's eyes would be bloodshot and she would be behaving strangely.

APP.102

15. Moreover, Emma often used drugs with a friend named Carol. Carol would bring her son over to play with Corey and Robert, and Emma and Carol would get high together in the other room.

16. On many occasions, my mother and I would speak to Emma about her drug addiction and try to convince her to get help.

17. When Emma's drug use escalated, she spent even less time with her sons and became more and more frustrated with taking care of them. Her main interest was in getting high and running around with different men.

18. Emma lived with different men. She was on and off of welfare, but during her times of heavy drug use, she was unable to hold on to her money. She would try to take care of her children, but there were many times when she was not providing them with care.

19. Corey told me that Emma always had visitors in their apartment and music would be played so loudly that Corey could not sleep at night. He said that he was tired at school during the day and couldn't concentrate on his schoolwork.

20. She would sometimes show up at our mother's house high on drugs. We were very worried about her and about how she was treating Corey and Robert.

21. On a number of occasions, Emma would call me, crying, and I would go over to her apartment to care for her. Her mood was always very sad and depressed.

22. I continued to have Corey and Robert stay over at my house often, particularly for weekends, and was worried when they would return back to their home with Emma.

4

APP.103

23.    Emma did not have much patience with Corey and Robert and she hit them and cursed and yelled at them quite often.  I was particularly worried about Emma's treatment of Corey.  I saw Emma hit and smack Corey many times.  Corey also told me on many occasions how his mother beat him and hit him on the head.  I would tell Emma not to hit Corey on the head.

24.    One time, Emma and Corey separately told me that she had beaten Corey with her high heel shoe because he either got left back in school or failed in school.  I was very furious with Emma for having hit Corey with her shoe, and my mother and I told her never to hit Corey again.

25.    I had a feeling that one of Emma's boyfriends, Bobby Koger, also was hitting Corey and Robert, but when I asked Emma, she immediately denied it.  I saw bruises on the boys' bodies when they spent the night at my house, but they told me that these were bruises from when they were playing.  I was very concerned that the boys were being abused, and I told my mother about it.  Emma continued to deny that anything was wrong.  I also saw bruises on Emma, who would wear shades to cover bruises on her face.  On one occasion, I went over to Emma's apartment after she called me and I remember almost getting into a fight with Bobby for hitting Emma.  I felt bad for my sister but was angry with her for subjecting her sons to such a bad environment.

26.    When I asked Corey and Robert how Bobby Koger treated them, they told me that he was very mean.  I believed that Emma or Bobby (or both of them) instructed the boys not to say anything more than that about how they were being treated.

27.    I was very concerned when Emma would take Corey and Robert back to their apartment, as I did not know whether they would be taken care of, and I worried about them having food to eat and being in a safe environment.  Corey appeared

5

sad a great deal of the time. Sometimes when I would ask him why he was so sad, he would tell me that he did not like his mother around "those kind of people." He would also tell me how it upset him to see his mother using drugs.

28. Corey and Robert would often get locked out of their apartment because they didn't have a key and Emma would not be at home when they came back from school. They would usually hang around the neighborhood until she returned home.

29. Sometimes when at my house, Corey would not go outside with the other children, but wanted to stay in the house with me. Corey appeared so sad that I figured something must have happened at home prior to his coming over to my house. When he would first arrive at my home at the beginning of a weekend, he would remain very quiet and look very sad. Towards the end of the weekend, his mood would lighten because my children would engage him in playing and going outside.

30. Even so, I cannot recall ever seeing Corey genuinely happy.

31. He would cry when his mother left him at my house, and Emma would tell him that if he did not stop she would spank him, or she would hit him on the hand and tell him to be quiet. Robert would also cry, and sometimes he would wake up in the middle of the night from crying in his sleep.

32. I tried to keep them at my house as much as possible so they wouldn't have to stay with Emma while she was using drugs and creating a bad environment for them.

33. Corey used to tell me that he didn't think his mother loved him. He would say this to me quite often – at least every other time he visited me. I would reassure him that Emma did love him, but Corey would overhear conversations when Emma would complain to me about how her children didn't listen and she wanted to put

6

APP.105

them away.  I told Emma that neither Corey nor Robert behaved badly or gave me a hard time, and that they generally listened to me.  Corey used to ask to live with me, but he also told me that he was concerned about his mother's well being and did not want to be away from her.  He told me that he didn't like the people his mother associated with. He seemed very conflicted and depressed when he thought about his mother.

### Corey was slower than other children

34.    When Corey and Robert would stay with me, I spent more time with Corey because he appeared slower than Robert and my two daughters, Queenie and Pricilla.  When my daughters read books, they were able to read better than Corey even though Priscilla was the same age as Corey and Queenie was younger.  Corey had difficulty reading and my daughters would help him to figure out how to read the words. Priscilla would tell me how Corey did not know how to read little words.  Corey was also not able to work out math problems that my daughters were able to do by themselves.  It would take much longer to explain things to Corey than to the rest of the children, and he could not do ordinary things that the others did, such as telling the time.  Even when Corey first started walking, he was not on the same level as the other children his own age.

35.    I told Emma to take him to the doctor when he was younger to have him evaluated.  Emma told me that she took Corey to the pediatrician and was told he was fine.  I explained to Emma that she had to disclose to the doctor what she observed in Corey, or the doctor would not know to look for the symptoms.

36.    From the time Corey was a young child until he was about ten years old, Corey would wet the bed in his sleep.  His clothing and the bed would be wet in the morning.  He would come to me in the morning with an embarrassed look on his face,

APP.106

and I would reassure him that it was okay. I would remind him not to drink too many fluids before going to bed, and I started to wake him up in the middle of the night to use the bathroom. Corey's mother would yell at Corey and complain about his bedwetting. I repeatedly told my sister not to yell at him, and that yelling would only make the problem worse. I tried to remind her that the doctor told us that Corey would eventually grow out of this problem, but my sister continued to yell at him. I never knew whether the sheets were washed at Corey's house after he wet the bed. My sister was not fond of housework or cooking, and I am not sure whether Corey washed the bed sheets himself or continued to sleep in the soiled bedding.

37. Corey had difficulty following certain instructions, and I would have to repeat myself many times before he could comprehend what I was directing him to do. Sometimes he appeared to be puzzled or mixed up when I would tell him certain things.

38. At age 10-13, he couldn't prepare a meal or even a simple sandwich. By age 15, he only improved a little in that he didn't make as much of a mess when preparing simple meals. I didn't give him much to do because he couldn't do it. I pampered him a lot because he needed more attention. Even when he made a sandwich, I'd have to stand there and check.

39. In early adolescence, he would switch topics during a conversation, so if you asked him a question, he would answer about something else.

40. When he was about 12-13 years old, I would send him to the store either by himself of with my children to buy snacks such as cookies, potato chips, soda or juice. I never gave him more than $5.00. I would usually give him change or dollar bills. Sometimes I told him exactly how much change he was supposed to get back from the

APP.107

clerk, and other times I didn't tell him anything.  Sometimes he would count the change in front of me, and he would always make mistakes and be a few cents short.  I would correct him, even though I noticed that the other children who were the same age were able to count small change all the time without making any mistakes.  Corey struggled and always made mistakes.

41.    Corey used to tell me that the children in school teased him a great deal about his academic abilities.  He would often look very sad when he told me about this.  I told him that some children cannot do as well as others, but he should keep trying to do the best he could.

42.    At age 14, his only interest was watching cartoons on television and playing by himself.  He would bring his homework with him when he spent the weekends at my house, but my children would get frustrated when they tried to help him because he struggled with his work.  My daughters would tell Corey how to say a word and he would immediately forget when he was shown the word again.  My daughters were frustrated that they would have to repeat the same thing to Corey over and over again.  They would show him how to do something, but if they moved on to something else, he would forget what he previously learned.  They complained that he had difficulty reading even the small words, and was not able to work out math problems that they were able to do on their own.  Sometimes Corey overheard my daughters complaining, or they would tease him for being slow to his face, and he would feel really badly about himself.

43.    Corey could not keep up academically with the other children, and I felt very sorry for him.

9

APP.108

44.    Other people took advantage of him, such as taking his lunch money.  People found it easy to take advantage of him all throughout his childhood and teen years.  He wouldn't understand others but didn't want to look bad, so other children easily tricked and manipulated him.

45.    Corey would get very frustrated or upset, and almost have a tantrum.  He could not express himself in a mature fashion.  He would cry much longer than the other children.  He would get very upset when he was teased by the other children.  When Corey would interact with the other children, he would mainly play by himself, but the other children would tease him and try to take his ball away from him.  If my children or Robert didn't intervene, the children in the neighborhood would bully him and take his ball or candy away from him.  He could not defend himself or stick up for himself without protection, and chose to play by himself most of the time instead.

46.    Based on my relationship and observations of Corey since he was a young child through elementary school, I believe that Corey was seriously disabled and slower than others.  He was always embarrassed by his slowness, and wanted to be considered a strong man who would have done what others told him to be more accepted in the group.

_Minnie Hodges_
MINNIE HODGES

Sworn to before me on this
30th day April, 2011

_Delores Green_
Notary Public

DELORES GREEN
Notary Public, State of New York
No. 31-4527811
Qualified in New York County
Commission Expires _Aug. 31, 2014_

10

# EXHIBIT 5

| DSS-3402 (3/81) NYC | CASE NAME Emma Lee Johnson | | | CHILD'S NAME Corey Johnson | | Date of Birth |
|---|---|---|---|---|---|---|
| **VISITATION PLAN** | COMPLETED BY Gloria Caro | | DATE 5/21/82 | SSC NUMBER: 4766716-28 | | |
| | AGENCY/DISTRICT JCCA/PCS | | | LOCAL DISTRICT/AGENCY USE | | |

- Complete a Visitation Plan for each child placed or to be placed in foster care.
- Complete according to the time requirements for the Initial Service Plan and revise at each Service Plan Review.

| PERMANENCY GOAL | | | | | ANT. COMP. DATE |
|---|---|---|---|---|---|
| Return to parent. | | | | | 8/83 |

**1. VISITATION SINCE LAST PLAN** (If child has been in placement).

| DATE | LOCATION | PARTICIPANTS | DATE | LOCATION | PARTICIPANTS |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | PLEASE SEE CALENDAR OF CONTACTS | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**2. DESCRIBE QUALITY OF VISITS,** highlighting positive and negative factors. If family is not meeting visitation goals, explain reasons and efforts to encourage visiting.

Child has visited once since entering Pleasantville Cottage School on May 7 to May 9, 1982.

Mother states that Corey can only visit maternal grandfather's home because of her own highly problematic living situation. She states that the man she lives with is drug addicted and involved in a drug scene which would be detrimental to Corey.

**3. PLAN FOR VISITATION IN NEXT PERIOD.** Include name of participants, frequency and location. Explain any changes in visitation plan.

Corey will visit mother according to our visiting calendar twice a month. Visits will take place at maternal grandfather's, Mr. Lou Johnson, 727 Schneider Avenue, Brooklyn.

He has lived with his grandfather on and off during difficulties at home. Mother states grandfather is functioning well and that she will spend time with Corey there.

*(Use reverse if additional space is required)*

**APP.111**

USCA4 Appeal: 20-15    Doc: 15-2    Filed: 01/07/2021    Pg: 117 of 241

| DSS-3403-F (3/81) NYC **GOAL AND OBJECTIVE REVIEW FAMILY** | CASE NAME Emma Lee Johnson | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| | COMPLETED BY Gloria Caro | DATE 5/21/82 | |
| [X] 90 Days  [X] 6 Months  [ ] Change in Program Status | AGENCY/DISTRICT JCCA/PCS | | |

Complete a Family Goal and Objective Review for the family of each child receiving foster care, preventive services for children, adoption or Child Protective Services at the time of the Service Plan Review. Service Plan Reviews occur as follows:

- 1st Service Plan Review 60 days from establishment of the Initial Service Plan.
- 2nd Service Plan Review 6 months from application for service for non-placement Child Protective Service case, 6 month from an indicated case determination.
- Subsequent Service Plan Reviews every 6 months thereafter.
- Change in Service Status - Prior to the status change.

LIST DATE, PLACE AND PARTICIPANTS FOR ALL FACE-TO-FACE CONTACTS WITH NATURAL FAMILY DURING REVIEW PERIOD. State Client's response to contacts with case planner, If unsatisfactory, state efforts to further involve family.

We met with ;Mrs. Johnson on Corey's admission date and on May 4, 1982. She cancelled on May 18, 1982. Mrs. Johnson appears to be cooperative. States she wishes to keep appointments in the office not in home. She is a chronically depressed and dependent woman who is currently overwhelmed by being unable to extricate herself from a relationship with a drug addicted man. She has incurred many debts and now works two jobs, finding little time to visit her children. She has a younger son, Robert, age 11, who is in placement at Children's Village.

---

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|

**1**

CCRS CODES
Client Goal
OBJ. OBJ. OBJ.
Serv. Serv. Serv.

Goal:    Mrs. Johnson will work at making decisions in her relationship with Mr. Kraeger to be less destructive or to extricate herself from it.

Mrs. Johnson has stated that her relationship with Mr. Kraeger is destructive to her and her children. She states Corey cannot visit her in her home because he is drug addicted, part of the drug scene and at times violent, she takes little responsibility herself. Casework service will explore referral for individual treatment.

---

| Goal No. | Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|

**2**

CCRS CODES
Client Goal
OBJ. OBJ. OBJ.
Serv. Serv. Serv.

Goal:    Mrs. Johnson will be consistent in her contact with Corey.

Mrs. Johnson states she now works at two jobs, has little time to visit PCS, but will allow home visits to her father. It is early in our contact. However, Mrs. Johnson has placed many obstacles to visiting Corey. Worker will offer flexible schedule and transportation and funds to cover cost of visits.

APP.112

Page

| DSS-3403-F(3/81) NYC **GOAL AND OBJECTIVE REVIEW FAMILY** | CASE NAME. Emma Lee Johnson | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| | COMPLETED BY Gloria Caro | DATE 5/21/82 | |

| Goal No. / Objective No. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
|---|---|
| 3 CCRS CODES Client Goal OBJ. OBJ. OBJ. Serv. Serv. Serv. | **Goal:** Mrs. Johnson will understand importance of having regular contact with Corey. She has parcelled out responsibility for each of her children. Robert, Corey's brother, visits his own father. Corey is to visit grandfather. Casework contact will establish whether Mrs. Johnson can be more available to her children. |
| Goal No. / Objective No. CCRS CODES Client Goal OBJ. OBJ. OBJ. Serv. Serv. Serv. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
| Goal No. / Objective No. CCRS CODES Client Goal OBJ. OBJ. OBJ. Serv. Serv. Serv. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |
| Goal No. / Objective No. CCRS CODES Client Goal OBJ. OBJ. OBJ. Serv. Serv. Serv. | Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service. |

**APP.113**

| DSS-3403-C (3/81) NYC | CASE NAME | | CHILD'S NAME | Date of Birth |
|---|---|---|---|---|
| **GOAL AND OBJECTIVE** | Emma Lee Johnson | | Corey Johnson | |
| **REVIEW** | COMPLETED BY | DATE | SSC NUMBER: | |
| **CHILD** | Gloria Caro | 5/21/82 | 4766716-28 | |
| ☒ 90 Days  ☒ 6 Months | AGENCY/DISTRICT | | LOCAL DISTRICT/AGENCY USE | |
| ☐ Change in Program Status | JCCA/PCS | | | |

Complete a Child Goal and Objective Review for each child receiving foster care, preventive services for children, adoption or Child Protective Service at the time of the Service Plan Review. Service Plan Reviews occur as follows:

- 1st Service Plan Review - 60 days from establishment of the Initial Service Plan.
- 2nd Service Plan Review - 6 months from application for services or from an indicated case determination for non-placement Child Protective Service cases.
- Subsequent Service Plan Reviews - every 6 months thereafter.
- Change in Service Status - prior to the status change.

| **PERMANENCY GOAL PROGRESS REPORT** | | YES | NO | Describe the effect progress in the achievement of the family's and child's goals and objectives has had on the accomplishment of this child's permanency goal. |
|---|---|---|---|---|
| PERMANENCY GOAL CHANGED | | | X | |

Child will return to mother. Caseworker will explore Mrs. Johnson's ability to offer consistent care and take responsibility for Corey. At our Diagnostic Center Mrs. Johnson was believed to be overwhelmed by her problems and unavailable to Corey emotionally at this time. Corey's problems of severe learning deficiencies, truancy and depressed affect would be aided by institutional care with an on-grounds school until his mother is able to take better hold of her life.

For child in foster boarding home or agency operated boarding home, list date, place and participants for all face-to-face contacts between child and caseworker during review period.

Corey is seen once a week for casework services.

| Goal No. | Objective No. | Include services given and client's response to services, client progress towards meeting goal and reason for major changes or deletions in goal or service. |
|---|---|---|
| 1 | | Goal: Corey will attend school every day and will improve academic functioning. |
| **CCRS CODES** | | |
| Client Goal | | Corey is a 13 year old boy who is reading on a 2nd grade level and has |
| OBJ.  OBJ.  OBJ. | | severe learning deficiencies and some organic impairment. He will attend |
| | | our on-grounds special school in a class of 8 children and receive special |
| Serv.  Serv.  Serv. | | remediation in reading and math. Class attendance will be monitored. |
| | | Close communication between school and cottage is maintained. |

**APP.114**

Page 2

DSS-3403-C (3/81) NYC

**GOAL AND OBJECTIVE REVIEW CHILD**

CASE NAME. Emma Lee Johnson

COMPLETED BY Gloria Caro

DATE 5/21/82

LOCAL DISTRICT/AGENCY USE

---

Goal No. 2

Objective No.

CCRS CODES

Client Goal

OBJ. OBJ. OBJ.

Serv. Serv. Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

Goal: Corey will feel safe at Cottage School.

Corey has had a chaotic home life for the past four years. He is slow to understand things. Cottage staff will make special effort to acclimate him to routine and provide a predictable environment for him.

---

Goal No. 3

Objective No.

CCRS CODES

Client Goal

OBJ. OBJ. OBJ.

Serv. Serv. Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

Goal: Corey will discuss and come to understand his family history.

Corey is confused about relationships in his family since he was recently told that his brother's father was not his.

Joint casework discussion with mother to help clarify these issues.

---

Goal No. 4

Objective No.

CCRS CODES

Client Goal

OBJ. OBJ. OBJ.

Serv. Serv. Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

Goal: Corey will understand his reasons for placement.

Corey believes he was bad and does not fully understand his mother's inability to cope with the many complicated aspects of her life.

Casework after Corey has developed some beginnings of a relationship will help him clarify these issues.

---

Goal No.

Objective No.

CCRS CODES

Client Goal

OBJ. OBJ. OBJ.

Serv. Serv. Serv.

Include services given and client's response to services, client progress toward meeting goal and reason for major changes or deletions in goal or service.

**APP.115**

| | | CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|---|
| **COMPREHENSIVE SERVICE PLAN FAMILY** | | Emma Lee Johnson | | |
| | | COMPLETED BY | DATE | |
| | | Gloria Caro | 5/21/82 | |
| | | AGENCY/DISTRICT | | |
| ☒ 90 Days ☒ 6 Months ☐ Change in Program Status | | JCCA/PCS | | |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE 10/ |
|---|---|---|---|
| | 1 | Mrs. Johnson will work at making decisions in her relationship with Mr. Krae[g | |

| | | OBJECTIVE/CLIENT TASK | | | METHOD/SERVICE TASK |
|---|---|---|---|---|---|
| CCRS CODE | Obj. No. A | Mrs. Johnson will consider individual treatment to help resolve relationship conflicts. | CCRS CODE | | Caseworker will offer referral for individual treatment. |
| CCRS CODE | Obj. No. | | CCRS CODE | | |
| CCRS CODE | Obj. No. | | CCRS CODE | | |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE 10/82 |
|---|---|---|---|
| | 2 | Mrs. Johnson will be consistent in her contact with Corey. | |

| | | OBJECTIVE/CLIENT TASK | | | METHOD/SERVICE TASK |
|---|---|---|---|---|---|
| CCRS CODE | Obj. No. A | Mrs. Johnson will plan specific times she can see Corey. | CCRS CODE | | Caseworker will help her arrange visits to suit her work schedule. |
| CCRS CODE | Obj. No. B | Mrs. Johnson will be available when Corey visits his grandfather. | CCRS CODE | | Casework discussion with mother. |
| CCRS CODE | Obj. No. | | CCRS CODE | | |

**APP.116**

| DSS-3404-F (3/81) NYC | CASE NAME | | | LOCAL DISTRICT/AGENCY USE | Pa |
|---|---|---|---|---|---|
| COMPREHENSIVE SERVICE PLAN FAMILY | Emma Lee Johnson | | | | |
| | COMPLETED BY | | DATE | | |
| | Gloria Caro | | 5/21/82 | | |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE 9/8 |
|---|---|---|---|
| | 3 | Mrs. Johnson will understand importance of having regular contact with Corey. | |

| | OBJECTIVE/CLIENT TASK | | METHOD/SERVICE TASK |
|---|---|---|---|
| CCRS CODE | Goal No. | CCRS CODE | |
| CCRS CODE | Goal No. | CCRS CODE | |
| CCRS CODE | Goal No. | CCRS CODE | |

**DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN**

Corey and Mrs. Johnson have participated in formulating service plan and visiting in a joint interview.

**AGENCY CONTACT PLAN WITH NATURAL PARENTS.** Include frequency and location of planned interviews.

We shall see Mrs. Johnson at our New York City office. She states she is working at two jobs and feels home visits in her home would not be feasible.

**CLIENT CONCURRENCE (Optional)**

I understand that all information pertaining to my case, including this Plan for Service developed by my worker and me. is confidential.

I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including the opportunity for an Administrative Review and Fair Hearing.

My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.
Goals and objective review and formulation of comprehensive service plan for family and child took place at treatment conference in which the unit administrator, psychiatrist, psychologist, child care workers, and school representative participated.

| SIGNATURE OF CLIENT, Parent or Guardian | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| X | | X | |
| CASE PLANNER'S SIGNATURE | DATE | SUPERVISOR'S SIGNATURE | DATE |
| X _Gloria Caro_ | 5/24/52 | X _Dolores Ford_ | / / |

APP.117

| DSS-3404-C (3/81) NYC | CASE NAME Emma Lee Johnson | | CHILD'S NAME Corey Johnson | Date of Birth |
|---|---|---|---|---|
| COMPREHENSIVE SERVICE PLAN CHILD | COMPLETED BY Gloria Caro | DATE 5/21/82 | SSC NUMBER: 4766716-28 | |
| XX 90 Days   XX 6 Months   ☐ Change in Program Status | AGENCY/DISTRICT JCCA/PCS | | LOCAL DISTRICT/AGENCY USE | |

| CCRS CODE | PERMANENCY GOAL | ANT. COMP. DATE 8/83 |
|---|---|---|
| | Return to parent. | |

| CCRS CODE | GOAL NO. | GOAL | ANT. COMP. DATE 10/82 |
|---|---|---|---|
| | 1 | Corey will attend school every day and improve academic functioning. | |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | A | Corey will not wander out of class. | | Close monitoring will be maintained between on-grounds school and cottage. |
| | B | Corey will improve reading level. | | Corey reads on 2nd grade level. One-to-one remediation will be provided at our on-grounds school. |
| | | | | |

| CCRS CODE | GOAL NO. | | ANT. COMP. DATE 10/82 |
|---|---|---|---|
| | 2 | Corey will feel safe at Cottage School. | |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | A | Corey will come to understand that he will be cared for. | | Corey has had a very unstable life. Cottage staff will acclimate him to structured routine. |
| | | | | |
| | | | | |

**APP.118**

Page 2

| DSS-3404-C (3/81) NYC COMPREHENSIVE SERVICE PLAN CHILD | CASE NAME Emma Lee Johnson | | CHILD'S NAME Corey Johnson | Date of Birth |
|---|---|---|---|---|
| | COMPLETED BY Gloria Caro | DATE 5/21/82 | SSC NUMBER: 4766716-28 | |

| CCRS CODE | Goal No. | GOAL | | ANT. COMP. DATE 10/82 |
|---|---|---|---|---|
| | 3 | Corey will discuss and understand family relationships. | | |

| | | OBJECTIVE/CLIENT TASK | | | METHOD/SERVICE TASK |
|---|---|---|---|---|---|
| CCRS CODE | Goal No. A | Corey will discuss his family. | CCRS CODE | | Casework sessions with Corey and mother will be directed toward clarifying family relationships. |
| CCRS CODE | Goal No. B | Corey will understand reasons for placement. | CCRS CODE | | Joint casework sessions with mother and Corey to discuss why he cannot visit or remain at home. |
| CCRS CODE | Goal No. | | CCRS CODE | | |

DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN.

Mrs. Johnson and Corey were seen together and to formulate service plan and visiting.

BRIEFLY DESCRIBE ANY COURT INVOLVEMENT in this case and indicate services which are being provided pursuant to a remand or court order.

N/A

For Child in Foster Boarding Home or Agency Operated Boarding Home, DESCRIBE THE AGENCY PLAN OF CONTACT BETWEEN THE CASEWORKER AND CHILD IN NEXT PERIOD. INCLUDE FREQUENCY AND LOCATION.

Goals and objective review and formulation of comprehensive service plan for family and child took place at treatment conference in which the unit administrator, psychiatrist, psychologist, child care workers, and school representative participated.

CLIENT CONCURRENCE (Optional)

I understand that all information pertaining to my case, including this Plan for Service developed by my worker and me, is confidential.

I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including the opportunity for an Administrative Review and Fair Hearing.

My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.

| SIGNATURE OF CLIENT, Parent or Guardian | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| X | | X | |
| CASE PLANNER'S SIGNATURE X Gloria Caro | DATE 5/24/82 | SUPERVISOR'S SIGNATURE X Bruce Peck | DATE 5/24/82 |

**APP.119**

| DSS-3407-S(3/81)NYC | CASE NAME Emma Lee Johnson | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| REASSESSMENT SUMMARY | COMPLETED BY Gloria Caro | DATE 5/21/82 | |
| | AGENCY/DISTRICT JCCA/PCS | | |

**4 / 26 / 82** DATE FAMILY BEGAN TO RECEIVE SERVICES FROM YOUR AGENCY

| Yes | No | |
|---|---|---|
| X | | A. This Reassessment Summary is being completed as part of a Service Plan Review. |

UPDATE changes, that have occurred since the last assessment summary, by answering each checklist item. The items on the checklist correspond to sections 1 through 8 of this form.

| Yes | No | |
|---|---|---|
| ☐ | X | Has there been a change in the level of risk to the child if he/she returns home or remains at home? (If yes complete question 1.) |
| ☐ | X | Has there been a change in the family's ability to benefit from the provision of preventive services? (If yes complete question 2.) |
| ☐ | X | Has there been a change in service needs? ( If yes complete question 3.) |
| ☐ | X | Has there been a change in program choice? (If yes complete Sect. B & questions 1 - 8.) |
| ☐ | X | Has there been a change in the factors justifying placement and or preventive services? (If yes complete question 5. |
| X | ☐ | Has there been a change in the child's location? (If yes complete question 6. |
| ☐ | X | Has this child been transfered to a more restrictive placement? (If yes complete Sect. B & questions 1 - 8.) |
| ☐ | ☐ | Has this child been in placement for 18 months or more and his/her permanency goal is return to home? (If yes complete question 8.) |

| Yes | No | |
|---|---|---|
| | | B. This Reassessment Summary is being completed as the result of a PROGRAM STATUS change and requires the completion of the checklist below. For any change indicated in Section B, complete sections 1 through 8 of this form. |

☐ Case Closing          ☐ Change in Permanency Goal

☐ Change in Level of Foster Care

X Change in Program choice

- Preventive Non-mandated
- Preventive Mandated
- Placement/Preventive Mandated
- Placement/Preventive Non-mandated
- Placement
- Child Protective Non-placement

X Movement Between Agencies or District   Transfer from PDC to PCS.

1. CONSIDERING IDENTIFIED PROBLEMS AND ASSETS; EVALUATE THE RISK TO THE CHILD IF SHE/HE RETURNS HOME, OR REMAINS AT HOME. Evaluate the areas of parental functioning or child's behavior which limit the family's ability to provide a safe and supportive environment for the child. According to mother, Mr. Kraeger, with whom she lives, is a violent, drug addicted man. Corey is at risk were he to return home. Mother feels unable to extricate or change the quality of her relationship at this time.

2. ASSESS THE FAMILY'S ABILITY TO BENEFIT FROM THE PROVISION OF FAMILY SUPPORT SERVICES AND TO MAINTAIN THE CHILD IN THE HOME. Support services at this time would not lessen risk to child. Child needs closely structured setting with on-grounds school to assure school attendance.

**DSS-3407-S(3/81) NYC**

**REASSESSMENT SUMMARY**

| CASE NAME | | | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|---|
| Emma Lee Johnson | | | | |
| COMPLETED BY | | | DATE | |
| Gloria Caro | | | 5/21/82 | |

**3. Complete the following service needs information:**

| A. NAME OF PERSON(S) NEEDING SERVICE | B. CCRS CODE | SERVICE NEEDS | C. CCRS CODE | AVAILABLE/ ACCEPTED* | D. PRIMARY/SECONDARY SERVICE NEED — CCRS CODE |
|---|---|---|---|---|---|
| Corey Johnson | 12 | Special Ed | C | Provided | |
| | 11 | Ed. Testing | C | Provided | |
| | 9 | Remedial Ed | C | Provided | |
| | 14 | Recreation | C | Provided | |
| | 24 | Medical/Dental | C | Provided | |
| | 30 | Casework Counseling | C | Provided | |
| | 29 | Psych/Psychological | C | Provided | |
| | 42 | Institution | C | Provided | |
| Mrs. Johnson | 30 | Casework Counseling | C | Provided | |
| *Corey* | | *Family Planning* | | *Planned* | |
| | | | | | |
| | | | | | |
| | | | | | |

\* A. **NOT AVAILABLE** - The required service is currently not being delivered to other clients in your service community.
   B. **REFUSED** - the client has not agreed to participate in the needed service.
   C. **PLANNED** - provision of the needed service is being planned; specific arrangements are being made or services are currently being provided.
   D. **PLANNED, AWAITING OPENING** - the needed service is available, but currently there are no openings for this client.

**4.** Based on the assessment of Problems, Assets and Service Needs, indicate which of the following Program Choices is most appropriate for the child-(ren) in this case.

| Program Choice CCRS code | NAME OF CHILD IN NEED OF SERVICE |
|---|---|
| E | Corey Johnson |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

A. **PREVENTIVE SERVICES (non-mandated):** Preventive Services are needed by this child and family. In their absence out-of-home placement would **NOT** be necessary within the next 60 days. Placement may be necessary for the child in the future.

B. **PREVENTIVE SERVICES (mandated):** Preventive Services are needed by this child and family. In their absence out-of-home placement <u>would</u> be necessary for the child within the next 60 days.

C. **PLACEMENT/PREVENTIVE (mandated):** This child is currently in placement. The provision of preventive services <u>will enable</u> him or her to return home within the next 90 days.

D. **PLACEMENT/PREVENTIVE (non-mandated):** This child is currently in placement. Preventive Services are also needed. However, these services will **NOT** enable the client to return home within the next 90 days.

E. **PLACEMENT SERVICES:** Out-of-home placement is needed for this child within the next 60 days. Also include children surrendered for adoption.

F. **CHILD PROTECTIVE SERVICES (non-placement):** Community based services are needed which are <u>not preventive</u> in nature.

**APP.121**

DSS-3407-3(3/81) NYC

| REASSESSMENT SUMMARY | CASE NAME Emma Lee Johnson | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| | COMPLETED BY Gloria Caro | DATE 5/21/82 | |

5. For each child whose program choice is Preventive Services (mandated), Placement/Preventive (non-mandated or mandated) or Placement S (see question 4, B,C,D and E) check the factors which describe the reason(s) why placement services and/or preventive services are needed.

**CHILD'S NAME**

1. Corey Johnson
2. Robert Johnson
3.
4.

**FACTORS**

Check all that apply.

| 1 (✓) | 2 (✓) | 3 (✓) | 4 (✓) | Factor |
|---|---|---|---|---|
| X | X | | | A. Caretaker expresses unwillingness to maintain the child in the home. |
| | | | | B. Parent(s) have voluntarily surrendered the child for adoption. |
| | | | | C. Child has been adjudged neglected in a Family Court proceeding. |
| | | | | D. Child has been adjudged abused in a Family Court proceeding. |
| | | | | E. Alleged abuse or neglect by parent or caretaker, in the caseworker's judgement, places the child imminent danger of serious physical or emotional harm. |
| | | | | F. Child has been placed in the custody of the Commissioner of Social Services under Article 7 or 10 of t Family Court Act and foster care placement has been recommended or ordered by the court. |
| | | | | G. Parents or caretakers are unavailable due to arrest, detainment, imprisonment, or other situations volving the law. |
| | | | | H. Parents or caretakers are temporarily unable to maintain the child at home due to a housing or financ emergency, acute physical illness, or other emergency situation. |
| | | | | I. Parents or caretakers are incapable of providing proper care due to chronic or permanent conditio such as diagnosed mental illness, diagnosed developmental disability, alcohol or drug abuse, physic disability or illness or other comparable condition. |
| | | | | J. Continuous, serious conflict between parent and child. |
| | | | | K. Parents are dead or missing. |
| | X | | | L. Child's behavior presents a serious danger to other people or to the child's own well being. |
| | | | | M. Child's behavior results in damage to property or a criminal act related to property. |
| | | | | N. Child's behavior, although not dangerous, results in severe management problems and constant disrup tion of group activities in at least two of the following three settings: home, school, and community. |
| X | | | | O. Child's behavior caused by a serious emotional, physical or development disability is characterized by severe deficits in adaptive behavior. |
| | | | | P. Other, describe: |

(use additional sheets as needed)

**APP.122**

DSS-3407-S(3/81) NYC

**REASSESSMENT SUMMARY**

| CASE NAME | LOCAL DISTRICT/AGENCY USE |
|---|---|
| Emma Lee Johnson | |

| COMPLETED BY | DATE |
|---|---|
| Gloria Caro | 5/21/82 |

6A. IF INITIAL OR SUBSEQUENT PLACEMENT IS OUT OF PARENTS' COUNTY/BOROUGH OR RESIDENCE, EXPLAIN REASON.

Appropriate placement not available in home borough.

B. IF INITIAL OR SUBSEQUENT PLACEMENT DOES NOT MEET THE PARENT(S)' EXPRESSED RELIGIOUS PREFERENCE, PLEASE EXPLAIN.

Religious instruction in Corey's faith is being provided.

C. IF THE CHILD'S PHYSICAL LOCATION HAS CHANGED SINCE LAST REVIEW, EXPLAIN EACH CHANGE.

7. IF THE CHILD HAS BEEN TRANSFERRED TO A MORE RESTRICTIVE PLACEMENT, state why previous placement could not be continued with additional services.

Child has been transferred from Diagnostic Unit to regular part of our institution.

8. Answer question 8 for all children whose PERMANENCY GOAL IS DISCHARGE TO PARENT(S) OR GUARDIAN(S) AND WHO HAVE BEEN IN PLACEMENT 18 MONTHS OR MORE.

A. Is discharge planned within the next 6 months?    ☐ Yes    ☐ No

B. If **No**, what specific barriers prevent this course of action, and explain what alternatives to the original Comprehensive Service Plan are being considered, or have been tried to achieve discharge to parent(s) or legal guardian(s).

| CASE PLANNER'S SIGNATURE | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| x Gloria Caro . | | X | |
| | | SUPERVISOR'S SIGNATURE x Bernice Jack | 5/24/82 |

**APP.123**

# EXHIBIT 6

# AFFIDAVIT

State of New York          )
                           ) ss:
County of New York         )

ROBERT JOHNSON, being duly sworn, deposes and says:

1.      I am currently 40 years old and live at 550 West 125th Street, apt. 2C, New York, NY 10027.

2.      Corey Johnson is my half brother.  Corey is about two years older than I. Emma Johnson, who is now deceased, was our mother.  My father is Robert Butler, Sr.  From the time I was born until I was about 10, I generally lived in the same household with Emma and Corey.  After that, Corey and I each were placed in separate group homes for periods of time, although we still saw each other on the weekends.  Later, in our late teens, Corey and I again lived together with our mother for a brief time and saw each other regularly.  I have not seen Corey since in or about 1990.

3.      By way of background, I am now married and have a young son.  I obtained my GED in 2002.  I failed it twice before due to difficulties with the math section.  In the past, I have spent time in prison on charges related to drug sales.

## General Family Background

4.      My mother, Emma Johnson, had Corey when she was about 17 years old and had me when she was about 19 years old.  Throughout our childhoods, Emma moved us from place to place and was involved with different men (some of whom were verbally and physically abusive both to her and to Corey and me).  When Corey and I were still young children, I witnessed her using drugs.  Our mother was not very stable and seemed to have difficulty dealing with Corey and me.  She yelled at us, hit us, and often left us to stay with other

904540.06-New York Server 4A                                                          1

**APP.125**

family members or friends for days, weekends, and sometimes even weeks and months because of her frustration with us.

5. My dad, Robert Butler, Sr., drove a taxi and did a few other things to earn a living. My father was smooth, laid back, proud to be a black man, and proud to have sons. During the brief time he and my mother were together, they were young and went out a lot together at night. They would go to night clubs and juke joints. When they went out, Corey and I would stay with my grandmother, Esther. My mother and father lived together only briefly.

6. Esther Johnson, Emma's mother and my and Corey's maternal grandmother, was the matriarch of our family. My grandmother took care of us a lot. She was very strict and took good care of us. We stayed with her at times during our childhood. During these times, she was separated from my grandfather, Love Johnson.

7. Corey and I had a good relationship with our grandfather, Love. I even used to call him "dad." Love would take me and Corey to work with him. He used to drive trucks; he would take us with him in the truck sometimes. We would hang out all day. Love was very close to our mother, and he loved her very much.

### Living with My Mother and Father

8. My parents were together for a very short period of time.

9. It is my understanding that we all lived in Brooklyn with my grandmother for a short period when I was very young.

10. We then moved into Manhattan, and my mother, father, Corey and I all lived together in an apartment on 14th Street.

11. My parents broke up when I was around 3 or 4, and my father moved to California to take advantage of a job opportunity.

APP.126

12.    My dad asked my mom to come with him to California, but she wanted to remain in New York.

13.    I didn't see my father regularly again until I was around age 8. Although he didn't live in New York, he would keep in touch by phone calls and short visits to New York. When he came, I would meet him in Brooklyn or Central Park.

14.    While I am my father's only biological child, my father always treated Corey like his own son. He never showed any favoritism to either of us. Corey never talked about his biological father, or how he felt about him; I think my dad (Robert Butler) was the only real father to Corey.

15.    When my dad moved to California and my parents broke up, our mother moved us to various places – Jersey City, Brooklyn, Queens, and, finally back to Manhattan. We lived in each place for a short period.

### Moving from Place to Place with My Mother and Corey

16.    While in New Jersey, we lived in Jersey City in the Gregory Park Apartments with my mother's boyfriend, Mitch.

17.    Mitch was pretty cool.

18.    Corey and I both attended school in Jersey City, but I don't remember much about it.

19.    After leaving Jersey City, we moved to Queens and lived with my uncle Amos (who is my mother Emma's brother) and his wife, Vonna.

20.    During the time we lived there, my uncle was hardly ever home because he was always working. Meanwhile, Vonna was very mean and always yelling.

21.    I did not like living there.

## Living with Bobby Koger in Manhattan

22.     We eventually settled in Harlem.

23.     My mother had met Bobby Koger, and we lived with him at 150th St. and Edgecombe.

24.     My mom got involved with Bobby Koger when I was around 7 years old, and he was in the picture until I was in my early teens.

25.     Things changed for the worse when my mother got involved with Bobby Koger.  She became less concerned with us, and was not involved with our schooling.  From an early age, Corey and I were pretty much on our own. When I was 7 (and Corey was about 9), we would go to school alone.   After she became involved with Bobby, our mother was not affectionate with us.  As discussed below, during this time, I witnessed my mother using drugs. She was always losing her job, and a lot of different people were going in and out of the house.

26.     I had never met anyone like Bobby Koger, and I disliked him. He was sick – he had diabetes and was a heroin addict. He was very bitter and violent.

27.     As a young boy, I was confused by Bobby's behaviors.

28.     When I was between the ages 8 and 10, I would wonder why Bobby had a needle stuck in his arm, why blood was dripping down his arm, and why he was bouncing around the room naked. I saw him get high and pass out while the needle was still in his arm.

29.     Bobby was violent towards my mother, me, and Corey.

30.     Bobby was verbally abusive to us as well as his own children. He was most aggressive when he was either having a drug binge or when he would find his money missing. He would have verbal and physical fights with my mother.  He would usually hit her

904540.06-New York Server 4A

4

**APP.128**

and then leave the house. After their fights, I would see the bruises he left on her. Sometimes she had to go to the hospital to have her injuries treated.

31.    During the fights between Bobby and Emma, Corey and I would sometimes go into our room and play video games on our Atari, just to escape the mayhem.

32.    Often, when I was as young as 10, I would try and jump in to stop Bobby from hitting my mother.

33.    Corey, then about 12 years old, did not jump in. He would just stand still and cry. I think he was afraid.

34.    We would never call the police. I didn't think too much about the fights between my mother and Bobby – I used to visit a friend down the hall, and his parents often fought physically but would then be back together soon afterwards, as if the fighting had never happened.

35.    I would steal money from Bobby every chance I got because I didn't like him. When I got caught, Bobby would strike me with an open hand. Sometimes, my mother intervened to protect me, but other times she wouldn't because, after all, I was wrong for stealing his money.

36.    It was during the time that we were living with Bobby Koger that I witnessed drug use by my mother. I was shocked when I first saw her use drugs, but after a while, Corey and I got used to it.

37.    I blame Bobby for my mother's drug use.

38.    At first, she smoked marijuana and would drink Harvey's Bristol Cream. I didn't notice heavier drug use until my early teens. My mom could have been using heavier drugs when I was younger, but I didn't become aware until I was older.

**APP.129**

39.    Later, when I was out in the streets at age 12 or 13 and I saw what cocaine users looked like, I realized my mom was one of them.

40.    When I was 13 or 14, I saw my saw my mom with a crack pipe in her bedroom.

41.    I believe that my mother continued to use drugs until her death in 1995.

### Corey Was Slow

42.    Even though he was two years older, throughout our lives, Corey was slower than I.

43.    Corey was unable to grasp a lot of things.  He also didn't pick up on things as quickly.

44.    Corey had difficulty in school.  By the time Corey was in about second grade, he had trouble in all of his subjects.  I often helped him with reading, writing, and penmanship.

45.    Corey's handwriting was (and still is) like chicken scratch.  Corey would ask me to show him how to write like me. I would do hand over hand with him to show him how to write better, but he never caught on to it.

46.    I don't know how Corey got promoted to higher grades.  Perhaps his teachers just passed him along without requiring that he be able to do the work.

47.    In general, I felt like I was more like the big brother than Corey. I got involved in the drug world long before Corey – I was about 13.  Corey would not even attempt to get involved in selling drugs until several years later.

48. I enjoyed hustling on the streets. I liked the lifestyle and the money I made. I wore a lot of nice clothes and jewelry, and I had a motorcycle. Even though I was younger, I would give Corey money to buy things, or else I would just give him things.

49. A lot of the guys that hung around me thought that I was the oldest sibling, because I was the one showing Corey the ropes.

50. Corey would brag to others about the way I dressed and the things I had.

51. Corey took a while to catch on to some things. For example, when I started hustling on the streets, I used to buy a lot of footwear and clothes. I kept them in the bedroom I shared with Corey. Corey would see the items and ask me where I got them. Corey never appeared to make the connection between me being out in the streets and selling drugs and me having money to buy the items.

52. Corey also had a hard time finding his way around. In terms of travelling, I would be able to pick up on a route the first time just by paying close attention. But Corey needed a lot more training in that area. Around the ages of eight to ten, my mother would choose me rather than Corey to go to my grandfather's house in Brooklyn because she knew that Corey would get lost.

53. Corey was unable to keep up an in-depth conversation. He would usually just stay quiet during those times.

**Corey Was a Follower**

54. When I was about seven or eight years old, Corey would sometimes get in trouble because of me – I would encourage or influence him to do mischievous things with me. For instance, I would ask Corey to steal money from Bobby Koger. I would just tell Corey, "Do

**APP.131**

it with me, because either way, if I get caught, I am going to tell mom that you were involved." Corey would very often go along with me and do what I asked.

55.    I heard from my father about an incident that happened when Corey was living in North Carolina that also shows how susceptible Corey was, even as an older teenager. My dad and his wife were out of the house, and Corey was convinced to throw a party. I think Corey had it because he saw it as a way to meet and attract girls. The house ended up getting robbed and trashed by the friends that Corey had over. My father was very angry, because he had a lot of nice things in the home. If I had been in North Carolina with Corey, that incident would not have happened.

### Corey's Failed Attempt at the "Street Life" in New York

56.    Corey was not a street person. He was a ball player, and liked girls. He would play basketball all day long. He was well known for playing basketball and messing around with girls.

57.    Corey got involved in the street life at the relatively late age of about 19.

58.    I didn't want Corey to get involved in selling drugs for several reasons. First, he didn't know anything about selling drugs. Also, it didn't fit his character or skills. Corey really didn't have what it took to be successful; he was not street smart enough. He didn't have "follow-through," wasn't "hip enough," and wasn't tough enough.

59.    The guys I was involved with selling drugs wouldn't let him participate. I believe that they could see that he just wasn't capable, as shown by the one experience I had with Corey attempting to sell drugs.

60.    Once, Corey approached me about selling drugs. He told me he wanted to be down with me and make money, too. I did him a favor and gave him 50 vials of crack to sell.

**APP.132**

Corey was supposed to sell one vial of crack for $5, and bring back $250 from the sales of 50 vials.

61.     After Corey finished his sales, he was extremely short on the money – he only brought back $50.

62.     I think Corey just could not calculate or count the amounts of money he was supposed to receive in each transaction.

63.     I had to take money out of my own pocket to make up the difference for Corey. I never sent him out to sell drugs after that. That was the first and last time I had Corey sell drugs with me.

### Corey's Time Living in New Jersey

64.     I saw Corey a few times when he was living in New Jersey in 1989 and 1990.

65.     When Corey first moved to Trenton, he lived in a house with girls and guys. He lived in several different places while in Trenton, always with others. Corey never lived by himself.

66.     I knew some other guys who were originally from New York who went to New Jersey, and with whom Corey was involved in New Jersey. Darold Brown and Aldon Mitchell, were my friends before they were friends with Corey. I hoped that Corey was in good hands with those guys and that they were looking out for him. I thought they knew what they were doing – I had contact with a few of them from New York. I felt like they had a well-run operation, which is why I didn't understand how Corey fit in. Then again, I didn't know the structure of the operation. Maybe their operations didn't require as much toughness or street smarts, maybe they gave Corey a role he could do.

APP.133

67.     When I witnessed Corey on the streets in New Jersey, his only role was to collect money from the guys who were actually selling and give them more drugs to sell. I didn't see him do anything more than transport money and drugs. He was definitely not a ring leader. He wasn't dealing with the drug buyers. I can't see any set-up other than one in which Corey only had to perform the simple task of transporting money or drugs to and from the real dealers working for Corey. Even in the slower-paced New Jersey, Corey's limited role in selling drugs was somewhat surprising to me, given the disastrous experience I had with him selling drugs in New York.

68.     In New Jersey, I met two of the guys who would later go to Virginia and become co-defendants in Corey case, Richard Tipton and Vernon Lance Thomas. I cannot see Corey being the boss in Virginia. The others were more street smart and also more headstrong than Corey.

69.     Corey was very loyal to his family or anyone he believed to be his family. If Corey considered the guys with whom he was involved in selling drugs in Virginia to be his family, then it isn't surprising to me that he would be protective of them if he thought they were being threatened.

70.     For some of the time Corey lived in Trenton, he lived with a woman called "Mudda." She was much younger than Corey. They lived in a "shack" that appeared to be a crack house. It was a real hovel. I would never have lived there because everything was old, dark, and dirty. I was surprised Corey would live in such a filthy house because we were young we were raised to be clean and tidy. There were a lot of wild, small children living in the home.

71.     While in New Jersey, Corey was also involved with a girl named Monica, who I believe to be the mother of Corey's daughter. I last spoke to Monica in 1996. I had called

**APP.134**

about seeing my niece.  Monica said she was with a family member and would call me back. She never called back and we lost contact.

### My Recent Contact with Corey

72.     I speak to Corey on a regular basis, at least once a week.  I would like to visit him in prison.

73.     I once had a conversation over the phone with Corey about our mother. Corey raised the topic.  He asked if I had visited her gravesite.  I told him that I hadn't, and that I was not ready to visit it.  I have this picture of our mother in my mind, and I don't want to see her any other way.  This was the first time we spoke over the phone about our mother's death.

*Robert Johnson* 6-29-11
ROBERT JOHNSON

Sworn to before me on this
29th day of June, 2011

*Delores Green*
Notary Public
DELORES GREEN
Notary Public, State of New York
No. 31-4627811
Qualified in New York County
Commission Expires Aug. 31, 2014

**APP.135**

# EXHIBIT 7

PLEASANTVILLE DIAGNOSTIC CENTER

Name of Child: COREY JOHNSON      Date of Evaluation: 2/8/82
Date of Birth: ███████          By:  Sundar Collimuttam, M.D.
Date of (PDC) Adm: 2/1/82        Worker: Ms. Offer
Referred by: Manhattan SSC

### PSYCHIATRIC EVALUATION - CONFIDENTIAL

Corey Johnson is a 13-year old Black boy the older of two half-
siblings living with his mother and her boyfriend attending Special
Education Class.  He is referred to the Diagnostic Center by Man-
hattan SSC for an evaluation as his mother has been requesting a
placement.  Corey's mother presents him with the complaint of having
difficulties in school.  He is disruptive in the class, fights and
does not learn and has a history of being truant.  In addition, he
does not listen to the mother at home and stays out late.  Corey
was suspended from school last year for fighting.  In addition, he
has been stealing from his mother and her boyfriend.  These prob-
lems have "always" been there but have become worse in the past two
years.  Corey believed his half-brother's father to be his natural
father until early last year when his father unexpectedly came into
the picture after being released from jail.  Corey has been seeing
his father very regularly since then.

Birth and early developmental history is normal.  Corey was enuretic
until age 11 and occasionally encopretic between ages 8 to 12.  He
stuttered until age 5 and still has a slight lisp.  Corey's parents
broke up when he was an infant and they lived with Robert's (his
half-brother's) father until age 6 and with the mother's current
boyfriend for the past four years who is described as being addict-
ed to Heroin and of being abusive to the kids.

Corey's half-brother was hospitalized last summer following a suicidal
attempt (walking on a ledge) and is currently in Children's Village.

Interview with the Child:

Corey came readily to the interview.  He is an alert, oriented and
cooperative boy who relates with eye contact and speaks with a slight
slur.  He talked of wanting to go to Children's Village.  He doesn't
want to return home for a while so that "I can straighten my head"
and "my mother can straighten herself out."  Corey feels he has prob-
lems with learning and reading.  He likes the school and the counselor
here.  He does not like what the kids do and the way they behave in
the cottage but feels that they also have problems as he does and he
has to straighten himself out and not bother about them.  He wants
to be a different person when he returns home.  Corey has been having
problems for two years "since I turned 12."  He thinks he has had prob-
lems because he became a teenager and he felt he had to do good things
so that his brother could look up to him.  He feels sad when his moth-
er keeps telling him about his father being in jail.  He has felt at
times like wanting to stab himself but has never done anything to hurt
himself and doesn't think that he will ever do it.  Corey talked about

APP.137

Corey Johnson
                                                                    -2-

his brother trying to kill himself "because of my mother," and says
that he feels very sad about it.   Corey blames his mother a great deal
for asking him to do things at home and for the way she talks about
his father.

"I hate him" referring to his mother's boyfriend who the family has
been living with for the last four years.   Corey says that he is on
drugs and doesn't treat any of them right.

His three wishes were: 1) "to get my act straight," 2) "to get my
head straight" and 3) "to be okay when I go back home."   He wants
to grow up to be a human being who people will look up to and trust.
He doesn't feel that people trust him now because he has been steal-
ing.   If he were to go to a deserted island and could take one per-
son with him he would take his brother along.   If he got lost in a
forest he did not know who would come looking for him.   Corey thinks
the best thing that ever happened to him in his life was that he met
his family and his relatives (his father) and the worst thing, he
couldn't think of anything.

He denies nightmares, denies hallucinations, denies suicidal or homi-
cidal thoughts.   He is not delusional, there is no evidence of paranoi
There is no evidence of any thinking disorder.

Corey shows moderately positive soft neurological signs.   His hopping
on one foot is very clumsy, so is skipping.   Finger-thumb sequence,
alternating movements of hands and tapping index finger on thumb on
each hand is very slow, clumsy and reckless.   In addition, he shows
evidence of right-left confusion on pointing to the examiner and on
writing confuses b's and d's.   Three dimensional drawings are very
poor and inaccurate.   Draw A Person was an immature drawing with no
hands or legs drawn obliquely on the page.

Diagnostic Impression:

Axis I.    Adjustment Disorder with Mixed Features.

Axis II.   Special Developmental Reading Disorder.

Axis III.  Positive Soft Neurological Signs.

Formulation:

Life has been very chaotic for this family especially during the
last four years with Corey's mother having had financial problems
of being in debt, having difficulties with her job and her relation-
ships.   Mother appears depressed and unavailable to the children emo-
tionally.   There have been frequent moves, stays in the homes of re-
latives often with the mother and children being in different homes.
This was followed with the period of being with the mother's boyfriend
who Corey did not get along with and would steal from "to get back at
him."   Corey is a child who has been reacting to the chaotic life
in the last four years.   In addition, he has shown evidence of mild
to moderate neurological deficits of dyslexia and speech impairment.

Corey Johnson                                                         -3-

He has the capacity to relate well and seems motivated towards improv
ment.  He seems to be happy with his mother and reaches out to her.
Corey's mother comes across as a depressed lady preoccupied with her
own problems and emotionally unavailable to the children.  She, how-
ever, seems very willing to be involved and seems to be motivated to-
wards treatment.

Corey I think would benefit from residential treatment.  This would
provide him with consistency which has been lacking and structure
and also provide him with Special Education.  His mother would need
help in dealing with her depression and in organizing her life to
help her be more available to her children when they return home to
her.
         Sundar Collimuttam, M.D.:ww  D-2/19/82   T-2/22/82


                              Sundar Collimuttam, M.D.
                              Psychiatrist

# EXHIBIT 8

3544

```
                 IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA
                         RICHMOND DIVISION


-----------------------------------------

UNITED STATES OF AMERICA,



                         Plaintiff;

     v.                                    CRIMINAL ACTION
                                              92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                         Defendants.

-----------------------------------------
                           VOLUME XX

                       February 10, 1993
                       Richmond, Virginia
                         10:00 a.m.

BEFORE:         HONORABLE JAMES R. SPENCER
                United States District Judge


APPEARANCES:    HOWARD C. VICK, JR., ESQ.
                WILLIAM H. PARCELL, III, ESQ.
                Office of the United States Attorney;
                    Counsel for Government;

                ROBERT P. GEARY, ESQ.
                ERIC D. WHITE, ESQ.
                    Counsel for Defendant Tipton;
                CRAIG S. COOLEY, ESQ.
                JOHN F. McGARVEY, ESQ.
                    Counsel for Defendant Johnson;
                DAVID P. BAUGH, ESQ.
                ARNOLD R. HENDERSON, V, ESQ.
                    Counsel for Defendant Roane;
                ROBERT J. WAGNER, ESQ.
                    Counsel for Defendant Reavis.
                JEFFREY B. KULL
                OFFICIAL COURT REPORTER
```

3545

P-R-O-C-E-E-D-I-N-G-S

THE CLERK:  Case Number 92CV68: United States of America versus Richard Tipton, Cory

Johnson, and James H. Roane, Jr., the twentieth day of trial. Are counsel ready to proceed?

MR. VICK: Government is ready.

MR. McGARVEY: Defendant Johnson is ready.

MR. GEARY: Defendant Tipton is ready.

MR. BAUGH: Defendant Roane is ready.

THE COURT: All right. Let's bring in the jury.

(The jury entered the courtroom.).

THE COURT: All right. Mr. McGarvey?

MR. McGARVEY: Thank you, Your Honor. May it please the Court, co-counsel, ladies and gentlemen of the jury and of the prosecution: Folks, why are we here today? Well, I figured it would be easier to tell you why we are not here. We are not here to try to excuse the acts of Cory Johnson. There is no excuse for eight murders. That's not what this is about. We are not here to try to tell you that Mr. Johnson didn't know the difference between right or wrong. When you folks entered your verdict, you decided that Mr. Johnson knew the difference between right and wrong. We are not here today to ask you not to punish Mr. Johnson. The alternatives here are life in the penitentiary without possibility of parole, to die in the penitentiary. I should think that anyone would think that is punishment. What we are here today to do is to decide whether or not to kill Cory Johnson. That's what it boils down to.

Traditionally, the death penalty in this country is reserved for the most severe cases, the cases where the guilty person is completely and totally blameworthy, fully responsible for his actions. Those factors which tend to lessen blame, which indicate that a person is not fully and totally blameworthy, should indicate that that person does not merit the most severe punishment; i.e., to be killed.

This isn't my point of view. This is the law. And the law requires this hearing before anyone can be given the death penalty. The purpose of this hearing is to assure that you folks consider that the guilty person deserves the maximum sentence of death. That person is guaranteed the right to this hearing in order to present reasons from our point of view why he doesn't deserve the maximum punishment. These reasons are called mitigation. The government has already put on what they called the aggravating factors. This is our opportunity to put on what is called mitigation.

The law states that mentally retarded persons cannot be executed. And the reason that they are excluded is because the law recognizes that mentally

retarded persons are not totally and completely blameworthy. They are not fully responsible for their actions.

Now, I'm not intending to suggest at this juncture or any other juncture that Cory Johnson is mentally retarded. It doesn't suggest that mentally retarded persons aren't responsible for their actions. It just indicates that the law recognizes that they are not as fully and totally blameworthy as an individual who has all his faculties.

Mentally retarded people have capabilities. Most mentally retarded people can hold jobs, raise families, be educated. Mildly mentally remember retarded people can be educated to, say, a sixth-grade reading level. I'm not suggesting that that is the case in the most severe cases of mental retardation, but in mildly mentally retarded cases, they can be educated. They can be arrested and they can be held accountable for their actions. However, because of the limitations that mentally retarded

3548

people have, they are not as fully responsible, as I indicated, not as fully blameworthy.

In this case, Cory Johnson, as I said, is not mentally retarded. But he has substantial mental, intellectual deficits that he has been plagued with his entire life. His IQ is within two points of being classified by the law mentally retarded, and therefore, legally not executable. Two points. He has severe neuropsychological impairment, and he is severely learning-disabled. This was diagnosed back when he was 13 years old, and we will present evidence today by Dr. Cornell here, who has administered tests and neuropsychological tests that have verified this. He has an IQ of 77.

In listening to Mr. Tipton's presentation yesterday, I was struck by the fact that he indicated that these learning-disabled ADD-type people tend to group together. And I think ultimately that's what we are going to be able to show you folks; that they somehow gravitated to each other. And when Dr. Evans yesterday was talking about the fact that learning-disabled people and ADD people have great difficulty in problem-solving, that they are very narrow minded, very focused, inflexible, I believe we will be able to show you folks today that that is the

3549

case with Cory Johnson. I don't just believe it. It is going to be shown. That is coupled with this severe learning disability and an IQ of 77.

Cory's situation, Cory's physical impairment, which I can't overemphasize is not Cory's fault -- what Cory did is Cory's fault, but what Cory's physical problems are are not his fault -- as I said,

they don't meet the standard definition of mental retardation. But his condition is very, very similar. As I indicated, mentally retarded people, mildly mentally retarded people can learn to read up to a sixth-grade level. But from the age of six to seven, Cory has been in special education. At 13, as I indicated, he was diagnosed with this learning disability. And after years and years of special education and the like, he is still only able to read on a second to third-grade level. So when I say that his condition is very similar to the mildly mentally retarded, in some instances it is much more severe. I've just given you an example of that. And this is after years and years of special instruction.

Now, we couple that with severe emotional deprivation as well. Again, when I was listening to Mr. Tipton's presentation yesterday I was struck by the similarity in backgrounds. Cory Johnson had a family. And I use "family" in quotations. He met his father when he was 12 years old. In the course of his lifetime he has seen his father three to five times since he was 12 years old. From age one until he was 12 years old, Cory Johnson moved at least 12 times. He moved 12 times to some relatives, to some friends, lived principally with his mother. And again, I mean no disrespect to Mr. Johnson, but I use the term "mother" in quotes as well. His mother was a drug abuser. His mother was abusive emotionally and physically to Cory. And to make matters worse, his mother took up with a number of gentlemen who were also drug abusers and physically abusive to Cory and his younger brother.

When Cory was 12-and-a-half to 13 years old, the New York justice system took jurisdiction over Cory and his brother and placed him in a foster care situation; principally, not because Cory had done anything wrong, but because his mother was flat-out unable, to put it charitably, to take care of him.

When I talked about emotional abuse, I'd like to illustrate that. Principally, the emotional abuse from his mother came about as a result of expectations that once again Cory Johnson couldn't meet. And he couldn't meet those expectations not because of anything that he had done, but because he was born with this severe neurological impairment. Despite that, Cory tried. His mother, believe it or not, expected Cory to go to college. And try as Cory Johnson might have, Cory Johnson couldn't read beyond the second-grade level. When the New York justice system took jurisdiction of Cory, they placed him in a foster home situation. This was the Pleasantville Cottage Home. You will hear from two people who

worked with him in this, the Jewish Child Care Association of New York. And what you will hear from these people and from the reports that we are going to give you is that despite Cory's mental and physical limitations, Cory always wanted to please. Cory was not a mean-spirited person. Despite his background, Cory wanted to learn. He wanted to learn. And I would suggest to you folks it is going to be shown that he wanted to learn because he wanted to please his mother. But there wasn't a darn thing that Cory could do to please his mother.

The reports are rife with references to the fact that Cory was not visited by his mother; that his mother took no interest in the fact that he was trying; and that on the few occasions that his mother actually did visit him, the notes suggest that she was very rejective of him to the point that the staff there made comments about it; that she would get phone calls from the Home, and she wouldn't return the phone calls. She would call only to cancel an appointment, and not reschedule them. But despite this, Cory tended to treat his mother like a goddess.

There was a quote that you folks are going to have in front of you that I found particularly instructive and particularly touching, and I'd like to read it to you now. This is from a January, 1983 treatment review of Cory Johnson by Gail Turnquest, the caseworker at the Pleasantville Cottage School.

"Child care workers note that Cory's behavior deteriorates when he has no contact with his mother. He can also become quite depressed when he has not heard from or seen her for a period of time. It is the opinion of his child care workers that Pleasantville is good for him and that he is functioning fairly well here. Cory realizes his learning disabilities. However, he struggles to do his homework. He is truly motivated to do well and to succeed, and has not yet given up on himself.

"Cory presents with no real behavior problems. Within the last two weeks, there has been some decline. Cory fantasizes that his mother will come up in a car and take him to Pizza Hut. Child care workers report that Cory's mood is basically that of a depressed child. He longs for his mother and acts out his realization that in fact his mother is emotionally unavailable to him. However, he denies his feelings when confronted directly. He also struggles to involve his father --" his father who he had seen three to five times in his life "-- who also does not come through for him. Sundays can be very difficult for Cory because he usually doesn't

have any visitors."

From the age of twelve-and-a-half until he was 18, this basically was Cory Johnson's life: attempting to learn and not being able to learn; attempting to be accepted by the only family that he had, his mother, and to be continually rejected by his mother. And you couple that with a childhood that was -- if you can call it a childhood -- basically, Cory took care of himself since he was three years old because his mother was too busy doing drugs and taking care of herself and living with her boyfriends.

When you couple this background of abuse, depression, lack of acceptance, rejection by the one person who mattered most to him, along with the severe, and I'm talking severe, cognitive deficiencies in Cory, it might provide somewhat of an explanation of what happened. As I suggested to you, there is no excuse.

At the conclusion of this presentation, I would suggest to you folks that the question you have to ask yourself is not whether Cory is guilty, not whether he should be punished, not whether he knew what he was doing was right or wrong. Those have already been decided. But whether he is fully and completely blameworthy; whether he is totally responsible for his actions. This penalty phase is, as the Supreme Court says, a narrowing process. Because as I indicated, the death penalty is reserved for those who are totally and completely blameworthy in the most severe cases.

When you ask yourself that question, you have to ask whether or not, after this presentation, Cory is fully and totally blameworthy; whether he is completely responsible for his actions. Has he lived his life as the normal, average person, who might be totally and fully responsible? Or has he lived his life under these situations that I have described.

We will demonstrate to you today that Cory is not a normal young person. He is 24 years old now. He has severe neurological impairment. He is two points above being mentally retarded. And when you couple that with this abusive background, I think you are going to be able to see that he is not as totally and completely responsible as a person who doesn't have those deficits. And life in the penitentiary without possibility of parole is no bargain, either. Thank you, folks.

THE COURT: All right. Call your first witness.

MR. COOLEY: Our first witness will be Dr. Dewey Cornell.

                        DEWEY CORNELL,
called as a witness by and on behalf of defendant
Johnson, having been first duly sworn by the Clerk,
was examined and testified as follows:
                  DIRECT EXAMINATION
BY MR. COOLEY:

Q    Dr. Cornell, good morning to you.

A    Good morning.

Q    Would you please tell the ladies and gentlemen
of the jury your full name and your profession?

A    Dr. Dewey G. Cornell.  I'm a clinical
psychologist and associate professor.

Q    And where are you employed?

A    University of Virginia.

Q    And is your title there associate professor?

A    I'm associate professor of education in the
programs in clinical and school psychology at the
University of Virginia.  I am also a faculty
associate of the Institute of Law, Industry and
Public Policy.

Q    And what are your professional duties as an
associate professor?

        MR. VICK:  We would stipulate as to his
expertise.

        MR. COOLEY:  I very much appreciate that,
Your Honor.  I would like for the jury to know
something about him.

        THE COURT:  Go ahead.

BY MR. COOLEY:

Q    Doctor, what are your professional duties as an
associate professor?

A    My principal duties are teaching, research, and
service at the University of Virginia.  I teach
graduate courses in our training program that trains
Ph.D.s in clinical and school psychology.  I teach
courses in personality assessment, in
psychopathology; that is, in mental disorders.  I am

I am also the assistant director of our training
clinic, which is a clinic that provides psychological
assessments, and I'm in charge of the psychological
assessments that our university clinic provides.  I
also am involved in the training of psychologists and
psychiatrists who specialize in forensic mental
health, and I conduct research in those areas as
well.

Q    I see.  Doctor, can you describe briefly your
educational background and any training that you had
in clinical psychology?

A    My training in clinical psychology began at the
University of Michigan.  I obtained my Master's
degree in 1979 and my Ph.D. in 1981 at the University
of Michigan from the Department of Psychology, from

Q    All right.  And did you include certain things such as definitions of some of the conditions that Cory has?

A    Yes.  I also included the federal and accepted professional definitions for learning difficulties, learning disabilities, and mental retardation as well.

MR. COOLEY:  Your Honor, with the Court's permission, we have a copy of the full report and appendages for each member of the jury.  The government already has their copies, and also a copy for each defense counsel and the Court.

THE COURT:  All right.

(Documents proffered to Court, counsel, and jury.)

MR. COOLEY:  If I could be so bold as to request of those folks who have received a copy if they could try to follow along with us as we go through it rather than leafing through, which I think is a tendency, naturally.  We would appreciate that in presenting it in the form Dr. Cornell has set it up.

3573

THE COURT:  All right.

BY MR. COOLEY:

Q    Doctor, if you would, we would like to start with a review of Cory's life and ask you, based on your evaluation and various sources of information that you have described to the ladies and gentlemen of the jury and obtained during the course of your evaluation, did you formulate an opinion about the psychological background, development of Cory Johnson?

A    Yes, I did.

Q    Could you summarize for us what you concluded?

A    When I put all the information that I reviewed together, I think there are two primary factors that I felt the jury should be informed about for purposes of mitigation.  The first of these is Cory Johnson's upbringing in a severely unstable, neglectful, and abusive family environment, which had a devastating effect on his psychological development and his emotional maturity.

The second main factor that I felt was important was his degree of brain impairment, which is exhibited as a very severe learning disability, a speech impairment which he suffered during his childhood years and still has remnants of today, and

3574

his generally impaired intelligence, which places him just above the level of mental retardation.  Those two factors in combination, I feel, made Cory unprepared to function in society, unprepared to survive on his own when he left institutional care

and had no place to turn to, and made him unable to cope and adapt to society in a way that a normal individual would.

Q    I'd like for you to explain to me and to the ladies and gentlemen of the jury, if you would, how you came to those conclusions.  Can you tell the Court what information about Cory's background led you to this, or these, conclusions?

A    This would take some time.  First, regarding his upbringing, I looked at his life as being in three phases: the first phase being his life with his mother up until about age 13; and then the years that he spent in institutional settings; and then finally, the third phase, after he left the institutions and was out pretty much on his own.

During that first phase of time when he was with his mother, or at least mother had formal legal custody of him, he lived in an extremely unstable situation.  He actually was under his grandmother's care initially as an infant.  When I interviewed his mother, she had very poor recollection of his upbringing and was not very involved in his child care.  That was either taken care of by her own mother, when she lived at home for a couple of years, or he was left basically unattended for long periods of time.  The mother could not recall details of his life, basic things that most mothers can recall about their children, such as when they learned to walk and talk, and how they were potty-trained, and how they did when they were in school.  Stories from their childhood.

She was not around very much during his upbringing.  She was involved in jobs that she held.  She was involved in relationships with a series of men.  And as she said a number of times, he couldn't fit into her life, and neither could his half-brother, Robert.  The father, of course, was not in the picture at all.  He was in prison.  He had no contact with Cory.  Cory was led to believe by his mother that his father was actually a man named Robert Butler, who was actually father to Cory's brother.  Cory only met his father, basically by coincidence, when he was 12 or 13 years old.  And up until that time, he thought the man named Robert Butler was his father.  This was a man that his mother lived with for a short period of time.  He was abusive.  They had a parting of the ways and he was one of a series of men that she lived with at various times who were abusive to her and to the children, and who were involved in drug abuse.  And at various times, those individuals moved in and out of the residence.

**APP.149**

Now, it was very difficult for me to determine where Cory lived and how many times he moved. I know that at least 12 times, his mother changed residence. But there were many more times in which Cory was sent back and forth to other relatives. He didn't have a stable place that was his home. He didn't have a single individual that he could regard as a parent in the sense of someone who is going to always be there, be there and take care of him. His mother nominally would be his parent, but his involvement with her was neglectful and abusive. And he and his brother had evidence of serious emotional problems well before they were teenagers.

He had troubles with enuresis, bedwetting, up until age 11; encopresis, fecal soiling of pants, when he was 10 and 11 years old, which are signs of quite serious emotional disturbance. His brother Robert, at a young age, I believe ten or eleven, made a suicide attempt and was hospitalized for five months in a psychiatric setting. So both these boys were quite emotionally troubled; understandably so, given the kind of extremely unstable environment that they grew up in.

And I mentioned also that there were abusive boyfriends. And the mother related to me a number of violent incidents in which either she or the boys were physically assaulted and threatened by various boyfriends. And Cory had quite serious difficulties with one boyfriend, to the point that she did not think it was safe for him to stay in her residence any longer. That is basically the first phase of Cory's life up until about age 13.

Q   If I could ask the ladies and gentlemen of the jury to go, and you as well, to the green tab and to turn that over to the chronology of events in Cory Johnson's life.

You have basically described what would be the top third of that chronology, I believe.

A   Yes.

Q   And he was, of course, born in Brooklyn, and his birthdate was in ███████████. You have indicated a number of movements by Cory with his mother or without his mother during the time frame from birth to the age of 13, at which time he was committed by her to the state, and ultimately placed in foster care; is that correct?

A   That's correct. At approximately age 13, he was placed in the Pleasantville Diagnostic Center, a residential facility for diagnosis of children with emotional disturbance. He was there for two months of evaluation, and at that point they felt it was more appropriate for him to be placed in an

institutional setting.  It is called the Pleasantville Cottage School.  It is called Cottage School, but actually what it involves is that he lives in a home that's supervised  --  in a cottage with several other emotionally-disturbed boys on the grounds.  There is also a school that he would attend during the day.  And he was placed there basically because the Court determined that his mother was not appropriate, and that he could not be well-raised at home.  He remained there from about age 13 to 16.

Q   If I could refer the jury to the blue tab in your book, open that first document that is behind the blue tab.

Doctor, you have blown that up, I believe.  You have taken a quotation from the petition which removed Cory from the home and indicated -- and I don't want to belabor this because I know that each person who has this can read for themselves -- but in that petition, and this is the language from the Court itself, there was a determination that the child, Cory, had been removed from his home on February 1st, 1982, and that the parent was unable to make adequate provision for his care, maintenance, and supervision; is that correct?

A   That's correct.  And in this tab are the quotations that I selected.  Now, in order to give you the context for these quotations, the next tab has the report, the legal petition, for example, that the quote comes from.  So I'm going to focus on the quotation, but it is possible for anyone to look at where that quotation came from and to read what came before it and what came after it.  In addition, there are other reports as well.

Q   If I can, so that everyone can understand what we are doing, the volume that's behind the blue tab are quotations which you have drawn from reports from the child care agencies.

A   Right.

Q   The specific reports from which these quotations are drawn are behind the orange tab.

A   That's right.

Q   We do not intend to read all of those reports or to require you to read them, but they are there in case there was a concern that your quote had been taken out of context; is that correct?

A   That's correct.

Q   And the items that are behind the orange tab are excerpts from the reports that are contained in these volumes that were supplied by the child care agencies.

A   That's right.

Q   If you would, can you relate to the ladies and

gentlemen what occurred and how things were occurring once this second stage arrives in Cory's life, where he has been voluntarily, by his mother, removed from his home or her home and placed with the state?

A    Yes.  Once he was placed with the state he had a series of psychiatric, psychological, and educational evaluations.  He had those initially when he first came there so that they could decide what needed to be done, and then he had further evaluations repeatedly over the years that he was there as they tried to monitor his progress and refine their treatment to help him.

And what I have done is I've gone through all of those records page by page, and what I have selected here are the ones that I felt that were most influential to me in formulating my opinion, and which I think accurately reflect his time spent at this institution.  And then I follow that up by contacting the authors of most of these reports.  I talked to six individuals that I could identify, and spoke with them about the reports to make sure I understood what they were saying and that I had an appropriate interpretation of what was said.

First of all, from the very beginning, they assessed that he had serious emotional problems.  They reported emotional disturbance that he had prior to coming to the child agency, and then they described what he was like once he is there.

The first psychiatric evaluation, which actually is page six of these quotations, describe that he was cooperative, that he related well, but that he had a slurred speech, and he said he doesn't want to come home for awhile so that "I can straighten my head and my mother can straighten herself out."  Quotations that he made to the psychiatrist who saw him, Collimuttam.

Cory feels he has problems with learning and reading.  He likes the school and the counselor here.  Cory feels sad when his mother keeps telling him about his father being in jail.  He has felt at times like wanting to stab himself, but has never done anything to hurt himself and doesn't think he will ever do it.  Cory talked about his brother trying to kill himself, "because of my mother," he said, and says that he feels very sad about it.

Q    Cory's brother was younger?

A    His brother was two years younger.  He made a suicide attempt and was placed at another agency called Children's Village, and he was there for awhile and then later was switched to Pleasantville as well.

Dr. Collimuttam I thought, summarized well his

early impression on page seven. He says, "life has been very chaotic for this family with Cory's mother having had financial problems, having difficulties with her job and her relationships. Mother appears depressed and unavailable to the child emotionally. There have been frequent moves, stays in the homes of relatives often with the mother and children being in different homes. This was followed up with a period of being with the mother's boyfriend, who Cory did not get along with and would steel from to get back at home. Cory is a child who has been reacting to the chaotic life in the last four years. In

3583

addition, he has shown evidence of mild to moderate neurological deficits of dyslexia and speech impairment."

And then Dr. Collimuttam gave him diagnoses using our standard diagnostic manual, the DSM-III. He saw him as having an adjustment disorder, which means he was reacting to stressful events in his life with symptoms. He was diagnosed as having a special developmental reading disorder. It is another term for dyslexia. It is another term for learning disability. Those are all interchangeable terms. He was also diagnosed as having positive soft neurological signs, which means that there was evidence that he had brain damage.

He was then given a psychological evaluation by a psychologist. This is a little bit out of order. This is on page five. Dr. Cary Gallaudet gave him a series of psychological tests. He described serious problems, deficits in nonverbal abstract reasoning, perceptual organization, visual perception and perceptual motor functioning. These weaknesses were also evident in his Bender-Gestalt test, which was characterized by rotations and distortions. Performance was comparable to a child five years below his chronological age, an underlying

3584

neurological deficit.

Q    Cory was age 14 at this point in time. Then he would have been operating at the level of a normal nine year old?

A    At the level of a 9 year old, yes. Yes, in these areas where he showed brain impairment. It says, "In summary, Cory is a sensitive and dependent boy who is struggling with issues revolving around independence. An underlying organic component," that means brain damage, "serves to exacerbate the anxiety, dependence, affectional needs, and hostile impulses, and as a result, Cory has an extremely hard time trying to integrate emotional challenges. Although evidence of a learning disability exists, he continues to be an ambitious boy who is motivated to

improve his situation and would benefit highly from both remediation in academic areas as well as psychotherapy."

What's surprising about this statement and other statements that follow is that Cory remained very motivated. He remained cooperative, eager to learn, and willing to take on the challenge of his disability. If any of you have had experience with learning-disabled youngsters, you know that even mildly disabled youngsters become discouraged. They try to avoid their disability, understandably so. What was unique about Cory was, first of all, that he had a very severe learning disability -- I'll talk more about that later -- but that he continued to be motivated to try to overcome it. He had an educational evaluation. That's page eight of the quotations, by an education specialist who again pointed out that he was reading on the second-grade level. Third-grade level was too difficult to read. His spelling was second-grade level. His arithmetic was mid-third grade. It said that he couldn't multiply by three. He couldn't divide a number by two. He couldn't read digits of more than four digits. He could recite the months of the year only up to August. He knew there were 12 months, but he couldn't say them all. So this is when he is 13 years old. And he doesn't know all the months in the year, he can't read and do arithmetic beyond about a second or third-grade level. Of course, he has moved at least 12 times and had to change schools and classrooms, and I'm sure that he wasn't given much of an opportunity for teachers to work with him while he was in schools.

I also looked at part of this at what his mother was like at this time. Because a very important part of any kind of treatment is to get the family involved and to work with them. And I got very consistent descriptions of his mother, who was the only family member that they had any contact with. This is on page nine, Gloria Caro, caseworker assigned to work with him, they have a conference report. This conference involves a psychiatrist, a psychologist, teachers. The mother is invited to come, although most of the time she did not come, and Cory participates in parts of these conversations. But the caseworker -- he had a series of caseworkers -- the first one said, "Ms. Johnson is an attractive, stylishly-dressed woman who works as a receptionist. She is an articulate woman who reacted to my statement with anger, indicating she is trying to put her life together. She says right now she does not have too much energy or time for her kids.

**APP.154**

She believes they will have to understand it.

"The message is, if her kids can live her life right now, okay.  If not, she can't see them.  She says she loves her kids, but putting her life together comes first.

"A joint interview with Cory elicited almost no comment from Cory, who stared at the ceiling while his mother pretty much lectured to him on how insensitive he was to 'where I am now and have to be.'  It was not concern for him and his situation, being separated from family, being institutionalized."

She continues.  She says, "It is difficult to see how Ms. Johnson can be engaged unless her needs are seen as primary.  She refuses referral for treatment for herself.  Further contact will reveal how fixed she is in this narcissistic, self-focused stand."

This is June.  He has been in the setting for about four months.  They are concerned that they cannot work with the mother, and this continued.  In January of 1983, this is page ten, he now had a new caseworker, had a change in caseworker.  He has now been in the institution almost a year.  And here we have the quotation you may have heard before:  "Child care workers note that Cory's behavior deteriorates when he has no contact with his mother.  He can become quite depressed when he has not heard from or seen her for a period of time.  It is the opinion of the child care workers that Pleasantville is good for him, that he is functioning fairly well here.  Cory realizes his learning disabilities.  However, he struggles to do his homework.  He is truly motivated to do well and succeed, and he has not yet given up on himself.  Within the last two weeks, there has been some decline.  Cory fantasizes that his mother will come up in a car and take him to Pizza Hut.  Child care worker reports that Cory's mood is basically that of a depressed child."

It continues to report that Cory wants to have contact with his mother, wants to have contact with his father.  He tries to maintain the view that they are available to him.  He cares about them, but not accepting that they are not available to him.

Q    If I might, obviously, these reports being written by his workers in 1982 and 1983, and for that matter, the remaining ones that you are going to comment on, obviously were not done in anticipation of a trial proceeding.

A    That's right.

Q    These are excerpts taken from the reports of evaluations being done of Cory in an effort to help

A     That's right.

Q     That transfer was made in the summer of 1984.

A     They made the transfer, started giving him summer employment jobs, doing manual labor.  He held a variety of summer jobs.  He was proud of the fact when I spoke with him, Cory was, that he stuck out those jobs.  He worked at them even though he didn't particularly like the manual labor that he had to do.  He also was placed in a more vocational-oriented program called BOCES.  It is a special educational program in which he was learning carpentry and did reasonably well.  He tended to do best when he did things with his hands that did not involve language.  Anything that involved language, he had serious impairment in.

Q     The last sentence in that first paragraph on page 15?

A     Yes.  "He is supposed to receive remedial reading and speech therapy, but for reasons not clear, has had no one-to-one instruction for several months."  This is a report of another psychiatrist, Dr. Clemmens.  This is, I think, the third psychiatrist to see him.  And again, they had trouble providing him with the special services he needed, and for some reason these services lapsed at various times.

Q     And this certainly was in spite of his desire to be  --  to have this treatment, to address his problem; is that correct?

A     He voices it here.  I think now at 16, he has been there several years.  He says, "Cory was sarcastic and extremely resentful about receiving neither remedial reading or speech therapy."  The psychiatrist quotes him.  "'School-wise, they haven't done a thing for me.'  When I questioned the lack of remedial reading he answered angrily, 'They get my hopes up high and then you do no shit.  That's why I want to depend on nobody no more.  You are all full of shit, every one of you.  Nobody has raised a finger."

He had an angry outburst to this psychiatrist over his frustration.  And then when I read that I thought well, he is now starting to really bad mouth the institution and show a more negative attitude.  I wondered what the staff think of him.  Dr. Clemmens in that report says  --  he agreed with him.  She said, "Outside of being raised in a problematic family he has to cope with a severe learning disability which is highly frustrating and embarrassing.  It is understandable that he feels bitter and resentful about not receiving adequate help.  In addition, it is difficult for him that he

apartment in a highrise. A social worker is assigned to meet with him weekly, to meet with the mother, and to continue to work towards Cory eventually going home. That's the plan. She expressed in this quotation her frustration.

"Ms. Johnson is extremely elusive. I have made

**3616**

numerous appointments with her and she has not kept them. She will call and cancel, but she will not follow up and make another appointment. She is also not terribly responsible about calling and arranging for Cory to come home over the weekend. Even though Ms. Johnson is quite irresponsible in her relationship to Cory, Cory talks about her as if she is a goddess and is terribly responsible in relation to her. It is as if he is compensating for her real neglect of him." This is stated several times in the records.

Q Ms. Noble makes a second report in the group home conference report on page 21.

A Right. It is now 1986, six months later or so. "On the whole, Cory continues to be using the residence well, and would seem to want to remain living there. He has made relationships with both the house parents and the boys, and is liked by both. Cory continues to be quite active and assertive in how he handles himself. And he can be a bit of a monopolizer. But the boys continue to take this in their stride and not seem to mind it. He talks a lot, apparently, in group meetings. Part of the boys' acceptance would seem to be related to Cory's ingenuousness and decency. Cory is very in

**3617**

earnest about succeeding and articulates that point of view to the other boys." At another place, they talk about him sort of almost like having a preacher quality. He is telling the other boys they have to do well.

MR. VICK: The editorialization, I thought, was not appropriate. I object to it.

THE COURT: The objection is overruled.

BY MR. COOLEY:

Q That reference is not -- that's coming out of the reports, isn't it?

A I'm referring to portions of the report that I read, that are not in the quotation, to try to explain them. Let me just read verbatim what he says here. "One senses that periodically Cory might feel the wish to live with his mother, but he doesn't discuss it openly and, I think, deep down he knows that his mother is just not able to provide a stable, secure home for him. Cory is quite secretive about his mother's lifestyle and doesn't share with me and, I don't believe, with the house parents, some of his

**APP.157**

chagrin at what his mother does.  We only pick it up by his behavior and what he does not say."

Q    Finally, Doctor, the difficulties with his mother continued to be reported in the June, 1986 report.  They had not seen her or had any contact with her at that point in time?

A    Right.

Q    And then Cory became aware of her own  --  of her, being his mother's, difficulties with the authorities.

A    That's right.  It says at the beginning of March '86, Cory learned that she was arrested and was in jail in New Jersey.  He told his house parent to inform me, and then Cory and I discussed it.  I haven't heard from her or any other family member.  Cory states he doesn't believe his mother is guilty and that she was framed.  He acknowledged it had something to do with the use of credit cards.  I suspect Cory knows the truth, but is keeping it from us."

Q    Doctor, let me ask you if you would to go back to the chronology, which is behind the green tab at the front of the book.  At this point in time, you have brought him down through the summer of 1986.

A    Yes.

Q    In the summer of 1986, the entry there on chronology that shows his age, 17, he was involved in something that brought him into the criminal justice system.

A    Yes.  That's right.  During this time he became aware of his mother's increasing involvement in drug abuse, crack addiction.  He was very upset by that.  His attitude declined dramatically.  And he became more involved with several of the other boys, Dwight and Mitch, who lived in the group home.  And he related to me that he wanted very much to be accepted by these boys; they were his friends.  He felt like they were  --  like he was loyal to them.  And one fellow, Mitch, whom he looked up to, told him he was having trouble with another boy.  He referred to him as a Hispanic young man.  And Mitch encouraged Dwight and Cory to go with him to try to intimidate this other boy.

And Cory related to me that they in fact did go up to this boy and threatened him, and that this boy, somewhat to his surprise, pulled out his paycheck -- Mitch and this boy worked together -- and gave it to them.  So in essence, they robbed him.  He told me at first they hadn't intended to do that, but when they saw that this boy did it, they went back and did it a second time.  And when that happened, the police were contacted.  Mitch was arrested.  Mitch then was

interviewed by the police and revealed that he was assisted by Cory and Dwight.  Cory and Dwight then spoke with their foster care people and went down to the jail or to the police department and turned themselves in.

Q    He was, in fact, incarcerated at that time at Riker's Island?

A    He was put in jail initially.  He was bailed out by the foster parents.  He then pled guilty and received a sentence of, I think, ten to twelve days in Riker's Island, which is a rather well-known, rather rough jail in an island in New York City.  And he was very distressed by that experience.  That was a very troubling experience.  He had never been exposed to quite that kind of environment before.  But he had got involved with Dwight and Mitch, wanted to be accepted by them.  Mitch wanted to take revenge on another boy, and Cory, who I don't think really knew this boy, wanted to be loyal to his friends and do what his friends did, and he got himself involved.  He admitted this candidly do me.

Q    No disputing he was guilty of that?

A    No.  He told me he was guilty.  He told me what he did.  He told me he was in jail.

Q    He continued after that to stay at Elmhurst for some months; is that correct?

A    Well, he came back to Elmhurst, after his time in jail.  He showed a real decline in attitude.  He seemed very uncooperative with the foster parents there.  He expressed a lot of anger.  They continued to press him about what was going on with his mother.  He got angry.  He was offended by that and he defended his mother.  And at one point, I believe in February, several months after this arrest, he had an argument with the staff and they laid down the law to him.  They told him "Look, if you aren't more cooperative, if you don't agree to follow our rules, you are going to have to leave."  I checked into it carefully.  He had not assaulted anyone.  He had not broken laws there.  But he was showing a bad attitude and they didn't accept boys there who didn't show that they wanted to be there.  So they told him that he would have to temporarily go home until his attitude improved.  And so he abruptly left, and he did not return.

Q    And thereafter, was there an occasion in which he was charged with an offense?

A    That's right.  He returned home to his mother, continued going to school, was suspended from school for squirting a teacher with a fire extinguisher the last week of school, did not attend his graduation.

Q    Was he to receive a diploma if he graduated?

3622

A    Well, there is  --  the mother couldn't tell me.  She didn't know.  My best understanding from the records and from what Cory told me is that he was to get a certificate of completion; that he couldn't get a full diploma because he was in the occupational training program and he could not pass the literacy test to get a diploma.

Q    Thereafter, he got into some trouble; is that correct?

A    Yes.  After that time, he was arrested and accused of another robbery with several other young men.  He was put in a police line-up and he was identified in the police line-up.  He strongly indicated to me and also indicated in the record at that time that he was mistakenly identified; that he was not  --  that he did not commit this offense.

Q    So as to that alleged attempted robbery, he denied that he was indeed the person who had committed that?

A    Yes.  That's the only thing he ever denied to me.

Q    From the birth through age 21.

A    Ever.

Q    In discussing those items with him, he acknowledged guilt and wrongdoing at any point where

3623

it was raised.

A    Yes.

Q    But as to this issue he did not, and in fact adamantly proclaimed his innocence; is that right?

A    That's right.  He acknowledged to me a number of extensive involvement in some drug dealing and illegal activity.  This is the only incident of which he was accused which he told me he did not do and that he was falsely accused.

Q    In spite of his proclamation of innocence, based on one-on-one identification of Cory, he was indeed convicted.

MR. COOLEY:  And Judge, we would reference for the record, I believe it is Government Exhibit PP-1, which is the conviction for attempted robbery.

BY MR. COOLEY:

Q    And he received what penalty?

A    I don't know the exact penalty.  He decided to plead guilty because he was told that he would receive several years in prison if he were convicted, and that he would be convicted.  And he decided that if he pled guilty he would get a period of up to a year.

MR. COOLEY:  And indeed, Judge, if we can ask the Court to take judicial notice of that, that

3624

exhibit, there is a one-year sentence to Riker's

still present and that I would arrive at the same diagnosis based on my own sources of information.  So I went back and conducted my own psychological testing of Cory.

Q    Now, these would be found behind the white tab in the book; is that correct?

A    Yes.

Q    And there are some blown-up  --  Marshal, could you help me?

       (Documents displayed on easel before jury.)

BY MR. COOLEY:

Q    Doctor, can you tell the ladies and gentlemen of the jury the results of your tests?  And they have before them in an expanded version, blown-up version, the graph.

A    Yes.  I'll try to be brief about this.  First, I wanted to document his level of intelligence.  I gave him the standard individual intelligence test called the Wechsler Adult Intelligence Scale-Revised Version.  It is a standard test for adults to assess their intelligence.  He had been previously given the children's version of that test when he was younger.

3681

This test is composed of a number of sub-tests that are listed here: information, digit span, vocabulary, and so on.  And those scores are combined to give you the person's IQ.  You expect that on each of these tests, the average score is a 10.  That is, the person right at the fiftieth percentile, right in the middle of the population in his age group, would attain a 10 sub-test score.  The average person gets a 10, sometimes you get a 9, 11, 12.  You vary a little bit around 10 as a big point.

     Obviously, a very bright person gets scores over 10, and a less intelligent person gets scores much lower than 10.  In Cory's case, you will see he started off getting 5's and 6's in all of these first set of tests.  Those are consistent with someone who is mildly retarded.  That is, if he had continued to get that pattern of 5's and 6's on all his tests he would have scored in the retarded range.  Those initial tests, the first ones that are listed there where he got the 5's and 6's, are all of the verbal tests, the language tests, vocabulary, arithmetic, comprehension, all things that involve use of language.

     The latter tests where he started to score higher are the nonverbal tests, sometimes called the

3682

performance tests.  These are tests that involve puzzles, blocks, things that he does with his hands. You will recall he had some carpentry training that probably enhanced his skills in that area.  And in those areas, he did better.  And actually, on one of

**APP.161**

them he got a 10, which would be the average expected score for a normal individual.

Because these latter scores were higher, his overall IQ fell above the range of mental retardation, just above that range.

(Another document displayed on easel.)

BY MR. COOLEY:

Q    The next to the last page in that section is a bar graph that is entitled "Reading and Math Scores."  Would you tell the ladies and gentlemen of the jury very briefly what that entails and what that shows us?

A    I gave him an intelligence test, but also gave him an achievement test.  Again, I gave him the standard individually-administered achievement test, the Woodcock-Johnson Test of Achievement.  This is a test.  Actually, I didn't give him the entire test.  There are 20-some parts to this test.  But I gave him specifically the tests in reading, two tests in reading and two tests in math, identification, and

3683

comprehension.  Identification is his ability to identify a word -- identify words.  He is presented a word, has to be able to pronounce what that word is to show he can identify it.  In Comprehension, he has to be able to comprehend the meaning of a sentence and choose the correct word to complete a sentence.  Those turn out to be too easily objectively scored tests of reading ability.  On both of those he scored at the second-grade level, a 2.4 means at the second-grade level, a 2.6 also is at the second-grade level.

In the area of mathematics.  The first is calculation, which is ability to do arithmetic problems: addition, subtraction, division, multiplication.  And there he scored at the sixth-grade level, 6.7.  He also had applied problems, which are kind of common sense word problems, such as how much change should you get back if you are buying something that costs a certain amount of money, so forth.  That's sort of a practical arithmetic skill.  There he was at the fourth-grade level.  So certainly, the second-grade scores in reading were very consistent with what he had obtained when he was a teenager.  The somewhat higher scores reflect the fact that he was able to do

3684

somewhat better in arithmetic, although obviously still a very low level.

Q    Finally, the last bar graph, the last page of that section, is labeled "Intelligence and Achievement."  Can you tell the ladies and gentlemen of the jury what that represents?

A    This bar puts together those two tests.  That

is, we look at someone's intelligence and look at their achievement and see if they correspond.  We expect that a person's achievement should be commensurate with their intelligence.  That is, even if you have got low intelligence, you ought to achieve up to the level of your intelligence.  Now, if you look here on just the right-hand side, you will see where it says "Math."  The black bar graph where it says 100, that's the expected level that the average person at the 50th percentile would get in both intelligence and achievement.  So that's sort of our standard.  In intelligence he gets a 77.  That was his IQ result.  That's clearly well below average.  It is close to the level of mental retardation.  In math he gets a 77.  If I take those grade-level scores and I can look them up in a table and transform them into a standard score, he gets a 77.  So his math level is equivalent, exactly

equivalent, to what his intellectual level is.  That to me is an indication that he is not learning disabled in math.  He is low in math, but he is at the level you would expect, given his intelligence.

If we look on the left, those three bars are not even.  We have the 100 standard bar that's black on the left, and he has a 77, which is the same intelligence score.  But then his reading is 53.  That is, if you transform that second-grade reading level into a standard score, it is a standard score of 53.  And that is clearly in the mentally retarded range, in the moderately retarded range, actually.  So that we cannot only see in this graph that his general intelligence is low, but his ability to learn in the area of reading is lower still.  So a person can be both mentally retarded and learning disabled.  In his case, he is very low in general intelligence, although not retarded, and learning disabled.

Q   Doctor, also, I believe you did a test in the course of this relating to Cory's writing.

(Document displayed on easel.)

A   I gave him a standard test of his ability to write, a test of written language, TOWL, the part of the test that is most commonly used.  The person is given a picture.  You see this outer-space scene.

And the young person is asked to make up a story to go with the picture.  They are given 15 minutes to write up a story.  Then you evaluate the story for its vocabulary, spelling, grammar, for its complexity of the themes that are presented, and this is the story that Cory gave me to this picture.  This was very striking to me because this story is very immature.  The writing is very immature.  The spelling is very immature, leaving aside the

penmanship.

Q    This is reprinted in the book before the ladies and gentlemen.  It is the fourth page back in behind the white tab.  And the third page back is your findings related to that; is that right?  And it also includes your typed-out interpretation of what Cory wrote.

A    Yes, I typed out what I thought he wrote.  There were a couple words I couldn't decipher, but I typed out the story which you can read and see is a very immature story.  And then below that, I have listed the scores that he received for this story, and the typical age level of someone who writes a story of that type.

Q    He begins his story with "Me and my mom."

A    You want me to read that?

3687

Q    Well  --

MR. VICK:  It is all in front of the jury.

MR. COOLEY:  I'm not going to use it.

THE COURT:  All right.  Go on.

BY MR. COOLEY:

Q    But the story was about Cory and his mother going to the moon?

A    That's right.  He chose to tell a story about he and his mother going on a trip together to see the rockets.

Q    And obviously there was more space, but he ended where he did.

A    Yes.  His story was a little short for someone of his age.

Q    Now, Doctor, you also had an opportunity to refer Cory for evaluation by Dr. Peck; you made some reference to that.  Dr. Peck is a neuropsychologist.  His report is found behind the pink tab in the book.  And I will ask you to somewhat rapidly summarize what the findings from Dr. Peck showed.

A    I gave intelligence and achievement.  I asked Dr. Peck to give him neuropsychological tests, which are sensitive to brain damage, to see if we could identify specific areas of brain impairment or dysfunction.  These tests are commonly given when

3688

someone has had a head injury or has  --  there is reason to believe that they have had some kind of brain impairment.  They are very technical tests.  There is a large number of them.  Nobody is expected to do poorly on all of them; that is, they tap as many areas of brain functioning as we have tests for, everything from abstract reasoning to fine motor coordination, visual motor coordination, auditory processing, lots of different areas.

And what Dr. Peck found is that Cory's performance indicated abnormal neuropsychological

functioning.  That is, it did indicate impairment, brain impairment, in a number of areas.  First of all, he found that he had impairment in visual memory, memory for things he sees, and visual sequencing.  That is, the ability to keep things in proper order sequentially, visually.  Now, if you think about reading, those are two critical skills. You have to keep the letters in the proper order and the words in the proper order, and you have to be able to remember what words are, how they are spelled and so forth, in order to read.  He has deficits in both those areas.

In addition, Dr. Peck found that he had deficits in auditory processing.  That is, often, if somebody can't read and they have visual problems, you try to teach them auditorily through the spoken word.  But he has deficits in auditory discrimination; that is, the ability to listen and understand what is said to him.  At the end of this complicated report that Dr. Peck has written, he points out that this kind of person could have difficulty understanding what people are saying, and that that could create social and interpersonal difficulties for him.  He doesn't quite understand when people are arguing with him or talking with him, what they are saying and what their intention is, and he doesn't have good skills in that area.  Abstract reasoning and judgment were poor. For example, on the category test, which is a highly sensitive test to brain impairment, he shows inflexible thinking; that is, kind of approach to problems where he cannot shift from one approach to another approach.  He cannot, when he is making an error or making a mistake in solving a problem, he does not show the ability to recognize a mistake and to shift from that mistake to another strategy.  He tends to persist in a poor strategy of solving problems.

So in a number of different areas, he shows neuropsychological impairment.  Not all areas. Rarely does anyone show impairment in all areas.  But he shows impairment in quite a number of them.

Q    If I could, I would move your attention to the concept of mental retardation.  I would ask you to look at this last chart that's being displayed to the jury.  Can you tell the ladies and gentlemen of the jury what they are being shown at this point?  And this would be the last page behind the second green tab, the definition of mental retardation.

A    Yes.

Q    What does the term mean?

A    Mental retardation means that the person has significantly sub-average intelligence which can be

measured by a general intelligence test, as well as impairment in adaptive behavior. Adaptive behavior means their ability to sort of function in every day life; to have practical intelligence, if you will, and good survival skills. And you can measure the first part by giving them an intelligence test. Individuals that fall in the range of 70 to 75 can be considered in the range of mental retardation. And then of course, anything lower than that indicates mental retardation. In addition to having low intelligence, you need to show that the person has impaired adaptive behavior in any two of about ten areas that are listed there. Certainly functional academics, the ability to do academic work is one in which he has impairment. Also, communication deficits with his speech impairment and communication problems, he has some deficits there. Self care, social skills, work, the ability to maintain a job, to have good work habits, to use the kind of common sense you need to hold a job, all of those are possible areas in which his functioning is not at a normal level. As I said before, my conclusion was that he is just above the level of mental retardation.

Q    And Doctor, when you made that, reached that conclusion, you were aware that if he could be categorized as mentally retarded, that Cory would not be death-eligible under the statute; is that right?

A    Yes. I realized this was a very serious issue. The law states very specifically that if he were mentally retarded, we would not have this sentencing hearing for the death penalty. So I checked my scores, went back, and saw him a second time. I consulted with colleagues. I wanted to make very sure that this was an accurate score. Because the definition of mental retardation is not a hard and fast absolute. It is a gray area. And people have stereotypes of mental retardation as someone who looks very impaired and looks unusual and so forth. But in fact, many mentally-retarded people look very normal and can function fairly well in daily life. So I did not very easily reach this conclusion that he is just above the level of mental retardation.

Q    And exactly where is he? How close is he to being mentally retarded?

A    The IQ score I got was 77. If he had gotten a 75, he would be within the range that counts as mental retardation. 70 to 75 is kind of the gray area. If you are in that area, you can be mildly retarded. He was two points above that, which is a matter of one or two questions on an intelligence test that would make the difference there.

APP.166

Q    Doctor, would it be fair to say that most mentally-retarded folks are only mildly retarded?

A    Yes.  There is a social stereotype we have of the retarded person that really is of the more seriously retarded person.  We used to think that everybody who was mentally retarded would have to be put in an institution and they could never live on their own or function or hold a job.  In fact, if you put people in institutions they will become institutionalized and sort of look and function that way.

    We now know that a mildly retarded person can be educated up to about the sixth-grade level.  We know that a mildly retarded person can hold a job if they have good training, if it is a structured job, if they have good supervision.  We know that many mildly retarded people get married, live on their own, pay their bills, have families.  So we know that mild mental retardation doesn't mean that the person is completely dysfunctional, the way that you might characterize it on television, but has some capabilities.  And so I had to compare that to Cory.

Q    On some tests Cory was given by you and on some of the tests he was given by the folks at Pleasantville Cottage School back in his adolescent years, Cory in fact scored in the mentally retarded range, did he not?

A    Yes.

Q    And would it be fair to say that in some areas, Cory functions on the same level as someone who is mentally retarded?

A    That's correct.

Q    And is it fair to say that because of his intellectual limitations, that Cory Johnson has impaired ability to reason?

A    Yes.

Q    Would it be fair to say that Cory Johnson has an impaired ability to use good judgment to control his behavior?

A    Absolutely.

Q    Would it be fair to say that Cory Johnson has impaired ability to understand and foresee the consequences of his actions?

A    He has impairment in that area, yes.

Q    Is there anything in the scientific literature on mental retardation about individuals with these limitations committing illegal acts?

A    Yes.  It is not uncommon for individuals who are mildly retarded to commit illegal acts.  We find, in part of assessing their adaptive behavior, that very commonly they do break the law.  They use poor judgment.  They don't have good self control.  And

they do break the law.

Q    Is it the case that mentally retarded individuals are often very dependent on others and tend to rely on others in the decisions they make?

A    Yes.  That's one of the factors you have to consider, because part of the limitation is that the person then is more vulnerable to what other people tell them to do or suggest that they do, or look for

cues in what other people are doing and try to fake it, emulate them.  And individuals with severe intellectual deficits are very susceptible to that kind of pressure.

Q    And while Cory Johnson is technically not mentally retarded, because he does have these similar intellectual limitations, would it be fair to say that he may be overly dependent on others and tend to rely on others for decisions?

A    Yes.

Q    Is it not the case that mentally retarded individuals are often overly susceptible to influence by others, doing what others direct them to do?

A    That's a standard part of when you evaluate anyone who is mentally retarded; you expect that that problem is going to be present to some degree, and it usually is.

Q    Part of their brain impairment is impairment in the ability to use independent judgment when somebody wants them to do something.

A    Yes.  And to foresee future consequences of actions.  That is, you can put a mildly retarded person and give them a very structured question, a very specific situation, and they can sort of give you the right answer.  But then you put them in a

different situation when they are in a different emotional state and they don't give you the right answer anymore.  They don't use the same level of judgment.  They are variable in their level of functioning.

Q    Would it be fair to say with the limitations that Cory Johnson has, as you and the other professionals and the reports have indicated, would it be fair to say that he, too, could be lacking in independent judgment and susceptible to being influenced by others?

A    To some degree, yes.  He would have to be.

Q    Does learning ability only affect ability to read and write or to do other kinds of schoolwork?

A    No.  That term is used because that's where it is first identified, but there is more to it.

Q    Is that just your opinion?

A    No, it is not.  If you take any standard textbook on learning disability, Handbook of Learning

# EXHIBIT 9

| DISCHARGE/TRANSFER | | JOHNSON. | | COREY JOHNSON | ▮ |
|---|---|---|---|---|---|
| CHANGE IN PERMANENCY PLAN | COMPLETED BY Lynn Polstein | | DATE 4/13/84 | SSC NUMBER 4766716-28 | |
| ☐ DISCHARGE ☐ TRANSFER | AGENCY/DISTRICT JCCA/PCS | | | LOCAL DISTRICT/AGENCY USE | |

- Complete a Discharge Plan for child in foster care 6 months prior to discharge or at the time the decision to discharge is made.

- Complete a Transfer Plan for child in foster care prior to transfer between Child Caring Agencies or Districts.

**PLAN**

We are requesting a change in permanency plan, from discharge to parent to discharge to self.

During the course of placement it has become clear that Ms. Johnson cannot provide Corey with the emotional support and attention he needs to overcome his severely impaired self-concept. Corey, who is severel learning disabled and barely able to read, feels inept and damaged. His mother is a narcissistic and self-focused woman whose lack of empathy and sensitivity toward Corey, exacerbates his bad feelings. When he is feeling depressed, he resorts to anti-social behavior to avoid this feeling.

**JUSTIFICATION OF DISCHARGE GRANT** to parent, relative or child when essential to effectuate discharge.

**ANTICIPATED LENGTH OF TRIAL DISCHARGE:**

**APP.170**

| COMPREHENSIVE SERVICE PLAN CHILD | | CASE NAME | JOHNSON, EMMA | | CHILD'S NAME | COREY JOHNSON | Date of Birth |
|---|---|---|---|---|---|---|---|
| ☐ 90 Days   ☐ 6 Months | | COMPLETED BY | LYNN POLSTEIN | DATE 4/13/84 | SSC NUMBER: 4766716-28 | | |
| ☐ Change in Program Status | | AGENCY/DISTRICT | JCCA/PCS | | LOCAL DISTRICT/AGENCY USE | | |

| CCRS CODE | PERMANENCY GOAL | ANT. COMP. DATE |
|---|---|---|
| | DISCHARGE TO SELF | |

| CCRS CODE | GOAL NO. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 1 | COREY WILL CONTINUE TO PARTICIPATE IN THE INTENSIVE REMEDIATION PROGRAM. | |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

| CCRS CODE | GOAL NO. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 2 | COREY WILL USE OPPORTUNITIES OFFERED HIM TO LEARN INDEPENDENT LIVING SKILLS. | |

| CCRS CODE | OBJ. NO. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | A | Corey will explore the possibilities of an off-campus job. | | A cottage parent will help Corey read ads and apply for a job. |
| | B | Corey will learn how to handle money so that he can begin to shop for himself. | | Teacher will help Corey learn enough simple arithmetic that he will be able to figure out correct change. |
| | | | | |

Case 3:92-cr-00068-DJN   Document 39-10   Filed 08/19/20   Page 4 of 6 PageID# 1683

| DSS-3404-C (3/81) NYC **COMPREHENSIVE SERVICE PLAN CHILD** | CASE NAME JOHNSON, EMMA | | CHILD'S NAME COREY JOHNSON | Date of Birth |
|---|---|---|---|---|
| | COMPLETED BY LYNN POLSTEIN | DATE 4/13/84 | SSC NUMBER: 4766716-28 | |

| CCRS CODE | Goal No. | GOAL | COREY WILL USE TREATMENT TO RESOLVE HIS FEARS THAT HE WILL LOSE HIS MOTHER THROUGH CONTINUED PLACEMENT. | ANT. COMP. DATE 10/8 |
|---|---|---|---|---|
| | 3 | | | |

| OBJECTIVE/CLIENT TASK | METHOD/SERVICE TASK |
|---|---|
| CCRS CODE / Goal No. | CCRS CODE |
| CCRS CODE / Goal No. | CCRS CODE |
| CCRS CODE / Goal No. | CCRS CODE |

**DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN.**

MEETING HELD 4/12/84.

**BRIEFLY DESCRIBE ANY COURT INVOLVEMENT** in this case and indicate services which are being provided pursuant to a remand or court order.

For Child in Foster Boarding Home or Agency Operated Boarding Home, **DESCRIBE THE AGENCY PLAN OF CONTACT BETWEEN THE CASE WORKER AND CHILD IN NEXT PERIOD. INCLUDE FREQUENCY AND LOCATION.**

**CLIENT CONCURRENCE (Optional)**

I understand that all information pertaining to my case, including this Plan for Service developed by my worker and me, is confidential.

I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including the opportunity for an Administrative Review and Fair Hearing.

My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.

| SIGNATURE OF CLIENT, Parent or Guardian | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| X | | X | |
| CASE PLANNER'S SIGNATURE X *Lynn Polster* | DATE 4/16/84 | SUPERVISOR'S SIGNATURE X *Bernice Falk* ( by LP) | DATE 4/16/0 |

**APP.172**

| | | | CASE NAME | | | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|---|---|---|---|

**COMPREHENSIVE SERVICE PLAN**
**FAMILY**

CASE NAME: JOHNSON

COMPLETED BY: LYNN POLSTEIN  DATE: 4/13/84

AGENCY/DISTRICT:

☐ 90 Days  ☐ 6 Months
☐ Change in Program Status

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 1 | MS. JOHNSON WILL REMAIN CONSISTENT IN HER CONTACTS WITH COREY DESPITE THEIR DECISION TO LIVE APART. | 10/ |

| | | OBJECTIVE/CLIENT TASK | | | METHOD/SERVICE TASK |
|---|---|---|---|---|---|

| CCRS CODE | Obj. No. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | A | Ms. Johnson will encourage Corey's regular visits. | | Social worker will continue regular meetings with Ms. Johnson around the issue of her continued involvement with Corey and the importance to him of feeling like family member even though he live apart from the family. |
| | B | Ms. Johnson will include Corey in all family celebrations and occasions. | | SAME AS ABOVE |
| | C | Ms. Johnson will not withdraw from Corey in response to her perceived belief that he is withdrawing from her. | | SAME AS ABOVE |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 2 | MS. JOHNSON WILL LEARN TO SUPPORT COREY'S STRENGTHS AND ACCEPT HIS WEAKNESSES. | 10/8 |

| CCRS CODE | Obj. No. | OBJECTIVE/CLIENT TASK | CCRS CODE | METHOD/SERVICE TASK |
|---|---|---|---|---|
| | A | Ms. Johnson will demonstrate approval of Corey's athletic abilities. | | Social worker will work with Ms. Johnson around giving Corey approval for what he does well and making less important those areas in which he has poor success. |
| | B | Ms. Johnson will de-emphasize Corey's academic abilities. | | SAME AS ABOVE |
| | | | | |

| DSS-3404-F (3/81) NYC | CASE NAME | | LOCAL DISTRICT/AGENCY USE |
|---|---|---|---|
| **COMPREHENSIVE SERVICE PLAN FAMILY** | JOHNSON | | |
| | COMPLETED BY | DATE | |
| | LYNN POLSTEIN | 4/13/84 | |

| CCRS CODE | Goal No. | GOAL | ANT. COMP. DATE |
|---|---|---|---|
| | 3 | MS. JOHNSON WILL ENCOURAGE COREY'S ATTEMPTS TO LEARN SKILLS SUCH AS COOKING, SHOPPING. | 10, |

| OBJECTIVE/CLIENT TASK | | METHOD/SERVICE TASK | |
|---|---|---|---|
| **CCRS CODE** / **Goal No.** | | **CCRS CODE** | |
| **CCRS CODE** / **Goal No.** | | **CCRS CODE** | |
| **CCRS CODE** / **Goal No.** | | **CCRS CODE** | |

**DESCRIBE THE FAMILY'S AND CHILD(REN)'S PARTICIPATION IN FORMULATING THE SERVICE PLAN AND, IF APPLICABLE, THE VISITATION PLAN**

Meeting held 4/12/84 with treatment team. Participants included Unit Administrator, acting as Independent Reviewer, Social Worker, Child Care Worker, Ms. Johnson and Corey.

**AGENCY CONTACT PLAN WITH NATURAL PARENTS.** Include frequency and location of planned interviews.

At least quarterly.

**CLIENT CONCURRENCE (Optional)**

I understand that all information pertaining to my case, including this Plan for Service developed by my worker and i is confidential.

I have been informed of the procedures by which I may express and seek remedy for any dissatisfaction, including th opportunity for an Administrative Review and Fair Hearing.

My worker and I will review this Plan for Services on a regular basis to evaluate my progress toward my goal.

I have jointly developed this Plan for Service with my caseworker and understand its content and purpose.

| SIGNATURE OF CLIENT, Parent or Guardian | DATE | LOCAL DSS/SSC SIGNATURE | DATE |
|---|---|---|---|
| X | | X | |
| CASE PLANNER'S SIGNATURE | DATE | SUPERVISOR'S SIGNATURE | DATE |
| X _Lynn Polstein_ | 4/16/84 | X _Bernice Falk (dy)_ | 4/16 |

APP.174

# EXHIBIT 10

APP.175

PLEASANTVILLE COTTAGE SCHOOL

### CURRENT ASSESSMENT

Name of Child: Corey Johnson  
Date of Birth: ███████  
School Grade: BOCES, 10th  
Placement: Voluntary

Date of Admission(PCS): 4-26-82  
Date of Admission(PDC): 2-1-82  
Date of Conference: 2-25-85  
Date of Assessment: 3-10-85

### CONFERENCE PARTICIPANTS:

Jerry Lefkowitz, Unit Administrator; Christine Aaron, Social Work Intern; Gerard Maier, Social Worker; Dr. Elizabeth Clemmens, Psychiatrist; Dr. Ken Barish, Psychologist; Rich Benedict, Teacher; Leon Robinson, Cottage Parent; Corey Johnson. Mrs. Johnson did not attend the conference.

### I.  REASON FOR PLACEMENT:

Corey Johnson was initially placed at Pleasantville Cottage School due to truancy, acting out in school and at home. An emotionally disturbed boy with organic deficits, he was raised in an unstable and chaotic environment. His mother was unavailable to him, unable to provide structure and support. Corey's developmental history included stuttering until age five and encopresis from age eight to twelve. He was left back in school in the 3rd and 4th grade. He was placed in a special class in 1980. He has severe learning disabilities and has only recently progressed beyond the 2nd grade reading level. Upon admission he was seen as a depressed youngster with soft neurological signs, was reacting to the family's chaotic situation and to his mother's unavailability.

### II.  CURRENT FUNCTIONING:

#### 1.) Adjustment to Placement:

Corey has been in Cottage #7 since June, 1984. He adjusted well to the cottage. Corey is not a managment problem. He has developed positive and appropriate interpersonal relaionships with both staff and other boys. Corey is a positive group leader in the cottage.

Corey continued to attend the B.O.C.E.S. Program this fall. It was arranged that Corey would receive remedial education. However, due to Corey's reluctance to attend, and staff's miscommunications around the time of the appointment, sessions were infrequent, irregular, and this was not beneficial to Corey. Currently Corey is given the remedial education materials as part of the BOCES program. Corey's motivation towards school work fluctuates. When emotionally upset or frustrated, Corey tends to slack off in school, and refrain from working. Due to his low self-esteem exacerbated by his perception he is "stupid" as a result of his experienced learning disability, Corey requires much support and reassurance to continue to apply self to school work. BOCES reports that he is doing satisfactorily in the carpentry program and that with more training, a future employment position as a carpenter's helper, is not unreasonable. Corey states he enjoys the carpentry work and considers it to be an area he would want to work in in the future.

Corey is a good athlete and enjoys sports. He participates regularly in physical activities and particularly enjoys playing baseball and basketball.

#### 2.) Response to Treatment:

Present worker has been working with Corey since 10/84. Corey has had numerous workers in the last year and initial work focused on development of a relationship with this young man. Corey attends sessions regularly. Corey is a friendly, related, appropriate and engaging young person. He is quite verbal, anxious to make a good impression, and seeks approval. Key issues for Corey continue to be around loss, and an inability to express ambivalence regarding his unavailable, though outwardly conforming mother. In late December and January Corey's half-brother Robert was admitt

**APP.176**

to the Pleasantville Diagnostic Center for evaluation.  Within the same time span, Ms. Johnson got a job. With Robert temporarily in placement, and a new job, Ms. Johnson withdrew more from Corey.  She requested home weekend trips go back to 2x month (Corey had been going home weekly), and refused a visit at the last minute.  Corey reacted with anger, and it was seen as a good sign that for the first time he was able to verball state his anger at her.  Corey regressed somewhat during this time period.  He refused to attend school on several days, was despondent, depressed, acting inappropriately in cottage (i.e. making animal noises) and avoided sessions with worker.  It is felt this was due to the mother's withdrawal, Robert's presence on campus (resulting in Corey feeling responsible for this boy) and his growing recognition he will be leaving PCS this summer.  With structure, reassurance, and support, Corey was able to mobilize self and pull out of the depression before acting out in any serious manner.  This is seen as a positive progression for Corey.

Recent sessions have dealt with age-appropriate issues including separation/ individuation and problem-solving.  Corey is quite concerned, anxious and ambivalent abo his upcoming discharge from PCS.  He is able to talk about his fears and hopes, and is interested in living in a group residence and attending an ed/voc. program.  This is a realistic plan for Corey.  Future work will focus on helping Corey to deal with the many changes with which he is faced, while continuing to enable him to grow and develop.

   3.) <u>Family Response to Treatment</u>:

Mrs. Johnson continues to be surfacely involved with Corey and PCS.  Though available to attend some meetings with the agency, she has frequently concelled appoint- ments – for apparently valid reasons.  She does not visit Corey on campus.

Mrs. Johnson is a self-focused woman concerned primarily with her own needs. Though verbally expressing her concern for Corey, her actions continue to speak to her emotional unavailability to him.  Current plans are for Corey to go to a group residence upon discharge from PCS.  Mrs. Johnson has agreed to this.  Her primary interest re Corey concerns his academic future.  Despite attempts to sensitize her to Corey's severe learning disability, and its impact on his self esteem – she continues to place emphasis on academics.

Work with Mrs. Johnson will continue to focus on the importance of her maintaining contact with Corey, and helping her to accept an appropriate ed/voc. and group residence referral for Corey.

III.   <u>PSYCHIATRIC EVALUATION AND PSYCHOLOGICAL EVALUATION</u>: (see current evaluations in clinical portion of this record.)

IV.   <u>PSYCHODYNAMIC EVALUATION</u>:

Corey is a 16 year old, tall, good-looking black youth of average weight. He is an organically impaired boy, whose learning disabilities strongly and negatively impact his self-esteem.  Corey is placed voluntarily at PCS.  Mrs. Johnson is a self- focused woman who has been unable to meet Corey's dependency and other emotional needs.

Corey is well oriented, and his sense of reality is good.  He generally uses good judgement-but is environment-sensitive and can become withdrawn, depressed, disorg ized and impulsive when his environment is chaotic or emotionally stressful.  Corey is a likeable, engaging youth who relates appropriately to both staff and peers.  He respo well to structure, is a positive group leader, and has a strong sense of responsibility Corey is concerned about his future plans and is engaged actively in sessions with worker.  His problem-solving skills have improved.  His ability to voice his thoughts and feelings is a considerable strength.  This strength has enabled him to maintain better self-control, and is a mobilizing force helping him to pull himself out of depression with outside support.

V.   DISCHARGE PLANNING:

     The present goal for Corey is discharge to self. It is felt that referral to a Group Residence will provide the structure that will enable Corey to grow and develop. At this point, a vocational program referral seems in Corey's best interests due to his severe learning disabilities. It is hoped that discharge will be effective by July, 1985. Corey had been working with school worker in finding an appropriate part-time job for Corey, as a way in which to gradually expose Corey to the community. School worker is presently on sick leave, and therefore caseworker will attempt to continue this process with Corey.

CONFERENCE RECOMMENDATION:

     1) Caseworker will continue to focus on providing Corey with support and encouragment to individuate.

     2) Caseworker will investigate possibility of a part-time job for Corey in the community.

     3) Referral will be made for appropriate vocational programs. If appropriate one not available, will consider referral to special education setting.

     4) Referrals will be made to Group Residence.

     5) Caseworker will work with Mrs. Johnson to help her accept appropriate plan for this boy. Work must be done to help Mrs. Johnson realistically appreciate Corey's academic limitations, and be able to provide support for him when referred to a vocatio training program.

                       Christine Aaron, MSW Intern

# EXHIBIT 11

USCA4 Appeal: 20-15    Doc: 15-2    Filed: 01/07/2021    Pg: 185 of 241

DSS-3621 **UCR REASSESSMENT AND SERVICE PLAN REVIEW**

## 6 Month

| CASE NAME | CASE NUMBER | COMPLETED BY | UNIT/WORKER NUMBER |
|---|---|---|---|
| Johnson | S 4766716 | Odette Noble | 908-5 |

| AGENCY/DISTRICT | PLAN DATE |
|---|---|
| JCCA-NYC | 6/28/86 |

**GENERAL INSTRUCTIONS:**

This form is to be completed 6 months from Day 1 (CID) and every 6 months thereafter (refer to Section VII of the UCR Desk Aid).

**Bold type following questions indicate Utilization Review Regulatory Reminders.**

1. **REASSESSMENT**

Write a narrative reassessment which describes changes in family situation and summarizes family's current functioning. *If a Foster Care Placement* describe adjustment to foster care of any child in placement. *For Protective Services Cases* reassess the family's ability to protect and potential to harm the child. Conclude with a statement which provides the most significant service priorities and (re)evaluate the family's ability to benefit from these services. **Continuing Necessity for Placement or Mandated Preventive Services; Risk of Foster Care; Ability to Benefit from Services.**

Mrs. Johnson continues to be elusive and impossible to engage. On 12/16/85 she kept an appointment, and I spoke with her about the importance of keeping regular appointments and letting us know who she is, and her concerns for Corey are. She didn't understand why we needed to know anything about her, but she did agree to keep appointments. I have not seen her since or had any contact with her; although, she did sign and return a consent for Corey to have oral surgery.

At the beginning of March '86 Corey learned that she was arrested and was in jail in New Jersey. He told his houseparent who informed me, and then Corey and I discussed it. I haven't heard from her or any other family member. Corey states he doesn't believe his mother is guilty, and that she was framed. He acknowledged it had something to do with the use of Credit Cards. I suspect Corey knows the truth, but is keeping it from us. He visited family in the home at xmas, and returned with extremely expensive leather goods. He was defensive when we discussed this with him, and said he got them from his relatives. Corey has talked with his mom in jail, but he states he doesn't want to visit her.

Corey's brother has returned from the South. I don't think he is attending school. Corey doesn't like to discuss his brother. When I've encouraged him to have the brother visit the residence he has shrugged it off.

Corey continues to use our services well, and expresses satisfaction about being in placement. It wouldn't seem that there is another constructive place for him to live.

(Reassessment)

APP.180

DSS-3627 (2/89)

| CASE NAME | | CASE NUMBER | |
|---|---|---|---|
| Johnson | | S | 4766716 |

**2. CASEWORK CONTACTS**

Summarize the nature of the interaction between the participants during the casework contacts. Indicate any barriers to such contacts and steps planned or taken to overcome those barriers. Include in the summary the frequency and location of the contacts. (If the Casework Contact Grid is completed, it is not necessary to include the frequency and location of contacts in the summary.) **Required Casework Contacts with Child, Child's Caretaker, Parents and In-Home Contacts.**

Corey is seen for weekly casework sessions. He has put up some resistence to appointments both verbally and by not keeping appointments. He also attends biweekly group meetings with caseworker houseparents and other boys. His attitude towards group is often negative, but he never misses.

Treatment Team Staff including GHD Director, Psychiatrist, Child Care Coordinator, Nurse, Houseparents and Caseworker meet on a biweekly basis.

Mother has resisted involvement (See Section 1).

**3. COURT INVOLVEMENT**

a) Has there been any court related or legal activity since the last Plan?

☐ Yes     ☒ No

If Yes, complete the following:*

| Date Of Event | Court | Event (Petition filed, hearing held, referral) | Type (ex. Neglect, Abuse JD, PINS, criminal court, etc.) | Child(ren) Involved | Outcome (Adjudication, Disposition, Court Orders, other) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

*For cases tracked in CCRS encode appropriate legal activities on Services Activity Log.

(Reassessment)

USCA4 Appeal: 20-15    Doc: 15-2    Filed: 01/07/2021    Pg: 187 of 241

DSS-3627 (2/84)

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S  4766716 |

3. b)  What effect did the legal activity have on the plan and the child's Permanency Planning Goal?

4. PROGRAM CHOICE AND PERMANENCY PLANNING GOAL

a)  List the names of each child for whom services are authorized and identify the program choice(s), permanency planning goal (PPG) and the anticipated completion date(ACD) for the PPG.

| CHILD'S NAME | PROGRAM CHOICE* (Choose all that apply) | PPG*ACD* | | | CHILD'S NAME | PROGRAM CHOICE* (Choose all that apply) | PPG*ACD* | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Goal | Mo. | Yr. | | | Goal | Mo. | Yr. |
| Corey | C | 03 | 11 | 89 | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PROGRAM CHOICE CODES**

A Preventive Non-Mandated
B Preventive Mandated
C Placement
D Protective

**PERMANENCY PLANNING GOALS**

01 Discharge to Parents
02 Discharge to Primary Resource Person(s)/Relative(s)
03 Discharge to Independent Living
04 Discharge to Adoption
05 Discharge to Adult Residential Care
06 Prevent Placement
07 Prevent Return to Placement
10 Independent Living -Unaccompanied Refugee Only
11 Protect Child (No PPG for CCRS)

b) If there has been a change in PPG since the previous plan, explain the reason.

*For cases tracked in CCRS encode the Program Choice, Reasons, PPG and Anticipated Completion Date on Assessment Plan Grid (turnaround).

(Reassessment)

DSS-3627-4(1/85)   Case 3:92-cr-00068-DJN   Document 39-12   Filed 08/19/20   Page 5 of 10 PageID# 1694

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S 4766716 |

**5. PERMANENCY PROGRESS** (for Placement Cases only)

Check (✓) each question "YES" or "NO." If "YES" is checked then give the requested information in the space provided. List the children involved in the righthand column.

| YES | NO | | WHICH CHILD |
|---|---|---|---|
| | X | A. Is any child with a permanency goal of return to parents or relatives expected to remain in placement another 6 months or more? If so, specify barriers preventing discharge, and what alternatives are being considered or have been tried.* | |
| | X | B. Has any child who is not legally free had a permanency goal of adoption 6 months or more? If so, specify the actions taken to free the child and any barriers to freeing. | |
| | X | C. Is any legally free child with a permanency goal of adoption not in adoptive placement? If so, specify the actions taken to place the child into an adoptive home and barriers to placement.** | |
| | X | D. Has any child been in an adoptive placement 6 months or more? If so, specify the barriers preventing legal adoption in this home and actions taken to overcome these. | |
| | X | E. Is any child expected to be discharged to Independent Living or Adult Residential Care within 24 months? If so, describe the services needed to permit discharge, and to support the child after discharge. Specify barriers to their provision. | |

**USE SPACE BELOW** to provide information requested for any "YES" answer given in Question 5. Be sure to indicate child(ren) involved.

*If such a child will be in care with a permanency goal of return home for 24 months, a UR exception is required.
*If a legally free child with a PPG of adoption will be free 12 months and not in adoptive placement, a UR exception is required.

**FOLLOW LOCAL PROCEDURES FOR UR EXCEPTION CASES.**

(Reassessment)

APP.183

DSS-3627-5(1/26)

| CASE NAME | CASE NUMBER | SCR NUMBER |
|---|---|---|
| Johnson | S 4766716 | |

**8. PLAN REVIEW: GOAL REVIEW AND SETTING**

Review all goals from previous plan (including any Plan Amendment). Restate each goal and explain the extent of goal achievement. If a previous goal is to be retained, complete the block by entering the date the goal is expected to be achieved, the tasks and the family member(s) and/or service providers(s) expected to carry out the tasks. If a goal is to be discontinued, complete all parts except target date and tasks. After reviewing previous goals, list any new goals set, omitting the question about goal achievement. **Services Consistent with Needs***

The Goal below is: New _____    Retained __X__    Target Date ___11/87___          Discontinued _____

(Re)State Goal: __Mrs. Johnson will remain consistent in her contacts with Corey despite__
_____their decision to live apart._____

Explain level of goal achievement: ___Mrs. Johnson remains inconsistent and hard to engage.___
_____(See Section 1)_____

**TASKS**

| CHILD/FAMILY (list names) | SERVICE PROVIDERS (list names) |
|---|---|
| Mrs. Johnson will encourage Corey's regular visits. | Social worker will continue regular meetings with Mrs. Johnson around the issue of her continued involvement with Corey and the importance to him of feeling included as a family. |
| Mrs. Johnson will include Corey in all family celebrations and occasions. | Same as above. |
| Mrs. Johnson will not withdraw from Corey in response to her perceived belief that he is withdrawing. | Same as above. |

The Goal below is: New _____    Retained __X__    Target Date ___11/89___          Discontinued _____

(Re)State Goal: __Mrs. Johnson will learn to support Corey's strengths and accept his__
_____weaknesses._____

Explain level of goal achievement: __As long as others are raising Corey, Mrs. Johnson appears__
__to be more accepting of Corey.  However, this remains an area of concern.__

**TASKS**

| CHILD/FAMILY (list names) | SERVICE PROVIDERS (list names) |
|---|---|
| Mrs. Johnson will demonstrate approval of Corey's athletic abilities. | Social worker will work with Mrs. Johnson around giving Corey approval for what he does well and making less important the areas in which he has poor success. |
| Mrs. Johnson will de-emphasize Corey's academic ability. | Same as above. |
| Mrs. Johnson will support the plan of vocational training for Corey. | Same as above. |

*For cases tracked in CCRS encode Child and Family Service Needs and Service Status on Assessment Plan Grid (turnaround).

(Reassessment)

APP.184

| CASE NAME | CASE NUMBER | SCR NUMBER |
|---|---|---|
| Johnson | S 4766716 | |

The Goal below is: New __X__  Retained _____  Target Date __11/86__  Discontinued _____

(Re)State Goal: __Corey will find a place for himself in the residence, make positive attachment to boys, houseparents and caseworker and learn to trust staff.__

Explain level of goal achievement: __Corey has established quite a positive leadership place for himself.__

**TASKS**

**CHILD/FAMILY (list names)**

Corey will participate constructively in biweekly group meetings.

**SERVICE PROVIDERS (list names)**

Caseworker will help Corey see the purpose of biweekly group meetings.

---

The Goal below is: New __X__  Retained _____  Target Date __11/89__  Discontinued _____

(Re)State Goal: __Corey will learn to face up to his mother's limitations and establish a separate identity.__

Explain level of goal achievement: __Corey remains quite identified with his mother and her life style; even though, he would seem to have some awareness of its destructiveness.__

**TASKS**

**CHILD/FAMILY (list names)**

Corey will learn to trust the JCCA staff, and share some of his conflicts about his mother's life style with them.

Corey will identify with a more constructive life style.

**SERVICE PROVIDERS (list names)**

Caseworker and houseparents will establish a trusting nurturing relationship with Corey.

Caseworker and houseparents will be constructive role models.

(Reassessment)

| CASE NAME | | CASE NUMBER | SCR NUMBER |
|---|---|---|---|
| Johnson | | S 4766716 | |

The Goal below is: New __X__    Retained _____    Target Date __6/88__                    Discontinued _____

(Re)State Goal: __Corey will attend Newtown High School Special Education program__
__daily and on time.__

Explain level of goal achievement: __Corey continues to be pleased with his report cards and _____
__is quite committed to school.__

### TASKS

**CHILD/FAMILY (list names)**

Corey will continue to attend specialized classes.

Corey will discuss his learning disability in treatment.

Corey will use nightly study hour constructively.

**SERVICE PROVIDERS (list names)**

Teacher will encourage Corey to keep working and help him to understand that his difficulties do not reflect upon his intelligence.

Social worker will work with Corey towards understanding the implication of his learning disability.

Houseparents will organize a nightly study hour.

---

The Goal below is: New _____    Retained _X_    Target Date __11/87__                    Discontinued _____

(Re)State Goal: __Corey will use opportunities offered him to learn independent living__
__skills.__

Explain level of goal achievement: __Corey wants very much to be able to care for himself in the__
__community.  The biggest obstacle will be for him to find a way to support himself.__
__We will continue to work with him toward this end.  He will again work for Neighborhood__
__Youth Corp this summer.__

### TASKS

**CHILD/FAMILY (list names)**

Corey will explore the possibilities of a part time job.

Corey will learn how to handle money so that he can shop for himself.

**SERVICE PROVIDERS (list names)**

Houseparents will help Corey read ads and apply for a job.

Caseworker, houseparents and teachers will help Corey learn enough simple arithmetic that he will be able to figure out correct change.

(Reassessment)

APP.186

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S 4766716 |

DSS-3521R(8/84)

7. FAMILY/CHILD VISITING PLAN (for Placement Cases only)

a) For each child in foster care, summarize the nature of the interaction between the child and parent(s) and/or relative(s) during the visits, highlighting positive and negative factors. Include in this summary the frequency and location of the visits. (If the Family/Child Visiting Grid is completed, it is not necessary to include the frequency and location of visits in the summary.)

Corey went home with his grandfather at xmas.  However, he returned late missing two days of school.  He was not very communicative re. visit.  Corey is allowed to visit his mother when she calls to arrange it, but she doesn't do so very often. While he states these visits go well, one wonders what really happens.

b) For each child in foster care, describe the visiting plan for the next period. Include who will visit, how often, and where. Indicate any changes from the previous visiting plan and the reason for the changes. **Facilitate Bi-Weekly Visiting.**

Corey is allowed a weekend visit a month and a day visit a month.



(Reassessment)

| CASE NAME | CASE NUMBER | SCR NUMBER |
|---|---|---|
| Johnson | S 4766716 | |

**8. PLAN DEVELOPMENT**

a) Discuss the level of involvement of parent(s) and children in the development of the service plan. **Parent/Child Participation.**

Corey was involved in developing service plan in regular discussions with houseparents and weekly caseworker meetings.

b) List all participants in the planning conference with their title or role and state date of conference. **Service Plan Review. Third Party Reviewer/Foster Care.**

Gilbert Gordon - Director GHD
Murray Gordon - Clinical Director - Third Party Reviewer
Diane Yarborough - Child Care Coordinator
Shari Siegel - Nurse
Odette Noble - Caseworker
John Rios - Residence Supervisor
Marvin Hunt - Houseparent
Carmen Carrasquillo - Houseparent
Joe Rivera - Houseparent

| | SIGNATURES | DATE SIGNED |
|---|---|---|
| Case Planner | Odette Noble | 5/8/86 |
| Case Planner's Supervisor | Gilbert Gordon | 5/8/86 |
| Case Manager | | |
| CPS Monitor | | |
| | | |
| | | |

I have read and I understand the Service Plan.

| | | |
|---|---|---|
| Parent | | |
| Parent | | |
| Child | | |
| Child | | |

(Parent/Child signatures are optional)

(Reassessment)

APP.188

# EXHIBIT 12

**APP.189**

FORM DSS-3826-NYC-E
4/85

HUMAN RESOURCES ADMINISTRATION
SPECIAL SERVICES FOR CHILDREN

## UCR PLAN AMENDMENT: FORM E
## FINAL DISCHARGE

| | | | SCR # |
|---|---|---|---|
| CASE NAME<br>Johnson | CASE NUMBER<br>S 4766716 | COMPLETED BY<br>Odette Noble | UNIT/WORKER NUMBER<br>OPA/908-5 |

| AGENCY/DISTRICT | JCCA - NYC |
|---|---|

GENERAL INSTRUCTIONS:

Complete Section I for all children being final discharged from foster care. If a Voluntary Agency did not receive written approval for trial discharge of a child or there was no trial discharge period, also complete Section II and obtain SSC approval.

**Bold type following questions indicate Utilization Review Regulatory Reminders**

### SECTION I: CASE REVIEW

| CHILD'S NAME | DATE OF TRIAL DISCHARGE | DATE OF FINAL DISCHARGE |
|---|---|---|
| Corey Johnson | 2/13/87 | 5/13/87 |
| | | |
| | | |

*If additional space is required, please attach another sheet.*

1. If a child has been on trial discharge, assess this period in terms of family and child adjustment, risk to child, and need for further services.*

   Caseworker wrote to both Mrs. Johnson and Corey on 2/18/87 (See Copies). They did not respond. On 3/9/87 Mrs. Chang, telephone #266-2500 from Parents and Children's Rights called saying that Mrs. Johnson had complained to them regarding our treatment of Corey. What happened was explained to her and caseworker said she would be willing to meet with Mrs. Johnson and Corey if Mrs. Chang felt it would be helpful. Mrs. Chang said she would get back to me if she had any difficulties. So far caseworker has not heard from her.

2. If a preventive agency is involved in the case, briefly describe services planned for the post-discharge period.

*For cases tracked in CCRS encode appropriate movement activities on Services Activity Log.

(Amendment E)

FORM DSS-3628-NYC E2
4/85

| | SCR # |
|---|---|
| CASE NAME  Corey Johnson | CASE NUMBER  s   4766716 |

TO BE COMPLETED BY A VOLUNTARY FOSTER CARE AGENCY ONLY IF THERE WAS NO WRITTEN AP-
PROVAL FOR TRIAL DISCHARGE OR THERE WAS NO TRIAL DISCHARGE PERIOD.

### SECTION II: TRIAL DISCHARGE INFORMATION

1. Discuss the circumstances surrounding the unplanned trial discharge or reason(s) there was no trial discharge
period.

In retrospect it would seem that Corey's behavior and attitude was deliberate
on his part, so there would have to be some kind of resolution.  However, Corey
couldn't ask his mother directly if he could return home for fear of her answer and
for fear he would have to take responsibility for what he wanted.

By provoking an incident he was able to test out living at home.

2. Are you requesting a discharge grant?

☒ Yes    Since Caseworker hasn't heard from either Corey    CHILD
or Mrs. Johnson discharge grant cannot be re-
quested at this time, but would like to ——————  COREY
keep the option open.  Effort will be
made for case aide to make a home
visit.

☐ No

IF YES, PLEASE INCLUDE A JUSTIFICATION.

(See form D 2/23/87).

(Amendment E2)

APP.191

FORM LSS-369 NYC E1
4/85

| | SCR # |
|---|---|
| **CASE NAME**    Corey Johnson | **CASE NUMBER** <br> S    4766716 |

TO BE COMPLETED BY A VOLUNTARY FOSTER CARE AGENCY ONLY IF THERE WAS NO WRITTEN AP-
PROVAL FOR TRIAL DISCHARGE OR THERE WAS NO TRIAL DISCHARGE PERIOD.

### SECTION III: PLAN AMENDMENT PARTICIPATION

Discuss the level of involvement of parent(s) and children in the development of the service plan amendment.
Specify how and when the discharge plan was conveyed to the parent(s) and/or child(ren), if applicable.
**PARENT/CHILD PARTICIPATION.**

      Mrs. Johnson was impossible to engage during the time Corey lived with us.
Corey was seen for weekly casework sessions; he participated in bi-weekly groups
and participated in a treatment team meeting on 1/9/87.

ON/mo

| SIGNATURES | DATE SIGNED |
|---|---|
| Case Planner _Odette Noble_ | 3/26/87 |
| Case Planner's Supervisor_____ | |
| Case Manager_____ | |
| Case Manager's Supervisor_____ | |
| CPS Monitor_____ | |
| _____ | |
| _____ | |
| _____ | |
| I have read and I understand the Service Plan. | |
| Parent_____ | |
| Parent_____ | |
| Child_____ | |
| Child_____ <br> (Parent/Child signatures are optional) | |

(Amendment E3)

APP.192

# EXHIBIT 13

## <u>AFFIDAVIT</u>

State of New York       )
                 ) ss:
County of Bronx       )

DAVID WASHINGTON, being duly sworn, deposes and says:

1.     I am currently 61 years old and reside at 4347 Furman Avenue, Bronx, New York.

2.     I worked for Jewish Child Care Association (the "JCCA") for 23 years. While working for the JCCA, I worked in various capacities, including about half this period at various group homes in New York City that were a part of the JCCA network.

3.     From about 1987 through 1989, I was a child care worker at Elmhurst Boys Residence in Elmhurst, New York, a foster care residence for youth operated by the JCCA.

4.     The residence consisted of two apartments, and housed up to eight boys at a time. I and other staff members alternated living in the apartment in three to four day shifts. In addition, a social worker who worked offsite would pay periodic visits to the apartment.

5.     I met and interacted with Corey Johnson during the approximately year-and-a-half period that I worked at the Elmhurst Boys Residence. As far as I remember, Corey was between 16 and 18 years old at the time.

6.     At the time that Corey was at Elmhurst Boys Residence, most of the other boys were black males of about the same age.

7.    My impression was that while there were many boys with below normal intellectual ability and various levels of functioning, almost all of the other boys there were more intelligent than Corey.

8.    My impression was that Corey sensed he was not as bright as the other residents. As a consequence, Corey would often not express his opinion and chose to remain quiet. For example, Corey would not join staff and residents during group conversations at meal time, and also did not join other residents to play games or for other recreational activities.

9.    While I do not know whether Corey understood all the rules that he was expected to follow at the Elmhurst Boys Residence, I do recall one instance in which Corey repeatedly turned on the television when he was not supposed to do so. This prompted me to unplug the television. I asked him to try to explain why he was disobeying rules, but he did not or could not articulate his reason for keeping the television on.

10.    Corey was very quiet, kept to himself and (although he was athletically built) never picked on anyone. During the year and a half that I knew Corey, he did not confide in me.

11.    Corey seemed outwardly sad much of the time I observed him. I very rarely saw him laugh or express happiness.

12.    Corey was a follower in that he would generally go along with what others wanted to do.

13.    In fact, Corey was known at the Elmhurst Boys Residence as someone who could be convinced to do what you asked him to do.

2

14. I recall an occasion when Odette Noble, a social worker at Elmhurst Boys Residence, asked Corey to speak in a group session and Corey refused.

15. As I recall, subsequently Corey was told to "leave." As I recall, this incident led to Corey's leaving Elmhurst Boys Residence, and I do not remember Corey returning to Elmhurst Boys Residence again.

16. This incident sticks out in my mind because I remember questioning whether Odette's reaction to Corey's refusal to speak was excessive, and also whether Corey understood what Odette intended when she told Corey to "leave."

_David Washington_

DAVID WASHINGTON

Sworn before me on this
1st day of March, 2012

_____
NOTARY PUBLIC

CLARENCE PYNE
Notary Public, State of New York
No. 5026495
Qualified in Bronx & Westchester County
Commission Expires 7—1—14

3

**APP.196**

# EXHIBIT 14

APP.197

**FORM DSS-3628-NYC-D1**
**4/85**

HUMAN RESOURCES ADMINISTRATION
SPECIAL SERVICES FOR CHILDREN

## UCR PLAN AMENDMENT: FORM D
## TRIAL DISCHARGE

| CASE NAME<br>Johnson | CASE NUMBER<br>S 4766716 | COMPLETED BY<br>Odette Noble | UNIT/WORKER NUMBER<br>908-5 |
|---|---|---|---|
| AGENCY/DISTRICT<br>JCCA-NYC | | | |

GENERAL INSTRUCTIONS:

Complete this form at least 30 days prior to the child's planned trial discharge or immediately after an unplanned trial discharge date has been established

**Bold type following questions indicate Utilization Review Regulatory Reminders**

### SECTION I: CASE REVIEW

| CHILD'S NAME | ANTICIPATED DATE<br>OF TRIAL DISCHARGE |
|---|---|
| Corey Johnson | 2/13/87 |
| | |
| | |

*If additional space is required, please attach another sheet.*

1. Discuss why trial discharge is now appropriate. What services or supervision will be provided to the family including the child, during the trial discharge period and by whom? Evaluate the risk of harm if the child returns home.* (If preventive services are being requested at this time, complete Form G, in addition to this Plan Amendment Form.)

As per 853C 2/6/87 Corey returned to his mother's home on 2/3/87 to give him an opportunity to consider his behavior and attitude in our residence.  If he was willing to change it, we would be most willing to consider his returning to the residence.  As you know Corey was offered a follow up appointment which he refused, and we have not heard from him or his mother.  Newtown High School has been informed that he is now living with his mother.  He is continuing to attend school. We have written to Corey and his mother offering further servcies.  If we hear from them,we will make every effort to try to help.

For cases tracked in CCRS encode appropriate movement activities on Services Activity Log.

(Amendment D)

APP.198

**FORM DSS-3628-NYC-D2**
**4/85**

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | s  4766716 |

2. Are you requesting a discharge grant?

☒ Yes                                                                            CHIILD

_____

_____

☐ No

IF YES, PLEASE INCLUDE A JUSTIFICATION BELOW.

Mrs. Johnson lives in a run  down building and would seem to have chronic financial
difficulty, although, she would seem to have money from questionable sources at times
and spends extravagantly.  As you know she spent 4 months in jail for credit card
fraud.  From our point of view Corey could use the help and if he asks for it even
though he left on a bad note, we would give him every consideration.  If we don't
hear from him in the next few weeks in response to my letters, we will not make
the request, however, I will make the request if I hear from him.

(Amendment D2)

FORM DSS-3628-NYC D3
4/85

| CASE NAME | CASE NUMBER |
|-----------|-------------|
| Johnson | S   4766716 |

**SECTION II: NEW GOALS**

Review the plan for the child and family. Indicate any goals, target dates, tasks or activities which will be altered in light of the status change. Use additional sheets as necessary. **SERVICES CONSISTENT WITH NEEDS.**

The Goal below is: New _____ Retained __X__ Target Date 6/88  Discontinued _____

(Re) State Goal: Corey will attend Newtown High School Special Education program

daily and on time.

Explain level of goal achievement: On 1/31/87 I met with Corey and Newtown teacher Mrs. Rosen,

re: Corey's progress.  It was pointed out that it is unlikely that he will be able to pass competency tests, but if he completes all his classes, he should be able to receive a certificate of completion in 6/87.   It is painful of Corey to face his dyslexia but at the same time there are other opportunities available to him.  He is involved with an OVR counselor, Mr. Gloekner, who is willing to help Corey explore programs in carpentry etc.

**TASKS**

| CHILD/FAMILY (LIST NAMES) | SERVICE PROVIDERS (LIST NAMES) |
|---------------------------|--------------------------------|
| Corey will attend Newtown and on time. | Caseworker will continue to be available to Newtown and Corey if they should ask. |

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

The Goal below is: New _____ Retained __X__ Target Date 11/89 Discontinued _____

(Re) State Goal: Corey will learn to face up to his mother's limitations and extablish

a separate identity.

Explain level of goal achievement: It would seem that Corey wanted this opportunity to live with his mother, but he just didn't know how to do it constructively.  Hopefully he will get a better sense of his mother and begin to see her more realistically.  If that happens at another point, he might be more willing to accept appropriate help from either JCCA or other agencies in the community.

**TASKS**

| CHILD/FAMILY(LIST NAMES) | SERVICE PROVIDERS (LIST NAMES) |
|--------------------------|--------------------------------|
| Corey will hopefully remember that JCCA staff is available. | Caseworker and houseparents will remain available to Corey if he should ask. |

(Amendment D3)

APP.200

**FORM DSS-3628-NYC D4**
**4/85**

| CASE NAME | CASE NUMBER |
|---|---|
| Johnson | S 4766716 |

## SECTION III: PLAN AMENDMENT PARTICIPATION

Discuss the level of involvement of parent(s) and children in the development of the service plan amendment. Specify how and when the the trial discharge plan was conveyed to the parent(s) and/or child(ren), if applicable. **PARENT/CHILD PARTICIPATION.**

Mrs. Johnson has not responded to our hand delivery letter. Corey met with Director, Mr. Gordon, Child Care Coordinator, Miss Yarborough and Senior Caseworker, Miss Noble on 2/3/87. He refused a follow up appointment and we have not heard from him since, although, he does telephone the other boys.

| SIGNATURES | DATE SIGNED |
|---|---|
| Case Planner _Odette Noble_ | 2/20/87 |
| Case Planner's Supervisor _Gilbert Gordon_ | 2/23/87 |
| Case Manager | |
| Case Manager's Supervisor | |
| CPS Monitor | |
| | |
| | |
| | |

I have read and I understand the Service Plan.

Parent

Parent

Child

Child
(Parent/Child signatures are optional)

(Amendment D4)

**APP.201**

# EXHIBIT 15

JEWISH CHILD CARE ASSOCIATION OF NEW YORK

GROUP HOME DIVISION

Three Month Conference Note

Due Date: 12/28/85

Dictation Date: 2/19/86

Resident: Corey Johnson

Group Home: Elmhurst Boys
Residence

Birthdate: ▮▮▮▮▮▮▮▮▮▮

Admission to Group Home: 6/28/85

From: Pleasantville Cottage School

Team Chairperson: Odette Noble

(Even though this is overdue, I will include
information up until 2/19/86.)

Treatment Team Participants & Titles:

Murray Gordon, Consulting Psychiatrist;
Diane Yarborough, Child Care Coordinator;
Shari Segal, Nurse; John Rios, House Super-
visor; Marvin Hunt, Joe Rivera and Connie
Carrasquella, House Parents.

I.   GROUP HOME PLACEMENT/SOCIALIZATION:

On the whole Corey continues to be using the residence well and would seem to
want to remain living there.  He has made relationships with both the house
parents and the boys, and is liked by both.  Corey continues to be quite active
and assertive in how he handles himself, and can be a bit of a monopolizer, but
the boys continue to take this in their stride and not seem to mind it.  Part
of the boys' acceptance would seem to be related to Corey's ingenuousness and
decency.  Corey is very in earnest about succeeding and articulates that point
of view to the other boys.

One senses that periodically Corey might feel the wish to live with his mother
but he doesn't discuss it openly and, I think, deep down he knows that his
mother is just not able to provide a stable, secure home for him. Corey is quite
secretive about his mother's life style and doesn't share with me and, I don't
believe, with the house parents, some of his chagrin at what his mother does.
We only pick it up by his behavior and what he does not say.

Over Christmas, we did have a bit of a difficulty with Corey because he was
given permission to go South with his grandfather and returned four days late.
Obviously, this is a serious concern and we spoke to Corey about it.  Corey
got quite distressed but we told him that it would call into question his
ability to stay with us if this kind of behavior persisted. We told Corey that
we expected him to return when he said he was going to return and we could not
have him returning when he chose to.  In fact, when we were making arrange-
ments for Corey to go to Florida to visit his grandfather, in the session with
his mother, Corey got very distressed when I questioned the time frame and
questioned his going.  His verbalization was that it was his family and that
we had no right to question what he did with his family.  Corey and I had a
number of discussions around this and it was pointed out to him that he lives
with us and that we take the daily responsibility of raising him and as a
minimum, we expect him to abide by what we say.

-2-

Ultimately, we were able to help Corey work this through and he seems to have a bit better understanding of our role in relation to him. Nevertheless, his mom's secretiveness and tendency to want Corey to keep her secrets does make our role very difficult. I sometimes wonder if we will ever break through what I perceive as Corey's false loyalty to his mother.

Along with what Corey was saying about his relationship with us by returning to the residence late, it was also distressing because he missed two days of school. This seems to be partly what his family does to him. They don't seem to have any real appreciation of what it takes to be able to succeed in a mainstream world. Corey, on the whole, is doing well in school and it's just not helpful for him to miss two whole days of school for no apparent reason.

Mrs. Johnson did not call and talk with us about his late return at all. This is characteristic of her style in relating to us. She seems to feel that we should take care of her son and that we have no right to ask her any questions or expect any information about her life style and what goes on. I have challenged this point of view in a session with Corey and Mrs. Johnson, but Corey does seem to be in collusion with his mother's point of view. It is difficult to know how we will handle this in the next period of time. What does seem to be important is that Corey is growing and developing and using our program, so it is questionable how much we challenge the mother's modus of operating. I suspect that Corey will be at risk when it comes time to leave us and the security that we have provided him all this time. I am not sure how much he has internalized our value system and can take a critical stand in relation to his mother's value system. It seems to me that this is necessary if he is going to be able to survive in the community and make constructive choices and not perpetuate the same patterns that he learned from his mother. However, we will try to work on this in the next period of time.

II.    EDUCATIONAL/VOCATIONAL/WORK EXPERIENCE;

Corey continues to attend the Special Ed Program at Newtown High School. He is doing very well. As indicated in the past dictation, this is a very restitutive experience for Corey and he takes school very seriously. He gets up in the morning, gets to school, and his report card was quite good, considering his learning deficits. His final report card on 1/31 indicated that he received 3 - 80's, 2 - 70's, a 75 and a 70. He was rated S (satisfactory) on all his behavior; was absent for a total of 5 times. I suspect there were a couple days of cutting but we did not find out about it prior to receiving the report card.

While theoretically we would expect Corey to work part-time but, at this point, we haven't insisted that he do so. He is on the wrestling team and this does consume a good deal of his time after school.

As indicated in the past dictation, Corey did have an appointment with OVR in September which I attended with him. At this point, he asked to put off getting OVR training until he completed high school. Since the high school experience is so constructive for him, we are supporting his attendance at high school.

-3-

Corey Johnson
Due Date: 12/28/85
Cont'd.

III. RECREATION:

Corey continues to be quite active in the community and does a number of
things with the other boys in the residence.  He plays football and basket-
ball with them regularly.  He also has gone to play pool with a house
parent and the boys and will go to films with them.  Corey tends to be a
bit girl crazy and has a way of flirting with girls and including them in
not only his life, but the other boys' lives.  He is very invested in his
participation in the wrestling team and appears to be doing well.

The recreational goals in the next period of time are as follows:

1.   Corey will learn to be more autonomous in his relationship
     with girls and find ways to establish meaningful connections
     with them, without getting involved with a number of them at
     the same time.

2.   Corey will learn to seek out leisure activities on his own
     and take  initiative to participate.

3.   Corey will appropriately and include other fellows in the
     residence in recreational activities and learn to engage
     in healthy competition with them.

4.   Corey will pursue his wrestling activity which will help
     build his self-esteem and gain confidence.

IV. ETHNIC and CULTURAL IDENTITY:

As indicated, the mother's life style is so mysterious and in some ways
amorphous, tht it is difficult to know just what Corey thinks and feels.
The mother would seem to be somewhat identified with Black street culture,
but it is difficult to know.  The few times that I have seen her in my
office, she has been expensively dressed but her clothes have not been
well cared for.

She is almost impossible to pin down and one really doesn't know what she
does.  Corey would seem to know but he does not share that with any of us
at this point.  As indicated by Corey's visiting the South, the mother has
family there but here again, Corey is quite secretive about what they are
all about, too.  He came back with a leather jacket, a leather bookbag and
a TV.  One wonders where family members get this kind of money but when we
questioned Corey about it, he got very defensive and distressed.  His re-
action was that we were accusing him of Mucyviς .  But that wasn't the
issue and we explained this to him.  We told him that we had some respon-
sibility to SSC in terms of the kinds of monies he had, and his spending
money.  We also felt that since we were raising him, that we should have
some control over it.  He simmered down some but it is very difficult to
get clear facts from him.

Certainly, all of Corey's family would seem to be Black and he does not
seem to have had much direct contact with White people, other than his
experience here at JCCA.

-5-

V.    **RELIGION:**

Corey acknowledges a belief in God and he and I have talked about this question from time to time. However, we never get into any real depth discussion and he has shown no interest in going to church. A couple of the boys in the residence have expressed some interest in the Nation of Islam. However, I don't know that Corey shares any of that interest.

We did have a discussion of Martin Luther King's contribution on Martin Luther King Day.

VI.   **FAMILY:**

Mother seems to feel little chagrin about not keeping appointments. When she does come in, she talks the right talk but you know she won't follow through. Recently, she called me collect, which was a bit surprising. I accepted the call and asked her why. She said she didn't have any money. She was calling to ask if Corey could visit the weekend. Permission was granted. Corey is allowed to visit his mother when she calls. However, she calls so seldom. We have thought of not letting Corey visit if she doesn't keep appointments but that would only be hurtful to Corey, and I'm not sure that it would be productive. With the exception of the Christmas visit South, Corey does come back on time and he really does try to cooperate. My feeling is that his pain is so intense and deep in his relationship with his mother that it will take a long time, if not years, for him to ever face up to how inadequate and neglectful his mother really is.

*Odette Noble*

Odette Noble, GSW
Group Home Division

D. 2/19/86   T. 2/20/86 ip

# EXHIBIT 16

## AFFIDAVIT

State of New Jersey )
) ss:
County of _Mercus_ )

DAROLD BROWN, being duly sworn, deposes and says:

1. I live at 873 Parkside Avenue, Trenton, NJ, 08618.

2. I was born in New York City on March 22, 1968. I grew up on 155th Street in New York City.

3. I first met Corey in New York through some mutual friends. Corey and I are the same age. But when I first met Corey, I had the impression that Corey was younger than I because Corey tended to hang out with guys who were younger. I was surprised when I later found out that we were the same age. I spent some time with Corey while in New York but did not really begin hanging out with him until we had both moved to New Jersey.

### Trenton Group Generally

4. Around 1986, I moved to Trenton, New Jersey with some friends and my brother, Darnell. Corey soon followed. We rented a house at 203 Locust Street in East Trenton.

5. In Trenton, Darnell and I formed a group that sold drugs.

6. I was generally in charge of our group. If I was not there, the group would listen to my brother Darnell. If Darnell was not there, they would listen to the next person in charge. Everyone in the group knew who was in charge and what the pecking order was.

7. Looking back, nothing that the group did showed good judgment. But within our group, my brother and I were the closest to having good judgment, which is why we were in charge.

1

APP.208

8. The group also included guys we called "block hustlers," "workers," or "worker ants." These terms, which we used interchangeably, were used to describe guys who had no rank or status within the group. They worked for someone else. They did not save money from drug sales and did not pay bills. They did not have cars or anything expensive. They did not have a plan for the future.

### Corey and His Role in Trenton Group

9. Corey was what we referred to as a block hustler, worker or worker ant.

10. Corey didn't have a level or rank in the organization. Corey was not someone that anyone in the group saw as a leader and no one would have listened to him.

11. Moreover, Corey was not capable of giving instructions to others. He would let others make decisions and go along with what someone else was doing just to please the other person.

12. Corey was a follower. Corey would go along with anything anyone in the family – our group – would say. If, hypothetically, you would say to Corey "let's rob a bank," Corey would be there with you. He wouldn't analyze whether it was a good idea. Corey's view was that he'd do anything for the people he considered his family.

13. Indeed, Corey would go along with whatever someone else was doing no matter who he was or what his status was within our group. If someone in the group said, "let's do something," Corey would automatically do it, no questions asked. Corey had poor judgment.

14. One time, some other friends of mine went to a party with Corey. I didn't attend, but heard that there was an argument between my other friends and a different group of guys. I rushed over to the party to prevent Corey from getting involved in any fight that might

2

unfold. Corey would go along with the crowd unless someone told him not to go along. Corey tended to listen to me when I spoke to him.

15. One of Corey's limitations was that he would always defer to someone else's leadership – even if the someone else was exhibiting what I would have recognized to be poor judgment.

16. Corey would even defer leadership to younger people, even if they seemed predisposed to defer to him because he was older than they.

17. Corey was trustworthy and loyal. He was respected by everyone in the group. Corey considered our group to be his family and was very protective of the group.

18. I don't believe Corey had the capacity to walk away from the group. Everyone he considered to be his family was in Trenton.

19. Based on the way Corey expressed himself, his intellect seemed very low to me. Corey had difficulties expressing himself. When Corey spoke, he was never very assertive and spoke of everyday things. He rarely initiated conversations. He seemed to have trouble following along in conversations and would often stay quiet. You had to spend time around Corey in order to fully understand his limitations, which were significant.

20. Because of his lack of leadership and intellectual abilities, Corey did not venture out on his own when it came to selling drugs. He always sold drugs for others and did what they told him to do.

21. If he had to travel, Corey would usually rely on a cab to take him and would rarely go out alone. I never saw Corey drive a car (and do not know if he even was able to).

22. Corey lived with us in the house in New Jersey for about a year before he moved out to live with a girl. I believe this girl's nickname was "Mudda" or something similar.

3

23. Corey generally did not share much information about his relationships.

24. The house we lived in Trenton (in which, as I have said, Corey lived for about a year) was occupied at times by as many as 15-20 guys.  Many of the people who stayed there would move in and out and often stay at hotel, motels, or with various women.  No one in the group talked about whatever families they may have had. The house was never very clean.  We mostly ate out and Chinese take-out boxes would be strewn all over the house.

25.  Corey sometimes gave one of the other roommates money to pay the bills, but I never saw Corey pay an actual bill himself or even count money on his own.

26. I never saw Corey count money.  In one situation, Corey could not account for his money and had no way of explaining where his money went.

27. Corey never had any real money.  When he was involved with a woman named Monica, he would give any money he made to her.  I felt that she took advantage of Corey.

28.  I thought Corey would remain at the same level – block hustler, worker or worker ant – as long as he sold drugs because he never figured out how to make it on his own.

29. I don't know whether Corey ever had a job besides his involvement in our group.  If Corey had not been with our group, the only other job I could have believed Corey to be able to perform would have been a job requiring manual labor, like on an assembly line, where the work is repetitive and a supervisor would have been available to tell Corey what to do. Corey could not handle a job where unexpected problems came up, as he would not know what to do.  Corey was not a problem solver.

4

## Roles of Thomas and Tipton in Trenton Group

30. Vernon Lance Thomas was also a block hustler, worker or worker ant, without rank or status in our group. He was very similar to Corey, just a hair above Corey in all of his capabilities.

31. Tipton, who we called "Whitey," was a block hustler, worker or worker ant, too. He had no rank in our group. Whitey was active, hyper, and rowdy.

32. Corey and Whitey were like yin and yang – Whitey was very loud, while Corey was quiet and laid back.

33. Both Whitey and Corey were followers, but between the two, Corey would follow Whitey. Corey would not even stop to analyze a situation before doing something; he would act based on nothing more than other people telling him to. On the other hand, Whitey would analyze a situation first, even if he would eventually be persuaded to do what you were asking him to do. Whitey was considerably more intelligent than Corey.

## My Brother and My Arrests in 1991, and Later Events

34. In 1991, my brother Darnell and I were arrested. Our arrests left the group without its leaders.

35. Corey's options were limited after our arrests. If Corey had gone back to New York, he would have had no friends there, only whatever family he had. As I mentioned earlier, the only job he could have done would have been rote manual labor. Corey needed to be told what to do.

36. I still found it amazing that guys who were workers or block hustlers in our group in New Jersey – Tipton, Thomas and Corey – went to Virginia to try to make a go of it without those who had led our group.

5

**APP.212**

37. It was not surprising to me that they had trouble in Virginia. None of them had good judgment – least of all, Corey. None of them had to do any planning while they were part of our group in New Jersey. In Trenton, my brother and I were around to handle any problems and we did so diplomatically.

38. If those who went to Virginia encountered others trying to sell drugs in Richmond, I can understand how the situation could have quickly escalated to violence. None of those guys – least of all Corey – had the leadership or other skills to resolve a situation like that.

39. Because of Corey's always deferring to others (including to Tipton), and because he was felt that those in our group were his family, I would have been particularly afraid for how he would have reacted in any situation in which there was no one with good leadership skills involved and if he felt that his "family" was in danger.

_Darold Brown_
DAROLD BROWN

Sworn to before me on this

_15_ day of June, 2011

_Helen Brown_
Notary Public

Sworn to and subscribed
before me this
_15_ day of June, 20 _11_

6

APP.213

# EXHIBIT 17

## AFFIDAVIT

State of New York      )
                            ) ss:
County of New York     )

DARNELL BROWN, being duly sworn, deposes and says:

1. I was born in 1970. I currently live at 411 Broad Street Northfield, NJ 08225.

2. I grew up in Manhattan and moved to Trenton in or about 1987. In Trenton, in or about 1989, my brother Darryl Brown introduced me first to Corey Johnson's brother Robert Johnson and then, also in or about 1989, to Corey Johnson.

3. After I met Corey, I started hanging out with him and ended up spending more time with Corey than with Robert. I played basketball with Corey and we also went to parties together. Corey was much quieter and more laid back than Robert.

4. In or around 1988 my brother Darryl, some friends and I started to spend time at a house at 203 Locust Street in East Trenton. After I met Corey he also started to spend time at that house. Corey did not live there; he lived at the places of various girlfriends but came to the house regularly.

5. The males who spent time at the house took part in selling drugs to support ourselves – although as I discuss later in this statement, Corey's role in the selling of drugs was very limited.

6. Those guys spending time at the house who had money would pay the bills. Corey was never one of those guys. Any money Corey ever had seemed to go to his girlfriend Monica or other girlfriends.

1

903464.05-New York Server 4A - MSW

**APP.215**

7. The women who came to the house did the laundry, cooked the meals, and did other household chores. They looked out for the men who came to the house, in terms of personal things.

8. Our group in Trenton was an informal family. We all had to trust each other for it to work. I considered Corey family – a cousin (even though he was not related to me). Corey treated me and my brother as if we were important members of his family. For example, he gave us money when we needed it, or he helped us when we needed a ride.

9. In our group in New Jersey, there was a hierarchy of responsibilities. The officers were the leaders in the group; they made the decisions. My brother Darryl and I were both officers. The workers were followers.

10. Corey was a worker and a follower. He sold drugs, but he never did so on his own. He never went anywhere or did anything without having someone with him. Corey's assignments when it came to selling drugs never required much. He was not given assignments that required much because Corey did not appear capable of making decisions on his own. He had to be told what to do. Corey did not refuse to do something once asked. Even if he did not seem to want to do something, he would do it.

11. Corey comprised the lowest level of the worker/follower group. He and Vernon Lance Thomas, who we called "V" and was also at a low level, were the quietest guys in the group. Compared to Corey, V was more likely to try to analyze something. But, as with Corey, V had to be told what to do.

12. "Whitey" (Richard Tipton) was also of our group in New Jersey. Whitey was also a worker. But within the worker group, Whitey was at a higher level than Corey or V. Whitey was more outgoing, outspoken and intelligent than either Corey or V.

903464.05-New York Server 4A - MSW

**APP.216**

13. Corey also seemed incapable of taking any initiative on his own in other aspects of his life. He was very unassertive in his personal life and never appeared to have any confidence in himself. He had several girlfriends, but other than Monica, I thought they looked like men.

14. If a girl liked Corey, she would have to take the initiative to approach him, because he would not approach her.

15. Corey did not talk much, especially when he was among a group of housemates. It was as though he did not want to be put on the spot. Corey went along with what everyone else was doing and did not come up with his own ideas.

16. I never knew Corey to have a job (aside from his lowest level involvement in the drug selling activity). I never knew Corey to have a car, and never saw him drive.

17. I never saw Corey read a book or a newspaper.

18. In my experience, Corey was a good person when it came to helping others. He gave food to people to who did not have any, and was generally willing to help people in need.

19. Sometimes, Corey would go along with me New York to visit his mother. I saw her a few times and she always appeared to be on drugs. Corey would never talk about his mother to me.

20. In 1991, my brother Darryl and I were both arrested and sent to prison.

21. Thereafter, some of the other guys from our New Jersey group went to Virginia.

22. I don't know which of them had the idea to go there, or what reason that person or person had for that idea.

3

903464.05-New York Server 4A - MSW

**APP.217**

23. The people from our group who went to Virginia – Whitey (Tipton), CO (Corey) and V (Thomas) – had all been workers in New Jersey.

24. Based on their statuses in our group, I would have expected Whitey, rather than Corey or V, to be the leader of the group in Virginia.

25. Corey unfortunately ended up in a situation in which those whom he was following were not as skilled at leadership as my brother and I had been.

DARNELL BROWN

Sworn before me on this

14th day of October, 2011

Notary Public

Susie Ng
NOTARY PUBLIC, State of New York
No. 01NG4948150
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires March 6, 201

4

903464.05-New York Server 4A - MSW

**APP.218**

# EXHIBIT 18

**APP.219**

not be right.  In the meantime, you all have been given a tremendous and heavy responsibility, and I know the weight of it is going to come down on you tonight.  But we are assured by our questions of you and our having dealt with you over the last few days that you are able to handle it.  So you all go home and have a good evening and we will start out fresh on tomorrow morning at 10 o'clock.

Everyone remain seated while the jury leaves the courtroom.  Just a second.  They tell me you have to report to a different place in the morning.  Check in at Room 302.  It is on the third floor in this hallway down this way.  That's Room 302 for your check-in.  Thank you.  We will see you tomorrow.

(The jury left the courtroom.)

All right, Mr. Marshal, you may remove the defendants.

(Proceedings adjourned at 5:11 p.m.)

0890

              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
                    RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,


                        Plaintiff;

    v.                                  CRIMINAL ACTION
                                            92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                        Defendants.

----------------------------------------
                      VOLUME V

                  January 15, 1993
                  Richmond, Virginia
                    10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge

APPEARANCES:    HOWARD C. VICK, JR., ESQ.
                WILLIAM H. PARCELL, III, ESQ.
                Office of the United States Attorney;
                    Counsel for Government;

                ROBERT P. GEARY, ESQ.
                ERIC D. WHITE, ESQ.
                    Counsel for Defendant Tipton;
                CRAIG S. COOLEY, ESQ.
                JOHN F. McGARVEY, ESQ.
                    Counsel for Defendant Johnson;
                DAVID P. BAUGH, ESQ.
                ARNOLD R. HENDERSON, V, ESQ.
                    Counsel for Defendant Roane;
                ROBERT J. WAGNER, ESQ.
                    Counsel for Defendant Reavis.
                JEFFREY B. KULL
                OFFICIAL COURT REPORTER

0891

                    P-R-O-C-E-E-D-I-N-G-S

THE CLERK:  Case Number 92CV68: United States of America versus Richard Tipton, Cory Johnson, James Roane, Jr. and Sandra Reavis, the fifth day of trial.  Are counsel ready to proceed?

MR. VICK:  The government is ready to proceed.

MR. GEARY:  Defendant Tipton is ready.

MR. McGARVEY:  Defendant Johnson is ready.

MR. HENDERSON:  Defendant Roane is ready.

MR. WAGNER:  Defendant Reavis is ready.

MR. VICK:  In light of opening statements by defense counsel yesterday, I do believe the government should now be allowed in direct examination of its witnesses who have been provided protection and money to be able to testify why it is indeed that they have been provided money by the government, and that's simply because they have been in protective custody.  Not a single witness has been provided any money other than necessity money to put them in hotels, put them in witness protection.  In light of opening, although that's not normally allowed, in light of the arguments that were here for an hour-and-a-half yesterday, we think that's proper testimony.

0892

THE COURT:  Well, Mr. Vick, I would not make a decision like that based on opening statements.  Opening statements are full of sound and fury and signify nothing.  If they do as they have indicated and bring out this information in cross-examination, then you can do that in rebuttal.  You can't do it in direct.

MR. VICK:  Yes, sir.

MR. GEARY:  May I be heard?  Your Honor, in

Q    Was Richard Tipton there on a continuous basis?
A    No, he was always away on spurts, gone for two months here, a month here.
Q    Did you ever have occasion to talk to Mr. Richard Tipton about Richmond, Virginia?
A    Yes.
Q    And what did Mr. Tipton tell you about Richmond, Virginia?
A    That there was big money down here.
Q    Big money in what regard?
A    Selling drugs.
Q    How did he say it was big money?
A    Said you could sell three times as much as what you were selling in New Jersey.
Q    Three times the quantity, or a gram of cocaine would sell for three times more?
A    A gram of cocaine would sell for three times

0922

more.
Q    On June 4th, 1991, there was a search of a residence that you were living in; is that correct?
A    Yes.
Q    What residence was that?
A    491 Martin Luther King Boulevard.
Q    Trenton?
A    Yes.
Q    Again, that's what you are pending sentencing for?
A    Yes.
Q    Who else lived in that house with you?
A    Darryl Matthews, also known as "Heavy D," "C.O.," also known as Cory Johnson, "V," Vernon Lance Thomas, and Gary Williams.
Q    And were drugs seized from that house?
A    Yes, they were.
Q    Were you present at the house when the search was conducted?
A    Yes.
Q    Based upon your presence at the house, did you know where the drugs were seized?
A    Yes.
Q    Where were they seized from?
A    Mostly from Darryl Matthews's room and "C.O."

0923

and "V's" room.
Q    The drugs seized from Darryl Matthews's room, whose were they?
A    Matthews's.
Q    How were they packaged?
A    In a big plastic bag.
Q    The drugs seized from the room of Cory Johnson, "C.O.," and "V," how were they packaged?
A    In crack vials.
Q    What room was that?

# EXHIBIT 19

## DECLARATION

I, ANN HARDING, hereby affirm the following:

1.      I live at 2120 Carrell Road, Apt 210, Fort Myers, FL 33901.

2.      For 22 years, I was a staff member at Pleasantville Cottage School ("Pleasantville" or "the school"), a residential treatment center for emotionally troubled youth run by the Jewish Child Care Association.

3.      I knew Corey Johnson from 1982-1985 while Corey was living at Pleasantville. We both lived in the older boys' cottage. When I was placed there he was already there. I had a supervisory role at the school and saw him on a daily basis.

4.      Corey was a sweet boy and a good kid. He was always very quiet and respectful, and did whatever I asked him to do. Corey obeyed all of the school's rules, as far as I knew. I cannot think of any instance where Corey violated the school's rules or behaved disobediently. Some kids were quiet, some were loud, it depended on the child.

5.      I had a good relationship with Corey. I frequently used to work the night shift, and Corey would come downstairs to my post when he could not sleep. Sometimes he said he was having nightmares because of a scary movie he had seen that day. He would ask if he could sit with me, and we would watch television together and talk until he was ready to go back to bed again. I was the only female staff member at Pleasantville at that time, and I believe Corey thought of me as a maternal figure.

6.      Corey was very slow intellectually. I knew this by the way he would talk to me. I do not remember anyone else at Pleasantville who was similarly slow intellectually.

APP.224

7.   Corey never discussed his "slowness" with me.

8.   I did not work with Corey on identifying and achieving his goals, as I did with other children at the school. Our conversations were basic and did not involve school or other residents at Pleasantville.

9.   Corey participated in social activities and got along well with his peers. Corey was generally friendly, nice, slow to anger, easygoing and respectful.

10.   I do not think Corey possessed leadership qualities. To the contrary, he was more of a follower than a leader in his interactions.

11.   I believe that Corey was probably taken advantage of by the other students occasionally.

12.   Corey understood and complied with basic requirements of the daily routine at Pleasantville. Very little changed at the school during the time that Corey was there, and I cannot remember any situation in which Corey had to adapt to new circumstances.

I declare the above is true and correct.

Dated: November 21, 2011

_Ann Harding_
ANN HARDING

City of Fort Myers
State of Florida

2

# EXHIBIT 20

## DECLARATION

I, SARAH JANE WOODSON WEST, hereby affirm the following:

1.      I live at 6849 Wood Haven Road, Roanoke, Virginia, 24019.

2.      For thirty-five years, ending in 2006, I was a volunteer prison chaplain with my husband, Bob West. I ministered to death row inmates for fifteen of those thirty-five years. I have met with death row prisoners on hundreds of occasions.

3.      I first met Corey Johnson in 1997, shortly after he was moved from Powhatan Correctional Facility. I visited with Corey at two correctional facilities in Virginia (Mecklenburg and Sussex), where my husband and I saw Corey individually and in groups. In addition to the visits my husband and I jointly made, I met with Corey one-on-one on five or six different times while Corey was in Virginia. My husband and I also made approximately five visits to see Corey at a prison in Terre Haute, Indiana. My last visit with Corey was in March 2006. I probably met with Corey Johnson on ten to eleven occasions.

4.      While Corey was at Mecklenburg, I also met Corey's co-defendants, James Roane and Richard Tipton. Both Roane and Tipton had stronger personalities than Corey. Tipton, in particular, was assertive and boastful. It seemed like he was always trying to accomplish or gain something from his contacts.

5.      Both Roane and Tipton were "up" on their cases and used the law library to research their cases. Corey was not knowledgeable about his case. Corey and I never discussed him using the law library.

**APP.227**

6.      Compared to Roane and Tipton, Corey appeared to be a follower.  Tipton and Roane could have been the bosses; they had the strong personalities, unlike Corey.  Corey wanted to be accepted and could have been influenced by others.

7.      I tried to act as a mother figure to all of the people I visited.  Corey seemed especially receptive to my visits.  When we visited the facilities in Virginia, Corey sought me out to talk to me.   At Mecklenburg, we held hands, spoke and prayed together.  At Sussex, I spoke with him through a hole in a door through which food was passed.

8.      During the times that I observed Corey, he was pleasant and eager for acceptance.  I did not observe him in disagreements with others.

9.      Corey is a fine person.  He was always polite, respectable and kind when we met.

I declare the foregoing is true and correct.

Dated: _March    24_, 2011.


_Sarah Jane Woodson West_
SARAH JANE WOODSON WEST


Commonweath of Virginia
City of Roanoke

2

APP.228

# EXHIBIT 21

## AFFIDAVIT

State of New York          )
                           ) ss:
County of New York         )

**PRISCILLA HODGES, being duly sworn, deposes and says:**

1.      My address is 400 East 105th Street, Apt. 3F, New York, NY 10029.

2.      I was born ████████████

3.      I am currently 43 years old.

4.      Corey Johnson is my first cousin.  Corey and his half-brother, Robert, are the sons of my mother's younger sister.  My mother is Minnie Hodges.  Her younger sister was Emma Johnson, who passed away in 1995. Corey is about 8 months younger than me.  I have known Corey as long as I can remember.

5.      We grew up together, and Corey and I were always very close.  We played, skated, and went to the movies together.  When we were children, I visited Corey's house, and more often, Corey would spend time at my house where he visited at least once a week. Corey frequently stayed the night at my house when he was a child.

6.      My mother Minnie practically raised him since he was a baby.

7.      I spent time with Corey not only when he was a child, but also when he was a teenager and a young adult in his early twenties. I also have maintained some contact with Corey since he has been in prison.

8.      Even when we were both children, I could tell that Corey was slow.

9.      For example, Corey wet his bed when he was as old as ten.  Aunt Emma complained to my mother about Corey wetting the bed, saying he was too old to be doing so.

Corey also wet the bed when staying at our house. Whenever Corey wet the bed at our house, he would try to cover the wet sheets with a comforter, but my sister Queenie and I could tell that he had wet the bed. I do not remember if we teased him, but we might have. My mother said that he was too old to be wetting the bed.

10. Corey was slow in other ways, too – ways that involved his ability to do things that required thinking and knowing about things. For example, Corey had significant problems counting change from the time he was a child until at least his late teens. On many occasions, I accompanied Corey to the store where he would pay for an item and receive change, and then ask me how much change he should have received and if he had in fact gotten the proper amount of change. He did not know how to calculate the proper amount of change or even how to count change, mechanically. Often times when Corey went to the store alone, Corey's mother would yell at him for bringing back incorrect change.

11. In addition, Corey always had great difficulty reading. He was embarrassed to read aloud because he would mispronounce words and would not know the meaning of even very simple words. I and others tried to help him with his reading. Despite the help he received, I did not see much improvement in Corey's reading even as he got older.

12. More generally, Corey did not do well in school. In addition to his reading problems, Corey's math skills were poor and also did not seem to improve despite his receiving help from me and others.

13. Indeed, Corey struggled with all of his classes. Corey needed help in all of his subjects and I regularly helped him with his homework in elementary. Corey also received regular homework help from his godsister, Courtney. Despite our efforts, I believe Corey continued to struggle in school throughout the time he attended.

APP.231

14.    As a child, Corey complained that other kids bothered him and would take his money, ball, or other possessions.  Corey would not assert himself with these other kids. Sometimes, Robert (who was two years younger than Corey) would confront them.  At other times, my sister Queenie or I would confront the neighborhood children whom Corey had accused of bothering him.

15.    Corey was a follower, rather than a leader, first as a child and then as a teenager.  Corey was easily influenced by others and could be persuaded to do things that, in my view, showed very poor judgment.  He would go to great lengths – and jeopardize his own well-being – just to fit in with the crowd.

16.    Once, when Corey was in his early teenage years, his "friends" dared him to roller skate down an incredibly steep hill, an act that no one else would attempt.  I told him not to do it, but his friends insisted.  He ended up falling and suffering a bruise and scrapes.  I believe he accepted the dare only to please his "friends."

17.    On another occasion when Corey was also a young teen, Corey's "friends" told him to ride his bike across a busy two-way street in the middle of traffic.  I warned Corey not to do it, but he did it anyway.  He made it across but was nearly hit by a car.  The driver had to slam on his brakes to avoid hitting Corey.

18.    Corey would do whatever his "friends" told him to do, even if it could have killed or seriously hurt him.

19.    Corey has always been very private and reserved; in my experience, he rarely volunteers information unless you ask him a specific question.  Even though we spent a lot of time together, Corey did not often talk about his feelings.

APP.232

20.    However, at various times when Corey was between 11 and 16 years old, he expressed to me feelings of hurt and sadness about his relationships with both his father and mother. For example, around the age of 11 or 12, Corey told me that he felt like his father did not want to be bothered with him because his father would go months or even a year between contacting (much less visiting) Corey. In addition, Corey would talk about his father breaking promises to visit him. At other times, Corey mentioned that he disliked his mother's boyfriends and questioned why she was even with them. Corey seemed to feel unloved by his parents.

21.    As a teenager, Corey was extremely shy, especially in approaching girls. On several occasions, I talked to my friends for him because he was too shy or afraid to talk to them on his own. He worried that girls would not like him.

22.    I know of three girls with whom Corey was friends during his teenage years. Two of them were also my friends. In both of those cases, I know that there was no romantic or sexual relationship between Corey and the girl. I do not know the nature of Corey's relationship with the third girl.

23.    Although Corey never directly admitted it to me, I am aware that both he and Robert were involved in the sale of drugs. I believe Robert started selling drugs when he was about 16 years old, and Corey began his involvement with the sale of drugs when he was a teenager. I think their mother Emma's involvement with drugs (using and possibly selling) played a role in each of her sons being involved in selling drugs. I encouraged them to stop their involvement in selling drugs.

24.    Robert appeared to have some success in selling drugs. He had a lot of money and nice clothes, which he appeared to acquire through drug selling.

4

APP.233

25. As compared to Robert, Corey seemed much less successful in his involvement in selling drugs. Corey had considerably less money and clothes. Sometimes, Robert (who was two years younger) would give Corey money or clothes to help him get by. I had the sense that Corey was trying to keep up with Robert but would always fall short.

26. On several occasions, Corey had problems obtaining the correct amount of money in exchange for drugs he was selling.

27. Once, I saw Robert get upset with Corey for coming up short on money in a drug sale. In fact, Robert's complaining about Corey's mishandling of money is how I first became aware that Corey was involved in the sale of drugs.

28. Men in the neighborhood whom I understood were supplying Corey with drugs to sell also got angry with Corey (and some would avoid dealing with him entirely) because Corey would come up short on money in drug deals.

29. Corey's trouble dealing with money in this context was not surprising to me because I already knew about Corey's change-counting problems.

30. During this period, Corey was no longer attending school and I encouraged him to return, if only to learn how to count change.

31. When they were in their late teenage years, Corey and Robert acted completely differently at my mother's house than when they were at home with Aunt Emma. When they came to my house, they did not talk about drug sales or making money. Nor did they bring their "friends" to my mother's house. My mother was religious, and Corey and Robert knew that they could not expose her to their street life.

32. During the same period, because I knew Aunt Emma lived with what I considered to be a negative lifestyle that involved heavy drug use, I visited Corey and Robert at

5

**APP.234**

Aunt Emma's house frequently to make sure they were okay. When I visited Corey at his mother's house, Aunt Emma often seemed "out of it," that is, under the influence of drugs or alcohol. She would complain of being tired, and would get very easily frustrated and angry with Corey and Robert. She often told Corey to get out of the house, and Corey would sometimes leave and not return until the next day. I do not know where Corey went or where he spent the night on those occasions.

33. From an early age (as reflected the incidents I mentioned above in paragraphs 16 and 17 above) and continuing into his adulthood, Corey was very susceptible to others' influence and his "friends" knew they could take advantage of him.

34. When Corey was 18 or 19, he went to live with his stepfather, Robert Butler, in North Carolina. I heard about an incident in which Mr. Butler's house was robbed after Corey had held a party at the house. It was my understanding that Corey's "friends" had convinced Corey to have a party and then used the party as a set-up to later rob the house.

35. Later, I saw Corey once or twice when he was living in New Jersey. I think he was about 20 years old. I met some of his friends there, including a guy they called "Whitey" (who was later one of Corey's co-defendants). I didn't know them well, but they seemed like tough guys. The males who Corey surrounded himself with in New Jersey did not seem like good people, but Corey considered them friends.

36. Throughout his life, from when he was very young up until when I visited him in New Jersey when he was in his early twenties, Corey struck me as directionless.

37. I am unaware of his ever having had a job.

38. I still keep in contact with Corey on the phone and through letters.

6

APP.235

39.    Corey's letters are extremely disorganized and incoherent.    There are always misspellings, words used incorrectly, and he jumps from topic from topic.   I become extremely frustrated reading Corey's letters.   Sometimes I have to put the letters down and return to them at a later time.

_____
PRISCILLA HODGES

Sworn to before me on this
30th day April, 2011

_____
Notary Public

DELORES GREEN
Notary Public, State of New York
No. 31-4527811
Qualified in New York County
Commission Expires Aug. 3, 2014

7

**APP.236**