**EXECUTION SCHEDULED FOR JANUARY 14, 2021**

No. 20-15

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT
_____

**UNITED STATES OF AMERICA,**

**Plaintiff – Appellee,**
**v.**

**COREY JOHNSON, A/K/A O, A/K/A CO,**

**Defendant – Appellant.**
_____

**APPENDIX VOLUME II**

_____

Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7983
donald.salzman@skadden.com

*Counsel for Appellant*

# TABLE OF CONTENTS

PAGE(S)

## VOLUME I

### I. DISTRICT COURT FILINGS

Motion for a Reconsideration of Sentence Hearing Pursuant to the
First Step Act of 2018 (Aug. 19, 2020), ECF No. 38 .................................. APP.1

Memorandum in Support of Motion for a Reconsideration of Sentence
Hearing Pursuant to the First Step Act of 2018 (Aug. 19, 2020),
ECF No. 39 ...................................................................................................... APP.7

Index of Exhibits to Memorandum in Support of Motion for a
Reconsideration of Sentence Hearing Pursuant to the First Step Act
of 2018 (Aug. 19, 2020), ECF No. 39-1 ...................................................... APP.65

Exhibit 1 to Memorandum in Support, Special Findings, Feb. 16,
1993, ECF No. 39-2 ...................................................................................... APP.67

Exhibit 2 to Memorandum in Support, 21 U.S.C. § 848 (1988)
(repealed 2006), ECF No. 39-3 .................................................................... APP.80

Exhibit 3 to Memorandum in Support, Affidavit of Antoinette Joseph
(Mr. Johnson's godmother), May 21, 2011, ECF No. 39-4 ....................... APP.87

Exhibit 4 to Memorandum in Support, Affidavit of Minnie Hodges
(Mr. Johnson's maternal aunt), Apr. 30, 2011, ECF No. 39-5 .................. APP.99

Exhibit 5 to Memorandum in Support, Gloria Caro, Reassessment
Summary, May 21, 1982, ECF No. 39-6 ..................................................... APP.110

Exhibit 6 to Memorandum in Support, Affidavit of Robert Johnson
(Mr. Johnson's half-brother), June 29, 2011, ECF No. 39-7 ................... APP.124

Exhibit 7 to Memorandum in Support, Sundar Collimuttam, M.D.,
Psychiatrist, Pleasantville Cottage School Psychological
Evaluation, Feb. 22, 1982, ECF No. 39-8 ................................................. APP.136

Exhibit 8 to Memorandum in Support, 2/10/93 Trial Tr. 3547-3548,
3573-3574, 3578, 3582, 3584-85, 3607, 3619-21, 3682, 3684,
3690-92, 3694-95, ECF No. 39-9 ............................................................... APP.140

Exhibit 9 to Memorandum in Support, Lynn Polstein, Change in
Permanency Plan, Apr. 13, 1984, ECF No. 39-10 .................................. APP.169

Exhibit 10 to Memorandum in Support, Christine Aaron, MSW Intern, Pleasantville Cottage School Current Assessment, Mar. 10, 1985, ECF No. 39-11 ....................................................................................... APP.175

Exhibit 11 to Memorandum in Support, Odette Noble, UCR Reassessment and Service Plan Review 6 Month, May 8, 1986, ECF No. 39-12 .............................................................................................. APP.179

Exhibit 12 to Memorandum in Support, Odette Noble, UCR Plan Amendment: Form E Final Discharge, Mar. 26, 1987, ECF No. 39-13 ....................................................................................................... APP.189

Exhibit 13 to Memorandum in Support, Affidavit of David Washington (caretaker at Elmhurst), Mar. 1, 2012, ECF No. 39-14 ....... APP.193

Exhibit 14 to Memorandum in Support, Odette Noble, UCR Plan Amendment: Form D Final Discharge, Feb. 23, 1987, ECF No. 39-15 ....................................................................................................... APP.197

Exhibit 15 to Memorandum in Support, Odette Noble, Three Month Conference Note, Feb. 20, 1986, ECF No. 39-16 ................................... APP.202

Exhibit 16 to Memorandum in Support, Affidavit of Darold Brown, June 15, 2011, ECF No. 39-17 ................................................................ APP.207

Exhibit 17 to Memorandum in Support, Affidavit of Darnell Brown, Oct. 14, 2011, ECF No. 39-18 ................................................................ APP.214

Exhibit 18 to Memorandum in Support, 1/15/93 Trial Tr. 921:12-922:01, ECF No. 39-19 ............................................................................ APP.219

Exhibit 19 to Memorandum in Support, Declaration of Ann Harding (staff member at Pleasantville), Nov. 21, 2011, ECF No. 39-20 ............ APP.223

Exhibit 20 to Memorandum in Support, Declaration of Sarah West (Mr. Johnson's prison chaplain), Mar. 24, 2011, ECF No. 39-21 ........... APP.226

Exhibit 21 to Memorandum in Support, Affidavit of Priscilla Hodges (Mr. Johnson's cousin), Apr. 30, 2011, ECF No. 39-22 ........................ APP.229

## VOLUME II

Exhibit 22 to Memorandum in Support, Affidavit of Julie McConnell, Mar. 23, 2011, ECF No. 39-23 .............................................................. APP.237

Exhibit 23 to Memorandum in Support, Affidavit of Odette Noble (Mr. Johnson's social worker), Dec. 1, 2011, ECF No. 39-24 ................ APP.240

Exhibit 24 to Memorandum in Support, L. Larrecq, City of New York Human Resources Administration, History Sheet, Nov. 20, 1984, ECF No. 39-25 ..................................................................................... APP.247

Exhibit 25 to Memorandum in Support, Amira Offer, CSW, Caseworker, Pleasantville Diagnostic Center Psychosocial Summary, Mar. 15, 1982, ECF No. 39-26 ............................................. APP.249

Exhibit 26 to Memorandum in Support, Lynn Polstein, Request for Authorization and Approval for Care and Services, Apr. 16, 1984, ECF No. 39-27 ..................................................................................... APP.255

Exhibit 27 to Memorandum in Support, Declaration of Esther Johnson (Mr. Johnson's maternal grandmother), Apr. 30, 2011, ECF No. 39-28 ............................................................................................... APP.257

Exhibit 28 to Memorandum in Support, Affidavit of James Sykes (Mr. Johnson's father), May 17, 2011, ECF No. 39-29 .................................. APP.263

Exhibit 29 to Memorandum in Support, Declaration of Pastor Bobby West (Mr. Johnson's prison chaplain), Mar. 24, 2011, ECF No. 39-30 .................................................................................................. APP.273

Exhibit 30 to Memorandum in Support, Inmate Education Data Transcript, Mar. 25, 2012, ECF No. 39-31 ............................................ APP.278

Exhibit 31 to Memorandum in Support, Motion to Have Defendant Declared Mentally Retarded, United States v. Vernon Lance Thomas, No. 3:92CR68 (E.D. Va. Apr. 15, 1993), ECF No. 39-32 ....... APP.280

Exhibit 32 to Memorandum in Support, Corey Johnson's IQ Scores Compared to IQ Scores of Federal Death Penalty Defendants Found Intellectually Disabled After Contested Atkins Hearings, ECF No. 39-33 ..................................................................................... APP.295

Exhibit 33 to Memorandum in Support, 6/1/93 Tr. 22#:1-14, ECF No. 39-34 ....................................................................................... APP.298

Exhibit 34 to Memorandum in Support, Jury Instructions 232a, ECF No. 39-35 ..................................................................................... APP.302

Exhibit 35 to Memorandum in Support, 2/12/93 Trial Tr. 3883-94, ECF No. 39-36 ............................................................................... APP.305

Government's Opposition to Defendant's First Step Act Motion (Sept. 23, 2020), ECF No. 58 ................................................................... APP.314

Reply in Support of Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 (Oct. 8, 2020), ECF No. 64 ...................................................................................................... APP.342

Index of Exhibits to Reply in Support of Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 (Oct. 8, 2020), ECF No. 64-1 ..................................................................... APP.361

Exhibit A to Reply, 01/27/93 Tr. 2737-2738, ECF No. 64-2 ....................... APP.362

Exhibit B to Reply, 06/01/93 Tr. 17, ECF No. 64-3 ................................... APP.365

Exhibit C to Reply, 01/13/93 Tr. 861, ECF No. 64-4 ................................. APP.369

## II. RELEVANT OPINIONS

Memorandum Opinion, *United States v. Roane*, No. 92CR98 (Oct. 29, 2020), ECF No. 66 ................................................................. APP.373

Memorandum Order (Nov. 19, 2020), ECF No. 75 ..................................... APP.416

## III. DOCKET SHEETS

E.D. Va. Docket Sheet, No. 92CR68 (1992-2019) ...................................... APP.430

E.D. Va. Docket Sheet, No. 92CR68 (2020) ............................................. APP.454

# EXHIBIT 22

## AFFIDAVIT

JULIE MCCONNELL, being duly sworn, deposes and says:

1.      I reside in Richmond, Virginia.

2.      During the early 1990's, I was the Executive Director of the Virginia Association to Abolish the Death Penalty and visited inmates on death row. I visited death row many times from 1989 to 1992.

3.      Prior to meeting Corey Johnson, I, along with Reverend Henry Gerrard, Sr. (who is now deceased), and King Salim Khalfani, had been visiting three other inmates at Powhatan Correctional Center in Virginia for some time.

4.      At first, Corey Johnson, James Roane and Richard Tipton were generally asleep during my visits and there was little interaction. Later, all three men began to interact with the three of us, and in particular, Reverend Gerrard. I estimate that I interacted with Corey Johnson on eight to ten different occasions. I interacted with Roane and Tipton approximately the same number of times.

5.      Corey appeared to be very simplistic in his thinking. He struck me as quite childlike. I had the sense that he really did not understand what had happened to him or why he was in prison. He was very suggestable and would basically agree to whatever you said to him. He was very polite, but seemed completely overwhelmed by the situation. If I had to guess, I would say that he probably suffers from mental retardation and a very low IQ. I have

worked with many young people with special education needs, and he certainly had some similar characteristics.

6. During the times I visited him, Corey appeared much younger than his counterparts and not at all worldly. He seemed shell-shocked, withdrawn and depressed. At the same time, Corey was very respectful and especially appreciative of Reverend Gerrard's religious role. I had the impression that he saw Reverend Gerrard as a father figure.

7. Compared to his co-defendants, Corey was the quietest of the three. Both Tipton and Roane were more verbal and outgoing. Corey appeared much slower than either Roane or Tipton. I did not perceive him as the leader of the trio. Indeed, I believe they indicated to me that he was the follower of the group. Tipton and Roane seemed very aware that Corey was slow. In my view, no one could reasonably have thought of Corey as the leader in that group.

_____
JULIE MCCONNELL

Commonwealth of Virginia
City of Richmond

I, Linda Lee McGrew, a Notary Public in and for the Commonwealth of Virginia at large, do hereby certify that the foregoing Affidavit was executed before me by Julie McConnell on this 23 day of March, 2011.

_____
Linda L. McGrew
Notary Public

My commission expires: April 30, 2015
Notary Registration No: 7389801



2

# EXHIBIT 23

USCA4 Appeal: 20-15    Doc: 15-3    Filed: 01/07/2021    Pg: 10 of 230

## AFFIDAVIT

State of New York       )
                             ) ss:
County of New York    )

ODETTE NOBLE, being duly sworn, deposes and says:

1.  I reside at 101 W. 85th St. Apt. 6-1, New York, New York.

2.  I received my master's degree in social work in 1973. From approximately 1973 until 1987, I was a caseworker for the Jewish Child Care Association (JCCA). During some of that period, as part of my work for JCCA, I ran therapy sessions for boys who lived at Elmhurst Boys Residence in Queens, New York (Elmhurst).

3.  Elmhurst was a group home located in an apartment unit. The residence housed eight boys – typically between 14 and 19 years of age – who, for various reasons, were not able to live with their families. Several individuals acted as house parents and provided supervision at the home. One house parent slept at the residence each night.

4.  As a social worker with responsibilities for Elmhurst, I met with each of the resident boys individually for an hour each week. I also conducted a group session with the boys and the house parents every other week.

5.  I met Corey Johnson when he was 16 years old, shortly after he moved into Elmhurst in June 1985. For approximately the next 20 months, until February 1987, when Corey left Elmhurst when he was age 18, Corey regularly attended my weekly individual therapy sessions as well as my bi-weekly group therapy sessions. In total, I met with Corey more than 100 times, either individually or in a group setting.

6.  After Corey left Elmhurst in 1987, I did not see Corey again until 1993, when I saw him in the court room as I testified at his trial in Richmond, Virginia. I have not seen Corey since the trial in 1993.

**APP.241**

7.      Compared to virtually all of the other boys I encountered at Elmhurst, Corey was much weaker cognitively.

8.      While living at Elmhurst, Corey attended special education classes at Newtown High School in Queens. Most of the other boys in the residence attended mainstream classes at high schools in the area and were expected to go on to college. I believe that this upset Corey.

9.      Corey had real intellectual limitations. During our sessions, I sometimes read to him and his comprehension of what I had read was poor. His own ability to read was very limited.

10.     Corey worked very hard, but because of these limitations, could just not perform well in school.

11.     Based on my regular interactions with Corey, I believe that Corey's cognitive problems were not limited to his school work.

12.     For example, even though he could understand the rules regarding group meetings well enough to follow those rules most of the time, he never understood the purpose or reasoning behind the rules.

13.     Corey did not pose any serious behavior problems for me. He was a very sweet kid -- not mean-spirited. He generally got along with and was liked by the other boys in the residence. Corey certainly was not one of the more difficult boys that I worked with in my years of working with teenagers.

14.     The residence had a strict policy against physical confrontations and, to my knowledge, Corey abided by that policy.

15.     During the time I knew Corey (from ages 16 to 18), he was "girl crazy" and we often spoke of him trying to develop close relationships.

2

**APP.242**

16.    In my view, Corey was not capable of "consequential" thinking. Thus, I believe, he lacked the ability to understand the consequences that his actions could have.

17.    In social settings, he did not initiate action, but rather went along with what others did. He was very susceptible to peer pressure.

18.    Corey did not have a good "read" of situations or other people. He was not very sensitive to social cues. He had difficulty learning "the rules of the game" and understanding who was in charge.

19.    In counseling him, I spoke with him about making good decisions and trying to judge who was trustworthy and who was not, but Corey seemed unable to apply our discussions to his actions.

20.    Corey was a poor social decisionmaker. When it came to making decisions, Corey seemed to live in the moment. As a result, Corey could be easily influenced into doing what his peers wanted him to do. If some of his more intellectually developed peers convinced Corey to do something, he would go along with it even if he did not perceive any logical reason for doing so. He would act in this way in circumstances in which, if he had been more intelligent, he would have realized that his actions could get him into difficulty.

21.    I believe that Corey's arrest for robbery in August of 1986 is an example of such a circumstance. Corey was arrested for robbery, along with two other teenagers, Mitch and Dwight. Mitch worked in the Youth Corps and apparently had a bossy co-worker against whom he wanted to retaliate. It is my understanding that Mitch enlisted the help of Dwight and Corey to rob the co-worker. I believe Mitch may have explained the situation to Dwight and Corey in a way that was intended to make it seem

3

APP.243

as if Mitch had somehow been wronged. Mitch was clearly the leader in this robbery. I believe Mitch may have chosen Corey as an accomplice due to Corey's known susceptibility to peer pressure. True to form, Corey went along with Mitch's plan.

22. Corey's mother very rarely visited him at Elmhurst. I met Corey's mother only once or twice during Corey's nearly two-year stay at Elmhurst, which was an unusually low number. By contrast, I met other boys' families much more frequently.

23. I frequently tried to contact Corey's mother by telephone, but she did not respond.

24. In short, Corey's mother was almost non-existent in his life while he was living at Elmhurst.

25. Whenever we talked about his mother, Corey could not discuss or consciously express any anger towards her. He would always talk about her as if she were terrific.

26. In my experience, Elmhurst gave a chance to youths who were coming out of bad, controlling situations to get their lives on track if they could honestly deal with their emotions. Corey did not confront his emotions with respect to his mother, and in my view, Corey's inability to do so was a problem for his development.

27. Elmhurst provided a structured environment for its residents. For example, the house parents shopped and cooked for the boys and even some of the leisure time was structured by the program.

28. That said, there was somewhat less structure at Elmhurst than at Pleasantville, where Corey had previously resided.

29. Corey may have needed more structure and support than Elmhurst provided.

4

APP.244

30. Towards the end of his time at Elmhurst, Corey began to ignore the instructions of house parents and the house rules.

31. In or about February of 1987, there was a meeting at which Corey was asked to leave Elmhurst for violating house rules. In my view, the message we were trying to communicate to Corey was "you should go away and think about this for awhile, and then come back."

32. However, Corey left Elmhurst permanently. We tried to invite Corey back to the residence, which we felt provided a structured and loving setting for him, especially compared to life with his mother or life on the streets. I, personally, as well as the rest of the staff wanted Corey to come back.

33. I believe that Corey's decisions to move out and stay out of the Elmhurst residence despite the staff's desire to have him back was an example of Corey's inability to think about the consequences of his actions and plan for his future.

34. I and my colleagues worried greatly for his future after he left Elmhurst.

35. As I mentioned above, while most of the boys living at Elmhurst were expected to (and did) go on to college, neither I nor my colleagues believed that Corey would be able to do so, because of his limited cognitive abilities.

36. Because of Corey's intellectual limitations, I had concerns that Corey would not be able to hold a job.

37. Beyond that, I questioned Corey's ability to negotiate even the simple, day-to-day tasks that community life requires, such as paying bills, obtaining a driver's license, or purchasing and maintaining a car. Somewhat more complex skills – like planning a budget – were clearly beyond Corey's abilities, in my view.

5

APP.245

38.   In short, I doubted that Corey was equipped to make it on his own, to live independently as an adult.  Some people stay in a protected setting their entire lives and that may have been what was appropriate for Corey.

_____
ODETTE NOBLE

Sworn before me on this
1st day of December, 2011

_____
Notary Public

PATRICIA TERRANOVA-GERACI
NOTARY PUBLIC, State of New York
No. 01TE5083454
Qualified in New York County
Commission Expires July 22, 2014

6

**APP.246**

# EXHIBIT 24

USCA4 Appeal: 20-15    Doc: 15-3    Filed: 01/07/2021    Pg: 17 of 230

Form W-25
Rev. 10/3/75

The City of New York
Human Resources Administration

## HISTORY SHEET

| CASE NAME | ADDRESS | CAT./CASE NO./SUF. |
|---|---|---|
| Johnson | | PAGE NO. |

**DATE**

**11/20/84** — Call from the w/ma stating she wants Rbt. replaced. Apparently Ms. Johnson is having problems handling Rbt. she reports she has not been able to get him into the correct cow placement & states that COW advises her they do not have the appropriate placement for him. Additionally, her former boyfriend (the drug addict she was with at the time of Corey's placement) last night tried to set fire to her apt. Ms. Johnson believes he is now in protective custody. But this added problem makes it all the more necessary that have Rbt placed.

Ms. Johnson proceeded to claim she'd been trying to get Rbt. replaced thru FCCA for several months without success. Note: Rbt. does not want to return to Children's Village. Since Ms. Johnson will be meeting with her PCS s/w later today, Sup. I advised her to fully discuss her replacement request with PCS

Note: mother states she is no p.a. recipient (&∴ not a candidate for payment towards cost of care)

L. Lawrence
Sup. I

APP.248

# EXHIBIT 25

APP.249

PLEASANTVILLE DIAGNOSTIC CENTER

PSYCHOSOCIAL SUMMARY

Name of Child:  COREY JOHNSON
Date of Birth:  ███████
Date of Adm:    2/1/82

## I. IDENTIFYING INFORMATION:

Corey is a 13-year old Black boy who was admitted to PDC on 2/1/82
on a Voluntary basis. His mother, Mrs. Johnson, requested    that
Corey be evaluated to determine whether placement at Children's Village would be
feasible, as his brother Robert is in placement there. Mrs. Johnson is currently
unemployed and resides with her drug addicted common-law husband in a
Brooklyn apartment.

## II. REASON FOR REFERRAL:

Corey's mother, a depressed, dependent woman is seeking placement for
Corey because she is struggling with taking charge of her own life
and is therefore unable to cope with Corey's problems at the present
time. Upon admission Mrs. Johnson reported that Corey had been truant
since September 1981. Corey's academic deficits have been a serious
problem and he has been left back twice in 3rd and 4th grade. His
behavior has reportedly been disruptive in school, he gets into fights
and does not learn. He currently reads on 2nd grade level and has not
improved in quite some time. Corey lived with his maternal grandfather
at times that his mother could not cope with his behavior. During his
last stay with his grandfather, while he was attending Catholic School,
Corey was suspended from school for fighting. Mrs. Johnson stated
that Corey had been stealing from her and her boyfriend, items such
as tape recorders, radios and she feels that this was done in anger
or revenge. As noted above, Mrs. Johnson has been living with a drug
addicted, unemployed man for the past four years and she noted that
although Corey's school problems have always been there, they have
intensified since she has been living with Mr. Krager (with whom she
is still living at the present time).

Until a year ago, Corey believed that his younger half-brother's father
was his real father. Corey's natural father unexpectedly came into
the picture after he was released from jail for armed robbery. Corey
has been visiting his father and his wife (who is expecting a baby)
regularly but feels that his father is uninvolved in his life and
is wary about approaching him.

Mrs. Johnson stated that her home environment has been unstable and
chaotic since she started living with Mr. Krager. He required numer-
ous emergency hospitalizations and Corey and his brother witnessed
many fights and arguments between Mrs. Johnson and Mr. Krager. Mrs. Joh
son is aware that she has been unable to provide a calmer more stable
and consistent home environment for her children and noted that she
is in the process of finding a job and seeking new residence so that
she can provide a better home for her children.

Corey Johnson                                                    -2-

III. FAMILY BACKGROUND:

Mrs. Johnson comes from a chaotic and unstable home environment as
well. She noted that her father drank heavily and was abusive with
her mother, "they fought all the time." She is the youngest of three,
her two older siblings had different fathers. Mrs. Johnson is "very
close" to her father who left the family during her adolescence but
continued to be supportive to her. He supports her financially and
emotionally when she is needy. Her father took care of Corey when-
ever Mrs. Johnson was emotionally unavailable.

Mrs. Johnson said that she became pregnant at age 17 in order to "get
away from home" but returned to live with her mother after Corey was
born. Mrs. Johnson went to work and Corey's maternal grandmother
cared for him. Subsequently Mrs. Johnson got pregnant with Robert
and was living with Robert's father for several years. Mrs. Johnson
reported that he was a good father to both children and a good provider, how-
ever, he used money to gamble. He apparently became a compulsive
gambler and although Mrs. Johnson believed that he had been paying
the bills she one day came home and discovered that the family had
been evicted from their apartment because their rent was not paid.
Mrs. Johnson subsequently left Robert's father and returned to her
mother's home. As noted above, she started living with Mr. Krager
four years ago. This has been a destructive and chaotic relation-
ship and Mrs. Johnson who has been quite depressed over this relation-
ship has not been able to extricate herself. Mr. Krager has been drug
addicted and has been involved with another woman over the past two
years and this has been a very painful situation for Mrs. Johnson
who feels trapped and wants help to reorganize her life.

IV. DEVELOPMENTALLY HISTORY OF CHILD:

There were no complications in pregnancy or birth. Corey weighed
7.4 at birth and was described as having been a "cheerful baby."
His early developmental milestones were normal, he walked and talked
at 1-year. Mrs. Johnson said that Corey was hyperactive and at age 2
she reported that he fell down a staircase and was admitted to Kings
County. He was released with no significant findings, and there were no neurological
tests.                        Corey stuttered until age 5 and he
continues to have a slight lisp. He was enuretic until age 11 and
encopretic occasionally between ages 8 and 12. Mrs. Johnson said
that Corey talks to an imaginary friend especially when he is angry
at her. She does not know how long he has been doing this. She noted
that Corey becomes defiant especially when he is jealous of his broth-
er Robert. Robert was hospitalized last summer at the Psychiatric
Institute following a suicidal attempt, (he walked on a ledge). Robert
became more of a problem for Mrs. Johnson during the last year with
significant increase in his aggressive unsocialized behavior. Robert's
behavior was seen as risk taking behavior and that has also increased
recently. Robert reportedly hates Corey and there was intense sibling
rivalry. Robert has been referred to Children's Village
following           a five month stay at the Psychiatric Institute.

V. CHILD AT PDC:

    Cottage

In our cottage, Corey is seen as an easy child to care for. He is

APP.251

Corey Johnson                                                           -3-

generally cooperative and challenges adults in a playful, immature,
way. He relates like a younger child and appears limited. He very
often acts silly and is seen as the cottage clown. This seems to stem
from his low self-esteem. Corey does not have friends, he appears
frightened of children and does not like any physical contact with
them. He also doesn't like to be teased by children and he gets very
verbal and loud when he is teased. He seeks adult intervention in
those situations and is calmed easily by adults. Corey seems to be
afraid of the dark but there has been no history of bedwetting or
nightmares during his stay at DC. Overall, he is a child who main-
tains a low profile in the cottage and has not been difficult to
care for.

### Casework

Initially, in our sessions, Corey was anxious and appeared to have a
great deal of discomfort especially around discussion related to his
mother and her drug addicted, common-law husband. With time Corey
appeared less anxious, spoke with greater ease and appropriately ex-
pressed anger at his mother for placing him away from home. He also
became more depressed and teary, in joint sessions with his mother,
when she told him that he can't come home for visits at the present
time. Mrs. Johnson, a depressed, dependent woman tearfully and pain-
fully told Corey that she doesn't want him to come home now for visits
and witness struggles, fights and drug abuse. She does not want him
to live in a "depressing" environment and said she is unavailable to
deal with Corey's emotional needs because of her own problems. She
noted that she would like to protect Corey and have him in placement
while she attempts to take charge of her life by seeking employment
and a new residence. Corey seemed to be more accepting of his mother's
current state of depression and views placement as a temporary option
because of his mother's current inability to cope. There are also
feelings of anger and rejection around this issue which surface from
time to time and need to continue to be addressed.

### School

Corey has had many failures in school and is reading on a 2nd grade
level. Testing indicated a lack of phonic skills which might enable
him to sound out words. He also has a minimal sight vocabulary. He
has difficulty blending and these combined factors make reading very
difficult for Corey. He could recite the month of the year in sequence
only up to August although he knew that there were twelve months in
the year. Corey could tell time on the hour only but seemed to feel
that he could learn in a short time. He is essentially seen as a co-
operative child in school who has great academic deficits and needs
individualized instruction.

## VI. FAMILY'S RESPONSE TO PDC:

Mrs. Johnson has kept all scheduled appointments and welcomed inter-
vention. She has visited Corey regularly with one exception when
she was expected to have lunch with him at the cottage and did not
keep this appointment. Corey was quite upset and disappointed and

Corey Johnson                                                    -4-

when Mrs. Johnson was called she said she was too depressed to come
Mrs. Johnson added that whe would contact Corey in the future if this should happen
again to let him know that she can't come. In order to enhance her self-esteem and
help her begin to feel like Corey's mother, arrangements were made to have her visit
him in the cottage and have lunch with him there. She has been quite
responsive to this plan and expresses gratefulness for the help that
she is getting here.

VII. DIAGNOSTIC APPRAISAL AND RECOMMENDATIONS:

Since Corey's admission to PDC on February 1, 1982 he has had psychiatri
and psychological testing, medical and dental examinations, the social
worker has completed the social history and met several times with his
mother and regularly with the boy. In addition, he has been evaluated
in our school and cared for in our cottage. On February 25, 1982 a
Multi-Disciplinary Conference was held with representatives of clinic-
al, child care and educational personnel. The findings and recommenda-
tions of that conference are contained in the Psychosocial.

Our psychologist found Corey to be a sensitive and dependent boy who
is struggling with issues revolving around independence. There was
an underlying organic component which serves to exacerbate the anxiety,
dependence, affectional needs and hostile impulses. As a result, Corey
has an extremely hard time trying to integrate emotional challenges.
He is motivated to improve his situation and would benefit from both
remediation in academic areas as well as psychotherapy. For a complete
report please refer to Dr. Gallaudet's evaluation.

Our psychiatrist sees Corey as a child who has the capacity to relate
well. He is happy with his mother and reaches out to her. His be-
havior is seen as reactive to a very chaotic home situation especial-
ly during the last four years with Mrs. Johnson having had great fin-
ancial problems and difficulties with her job and in her relationship.
For complete evaluation please see Dr. Collimuttam's report.

Our psychosocial formulation is that Corey is a likeable, related,
youngster whose depression is seen as reactive to an unstable family
situation within the past 4 years and to maternal rejection. Corey's mother
is depressed and unavailable emotionally. For the last four years
she has been living with an umemployed, drug addicted man who mis-
treated her and her children. Mrs. Johnson has had great financial
difficulties as she is unemployed and in debt (having supported her
boyfriend's addiction as well). Furthermore she is stressed in this
relationship as her common-law husband is involved with another woman
and Mrs. Johnson, who is quite dependent on this man, feels trapped,
unable to extricate herself from this relationship. Corey's acting
out behavior is reactive to her emotional absence and her common-law
husband's abusive and destructive behavior.

We, therefore, with reluctance, recommend placement in a residential
treatment center at the present time while Mrs. Johnson takes a better
hold of her life. Although Corey has great educational deficiencies
and needs intensive remedial work, we believe that he could have re-
turned home and residential treatment placement is only a viable op-

Corey Johnson                                                    -5-

tion because Mrs. Johnson is depressed and overwhelmed with diffi-
culties in her own life at the present time.  Mrs. Johnson will benefit from treatment
to help her cope with her problems, reorganize her life and then
become more available to her children so that they may return home.
She has agreed to contact Robert's former therapist at Psychiatric
Institute and will seek counselling.  We have tried to schedule an
appointment, during her recent visit to Corey, but have been unsuccess-
ful.  Mrs. Johnson stated that she will contact Robert's therapist
and will resume treatment.
　　　　Amira Offer, CSW:ww  D-3/9/82    T-3/15/82

                              Amira Offer, CSW
                              Caseworker

APP.254

# EXHIBIT 26

Form W-853C (fcce)
Rev. 3/20/75

The City of New York
Department of Social Services
Special Services for Children

## REQUEST FOR AUTHORIZATION AND APPROVAL
## FOR CARE AND SERVICES

TO:

SPECIAL SERVICES FOR CHILDREN

80 Lafayette Street

New York, New York 10013

SSC WORKER

| | | |
|---|---|---|
| AGENCY DATE | April 16, 1984 | |
| CASE SURNAME | JOHNSON | |
| BCW CASE NO. | 4766716-28 | TEAM/CSLD 9095 |
| Mother's full name (incl. maiden name) | EMMA JOHNSON | Social Security No. |
| Address | 640 Riverside Drive | |
| City New York | St. N.Y. | ZIP 10031 |
| Father's full name | JAMES SYKES | Social Security No. |
| Address Unknown | | |
| City | St. | ZIP |

AGENCY FOLD

TO: AGENCY Jewish Child Care Association of New York

PLEASANTVILLE COTTAGE SCHOOL

345 Madison Avenue

New York, New York 10017

NAME OF WORKER  LYNN POLSTEIN

Shaded area for IARP use only

INDICATE FOR:
Code 00 Addl. Placement Effective Date
Code 02 Ann. Reauthorization Annual Period
Other Specifications Below

| IARP FOLD | CHILDREN | | | DATE OF BIRTH | WHEREABOUTS ADDRESS OR AGENCY | INITIAL PLACEMENT DATE | CITY BILL NUMBER | Request Code | APPD | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | SURNAME | FIRST | M.I. | | | | | | YES | NO | |
| 1 | JOHNSON, | COREY | | ███ | PCS | 2/1/82 | 12178 | 49 | | | |
| 2 | | | | | | | | | | | |
| 3 | | | | | | | | | | | |
| 4 | | | | | | | | | | | |

AGENCY: (Check one) ☐ Reply ☐ Report Only ☑ Request (See Reverse) Specify Type of Request: Permanency Goal Change

SUMMARY: (ATTACH ADDITIONAL SHEET OF PAPER IF REQUIRED)

This is to request a change in discharge goal for Corey Johnson. We are requesting that Co have a permanency goal of discharge to independent living.

Corey is a 15½-year old boy with severe learning disabilities in reading, spelling and arithmethic. Within the course of his placement, these disabilities have been identified and he has received a program to remediate his defects. To date, his progress in learning to read has been only minimally successful. Coupled with, and perhaps as a result of, his learning problems, Corey has a very damaged sense of self which interferes with his assertiveness and which seems to be at the root of his feelings of depression and hopelessn. He is a youngster who needs to live in an environment in which he feels nurtured and in which his non-academic strengths are supported. When his environment is non-supportive, Corey act out in the community by stealing and truancy.

During the course of placement, work has been done to enable Mrs. Johnson to be more (OVER)

### AUTHORIZATION SPECIFICATIONS FOR REQUEST CODES OTHER THAN 00 AND 02

| DISCHARGE | | NAME, RELATIONSHIP, ADDRESS | | CODE 15 | PLACE ON ADOP. REFERRAL | AGENCY: |
|---|---|---|---|---|---|---|
| CODE | TYPE | TO: | | | | |
| 04 | FINAL | | | CODE 28 | TAKE SURRENDER | DATE: |
| 05 | \$500 | | | | | |
| 06 | TRIAL | DATE: | | | | |
| CODE 07 | EXTEND CARE | Until date: | CODE 20 RETURN TO CARE | EFFECTIVE DATE | | CODE 33 PL. IN PFDC | Parent's \$ |
| | | | CODE 55 PROC.SUSP. PAYMENT | REASON | | |

SSC: (Check one) ☐ Reply ☐ Request ☐ Report

We support your request to change the permanency Goal to "Independent Living".

AUTHORIZING SIGNATURE

DATE: 5-1-81

# EXHIBIT 27

## DECLARATION

I, ESTHER JOHNSON, hereby affirm the following:

1.    I live at 10 West 138th Street, Apartment 4K, New York, New York 10037.

2.    I am Corey Johnson's maternal grandmother.  The youngest of my three children, Emma Lee Johnson (who is no longer alive), was Corey's mother.

3.    I was born on ███████████ in Sumpter, South Carolina.  My parents were Julius and Emma Brunson.

4.    My parents worked hard and were very strict with me.  I tried to avoid getting in trouble because when I did, I would receive a "whooping" from my parents.

5.    While in South Carolina, when I was about 17 years old, I had my eldest daughter, Minnie Hodges.  About two years later, my son Amos Brunson was born. His father was a man named Jimmy Lee Brown.

6.    A few years later, I met and later married Love Johnson, with whom I had my third child, Emma, Corey Johnson's mother.

7.    Love Johnson and I lived with my three children in South Carolina for a short period before relocating to New York.  We moved to New York without bringing my children with us, leaving them with my parents.  The children joined us some time later.

8.    Love and I were married for many years.  He drank a lot and ran around with many other women, which is why we eventually divorced.  He would also occasionally hurt me when he was drunk.  While I drank alcohol in excess when I was younger, after I stopped, I found it very difficult to be around Love when he was drinking because he behaved badly.

9.    I lived in Brooklyn, New York in 1968, when Corey was born.

1

**APP.258**

10.    Corey's father, James Sykes, was a nice man who treated me and Emma with respect when he was dating Emma. At the beginning of their relationship, he spent a lot of time at our house. Emma got along well with him. I remember that there was a discussion about Emma and James getting married. I wanted them to get married.

11.    Corey was born at Brooklyn Jewish Hospital. I was with Corey's mother, Emma, at the hospital during his delivery.

12.    After it became clear that Emma and James would marry, Emma wanted to see other people after Corey was born. Emma began spending time with the type of people that I did not like, because they were pushing her around and did not treat her properly. I think these people also hit Emma and used drugs but this never happened in front of me.

13.    While Corey was growing up, Emma dated a number of different men. She first dated Robert Butler, with whom she had her younger son, Robert Johnson. She later dated a man she called "Mitch," with whom she lived in Jersey City. He was a very nice man, who treated Corey well and wanted to adopt him. However, Mitch was killed in a dispute following card game. Corey and Robert were with me when they learned that Mitch had been killed.

14.    Emma later became involved with a man named Bobby Koger, who treated Emma, Corey and Robert very badly. He never hurt her in front of me, but I could tell that he was bad for her and told her that I did not think that he was right for her. Bobby also used to drink a lot. He was not a good person.

15.    Emma also had some friendships with women of whom I did not approve. In particular, I did not like her friend Carol because I thought she was a bad influence on Emma. Carol talked about people behind their backs. She used to take Emma's clothes and talk rudely

2

APP.259

to people. She wanted me to be like a mother to her, but I told her that she would need to change her ways for me to do that. She never did that.

16.     During Corey's and Robert's childhoods, Emma and the children lived with me at various times. Even when they were not living in my house with me, Emma often left Corey and Robert with me on nights and weekends. Corey and Robert even had a bedroom at my house. Emma was working and could not take care of them as much as I could. I fed them, clothed them and watched over them when they went outside. I did not let them go too far from the house and I gave them a curfew when they went outside. I always talked to them about right about wrong, and they attended church with me on most Sundays. I treated them as if they were my own children.

17.     Corey was a good boy, while Robert could be mischievous at times. I treated them strictly, the way that I was raised.

18.     In general, they did not give me a hard time. They showed me respect. They usually obeyed when I told them to do something (although sometimes Corey needed things repeated to him before he would understand what I was saying).

19.     Corey was a quiet child, while Robert liked to talk a lot. Even though he was two years younger than Corey, Robert was better at standing up for himself, and Corey was more likely to be taken advantage of.

20.     Corey was the kind of child that always took the back seat and let other people take the front seat. If he had money, children would not need to steal it from him because he would give it away.

21.     Corey did not engage much with other children and did not make friends easily. I do not think that Corey got into fights at school, but my understanding was that he was

3

APP.260

teased a lot by the other children. Robert often told me that the children picked on Corey at school, although I am not sure what the children teased him about.

22. On more than one occasion, Corey came home from school without the sweater that he had worn to school that day. When his mother, Emma, questioned him after this had happened, he told her that boys from school had taken his sweater from him. Emma not only became very angry with Corey but physically beat him for allowing the boys to take his sweater.

23. While I do not recall what prompted Emma to do so, I recall another incident in which Emma beat Corey with a shoe on the head. I asked her not to do it again.

24. I specifically remember talking to Emma about the physical beatings she gave Corey and Robert and encouraging her to talk to them instead of hitting them.

25. Throughout his childhood and teenage years, Corey seemed to be slower than Robert, even though he was two years older.

26. For example, Corey had problems dealing with money and I did not feel comfortable trusting Corey with money. If I wanted Corey to buy something for me from the store across the street where the owner knew both me and Corey, I would send Corey's younger brother Robert to accompany Corey, to make sure that the purchase was done right and that Corey received the proper change. I did not want to send Robert alone, however, because he would spend the entire amount. Therefore sending them together was the best solution.

27. I recall that Corey had problems in school, although I do not know the full extent of his problems. I heard to he had difficulties studying and succeeding in school. Also, I believe that he had problems with reading. Even now, when he writes me letters from prison as

4

APP.261

an adult, I have trouble reading his letters. His spelling is not very good and the letters contain a lot of grammatical errors.

28.    I was sick quite often with diabetes and in and out of hospital a lot when Corey approached his teenage years and in his early teen years. I think that the family kept a lot of problems from me back then because they were concerned about my health and did not want to worry me. For instance, I remember hearing that Corey had been sent away to school north of New York City, but Emma did not tell me much about it. I do not know much about what happened with him while he was there.

29.    I was not aware that Emma was using drugs until my daughter, Minnie Hodges, told me so shortly after Corey was born. However, I think that I may have been in denial, because I didn't want to believe that Emma was using drugs.

30.    After I learned about her drug use, I frequently told her that she needed to stop. Because of this, she never used drugs in front of me, and she put on an act as if she was not using drugs when she was around me.

31.    Shortly before Emma died, I knew that she had boils underneath her arms and was too weak and sick to the go the doctor. However, I do not know the details of her death.

32.    The last time I saw Corey was on Mother's Day many years ago, while his mother was still alive. He brought me some decorative flowers.

I declare the above is true and correct.

Dated: April 30, 2011.

ESTHER JOHNSON

New York, New York

5

# EXHIBIT 28

## AFFIDAVIT

State of New York          )
                           ) ss:
County of Bronx            )

JAMES SYKES, being duly sworn, deposes and says:

1.      I was born [REDACTED]. I am currently 62 years old and live in the Bronx, New York with my son, James Sykes, Jr. I am currently unemployed, although actively looking for work, and receive public assistance. In the past, I spent time in prison and used heroin for about 25 years. I have now been clean for more than 15 years and have served as a drug counselor to others with substance abuse problems.

2.      Corey Johnson is my son. He was my first child and my only child with Emma Johnson. Corey was born when I was about 17 years old. Although Emma and I never married or lived together after Corey was born, and I was absent for significant periods of Corey's youth, I made contact with Corey when he was about 10 or 11 years old and spent time intermittently with him until he was about 17.

3.      After Corey, I later had four other biological children: two children by Mabel Sykes (James and Anita), one child by Maryann Sykes (Fairesha), and another child by Lori Martin (Amir). Mabel, who died in 1992, had three other children, who are my stepchildren (Elizabeth, Nadine, and Curtis).

## MY LEARNING DISABILITY

4.      I graduated junior high school (JHS 271 in Brooklyn) and later attended high school (Boys High School in Brooklyn), despite not knowing how to read at or near my grade level. Back then, many children were socially promoted to higher grades without being able to do the required work.

1

**APP.264**

5.      I completed the 9th grade and then dropped out.  At the time I dropped out, I was reading only at a 5th grade level.

6.      Later in life, I discovered that I had a learning disability.

7.      Both while I was in junior high school and as an adult, I was given various tests, including two IQ tests.  Based on the results of these tests, I was diagnosed as learning disabled and told I had spatial deficits and dyslexia.  I first received this diagnosis when I was in my late twenties or early thirties.

8.      As an adult, I have been evaluated by and have received services through VESID (Office of Vocational and Educational Services for Individuals with Disabilities) – a program that helps peoples with disabilities secure employment and maintain independent lives.

9.      In mid-1990s, I began attending Hudson Valley Community College under a special program through the Americans with Disabilities Act and graduated with an Associates Degree.  In 1998 enrolled at SUNY Albany, also under the ADA program.  At both Hudson Valley and at SUNY Albany, I received extra time to complete assignments and tests, and proctors would assist me in writing my answers on exams.

10.      Nonetheless, I had a difficult time in this program.  I always have had a lot of problems retaining information.  In the end, however, I was able to complete the program and in May 2000, I graduated with a degree in sociology from SUNY Albany.

11.      I had a total of four siblings, three brothers (two now deceased) and one sister.  My youngest brother, Ezzie Johnson, was sent to Cleveland, Ohio to live with our aunt.  He is now about 55-56 years old and resides in Cleveland, Ohio.  My other siblings and I would see him during visits.  As a child, Ezzie attended a special school because of his difficulties in becoming educated in rather basic things.  In particular, he could not retain information and it took him a long time to learn his ABCs.  Ezzie did not learn the alphabet until he was around the

2

APP.265

age of 12 or 13. My sister, Daphne (Sykes) Moore (also still living), has a history of mental illness. I am not sure of her exact diagnosis but am aware that she has been treated and hospitalized for her illness in the past.

## MY RELATIONSHIP WITH EMMA JOHNSON AND COREY'S EARLY YEARS

12.    Emma Johnson and I met at a party in Brooklyn. At that time, I was living in the Crown Heights section of Brooklyn with my mother, Sarah Sykes. I believe that I was about 15 years old and attending junior high school in Brooklyn (JHS 271) when I met Emma. I believe that Emma was younger, about 14 years of age, and attending junior high school at the time. Emma was visiting her aunt and cousins in the area when we met.

13.    After we met, Emma and I started dating. We went out to the movies, went to Coney Island, and double-dated with Emma's brother and his girlfriend.

14.    When I first knew her, Emma was living with her parents and two siblings. Emma attended church on a regular basis and was closely protected by her parents. Our dates were sometimes chaperoned by Emma's brother and sister.

15.    Esther Johnson, Emma's mother, was really nice to me when we started dating, and we got along well.

16.    Love Johnson, Emma's father, was a small but strong man. He had been a Chief Petty Officer in the Navy and was a war veteran. Love was responsible for maintenance work in a building. I used to help him clean up the building.

17.    Love used to drink a lot, though, and was pretty hard-headed. He went out a great deal with his friends, and he had a lot of lady friends.

18.    I witnessed arguments between Love and Esther. Most of the time, the arguments seemed to be about infidelities. Eventually, Love and Esther separated and Emma moved out.

3

**APP.266**

19.     Love treated Emma better than her brother and sister.  He gave Emma money and freedom.  In fact, Emma's father pretty much gave her whatever she wanted, and he would say Emma was spoiled by him.  Love was in agreement with my dating Emma.

20.     When I was dating Emma, her sister, Minnie, had a tendency to agree with others and was easy to convince.  Later, when Corey was a teenager I noticed that Corey displayed similar characteristics but to an even greater extent.  I remember Minnie being slow – in that she did not fully understand certain things and did not catch on easily to other things.  Minnie behaved much younger than her age.  She did not go outside often, and when she did, she went with her mother or brother.

21.     I also knew Amos Brunson, Emma's brother.  He was a good, kind-hearted, hard-working person.

22.     At the time I was dating Emma, I was involved with a gang called the Chapmans. Other popular gangs were the Tomahawks and the Buccaneers. The gangs fought each other, but they were also into dancing, taking care of the neighborhood, and marching in the streets.  My gang even had a drum and bugle group – I played the drums.

23.     Emma became pregnant with Corey while we were dating.

24.     My involvement with gangs and fighting got me in trouble and ultimately incarcerated.

25.     I was about 17 years old and incarcerated on a robbery charge when Corey was born.  Even though I was a minor, I was sent to adult prisons (Elmira CF and Woodbourne CF).  I believe I was in prison for about a year or so.

26.     When I was released from prison, Corey was about 18 months old.

4

APP.267

27.    After my release from prison, I moved in with my mother in Brooklyn. Emma and Corey were living with her mother in Brooklyn. Emma was still living apart from Love.

28.    During this time, I saw Corey frequently. I used to pick him up and take him around regularly. As an infant, Corey appeared to me healthy and vibrant.

29.    My mother, Sarah Johnson, also saw Corey when he was a baby. However, there was a conflict between her and Emma's mother, Esther. Esther wanted me and Emma to marry; my mother disagreed because she thought we were too young. I later learned that my mother refused to sign papers that would permit the marriage. This incident soured my relationship with Esther.

30.    When I was around age 18, I was introduced to heroin and started sniffing it. I continued to use drugs on and off for many years.

31.    Due to my involvement with drugs, I was soon incarcerated again, and my time with Corey as a baby was short-lived.

32.    I went back to prison. After I got out of prison for the second time, I went to Emma's house, but the family had moved, with no forwarding address. I visited the home of a cousin of the family, thinking he could help me locate Emma and Corey, but he had moved as well.

33.    I eventually learned of Emma and Corey's whereabouts while serving another prison term.

34.    One of the correctional officers knew Minnie (Emma's sister). The officer gave me Love Johnson's address and phone number, and that enabled me to get in touch with Emma once I got out of prison.

5

APP.268

## MY RELATIONSHIP WITH COREY FROM ABOUT AGES 9 TO 17

35. When I got in touch with her, Emma told me that Corey was living with his grandfather, Love Johnson, in Brooklyn and provided me with Love's address. Emma claimed that Corey was staying with his grandfather because he was not manageable. Emma complained of Corey's "antics," and also said that Corey was also having problems in school. I believe that Love took good care of Corey.

36. After having not seen him since he was a baby, I finally saw Corey again when he was 9 or 10.

37. Thereafter, I had contact with him until he was about 17 or so. The visits and contact were quite sporadic. Corey was placed in several different schools and residences during this time. In addition, during this period, I violated parole and was sent to a prison upstate for a time.

38. When I first came back into contact with Corey, I was living in the Brownsville section of Brooklyn, and Corey would sometimes visit me. Corey and I also visited my other children, his half-siblings.

39. I was told that Corey was having problems with reading and math, and that he could not read or write. I talked to Corey about this, but I didn't know what to do about this.

40. I met Bobby Koger, Emma's boyfriend, on one occasion when Corey was between the ages of 10 and 13 (I cannot recall his exact age).

41. Previously, Love had called me and told me that Corey was being physically abused by Bobby. Love suggested that I try to obtain custody of Corey.

6

APP.269

42.     I confronted Bobby about the abuse on a Sunday when Corey, Bobby, and I were all at Love Johnson's house.  Bobby and I exchanged harsh words, and I told Bobby not to hit or beat Corey.

43.     Bobby was vocal about his dislike for Corey and said that Corey did not listen and was difficult.  Bobby told me Corey needed to be put away due to his behavior.

44.     Bobby said that if he did not take care of Corey, someone else would.  Bobby also said Corey would get himself killed.  I took this to mean that he would kill Corey because Corey was bothering him so much.  The conversation got really heated.

45.     On that day, Corey told me that he felt that Bobby did not want him around.  Corey further told me that he believed that his mother was choosing Bobby over him.

46.     Based on my observations of Corey's demeanor and physical appearance in the presence of Bobby that day, I believe that Corey was being abused by Bobby. Corey did not look directly at Bobby – he was always keeping his head down or looking away from Bobby.  Corey did not sit or stand next to Bobby.  I also remember seeing dark bruises on Corey's forehead that day.

47.     The day described above is the only time I saw Bobby.

48.     When Corey was about 12 and placed upstate at the Pleasantville Cottage School, Corey would sometimes visit me over the weekends.

49.     While Corey was at Pleasantville, I once went to see his counselors there. They told me that Corey was not doing well in school but was not a troublemaker.

50.     The main problem, they said, was that Corey could not read.  Also, Corey's tendency to follow others would land him in trouble.

51.     When I saw Corey between the ages of 10 to 13 or so, he did not talk much about his living situation.  We would basically talk about the family and sometimes school.

7

I remember Corey telling me that he often felt embarrassed about not being able to read and that he would clown around and try to be funny to distract from the fact that he could not read.

52.    In truth, I never felt as though I really got a chance to know Corey because I had lost contact with Corey during his crucial growing years.

53.    I did not realize that Corey felt as though he was not wanted by me. He was always playful around me and my other children and stepchildren, and he appeared to be happy.  I was not aware of how Corey felt – but I did not ask him either.  I would ask Corey how things were at home, and he would respond that things were fine.  I would not push the conversation and just accepted his answer.

54.    He spoke very little about his mother; when I asked about her, Corey would just say she was doing well.

55.    It troubles to me to think that I could possibly have made things better for Corey by asking him to live with me and my wife at the time (Maryann), but never did so.  I never made Corey an offer to come live with me.

56.    Later, when Corey was around 16 or 17 and living at the Elmhurst group home, he came over to visit me a couple of times and I believe he saw other members of my family.  Corey always seemed glad to come on these visits, but he also would act a little distant.

57.    I did not see Corey after he left school, when I understand he was hustling on the streets.  At that time, I tried to get information about Corey from Emma, but she was not informative.

58.    Emma gave up on Corey.  While I was not aware of Emma using drugs when I was around her frequently (when she was a teenager), in later years when Emma was in her late twenties I became aware that she abused drugs.  Still, I was surprised when I learned she had died of a drug overdose.

59.    My mother recently told me that she would have helped Corey during the time after he left high school, but no one ever told her anything about his situation then.

## MY CONTACT WITH COREY SINCE HIS INCARCERATION

60.    I spoke with Corey a few times while he was on death row in Virginia. I have also sent him some money. Corey never talked much on the phone; we basically talked about Corey's maternal grandmother and myself.

61.    I speak to Corey on the phone about once a month. We usually only speak for a few minutes and I ask him how he is doing. Sometimes, he also tells me about his daughter

62.    Since Corey has been in prison, our communication has mostly been by phone. Occasionally, Corey writes me letters but they are infrequent. The letters are also difficult to understand and I have to read them several times to understand them. Both his handwriting, grammar, and spelling are very poor.

_____
JAMES SYKES

Sworn to before me on this
_17_ day of May, 2011

_____
Notary Public

ARLETTE GUERRA
Notary Public - State of New York
NO. 01GU6178311
Qualified in Bronx County
My Commission Expires 11/26/11

9

# EXHIBIT 29

## DECLARATION

I, Bobby H. West, hereby affirm the following:

1.     I reside at 6849 Wood Haven Road, Roanoke, Virginia 24019.

2.     I am Senior Pastor of Covenant Community Church in Salem Virginia. I am also ordained by the Church of God in Anderson, Indiana.

3.     From approximately 1971 until 2006, I was a volunteer prison chaplain with my wife, Sarah West. During my thirty-five years as a chaplain, I met with several thousand prisoners.

4.     For fifteen of those thirty-five years, I ministered specifically to death row inmates. For those fifteen years, I spent approximately five hours every other week visiting with death row inmates in Virginia. I estimate that I met with approximately seventy-five death row prisoners during those years.

5.     I first met Corey Johnson in 1997 at the Mecklenburg Correctional Center in Boydton, VA, shortly after Corey was moved there from Powhatan Correctional Facility. I visited with Corey every other week while he was at Mecklenburg, where he lived on a pod that housed between eight to twelve prisoners. During that time, I saw him both individually and as part of larger group meetings with the other men on the pod. During this time, I also met with Corey's co-defendants, James Roane and Richard Tipton, and had an opportunity to observe them individually as well as with Corey. When Corey was moved to a facility in Sussex County, Virginia, I visited him there as well. In total, I estimate that I saw Corey approximately one hundred times while he was at the two Virginia facilities. Later, Corey was transferred to a facility in Terre Haute, Indiana, where I visited him four or five times. My last in-person visit with Corey was in

APP.274

March 2006. I have probably spoken to Corey ten to twelve times while he has been in Indiana. My phone contact with him ended in 2005.

6.    At Mecklenburg, I was able to see Corey in the same setting as James Roane and Richard Tipton. Corey was less vocal and opinionated than either Roane or Tipton. Whereas Roane and Tipton expressed anger regarding, for example, the prison food, Corey seemed to "go with the flow." Roane and Tipton challenged the statements of others if they disagreed with them, whereas I did not observe Corey do the same. Corey seemed considerably less intelligent than Roane or Tipton in the way he spoke.

7.    Roane and Tipton were "up" on their legal cases, including the argument that they and Corey should not have been tried together. On the other hand, Corey expressed no understanding of the status of his legal case and instead appeared to rely completely on his lawyers regarding what should be done on his behalf. Corey expressed hope that his lawyers were doing a good job representing him.

8.    Most of the men on death row at Mecklenburg, including Roane and Tipton, were researching their cases. I have no memory of any discussion with Corey related to the use of the law library. He only commented from time to time that he had talked to his attorneys.

9.    Corey was less vocal and opinionated than most death row prisoners I have observed. Generally, the more vocal inmates had jobs in prison but Corey did not. In general, Corey did not appear to possess leadership capabilities.

10.    At Mecklenburg, Corey lived on a pod, where eight to twelve other men also lived. Corey appeared to get along with his fellow prisoners. I did not observe him

2

in disagreements with anyone. As compared to Roane and Tipton, Corey seemed softer and kinder. In my interactions with Corey, he was soft-spoken, quiet, and humble. He seemed eager to please, wanting to "say the right thing."

11.    During my discussions with Corey over the years, we generally talked about his family, daily living activities, and sporting events. Where it was common for other death row prisoners to raise deep or complex spiritual questions, Corey never did. We had very basic spiritual discussions.

12.    While I observed him, Corey did not appear to engage in subjects that required analysis or decision making. This was in contrast to Tipton and Roane, who did make decisions. For example, Tipton would say things that would hurt him in prison, just to make a point. I envisioned Tipton as the strong man of the group, with Corey down at the bottom of the pecking order in terms of power.

13.    During the time I was in contact with Corey, I wrote several letters to Corey. I never received any letters from Corey. When I visited Corey in the pod area of Mecklenburg or at his cell door in Sussex, I never observed him writing letters. He also never discussed writing letters to anyone with me.

14.    I learned about the crimes of which Corey Johnson, James Roane and Richard Tipton had been tried and convicted. Based on my interactions with Corey Johnson, those crimes seemed totally out of character for Corey. On the other hand, based on my interactions with James Roane, I found it less difficult to believe Roane could have been involved in such crimes. And, based on my interactions with Richard

3

Tipton, I did not find it difficult to believe that Tipton would be involved in such crimes.

15.    Based on my observations of Corey alone and his interactions with Roane and Tipton, I believe that Corey wanted to be considered a strong man who would have done what others told him to be more accepted in the group.

I declare the foregoing is true and correct.

Dated: _MARCH 24_, 2011.

_Bobby H. West_
BOBBY H. WEST

Commonwealth of Virginia
City of Roanoke

USCA4 Appeal: 20-15    Doc: 15-3    Filed: 01/07/2021    Pg: 47 of 230

# EXHIBIT 30

```
   THAEK          *           INMATE EDUCATION DATA         *      05-25-2012
   PAGE 001 CF 001 *               TRANSCRIPT               *      08:23:09

   REGISTER NO: 27832-054     NAME..: JOHNSON                    FUNC: PRT
   FORMAT.....: TRANSCRIPT     RSP OF: THP-TERRE HAUTE USP

   ---------------------------- EDUCATION INFORMATION ----------------------------
   FACL ASSIGNMENT DESCRIPTION                     START DATE/TIME STOP DATE/TIME
   THP   ESL HAS    ENGLISH PROFICIENT             08-24-1999 0001 CURRENT
   THP   GED EN     ENROLL GED NON-PROMOTABLE      08-24-1999 0001 CURRENT
   THP   GED SAT    GED PROGRESS SATISFACTORY      04-28-2000 1233 CURRENT

   ---------------------------- EDUCATION COURSES ----------------------------
   SUB-FACL  DESCRIPTION                     START DATE  STOP DATE EVNT AC LV  HRS
   THP SCU   SCU GED 7:30-9:00 AM            08-04-2005 CURRENT
   THA SCU   SCU GED SELF STUDY-12-1PM       08-25-1999 03-07-2005  P  W  I   518

   ---------------------------- HIGH TEST SCORES ----------------------------
   TEST           SUBTEST       SCORE     TEST DATE     TEST FACL    FORM     STATE
   ABLE           LANGUAGE       2.8      02-15-2000    THA          F
                  NUMBER OPR     5.7      02-15-2000    THA          F
                  PROB SOLV      4.5      02-15-2000    THA          F
                  READ COMP      7.3      02-15-2000    THA          F
                  SPELLING       3.6      02-15-2000    THA          F
                  VOCABULARY     7.0      02-15-2000    THA          F
   GED PRAC       LIT/ARTS     400.0      04-12-2006    THP          PE
                  MATH         330.0      04-12-2006    THP          PE
                  SCIENCE      350.0      04-12-2006    THP          PE
                  SOC STUDY    350.0      04-12-2006    THP          PE
                  WRITING      380.0      04-12-2006    THP          PE
```

```
   GC000        TRANSACTION SUCCESSFULLY COMPLETED
```

APP.279

# EXHIBIT 31

APP.280

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,       }
                                }
v.                              }  *Criminal No. 3:92CR68*
                                }
VERNON LANCE THOMAS.            }

**MOTION TO HAVE DEFENDANT DECLARED MENTALLY RETARDED**

**COMES NOW** the defendant, Vernon Lance Thomas, by and through his counsel, Cary B. Bowen, Attorney at Law, and requests that the defendant be declared mentally retarded, and to that end states as follows:

1. That the defendant, Vernon Lance Thomas, stands charged herein with capital murder, as well as other related charges, currently scheduled for a jury trial on April 26, 1993.

2. That Henry L. Dee, Ph.D., P.A., has evaluated and tested the defendant and has determined him to be mentally retarded. (A copy of said evaluation is attached hereto as Exhibit "A" as well as a copy of Dr. Dee's CV as Exhibit "B").

3. That the American Association on Mental Retardation has defined "mental retardation" as follows:

> Mental retardation consists of substantial limitations in present functioning characterized by significantly sub-average intellectual functioning (i.e. an I.Q. of 70 - 75 or below), existing concurrently with related limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.

4. That the accused's performance on the Wechsler Adult Intelligence Scale - Revised Edition fell into the retarded range with a full scale I.Q. of 71.



**APP.281**

5. That the Wechsler Adult Intelligence Scale - Revised Edition is generally considered to be the most reliable and valid test to determine mental levels and is used throughout the country.

6. That the accused had a score of 60 on the Stanford - Binet Verbal Reasoning sub tests.

7. That the accused not only performs in the retarded range on the I.Q. testing but that he also shows significant adaptive impairments which further define and reinforce the fact that he is mentally retarded.

8. That the United States does not allow anyone determined to be mentally retarded to be executed.

**WHEREFORE**, premises considered, defendant herein should be declared mentally retarded.

Respectfully submitted,

**VERNON LANCE THOMAS**

By _____
Counsel

Reginald M. Barley, Esquire
2025 East Main Street
Richmond, Virginia 23219
(804) 783-8468

Cary B. Bowen, Esquire
**Bowen and Bowen, Attorneys at Law, P.C.**
304 West Broad Street
Richmond, Virginia 23220-4219
(804) 648-7400

APP.282

## CERTIFICATE

I hereby certify that a true and exact copy of the foregoing Motion was mailed, postage prepaid, this 15th day of April, 1993, to Howard C. Vick, Jr., Assistant United States Attorney, Office of the United States Attorney, Main Street Centre, 600 East Main Street, Suite 1800, Richmond, Virginia 23219.

CARY B. BOWEN, Esquire

*Henry L. Doe, Ph.D., P.A.*

CLINICAL AND CONSULTING PSYCHOLOGY

1506 SOUTH FLORIDA AVENUE
LAKELAND, FLORIDA 33802
(813) 688-6477

<u>United States</u> v. <u>Vernon Lance Thomas</u>
Criminal No. 3:92CR68
EXHIBIT "A"

April 9, 1993

Resume' of Neuropsychological Evaluation

Re:   Vernon Thomas

Test Battery:  Wechsler Adult Intelligence Scale - Revised;
Selected Subtests of the Stanford-Binet: Fourth Edition;
Selected Subtests of the Woodcock-Johnson Tests of
Achievement - Revised; Minnesota Multiphasic Personality
Inventory; 16 PF Test Profile; Denman Neuropsychology Memory
Scale; Multilingual Aphasia Examination: Controlled Word
Association, Sentence Repetition, Oral Language Token Test,
Visual Naming; Benton Visual Retention Test; Finger
Localization; Right/Left Orientation; Stereognosis Test;
Judgment of Line Orientation; Facial Recognition Test; Visual
Form Discrimination; Clinical Interview and Interpretation

APP.284

VERNON THOMAS

REASON FOR REFERRAL AND BACKGROUND INFORMATION

Vernon Thomas is a twenty-five year old, African-American
male who was referred for evaluation by Cary Bowen, Esquire,
appointed counsel. According to Mr. Thomas, he is charged
with, among other things, murder and conspiracy to commit
murder in a continuing criminal enterprise.

He reports that the crime allegedly occurred on February 1,
1992, although he is unable to supply the time of day or
night that it is supposed to have occurred. He reports that
the prosecutor alleges that he shot two people on February 1
He is alleged to be the person who was actually involved in
the shooting and is also alleged to have "masterminded" the
operation and ordered the murder of others.

He reports that he is accused of having conspired with his
co-defendants to distribute drugs and to murder.

With regard to his Competence to Proceed, Mr. Thomas
apparently understands the function of his attorney, the
prosecution, the role of the jury, and the judge. He
understands the nature of a Plea Bargain.


HISTORY

Mr. Thomas was born on ███████████████, at St. Luke's
Hospital in New York, to Illona Miller Thomas and Richard
Thomas. Mrs. Thomas is currently forty-six years of age and
disabled with heart problems. Mr. Thomas reports that his
father, Richard Thomas, lives in Chicago and he denies any
knowledge of what he does, and indeed, reports that since his
parents separated when he was approximately eight or nine
years of age, he rarely ever saw his father.

Further evidence revealed that Mr. Thomas believed that his
father fled New York with a homosexual lover and took up
residence in Chicago, which has led to some of his bitter
comments about the fact that "It's like I don't have any
father", etc.

Mr. Thomas reports that he went through eleven years of
schooling and left because "I was getting too old", and
revealed that he had "reading problems" in school. While he
reports that he learned these skills afterwards "on the
street", there is good reason to question this statement
because of his present abilities (see below).

Henry L. Dee, Ph.D., P. A.
Page 2

It would appear from his school record that by the time he was roughly twelve years of age, Mr. Thomas was placed in special education. According to the report of Jerry Kulba, who was in charge of the special education program at the time Vernon was in PS 143 in New York City, Vernon was seen as a "very low functioning" child. Even in this special education program, he was in the low functioning group and Mr. Kulba estimated his IQ at that time to be roughly 60. At first, he was classified as CRMD (children with retarded mental development). Later, the labels in the school system were changed and he was classified as EMR or educable mentally regarded. At that time, the perameters for EMR were an IQ between 50 and 75. At that time, his estimated IQ was well below 70 and his achievement scores were very low. Mr. Kulba also described Mr. Thomas as being "a follower.....easily swayed......could be drawn by the promise of anything....friendship.....not necessarily money."

Phyllis Williams, the principal at PS 143, was at that time a special education teacher while Mr. Thomas attended school. She describes him as "limited....very limited." She had him in her Social Studies class and describes his writing as "very poor and his reading ability very limited." Indeed, she describes his attempts at reading as "painful to watch...". She too reported that his IQ was clearly below 75. She described him as "not well cared for.....disheveled", and also describes him as having been easily led. She felt he had grave difficulties in premeditating or planning anything and stated that he needed "simple, clear directions from others."

While his high school records have been diligently searched for, his special education records have somehow been lost or destroyed.

Rodney Lofton, the supervisor of special education at Mr. Thomas' middle school IS 143 notes that Mr. Thomas had "learning disabilities with attention and concentration problems", and that while very extensive efforts had been made to locate the special education records, they simply cannot be found anywhere in the city school system.

Mr. Thomas' brother, Ralph Miller, notes that he recalls that Vernon had problems in school and that other children frequently made fun of him. He reported that it was difficult for Vernon to admit that he couldn't do the work and couldn't understand what he was reading. While he was allegedly somewhat better with math, his reading was always a serious impediment. Ralph recalled that Vernon would try to look for jobs after leaving high school, but was unable to

APP.286

Henry L. Dee, Ph.D., P. A.
Page 3

obtain work.  He had not completed high school, had no job
training or skills and frequently asked his brother for
money.  Indeed, the only job that he apparently successfully
carried on for any period of time was that with a messenger
service for roughly six months, and a  Federally Funded
summer youth job funded by the city.  It involved delivering
mail to different buildings.  The only other work that he
apparently was able to do was clean-up work at the U. S.
Tennis Open, a job that was obtained for him by others.

Fran Leichter, Vernon's home room teacher, noted that he was
a lad who "could be swayed.....not very bright."  She too
felt that he was probably retarded and described the family
as dysfunctional. She described Vernon as a person who wanted
to please other people.  He would frequently comply with the
requests of other people.

Mr. Thomas lived at home with his mother until age twenty-
one, apparently because he could not maintain employment and
a home of his own.  He did get an apartment with a Nicole
Bishop at age twenty-four, but never really lived on his own.
Ms. Bishop reports that while Vernon talked about wanting to
find a job, he really did not know how to go about looking
for work and had no idea of what he could do.  She reports
that he never had a checking or savings account and would
carry only small amounts of cash.  He occasionally could give
her $50.00 or $60.00 for groceries.

He was and is lacking in the skills required to seek out
employment and certainly has no vocational training.  His
lack of formal education is clearly a bar to gainful
employment, particularly with his academic limitations (see
below).

As much of his school records as could be found were
reviewed.  As of the time that he left school in the eleventh
grade, he was still failing in reading and math, as he
frequently had in school previously.  On the California Test
of Basic Skills at that time, he was reading some place
between Grade Level 3 and 3.6, which is, of course, not
functional literacy for someone of his age or educational
level.  It certainly would not allow him to do high school
work, something that he alluded to when he said that he was
leaving school in part because he was getting too old, and it
was implied, that it was also in part because he was learning
nothing.  Consistent with this, throughout his school
history, he seems to most of the time not met the criteria
for promotion and nowhere could I find evidence that he read
above Grade Level 3.5 or 3.6 or that any of his general
educational development exceeded this.

APP.287

Henry L. Dee, Ph.D., P. A.
Page 4

His early school records contain frequent comments about his behavior which suggests that he suffered an Attention Deficit Disorder with Hyperactivity. He rarely completed his work and needed constant attention even though interestingly, he was frequently noted to be "courteous". As he grew older, he apparently began to outgrow the hyperactivity and was able to sit and do more of his work but continued to require constant support and attention.

Information gathered by Jill Miller, MSSW, indicated that besides the rather distressing loss of his father at age nine, there was apparently significant neglect of he and his five siblings. His mother attempted to raise the children alone, but also tried to carry on some life of her own and apparently indulged in some alcohol abuse. On one occasion, when Vernon was but seventeen months of age, she left the children alone and the family apartment caught fire. The firemen, after pulling the children from the blaze, found it necessary to resuscitate Vernon twice, suggesting potential for possible brain damage from lack of oxygen. The possible etiology of his later educational and mental handicaps.

## INTELLECTUAL AND NEUROPSYCHOLOGICAL FACTORS

### Wechsler Adult Intelligence Scale - Revised

| Area Measured | Approximate Percentile | Rating |
|---|---|---|
| Information | 1 | Very Low |
| Digit Span | 5 | Low |
| Vocabulary | 1 | Very Low |
| Arithmetic | 16 | Low |
| Comprehension | 1 | Very Low |
| Similarities | 0.4 | Very Low |

Verbal Abilities: 1st Percentile

| | | |
|---|---|---|
| Picture Completion | 9 | Low |
| Block Design | 5 | Low |
| Digit Symbol | 37 | Average |

Performance Abilities: 7th Percentile

General Intellectual Functioning: 3rd Percentile

Mr. Thomas' performance on the Wechsler Adult Intelligence Scale - Revised Edition, fell into the retarded range, with a

USCA4 Appeal: 20-15    Doc: 15-3    Filed: 01/07/2021    Pg: 58 of 230

Henry L. Dee, Ph.D., P. A.
Page 5

Full Scale IQ of 71. Mental retardation, as defined by the American Association on Mental Retardation, consists of substantial limitations in present functioning characterized by significantly sub-average intellectual functioning (i.e. an IQ of 70 - 75 or below), existing concurrently with related limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  It is also a condition that is manifest before age eighteen, and this is clearly the case in Mr. Thomas as can be seen from the history and the history of his testing.

The Wechsler Adult Intelligence Scale - Revised Edition, is generally considered the most reliable and valid test of mental level, being in absolutely standard use throughout the country.  It is the standard which other tests are compared because of its superior norms, construction, and validity.

The Woodcock-Johnson Tests of Achievement - Revised Edition, is similarly regarded as an absolutely objective, standard measure of practical academic skills, and is once again, probably the most frequently used test of these abilities. On these tests, his performance indicated broad written language capacities at Grade Level 2.1, letter-word identification at Grade Level 4.7, passage comprehension at Grade Level 4.6, dictation skills at Grade Level 2.5 and writing samples at Grade Level 2.4.  He, thus, has little in the way of reading or writing skills, which is consistent with his previous history and general mental level.

In the area of self-direction, one indication that can be gained (aside from the above testimony of those that knew him) is his performance on the verbal reasoning subtests of the Stanford-Binet, which yield a Verbal Reasoning score of 60, which is well below two standard deviations below the mean, indicating little capacity for competent verbal reasoning to assist him in handling situations requiring judgment and ability to make appropriate decisions.

On the Denman Neuropsychology Memory Scale, a clinical assessment of immediate recall, short term memory, and long term memory in both verbal and nonverbal areas, his performance yielded a Full Scale Memory Quotient of 75, which may be compared to his Full Scale Intelligence Quotient of 71, which indicates that his memory is about at the same level as his compromised general mental level, i.e. severely impaired.

On the Multilingual Aphasia Examination, a clinical

USCA4 Appeal: 20-15   Doc: 15-3   Filed: 01/07/2021   Pg: 59 of 230

Henry L. Dee, Ph.D., P. A.
Page 6

assessment of linguistic skills, he showed basically intact verbal fluency and auditory verbal language comprehension, but defective immediate verbal repetition and very marginal capacity to name a variety of common visual objects, his performance falling at the 5th percentile.

His performance on tests of finger localization and right/left orientation were broadly intact.

His performance on a test of stereognosis (crossmodal spatial perception) was basically intact.

The same may be said of his performance on a test of facial recognition, although his performance was done in such a slow fashion that it was apparent that it was an extremely difficult task for him.

On a test of judgment of line orientation, he shows severely defective performance.

These findings are consistent with a diagnosis of mental retardation. He shows an IQ in the retarded range, with significant adaptive impairments in the area of academic skills, capacity to seek and maintain employment, difficulties with self-direction and planning, limited social skills (see below) and the fact that this retardation has apparently been an aspect of his life that has been constant throughout his life. Like most individuals who are retarded, and this examiner has seen thousands of them, Mr. Thomas has acquired certain ways of interacting and behaving which allow him to "pass" as a nonretarded individual, particularly to the casual observer. Nonetheless, careful intellectual assessment certainly confirms this examiner's clinical impression of mental retardation.

He has needed support and direction for all of his life and will probably continue to need it for the rest of his life.

Looking at Mr. Thomas from a neuropsychologist's point of view, which is, of course, the purpose of this examiner, it is clear that Mr. Thomas suffers an Organic Brain Syndrome based on his performance on the Wechsler (which is actually a neuropsychological instrument) and other scattered cognitive deficits, including memory impairment, difficulties with spatial orientation and certain personality features (see below).

PERSONALITY FACTORS

Mr. Thomas' performance on the personality tests indicate

Henry L. Dee, Ph.D., P. A.
Page 7

that he is a person who feels lonely, misunderstood, and not
a part of his social environment.  This is apparently based
upon a lifelong history of mild to moderate rejection by his
peers because of his mental retardation, something of which
he is acutely aware.

His profile also indicates that he is likely to be overactive
and impulsive as well as undercontrolled.  This is, of
course, not surprising, since people who have cerebral
involvment of whatever etiology show most frequently two
behavioral characteristics:  memory impairment and increased
impulsivity and an incapacity to control their impulses.
Such people frequently show poor social judgment, and all of
these characteristics are clear in Mr. Thomas' case.

Parenthetically, it might be added that the same is true of
people who show mental retardation, but after all, mental
retardation and cerebral damage or disease are but two sides
of the same coin, i.e. two ways of looking at the same
phenomenon.

He is an extremely concrete-thinking person who has
difficulty reasoning through things.  The notion of abstract
reasoning or analogies is almost totally foreign to him.

Interestingly enough, he does appear on the psychological
tests to be a person who is somewhat easily led and who tends
to go along with others in order to win their approval and
support.  Once again, this probably has its origin in his
feelings of alienation and rejection by his peers, i.e. a
general desire to want to be "one of the guys".

SUMMARY IMPRESSION

1 - Mental Retardation, with multiple deficits in adaptive
    functioning.

2 - Organic Brain Syndrome with Mixed Features, i.e.
    generally lowered intellectual capacity, memory, and
    difficulties in impulse control and judgment.

*Henry L. D.— Ph.D.*

Henry L. Dee, Ph.D., P. A.

HLD/ab

APP.291

CURRICULUM VITAE

United States v. Vernon Lance Thomas
Criminal No. 3:92CR68

EXHIBIT "B"

HENRY L. DEE

BORN:

Chattanooga, Tennessee

DEGREES:

| | |
|---|---|
| B.A. | University of South Florida, 1964 |
| M.A. | University of Iowa, 1966 |
| Ph.D. | University of Iowa, 1969 |

APPOINTMENTS:

| | |
|---|---|
| 1964-65 | Research Assistant in Psychological Psychology, University of Iowa |
| 1965-66 | Graduate Assistant in Psychology, University of Iowa |
| 1966-67 | Intern in Psychology, Connecticut Valley Hospital |
| 1967-68 | Graduate Assistant in Psychology, Scott County Mental Health Center, Davenport, Iowa |
| Summer, 1968 | Lecturer in Psychology, University of Iowa |
| 1968-70 | Research Associate in Neurology and Psychology, University of Iowa |
| 1970-73 | Consultant in Psychology, Veterans Administration Hospital, Iowa City, Iowa |
| 1973-77 | Consulting Psychologist, Byron Harless, Reid and Associates, Inc., Lakeland, Florida |
| 1977- | Consulting Psychologist, independent practice Lakeland, Florida |
| 1988- | Supervising and Consulting Psychologist for the Child Protection Team, Lakeland, Florida (Polk Highland, and Hardee counties) |
| 1988- | Consulting Psychologist, Vocational Rehabilitation, Winter Haven, Florida (Polk and Highlands counties) |

MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS:

American Psychological Association
American Adademy of Neurology
Academy of Aphasia
Society of Neuroscience
American Association for the Advancement of Science
Sigma Xi
Iowa Academy of Science

HENRY L. DEE                                                    Page Two

Publications:

Dee, H. L. & Fontenot, D. J. Use of the non-preferred hand in graphomotor performance: a methodological study. Confinia Neurologica, 1969, 31, 273-280

Dee, H.L. Visuoconstructive and visuoperceptive deficit in patients with unilateral cerebral lesions. Neuropsychologia, 1970, 8, 305-314.

Dee, H. L. & Benton, A. L. A crossmodal investigation of spatial performances in patients with unilateral cerebral lesions. Cortex, 1970, 6, 261-272.

Dee, H.L., Benton, A.L. & Van Allen, M. W. Apraxia in relation to hemispheric locus of lesion and aphasia. Transactions of the American Neurological Association, 1970, 95, 147-150.

Dee, H.L. Auditory asymmetry and strength of manual preference Cortex, 1971, 7, 236-245.

Dee, H.L. & Van Allen, M. W. Simple and choice reaction time and motor strength in unilateral cerebral disease. Acta Psychiatrica Scandinavica, 1971, 47, 315-323.

Dee, H.L. Mental Retardation and brain damage. Paper presented at the 1972 meeting of the American Association on Mental Deficiency.

Dee, C. K. & Dee, H.L. Objective assessment of the characteristics of parents of children with developmental problems: Journal of Consulting & Clinical Psychology, 1972, 38, 464.

Dee, H.L. & Van Allen, M. W. Psychomotor testing as an aid in the recognition of cerebral disease. Neurology, 1972, 22, 845-848.

Dee, H.L. & Van Allen, M. W. Hemispheric differences in complex reaction time. Transactions of the American Neurological Association, 1972, 97.

Dee, H.L. & Van Allen, M. W. Speed of decision-making processes in patients with unilateral cerebral disease. Archives of Neurology, 1972, 28, 163-166.

APP.293

CURRICULUM VITAE

HENRY L. DEE                                         Page Three

Publications:  (Continued)

> Dee, H. L. & Fontenot, D.J. Cerebral dominance and lateral
> differences in perception and memory. Neuropsychologia,
> 1973, 2, 167-173.
>
> Dee, H. L. & Hannay, H. J. Asymmetry in perception:
> attention vs. other determinants. Acta Psychologia, 1973,
> 37, 241-247.
>
> Dee, H. L. & Hannay, H. J. Asymmetry in Perception:  Famil-
> ization and labeling as determinants (two papers in pre-
> paration).                                       .
>
> Dee. H. L. & Hannay, H. J. Asymmetry in perception:
> attention vs. other determinants.  Acta Psychologica,
> 1973, 37, 241-247.
>
> Dee, H. L. & Hannay, H. J. Reversal of Asymmetry in Human
> Perceptual Performance as a function in labeling, Mode
> of Response, and Familiarity.  In press, Cortex
>
> Dee, H. L. & Hannay, H. J. Experimental REversal of a
> Left Visual Field Superiority for Forms.  In press,
> Percept. Mot. Skills

# EXHIBIT 32

**APP.295**

**Corey Johnson's IQ Scores Compared to IQ Scores of Federal Death Penalty Defendants Found Intellectually Disabled After Contested *Atkins* Hearings**

The following chart demonstrates that Corey Johnson's IQ scores, both before and after being corrected for the Flynn effect, are similar to the IQ scores for other federal capital defendants who were granted relief by courts and found to be intellectually disabled after contested *Atkins* hearings. This chart includes IQ scores in Corey Johnson's case, the three cases in Chart 2 in Corey Johnson's clemency petition, and three additional cases. It does not include other federal capital defendants for whom the Government did not authorize the filing of a death notice nor does it include those cases in which the Government withdrew death notices based on IQ scores in the range similar to Corey Johnson's IQ scores.

| Case | Year *Atkins* Claim Decided | Full Scale IQ | | Flynn Adjusted Full Scale IQ | |
|---|---|---|---|---|---|
| | | Year | IQ | Year | Flynn IQ |
| *United States v. Johnson*, No. 92CR68 (E.D. Va. 1993). | | 1977 | 73 | 1977 | 71 |
| | | 1981 | 78 | 1981 | 75 |
| | | 1985 | 69 | 1985 | 65 |
| | | 1992 | 77 | 1992 | 73 |
| *United States v. Nelson,* 2:02-CR 00304 CJB-ALC (E.D. La. Feb. 22, 2006). | **2006** | 1994 | 65 | N/A[1] | N/A |
| | | 1997 | 76 | N/A | N/A |
| | | 2004 | 72 | N/A | N/A |
| | | 2005 | 78 | N/A | N/A |
| *United States v. Davis*, 611 F. Supp. 2d 472 (D. Md. 2009). | **2009** | 1982 | 76 | 1982 | 66 |
| | | 1992 | 76 | 1992 | 73 |
| | | 2006 | 65 | 2006 | 62 |
| | | 2009 | 70 | 2009 | 70 |

---

[1] The *Nelson* court did mention the Flynn effect in its decision and did not correct Nelson's IQ scores for the Flynn effect.

| Case | Year Decided | Full Scale IQ | | Flynn Adjusted Full Scale IQ | |
|---|---|---|---|---|---|
| | | Year | IQ | Year | Flynn IQ |
| *United States v. Shields*, No. 2:04-cr-20254 BBD-tmp (W.D. Tenn. May 11, 2009). | **2009** | 1989 | 69 | 1989 | N/A[2] |
| | | 1992 | 73 | 1992 | N/A |
| | | 1995 | 70 | 1995 | N/A |
| | | 1997 | 68 | 1997 | N/A |
| | | 2005 | 68 | 2005 | N/A |
| *United States v. Hardy*, 762 F. Supp. 2d 849 (E.D. La. 2010). | **2010** | 1993 | 73 | 1993 | 67 |
| | | 1993 | 76 | N/A[3] | N/A |
| *United States v. Lewis*, No. 1:08 CR 404, 2010 WL 5418901 (N.D. Ohio Dec. 23, 2010). | **2010** | 2008 | 72 | 2008 | 67.71 |
| | | 2010 | 75 | 2010 | 72.03 |
| *United States v. Smith*, 790 F. Supp. 2d 482 (E.D. La. 2011). | **2011** | 2004 | 67 | 2004 | 64/65 |
| | | 2006 | 67 | 2004 | 64/65 |

[2] The *Shields* court found that the Flynn effect is a valid scientific phenomena that must be considered and is particularly relevant in assessing dated IQ tests (administered years after the test was normed), but the *Shields* court did not calculate scores as corrected for the Flynn effect.

[3] The *Hardy* Court found that the practice effect inflated the second IQ test given to Hardy and disregarded that test. For this reason, the Court did not apply the Flynn effect and did not correct this IQ test for norm obsolescence.

2

**APP.297**

# EXHIBIT 33

APP.298

1 #

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

-------------------------------------------

UNITED STATES OF AMERICA,


                                    Plaintiff;

     v.                                  CRIMINAL ACTION
                                            92CV68
RICHARD TIPTON, CORY JOHNSON, and
JAMES H. ROANE, JR.,

                                    Defendants.

-------------------------------------------

FILED
JUN 2 9 1993
D-PHB
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

                     June 1, 1993
                     Richmond, Virginia
                     9:30 a.m.


BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney
               Main Street Centre
               Richmond, Virginia  23219
                         Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
               CRAIG S. COOLEY, ESQ.
               JOHN McGARVEY, ESQ.
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                         Counsel for Defendants.

               JEFFREY B. KULL
               OFFICIAL COURT REPORTER

4862

APP.299

2 #

P-R-O-C-E-E-D-I-N-G-S

THE CLERK: Case Number 92CV68: United States of America versus Richard Tipton, Cory Johnson, and James H. Roane, Jr.  Mr. Howard C. Vick and Mr. William H. Parcell, III represent the United States.  Mr. Eric D. White and Mr. Robert P. Geary represent Defendant Tipton.  Mr. Craig S. Cooley and Mr. John F. McGarvey represent Defendant Johnson.  Mr. David P. Baugh and Mr. Arnold R. Henderson, V represent Defendant Roane.  Are counsel ready to proceed?

MR. VICK:  The government is ready to proceed.

MR. GEARY:  Defendant Tipton is ready.

MR. COOLEY:  Defendant Johnson is ready.

MR. BAUGH:  Defendant Roane is ready, Your Honor.

THE COURT:  All right.  We had a couple of outstanding motions.  And before we get into the sentencing proper, we need to go ahead and rule on these motions.  They have been fully briefed and there is no need for any additional argument.

MR. BAUGH:  Your Honor, if I might, I would ask permission to allocute or argue for new sentencing phase as Defendant Roane, in light of the

4863

22#

All crimes, crimes is not good, period. All crimes, period, is not good. Being the fact that you are here, take a lesson to what's going on. I mean, you get old enough and realize that this is not the life that you are living. I am unfortunate that I never had nobody. That's no excuse. I'm a grown man. I am going to take my punishment the way I have to. Same with my co-defendants. They have to take their punishment. We have to deal with this reality. And I would hope that you take heed to this. I would hope you discuss this. Because I would hate to see you all end up this way. I would hate to see you have kids in this way, because this is not right. This is stress.

No man can really stand up here and have somebody come and sentence them to death. I can't take it. My co-defendants can't take it. We try to joke about it, to laugh, you know, to laugh the stress off. But it is a hurting feeling knowing the fact that you will be sentenced to death and you don't know when it is going to happen.

I'm sorry for my family, my co-defendants' families. I didn't mean no harm to you. I love you all. I love you from the heart. I thank my counselors again. I'm not mad at Mr. Vick, because

4883

# EXHIBIT 34

The United States Government does not apologize to you for the photographs you have had to see. We don't owe to you the apology. We didn't kill them. It is part of our job to produce those photographs so you will see how horrendous and horrible these people were and are.

I, too, appreciate you listening on behalf of the United States Government. The government would also want to encourage you to go through all of these exhibits and evidence. You go through your notes. What I have said, Mr. Vick said, or the defense lawyers say, is not fact. It is not law. The facts are what you recall. Judge Spencer will give you the law.

One other thing about Judge Spencer: These lawyers have been saying 5K.1, 5K.1, 5K.1. There is only one human being in the whole world that can cut a sentence in this case, and that's that man. You heard Gaiters and Hardy both tell you they pled in front of Judge Spencer. The government can make the motion. But it is in that man's discretion. And you go back and look at Gaiters' and Hardy's plea agreements, and what do they tell you? They have to be truthful in their cooperation with the government, all the people that are getting 5K's. That man knows it, these men know it.

MR. GEARY: I object. Greg Scott is a key witness in this case.

MR. PARCELL: Ladies and gentlemen, thank you very much.

MR. GEARY: Another misstatement by Mr. Parcell.

THE COURT: Objection overruled. We are going to take about 10 or 15 minutes, then we will get started with the instructions. They are going to take awhile, and you have been sitting awhile. So we will give you a break. Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

(Defendants removed from courtroom.)

(Recess taken from 11:50 a.m. to 12:05 p.m.)

## Court Instructions to Jury re Guilt (3192)

THE COURT: All right, let's bring in the jury.

(The jury entered the courtroom.)

Members of the jury: You have now heard all of the evidence in the case as well as the final arguments of the lawyers for the parties. It becomes my duty therefore to instruct you on the rules of law that you must follow and apply in arriving at your

the following elements beyond a reasonable doubt:
First, that a racketeering activity actually did
exist; second, that the racketeering activity
affected interstate commerce; third, that an
individual defendant did knowingly and intentionally
commit or conspire to commit the crime charged in the
particular count under consideration.  Fourth, that
the defendant acted for the purpose of gaining
entrance to the racketeering activity or for the
purpose of maintaining or increasing his position in
the racketeering enterprise; or that the defendant
received or was promised that he would receive
something of pecuniary value from the racketeering
enterprise in exchange for his acts.

I will now explain and define for you the
meaning of certain terms found in the statute and
within these instructions relating to the elements of
the 1959 murders referred to as violent crimes in aid
of racketeering activity.

As I've outlined for you, those offenses are in
Counts Four, Seven, Ten, Thirteen, Fourteen, Sixteen,
Twenty-one, Twenty-two, Twenty-three, Twenty-seven,
Twenty-eight, Twenty-nine, and Thirty of the
indictment.

"Racketeering activity" means any act or threat
involving murder or dealing in narcotic or other
dangerous drugs.  An enterprise includes any group of
individuals associated in fact which is engaged in or
the activities of which affect interstate commerce.
The phrase "anything of pecuniary value" means
anything of value in the form of money or negotiable
instrument, a commercial interest, or anything else
the primary significance of which is economic
advantage.

It is charged in the indictment that within the
Eastern District of Virginia, between on or about
January 13th, 1992 and on or about February 19th,
1992, the defendants Richard Tipton, Cory Johnson,
James H. Roane, Jr., Vernon Lance Thomas, and
Sterling Hardy used a firearm during and in
relationship  --  or in relation to the commission of
a crime of violence or a drug-trafficking crime.

Now again, as I mentioned with respect to some
of the charges I discussed earlier, no single

defendant is charged in each of these counts.  The
verdict form will assist you in keeping track of
which defendants are charged in which counts and in
giving individual consideration to each defendant for
each count against him or her.

Let me read the firearms statute.  And the
firearms violations are contained in Counts Six,
Nine, Twelve, Fifteen, Twenty, and Twenty-six.  Title

# EXHIBIT 35

```
                 IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF VIRGINIA
                          RICHMOND DIVISION

        -----------------------------------------

        UNITED STATES OF AMERICA,


                             Plaintiff;

             v.                              CRIMINAL ACTION
                                                  92CR68
        RICHARD TIPTON, CORY JOHNSON,
        JAMES H. ROANE, JR., AND
        SANDRA REAVIS,
                             Defendants.

        -----------------------------------------
                            VOLUME XXII

                         February 12, 1993
                         Richmond, Virginia
                            10:00 a.m.

        BEFORE:         HONORABLE JAMES R. SPENCER
                        United States District Judge


        APPEARANCES:    HOWARD C. VICK, JR., ESQ.
                        WILLIAM H. PARCELL, III, ESQ.
                        Office of the United States Attorney;
                            Counsel for Government;

                        ROBERT P. GEARY, ESQ.
                        ERIC D. WHITE, ESQ.
                            Counsel for Defendant Tipton;
                        CRAIG S. COOLEY, ESQ.
                        JOHN F. McGARVEY, ESQ.
                            Counsel for Defendant Johnson;
                        DAVID P. BAUGH, ESQ.
                        ARNOLD R. HENDERSON, V, ESQ.
                            Counsel for Defendant Roane;
                        ROBERT J. WAGNER, ESQ.
                            Counsel for Defendant Reavis.
                          JEFFREY B. KULL
                        OFFICIAL COURT REPORTER
```

                         P-R-O-C-E-E-D-I-N-G-S
            THE CLERK:  Criminal Action Number 92CR68:
United States of America versus Richard Tipton, Cory

All right, let's bring in the jury, please.

(The jury entered the courtroom.)

All right, this morning we are going to have the closing arguments in the aggravation and mitigation phase.  Mr. Vick?

MR. VICK:  Thank you, Your Honor.  Good morning again, ladies and gentlemen.  First, I'd like to take the time very briefly to thank you for your attention throughout this five weeks of trial.  Your attention this week has also been admirable, and I'm sure that you will go back and apply that same sort of diligence to the verdict that you render on this phase of trial.

Ladies and gentlemen, now it is your time.  The lawyers have had their time.  The evidence has all been presented.  Now it is time for you to go back and do your duty.

Each of you during the voir dire, prior to your selection as members of this jury, stated that in the appropriate case, given the appropriate

3882

circumstances, that you could indeed render a verdict of death against a defendant.  Ladies and gentlemen, I submit that based upon the evidence that you have seen from this witness stand over the last five weeks, that this is the appropriate case to render a verdict of death as to each and every defendant.

You took an oath.  It is an awesome responsibility.  It is an awesome duty.  But nonetheless, it is just that, a duty.  Your duty, ladies and gentlemen of the jury, given the evidence that you have heard, requires no less verdict than death.

As I said in my opening this week, and as I remind you now, ladies and gentlemen, this is a case where you are deciding the fate of mass murderers. Each of these defendants has been convicted by you of being just that, a mass murderer.  Each of these defendants comes before you for sentencing having killed a number of people.

The human cost of what these three men have done to support their drug dealing, to further their drug dealing, is immeasurable.  Absolutely immeasurable. The evidence is clear, beyond a reasonable doubt, that they have laid waste to the lives of a number of people for their own personal gain, for their own

3883

personal satisfaction, for their own personal machismo.  They have left ten dead people on the streets of the City of Richmond.  They have left two people so seriously wounded that they will never recover.  They have left one other seriously wounded person.  They have shot one person in front of her children.

Think of the immeasurable harm that has been done to the minds of Montez McCoy and his sisters, who saw their uncle brutally mowed down in front of them, and saw their mother shot by James Roane and Cory Johnson.  You can't quantify or qualify the amount of harm that has been caused by these people.

As I said at the beginning of this week and I remind you now, we have the burden -- that is, the United States, the government -- of proving the aggravating factors which need to be proven in order to impose the death penalty beyond a reasonable doubt.  I also told you that we would not put on a great deal of evidence this week.  And you saw.  We did not put on a great deal of evidence.  Our evidence came prior to this week, in the four weeks of testimony which led you to find these people guilty.  That evidence, as you know, has already been reintroduced and is in front of you in total this

3884

week.  That evidence is to be considered by you in total this week when rendering the appropriate sentence against these defendants.

The aggravating factors are listed in the jury's instructions, in the Court's instructions to you.  There are specific aggravating factors as to each and every defendant.  In most cases, they repeat themselves as to each defendant:

That the defendant intentionally killed the victim; that the defendant intentionally inflicted serious bodily injury which resulted in the death of a victim; that the defendant intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim which resulted in the death of the victim; that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person other than one of the participants in the offense and which resulted in the death of the victim.

Those four aggravating factors are repeated as to each and every defendant in this case.  And given the evidence that is presented to you, the government has shown beyond a reasonable doubt that each and every one of those factors has been satisfied.  Each

3885

and every murder committed in furtherance of the Continuing Criminal Enterprise satisfies all four of those aggravating factors.

Remember I told you at the beginning of the week that the aggravating factors are to a certain extent duplicative or overlapping?  But going back, applying your common sense, what you understand to be the normal meaning of those words, you will see that the government has proven each one of those aggravating

factors beyond a reasonable doubt as to each one of the defendants.

That is the first group of aggravating factors out of which you must find that at least one exists. I submit all four exist as to each and every defendant, each and every murder that they are being sentenced on here today.

In the second group of aggravating factors, defendant Cory Johnson and defendant Richard Tipton have been charged with, in the commission of the offenses enunciated in the indictment, the defendant knowingly created a grave risk of death to one or more persons in addition to the victims of the offense. Clearly they have done that in the case of Gwendolyn and "Pepsi" Greene. That has been proven to you beyond a reasonable doubt. You have already

3886

found that aggravating factor beyond a reasonable doubt, as you have already found the other aggravating factors beyond a reasonable doubt, shown by the verdict you returned on the guilt phase of this case.

As to each one of the defendants, it is charged that the defendant committed the murders enunciated after substantial planning and premeditation. The Court will provide you instructions on that, and I submit to you that you have already found beyond a reasonable doubt that these murders were committed after substantial planning and premeditation. Each one of these murders was premeditated. You know that from the evidence that has been presented.

And I remind you just briefly of the evidence that indeed shows premeditation. Remind yourself of the clear testimony from the mouths of "J.R." and "Whitey" to Ronita Hollman and others in the Newtowne area. "We are going to take over up here." Remind yourself of that credo following them down here from New York, from New Jersey, with the New York Boyz, where they clearly intended to take over blocks in New Jersey. They brought that mind set, that modus operandi, that way of operating, to Richmond. And indeed, they implemented it in the most violent

3887

fashion that they could. They laid waste the bodies that they promised they would lay waste in order to take over. Clear premeditation. But as to each one of the specific murders charged in the indictment, you also have clear premeditation based upon the evidence that you have heard, and substantial planning.

The Court's instruction to you as to substantial planning says that substantial planning means planning which is considerable, or ample, for the commission of the crime at issue. Ample for the

commission of the crime at issue. Clearly, as to each one of the murders perpetrated by these defendants, they put in ample enough planning to carry it out. Start with murder number one, the murder of Doug Talley by Richard Tipton and James Roane: 84 stab wounds, most of them to the head and upper body. 84 stab wounds where they clearly intended to plan that murder by taking him to South Richmond, by recovering the knife that was used to stab him 84 times. They got out of the car and talked about it with each other, James Roane and "Whitey," got back in the car. James Roane grabbed him around the neck, and "Whitey" began to stab him for four or five minutes. They then took that knife, disposed of that knife by giving it to "Pepsi" Greene to hold.

And you have the lead-in to the clear premeditation and murder of the next victim, Douglas Moody. They went and retrieved that knife. Why did they retrieve that knife, ladies and gentlemen? They retrieved that knife with one thought in mind: killing Doug Moody. Clear premeditation, substantial planning. They intended the consequences of their actions. They intended to kill these people to clear their way for drug dealing in Newtowne.

Go next to the murder of Peyton Maurice Johnson. They stalked that man. "J.R." stalked that man. They went and retrieved the weapons, which is further planning, further evidence of premeditation and planning, as indeed the purchase of the weapons themselves is evidence of premeditation and planning. Why do you think they purchased those weapons? To carry out their plan of taking over Newtowne. And they used them beginning the day they got them, January 14th, 1992. They stalked Peyton Maurice Johnson. "J.R." found him. "C.O." and "E.B." walked in that house and blew that man away like he was an animal. They then took the guns and, planning and premeditating their next murder, gave them to "Papoose" to wipe down and hide.

They went and retrieved those guns and indeed killed Louis Johnson with those guns on January 29th. Remember the statements of Sterling Hardy and Jerry Gaiters, where "J.R." told them "Keep him in the alley." Keep Louis Johnson in the alley. They pulled up clearly intending to kill that man. They got out of the car, put the guns to his head, and blew him away like an animal in the street, also. Clear planning and premeditation as to that murder.

The triple homicide in Church Hill, "Mousey" Armstrong, again hunted down like an animal by "C.O." He made Jerry Gaiters take him and find "Mousey"

Armstrong.  Could there be any question in your mind as to the premeditation and planning of that.

Could there be any question in your mind as to the premeditation and planning of the killings on February 19th, 1992, where "C.O." and "Whitey" hunted down Linwood Chiles and Curt Thorne, found them with "Pepsi" and Gwen and mowed all of them down because they had received a telephone call from "V" in the jail indicating that they might be cooperating with the police?  How much more clear planning and premeditation could there be than that particular murder.

The aggravating factors, ladies and gentlemen, have been proven to you already beyond a reasonable doubt.  Your jury verdict on the guilt phase of this trial establishes that.  There is listed, as to each of the defendants, other factors, non-statutory factors, that you can consider when rendering the proper verdict of sentence against these defendants: that the defendants committed multiple murders.  Indeed, that they are mass murderers.  That the defendants have substantial criminal histories.  In the case of James Roane, you will see a series of convictions against him.  You will see two convictions against Cory Johnson.  No convictions of record have been introduced into evidence as to Richard Tipton, but I suggest to you that based upon the evidence you have heard, Richard Tipton, Cory Johnson, and James Roane were virtual crime waves in and of themselves.  Wherever they went, crime followed, be it New York, New Jersey, or Richmond.  They were virtual crime waves with substantial criminal histories.  Remind yourself of Anthony Howlen and his mutilated face; the arrest of Richard Tipton by the police in New Jersey.  They are in and of themselves crime waves.

That the defendant, each of them, has been charged with seriously wounding individuals in the course of the murders outlined.  Remind yourself again of Gwen and "Pepsi," of Martha, and the woundings that they received because these people wanted to carry out their drug business.  And each of them has been charged in the statutory aggravating factor with knowingly and willfully being a member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant has been charged.  And that's important.  You need to remember that.

Now, you can find that a verdict of death should be entered as to each one of these defendants only on the CCE murders that they have been found guilty of.  So for example, you could find that Richard Tipton

deserves to die for the murder of Doug Talley, or that Cory Johnson deserves to die for the murder of Linwood Chiles, or that James Roane deserves to die for the murder of Peyton Maurice Johnson. You have got to decide that individually as to the murders charged in the indictment.

But in rendering that decision, you are free to remember all of the evidence of other murders and crimes that were carried out in furtherance of this conspiracy. You are not constrained in making that decision as to what the appropriate punishment is for that CCE murder to limit yourself only to that murder. You can consider the goals of the conspiracy. You can consider the actions of other co-conspirators and what they did in furtherance of this conspiracy when rendering that. You cannot kill James Roane, statutorily, because of his murder of Torrick Brown. But you can indeed consider that when determining whether that's the appropriate verdict for him based upon his murder of Peyton Maurice Johnson. You can consider the fact that he, in reptillian-like coldness went in and shot Torrick Brown. That can all be considered by you. It is in evidence. It has been proven beyond a reasonable doubt.

You can consider the evidence that's been put on this week by the government concerning the fact that from jail, while incarcerated, these defendants continued to try to have people killed. Specifically, you can consider that "Whitey" wanted C.T. Woody killed and wanted "Wildman" killed. You can consider that Cory Johnson wanted C.T. Woody killed and wanted Valerie Butler killed. You can consider that James Roane wanted Martha McCoy and Montez McCoy and the other witnesses killed, and was even going to take action against Doug Cunningham and the uncle of Martha McCoy if they testified at trial. You can properly consider that in rendering the right verdict and deciding what is the proper verdict in this situation of mass murder.

Go back and look at what the government has to prove. I submit to you each and every one of the aggravating factors has been proven to you beyond a reasonable doubt. You have already found them in your guilt phase verdict.

The defense case this week -- let me back up a second. In reaching your decision, what you need to do, and the Court will instruct you about this, what you need to do is take the government's aggravating factors that have been proven beyond a reasonable doubt, take the mitigating factors that you find to have been proven, and simply weigh them. It is not a

mathematical formula.  You don't have to go back there and say the government has proven 16 aggravating factors and the defense has proven 83 based upon the Court's submission to me, so therefore, the defense evidence weighs more.  No. Any one aggravating factor can be found by you to outweigh the entire defense case as to the mitigating factors that you must decide.  It is a weighing

3894

decision that you must make.  Given what you saw in the first four weeks of trial concerning these men's actions as opposed to given what you have seen this week concerning the mitigation, what is the appropriate sentence?  What should these men be sentenced to?

And while we are speaking about that, let's talk about the evidence that you have heard this week in mitigation.  The evidence that you have heard in aggravation is clear, clear beyond a reasonable doubt.  What have you heard this week?  From defendant Tipton, you heard that it is not his fault. His bad youth made him do it.  His bad relationship with his mother made him do it.  It is not his fault.

We are sorry he has had an unfortunate youth. He is not the only child who has had an unfortunate youth.  Indeed, each one of these defendants has put on evidence this week about attention deficit problems, learning disabilities.  I suggest that each one of you on that jury knows someone who has a learning disability.  Is that an excuse for murder.

Each one of the defense counsel stood up and said to you, "We don't intend this as an excuse." That's a smokescreen, ladies and gentlemen.  That's

3895

exactly what it is intended as.  It is intended as a smokescreen.  It is intended as an excuse.  These people cannot be forgiven their actions because they had a hard time learning.  And that's in essence what you have been asked to do this week.  That would substantially negate all the hard work that has been done by all those other people with learning disabilities and bad backgrounds who overcome that. People with those learning disabilities and bad backgrounds don't have a license to kill.  Indeed, you remember Dr. Bright's testimony about Richard Tipton.  He has worked with thousands of children with learning disabilities.  Never before, ever, has he worked or seen one who has committed six murders. None of the doctors who testified here this week, despite their extensive involvement with children with these problems, has testified that they ever have seen anybody commit the amount of murders that these defendants have been found guilty of

**APP.313**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Richmond Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 3:92-cr-68 (DJN) |
| | ) | |
| COREY JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

### Government's Opposition to
### Defendant's First Step Act Motion

Corey Johnson was convicted in February 1993 for his role in a drug organization that was responsible for numerous murders and maimings. A jury found that Johnson participated in seven murders and convicted him of, among other things, seven counts of violating 21 U.S.C. § 848(e)(1)(A). The jury ultimately imposed a death sentence on all seven murder convictions.

In the first of these murders, which occurred in mid-January 1992, and was charged as Count 8, Johnson used a semi-automatic weapon to gun down Peyton Johnson at a tavern. Peyton Johnson was a rival drug dealer. *United States v. Tipton*, 90 F.3d 861, 868 (4th Cir. 1996). Less than two weeks later, on January 29, 1992, Johnson murdered Louis Johnson. *Id*. at 869. This murder, which was charged as Count 11, occurred after Johnson approached Louis Johnson in an alley, and, believing him to have previously threatened him while acting as a bodyguard for a rival drug dealer, began shooting him. *Id*. While Louis Johnson lay on the ground, either Johnson or another codefendant shot him twice at close range. *Id*.

The third, fourth, and fifth murders occurred on February 1, 1992, and were charged in Counts 17, 18, and 19. These murders began with a drug debt owed by Dorothy Mae Armstrong and ended in her death by gunfire. Johnson located Armstrong at her brother's home, approached

**APP.314**

the home, and opened fire on Armstrong and Anthony Carter. *Id*. Armstrong's brother, Bobby Long, fled out the front door but was fatally shot by Johnson in the front yard. *Id*.

The sixth and seventh murders, charged in Counts 24 and 25, occurred in early February 1992 and resulted in the deaths of Curtis Thorne and Linwood Chiles. Johnson, along with codefendant Richard Tipton, shot Chiles at close range after instructing him to place his head on the steering wheel of his car. *Id*.; *United States v. Roane*, 378 F.3d 382, 389 n.6 (4th Cir. 2004). Johnson and Tipton also murdered Thorne by gunfire. Thorne's autopsy report indicated he had been hit by bullets from two different directions. *Id*. Two other passengers in the car, Gwen and Priscilla Greene, were also critically wounded in this attack. *Id*.

A jury convicted Johnson of all seven § 848(e)(1)(A) murders discussed above, as well as eleven counts of committing violent crimes in aid of racketeering activity under 18 U.S.C. § 1959. Two of those counts (Counts 29 and 30) related to the maiming of Gwen and Priscilla Greene during the attack on Chiles and Thorne. Two other convictions under § 1959 stemmed from Johnson's murder of Torrick Brown (Count 14) and wounding of Martha McCoy (Count 16). Johnson killed Brown due to his codefendant James Roane's personal grievance. Namely, that Brown was "messing" with his girlfriend. *Id*. at 891. Johnson and Roane located Brown at his apartment on the evening of February 1, 1992, and, armed with semi-automatic weapons, opened fire on Brown as he approached his doorway. *Id*. at 869. Brown was killed in the attack. McCoy was critically wounded and was likely shot due to her being a potential eyewitness to Brown's murder. *Id*. at 891.

Johnson's convictions and sentences have withstood the test of direct appeal and collateral review. *See, e.g.*, *Tipton*, 90 F.3d at 870–903; *Roane*, 378 F.3d at 395–407. On August 19, 2020, Johnson, filed a motion to reduce his sentence under § 404 of the First Step Act. (ECF No. 39.) In

2

seeking a sentence reduction under § 404, Johnson argues that his seven convictions under § 848(e)(1)(A) (Counts 8, 11, 17, 18, 19, 24, and 25) are "covered offenses." He also contends that his concurrent sentences on Counts 31 and 32, drug offenses that in the context of this case are essentially incidental, are also covered offenses. As to relief, Johnson requests "that the Court [] order a capital resentencing hearing at which a new jury would determine whether to reduce his sentences pursuant to § 404(b) of the First Step Act." (*Id.* at 2.) After this capital resentencing, Johnson requests that "this Court should use its discretion to reduce those counts in light of all of the evidence, pursuant to § 3553(a)." (*Id.*)

Johnson's requests should be denied. Globally, the penalties for trafficking in crack cocaine were changed because of findings like the U.S. Sentencing Commission's that "crack is associated with significantly less trafficking-related violence … than previously assumed." *Kimbrough v. United States*, 552 U.S. 85, 98 (2007) (internal quotation marks and citation omitted). But Johnson's particular case involved an extremely violent drug organization. His death sentences for the murders of Peyton Johnson, Louis Johnson, Bobby Long, Anthony Carter, Dorothy Mae Armstrong, Curtis Thorne, and Linwood Chiles were driven by his violent acts, and the Fair Sentencing Act would not realistically have made any difference in this case if it had been in effect at the time he was prosecuted. Under § 404(b), even when a defendant has a covered offense, the Court should assess a defendant's case "as if" the Fair Sentencing Act had applied. *See, e.g.*, *United States v. Jones*, 962 F.3d 1290, 1303 (11th Cir. 2020). As discussed below, if the Fair Sentencing Act had been in effect at the time of Johnson's prosecution, he would still have death sentences for all seven murder counts. Regardless of whether the "as if" provision in § 404(b) is treated as guiding judicial discretion or as a mandatory limit on sentence reductions, Johnson's request should be denied. He seeks an unjustified windfall. Johnson offers no persuasive basis for this

3

**APP.316**

Court to reduce his sentence for intentionally killing numerous people. Nothing he offers in mitigation outweighs the gravity of his criminal conduct—conduct so serious that a jury imposed the highest sentence available under the law.

Johnson's requested sentence reduction also falters on legal grounds. Johnson is mistaken that his convictions under § 848(e)(1)(A) should be deemed "covered offenses" under § 404(a) of the First Step Act. His convictions under § 848(e)(1)(A) are not covered offenses. *See United States v. Snow*, 967 F.3d 563 (6th Cir. 2020). In labeling § 848(e)(1)(A) a covered offense, Johnson seeks not a sentence reduction, but rather elimination of criminal liability for a drug-related murder, as *Snow* persuasively explains. As the Tenth Circuit has likewise observed, "[u]nlike a direct appeal of a conviction, which challenges the underlying conviction, a motion brought under the 2018 FSA only challenges the sentence—the length of incarceration[.]" *United States v. Mannie*, — F.3d —, 2020 WL 4810084, at *6 (10th Cir. Aug. 18, 2020). The result Johnson seeks cannot be squared with the text of § 404, which includes no provision for eliminating criminal liability, and would be inconsistent with the Savings Statute, 1 U.S.C. § 109, which operates as a background provision to preserve criminal liability, including for death sentences. *See, e.g.*, *United States v. Stitt*, 552 F.3d 345, 353–55 (4th Cir. 2008).

Moreover, the Sixth Circuit in *Snow* considered and rejected the best-case scenario for finding § 848(e)(1)(A) a covered offense. As the Fourth Circuit has explained, § 848(e)(1)(A) has three prongs. *United States v. Hager*, 721 F.3d 167, 179–80 (4th Cir. 2013) (citing *United States v. Aguilar*, 585 F.3d 652, 657 (2d Cir. 2009)). Only one of those prongs requires proof of a violation 21 U.S.C. § 841(b)(1)(A), an offense that might have been modified by the Fair Sentencing Act. The other two prongs of § 848(e)(1)(A) require that the charged murder be in relation to a continuing criminal enterprise under 21 U.S.C. § 848 and do not require proof of a

4

violation of § 841(b)(1)(A). Notably, Johnson was separately convicted in Count 2 of engaging in a continuing criminal enterprise, and his § 848(e)(1)(A) convictions rested on those findings. *See Tipton*, 90 F.3d at 887. Johnson did not incur criminal liability under § 848(e)(1)(A) by having the government rely on the prong requiring a § 841(b)(1)(A) violation. But as *Snow* persuasively explains, even if Johnson's § 848(e)(1)(A) convictions had depended on a violation of § 841(b)(1)(A), those offenses still would not be covered offenses under the First Step Act.

Johnson's argument that § 404 provides an avenue for a resentencing is also legally untenable. Section 404 specifically provides for a sentence reduction by a court, but by statute and constitutional command, the death sentence must be imposed by a jury. Under 21 U.S.C. § 848(i), in a capital sentencing procedure that is saved by the Savings Statute, as *Stitt* held, a court must conduct a capital sentencing before a jury. And if the jury returns a death sentence, the court must impose that sentence. "Upon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death." 21 U.S.C. § 848(l). This more specific provision about a death sentence governs over the more general provisions of § 404. "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'clearly expressed congressional intention' that such a result should follow." *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018). The most natural reading of § 404 is that it does not displace the provisions governing capital sentencings and does not disturb a death sentence, which must be imposed by a jury, not a court. Section 404 simply does not permit a court to upset a death sentence.

These points also fit with the background rule, accepted by every circuit to address the question, that a § 404 motion does not trigger a *de novo* resentencing and is instead a limited proceeding. *See, e.g.*, *United States v. Easter*, – F.3d –, 2020 WL 5525395, at *7 (3d Cir. Sept. 15,

2020) ("We also hold, however, that Easter is not entitled to a plenary resentencing hearing"); *United States v. Smith*, 958 F.3d 494, 499 (6th Cir. 2020) ("Our sister circuits have likewise held that the First Step Act authorizes a limited sentencing modification, not a full resentencing." (citing *United States v. Curry*, 792 F. App'x 267, 268 (4th Cir. 2020)); *United States v. Foreman*, 958 F.3d 506, 508 (6th Cir. 2020) ("[N]othing in the First Step Act entitles a defendant to a plenary resentencing."); *United States v. Hamilton*, 790 F. App'x 824, 826 (7th Cir. 2020); *United States v. Williams*, 943 F.3d 841, 843 (8th Cir. 2019)); *see also United States v. Denson*, 963 F.3d 1080, 1086–87 (11th Cir. 2020); *United States v. Jackson*, 945 F.3d 315, 321 (5th Cir. 2019).

**Procedural History**

**A.      Johnson is indicted, convicted, and sentenced.**

On July 20, 1992, Johnson, along with six others, was charged as part of a 33-count indictment with:

- Conspiracy to possess with intent to distribute and to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846 (Count 1);

- Engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(a) (Count 2);

- Capital murder in furtherance of a criminal enterprise, in violation of 21 U.S.C. § 848(e) and 18 U.S.C. § 2 (Counts 8, 11, 17, 18, 19, 24, and 25);

- Commission of violent crimes in aid of racketeering activity, in violation of 18 U.S.C. § 1959 (Counts 10, 13, 14, 16, 21, 22, 23, 27, 28, 29, and 30);

- Use of a firearm in relation to a crime of violence or a drug-trafficking offense, in violation of 18 U.S.C. § 924(c) (Counts 9, 12, 15, 20, and 26); and

- Possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1) (Counts 31 and 32).

(Second Superseding Indictment.) These charges stemmed from Johnson's leadership role, along with Richard Tipton and James Roane, in a continuing criminal enterprise, the "New York Boyz,"

6

**APP.319**

that trafficked large quantities of cocaine in the Richmond, Virginia area between 1990 and 1992.

The facts relevant to the instant motion were summarized by the Fourth Circuit on direct appeal as follows:

> Tipton, Roane, and Cory Johnson were principal "partners" in a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992. The conspiracy's operations began in Trenton, New Jersey where Johnson and Tipton, both from New York City, became members. In August of 1990, the conspiracy expanded its operations to Richmond, Virginia where Roane joined the conspiracy in November of 1991. The Trenton-based operation came to an end on June 4, 1991 when police confiscated a large quantity of crack cocaine and firearms. In late 1991, the conspiracy's operations were expanded from the Central Gardens area of Richmond to a second area in Richmond called Newtowne.
>
> During the period of the conspiracy's operation, its "partners", including appellants, obtained wholesale quantities of powdered cocaine from suppliers in New York City, converted it by "cooking" into crack cocaine, then packaged it, divided it among themselves, and distributed it through a network of 30–40 street level dealers, "workers." Typically, the appellants and their other partners in the conspiracy's operations took two-thirds of the proceeds realized from street-level sales of their product.
>
> Over a short span of time in early 1992, Tipton, Cory Johnson, and Roane were variously implicated in the murders of ten persons within the Richmond area—all in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the "partners."
>
> On January 4, 1992, Tipton and Roane drove Douglas Talley, an underling in disfavor for mishandling a drug transaction, to the south side of Richmond. Once there, Roane grabbed Talley from the rear while Tipton stabbed him repeatedly. The attack lasted three to five minutes and involved the infliction of eighty-four stab wounds to Talley's head, neck, and upper body that killed him.
>
> On the evening of January 13, 1992, Tipton and Roane went to the apartment of Douglas Moody, a suspected rival in their drug-trafficking area, where Tipton shot Moody twice in the back. After Moody fled by jumping through a window, both Tipton and Roane pursued. Roane, armed with a military-style knife retrieved from an apartment where the knife was kept for co-conspirator Curtis Thorne, caught up with Moody in the front yard of the apartment where he stabbed him eighteen times, killing him.
>
> On the night of January 14, 1992, Roane, Cory Johnson, and a third person retrieved a bag of guns that they had left at an apartment earlier that day. Roane then located

7

Peyton Johnson, another rival drug dealer, at a tavern. Shortly after Roane left the tavern, Cory Johnson entered with another person and fatally shot Peyton Johnson with a semi-automatic weapon.

On January 29, 1992, Roane pulled his car around the corner of an alley, got out of the vehicle, approached Louis Johnson, whom appellant Johnson thought had threatened him while acting as bodyguard for a rival dealer, and shot him. Cory Johnson and co-conspirator Lance Thomas then got out of Roane's car and began firing at Louis Johnson. As Louis Johnson lay on the ground, either Cory Johnson or Thomas shot him twice at close range. Louis Johnson died from some or all of these gunshot wounds.

On the evening of February 1, 1992, Cory Johnson and Lance Thomas were told that Roane had gone to the apartment of Torrick Brown, with whom Roane had been having trouble. Johnson and Thomas armed themselves with semi-automatic weapons and went to the apartment where they joined appellant Roane outside. The three then knocked on Brown's door and asked his half-sister, Martha McCoy, if Brown was there. She summoned Brown to the door and Cory Johnson, Roane, and Thomas opened fire with semi-automatic weapons, killing Brown and critically wounding McCoy.

In late January, 1992, after being threatened by Cory Johnson for not paying for a supply of crack cocaine, Dorothy Armstrong went to live with her brother, Bobby Long. On February 1, Cory Johnson learned from Jerry Gaiters the location of Long's house. Thereafter, Tipton and an unidentified "young fellow" picked up Gaiters and Cory Johnson who were then driven by Tipton to a house where the group obtained a bag of guns. After dropping off the unidentified third party, the group proceeded to Long's house. Upon arriving at Long's house, Cory Johnson and Gaiters got out of the car and approached the house. While Tipton waited in the car, Cory Johnson and Gaiters went to the front door. When Long opened the door, Cory Johnson opened fire, killing both Dorothy Armstrong and one Anthony Carter. Bobby Long fled out the front door, but was fatally shot by Cory Johnson in the front yard.

In early February 1992, Cory Johnson began to suspect that Linwood Chiles was cooperating with the police. On February 19, 1992, Johnson borrowed Valerie Butler's automobile and arranged to meet with Chiles. That night, Chiles, Curtis Thorne, and sisters Priscilla and Gwen Greene met Cory Johnson and drove off together in Chiles's station wagon. Chiles parked the car in an alley, and Tipton soon drove in behind it in another car, got out, and came up alongside the stationwagon. With Tipton standing by, Cory Johnson told Chiles to place his head on the steering wheel and then shot Chiles twice at close range. Additional shots were fired, killing Thorne and critically wounding both of the Greene sisters. The autopsy report indicated that Thorne had been hit by bullets fired from two different directions.

8

*Tipton*, 90 F.3d at 868–69.

In February 1993, a jury convicted Johnson of seven capital murders under § 848(e) (Counts 8, 11, 17, 18, 19, 24, 25); conspiracy to possess cocaine base with the intent to distribute under § 846 (Count 1); engaging in a continuing criminal enterprise under § 848(a) (Count 2); committing violent crimes in aid of racketeering activity under § 1959 (Counts 10, 13, 14, 16, 21, 22, 23, 27, 28, 29, 30); using a firearm in relation to a crime of violence or a drug-trafficking offense under § 924(c) (Counts 9, 12, 15, 20, 26); and possession of cocaine base with the intent to distribute under § 841(a)(1) (Counts 32, 33). Following a penalty hearing on the capital murder counts, the jury recommended that Johnson be sentenced to death for all of the seven murders for which he was convicted under § 848(e) (Counts 8, 11, 17, 18, 19, 24, 25). *See Tipton*, 90 F.3d at 870.

In accordance with the jury's recommendation, the Honorable James R. Spencer, then the presiding district judge, sentenced Johnson to death. *Id*. The jury also sentenced Richard Tipton to death on three of the § 848(e)(1)(A) murders for which he had been convicted, and sentenced James Roane to death for one of the three § 848(e)(1)(A) murders for which he was convicted. *Id*.

After sentencing, Judge Spencer refused, however, to order the defendants' execution on the grounds that Congress neither authorized the means by which the death sentences were to be carried out nor authorized the Attorney General to implement regulations to that effect. *Id*.

All three defendants appealed their convictions and sentences and the government cross-appealed Judge Spencer's stay of execution of the death sentences. *Id*. The Fourth Circuit affirmed the defendants' convictions and sentences, with the exception of the Count One § 846 cocaine conspiracy, which it vacated as being a lesser included offense of the § 848 continuing criminal enterprise convictions. *Id*. at 891, 903. As to Judge Spencer's refusal to execute the defendants'

9

death sentences, the Fourth Circuit reversed and "remand[ed] with instructions to enter appropriate orders for the executions in accordance with regulation promulgated by the Attorney General." *Id*. at 903.

### B.  Johnson's post-conviction litigation.

Following the Fourth Circuit's decision, Johnson sought relief from the district court under 28 U.S.C. § 2255. The district court dismissed or denied all of Johnson's claims and he appealed. *See Roane*, 378 F.3d at 389.

On appeal, Johnson claimed that (1) the district court erred by (a) not properly instructing the jury regarding the unanimity requirement of § 848(e), as well as by committing other instructional errors; (b) improperly adjudicating his discovery request at the § 2255 stage and by awarding summary judgment; and (c) denying his request to interview jurors; (2) that his trial was tainted by prosecutorial misconduct because the government knowingly introduced perjured testimony and withheld certain exculpatory evidence; (3) that his death sentences were constitutionally invalid under the Fifth Amendment because the indictment failed to allege the statutory aggravating factors under 21 U.S.C. § 848(n)(1)-(12); (4) that his counsel was ineffective for failing to (a) further investigate his alleged gang activities in New York and New Jersey; (b) request a voir dire inquiry on whether prospective jurors had a tendency to favor the death penalty; (c) present mitigating evidence regarding prison conditions; and (d) request certain unanimity instructions; (5) that the prosecution discriminated against women in the jury selection process; and (6) that his death sentence violates the Eighth Amendment because "he is mentally retarded and cannot constitutionally be executed, and that his counsel were ineffective in failing to address this issue at sentencing and on direct appeal." *Id*. at 395–96 & n.8.

The Fourth Circuit rejected each argument in a lengthy opinion. *Id*. at 396–407.

10

C.      Johnson's motion under § 404(b) of the First Step Act.

On August 19, 2020, Johnson filed the instant motion for a sentence modification under § 404(b) of the First Step Act. (ECF No. 39.) In his motion, Johnson advances one overarching argument: that his murder convictions under § 848(e) (Counts 8, 11, 17, 18, 19, 24, and 25), and his cocaine distribution convictions (Count 31 and 32) are "covered offenses" under § 404(b) of the First Step Act. As to relief, Johnson requests "that the Court [] order a capital resentencing hearing at which a new jury would determine whether to reduce his sentences pursuant to § 404(b) of the First Step Act." (*Id.* at 2.) After this capital resentencing, Johnson requests that "this Court should use its discretion to reduce those counts in light of all of the evidence, pursuant to § 3553(a)." (*Id.*)

## Argument

As outlined above, Johnson's convictions for capital murder in furtherance of a criminal enterprise under § 848(e) (Counts 8, 11, 17, 18, 19, 24, and 25) are not covered offenses under § 404(b) of the First Step Act. For this reason, he is not entitled to a modification of his death sentence under the Act. Moreover, even assuming Johnson's death sentences could be reduced, this Court should exercise its discretion under the First Step Act and deny his motion. *See* First Step Act § 404(c) ("Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section."). A district court is "not obligated to reduce [the defendant's] sentence at all." *United States v. Jackson*, 952 F.3d 492, 502 (4th Cir. 2020). For example, the Fourth Circuit has recognized that relief may be denied to "defendants who almost certainly would not have faced a different sentence if they had been charged, convicted, and sentenced after the Fair Sentencing Act." *United States v. Wirsing*, 943 F.3d 175, 179 (4th Cir. 2019) (citing *United States v. Peters*, 843 F.3d 572, 577, 581 (4th Cir. 2016)). Even when a defendant has a covered

11

APP.324

offense, a court may consider the drug quantities involved in the offense "in evaluating [the defendant's] motion on the merits." *United States v. Gravatt*, 953 F.3d 258, 264 (4th Cir. 2020). The drug quantities in this case far exceeded the new 280-gram threshold imposed by the Fair Sentencing Act. For Johnson in particular, the PSR attributed him with 18.49 kilograms of crack. *See* PSR ¶ 55; *see also id*. at 37.

In seeking relief under the First Step Act for his seven § 848(e) convictions, all of which resulted in the imposition of the death penalty, Johnson fails to show that they are covered offenses, and offers no support for his theory that he is entitled to a new capital resentencing. Still more, Johnson offers no relevant authority for the proposition that after a capital resentencing, a court can subsequently reduce a sentence under the § 3553(a) factors. (*See* ECF No. 39 at 2.) In fact, such an approach is directly in conflict with the Fourth Circuit's decision in *Stitt*, as explained in more detail below.

## I.      Johnson's murder convictions under § 848(e) are not covered offenses under § 404(b) of the First Step Act.

The First Step Act provides that a sentencing court "may … impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed." First Step Act § 404(b), 132 Stat. at 5222. Under the First Step Act, a "covered offense" is "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010, that was committed before August 3, 2010." *Id.* § 404(a), 132 Stat. at 5222.

As noted above, for an offense to qualify as "covered" under § 404(b), its statutory penalties must have been modified by the Fair Sentencing Act. *See Wirsing*, 943 F.3d at 180 ("On its face, the First Step Act allows the retroactive application of the modifications to penalties that Congress enacted in the Fair Sentencing Act."). The statutory penalties for a violation of § 848(e),

12

**APP.325**

however, were not changed by the Fair Sentencing Act. The penalties under § 848(e), remain, both before and after the Fair Sentencing Act, 20 years to life imprisonment or death. *See* § 848(e)(1)(A). Neither the Fair Sentencing Act nor the First Step Act altered this scheme.

Because the plain language of the First Step does not encompass convictions under § 848(e), those offenses are not "covered offenses" under the First Step Act. Although the bare text of the Act bars relief, further support is found for excluding § 848(e) from § 404(b)'s coverage in the operation of the statute itself. In *United States v. NJB*, 104 F.3d 630 (4th Cir. 1997), the Fourth Circuit held that § 848(e) is a separate substantive offense, and not just a penalty enhancement. *Id*. at 633. Section 848(e) is therefore separable from its underlying "predicates," whether they be acts "in furtherance of a continuing criminal enterprise" or "offense[s] punishable under section 841(b)(1)(A)[.]" *See* § 848(e)(1)(A). In the context of a § 848(e)(1)(A) prosecution, these predicates function as elements which must be found by a jury. As such, it is impossible for them to be "statutory penalties for which were modified . . . the Fair Sentencing Act of 2010." First Step Act § 404(a), 132 Stat. at 5222.

Moreover, § 848(e)(1)(A) has three prongs. *Hager*, 721 F.3d at 179–80 (citing *Aguilar*, 585 F.3d at 657). Only one of those prongs requires proof of a violation § 841(b)(1)(A), while the other two prongs of § 848(e)(1)(A) require that the murder be in relation to a continuing criminal enterprise under 21 U.S.C. § 848 and do not require proof of a violation of § 841(b)(1)(A). Johnson was convicted in Count 2 of engaging in a continuing criminal enterprise, and his § 848(e)(1)(A) convictions rested on those findings. *See Tipton*, 90 F.3d at 887 ("The Government's evidence expressly linked each of the nine § 848(e) murders of which the appellants were severally convicted to a furtherance of the CCE's purposes: either silencing potential informants or witnesses, eliminating supposed drug trafficking rivals, or punishing underlings for various drug-

13

trafficking misfeasances."). Johnson did not sustain criminal liability under § 848(e)(1)(A) by having the government rely on the prong requiring a § 841(b)(1)(A) violation.

The predicate facts required to find a violation of § 848(e) are akin to elements of the crime, and even though § 848(e) references § 841(b)(1)(A), a defendant is only eligible for a § 404(b) reduction if the *penalties* for his offense of conviction have been modified by the Fair Sentencing Act. Here, the Fair Sentencing Act did no such thing. *See United States v. Guerrero*, 813 F.3d 462, 464–65 (2d Cir. 2016) ("The [Fair Sentencing] Act makes no mention of § 848(e)(1)(A)."); *see also United States v. Spearman*, No. 91-CR-50013-01 (BAF), 2020 WL 4390632, at *5 (E.D. Mich. Aug. 1, 2020) ("The § 848(e)(1)(A) drug-related murder convictions … likewise have nothing to do with drug quantities, and the statutory penalty (twenty years to life) has not been changed by the Fair Sentencing Act or the First Step Act."); *United States v. Martinez*, No. 06 CR. 987-1 (DC), 2020 WL 4226639 (S.D.N.Y. July 23, 2020) (after the First Step Act, "Count Two -- the [§ 848(e)(1)(A)] murder count -- still carries a mandatory minimum sentence of twenty years") (Chin, J.,); *United States v. Potts*, 389 F. Supp. 3d 352, 356 (E.D. Pa. 2019) ("The Fair Sentencing Act made many changes to elements of various crack offenses, but it did not amend the text of § 848(e)."); *United States v. Valentine*, No. 06-CR-580 (JSR), 2019 WL 3242494, at *1 (S.D.N.Y. July 2, 2019) ("[T]he Fair Sentencing Act … did not modify the sentences for the [§ 848(e)(1)(A)] murder … crimes to which defendant pled guilty").[1]

To be sure, § 2 of the Fair Sentencing Act modified the statutory penalties for crack cocaine offenses by increasing the quantity of crack cocaine necessary to trigger the minimums—"raising the amount from 15 grams to 28 grams for the 5–year minimum sentence, and from 50 grams to

---

[1] The government recognizes that since the passage of the First Step Act, several district courts have held otherwise. *See* ECF No. 39 at 8–10. For the reasons appearing in this section, the government respectfully maintains that these cases are wrongly decided.

14

280 grams for the 10–year minimum sentence." *United States v. Black*, 737 F.3d 280, 282 (4th Cir. 2013). And of course, § 404 of the First Step Act "makes retroactive the provisions of the Fair Sentencing Act of 2010 that reformed crack cocaine sentencing." *United States v. Woodson*, 962 F.3d 812, 813 (4th Cir. 2020). But none of these amendments altered § 848(e)'s penalty scheme. It may be the case that the Fair Sentencing Act indirectly limited the number of defendants who can be charged with § 848(e) offenses by increasing the threshold amounts of crack cocaine required under § 841(b)(1)(A), but even assuming the truth of the latter does not render § 848(e) a covered offense under the First Step Act.

The Second Circuit has rejected a similar attempt to obtain relief under the Fair Sentencing Act from an § 848(e) conviction. In *United States v. Guerrero*, 813 F.3d 462 (2d Cir. 2016), the defendant argued that the Fair Sentencing Act compelled vacatur of his § 848(e) conviction because after the Act's passage, "§ 848(e)(1)(A)'s drug trafficking element required the jury to find that the conspiracy involved at least 280 grams of crack cocaine" and "[b]ecause only a quantity of 50 grams was alleged and proved, … the Government failed to establish an element of the charged murder offense[.]" *Id.* at 465. The Second Circuit rejected this argument, holding as follows:

> A defendant may be convicted under § 848(e)(1)(A) if he was engaged in a drug trafficking offense punishable under § 841(b)(1)(A) at the time he committed intentional murder. The crime is complete at the time of the murder, *see* 21 U.S.C. § 848(e)(1)(A), and it is as of that time that the statute's drug trafficking element is measured. Here, Guerrero committed the murders in September 1994, at which time the threshold quantity of crack cocaine necessary under § 841(b)(1)(A) was 50 grams or more. The jury's finding that Guerrero had been engaged in a conspiracy to distribute 50 grams or more of crack cocaine at the time he intentionally killed Ortega and Garrido therefore satisfied the drug trafficking element of the § 848(e)(1)(A) murder offense. There was no error in the indictment, the instructions, or the verdict.

\*       \*       \*

15

> No other conclusion flows from the FSA, a sentencing statute principally designed to increase threshold quantities of drugs necessary to trigger certain enhanced penalty schemes, to remove certain mandatory minimum sentences, and to direct the promulgation of new Sentencing Guidelines.

*Id*. As in *Guerrero*, Johnson's convictions under § 848(e)(1)(A) were complete the day his seven murders occurred "and it is as of that time that the statute's drug trafficking element is measured." Neither the Fair Sentencing Act nor the First Step Act counsel otherwise, *see id*. at 466 ("Because the FSA did not expressly extinguish any criminal liability under § 848(e)(1)(A), the law's enactment did not retroactively invalidate Guerrero's conviction."), and there is no reason to believe that Congress, through statutes aimed at remedying disparities between cocaine base and powder cocaine, *see Gravatt*, 953 F.3d at 260, intended to absolve murders from criminal liability, to say nothing of vacating lawfully imposed death sentences. *Cf*. ECF No. 38 at 2 (requesting resentencing hearing on all seven § 848(e)(1)(A) counts).

The only court of appeals to have considered the eligibility of a § 848(e) conviction under the First Step Act has held that it is not a "covered offense" under § 404(b). In *United States v. Snow*, 967 F.3d 563 (6th Cir. 2020), the defendant argued that the Fair Sentencing Act's increase of the threshold amount of crack cocaine under § 841(b)(1)(A) to 280 grams "combined with § 848(e)(1)(A)'s requirement of an offense punishable under § 841(b)(1)(A), qualifies his § 848(e)(1)(A) conviction as a "covered offense," making him eligible for a First Step Act sentence reduction." *Id*. at 564. The Sixth Circuit disagreed, holding "that the First Step Act's text and structure do not support extending resentencing relief to Snow's § 848(e)(1)(A) conviction." *Id*.

*Snow* first noted that "[i]n run-of-the-mill First Step Act cases, applying the Fair Sentencing Act retroactively requires only a change in degree: adjusting from a previous and higher statutory sentencing range to a new and lower one." *Id*. at 565. "Thus,"

16

the court continued, "in such cases, it makes sense to say that the Fair Sentencing Act 'modified' the statutory penalties. But the same is not true of Snow's § 848(e)(1)(A) conviction for murder while engaged in a conspiracy to distribute at least 50 grams of cocaine base." *Id.* This was so, the court held, because

> [t]he Fair Sentencing Act did not reduce the sentencing range that applies to a conviction with those elements. Instead, after the Fair Sentencing Act, those elements no longer amount to an offense under § 848 at all and there is no applicable statutory sentencing range. The elimination of statutory penalties cannot be called a "modification" of statutory penalties without putting great strain on the ordinary meaning of the word "modify." This strongly suggests that Snow's § 848(e)(1)(A) conviction cannot be considered a covered offense as defined in § 404(a) of the First Step Act.

*Id.* Continuing, the Sixth Circuit noted that § 404(b) of the Act confirmed its conclusion. As it reiterated, § 404(b) permits courts to "impose a reduced sentence" for a covered offense "'as if [the changes made by the Fair Sentencing Act] were in effect' when the offense was committed." *Id.* Revisiting the defendant's § 848(e)(1)(A) conviction under this rubric, however, would have resulted in the unusual step of eliminating the statutory penalties for his conviction. As *Snow* held,

> if the district court chose to revisit Snow's Count 2 sentence as if the Fair Sentencing Act were in effect, it would be unable to "impose" any sentence because, again, there would no longer be any statutory penalties prescribed for Snow's conviction. In other words, § 404(b) on its face presupposes that the district court may still impose some sentence even after applying the Fair Sentencing Act retroactively; it simply does not contemplate the elimination of a sentence, as would be required here.

*Id.* "In sum," the Sixth Circuit concluded the defendant's "§ 848(e)(1)(A) conviction is not a covered offense and he is ineligible for a reduction in his sentence for Count 2." *Id.*

The Sixth Circuit's holding accounts for both the text of the First Step Act as well as

17

§ 404(b)'s actual, "real time" operation. This Court should adopt its reasoning.[2]

## II.    The First Step Act did not displace § 848(e)'s detailed provisions concerning imposition of the death penalty.

Johnson was convicted of seven counts of capital murder in furtherance of a criminal enterprise, in violation of § 848(e) (Counts 8, 11, 17, 18, 19, 24, 25) and was sentenced to death on all seven counts. Johnson was sentenced in accordance with the jury's recommendation pursuant to 21 U.S.C. § 848(l), *Tipton*, 90 F.3d at 870, a statutory provision which has since been repealed.

The Fourth Circuit has held that even in a case where a defendant obtains post-conviction relief from a faulty capital sentencing proceeding, courts are still obligated to follow the penalty scheme attendant to § 848(e) convictions, even if they have been repealed and replaced by the different procedures of the Death Penalty Act, 18 U.S.C.A. § 3591 *et seq*. ("FDPA"). *See United States v. Stitt*, 552 F.3d 345 (4th Cir. 2008). In *Stitt*, a defendant was convicted and sentenced to death under § 848(e)(1)(A). *Id*. at 352. The defendant obtained relief under § 2255 due to his defense attorney's conflict of interest during the penalty phase of his trial, which resulted in vacatur of his death sentence. *Id*. at 348. During the pendency of various appeals related to the case, Congress repealed §§ 848(g) through (r) and made § 848(e) convictions death penalty eligible in

---

[2] Although Johnson is likely eligible for a sentence modification on Counts 31 and 32, crack offenses under § 841(a)(1), the Court need not reach this contention due to his ineligibility for relief under the concurrently imposed death sentences under § 848(e). *See United States v. Charles*, 932 F.3d 153, 160 (4th Cir. 2019) ("[T]he [concurrent-sentence] doctrine still has continuing force as a species of harmless-error review where a defendant seeks to challenge the legality of a sentence that was imposed for a valid conviction, but where the challenged sentence runs concurrently with a valid sentence of an equal or greater duration."); *accord United States v. McCain*, – F.3d –, 2020 WL 5414850, at *5 (4th Cir. Sept. 10, 2020) ("Even assuming the district court plainly erred in not vacating McCain's Section 1512 conviction, he has not shown that the error affected his substantial rights. McCain received two concurrent life sentences: on Count One for violating Section 1512 and on Count Five for violating Section 924.").

18

accordance with the FDPA. *Id*. 352. Given this change-in-law, the district court refused to empanel a new sentencing jury under the relevant, but since-repealed, provisions of § 848, instead opting to resentence the defendant to life imprisonment without a jury. *Id*. at 351-52.

The government appealed and the Fourth Circuit reversed. In so holding, the Fourth Circuit held that the Savings Statute, 1 U.S.C. § 109, saved §§ 848(g) through (r) as applied to the defendant. *Stitt* first noted that "courts are in agreement that 'sentencing provisions' are saved as part of the 'prosecution' of a 'penalty' even when a later change alters the availability of a particular sentence." *Id*. at 354. As such, *Stitt* held that "we continue to apply the original sentencing provisions because the repeal of §§ 848(g)-(r) would have the effect of eliminating a previously-available sentencing option, a death sentence, at the resentencing." *Id*. *Stitt* also noted "that the penalty provided in § 848(e) cannot be fully preserved without also preserving the mechanisms for enforcing it, §§ 848(g)-(r). Indeed, the repealed portions of § 848 are a constitutionally required condition precedent to imposing § 848(e)'s penalty of a death sentence." *Id*. Concluding, the Fourth Circuit held that because the "'enforcing provisions' of § 848(g)-(r) are both akin to a 'sentencing provision' and also have a constitutionally mandated 'special relation to the accrued right,' the Savings Statute operates to save them against Stitt. And, § 848(i)(1)(B)(iv) provided for the empanelling of a sentencing jury in cases where the original death sentence was later vacated." *Id*.

Addressing the district court's assertion of equitable power to personally resentence the defendant, despite an earlier jury's imposition of the death penalty, *Stitt* held as follows:

> Section 848(i) provided that, if the Government files the appropriate death-eligibility notice (which it did in 1998), and if the defendant is found guilty of the death eligible offenses (which Stitt was in 1999), then "the judge who presided at the trial … *shall* conduct a separate hearing to determine the punishment to be imposed." 21 U.S.C.A. § 848(i)(1) (emphasis added). That hearing "*shall*" be conducted "before a jury impaneled for the purpose of the hearing if … after initial

19

> imposition of a sentence under this section, redetermination of the sentence under this section is necessary." 21 U.S.C.A. § 848(i)(1)(B)(iv) (emphasis added). And, if a jury recommends a sentence of death, "the court shall sentence the defendant to death." 21 U.S.C.A. § 848(l) (emphasis added). Given the repeated use of the term "shall," we believe it was not "appropriate" for the district court to forego empanelling a new penalty-phase jury.

*Id*. at 355–56.

Given the First Step Act's text and animating purpose, *Gravatt*, 953 F.3d at 260, there is little indication that it was intended to override the § 848(e)'s more specific provisions addressing the imposition of death sentences. Relatedly, there is no evidence that the First Step Act permits courts to disturb jury-imposed death sentences as an exercise of discretion under § 404(b) and Johnson points to no statute or case providing as such. Johnson's argument for a resentencing on all seven § 848(e) counts should therefore be rejected.

## III.    Johnson's remaining arguments are improperly brought in a First Step Act motion.

Johnson raises four additional points which, although having no bearing on the instant motion, he nonetheless asks this Court to consider. Each should be rejected as improvidently brought in a First Step Act motion or barred by prior litigation in this case.

Johnson first notes that his conviction on Count 1 was vacated by the Fourth Circuit on direct appeal. (ECF No. 39 at 43.). He therefore asks to be resentenced "without the influence of this superadded, unconstitutional conviction on the sentencing decision." (*Id*.) Johnson also states that his § 924(c) convictions (Counts 9, 12, 15, 20, and 26) are invalid in light of the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). (*Id*. at 43-44.) Johnson also claims that his eleven convictions for committing violent crimes in aid of racketeering activity under § 1959 (Counts 10, 13, 14, 21, 22, 23, 27, and 28) were improperly charged and are therefore invalid. (*Id*. at 44-46.) And finally, Johnson claims that he has an intellectual disability and can demonstrate that fact through a new capital resentencing. (*Id*. at 13-34.)

As noted above, each argument is either irrelevant to the Court's consideration of the instant motion, improperly raised through a First Step Act motion, or barred by prior litigation in this case. With regards to Johnson's first argument, of course the government recognizes that the Fourth Circuit vacated his conviction on Count 1. This vacatur occurred in 1996 though, *see Tipton*, 90, F.3d at 891, and presumably resulted in little more than an amended judgment. The time has long-since-passed to seek any other type of relief from the Fourth Circuit's vacatur. And in any event, the likelihood that the elimination of a cocaine distribution conspiracy conviction would/will have any impact on Johnson's sentence is infinitesimal in light of the fact that he stands convicted of seven murders.

As to Johnson's *Davis* argument, and as he himself recognizes, he is currently seeking authorization from the Fourth Circuit to even raise such a claim in the district court. Accordingly, even if a First Step Act motion was the proper forum to raise such a claim, it would make little sense to consider his *Davis* argument until after the Fourth Circuit actually authorizes it, to say nothing about its success on the merits. Because Johnson's application to file a successive § 2255 petition on this very issue is fully briefed and pending before the Fourth Circuit, the government does not address the merits of this claim herein. *See In re Corey Johnson*, No. 20-8, ECF Nos. 2, 7, 12, 13, 14, 16, 17, 18.

Johnson's claims of instructional error also have no place in a First Step Act motion. To begin, the First Step Act permits sentence modifications under specified circumstances. The Act is not a vehicle by which to raise perceived infirmities in a conviction. *See United States v. Moore*, – F.3d –, 2020 WL 5523205, at *5 (2d Cir. Sept. 15, 2020) ("By its express terms, [§ 404 of the First Step Act] does not require plenary resentencing or operate as a surrogate for collateral review, obliging a court to reconsider all aspects of an original sentencing."); *Mannie*, 2020 WL 4810084,

21

**APP.334**

at *6 ("Unlike a direct appeal of a conviction, which challenges the underlying conviction, a motion brought under the 2018 FSA only challenges the sentence—the length of incarceration."). If Johnson believed instructional error infected his eleven § 1959 convictions, he should have raised the argument on direct appeal or in a § 2255 motion. At this juncture, Johnson would need prefilling authorization from the Fourth Circuit to even raise such arguments before this Court. *See In re Vassell*, 751 F.3d 267, 271 (4th Cir. 2014) ("Section 2255(h) requires a court of appeals considering whether to authorize a second or successive § 2255 motion to follow the gatekeeping procedure 'provided in section 2244.'"). Because Johnson has not done so, his claims of instructional error are improperly raised in the instant motion.[3]

And finally, Johnson's attempt to re-litigate his mental status should be rejected as both procedurally improper and barred by the law of the case doctrine. As a preliminary matter, a First Step Act motion is not a vehicle to raise arguments about a defendant's mental health at the time of his offense conduct and sentencing. Notwithstanding, Johnson has already litigated this general issue in the district court and on appeal, and lost. In appealing the denial of his § 2255 motion, Johnson argued that "he is mentally retarded and that, under federal law, he cannot be executed[] … [and] that his counsel were ineffective for failing to argue this point during sentencing." *Roane*, 378 F.3d at 408. Like the district court, the Fourth Circuit disagreed.

---

[3] On direct appeal, the Fourth Circuit rejected an instructional error challenge brought by Johnson, Tipton, and Roane to their § 1959 convictions. The defendants argued that "the district court failed to differentiate between 'an enterprise engaged in racketeering activity' and the 'racketeering activity' in which it was engaged." *Tipton*, 90 F.3d at 888. The Fourth Circuit rejected the argument on plain error review, holding that "we are satisfied that, as the Government contends, the jury was adequately told that the elements were separate and distinct ones and that both must be proved. Viewed in total context, the two isolated references to 'racketeering activity' when 'enterprise engaged in racketeering activity' was appropriate must have been understood as short-hand references to the 'enterprise' itself." *Id.*

In rejecting the first argument, the Fourth Circuit held as follows:

> The district court found, based on data of the American Association on Retardation, that an IQ of 75 or below places a person in the retarded category. At the penalty phase of Johnson's trial, Dr. Dewey Cornell, a psychologist, testified that, on October 10, 1992, he had administered a Wechsler Adult Intelligence Scale Test ("WAIS Test"). Johnson exhibited an IQ of 77, which indicated a "generally impaired intelligence," placing him "just above the level of mental retardation." Importantly, Dr. Cornell testified that he knew the significance of finding Johnson's IQ to be above 75 (i.e., this finding would render Johnson death-eligible), and that he double-checked his numbers and consulted colleagues before reaching this conclusion.
>
> Despite Dr. Cornell's evidence, Johnson asserts that he is in fact mentally retarded. In support of this proposition, Johnson points to evidence offered during the penalty phase that his IQ was somewhere between 69 and 74 in 1985, and he relies on a 1996 publication concluding that the WAIS test tends to inflate IQ scores over the years:
>
> > Individuals appear to gain 3-5 IQ points over a ten year period. Since the WAIS-R was published in 1981, this inflation factor could mean that the average IQ could be as high as 105-107 points rather than the accepted value of 100.
>
> Based on these authorities, Johnson maintains that his actual IQ is below 75 and that his score of 77 is a product of score inflation. As the district court explained, however, Dr. Cornell's evidence that he double-checked his findings and consulted with colleagues before concluding that Johnson was not mentally retarded "belies the suggestion that Dr. Cornell's analysis did not account for possible variations in his testing instrument." Accordingly, Johnson is not barred from execution due to mental retardation.

*Id*. at 408–09 (internal citations omitted). With regards to Johnson's related ineffective assistance

of counsel argument, the Fourth Circuit held as follows:

> Johnson next contends that his counsel was ineffective for failing to assert possible IQ-score inflation at sentencing. We agree with the district court that Johnson's trial attorney was not ineffective for failing to raise this issue. Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." And "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." In this instance, Johnson's lawyer was presented with a mental health report, and he was under no

23

mandate to second-guess that report. In these circumstances, Johnson's counsel was not constitutionally ineffective in this respect.

*Id*. at 409 (internal citations omitted).

As is clear from the Fourth Circuit's decision, Johnson's arguments concerning his mental health have been fully aired and rejected.[4] In addition to being inappropriately brought in a First Step Act motion, these arguments are barred by the mandate rule and the law of the case doctrine. *See United States v. Alston*, 722 F.3d 603, 606 (4th Cir. 2013) ("The mandate rule is a specific application of the law of the case doctrine that prohibits a lower court from reconsidering on remand issues laid to rest by a mandate of the higher court." (internal quotation marks omitted)); *United States v. Susi*, 674 F.3d 278, 283 (4th Cir. 2012) (mandate rule "compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court.").

Ultimately, Johnson's motion offers no persuasive reason for reducing his sentence—even if a reduction were authorized—given the gravity of his crimes. Even if the Fair Sentencing Act were applied, Johnson would still face statutory maximums of life for every count on which he received a death sentence for murder. His guideline range would remain unchanged at life imprisonment. He would still be eligible for a death sentence and the jury's decision to impose death sentences on all seven murder counts would still stand.

## IV.    Response to the Court's September 4, 2020, Order.

On September 4, 2020, the Court ordered the government to provide its position with regards to Johnson's First Step Act motion. (*See* ECF No. 46.) As noted above, the government

---

[4] Although Johnson's motion does not formally cite the Supreme Court's decision *in Atkins v. Virginia*, 536 U.S. 304 (2002), several of his secondary sources make reference to this decision. It bears mentioning that the Fourth Circuit's rejection of Johnson's mental status argument came two years after *Atkins* and acknowledged the Court's decision therein. *See Roane*, 378 F.3d at 408.

24

maintains that Johnson's death sentences cannot be reduced under § 404 of the First Step Act. His convictions under § 848(e) are not "covered offenses," and § 404 does not authorize a court to reduce the death sentences imposed by the jury. Even if that were not the case, this Court should exercise its discretion under the First Step Act, *see* First Step Act § 404(c), and deny Johnson's request for a sentence reduction due to the serious nature of his offenses and the risk he poses to the public.

Johnson stands convicted of seven murders under § 848(e). The details of the murders are distilled as follows:

- In mid-January 1992, Johnson and another individual used semi-automatic weapons to gun down Peyton Johnson at a tavern (Count 8). Peyton Johnson was a rival drug dealer. *Tipton*, 90 F.3d at 868. The medical examiner's report noted that Peyton Johnson was left with 15 gunshot wounds to his head, chest, and legs. PSR ¶ 73.

- Less than two weeks later, on January 29, 1992, Johnson murdered Louis Johnson (Count 11). *Tipton*, 90 F.3d at 869. Johnson approached Louis Johnson in an alley, and, believing him to have previously threatened him while acting as a body guard for a rival drug dealer, began shooting him. *Id*. While Louis Johnson lay on the ground, either Johnson or another codefendant shot him twice at close range. *Id*. Louis Johnson's body was found on the street with seven gunshot wounds, several of which were to his head and body. PSR ¶ 75.

- In early February 1992, Johnson murdered Bobby Long, Anthony Carter, and Dorothy Mae Armstrong (Counts 17, 18, and 19). Armstrong was murdered because she owed a drug debt to Johnson and Tipton and because "she knew too much" about their activities. PSR ¶ 85. The pair located Armstrong at her home, where she was hiding until she could repay her debts, and while Tipton acted as lookout, Johnson burst through the side door and shot her. PSR ¶ 86; *Tipton*, 90 F.3d at 869. Carter and Long were also killed as part of this attack, likely because they witnessed Armstrong's murder. PSR ¶ 87.

- In February 1992, Johnson murdered Curtis Thorne and Linwood Chiles (Counts 24 and 25). The murder involved Johnson and Tipton arranging to meet Thorne, Chiles, and Priscilla and Gwen Greene in an alley. Johnson then instructed Chiles to place his head on the steering wheel of his car and, with Tipton standing by, shot him at close range. *Tipton*, 90 F.3d at 869. Tipton also participated in this shooting. *Roane*, 378 F.3d at 389 n.6. Additional shots were fired at Thorne and the Greene sisters. *Id*. Thorne's autopsy report indicated

25

**APP.338**

that he had been hit by bullets from two different directions. *Id*. When police arrived at the scene, they found a male victim lying on the ground outside the rear passenger door and one of the Greene sisters on the curb several feet away. Chiles was found slumped over the steering wheel, with the other Greene sister to his right in the passenger seat. PSR ¶ 90. The Greene sisters were simply in the wrong place at the wrong time. PSR ¶ 92.

Johnson was also convicted of eleven counts of committing violent crimes in aid of racketeering activity under 18 U.S.C. § 1959. Two of those counts (Counts 29 and 30) related to the maiming of Gwen and Priscilla Greene during the attack on Chiles and Thorne. Two other convictions under § 1959 stemmed from Johnson's murder of Torrick Brown (Count 14) and wounding of Martha McCoy (Count 16). Johnson killed Brown due to his codefendant Roane's personal grievance. Namely, that Brown was "messing" with his girlfriend. *Tipton*, 90 F.3d at 891. Johnson and Roane located Brown as his apartment on the evening of February 1, 1992, and, armed with semi-automatic weapons, opened fire on Brown as he approached his doorway. *Id*. at 869. Brown was killed in the attack. McCoy was critically wounded and was likely shot due to her being a potential eyewitness to Brown's murder. *Id*. at 891. Johnson and Roane shot McCoy in front of her three children, aged two to seven, whom she was feeding at the moment Johnson began firing his weapon at Brown. PSR ¶ 78.

As is evident, the nature and circumstances of Johnson's offenses could hardly be worse. Johnson received numerous terms of life imprisonment and a death sentence on all seven murder counts. There is every reason to believe that a defendant who plotted and participated in violent murders, and callously attacked unrelated bystanders, poses a serious risk to public safety. Johnson's murders were deliberate and premeditated. The passage of time and new Congressional legislation cannot undo such grave acts. *See United States v. Umana*, 750 F.3d 320, 358 (4th Cir. 2014) (death penalty proportional to crime where defendant "killed two people in furtherance of a racketeering enterprise, … had killed before and posed a danger in the future.").

26

The Court also requested that the government provide the following information:

**A. The number of months and years of supervised release that it considers appropriate;**

The government believes that a lifetime period of supervised release would be appropriate should the Court reduce Johnson's sentence.

**B. The status of Johnson's educational and vocational training;**

Between 1999 and 2020, Johnson has taken numerous courses in prison, including:

1. Art courses (water color, colored pencil, charcoal pencil, and crochet);
2. Exercise courses (yoga and abdominal techniques); and
3. General educational and vocational courses (GED Self-Study and other unspecified GED courses).

**C. The status of any treatment pertaining to substance abuse or physical/mental health;**

The government is not aware of any mental or substance abuse treatment, or any other treatment that is germane to the issues in this motion.

**D. Johnson's post-sentencing conduct:**

The government is not aware of any prison infractions related to Johnson.

## Conclusion

For the reasons explained above, the Court should deny Johnson's First Step Act motion.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:    _____/s/_____
Richard D. Cooke
Joseph Attias
Assistant United States Attorneys

27

**APP.340**

**Certificate of Service**

I certify that on September 23, 2020, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.

By:    _____/s/_____

Joseph Attias
Assistant United States Attorney

28

**APP.341**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Richmond Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 3:92CR68 (DJN)** |
| | : | **CAPITAL CASE** |
| **COREY JOHNSON** | : | |
| | : | |
| **Defendant.** | : | |

**REPLY IN SUPPORT OF MOTION FOR A RECONSIDERATION OF SENTENCE**
**HEARING PURSUANT TO THE FIRST STEP ACT OF 2018**

David E. Carney, VA Bar # 43914
Donald P. Salzman*
Lotus D. Ryan, VA Bar # 71425
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Ph: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

Alexander C. Drylewski*
Judith A. Flumenbaum*
Skadden, Arps, Slate, Meagher & Flom, LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000

*Admitted Pro Hac Vice

*Counsel for Corey Johnson*

APP.342

## TABLE OF CONTENTS

I.     Mr. Johnson's Convictions Are Covered Offenses Subject to Reconsideration by a Sentencing Jury. ..................................................................................................1

     A.     Mr. Johnson's Convictions Under 21 U.S.C. § 848 Rest on Violations of 21 U.S.C. § 841(b)(1)(A), Which Is a Covered Offense ........................................1

     B.     The Government Is Not Helped by the Out-of-Circuit Cases It Cites.....................3

     C.     Mr. Johnson Is Entitled to Have His Capital Sentences Reconsidered by a Jury..................................................................................................................6

II.     Mr. Johnson's Mitigation Evidence Is Properly Considered by This Court or the Resentencing Jury .................................................................................................8

III.     The First Step Act and Fair Sentencing Act Were Intended to Correct Racial Disparities in Sentencing, as Exemplified by This Case ....................................12

**APP.343**

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Andrews v. United States*, 373 U.S. 334 (1963)..............................................................7

*Blockburger v. United States*, 284 U.S. 299 (1932)..........................................................2

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) .....................................................................9

*Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018)......................................................8

*Kimbrough v. United States*, 552 U.S. 85 (2007) ...........................................................12

*Lockett v. Ohio*, 438 U.S. 586 (1978) ...............................................................................9

*Richardson v. United States*, 526 U.S. 813 (1999) .........................................................13

*Skipper v. South Carolina*, 476 U.S. 1 (1986) .................................................................9

*United States v. Brown*, No. 3:08-CR-00011-1, 2020 WL 3106320 (W.D. Va. June 11, 2020) ...........................................................................................................1, 2, 5

*United States v. Chambers*, 956 F.3d 667 (4th Cir. 2020).........................................9, 10

*United States v. Davis*, No. 5:93-cr-30025, 2020 WL 1131147 (W.D. Va. Mar. 9, 2020), *appeal filed*, No. 20-6383 (4th Cir. Mar. 20, 2020)..........................................6

*United States v. Gravatt*, 953 F.3d 258 (4th Cir. 2020)................................................4, 8

*United States v. Guerrero*, 813 F.3d 462 (2d Cir. 2016) ..................................................4

*United States v. NJB*, 104 F.3d 630 (4th Cir. 1997) .........................................................2

*United States v. Snow*, 967 F.3d 563 (6th Cir. 2020)........................................................5

*United States v. Stitt*, 459 F.3d 483 (4th Cir. 2006)......................................................7, 8

*United States. v. Stitt*, 552 F.3d 345 (4th Cir. 2008)........................................................8

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996).....................................................2, 3

*United States v. Webster*, 639 F.2d 174 (4th Cir. 1981) .................................................13

*United States v. Wirsing*, 943 F.3d 175 (4th Cir. 2019)...................................................4

*Wiggins v. Smith*, 539 U.S. 510 (2003).............................................................................9

ii

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ............................................................9

**STATUTES**

18 U.S.C. § 3553 ............................................................................................... passim

18 U.S.C. § 3594 ..............................................................................................................8

21 U.S.C. § 841 .................................................................................................. passim

21 U.S.C. § 846 .............................................................................................................2, 3

21 U.S.C. § 848 .................................................................................................. passim

21 U.S.C. § 848(*l*) (1988) ............................................................................................7, 8

Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 ...........................................6, 7

Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 ..................................... passim

First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 ............................................... passim

**OTHER AUTHORITIES**

United States' Motion to Remand, *United States v. Maupin*, No. 19-6817 (4th Cir. Aug. 29, 2019), ECF No. 26 .......................................................................................................6

**APP.345**

The Government's Opposition to Defendant's Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act (the "Opposition") fails to provide a basis to deprive Mr. Johnson of the statutory relief afforded by the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.  The charges for which Mr. Johnson received his death sentences are covered offenses, and he is entitled to have his sentences reconsidered by a jury.  As Mr. Johnson has highlighted for this Court, he has substantial evidence, including his unblemished 27-year record of incarceration, to put before a sentencer that demonstrates a life sentence is sufficient, and not more than necessary, to meet the purposes of 18 U.S.C. § 3553(a)(2).  Accordingly, Mr. Johnson is eligible for reconsideration of his sentences on Counts 2, 8, 11, 17-19, 24, 25, 31, and 32 pursuant to Section 404 of the First Step Act, and he respectfully asks this Court to grant him a capital resentencing hearing before a jury.

I.     **Mr. Johnson's Convictions Are Covered Offenses Subject to Reconsideration by a Sentencing Jury.**

A.  **Mr. Johnson's Convictions Under 21 U.S.C. § 848 Rest on Violations of 21 U.S.C. § 841(b)(1)(A), Which Is a Covered Offense**

No matter how one looks at Mr. Johnson's convictions under § 848(e), they are covered offenses under the First Step Act.  As Mr. Johnson noted in his initial Memorandum in Support of Motion for Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 ("Memorandum"), the Western District of Virginia, this Court's sister jurisdiction, concluded that § 848 as a whole is a covered offense.  *See United States v. Brown*, No. 3:08-cr-00011-1, 2020 WL 3106320, at *4 (W.D. Va. June 11, 2020) (Section 848 is a covered offense *in toto* "because at least one of the penalties . . . was modified by Section 2 or 3 of the Fair Sentencing

**APP.346**

Act.").  The Government has not appealed that decision.  Nor has the Government addressed *Brown* in its Opposition and has, therefore, waived its opportunity to do so.[1]

Instead, while recognizing that § 848(e) may specifically rest on a § 841(b)(1)(A) predicate, the Government nevertheless argues that Mr. Johnson's § 848(e) convictions are not covered offenses because they rest on an alternative basis: a continuing criminal enterprise ("CCE").  Opposition at 13-14.  The Government's argument, however, is no more than a sleight of hand because, as the Fourth Circuit's opinion on Mr. Johnson's direct appeal makes clear, his CCE convictions rest on § 841(b)(1)(A) offenses.  *United States v. Tipton*, 90 F.3d 861, 891, 903 (4th Cir. 1996).

In that opinion, as the Government acknowledges, Opposition at 9, the Fourth Circuit vacated Count 1—conspiracy to distribute cocaine in violation of 21 U.S.C. § 846—on the basis that Count 1 was a lesser included offense of each of Mr. Johnson's § 848 charges.  *Tipton*, 90 F.3d at 891, 903.  The conspiracy charged in Count 1 was, in turn, based upon violations of § 841(b)(1)(A).  *See* Second Superseding Indictment at 2, Docket Entry 115 (Count 1 alleges Mr. Johnson did "possess with the intent to distribute, and to distribute . . . at least fifty (50) grams or more of a mixture or substance described in Title 21, United States Code, Section 841(b)(1)(A)(ii), which contains cocaine base.").  To have Count 1 be a lesser included offense of the § 848 offenses, all of the elements of Count 1 must have also been elements of § 848.  *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  ("[T]he test to be applied to determine

---

[1]    Without directly addressing *Brown*, the Government cites *United States v. NJB*, 104 F.3d 630 (4th Cir. 1997), for the proposition that § 848(e) is a separate offense, and not an integral part of an indivisible § 848 statute.  Opposition at 13.  This argument gets the Government nowhere.  In *Brown*, the court found that § 848(a), which does not itself specifically mention § 841(b)(1)(A), was nevertheless a covered offense.  Therefore, consistent with *Brown*, criminality under § 848(e) *does* specifically rest on violations of § 841(b)(1)(A).

*(cont'd)*

2

**APP.347**

whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.").

The direct appeal opinion further underscores that Mr. Johnson's CCE violation in Count 2 was based on a series of violations of § 841.[2] *Tipton*, 90 F.3d at 884.[3] In other words, the Fourth Circuit has specifically determined that the CCE conviction, on which Mr. Johnson's § 848(e) offenses were based were, in turn, based on drug distribution offenses charged under § 841(b)(1)(A). Thus, it is the law of this case that § 841(b)(1)(A) offenses were the predicates for the § 848(e) offense, which the Government is not free to dispute. Accordingly, Mr. Johnson's § 848(e) convictions are covered offenses.

## B. The Government Is Not Helped by the Out-of-Circuit Cases It Cites

While conceding that its position in this case does not align with the holdings of courts within the Fourth Circuit, Opposition at 14 n.1, the Government seeks to persuade this Court with out-of-circuit authority that § 848(e) is not a covered offense. The Government lacks any convincing basis for asking this Court to disregard relevant and well-reasoned authority for two inapposite cases from the Second and Sixth Circuit.

---

[2]    The Government does not dispute that Mr. Johnson's convictions for possession with intent to distribute in violation of § 841(a)(1)—Counts 31 and 32 of the indictment—are covered offenses. Opposition at 18 n.2.

[3]    As the Fourth Circuit explained in its direct appeal opinion, Count 2 "identified and incorporated by reference all violations of 21 U.S.C. §§ 841 and 846 charged against the appellants elsewhere in the indictment . . . , including the conspiracy charged [under § 846] in Count 1 [and] the drug distribution jointly charged [under § 841(b)(1)(A)] in Count 32." *Id.*; *see also* Second Superseding Indictment at 6, Docket Entry 115 (Count Two charges Mr. Johnson with "engag[ing] in a Continuing Criminal Enterprise, that is, . . . violat[ing] Title 21, United States Code, Section 841 and 846" as "part of a continuing series of violations.").

*(cont'd)*

3

**APP.348**

The Government cites *United States v. Guerrero*, 813 F.3d 462 (2d Cir. 2016), for the proposition that because Mr. Johnson possessed the requisite quantity of crack under § 841(b)(1)(a) at the time the § 848 offense was committed, his liability under § 848(e)(1)(a) is unchanged. Opposition at 15-16.[4] However, *Guerrero*, which predates the First Step Act, is inapposite. In *Guerrero*, the defendant was convicted prior to, but sentenced after, the enactment of the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372, and argued on appeal for vacatur of his conviction based on retroactivity of the Fair Sentencing Act, which was prospective only. *Id.* at 464-65. *Guerrero* does not address, and bears no relevance to, a court's "covered offense" determination for purposes of resentencing under the First Step Act.

Moreover, the Government's position is inconsistent with the remedial purpose of the First Step Act, which was based on the recognition that sentences for crack offenses prior to enactment of the Fair Sentencing Act were too severe. *See, e.g.*, *United States v. Gravatt*, 953 F.3d 258, 260 (4th Cir. 2020). Congress enacted the Fair Sentencing Act "in response to extensive criticism about the disparity in sentences between crack cocaine offenses and powder cocaine offenses." *Id.* (quoting *United States v. Black*, 737 F.3d 280, 282 (4th Cir. 2013)). Congress also enacted the First Step Act to address "disparities between sentences for crack cocaine offenses and powder cocaine offenses [that] remained for defendants sentenced before . . . the effective date of the Fair Sentencing Act." *Id.*; *see also Wirsing*, 943 F.3d at 186 ("Congress's clear intent was to apply the Fair Sentencing Act to pre-Fair Sentencing Act

---

[4]    The Fourth Circuit has held that—in the absence of a plea statement or special jury verdict specifying the amount of a drug that was distributed—a court may not make its own finding, regardless of the evidence presented by the Government at trial. *United States v. Wirsing*, 943 F.3d 175, 181 (4th Cir. 2019). There was no such special jury verdict in Mr. Johnson's case.

4

offenders."). Thus, the Government's reliance on *Guerrero* is both misplaced and inconsistent with the legislative purpose of the statute.

Next, the Government relies on *United States v. Snow*, 967 F.3d 563 (6th Cir. 2020), to argue that § 848(e)(1)(A) is not a "covered offense" because it constitutes a separate offense, not a sentencing enhancement, and thus under the Fair Sentencing Act modifications, Mr. Johnson would be subject to a vacatur of his conviction instead of a lower sentencing range. As an initial point, the Government's position that § 848(e)(1)(A) constitutes a separate offense is unpersuasive. *See, e.g.*, *Brown*, 2020 WL 3106320, at *3-4 (explaining that the most "straightforward" understanding of § 848 is that the "statute of conviction is § 848 as a whole," with the specific subsections setting forth the penalties) (citing *United States v. Smith*, 954 F.3d 446, 450 (1st Cir. 2020))).

Most importantly, Mr. Johnson has not argued that the Fair Sentencing Act modifications to § 841(b)(1)(A) render him not guilty under § 848(e)(1)(A) or that his convictions should be vacated under the First Step Act. Mr. Johnson simply argues that his convictions are "covered offenses" under the First Step Act because they are based on violations of § 841(b)(1)(A)— which the Fair Sentencing Act modified—and thus his sentences are subject to reconsideration, just as the First Step Act contemplates. Indeed, after considering the necessary sentencing factors, the sentencer may impose the same sentence that Mr. Johnson currently has, or a reduced sentence, if that reduced sentence is "sufficient, but not more than necessary" to effectuate the goals described in 18 U.S.C. § 3553. *See* Pub. L. No. 115-391, § 404(c), 132 Stat. 5194, 5222 (2018) ("Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section."). Thus, the Government's reliance on *Snow* is also unpersuasive.

5

Furthermore, the Government has conceded in similar cases that "covered offenses" include those that were indirectly modified by sections 2 and 3 of the Fair Sentencing Act because they rested on a violation of § 841(b)(1)(A). *See, e.g.*, United States' Mot. to Remand at 8, *United States v. Maupin*, No. 19-6817 (4th Cir. Aug. 29, 2019), ECF No. 26 (agreeing that RICO conviction was a "covered offense" under the First Step Act because the violation rested on a predicate offense involving the distribution of crack cocaine); *United States v. Davis*, No. 5:93-cr-30025, 2020 WL 1131147, at *2 (W.D. Va. Mar. 9, 2020) ("The government acknowledges that the defendant is eligible for a sentence reduction under the 2018 FSA for . . . Count Two due to § 848's requirement of a § 841(b)(1)(A) violation."), *appeal filed*, No. 20-6383 (4th Cir. Mar. 20, 2020).

**C. Mr. Johnson Is Entitled to Have His Capital Sentences Reconsidered by a Jury**

The Government's contention that the First Step Act is inapplicable to capital offenses lacks merit.

First, the Government spends several pages of its Opposition attacking a position that Mr. Johnson has not taken in this litigation—that the "First Step Act permits courts[5] to disturb jury-imposed death sentences as an exercise of discretion under § 404(b)." Opposition at 18-20. In opposition to Mr. Johnson's request for resentencing, the Government contends that the "First Step Act did not displace § 848(e)'s detailed provisions concerning imposition of the death penalty." *Id.* at 18. Mr. Johnson, though, has not argued that any of these detailed provisions are displaced by the First Step Act. To the contrary, because Mr. Johnson's § 848(e) offenses are covered offenses for purposes of the First Step Act, he requests jury consideration consistent with the provisions of the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (the

---

[5]    The Government here apparently means a district court judge.

6

"ADAA"). Specifically, the applicable ADAA provisions state that: (1) a sentencing jury must be impaneled pursuant to § 848(i); (2) the sentencing jury receives aggravating and mitigating evidence pursuant to § 848(j); and (3) the sentencing jury determines whether a sentencing reduction from death to life imprisonment is appropriate, consistent with the provisions of § 848(k). If the sentencing jury determines that a reduction to a life sentence is appropriate, a court must impose the sentence determined by the jury pursuant to § 848(*l*) (1988) (repealed 2006).

Contrary to the Government's claim, the First Step Act does not bar resentencing in capital cases. The Fourth Circuit has recognized that when Congress passes a law that confers rights on capital and noncapital defendants and the wording of the law fails to consider the special and necessary aspects of capital jurisprudence, courts have an obligation to shape equitable relief for the capital defendants notwithstanding that the express statutory language of a statute only provides a mechanism for relief to non-capital defendants. *United States v. Stitt*, 459 F.3d 483, 485 (4th Cir. 2006) ("*Stitt IV*") (holding that because *Andrews v. United States*, 373 U.S. 334 (1963), required resentencing before a grant of relief pursuant to § 2255 could be appealed in a non-capital case, the same requirement necessarily applied in a capital case). In other words, capital resentencing can, and must, be done by a jury pursuant to the First Step Act notwithstanding the Government's contention that the First Step Act does not apply to capital cases.

The Government points to nothing in the plain language of the First Step Act or in the legislative history to suggest that capital cases were meant to be excluded from relief. Nor does the Government offer statutory or case law support to establish that capital defendants are not entitled to a jury resentencing under the First Step Act. The purpose of the statute is to provide

**APP.352**

for resentencing consideration for defendants sentenced under a regime that sentenced too harshly those defendants convicted of crack-related offenses. *See, e.g.*, *Gravatt*, 953 F.3d at 260. Under the holding of *Stitt IV*, and absent any evidence of legislative intent to the contrary, the First Step Act should not be read to exclude covered capital offenses or capitally-sentenced prisoners from resentencing consideration.

In this regard, the Government fails the tests of two of the cases upon which it relies. Opposition at 5 (citing *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018)), 18-19 (citing *United States v. Stitt*, 552 F.3d 345 (4th Cir. 2008) ("*Stitt V*")). First, the Government, and not Mr. Johnson, seeks to suggest that the First Step Act and § 848(*l*) (1988) (repealed 2006) (and 18 U.S.C. § 3594) cannot be harmonized. Given this, it is the Government's "heavy burden" to show that Congress intended the disharmony, *Epic Sys.*, 138 S. Ct. at 1624, and the Government fails to carry the burden. Second, the Government, not Mr. Johnson, is resisting the effort to empanel a new sentencing jury, despite the fact that such a result is consistent with the First Step Act and compelled by § 848(*l*) (1988) (repealed 2006) (and § 3594). The Government's approach in Mr. Johnson's case is the same flawed approach that led the Fourth Circuit to reverse in *Stitt IV*, and Mr. Johnson respectfully suggests this Court should reject the Government's position here.

## II.    Mr. Johnson's Mitigation Evidence Is Properly Considered by This Court or the Resentencing Jury

In its Opposition, the Government misapprehends Mr. Johnson's purposes in highlighting his mitigation evidence. The First Step Act and the Fourth Circuit's cases interpreting and implementing the Act make clear that once a defendant has demonstrated he or she has committed a covered offense, that defendant is entitled to have a sentencer consider all evidence going to "the nature and circumstances of the offense and the history and characteristics of the

8

defendant," 18 U.S.C. § 3553(a)(1), to determine a sentence that is "sufficient, but not greater than necessary" to effectuate the purposes of § 3553(a)(2). *United States v. Chambers*, 956 F.3d 667, 674-75 (4th Cir. 2020) ("[T]here are generally no limitations on the types of character and background information a court may consider.").

In his initial Memorandum, Mr. Johnson sketched out four categories of evidence he intends to put before a sentencer to make this determination. Each of the four categories Mr. Johnson highlighted is an appropriate factor for a sentencer to consider, and these categories have also long been recognized as relevant to capital sentencing determinations. Capital sentencing determinations "require that the sentencer . . . not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original). "A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). While individualized sentencing in non-capital cases reflects "simply enlightened policy," in capital cases, "the fundamental respect for humanity underlying the Eighth Amendment" makes such consideration "constitutionally indispensable." *Id.* The Supreme Court has long held that this includes consideration of a defendant's age, difficult family history, and emotional disturbance, *Eddings v. Oklahoma*, 455 U.S. 104, 113 (1982), his record as a well-behaved and well-adjusted prisoner, *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986), and his disadvantaged background and diminished mental capacity, *Wiggins v. Smith*, 539 U.S. 510, 512-13 (2003).

9

**APP.354**

While Mr. Johnson provided a description of his evidence to give this Court the flavor of the evidence he would present to a jury in his initial Memorandum, he highlights a few points about these categories in reply.

First, although much of the evidence Mr. Johnson has highlighted in his Memorandum was presented at trial, a resentencing decision must be based upon all of the evidence now available. *Chambers*, 956 F.3d at 675 ("Having concluded that the § 3553(a) factors apply in the § 404(b) context, post-sentencing evidence 'may be highly relevant to several of [those] factors.'") (quoting *Pepper v. United States*, 562 U.S. 467, 491 (2011)).  This includes the fact, acknowledged by the Government, that he has a 27-year unblemished record in prison—stark evidence that he is not a danger in prison.  Memorandum at 34-36; Opposition at 27.[6]  At the time of his trial and initial penalty-phase hearing, the jury had no such evidence on which to base its sentencing decision, but this is often a powerful determiner of sentences for courts and juries.

Second and notably, the Government does not respond to most of Mr. Johnson's other evidence in support of imposing a reduced sentence after reconsideration of the § 3553 factors, including (1) the abuse and neglect he suffered at the hands of his caretakers; (2) his persistent school failure and inability to learn; (3) his mother's abandonment of him; (4) his discharge into the community after a residential stay without independent living skills or support; and (5) his vulnerability to being manipulated by others in light of his desire to be accepted.  Memorandum at 13-33.

---

[6]  Section 3553(2)(C) states that a sentencer should consider the sentence sufficient "to protect the public from further crimes of the defendant."  In its Opposition, the Government notes it "is not aware of any prison infractions related to Johnson."  Opposition at 27 (observing also Mr. Johnson's participation in art, exercise, and general educational classes including water color, colored pencil, charcoal pencil, crochet, yoga, abdominal techniques, and GED courses).

Third, the Government comments only on the issue of Mr. Johnson's intellectual impairments, dismissing it on the basis that "a First Step Act motion is not a vehicle to raise arguments of a defendant's mental health at the time of his offense conduct and sentencing." Opposition at 22.  Actually, the First Step Act is precisely a vehicle for presenting any and all evidence that would mitigate the sentence a defendant received, which includes arguments about his mental health and impairments.  Whether or not Mr. Johnson will eventually be permitted to argue to a jury that, under current medical and legal standards, he should be deemed intellectually disabled, he is not making that argument here.  He has only described in his First Step Act motion his history: as a child, teenager and young adult who was never able to read beyond a second- or third-grade level or to count money; soiled his bed until adolescence; was deemed by the professionals who ran the institutional home to which he was sent when his mother abandoned him to be among the most severely impaired special needs child they had ever worked with; was consistently in special education classes and was unable to pass school competency tests.  Memorandum at 18-31.  Section 3553(a)(1) specifically instructs a court to consider a defendant's history and Mr. Johnson's mental impairments are a critical aspect of his history.

Mr. Johnson acknowledges that the crimes he committed were extremely violent and caused great pain, and that for them he must never leave prison.  However, across the country, prosecutors have chosen not to seek death, and courts and juries have determined not to impose death, on defendants who committed crimes that were equally aggravated.  Memorandum at 36-38.  This includes Mr. Johnson's own co-defendant, Vernon Lance Thomas, for whom the

11

**APP.356**

Government itself withdrew its request for a death sentence despite his being guilty of four CCE murders,[7] presumably because of Mr. Thomas's own borderline intellectual disability.[8]

Mr. Johnson's struggles and impairments and his model incarceration history are highly relevant considerations to any decision about his sentence; he should not be foreclosed from raising any of them.

### III.    The First Step Act and Fair Sentencing Act Were Intended to Correct Racial Disparities in Sentencing, as Exemplified by This Case

Finally, the Government argues that penalties for crack-related offenses were changed because of findings that crack is associated with less violence than previously thought, and that this rationale undermines Mr. Johnson's request for reconsideration of his sentences for his § 848 convictions.  Opposition at 3.  However, the Government's reasoning warps the purpose of both the First Step Act and the Fair Sentencing Act, which were enacted to improve the vastly disparate racial impact of the previous sentencing guidelines pertaining to crack versus powder cocaine.[9]

These race disparities are evident in Mr. Johnson's case, which concluded 17 years prior to the passage of the Fair Sentencing Act.  The CCE statute pursuant to which he was prosecuted "is sometimes called 'the kingpin statute' because it is designed to apply to ringleaders of large-

---

[7]    Memorandum at 36-38.

[8]    Mr. Thomas presented evidence to the Government pre-trial that he had an IQ of 71.  *Id.* at 36-37; Mem. Ex. 31, ECF No. 39-32.

[9]    At the time Mr. Johnson was sentenced in this case, the sentencing disparity between crack and powder cocaine fell most heavily on African-American defendants.  *See, e.g.*, *Kimbrough v. United States*, 552 U.S. 85, 98 (2007) (noting Sentencing Commission's finding that "[a]pproximately 85 percent of defendants convicted of crack offenses in federal court are black; thus the severe sentences required by the 100-to-1 ratio are imposed primarily upon black offenders" (citation omitted)).

12

scale illegal narcotics operations." *United States v. Webster,* 639 F.2d 174, 180 (4th Cir. 1981); *see also Richardson v. United States,* 526 U.S. 813, 819 (1999).  Just as Mr. Johnson's motion does not impact the validity of his § 848 convictions, the racial injustice landscape for the Fair Sentencing Act and the First Step Act does not invalidate his § 848 drug kingpin convictions. However, the racial injustice backdrop is relevant to the sentencer because it provides context to understand Mr. Johnson's particular situation.  For example, despite Mr. Johnson's involvement in drug distribution activities, he had no assets and was described as living in squalor during the period when he was engaged in drug trafficking, including in Trenton and in Richmond.

The Presentence Investigation Report (the "PSR") confirms that Mr. Johnson had a "net worth of zero and no liquid assets."  PSR at 29.  Indeed, Mr. Johnson's living conditions in Trenton, New Jersey, where he lived for the majority of the drug conspiracy, are described as a "'shack' that appeared to be a crack house," a "a real hovel" that was "old, dark, and dirty," that "was occupied at times by as many as 15-20 guys," and was "never very clean" with "Chinese take-out boxes [ ] strewn all over the house."  Mem. Ex. 6, ECF No. 39-7; Mem. Ex. 16, ECF No. 39-17.  Mr. Johnson had no car, no substantial jewelry and no items of substantial value, and he could not afford to rent an apartment, let alone own a home.  1/27/93 Tr. 2737:21-24, 2738:2-9 (identifying Mr. Johnson's "expensive" possessions as  "Timberland boots and Guess jeans") (Ex. A); 6/1/93 Tr. 16:24 - 17:17 (Defense closing argument) (Ex. B); 1/13/93 Tr. 861:5-17 (Defense opening statement) (Ex. C).  This is certainly mitigating evidence that a jury should consider when determining whether a sentence reduction is appropriate in Mr. Johnson's case, in addition to the compelling evidence regarding his childhood, upbringing, and mental capacity.

## CONCLUSION

For the reasons set forth above and in Mr. Johnson's Memorandum, Mr. Johnson respectfully requests that this Court conclude that his convictions under Counts 2, 8, 11, 17-19, 24, 25, 31, and 32 are covered offenses under Section 404 of the First Step Act and grant him a capital resentencing hearing.

Dated: October 8, 2020                    Respectfully submitted,


/s/
David E. Carney, VA Bar # 43914
Donald P. Salzman*
Lotus D. Ryan, VA Bar # 71425
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

Alexander C. Drylewski*
Judith A. Flumenbaum*
Skadden, Arps, Slate, Meagher & Flom, LLP
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000

*Admitted Pro Hac Vice

*Counsel for Corey Johnson*

14

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of October 2020, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will then send notification of such

filing to all parties and counsel included on the Court's Electronic Mail notice list.

/s/_____

David E. Carney, VA Bar # 43914
Skadden, Arps, Slate, Meagher & Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

**APP.360**

**INDEX OF EXHIBITS TO REPLY IN SUPPORT OF
MOTION FOR A RECONSIDERATION OF SENTENCING HEARING
PURSUANT TO THE FIRST STEP ACT OF 2018**

| Exhibit No. | Description |
|---|---|
| A | 01/27/93 Tr. 2737-2738 |
| B | 06/01/93 Tr. 17 |
| C | 01/13/93 Tr. 861 |

**APP.361**

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------

UNITED STATES OF AMERICA,


                              Plaintiff;

       v.                                    CRIMINAL ACTION
                                                  92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

----------------------------------------
                    VOLUME XII

                 January 27, 1993
                 Richmond, Virginia
                    10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                   JEFFREY B. KULL
               OFFICIAL COURT REPORTER

                    P-R-O-C-E-E-D-I-N-G-S
          THE CLERK:  Case Number 92CV68: United
States of America versus Richard Tipton, Cory

A    I actually saw.
Q    You actually saw it.  Was it someplace other than your home?
A    Yes.
Q    Where was it?
A    It was at Nita's house.
Q    How often were you at Nita's house?
A    Almost every day.
Q    Who was taking care of your children while you were at Nita's house?
A    They were there with me.

2737

Q    With you?
A    Yes.
Q    So drug dealing was taking place in front of your children, correct?
A    No.
Q    If they were there and drug dealing was taking place, were they in another room, what?
A    They were outside.
Q    Did you leave them out in the car while the dealing took place?
A    No.
          MR. VICK:  No need to get offensive.
          THE COURT:  Mr. McGarvey, go on.  Ask some more questions.
          MR. McGARVEY:  I asked the question, Your Honor.  I would ask her to answer.
BY MR. McGARVEY:
Q    Where were your kids when the drug dealing was going on at Nita's house?
A    Outside playing with other kids.
Q    With respect to Mr. Johnson, did Mr. Johnson own a lot of diamonds, jewelry, gold, anything like that?
A    No.
Q    Did he have expensive clothes?  I saw the black

2738

hooded sweatshirt; did he own expensive clothes?
A    What he had was expensive.
Q    The black hooded sweatshirt was expensive?
A    No, but the Timberland boots and Guess jeans were expensive clothing.
Q    Guess jeans and Timberland boots.
A    Yes.
Q    Did he have an automobile?
A    No.
Q    He borrowed your automobile?
A    Yes.
Q    When you were asked and then pressed by Mr. Vick for an amount of money that you had seen, first you said that you didn't know.  And then he said "more than a hundred" and you agreed.  And then "up to a thousand  --"

**APP.364**

# EXHIBIT B

APP.365

8C

1 #

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

------------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

        v.                              CRIMINAL ACTION
                                        92CV68
RICHARD TIPTON, CORY JOHNSON, and
JAMES H. ROANE, JR.,

                              Defendants.

------------------------------------------

                    June 1, 1993
                  Richmond, Virginia
                     9:30 a.m.

FILED
JUN 2 9 1993
D-PHB
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

BEFORE:          HONORABLE JAMES R. SPENCER
                 United States District Judge

APPEARANCES:     HOWARD C. VICK, JR., ESQ.
                 WILLIAM H. PARCELL, III, ESQ.
                 Office of the United States Attorney
                 Main Street Centre
                 Richmond, Virginia  23219
                         Counsel for Government;

                 ROBERT P. GEARY, ESQ.
                 ERIC D. WHITE, ESQ.
                 CRAIG S. COOLEY, ESQ.
                 JOHN McGARVEY, ESQ.
                 DAVID P. BAUGH, ESQ.
                 ARNOLD R. HENDERSON, V, ESQ.
                         Counsel for Defendants.

                   JEFFREY B. KULL
                 OFFICIAL COURT REPORTER

4862

16#

Good morning.  Counsel, have you all had an adequate opportunity to review the pre-sentence report and discuss it with your client?

MR. COOLEY:  We have, Your Honor.

THE COURT:  Do you have any objections, comments, or amendments to the Presentence Report?

MR. COOLEY:  Yes, Your Honor.

THE COURT:  All right.

MR. COOLEY:  As the Court knows, we filed a position paper regarding the sentencing factors, and we raised principally the two issues of the exaggerated quantity of cocaine that was allegedly distributed.  I would adopt the comments made by counsel for Mr. Tipton, but I would also note to the Court that while counsel for the government indicates there was testimony from Mr. Townes, Mr. Saunders regarding the quantity that was being distributed by them and by others, the Court will also recall that their testimony related to at the conclusion of each month when there was a necessity for the five folks living at that one home to contribute the $100 for their share of the rent.  They didn't have it and they often fought over it.

The Court will also recall from the evidence that came before you that there was absolutely no

4877

17

testimony relating to the accrual of funds, of assets for any of the three individuals, specifically with Cory Johnson. No cars, no substantial jewelry, no items or assets of any value whatsoever. Indeed, when pressed, each of the witnesses, most, said they couldn't identify anything that he had as to Cory Johnson, and one ultimately said to the jury that what he had was nice, and when questioned further, she said it was a Guess shirt and a pair of Timberland boots. That's the totality of the assets described and attributed to Mr. Cory Johnson out of this purported 42, and in addition to 42-and-a-half kilograms of cocaine. And I would suggest to the Court that the lifestyle that was proven by the government's witnesses contradicts the government's theory as to the quantity of the drugs that were being distributed.

Your Honor, in addition to that issue, we have raised the jeopardy issues or the issues that the Court has already addressed and ruled upon. I would simply note to the Court that in challenging whether the sentences could be imposed upon the counts that were related to the murders in furtherance of racketeering, that while it certainly could be, I believe, under the government's theory that if

4878

# EXHIBIT C

MR. HENDERSON:  Judge, in light of the order the Court sent, I have previously made arrangements to have a hearing in Richmond at 9 o'clock in the morning.  I don't know that I will be able to be here by 9:30.

MR. WHITE:  We really don't have that more to pick.

THE COURT:  We can do it without you.  I think we will be fine.  62.  We might get enough.

(Proceedings adjourned at 6:31 p.m.)

IN THE  UNITED  STATES  DISTRICT  COURT
FOR  THE  EASTERN  DISTRICT  OF  VIRGINIA
RICHMOND  DIVISION

------------------------------------------

UNITED STATES OF AMERICA,

                              Plaintiff;

    v.                              CRIMINAL ACTION
                                    92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                              Defendants.

------------------------------------------
                    VOLUME III

                              January 13, 1993
                              Richmond, Virginia
                                10:00 a.m.

BEFORE:          HONORABLE JAMES R. SPENCER
                 United States District Judge


APPEARANCES:     HOWARD C. VICK, JR., ESQ.
                 WILLIAM H. PARCELL, III, ESQ.
                 Office of the United States Attorney;
                      Counsel for Government;

                 ROBERT P. GEARY, ESQ.
                 ERIC D. WHITE, ESQ.
                      Counsel for Defendant Tipton;
                 CRAIG S. COOLEY, ESQ.
                 JOHN F. McGARVEY, ESQ.
                      Counsel for Defendant Johnson;
                 DAVID P. BAUGH, ESQ.
                 ARNOLD R. HENDERSON, V, ESQ.
                      Counsel for Defendant Roane;
                 ROBERT J. WAGNER, ESQ.
                      Counsel for Defendant Reavis.
                      JEFFREY B. KULL
                 OFFICIAL COURT REPORTER.

(January 13th, 1993 at 9:35 a.m.  United States versus Richard Tipton, et al., the third day of trial.)

(A juror entered Chambers.)

THE COURT:  This is Ava K. Holloway.

BY THE COURT:

Q    Ms. Holloway, just have a seat.  Ms. Holloway, I have got to ask you a few questions.  And before I ask these questions of you, I need to give you some information.  What I want you to understand is that this is a trial that could possibly proceed in two stages.  The first stage is when the government would put on its evidence in an attempt to prove the defendants guilty beyond a reasonable doubt.  Now, you would listen to all of that evidence, I would advise you as to the law, the jury would go out and decide whether or not the defendants are guilty or not guilty.  That's the first stage.

The second stage is if you all were to find the defendants guilty of certain of these charges, then we would proceed to a sentencing or penalty phase.  This is the second stage.  This is when the government would have the opportunity to present or bring to your attention aggravating evidence, try to convince you that the death penalty is appropriate in this case.  The defense would have the opportunity to

Mr. Gaiters being a capital defendant.

MR. COOLEY: That might be true of the government. His actions qualify him is what I said, Judge, and that's evidence.

THE COURT: I think that's fair.

MR. COOLEY: Sterling Hardy is another one of the government's bounty hunters. In his opening statement, Mr. Vick said, "not an angel of a man." That is truly a masterful understatement. The information is that Sterling Hardy participated in the events of these killings. The government's information is that Sterling Hardy personally directed the killing of Linwood Chiles. Sterling Hardy, by his actions, is subject to the potential of capital punishment. But no more. No more. Because he is a bounty hunter who has joined the team.

There are 30 other felons, convicted or admitted, also looking for their reward, their silver, their money, their immunity, their 5K. They will allege that these young folks, all of these young folks, are members of an ongoing Continuing Criminal Enterprise and that they reaped substantial income. But the evidence will belie that, ladies and gentlemen. Cory Johnson came to Richmond in October of 1991, October of 1991, for the first time. Cory knew Richard Tipton, but he never met James Roane until December or later, December of 1991 or later. Cory owned no car. You are not going to hear any witness testify Cory had a car. Cory had owned no truck. He had no BMW, no Mercedes. He didn't even have a 1979 Pontiac. He had no vehicle. Cory, I think you will hear, owned no house, couldn't rent an apartment, generally lived with four, five, sometimes seven and eight other folks in an apartment. Cory, the evidence will show, had no bank account, no substantial cash holdings. Cory had no flashy clothes, no jewelry. Cory had not even small assets, much less substantial assets, as the government alleges and must prove to establish the Continuing Criminal Enterprise.

MR. VICK: That's a misstatement, also. We need not prove substantial assets. We need only prove there was substantial income, money generated.

THE COURT: That is correct. The objection will be sustained.

BY MR. COOLEY:

Q    I apologize. That's correct. The evidence will show, ladies and gentlemen, that Cory Johnson was not a member of a Continuing Criminal Enterprise. The evidence from the bounty hunters will suggest that Cory was involved in some street-level sales. But a kingpin? Never. A manager? Never. Supervisor?

**APP.372**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

v.                                                          Criminal No. 3:92cr68 (DJN)

JAMES H. ROANE, JR.,
        Defendant.

**MEMORANDUM OPINION**

Convicted serial killer James H. Roane, Jr. ("Defendant" or "Roane") comes before the

Court with a Motion for Imposition of a Reduced Sentence Pursuant to Section 404 of the First

Step Act (ECF No. 17) in a last ditch effort to avoid the just punishment imposed on him for his

role in killing multiple people in furtherance of his drug enterprise. Defendant has challenged

his convictions and sentences on numerous occasions throughout the years. But each time they

survived appellate review. Defendant now seeks to latch onto laws passed to reduce the

sentencing disparities between non-violent crack and powder cocaine offenses as a vehicle to

reduce his sentences imposed for multiple drug-related murders. But those murders, and the

statute under which a jury convicted Defendant for them, have nothing to do with the penalties

for drug quantities that the First Step Act addressed. Because the First Step Act does not cover

the offenses for which a jury convicted Defendant, the Court will deny his Motion.

**I.      BACKGROUND[1]**

**A.      Factual Background**

Defendant, along with Richard Tipton ("Tipton") and Cory Johnson ("Johnson")

---

[1]    The Court takes these background facts from the Fourth Circuit's opinion in *United States v. Roane*, 378 F.3d 382 (4th Cir. 2004), which recited the factual summary *in haec verba* from *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), the opinion on the defendants' direct appeal.

(collectively, the "partners"), ran a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992. *Roane*, 378 F.3d at 389. The partners in the conspiracy obtained wholesale quantities of powder cocaine from suppliers in New York City, converted it into crack cocaine, divided it among themselves and then distributed it through a network of 30-40 street level dealers. *Id.* at 389-90. Typically, the partners took two-thirds of the proceeds realized from the street-level sales of their product. *Id.* at 390.

Over a short time in early 1992, the partners took part, in some form, in the murders of ten persons in the Richmond area. *Id.* These murders occurred "in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the 'partners.'" *Id.* The murders described below directly implicated Defendant.

On January 4, 1992, Roane and Tipton drove Douglas Talley, an underling in disfavor for mishandling a drug transaction, to the south side of Richmond. *Id.* Roane grabbed Talley and Tipton stabbed him repeatedly for three to five minutes. *Id.* Talley died from eighty-four stab wounds to his head, neck and upper body. *Id.*

On January 13, 1992, Roane and Tipton went to the apartment of Douglas Moody, a suspected rival in their drug-trafficking area, and Tipton shot Moody twice in the back. *Id.* Roane chased down the fleeing Moody and stabbed him eighteen times, killing him. *Id.*

On January 14, 1992, Roane and Johnson located Peyton Johnson, another rival drug dealer, at a tavern. *Id.* Shortly after Roane left the tavern, Cory Johnson entered and fatally shot Peyton Johnson. *Id.*

On January 29, 1992, Roane pulled his car around the corner of an alley, got out and shot

2

Louis Johnson, who had threatened one of the partners while acting as a bodyguard for a rival drug dealer. *Id.* Roane first shot Louis Johnson, and then Cory Johnson and Lance Thomas ("Thomas") got out of Roane's car and shot Louis Johnson again. *Id.* Louis Johnson died from these gunshot wounds. *Id.*

On February 1, 1992, Roane, Johnson and Thomas went to the apartment of Torrick Brown, who had given Roane trouble. *Id.* After the three men knocked on the apartment door, Brown's half-sister opened the door and summoned Brown. *Id.* The three men opened fire with semiautomatic weapons, killing Brown and critically wounding his half-sister. *Id.*

### B.    Verdict and Sentencing

In January and February of 1993, United States District Judge James R. Spencer presided over the trial of Defendant and his co-conspirators. Defendant[2] faced capital murder charges for Murder in Furtherance of a Continuing Criminal Enterprise ("CCE") under 21 U.S.C. § 848(e)(1)(A) for three of these killings — Moody (Count Five), Peyton Johnson (Count Eight) and Louis Johnson (Count Eleven) (collectively, the "Capital Murder Counts" or "Capital Murder Convictions"). *Id.* at 391; (Second Superseding Indictment ("Indictment") (Dkt. No. 115) at 7-10). On February 3, 1993, the jury convicted him of all three Capital Murder Counts. 378 F.3d at 391. The jury also convicted Defendant of participating in a Conspiracy to Possess Cocaine Base with the Intent to Distribute, in violation of 21 U.S.C. § 846 (Count One), and engaging in a CCE, in violation of 21 U.S.C. § 848(a) (Count Two). *Id.*; (Indictment at 1-6.) Additionally, the jury convicted Defendant of five counts of Committing Acts of Violence in Aid of Racketeering ("VICAR"), in violation of 18 U.S.C. § 1959 (Counts Seven, Ten, Thirteen, Fourteen, Sixteen), and four counts of Using a Firearm in Relation to a Crime of Violence or a

---

[2]    The Court tried Roane, Tipton and Johnson along with four other defendants on a thirty-three-count superseding indictment.

3

Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c) (Counts Six, Nine, Twelve, Fifteen). 378 F.3d at 392; (Indictment at 8-13). Finally, the jury convicted Defendant of one count of Possession of Cocaine Base with the Intent to Distribute, in violation of 21 U.S.C. § 841(a)(1) (Count Thirty-Two (the "Drug Distribution Count" or the "Drug Distribution Conviction")). 378 F.3d at 392; (Indictment at 21). Defendant's First Step Act Motion pertains only to the Capital Murder Counts and the Drug Distribution Count.

On February 16, 1993, following a penalty hearing on the Capital Murder Counts, the jury recommended that Defendant be sentenced to death for the murder of Moody. 378 F.3d at 392. On June 1, 1993, pursuant to 21 U.S.C. § 848(l), the Court sentenced Roane to death for Count Five. *Id.* Relevant here, the Court also sentenced Defendant to life imprisonment for each of the Capital Murder Convictions that he did not receive a death sentence — Counts Eight and Eleven. *Id.* Defendant also received a life imprisonment sentence for the CCE conviction in Count Two, life sentences for Counts Seven, Ten, Thirteen and Fourteen, and a forty-year term of imprisonment on Count Thirty-Two, the Drug Distribution Count, all to run concurrently with the other sentences imposed. *Id.*; (Dkt. No. 594).[3][4]

---

[3]    The jury convicted Richard Tipton of six counts of Murder in Furtherance of a CCE (Counts Three, Seventeen, Eighteen, Nineteen, Twenty-Four, Twenty-Five); one count of participating in a Conspiracy to Possess Cocaine Base with Intent to Distribute (Count One); one count of engaging in a CCE (Count Two); eight counts of VICAR (Counts Four, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Seven, Twenty-Eight, Twenty-Nine, Thirty); two counts of Use of a Firearm in Relation to a Crime of Violence or Drug Trafficking Offense (Counts Twenty, Twenty-Six); and two counts of Possession with Intent to Distribute Crack Cocaine (Counts Thirty-Two, Thirty-Three). (Dkt. No. 592.)

The jury recommended a death sentence as to each of Counts Three, Twenty-Four and Twenty-Five. In addition to the death sentences, the Court sentenced Tipton to sentences of life imprisonment for Counts Two, Four, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Seven and Twenty-Eight. Tipton received a sentence of forty years' imprisonment for Count Thirty-Two, thirty years' imprisonment for each of Counts Twenty-Nine and Thirty, twenty years' imprisonment for each of Counts Twenty-Six and Thirty-Three and five years' imprisonment for

4

The Court refused to order the execution on the grounds that Congress had neither directly authorized the means to carry out the death sentences, nor properly delegated to the Attorney General the authority to issue the implementing regulations that the Government invoked. *Id.* As a result, the Court stayed the execution of the death sentences until such time as Congress had authorized the means of execution. *Id.*

## C.    Post-Trial Proceedings

The defendants appealed their convictions and sentences and the Government cross-appealed the stay of the death sentences. *Id.* at 392. In a lengthy opinion, the Fourth Circuit analyzed and disposed of approximately sixty issues, including challenges by the defendants to aspects of the jury-selection process and both the guilt and penalty phases of the trial. *Tipton*, 90 F.3d 861. The Fourth Circuit rejected nearly all of the claims, affirming the convictions and sentences of all of the defendants, except that it vacated on double jeopardy grounds the drug conspiracy convictions under 21 U.S.C. § 846, finding that the CCE convictions in Count Two

---

Count Twenty. (Dkt. No. 592.)

[4]    The jury convicted Cory Johnson of seven counts of Murder in Furtherance of a CCE (Counts Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-Four, Twenty-Five); one count of participating in a Conspiracy to Possess Cocaine Base with Intent to Distribute (Count One); one count of engaging in a CCE (Count Two); eleven counts of VICAR (Counts Ten, Thirteen, Fourteen, Sixteen, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Seven, Twenty-Eight, Twenty-Nine, Thirty); five counts of Use of a Firearm in Relation to a Crime of Violence or Drug Trafficking Offense (Counts Nine, Twelve, Fifteen, Twenty, Twenty-Six); one count of Distribution of Crack Cocaine (Count Thirty-One); and one count of Possession with Intent to Distribute Crack Cocaine (Count Thirty-Two). (Dkt. No. 593.)

The jury recommended a death sentence for all seven of Johnson's capital convictions. In addition to the death sentences, the Court sentenced Johnson to sentences of life imprisonment for Counts Two, Ten, Thirteen, Fourteen, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Seven and Twenty-Eight. Johnson received a sentence of forty years' imprisonment for Count Thirty-Two, thirty years' imprisonment for each of Counts Twenty-Nine and Thirty, twenty years' imprisonment for each of Counts Twelve, Fifteen, Sixteen, Twenty, Twenty-Six and Thirty-One and five years' imprisonment for Count 9. (Dkt. No. 593.)

5

precluded sentences for the drug conspiracy offenses. *Id.* at 903. Additionally, the Fourth Circuit vacated the stay of the death sentences and remanded for the executions to proceed in accordance with regulations promulgated by the Attorney General. *Id.* at 901-03.

Defendant continued to press his appeals. On June 1, 1998, Defendant filed a motion under 28 U.S.C. § 2255 to vacate and set aside his sentences. *Roane*, 378 F.3d at 392. Chief among his habeas claims, Defendant advanced an actual innocence claim with respect to the Moody murder and argued that his trial attorney had rendered ineffective assistance of counsel in his investigation and defense of the Moody murder charges. *Id.* at 393. The district court held an evidentiary hearing on the habeas claims before issuing an opinion denying Defendant's actual innocence claim, but granting his ineffective assistance of counsel claim. *Id.* Consequently, the district court vacated Defendant's convictions on the Moody murder charges — Counts Five (Murder in Furtherance of CCE), Six (Use of a Firearm in Relation to Crime of Violence or Drug Trafficking Crime) and Seven (VICAR). *Id.* at 394. The Government appealed the ineffective assistance of counsel ruling and Defendant cross-appealed certain claims resolved against him. *Id.* Notably, Defendant did not appeal the denial of his actual innocence claim. *Id.* at 394 n.3.

The Fourth Circuit ruled against Defendant on all accounts. Specifically, the court affirmed on all of the grounds raised by Defendant and reversed the grant of relief based on ineffective assistance of counsel. *Id.* at 408-12. In so ruling, it reversed the vacatur of Defendant's convictions on Counts Five, Six and Seven. *Id.* at 412.

In 2009, Defendant filed an application with the Fourth Circuit to file a successive § 2255 petition on actual innocence grounds. The Fourth Circuit denied his request. *In re James Roane, Jr.,* No. 09-8 (4th Cir.), ECF No. 24. On May 22, 2020, Defendant filed yet another

6

application with the Fourth Circuit for a successive § 2255 petition pursuant to the Supreme

Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). The application remains

pending, as the Fourth Circuit placed the case in abeyance pending its decision in *United States

v. Taylor. In re James Roane, Jr.*, No. 20-7 (4th Cir.), ECF Nos. 2, 18.[5]

## D.    Defendant's First Step Act Motion

On July 22, 2020, Defendant filed the instant motion under § 404 of the First Step Act,

asking the Court to reduce his sentences for the Capital Murder Counts and the Drug Distribution

Count. (Def.'s Mot. for Imposition of a Reduced Sentence Pursuant to Section 404 of the First

Step Act ("Def.'s Mot.") (ECF No. 17).) Defendant argues that these convictions constitute

covered offenses under the First Step Act, because the Fair Sentencing Act modified the

statutory penalties for §§ 841 and 848, and the First Step Act allows the Court to retroactively

impose those modified statutory penalties. (Def.'s Mot. at 2-5.) Defendant argues that the

statutory maximum under § 848 "was increased to a death sentence as a result of his possession

with intent to distribute cocaine base conviction that would no longer subject him to the death

penalty." (Def.'s Mot. at 3-4.) Further, Defendant claims that, because his Count Two CCE

conviction rested on his Drug Distribution Conviction, and his Capital Murder Convictions

---

[5]    On October 14, 2020, the Fourth Circuit decided *United States v. Taylor*, holding that attempted Hobbs Act robbery does not a "crime of violence" upon which a § 924(c) conviction can be predicated. __ F.3d __, 2020 WL 6053317, at *5 (4th Cir. Oct. 14, 2020). However, the Fourth Circuit has not yet ruled on Defendant's application to file a successive § 2255 petition.

In any event, *Taylor* has no impact on Defendant's First Step Act Motion. Neither the Capital Murder Convictions nor the Drug Distribution Convictions were predicated on an attempted robbery or, more generally, a crime of violence. Indeed, Defendant does not attack the counts at issue here in his proposed successive § 2255 petition. *In re James Roane, Jr.*, Case No. 20-7 (4th Cir.), ECF No. 2-2 (moving to vacate his convictions under 18 U.S.C. § 924(c) in Counts Six, Nine, Twelve and Fifteen). Although in his proposed § 2255 petition he argues that his Capital Murder Convictions cannot form the predicates for his § 924(c) convictions, he does not attack the convictions or sentences for the Capital Murder Counts. *Id.*

7

rested on his CCE conviction, then his Capital Murder Convictions must be covered offenses under the First Step Act. (Def.'s Reply in Supp. of Mot. for Imposition of a Reduced Sentence Pursuant to Section 404 of the First Step Act ("Def.'s Reply") (ECF No. 60) at 2-3.) At bottom, then, Defendant claims that his Drug Distribution Conviction pervades his Capital Murder Convictions, bringing his Capital Murder Convictions under the coverage of the First Step Act.

Because his convictions constitute covered offenses under the First Step Act, Defendant claims that this entitles him to "complete review on the merits," which includes a consideration of the sentencing factors in 18 U.S.C. § 3553(a). (Def.'s Mot. at 5.) To that end, Defendant devotes the bulk of his brief to arguing that the sentencing factors warrant a reduced sentence. Specifically, Defendant advances his actual innocence claim with respect to the murder of Douglas Moody, the subject of Count Five. (Def.'s Mot. at 9-16.) Further, Defendant argues that his history militates in favor of a sentence reduction, specifically his neglectful and abusive childhood. (Def.'s Mot. at 17-33.) Additionally, Defendant argues that he suffers from brain damage, warranting a reduced sentence. (Def.'s Mot. at 33-40.) Finally, Defendant argues that he has changed for the good in prison and his discipline record reflects good conduct over the course of his incarceration, weighing in favor of a sentence reduction. (Def.'s Mot. at 40-45.) Because some of his sentences warrant reduction, and his multiple sentences constitute a complete sentencing package, Defendant claims that the entire sentencing package contains fatal deficiencies. (Def.'s Mot. at 45-49.) To reach this conclusion, Defendant argues that several of his convictions are invalid, despite the Fourth Circuit only invalidating one conviction to date following multiple appeals. (Def.'s Mot. at 45-49.) Because these invalid convictions infect the entire sentencing package, Defendant argues that the Court must conduct a full and complete resentencing. (Def.'s Mot. at 50-52.) Accordingly, Defendant requests that the Court grant an

8

evidentiary hearing regarding the imposition of a reduced sentence on the Drug Distribution Conviction and the two Capital Murder Convictions that carry life sentences. (Def.'s Mot. at 53.) Additionally, Defendant asks the Court to order a resentencing hearing before a jury on Count Five — the Capital Murder Conviction for which he received the death penalty. (Def.'s Mot. at 53.)

On August 28, 2020, the Government filed its opposition to Defendant's Motion, primarily arguing that his convictions under § 848(e) do not constitute covered offenses and, therefore, the Court may not reduce his sentence. (Govt's Opp. to Def.'s First Step Act Mot. ("Govt's Resp.") (ECF No. 43).) On October 2, 2020, Defendant filed his reply, rendering this matter now ripe for review.

## II.   STATUTORY BACKGROUND

Defendant's motion relies on the interplay between three statutes, each of which plays a role in the Court's analysis. First, 18 U.S.C. § 3582(c)(1)(B) grants the Court the authority to consider modifying Defendant's sentence. Second, the Fair Sentencing Act provides the substantive relief sought in Defendant's motion. Third, the First Step Act allows the Court to apply the Fair Sentencing Act retroactively. Essentially, the Fair Sentencing Act altered the sentences applicable to certain offenses and the First Step Act provides the vehicle by which the Court may apply those altered sentences.

Neither party has identified any binding authority from the Fourth Circuit or the Supreme Court (or persuasive authority from other circuit courts) interpreting the relevant portions of these statutes and their interplay with each other as applied to these facts and counts of conviction. Thus, the Court must primarily engage in an exercise of statutory interpretation. "The starting point of any issue of statutory interpretation . . . is the language of the statute

9

itself." *United States v. Bly*, 510 F.3d 453, 460 (4th Cir. 2007). "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (citations omitted). Because none of the three statutes at issue suffers from ambiguity, and because their relationships to each other and the statutes under which the jury convicted Defendant lack ambiguity as well, the Court's analysis begins and ends with the text.

## A.    18 U.S.C. § 3582(c)(1)(B)

Courts operate under a "baseline rule of sentence finality," which states that "sentences may not be modified once imposed." *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020). Congress has provided a "narrow exception to finality" in 18 U.S.C. § 3582(c)(1)(B). *United States v. Wirsing*, 943 F.3d 175, 184 (4th Cir. 2019). This statute provides that "[t]he court may not modify a term of imprisonment once it has been imposed except that, in any case, the court may modify an imposed term of imprisonment *to the extent otherwise expressly permitted by statute*." 18 U.S.C. § 3582(c)(1)(B) (emphasis added).

This general rule of finality guides the Court in its interpretation of the scope of the other specific statutes in this case. By the plain language of § 3582(c)(1)(B), the Court may modify Defendant's sentences only as *expressly permitted* by the Fair Sentencing Act and the First Step Act. *See Wirsing*, 943 F.3d at 184 ("The First Step Act thus fits under the narrow exception to finality provided in § 3582(c)(1)(B) because it expressly permits the court to modify a term of imprisonment." (quotations omitted)). Accordingly, the Court turns to those statutes.

## B.    The Fair Sentencing Act

The Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010), provided

10

the substantive change that Defendant claims entitles him to a reduction of his sentences for his murder convictions. The Fair Sentencing Act addressed a sentencing disparity between crack and powder cocaine offenses by increasing the amount of crack cocaine needed to trigger mandatory minimum sentences. *Wirsing*, 943 F.3d at 178. The disparity originated in a statute passed in 1986 titled the Anti-Drug Abuse Act of 1986. *Kimbrough v. United States*, 552 U.S. 85, 95 (2007) (citing Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207). The Anti-Drug Abuse Act introduced mandatory minimums for drug offenses tied to specific weights of particular drugs. Anti-Drug Abuse Act § 1002, 100 Stat. at 3207-2 to -4 (codified at 21 U.S.C. § 841(b)(1)). A defendant convicted of an offense involving 5 kilograms of cocaine or 50 grams of crack cocaine faced a ten-year mandatory minimum. *Id.* § 1002, 100 Stat. at 3207-2. Similarly, the statute mandated a five-year minimum sentence for a conviction of 500 grams or more of powder cocaine or 5 grams or more of crack cocaine. *Id.* § 1002, 100 Stat. at 3207-3. Thus, the Anti-Drug Abuse Act provided that "a drug trafficker dealing in crack cocaine [was] subject to the same sentence as one dealing in 100 times more powder cocaine." *Kimbrough*, 552 U.S. at 91.

This "100-to-1 ratio came under heavy criticism." *Wirsing*, 943 F.3d at 177 (citing *Dorsey v. United States*, 567 U.S. 260, 268 (2012) and *Kimbrough*, 552 U.S. at 97-100). Such criticism stemmed from the fact that "research showed the relative harm between crack and powder cocaine [was] less severe than 100 to 1." *Dorsey*, 567 U.S. at 268. Additionally, "the public had come to understand sentences embodying the 100-to-1 ratio as reflecting unjustified race-based differences." *Id.* Finally, the disparity "mean[t] that a major supplier of powder cocaine [could] receive a shorter sentence than a low-level dealer who b[ought] powder from the supplier but then convert[ed] it to crack." *Kimbrough*, 552 U.S. at 95.

11

In 2010, Congress passed the Fair Sentencing Act to reduce this disparity. *See United States v. Black*, 737 F.3d 280, 282 (4th Cir. 2013) ("Congress enacted the Fair Sentencing Act [] in response to extensive criticism about the disparity in sentences between crack offenses and powder cocaine offenses."). In § 2, the Fair Sentencing Act reduced the statutory minimums for crack cocaine offenses by increasing the quantity of crack cocaine necessary to trigger the minimums. *Id.* Specifically, Section 2 amended 21 U.S.C. § 841(b)(1) to raise the amount from 5 grams to 28 grams for the 5-year minimum, and from 50 grams to 280 grams for the 10-year minimum sentence. Fair Sentencing Act § 2, 124 Stat. at 2372 (codified at 21 U.S.C. § 841(b)(1)). Additionally, in Section 3, the Fair Sentencing Act eliminated the mandatory minimum sentence for "simple possession" of crack cocaine. *Id.* § 3, 124 Stat. at 2372 (codified at 21 U.S.C. § 844(a)).

Although the Fair Sentencing Act reduced the sentencing disparity in offenses involving the possession, production or distribution of crack cocaine, it did not amend the statutory penalties for violent crimes in furtherance of trafficking crack cocaine. On the contrary, rather than reducing the statutory penalties for violent drug offenses, Congress instructed the United States Sentencing Commission to amend the sentencing guidelines to increase the offense levels "if the defendant used violence, made a credible threat to use violence, or directed the use of violence during a drug trafficking offense." *Id.* § 5, 124 Stat. at 2373. Likewise, Congress directed the Sentencing Commission to increase the offense levels based on the defendant's role and other aggravating factors, including that the "defendant committed the drug trafficking offense as part of a pattern of criminal conduct engaged in as a livelihood." *Id.* at § 6, 124 Stat. at 2373-4. The statute's language clearly demonstrates Congress' intent to reduce the penalties for non-violent crack cocaine offenses without commensurate reductions for violent crack

12

APP.384

cocaine offenses.

Later, the Supreme Court held that the new penalty provisions in the Fair Sentencing Act applied to all crack cocaine offenders sentenced on or after August 3, 2010, even for offenses committed before that date. *Dorsey*, 567 U.S. at 264. However, the modifications to the statutory minimum sentences did "not apply retroactively to defendants who both committed crimes and were sentenced for those crimes before August 3, 2010." *Black*, 737 F.3d at 287.

## C.    The First Step Act

In December 2018, Congress remedied the non-retroactivity of the Fair Sentencing Act with the passage of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. "On its face, the First Step Act allows the retroactive application of the modifications to penalties that Congress enacted in the Fair Sentencing Act." *Wirsing*, 943 F.3d at 180. Specifically, Section 404 made the Fair Sentencing Act's modifications to crack cocaine offenses retroactive for defendants convicted before its enactment.

Section 404 has three subsections. Subsection 404(a) defines which offenses the First Step Act's imposition of retroactivity covers:

> (a) DEFINITION OF COVERED OFFENSE.— In this section, the term "covered offense" means a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (citation omitted), that was committed before August 3, 2010.

First Step Act, § 404(a), 132 Stat. at 5222. For those defendants sentenced for a covered offense, the next subsection provides how the Court may reduce that sentence:

> (b) DEFENDANTS PREVIOUSLY SENTENCED.— A court that imposed a sentence for a covered offense, may, on motion of the defendant, the Director of the Bureau of Prisons, the attorney for the Government, or the court, impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 (citations omitted) were in effect at the time the covered offense was committed."

*Id.* § 404(b), 132 Stat. at 5222. The final subsection of § 404 limits those defendants who may

13

bring a motion and makes clear that the Court retains discretion whether to grant a motion for a sentence reduction:

> (c) LIMITATIONS.— No court shall entertain a motion made under this section to reduce a sentence if the sentence was previously imposed or previously reduced in accordance with the amendments made by sections 2 and 3 of the Fair Sentencing Act (citations omitted) or if a previous motion made under this section to reduce the sentence was, after the date of the enactment of this Act, denied after a complete review of the motion on the merits. Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section.

*Id.* § 404(c), 132 Stat. at 5222. Thus, Section 404 of the First Step Act defines which sentences the Court may reduce and provides the procedure and authority to apply the Fair Sentencing Act's crack cocaine penalties retroactively for defendants who committed their covered offenses before August 3, 2010.

## III.   ANALYSIS

Defendant argues that the First Step Act grants the Court authority to modify his sentences for offenses committed under § 848(e) and § 841. The Court entertains this request for a modified sentence mindful of the "baseline rule of sentence finality," *Chambers*, 956 F.3d at 671, and that "[t]he law closely guards the finality of criminal sentences against judicial 'change of heart.'" *United States v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010); 18 U.S.C. §3582(b). Clearly, Defendant's desire to have the sentences reduced for his Capital Murder Convictions drives his request, so those offenses likewise will direct the Court's analysis. Thus, Defendant's motion first and foremost requires the Court to determine whether Defendant's convictions for Murder in Furtherance of a Continuing Criminal Enterprise, in violation of 21 U.S.C. § 848(e)(1)(A), constitute covered offenses under the First Step Act.

The Court must first address the threshold covered offense question, because "eligibility [for a sentence modification] turns on the proper interpretation of a 'covered offense.'" *Wirsing,*

14

943 F.3d at 185; *United States v. Gravatt*, 953 F.3d 258, 260 (4th Cir. 2020) ("[T]he existence of a 'covered offense' is a threshold requirement under the [First Step] Act."). By its own terms, the First Step Act defines a "covered offense" as "a violation of a Federal criminal statute, the statutory penalties for which were modified by Sections 2 or 3 of the Fair Sentencing Act of 2010." First Step Act, § 404(a), 132 Stat. 5222. Accordingly, eligibility turns on which statute Defendant violated and whether Section 2 or 3 of the Fair Sentencing Act modified the statutory penalties for that statute. *See United States v. Woodson*, 962 F.3d 812, 816 (4th Cir. 2020) (emphasizing that "covered offense" inquiry turns on change to statutory penalties for the defendant's statute of conviction). In conducting its covered offense inquiry, the Court first will analyze Defendant's particular convictions; then, it will conduct a textual analysis of the statute of those convictions; and, finally, it will analyze the potential application of Defendant's reading of the statute.

Because the Court ultimately finds that Defendant's Capital Murder Convictions do not constitute covered offenses, the Court will then determine whether Defendant's Drug Distribution Conviction nevertheless warrants a sentence reduction.

## A.    Defendant's Capital Murder Convictions under § 848(e).

Defendant argues that his Capital Murder Counts qualify as covered offenses under the First Step Act. In each of those counts, the jury convicted Defendant of violating 21 U.S.C. § 848(e)(1)(A). To determine whether Defendant's statute of conviction for these counts constitutes a covered offense, the Court will first examine which statutes the relevant provisions of the Fair Sentencing Act affected. Section 2 of the Fair Sentencing Act, titled "Cocaine Sentencing Disparity Reduction," amended 21 U.S.C. §§ 841(b)(1)(A)(iii), 841(b)(1)(B)(iii), 960(b)(1)(C) and 960(b)(2)(C). Additionally, Section 3 of the Fair Sentencing Act, titled "Elimination of Mandatory Minimum Sentences for Simple Possession," amended 21 U.S.C.

15

§ 844(a).  Thus, together, Sections 2 and 3 expressly affected three criminal statutes:  21 U.S.C. § 841(b)(1), 21 U.S.C. § 960(b) and 21 U.S.C. § 844(a).  Violations of these three statutes constitute "covered offenses" under § 404(a) of the First Step Act.  However, § 848 proves conspicuously absent from Sections 2 and 3 of the Fair Sentencing Act.  And for good reason:  as § 848 targets dangerous drug kingpins while the Fair Sentencing Act seeks to address the sentencing disparity between low-level crack dealers and large-scale powder cocaine distributors.

Given that § 3582(c)(1)(B) permits modifications to a sentence only when "expressly permitted" by statute or Rule 35, and only then "to the extent" that the statute expressly provides, this absence provides strong evidence that a violation of § 848(e)(1)(A) does not constitute a "covered offense."  18 U.S.C. § 3582(c)(1)(B); *see United States v. Johnson*, 529 U.S. 53, 58 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others.  The proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth.").  However, because some parts of the CCE statute reference the statutes that the Fair Sentencing Act did modify, the Court will make further inquiry into the question.  Armed with an understanding of what statutes the Fair Sentencing Act affected, the Court can now turn to an analysis of whether the Fair Sentencing Act affected the statutory penalties for Defendant's statute of conviction.  Specifically, the Court must identify with particularity Defendant's statute of conviction and then address Defendant's arguments as to why his particular convictions qualify as covered offenses.

### i.    Section 848(e)(1)(A) as a Standalone Offense Constitutes Defendant's Statute of Conviction.

In identifying with particularity Defendant's statute of conviction, the Court must determine whether to analyze § 848 as a whole or specifically § 848(e)(1)(A) as Defendant's

16

statute of conviction. Indeed, the Court's review of § 848 and the relevant case law indicates that the Fair Sentencing Act potentially modified the sentencing penalties for some § 848 convictions, but not all. For the reasons stated below, the Court finds that § 848(e)(1)(A) constitutes Defendant's statute of conviction, rendering the case law regarding other sections of § 848 inapposite.

Section 848 penalizes engaging in a "continuing criminal enterprise," which occurs if:

(1) he violates a provision of this subchapter or subchapter II the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

21 U.S.C. § 848(c). Section 848 contains three substantive provisions, each of which provides for its own criminal liability and penalties. 21 U.S.C. § 848(a), (b), and (e). Section 848(a) provides for a 20-year mandatory-minimum sentence for "any person who engages in a continuing criminal enterprise," and increases that mandatory-minimum to 30 years if the person has a previous drug conviction. 21 U.S.C. § 848(a). Section 848(b) mandates a life sentence for any principal of a sufficiently large continuing criminal enterprise, as measured in terms of either drug quantity or gross receipts. 21 U.S.C. § 848(b). Notably, the drug quantity necessary to trigger the mandatory life sentence hinges on the amount in 21 U.S.C. § 841(b)(1)(B). Thus, Section 2 of the Fair Sentencing Act may have an indirect effect on the statutory penalties of 21 U.S.C. § 848(b).

However, the possibility that the First Step Act may implicate § 848(b) does not help

17

Defendant, because the jury convicted Defendant of violating § 848(e). And under Fourth Circuit precedent, § 848(e) acts as an entirely self-contained subsection of the statute. *See United States v. NJB*, 104 F.3d 630, 635 (4th Cir. 1997) ("In sum, because § 848(e) clearly sets forth a separate substantive violent offense, the Government's certification of this fact did not constitute error."). Indeed, § 848(e)(1)(a) clearly defines the conduct that it prohibits and the penalties for violating it. Moreover, other provisions in a previous version of the statute referenced § 848(e) as a distinct offense, which the Fourth Circuit has determined "clearly expresses Congress' intent that § 848(e) be a separate crime." *Id.* at 633. Thus, for purposes of Defendant's First Step Act motion, the Court finds that § 848(e)(1)(A) — and not § 848 broadly — constitutes his statute of conviction.

Focusing then on Defendant's statute of conviction, the Court finds that § 848(e)(1)(A) does not constitute a covered offense within the meaning of the First Step Act. Section 848(e)(1)(A) provides that:

> any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.

21 U.S.C. § 848(e)(1)(A). This statute clearly defines the conduct that it prohibits — killing in furtherance of any one of three distinct predicate offenses — and the statutory penalties for engaging in the prohibited conduct — death or life imprisonment with a mandatory minimum of 20 years' imprisonment. The Fair Sentencing Act did not change either. Accordingly, the Court starts with the premise that, on its face, neither sections 2 nor 3 of the Fair Sentencing Act directly altered the statutory penalties in § 848(e) and, therefore, the First Step Act does not directly apply. However, in arguing that his Capital Murder Convictions constitute covered

18

APP.390

offenses, Defendant relies on the specific facts underlying his convictions. Yet, the facts underlying Defendant's convictions cut against a finding that his Capital Murder Convictions constitute covered offenses under the First Step Act.

### ii.     Defendant's Conviction Under § 848(e)(1)(A) Did Not Directly Rely on a Violation of § 841(b)(1)(A).

Defendant argues that the First Step Act covers his convictions under § 848(e), because his "statutory maximum under § 848 was increased to a death sentence as a result of his possession with intent to distribute cocaine base conviction that would no longer subject him to the death penalty." (Def.'s Mot. at 3-4.) Defendant further claims that "[b]ecause conviction of an offense punishable under § 841(b)(1)(A) is incorporated as an element of § 848(e)(1)(A), Mr. Roane's § 848 convictions would no longer be subject to the death penalty." (Def.'s Mot. at 4.) In addition to the fact that his argument stretches the First Step Act well beyond Congress' intended reach, as discussed below, his argument plainly misstates the facts of his § 848(e)(1)(A) convictions. In truth, Defendant's § 848(e)(1)(A) convictions had no basis in § 841(b)(1)(A) and did not incorporate § 841(b)(1)(A) as an element.

As the statute itself makes clear and the Fourth Circuit has noted, §848(e)(1)(A) has three distinct prongs. *United States v. Hager*, 721 F.3d 167, 179-80 (4th Cir. 2013). A review of the record clearly demonstrates that Defendant's convictions rested on the first prong — engaging in or working in furtherance of a continuing criminal enterprise. First, in the Indictment, the Capital Murder Counts all charge Defendant with a specific killing "while engaged in and working in furtherance of a Continuing Criminal Enterprise." (Indictment at 7, 9-10.) The Counts make no mention of § 841(b)(1)(A). Second, the Court's instructions to the jury with respect to these Counts make no reference to § 841(b)(1)(A). Instead, the Court informed the jurors that the Indictment charged Defendant with a killing "while engaged in or working in

19

furtherance of a continuing criminal enterprise." (Instruction No. 20.)  Importantly, the jury

instruction providing the statute of offense appears below, exactly as the jury received it:

> Title 21, United States Code, Section 848(e)(1)(A) provides in pertinent part that:
>
>> any person engaging in or working in the furtherance of a continuing criminal enterprise . . . who intentionally kills or counsels, commands, induced, procures, or causes the intentional killing of an individual and such killing results
>
> is guilty of an offense against the United States.

(Instruction No. 21.)  Indeed, the jury instructions *expressly omitted* the statute's reference to

§ 841(b)(1)(A).  The Court further instructed the jury on the elements of the offense, referencing

only the continuing criminal enterprise and, again, omitting any reference to § 841(b)(1)(A).

Finally, on the verdict form returned by the jury for the Capital Murder Counts, the jury found

Defendant guilty of "Killing of [victim's name] while Engaged In or Working In Furtherance of

a Continuing Criminal Enterprise." (Instruction No. 21.)  Again, no mention of § 841(b)(1)(A)

existed.  Simply put, Defendant's convictions in no way rest on the second prong — engaging in

an offense punishable under § 841(b)(1)(A).

As the record makes clear, Defendant's conviction on Count Two for engaging in a CCE

served as the predicate offense for his Capital Murder Convictions.  And, neither the Fair

Sentencing Act nor the First Step Act extinguished his criminal liability for his CCE conviction

under § 848(a).  A CCE conviction requires proof that the defendant "violate[d] any provision of

this subchapter or subchapter II the punishment for which is a felony." 21 U.S.C. § 848(c).  In

finding Defendant guilty of the CCE violation in Count Two, the jury found that Defendant had

committed felony violations of federal narcotics laws, including § 841(a).  That is, in Count

Thirty-Two, the jury found beyond a reasonable doubt that Defendant had possessed with the

intent to distribute, and conspired to possess with the intent to distribute, more than 50 grams of

20

APP.392

crack cocaine. The jury's findings would still lead to convictions of felony federal narcotics laws, including § 841(a), even after the Fair Sentencing Act. *See* 21 U.S.C. § 841(b)(1)(B)(iii) (providing for a sentence of 5 to 40 years' imprisonment for more than 28 grams of crack cocaine); *United States v. Venable*, 943 F.3d 187, 193 (4th Cir. 2019) (noting how the offenses reclassified under Fair Sentencing Act remain felonies). The Fair Sentencing Act did not change the fact that Defendant would still have been found guilty of federal narcotics laws, only that the statutory penalties for such stand-alone convictions based on those violations would have differed.

The verdicts in this case make clear that the jury found beyond a reasonable doubt that Defendant had committed the predicate offenses for both § 848(a) and § 848(e)(1)(A), and any modification to the statutory penalties of the underlying offenses does not change that finding. *Cf. United States v. Hopkins*, 310 F.3d 145, 153 (4th Cir. 1997) ("Moreover, a defendant's conviction under § 924(c) does not depend on his being convicted — either previously or contemporaneously — of the predicate offense, as long as all of the elements of that offense are proved and found beyond a reasonable doubt." (internal quotations omitted)). In short, Defendant's possession with intent to distribute more than 50 grams of crack can still serve as a predicate for his CCE conviction, regardless of his sentencing exposure for a separate charge for that conduct. Consequently, the jury necessarily found beyond a reasonable doubt that Defendant had committed all of the elements of an offense for engaging in a continuing criminal enterprise, in violation of § 848(a), regardless of the statutory penalties for each element. Likewise, the jury found that Defendant had committed all of the elements necessary to prove a violation § 848(e)(1)(A), regardless of the statutory penalties for each element standing alone. And Defendant received the challenged sentences for murdering individuals in furtherance of a

21

continuing criminal enterprise, not for violating the federal narcotics laws. Thus, the statutes modified by the Fair Sentencing Act did not form the predicate for Defendant's convictions under § 848(e)(1)(A).

### iii.   Defendant's § 848(e)(1)(A) Convictions Did Not Indirectly Rely on a Violation of § 841(b)(1)(A).

Aside from incorrectly arguing that § 841(b)(1)(A) formed the predicate for his Capital Murder Convictions, Defendant also asks the Court to connect several dots to find that his convictions under § 848(e)(1)(A) constitute covered offenses. (Def.'s Reply at 2.) Specifically, Defendant offers two alternative paths for the Court to reach this conclusion. First, Defendant argues that the Fourth Circuit found that Defendant's § 848(e)(1)(A) conviction included as a lesser offense his conviction under § 846 in Count One, vacating his Count One conviction on Double Jeopardy grounds.[6] (Def.'s Reply at 2.) His § 846 conviction, in turn, rested on a conspiracy to violate § 841(b)(1)(A). According to Defendant, because the Fair Sentencing Act modified the statutory penalties for violations of § 841(b)(1)(A), it modified the statutory penalties for violations of § 846 and, therefore, modified the statutory penalties for violations of § 848(e)(1)(A). In sum, Defendant argues that his "§ 848(e)(1)(A) convictions did indeed rest on proof of a violation of § 841(b)(1)(A)." (Def.'s Reply at 2.)

Alternatively, Defendant argues that his § 848(e)(1)(A) conviction relied on his § 848(a) conviction in Count Two.[7] (Def.'s Reply at 2.) His § 848(a) conviction, in turn, rested on violations of § 841(b)(1)(A). (Def.'s Reply at 2.) Again, according to Defendant, this modified the statutory penalties for violations of § 848(a) and, therefore, modified the statutory penalties

---

[6]    Notably, the Fair Sentencing Act did not expressly modify the statutory penalties for violations of § 846.

[7]    Likewise, the Fair Sentencing Act did not expressly modify the statutory penalties for violations of § 848(a).

22

for violations of § 848(e)(1)(A). (Def.'s Reply at 2.)  In essence, Defendant argues that his Capital Murder Convictions necessarily flow from his Drug Distribution Convictions, rendering them covered by the First Step Act.

However, this argument ignores the fact that § 848(e)(1)(A) operates as a stand-alone offense. *See NJB*, 104 F.3d at 633 (holding that the statute "clearly expresses Congress' intent that § 848(e) be a separate crime").  Importantly, this also ignores the fact that Congress created distinct penalties for violations of § 841 on the one hand, and violations of § 848 on the other. *Garrett v. United States*, 471 U.S. 773, 794-95 (1985) (allowing cumulative sentences for § 841 and § 848 convictions).  Indeed, the Supreme Court in *Garrett* held "that Congress intended separate punishments for the underlying substantive predicates and for the CCE offense." *Id.* at 795.  Because Congress created separate punishments, modifications to the statutory penalties in § 841 do not necessarily result in modifications to the statutory penalties in § 848.  Moreover, as described above, the jury found beyond a reasonable doubt that Defendant had committed all of the elements of § 848(e)(1)(A), regardless of the statutory penalties that those elements could expose Defendant to when charged as separate offenses.

Defendant's argument attempts to rewrite the definition of a covered offense to mean "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010, or a violation of a Federal criminal statute that rests on the violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010."  Congress did not write the First Step Act this broadly.  Instead, Congress limited covered offenses to those discreet offenses whose statutory penalties the Fair Sentencing Act modified.  The following textual analysis of the statute confirms the conclusion that Congress did not intend the First Step Act to reach so broadly as to

23

APP.395

cover all offenses related to crack cocaine, especially deadly offenses.

**B.      A Textual Analysis of the Statutes at Issue Demonstrates That Congress Did Not Intend to Cover § 848(e)(1)(A) Convictions Under the First Step Act.**

In analyzing the texts of the statutes at issue, it becomes clear that Congress did not intend for the First Step Act to cover offenses under § 848(e)(1)(A). The structure of the Fair Sentencing Act further evinces this intent. Likewise, the general Savings Statute confirms that the First Step Act does not cover Defendant's murder convictions.

**i.      Congress Clearly Did Not Intend for the First Step Act to Cover Convictions Under § 848(e).**

Congress' clearly expressed intent with respect to both § 848(e)(1)(A) and the Fair Sentencing Act directly contradicts Defendant's argument for application of the First Step Act to § 848(e)(1)(A). Congress enacted § 848 to combat violent drug traffickers. "A common-sense reading of [the definition of a continuing criminal enterprise] reveals a carefully crafted prohibition aimed at a special problem. This language is designed to reach the 'top brass' in the drug rings, not the lieutenants and foot soldiers." *Garrett*, 471 U.S. at 781. Conversely, the Fair Sentencing Act aimed to ameliorate a disparate sentencing scheme for those lieutenants and foot soldiers (but not the top brass) serving sentences for possession and distribution (but not for violence). *See, e.g., Kimbrough*, 552 U.S. at 98 (noting that the disparate sentencing scheme ran contrary to the "goal of punishing major drug traffickers more severely than low-level dealers"); *Dorsey*, 567 U.S. at 269-70 (noting that Congress enacted the Fair Sentencing Act in response to, among other problems, the disproportionate treatment of low-level dealers and major drug traffickers). And in passing the First Step Act, "Congress's clear intent was to apply the Fair Sentencing Act to pre-Fair Sentencing Act offenders, including those who were heretofore ineligible for such relief." *Wirsing*, 943 F.3d at 186.

Defendant did not simply deal drugs. Defendant dealt drugs, managed other drug dealers

24

and *murdered others in furtherance of his drug dealing.* Nothing in the three statutes above indicates that Congress intended to reduce the sentences for lethal drug dealers. In fact, the Fair Sentencing Act's instructions to *increase* the guidelines for violent drug crimes clearly demonstrates the opposite intent of that which Defendant seeks.

This conclusion becomes even stronger in light of the fact that Congress must "expressly" provide for any exceptions to the narrow rule of sentencing finality. Defendant asks the Court to shoehorn a stretched implication into a narrow exception to allow a serial murderer to use the First Step Act to reduce his murder sentences, all in contradiction of the Fair Sentencing Act's clear intent. *See Chambers*, 956 F.3d at 676 (Rushing, J., dissenting) ("As the text makes clear, Congress's concern in Section 404 was to extend the cocaine sentencing provisions of the Fair Sentencing Act retroactively, not to provide a general opportunity to collaterally attack a final sentence.").

### ii.    The Structure of The First Step Act Demonstrates that It Does Not Apply to Defendant's Convictions.

The First Step Act's structure directs its application in a manner that demonstrates its inapplicability to Defendant's convictions. The text indicates that "[a] court that imposed a sentence for a covered offense may . . . impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 . . . were in effect at the time the covered offense was committed." First Step Act, § 404(b). Put simply, if a defendant received a sentence before the Fair Sentencing Act that was subject to shorter statutory penalties after the Fair Sentencing Act, then the Court may now — in its discretion — impose a shorter sentence. Here, that is not possible.

If Defendant had been convicted of § 848(e)(1)(A) after the passage the Fair Sentencing Act, his sentences on the Capital Murder Counts still would have subjected him to either a sentence of death or life imprisonment with a mandatory minimum of 20 years' imprisonment.

25

The Fair Sentencing Act did not alter that a jury would render his sentence on these Counts. And, nothing in sections 2 or 3 of the Fair Sentencing Act would have changed the instructions or evidence given to the jury in the penalty phase. Moreover, unlike a covered offense under § 841, the Court here would have no new statutory penalties on which to base a reduced sentence. In sum, nothing in sections 2 or 3 of the Fair Sentencing Act would have changed Defendant's sentencing exposure on his § 848(e)(1)(A) convictions. This precludes the Court from imposing a reduced sentence "as if" the Fair Sentencing Act had been in effect. If the possibility of a reduced sentence for an offense does not exist, then the "reduced sentence" and "as if" provisions in the First Step Act have no meaning. But Congress chose to include these provisions, and this Court must "give effect to Congress' choice" to include the provisions. *See Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 354 (2013); *United States v. Menasche*, 348 U.S. 528 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section."). Consequently, the Court will not interpret the statute in a way that essentially reads the "reduced sentence" and "as if" provisions out of the statute. *United States v. Atlantic Research Corp.*, 551 U.S. 128, 137 (2007) (rejecting an interpretation that would render a statutory provision "a dead letter"). The fact that the Court cannot impose a reduced sentence under the Fair Sentencing Act supports the conclusion that Defendant's § 848(e)(1)(A) convictions do not constitute covered offenses.

### iii. The Savings Statute Renders the Penalties for Defendant's § 848(e)(1)(A) Convictions Unchanged.

The Government argues that the Savings Statute precludes a finding that Defendant's Capital Murder Convictions constitute covered offenses. (Govt's Resp. at 23.) The Court agrees.

26

The general Savings Statute provides in pertinent part:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109. First, neither the First Step Act nor the Fair Sentencing Act expressly provided for the release or elimination of any penalty or liability incurred under § 848(e)(1)(A), so the Court starts with the presumption that neither Act had the effect of doing so. Yet, even under Defendant's theory that the modifications of the penalties in § 841(a)(1) work their way up the chain to modify the penalties of § 848(e), the chain breaks under the weight of the Savings Statute.

The Savings Statute comes into play with respect to the reduced penalties for crack offenses, because "[c]ase law makes clear that the word 'repeal' applies when a new statute simply diminishes the penalties that the older statute set forth." *Dorsey*, 567 U.S. at 272; *see also United States v. Bullard*, 645 F.3d 237, 248 (4th Cir. 2011) ("But we have squarely held that although § 109 specifically refers only to repealed statutes, it also applies to statutes changed by amendment." (internal quotations omitted)). Accordingly, the Fair Sentencing Act "repealed" § 841(a)(1) and § 841(b)(1) and replaced them with different statutory penalties.

In examining the effect of a later statute under the Savings Statute, Congress need not use any particular magic words to extinguish liability or penalties, because the Savings Statute "cannot justify a disregard of the will of Congress as manifested either expressly or by *necessary implication* in a subsequent enactment." *Dorsey*, 567 U.S. at 274 (internal quotations omitted) (emphasis in original). Neither the Fair Sentencing Act nor the First Step Act expressly provided

27

APP.399

that it would extinguish liability incurred under § 841(a)(1). Likewise, neither necessarily implied that they would extinguish liability incurred under § 841(a)(1). Instead, they altered the statutory penalties but not criminal liability. Thus, under the Savings Statute, neither statute could have the effect of extinguishing criminal liability for violations of § 841(a)(1). *See United States v. Stitt*, 552 F.3d 345, 353 (4th Cir. 2008) (explaining that "under the Savings Statute, a liability that arises under a later-repealed statute is preserved despite repeal and may be enforced by a post-repeal action." (internal quotations omitted)).

Consequently, Defendant's criminal liability incurred for violations of § 841(a)(1) in Count Thirty-Two stands. Defendant's criminal liability incurred for violations of § 848(a) for engaging in a continuing criminal enterprise in Count Two — based in part on conduct that violated § 841(a) — stands. And his criminal liability for murders — based in part on conduct that violates § 848(a) — stands.

Indeed, Defendant correctly concedes that his convictions under all of these statutes remain intact. (Def.'s Reply at 5.) Defendant completed each crime at the time of the murder, and no adjustments to the penalties of the offenses in § 841 have altered his criminal liability or the penalties for § 848. *See Dorsey*, 567 U.S. at 272 ("Case law also makes clear that penalties are 'incurred' under the older statute when an offender becomes subject to them, *i.e.*, commits the underlying conduct that makes the offender liable."); s*ee also United States Guerrero*, 813 F.3d 462, 466 (2d Cir. 2016) ("Because the [Fair Sentencing Act] did not expressly extinguish any criminal liability under § 848(e)(1)(A), the law's enactment did not retroactively invalidate Guerrero's convictions."). Accordingly, the Savings Statute pushes Defendant's § 848(e)(1)(A) conviction farther beyond the reach of the First Step Act than even a straightforward reading of the statutes suggests.

28

APP.400

C.    **Application of the Fair Sentencing Act Demonstrates that It Does Not Apply to Defendant's Convictions.**

Not only would the conclusion that the First Step Act covers Defendant's convictions contravene the intent of Congress as clearly expressed in the text of the statutes, but attempting to apply that conclusion proves untenable. This result further demonstrates the defect in Defendant's argument.

i.    **Section 848(e) Differs from the Other Statutes Found to Have Been Indirectly Modified by the Fair Sentencing Act.**

The Court recognizes that the Fourth Circuit has found that the First Step Act can cover offenses not directly amended by sections 2 or 3 of the Fair Sentencing Act. *See, e.g., Woodson*, 962 F.3d at 816 (finding a conviction under § 848(b)(1)(C) a "covered offense" although the Fair Sentencing Act did not amend the text). The Fourth Circuit's analysis in *Woodson* as to why "Congress did not need to amend the text of Subsection 841(b)(1)(C) to make this change" supports the conclusion that Defendant's convictions under § 848(e)(1)(A) do not constitute covered offenses. *Id.* In *Woodson*, the Fourth Circuit used a before-and-after approach to determine whether the Fair Sentencing Act modified § 841(b)(1)(C), the statute at issue there. *Id.* In answering in the affirmative, the court noted:

> Before the Fair Sentencing Act, Subsection 841(b)(1)(C)'s penalty applied only to offenses involving less than 5 grams of crack cocaine (or an unspecified amount). But because of the changes rendered by Section 2 of the Fair Sentencing Act, the penalty in Subsection 841(b)(1)(C) now covers offenses involving between 5 and 28 grams of crack cocaine as well.

962 F.3d at 816. Continuing, "Subsection 841(b)(1)(C) set forth the penalty for quantities of crack cocaine between zero and 5 grams (or an unspecified amount) before the Fair Sentencing Act, and between zero and 28 grams (or an unspecified amount) after. This is a modification." *Id.* The court went on to note that Woodson's conviction of 0.41 grams of crack cocaine amounted to 8.2% of the upper end of Subsection 841(b)(1)(C)'s range before the Fair

29

Sentencing Act, but only 1.5% of the upper end after the Fair Sentencing Act, which a sentencing judge could find relevant. *Id.* at 817. Because of the calculable differences in the penalties associated with Woodson's conviction before and after the Fair Sentencing Act, the Fourth Circuit found the offense covered by the First Step Act. The conclusion in *Woodson* falls squarely in line with Congress' intent to reduce the crack cocaine-to-powder cocaine disparity for non-violent offenses, even if it did not directly amend the text of § 841(b)(1)(C).

Applying the same before-and-after analysis here to Defendant's convictions leads to the opposite result. Before the Fair Sentencing Act, § 848(e)(1)(A)'s penalties applied to killings in furtherance of a continuing criminal enterprise. After the changes rendered by Section 2 of the Fair Sentencing Act, the penalty in § 848(e)(1)(A) still covers killings in furtherance of a continuing criminal enterprise. In other words, § 848(e)(1)(A) set forth the penalty for killing in furtherance of a continuing criminal enterprise both before and after the Fair Sentencing Act. No modification exists. The penalties in § 848(e)(1)(A) simply do not depend on a specific quantity of drugs. Both before and after the passage of the Fair Sentencing Act Defendant's convictions for killing Douglas Moody, Peyton Johnson and Louis Johnson in furtherance of a continuing criminal enterprise remain punishable by death or life imprisonment with a mandatory minimum of 20 years' imprisonment. As a result, this case differs from *Woodson*, where the Fourth Circuit found that by modifying the conduct at issue under § 841(b)(1)(C), the Fair Sentencing Act also modified the statutory penalties for § 841(b)(1)(C). Here, unlike in *Woodson*, Congress did not modify the conduct at issue in § 848(e)(1)(A) and, therefore, did not modify the statutory penalties. Accordingly, the suggestion that Congress amended § 848(e)(1)(A) to reduce the penalties for lethal drug traffickers finds itself far afield of any intent expressed by Congress.

30

### ii.   The First Step Act Cannot Override the Sentencing Statutes Applicable to Defendant's Convictions.

Even if the Fair Sentencing Act could have indirectly modified the statutory penalties for convictions under § 848(e)(1)(A), the Court could not reduce Defendant's death sentence. A comparison of the language between the statutes at issue reveals that Congress did not intend for the First Step Act to authorize courts to reduce death sentences imposed under § 848(e)(1)(A). First, Defendant's sentencing statute mandated the imposition of the death penalty upon the jury's recommendation.[8] 21 U.S.C. § 848(l) (repealed 2006) ("Upon the recommendation that the sentence of death be imposed, the court shall sentence the defendant to death."). The statute that would govern sentencing if Defendant were convicted for similar crimes today likewise contains mandatory language. *See* 18 U.S.C. § 3591(a) (mandating that a defendant "shall be sentenced to death" if the jury recommends such a sentence following a hearing). That mandatory language contrasts starkly with the First Step Act, which contains undeniably permissive language in two of its three sections: "A court that imposed a sentence for a covered offense *may*, on motion of the defendant . . . impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time the covered offense was committed." First Step Act, § 404(b) (emphasis added). The next subsection reinforces the discretion granted the courts: "Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section." *Id.*, § 404(c).

The Court must give effect to both statutes. "[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the

---

[8]   Congress repealed §§ 848(g)-(r) in 2006 and made § 848(e)(1)(A) offenses subject to the death penalty provisions of the Federal Death Penalty Act, 18 U.S.C. § 3591, *et seq.* ("FDPA"). Pub. L. 109-177, 120 Stat. 231, 232. However, the Fourth Circuit has held that §§ 848(g)-(r) continue to apply to defendants sentenced before the repeal of those sections. *Stitt*, 552 F.3d at 354 ("We think this case law leads inexorably to the conclusion that §§ 848(g)-(r) are saved by the Savings Statute.").

contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). Regarding both as effective leads the Court to follow the mandate set forth in the sentencing statutes and sentence Defendant to death as the jury recommended. The permissive language of the First Step Act cannot overrule the mandatory language in the sentencing statutes. And, instead of "clearly expressed congressional intention to the contrary" of this conclusion, Congress' definitively expressed intent supports this conclusion. With the Fair Sentencing Act, Congress intended to increase the sentences of violent drug offenders. *See* Fair Sentencing Act, § 5, 124 Stat. at 2373 (directing the Sentencing Guideline Commission to increase the Sentencing Guidelines "if the defendant used violence, made a credible threat to use violence, or directed the use of violence during a drug trafficking offense."). Thus, it defies logic to suggest that Congress intended the First Step Act to grant discretion to the courts in sentencing the most violent drug offenders when none previously existed. Allowing the Court to override the jury's death recommendation to reduce Defendant's sentences for his § 848(e)(1)(a) convictions would run contrary to the intent of the Fair Sentencing Act and result in giving the sentencing statutes no effect. This the Court cannot do.

Defendant's specific request with respect to Count Five highlights the difficulty in squaring the two statutes in the manner that he suggests. Although the First Step Act only gives courts the discretion to impose a reduced sentence for a covered offense, Defendant does not (and cannot) request that the Court impose a reduced sentence for Count Five. Defendant instead asks the Court to impanel a new sentencing jury. But the First Step Act did not expressly vest the courts with the discretion or authority to impanel a new sentencing jury, because Congress did not intend the statute to cover violent offenses for which a jury could sentence a defendant to death. Therefore, the Court cannot grant Defendant's request.

APP.404

### iii.    The Sentencing Guidelines Demonstrate that Defendant's Convictions Do Not Fall Under the First Step Act.

The Sentencing Guidelines further support the conclusion that Defendant's sentencing exposure under his § 848(e)(1)(A) remained unchanged by the First Step Act.[9] The Fair Sentencing Act did not result in changes to the guidelines for convictions under § 848(e). Those convictions currently fall under the "First Degree Murder" section of the Sentencing Guidelines, which suggest a guideline sentencing range of life imprisonment.[10] U.S.S.G. § 2A1.1. Likewise, before the Fair Sentencing Act, and at the time of Defendant's sentencing, convictions under § 848(e) fell under the "First Degree Murder" section of the Sentencing Guidelines. *See, e.g.,* U.S.S.G. § 2A1.1 (U.S. Sentencing Comm'n 1993); (PSR at 42). Moreover, unlike other sections of the Sentencing Guidelines that take into account the drug quantity in the underlying offense, the "First Degree Murder" section contains no such provision. *Compare, e.g.,* U.S.S.G. § 2D1.1 (taking into account drug quantity in calculating base offense level for various offenses), *with* U.S.S.G. § 2A1.1 (no reference to drug quantities in calculating base offense level for first degree murder). This provides further support for the conclusion that the Fair Sentencing Act had no effect on the penalties applicable to Defendant's Capital Murder Convictions.

---

[9]    The Court recognizes that the First Step Act concerns changes to the statutory penalties rather than the Sentencing Guidelines. *See Wirsing,* 943 F.3d at 186 ("The First Step Act specifies that it is 'statutory penalties' that are at issue to avoid any ambiguity that might arise in the sentencing context between penalties specified by statute or by the Guidelines."). Nevertheless, this brief analysis of the relevant Sentencing Guidelines highlights the lack of change to Defendant's sentencing exposure produced by the First Step Act and illustrates that Congress did not intend to reduce the statutory penalties for violent drug offenders.

[10]    "This guideline applies when a sentence of death is not imposed under [21 U.S.C. § 848(e)]." U.S.S.G. § 2A1.1 cmt. 3. And, of course, the Fair Sentencing Act did not change the fact that the death penalty (or a sentence of life imprisonment) may still be imposed under 21 U.S.C. § 848(e).

APP.405

**D.    Other Courts Have Considered Similar, But Not Identical, Issues.**

Defendant further argues that other courts have found that § 848 convictions qualify as covered offenses. (Def. Mem. at 5.) However, Defendant cites only non-binding and inapposite cases. The Fourth Circuit has not spoken on the issue. Yet, in the only published circuit court opinion to address an § 848(e) conviction under the First Step Act, the Sixth Circuit came to the same conclusion as the Court does here. In *United States v. Snow*, the Sixth Circuit held that Defendant's conviction under § 848(e)(1)(a) for conspiracy to kill a person while engaged in a conspiracy to distribute at least 50 grams of cocaine base did not constitute a covered offense for purposes of the First Step Act. 967 F.3d 563, 564 (6th Cir. 2020). The defendant argued that the increase in the threshold quantity to trigger § 841(b)(1)(A), combined with § 848(e)(1)(A)'s requirement of an offense punishable under § 841(b)(1)(A), qualified his § 848(e)(1)(A) conviction as a covered offense. *Id.* at 564. The Sixth Circuit rejected this argument: "We disagree and hold that the First Step Act's text and structure do not support extending resentencing relief to Snow's § 848(e)(1)(A) conviction." *Id.*

This rejection relied on two main reasons. First, the court determined that under the defendant's theory, the previous elements of the defendant's conviction — murder in furtherance of a conspiracy to distribute at least 50 grams of cocaine base — "*no longer amount to an offense under § 848 at all* and there is *no* applicable statutory sentencing range" after the Fair Sentencing Act. *Id.* at 565 (emphasis in original). The Sixth Circuit determined that this constituted an elimination of statutory penalties, not a modification, and, therefore, the First Step Act did not apply. Second, and relatedly, the district court could not impose a reduced sentence as if the Fair Sentencing Act had been in effect, because the First Step Act "simply does not contemplate the *elimination* of a sentence, as would be required here." *Id.* (emphasis in original). Therefore, it

34

concluded that "Snow's § 848(e)(1)(A) conviction is not a covered offense and he is ineligible for a reduction in his sentence for Count 2." *Id.* For the reasons stated above, the Court agrees with the Sixth Circuit's conclusion.

The cases cited by Defendant for the proposition that "courts have consistently found that a conviction under § 848 is a covered offense under the First Step Act" fail to persuade the Court. (Def.'s Mot. at 5.) For example, in *United States v. Davis*, the court found that "a defendant's § 848(e)(1)(A) conviction is a covered offense because it relies on the drug quantity thresholds set by § 841 and, therefore, requires a jury finding that the defendant committed a murder in furtherance of a drug conspiracy to sell 280 or more grams of cocaine base." 2020 WL 1131147, at *2 (W.D. Va. Mar. 9, 2020). Here, however, as described above, Defendant's § 848(e)(1)(A) conviction does not rely on the drug quantity thresholds set by § 841. Moreover, for the reasons stated above, the Court disagrees with the reasoning in *Davis*.[11]

The remaining cited cases are inapposite. In *United States v. Brown*, the Court found that the defendant's convictions under § 848 (a) and (b) constituted covered offenses under the First Step Act. 2020 WL 3106320 (W.D. Va. June 11, 2020). It did not address a conviction under § 848(e)(1)(A). In any event, its finding that § 848 as a whole constituted the statute of conviction contradicts Fourth Circuit precedent that § 848(e)(1)(A) stands by itself apart from the rest of § 848. *See NJB*, 104 F.3d at 633 (holding that the statute "clearly expresses Congress' intent that § 848(e) be a separate crime"). Likewise, in *United States v. Kelly*, the Court addressed the defendant's convictions under § 848(c) and sentence under § 848(a) and (b). No. 2:94cr163 (E.D. Va. June 5, 2020). It did not address a conviction under § 848(e)(1)(A).

---

[11]    Despite the faulty eligibility analysis, the court in *Davis* did find that the First Step Act did not alter the § 848(e)(1)(A) conviction and instead only made him eligible for a sentence reduction. And the court denied him such a reduction. 2020 WL 1131147, at *2-3.

APP.407

Finally, in *Wright v. United States*, the Court addressed the defendant's § 841 convictions, but excluded the defendant's § 848(c) conviction when listing the counts covered by the First Step Act. 425 F. Supp. 3d 588, 592-94 (E.D. Va. 2019). It did not address a conviction under § 848(e)(1)(A) or any other section of § 848 and, therefore, has no bearing on the instant analysis. The other unpublished, out-of-district and out-of-circuit cases cited by Defendant similarly fail to convince this Court that it may modify Defendant's sentences for convictions for murder in furtherance of a continuing criminal enterprise in violation of § 848(e)(1)(A).

At bottom, Defendant comes before the Court with unaltered convictions under a statute with unaltered statutory penalties and asks the Court to alter his sentence. Defendant received a death sentence and life imprisonment sentences for drug-related murders. However, these sentences had no foundation in the type or quantity of drug that led to the murders. Instead, they were predicated on the fact that Defendant killed multiple people to advance his drug enterprise. Yet, Defendant attempts to use the Fair Sentencing Act and First Step Act — enacted to correct disparate sentences that had a foundation only in the type and quantity of the drug at issue — to reduce his sentences for these murders. Congress plainly did not intend for those Acts to apply to Defendant's deadly drug crimes.

Because the statutory penalties for his statute of conviction remain unchanged, the First Step Act does not reach Defendant's sentences under § 848(e)(1)(A). *See United States v. Woodson*, 962 F.3d at 816-17 (holding that "the relevant change for purposes of a 'covered offense' under the First Step Act is a change to the statutory penalties for a defendant's statute of conviction"). Accordingly, the Court holds that Defendant's convictions under § 848(e)(1)(A) for the Capital Murder Counts do not constitute "covered offenses" for purposes of the First Step Act. The Court's decision on these counts does not end the analysis, as Defendant also moves

36

for a reduction of his sentence imposed for his Drug Distribution Conviction.

**E.     Count Thirty-Two's Status as a Covered Offense Will Not Result in a Sentence Reduction.**

Although the First Step Act does not cover Defendant's convictions under

§ 848(e)(1)(A), it does cover his Drug Distribution Conviction in Count Thirty-Two for

violations of § 841(a)(1).  Under Count Thirty-Two, Defendant received a sentence of forty

years' imprisonment for a violation of § 841(a)(1), to run concurrently with any other sentence

imposed.  Defendant argues that this sentence makes up part of a larger sentencing package that

the Court must revisit.[12]  Therefore, the combination of a covered offense with non-covered

offenses presents two issues that the Court must resolve.  First, does a conviction of one covered

offense entitle Defendant to reconsideration of his sentences for all convictions?  And second,

should the Court reduce Defendant's sentence for his Drug Distribution Conviction?  For both

questions, the Court answers in the negative.

**i.     The Court Cannot Impose a Reduced Sentence for Non-Covered Offenses.**

First, the statute's text demonstrates that the First Step Act does not permit the Court to

impose a reduced sentence for non-covered offenses.  By its operative language, section 404(b)

provides, "[a] court that imposed a sentence for a covered offense may . . . impose a reduced

sentence as if sections 2 and 3 of the Fair Sentencing Act . . . were in effect at the time the

covered offense was committed."  First Step Act, § 404(b), 132 Stat. 5194.  In deciphering the

meaning of the term "sentence," the Court must keep in mind the "normal rule of statutory

---

[12]     Defendant also attacks the other convictions that comprise his sentencing package.
(Def.'s Mot. at 47-50.)  However, only Counts Five, Eight, Eleven and Thirty-Two form the
basis of his First Step Act Motion, as only those counts could arguably fall under the First Step
Act.  Because a First Step Act motion does not provide the proper vehicle for the attacks on
Defendant's other convictions that he raises, the Court will not entertain those arguments here.
*See Chambers*, 956 F.3d at 676 (Rushing, J., dissenting) (noting that the First Step Act does not
"provide a general opportunity to collaterally attack a final sentence").

37

interpretation that identical words used in different parts of the same statute are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 33-34 (2005). Giving the word "sentence" a consistent meaning in Section 404(b), the Court can impose a "reduced sentence" only to replace the "sentence for a covered offense." Along these same lines, the Court must read section 404(b) in conjunction with the narrow limitations placed on sentence modifications by 18 U.S.C. § 3582(c)(1)(B). And, section 404(b) did not expressly permit the Court to modify a defendant's sentence for a non-covered offense. Accordingly, the Court finds that it cannot reduce Defendant's sentences for the Capital Murder Convictions based solely on the fact that Defendant received a sentence for a covered offense for the Drug Distribution Count.

> ii.    **The Calculation of Defendant's Sentence and the Concurrent Sentences Imposed Weigh Against a Sentence Reduction.**

Although the First Step Act covers Defendant's offense in Count Thirty-Two, the Court need not reduce his sentence. Even if a defendant meets the eligibility criteria for a sentence reduction under the First Step Act, the Court retains discretion over whether to grant the reduction. *Wirsing*, 943 F.3d at 180 ("Among other limitations, Congress left the decision as to whether to grant a sentence reduction to the district court's discretion."); FSA § 404(c), 132 Stat. at 5222 ("Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section."). Here, the Court will exercise that discretion and deny Defendant's request for a reduction below forty years' imprisonment.

In exercising this discretion, the Court notes that Defendant's sentence appears to have been imposed as if the Fair Sentencing Act were in effect at the time of his sentencing. In Count Thirty-Two, the jury convicted Defendant of Possession with Intent to Distribute 50 Grams or More of Cocaine Base, in violation of §§ 841(a)(1) and (b)(1)(A)(ii). At the time of Defendant's

sentencing, before the Fair Sentencing Act, Defendant's conviction for more than 50 grams of cocaine base mandated a sentence of ten years to life imprisonment. *Wirsing*, 943 F.3d at 180-81. Today, after the Fair Sentencing Act, possession of 50 grams of cocaine base mandates a sentence of imprisonment of five to forty years. 21 U.S.C. § 841(b)(1)(B)(iii). However, in preparing Defendant's Presentence Investigation Report (("PSR") ECF No. 27-1), the Probation Officer calculated Defendant's statutory penalty range for Count Thirty-Two as five to forty years' imprisonment. (PSR at 36, 53.) The Court sentenced Defendant within this range, albeit at the top of this range — forty years. Accordingly, due to a potential miscalculation, it would appear as if Defendant already received the benefit of the Fair Sentencing Act with respect to the Drug Distribution Conviction.

The concurrent sentence doctrine further counsels against reducing Defendant's sentence for the Drug Distribution Conviction. The concurrent sentence doctrine generally provides that where a defendant receives concurrent sentences on plural counts, a reviewing court need not pass on the validity of a sentence where the sentence runs concurrently with an equal or longer sentence. *United States v. Charles*, 932 F.3d 153, 160-61 (4th Cir. 2019). The doctrine "has continuing force as a species of harmless-error review where a defendant seeks to challenge the legality of a *sentence* that was imposed for a valid conviction, but where the challenged sentence runs concurrently with a valid sentence of an equal or greater duration." *Id.* (emphasis in original). Here, Defendant received a forty-year sentence for his covered offense to run concurrently with his death sentence and five other life imprisonment sentences. These other sentences clearly eclipse his sentence on the Drug Distribution Conviction, such that the Court need not pass on imposing a new sentence for Count Thirty-Two.

39

APP.411

### iii.    The § 3553(a) Factors Weigh Against A Sentence Reduction.

Even absent these factors, the Court would not exercise its discretion to reduce

Defendant's sentence.  In declining to reduce Defendant's sentence, the Court has considered the

factors set forth in 18 U.S.C. § 3553(a), which include:

1.    the nature and circumstances of the offense and the history and characteristics of the defendant;

2.    the need for the sentence imposed –

    a.    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    b.    to afford adequate deterrence to criminal conduct;

    c.    to protect the public from further crimes of the defendant; and

    d.    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3.    the kinds of sentences available;

4.    the kinds of sentences and the sentencing range established for [the applicable offense category as set forth in the guidelines];

5.    any pertinent policy statement . . . by the Sentencing Commission;

6.    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7.    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  The applicable factors weigh against granting Defendant's motion.

First, "the nature and circumstances of the offense and the history and characteristics of

the defendant" weigh heavily against Defendant.  Defendant murdered multiple people on

different occasions in cold blood in furtherance of his drug trafficking.  Even before these

convictions, Defendant committed several other violent and drug-related crimes, leading to a

criminal history category of V.  (PSR at 50-52.)  The Court has considered Defendant's good

APP.412

conduct and rehabilitative efforts while in prison, which factor in his favor. Moreover, the Court has considered the evidence of the mitigating factors that Defendant has raised in his Motion, including his abusive childhood and his brain damage. However, these mitigating factors do not outweigh the heinous nature and circumstances of his offenses.[13]

Next, the Court believes that reducing Defendant's sentence would not reflect the seriousness of the offense, promote just punishment for the offense, provide respect for the law or afford adequate deterrence to criminal conduct. Indeed, reducing the sentence of a lethal drug dealer would undermine these goals. Defendant has proven himself as the ultimate danger to the community. Defendant led an extremely violent drug enterprise that killed at least ten people, with Defendant personally implicated in at least five killings. The jury recognized Defendant's status as a highly dangerous individual in sentencing him to the death penalty — a penalty reserved for only the most vicious and dangerous criminals. Defendant's rehabilitative efforts, although substantial and commendable, pale in comparison to the dangers that he poses to society. A reduced sentence would fail to reflect the seriousness of Defendant's crimes. Nor would a reduced sentence provide for a just punishment for Defendant's horrific acts. Likewise, reducing the sentence of a serial killer would undermine respect for the law and detract from adequate deterrence to criminal conduct.

---

[13]    In his First Step Act Motion, Defendant advances claims of actual innocence for the murder of Douglas Moody in arguing that the circumstances of the offense militate in favor of a reduced sentence. (Def.'s Mot. at 8-16.) However, his actual innocence claim has received multiple exhaustive reviews by this Court and the Fourth Circuit. Each review has resulted in a rejection of the actual innocence claim. In any event, a First Step Act Motion does not provide the proper vehicle to litigate this claim yet again.

Notably, his insistence on pressing his rejected actual innocence claim undermines his argument that he has accepted responsibility for his actions and changed his life. Nevertheless, the Court has considered the evidence supporting Defendant's claim of actual innocence and his rehabilitation, but it finds that this evidence does not outweigh the reprehensible nature and circumstances of the offense.

41

The kinds of sentences and sentencing range weigh in favor of not reducing Defendant's sentence, as he has already received a sentence in the applicable Guideline Range for the Drug Distribution Conviction. Likewise, no policy statement from the Sentencing Commission weighs in favor of reducing Defendant's sentence, as the Guidelines for both offenses remain unchanged with respect to the Drug Distribution Conviction and the Capital Murder Convictions. Finally, the Court finds that reducing Defendant's sentence could lead to unwarranted sentence disparities, as defendants with similar records who have been convicted of similar conduct would likely not receive sentences below what Defendant has received here.

The applicable § 3553(a) factors, taken as a whole, counsel against reducing Defendant's term of imprisonment for Count Thirty-Two below forty years.

## IV.    CONCLUSION

Throughout both the guilt and penalty phases, the jury in this case heard all of the evidence relating to Defendant's role in this drug enterprise and the five individuals that he killed to protect his enterprise. Beyond evidence of the atrocious crimes for which it convicted Defendant, the jury heard evidence relating to his character. That jury — speaking on behalf of the community — unanimously decided that this heinous serial killer deserved to die for his actions. The Court refuses to overturn the will of the community. It is not the Court's role to revisit the jury's determination, especially when doing so would run contrary to the goals of the First Step Act.

For the reasons stated above, the Court finds that Defendant's convictions on Counts Five, Eight and Eleven do not constitute covered offenses under the First Step Act. Although Defendant's conviction on Count Thirty-Two does constitute a covered offense, the Court declines to exercise its discretion to reduce Defendant's sentence. Therefore, Defendant's

APP.414

Motion for Imposition of a Reduced Sentence Pursuant to Section 404 of the First Step Act (ECF No. 17) will be denied.

An appropriate Order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Dated: October 29, 2020

43

**APP.415**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

v.                                                    Criminal No. 3:92cr68 (DJN)

COREY JOHNSON,
      Defendant.

**MEMORANDUM ORDER**
**(Denying First Step Act Motion)**

Convicted serial killer Corey Johnson ("Defendant" or "Johnson") comes before the

Court with a Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of

2018 (ECF No. 38) in a last-ditch effort to avoid the just punishment imposed on him for his role

in killing multiple people in furtherance of his drug enterprise.  The Court has already rejected a

nearly identical effort from one of Defendant's co-conspirators.[1]  Defendant has challenged his

convictions and sentences on numerous occasions throughout the years.  But each time they

survived appellate review.  Defendant now seeks to latch onto laws passed to reduce the

sentencing disparities between non-violent crack and powder cocaine offenses as a vehicle to

reduce his sentences imposed for running a drug enterprise and committing multiple murders in

furtherance of the drug enterprise.  But that enterprise and those murders, and the statutes under

which a jury convicted Defendant for them, have nothing to do with the penalties for drug

quantities that the First Step Act addressed.

---

[1]    The Court hereby expressly incorporates into this Memorandum Order the Memorandum
Opinion (the "*Roane* Mem. Op." (ECF No. 67)) denying Roane's First Step Act Motion, entered
on October 29, 2020.  The instant Memorandum Order supplements the *Roane* Memorandum
Opinion to address the new or individualized arguments raised by Defendant.

**APP.416**

## I.    BACKGROUND[2]

### A.    Factual Background

Defendant, along with Richard Tipton ("Tipton") and James Roane, Jr. ("Roane") (collectively, the "partners"), ran a substantial drug-trafficking conspiracy that lasted from 1989 through July of 1992. *Roane*, 378 F.3d at 389. The partners in the conspiracy obtained wholesale quantities of powder cocaine from suppliers in New York City, converted it into crack cocaine, divided it among themselves and then distributed it through a network of 30-40 street level dealers. *Id.* at 389-90. Typically, the partners took two-thirds of the proceeds realized from the street-level sales of their product. *Id.* at 390.

Over a short time in early 1992, the partners took part, in some form, in the murders of ten persons in the Richmond area. *Id.* These murders occurred "in relation to their drug-trafficking operation and either because their victims were suspected of treachery or other misfeasance, or because they were competitors in the drug trade, or because they had personally offended one of the 'partners.'" *Id.* The murders described below directly implicated Defendant.

On January 14, 1992, Roane and Johnson located Peyton Johnson, another rival drug dealer, at a tavern. *Id.* Shortly after Roane left the tavern, Corey Johnson entered and fatally shot Peyton Johnson with a semiautomatic weapon. *Id.*

On January 29, 1992, Roane pulled his car around the corner of an alley, got out and shot Louis Johnson, who had threatened one of the partners while acting as a bodyguard for a rival drug dealer. *Id.* Corey Johnson and Lance Thomas ("Thomas") then got out of Roane's car and

---

[2]    The Court takes these background facts from the Fourth Circuit's opinion in *United States v. Roane*, 378 F.3d 382 (4th Cir. 2004), which recited the factual summary *in haec verba* from *United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), the opinion on the defendants' direct appeal.

2

began firing at Louis Johnson. *Id.* As Louis Johnson laid on the ground, either Corey Johnson or Thomas shot him twice at close range. *Id.* Louis Johnson died from these gunshot wounds. *Id.*

On February 1, 1992, Roane, Johnson and Thomas went to the apartment of Torrick Brown, who had given Roane trouble. *Id.* After the three men knocked on the apartment door, Brown's half-sister opened the door and summoned Brown. *Id.* The three men opened fire with semiautomatic weapons, killing Brown and critically wounding his half-sister. *Id.*

In late January 1992, after Johnson threatened Dorothy Armstrong for not paying for a supply of crack cocaine, Armstrong went to live with her brother, Bobby Long. *Id.* On February 1, 1992, Johnson, Tipton and Jerry Gaiters ("Gaiters") went to Long's house. *Id.* at 391. While Tipton waited in the car, Johnson and Gaiters approached the front door. *Id.* When Long opened the door, Johnson opened fire, killing Dorothy Armstrong and Anthony Carter. *Id.* As Bobby Long fled out the front door, Johnson shot him dead in the front yard. *Id.*

On February 19, 1992, Johnson arranged to meet with Linwood Chiles, who Johnson suspected of cooperating with the police. *Id.* That night, Chiles and Johnson drove off together in Chile's station wagon, with Curtis Thorne and sisters Priscilla and Gwen Greene also in the car. *Id.* Chiles parked in an alley before Tipton parked behind the station wagon and walked up beside it. *Id.* With Tipton standing by, Johnson told Chiles to place his head on the steering wheel before shooting him twice at close range. *Id.* The partners fired additional shots, killing Thorne and critically wounding the Greene sisters in the station wagon. *Id.*

**B.    Verdict and Sentencing**

In January and February of 1993, United States District Judge James R. Spencer presided

3

over the trial of Defendant and his co-conspirators. Defendant[3] faced capital murder charges for Murder in Furtherance of a Continuing Criminal Enterprise ("CCE") under 21 U.S.C. § 848(e)(1)(A) for seven of these killings — Peyton Johnson (Count Eight), Louis Johnson (Count Eleven), Armstrong (Count Seventeen), Carter (Count Eighteen), Long (Count Nineteen), Thorne (Count Twenty-Four) and Chiles (Count Twenty-Five) (collectively, the "Capital Murder Counts" or "Capital Murder Convictions"). *Id.* at 391; (Second Superseding Indictment ("Indictment") (Dkt. No. 115) at 7-18). On February 3, 1993, the jury convicted him of all seven Capital Murder Counts. 378 F.3d at 391. The jury also convicted Defendant of one count of participating in a Conspiracy to Possess Cocaine Base with Intent to Distribute, in violation of 21 U.S.C. § 846 (Count One); one count of engaging in a CCE, in violation of 21 U.S.C. § 848(a) (Count Two (the "CCE Count" or "CCE Conviction")); eleven counts of Committing Acts of Violence in Aid of Racketeering ("VICAR"), in violation of 18 U.S.C. § 1959 (Counts Ten, Thirteen, Fourteen, Sixteen, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Seven, Twenty-Eight, Twenty-Nine, Thirty); five counts of Use of a Firearm in Relation to a Crime of Violence or Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c) (Counts Nine, Twelve, Fifteen, Twenty, Twenty-Six); and two counts of Distribution of or Possession with Intent to Distribute Crack Cocaine, in violation of § 841(a)(1) (Counts Thirty-One and Thirty-Two (the "Drug Distribution Counts" or the "Drug Distribution Convictions")). 378 F.3d at 392; (Dkt. Nos. 466, 593). Defendant's First Step Act Motion pertains only to the CCE Conviction, the Capital Murder Convictions and the Drug Distribution Convictions.

On February 16, 1993, following a penalty hearing on the Capital Murder Convictions, the jury recommended that Defendant be sentenced to death for all seven of the Capital Murder

---

[3] The Court tried Roane, Tipton and Johnson along with four other defendants on a thirty-three-count superseding indictment.

4

Convictions. 378 F.3d at 392. On June 1, 1993, pursuant to 21 U.S.C. § 848(l), the Court sentenced Johnson to death for Counts Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-Four and Twenty-Five. (Dkt. No. 593.) Defendant received a life imprisonment sentence for the CCE Conviction and each of the VICAR convictions. *Id.* Additionally, Defendant received a sentence of forty years' imprisonment for Count Thirty-Two, thirty years' imprisonment for each of Counts Twenty-Nine and Thirty, twenty years' imprisonment for each of Counts Twelve, Fifteen, Sixteen, Twenty, Twenty-Six and Thirty-One and five years' imprisonment for Count Nine. *Id.*

The Court refused to order the execution on the grounds that Congress had neither directly authorized the means to carry out the death sentences, nor properly delegated to the Attorney General the authority to issue the implementing regulations that the Government invoked. 378 F.3d at 392. As a result, the Court stayed the execution of the death sentences until such time as Congress had authorized the means of execution. *Id.*

C.     **Post-Trial Proceedings**

The defendants appealed their convictions and sentences and the Government cross-appealed the stay of the death sentences. *Id.* at 392. In a lengthy opinion, the Fourth Circuit analyzed and disposed of approximately sixty issues, including challenges by the defendants to aspects of the jury-selection process and both the guilt and penalty phases of the trial. *Tipton*, 90 F.3d at 861. The Fourth Circuit rejected nearly all of the claims, affirming the convictions and sentences of all of the defendants, except that it vacated on Double Jeopardy grounds the drug conspiracy convictions under 21 U.S.C. § 846, finding that the CCE convictions in Count Two precluded sentences for the drug conspiracy offenses. *Id.* at 903. Additionally, the Fourth Circuit vacated the stay of the death sentences and remanded for the executions to proceed in

5

APP.420

accordance with regulations promulgated by the Attorney General. *Id.* at 901-03.

Defendant continued to press his appeals. On June 1, 1998, Defendant filed a motion under 28 U.S.C. § 2255 to vacate and set aside his sentences. *Roane*, 378 F.3d at 392. The Court granted the Government's summary judgment motion, and Defendant appealed. *Id.* at 393. The Fourth Circuit affirmed, ruling against Defendant on all accounts. *Id.* at 398-406.

In 2016, Defendant filed multiple applications with the Fourth Circuit to file successive § 2255 petitions to invalidate his § 924(c) convictions. The Fourth Circuit denied his requests. *In re Corey Johnson*, No. 16-4 (4th Cir. 2016), ECF Nos. 2, 10; *In re Corey Johnson*, No. 16-13 (4th Cir. 2016), ECF Nos. 2, 8. On May 22, 2020, Defendant filed yet another application with the Fourth Circuit for a successive § 2255 petition pursuant to the Supreme Court's decision in *United States v. Davis*, 139 S. Ct. 2319 (2019). The Fourth Circuit has placed the case in abeyance pending its decision in *United States v. Dickerson*. *In re Corey Johnson*, No. 20-8 (4th Cir. 2020), ECF Nos. 2, 23.[4]

## D.      Defendant's First Step Act Motion

On August 19, 2020, Defendant filed the instant motion under § 404 of the First Step Act, asking the Court to reduce his sentences for the CCE counts, the Capital Murder Counts and the Drug Distribution Counts. (Mem. in Supp. of Def.'s Mot. for Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 ("Def.'s Mot.") (ECF No. 39).) Defendant argues that these convictions constitute covered offenses under the First Step Act, because the Fair

---

[4]      Johnson's proposed successive § 2255 petition has no impact on his First Step Act motion. In his proposed petition, he attacks his convictions under § 924(c) and does not attack the counts at issue here. *In re Corey Johnson*, No. 20-8 (4th Cir. 2020), ECF No. 2-2 (moving to vacate his convictions under 18 U.S.C. § 924(c) in Counts Nine, Twelve, Fifteen, Twenty and Twenty-Six). Although in his proposed § 2255 petition he argues that his Capital Murder Convictions cannot form the predicates of his § 924(c) convictions, he does not attack the convictions or sentences for the Capital Murder Counts. *Id.*

Sentencing Act modified the statutory penalties for §§ 841 and 848, and the First Step Act allows the Court to retroactively impose those modified statutory penalties. (Def.'s Mot. at 8-10.) Because his resentencing implicates the death penalty, Defendant claims that a jury must resentence him on the Capital Murder Convictions. (Def.'s Mot. at 11.) To that end, Defendant devotes the bulk of his brief to arguing that mitigating factors warrant a reduced sentence. Specifically, Defendant argues that his abusive and neglectful childhood and intellectual disability counsel against imposing the death penalty. (Def.'s Mot. at 16-31.) Further, Defendant argues that his remorse and post-conviction record warrant a reduced sentence. (Def.'s Mot. at 32-35, 40-42.) Finally, Defendant claims that his entire sentencing package contains fatal deficiencies, warranting a sentence reduction. (Def.'s Mot. at 43.) To reach this conclusion, Defendant argues that his § 846, § 924(c) and VICAR convictions are all invalid, despite the Fourth Circuit only invalidating the § 846 conviction to date (on Double Jeopardy grounds) following multiple appeals. (Def.'s Mot. at 43-46.) Accordingly, Defendant requests that the Court grant a full resentencing hearing on the Capital Murder Convictions and a reconsideration of the sentence on the remaining convictions by the Court. (Def.'s Mot. at 47.)

On September 23, 2020, the Government filed its opposition to Defendant's Motion, primarily arguing that his convictions under §848 do not constitute covered offenses and, therefore, the Court may not reduce his sentence. (Govt's Opp. to Def.'s First Step Act Mot. ("Govt's Resp.") (ECF No. 39).) On October 8, 2020, Defendant filed his reply ("Def.'s Reply" (ECF No. 64)), rendering this matter now ripe for review.

## II.    DISCUSSION

The Court must first address whether Defendant's convictions for which he seeks a reduction constitute covered offenses. *United States v. Gravatt*, 953 F.3d 258, 260 (4th Cir.

7

2020) ("[T]he existence of a 'covered offense' is a threshold requirement under the [First Step] Act."). Defendant's desire to have his death sentences reduced for his Capital Murder Convictions clearly drives his request, but the Court has recently determined that those convictions do not constitute covered offenses under the First Step Act. Thus, the Court need not engage in that analysis again. The Court will then address whether Defendant's CCE Conviction constitutes a covered offense, because it did not previously have occasion to address that conviction. Finally, the Court must determine whether to reduce Defendant's sentences for the Drug Distribution Counts, which do constitute covered offenses.

### A. Defendant's Capital Murder Convictions under § 848(e) Do Not Constitute Covered Offenses.

Defendant argues that his Capital Murder Convictions qualify as covered offenses under the First Step Act. The Court has recently rejected this identical argument as advanced by his co-conspirator, James Roane. On October 29, 2020, the Court denied Roane's First Step Act Motion. (ECF No. 66.) In the accompanying Memorandum Opinion, the Court thoroughly analyzed the question of whether the defendants' murder convictions under § 848(e)(1)(A) constitute covered offenses under the First Step Act. *Roane* Mem. Op. at 15-37. The Court concluded that they do not. *Id.* That analysis applies equally to Defendant's Capital Murder Convictions, and Defendant has offered no compelling arguments to reach a different result. Therefore, the Court hereby incorporates its previous Memorandum Opinion and finds that Defendant's Capital Murder Convictions under Counts Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-Four and Twenty-Five do not constitute covered offenses for purposes of the First Step Act.

### B. Defendant's CCE Conviction under § 848(a) Does Not Constitute a Covered Offense.

Defendant also argues that his CCE Conviction in Count Two constitutes a covered

8

offense. (Def.'s Mot. at 8-10.) In the *Roane* Memorandum Opinion, the Court did not analyze whether a conviction under § 848(a) constitutes a covered offense, because Roane did not move to reduce his sentence imposed under Count Two. However, for many of the same reasons that Defendant's Capital Murder Convictions do not constitute covered offenses, his CCE Conviction likewise does not constitute a covered offense.

First, the Fair Sentencing Act did not modify the statutory penalties in § 848(a), demonstrating that the First Step Act does not apply. *See Roane* Mem. Op. at 24-28 (determining that textual analysis of statutes at issue demonstrate that convictions under § 848(e)(1)(A) do not constitute covered offenses). Second, and relatedly, Congress did not intend for the Fair Sentencing Act to reduce the sentences for the drug kingpins that § 848 targets. *See Roane* Mem. Op. at 24-25 (explaining why Congress did not intend the Fair Sentencing Act to apply to § 848(e) convictions). Third, Defendant's CCE Conviction, and the convictions predicating his CCE Conviction, remain valid. That is, the jury found beyond a reasonable doubt that Defendant had committed all of the required elements of a violation of § 848(a), regardless of the statutory penalties that those elements could expose Defendant to when charged as separate offenses. *See id.* at 22-23, 26-28 (explaining why convictions remain valid). Finally, should the Court resentence Defendant under Count Two, his sentencing exposure would remain the same as when the Court originally imposed his sentence — a potential life imprisonment sentence. In short, just as with his Capital Murder Convictions, Defendant comes before the Court with unaltered convictions for statutes that have unaltered statutory penalties and asks the Court to alter his sentence anyway. The First Step Act does not allow for such a result.

**C.    The Court Will Not Reduce Defendant's Sentences for the Drug Distribution Convictions.**

Although the First Step Act does not cover Defendants convictions under § 848(a) or (e), it does cover his Drug Distribution Convictions in Counts Thirty-One and Thirty-Two for violations of § 841(a)(1). However, even if a defendant meets the eligibility requirement for a sentence reduction under the First Step Act, the Court retains discretion over whether to grant the reduction. *United States v. Wirsing*, 943 F.3d 175, 180 (4th Cir. 2019) ("Among other limitations, Congress left the decision as to whether to grant a sentence reduction to the district court's discretion."). The Court imposed a sentence of twenty years' imprisonment for Count Thirty-One and forty years' imprisonment for Count Thirty-Two. (Dkt. No. 593.) Under the current statutory penalties, the Court may impose a sentence up to twenty years' imprisonment for Count Thirty-One and forty years' imprisonment for Count Thirty-Two. Thus, Defendant received sentences in 1993 that remain within the statutory penalties today. However, the Court could still exercise its discretion and reduce Defendant's sentences for the Drug Distribution Convictions.[5]

The Court will not exercise its discretion to reduce Defendant's sentence. In declining to reduce Defendant's sentence, the Court has considered the factors set forth in 18 U.S.C. § 3553(a), which include:

1.    the nature and circumstances of the offense and the history and characteristics of the defendant;

2.    the need for the sentence imposed –

   a.    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

---

[5]    As the Court previously decided, the fact that Defendant received sentences for covered offenses does not permit the Court to impose a reduced sentence for his non-covered offenses. *See Roane* Mem. Op. at 37-38.

APP.425

b.    to afford adequate deterrence to criminal conduct;

c.    to protect the public from further crimes of the defendant; and

d.    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3.    the kinds of sentences available;

4.    the kinds of sentences and the sentencing range established for [the applicable offense category as set forth in the guidelines];

5.    any pertinent policy statement . . . by the Sentencing Commission;

6.    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7.    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The applicable factors weigh against granting Defendant's motion.

First, "the nature and circumstances of the offense and the history and characteristics of the defendant" weigh heavily against Defendant. Defendant murdered multiple people on different occasions in cold blood in furtherance of his drug trafficking. Defendant maimed several others in the commission of those murders. Defendant did not limit his violence to others engaged in drug trafficking — innocent bystanders fell victim to Defendant simply as a result of finding themselves in the wrong place at the wrong time. Moreover, even before these convictions, Defendant committed other violent and drug-related crimes, leading to a criminal history category of IV. (PSR ¶ 123-25.) The Court has considered Defendant's good conduct and rehabilitative efforts while in prison, which factor in his favor. Moreover, the Court has considered the evidence of the mitigating factors that Defendant has raised in his Motion, including his neglectful and abusive childhood and his intellectual disability. However, these mitigating factors do not outweigh the heinous nature and circumstances of his offenses.

Next, the Court believes that reducing Defendant's sentence would not reflect the

11

seriousness of the offense, promote just punishment for the offense, provide respect for the law or afford adequate deterrence to criminal conduct. Indeed, reducing the sentence of a lethal drug dealer would undermine these goals. Defendant has proven himself as the ultimate danger to the community. Defendant led an extremely violent drug enterprise that killed at least ten people, with Defendant personally implicated in at least eight killings. The jury recognized Defendant's status as a highly dangerous individual in sentencing him to the death penalty — a penalty reserved for only the most vicious and dangerous criminals. Defendant's rehabilitative efforts, although substantial and commendable, pale in comparison to the dangers that he poses to society. A reduced sentence would fail to reflect the seriousness of Defendant's crimes. Nor would a reduced sentence provide for a just punishment for Defendant's horrific acts. Likewise, reducing the sentence of a serial killer would undermine respect for the law and detract from adequate deterrence to criminal conduct.

The kinds of sentences and sentencing range weigh in favor of not reducing Defendant's sentence, as he has already received sentences in the applicable Guideline Range for the Drug Distribution Convictions. Likewise, no policy statement from the Sentencing Commission weighs in favor of reducing Defendant's sentences, as the Guidelines for both offenses remain unchanged.

Finally, the Court finds that reducing Defendant's sentence could lead to unwarranted sentence disparities, as defendants with similar records who have been convicted of similar conduct would likely not receive sentences below what Defendant has received here. Defendant argues the opposite, claiming that the life sentences (rather than death) imposed for four murder convictions on his co-conspirator, Thomas, demonstrates that Defendant's sentence "is disproportionate compared to other similarly situated defendants." (Def.'s Mot. at 2; Def.'s

12

Reply at 11-12.) However, the Court has reviewed and considered Thomas's convictions and sentences and finds that they do not warrant reducing Defendant's sentences. With respect to the murder convictions, Defendant arguably played a larger role in the killings. For instance, although the jury convicted both Thomas and Defendant of the murders of Thorne and Chiles, Defendant pulled the trigger while Thomas sat in jail at the time of the killings. *United States v. Reavis*, 48 F.3d 763, 766 (4th Cir. 1995) (describing respective roles in murders in affirming Thomas's convictions). More importantly, an individualized inquiry into whether the specific defendant deserves the death penalty constitutes the hallmark of the penalty phase in death penalty litigation. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (holding that the Eighth and Fourteenth Amendment require the sentencer to make an individualized consideration of mitigating factors); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) ("[T]he fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense."). And here, the jury made that individualized determination, finding that Defendant deserved the death penalty after hearing the evidence relating to Defendant's character and record and the circumstances of the murders. Moreover, with respect to the Drug Distribution Convictions that the First Step Act covers, Defendant received the same sentences as his co-conspirators, and those sentences do not diverge from other similarly-situated defendants such that the Court should reduce them.

The applicable § 3553(a) factors, taken as a whole, counsel against reducing Defendant's term of imprisonment for Count Thirty-One below twenty years or Count Thirty-Two below forty years.

### III.   CONCLUSION

Throughout both the guilt and penalty phases, the jury in this case heard all of the evidence relating to Defendant's role in this drug enterprise and the eight individuals that he killed to protect his enterprise.  Beyond evidence of the atrocious crimes for which it convicted Defendant, the jury heard evidence relating to his character.  That jury — speaking on behalf of the community — unanimously decided that this heinous serial killer deserved to die for his actions.  The Court refuses to overturn the will of the community.  It is not the Court's role to revisit the jury's determination, especially when doing so would run contrary to the goals of the First Step Act.

For the reasons stated above and in the Court's *Roane* Memorandum Opinion, the Court finds that Defendant's convictions on Counts Two, Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-Four and Twenty-Five do not constitute covered offenses under the First Step Act.  Although Defendant's convictions on Counts Thirty-One and Thirty-Two do constitute covered offenses, the Court declines to exercise its discretion to reduce Defendant's sentence.  Therefore, Defendant's Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 (ECF No. 38) will be denied.

Let the Clerk file a copy of this Memorandum Order electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Dated:  November 19, 2020

14

**APP.429**

# I. CHARGES

**CRIMINAL**

| | | | |
|---|---|---|---|
| PO | 422 3 2218 | | |
| Misd. □ | 422 3 2218 | Off./Sentence | |
| Felony ⊠ | District Off Judge/Magistr. | | |

☐ WRIT  ☐ JUVENILE  ☐ ALIAS  OFFENSE ON INDEX CARD ▶

VS. JOHNSON, CORY a/k/a "O"; a/k/a "CO"

JURY

| | |
|---|---|
| Mo. Day Yr. | 04 24 92 |
| No. of Def's | 7 |
| U.S. MAG. CASE NO. ▶ | |

Docket No. Def. 3:92CR68-02

SUPERSEDING INDICTMENT: SAME CODE SECTIONS & COUNTS AS BELOW
SECOND SUPERSEDING INDICTMENT: SAME CODE SECTIONS & COUNTS AS BELOW

| Code | Charge | Cts | DISM. NG |
|---|---|---|---|
| 21:846 | Conspiracy (Ct. 1) | 1 | ⊠ |
| 21:848 | Continuing Criminal Enterprise (Ct. 2) | 1 | ⊠ |
| 21:848(e)(1)(A) & 18:2 | Murder in furtherance of CCE; aid & abet (Cts. 8, 11, 17-19; 24 & 25) | 7 | ⊠ |
| 18:924(c) & 2 | Use of firearm in relation to crime of violence or drug trafficking crime; aid & abet (Cts. 9, 12, 15, 20 & 26) | 5 | ⊠ |
| 18:1959 & 2 | Violent Crimes in aid of racketeering; aid & abet (Cts. 10, 13, 14, 16, 21-23, 27-30) | 11 | ⊠ |
| 21:841(a)(1) & 18:2 | Distribution of Crack; aid & abet (Ct. 31) | 1 | ⊠ |
| 21:841(a)(1) & 18:2 | Possession w/intent to distribute crack; aid & abet (Cts. 32) | 1 | ⊠ |

SUPERSEDING COUNTS

# II. KEY DATE

**INTERVAL ONE**

| KEY DATE | | KEY DATE | |
|---|---|---|---|
| ▶ | ☐ arrest  ☐ sum'ns  ☐ custody  ☐ appears—on complaint | 4/24/92 | ☐ Indictment  ⊠ filed/unsealed  ☐ consent to Magr. trial on complaint  ☐ Information  ☐ Felony-W/waiver |
| EARLIEST OF | | APPLICABLE | |

**END ONE AND/OR BEGIN TWO (OR RESTART PERIOD TO TRIAL)**

| KEY DATE | |
|---|---|
| 8/11/92 | a) ⊠ 1st appears on pending charge /R40 |
| 5/18/92 & 7/20/92 | b) ☐ Receive file R20/21  c) ⊠ Supsdg. ⊠ Ind ☐ Inf  d) ☐ Order New trial  e) ☐ Remand  f) ☐ G/P Withdrawn |

**END INTERVAL TWO**

| KEY DATE | |
|---|---|
| ▶ 1/11/93 | ☐ Dismissal  Pled ☐ guilty  ☐ Nolo  ⊠ Trial (voir dire) began  ⊠ Jury ☐ N.J. |
| APPLICABLE | After N.G. / After nolo |

| 1st appears with or waives counsel | ARRAIGNMENT 8/11/92 | 1st Trial Ended 2/16/93 | RE-TRIAL | 2nd Trial Began | DISPOSITION DATE 2/16/93 | SENTENCE DATE 6/1/93 | ☐ PTD Nolle ☐ Pros. | FINAL CHARGES DISMISSED ☐ on S.T. ☐ grounds ☐ W.P. ☐ WOP | on def motion on gov't motion |

# III. MAGISTRATE

| | | DATE | INITIAL/NO. |
|---|---|---|---|
| Search Warrant | Issued | | |
| | Return | | |
| Summons | Issued | | |
| | Served | | |
| Arrest Warrant Issued | | | |
| COMPLAINT ▶ | | | |
| Date of Arrest | | | |

OFFENSE (In Complaint)

| | | INITIAL/NO. | OUTCOME: |
|---|---|---|---|
| INITIAL APPEARANCE DATE ▶ | | | ☐ DISMISSED |
| PRELIMINARY EXAMINATION | Date Scheduled ▶ | | HELD FOR GJ OR OTHER PROCEEDING IN THIS DISTRICT |
| OR ☐ REMOVAL HEARING | Date Held ▶ | | HELD FOR GJ OR OTHER PROCEEDING IN DISTRICT BELOW |
| ☐ WAIVED  ☐ NOT WAIVED | Tape Number | | |
| ☐ INTERVENING INDICTMENT | | | |

Show last names and suffix numbers of other defendants on same indictment/information:

01-Tipton; 03-Roane; 04-Thomas; 05-Gaiters; 06-Hardy; 07-Reavis

RULE  20  21  40  In  Out

# IV. NAMES & ADDRESSES OF ATTORNEYS, SURETIES, ETC.

**ATTORNEYS**
U.S. Attorney or Asst.

Howard C. Vick, AUSA; William H. Parcell, III, Special AUSA

*2255 See Tipton's Docket Sheet*

Defense: 1 ⊠ CJA.  2 ☐ Ret.  3 ☐ Waived.  4 ☐ Self.  5 ☐ Non / Other.  6 ☐ PD.  7 ☐ CD

John F. McGarvey, Esquire
320 West Broad Street
Richmond VA 23220
644-3420

Craig S. Cooley, Esquire
P.O. Box 7268
Richmond VA 23221
358-2328

2255 petition  as of 8/1/01
Barbara L. Hartung, Esq.  Suite 600
#504, 1001 East Main Street  700 E. Main
Richmond, VA 23219  353-4999
649-1088  FAX 353-5299

Edward E. Scher, Esquire
Thorsen & Scher  316 West Broad St.
3810 Augusta Avenue  -4219
Richmond, VA 23220-4219
359-3000  FAX 359-3139

*See Tipton's docket sheet for 2255 govt atty*

| Status | : |
|---|---|
| On Motion | : 11-2-92, 7:00 |
| FPTC | : |

*From 8-11-92 3:00*

4CCA No.: 93-4006
Consolidated w/No.: 93-4005(L)

**BAIL ● RELEASE**

PRE-INDICTMENT

| Release Date | |
|---|---|
| Bail ☐ Denied | ☐ Fugitive / ☐ Pers. Rec. / ☐ PSA |
| AMOUNT SET $ | Conditions |
| Date Set | ☐ 10% Dep. / ☐ Surety Bnd |
| ☐ Bail Not Made | ☐ Collateral |
| Date Bond Made | ☐ 3rd Prty / ☐ Other |

POST-INDICTMENT

| Release Date | |
|---|---|
| Bail ☐ Denied | ☐ Fugitive / ☐ Pers. Rec. / ☐ PSA |
| AMOUNT SET $ | Conditions |
| Date Set | ☐ 10% Dep. / ☐ Surety Bnd |
| ☐ Bail Not Made | ☐ Collateral |
| Date Bond Made | ☐ 3rd Prty / ☐ Other |

## FINE AND RESTITUTION PAYMENTS

| DATE | RECEIPT NUMBER | C.D. NUMBER | DATE | RECEIPT NUMBER | C.D. NUMBER |
|---|---|---|---|---|---|
| | | | | | |

X Docket Entries Begin On Reverse Side

APPEALS FEE PAYMENTS

APP. 430

U.S. Government Attorneys

IV. NAMES & ADDRESSES OI

Robert J. Erickson
Deputy Chief,
Criminal Division
Appellate Section
U.S. Department of Justice
Room 6102, Patrick Henry Bdlg.
601 D Street, N.W.
Washington, D.C.   20530
(202) 514-2841

and

G. Wingate Grant
Assistant U. S. Attorney

X

DATE

**APP.431**

| DATE | DOCUMENT NO. | | V. PROCEEDINGS | VI. EXCLUDABLE DELAY |
|---|---|---|---|---|

MASTER DOCKET  MULTIPLE DEFENDANT CASE    PAGE 1 OF

X  PROCEEDINGS DOCKET FOR SINGLE DEFENDANT

3:92CR68-02

(OPTIONAL) Show last names of defendants    **V. PROCEEDINGS**

| | | |
|---|---|---|
| **1992** | | |
| April 24 | 1 | Indictment, a true bill, returned before a Judge in Open Court at Richmond, filed.  UNDER SEAL    lcq |
| April 24 | | IN OPEN COURT: Spencer, J., GJCR.  Appearances:  AUSA only. Govt's motion that BW be issued, GRANTED.    lcq |
| April 28 | 2 | Govt's Motion to Unseal, filed.    lcq |
| April 28 | 3 | ORDER granting govt's motion to unseal indictment ent'd, JRS, filed.    lkm |
| May 7 | 42 | Govt's Motion Concerning the Setting of the Trial Date, filed.phb |
| May 18 | 49 | Superseding Indictment, a true bill, returned before the Judge in Open Court at Richmond, filed.    lkm |
| June 29 | 99 | CJA 20, appt of counsel, John McGarvey, for deft, executed, filed.  lkm |
| June 29 | 100 | CJA 20, appt of counsel, Craig Cooley, for deft, executed, filed.  lkm |
| June 29 | 101 | Govt's motion for issuance of subpoenas pursuant to Local Rule 19(e) for production prior to trial filed.    lkm |
| July 1 | 102 | ORDER granting govt's motion for early issuance of subpoenas; ent'd, JRS, filed.  Copies to counsel.    lkm |
| July 14 | 110 | ORDER granting defts Tipton, Roane & Thomas' motion for continuance of trial set for 9/16/92.  Trial rescheduled for 10 a.m. on 1/11/93; ent'd, JRS, filed.  Copies mailed.    lkm |
| July 20 | 115 | Second Superseding Indictment, a true bill, returned to a Judge in open court at Richmond, filed.    lkm |
| July 21 | — | Transcript of bond hearing on 5/5/92 filed by OCR.    lkm |
| July 23 | — | Copies of second superseding indictment mailed to counsel.    lkm |
| July 23 | — | BW issued as detainer on 2nd superseding indictment pursuant to order of USMJ Lowe.    lkm |
| July 31 | 124 | Deft's ex parte motion for preparation of transcript filed.    lkm |
| Jul. 31 | 125 | AMENDED ORDER continuing trial until 1/11/93.  ENT 7/31/92, JRS, filed.  Cps. dist.    phb |
| Jul. 31 | — | Magistrate's papers from SD/NY-New York, rec'd.    phb |
| Aug. 3 | 127 | ORDER UNDER SEAL .  ENT 8/3/92, JRS, filed.  Cps. dist.  phb |
| Aug. 5 | 128 | Deft's Motion for Appointment of Psychiatric, Neurologic, Investigative, Medical, & Mitigation Experts, filed.    phb |
| Aug. 5 | 129 | Deft's Motion for a Bill of Particulars, filed.    phb |
| Aug. 5 | 130 | Deft's Memorandum in Support of Motion, filed.    phb |
| Aug. 5 | 131 | Deft's Motion for Early Disclosure of Jencks Act & Brady Material & Incorporated Memorandum, filed.    phb |
| Aug. 5 | 132 | Deft's Motion for Disclosure of R.404 Evidence & Incorporated Memorandum, filed.    phb |
| Aug. 5 | 133 | Deft's Motion for Discovery & Inspection & Incorporated Memorandum, filed.    phb |
| Aug. 5 | 134 | Deft's Motion for Disclosure of Exculpatory Evidence & Incorporated Memorandum, filed.    phb |
| Aug. 5 | 135 | Deft's Motion to Adopt Codef's Motions & Supporting Memorandum, filed.    phb |
| Aug. 5 | 136 | Deft's Ex Parte Motion for Preparation of Transcript,filed.phb |
| Aug. 7 | 137 | EX PARTE ORDER that Deft's motin for 6/12/92 & 7/28/92 transcripts is GRANTED.  ENT 8/7/92, JRS, filed.  Cps.dist.phb |
| Aug. 11 | | IN OPEN COURT:  Lowe, M., Kull, OCR.  Appearances:  Deft. w/counsel. AUSA  Matter came on for arraignment.  Deft WFA, entered plea of not guilty to all charges; requested trial by jury.  Jury trial set for 1/11/93 at 10:00 a.m. Deft. to file any brief or objections within 10 days.  Bond hearing set for 8/17/92 at 2:00 p.m.  Deft. remanded. (:12)    lcq |
| Aug. 11 | 138 | Temporary Detention Order, ENT 08-11-92, DGL, filed.    lcq |
| Aug. 17 | | PROCEEDINGS BEFORE MAGISTRATE:  Lowe, M. Kull, OCR.  Appearances: Deft. w/counsel. AUSA.  Matter came on for bond hearing. Govt. adduced evidence, rested. Deft. adduced no evidence. Case submitted w/no arguments.  Govt's list of murders and witnesses submitted, UNDER SEAL.  Findings of fact stated from the bench. |

CONTINUED TO PAGE

**APP.432**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET   *U. S. vs*

JOHNSON, CORY                          PAGE 2

AO 256A ⊕

| | | | | | |
|---|---|---|---|---|---|
| | | | 92CR68-02 | | |
| | | | Yr. | Docket No. | Def. |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|
| | (Document No.) | (a) | (b) | (c) | (d) |
| **1992** | | | | | |
| Aug. 17 | PROCEEDINGS BEFORE MAGISTRATE continued:  Deft. held w/o bond.  Deft's request for transcript of bond hearing, GRANTED.  Deft. remanded to custody. (:30)                          lcq | | | | |
| Aug. 18 | 140  Order of Detention Pending Trial, ENT 08-18-92, DGL, filed.                                    lcq | | | | |
| Aug. 18 | 141  Govt's Omnibus Response to Deft. Johnson's Pre-trial Motions, filed.                         lcq | | | | |
| Aug. 20 | 144  ORDER that Deft's motion for a bill of particulars is DENIED.  ENT 8/20/92, JRS, filed.  Cps. dist.   phb | | | | |
| Aug. 20 | 145  ORDER re: schedule of Discovery & Inpsection, Brady Material, & Jencks/Giblio Materials.  ENT 8/20/92, JRS, filed.  Cps. dist.                    phb | | | | |
| Aug. 21 | 146  Deft's Motion for Penalty Phase Discovery,filed.  phb | | | | |
| Aug. 27 | 148  ORDER of the Court - EX PARTE.  (SEALED)  ENT 8/27/92, JRS, filed.  Cps. dist.             phb | | | | |
| Sep. 9 | 155  Govt's Response to Deft's Motion for Penalty Phase Discovery, filed.                            phb | | | | |
| Sep. 17 | 160  Deft's Motion for Bill of Particulars of the Notice of the Intention of the Govt to Seek the Death Penalty, filed.                                phb | | | | |
| Oct. 8 | -  Marshal's return on 4/24/92 Warrant for Arrest, executed, & filed.                                 phb | | | | |
| Oct. 8 | -  Marshal's return on 7/23/92 Warrant for Arrest, unexecuted, & filed.                               phb | | | | |
| Oct. 14 | 174  Deft's Motion for Compliance w/18:3432, filed.   phb | | | | |
| Oct. 14 | 175  Deft's Motion for Continuance, filed.        phb | | | | |
| Oct. 14 | 176  Deft's Motion for Discovery & Inspection from Codefts at a Joint Trial, filed.                    phb | | | | |
| Oct. 14 | 177  Deft's Notice of Request for Hearing, filed.   phb | | | | |
| October 14 | 179 Govt's Response to Deft's Motion for Bill of Particulars of the Notice of the Intention of the United States to Seek the Death Penalty, filed.                          rlw | | | | |
| Oct. 14 | 181 Deft's ex parte motion **UNDER SEAL** filed.   lkm | | | | |
| Oct. 20 | 182  EX PARTE ORDER UNDER SEAL.  ENT 10/20/92, JRS, filed. Cps. to Deft's attys.                    phb | 2 | 10/21/92 | T2 | |
| Nov. 2 | -  **IN OPEN COURT:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Matter came on for hearing on pending motions.  Counsel heard on following motions: to continue trial; for discovery & inspection; for penalty phase discovery; for bill of particulars; for notice of govt's intention to seek death penalty; for early disclosure of Jencks & Brady; for compliance w/ 18 USC 3432; for discovery & inspection from co-defts.  Motions taken under advisement; order to issue. Deft remanded.     lkm | | | | |
| Nov. 4 | 197  Deft's Motion and Memorandum to Transfer Deft, filed.                                        jtj | | | | |
| Nov. 9 | 201 Deft's Ex Parte Motion **UNDER SEAL** filed.    lkm | | | | |

FILE No. 2

FILE No. 3

FILE No. 4

Interval
(per Section II)

Start Date
End Date   Ltr.  Total

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

U.S. v. JOHNSON, CORY          PAGE 3          3:92CR68

AO 256A

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|------------|-------------------------|-----|-----|-----|-----|
| | (Document No.) | | (a) | (b) | (c) | (d) |

**1992**

**Nov. 9** — 202 — Ex Parte ORDER UNDER SEAL ent'd, JRS, filed. Copy to deft's counsel.   lkm

**Nov. 9** — 204 — ORDER ent'd, JRS, filed, with Court's ruling on motions heard in open court on 11/2/92. 1. Motion for continuance – denied. 2. motion for guilty phase discovery – denied. 3. motion for penalty phase discovery – granted; govt to provide information as it is available, but no later than 12/1/92 as relates to non-statutory aggravating factors; motion denied as to statutory aggravating factors. 4. motion for reconsideration w/respect to bill of particulars – denied. 5. motion for bill of particulars of notice of intention to govt to seek death penalty – denied. 6. mtion for compliance w/18 USC 3432 to furnish list of witnesses – granted; to be furnished no later than 1/1/93. 7. motion for discovery & inspection from co-defts – denied. 8. motion for early disclosure of Jencks and Brady materials – Order of 8/20/92 modified; govt ordered to produce such material no later than 1/4/93; counsel may disclose info to clients; may not provide clients w/copies; all such materials to be returned to USAtty at conclusion of trial; order of 8/20/92 remains in effect in all other respects. 9. motion to adopt co-defts' motions – denied; court will permit deft upon filing of appropriate motion to adopt co-deft Tipton's motion on constitutionality of federal death penalty statute & supporting memorandum.   Copy to counsel. lkm

**Nov. 16** — 209 — ORDER that U.S. Marshal's Office transport Deft from Western Piedmont Regional Jail to the Richmond City Jail at the first opportunity.  ENT 11/16/92, JRS, filed. Cps. dist.   phb

**Nov. 18** — 212 — Petition & ORDER FOR WHCAT for Maurice Saunders ret. 11/19/92 at 9 AM.  ENT 11/18/92, JRS, filed.   phb

**Nov. 18** — – — WHCAT for Maurice Saunders ret. 11/19/92 at 9 AM, issued.   phb

**Nov. 19** — 214 — ORDER that Govt has until 11/27/92 to respond to Deft's Motion to Dismiss, filed.   phb

**Nov. 23** — 218 — Deft's Ex Parte Motion for Issuance of Subpoena Duces Tecum, filed.  SEALED   phb

**Nov. 23** — 219 — Deft's Motion on the Constitutionality of the Fed. Death Penalty Statute on Its Fact & as Applied to Him, filed. phb

**Nov. 23** — 220 — Deft's Memo. in Support of Motion, filed.   phb

**Nov. 24** — – — Marshal's return on WHCAT for Maurice Saunders, unexecuted, & filed.   phb

**Dec. 1** — 231 — Govt's Motion for Reciprocal Discovery, filed.   phb

**Dec. 2** — 232 — EX PARTE ORDER UNDER SEAL.  ENT 12/2/92, JRS, filed. Cps. dist.   phb

**Dec. 2** — 234 — EX PARTE ORDER UNDER SEAL.  ENT 12/2/92, JRS, filed. Cps. dist.   phb

**Dec. 8** — 309 — Govt's response to deft's motion on constitutionality of Federal death penalty statute filed.   lkm

**Dec. 10** — 316 — Govt's notice of intention to provide victim impact testimony filed.   lkm

CONTINUED ON NEXT PAGE

Interval
(per Section II)

Start Date
End Date

Ltr. Total
Code Days

**APP.434**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET    *U. S. vs*    JOHNSON, CORY

AO 256A ⊕

3:92CR68-02

Yr. | Docket No. | Def.

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|---|-------------------------|-----|-----|-----|-----|
| | | | (a) | (b) | (c) | (d) |
| | | (Document No.) | | | | |
| **1992** | | | | | | |
| Dec. 10 | – | One (I) box of records received from Dr. Natalie Weissblum, NY,NY in response to subpoena.    km | | | | |
| Dec. 14 | 322 | Deft's Motion for Pretrial Conference, filed.    phb | | | | |
| Dec. 14 | 323 | Deft's Motion for Severance of Defts at Penalty Phase, filed.    phb | | | | |
| Dec. 14 | 324 | Deft's Memo. in Support of Motion, filed.    phb | | | | |
| Dec. 14 | 325 | Deft's Motion to Dismiss the Death Penalty Provision of 21 USC §848, for Want of Justice w/out Discrimination, filed.    phb | | | | |
| Dec. 14 | 326 | Deft's Memo. in Support of Motion, filed.    phb | | | | |
| Dec. 21 | 334 | Deft's Motion in Limine, filed.    phb | | | | |
| Dec. 21 | 335 | Deft's Request for Bill of Particulars Regarding Notice of the Intention of the Govt to Provide Victim Impact Testimony, filed.    phb | | | | |
| Dec. 21 | 336 | Govt's Motion for Permission to Allow Jurors to Take Notes During Trial, filed.    phb | | | | |
| Dec. 22 | 340 | Petition & ORDER FOR WHCAT for Douglas Cunningham ret. 1/11/93 at 10 AM.  ENT 12/22/92, JRS, filed.    phb | | | | |
| Dec. 22 | – | WHCAT for Douglas Cunningham ret. 1/11/93 at 10 AM, issued.    phb | | | | |
| Dec. 22 | 341 | Petition & ORDER FOR WHCAT for Rodney Tucker ret. 1/11/93 at 10 AM.  ENT 12/22/92, JRS, filed.    phb | | | | |
| Dec. 22 | – | WHCAT for Rodney Tucker ret. 1/11/93 at 10 AM, issued.phb | | | | |
| Dec. 22 | 342 | Petition & ORDER FOR WHCAT for Gregory Noble ret. 1/11/93 at 10 AM.  ENT 12/22/92, JRS, filed.    phb | | | | |
| Dec. 22 | – | WHCAT for Gregory Noble ret. 1/11/93 at 10 AM, issued.phb | | | | |
| Dec. 22 | 343 | Petition & ORDER FOR WHCAT for Daryl Moses ret. 1/11/93 at 10 AM.  ENT 12/22/92, JRS, filed.    phb | | | | |
| Dec. 22 | – | WHCAT for Daryl Moses ret. 1/11/93 at 10 AM, issued.phb | | | | |
| Dec. 22 | 344 | ORDER that parties & their counsel are ORDERED to treat all juror information as CONFIDENTIAL.  This require-ment applies equally to specific information about individual jurors & to information about the panel as a whole.  Counsel are REMINDED that per Local R.9(A) (1), "no juror shall be approached, either directly or through any member of his or her immediate family, in an effort to secure information concerning such juror."  ENT 12/22/92, JRS, filed.  Cps. dist.  phb | | | | |
| Dec. 22 | – | **IN OPEN COURT:** Spencer, J., Medford W. Howard, Ct. Rept. Appearances: Defts Tipton, Johnson, Roane w/counsel; deft Reavis by counsel; AUSA. Matter came on for hearing on defts' motion on constitutional challenge to statue. Counsel submitted issue on briefs by parties. Order to enter. Pretrial conference held to resolve issue raised by counsel prior to trial. Counsel for Tipton, Johnson, Roane heard. Govt heard.  Court to enter order setting forth procedures to be followed at trial. Defts remanded.  (:40)    lkm | | | | |
| Dec. 23 | 348 | ORDER granting govt's motion for reciprocal discovery; directing defts to provide govt w/all materials required under FRCrP 16(b) and 12.2 by 12/30/92; entered, JRS, filed.  Copies to counsel.    lkm | | | | |
| Dec. 23 | 349 | Pretrial Order ent'd, JRS, filed.  Copies to counsel.    lkm | | | | |

Interval
(per Section II)

Start Date
End Date

Ltr. | Total
Code | Days

**APP.435**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET                    US v JOHNSON, CORY                    PAGE 5    3:9

AO 256A

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
| | | | (a) | (b) | (c) | (d) |
| | | (Document No.) | | | | |
| **1992** | | | | | | |
| Dec. 29 | 371 | MEMORANDUM OPINION of the Court.  ENT 12/29/92, JRS, filed.  Cps. dist.                          phb | | | | |
| Dec. 29 | 372 | ORDER that Defts' motions challenging the constitutionality of the death penalty provisions of 21:848 are DENIED. ENT 12/29/92, JRS, filed.  Cps. dist.          phb | | | | |
| Dec. 30 | 375 | Deft's ex parte motion **UNDER SEAL** filed.          lkm | | | | |
| Dec. 31 | 378 | Petition & ORDER FOR WHCAT for Anthony Holland ret. 1/11/93 at 10 AM.  ENT 12/31/92, JRS, filed.    phb | | | | |
| Dec. 31 | - | WHCAT for Anthony Holland ret. 1/11/93 at 10 AM, issued. phb | | | | |
| Dec. 31 | 383 | **EX PARTE ORDER UNDER SEAL.**  ENT 12/31/92, JRS, filed. Copy to Deft's atty.                        phb | | | | |
| **1993** | | | | | | |
| Jan. 4 | 387 | ORDER Govt will not be permitted to make use of certain information re:  nonstatutory aggravating factors at trial if the Govt has failed to provide such information to the Defts as previously ordered.  Govt is REMINDED it may only introduce information re:  nonstatutory aggravating factors for which notice has been provided. Deft's motions for trial date continuance are DENIED. ENT 1/4/93, JRS, filed.  Cps. dist.              phb | | | | |
| Jan. 4 | 388 | ORDER **DENYING** Defts Johnson & Roane's motions to dismiss for want of justice w/out discrimination and Deft Tipton's motion to dismiss on grounds of racial discrimination.  ENT 1/4/93, JRS, filed.  Cps. dist.phb | | | | |
| Jan. 4 | 389 | ORDER **DENYING** Defts Johnson & Roane's motion to sever their trial.  ENT 1/4/92, JRS, filed.  Cps. dist. phb | | | | |
| Jan. 04 | 393 | Defts' Motion to Compel Disclosure of Addresses of Witnesses & Motion to Continue, rec'd.                        rlw | | | | |
| Jan. 05 | 394 | Order directing that Gov't shall not be permitted to introduce certain victim impact testimony at the sentencing phase and that motions by Deft and Co-Deft  Tipton          seeking bills of particulars are hereby **MOOT**; ent'd 01-05-93 (JRS), filed.  Copies distributed.                                          rlw | | | | |
| Jan. 05 | 396 | **EX PARTE ORDER**, pursuant to Co-Deft Roane's ex parte motion, pursuant to 21 USC §848(q)(9), relating to certain reasonable and necessary services required for his representation, **APPROVING** and **AUTHORIZING** the hiring of a stenographer by counsel for Co-Deft Roane for purposes of transcribing statements made on investigatory tapes previously provided to Deft and Co-Defts by Gov't, up to a maximum total cost for such services of $1,000.00, and defense counsel are **ADMONISHED** that these services should be thoroughly documented to assure payment of such services, and to ensure that services are not duplicative of other services; ent'd 01-05-93 (JRS), filed.  Copies distributed.          rlw | | | | |
| Jan. 05 | 398 | **Order** that Deft's motion in limine seeking to exclude certain evidence of unadjudicated criminal conduct alledged to have been committed by Deft in New Jersey in 1989-1991 is hereby **DENIED**; ent'd 01-05-93 (JRS), filed.  Copies distrbuted.      rlw | | | | |

*File No. 7*

*File No. 8*

| | | Interval (per Section II) | Start Date End Date | Ltr. Code | Total Days |

**APP.436**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET    U. S. vs    JOHNSON, COREY    PAGE 6

AO 256A ⊕

3:92CR68-02

Yr. | Docket No. | Def.

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|--|-------------------------|-----|-----|-----|-----|
| | | (Document No.) | (a) | (b) | (c) | (d) |
| **1993** | | | | | | |
| Jan. 5 | 399 | Govt's Proposed Voir Dire for the Jury, filed.        phb | | | | |
| Jan. 6 | 400 | Govt's Response to the Court's Order to Specify Which Aggravating Factors Relate to Which Offense, filed.phb | | | | |
| Jan. 6 | 401 | Deft's Motion for Reconsideration of Atty. Participation in Voir Dire, filed.        phb | | | | |
| Jan. 7 | 402 | ORDER that Deft's motion for reconsideration of atty. participation in voir dire is DENIED.  Counsel is REMINDED they may propose questions to be asked.  ENT 1/7/93, JRS, filed.  Cps. dist.        phb | | | | |
| Jan. 7 | 403 | Petition & ORDER FOR WHCAT for Austin O. Nwanze ret. 1/11/93 at 10 AM.  ENT 1/7/93, JRS, filed.        phb | | | | |
| Jan. 7 | - | WHCAT for Austin O. Nwanze ret. 1/11/93 at 10 AM, issued.phb | | | | |
| Jan. 7 | 404 | Govt's Proposed Jury Instructions, filed.        phb | | | | |
| Jan. 11 | 414 | Deft's Proposed Voir Dire Questions for the Jury,filed.phb | | | | |
| Jan. 11 | 415 | Govt's List of Exhibits, filed.        jtj | | | | |
| Jan. 11 | 416 | Govt's List of Witnesses, filed.        jtj | | | | |
| Jan. 11 | 417 | Deft's ex parte request for subpoenas, filed.        phb | | | | |
| Jan. 11 | - | **JURY TRIAL PROCEEDINGS, DAY 1:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. IN CHAMBERS: Pretrial motion heard; denied.  Procedure discussed; issues revolved. Govt's motion to dismiss Cts. 11-13 as to deft Tipton granted. IN OPEN COURT:  Jury panel No. 1 appeared; sworn; examined on voir dire.  Individual voir dire commenced.  Trial adjourned for the day; to commence at 9:30 a.m. on 11/12/93.  (7.0)        lkm | 2 | 1/1/93 | T2 | 83 |
| Jan. 12 | - | **JURY TRIAL PROCEEDINGS, DAY 2:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA.  Individual voir dire continued with Panel 1.  Voir dire begun with Panel 2; excused until 1:00 P.M. on 1/13/93.  Panel 1, Nos. 115-130 to return at 9:30 a.m. on 1/13/93.  Deft remanded.        (8:15)        lkm | | | | |
| Jan. 12 | 420 | Petition & ORDER FOR WHCAT for Ronita Rochelle Hollman ret. 1/19/93 at 10 AM.  ENT 1/12/93, JRS, filed.        phb | | | | |
| Jan. 12 | - | WHCAT for Ronita Rochells Hollman ret. 1/19/93 at 10 AM, issued.        phb | | | | |
| Jan. 12 | 421 | Petition & ORDER FOR WHCAT for Austin O. Nwanze ret. 1/25/93 at 10 AM.  ENT 1/13/93, JRS, filed.        phb | | | | |
| Jan. 12 | - | WHCAT for Austin O. Nwanze ret. 1/25/93 at 10 AM, issued.phb | | | | |
| Jan. 13 | 422 | EX PARTE ORDER that Deft's motion for subpoenas is GRANTED, & Clerk is DIRECTED to issue subpoenas as set for in motion.  ENT 1/13/93, JRS, filed.        phb | | | | |
| Jan. 13 | - | **JURY TRIAL PROCEEDINGS, DAY 3:** Spencer, J., Kull, OCR. Counsel present.  Individual voir continued w/Panel 1; to return at 9:30 a.m. on 1/14/93.  Panel 2 excused except for 26 jurors listed on attached list; remaining Panel 2 jurors to return at 10 a.m. on 1/14/93.        (1:40)        lkm | | | | |
| Jan. 14 | 427 | Petition & ORDER FOR WHCAT for Douglas Cunningham ret. 1/18/93 at 10 AM.  ENT 1/14/93, JRS, filed.        phb | | | | |
| Jan. 14 | - | WHCAT for Douglas Cunningham ret. 1/18/93 at 10AM, issued.phb | | | | |
| Jan. 14 | - | **JURY TRIAL PROCEEDINGS, DAY 4:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. IN CHAMBERS:  All motions in limine heard; Court to review video b/4 decision; other motions denied.  Court directed that questionnaires will be part of the record.  IN OPEN COURT:  Jury empaneled; sworn to try issue.  Opening statements made.  Trial adjourned for the day; to commence at 10 a.m. on 1/15/93.  Deft remanded.  (6:55) lkm | | | | |

FILE NO. 8

Start Date
End Date   Ltr. | Total
(per Section II)

**APP.437**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

AO 256A

U.S. v. JOHNSON, CORY

PAGE 7

3:92CR68-02

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|-------------------------|------|------|------|------|
| | (Document No.) | (a) | (b) | (c) | (d) |

**1993**

**Jan. 14** — 428 Deft's Supplemental Proposed Voir Dire Questions, rec'd by the Court during voir dire and filed as of this date. jtj

**Jan. 15** — Marshal's return on WHCAT for Douglas Cunningham ret. 1/11/93 at 10 AM, unexecuted, & filed. phb

**Jan. 15** — Marshal's return on WHCAT for Austin O. Nwanze ret. 1/11/93 at 10 AM, unexecuted, & filed. phb

**Jan. 15** — 432 Petition & ORDER FOR WHCAT for Douglas Cunningham ret. 1/18/93 at 10 AM. ENT 1/15/93, JRS, filed. phb

**Jan. 15** — WHCAT for Douglas Cunningham ret. 1/18/93 at 10 AM, issued. phb

**Jan. 15** — JURY TRIAL PROCEEDINGS, DAY 5: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Govt's evidence begun. Trial adjourned for the day; to commence at 10 a.m. on 1/18/93. Deft remanded. lkm

**Jan. 18** — 434 Defts' Motion for court-supervised access to witnesses in witness protection program filed. lkm

**Jan. 18** — JURY TRIAL PROCEEDINGS, DAY 6: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Counsel heard in argument as to order of witnesses; Court left issue up to counsel. Counsel heard on defts' motion for court-supervised access to WPP witnesses; motion denied. Jury appeared. Govt's evidence continued. Trial adjourned for the day; to commence at 10 a.m. on 1/19/93. Deft remanded. (5:05) lkm

**Jan. 19** — Marshal's return on WHCAT for Douglas Cunningham ret. 1/18/93 at 10 AM, unexecuted, & filed. phb

**Jan. 19** — JURY TRIAL PROCEEDINGS, DAY 7: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Govt's evidence continued. Trial adjourned for the day; to commence at 10 a.m. on 1/21/93. Deft remanded. (4:40) lkm

**Jan. 21** — JURY TRIAL PROCEEDINGS, DAY 8: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Govt's evidence continued. Trial adjourned for the day; to commence at 10 a.m. on 1/22/93. Deft remanded. (4:30) lkm

**Jan. 21** — 439 Deft's Appellate exhibit filed. lkm

**Jan. 22** — JURY TRIAL PROCEEDINGS, DAY 9: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Govt's evidence continued. BW for Dennis Moody - issued as a material witness - quashed upon completion of Moody's testimony. Trial ajourned for the day; to commence at 10 a.m. on 1/25/93. Deft remanded. (4:10) lkm

**Jan. 25** — Marshal's return on WHCAT for Ronita Rochelle Hollman ret. 1/19/93 at 10 AM, executed, & filed. phb

**Jan. 25** — JURY TRIAL PROCEEDINGS, DAY 10: Spencer, J., Kull, OCR. appearances: Deft w/counsel, AUSA. Jury appeared. Defts' motion to voir dire jury on Saturday's newspapers article (Tipton appellate exhibit) granted. Voir dire conducted. Individual voir dire conducted as to Mr. Cooke and Ms. Hayes. Mr. Cooke remains as juror; Ms. Hayes excused; first alternate, Debra J. Dabney seated. Govt's evidence continued. Voir dire as to witness Montez McCoy conducted in chambers. Trial adjourned for the day; to commence at 10 a.m. on 1/26/93. (4:30) lkm

*(right margin, handwritten)* File No. 8

Interval (per Section II)

Start Date / End Date

Ltr. | Total

APP.438

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET · *U. S. vs*   JOHNSON, CORY       3:92CR68-02

AO 256A ⊕                                         Yr. | Docket No. | Def.

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |||| 
|---|---|---|---|---|---|
| | (Document No.) | (a) | (b) | (c) | (d) |
| **1993** | | | | | |
| Jan. 26 | Marshal's return on WHCAT for Austin O. Nwanze ret. 1/25/93 at 10 AM, unexecuted, & filed.                    phb | | | | |
| Jan. 26 | **JURY TRIAL PROCEEDINGS, DAY II:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Govt's evidence continued. Trial ajourned for the day; to commence at 10 a.m. on 1/27/93. Deft remanded.   (4:30)        lkm | | | | |
| Jan. 27 | 443 Deft's Ex Parte Motion for Issuance of Subpoenae, filed.                                              phb | | | | |
| Jan. 27 | - SO ORDERED that subpoenae be issued.  ENT 1/27/93, JRS, filed. Cps. dist.                              phb | | | | |
| Jan. 27 | **JURY TRIAL PROCEEDINGS, DAY I2:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Motion of defts Tipton, Johnson, Roane for Court to conduct examination as to competence of witnesses Pepsi Greene and Gwen Greene to testify denied. Govt's evidence continued. Trial adjourned for the day. Jury to return at 10 a.m. on 1/29/93; counsel to return at 9:45 a.m. on 1/28/93 for motions. Defts remanded. (4:55) | | | | |
| Jan. 28 | - **JURY TRIAL PROCEEDINGS, DAY I3:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Matter came on for hearing on motions at conclusion of govt's evidence. Counsel heard on motion to strike and motions for judgments of acquittal. All motions denied except motions for judgment as to murder of Brown and wounding of McCoy; motion TUA. Deft remanded.(:55)lkm | | | | |
| Jan. 28 | 446 Deft's Ex Parte Motion for Issuance of Subpoena, filed.                                              phb | | | | |
| Jan. 29 | - SO ORDERED that Clerk issue subpoena for Det. M.D.Scott. ENT 1/28/93, JRS, filed. Copy to Deft's atty.    phb | | | | |
| Jan. 29 | 447 Deft's Ex Parte Motion for Issuance of Subpoena, filed.                                              phb | | | | |
| Jan. 29 | - SO ORDERED that Clerk issue subpoena for Odette Noble. ENT 1/29/93, JRS, filed.  Copy to Deft's atty.    phb | | | | |
| Jan. 29 | 448 Deft's Ex Parte Motion, filed.  (SEALED)     phb | | | | |
| Jan. 29 | - **JURY TRIAL PROCEEDINGS, DAY I4:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Govt's motion in limine as to testimony of some of defts' witnesses heard; guidelines directed by the Court. Court's ruling given as to Rule 29 motions as to Torrick Brown's murder. Motion denied. Jury appeared. Govt's case continued, concluded. Govt rested. Defts adduced evidence. Trial adjourned for the day; to commence at 10 a.m. on 2/1/93. Deft remanded. (2:35)   lkm | | | | |
| Feb. 1 | 451 EX PARTE ORDER UNDER SEAL.  ENT 2/1/93, JRS, filed. Cps. dist.                                       phb | | | | |
| Feb. 1 | 454 Appellate Exhibit for Tipton and Johnson filed.   lkm | | | | |
| Feb. 1 | - **JURY TRIAL PROCEEDINGS, DAY I5:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Defts' evidence continued and concluded. Defts rested. Evidence concluded. Defts' renewed motions for dismissal heard; denied. Closing arguments of Govt, Tipton, & Johnson made. Trial adjourned for the day; to commence at 9:30 a.m. on 2/2/93. Deft remanded. (4:05) lkm | | | | |

FILE No. 8

FILE No. 9

CONTINUED ON NEXT PAGE

Interval (per Section II) | Start Date End Date | Ltr. | Total

**APP.439**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET                U.S. v. JOHNSON, CORY                    3:92CR68-02

AO 256A

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|--|--------------------------|--------|--------|--------|--------|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| **1993** | | | | | | |
| Feb. 2 | – | **JURY TRIAL PROCEEDINGS, DAY 16:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Closing arguments of defts Roane and Reavis made. Govt's rebuttal made. Jury charged by the Court. Objections noted to charge. Jury retired to deliberate at 1:25 p.m. Trial adjourned for the day; to commence at 9:30 a.m. on 2/3/93. Deft remanded. (3:40) | lkm | | | |
| Feb. 2 | 457 | Appellate Exhibit on behalf of defts Tipton & Johnson filed. | lkm | | | |
| Feb. 2 | 458 | Jury Instruction offered on behalf of defts Tipton, Johnson, Roane & Reavis; refused by the Court; filed. | lkm | | | |
| Feb. 2 | 459 | ORDER directing that lunch be furnished to jury on 2/1/93 ent'd, JRS, filed. Copy to financial. | lkm | | | |
| Feb. 2 | 460 | ORDER directing that lunch be furnished to jury on 2/2/93 ent'd, JRS, filed. Copy to financial. | lkm | | | |
| Feb. 2 | 462 | Deft's ex parte motion for advance fund for penalty-phase witnesses filed; SO ORDERED, JRS, filed. | lkm | | | |
| Feb. 3 | – | **JURY TRIAL PROCEEDINGS, DAY 17:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Jury excused to continue deliberations. Question of jury rec'd, answered. Jury returned verdict at 5:05 p.m. Jury found deft Johnson guilty as charged in Counts 1,2,8,9,10,11,12,13,14,15,16,17,18, 19,20,21,22,23,,24,25,26,27,28,29,30,31,32 (all counts as charged in indictment. Jury polled. Jury excused until 10 a.m. on 2/8/93 for penalty phase. Court directed lawyers to make no comments to press. Deft remanded.                    (:45) | lkm | | | |
| Feb. 3 | 466 | Jury Verdict filed. | lkm | | | |
| Feb. 4 | 470 | Govt's List of Proposed Witnesses (Penalty Phase), filed. | phb | | | |
| Feb. 4 | 470A | ORDER that jurors' 2/3/93 lunch bill be paid by Clerk. ENT 2/4/93, JRS, filed. | phb | | | |
| Feb. 5 | 471 | Petition & ORDER FOR WHCAT for Douglas Cunningham ret. 2/8/93 at 10 AM. ENT 2/5/93, JRS, filed. | phb | | | |
| Feb. 5 | – | WHCAT for Douglas Cunningham ret. 2/8/93 at 10AM, issued. | phb | | | |
| Feb. 5 | 472 | Petition & ORDER FOR WHCAT for Paris Robinson ret. 2/8/93 at 10 AM. ENT 2/5/93, JRS, filed. | phb | | | |
| Feb. 5 | – | WHCAT for Paris Robinson ret. 2/8/93 at 10 AM, issued. | phb | | | |
| Feb. 5 | 478 | Petition and ORDER directing that WHCAT be issued for Rodney Tucker ret. 2/8/93 at 10:00 a.m., ENT 02-05-93, DGL, filed. | lcq | | | |
| Feb. 5 | | WHCAT issued for Rodney Tucker ret. 2/8/93 at 10:00 a.m. | lq | | | |
| Feb. 5 | 479 | Deft's Motion for Proffer from the Govt as to Relevance of the Testimony from Proposed Witnesses, filed. | phb | | | |
| Feb. 5 | 480 | Deft's Motion in Linine Re: 1)Murder of Torrick Brown & Wounding of Martha McCoy & 2)Murder of Katrina Rozier, filed. | phb | | | |
| Feb. 8 | 483 | Govt's Amended List of Proposed Witnesses (Penalty Phase), filed. | phb | | | |

Interval
(per Section II)

Start Date
End Date

Ltr. Total

**APP.440**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET   *U. S. vs*   JOHNSON, CORY   PAGE 10   3:92CR68-02

AO 256A ⊕

| | | Yr. | Docket No. | Def. |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
|---|---|---|
| | (Document No.) | (a) | (b) | (c) | (d) |

**1993**

Feb. 8 — 484 — Govt's List of Proposed Exhibits (Penalty Phase), filed. phb

Feb. 8 — 485 — Petition & ORDER FOR WHCAT for Melvin E. Garrison aka Willie Seward ret. 2/8/93 at 1PM. ENT 2/8/93, JRS, filed. phb

Feb. 8 — — WHCAT for Melvin E. Garrison aka Willie Seward ret. 2/8/93 at 1 PM, issued. phb

Feb. 8 — — Marshal's return on WHCAT for Rodney Tucker ret. 1/11/93 at 10 AM, executed, & filed. (iss.12/22/92) phb

Feb. 8 — — Marshal's return on WHCAT for Rodney Tucker ret. 1/11/93 at 10 AM, executed, & filed. (iss.12/29/92) phb

Feb. 8 — — **JURY TRIAL PROCEEDINGS, DAY 18 OF TRIAL, DAY I of PENALTY PHASE:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. IN CHAMBERS: Counsel heard as to procedures to be followed in penalty phase. Counsel heard in argument on motions; Court's rulings in record. IN OPEN COURT: Jury appeared. Jury instructed by the Court on penalty phase. Govt adduced evidence; rested. Jury discharged for the day. Counsel heard in arguments on motion for mistrial and motions regarding aggravating factors. Court's ruling given from the bench as to those statutory and non-statutory factors that would be dismissed. Trial adjourned for the day; to commence at 10 a.m. on 2/9/93. Deft remanded. (2:10) lkm

Feb. 8 — 490 — Govt's Notice of the Intention of the U.S.A. to Seek the Death Penalty, filed. phb

Feb. 9 — — **JURY TRIAL PROCEEDINGS, DAY 19 OF TRIAL, DAY 2 OF PENALTY PHASE:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. IN CHAMBERS: Counsel heard of deft Tipton's motion, joined by all defts, to excuse juror Cooke because of previous newspaper article on shooting at Det. Woody's car & trial testimony of defts' plans to have Det. Woody killed. Motion denied. *Style* article of 2/9/93 submitted as appellate exhibit on behalf of all defts. IN OPEN COURT: Jury appeared. Jury admonished by the Court to avoid 2/9/93 issue of *Style*. Opening statement made on behalf of deft Tipton. Evidence adduced on behalf of deft Tipton; deft rested. Trial adjourned for the day; to commence at 10 a.m. on 2/10/93. Deft remanded. (3:05) lkm

Feb. 9 — 491 — Appellate Exhibit filed on behalf of all defts. lkm

Feb. 9 — 492 — Deft's Tendered Punishment Phase Instructions filed. phb

Feb. 10 — — **JURY TRIAL PROCEEDINGS, DAY 20 OF TRIAL, DAY 3 OF PENALTY PHASE:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Deft Johnson's opening statement made. Evidence adduced by deft Johnson. Deft rested. Trial adjourned for the day; to commence at 10 a.m. on 2/11/93. Deft remanded. (4:05) lkm

CONTINUED ON NEXT PAGE

File No. 9

File No. 10

Interval (per Section II) | Start Date End Date | Ltr. | Total

**APP.441**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

U.S. v. JOHNSON, CORY

PAGE 11       3:92CR68

AO 256A

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|------|-----|-----|-----|-----|
| | (Document No.) | (a) | (b) | (c) | (d) |
| **1993** | | | | | |
| Feb. 11 | JURY TRIAL PROCEEDINGS, DAY 21 OF TRIAL, DAY 4 OF PENALTY PHASE: Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSA. Jury appeared. Deft Roane's opening statement made. Evidence adduced by deft Roane. Deft rested. Trial adjourned for the day; to commence at 10 a.m. on 2/12/93. Deft remanded.    (3:35)    lkm | | | | |
| Feb. 11 | 496 ORDER FOR SEQUESTRATION.  ENT 2/11/93, JRS, filed. Cps. dist. (SEALED)    phb | | | | |
| Feb. 12 | Marshal's return on executed WHCAT for Douglas Cunningham, filed.    lcq | | | | |
| Feb. 12 | Marshal's return on executed WHCAT for Daryl Moses, filed.    lcq | | | | |
| Feb. 12 | Marshal's return on executed WHCAT for Gregory Noble, filed.    lcq | | | | |
| Feb. 12 | Marshal's return on executed WHCAT for Melvin E. Garrison, filed.    lcq | | | | |
| Feb. 12 | Marshal's return on executed WHCAT of Douglas Cunningham, filed.    lcq | | | | |
| Feb. 12 | Marshal's return on executed WHCAT for Rodney Tucker, filed.    lcq | | | | |
| Feb. 12 | Marshal's return on executed WHCAT for Paris Robinson, filed.    lcq | | | | |
| Feb. 12 | JURY TRIAL PROCEEDINGS, DAY 22, DAY 5 OF PENALTY PHASE. Appearances: Deft w/counsel, AUSA. Jury appeared. Closing arguments of counsel made. Defts' motions for mistrial and renewed motions for severance based on govt's closing arguments heard; ruling given from the bench; motions denied. Jury charged by the Court. Alternate jurors discharged. Jury retired to deliberate at 2:30 p.m. No objections noted to charge. Trial adjourned for the day; to commence on 2/13/93 at 9:30 a.m. Deft remanded.    lkm | | | | |
| Feb. 13 | JURY TRIAL PROCEEDINGS, DAY 23, DAY 6 OF PENALTY PHASE. Appearances: Deft w/counsel, AUSA. Jury appeared.. Jury retired to continue deliberations. Inquiry of jury rec'd, answered. Trial adjourned for the day; to commence at 9:30 a.m. on 2/15/93. Deft remanded.    lkm | | | | |
| Feb. 15 | JURY TRIAL PROCEEDINGS, DAY 24, DAY 7 OF PENALTY PHASE. Appearances: Deft w/counsel, AUSA. Jury appeared. Jury retired to continue deliberations. Trial adjourned for the day; to commence at 9:30 a.m. on 2/16/93. Deft remanded.    (:06)    lkm | | | | |
| Feb. 16 | 498 ORDER that jurors be kept together in custody of U.S. Marshal who shall furnish them lunch Feb. 8, 9, 10, 11, 12, & 13, 1993.  ENT 2/16/93, JRS, filed.    phb | | | | |
| Feb. 16 | 499 ORDER that U.S. Marshals Service & U.S. Bureau of Prisons are DIRECTED to permit Deft reasonable access to phones to speak w/counsel.  ENT 2/16/93, JRS, filed.  Cps. dist.    phb | | | | |

CONTINUED ON NEXT PAGE

| Interval (per Section II) | Start Date End Date | Ltr. Code | Total Days |
|---|---|---|---|

**APP.442**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET    *U. S. vs*

JOHNSON, CORY

AO 256A ⊕

3:92CR68-02

Yr. | Docket No. | Def.

| DATE | (Document No.) | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
|------|------|------|------|
| | | | (a) \| (b) \| (c) \| (d) |

**1993**

Feb. 16 — **JURY TRIAL PROCEEDINGS, DAY 25, DAY 8 OF PENALTY PHASE.** Appearances: Deft w/counsel, AUSA. Jury appeared. Jury retired to continue deliberations. Jury returned verdict at 1:30 p.m. Jury voted a sentence of death as to killing of Peyton Maurice Johnson, Louis J. Johnson, Bobby Long, Anthony Carter, Dorothy Mae Armstrong, Curtis Thorne, and Linwood Chiles. Jury polled. Jury discharged. Sentencing set for 9 a.m. on 5/18/93. Sentencing Guideline Order ent'd. Deft remanded. (:40) lkm

Feb. 16   508   Special Findings of Jury filed. lkm

Feb. 16   509   Decision Form as to the killing of Peyton Maurice Johnson filed. kkm

Feb. 16   510   Decision Form as to the killing of Louis J. Johnson filed. lkm

Feb. 16   511   Decision Form as to the killing of Bobby Long filed. lkm

Feb. 16   512   Decision Form as to the killing of Anthony Carter filed. lkm

Feb. 16   513   Decision Form as to the killing of Dorothy Mae Armstrong filed. lkm

Feb. 16   514   Decision Form as to the killing of Curtis Thorne filed. lkm

Feb. 16   515   Decision Form as to the killing of Linwood Chiles filed. lkm

Feb. 16   516   Certificate of Jury filed. lkm

Feb. 16   523   Sentencing Guideline Order ent'd, JRS, filed. lkm

Feb. 16   —   Trial exhibits in exhibit room; weapons & drugs in Drawer 2 of evidence safe; trial minutes, etc. in expandable w/file. km

March 16   535   Third Superseding Indictment returned before a Judge in Open Court, filed. (Applied to deft Thomas; not this deft) lkm

May 7   567   Govt's Motion, filed. phb

May 14   572   Defts' Motion to Bar Imposition of the Death Penalty & for a New Jury Sentencing Hearing Due to Improper Weighing of Aggravating Circumstances, filed. phb

May 17   573   Defts' Motion to Bar Execution of Defts Due to Absence of a Congressionally Authorized Execution Method, filed. phb

May 18   580   Deft's Motion for Stay of Execution, filed. phb

May 18   —   **IN OPEN COURT:** Spencer, J., Kull, OCR. appearances: Deft w/counsel, AUSA. Deft's motion for continuance of sentencing heard; granted. Sentencing rescheduled for 9:30 a.m. on 6/1/93. Deft remanded. lkm

May 21   581   Deft's Motion for New Penalty Phase Trial, filed. phb

May 21   585   ORDER that Defts' Joint Motion to Bar Imposition of Death Penalty Due to Improper Weighing of Aggravating Circumstances is DENIED. Deft Tipton's Motion for Leave to Interview Jury Foreperson RE: Penalty Phase Deliberations is DENIED. Deft Tipton's Motion for Disclosure of Information Relating to Mental Condition of Deft Thomas is DENIED, but doe not preclude Deft from asking 4CCA to order same, if appealed. Defts' Motions to Stay Execution are DENIED. ENT 5/21/93, JRS, filed. Cps. dist. phb

Interval (per Section II) | Start Date End Date | Ltr. Code | Total Days

**APP.443**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

AO 256A

U.S. v. JOHNSON, CORY          PAGE 13      3:92CR68-C

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|-------------------------|---------|---------|---------|---------|
|      | (Document No.) | (a) | (b) | (c) | (d) |
| **1993** | | | | | |
| May 24 | 586  MEMORANDUM OPINION of the Court.  ENT 5/24/93, JRS, filed.  Cps. dist.                    phb | | | | |
| May 24 | 587  ORDER that Deft's motion for new sentencing hearing is DENIED.  ENT 5/24/93, JRS, filed.  Cps. dist.    phb | | | | |
| May 25 | 588  Govt's Memo. in Opposition to the Motion to Bar Execution of Defts Due to the Absence of a Congressionally-Authorized Execution Method, filed.              phb | | | | |
| May 28 | 590  Deft's Position w/Respect to Sentencing Factors, filed. phb | | | | |
| May 28 | 591  Deft's Motion to Vacate Judgments of Convictions, filed. phb | | | | |
| June 1 | -  **SENTENCING PROCEEDINGS:** Spencer, J., Kull, OCR. Appearances: Deft w/counsel, AUSAs. Matter came on for sentencing.  Deft's motion to vacate judgment denied. Court advised parties that jury's recommended sentence would be imposed but that the Court would not designate method of execution unless and until Congress enacted proper legislation. Objections to PSR heard; overruled.  Statements made on behalf of and by deft.  Govt heard.  Sentence imposed: Cts. 8, 11, 17, 18, 19, 24, 25 - Death as to each ct.  Life plus 85 years consisting of Ct. 2 - Life.  Cts. 10,13,14,21,22,23,27,28 - Life as to each ct, concurrent.  Ct. 29 - 30 yrs, concurrent. Ct. 30 - 30 yrs, concurrent.  Ct. 16 - 20 yrs, concurrent. Ct. 31 - 20 yrs, concurrent.  Ct. 32 - 40 yrs, concurrent.  Ct. 9 - 5 yrs consecutive.  Cts 12,15,20,26 - 20 yrs as to each ct., consecutive.  Should deft be released, deft is placed on 5 yrs. supr release.  $1300 SA.  Note: conspiracy sentence is set aside when deft is convicted of both 21 USC 848 and 21 USC 848; no sentence was imposed as to Ct. 1.  Deft advised of right of appeal.  Deft remanded to BOP until sentence is carried out.                              lkm | | | | |
| June 1 | 593  Judgment is a Criminal Case ent'd, JRS, filed.  Copies distributed. lkm | | | | |
| June 10 | 598  Deft's Notice of Appeal filed.  TPO to both counsel.      lkm | | | | |
| June 10 | 599  Deft's Notice of Appeal from Sentence of Death filed.      lkm | | | | |
| June 17 | ---  P.S.R. from Probation Office, rec'd. <u>UNDER SEAL</u>      jjp | | | | |
| June 18 | 600  ORDER that Defts are hereby ORDERED to file such amended motions by and no later than July 9, 1993, ENT 06/18/93, JRS, filed. Cps. mailed.                    jjp | | | | |
| Jun. 29 | 601  Govt's Notice of Appeal, filed.  TPO pkg. sent.      phb | | | | |
| Jun. 29 | -  Transcript of 6/1/93, filed by OCR.              phb | | | | |
| July 22 | ---  Order from USCA consolidating cases Richard Tipton 93-4005, Cory Johnson 93-4006, James H. Roane, Jr. 93-4007, Tipton, Johnson and Roane 93-4009, and Tipton 93-4010, for purposes of briefing and oral argument, filed.                          jjp | | | | |
| Aug. 25 | 610  Copy of 4CCA Order extending time to file transcript, filed.                        phb | | | | |
| Aug. 30 | 611  MEMORANDUM OPINION of the Court.  ENT 8/30/93, JRS, filed.  Cps. dist.                    phb | | | | |
| Aug. 30 | 612  ORDER that Deft Tipton's Amended Motion to Vacate Judgments of Conviction is DENIED.  ENT 8/30/93, JRS, filed. Cps. dist.                        phb | | | | |

Interval                Start Date    Ltr. Total
(per Section II)        End Date

| UNITED STATES DISTRICT COURT | | | | |
|---|---|---|---|---|
| CRIMINAL DOCKET   U.S. vs   JOHNSON, CORY | | PAGE 14 | | 3:92CR68-02 |
| AO 256A ⊕ | | | | Yr. / Docket No. / Def. |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|
| | (Document No.) | (a) | (b) | (c) | (d) |
| **1993** | | | | | |
| Sep. 3 | Transcript of proceedings of January 11, 1993, Volume I, filed by OCR.    lcq | | | | |
| Sep. 3 | Transcript of proceedings 1f January 12, 1993, Volume II, filed by OCR.    lcq | | | | |
| Sep. 3 | Transcript of proceedings of January 13, 1993, Volume III, filed by OCR.    lcq | | | | |
| Sep. 3 | Transcript of proceedings of January 14, 1993, Volume IV, filed by OCR.    lcq | | | | |
| Sep. 3 | Transcript of proceedings of January 15, 1993, Volume V, filed by OCR.    lcq | | | | |
| Sep. 3 | Transcript of proceedings of January 18, 1993, Volume VI, filed by OCR.    lcq | | | | |
| Sep. 3 | Transcript of proceedings of January 19, 1993, Volume VII, filed by OCR.    lcq | | | | |
| Sep. 3 | Transcript of proceedings of January 20, 1993, Volume VIII, filed by OCR.    lcq | | | | |
| Sep. 3 | Transcript of proceedings of January 21, 1993, Volume IX, filed by OCR.    lcq | | | | |
| Sep. 8 | Transcript of 1/25/93, Vol. X, filed by OCR.    phb | | | | |
| Sep. 8 | Transcript of 1/26/93, Vol. XI, filed by OCR.    phb | | | | |
| Sep. 8 | Transcript of 1/27/93, Vol. XII, filed by OCR.    phb | | | | |
| Sep. 8 | Transcript of 1/28/93, Vol. XIII, filed by OCR.    phb | | | | |
| Sep. 8 | Transcript of 1/29/93, Vol. XIV, filed by OCR.    phb | | | | |
| Sep. 8 | Transcript of 2/1/93, Vol. XV, filed by OCR.    phb | | | | |
| Sep. 8 | Transcript of 2/2/93, Vol. XVI, filed by OCR.    phb | | | | |
| Sep. 8 | Transcript of 2/3/93, Vol. XVII, filed by OCR.    phb | | | | |
| Sep. 14 | Transcript of 2/8/93, Vol. XVIII, filed by OCR.    phb | | | | |
| Sep. 14 | Transcript of 2/9/93, Vol. XIX, filed by OCR.    phb | | | | |
| Sep. 14 | Transcript of 2/10/93, Vol. XX, filed by OCR.    phb | | | | |
| Sep. 20 | Transcript of proceedings of February 11, 1993 Volume XXI, filed by OCR.    lcq | | | | |
| Sep. 20 | Transcript of proceedings of February 12, 1993 Volume XXII, filed by OCR.    lcq | | | | |
| Sep. 20 | Transcript of proceedings of February 13, 1993 Volume XXIII, filed by OCR.    lcq | | | | |
| Sep. 20 | Transcript of proceedings of February 15, 1993 Volume XXIV, filed by OCR.    lcq | | | | |
| Sep. 20 | Transcript of proceedings of February 16, 1993 Volume XXV, filed by OCR.    lcq | | | | |
| Sept. 29 | 615  Certification of Completion sent to USCA re: appeal by Deft. (jpea) | | | | |
| Nov. 30 | -  Transcript of 12/22/92 at 2:00 p.m., filed by Crane-Snead. phb | | | | |
| Dec. 15 | 628  Amended Certificate of Completion sent to USCA re: appeal (jpea) | | | | |
| Dec. 20 | --- Amended Certificate of Completion RETURNED to USDC from USCA because additional transcripts requested.    JJP | | | | |
| Dec. 22 | Transcript of proceedings of November 2, 1992 filed by OCR.    lcq | | | | |
| **1994** | | | | | |
| Jan. 20 | -  Transcript of 8/11/92 filed by OCR.    phb | | | | |
| | * See Next Page * | | | | |

| | | Interval (per Section II) | Start Date End Date | Ltr. Code | Total Days |
|---|---|---|---|---|---|

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

AO 256A

U.S. v. JOHNSON, CORY     PAGE 15     3:92CR68-02

| DATE | PROCEEDINGS (continued) | | V. EXCLUDABLE DELAY | | | |
|------|---|---|---|---|---|---|
| | —(Document No.)— | | (a) | (b) | (c) | (d) |
| **1994** March 7 | 632 | 2nd Amended Certificate of Completion sent to USCA re: appeal by Deft.(jpea) | | | | |
| **1996** | | | | | | |
| July 8 | 650 | Per curiam opinion, Vol. 1 of 2, affirming in part, vacating and remanding, filed.    dht | | | | |
| July 8 | 651 | Per curiam opinion, Vol. 2 of 2, affirming in part, vacating and remanding, filed.    dht | | | | |
| Novm 5 | 652 | Cert. copy of judgment of USCA, filed.    dht | | | | |
| Nov. 22 | 654 | ORDER of Execution setting date of 3-20-97 setting forth procedures to be followed, ent'd, JRS, filed. Copies as directed.    lkm | | | | |
| **1997** | | | | | | |
| Feb. 20 | 656 | Deft's Consent Motion to Stay Execution filed.    lkm | | | | |
| Feb. 21 | 657 | ORDER granting motion for stay of deft's execution scheduled for 3/20/97; execution stayed pending further order of Court. Copies to counsel.    lkm | | June 2 | Order of Su denying cer | |
| **\*\*\*\*** Oct. 14 | 675 | Deft's Motion for leave to proceed in forma pauperis filed.    lkm | | | | |
| Oct. 14 | 676 | Petitioner's Motion for appointment of counsel before filing writ of H.C. filed.    lkm | | | | |
| Oct. 14 | 677 | Petitioner's Memorandum in support of motion for appointment of counsel filed.    lkm | | | | |
| Nov. 14 | 679 | ORDER granting motion to proceed in forma pauperis; granting motion for appointment of counsel; appointing Barbara L. Hartun, Esq., and Edward E. Scher, Esq for petitioner.    lkm | | | | |
| Nov. 14 | 680 | CJA30 appointing Edward E. Scher, Esquire.    lkm | | | | |
| Nov. 14 | 681 | CJA 30 appointment Barbara L. Hartung, Esquire.    lkm | | | | |
| **1998** Feb. 23 | 693 | CJA30, No. 2 sent to Edward E. Scher, filed.    lkm | | | | |
| \*\*April 16 | 699 | CJA30, No. 2, for Ms. Hartung filed.    lkm | | | | |
| April 17 \*\*\* | 701 | ORDER directing that Petition for writ of habeas corpus be filed by 6/1/98, ent'd, JRS, filed. Copies mailed.    lkm | | | | |
| May 8 | 702 | Motion Pursuant to Local Rule 83.5 for leave to interview Jurors, Incorporating Memorandum in Support as to Cory Johnson, Richard Tipton and James Roane, Jr. Filed. | lcn | | | |
| May 22 | 707 | (See Richard Tipton) | | | | |
| May 26 | 708 | (See Richard Tipton) | | | | |
| May 26 | 709 | (See Richard Tipton) | | | | |
| June 5 | 712 | (See Richard Tipton) | | | | |
| June 10 | 713 | (See Richard Tipton) | | | | |
| June 1 | 714 | 2255 petition filed as to Cory Johnson. Civil Action #3:98CV895. | lcn | | | |
| June 15 | 719 | Memorandum in support of [714] Motion to vacate set aside, or correct sentence. as to Cory Johnson. Filed. | lcn | | | |
| \*\* Apr. 16 | 700A | Petitioner's Motion UNDER SEAL.    lkm | | | | |
| Apr. 16 | 700B | Petitioner's Motion UNDER SEAL.    lkm | | | | |
| \*\*\*Apr. 24 | 701A | ORDER UNDER SEAL.    lkm | | | | |

Interval (per Section II)     Start Date End Date     Ltr. Code    Total

**APP.446**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET    *U. S. vs*    Cory Johnson    *Page 16*    3:92CR68-02

AO 256A ⊕

| | | Yr. | Docket No. | Def. |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
| | (Document No.) | (a) | (b) | (c) | (d) |
| June 16 | 721 ORDER as to Cory Johnson directing the Respondent to file an answer to the claims contained in the petition no later than August 14, 1998; and the Petitioner Johnson shall respond to respondent's answer within thirty (30) days of receipt of a copy of the answer. Entered JRS 6-16-98. Filed Copies distr. | 1cn | | | |
| July 22 | 727 (See Richard Tipton) | | | | |
| July 24 | 728 (See Richard Tipton) | | | | |
| Aug. 14 | 731 CJA30, No. 3, to Barbara Hartung. | 1km | | | |
| Sept. 3 | 735 Govt's Consent Motion for additional extension of time to file response to 2255 filed. | | 1km | | |
| Sept. 3 | 736 Order granting extension to file response to 2255 until 9/29/98, ent'd, JRS, filed. Copies mialed. | 1km | | | |
| Sept. 24 | 737 Deft's first amendment to intitial petition under 2255 and to memorandum in support of petition. | 1km | | | |
| Sept. 25 | 738 Consent Motion for additional extension of time for U.S. to file response to 2255 Petition filed. | 1km | | | |
| Sept. 28 | 739 ORDER granting U.S. extension of time until 10/29/98 to filed consolidated response to 2255 petition; ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Oct. 29 | 745 Govt's Motion for leave to file outsized consolidated response to 2255 motions filed. | 1km | | | |
| Oct. 29 | 746 Govt's Memorandum in response to Petitioners' Motions under 2255 filed. | 1km | | | |
| Nov. 20 | 748 Joint Consent Motion for extension of time for Petitioners to file reply to U.S. Memorandum for dismissal of 2255 Petitions filed. | | 1km | | |
| Nov. 25 | 749 ORDER granting leave for petitioners to file response to govt's Memorandum on 2/1/99; ent'd, JRS,filed. Copies mailed. | 1km | | | |
| 1999 | | | | | |
| Jan. 11 | 751 ORDER granting govt's motion for leave to file outsized consolidated response to petitioners' motion under 2255, ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Jan. 19 | 752 Joint Consent Motion for extension of time to file petitioners' reply to US memorandum requesting summary dismissal of 2255 motions for collateral relief filed. | 1km | | | |
| Jan. 28 | 753 ORDER extending time for petitioners to file response to govt's memo seeking dismissal of 2255 petition until 2/22/99; ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Feb. 18 | 754 Petitioners' Joint Consent Motion for Extension of Time to respond to U.S. Memo requesting dismissal of 2255 filed. | 1km | | | |
| Feb. 22 | 755 ORDER granting motion to extend petitioners' time to respond to govt's response to 2255 until 3/15/99, ent'd, JRS, filed. Copies mailed. | 1km | | | |
| March 15 | 760 Petitioner Johnson's Motion for leave to amend and Second Amendment to Initial Petition under 2255 and to Memo in support of Petition filed. | 1km | | | |
| March 15 | 761 Petitioner Johnson's Reply Memorandum in support of initial Petition under 2255 filed. | 1km | | | |

Interval (per Section II) | Start Date End Date | Ltr. Code | Total Days

APP.447

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET

AO 256A

**U.S. v. CORY JOHNSON**          3:92 CR68-02          *page 17*

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|--|-------------------------|:---:|:---:|:---:|:---:|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| **1999** | | | | | | |
| April 26 | 765 | Petitioner's Notice of Supplemental Authority filed.          lkm | | | | |
| May 20 | 768 | Order granting petitioner's motion for leave to file second amendment to 2255 Petition; ent'd. JRS, filed. Copies to counsel.          lkm | | | | |
| **June 14** | 769 | CJA 30, No. 4, filed; mailed to counsel.          lkm | | | | |
| June 24 | 770 | Joint Petitioners' Motion for leave to take discovery.          lkm | | | | |
| June 29 | 771 | Petitioners' Joint Motion to Amend 2255 Petition filed.          lkm | | | | |
| July 7 | 772 | Govt Motion for extension of time to file response to Petitioners' joint motion for leave to take discovery (Styled as Consent Motion; no signatures of Petitioners; counsel.)          lkm | | | | |
| July 9 | 773 | ORDER granting govt motion for extension of time to respond to petitioners' Joint Motion for leave to take discovery; Response due by 9/7/99; ent'd, JRS, filed. Copies mailed.          lkm | | | | |
| 7/16/99 | 774 | Govt's Response to Petitioners' Motion to Amend petition filed. lkm | | | | |
| Aug. 3 | 775 | ORDER granting Petitioners' Motion for leave to amend petition; directing amendments be filed by 10/1/99; govt response 60 days thereafter; petitioners' replies 20 days thereafter; ent'd, JRS, filed. Copies mailed.          lkm | | | | |
| Sept. 2 | 776 | Govt's Motion for extension of time to file Response to Petitioners' Joint Motion for leave to take discovery filed.          lkm | | | | |
| Sept. 7 | 777 | Petitioner Johnson's Response to govt's Motion for extension of time to file response to petitioners' Joint Motions for leave to take discovery filed.          lkm | | | | |
| Sept. 24 | 778 | Govt's Response to Petitioners' Consolidated Motion for Discovery filed.          lkm | | | | |
| Oct. 1 | 780 | Johnson's Third Amendment to initial Petition under 2255 w/supporting Memorandum filed.          lkm | | | | |
| Oct 13 | 782 | Consent Motion for an extention to time for Petitioner to file a reply to the govt's response to Petitoners' Joint Motion for Leave to take discovery, filed          srb | | | | |
| Nov. 10 | 783 | ORDER granting Petitioners' motion for extension of time to file reply to govt's response to petitioners' joint motion for leave to take discovery; directing reply be filed by COB on 1/10/00; ent'd, JRS, filed. Copies mailed.          lkm | | | | |
| Nov. 30 | 784 | Consolidated Response of U.S. to Petitioners Tipton's & Roane's 2nd Amendment to 2255 Petition & to Petitioner Johnson's 3rd Amendment to 2255 Petition.          lkm | | | | |
| Dec. 10 | 785 | Joint Consent Motion for extension of time to file Petitioners' Reply to U.S. Consolidated Response to Second and Third Amendment to 2255 Petitions filed.          lkm | | | | |
| **2000** | | | | | | |
| Jan. 5 | 786 | Petitioner Tipton's Motion for appt of counsel; Petitioners' Joint Motion for extension of time to file reply to U.S.'s consolidated response to Second and Third Amendments to 2255 Petition; Petitioners' Joint Motion for extension of time to file reply to U.S.'s response to Petitioners' consolidated motion for discovery; filed.          lkm | | | | |
| Jan. 6 | 787 | ORDER granting petitioner Tipton's motion for new counsel; counsel to be appointed; granting Petitioner Tipton's motions for extensions of time on matters pending b/4 Court; granting Petitioner Johnson's and Roane's motions for extensions of time requested in Pleadings No. 782 and 785; directing responses be filed by 2/14/00; ent'd, JRS, filed. Copies faxed & mailed.          lkm | | | | |

Interval (per Section II) | Start Date / End Date | Ltr. | Total

| UNITED STATES DISTRICT COURT CRIMINAL DOCKET | | U. S. vs | JOHNSON, CORY | | 92CR68-02 | | |
|---|---|---|---|---|---|---|---|
| AO 256A ⊕ | | | Page 18 | | Yr. | Docket No. | Def. |

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| **2000** | | | | | | |
| Feb. 14 | 791 | Petitioner Johnson's Reply to Govt's Consolidated Response to Petitioner's 3rd Amendment to 2255 Petition.filed.    lkm | | | | |
| Feb. 14 | 792 | Petitioner Johnson's Reply to U.S.'s Response to Petitioners' Consolidated Motion for Discovery filed.    lkm | | | | |
| March 6 | 796 | Petitioner Johnson's Supplemental Exhibit in support of Claim VIII of initial 2255 Petition filed.    lkm | | | | |
| April 27 | 799 | Petitioner Johnson's Notice Adopting Tipton's Reply in support of Tipton's 2nd Amendment to his 2255 Petition.filed.    lkm | | | | |
| April 27 | 800 | Petitioner Johnson's Notice Adopting Tipton's Reply in support of Petitioners' Joint Discovery Motions filed.    lkm | | | | |
| April 27 | 801 | Petitioner Johnson's Notice of Supplemental Authority in support of Petitioners' Joint Motion for Leave to Take Discovery filed.    lkm | | | | |
| April 27 | 802 | Petitioner Johnson's Notice of Supplemental Authority in support of his 2255 Petition raising cliams of Ineffective Assistance by Counsel filed.    lkm | | | | |
| May 3 | 803 | Memorandum Opinion relating to Petitioners' Joint Motion for leave to take discovery ent'd, JRS, filed.Copies mailed. | | lkm | | |
| May 3 | 804 | ORDER denying Petitioners' Joint Motion for leave to take discovery EXCEPT as to Tipton who will have until 6/16/00 to have knife tested and relevant information submitted; ent'd, JRS, filed.  Copies mailed.    lkm | | | | |
| June 1 | 805 | Petitioners' Joint Motion for reconsideration of Court's Discovery Order and supporting memorandum filed.    lkm | | | | |
| June 22 | 809 | ORDER granting motion of U.S. for extension until 7/10/00 to file response to Petitioners' Joint Motion for reconsideration of Discovery Order; ent'd, JRS, filed. Copies mailed.    lkm | | | | |
| July 10 | 813 | Response of U.S. to Petitioners' Joint Motion for Reconsideration of Discovery Order & supporting Memorandum filed.    lkm | | | | |
| July 12 | 814 | Petitioner's Notice of Supplemental Authority and Second Supplemental Exhibit in support of Claim VIII of 2255 filed.  lkm | | | | |
| July 19 | 815 | Petitioners' Reply to Response of U.S. to Petitioners' Joint Motion for Reconsideration of Court's Discovery Order and Supporting Memorandum filed.    lkm | | | | |
| Aug. 17 | 820 | Petitioner Johnson's Notice of Supplemental Authority and Supplemental Exhibit in support of Claim IV(B)(1) of Second Amendment to 2255 Petition filed.    lkm | | | | |
| Sept. 25 | 826 | Petitioner's Notice of Supplemental Authority w/exhibit filed.  lkm | | | | |
| Dec. 11 | 830 | ORDER directing that Tipton's Motion to Amend 2255 Petition is granted; directing counsel to provide index for grounds for relief, listing of claims raised in Petition w/i 15 days; govt to respond & file index w/i 30 days; directing that Court will review only those claims so designated as directed in this Order; ent'd, JRS, filed. Copies mailed and faxed.    km | | | | |
| Dec. 14 | 831 | Petitioner's Motion for extension of time to respond to Order of 12/11/00 filed.  (Styled Consent Motion; no signatures for other Petitioners; filed only as to Johnson.)    lkm | | | | |
| Dec. 18 | 832 | ORDER granting Petitioner Johnson's motion for extension of time until 1/9/01 for filing directed in Order of 12/11/00; govt's response due 1/24/01.  Copies mailed.    lkm | | | | |

| | Interval (per Section II) | Start Date End Date | Ltr. Total Code Days |
|---|---|---|---|

USCA4 Appeal: 20-15    Doc: 15-3    Filed: 01/07/2021    Pg: 219 of 230

UNITED STATES DISTRICT COURT      JOHNSON, CORY            Page 19
CRIMINAL DOCKET

AO 256A

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| **2001** | | | | | | |
| Jan. 9 | 835 | Petitioner's Index to Grounds for 2255 Relief filed. | lkm | | | |
| Jan. 18 | 837 | Govt's Motion for extension of time to file Index of Pleadings filed. | | lkm | | |
| | Jan. 19 | — SO ORDERED: Govt's motion for extension of time to file Index until 1/29/01; ent'd, JRS, filed. Copies to counsel. | lkm | | | |
| Jan. 29 | 838 | Govt's Index to 2255 claims raised by petitioner Johnson filed. | lkm | | | |
| July 18 | 843 | Ms. Hartung's Notice of New address and telephone number filed. | lkm | | | |
| August 10 | 844 | ORDER granting [841] Motion to Amend. United States DIRECTED to file its response to the amended claim w/in 20 days of date of entry hereof. Any reply by Tipton, Johnson or Roane shall be filed w/in 30 days of date of entry hereof; def. Tipton, Johnson or Roane shall file w/in 30 days of date of entry hereof briefs directed to additional allega- tions of default; United States must inform the Court w/in 15 days of date of entry hereof to demand summary judgment on the record currently before the Court. ENTERED: JRS. Copies mailed: yes | | lts | | |
| Aug. 10 | 847 | Petitioner's Notice and Motion adopting Petitioner Roane's Third Amendment as Johnson's Fourth Amendment to 2255 petition filed pursuant to Order of 8/10/01. | lkm | | | |
| Aug. 22 | 850 | Petitioners' Joint Consent Motion for extension of time to file briefs in response to govt's new allegations of procedural default filed. | lkm | | | |
| Aug. 23 | 851 | Govt's Motion to Dismiss, or in the alternative, for summary judgment and Brief in support filed. | lkm | | | |
| Aug. 30 | 852 | Joint Consent Motion for extension of time for petitioners to file opposition to govt's motion to dismiss or for summary judgment filed (As to petitioners Johnson & Roane only; incorrect signature as to Tipton.) | lkm | | | |
| Aug. 30 | 853 | Govt's Supplemental Motion to Dismiss, or in alternative, for Summary Judgment; Response of US to petitioners' Johnson & Tipton's 4th Amended motion and petitioner Roane's 3rd amended motion filed. | lkm | | | |
| Aug. 31 | 854 | ORDER granting petitioners extension of time to 10/1/01 to file responses to new assertions of procedural default; govt's reply due 10/11/01. Court directs U.S. to file statement of undisputed facts for summary judgment claims by 9/20/01; petitioners to respond by 10/22/01; U.S. to reply by 11/2/01; ent'd, JRS, filed. | lkm | | | |
| Sept. 19 | 855 | Govt's Motion for extension of time to file Statement of Undisputed Facts filed. | lkm | | | |
| Sept. 25 | 856 | ORDER grant govt's motion for extension of time to file statement of undisputed facts until 10/10/01; responses due 11/12/01; reply due 11/22/01; ent'd, JRS, filed. Copies mailed. | lkm | | | |
| Oct. 1 | 858 | Petitioner's Reply to govt's claims of procedural default filed. | lkm | | | |

SEE NEXT PAGE

Interval    Start Date    Ltr.   Total
(per Section II)    End Date    Code   Days

**APP.450**

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET | U. S. vs | JOHNSON, CORY | Page 20 | 3:92CR68-2

AO 256A ⊕

| | Yr. | Docket No. | Def. |

| DATE | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY |
| | (Document No.) | (a) | (b) | (c) | (d) |
|---|---|---|---|---|---|

**2001**

| Oct. 10 | 860 | Govt's Motion for extension of time to reply to petitioners' Procedural Default Responses filed. | lkm |
| Oct. 10 | 861 | Govt's Supplemental Statement of Undisputed Material Facts in support of govt's Motion for Summary Judgment filed. | lkm |
| Oct. 23 | 862 | ORDER granting U.S. an extension of time until 10/26/01 to file responses to petitioners' new assertions of procedural default; ent'd, JRS, filed. Copies mailed. | lkm |
| Oct. 26 | 864 | Govt's Response to Petitioner's Pleading regarding procedurally defaulted claims filed. | lkm |
| Nov. 13 | 868 | Petitioner's Opposition to govt's Motion for Summary Judgment and Motion to Dismiss and Supplemental Statement of undisputed material facts in support of its Motion for Summary Judgment filed. | lkm |
| Nov. 27 | 870 | EX PARTE, SEALED ORDER as to deft Johnson filed. | lkm |
| Dec. 4 | 871 | Petitioner Johnson's Exparte, Under Seal motion filed. | |

**2002**

| | | | lts |
| Jan. 2 | 872 | Exparte, Under Seal ORDER ent'd, JRS, filed. Copy to counsel. | lkm |
| Jan. 4 | 873 | Exparte, Under Seal Response filed by Petititioner Johnson. | lkm |
| Jan. 14 | 874 | ORDER, Ex parte, Under Seal, ent'd as to Petitioner Johnson, JRS, filed. Copy to Johnson counsel only. | lkm |
| Aug. 14 | 886 | ORDER directing all counsel to advise the Court by 8/30/02 if any motion/amendment based on videotapes recently provided by the U.S. will be filed. Any such pleading must be filed by 9/13/02; U.S. to reply by 10/4/02; ent'd, JRS, filed. Copies mailed. | lkm |
| Aug. 30 | 888 | Petitioner Johnson's Consent motion for 2 week extension of time to review videotapes and submit notice to Court filed. | lkm |
| Aug. 30 | 889 | Petitioner Johnson's Notice and motion adopting argument of Petitioner roane submitted in reponse to govt letter dated 7/18/02 filed. | lkm |
| Sept. 11 | 893 | ORDER extending deadlines in Order of 8/14/02 to 9/13/02 to advise Court if motion or amendment will be filed relating to videotapes and 9/27/02 to file any such motion or amendment; ent'd, JRS, filed. Faxed and mailed to counsel. | lkm |
| Sept. 13 | -- | By letter: counsel advises that Petitioner Johnson will not be filing any additional motions or amendments relating to videotapes interviews. | lkm |

**2003**

| May 1 | 896 | Memorandum Opinion ent'd, JRS, filed. Copies mailed. | lkm |
| May 1 | 897 | ORDER granting US' motion for summary judgment in part, denying in part; dismisssing Petitioners Tipton and Johnson' grounds for 2255 relief & their motions under 2255 are denied; dismissing all of Petitioner Roane's 2255 grounds except for his claim that he was denied effective assistance of counsel in conjunction with charges pertaining to murder of Douglas Moody & his claim that he is innocent of the murder of Moody; denyinig Tipton's request to conduct add'l discovery; ent'd, JRS, filed. Copies mailed. | |

Interla | Start Date | Ltr. | Total
(per Section II) | End Date

APP.451

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET                        JOHNSON, CORY

AO 256A

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|------|---|---|---|---|---|---|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| **2003** | | | | | | |
| May 15 | 900 | Motion of Petitioners Tipton, Johnson & Roane to alter Court's Order and Opinion dated 5/1/03 pursuant to FRCiP 52(b) and 59(e) filed. | 1km | | | |
| May 27 | 901 | Govt's motion for extension of time to file response to Petitioners' motions pursuant to Rules 52 and 59 filed. | 1km | | | |
| June 2 | 902 | ORDER granting govt's motion for extension of time to respond to petitioners' motion to alter opinion of 5/1/03, ent'd JRS, filed. Cps mailed. | 1km | | | |
| June 5 | 903 | Counsel's Notice of new address filed by Mr. Scher. | 1km | | | |
| June 12 | 904 | Govt's Response to petitioners' motion to alter Order of 5/1/03 filed. | 1km | | | |
| July 15 | 906 | Memorandum Opinion ent'd, JRS, filed; cps mailed. | 1km | | | |
| July 15 | 907 | ORDER denying Petitioners' motion to alter or amend judgment ent'd 5/1/03 ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Sept. 11 | 908 | Petitioner Johnson's Notice of Appeal from Order ent'd 5/1/03, Order of 7/15/03, Order of 5/1/03, Order of 6/10/03, Order of 5/3/00 filed. | 1km | | | |
| Sept 17 | --- | Copy of Notice of Appeal, Orders, Memorandum Opinions, and docket sheet sent to USCA. | 1cb | | | |
| Oct. 10 | 913 | Petitioner Johnson's Motion for Certificate of Appealability filed. | 1km | | | |
| Oct. 24 | 916 | Response of U.S. to Petitioners Tipton and Johnson's Applications for Certificates of Appealability filed. | 1km | | | |
| Nov. 3 | 918 | Petitioner's Johnson Rely to Response of U.S. to Petitioner's Application for Certificate of Appealability filed. | 1km | | | |
| Nov. 26 | 920 | Memorandum of the Court ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Nov. 26 | 921 | Order granting Petitioners' motions for certificates of appealability ent'd, JRS, filed. Copies mailed. | 1km | | | |
| Dec. 9 | 923 | Certification of completion sent to USCA re: as to Cory Johnson [908] appeal by Cory Johnson | 1cb | | | |
| Aug. 9 | 935 | Opinion of USCA affirming in part, reversing in part, rec'd, filed. | 1km | | | |
| Oct. 12 | 937 | Mandate of USCA filed. | 1km | | | |
| Oct. 18 | 938 | Govt's motion to vacate stays of execution & vacate orders setting time, place & method of execution filed. | 1km | | | |
| Oct. 31 | 941 | Petitioner's Memorandum in opposition to govt's motion to vacate stay of execution & to vacate order setting execution filed. | 1km | | | |
| Nov. 3 | 942 | Govt's Reply Memorandum to its Motion to vacate stay of execution, etc. filed. | 1km | | | |

Interval (per Section II) | Start Date End Date | Ltr. Code | Total Days

USCA4 Appeal: 20-15   Doc: 15-3   Filed: 01/07/2021   Pg: 222 of 230
Case 3:92-cr-00068-DJN   Document 72   Filed 11/17/20   Page 24 of 24 PageID# 2190

PAGE 22

UNITED STATES DISTRICT COURT
CRIMINAL DOCKET   *U. S. vs*   JOHNSON, CORY                    3:92CR68-02

AO 256A ⊕

| DATE | | PROCEEDINGS (continued) | V. EXCLUDABLE DELAY | | | |
|---|---|---|---|---|---|---|
| | (Document No.) | | (a) | (b) | (c) | (d) |
| 2005 | | | | | | |
| Nov. 16 | 943 | Govt's Notice advising Court that matter is ripe & that no hearing is requested.   1km | | | | |
| Nov. 17 | 944 | ORDER granting govt's motion to vacate Orders of 11/22/96; Orders vacated.  Court to issue execution orders; vacting Order of 2/21/97 staying execution; ent'd, JRS, filed.   1km | | | | |
| Nov. 17 | 946 | ORDER directing execution of the sentence of death by a U.S. Marshal; execution shall be by lethal injection at date and place designated by the Director, Bureau of Prisons; committing Johnson to custody of Attorney General for appropriate detention pending execution; directing U.S. Marshal designated to promptly return to the Court the document informing the Court that the sentence of death has been executed; ent'd, JRS, filed. Copies to counsel, USM, BOP.   1km | | | | |
| 7/31/09 | 969 | ORDER - appointing PAUL GILL, Asst. Federal Public Defender for the purpose of seeking clemency kbh | | | | |
| 8/11/10 | 974 | EXPARTE MOTION   KBH | | | | |
| 8/17/10 | 975 | EXPARTE ORDER   KBH | | | | |
| 9/10/10 | 976 | USCA Order That the Court GRANTS counsel's motion to withdraw from further representation   kbh | | | | |
| 6/30/14 | 991 | Sealed Ex Parte Motion by Cory Johnson (w/sketch Order)   JLT | | | | |
| 5/20/16 | | USCA 2244 In re: Cory Johnson case docketed. USCA Case No. 16-4; Case Manager R.Warren   1cb | | | | |
| 6/6/16 | 1000 | USCA 2244 ORDER: The Court DENIES movant's 28 U.S.C. 2244 motion(in #16-4).   1cb | | | | |
| 6/20/16 | | USCA 2244 In re: Cory Johnson case docketed. USCA Case No. 16-13, Case manager R.Warren.   1cb | | | | |
| 6/22/16 | 1002 | USCA 2244 ORDER: The Court DENIES MOVANT"S 28 U.S.C. 2244 motion (in #16-13).   1cb | | | | |
| 4/17/19 | | USCA 2244 In re: Cory Johnson case docketed. USCA Case No. 19-1; Case Manager E.Borneisen   1cb | | | | |
| 5/14/19 | 1003 | USCA ORDER: Movant has filed a motion under 28 USC 2244 for an order authorizing the district court to consider a second or successive application for relief under 28 USC 2255. THE COURT DENIES THE MOTION  for authorization to file a second or successive application for relief under 28 USC 2255 and GRANTS THE MOTION FOR LEAVE TO FILE A REPLY.   1cb | | | | |

Interval (per Section II)   Start Date End Date   Ltr. Total

2255,CLOSED,DEATHP

# U.S. District Court
# Eastern District of Virginia - (Richmond)
# CRIMINAL DOCKET FOR CASE #: 3:92-cr-00068-DJN-2

Case title: USA v. Tipton, et al                     Date Filed: 04/24/1992

Related Case: 3:20-cv-00957-DJN           Date Terminated: 06/01/1993

Assigned to: District Judge David J. Novak

## Defendant (2)

**Cory Johnson**                     represented by    **David Emmett Carney**
*TERMINATED: 06/01/1993*                                    Skadden Arps Slate Meagher & Flom LLP
*also known as*                                            1440 New York Ave NW
"O"                                                   Washington, DC 20005-2111
*also known as*                                              (202) 371-7000
"Co"                                                  Email: David.Carney@skadden.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander C Drylewski**
Skadden Arps Slate Meagher & Flom
One Manhattan West
New York City, NY 10001
**NA**
212-735-2123
Fax: 917-777-2129
Email:
Alexander.Drylewski@skadden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Appointed Attorney*

**Donald Paul Salzman**
Skadden, Arps, Slate, Meagher & Flom
(DC-NA)
1440 New York Avenue, N.W.
Washington, DC 20005
**NA**
202-371-7983
Fax: 202-661-9098
Email: salzman@skadden.com

**APP.454**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Appointed Attorney*

**Judith A Flumenbaum**
Skadden Arps Slate Meagher & Flom
One Manhattan West
New York City, NY 10001
**NA**
212-735-2764
Fax: 917-777-2764
Email: Judy.Flumenbaum@skadden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Appointed Attorney*

**Lotus Davna Ryan**
Skadden Arps Slate Meagher & Flom LLP
(DC)
1440 New York Ave NW
Washington, DC 20005-2111
202-371-7000
Fax: 202-661-0527
Email: lotus.ryan@skadden.com
*ATTORNEY TO BE NOTICED*

## Pending Counts

None

## Highest Offense Level (Opening)

None

## Terminated Counts

None

## Highest Offense Level (Terminated)

None

## Complaints

None

## Disposition

## Disposition

## Disposition

---

## Intervenor

**APP.455**

**Willie Lee Seward**

---

**Plaintiff**

**USA**
*TERMINATED: 05/27/1992*

represented by **S. David Schiller**
Office of the U.S. Attorney
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219
(804) 819-5400
Email: david.schiller@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph Attias**
United States Attorney Office (Richmond-NA)
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219
**NA**
804-819-5400
Email: joseph.attias2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Richard D. Cooke**
United States Attorney's Office
(Richmond)
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219
804-819-5449
Email: richard.cooke@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Thomas Arthur Garnett**
US Attorney Office (Richmond)
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219
(804) 819-5431
Email: Thomas.A.Garnett@usdoj.gov

**APP.456**

*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/23/2020 | | Case reassigned to District Judge David J. Novak. District Judge James R. Spencer no longer assigned to the case. (jsmi, ) (Entered: 03/23/2020) |
| 05/27/2020 | | Appeal Remark: USCA 2255 case docketed. USCA Case 20-8, Case Manager EBorneisen (lgar, ) (Entered: 05/27/2020) |
| 07/16/2020 | 12 | 2255 ORDER of USCA as to Cory Johnson : Upon consideration of submissions relative to the movants motion to hold in abeyance, the court grants the motion and places this case in abeyance pending a decision by this court in United States v. Taylor, No. 19-7616. Entered at the direction of Judge Motz with the concurrence of Judge Floyd. Judge Wilkinson voted to deny authorization to file a successive motion under 28 U.S.C. § 2255. (lbre, ) (Entered: 07/16/2020) |
| 08/07/2020 | 28 | NOTICE OF ATTORNEY APPEARANCE Richard D. Cooke appearing for USA. (Cooke, Richard) (Entered: 08/07/2020) |
| 08/19/2020 | 33 | NOTICE OF ATTORNEY APPEARANCE: David Emmett Carney appearing for Cory Johnson (Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 34 | Motion to appear Pro Hac Vice by Donald P. Salzman and Certification of Local Counsel David E. Carney (Filing fee $ 75 receipt number 0422-7359816.) by Cory Johnson. (Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 35 | Motion to appear Pro Hac Vice by Alexander C. Drylewski and Certification of Local Counsel David E. Carney (Filing fee $ 75 receipt number 0422-7359818.) by Cory Johnson. (Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 36 | Motion to appear Pro Hac Vice by Judith A. Flumenbaum and Certification of Local Counsel David E. Carney (Filing fee $ 75 receipt number 0422-7359819.) by Cory Johnson. (Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 37 | MOTION for Leave to File Excess Pages by Cory Johnson. (Attachments: # 1 Proposed Order)(Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 38 | MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* by Cory Johnson. (Attachments: # 1 Proposed Order)(Carney, David) (Entered: 08/19/2020) |
| 08/19/2020 | 39 | Memorandum in Support by Cory Johnson re 38 MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* (Attachments: # 1 Exhibit Index, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 |

**APP.457**

| | | Exhibit 35)(Carney, David) (Entered: 08/19/2020) |
|---|---|---|
| 08/20/2020 | 40 | ORDER that the Court hereby GRANTS Defendant Corey Johnsons 37 Motion for Leave to File Excessive Pages. The Government shall have an equal number of pages for its response. See Order for details. Signed by District Judge David J. Novak on 8/20/2020. (jsmi, ) (Entered: 08/20/2020) |
| 09/04/2020 | 46 | ORDER as to Corey Johnson that the Court hereby DIRECTS the United States Attorney's Office to respond within 15 days of this Order and to explain its position regarding Defendant's First Step Act Motion and requested relief. If Defendant disagrees with the Government's response, Defendant may reply to the Government's response within 15 days of the date that the Government's response is filed. The United States Probation Office is DIRECTED to prepare a First Step Act Worksheet within 14 days of the date of entry hereof. See Order for details. Signed by District Judge David J. Novak on 9/2/2020. (jsmi, ) (Entered: 09/04/2020) |
| 09/04/2020 | 47 | ORDERS granting 34 , 35 , and 36 Motions for Pro hac vice as to Cory Johnson. Alexander C. Drylawski, Judith A. Flumenbaum, and Donald P. Salzman added. Signed by District Judge David J. Novak on 9/2/2020. (jsmi, ) (Entered: 09/04/2020) |
| 09/18/2020 | 51 | First Step Act Work Sheet (Sealed Document) as to Cory Johnson (drumheller, dorothy) (Entered: 09/18/2020) |
| 09/21/2020 | 52 | MOTION for Extension of Time to File Response/Reply as to 39 Memorandum in Support of Motion,,, 38 MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* by USA as to Cory Johnson. (Attias, Joseph) (Entered: 09/21/2020) |
| 09/22/2020 | 56 | ORDER that Government's 52 Unopposed Motion for a Two Day Extension for Filing the United States' Response to§ 404 Motion moving for a two-day extension to respond to Defendant Corey Johnson's First Step Act Motion is hereby GRANTED. The Government shall have until September 23, 2020, by which to file its response to Defendant's First Step Act Motion. Signed by District Judge David J. Novak on 9/21/2020. (jsmi, ) (Entered: 09/22/2020) |
| 09/23/2020 | 58 | RESPONSE in Opposition by USA as to Cory Johnson re 38 MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* (Attias, Joseph) (Entered: 09/23/2020) |
| 10/08/2020 | 63 | NOTICE OF ATTORNEY APPEARANCE: Lotus Davna Ryan appearing for Cory Johnson (Ryan, Lotus) (Entered: 10/08/2020) |
| 10/08/2020 | 64 | Reply to Motion by Cory Johnson re 38 MOTION to Reduce - First Step Act *(Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018)* (Attachments: # 1 Index to Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C) (Carney, David) (Entered: 10/08/2020) |
| 11/03/2020 | 68 | ORDER of USCA(20-8) as to Cory Johnson : For reasons appearing to the court, this case is placed in abeyance pending a decision by this court in U.S. v. Juan Ortiz-Orellana, No. 16-4844. (lgar, ) (Entered: 11/03/2020) |
| 11/17/2020 | | PAPER DOCKET SHEET as to Cory Johnson. (jsmi, ) (Entered: 11/17/2020) |

APP.458

| | 72 | |
|---|---|---|
| 11/19/2020 | 75 | ORDER as to Cory Johnson that the Court finds that Defendant's convictions on Counts Two, Eight, Eleven, Seventeen, Eighteen, Nineteen, Twenty-Four and Twenty-Five Jo not constitute covered offenses under the First Step Act. Although Defendant's convictions on Counts Thirty-One and Thirty-Two do constitute covered offenses, the Court declines to exercise its discretion to reduce Defendant's sentence. Therefore, Defendant's 38 Motion for a Reconsideration of Sentence Hearing Pursuant to the First Step Act of 2018 will be denied. Signed by District Judge David J. Novak on 11/19/2020. (jsmi, ) (Entered: 11/19/2020) |
| 11/20/2020 | 77 | NOTICE *of Appeal* by Cory Johnson re 75 Order on Motion to Reduce - First Step Act,, (Carney, David) (Entered: 11/20/2020) |
| 11/20/2020 | 78 | NOTICE *of execution date* by USA (Cooke, Richard) Modified on 11/23/2020 to correct text(tjoh, ). (Entered: 11/20/2020) |
| 11/23/2020 | 79 | Transmission of Notice of Appeal to US Court of Appeals as to Cory Johnson re 77 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (lbre, ) (Entered: 11/23/2020) |
| 11/23/2020 | | USCA Case Number 20-15, Case Manager E.Borneisen, for 77 Notice of Appeal filed by Cory Johnson.(lbre, ) (Entered: 11/24/2020) |
| 12/08/2020 | 84 | MOTION TO INTERVENE by Willie Lee Seward. (jsmi, ) (Entered: 12/08/2020) |
| 12/14/2020 | 86 | MOTION to Vacate under 28 U.S.C. 2255 by Cory Johnson. (Attachments: # 1 Index to Exhibits, # 2 Exhibit 1, # 3 Exhibit 1(a), # 4 Exhibit 2, # 5 Exhibit 2(a), # 6 Exhibit 3, # 7 Exhibit 3(a), # 8 Exhibit 4, # 9 Exhibit 5, # 10 Exhibit 6)(Carney, David) Civil case 3:20-cv-00957 opened. (Entered: 12/14/2020) |
| 12/14/2020 | 87 | NOTICE *of Submission of Exhibit 7 - Parts 1-3* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 7 - Part 1, # 3 Exhibit 7 - Part 2, # 4 Exhibit 7 - Part 3)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 88 | NOTICE *of Submission of Exhibits 8 - 17* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 8, # 3 Exhibit 9, # 4 Exhibit 10, # 5 Exhibit 11, # 6 Exhibit 12, # 7 Exhibit 13, # 8 Exhibit 14, # 9 Exhibit 15, # 10 Exhibit 16, # 11 Exhibit 17)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 89 | NOTICE *of Submission of Exhibits 18 - 30* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 18 - Part 1, # 3 Exhibit 18 - Part 2, # 4 Exhibit 19, # 5 Exhibit 20, # 6 Exhibit 21, # 7 Exhibit 22, # 8 Exhibit 23, # 9 Exhibit 24, # 10 Exhibit 25, # 11 Exhibit 26, # 12 Exhibit 27, # 13 Exhibit 28, # 14 Exhibit 29, # 15 Exhibit 30)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 90 | NOTICE *of Submission of Exhibits 31 - 44* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 31, # 3 Exhibit 32, # 4 Exhibit 33, # 5 Exhibit 34, # 6 Exhibit 35, # 7 Exhibit 36, # 8 Exhibit 37, # 9 Exhibit 38, # 10 Exhibit 39, # 11 Exhibit 40, # 12 Exhibit 41, # 13 Exhibit 42, # 14 |

**APP.459**

| | | Exhibit 43, # 15 Exhibit 44)(Carney, David) (Entered: 12/14/2020) |
|---|---|---|
| 12/14/2020 | 91 | NOTICE *of Submission of Exhibits 45 - 54* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 45, # 3 Exhibit 46, # 4 Exhibit 47, # 5 Exhibit 48, # 6 Exhibit 49, # 7 Exhibit 50, # 8 Exhibit 51, # 9 Exhibit 52, # 10 Exhibit 53, # 11 Exhibit 54)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 92 | NOTICE *of Submission of Exhibits 55 - 70* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 55, # 3 Exhibit 56, # 4 Exhibit 57, # 5 Exhibit 58, # 6 Exhibit 59, # 7 Exhibit 60, # 8 Exhibit 61, # 9 Exhibit 62, # 10 Exhibit 63, # 11 Exhibit 64, # 12 Exhibit 65, # 13 Exhibit 66, # 14 Exhibit 67, # 15 Exhibit 68, # 16 Exhibit 69, # 17 Exhibit 70)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 93 | NOTICE *of Submission of Exhibits 71 - 74* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 71, # 3 Exhibit 72, # 4 Exhibit 73 - Part 1, # 5 Exhibit 73 - Part 2, # 6 Exhibit 74)(Carney, David) (Entered: 12/14/2020) |
| 12/14/2020 | 94 | NOTICE *of Submission of Exhibits 75 - 79* by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Attachments: # 1 Index to Exhibits, # 2 Exhibit 75 - Part 1, # 3 Exhibit 75 - Part 2, # 4 Exhibit 76, # 5 Exhibit 77, # 6 Exhibit 78, # 7 Exhibit 79)(Carney, David) (Entered: 12/14/2020) |
| 12/15/2020 | 95 | ORDER that the Government file a brief addressing these issues, which shall not exceed 14 pages, not later than December 21, 2020. Petitioner shall file any reply, limited to 7 pages, not later than December 24, 2020. Following this briefing, should the Court find that it may consider the merits of the Second § 2255 Petition, the Court will set a briefing schedule to address the merits of the Second § 2255 Petition. See Order for details. Signed by District Judge David J. Novak on 12/15/2020. (jsmi, ) (Entered: 12/15/2020) |
| 12/21/2020 | 96 | RESPONSE in Opposition by USA as to Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 (Cooke, Richard) (Entered: 12/21/2020) |
| 12/24/2020 | 97 | REPLY TO RESPONSE to by Cory Johnson re 86 MOTION to Vacate under 28 U.S.C. 2255 *(Corey Johnson's Reply Pursuant to December 15, 2020 Order)* (Attachments: # 1 Exhibit 1)(Carney, David) (Entered: 12/24/2020) |
| 12/31/2020 | 98 | MOTION for Leave to File by USA as to Cory Johnson. (Attachments: # 1 Exhibit supplemental authority, # 2 Proposed Order)(Cooke, Richard) (Entered: 12/31/2020) |
| 01/02/2021 | 99 | MEMORANDUM OPINION as to Cory Johnson. Signed by District Judge David J. Novak on 1/2/2021. (cgar) (Entered: 01/02/2021) |
| 01/02/2021 | 100 | ORDER granting 98 Motion for Leave to File Supplemental Authority as to Cory Johnson (2). Signed by District Judge David J. Novak on 1/2/2021. (cgar) (Entered: 01/02/2021) |
| 01/02/2021 | 101 | Supplemental Authority by USA as to Cory Johnson. (cgar) (Entered: 01/02/2021) |
| 01/02/2021 | | |

**APP.460**

| | 102 | ORDER dismissing without prejudice for want of jurisdiction 86 Motion to Vacate (2255) certificate of appealability is denied as to Cory Johnson (2). Appeal must be filed within sixty (60) days. Signed by District Judge David J. Novak on 1/2/2021. (cgar)<br>Civil Case 3:20-cv-00957-DJN closed. (Entered: 01/02/2021) |
|---|---|---|
| 01/04/2021 | 103 | NOTICE *of Appeal* by Cory Johnson re 102 Order on Motion to Vacate (2255), (Carney, David) (Entered: 01/04/2021) |
| 01/05/2021 | 104 | Transmission of Notice of Appeal to US Court of Appeals as to Cory Johnson re 103 Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (lbre, ) (Entered: 01/05/2021) |

### PACER Service Center

**Transaction Receipt**

01/06/2021 13:20:18

| PACER Login: | LotusRyan:6526587:0 | Client Code: | 811110-06586 Ryan |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 3:92-cr-00068-DJN |
| Billable Pages: | 6 | Cost: | 0.60 |

**APP.461**