**EXECUTION SCHEDULED FOR JANUARY 14, 2021 AT 6:00 P.M. ET**

**No. 20-15**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**United States Of America
Plaintiff - Appellee,**

**v.**

**Corey Johnson, A/K/A O, A/K/A CO,
Defendant - Appellant.**

_____

**No. 21-1**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

**United States Of America
Plaintiff - Appellee,**

**v.**

**Corey Johnson, A/K/A O, A/K/A CO,
Defendant - Appellant.**

_____

**CAPITAL CASE**

**EMERGENCY PETITION FOR REHEARING EN BANC**

_____

Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher &
Flom, LLP
1440 New York Avenue, NW
Washington, DC 20005
Ph: (202) 371-7246
Fax: (202) 661-8295
Email: david.carney@skadden.com

*Counsel for Corey Johnson*

## INTRODUCTION AND RULE 35(b)(1) STATEMENT

En banc rehearing is warranted because the panel decision raises two questions of exceptional importance.  *See* Fed. R. App. P. 35(b)(1)(B).

First, Mr. Johnson has an absolute right to seek reconsideration of his death sentence under the First Step Act.  As Judge Motz wrote, there are "compelling arguments" supporting Mr. Johnson's right to this resentencing.  (No. 20-15, ECF No. 26 at 8.)  And because the government seeks to execute Mr. Johnson before he can seek resentencing, the en banc court should take up the "difficult and important issues" he has raised.  (*Id.* at 9.)

Second, the plain language of the federal statute prohibits the United States from executing Mr. Johnson due to his intellectual disability.  18 U.S.C. § 3596(c); 21 U.S.C. § 848(*l*).  Judge Motz recognized the provision as a "safeguard" in the federal system, but incorrectly believed this Court was precluded by precedent from so finding.  This Court should grant rehearing and a stay of execution and hold that federal law provides a mechanism for Corey Johnson – whose case rests on a decades-old partial diagnosis dependent on a single miscalculated IQ score – to establish that he is ineligible for execution.

Mr. Johnson respectfully petitions the Court to grant en banc review and grant the requested preliminary relief pending the Court's review of the merits of his appeals.

## BACKGROUND FACTS

Corey Johnson was convicted in 1993 of multiple offenses stemming from crack distribution activities, including murder in the course of a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848(e). He was sentenced to death for the § 848(e) offenses.

On August 19, 2020, Mr. Johnson sought a sentence reconsideration from death to life without possibility of parole under the First Step Act for his violations of 21 U.S.C. § 848. The district court denied this motion. (20-15_J.A.154.)[1] On November 20, the government set a January 14, 2021, execution date for Mr. Johnson. (20-15_J.A.528.) On December 14, 2020, Mr. Johnson filed a motion pursuant to 28 U.S.C. § 2255 ("§ 2255") in the district court seeking to establish that he could not be executed because the FDPA prohibits the government from executing mentally retarded prisoners.[2] (21-1_J.A.84.) On January 2, 2021, the district court found that the § 2255 motion was an unauthorized successive motion and dismissed it without considering the merits. (21-1_J.A.81.)

---

[1]  Citations to the joint appendix at Dtk. 20-15, ECF Nos. 11-1, 11-2 are referred to as "20-15_J.A." and citations to the joint appendix at Dkt. 21-1, Nos. 5-4 – 5-6, 6-1, 6-2, 7-1, 7-2 are referred to as "21-1_J.A."

[2]  The modern term is "intellectually disabled." This Petition uses "mentally retarded" only when citing statutes and case law or quoting documents.

Mr. Johnson appealed both orders to this Court and requested stays of his execution pending appeal. (20-15, ECF Nos., 10, 15-1; 21-1, ECF Nos., 5-1, 8-1.)

Yesterday, a three-judge panel denied Mr. Johnson's motions for stay under the First Step Act and the FDPA. (20-15, ECF No. 26.) Judge Motz dissented with respect to Mr. Johnson's motion to stay pursuant to the First Step Act, concluding that he raised a "timely and serious challenge . . . that should be resolved prior to his execution." (*Id.* at 7.) And while the Panel unanimously denied Mr. Johnson's motion to stay pursuant to the FDPA, Judge Motz noted that his claim raised "grave concerns about the propriety to now executing him."[3] (*Id.* at 6 (Motz, J., concurring).)

## ARGUMENT

Mr. Johnson is entitled to a stay of execution because (1) he has a significant possibility of success on the merits; (2) he is likely to suffer irreparable injury otherwise; (3) the balance of equities tip in his favor; (4) an injunction is in the public interest; and (5) he did not unduly delay in bringing his claims. *See generally Dunn v. McNabb*, 138 S. Ct. 369 (2017).

---

[3] The issue is the same regardless of whether the FDPA (§ 3596) or the ADAA (§848(l) applies. *See* footnote 4, *infra.*

3

## I.    Mr. Johnson is likely to prevail on the merits of his appeals.

### a.    The First Step Act permits Mr. Johnson to ask a jury to reconsider his death sentences.

This Court has recently penned several opinions explaining the purpose of the First Step Act of 2018; the mode of analysis district courts should use to determine whether a defendant is eligible for reconsideration of his sentence under it; and the factors a sentencer must take into consideration before exercising its discretion to reduce that defendant's sentence. *See United States v. Wirsing*, 943 F.3d 175, 186 (4th Cir. 2019); *United States v. Gravatt*, 953 F.3d 258, 262 (4th Cir. 2020); *United States v. Woodson*, 962 F.3d 812, 816 (4th Cir. 2020); *United States v. Chambers*, 956 F.3d 667, 670 (4th Cir. 2020). To summarize briefly: in recognition of grave racial inequities in sentencing occasioned by unreasonable disparities in sentencing for distribution of crack cocaine versus powder cocaine embedded in the Anti-Drug Abuse Act (the "ADAA"), Congress passed the Fair Sentencing Act in 2010. Pub. L. No. 111-220, § 2, 124 Stat. 2372.  The 2010 Act adjusted penalties for offenses involving crack by increasing the threshold drug quantities required to trigger mandatory minimum sentences under § 841(b)(1). Because the Fair Sentencing Act operated prospectively only, eight years later, Congress passed the First Step Act to provide relief for prisoners convicted of certain drug offenses committed *before* the Fair Sentencing Act was passed by giving them one opportunity to come back into court to seek reconsideration of

4

their sentences. This right was considered so important, Congress eliminated all procedural barriers for bringing such a claim. Mr. Johnson, who was convicted and sentenced for drug crimes in 1993, availed himself of this opportunity by filing a First Step Act claim in August 2020.

The First Step Act created a two-step process to determine whether a defendant is entitled to resentencing. First, the court must determine whether a defendant has committed a "covered offense." This requires looking at whether the penalties for defendant's "statute of conviction" were modified, even slightly, by the Fair Sentencing Act. *Wirsing*, 943 F.3d at 185; *Woodson*, 962 F.3d at 816; *see also United States v. Shaw*, 957 F.3d 734, 739 (7th Cir. 2020). This Court has made clear that courts should not employ a "complicated [or] eligibility-limiting determination at the 'covered offense' stage of the analysis," *United States v. Wirsing*, 943 F.3d at 186 (citation omitted), and that this determination requires a purely legal analysis of the statutes rather than the facts of the convictions at issue. *See, e.g.*, *Gravatt*, 953 F.3d at 262; *Woodson*, 962 F.3d at 816; *see also Shaw*, 957 F.3d at 739.

If an offense is "covered," the defendant's sentence then must be reconsidered. During this second step, the sentencer must consider the entire range of factors that go into a sentencing determination, applying current law and considering post-conviction information the defendant proffers, including his

prison adjustment and other relevant mitigating factors, to provide just and adequate punishment. *See, e.g.*, *Chambers*, 956 F.3d at 674.

> **i. Mr. Johnson's convictions under 21 U.S.C. § 848(e) are "covered offenses" because the penalties for his statute of conviction were modified by the Fair Sentencing Act.**

Mr. Johnson was convicted of and sentenced pursuant to 21 U.S.C. §§ 848(a) and 848(e). As Judge Motz correctly noted in her dissent from the denial of a stay of execution, Mr. Johnson has presented "compelling arguments that his statute of conviction is 21 U.S.C. § 848—a cohesive statute centered on the definition of 'continuing criminal enterprise' in § 848(c)—for which the penalties of various subsections have indisputably been modified." (No. 20-15, ECF No. 26 at 8.) In other words, Mr. Johnson has met the threshold to be eligible for reconsideration of his sentence.

As Judge Motz explained, § 848 is Mr. Johnson's statute of conviction because, by its plain language and construction, § 848 is a single federal criminal statute, the punishments for which rest on an initial determination that the accused engaged in a CCE specifically defined by § 848(c).[4] The remaining subsections lay out additional elements that, if found, carry specific penalties, and cannot exist

---

[4]  Both the district court and the government have contended that § 848 cannot be the statute of conviction because in *United States v. NJB,* 104 F.3d 630 (4th Cir. 1997), this Court said that § 848(e) was a standalone offense. Inasmuch as Judge Motz authored *NJB*, her opinion yesterday holds particular weight.

6

independent of subsection (c).  *See United States v. Brown*, No. 08-cr-00011-1, 2020 WL 3106320, at *4 (W.D. Va. June 11, 2020) (explaining that § 848(c) is the centerpiece of the statute defining a CCE and that by virtue of § 848's brevity and overall uniformity of purpose, it must constitute the "statute of conviction" for all CCE crimes in Title 21).  Thus, § 848 as a whole is the statute of conviction for purposes of the First Step Act.  Other courts have used similar analysis to conclude that because § 848 in its entirety is the "statute of conviction," and any violation under any of its subsections is a "covered offense." *See, e.g.*, *Brown*, 2020 WL 3106320, at *4 (holding that the "most straightforward solution" was to consider § 848 in its entirety as the statute of conviction); *United States v. Dean*, No. 97-276(3), 2020 WL 2526476, at *3 (D. Minn. May 18, 2020) (holding that § 848 is the statute of conviction).

Again, as Judge Motz highlighted, subsections of § 848 have been modified by operation of the Fair Sentencing Act, so § 848 is a "covered offense."[5] (No. 20-15, ECF No. 26 at 8.)  As this Court explained in *Woodson*, for instance, a defendant's offenses under both § 841(b)(1)(B)(iii) and (b)(1)(C) were modified by the Fair Sentencing Act because that act changed the applicable drug weights

---

[5]  Moreover, § 848(c) necessarily involves drug offenses, and the drug offenses charged in this case—violations of § 841(b)(1)(A) and § 846—carried penalties that were modified by the Fair Sentencing Act.  Pub. L. No. 111-220, § 2, 124 Stat. 2372, 2372.

triggering a sentence within § 841(b)(1)(C), which had *the effect* of changing the penalty. *Woodson*, 962 F.3d at 815. Thus, Congress did not need to explicitly modify the text of these provisions in order to affect the penalties connected to them. *Id.*. The government has conceded elsewhere that the penalty provisions of § 848 have been modified, because both subsections (b) and (e) include violations of § 841(b)(1)(A) as predicate offenses. *See, e.g.*, *Brown*, 2020 WL 3106320, at *2.

Even if this Court were to deem § 848(e) a standalone statute of conviction—which it should not, because 848(e) is part of the integrated whole of § 848—the penalties for subsection (e) have themselves been modified by the First Step Act. It must also, therefore, constitute a covered offense.

Finally, even if this Court were to adopt the district court's complicated, eligibility-limiting, conduct-specific analysis it cautioned against in *Wirsing*, Mr. Johnson's offenses would still constitute "covered offenses" because, as this Court determined on direct appeal, his CCE offenses all rest on his underlying violations of § 841(b)(1)(A). *See United States v. Tipton*, 90 F.3d 861, 884 (4th Cir. 1996).

Thus, no matter how one slices it, Mr. Johnson's § 848 violations are "covered offenses," and he has met the threshold requirement that entitles him to reconsideration of his capital sentences.

8

### ii. When a death row inmate seeks resentencing, the sentencer must consider post-conviction evidence under current legal standards to whether the death penalty is still appropriate.

This Court requires reconsideration of a sentence to be conducted after the resentencer has engaged in a robust analysis of whether the death penalty is appropriate under current standards, such as those for the determination of intellectual disability, and only after considering the entire range of factors that go into a sentencing determination, including post-conviction prison adjustment. *See, e.g.*, *Chambers*, 956 F.3d at 674; *see also Pepper v. United States*, 562 U.S. 476, 491 (2011) (holding that in the resentencing context, post-sentencing evidence "may be highly relevant to several of [those] factors."). Given the overwhelming evidence of Mr. Johnson's intellectual disability and his pristine prison record extending beyond two decades (20-15_J.A.195-204), a legally appropriate sentence reconsideration would have to yield a sentence less than death. This robust analysis is something the district court refused to do, insisting instead it was not its role to reconsider the sentence imposed by Mr. Johnson's 1993 sentencing jury. In fact, that is precisely the district court's role.

While a court can ultimately decide not to reduce any defendant's sentence under the First Step Act, it cannot choose to defer to the "will of the community" as reflected under a different sentencing regime. The "will of the community" is

reflected in part through legislation, which represents a declaration of the community's public policy goals. Here, the public policy is to permit resentencing.

### b. The Federal Death Penalty Act prohibits the United States from executing an intellectually disabled prisoner.

*The United States cannot execute someone who is intellectually disabled at the time of execution.* Under the FDPA, a death sentence "shall not be carried out upon a person who is mentally retarded." 18 U.S.C. § 3596(c).[6] The district court found that Mr. Johnson could not challenge his execution on this ground because his motion was successive. (21-1_J.A.78.) This was error.

The text of the provision and its placement among other directives for the time of execution demonstrate Congress's intent to allow an inquiry at the time of execution. *See* § 3596(c) (included in the section on "implementation" of a death sentence and along with prohibitions on execution of someone who is pregnant or incompetent). Legislative history further supports this, as well as the potential need for more than one inquiry into intellectual disability. The extent to which scientific standards develop – and they have changed enormously since 1993 – underscores the possible need for such an inquiry.

---

[6]   Mr. Johnson was convicted pursuant to the now-repealed 21 U.S.C. § 848. As the district court found, "§ 848(l) and § 3596(c) contain identically worded prohibitions on executing intellectually disabled individuals." Mem. Op. at 10 n.5 (Dismissing § 2255 Petition), ECF No. 99. The argument is the same whichever provision governs.

Judge Motz understood this.  Her separate opinion below recognized that § 3596(c) stands as a "safeguard" in intellectual disability cases, and that required recalibration of test scores, and other recent developments "raise significant questions about [Mr. Johnson's] intellectual functioning,"  (20-15, ECF No. 26 at 6.)  Quoting Justice Sotomayor's opinion on this very point, *Bourgeois v. Watson*, 141 S. Ct. 507, 509 (2020), Judge Motz nevertheless believed this Court bound by the "precedent" of the Supreme Court's not adopting that view in its denial of certiorari in that case.  (*Id.* at 7.)  Respectfully, this is not so, as certiorari denials hold no precedential value.  *See Ramos* v. *Louisiana*, 140 S. Ct. 1390, 1404 (2020) (cert denials have no legal significance on merits of claim (citations omitted)).

This Court should grant rehearing to address these questions. Mr. Johnson is intellectually disabled, and his motion is properly before this Court.

*Corey Johnson is intellectually disabled under current diagnostic standards.* The American Psychiatric Association ("APA") and the American Association on Intellectual and Developmental Disabilities ("AAIDD") contain "the best available description of how mental disorders are expressed and can be recognized by trained clinicians."  *Moore v. Texas*, 137 S. Ct. 1039, 1053 (2017) (*"Moore I"*) (citation omitted).  They establish three criteria for intellectual disability: significant deficits in intellectual functioning, significant deficits in adaptive functioning, and onset before the age of eighteen.  Three nationally-recognized

11

experts in intellectual disability agree that Mr. Johnson meets all three criteria. (21-1_J.A.193, 21-1_J.A.262, 21-1_J.A.325.)  Ample evidence documented during Mr. Johnson's childhood supports their conclusions.

*Intellectual Functioning.*  Under current diagnostic standards, an IQ score of 75 or below (adjusted to account for standard error of measurement) satisfies this prong.  Mr. Johnson has four valid and reliable IQ scores on gold-standard IQ tests within this presumptive range. When corrected for the Flynn Effect,[7] as current diagnostic standards require, *see* 21-1_J.A.1413, his IQ scores are approximately 72, 75, 65, and 73.

*Adaptive Functioning.*  This measures "how well a person meets community standards of personal independence and social responsibility." (21-1_J.A.1413.); *see also Moore I*, 137 S. Ct. at 1045; *Hall v. Florida*, 572 U.S. 701, 710 (2014). All three experts concluded, after an exhaustive review of materials, that Mr. Johnson had significant deficits in all aspects of adaptive functioning.  (21-1_J.A.173, 21-1_J.A.253, 21-1_J.A.322-24)  In the conceptual domain, he was unable to learn or adjust to changing circumstances.  He remained in the second grade for three years, repeated third and fourth grades, and continued to fall further

---

[7]  According to the Flynn Effect, IQ tests across populations increase slowly over time—approximately .3 points per year or 3 points over ten years.  Federal courts have "acknowledged the appropriateness of considering Flynn-adjusted scores." *See United States v. Davis*, 611 F. Supp. 2d 472, 487 (D. Md. 2009).

and further behind academically. (*See* 21-1_J.A.114-118.) At age eight, he had "no concept of number facts, no reading skills, [could not] retain sight vocabulary words," and "had difficulty saying the alphabet." (*See, e.g.*, 21-1_J.A.114, 119.) In his early twenties, his reading and writing abilities were no higher than the second-grade level. (21-1_J.A.117-118).

In the practical domain, he always struggled with self-care: He wet and soiled his bed until he was 12 years old and needed constant reminders to keep himself clean. (21-1_J.A.126-127.) As he entered his teen years and into his adulthood, he never acquired the skills to take care of himself. He has never lived on his own or held down a job, and those who know him best did not believe he could learn the skills to do either. (21-1_J.A.127-129.)

In the social domain, Mr. Johnson had "difficulty in understanding social cues and norms," and was, over the course of his life, the quintessential follower, easily influenced by and victimized by peers, who took his money, tricked and manipulated him. (21-1_J.A.123-125 (citations omitted).

Mr. Johnson, thus, epitomizes the reasons the courts have considered those with intellectual disability to lack the degree of moral culpability as those who are not disabled in this way.

13

*Onset Before the Age of 18.* Mr. Johnson's significant limitations in intellectual and adaptive functioning are well-documented before he turned 18. (21-1_J.A.252; 21-1_J.A.193; 21-1_J.A.325.)

*The Improper Basis Employed to Reject Mr. Johnson's § 3596 Claim.* Both the district court and Judge Wilkinson, however, ignored this evidence in favor of the 1993 testimony of the Dewey Cornell, PhD, the psychologist hired at trial to do a general psychological assessment of Mr. Johnson and to testify to relevant mitigation at the penalty phase in 1993. Dr. Cornell "determined" that Mr. Johnson could not be intellectually disabled based on a single IQ test he administered prior to trial, on which Mr. Johnson scored a 77 (which was uncorrected for the Flynn Effect), and testified to that effect at the penalty phase. (21-1_J.A.507.) In the early 2000's, this Court found that enough reason to reject Mr. Johnson's § 2255 claim that he was intellectually disabled. *United States v. Roane*, 378 F.3d 382, 408-09 (4th Cir. 2004).

Dr. Cornell's analysis flunks current diagnostic standards in several ways, both because he failed to adjust the score of the IQ test he administered to account for the Flynn Effect, incorrectly dismissed another IQ test that was within the presumptive range of intellectual disability, and ignored Mr. Johnson's other signs of intellectual disability. *See Hall*, 572 U.S. at 723 ("when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the

14

defendant must be able to present additional evidence of intellectual disability");
*Moore I*, 137 S. Ct. at 1050 ("[W]e require that courts continue the inquiry and consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits").

The critical point is that § 3596 requires a court to examine the evidence of a defendant's intellectual disability at the time of implementation of a death sentence, without regard for stale legal determinations made under decades-old standards. *This would be the first evidentiary hearing ever held to establish Mr. Johnson's intellectual disability.*[8]

*Mr. Johnson's second § 2255 motion was not a successive motion.* The phrase "second or successive" is a term of art and "not every numerically second petition [or motion] is a 'second or successive' petition [or motion] within the meaning of the AEDPA." *United States v. Hairston*, 754 F.3d 258, 262 (4th Cir. 2014) (citation omitted). Rather, courts should look to the individual circumstances of each case to avoid "an interpretation of the [AEDPA] statute that would . . . 'close our doors to a class of habeas petitioners seeking review without any clear indication that such

---

[8]    A properly conducted hearing pursuant to the First Step Act would also require the use of contemporary medical and legal standards for an intellectual disability determination.

15

was Congress' intent.'" *Panetti v. Quarterman*, 551 U.S. 930, 947-78 (2007) (citation omitted).

Here, the basis for Mr. Johnson's claim is a statute creating an independent, substantive prohibition on implementation of the death penalty for the intellectually disabled. The plain language, structure, and statutory history of the statute establish that Congress intended to permit this determination to be made when execution is imminent. In light of these strong indications of Congress' intent, this Court should not close the door on Mr. Johnson's claim particularly where, as here "[n]o federal court has ever assessed this evidence or considered whether it forecloses a lawful imposition of the death penalty in Johnson's case." (20-15, ECF No. 26 at 6.)

## II.    Mr. Johnson faces irreparable injury.

Because the United States intends to execute Mr. Johnson tomorrow, he unquestionably faces irreparable injury. *See Wainwright v. Booker*, 473 U.S. 935, 935 n.1 (1985) (recognizing that irreparable injury "is necessarily present in capital cases").

## III.   A balancing of the equities supports a stay.

Staying Mr. Johnson's execution briefly for this Court to consider these grave issues will not substantially injure the United States. The government initially set an execution date for Mr. Johnson in 2006, but could not carry the execution then because of flaws in its execution protocol. It spent 2011 to July 2019

16

without any execution protocol at all, *see* Mem. Op., *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145 (D.D.C. Nov. 20, 2019), ECF No. 50, then waited another 16 months to schedule Mr. Johnson's execution. *See* Notice of Execution, *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-mc-145 (D.D.C. Nov. 20, 2020), ECF No. 330.

This case is extraordinary: overwhelming and unrefuted evidence—which "no federal court has ever . . . considered," (20-15, ECF No. 26 at 6.)— demonstrates Mr. Johnson's intellectual disability and the fallacies of Dr. Cornell's decades-old assessment; racial inequities, now addressed by the First Step Act, tainted his sentencing proceeding; and federal statutes give him robust rights to correct those injustices. Although the government normally has a "strong interest" in "proceeding with its judgment," *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004) (citation omitted), that interest should sensibly yield here to afford Mr. Johnson the chance to vindicate those rights.

## IV.    Executing Mr. Johnson now serves no legitimate public interest.

The FDPA's terms embody the public interest in ensuring that the United States does not execute intellectually disabled people. Likewise, the First Step Act reflects a public interest in allowing people such as Mr. Johnson who were subject to a discriminatory sentencing regime to seek resentencing. The United States has no legitimate interest in executing a prisoner in violation of federal law.

17

**V.    Mr. Johnson did not unnecessarily delay in bringing these claims.**

This is not a case where a death row prisoner is bringing a last-minute motion for stay of execution as a tactical step. Mr. Johnson has timely and diligently pursued his challenges under both the FDPA and the First Step Act.

Mr. Johnson sought relief under the First Step Act in August 2020, just months after courts determined in non-capital cases that 21 U.S.C. § 848 was a covered offense, and after the district court determined that any sentencing reconsideration had to consider post-conviction conduct. *United States v. Davis*, No. 93-CR-30025, 2020 WL 1131147, at *2 (W.D. Va. Mar. 9, 2020); *United States v. Jimenez*, No. 92-CR-550-01, 2020 WL 2087748, at *2 (S.D.N.Y. Apr. 30, 2020); Mem. Order at 5, *United States v. Kelly*, No. 94-CR-163-4 (E.D. Va. June 5, 2020), ECF No. 1133. The government set his execution hours after he had noticed his appeal to this Court.

Mr. Johnson's current § 2255 motion could be raised only "[w]hen the sentence is to be implemented." 18 U.S.C. § 3596(a), (c). When the government scheduled Mr. Johnson's execution for January 14, 2021, Mr. Johnson promptly filed, his § 2255 motion challenging the implementation of his sentence under the FDPA.

18

## CONCLUSION

The Court should grant the petition and stay Mr. Johnson's execution pending resolution of his claims under the First Step Act and FDPA.

Dated: January 13, 2021            Respectfully submitted,

                                   /s/David E. Carney
                                   Donald P. Salzman
                                   Jonathan Marcus
                                   David E. Carney
                                   Skadden, Arps, Slate, Meagher &
                                   Flom, LLP
                                   1440 New York Avenue, NW
                                   Washington, DC 20005
                                   david.carney@skadden.com

                                   *Counsel for Corey Johnson*

20

## CERTIFICATE OF COMPLIANCE

1.      This motion contains 4,191 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. Rule 27(d)(2) and Rule 35(b)(2)(A).  Mr. Johnson has requested leave to exceed the page limits.

2.      This motion complies with the font, spacing, and type size requirements set forth in Fed. R. App. P. Rule 32(a)(5).

<div align="right">/s/ David E. Carney           </div>

## CERTIFICATE OF SERVICE

I certify that on this 13th day of January 2021, the foregoing

document was served on all parties or their counsel of record though the CM/ECF

system, which will then send notification of such filing to all parties and counsel

included on the Court's Electronic Mail notice list.

<div style="margin-left: 50%;">

/s/ David E. Carney
Donald P. Salzman
Jonathan Marcus
David E. Carney
Skadden, Arps, Slate, Meagher &
Flom LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7983
donald.salzman@skadden.com

*Counsel for Corey Johnson*

</div>

22