IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 20-15; 21-1 |
| | ) | |
| COREY JOHNSON, | ) | |
| | ) | |
| Appellant. | ) | |

**United States' Response in Opposition
to Defendant's Petition for Rehearing En Banc**

In 1993, a unanimous jury imposed seven death sentences on Corey Johnson for the murders of seven people—Peyton Maurice Johnson; Louis J. Johnson, Jr.; Bobby Long; Anthony Carter; Dorothy Mae Armstrong; Curtis Thorne; and Linwood Chiles.  Johnson was also convicted for the murder of an eighth person, Torrick Brown, Jr., and the assault of Martha McCoy, who Johnson and his co-defendants shot six times in front of her three children.  Today, over 27 years later, the family members of Johnson's numerous victims are currently en route to Terre Haute, Indiana, to witness the execution of his sentence.

Johnson has been litigating his case for decades, and his convictions and sentences have withstood direct appeal, initial collateral review, and multiple successive rounds of habeas litigation.  He nonetheless asks this Court, en banc, to

take the extraordinary step of staying his execution the day before it is scheduled, overruling the sound judgments of the district court and the panel.  As the Supreme Court has recently and repeatedly instructed, a stay of execution "is not available as a matter of right[,]" *Hill v. McDonough*, 547 U.S. 573, 584 (2006), and "last-minute stays" of executions "should be the extreme exception, not the norm." *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (citation omitted).  Indeed, just yesterday the Supreme Court summarily vacated a stay issued by the en banc D.C. Circuit on the eve of execution after the district court and panel had denied relief.  *See Rosen v. Montgomery*, No. 20A122 (Jan. 12, 2021).

Johnson's extraordinary request is based on meritless claims.  First, he seeks resentencing under the First Step Act for murder convictions on which the Fair Sentencing Act had *no effect whatsoever*.  Indeed, Johnson does not dispute—nor could he—that the penalties for his murder convictions are precisely the same now as they were the day he was convicted, and nothing in the First Step Act authorizes a new capital sentencing.  In dissenting from the panel, Judge Motz never opined that Johnson had a "significant possibility of success on the merits" of this claim, *Dunn v. McNabb*, 138 S. Ct. 369 (2017), instead suggesting only that he "presents a novel question that is deserving of further consideration," Dkt. No. 26 at 8 (opinion of Motz, J.).  But that is not sufficient to warrant a stay, and the Supreme Court has

recently vacated a stay of execution based on a similar watered-down standard.  See

*Purkey v. United States*, 964 F.3d 603 (7th Cir.), *stay vacated*, 141 S. Ct. 195 (2020).

Second, Johnson seeks to litigate—again—his claim of intellectual disability,

which this Court has "squarely rejected."  Dkt. No. 26 at 4 (opinion of Wilkinson,

J.).   Johnson contends that the Federal Death Penalty Act (FDPA), 18 U.S.C.

§ 3596(c), creates, sub silentio, an exception to the carefully reticulated procedures

of 28 U.S.C. §§ 2244 and 2255, but the single sentence of the FDPA on which he

relies does no such thing.  The Seventh Circuit persuasively rejected the very same

argument, and the Supreme Court then denied certiorari and a stay of execution.

*Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2020), *cert. denied*, No. 20-6500 (U.S.

Dec. 11, 2020).

By initiating his stay motions within days of his execution—and by failing,

notwithstanding Fed. R. App. P. 8(a)(1)(A), to seek a stay from the district court at

all—Johnson has pursued tactics that are more conducive to delay than to

adjudication of the merits of his claims.  That alone should foreclose the equitable

relief he seeks.  And on the merits, Johnson's claims have been rejected by every

court of appeals to consider them.  This Court should deny rehearing en banc.

**A. Section 404 of the First Step Act does not authorize a court to reduce Johnson's seven death sentences.**

Johnson's Section 404 argument fails because his capital convictions under

21 U.S.C. § 848(e)(1)(A) are not "covered offenses" under the First Step Act, and

that Act does not silently reopen capital sentencing proceedings, requiring a court to impanel new capital sentencing juries.  Moreover, the district court has indicated that it would not reduce Johnson's capital sentences even it could.

1.      A "covered offense" is "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010, that was committed before August 3, 2010."  First Step Act § 404(a), 132 Stat. at 5222.  That statute applies straightforwardly here:  Because the "statutory penalties" for "a violation of" § 848(e)(1)(A) were *not* "modified by" the Fair Sentencing Act, that criminal violation is *not* a "covered offense."  *See, e.g.*, *United States v. Guerrero*, 813 F.3d 462, 464–465 (2d Cir. 2016) ("The [Fair Sentencing] Act makes no mention of § 848(e)(1)(A).").  Indeed, the penalties under § 848(e)(1)(A) are precisely the same now as they were when Johnson was convicted.  It would thus be nonsensical to "impose a reduced sentence" for those crimes "as if sections 2 and 3 of the Fair Sentencing Act of 2010 were in effect at the time [they were] committed," because the Fair Sentencing Act of 2010 changed nothing about Johnson's liability or sentencing exposure for those crimes.  First Step Act § 404(b), 132 Stat. at 5222.

That simple textual analysis accords with the purpose and history of § 404, which was designed to alleviate disparities between certain crack- and powder-cocaine dealers—not to provide a windfall in drug-related murders where penalties

remain unchanged. Johnson responds that other portions of § 848 may contain "covered offenses," and that every crime described in various subsections of § 848 should therefore be lumped together as one "covered offense." But that approach violates basic principles of federal criminal law, which recognize that different statutory subsections create distinct crimes with their own elements and statutory penalties. *See, e.g.*, *Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016); *Alleyne v. United States*, 570 U.S. 99, 103 (2013). Congress legislated against these basic legal principles when it enacted the First Step Act. *See, e.g.*, *Porter v. Nussle*, 534 U.S. 516, 528 (2002). Indeed, Congress specifically defined a "covered offense" as a particular "*violation* of a Federal criminal statute." First Step Act § 404(a), 132 Stat. at 5222 (emphasis added). Johnson's argument also proves far too much and would convert into "covered offenses" the many violations of 21 U.S.C. § 841 involving controlled substances other than crack cocaine, such as heroin and methamphetamine, despite the Fair Sentencing Act's irrelevance to them.

Johnson does not, and cannot, dispute that § 848(e)(1)(A) sets forth a criminal "violation" that is distinct from the crimes in other subsections of § 848. *See United States v. NJB*, 104 F.3d 630 (4th Cir. 1997) (holding that § 848(e) is a separate substantive offense). Specifically, § 848(e)(1)(A) criminalizes intentional killings by "any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section

841(b)(1)(A) of this title or section 960(b)(1) of this title." Although the Fair Sentencing Act affected certain penalties under § 841(b)(1)(A), those changes had no effect on the penalties under § 848(e)(1)(A), which remain the same before and after the Fair Sentencing Act. In any event, Johnson's predicate offense for his § 848(e)(1)(A) convictions was not a violation of § 841(b)(1)(A) at all, but rather his engagement in "a continuing criminal enterprise," § 848(e)(1)(A). *See Tipton*, 90 F.3d at 887; *United States v. Roane*, 2020 WL 6370984, at *10 (E.D. Va. Oct. 29, 2020) (same). Thus, even if the variant of § 848(e)(1)(A) that incorporates a § 841(b)(1)(A) violation were a "covered offense"—which it is not—it would have no bearing on Johnson's case.

The circuits to have considered whether § 848(e) was affected by the Fair Sentencing Act or is a "covered offense" under the First Step Act have correctly answered those questions in the negative, even in cases in which the defendant *was* convicted under the prong of § 848(e)(1)(A) requiring proof of a violation § 841(b)(1)(A). *See Guerrero*, 813 F.3d at 456–66; *United States v. Snow*, 967 F.3d 563, 564 (6th Cir. 2020) ("the First Step Act's text and structure do not support extending resentencing relief to Snow's § 848(e)(1)(A) conviction"). Johnson's § 848(e)(1)(A) convictions are even further attenuated from any statute whose penalties were modified by the Fair Sentencing Act, for as the district court explained, "neither the Fair Sentencing Act nor the First Step Act extinguished his

criminal liability for his CCE [Continuing Criminal Enterprise] conviction," so the existence of that predicate for his § 848(e)(1)(A) convictions was also unchanged. *Roane*, 2020 WL 6370984, at *11.

Johnson's murder convictions were thus unaffected by the Fair Sentencing and First Step Acts: those statutes did not affect Johnson's liability, his statutory penalties, or even anything about "the instructions or evidence given to the jury in the penalty phase." *Id*. at *13. A court conducting a resentencing today "would have no new statutory penalties on which to base a reduced sentence." *Id.* As the district court explained, Johnson "comes before the Court with unaltered convictions under a statute with unaltered statutory penalties and asks the Court to alter his sentence." *Id.* at *18. That request must fail.

2.    That Johnson was sentenced to death by a jury—7 times—for his violations of § 848(e)(1)(A) makes this point even clearer. Johnson contends that the First Step Act entitles him to a full capital resentencing hearing, but the statute itself makes no such provision. Instead, the First Step Act simply states that a "court" "may" "impose a reduced sentence" for a covered offense, in its discretion. First Step Act, § 404(b)-(c), 132 Stat. at 5222. By contrast, the statute under which Johnson was convicted "mandated the imposition of the death penalty upon the jury's recommendation." *Roane*, 2020 WL 6370984, at *16 (citing 21

U.S.C. 848(1)).[1]  The First Step Act does not contemplate the vacatur of any death sentences, the reimpaneling of a capital sentencing jury, or the imposition of any new capital sentences—making it plain that Congress did not include capital crimes like Johnson's within the scope of "covered offenses."

3.      Finally, even if a district court *could* resentence Johnson for his violations of § 848(e)(1)(A), Johnson would still not be entitled to the relief he seeks.  Sentence reductions under the First Step Act are purely discretionary.  *See* First Step Act § 404(c) ("Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section."); *United States v. Jackson*, 952 F.3d 492, 502 (4th Cir. 2020) ("[U]nder the First Step Act," district court is "not obligated to reduce [the defendant's] sentence at all.").  For the reasons explained by the district court, the 18 U.S.C. § 3553(a) factors do not support reducing Johnson's sentences even for convictions that *are* covered offenses under the First Step Act:

> Defendant murdered multiple people on different occasions in cold blood in furtherance of his drug trafficking. Defendant maimed several others in the commission of those murders. Defendant did not limit his violence to other engaged in drug trafficking—innocent bystanders fell victim to Defendant simply as a result of finding themselves in the wrong place at the wrong time.

---

[1] Johnson was convicted before the FDPA was enacted.  His sentence was controlled by the now-repealed provisions of 21 U.S.C. § 848. *See United States v. Stitt*, 552 F.3d 345, 353 (4th Cir. 2008); *Tipton*, 90 F.3d at 902; *Roane*, 2020 WL 6370984, at *16 n.8.

*Johnson*, No. 92-CR-68, Dkt. 75 at 11. The district court specifically "refuse[d] to overturn the will of the community" reflected in the jury's "unanimous[] deci[sion] that this heinous serial killer" deserved the death penalty. *Id.* at 11-14. Johnson therefore has no prospect of success in his request for resentencing.

### B. The Federal Death Penalty Act confers no right to a new eve-of-execution hearing on Johnson's previously adjudicated claim that he has an intellectual disability.

In his second claim, Johnson seeks to re-litigate the question of his intellectual disability—a claim this Court considered on the merits and rejected in 2004. *Roane*, 378 F.3d at 409. Claiming the FDPA entitled him to do so, Johnson filed a successive petition in the district court without first obtaining this Court's authorization. *See* 28 U.S.C. § 2244(b)(3)(A). This was error, the district court correctly treated it as such, and the panel correctly denied a stay. Particularly given the Supreme Court's recent denial of a stay of execution in an analogous context, *see Bourgeois v. Watson*, 977 F.3d 620 (7th Cir. 2020), *cert. denied*, No. 20-6500, 2020 WL 7296816 (U.S. Dec. 11, 2020), he cannot demonstrate a likelihood of success on the merits.

Johnson argues that the provisions of AEDPA – particularly § 2244(b)(3)(A) – are inapplicable because his intellectual disability claim was unripe earlier. Stay Mot. 6. But that argument conflates competency and intellectual disability claims. Because "[i]ntellectual disability is a permanent condition that must manifest before

the age of 18[,]" *Bourgeois*, 977 F.3d at 637 (citing *Atkins v. Virginia*, 536 U.S. 304, 318 (2002)), Johnson's intellectual disability claim was *not* unavailable to him previously. To the contrary, Johnson's "intellectual disability ripened years ago, and the courts rejected it years ago." *United States v. Johnson*, 2021 WL 17809, at *8 (E.D. Va. Jan. 2, 2021).

Johnson's reliance on *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Panetti v. Quarterman*, 551 U.S. 930 (2007), is similarly misplaced. First, *Panetti* is inapposite because Johnson did, in fact, raise the same intellectual disability claim in his prior § 2255 motion and on appeal, and the courts adjudicated that claim on the merits. *Roane*, 378 F.3d at 408–09. He cannot, therefore, argue that his claim was unripe at the time of his first § 2255 motion when he raised that precise claim in 2004 and litigated it to completion. Moreover, *Pannetti* addressed unripe *Ford* claims, not intellectual disability claims under § 3596(c) or *Atkins*. As noted above, that difference is critical to determining whether late-breaking claims should be deemed so unripe as to evade the strictures on successive petitions. *See Bourgeois*, 977 F.3d at 63; *see also Busby v. Davis*, 925 F.3d 699, 714 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 897 (2020); *Williams v. Kelley*, 858 F.3d 464, 472 (8th Cir. 2017).

Here, Johnson's intellectual disability claim was not just available; it was litigated and decided by this Court. AEDPA's very purpose is to "conserve judicial resources, reduc[e] piecemeal litigation," and "lend[] finality to ... judgments within

a reasonable time[.]" *Banister v. Davis*, 140 S. Ct. 1698, 1705–06 (2020) (citation omitted). It does not permit a defendant to pursue the same claim of permanent intellectual disability many times over without authorization. *See* § 2244(b)(3)(A); *United States v. Winestock*, 340 F.3d 200, 205 (4th Cir. 2003).

Johnson also errs in contending that, unlike most § 2255 claims, § 3596(c) "contemplates that, where applicable, a determination of 'mental retardation' will be made when the government sets an execution date." Informal Br. 17. In Johnson's view, § 3596(c) trumps AEDPA's requirements, thus permitting him to move first in the district court for a revaluation of his intellectual disability.  But neither the FDPA nor a similarly-worded provision of the Anti-Drug Abuse Act of 1988 (ADAA) (under which Johnson was actually sentenced) function, sub silentio, as an exception to § 2244(b)(3)(A)'s requirements. Most critically, the text of § 3596(c) says nothing about overriding the limits on successive § 2255 motions. *See Bourgeois*, 977 F.3d at 632. Instead, § 3596(c) simply says that "[a] sentence of death shall not be carried out upon a person who is mentally retarded," establishing by statute the very same rule established in *Atkins*. *See id.* at 631.  And, as the district court observed, neither the FDPA nor the ADAA creates any distinct process for adjudicating the very same intellectual-disability claim.  Johnson cites no relevant authority for the proposition that § 3596(c), or its predecessor provision in the ADAA, operates as a standalone exception to the bar on successive petitions, and

the government is aware of none.  Couching a claim in the language of § 3596(c) is simply not enough to circumvent the requirements of § 2244(b)(3)(A). *Accord In re Wright*, 826 F.3d 774, 782 (4th Cir. 2016).

Johnson argues that the plain language of § 3596(c) "demonstrates that [a] determination must be made [as to a defendant's intellectual disability] when an execution date is set; it applies when the sentence of death is to 'be carried out.'" Stay Mot. 9.  While it is true that § 3596(c) bars the death penalty from being "carried out" on a person with an intellectual disability, "it does not follow,"  as the district court held, "that a determination on a defendant's intellectual disability must occur shortly before execution." *Johnson*, 2021 WL 17809, at *10.  A successful challenge under § 3596(c) "that occurs pretrial, at sentencing or in the time to raise a federal habeas petition will prevent the death sentence from being 'carried out[.]'" *Id*. Moreover, for the reasons discussed above, because intellectual disability is a permanent condition that must manifest itself prior the defendant's commission of the crime, it would make little sense for Congress to have codified a procedure to assess a defendant's intellectual disability years, or possibly decades later.

Nor does Congress's use of the word "is" in § 3596(c) change the outcome of the analysis.  *See* § 3596(c).  As the Seventh Circuit observed, Congress's use of the present tense verb "is" simply reflects the fact that "[i]ntellectual disability is a *permanent* condition that must manifest before the age of 18." *Bourgeois*, 977 F.3d

at 637 (emphasis added); *see Atkins*, 536 U.S. at 318. Given the early manifestation and continuous nature of intellectual disability, it would not have made sense for Congress to have phrased the statute differently, so as to proscribe, for example, "the execution of someone who merely 'was' intellectually disabled when they were sentenced, or who 'will be' intellectually disabled when their sentence is carried out." *Id*. As a permanent and continuing condition that must have manifested during youth, intellectual disability differs from "the temporary condition of incompetency, which may come and go." *Id.* Intellectual disability likewise differs from pregnancy, which Congress addressed in 18 U.S.C. § 3596(b). Notably, although Congress provided that a death sentence could not be carried out "upon a woman *while* she is pregnant," § 3596(b) (emphasis added)—implying a transient condition—it did not use the same language in § 3596(c).

For the same reasons, Johnson errs in arguing that the FDPA's mention of pregnancy, incompetency, and intellectual disability in proximity to each other supports his claim. As the district court explained, "§ 3596(c) "concerns who the Government may not execute. It does not concern when to determine ineligibility. The fact that eligibility for the other two types of individuals [pregnancy and incompetency] can only be determined on the eve of execution does not mean that the Court must re-review a determination of intellectual disability, particularly when

the defendant's ineligibility would stem from a condition that has not developed since the previous determination." *Johnson*, 2021 WL 17809, at *10.

At bottom, to accept Johnson's argument is to agree that § 3596(c) silently creates a multi-step process for a defendant to demonstrate his intellectual disability: at trial and appeal and/or collateral review, as well as after the government sets an execution date. But this theory is unpersuasive. *See Bourgeois*, 977 F.3d at 637–38 ("with no textual (or other) support, we are unwilling to accept Bourgeois's sweeping argument that a fresh intellectual-disability claim arises [under § 3596(c)] every time the medical community updates its literature"). Such a multi-step procedure "would require piecemeal litigation, the waste of judicial resources and a lack of finality of the defendant's death sentence, all in contravention to the aims of the AEDPA." *Johnson*, 2021 WL 17809, at *10. Johnson's implausible reading of the FDPA cannot support his request for a stay.

Finally, the district court and this Court were correct in rejecting Johnson's intellectual-disability claims in his first § 2255 petition. As the government explained in its opposition to a stay in No. 21-2, the extensive evidence from prior proceedings establishes that Johnson does not possess an intellectual disability that precludes the application of the death penalty. *See* U.S. Resp. in Opp. to Motion for a Stay, No. 21-2 (Jan. 10, 2021) at 16-20. While Judge Motz noted Johnson's central argument that "courts now routinely recalibrate decades old IQ test scores" pursuant

to the "Flynn effect," this Court considered and rejected Johnson's claim based on the very same argument in his initial § 2255 proceedings. Dkt. 26 at 6 (opinion of Motz, J.); *see generally Raulerson v. Warden*, 928 F.3d 987, 1008 (11th Cir. 2019), *cert. denied*, 140 S. Ct. 2568 (2020) ("[T]here is no consensus about the Flynn effect among experts or among the courts.").

### C.    Equitable considerations weigh against entry of a last-minute stay.

The Supreme Court has repeatedly emphasized that "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a sentence." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019). Once post-conviction proceedings "have run their course," "an assurance of real finality" is necessary for the government to "execute its moral judgment." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). That interest in carrying out Johnson's sentence is magnified by the heinous nature of his crimes and the length of time that has passed since his sentence. And last-minute stays or injunctions of federal executions in particular "'should be the extreme exception, not the norm.'" *Lee*, 140 S. Ct. at 2591. A court considering a stay therefore "must … apply 'a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.'" *Hill*, 547 U.S. at 584.

Johnson's delay in pursuing these claims is plain. The district court denied his First Step Act motion on November 19, 2020, and the government scheduled his execution the next day. Nonetheless, Johnson waited seven more weeks, until his execution was less than one week away, to file the stay application that is now before this Court. And Johnson's FDPA claim relies on evidence that, even on his own accounting, he has possessed for over *five years*. Yet—despite being well aware of (and litigating against) the government's years-long process of revising the lethal injection protocol—Johnson waited until three weeks after his execution was scheduled to file his FDPA claim, and waited until *six days* before his execution to seek a stay from this Court. Those delays constitute "grounds for denial of" his request. *Bucklew*, 139 S. Ct. at 1134.

The public and the many victims' families have an overwhelming interest in implementing the capital sentence imposed more than a quarter-century ago. Johnson is a convicted serial killer who murdered and maimed multiple people on different occasions, and whose victims included innocent bystanders. Their families have waited decades for the sentence to be enforced and are currently en route to Terre Haute, Indiana for the execution. "The time has long since passed for the judgment of the jury and that of so many courts thereafter to be carried out." Dkt. 26 at 5 (op. of Wilkinson, J.).

## Conclusion

For the reasons stated above, this Court should deny Johnson a stay of execution.

Date: January 13, 2021

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: _____/s/_____

Richard D. Cooke
Joseph Attias
Assistant United States Attorneys
919 East Main Street, Suite 1900
Richmond, Virginia 23219
(804) 819-5400

## Certificate of Service and Compliance

I certify that this response contains 3,900 words. I also certify that on January 13, 2021, I filed electronically the foregoing with the Clerk of the Court using the CM/ECF system and will serve the defendant's counsel in the district court via email.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:        /s/

Joseph Attias
Assistant United States Attorney